1    Jason H. Tarricone (SBN 247506)
jason@clsepa.org
2    Margaret McBride (SBN 294066)
mmcbride@clsepa.org
3    COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
1861 Bay Road
4    East Palo Alto, CA 94303
Tel: (650) 326-6440
5    Fax: (866) 688-5204

6    Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
7    Laura L. Ho (SBN 173179)
lho@gbdhlegal.com
8    William C. Jhaveri-Weeks (SBN 289984)
wjhaveriweeks@gbdhlegal.com
9    Megan E. Ryan (SBN 264922)
mryan@gbdhlegal.com
10   Katharine L. Fisher (SBN 305413)
kfisher@gbdhlegal.com
11   GOLDSTEIN, BORGEN, DARDARIAN & HO
300 Lakeside Drive, Suite 1000
12   Oakland, CA 94612
Tel: (510) 763-9800
13   Fax: (510) 835-1417

14   Attorneys for Plaintiffs
(*Additional Counsel for Plaintiffs listed on following page*)
15

16                  UNITED STATES DISTRICT COURT

17                  NORTHERN DISTRICT OF CALIFORNIA

18                      OAKLAND DIVISION

| | |
|---|---|
| 19   JAVANNI MUNGUIA-BROWN, ANGELINA MAGAÑA, NORMA RODRIGUEZ, and DAVID 20   BONFANTI, individually and on behalf of others similarly situated, | Case No.: 4:16-cv-01225-JSW-MEJ |
| 21         Plaintiffs, | CLASS ACTION |
| 22   vs. | **PLAINTIFFS' REPLY MEMORANDUM IN FURTHER SUPPORT OF THEIR MOTION FOR CLASS CERTIFICATION** |
| 23   EQUITY RESIDENTIAL, a real estate investment trust, ERP OPERATING LIMITED PARTNERSHIP, 24   a partnership, EQUITY RESIDENTIAL MANAGEMENT, L.L.C., EQR-WOODLAND 25   PARK A LIMITED PARTNERSHIP, and EQR-WOODLAND PARK B LIMITED PARTNERSHIP, | Hon. Jeffrey S. White  Date:      October 27, 2017  Time:     9:00 a.m.  Dept:     Courtroom 5 |
| 26         Defendants. | Trial Date:    None Set |

27

28

Craig Nicholas (SBN 178444)
craig@nicholaslaw.org
Alex Tomasevic (SBN 245595)
alex@nicholaslaw.org
NICHOLAS & TOMASEVIC, LLP
225 Broadway, 19th Floor
San Diego, CA 92101
(619) 325-0492
(619) 325-0496

Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page

I.  INTRODUCTION ................................................................................................ 1

II. CLASS CERTIFICATION SHOULD BE GRANTED ..................................... 2

  A.  The Named Plaintiffs Have Article III Standing, Which Ends the Standing Inquiry. ............................................................................................................... 2

  B.  Plaintiffs Explicitly Moved for Certification of Their UCL Claim, Which Presents the Same Analysis for Class Certification as Their Section 1671(d) Claim. ..................................................................................................................... 4

  C.  EQR's Affirmative Defenses Do Not Create Predominant Individual Issues. ............ 5

    1.  Whether the "Voluntary Payment" Doctrine Applies Is a Common Question, and the Classwide Answer Will Be "No." ................... 5

    2.  EQR's Offset Affirmative Defense Does Not Defeat Certification. .............. 6

      a.  Offset Is a Defense Against Damages that Will Not Result in the Class Owing EQR Money, Even if EQR's Costs Exceeded Its Late Fee. ................... 6

      b.  Calculations of Fees Paid and Offset Amounts Can Easily Be Managed. ................... 8

      c.  The Offset Analysis Does Not Violate EQR's Due Process Rights. ................... 9

    3.  Defendants' Undeveloped Arguments About Other Affirmative Defenses Fail to Show that Individualized Issues Will Predominate. ................... 9

  D.  EQR's Other Challenges to the Woodland Park Class Lack Merit. .......................... 10

    1.  EQR Does Not Dispute that It Charged a Flat $50 Late Fee to the Members of the Woodland Park Preexisting Lease Class for Several Years. ................... 10

    2.  The Effect (if Any) on the Woodland Park Class of EQR's Settlement of a Section 1671(d) Claim in 2000 Is a Common Question. ................... 11

  E.  The Named Plaintiffs Are Adequate and Typical. ................................................... 11

    1.  David Bonfanti ................................................................................. 12

    2.  Javanni Munguia-Brown .................................................................. 13

    3.  Norma Rodriguez ............................................................................ 13

    4.  Angelina Magaña ............................................................................. 14

i

692342.8

F. The Class Notices Should Be Issued. ...........................................................15

III. CONCLUSION ................................................................................................15

692342.8

# TABLE OF AUTHORITIES

Page(s)

**Federal Cases**

*Adamson v. ADT, LLC,*
2014 WL 12551405 (C.D. Cal. Apr. 7, 2014) ..................................................................5, 6

*Alpert v. U.S. Indus.,*
59 F.R.D. 491 (C.D. Cal. 1973) ...........................................................................................8

*Ballard v. Equifax Check Services, Inc.,*
158 F. Supp. 2d 1163 (E.D. Cal. 2001) ................................................................................7

*Ballard v. Equifax Check Servs., Inc.,*
186 F.R.D. 589 (E.D. Cal. 1999) ......................................................................................3, 8

*Brazil v. Dole Packaged Foods, LLC,*
2014 WL 2738179 (N.D. Cal. June 16, 2014) .....................................................................5

*Briseno v. ConAgra Foods, Inc.,*
844 F.3d 1121 (9th Cir. 2017) .............................................................................................9

*Campos v. W. Dental Servs., Inc.,*
404 F. Supp. 2d 1164 (N.D. Cal. 2005) ...............................................................................8

*CLN Props., Inc. v. Republic Servs., Inc.,*
2010 WL 5146734 (D. Ariz. Dec. 13, 2010) .......................................................................6

*Cotchett v. Avis Rent A Car Sys., Inc.,*
56 F.R.D. 549 (S.D.N.Y. 1972) ...........................................................................................8

*Davis v. Homecomings Fin.,*
2006 WL 2927702 (W.D. Wash. Oct. 10, 2006) .................................................................6

*Ehret v. Uber Techs., Inc.,*
148 F. Supp. 3d 884 (N.D. Cal. 2015) .................................................................................2

*Ellsworth v. U.S. Bank, N.A.,*
2014 WL 2734953 (N.D. Cal. June 13, 2014) .....................................................................6

*Endres v. Wells Fargo Bank,*
2008 WL 344204 (N.D. Cal. Feb. 6, 2008) .........................................................................6

*Hahn v. Massage Envy Franchising, LLC,*
2014 WL 5100220 (S.D. Cal. Sept. 25, 2014) .....................................................................7

*Hester v. Vision Airlines, Inc.,*
2009 WL 4893185 (D. Nev. Dec. 16, 2009), *aff'd*, 687 F.3d 1162 (9th Cir. 2012) ..........10

692342.8

*Jovel v. Boiron, Inc.*,
   2014 WL 1027874 (C.D. Cal. Feb. 27, 2014) ...................................................................12

