UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JAVANNI MUNGUIA-BROWN, et al.,

Plaintiffs,

v.

EQUITY RESIDENTIAL, et al.,

Defendants.

Case No. 16-cv-01225-JSW (TSH)

**DISCOVERY ORDER**

Re: Dkt. Nos. 165, 170

Plaintiffs sue Defendants Equity Residential, et al., for two causes of action under California law. Plaintiffs allege that Defendants have a policy of charging tenants the greater of $50 or 5% of their outstanding balance for late rent payments. Plaintiffs claim this is an unlawful penalty under California Civil Code § 1671(d) and a violation of California Business and Professions Code § 17200. The present discovery dispute concerns Plaintiffs' contention that in the course of opposing their summary judgment motion, Defendants selectively disclosed certain attorney-client privileged communications – namely, that outside counsel and in-house counsel advised that the late fee was legal – and Plaintiffs say this amounts to a subject matter waiver under Federal Rule of Evidence 502(a) of all such communications. For the reasons that follow, the Court agrees.

**A.  Preliminary Matters**

Before we get to the main issue, we need to clear out the underbrush. First, Defendants say this motion to compel is tardy. Plaintiffs' motion focuses on a privilege log Defendants served in July 2017, as well as two Rule 30(b)(6) depositions that occurred in June 2017. Defendants argue that waiting for nearly three years to bring this motion is an unwarranted delay, and for this reason alone the Court should deny the motion.

The Court disagrees. Local Rule 37-3 states that the deadline to move to compel is seven days after the close of fact discovery, and here the close of fact discovery is March of next year, ECF No. 151, so the motion is timely. Also, Plaintiffs' motion to compel is based on a claim of waiver, so looking to the time when privilege was first asserted (2017) is a distraction. The relevant time is the conduct that Plaintiffs point to as the waiver, which is primarily Defendants' March 2019 summary judgment opposition. That was still over a year ago, but it's not the extraordinary three-year delay that Defendants assert.

Next, the parties go around and around on whether California or Illinois law applies to privilege in this case. Each seems to attribute positions to the other, and it's not clear that either side is advocating for either state's law. In any event, it doesn't matter. Because Plaintiffs' claims arise under state law, in general "state law governs privilege," Fed. R. Evid. 501. An exception is set out in Rule 502, however, which is the rule that applies "to disclosure of a communication or information covered by the attorney-client privilege or work-product protection." Fed. R. Evid. 502. Subsection (f) of Rule 502 clarifies that "notwithstanding Rule 501, this rule applies even if state law provides the rule of decision." *See Century Aluminum Co. v. AGCS Marine Ins. Co.*, 285 F.R.D. 468, 471 n.2. (N.D. Cal. 2012) ("The Federal Rules of Evidence govern the scope of waiver even if state law provides the rule of decision."). Thus, because this motion concerns a claim that Defendants' partial disclosure of attorney-client privileged communications results in a subject matter waiver, Rule 502 applies, not state law.

In addition, despite the many references to attorney work product in the parties' joint discovery letter brief at ECF No. 165, only the attorney-client privilege is at issue. The objections in Denise Beihoffer and Jim Fiffer's depositions were based solely on privilege, ECF No. 165-1, Exs A and D, and Defendants' privilege log asserts only attorney-client privilege. ECF No. 167 (noting Court's skepticism that Defendants claimed any of the documents were work product); ECF No. 170 at 5 (Defendants' confirmation that the privilege log asserted only attorney-client privilege and not work product).

**B.    Analysis**

Now, to the merits. Rule 502(a) provides:

2

> When the disclosure is made in a federal proceeding or to a federal office or agency and waives the attorney-client privilege or work-product protection, the waiver extends to an undisclosed communication or information in a federal or state proceeding only if:
>
> (1) the waiver is intentional;
>
> (2) the disclosed and undisclosed communications or information concern the same subject matter; and
>
> (3) they ought in fairness to be considered together.

The Advisory Committee Notes explain that "a subject matter waiver (of either privilege or work product) is reserved for those unusual situations in which fairness requires a further disclosure of related, protected information is order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." "'The idea is to limit subject matter waiver to situations in which the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials.'" *Century Aluminum Co.*, 285 F.R.D at 472 (quoting 8 Charles Alan Wright, et al., Federal Practice and Procedure § 2016.2 (3d ed., 2010 update)).