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
   305 F.R.D. 164 (N.D. Cal. 2015) ...........................................................................................3

*Kirola v. City & Cnty. of S.F.*,
   860 F.3d 1164 (9th Cir. 2017) ................................................................................................2

*Lambert v. Nutraceutical Corp.*,
   --- F.3d ---, 2017 WL 4081089 (9th Cir. Sept. 15, 2017) .....................................................9

*Lee v. Pep Boys-Manny Moe & Jack of Cal.*,
   2015 WL 9480475 (N.D. Cal. Dec. 23, 2015) .....................................................................12

*Longest v. Green Tree Servicing LLC*,
   308 F.R.D. 310 (C.D. Cal. 2015) ..........................................................................................11

*Marlin v. Chase Cardmember Servs.*,
   2009 WL 1405196 (E.D. Cal. May 19, 2009) .......................................................................8

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) ..................................................................................................2

*MicroTechs., LLC v. Autonomy, Inc.*,
   2017 WL 1848470 (N.D. Cal. May 8, 2017) ......................................................................11

*Moeller v. Taco Bell Corp.*,
   220 F.R.D. 604 (N.D. Cal. 2004) .........................................................................................12

*Monaco v. Bear Stearns*,
   09-cv-5438-SJO (ECF No. 260) (C.D. Cal. Sept. 26, 2012) ................................................6

*Monaco v. Bear Stearns*,
   2012 WL 10006987 (C.D. Cal. Dec. 10, 2012) ....................................................................6

*O'Donovan v. CashCall, Inc.*,
   278 F.R.D 479 (N.D. Cal. 2011) .......................................................................................4, 8

*Parrish v. Nat'l Football League Players Ass'n*,
   2008 WL 1925208 (N.D. Cal. Apr. 29, 2008) ....................................................................11

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ..................................................................................................4

*Roberts v. Heim*,
   1994 WL 675261 (N.D. Cal. Sept. 16, 1994) .......................................................................8

*Rodman v. Safeway, Inc.*,
   --- F. App'x ---, 2017 WL 3327829 (9th Cir. Aug. 4, 2017) ...............................................6

iv

692342.8

*Rodman v. Safeway, Inc.*,
    125 F. Supp. 3d 922 (N.D. Cal. 2015) ..................................................................................6

*Rodman v. Safeway, Inc.*,
    2014 WL 988992 (N.D. Cal. Mar. 10, 2014) ......................................................................6

*Spagnola v. Chubb Corp.*,
    264 F.R.D. 76, (S.D.N.Y. 2010) ........................................................................................6

*Sparrow v. Mazda Am. Credit*,
    385 F. Supp. 2d 1063 (E.D. Cal. 2005) ..............................................................................8

*Stuart v. Radioshack Corp.*,
    2009 WL 281941 (N.D. Cal. Feb. 5, 2009) ......................................................................12

*Torres v. Mercer Canyons Inc.*,
    835 F.3d 1125 (9th Cir. 2016) ............................................................................................3

*Tyson v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ....................................................................................................2, 3

*Ubaldi v. SLM Corp.*,
    2014 WL 12639953 (N.D. Cal. Dec. 19, 2014) ..........................................................3, 7, 9

*Ubaldi v. SLM Corp.*,
    2014 WL 1266783 (N.D. Cal. Mar. 24, 2014) ....................................................................6

*Williams Corp. v. Kaiser Sand & Gravel Co.*,
    146 F.R.D. 185 (N.D. Cal. 1992) ......................................................................................12

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2011) ............................................................................................9

**State Cases**

*Am. Oil Serv. v. Hope Oil Co.*,
    194 Cal. App. 2d 581 (1961) ..............................................................................................5

*Beasley v. Wells Fargo Bank*,
    235 Cal. App. 3d 1383 (1991) ............................................................................................3

*In re Cellphone Term. Fee Cases*,
    193 Cal. App. 4th 298 (2011) ............................................................................................3

*Dillon v. U-A Columbia Cablevision*,
    292 A.D.2d 25 (2002), *aff'd*, 100 N.Y.2d 525 (2003) ......................................................6

*Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*,
    9 Cal. 3d 731 (1973) ..........................................................................................................7

*Texas S. Rentals, Inc. v. Gomez*,
  267 S.W.3d 228 (Tex. App. 2008) ..................................................6

*In re Tobacco II Cases*,
  46 Cal. 4th 298 (2009)..................................................................5

**Federal Statutes**

29 U.S.C.
  § 1367(c)(4) ..................................................................................8

**State Statutes**

Unfair Competition Law, Cal. Bus. & Prof. Code
  § 17200 *et. seq.* ................................................................1, 4, 5, 9

**Rules**

Fed. R. Civ. P. 23 .......................................................... *passim*

**Other Authorities**

Newberg on Class Actions (5th ed.)
  § 4:55 ............................................................................................5
  § 4:56 ............................................................................................8

Rstm't (3d) of Restitution & Unjust Enrich. (2011) ("Rstmt.")
  § 6 ..............................................................................................5, 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

692342.8

# I. **INTRODUCTION**

This case challenges late fee policies that EQR applied uniformly to two classes of California tenants. EQR concedes the existence of the common legal questions that are dispositive of this Motion: first, whether EQR performed a "reasonable endeavor" to estimate the actual costs it incurs as a result of late rent payments when selecting the late fee charged to each class (*see* Opp. at 8); and second, whether these actual costs are impractical to calculate in advance (*id.* at 8, 12). EQR also admits that the answers to the common legal questions turn on common facts. EQR does not dispute the classwide process it followed when adopting the standard California late fee in 2008. Pl. Br. at 5-9. EQR concedes that each member of the Standard Late Fee Class was subject to the standard late fee throughout the class period. *See* Opp. at 4.

With respect to manageability, EQR does not dispute that: (i) MRI can identify every tenant who was charged the standard late fee and every tenant at Woodland Park who was charged the flat $50 fee (Pl. Br. at 14-15); (ii) MRI contains data showing exactly how much each tenant in each class has been *charged* and *paid* in late fees during the class period, and MRI can export that data for the whole class into Excel (*id.* at 14); and (iii) MRI can generate the email addresses and/or mailing addresses of the members of both classes (*id.* at 15). The Opposition does not even mention "MRI" or the "charge codes" it uses, much less disprove MRI's capabilities as detailed in Plaintiffs' opening brief.