In opposing summary judgment, EQR argued that it "wanted to make sure that its process for evaluating the potential change in late fees was fair, reasonable, and lawful." ECF No. 131 at 17. To support that argument, it cited (among other evidence) paragraphs 12-20 of the Beihoffer Declaration. Those paragraphs described an effort from around April 2008 through early June 2008 to assess EQR's proposed late fee. ECF No. 131-1 ¶ 12. Beihoffer described the various considerations the company examined in determining that a 5% late fee was reasonable. *Id.* ¶¶ 12-20. Paragraph 17 of that declaration states: "In addition to looking at our own internal costs and damages, the Company also surveyed our peer companies' late fees to ensure that we were within the range others were charging. **We also consulted with our outside counsel in California. These inquiries confirmed that, under the circumstances, a 5% late fee was reasonable**." (emphasis added). This is a flat-out disclosure of the content of the attorney-client communications with outside counsel in California. This paragraph goes way beyond saying that

3

lawyers looked at a proposed policy and later the company adopted it.  Paragraph 17 "confirmed" what the content of the legal advice was.  This paragraph, by itself, is enough to justify a subject matter waiver with respect to legal advice on the legality of the proposed late fee.  *See also McCormick-Morgan, Inc. v. Teledyne Indus., Inc.*, 765 F. Supp. 611, 613-14 (N.D. Cal. 1991) (once waiver is found, subject matter cannot be limited by time period).

Paragraph 18 goes on to state: "**Our in-house legal team also evaluated whether the proposed late fee adjustment would comply with California law, including California Civil Code section 1671 and applicable authorities and publications discussing it**."  And paragraph 20 states: "We ultimately determined, after spending more than a month **considering all of these various issues**, that a 5% late fee was reasonable."  (emphasis added).

Paragraphs 18 and 20 are not quite as direct as paragraph 17, but the very specific description of exactly what issue the in-house legal team was evaluating combined with paragraph 20's reference to "considering all of these various issues," clearly implies that the legal team said the 5% late fee was legal.

In addition, on summary judgment, EQR argued that it "has repeatedly assessed—and regularly monitors—its late fees to ensure that they are reasonable in light of EQR's costs and damages."  ECF No. 131 at 16.  For this proposition it cited the Fiffer Deposition, pages 149:22-150:23.  And Fiffer did indeed say that EQR has analyzed its late fee on an annual basis since 2008.  Then, on the next two pages of the transcript, when he was asked "What does the approximately annual investigation consist of?," Fiffer said:

> Well, we -- we -- I mean, being in the marketplace on a daily basis, not only for the 12-month period but, you know, forever back to when the company was formed in 1993, the people that are working they -- you know, they know what -- they know what's going on, they have resources that are available to them or even inflicted on them as to any -- any changes in the law, changes in policy, changes in the way that the judges view certain activities by landlords.  There's communications from apartment associations, **from landlord-tenant law firms that we use in the jurisdiction**, and so -- and, you know, **we have people in the Legal department that were assigned to be legal representatives**

**whose portfolio consisted of different markets and it was their job to be aware of any changes in the law either statutory or through case law or through what was happening in the court system. So all of this information was -- was, shall we say, amalgamated**, so to speak, every year or so as kind of a gut check to make sure that what we were doing continued to pass legal muster. **So that if there was any information that we had at any time when any of those annual reviews was conducted that would suggest that our late fee practice didn't pass legal muster, then we would have done something about it**.

ECF No. 165-1 (emphasis added).

This is also a disclosure of attorney-client communications. Fiffer testified that during these annual reviews, there were communications with outside counsel, and there was also analysis done by in-house counsel, and "all of this information" was "amalgamated," and "if there was any information . . . that would suggest that our late fee practice didn't pass legal muster, then we would have done something about it." Although Fiffer stated it in the negative (attorneys did not provide any information that late fee was not legal), because Fiffer also stated that the company did indeed get legal advice from its attorneys and he identified the subject on which the advice was provided, EQR has disclosed what the outside counsel and in-house counsel advised: the late fee was legal.