Each argument EQR raises to oppose class certification fails. *First*, EQR raises an Article III challenge to absent class members. Standing, however, is determined by reference to the named plaintiffs, whose standing is undisputed. *Second*, EQR "guesses" that Plaintiffs are not seeking to certify their Unfair Competition Law ("UCL") claim in addition to their Section 1671(d) claim. But Plaintiffs' notice of motion requests certification of both claims, Plaintiffs' brief explains that the UCL claim borrows the analysis of the 1671(d) claim, and EQR offers no valid reason that certification of the derivative UCL claim should be denied if certification of the 1671(d) claim is granted. *Third*, EQR suggests that its affirmative defenses will create individualized issues, but the opposite is true. EQR's "voluntary payment" defense does not apply to consumer protection statutes, and even if it did, the class would defeat it here because the late fees were not paid to settle a dispute about the legality of the fee, the facts about how EQR set the fee were unknown to the class, and a "reasonably prudent" tenant would have felt compelled to pay the fees. EQR's "offset" defense is not part of the liability analysis, and could not result in the class owing money to EQR. EQR's other

1

1  defenses do not raise individualized issues that predominate over the common questions in this case.  *Fourth*,

2  EQR's challenges to the Woodland Park class raise common legal questions.  And *fifth*, the plaintiffs are

3  adequate and typical.  Each is stepping forward to seek reimbursement of high late fees for the class.  EQR's

4  efforts to make these unsophisticated individuals look foolish fail upon a review of their actual testimony.[1]

## II.  CLASS CERTIFICATION SHOULD BE GRANTED

### A.  The Named Plaintiffs Have Article III Standing, Which Ends the Standing Inquiry.

7          EQR's lead argument – that class certification must be denied because it is possible that some absent

8  class members were charged late fees but did not pay them, and therefore allegedly lack Article III standing

9  – is incompatible with Ninth Circuit law:  "'"[O]nce the named plaintiff demonstrates her individual standing

10  to bring a claim, the standing inquiry is concluded, and the court proceeds to consider whether the Rule 23(a)

11  prerequisites for class certification have been met.'"  *Kirola v. City & Cnty. of S.F.*, 860 F.3d 1164, 1176 (9th

12  Cir. 2017) (quoting *Melendres v. Arpaio*, 784 F.3d 1254, 1261-63 (9th Cir. 2015)).  EQR does not dispute

13  that the named plaintiffs have Article III standing.  EQR's reliance on the pre-*Melendres* case *Mazza v. Am.

14  Honda Motor Co.*, 666 F.3d 581 (9th Cir. 2012), for the proposition that no class can be certified if any

15  member lacks Article III standing cannot be squared with current law.  Even before the Ninth Circuit's

16  recent decisions on this issue, "many district courts ha[d] declined to apply the *Mazza* language and have

17  instead adhered to [Ninth Circuit decisions] ruling that only one named plaintiff must meet standing

18  requirements."  *Ehret v. Uber Techs., Inc.*, 148 F. Supp. 3d 884, 903 (N.D. Cal. 2015).

19          EQR attempts to muddy the water by suggesting that the class definition does not "fit" because, EQR

20  asserts, Plaintiffs seek "a refund of late fees *paid*" even for "class members who were merely *charged* a late

21  fee."  Opp. at 6.  But that is not what Plaintiffs seek:  class members will be entitled to restitution only of

22  payments they actually made, as the term "restitution" indicates.  If it turns out that certain class members

23  have been charged fees but have not paid them, liability will still be established in their favor, and EQR will

24  be bound by the finding, but such class members' restitution will be zero.  This is often the case in class

25  actions.  For example, EQR itself cites the recent *Tyson* case, in which the U.S. Supreme Court affirmed

26  certification of a class in which some, but not all, of the class members had been injured by the employer's

---

[1] EQR also does not dispute that numerosity is satisfied for both classes (Opp. at 25), that Mr. Bonfanti satisfies the typicality requirement for the Standard Late Fee Class, and that Plaintiffs' counsel are adequate.

692342.8

donning and doffing payment policy. *See Tyson v. Bouaphakeo*, 136 S. Ct. 1036, 1046 (2016). The Supreme Court noted that it remained to be seen whether, in the damages phase, the district court would be able to formulate a methodology for allocating the jury award only to those class members who, based on the jury's fact-finding, had been injured. *Id.* at 1050. That uncertainty was not an obstacle to class certification.[2]

In this case, Plaintiffs have demonstrated in detail how EQR tracks, and can generate a report of, each class member's late fee payments, because EQR allocates such payments to the "LAT" charge code in MRI. Pl. Br. at 13-14. Such a report could account for fees that were waived or refunded. *Id.* EQR does not challenge that factual showing. EQR's conclusory assertion in its Article III argument that "determining who *paid* late fees (as opposed to who was *charged* a late fee) requires an extensive individualized inquiry…" (Opp. at 6) is unsupported by any fact cite, and is contradicted by Plaintiffs' evidence.

Plaintiffs' class definition will be intelligible to putative class members. If the class were defined as individuals who *paid* late fees, recipients of the notice might not know whether they are in the class, because the information EQR provides to them does not reveal how EQR allocates their payments to variuod outstanding charges. Opp. at 13 ("ledger" available to tenants does not show how payments are allocated). But if the class is defined as those who were "charged" late fees, recipients will know whether they are in the class. EQR's records will be used in the damages phase to show how much each class member paid.

Confirming the logic of Plaintiffs' definition, nearly all of the Section 1671(d) certification cases the parties have cited have defined the class the way Plaintiffs have: as the individuals who were *charged* the allegedly unlawful fees, not those who *paid* them. *Ubaldi v. SLM Corp.*, 2014 WL 12639953, at *11 (N.D. Cal. Dec. 19, 2014) (certifying class who "incurred" late charge); *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 600-01 (E.D. Cal. 1999) (certifying class who received letter "demanding payment" of service charge); *In re Cellphone Term. Fee Cases*, 193 Cal. App. 4th 298, 304 (2011) (class of those "charged" fee); *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1389-90 (1991) (class of those "assessed" fee).[3]

---

[2] EQR cites *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125 (9th Cir. 2016), but there, the court was evaluating Rule 23(b)(3), not Article III. Under *Torres*, Plaintiffs' definition "fits" because the class consists of all who were charged the late fees Plaintiffs challenge. EQR also cites *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 191 (N.D. Cal. 2015) (pre-*Melendres*), which supports the notion that a class is properly defined as individuals *likely* to be injured by a uniform policy, not those proven at class certification to have been injured.

[3] If the Court disagrees, and concludes that defining the class as individuals who were "charged" late fees is overbroad, the remedy would not be to deny certification, but to narrow the definition to consist of tenants who "paid" late fees, as indicated by MRI's records. *See, e.g., Wolph v. Acer Am. Corp.*, 272

**B.** **Plaintiffs Explicitly Moved for Certification of Their UCL Claim, Which Presents the Same Analysis for Class Certification as Their Section 1671(d) Claim.**

EQR incorrectly asserts that Plaintiffs "do not say which causes of action they are seeking to certify." Opp. at 6. Plaintiffs' Complaint asserts only two causes of action, and Plaintiffs' Notice of Motion seeks "an Order pursuant to [FRCP] 23(a) and (b)(3) that … [c]ertifies this case as a class action **for all causes of action**" (ECF 64 at 1-2 (emphasis added)). In addition, Plaintiffs' Opening Brief explains multiple times that if the late fees violate 1671(d), they also violate the UCL. *See* Pl. Br. at 1, 20 (UCL makes violations of other laws independently actionable). In the few respects where there are differences between the Section 1671(d) and UCL "unlawful" analysis, Plaintiffs briefed them. For example, Plaintiffs pointed out that there is an additional "common question of which Defendants are liable" under the UCL, because "Plaintiffs argue that under the UCL, if the late fee is 'unlawful' under Section 1671(d), then each entity that acquired the late fee payments is liable." Pl. Br. at 20 (citing cases). Notwithstanding EQR's unfounded "guess" that Plaintiffs are seeking to certify only their Section 1671(d) claim and not the derivate UCL claim, EQR offers several reasons why certification of Plaintiffs' UCL claims should be denied. Opp. at 6-7. *Id.* Each fails.