Beihoffer's declaration and Fiffer's testimony are a purposeful interjection of attorney-client communications to defend the late fee on the merits. There is a tiny amount of indirection in paragraphs 18-20 of the declaration and in Fiffer's testimony, where both witnesses specifically include attorneys in the collection of people who provided advice, and then say the amalgamated advice gave the company no concern, but since both witnesses specifically tell us what the attorneys looked into, we know what the advice was – and we are intended to know that. There is no indirection at all in paragraph 17 of Beihoffer's declaration, which just flat-out says what the advice from outside counsel was. And it's hard to dismiss this selective disclosure of attorney-client communications as immaterial to the outcome of the case because in the decisive paragraph in Judge White's order denying summary judgment, he found disputes of fact because: "The

5

record indicates that Defendants considered the increase in the late fees in 2008 for over a month's time, after consideration of the increase in labor costs, administrative costs related to the collection of unpaid rent, property operations costs, alignment with competitors' late fees charges, **and review of analyses done by their legal team**, including reference to a guidance to tenants published by the Los Angeles County's Department of Consumer and Business Affairs." ECF No. 142 at 5-6 (emphasis added).  Among the evidence cited by Judge White in support of that finding are paragraphs 10-20 of the Beihoffer declaration, discussed above, and page 152 lines 1-17 of the Fiffer deposition, which is the bold language quoted above about legal review.

So, the first element of the Rule 502(a) test is satisfied because we have an intentional waiver from the Defendants' affirmative use of attorney-client communications to defend the lawfulness of their late fee. Fed. R. Evid. 502(a)(1). The second element is also satisfied because the disclosed and undisclosed communications relate to the same subject. *Id*. (a)(2). Fiffer (an in-house lawyer) was specifically instructed in his deposition not to say what advice he provided in 2008 concerning the proposed late fee. ECF No. 165-1, Ex. A, pp. 12-16. Beihoffer (also in-house counsel) was similarly instructed, ECF No. 165-1, Ex. D, pp. 141-42, and Defendants claim privilege over written communications concerning legal advice about the lawfulness of the late fee. ECF No. 165-1, Ex. C (privilege log).

The third requirement for waiver – that the undisclosed communications "ought in fairness to be considered together" with the disclosed ones, Fed. R. Evid. 502(a)(3) – is also satisfied here. The story that Defendants received copious legal advice year after year from outside and in-house attorneys, who all advised that the late fee was legal, is powerful evidence that Defendants made a reasonable endeavor to come up with an appropriate fee. It makes them look diligent and thorough. Indeed, this legal advice, combined with other evidence, was enough to stop the Plaintiffs' summary judgment motion.

But fairness requires that this story be subject to meaningful cross-examination. After all, what if Defendants are lying about what their lawyers told them? Or, more likely, what if Defendants are spinning, or putting a gloss on what the lawyers told them? What if their lawyers actually told them that the late fee was probably legal but nothing in life is certain and they might

lose a legal challenge?  What if different lawyers told them different things?  Defendants have testified to the high-level conclusion that many lawyers analyzed the late fee and they all advised it was legal.  If the truth is anything more nuanced than that, their story could quickly fall apart.  The only way to test Defendants' story is to consider the undisclosed communications together with the disclosed ones.  Otherwise, cross-examination is impossible.

It is important to remember just how extreme Defendants' selective disclosures were.  They instructed Beihoffer in her deposition to refuse to say what legal advice she gave the company in 2008 when it was evaluating its proposed late fee, and then two years later they had her submit a declaration on summary judgment that stated in paragraph 17 that outside counsel in 2008 advised that the fee was legal.  That's a straight-up selective disclosure, and it operates to waive the privilege.  *See Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010) ("Disclosing a privileged communication . . . . results in waiver as to all other communications on the same subject.").

Finally, the Court must determine the scope of the waiver.  Rule 502 seems clear about that:  the "waiver extends to an undisclosed communication or information . . . only if . . . the disclosed and undisclosed communications or information concern the same subject matter . . ." Fed. R. Evid. (a)(2); *see also Hernandez*, 604 F.3d at 1101 (error to find blanket waiver of the attorney-client privilege because waiver extends only to the same subject).  Here, the subject of the disclosed communications is the legal advice from outside counsel and in-house counsel concerning the legality of the late fee.  Accordingly, Defendants have waived attorney-client privilege as to all attorney-client communications on that subject.

For these reasons, the Court orders Defendants to produce all attorney-client communications within this subject that were withheld based on privilege.  Because the one and only thing the Court has ruled on is the waiver of privilege, this order does not require the production of documents that were also withheld for other reasons, such as any agreements the parties may have made concerning custodians, date ranges, and so on.  The Court also orders Defendants to make Beihoffer and Fiffer available for deposition concerning the subject as to which the Court has found a waiver.

**IT IS SO ORDERED.**

Dated: June 9, 2020

THOMAS S. HIXSON
United States Magistrate Judge