*First*, EQR challenges certification of the UCL claim because the proposed class does not seek injunctive relief. *See* Opp. at 7. But the class seeks restitution under the UCL. *See, e.g.*, *Pulaski & Middleman, LLC v. Google, Inc*., 802 F.3d 979, 986 (9th Cir. 2015) (class restitution available under UCL).[4]

*Second*, EQR asserts that Plaintiffs "do not discuss the elements of their UCL claim." Opp. at 7. Plaintiffs explain, however, that if the elements of their Section 1671(d) violation are established, a UCL unlawful claim is established. Pl. Br. at 20 (citing *Hauk v. JP Morgan Chase Bank U.S.*, 552 F.3d 1114, 1122 (9th Cir. 2009)). Courts certify UCL "unlawful" claims "premised on the same underlying violations" of other certified claims. *See O'Donovan v. CashCall, Inc.*, 278 F.R.D 479, 499 (N.D. Cal. 2011).[5]

*Third*, EQR argues that defining the class as tenants who were "charged" late fees violates "the UCL's lost-money-or-property standing requirements." Opp. at 7. But in a UCL class action, only the class

---

F.R.D. 477, 483 (N.D. Cal. 2011) (White, J.) (narrowing class definition in Court's discretion, then proceeding to Rule 23 factors under narrowed definition); *see also* Fed. R. Civ. P. 23(c)(1)(B)-(C).

[4] EQR emphasizes that Plaintiffs do not seek to certify an injunctive relief claim, even though Plaintiffs amended the complaint in 2016 to add a current tenant for that purpose. Opp. at 1, 3. Shortly before this Motion was filed, the new plaintiff moved out of his EQR apartment. *See* (ECF No. 64-6) Decl. A ¶ 4. Plaintiffs may seek leave to amend to name one or more current tenants in the future.

[5] Plaintiffs seek to certify a derivative UCL "unlawful" claim, not an "unfair" claim. Opp. at 7.

692342.8

1   representatives must meet the statutory standing requirement. *See In re Tobacco II Cases*, 46 Cal. 4th 298,

2   314-19 (2009); *Brazil v. Dole Packaged Foods, LLC*, 2014 WL 2738179, at *2 n.3 (N.D. Cal. June 16,

3   2014). EQR does not dispute that the named Plaintiffs have UCL standing.

4   **C.      EQR's Affirmative Defenses Do Not Create Predominant Individual Issues.**

5           Conceding that the common liability questions Plaintiffs described in their motion are common class

6   questions (*see supra* § I), EQR argues that certification should be denied because its affirmative defenses will

7   allegedly overwhelm the common issues. This argument rarely succeeds. *See* Newberg on Class Actions

8   (5th ed.) § 4:55. EQR cannot justify a departure from the general rule here.

9           **1.      Whether the "Voluntary Payment" Doctrine Applies Is a Common Question, and the
              Classwide Answer Will Be "No."**

10
11          Under the "voluntary payment" doctrine (Opp. at 8-11), a party engaged in a dispute over the validity

12  of a debt who agrees to settle the dispute by making payment is barred from later recovering the payment.

13  *See, e.g.*, *Am. Oil Serv. v. Hope Oil Co.*, 194 Cal. App. 2d 581, 587 (1961) (doctrine did not apply because

14  "payments were not made … to settle the controversy"); Rstm't (3d) of Restitution & Unjust Enrich. (2011)

15  ("Rstmt.") § 6 cmt. e (doctrine applies to "money voluntarily paid *in the face of a recognized uncertainty as*

16  *to the existence or extent of the payor's obligation*"). The doctrine does not apply if payment was made

17  without "full knowledge of the facts," or if a "reasonably prudent" person would have felt compelled to

18  make the payment. *See Adamson v. ADT, LLC*, 2014 WL 12551405, at *5 (C.D. Cal. Apr. 7, 2014).

19          EQR's voluntary payment defense will fail for common reasons. *First*, the defense does not excuse

20  violation of a California consumer protection statute. *See, e.g.*, *Adamson*, 2014 WL 12551405, at *5-6

21  (citing line of authority that voluntary payment "doctrine [did] not apply at all because the statutory

22  provisions at issue are designed by the legislature to protect consumers and cannot be waived"). If tenants

23  could not challenge late fees merely because they had paid them, the Legislature's intent in regulating lease

24  terms would be frustrated. *Second*, if the doctrine applies, payment of late fees without knowledge that they

25  are potentially unlawful is not a voluntary settlement of a known dispute. The Restatement explicitly states:

26  if the contract of a cable television provider "calls for payment of a 'late fee,'" and it "later transpires that

27  Provider's late fee may be illegal and unenforceable," customers who "bring an action in restitution to

28  recover fees previously paid" would not be subject to the defense because such payments would not be

"voluntary" settlements of a known dispute. Rstmt. § 6 Illus. 21. *Third*, tenants lacked full knowledge that EQR set its late fee without engaging in any endeavor to estimate costs, but simply out of competitive concerns. *See, e.g.*, *Ubaldi v. SLM Corp.*, 2014 WL 1266783, at *11–12 (N.D. Cal. Mar. 24, 2014) (certifying § 1671(d) class; whether class members had "full knowledge" of defendant's non-public actions was common question). And *fourth*, a "reasonably prudent" tenant would have felt compelled to pay the fees, given that EQR admits that it engages in collections, and its lease states that additional late fees will be charged on unpaid balances. *See* Decl. of Megan E. Ryan ISO Mot. for Class Cert. (ECF No. 63-4) ("1st Ryan Decl.") Ex. J at WP003105; *Adamson*, 2014 WL 12551405, at *6 (customers would have felt compelled to pay fee rather than risk collection efforts and credit damage).[6]

EQR emphasizes *Monaco v. Bear Stearns*, but that court *granted* certification of the UCL claim, which was based on the legality of a contract term. 09-cv-5438-SJO (ECF No. 260) (C.D. Cal. Sept. 26, 2012). EQR cites only the court's decision denying class certification on the breach-of-contract claim, which required individualized proof of intent. 2012 WL 10006987, at *9-10 (C.D. Cal. Dec. 10, 2012).[7]

**2.      EQR's Offset Affirmative Defense Does Not Defeat Certification.**

   **a.      Offset Is a Defense Against Damages that Will Not Result in the
             Class Owing EQR Money, Even if EQR's Costs Exceeded Its Late Fee.**

Plaintiffs have pleaded claims to recover fees paid. If the late fee is held unlawful, the Court will determine the restitution owed to the class. The restitution will be an amount between (a) the full amount of

---

[6] Even when the doctrine applies, it can be adjudicated classwide. In *Rodman v. Safeway, Inc.*, 2014 WL 988992, at *9-10 (N.D. Cal. Mar. 10, 2014), the court certified a breach-of-contract claim against a store that charged higher prices for online purchases despite representations to the contrary, finding "no reason to suspect that it [was] likely that a predominant number of Class Members might have knowingly and willingly chosen to pay an additional fee that they were under no obligation to pay." The court granted summary judgment to the class on the voluntary payment defense because there was no evidence that they paid with knowledge of the breach of contract. *Rodman v. Safeway, Inc.*, 125 F. Supp. 3d 922, 941 (N.D. Cal. 2015). The Ninth Circuit affirmed. *See Rodman v. Safeway, Inc.*, --- F. App'x --- , 2017 WL 3327829, at *2 (9th Cir. Aug. 4, 2017); *see also Ellsworth v. U.S. Bank, N.A.*, 2014 WL 2734953, at *28-29 (N.D. Cal. June 13, 2014) (voluntary payment defense "susceptible to common methods of proof" where customers had similar contracts and were charged inflated premiums); *cf.* Opp. at 10, citing *Smith v. U.S. Bank, N.A.*, 2017 WL 698530, at *15 (S.D. Fla. Feb. 22, 2017) (not certifying *nationwide* class because voluntary payment doctrine "varies from state to state").

[7] EQR relies on cases that applied other states' laws, involved individualized proof of reliance, or lacked a uniform policy. *See Texas S. Rentals, Inc. v. Gomez*, 267 S.W.3d 228, 240-42 (Tex. App. 2008) (Texas fraud claim requiring reliance); *Davis v. Homecomings Fin.*, 2006 WL 2927702, at *1 (W.D. Wash. Oct. 10, 2006) (Washington fraud-based claim requiring reliance); *Dillon v. U-A Columbia Cablevision*, 292 A.D.2d 25, 27-28 (2002), *aff'd*, 100 N.Y.2d 525 (2003) (New York law claim; holding later squarely rejected by Restatement); *Spagnola v. Chubb Corp.*, 264 F.R.D. 76, 98-99 (S.D.N.Y. 2010) (New York breach of contract claims on non-uniform contracts required individualized analyses); *Endres v. Wells Fargo Bank*, 2008 WL 344204, at *4, 12 (N.D. Cal. Feb. 6, 2008) (varying disclosures created individual reliance issues); *CLN Props., Inc. v. Republic Servs., Inc.*, 2010 WL 5146734, at *9-10 (D. Ariz. Dec. 13, 2010) (no uniform communication).

fees class members paid, and (b) no restitution (a complete offset) if EQR proves that its actual costs from late payments exceeded the fees it collected. As such, courts treat the offset determination as a "damages" question that arises after the legality of the fee is determined. In *Ballard v. Equifax Check Services, Inc.*, the court granted summary judgment to the plaintiff class on the legality of the fee, holding that the defendant could "raise the issue of its actual damages in the damages phase of this litigation." 158 F. Supp. 2d 1163, 1176 (E.D. Cal. 2001). In *Hahn v. Massage Envy Franchising, LLC*, the court did the same, "reserving the amount of restitution for trial." 2014 WL 5100220, at *17 (S.D. Cal. Sept. 25, 2014). EQR's "actual costs" are part of the analysis only after Plaintiffs prevail on the merits of the claim they have pleaded.

EQR argues that even if the class establishes that EQR violated Section 1671(d), the Court could order class members to pay EQR *even more* than they have already paid if EQR proves its costs were greater than its late fee. EQR's only support is a line of dicta in *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731 (1973). Opp. at 12. *Garrett* reviewed the sufficiency of a complaint, and noted that if the late fee provision were voided, the plaintiff would not "escape [] unscathed," but would "remain [] liable for the actual damages" caused by the breach. *Garrett*, 9 Cal. 3d at 741. In *Garrett*, it appeared that the allowable actual damages would be a small fraction of the fee the defendant had charged. *Id.* at 740-41 & n.11. As such, *Garrett* did not consider whether the court could order the plaintiff to make an *affirmative payment* to the lender above and beyond the contracted amount, as opposed to merely offsetting the plaintiff's damages. Since 1973, when *Garrett* was decided, not a single case has awarded the party in EQR's position *additional* payment as relief on a plaintiff's successful 1671(d) claim. Instead, courts have interpreted *Garrett* to mean that the successful plaintiff's restitution can be "offset" by the defendant's actual costs. *See Hahn*, 2014 WL 5100220, at *12; *see also Ubaldi*, 2014 WL 12639953, at *10 (granting class certification and rejecting argument that defendants could be entitled to recover costs from the plaintiffs as "highly speculative").

The only way EQR could theoretically be awarded even higher "damages" for tenants' late payment of rent would be if EQR sought and was granted leave to file counterclaims against its tenants and then prevailed. EQR has not attempted to do so. *See* Answer (ECF No. 47) at 7 ("In the event Plaintiffs recover any monetary award, that award must be offset by the amounts plaintiffs owe or owed Defendants."). EQR's own cited authority indicates that the speculative possibility that EQR might seek, and be granted, leave to assert counterclaims is not a reason to deny certification. Opp. at 15 (citing *Heaven v. Trust Co. Bank*, 118

7

692342.8

1 | F.3d 735, 738 (11th Cir. 1997) (recognizing that "denial of class certification based on speculation regarding

2 | the potential assertion of counterclaims" where "none had been filed" was "an abuse of discretion")).[8]

3 | It would be unreasonable for the class notice to state that EQR could hypothetically seek permission

4 | to amend its pleading to assert counterclaims to try to recover *more* from class members than EQR told them

5 | they would have to pay. Such claims are speculative, would be designed to chill the exercise of rights under

6 | consumer protection statutes, and would be vulnerable to obvious defenses, given that EQR required its

7 | tenants to sign the contract in which it promised not to seek more than a specified amount for late payments.[9]

8 | **b.    Calculations of Fees Paid and Offset Amounts Can Easily Be Managed.**

9 | An Excel file of the fees that each class member actually paid can be generated from MRI. *See* Pl.

10 | Br. at 14. Rather than dispute Plaintiffs' contentions about the capabilities of MRI, EQR makes a cursory

11 | assertion that by looking at a tenant's "ledger" (a less detailed document available to tenants), it is hard to tell

12 | how much of a tenant's payments were allocated to late fees. Opp. at 13 (citing Winn Decl. Ex. 18). EQR is

13 | directing the Court to the wrong document. Plaintiffs rely on the Resident Ledger Summary Report, an

14 | internal report that breaks down payments by charge code, proving that EQR can run a report showing how

15 | much each class member paid, as EQR's MRI manager Ms. Henkel confirmed. Pl. Br. at 14. EQR notes

16 | that this report does not already exist (Opp. at 13), but does not dispute that EQR can generate it.

17 | The offset amounts that EQR may attempt to prove will also be manageable on a class basis. *First*,

---

18 |

19 | [8]Courts regularly deny requests to file counterclaims that would have a "chilling effect" on consumer protection laws. *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 599 (E.D. Cal. 1999) (chilling effect of counterclaims was "compelling reason" for declining jurisdiction under 29 U.S.C. § 1367(c)(4)); *Marlin v.*

20 | *Chase Cardmember Servs.*, 2009 WL 1405196, at *4-5 (E.D. Cal. May 19, 2009) (denying leave to add counterclaims for same reason); *Campos v. W. Dental Servs., Inc.*, 404 F. Supp. 2d 1164, 1170 (N.D. Cal.

21 | 2005) (same); *Sparrow v. Mazda Am. Credit*, 385 F. Supp. 2d 1063, 1071 (E.D. Cal. 2005) (same). Even if EQR seeks and is granted leave to file counterclaims, the existence of "counterclaims against either the class representatives or absent class members will not defeat class certification in most cases" and when they are

22 | brought, "a host of procedural mechanisms allow courts to manage potential conflicts without finding that the counterclaim defeats predominance." *See* Newberg on Class Actions (5th ed.) § 4:56; *see also O'Donovan*,

23 | 278 F.R.D. at 504 (certifying claims under consumer protection statute, rejecting argument that defendant would need to file compulsory counterclaims against debtors). EQR cites a 45-year old case for the proposition that the possibility of counterclaims prevents certification (Opp. at 15, citing *Alpert v. U.S. Indus.*, 59 F.R.D.

24 | 491, 498 (C.D. Cal. 1973)). In that outlier, the decision was driven by the obvious frivolousness of the claim.

25 | [9] The cases EQR cites to justify including a "warning" about un-pleaded counterclaims in the class notice are unavailing. *First, Roberts v. Heim*, 1994 WL 67526† (N.D. Cal. Sept. 16, 1994), involved a unique issue of personal jurisdiction over counterclaims against non-California entities, and the Court held that such claims

26 | could simply be brought in separate cases where the entities resided. *Second*, EQR mis-cites *Alpert* (discussed above) by quoting out of context language that related to an improper request to certify the class under 23(b)(2), preventing anyone from opting out. And *third*, EQR cites a 45-year old antitrust case from New York,

27 | *Cotchett v. Avis Rent A Car Sys., Inc.*, 56 F.R.D. 549 (S.D.N.Y. 1972), which suffered from numerous problems that precluded certification, and in which the court expressed doubts about the fact that class

28 | members' maximum claim would be $1 but they would have to opt out to avoid an actually-filed counterclaim.

---

692342.8

1    the legal question of *which* costs EQR can include in its offset is a common question. *See* Pl. Br. at 19-20.

2    *Second*, some of the costs EQR purports to recoup can *only* be analyzed in aggregate, such as the cost of

3    implementing MRI, or EQR's cost of borrowing funds. *Third*, EQR points to certain costs that may vary

4    from person to person, such as collection expenses (assuming the Court holds that such costs can be

5    recouped through late fees). Courts have rejected the argument that such variations in the offset prevent

6    class certification in Section 1671(d) cases. *See Ubaldi*, 2014 WL 12639953, at *11 ("Defendants

7    specifically point to varying costs which, according to Defendants, would offset against potential class

8    members' damages claims[,] [but] 'damages calculations alone cannot defeat certification' and … these

9    offsets are readily calculable because Defendants track and maintain records of servicing, collection, and IT

10   operations expenses…."). Indeed, EQR itself performed an analysis of its costs for prior litigation, so it can

11   be done. *See* Pl. Br. at 6 & 1st Ryan Decl. Ex. L at WP00852. EQR tracks its costs information in MRI. Pl.

12   Br. at 10, 12. If EQR wishes to show that collection costs fully offset certain tenants' restitution, EQR can

13   attempt to do so. *See also Lambert v. Nutraceutical Corp.*, --- F.3d --- , 2017 WL 4081089, at *9 (9th Cir.

14   Sept. 15, 2017) ("We have repeatedly emphasized that uncertain damages calculations should not defeat

15   certification," and damages calculations under the UCL "are particularly forgiving," so "even if the result

16   reached is an approximation, uncertain damages should not prevent class certification"). EQR has not

17   rebutted the manageability of Plaintiffs' trial plan. *See* Pl. Br. at 23-24.[10]

18              **c.      The Offset Analysis Does Not Violate EQR's Due Process Rights.**

19              Citing no case, EQR invokes its "due process" rights. Opp. 15-16. There is no due process concern

20   here. If Plaintiffs prevail on the merits, each class member will have proved that she was charged an

21   unlawful fee. EQR can proffer evidence of its actual costs to dispute the aggregate restitution award. *See*

22   *Briseno v. ConAgra Foods, Inc.*, 844 F.3d 1121, 1132 (9th Cir. 2017) (no due process concern when

23   aggregate damages determined; allocation of damages does not implicate defendant's due process rights).

24              **3.      Defendants' Undeveloped Arguments About Other Affirmative Defenses Fail to Show**
                **that Individualized Issues Will Predominate.**

25
26              EQR lists several other affirmative defenses that it argues will defeat class certification – "offset [*i.e.*,

27   _____
     [10] *Cf.* Opp. at 15, citing *Daniel F. v. Blue Shield of Cal.*, 305 F.R.D. 115 (N.D. Cal. 2014) (challenge to health
28   insurer's exclusion of types of "residential treatment" gave rise to individual questions because class members
     had received many different treatments, each of which would have to be evaluated); *Zinser v. Accufix Research
     Inst., Inc.*, 253 F.3d 1180 (9th Cir. 2011) (products liability case bearing no resemblance to this one).

1  for things like unpaid rent or property damage], consent, waiver, compromise and release, and unclean

2  hands" – but provides no legal or factual cites to support of any of them.  *See* Opp. at 14.

3  　*First*, EQR argues that it will be entitled to seek an offset for property damage, unpaid rent, and early

4  lease terminations.  Those claims are separate and unrelated to this case, and EQR can pursue them in

5  separate actions if it has not already.  Denying class certification because of them would be like denying

6  certification of an unpaid overtime case because some employees did not return their tools.  *See, e.g., Hester*

7  *v. Vision Airlines, Inc.*, 2009 WL 4893185, at *4-5 (D. Nev. Dec. 16, 2009) (certifying wage claim where

8  counterclaims for breach of non-disclosure agreement did not "have any bearing on the recovery of" wages),

9  *aff'd*, 687 F.3d 1162 (9th Cir. 2012).  In addition, EQR presents no evidence of the existence of such claims.

10  　*Second*, EQR asserts that some tenants may have entered into settlements with EQR that resulted in

11  waiver or compromise and release.  Opp. at 14.  Again, EQR offers no evidence to support this assertion.  If

12  EQR has entered into such settlements, EQR can assert those defenses during the damages phase.

13  　*Third*, EQR gives no explanation of its "unclean hands" or "consent" defense.

14  **D.**　　**EQR's Other Challenges to the Woodland Park Class Lack Merit.**

15  　　**1.**　　**EQR Does Not Dispute that It Charged a Flat $50 Late Fee to the Members of the Woodland Park Preexisting Lease Class for Several Years.**

16  　Plaintiffs' opening brief explained that when EQR acquired Woodland Park in December 2011, "[a]t

17  the outset, EQR charged all [existing] tenants $50 late fees, rather than charging them the late fee amounts

18  specified in their existing leases."  Pl. Br. at 11-12.  After a period of "years" of charging $50, "[e]ventually,

19  EQR reviewed the non-EQR leases of such tenants and input the late fee terms of those leases into MRI."  *Id.*

20  Rather than dispute this, the Opposition pretends Plaintiffs did not say it:  "As Plaintiffs acknowledge in their

21  motion, Equity Residential did not have a policy of charging a flat $50 late fee to residents at Woodland

22  Park; rather, it extracted the specific late fee information from each lease and used that information to assess

23  late fees."  *See* Opp. at 5.  Thus, EQR does not dispute that for a several-year period (*i.e.*, the Class Period)

24  EQR had a policy of charging a flat $50 late fee.  *See* Pl. Br. at 11 & n.3.  Plaintiffs also established that MRI

25  can determine the dates on which the $50 late fees were charged (and paid).  Pl. Br. at 14.[11]

26

27

28  _____

[11]The Opposition evidence indicates that EQR charged the $50 fee until approximately October 2014.
Decl. of A. Winn, Ex. 18 (Munguia-Brown Ledger) at WP18 (charged flat $50 fee until October 2014).

692342.8

EQR also argues that the Woodland Park class members cannot invoke Section 1671(d) because EQR did not sign their leases, and EQR notes that the leases differed. Opp. at 19. But EQR assumed the leases and applied a common $50 late fee to each class member. *See, e.g.*, *MicroTechs., LLC v. Autonomy, Inc.*, 2017 WL 1848470, at *16 (N.D. Cal. May 8, 2017) (parties may, by conduct, impliedly modify contract term). Whether the fee is subject to Section 1671(d) is a common question.

### 2. The Effect (if Any) on the Woodland Park Class of EQR's Settlement of a Section 1671(d) Claim in 2000 Is a Common Question.

EQR asserts that "a California court has already found that Equity Residential's $50 late fee 'complies with section 1671(d),'" which, EQR claims, "raises a key preliminary question for the Woodland Park Class" – *i.e.*, a common question. Opp. at 19. A description of that case is enlightening. It was a non-class case brought under Section 17200 as a "representative" action before such actions were eliminated by Proposition 64. The plaintiffs' attorney, "Cash Bonas," settled the case for $70,000 in attorneys' fees and no payment to any tenant. *See* 1st Ryan Decl. Ex. K at WP002915, 2922. (Several years later he was disbarred. *See* http://members.calbar.ca.gov/fal/Member/Detail/179837). The so-called "finding" to which EQR refers was nothing more than a cursory order approving the uncontested motion for "approval" of a non-class settlement agreement that Mr. Bonas submitted with EQR's lawyers. The order bound no one other than the parties thereto. Whatever weight is due to the Superior Court's prior "finding" is a common question.

### E. The Named Plaintiffs Are Adequate and Typical.

This is a simple case challenging high late fees. Each named plaintiff understands that and is willing to represent the class. Defendants attack the plaintiffs based on their lack of sophistication, but courts have long rejected such efforts. It is well settled that "Rule 23 should not be used to defeat the ends of justice by facilitating the dismissal of class action complaints involving unsophisticated named plaintiffs." *Longest v. Green Tree Servicing LLC*, 308 F.R.D. 310, 325 (C.D. Cal. 2015) (quotes omitted). "It would be unfair to deny someone ... access to our courts merely because he is unable to articulately respond to questions from attorneys." *Parrish v. Nat'l Football League Players Ass'n*, 2008 WL 1925208, at *6 (N.D. Cal. Apr. 29, 2008) (representative with limited understanding of legal process adequate despite "repeatedly g[iving] conflicting and peculiar answers in response to questioning relating to this suit"). The named plaintiff need only "understand the gravamen of the claim," not "be intimately familiar with every factual and legal issue in

the case." *Moeller v. Taco Bell Corp.*, 220 F.R.D. 604, 611 (N.D. Cal. 2004) (quotation omitted).[12]

### 1. David Bonfanti

Mr. Bonfanti testified that his goal is "to get [his] late fees returned" and that he "would like hopefully [that] other people get their late fees returned." *See* Decl. of Megan E. Ryan ISO Pls.' Reply ("2d Ryan Decl.") Ex. A (Bonfanti Dep.) at 104:20-23. He testified: "I have an obligation in this as a class representative to ensure everyone's interests, not simply my own." *Id.* at 106:7-11; 111:14-20; 199:16-200:12; 225:15-25. He understands his role: "I represent the class of people who were charged 5 percent, minimum of 50." *Id.* at 111:24-112:2. He spent 30-40 hours on the case even before being deposed and responding to discovery, including several meetings with his attorneys. *Id.* at 79:19-80:25. He joined the case after researching EQR's fee on the internet and finding counsel. *Id.* at 81:18-25; 105:11-16; 68:12-17.

Contrary to EQR's assertions, Mr. Bonfanti read the complaint and knows its allegations, communicates with his counsel, knew the complaint was amended to add him, and knew Plaintiffs had filed a class certification motion (the only motion filed since he joined the case). *Id.* at 108:21-23; 100:10-24; 109:19-21; 203:6-9; 204:22-205:2; *cf.* Opp. at 18, 20 (citing *Lee v. Pep Boys-Manny Moe & Jack of Cal.*, 2015 WL 9480475, at *11 (N.D. Cal. Dec. 23, 2015) (plaintiff had never read complaint, not read discovery, not done anything for case but look at letter and attend deposition)). EQR claims that Mr. Bonfanti "believes this case is 'not [class members'] business," but the fact that he did not want to approach his neighbors directly and inform them that he was filing a class action does not make him inadequate – notice of the case should come from a court. Bonfanti Dep. at 126:22-127:1. He was not confused about his declaration: "My declaration says that I lived at Equity Residential and that I paid a certain amount of rent and the terms of my lease and that it's all true, and I provide documentation to that effect…It's a statement of my experience." *Id.* at 234:16-22; 237:22-238:6. That he could not answer a hypothetical about what conflicts might disqualify a representative or recall whether Plaintiffs are presently seeking injunctive relief (Opp. at 17-18) is of no moment. *Moeller*, 220 F.R.D. at 611.

---

[12] The cases cited by EQR support Plaintiffs' adequacy here. *See Stuart v. Radioshack Corp.*, 2009 WL 281941, at *11 (N.D. Cal. Feb. 5, 2009) (adequate because understood "gist" of claim that he and others were not reimbursed for expenses, even though he had not read policy, did not understand policy, and did not care about policy because it no longer affected him); *Williams Corp. v. Kaiser Sand & Gravel Co.*, 146 F.R.D. 185, 187 (N.D. Cal. 1992) (adequate despite not having read complaint carefully; was deposed, produced documents, and described elements of claim); *cf. Jovel v. Boiron, Inc.*, 2014 WL 1027874, at *2 (C.D. Cal. Feb. 27, 2014) (not adequate because testimony contradicted complaint in a way that destroyed liability).

692342.8

### 2. __Javanni Munguia-Brown__

Ms. Munguia-Brown initiated this litigation "so that residents [who] were charged these egregious charges … get their money back for what they were charged for their late fees." *See* 2d Ryan Decl. Ex. B (Munguia-Brown Dep.) at 10:17-19; 153:14-154:3. EQR claims she is atypical because she testified about being charged an "additional" late fee even when paying rent on time (Opp. at 22), but Ms. Munguia-Brown was referring to EQR's practice of charging late fees when a tenant carries a balance even if the tenant pays that month's rent on time, a practice she references later in her deposition, and one that is consistent with the class's claims. *Id*. at 115:2-7; 129:2-8; *see also* Pl. Br. at 13 (MRI does this). EQR faults her for confusion about the term "auto late fee" in EQR's documents, but the gist of her claim is straightforward: she is challenging the $50 late fee charged to her and the class. Her dissatisfaction that EQR did not notify her of its late fee practices does not make her atypical. *Id*. at 75:4-24.

Ms. Munguia-Brown has spoken with her attorneys regularly, understands who she is suing, knew the complaint was amended, understood that discovery showed a difference between tenants with a standard lease and those at Woodland Park with predecessor leases, knew she was seeking class status, responded to discovery, and reviewed her declaration. *Id*. at 84:25-85:3; 131:21-25; 92:21-93:2; 100:3-6; 144:16-17; 125:16-126:1; 146:1-8. Asked whether she was representing tenants outside of Woodland Park, she incorrectly said yes (Opp. at 22), but that is understandable because the class definition had recently changed based on information disclosed by EQR leading up to the class certification motion, which was filed three calendar days before Ms. Munguia-Brown's deposition. She understands that her role is "to speak on behalf of all the other residents that I represent in this class-action lawsuit and be able to retain these late-fee charges that they were charged." *Id*. at 124:17-22; 125:4-10.

### 3. __Norma Rodriguez__

Ms. Rodriguez is a Spanish-only-speaking blue collar worker. EQR tries to portray her as admitting that she is participating in this case only for her own interests, but she testified that she was seeking reimbursement of late fees "Not just for me" but "[f]or the group of tenants in Woodland Park who also live in East Palo Alto." *See* 2d Ryan Decl. Ex. C (Rodriguez Dep.) at 149:20-150:13. She testified that she had "agreed to become a class representative." *Id*. at 90:12-14; 146:8-147:1. She testified that her role required her to miss work to appear for her deposition and to potentially be exposed to liability for EQR's costs. *Id*. at

13

150:23-151:11. When EQR's attorney asked if she was "seeking to represent other tenants," Ms. Rodriguez asked him to clarify the meaning of the word "represent," but he declined and moved on (apparently afraid of the answer). *Id.* at 146:8-14. When asked what the "duties" of a class representative are (a confusing question for a Spanish-speaking lay witness), she instead described the Woodland Park Preexisting Lease class she represents: "a small group of tenants [*i.e.*, compared to the statewide Standard Late Fee Class] who have been charged late fees without having a contract with Equity." *Id.* at 90:15-19.

Contrary to EQR's assertions, Ms. Rodriguez accurately testified "I never had [*i.e.*, signed] a contract with [EQR]. Only with the old owner." Rodriguez Dep. at 59:21-24. She testified that the Defendant was "Equity, the Company," and that she relies on her attorneys to understand legal issues (*e.g.*, which subsidiaries are liable). *Id.* at 59:25-60:10; 97:14-22; 102:2-17. Her testimony that she was required to pay rent by the fifth of the month is consistent with her lease's provision that no late fee will be charged if rent is paid by that date, and her lease is not "non-existent" – it is an exhibit to her declaration (ECF No. 64-6, Decl. D, Ex. 2 (MUN000187)). She "know[s] what the complaint says … because my attorney told me in my language." *Id.* at 75:12-23. EQR faults her for not having a source of information about the case other than her attorneys, but that is normal. *Id.* at 77:2-25. EQR claims she does not know "the meaning of some of the basic words" in her declaration (Opp. at 24), but EQR's citations do not support this. *See also* Dep. at 136:6-19 (read declaration in Spanish before signing). EQR faults her for not understanding a question about the "purpose" of her declaration, but EQR's counsel refused to clarify it despite her repeated response that she did not understand what he meant. *Id.* at 99:19-101:18. That she disliked other things EQR did does not make her atypical.[13]

### 4. <u>Angelina Magaña</u>

Ms. Magaña is also a Spanish-only speaker, which is the source of many of EQR's challenges to her. EQR tells the Court she "claimed that she was suing a man named Col[l]in" (Opp. at 20), but EQR has submitted the video of Ms. Magaña's deposition, and Plaintiffs urge the Court to view the answer in question (beginning at 10:29:20 a.m. on the video). At the outset of the deposition, EQR's counsel asked "Who are you suing?" and Ms. Magaña said "Equity." She said it quietly, but she said it twice, as the Court will hear.

---

[13] EQR complains about the following privilege objection: "Q. How do you know [what the complaint] says? A. Well, I know because my attorney told me in my language. Q. What did he tell you? [Assertion of privilege]." Dep. 75:12-76:21. That EQR's counsel cannot ask "What did [your attorney] tell you" hardly supports EQR's claim that Plaintiffs' counsel prevented EQR from asking "any probing questions about her understanding of the claims." Opp. at 23.

The translator misheard her and translated the answer as "Collin." Rather than clarify the record, EQR's counsel pounced and asked Ms. Magaña a series of questions about a man named Collin – a word she had not said. The subsequent questions and answers in Spanish were grammatically consistent with her understanding that she was talking about (and being asked about) an entity. *See* Decl. of Coral Trevino (explaining translation). After the first break, Ms. Magaña corrected the mistranslation, explaining that there was no "Collin." *See* 2d Ryan Decl. Ex. D (Magaña Dep.) 20:3-21:14; 22:20-23. Hoping to portray her as not only too stupid to know who she is suing but also a liar, EQR's counsel continued to ask her "Collin" questions, and she repeated that there was no "Collin," and the defendants in the case are "Equity, Equity." *Id.* at 67:3-5; 73:12-23 ("Q. You don't know how to spell 'Collin'? A. No. What is 'Collin'?... Q There's not a person named 'Collin'? A. No."). *Id.* Ms. Magaña is not stupid or dishonest; she was misheard.

Asked "Why are you suing Equity Residential," she testified "Because I'm representing all the tenants so that they don't get charged the late fees." 112:1-8; 58:5-15; 45:24-46:12 (brought case "[b]ecause they charge $50, and it's a lot"); 10:17-25; 13:17-20; 67:3-5. Her role is to "help the attorneys" by doing things "like I'm here right now" being deposed. 161:5-162:7. Ms. Magaña knows who her attorneys are: she identified "Jason" Tarricone, but could not remember the names of all her attorneys. 18:23-19:4; 21:21-22:12. Ms. Magaña testified that she talks with her attorneys and does not "just do what [her] attorneys tell [her] to do." 52:7-14, 26:1-11. She does not read English, but her "attorneys told [her] what the complaint says." *Id.* at 43:18-21. Without naming the document or showing it to her, EQR elicited testimony that she had signed her declaration after being "told what it was about" but without having read it; when she was actually shown the document (which is in Spanish), she confirmed that she had read it before signing. *Id.* at 150:9-151:6. Like Ms. Rodriguez, the fact that she disliked other actions that EQR took that are not part of this lawsuit does not make her atypical. She is adequate to represent the class.

## F. The Class Notices Should Be Issued.

Other than its meritless request to add a warning about the speculative possibility of counterclaims, EQR does not object to the class notices, nor dispute that it has contact information for the class (Pl. Br. at 15), nor object to the proposed plan for notice (*id.* 25). The Court should authorize notice as requested.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs ask the Court to grant class certification.

| | |
|---|---|
| 1 | Dated:  October 10, 2017 |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |

Dated:  October 10, 2017                    Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

*/s/  Linda M. Dardarian*

Linda M. Dardarian
William C. Jhaveri-Weeks
Megan E. Ryan
Katharine L. Fisher

*Attorneys for Plaintiffs*

692342.8