Aaron T. Winn (SBN 229763)
Karen L. Alexander (SBN 265926)
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: 619.744.2200
Facsimile: 619.744.2201
E-mail: atwinn@duanemorris.com
            klalexander@duanemorris.com

Justin J. Fields (SBN 259491)
**DUANE MORRIS LLP**
One Market, Spear Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone: 415.957.3000
Facsimile: 415.957.3001
E-mail: jfields@duanemorris.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, et al. <br><br> Plaintiffs, <br><br> v. <br><br> EQUITY RESIDENTIAL, et al., <br><br> Defendants. | Case No. 16-cv-01225-JSW <br><br> **DECLARATION OF KAREN ALEXANDER IN SUPPORT OF DEFENDANTS' MOTION TO DECERTIFY THE CLASSES** <br><br><br> Date: April 28, 2022 <br> Time: 9:00 a.m. <br> Dept.: Courtroom 5 <br> Judge: Hon. Jeffrey S. White |

1

I, Karen Alexander, declare as follows:

1. I am an attorney with the law firm of Duane Morris LLP, counsel of record for Equity Residential.[1] I am licensed to practice before the courts in the State of California and am admitted to practice in the United States District Court for the Northern District of California. I have personal knowledge of the facts set forth within this declaration and if called as a witness, could and would competently testify thereto.

2. Attached hereto as Exhibit 1 is a true and correct copy of the expert report of Mark J. Hosfield dated May 10, 2021 (redacted).

3. Attached hereto as Exhibit 2 is a true and correct copy of the supplemental expert report of Mark J. Hosfield dated August 13, 2021 (redacted).

4. Attached hereto as Exhibit 3 is a true and correct copy of the Rebuttal Report of Andrew D. Schwarz dated July 9, 2021.

5. Attached hereto as Exhibit 4 is a true and correct copy of the Rebuttal Report of Christian Tregillis dated July 9, 2021 (redacted).

6. Attached hereto as Exhibit 5 is a true and correct copy of the Supplemental and Rebuttal Report of David Breshears dated July 9, 2021 (redacted).

7. Attached hereto as Exhibit 6 is a true and correct copy of excerpts from the deposition of Christian Tregillis taken by my office on September 21, 2021.

8. Attached hereto as Exhibit 7 is a true and correct copy of excerpts from the deposition of Andrew Schwarz taken by my office on September 30, 2021.

9. Each of the expert reports contained at Exhibits 1,2, 4 & 5 have been redacted to omit certain sensitive, confidential and/or proprietary information belonging to Equity, including but not limited to Equity's payroll costs, Equity's calculation of WACC (weighted average cost of capital), the aggregate amount of late fees charged and paid during the class period, and legal fees. This information is not available to the public, and if it became publicly disclosed, there is a substantial risk its release would damage

---

[1] For ease of reference only, this Declaration refers to all defendants as "Equity."

Equity's business interests, for example by giving an unfair competitive advantage to Equity's competitors or suppliers. However, it is Equity's position that none of the sensitive, confidential information that has been redacted from Exhibits 1-5 is necessary for the Court's determination of the instant Motion to Decertify.

I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct.

Dated: March 24, 2022

/s/ *Karen L. Alexander*
Karen L. Alexander

# EXHIBIT 1

REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

_____

JAVANNI MUNGUIA-BROWN, ANGELINA MAGAÑA, NORMA RODRIGUEZ, and DAVID
BONFANTI, individually and on behalf of others similarly situated,

Plaintiffs,

v.  Case No. 4:16-cv-01225-JSW

EQUITY RESIDENTIAL, ERP OPERATING LIMITED PARTNERSHIP, EQUITY RESIDENTIAL
MANAGEMENT, L.L.C., EQR-WOODLAND PARK A LIMITED PARTNERSHIP, and EQR-
WOODLAND PARK B LIMITED PARTNERSHIP,

Defendants.

_____

EXPERT REPORT AND DISCLOSURE

OF MARK J. HOSFIELD

Submitted May 10, 2021

CONFIDENTIAL

United States District Court for the Northern District of California, Oakland Division
Case No. 4:16-cv-01225-JSW

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

# Table of Contents

I.    Background and Experience ...................................................................................................1

II.   Scope and Retention ............................................................................................................1

III.  Information Relied Upon .....................................................................................................2

IV.  Background Information .......................................................................................................6

V.   Opinions, Basis and Reasoning ..........................................................................................11

VI.  Conclusion .........................................................................................................................37

Exhibit 1:       Curriculum Vitae of Mark J. Hosfield

Exhibit 2:       Index to Documents Primarily Relied Upon in Forming Opinions

Exhibit 3.1:    Comparison of Equity's Cost Savings per Late Fee and Average Late Fee Charged

Exhibit 3.2:    Comparison of Cost to Equity per Late Fee and Average Late Fee Charged

Exhibit 4.1:    Calculation of Equity's Employee Cost Savings Related to Rent Delinquency

Exhibit 4.2:    Calculation of Equity's Employee Costs Related to Rent Delinquency

Exhibit 5:       Calculation of Eviction Costs Incurred by Equity

Exhibit 6:       Calculation of Collection Costs Incurred by Equity

Exhibit 7:       Calculation of Interest Costs on Late Rent

Exhibit 8:       Calculation of Equity's WACC


Appendix A:    Summary of Late Fees

Appendix B:    Employee Costs by Job Title

Appendix C:    Employee Time by Job Function

Appendix D:    Reductions in Staffing if All Residents Paid Their Rent on Time

Appendix E:    Interview Quartile Analysis

CONFIDENTIAL

**REDACTED**

## I.      Background and Experience

I am currently a principal of Davis & Hosfield Consulting LLC.  I have previously been a partner at Coopers
& Lybrand, Arthur Andersen and, most recently, KPMG LLP, in the Forensic Services Practice.  Since 1987,
I have focused on providing consulting and expert witness assistance to clients in commercial disputes.  Prior
to that, I gained financial management and operational experience as both a Controller and Vice President of
Finance of a corporation, as well as in the consulting practice at Coopers & Lybrand.  I have also taught
accounting classes and have lectured on finance and accounting topics.

I have performed a variety of economic, business and financial analyses on behalf of clients in disputes
including breach of contract, lost profits, trademark and patent infringement, business valuation, construction
cost and delay claims, lender liability, post-acquisition, computer software failure, economic damages in
personal injury, wrongful death, employment discrimination and wrongful termination, and financial
misrepresentation.  I have also consulted on disputes involving claims of unjust enrichment, fraud, and breach
of implied warranty.  I have testified as an expert witness at deposition and trial in both state and federal
courts, as well as at arbitration.

A complete description of my background and qualifications is set forth in my curriculum vitae and list of
testimony, which is attached as Exhibit 1.

## II.     Scope and Retention

The above referenced matter relates to claims asserted by Javanni Munguia-Brown, Angelina Magaña, Norma
Rodriguez, and David Bonfanti (collectively, "Named Plaintiffs"), and those similarly situated ("Plaintiffs")
against Equity Residential, ERP Operating Limited Partnership, Equity Residential Management, L.L.C.,
EQR-Woodland Park A Limited Partnership, and EQR-Woodland Park B Limited Partnership (collectively,
"Equity" or "Defendants").  Plaintiffs allege in their Second Amended Complaint that Equity has "charged
Class Members Excessive Late fees [] for being both late in paying rent and for carrying a minimal balance
even when they paid the current rent on time."[1]

---

[1] Second Amended Complaint for Injunctive Relief, Declaratory Relief, and Damages; Class Action, dated February 8,
2017, p. 12.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

I have been retained by Baker & Hostetler LLP ("Counsel") on behalf of Equity in the above-referenced matter to prepare analyses to assist the Court in this matter relating to Equity's communities in California. Specifically, I have calculated, by year, for the period September 3, 2010 through February 29, 2020:[2]

1. The number and amount of late fees Equity has charged the Standard Late Fee Class members and the Woodland Park Preexisting Lease Class members;[3]

2. The costs incurred by Equity related to rent delinquency;

3. The cost savings Equity would have achieved if all residents paid their rent on time;

4. Equity's average cost per late fee compared to the average late fee charged;

5. The average cost per late fee that Equity would have saved if all residents paid their rent on time compared to the average late fee charged; and

6. The outstanding account balances for all Standard Late Fee Class members and Woodland Park Preexisting Lease Class members.

My project team and I have been engaged for this assignment at the hourly billing rates of the individuals assigned plus expenses. My project team's billing rates for this engagement range from $175 to $575 per hour and my billing rate for this engagement is currently $675 per hour. The amount of our fees is not contingent upon the opinions expressed herein or on the outcome of this matter.

### III.     Information Relied Upon

My opinions are based upon information available to me as of the date of this report. I have relied upon and examined documents produced by the parties, along with publicly available information. A listing of all documents primarily relied upon is attached as Exhibit 2.

My team and I also interviewed the following individuals from Equity communities in California:

---

[2] I have only considered Equity's costs incurred and cost savings through February 29, 2020, prior to the COVID-19 pandemic.
[3] The Standard Late Fee Class and Woodland Park Preexisting Lease Class are defined later in this report. The number and amount of late fees Equity has charged the Standard Late Fee Class members and the Woodland Park Preexisting Lease class members are calculated for the periods September 3, 2010 through January 31, 2021 and December 1, 2011 through February 29, 2016, respectively.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

## Office Management

| Name | Position | Community Name |
|------|----------|----------------|
| Melissa Levix | General Manager | Marina 41 |
| Brandon Robles | General Manager | Westgate |
| Alex Sakr | Acting Manager | SoMa Square Apartments |
| Brittany Barajas | Community Manager | Canyon Creek (CA) |
| Lisette Barajas | Community Manager | Summit at Sausalito |
| Shelly Birtell | Community Manager | Breakwater at Marina Del Rey |
| Jeska Bravante | Community Manager | Schooner Bay I and Schooner Bay II |
| Irina Garland | Community Manager | Del Mar Ridge |
| Michelle Grubbs | Community Manager | Wood Creek I and Wood Creek II |
| Bianca Hillo | Community Manager | Oaks |
| Alyssa Hilovsky | Community Manager | Arbor Terrace |
| Chad Johnson | Community Manager | Teresina |
| Melanie Kreitz | Community Manager | La Terrazza at Colma Station |
| David Lewis | Community Manager | Jia |
| Nicole Mesa | Community Manager | Regency Palms |
| Olivia Milla | Community Manager | Ridgewood Village I and II |
| Tara O'Connell | Community Manager | Carmel Terrace |
| Jennifer Phommavongsa | Community Manager | Portofino |
| Joel Shannon | Community Manager | Vintage at 425 Broadway |
| Franz Tibayan | Community Manager | Reserve at Mountain View |
| Marissa Vasquez | Community Manager | Canyon Ridge |
| Katie Wood | Community Manager | Acappella |
| Claudia Cabrera | Assistant Community Manager | Mozaic at Union Station |
| Julie Ellis | Assistant Community Manager | Prado |
| Carina Gomes | Assistant Community Manager | Hesby |
| Jackie LaFace | Community Administrator | Mill Creek |

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

Leasing

| Name | Position | Community Name |
|------|----------|----------------|
| Marcella Alvarez | Leasing Consultant | Carmel Terrace |
| Vicki Barber | Leasing Consultant | Canyon Creek (CA) |
| Reggie Bautista | Leasing Consultant | Mozaic at Union Station |
| Levi Bennett | Leasing Consultant | Montierra |
| Jamie Brewer | Leasing Consultant | Centre Club |
| Jynna Canilao | Leasing Consultant | Riva Terra I and II |
| Victoria Collins | Leasing Consultant | Ridgewood Village I and II |
| Thalia Cordova | Leasing Consultant | Hesby |
| Georgeta (Monica) Dinu-Esanu | Leasing Consultant | Mill Creek |
| Carlos Escobar | Leasing Consultant | 88 Hillside |
| Kevin Frazier | Leasing Consultant | Vantage Hollywood |
| Tatiana Gevelekian | Leasing Consultant | Westside |
| Madeline Hansen | Leasing Consultant | Oaks |
| Alex Heang | Leasing Consultant | Acappella |
| Stephanie Jorgensen | Leasing Consultant | Centre Club |
| Alexandra Keesling | Leasing Consultant | Teresina |
| Michael Lee | Leasing Consultant | Glo |
| Neki McGrady | Leasing Consultant | Montierra |
| Elisia Morales | Leasing Consultant | Jia |
| Sylvia Najarro | Leasing Consultant | Oaks |
| Renne Paz Vazquez | Leasing Consultant | Oak Park South |
| Tiffany Pineda | Leasing Consultant | Azure |
| Samantha Quifille | Leasing Consultant | Kelvin Court |
| Araceli Roman | Leasing Consultant | Mill Creek |
| Tamara Schimmele | Leasing Consultant | Creekside (San Mateo) |
| Vano Shahmoradian | Leasing Consultant | Glo |
| Charlotte Truex | Leasing Consultant | Woodcreek I and II |
| Susan Vandenberg | Leasing Consultant | Summit at Sausalito |
| Kristina Waller | Leasing Consultant | Breakwater at Marina Del Rey |
| Grace Balahadia | Leasing Administrator | Park Hacienda |
| Devon Matier | Leasing Administrator | Teresina |
| Martha Melendez | Leasing Administrator | Westgate |
| Kristin Stevens | Leasing Manager | Oak Park South |

My team and I also held discussions with the following individuals from Equity:

- Traci Baumgarten, Residential Financial Director – Central Business Group;

- Shanna Dion, Vice President – Property Management;

- Jerry Felde, Director of Financial Applications;

- Alla Feldman, Senior Regional Manager;

**REDACTED**

- Jesse Jennell, Senior Regional Manager;

- Mark Johnson, Director of HR Technology;

- Debra Rivera, Vice President – Property Management; and

- Taylor Robertson, Vice President – Financial Planning and Analysis.

My opinions are based on my skills, knowledge, experience, education, and training, as well as information gathered by and/or provided to me as of the date of this report. It is usual and customary for experts to consider and/or rely upon sources of information such as those identified above and in Exhibit 2 in forming opinions.

I understand that I may be asked to testify regarding my opinions contained herein as well as related matters, including those raised on cross examination; those necessary to address matters raised by other witnesses who testify concerning damages issues; or those otherwise raised at or before trial by the attorneys for the class or the Court in relation to matters set forth in this report. I expect to further elaborate and expand on the content of my report as necessary to make my testimony understandable. To the extent helpful to explain, or to put in context, the subject matters discussed throughout my report, I also expect to provide further general explanations of the matters I discuss. In connection with any testimony, I may rely on materials referenced in this report and in the attachments and demonstrative exhibits to be prepared and identified before my testimony.

The opinions expressed herein are subject to revision and/or supplementation based upon my review of further discovery, the opposing expert's reports, depositions, and other information that I may receive between now and through trial. I will make such revisions or supplementation to my report if and when additional information becomes available that affects my opinions.

**REDACTED**

## IV.    Background Information

### Parties to this matter

**The Named Plaintiffs**

Ms. Munguia-Brown, Ms. Magaña, and Ms. Rodriguez all resided at the apartment community known as "Woodland Park."  Ms. Munguia-Brown moved into the Woodland Park community in October 2008,[4] Ms. Magaña in August 2006,[5] and Ms. Rodriguez in approximately 2002.[6]  Mr. Bonfanti resided at the "Bella Vista" apartment community between October 2014 and July 2017.[7]

### The Defendants

Equity Residential is a Maryland real estate investment trust incorporated on July 21, 1992, with a principal place of business in Chicago, Illinois.[8]  ERP Operating Limited Partnership is organized under the laws of Illinois with a principal place of business in Chicago, Illinois, and Equity Residential is its general partner.[9]  Equity Residential Management L.L.C. is a Delaware limited liability company organized on December 1, 2006, with a principal place of business in Chicago, Illinois.[10]  Equity Residential Management L.L.C. is the entity that managed Woodland Park.[11]  "EQR-Woodland Park A Limited Partnership and EQR-Woodland Park B Limited Partnership each owned roughly [25%] of the real property that comprises the Woodland Park community."[12]  EQR-Woodland Park A Limited Partnership is organized under the laws of Delaware with a principal place of business in Chicago, Illinois.[13]  "EQR-Woodland Park A Limited Partnership owns the units where plaintiffs Munguia-Brown and Magana reside; EQR-Woodland Park B Limited Partnership owns

---

[4] Munguia-Brown Deposition Exhibit 10: Declaration of Javanni Munguia-Brown in Support of Plaintiffs' Motion for Class Certification, dated August 10, 2017, p. 1.

[5] Magaña Deposition Exhibit 6: Declaration of Angelina Magaña in Support of Plaintiffs' Motion for Class Certification, dated August 15, 2017, p. 1.

[6] Rodriguez Deposition Exhibit 19: Declaration of Norma Rodriguez in Support of Plaintiffs' Motion for Class Certification, p. 3.

[7] Bonfanti Deposition Exhibit 1: Bonfanti Resident Statement (WP003382-WP003390 at WP003382).

[8] Defendant Equity Residential's Responses to Plaintiff Javanni Munguia-Brown's Form Interrogatories, dated November 17, 2014, pp. 4-5.

[9] ERP Operating Limited Partnership's Responses to Plaintiff Javanni Munguia-Brown's Form Interrogatories, dated November 17, 2014, p. 5.

[10] Defendant Equity Residential Management, L.L.C.'s Responses to Plaintiff Javanni Munguia-Brown's Form Interrogatories, dated April 30, 2015, pp. 5-6.

[11] Defendants' Answer to Plaintiffs' Second Amended Complaint, dated February 22, 2017, p. 1.

[12] Defendants' Answer to Plaintiffs' Second Amended Complaint, dated February 22, 2017, p. 1.

[13] EQR-Woodland Park A Limited Partnership's Amended Response to Plaintiff's Form Interrogatories, dated August 2015, pp. 4-5.

**REDACTED**

the unit where plaintiff Rodriguez resides. These two partnerships contract with Equity Residential Management, L.L.C. to manage their properties, including the three units occupied by the plaintiffs."[14]

## Class description

**Standard Late Fee Class**

The Standard Late Fee Class is defined as "[a]ll Equity Residential tenants in California from September 3, 2010 until the date of class certification who were charged one or more late fee(s) under Equity Residential's standard late fee provision: 5% of the outstanding balance owed (capped at 5% of the total amount of monthly recurring charges) or $50, whichever is greater."[15] Class certification was granted on October 23, 2017.[16] Therefore, the "Standard Late Fee Class Period" is from September 3, 2010 through October 23, 2017.[17]

**Woodland Park Preexisting Lease Class**

The Woodland Park Preexisting Lease Class is defined as "[a]ll Equity Residential tenants in the Woodland Park Property from December 1, 2011 until [Equity] sold the property in February 2016 who were charged one or more late fee(s) of $50 under Equity Residential's policy of charging a flat $50 late fee to tenants on pre-existing non-EQR leases."[18] The "Woodland Park Preexisting Lease Class Period" is from December 1, 2011 through February 29, 2016.[19]

**Equity's process for collection of late rent**

I understand that in California, Equity's Residential Lease Term Sheet provides for a late fee of $50 or 5% of the unpaid rent, whichever is greater, that is charged on the 5th of the month. For example, David Bonfanti II's Residential Lease Term Sheet for his October 11, 2014 through July 14, 2015 lease at Bella Vista states, "[y]our rent is due on the 1st of each month. If [Equity does] not receive your rent and other recurring charges, in person before the close of business, or electronically by 11:59 pm local time, on day 4, you will be

---

[14] Defendant Equity Residential Management, L.L.C.'s Responses to Plaintiff Javanni Munguia-Brown's Form Interrogatories, dated April 30, 2015, p. 14.
[15] Plaintiff Norma Rodriguez's Second Set of Interrogatories to Defendant Equity Residential Management L.L.C., dated February 22, 2018, p. 1; Order Granting Motion for Class Certification, dated October 23, 2017, p. 2.
[16] Order Granting Motion for Class Certification, dated October 23, 2017, pp. 11 and 12.
[17] Order Granting Motion for Class Certification, dated October 23, 2017, pp. 2, 11 and 12.
[18] Plaintiff Norma Rodriguez's Second Set of Interrogatories to Defendant Equity Residential Management L.L.C., dated February 22, 2018, p. 2; Order Granting Motion for Class Certification, dated October 23, 2017, p. 3.
[19] Order Granting Motion for Class Certification, dated October 23, 2017, pp. 3, 11 and 12.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

charged a late fee as follows: 5% on the 5th - minimum of $50."[20] "[D]uring the class period, the Standard Lease for all California residential tenants has included a late fee provision" and "during the class period, Defendants' Standard Late Fee was the greater of 5% of the unpaid rent or $50."[21]

Equity describes its costs related to rent delinquency in its Residential Lease Term Sheets:

> You acknowledge that if [Equity does] not receive your rent or other lease related charges on time, [Equity] will incur costs, the exact dollar amount of which is difficult or impracticable to determine. Such costs may include, among other things, lost use of funds, bank or other charges, costs incurred in connection with accounting for and attempting to collect late payments; collection expenses; and other administrative and accounting costs. As a result, if [Equity does] not receive your rent when it is due, [Equity] will assess late fees as described in the Late Fees section of the Term Sheet.[22]

"[T]he late fee language used in the residential lease term sheets that Defendants produced in this action is generally representative of the late fee language in effect in Defendants' standard residential leases in California from the start of the currently-defined claims period until the present."[23]

I obtained a detailed understanding of Equity's late rent collection process from my interviews with Equity personnel from communities in California, and also from information obtained from Equity's corporate team. While there are some slight differences in Equity's late rent collection process across its communities, primarily related to the start of the eviction process, I have outlined the general process below.[24]

---

[20] Residential Lease – Term Sheet for David Bonfanti II's Lease from October 11, 2014 through July 14, 2015 (WP003937-WP003946 at WP003938).

[21] Defendants' Supplemental Responses to Plaintiff Javanni Munguia-Brown's Third Set of Requests for Admissions, dated April 13, 2021, p. 4.

[22] Residential Lease – Term Sheet for David Bonfanti II's Lease from October 11, 2014 through July 14, 2015 (WP003937-WP003946 at WP003940).

[23] Defendants' Supplemental Responses to Plaintiff Javanni Munguia-Brown's Third Set of Requests for Admissions, dated April 13, 2021, p. 4.

[24] I describe Equity's rent collection process as it was implemented prior to the COVID-19 pandemic. I understand that Equity's operations were impacted by the COVID-19 pandemic beginning in March 2020. Community staff modified operations to reduce virus transmission risks in accordance with federal, state and local health guidelines and mandates which evolved over time, including masking, social distancing, and cleaning protocols. "Stay at Home" orders meant that Equity's residents were not leaving their apartment homes during the day, which increased management and customer service needs. Equity voluntarily halted evictions, waived late fees and encouraged payment plans for those impacted by the pandemic before the end of March 2020. Federal, state and local orders, statutes and ordinances also required modifications to Equity's normal operations in regard to rent payments, late fee charges and collection practices, in addition to operational changes and requirements. As a result of these factors, during the pandemic, Equity's management and staff have been required to expend more time and effort in collecting delinquent rent. Equity's management and service staff are "front-line" workers (although leasing employees, for the most part, could

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

On the first day of each month, Equity sends its residents an automatic email notifying them that rent is due and their balance is available to view on Equity's online resident portal.[25]  I understand that rent that is not paid in full by the first day of the month is late.  On the second day of the month, Equity begins to incur employee costs related to delinquent rent.  For example, Samantha Kopczyk testified that when she was a Leasing Consultant for Equity, "many residents that know they're going to be late will often call [Equity] early in the month, sometimes before the month has started, to give [Equity] a heads-up that they're going to be late or to see if [Equity] can give them an extension or just to see what their options are."[26]  Grace Balahadia confirmed that when she was a Leasing Administrator for Equity, she would "contact residents between the 1st and the 4th of the month to remind them if they had not paid their rent by the 1st."[27]  Beginning the second day of the month, Equity also begins to incur interest costs on late rent.  These interest costs increase over time as a resident's rent balance remains unpaid.

If rent has not been paid by the fifth day of the month, Equity assesses a late fee of $50 or 5% of the unpaid rent, whichever is greater.  Community team members run another delinquency report to see who has not paid their rent balance and was charged a late fee.  For each resident/unit that did not timely pay their rent balance, community team members print three-day notices and physically post the notices on each unit.[28]  While the format of these three-day notices may vary among Equity's communities, they generally detail that the resident is required to pay their unpaid rent balance within three days of receiving the notice or otherwise "quit and deliver the possession of the premises."[29]  Community team members involved in rent collection typically spend most of the fifth day of each month checking the delinquency report, processing three-day notices, posting three-day notices, and emailing residents that were charged a late fee.  During the three-day notice period, community team members run the delinquency report and follow up with residents on their outstanding rent balance.[30]

---

work remotely), requiring daily balancing of employee safety, resident and general public safety, and customer service. Equity did not implement furloughs or mass lay-offs as a result of the pandemic.
[25] Deposition of Denise Beihoffer, dated June 21, 2017, p. 148.
[26] Deposition of Samantha Kopczyk, dated February 19, 2021, p. 49.
[27] Deposition of Grace Balahadia, dated February 23, 2021, pp. 13-14, 86, and 109-110.
[28] See, e.g., Deposition of Grace Balahadia, dated February 23, 2021, pp. 86-87; Deposition of Samantha Kopczyk, dated February 19, 2021, p. 57.
[29] Three-Day Notice to Pay Rent or Quit (Amended for Use in Berkeley) (WP004053-WP004054 at WP004053); Three-Day Notice to Pay Rent or Quit (State of California) (WP004063-WP004064 at WP004063); Three Day Notice to Pay Rent or Quit (C.C.P. Section 1161 Subsection 2) (WP000841).
[30] See, e.g., Deposition of Grace Balahadia, dated February 23, 2021, p. 87; Deposition of Samantha Kopczyk, dated February 19, 2021, p. 60.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

After the three-day notice expires, residents are eligible for eviction.[31]  However, community team members will often work with residents throughout the three-day notice period and over the following weeks in an attempt to collect the unpaid rent and avoid the eviction process.  During this time, community team members run the delinquency report, follow up with residents that have outstanding balances, and may make payment arrangements with residents.[32]  Community team members simultaneously begin preparing all of the background documents necessary to commence eviction proceedings.[33]

If a defaulting resident does not reach a payment agreement with the community, community team members will forward the defaulting resident's files to legal counsel to commence eviction proceedings.[34]  A resident can pay his/her rent and become current any time before the court officially enters the eviction order.[35]  Once the court rules on eviction, the resident receives a notice to vacate the community.  During this time, community team members fill out paperwork for the sheriff and answer any questions the resident has prior to eviction.[36]

**Certain citations regarding damages calculations, liquidated damages and late fees in California**

For reference, I have reviewed Judge White's August 12, 2019 Summary Judgment Ruling in this case, the authorities cited therein, and additional authorities, including the following cases:

- *Bayol v. Zipcar, Inc.*, 78 F.Supp.3d 1252 (N.D. Cal. 2015);
- *Beasley v. Wells Fargo Bank*, 235 Cal.App.3d 1390 (1991);
- *Blum v. Swarbrick*, No. ACIAS 900013, 2010 WL 9009712, (Cal. App. Dep't Super. Ct. Apr. 7, 2010);
- *Del Monte Properties & Investments, Inc. v. Dolan*, 26 Cal.App.5th Supp. 20 (2018);
- *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal.3d 731 (1973);
- *Hollywood Inv. Props. LP v. Mohamad Sayed Ibrahim*, No. BV030969, 2015 WL 3653609, (Cal. App. Dep't. Super. Ct. May 12, 2015);

---

[31] Three-Day Notice to Pay Rent or Quit (Amended for Use in Berkeley) (WP004053-WP004054 at WP004053); Three-Day Notice to Pay Rent or Quit (State of California) (WP004063-WP004064 at WP004063); Three Day Notice to Pay Rent or Quit (C.C.P. Section 1161 Subsection 2) (WP000841).
[32] See, e.g., Deposition of Samantha Kopczyk, dated February 19, 2021, pp. 50-51 and 60-63.
[33] See, e.g., Deposition of Samantha Kopczyk, dated February 19, 2021, p. 51.
[34] See, e.g., Deposition of Samantha Kopczyk, dated February 19, 2021, p. 51.
[35] See, e.g., Deposition of Samantha Kopczyk, dated February 19, 2021, pp. 74-75.
[36] See, e.g., Deposition of Tara O'Connell, dated December 9, 2020, pp. 123-124.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

- *Michael Freeman v. United Dominion Realty Trust, Inc.*, No. E042905, 2008 WL 1838373, (Cal. Ct. App. Apr. 25, 2008) (as modified May 6, 2008);
- *Orozco v. WPV San Jose, LLC*, 36 Cal.App.5th 375 (2019); and
- *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal.4th 970 (1998).

## V. Opinions, Basis and Reasoning

I have calculated, by year, for the period September 3, 2010 through February 29, 2020:[37]

1. The number and amount of late fees Equity has charged the Standard Late Fee Class members and the Woodland Park Preexisting Lease Class members;[38]
2. The costs incurred by Equity related to rent delinquency;
3. The cost savings Equity would have achieved if all residents paid their rent on time;
4. Equity's average cost per late fee compared to the average late fee charged;
5. The average cost per late fee that Equity would have saved if all residents paid their rent on time compared to the average late fee charged; and
6. The outstanding account balances for all Standard Late Fee Class members and Woodland Park Preexisting Lease Class members.

Before I discuss my calculations, it is important to note that fixing or determining actual damages for delinquent rent is extremely difficult because the activities and amount of time required to account for and collect late rent varies widely. Because of the extensive analysis required to calculate these damages, and the frequency with which tenants fail to timely pay rent, it would be impracticable to calculate actual damages each time a resident failed to timely pay rent.

---

[37] While the Standard Late Fee Class Period ended on October 23, 2017, it is fair to estimate Equity's costs through February 29, 2020, because Equity continued to charge late fees to the Standard Late Fee Class members and continued to incur costs related to collecting delinquent rent from the Standard Late Fee Class members after October 23, 2017.
[38] The number and amount of late fees Equity has charged the Standard Late Fee Class members and the Woodland Park Preexisting Lease class members are calculated for the periods September 3, 2010 through January 31, 2021 and December 1, 2011 through February 29, 2016, respectively. I have deducted from the number and amount of late fees Equity has charged any late fees that were reversed.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

1. **Calculation of the number and amount of late fees Equity has charged the Standard Late Fee Class members and the Woodland Park Preexisting Lease Class members**

I have reviewed in detail the resident ledger data that has been produced in this matter, which contains all transactional records of the Standard Late Fee Class[39] and the Woodland Park Preexisting Lease class members.[40]  I understand that late fees charged are indicated by the CHGCODE of "LAT" and a SRCCODE of "CH".[41]  With this understanding, I was able to determine the total number and amount of late fees charged.  I deducted from these amounts any late fees that were reversed.  I understand that late fee reversals are indicated by the SRCCODE of "NC".[42]

From September 3, 2010 through January 31, 2021, members of the Standard Late Fee Class were charged 338,889 late fees totaling $█████.[43]  After accounting for reversals, from September 3, 2010 through January 31, 2021, members of the Standard Late Fee Class were charged 290,503 late fees totaling $█████[44]

From December 1, 2011 through February 29, 2016, members of the Woodland Park Preexisting Lease Class were charged 11,968 late fees totaling $████[45]  After accounting for reversals, from December 1, 2011 through February 29, 2016, members of the Woodland Park Preexisting Lease Class were charged 8,650 late fees totaling $████[46]

2. **Calculation of the costs incurred by Equity related to rent delinquency**

Equity incurs a variety of costs related to rent delinquency.  These include, but are not limited to:

- Employee costs;
- Eviction costs;

---

[39] WP003910; WP014498.
[40] WP008044.
[41] Discussion with Taylor Robertson
[42] Discussion with Taylor Robertson.
[43] Appendix A, Schedule 1A.
[44] Appendix A, Schedule 4A.
[45] Appendix A, Schedule 1B.
[46] Appendix A, Schedule 4B.

**REDACTED**

- Collection costs; and

- Interest costs.

I have quantified these costs for both the Standard Late Fee Class and the Woodland Park Preexisting Lease Class.[47]  Those calculations are discussed below.

**Employee costs**

Equity's employees spend a substantial portion of their time on the collection of delinquent rent.  If a resident does not pay their rent and Equity begins the eviction process, those time demands increase substantially.  Equity's employee costs resulting from delinquent rent can be determined by examining the time Equity's employees spend performing delinquency-related tasks and attempting to collect late rent.

*The process for determining Equity's employee costs related to rent delinquency*

To determine the employee costs related to rent delinquency, I conducted interviews of over 50 employees working at a sample of Equity's communities throughout California.  To generate a list of representative interviewees, I categorized Equity's communities in California using two criteria: the number of units at each community and the number of late fees charged per month per unit at each community.  Next, I ranked each of the two criteria into quartiles.  Quartile One reflects the highest 25% in each criterion continuing through Quartile Four, which reflects the lowest 25% in each criterion.  I then selected interviewees working at communities that would provide representation for each quartile.[48]  A list of the employees I interviewed is provided above and in Appendix C.

Using information provided by Equity's corporate team, I obtained a detailed understanding of Equity's rent collection process, as described above.  Using this understanding, I identified the following categories of tasks performed by Equity's administrative employees in California:

- Filling vacant apartments by attracting and screening new residents;

- Negotiating new and renewal leases;

- Addressing resident move-ins and move-outs;

---

[47] I have only considered Equity's costs incurred and cost savings through February 29, 2020, prior to the COVID-19 pandemic.
[48] Appendix E.

**REDACTED**

- Resolving resident complaints and enforcing community rules;

- Supervision of community maintenance and repairs;

- Collection of delinquent rent;

- Managing budget issues and financial reporting;

- Preparing required reports and records and participating in required company programs; and

- Other tasks not captured by any of the above categories.

During each interview, I discussed the above task categories with each employee to understand the amount of time the employee spends performing each task. Given the nature of the ongoing COVID-19 pandemic and its effects on Equity's operations, I instructed each interviewee to provide their answers regarding their activities and time spent performing tasks prior to the COVID-19 pandemic. I explained that the employee could provide time estimates in any format, i.e., by day, week, or month. I logged their responses into a spreadsheet and converted any daily or monthly estimates into weekly estimates for consistency. At the end of the interview, I read back each employee's responses to give them an opportunity to review for accuracy. The results of those interviews are summarized in Appendix C.

Based on the interviews conducted, I determined that Equity's office management employees spent 12.32% of their time on the collection of delinquent rent and leasing employees spent 4.45% of their time on the collection of delinquent rent.[49, 50]

I discovered after the interviews were conducted that some interviewees were class members. I did not include the results of my interviews with any of these employees in my calculations.

While these percentages are generally based on the time spent performing tasks by Equity employees around 2018 and 2019, I believe that these percentages can conservatively be used to estimate Equity employees' time spent on delinquency-related tasks from September 3, 2010 through February 29, 2020. This is

---

[49] Appendix C, Summary – Office Management and Summary – Leasing.
[50] In my interview with Grace Balahadia, I learned that Ms. Balahadia spent 24.76% of her time on the collection of delinquent rent (see Appendix C, Schedule 56). Ms. Balahadia testified in her deposition that she spent 30% of her time on delinquency-related activities while working at Park Place and 20% of her time on delinquency-related activities while working at Park Hacienda, for an average of 25% (Deposition of Grace Balahadia, dated February 23, 2021, pp. 34-35 and 64-65). Ms. Balahadia's deposition testimony corroborates her interview response as it relates to her time spent on the collection of delinquent rent.

**REDACTED**

primarily because the percentage of time Equity employees spend on rent delinquency is driven by the proportion of the population that is delinquent in paying their rent. Considerably, the data shows that rent delinquency in the years 2011 through 2017 was generally greater than in 2018 and 2019. The following graph details the number of late fees charged by Equity from 2011 through 2019:[51]



The graph above suggests that there were more delinquent residents at Equity's communities in years 2011 through 2017 than in 2018 and 2019. As such, it is reasonable to assume that the percentage of time spent by Equity's management, administrative and leasing employees on delinquency-related tasks around 2018 and 2019, 12.32% for office management employees and 4.45% for leasing employees, would be less than the percentage of time spent by those employees in years 2011 through 2017.

Further, Tara O'Connell, Community Manager for Equity, testified that, from 2013 to 2020, three-day notices are "generated by the system and then printed at the office."[52] However, prior to 2013, "[c]ommunity managers used to have to manually with an Excel spreadsheet pull up a report in [their] system, transfer it over to a PDF, all the information, and print up each individual three-day notice [themselves] on-site."[53] Ms. O'Connell's testimony suggests that certain delinquency-related tasks were slightly more labor intensive prior

---

[51] Appendix A, Schedule 1A and Schedule 3.
[52] Deposition of Tara O'Connell, dated December 9, 2020, pp. 112-113.
[53] Deposition of Tara O'Connell, dated December 9, 2020, pp. 112-113.

**REDACTED**

to 2013 than they were from 2013 to 2020.  I understand that since 2013, there have not been technological advances that have impacted the delinquent rent collection process.

Therefore, the percentage of time spent by Equity's management, administrative and leasing employees on rent delinquency around 2018 and 2019 is a reasonable proxy for the percentage of time spent by those employees from September 3, 2010 through February 29, 2020.

*Calculation of employee costs related to rent delinquency*

To calculate the employee costs related to rent delinquency, I relied on spreadsheets produced by Equity that contain all of Equity's employee costs for their administrative employees, including salaries and benefits.[54] Using these spreadsheets, I summarized Equity's employee costs by job title.[55]  I then separated those job titles into two categories, office management and leasing, recognizing that delinquency-related tasks would differ depending if the employee was involved in office management or leasing operations.[56]  The costs included in my calculations are limited to the costs for Equity employees who are resident-facing and directly involved in the rent delinquency process.

To determine the employee costs related to rent delinquency, I multiplied the percentage of time spent by Equity employees on the collection of delinquent rent by Equity's costs for employees involved in the delinquency process.[57]  This results in the following employee costs related to rent delinquency:

---

[54] WP004068.xlsx; WP008806.xlsx; WP003797.xlsx; WP003890.xlsx.  For the period November 2011 through June 2016, I received employee-specific cost data from Equity that includes costs for 149 communities (see WP004068.xlsx, Tab "201111.201606 summary").  Equity also provided community-level cost data for the period November 2011 through June 2016 which includes costs for 159 communities (see WP003797.xlsx).  Therefore, the employee-specific cost data was missing data for 10 communities.  I requested additional data from Equity containing employee-specific cost data for the 10 missing communities, which was provided to me with the filename CA Payroll Exp.2011.2016 missing properties.xlsx, thereafter produced with the Bates number WP008806.xlsx.
[55] Appendix B, Schedule 5A and 5B.
[56] Appendix B, Schedule 5A and 5B.
[57] Exhibit 4.2, Schedules 2A, 2B, 3A and 3B.

**REDACTED**

Standard Late Fee Class[58]

|  | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ 14,873,999 | $ 2,375,781 | $ 17,249,780 |

Woodland Park Preexisting Lease Class[59]

|  | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ 105,610 | $ 82,897 | $ 74,640 | $ 91,030 | $ 354,177 |

It is important to note that the employee costs included in my calculations are not fixed costs. Instead, they are community-level costs which are management-controllable, i.e., positions can be eliminated or changed at the discretion of management. I understand from discussions with Debra Rivera, Vice President – Property Management for Equity, that Equity is constantly looking for ways to reduce its employee costs, which is one of Equity's largest expenses. Specifically, I understand from Ms. Rivera that Equity has a history of reducing headcount when changes in the environment or technology, such as new software or process management, reduces needs or increases efficiency.

It is also important to note that there are no costs for maintenance staff included in these costs. This is conservative given my understanding that Equity's maintenance staff are sometimes involved in the rent delinquency process. For example, Amelia Ott, Leasing Administrator for Equity, testified that there are times when service technicians at Berkeley Apartments "post envelopes on doors, because they were already taking a golf cart out. … [A]nybody could be asked to go and post notices or mail notices or fold them or print them at any time."[60] These employee costs are also conservative in that they do not include any costs for Equity's regional and senior management personnel who spend time on the collection of delinquent rent. For example, I understand from discussions with Ms. Rivera that Equity's vice presidents review delinquency in

---

[58] Exhibit 4.2, Schedule 1A.
[59] Exhibit 4.2, Schedule 1B.
[60] Deposition of Amelia Ott, dated March 30, 2021, p. 72.

**REDACTED**

their regular financial meetings.  If delinquency has increased substantially, then regional managers work with community managers to make sure delinquency procedures are being followed.

**Eviction costs**

To calculate the amount of eviction costs, I relied on spreadsheets provided by Equity that detail Equity's expended legal fees and SODA court fees for Standard Late Fee Class and Woodland Park Preexisting Lease Class members.[61]  I deducted from those fees any eviction costs that were paid by class members, which I understand from discussions with Taylor Robertson, Vice President – Financial Planning and Analysis for Equity, are designated by either an EVI or S05 CHGCODE.[62]  Performing this calculation results in the following eviction costs:

Standard Late Fee Class[63]

|  | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Eviction Costs | $ ▮ | $ ▮ | $ ▮ |

Woodland Park Preexisting Lease Class[64]

|  | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Eviction Costs | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ |

[61] WP004445.xlsx; WP008809.xlsx; WP008810.xlsx; WP007956.xlsx; WP003701.xlsx; WP003797.xlsx, Tab "EQ505025 SODA - Court Evic Fees"; WP003890.xlsx, Tab "eq505025 soda-court evic fees."  It appears that the eviction cost data contained in WP004445.xlsx is very similar to the eviction cost data contained in WP008809.xlsx and WP008810.xlsx.  For my calculations, I rely on WP004445.xlsx for all eviction costs from September 2010 through December 2019, and I rely on WP008809.xlsx for eviction costs from January through February 2020 (see Exhibit 5, Schedule 4A).
[62] WP003910; WP008044.
[63] Exhibit 5, Schedule 1A.
[64] Exhibit 5, Schedule 1B.

**REDACTED**

## Collection costs

Another cost to Equity related to rent delinquency is collection costs. Based on my discussions with Ms. Robertson, I understand that after a resident moves out, their ongoing, unpaid rent balances are sent to a collection agency/law firm. I also understand that Equity uses two firms for collections in California: Fair Collections & Outsourcing, Inc. ("FCO") and Kimball, Tirey & St. John LLP ("KTS"). Equity pays the collection agency/law firm a fee that represents a percentage of the amount collected.[65]

I have been provided spreadsheets detailing the total amount of Equity's collection fees paid to collection agencies/law firms over the relevant time period.[66] I have assumed that all collection costs incurred by Equity during the Standard Late Fee Class Period from September 3, 2010 through October 23, 2017 are related to unpaid account balances for either the Standard Late Fee Class or the Woodland Park Preexisting Lease Class. After October 23, 2017, I allocated the collection costs to only the Standard Late Fee Class by multiplying the collection costs by Standard Late Fee Class late fees as a percentage of total late fees.[67] I recognize that the amounts collected by the collection agency/law firm include other unpaid amounts in addition to ongoing, unpaid rent. Therefore, I calculated rent balances as a percentage of account balances for the Standard Late Fee Class and Woodland Park Preexisting Lease Class, respectively.[68] I then multiplied those percentages by the collection costs for the Standard Late Fee Class and Woodland Park Preexisting Lease Class, respectively, to estimate the amount of collection costs related to ongoing, unpaid rent.[69] The following charts detail the results of these calculations:

Standard Late Fee Class[70]

| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Collection Costs | $ ▇▇▇▇ | $ ▇▇▇▇ | $ ▇▇▇▇ |

---

[65] Discussion with Taylor Robertson.
[66] WP003797.xlsx, Tab "EQ505597 Bad Debt Col Agency" and WP003890.xlsx, Tab "eq505597 bad debt col agency."
[67] Exhibit 6, Schedule 2A.
[68] Exhibit 6, Schedules 3A and 3B.
[69] Exhibit 6, Schedules 1A and 1B.
[70] Exhibit 6, Schedule 1A.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

Woodland Park Preexisting Lease Class[71]

| | 12/1/2011 - 12/31/2012 | | 2013 | | 2014 | | 1/1/2015 - 2/29/2016 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|
| Collection Costs | $ | 1,343 | $ | 2,309 | $ | 2,764 | $ | 634 | $ | 7,050 |

## Interest costs

When residents breach their lease agreements by failing to pay rent on time, Equity incurs a substantial interest cost by not having those funds available to either invest or pay off debt. I have calculated that interest cost in three components:

1. Interest on late rent before residents move out;
2. Interest on late rent after residents move out and before their accounts are sent to collections; and
3. Interest on late rent after residents' accounts are sent to collections.

*Calculation of Equity's Weighted Average Cost of Capital ("WACC")*

To calculate the interest costs of late rent to Equity, I first calculated Equity's WACC. WACC is defined as "the cost of capital (discount rate) determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure."[72] Equity's cost of capital is relevant to my calculations of the interest cost of late rent to Equity, because it captures both the interest expense Equity incurs as well as the interest revenue Equity loses from not collecting rent payments on time.

To calculate Equity's WACC for 2010 through 2020, I relied on Equity's public filings for its cost of debt and capital structure, and I relied on Business Valuation Resources' Cost of Capital Professional for Equity's pre-tax cost of equity.[73] I used that information to determine the percentage of Equity's capital that is made up of equity and debt, and I applied those percentages to Equity's cost of equity and cost of debt, respectively.[74] By adding Equity's weighted cost of equity and weighted cost of debt, I determined that Equity's WACC has

---

[71] Exhibit 6, Schedule 1B.
[72] https://sub.bvresources.com/defaulttextonly.asp?f=bvglossary.
[73] Exhibit 8, Schedule 2.
[74] Exhibit 8, Schedule 1.

**REDACTED**

ranged from 6.36% to 8.75% from 2010 through 2020.[75]  The details of those calculations can be found in Exhibit 8.

*Calculation of interest on late rent before residents move out*

To calculate interest on late rent before residents move out, I relied on Equity's resident ledger data.[76]  Equity's resident ledger data includes all rent charges as well as rent payments and credits, which I understand are denoted by CHGCODE "RNT".[77]  As I described above, I also understand that rent that is not paid in full by the first day of the month is late.  With this understanding, I was able to determine a running rent balance for all Standard Late Fee Class members and all Woodland Park Preexisting Lease Class members.  I then calculated daily interest on each resident's running rent balances using Equity's WACC for the relevant time period.[78]  The following charts detail the total interest on late rent before residents move out for both the Standard Late Fee Class and Woodland Park Preexisting Lease Class:

Standard Late Fee Class[79]

|  | Standard Late Fee Class Period | Post Class Period |  |
|  | Sep. 3, 2010 - Oct. 23, 2017 | Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Interest on Late Rent | $ 1,921,042 | $ 444,397 | $ 2,365,439 |

Woodland Park Preexisting Lease Class[80]

|  | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Interest on Late Rent | $ 19,289 | $ 10,345 | $ 5,986 | $ 4,255 | $ 39,875 |

---

[75] Exhibit 8, Schedule 1.
[76] WP003910; WP008044.
[77] Discussion with Taylor Robertson; WP003910; WP008044.
[78] Exhibit 7, Schedules 1A and 1B.
[79] Exhibit 7, Schedule 1A.
[80] Exhibit 7, Schedule 1B.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

*Calculation of interest on late rent after residents move out and before their accounts are sent to collections*

For my calculation of interest on late rent after residents move out and before their accounts are sent to collections, I relied on a spreadsheet that I directed Equity to produce which contains collections data for accounts sent to FCO and KTS.[81]  The collections data indicates which accounts were sent to FCO and which accounts were sent to KTS.[82]  While the collections data does not indicate which name groups correspond to Standard Late Fee Class members and Woodland Park Preexisting Lease Class members, I referenced the resident ledger data provided for the Standard Late Fee Class[83] and Woodland Park Preexisting Lease Class,[84] respectively, to determine which name groups correspond to members of each class.

For my calculation of interest on late rent after residents move out and before their accounts are sent to FCO, I relied on the resident ledger data and my calculation of the running rent balance described above to determine the unpaid rent balances for all Standard Late Fee Class and Woodland Park Preexisting Lease Class members as of the date each class member moved out.[85]  The collections data includes the rent balances for class members when their accounts were sent to FCO.[86]  For all accounts sent to FCO, I took the average of their rent balance at move out and their rent balance when their account was sent to FCO to determine the average rent balance after move out and before collections.  I understand from my discussions with Ms. Robertson that a resident's account is typically sent to FCO 45 days after they move out.  Therefore, I calculated interest on each resident's average rent balance from the day they move out through the day their account is sent to FCO assuming 45 days of interest and using Equity's WACC.[87]

For my calculation of interest on late rent after residents move out and before their accounts are sent to KTS, I understand from Ms. Robertson that Equity does not track each resident's rent or account balance when their account is sent to KTS.  This is because KTS payments are posted directly to the resident ledger.  However, I was provided data on the current rent balances as of May 7, 2021 for accounts sent to KTS.[88]  As such, my analysis of interest costs on late rent after residents move out and before their accounts are sent to KTS is

---

[81] WP011498.xlsx.
[82] For accounts sent to FCO: WP011498.xlsx, Tab "Data," column G and Tab "Field Descriptions," row 7.  For accounts sent to KTS: WP011498.xlsx, Tab "Data," column I and Tab "Field Descriptions," row 9.
[83] WP003910.
[84] WP008044.
[85] WP003910; WP008044.
[86] WP011498.xlsx, Tab "Data," column K and Tab "Field Descriptions," row 11.
[87] Exhibit 7, Schedules 2A and 2B.
[88] WP011498.xlsx, Tab "Data," column K and Tab "Field Descriptions," row 11.

**REDACTED**

limited to interest on the current, outstanding rent balance.[89] I understand from discussions with Traci Baumgarten, Residential Financial Director – Central Business Group for Equity, that a resident's account is typically sent to KTS 60 days after they move out. Therefore, I calculated interest on each resident's current rent balance as of May 7, 2021 assuming 60 days of interest and using Equity's WACC.[90] My analysis of Equity's interest costs on late rent is understated in that I do not calculate interest on the portions of rent balances that were paid after residents moved out and before their accounts were sent to KTS.

The following charts detail the results of those calculations for the Standard Late Fee Class and Woodland Park Preexisting Lease Class:

Standard Late Fee Class[91]

|  | Standard Late Fee Class Period | | Post Class Period | | |
|---|---|---|---|---|---|
|  | Sep. 3, 2010 - Oct. 23, 2017 | | Oct. 24, 2017 - Feb. 29, 2020 | | Total |
| Interest on Late Rent | $ | 187,062 | $ | 42,109 | $ | 229,171 |

Woodland Park Preexisting Lease Class[92]

|  | 12/1/2011 - 12/31/2012 | | 2013 | | 2014 | | 1/1/2015 - 2/29/2016 | | Total |
|---|---|---|---|---|---|---|---|---|---|
| Interest on Late Rent | $ | 1,289 | $ | 1,104 | $ | 138 | $ | 170 | $ | 2,701 |

*Calculation of interest on late rent after residents' accounts are sent to collections*

For my calculation of interest on late rent after residents' accounts are sent to FCO, I relied on the collections data that details each resident's account balance when sent to FCO, rent balance when sent to FCO, and current account balance as of May 7, 2021.[93] I have assumed that any payments or write-offs are applied to

---

[89] WP011498.xlsx, Tab "Data," column K and Tab "Field Descriptions," row 11.
[90] Exhibit 7, Schedules 2A and 2B.
[91] Exhibit 7, Schedule 2A.
[92] Exhibit 7, Schedule 2B.
[93] WP011498.xlsx, Tab "Field Descriptions," rows 10, 11 and 16 and Tab "Data," columns J, K and P.

REDACTED

rent balance and balance for all other charges based on the proportions of account balance that are rent balance and balance for all other charges, respectively, when the account is sent to FCO. For example, if someone's account balance when sent to FCO is comprised of 70% rent balance and 30% balance for all other charges, then any payment or write-off is applied 70% to rent balance and 30% to balance for all other charges. Therefore, to determine the portion of the current account balance as of May 7, 2021 that is rent balance, I first determined the rent balance percentage of each resident's account balance when sent to FCO. I then applied that percentage to each resident's current account balance as of May 7, 2021 to determine their current rent balance. I took the average of each resident's rent balance when sent to FCO and current rent balance as of May 7, 2021 to determine their average rent balance while in collections through FCO.

For my calculation of interest on late rent after residents' accounts are sent to KTS, I calculated interest on the current rent balance as of May 7, 2021 for each account sent to KTS.[94] My analysis of Equity's interest costs on late rent is understated in that I do not calculate interest on the portions of rent balances that were paid in collections by class members whose accounts were sent to KTS.

I understand from discussions with Ms. Robertson that Equity never stops collecting late rent, i.e., it is always an option for Equity to collect late rent. As such, I calculated interest on each resident's rent balance in collections using Equity's WACC through February 29, 2020 for the Standard Late Fee Class members and through February 29, 2016 for the Woodland Park Preexisting Lease Class members.[95] The following charts detail the results of those calculations for the Standard Late Fee Class and Woodland Park Preexisting Lease Class:

Standard Late Fee Class[96]

|  | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | | Total | |
| --- | --- | --- | --- | --- | --- | --- |
| Interest on Late Rent | $ | 3,673,931 | $ | 3,388,933 | $ | 7,062,864 |

---

[94] WP011498.xlsx, Tab "Data," column K and Tab "Field Descriptions," row 11.
[95] Exhibit 7, Schedules 4A and 4B.
[96] Exhibit 7, Schedule 4A.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

Woodland Park Preexisting Lease Class[97]

| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Interest on Late Rent | $ 3,869 | $ 14,894 | $ 17,043 | $ 21,596 | $ 57,402 |

I understand from discussions with Ms. Baumgarten that Equity collects, on average, 18% of unpaid rent balances in the first year an account is in collections and an additional 13% in the second year. I also understand that after the first two years in collections, Equity's collection rate decreases. As such, I performed another calculation assuming two years of interest on each class member's average rent balance in collections. The following charts detail the results of those calculations for the Standard Late Fee Class and Woodland Park Preexisting Lease Class:

Standard Late Fee Class[98]

| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Interest on Late Rent | $ 1,924,204 | $ 922,327 | $ 2,846,531 |

Woodland Park Preexisting Lease Class[99]

| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Interest on Late Rent | $ 3,869 | $ 14,894 | $ 12,117 | $ 6,687 | $ 37,567 |

It should be noted that in certain cases, Equity never collects the outstanding rent balance from former residents. In these situations, the interest cost on unpaid rent is indefinite and significant. Not only does

---

[97] Exhibit 7, Schedule 4B.
[98] Exhibit 7, Schedule 3A.
[99] Exhibit 7, Schedule 3B.

**REDACTED**

Equity lose the unpaid rent balance, but it also loses the interest income that it could have generated from rent payments or the income expense that it could have avoided by having those funds available to pay off debt.

### Equity's Total Costs Related to Rent Delinquency

For the Standard Late Fee Class, the following are Equity's total costs related to rent delinquency, including employee costs, eviction costs, collection costs, and interest costs from September 3, 2010 through February 29, 2020:[100]

| | Standard Late Fee Class Period<br>Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period<br>Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ ███ | $ ███ | $ ███ |
| Eviction Costs | | | |
| Collection Costs | | | |
| Interest Costs | | | |
| **Total Costs** | $ 27,513,973 | $ 4,837,558 | $ 32,351,531 |

For the Woodland Park Preexisting Lease Class, the following are Equity's total costs related to rent delinquency, including employee costs, eviction costs, collection costs, and interest costs from December 1, 2011 through February 29, 2016:[101]



| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ ███ | $ ███ | $ ███ | $ ███ | $ ███ |
| Eviction Costs | | | | | |
| Collection Costs | | | | | |
| Interest Costs | | | | | |
| **Total Costs** | $ 269,003 | $ 199,577 | $ 159,138 | $ 182,076 | $ 809,794 |

---

[100] Exhibit 3.2, Schedule 1A. This chart and all following charts and graphs incorporate the calculation of interest costs in collections for two years, with the exception of the charts which only include costs through each resident's move-out date.

[101] Exhibit 3.2, Schedule 1B.

**REDACTED**

Alternatively, I calculated Equity's total costs related to rent delinquency but only included costs through each resident's move-out date. For the Standard Late Fee Class, the following are Equity's total costs related to rent delinquency, including employee costs, eviction costs, and interest costs through each resident's move-out date from September 3, 2010 through February 29, 2020:[102]



| | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs Eviction Costs Interest Costs | $ ■ | $ ■ | $ ■ |
| **Total Costs** | $ 24,245,286 | $ 3,698,223 | $ 27,943,509 |

For the Woodland Park Preexisting Lease Class, the following are Equity's total costs related to rent delinquency, including employee costs, eviction costs, and interest costs through each resident's move-out date from December 1, 2011 through February 29, 2016:[103]

| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs Eviction Costs Interest Costs | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| **Total Costs** | $ 262,502 | $ 181,270 | $ 144,119 | $ 174,585 | $ 762,476 |

## Other Considerations

*Standard Late Fee Class percentage of total late fee charges after October 23, 2017*

As discussed above, the Standard Late Fee Class period ended on October 23, 2017.[104] Beginning on October 24, 2017, the late fees charged to members of the Standard Late Fee Class represent only a portion of the total late fees charged to residents in Equity communities. To estimate the percentage of Equity's costs related to

---

[102] Exhibit 3.2, Schedule 2A.
[103] Exhibit 3.2, Schedule 2B.
[104] Plaintiff Norma Rodriguez's Second Set of Interrogatories to Defendant Equity Residential Management L.L.C., dated February 22, 2018, p. 2.

**REDACTED**

rent delinquency that are specific to Standard Late Fee Class members after October 23, 2017, I calculated the number of late fees for Standard Late Fee Class members as a percentage of the total number of late fees from October 24, 2017 through February 29, 2020.[105] I then applied those percentages to the relevant costs to estimate the costs related to rent delinquency for the Standard Late Fee Class members.[106]

*Woodland Park Costs related to the Woodland Park Preexisting Lease Class*

The late fees charged to Woodland Park Preexisting Lease Class members represent only a portion of the total late fees charged to residents at Woodland Park during the Woodland Park Class Period. To estimate the percentage of Woodland Park's costs related to rent delinquency that are specific to the Woodland Park Preexisting Lease Class, I calculated the number of late fees for Woodland Park Preexisting Lease Class members as a percentage of the number of late fees for all Woodland Park residents each year.[107] I then applied those percentages to the relevant costs for Woodland Park to estimate the costs related to rent delinquency for the Woodland Park Preexisting Lease Class members.[108] All the remaining Woodland Park costs related to rent delinquency are considered Standard Late Fee Class costs.

The resident ledger data and collections data is specific to the Standard Late Fee Class and the Woodland Park Preexisting Lease Class members.[109] Therefore, I did not use the percentages discussed above to calculate the interest costs of late rent for the Standard Late Fee Class and the Woodland Park Preexisting Lease Class members.

### 3. The cost savings Equity would have achieved if all residents paid their rent on time

An alternative, reasonable measure of the cost to Equity of delinquent rent is to determine the cost savings that Equity would have achieved if all residents paid their rent on time. To determine how staffing would change in an environment where there was no more delinquent rent, I had interviews with Equity leadership, specifically Ms. Rivera, Shanna Dion, Vice President – Property Management, Alla Feldman, Senior Regional Manager, and Jesse Jennell, Senior Regional Manager. I asked them to consider the following

---

[105] Appendix A, Schedule 3.
[106] Exhibit 4.1; Exhibit 4.2; Exhibit 5; Exhibit 6.
[107] Appendix A, Schedule 2.
[108] Appendix B; Exhibit 5; Exhibit 6.
[109] WP003910; WP008044; WP011498.xlsx.

**REDACTED**

question specific to the area that they manage: "If all residents paid their rent on time, how would Equity's staffing needs change?"  We built a model for each region based on data I directed Equity to produce which details the total annual cost of Equity's employees that are involved in the delinquency process in the following California markets: Los Angeles,[110] San Francisco, Orange County, and San Diego.[111]  Within the model, communities were combined into groups based on geography and the ability to share staff.  Ms. Rivera, Ms. Dion, Ms. Feldman, and Mr. Jennell then reviewed the employee lists in the markets for which they were responsible and determined how staffing would change if all residents paid their rent on time.  The staffing changes can be grouped into the following categories:[112]

- The position was eliminated;
- An employee was shared by two or more properties;
- The title and responsibilities changed; or
- A full-time employee was converted to a part-time employee.

In the situation where title and responsibilities changed, I directed Ms. Rivera, Ms. Dion, Ms. Feldman, and Mr. Jennell to provide me the midpoint salary for the updated position.  To convert that salary into an annual cost, I calculated salary as a percentage of annual cost for Equity employees by position and market.[113]  I then divided the midpoint salary information by salary as a percentage of annual cost to estimate the total annual cost for each position.[114]

In the situation where a full-time employee was converted to a part-time employee, I learned from my discussions with Equity leadership that a part-time employee typically works 3 days, or 24 hours, per week.  Therefore, a part-time employee works 60% of a full-time employee's 40-hour schedule.  However, because part-time employees do not receive certain benefits, such as health insurance and bonuses,[115] the annual cost of a part-time employee cannot be estimated by simply multiplying the annual cost for a full-time employee by 60%.  To estimate the annual cost of a part-time employee, I first multiplied the full-time equivalent

---

[110] I understand that the Inland Empire market is included with Los Angeles.
[111] WP008808.xlsx.  I understand that WP008808.xlsx contains cost data that is a compilation of info contained in Equity's payroll records, e.g., those produced at WP004068.xlsx, WP008806.xlsx, WP003797.xlsx and WP003890.xlsx. The cost data in WP008808.xlsx is generally consistent with other cost data previously produced.
[112] Appendix D, Schedules 2, 3 and 4.
[113] Appendix D, Schedules 2, 3, 4 and 5.
[114] Appendix D, Schedules 2, 3 and 4.
[115] See, e.g., WP008808.xlsx, Tab "Office," Employee Number 69,157.

**REDACTED**

employee's annual cost by 60% to account for less hours worked by the part-time employee. I then multiplied that result by the annual cost for a part-time employee as a percentage of the annual cost for a full-time employee to estimate the cost associated with employing a part-time employee.[116]

After accounting for the various staffing changes and performing the calculations described above, I determined that, if all residents paid their rent on time, Equity would reduce its costs for employees involved in the delinquency process by 9.78%.[117] I understand from my discussions with Ms. Rivera that, while the 9.78% reduction in employee costs is based on 2017 data, Equity would expect a similar percentage reduction in staffing any year from September 2010 through February 2020 if all residents paid their rent on time. This is consistent with my understanding that delinquency rates and delinquency-related tasks have remained relatively consistent from September 2010 through February 2020.

I then multiplied the percentage of employee costs that would be reduced if all residents paid their rent on time by Equity's costs for employees involved in the delinquency process.[118] This results in the following employee costs related to rent delinquency:

Standard Late Fee Class[119]

|  | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ 17,739,414 | $ 2,764,964 | $ 20,504,378 |

---

[116] Appendix D, Schedules 2 and 3.
[117] Appendix D, Schedule 1.
[118] Exhibit 4.1, Schedules 2A, 2B, 3A and 3B.
[119] Exhibit 4.1, Schedule 1A.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

Woodland Park Preexisting Lease Class[120]

| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ 106,568 | $ 81,229 | $ 71,085 | $ 86,827 | $ 345,709 |

As discussed previously, I understand from my discussions with Ms. Rivera that Equity is constantly looking for ways to reduce its employee costs, which is one of Equity's largest expenses. Specifically, I understand from Ms. Rivera that Equity has a history of reducing headcount when changes in the environment or technology, such as new software or process management, reduces needs or increases efficiency. Therefore, the analysis described above is a reasonable determination of the impact to Equity's employee costs if it no longer needed people to perform any of the tasks related to rent delinquency.

### Equity's Total Cost Savings Related to Rent Delinquency

For the Standard Late Fee Class, the following are the total costs related to rent delinquency that Equity would have saved if all residents paid their rent on time, including employee costs, eviction costs, collection costs, and interest costs from September 3, 2010 through February 29, 2020:[121]

| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ ███ | $ ███ | $ ███ |
| Eviction Costs | | | |
| Collection Costs | | | |
| Interest Costs | | | |
| Total Costs | $ 30,379,388 | $ 5,226,741 | $ 35,606,129 |

---

[120] Exhibit 4.1, Schedule 1B.
[121] Exhibit 3.1, Schedule 1A. This chart and all following charts and graphs incorporate the calculation of interest costs in collections for two years, with the exception of the charts which only include costs through each resident's move-out date.

CONFIDENTIAL

REDACTED

For the Woodland Park Preexisting Lease Class, the following are the total costs related to rent delinquency that Equity would have saved if all residents paid their rent on time, including employee costs, eviction costs, collection costs, and interest costs from December 1, 2011 through February 29, 2016:[122]



| | 12/1/2011 -<br>12/31/2012 | 2013 | 2014 | 1/1/2015 -<br>2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| Eviction Costs | | | | | |
| Collection Costs | | | | | |
| Interest Costs | | | | | |
| **Total Costs** | $ 269,961 | $ 197,909 | $ 155,583 | $ 177,873 | $ 801,326 |

Alternatively, I calculated Equity's total cost savings related to rent delinquency but only included costs through each resident's move-out date. For the Standard Late Fee Class, the following are the total costs related to rent delinquency that Equity would have saved if all residents paid their rent on time, including employee costs, eviction costs, and interest costs through each resident's move-out date from September 3, 2010 through February 29, 2020:[123]

| | Standard Late Fee<br>Class Period<br>Sep. 3, 2010 -<br>Oct. 23, 2017 | Post Class<br>Period<br>Oct. 24, 2017 -<br>Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ ■ | $ ■ | $ ■ |
| Eviction Costs | | | |
| Interest Costs | | | |
| **Total Costs** | $ 27,110,701 | $ 4,087,406 | $ 31,198,107 |

For the Woodland Park Preexisting Lease Class, the following are the total costs related to rent delinquency that Equity would have saved if all residents paid their rent on time, including employee costs, eviction costs,

---

[122] Exhibit 3.1, Schedule 1B.
[123] Exhibit 3.1, Schedule 2A.

REDACTED

and interest costs through each resident's move-out date from December 1, 2011 through February 29, 2016:[124]



| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs Eviction Costs Interest Costs | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| Total Costs | $ 263,460 | $ 179,602 | $ 140,564 | $ 170,382 | $ 754,008 |

#### 4. Equity's average cost per late fee compared to the average late fee charged

It is appropriate to compare Equity's average cost per late fee to the average late fee charged given Equity considers its costs related to rent delinquency when assessing late fees. Equity explicitly describes these costs in its Residential Lease Term Sheets:

> You acknowledge that if [Equity does] not receive your rent or other lease related charges on time, [Equity] will incur costs, the exact dollar amount of which is difficult or impracticable to determine. Such costs may include, among other things, lost use of funds, bank or other charges, costs incurred in connection with accounting for and attempting to collect late payments; collection expenses; and other administrative and accounting costs. As a result, if [Equity does] not receive your rent when it is due, [Equity] will assess late fees as described in the Late Fees section of the Term Sheet.[125]

I have compared Equity's average cost per late fee to the average late fee charged to determine the reasonableness of Equity's late fees. To determine Equity's average cost per late fee, I divided Equity's total costs incurred related to rent delinquency for the Standard Late Fee Class and Woodland Park Preexisting Lease Class by the total number of late fees charged to the Standard Late Fee Class and Woodland Park Preexisting Lease Class, respectively.[126] To calculate the average late fee charged, I divided the total amount of late fees charged to the Standard Late Fee Class and Woodland Park Preexisting Lease Class members by

---

[124] Exhibit 3.1, Schedule 2B.
[125] Residential Lease – Term Sheet for David Bonfanti II's Lease from October 11, 2014 through July 14, 2015 (WP003937-WP003946 at WP003940).
[126] Exhibit 3.2, Schedules 1A, 1B, 2A, 2B, 3A and 3B.

**REDACTED**

the number of late fees charged to the Standard Late Fee Class and Woodland Park Preexisting Lease Class members, respectively.[127]

Due to the COVID-19 pandemic, Equity's rent collection and late fee processes changed substantially. Specifically, I understand from discussions with Ms. Rivera that:

- Equity temporarily stopped charging late fees;
- Equity temporarily stopped evicting residents; and
- Equity's process of collecting delinquent rent became more complicated, including the implementation of programs for rent relief funding and payment plan guidelines. As a result, Equity employees have spent more time during the COVID-19 pandemic on the collection of delinquent rent, including the addition of roles to exclusively focus on delinquency and eviction management.

As such, my comparison of Equity's average cost per late fee to the average late fee charged is limited to the period from September 3, 2010 through February 29, 2020, prior to the COVID-19 pandemic.

On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee exceeded the average late fee charged from September 3, 2010 through February 29, 2020:[128]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 - 10/23/17 | 10/24/17 - 12/31/17 | Post-Class Period | | 1/1/20 - 2/29/20 | Total |
| | | | | | | | | | | 2018 | 2019 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg Costs Incurred per Late Fee | $ 72.69 | $ 68.39 | $ 71.62 | $ 84.31 | $ 93.77 | $ 101.33 | $ 106.44 | $ 121.50 | $ 139.48 | $ 132.19 | $ 138.07 | $ 125.59 | $ 95.67 |
| Avg Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| Difference | $ 4.66 | $ (1.73) | $ 0.49 | $ 10.05 | $ 10.78 | $ 10.69 | $ 9.74 | $ 20.53 | $ 36.05 | $ 29.71 | $ 32.53 | $ 20.91 | $ 10.67 |

[127] Appendix A, Schedules 1A and 1B.
[128] Exhibit 3.2, Schedule 1A.

REDACTED

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee exceeded the average late fee charged from December 1, 2011 through February 29, 2016:[129]

| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Costs Incurred per Late Fee | $ 62.38 | $ 81.63 | $ 69.64 | $ 62.23 | $ 67.66 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | $ 11.72 | $ 29.91 | $ 16.77 | $ 12.60 | $ 16.61 |

Alternatively, I performed these comparisons but only included Equity's costs through each resident's move-out date. On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee through each resident's move-out date was $2.37 less than the average late fee charged from September 3, 2010 through February 29, 2020:[130]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 - 10/23/17 | 10/24/17 - 12/31/17 | Post-Class Period | | | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 2018 | 2019 | 1/1/20 - 2/29/20 | |
| Avg. Costs Incurred per Late Fee | $ 69 80 | $ 63 86 | $ 63 86 | $ 72 27 | $ 81 84 | $ 90 12 | $ 93 15 | $ 103 32 | $ 112 28 | $ 101 54 | $ 101 36 | $ 100 72 | $ 82 63 |
| Avg. Late Fee Charged | 68 03 | 70 12 | 71 13 | 74 26 | 82 99 | 90 64 | 96 70 | 100 97 | 103 43 | 102 48 | 105 54 | 104 68 | 85 00 |
| Difference | $ 1.77 | $ (6.26) | $ (7.27) | $ (1.99) | $ (1.15) | $ (0.52) | $ (3.55) | $ 2.35 | $ 8.85 | $ (0.94) | $ (4.18) | $ (3.96) | $ (2.37) |

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee through each resident's move-out date exceeded the average late fee charged from December 1, 2011 through February 29, 2016:[131]

| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Costs Incurred per Late Fee | $ 60.88 | $ 74.14 | $ 63.07 | $ 59.67 | $ 63.71 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | $ 10.22 | $ 22.42 | $ 10.20 | $ 10.04 | $ 12.66 |

---

[129] Exhibit 3.2, Schedule 1B.
[130] Exhibit 3.2, Schedule 2A.
[131] Exhibit 3.2, Schedule 2B.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

### 5. The average cost per late fee that Equity would have saved if all residents paid their rent on time compared to the average late fee charged

I also compared the average cost per late fee that Equity would have saved if all residents paid their rent on time to the average late fee charged. On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee would have exceeded the average late fee charged from September 3, 2010 through February 29, 2020:[132]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 - 10/23/17 | 10/24/17 - 12/31/17 | Post-Class Period | | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 2018 | 2019 | | |
| Avg. Cost Savings per Late Fee | $ 81.20 | $ 76.00 | $ 79.59 | $ 93.29 | $ 104.01 | $ 112.18 | $ 117.43 | $ 131.48 | $ 149.41 | $ 142.61 | $ 149.78 | $ 139.01 | $ 105.29 |
| Avg. Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| Difference | $ 13.17 | $ 5.88 | $ 8.46 | $ 19.03 | $ 21.02 | $ 21.54 | $ 20.73 | $ 30.51 | $ 45.98 | $ 40.13 | $ 44.24 | $ 34.33 | $ 20.29 |

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee would have exceeded the average late fee charged from December 1, 2011 through February 29, 2016:[133]

| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Cost Savings per Late Fee | $ 62.61 | $ 80.94 | $ 68.09 | $ 60.79 | $ 66.96 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| Difference | $ 11.95 | $ 29.22 | $ 15.22 | $ 11.16 | $ 15.91 |

Alternatively, I performed these comparisons but only included Equity's costs through each resident's move-out date. On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee through each resident's move-out date would have exceeded the average late fee charged from September 3, 2010 through February 29, 2020:[134]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 - 10/23/17 | 10/24/17 - 12/31/17 | Post-Class Period | | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | 2018 | 2019 | | |
| Avg. Cost Savings per Late Fee | $ 78.31 | $ 71.47 | $ 71.83 | $ 81.24 | $ 92.08 | $ 100.97 | $ 104.14 | $ 113.29 | $ 122.21 | $ 111.96 | $ 113.07 | $ 114.14 | $ 92.26 |
| Avg. Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| Difference | $ 10.28 | $ 1.35 | $ 0.70 | $ 6.98 | $ 9.09 | $ 10.33 | $ 7.44 | $ 12.32 | $ 18.78 | $ 9.48 | $ 7.53 | $ 9.46 | $ 7.26 |

---

[132] Exhibit 3.1, Schedule 1A.
[133] Exhibit 3.1, Schedule 1B.
[134] Exhibit 3.1, Schedule 2A.

**REDACTED**

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee through each resident's move-out date would have exceeded the average late fee charged from December 1, 2011 through February 29, 2016:[135]

| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Cost Savings per Late Fee | $ 61.10 | $ 73.46 | $ 61.52 | $ 58.23 | $ 63.00 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | $ 10.44 | $ 21.74 | $ 8.65 | $ 8.60 | $ 11.95 |

6. **The outstanding account balances for all Standard Late Fee Class members and Woodland Park Preexisting Lease Class members**

I understand that many Standard Late Fee Class members and Woodland Park Preexisting Lease Class members have outstanding account balances with Equity. Therefore, any damages due to those class members would need to be reduced by their outstanding account balances.

As of May 7, 2021, the total outstanding account balance for all Standard Late Fee Class members was $44,625,846.[136] As of May 7, 2021, the total outstanding account balance for all Woodland Park Preexisting Lease Class members was $565,332.[137]

VI. **Conclusion**

I have concluded that Equity's average costs related to rent delinquency generally exceeded the average late fees charged during the relevant periods. I have also concluded that Equity's cost savings if all residents paid their rent on time would have exceeded the average late fees charged during the relevant periods.

---

[135] Exhibit 3.1, Schedule 2B.

[136] WP011498.xlsx. This figure only includes Standard Late Fee Class members who have vacated (see WP011498.xlsx, Tab "Field Descriptions," row 6 and Tab "Data," column F).

[137] WP011498.xlsx. This figure only includes Woodland Park Preexisting Lease Class members who have vacated (see WP011498.xlsx, Tab "Field Descriptions," row 6 and Tab "Data," column F).

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

From September 3, 2010 through January 31, 2021, members of the Standard Late Fee Class were charged 338,889 late fees totaling $█████[138] After accounting for reversals, from September 3, 2010 through January 31, 2021, members of the Standard Late Fee Class were charged 290,503 late fees totaling $████[139]

From December 1, 2011 through February 29, 2016, members of the Woodland Park Preexisting Lease Class were charged 11,968 late fees totaling $████.[140] After accounting for reversals, from December 1, 2011 through February 29, 2016, members of the Woodland Park Preexisting Lease Class were charged 8,650 late fees totaling $███[141]

*Costs Incurred Method*

As it relates to the Standard Late Fee Class, Equity incurred the following total costs related to rent delinquency from September 3, 2010 through February 29, 2020:[142]

| | Standard Late Fee Class Period | Post Class Period | |
| | Sep. 3, 2010 - Oct. 23, 2017 | Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ ████ | $ ████ | $ ████ |
| Eviction Costs | | | |
| Collection Costs | | | |
| Interest Costs | | | |
| **Total Costs** | $ 27,513,973 | $ 4,837,558 | $ 32,351,531 |

---

[138] Appendix A, Schedule 1A.
[139] Appendix A, Schedule 4A.
[140] Appendix A, Schedule 1B.
[141] Appendix A, Schedule 4B.
[142] Exhibit 3.2, Schedule 1A.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

As it relates to the Woodland Park Preexisting Lease Class, Equity incurred the following total costs related to rent delinquency from December 1, 2011 through February 29, 2016:[143]



| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ ▮ | $ ▮ | $ ▮ | $ ▮ | $ ▮ |
| Eviction Costs | | | | | |
| Collection Costs | | | | | |
| Interest Costs | | | | | |
| Total Costs | $ 269,003 | $ 199,577 | $ 159,138 | $ 182,076 | $ 809,794 |

Alternatively, I calculated Equity's total costs related to rent delinquency but only included costs through each resident's move-out date. As it relates to the Standard Late Fee Class, Equity incurred the following total costs related to rent delinquency through each resident's move-out date from September 3, 2010 through February 29, 2020:[144]

| | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ ▮ | $ ▮ | $ ▮ |
| Eviction Costs | | | |
| Interest Costs | | | |
| Total Costs | $ 24,245,286 | $ 3,698,223 | $ 27,943,509 |

---

[143] Exhibit 3.2, Schedule 1B.
[144] Exhibit 3.2, Schedule 2A.

REDACTED

As it relates to the Woodland Park Preexisting Lease Class, Equity incurred the following total costs related to rent delinquency through each resident's move-out date from December 1, 2011 through February 29, 2016:[145]



|  | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs Eviction Costs Interest Costs | $ ■ | $ ■ | $ ■ | $ ■ | $ ■ |
| **Total Costs** | **$ 262,502** | **$ 181,270** | **$ 144,119** | **$ 174,585** | **$ 762,476** |

I then compared Equity's average cost per late fee to the average late fee charged for the Standard Late Fee Class and Woodland Park Preexisting Lease Class members. On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee exceeded the average late fee charged from September 3, 2010 through February 29, 2020:[146]

|  |  |  |  |  |  |  |  |  |  | Post-Class Period |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 - 10/23/17 | 10/24/17 - 12/31/17 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
| Avg. Costs Incurred per Late Fee | $ 72.69 | $ 68.39 | $ 71.62 | $ 84.31 | $ 93.77 | $ 101.33 | $ 106.44 | $ 121.50 | $ 139.48 | $ 132.19 | $ 138.07 | $ 125.59 | $ 95.67 |
| Avg. Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| **Difference** | **$ 4.66** | **$ (1.73)** | **$ 0.49** | **$ 10.05** | **$ 10.78** | **$ 10.69** | **$ 9.74** | **$ 20.53** | **$ 36.05** | **$ 29.71** | **$ 32.53** | **$ 20.91** | **$ 10.67** |

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee exceeded the average late fee charged from December 1, 2011 through February 29, 2016: [147]

|  | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Costs Incurred per Late Fee | $ 62.38 | $ 81.63 | $ 69.64 | $ 62.23 | $ 67.66 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | **$ 11.72** | **$ 29.91** | **$ 16.77** | **$ 12.60** | **$ 16.61** |

---

[145] Exhibit 3.2, Schedule 2B.
[146] Exhibit 3.2, Schedule 1A.
[147] Exhibit 3.2, Schedule 1B.

REDACTED

Alternatively, I performed these comparisons but only included Equity's costs through each resident's move-out date. On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee through each resident's move-out date was $2.37 less than the average late fee charged from September 3, 2010 through February 29, 2020:[148]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Post-Class Period | | | | | Total |
| | | | | | | | | 1/1/17 - 10/23/17 | 10/24/17 - 12/31/17 | 2018 | 2019 | 1/1/20 - 2/29/20 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg Costs Incurred per Late Fee | $ 69.80 | $ 63.86 | $ 63.86 | $ 72.27 | $ 81.84 | $ 90.12 | $ 93.15 | $ 103.32 | $ 112.28 | $ 101.54 | $ 101.36 | $ 100.72 | $ 82.63 |
| Avg Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| Difference | $ 1.77 | $ (6.26) | $ (7.27) | $ (1.99) | $ (1.15) | $ (0.52) | $ (3.55) | $ 2.35 | $ 8.85 | $ (0.94) | $ (4.18) | $ (3.96) | $ (2.37) |

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee through each resident's move-out date exceeded the average late fee charged from December 1, 2011 through February 29, 2016:[149]

| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Costs Incurred per Late Fee | $ 60.88 | $ 74.14 | $ 63.07 | $ 59.67 | $ 63.71 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | $ 10.22 | $ 22.42 | $ 10.20 | $ 10.04 | $ 12.66 |

---

[148] Exhibit 3.2, Schedule 2A.
[149] Exhibit 3.2, Schedule 2B.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.


*Cost Savings Method*

I also calculated the total costs that Equity would have saved if all residents paid their rent on time.  As it relates to the Standard Late Fee Class, Equity would have saved the following total costs related to rent delinquency from September 3, 2010 through February 29, 2020:[150]

| | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs Eviction Costs Collection Costs Interest Costs | $ ███ | $ ███ | $ ███ |
| Total Costs | $  30,379,388 | $  5,226,741 | $  35,606,129 |

As it relates to the Woodland Park Preexisting Lease Class, Equity would have saved the following total costs related to rent delinquency from December 1, 2011 through February 29, 2016:[151]



| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs Eviction Costs Collection Costs Interest Costs | $ ███ | $ ███ | $ ███ | $ ███ | $ ███ |
| Total Costs | $  269,961 | $  197,909 | $  155,583 | $  177,873 | $  801,326 |

Alternatively, I calculated the total costs that Equity would have saved if all residents paid their rent on time but only included costs through each resident's move-out date.  As it relates to the Standard Late Fee Class,

---

[150] Exhibit 3.1, Schedule 1A.
[151] Exhibit 3.1, Schedule 1B.

**REDACTED**

Equity would have saved the following total costs related to rent delinquency through each resident's move-out date from September 3, 2010 through February 29, 2020:[152]

|  | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs Eviction Costs Interest Costs | $ ████ | $ ████ | $ ████ |
| **Total Costs** | $ 27,110,701 | $ 4,087,406 | $ 31,198,107 |

As it relates to the Woodland Park Preexisting Lease Class, Equity would have saved the following total costs related to rent delinquency through each resident's move-out date from December 1, 2011 through February 29, 2016:[153]

|  | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs Eviction Costs Interest Costs | $ ████ | $ ████ | $ ████ | $ ████ | $ ████ |
| **Total Costs** | $ 263,460 | $ 179,602 | $ 140,564 | $ 170,382 | $ 754,008 |

I then compared the average cost per late fee that Equity would have saved if all residents paid their rent on time to the average late fee charged. On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee would have exceeded the average late fee charged from September 3, 2010 through February 29, 2020:[154]



|  | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 - 10/23/17 | Post-Class Period 10/24/17 - 12/31/17 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Avg Cost Savings per Late Fee | $ 81.20 | $ 76.00 | $ 79.59 | $ 93.29 | $ 104.01 | $ 112.18 | $ 117.43 | $ 131.48 | $ 149.41 | $ 142.61 | $ 149.78 | $ 139.01 | $ 105.29 |
| Avg Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| **Difference** | $ 13.17 | $ 5.88 | $ 8.46 | $ 19.03 | $ 21.02 | $ 21.54 | $ 20.73 | $ 30.51 | $ 45.98 | $ 40.13 | $ 44.24 | $ 34.33 | $ 20.29 |

[152] Exhibit 3.1, Schedule 2A.
[153] Exhibit 3.1, Schedule 2B.
[154] Exhibit 3.1, Schedule 1A.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee would have exceeded the average late fee charged from December 1, 2011 through February 29, 2016:[155]

|  | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Cost Savings per Late Fee | $ 62.61 | $ 80.94 | $ 68.09 | $ 60.79 | $ 66.96 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | **$ 11.95** | **$ 29.22** | **$ 15.22** | **$ 11.16** | **$ 15.91** |

Alternatively, I performed these comparisons but only included Equity's cost savings through each resident's move-out date. On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee through each resident's move-out date would have exceeded the average late fee charged from September 3, 2010 through February 29, 2020:[156]

|  | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 - 10/23/17 | 10/24/17 - 12/31/17 | Post-Class Period | | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |  |  |  | 2018 | 2019 |  |  |
| Avg. Cost Savings per Late Fee | $ 78.31 | $ 71.47 | $ 71.83 | $ 81.24 | $ 92.08 | $ 100.97 | $ 104.14 | $ 113.29 | $ 122.21 | $ 111.96 | $ 113.07 | $ 114.14 | $ 92.26 |
| Avg. Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| **Difference** | **$ 10.28** | **$ 1.35** | **$ 0.70** | **$ 6.98** | **$ 9.09** | **$ 10.33** | **$ 7.44** | **$ 12.32** | **$ 18.78** | **$ 9.48** | **$ 7.53** | **$ 9.46** | **$ 7.26** |

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee through each resident's move-out date would have exceeded the average late fee charged from December 1, 2011 through February 29, 2016:[157]

|  | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Cost Savings per Late Fee | $ 61.10 | $ 73.46 | $ 61.52 | $ 58.23 | $ 63.00 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | **$ 10.44** | **$ 21.74** | **$ 8.65** | **$ 8.60** | **$ 11.95** |

---

[155] Exhibit 3.1, Schedule 1B.
[156] Exhibit 3.1, Schedule 2A.
[157] Exhibit 3.1, Schedule 2B.

REDACTED

The following graph compares Equity's average cost per late fee, Equity's average cost savings per late fee if all residents paid their rent on time, and the average late fee charged for the Standard Late Fee Class members:[158]



The following graph compares Equity's average cost per late fee, Equity's average cost savings per late fee if all residents paid their rent on time, and the average late fee charged for the Woodland Park Preexisting Lease Class members: [159]



---

[158] Exhibit 3.1, Schedule 1A; Exhibit 3.2, Schedule 1A.
[159] Exhibit 3.1, Schedule 1B; Exhibit 3.2, Schedule 1B.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

The following graph compares Equity's average cost per late fee, Equity's average cost savings per late fee if all residents paid their rent on time, and the average late fee charged for the Standard Late Fee Class members, but only including costs through each resident's move-out date: [160]



The following graph compares Equity's average cost per late fee, Equity's average cost savings per late fee if all residents paid their rent on time, and the average late fee charged for the Woodland Park Preexisting Lease Class members, but only including costs through each resident's move-out date: [161]



---

[160] Exhibit 3.1, Schedule 2A; Exhibit 3.2, Schedule 2A.
[161] Exhibit 3.1, Schedule 2B; Exhibit 3.2, Schedule 2B.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.


I hold these opinions to a reasonable degree of certainty. If additional information becomes available after the date of my report that may influence the opinions I have rendered, I will supplement my report accordingly.


**Other datapoints related to the collection of delinquent rent**

*Equity's costs related to the collection of delinquent rent for the Named Plaintiffs*

Equity has incurred significant costs related to the collection of delinquent rent from the Named Plaintiffs. For example, Equity's resident statement for Ms. Munguia-Brown reflects 51 months of residency from December 2011 through February 2016.[162] Ms. Munguia-Brown was charged a late fee in 31 of those 51 months, demonstrating that she did not pay her rent before the 5th day of the month 61% of the time.[163] In those 31 months where Ms. Munguia-Brown was charged a late fee, Equity incurred employee costs for the employees who were involved in collecting Ms. Munguia-Brown's delinquent rent as well as interest costs on the late rent.


In addition, I understand that around March 2013, the eviction process was started for Ms. Munguia-Brown due to her rent delinquency. ████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████ ████████████████████████████████████████████████████
██████████████████████████████ ██████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████


*Equity's communities in California*

From September 2010 through February 2020, the number of communities owned by Equity in California ranged from 97 to 146 communities.[167] The number of units at each of those communities ranged from 18 to

---

[162] Javanni Brown Resident Statement.
[163] Javanni Brown Resident Statement. Calculated as (31/51).
[164] Javanni Brown Resident Statement, p. 5.
[165] Stipulation, dated March 14, 2013 (WP000048-WP000051 at WP000048-WP000049).
[166] Javanni Brown Resident Statement, p. 5.
[167] WP003797.xlsx, Tab "Units"; WP003890.xlsx, Tab "units."

**REDACTED**

1,812 units.[168]  From September 2010 through February 2020, the maximum number of units managed by Equity in California was 37,319 units.[169]

*1999 Late Fee Cost Study conducted by PricewaterhouseCoopers for Equity Residential Properties ("PwC Study")*

The PwC Study concluded that Equity incurred "Collection Costs, Damages & Other Recoverable Losses Applicable to Late Fees" in excess of the revenue it received from late fees.[170]  While the PwC Study results are approximately 20 years old, I believe they provide useful data points for comparison purposes.

For example, the PwC Study determined that, in 1997, Equity's leasing employees spent 2.4% of their time on delinquency-related tasks and Equity's management employees spent, on average, 11.75% of their time on delinquency-related tasks.[171]  As discussed above, it is my opinion that, in the period immediately preceding COVID-19, Equity's leasing employees spent 4.45% of their time on delinquency-related tasks and Equity's management employees spent 12.32% of their time on delinquency-related tasks.[172]  I also understand from discussions with Equity leadership that Equity's costs for employees involved in the delinquency process would be reduced by 9.78% if there was no rent delinquency.[173]

*Percentage late fees*

A percentage late fee, such as Equity's 5% late fee, is economically sound in that it tracks with inflation, i.e., as rents and costs increase, so does the late fee.  This is evidenced by the charts above which indicate that Equity's costs related to rent delinquency have generally increased over time.  I also understand from Counsel that a number of jurisdictions have declared percentage late fees of up to 10% lawful.  I further understand that Los Angeles County has provided guidance that "[l]ate fees that are 5% or less of your monthly rent are considered reasonable."[174]

---

[168] WP003797.xlsx, Tab "Units"; WP003890.xlsx, Tab "units."
[169] WP003797.xlsx, Tab "Units"; WP003890.xlsx, Tab "units."
[170] PricewaterhouseCoopers Late Fee Cost Study Draft for Equity Residential Properties, dated April 7, 1999, p. 2.
[171] PricewaterhouseCoopers Late Fee Cost Study Draft for Equity Residential Properties, dated April 7, 1999, Schedule C-1.  Percentage of time spent by management employees on delinquency-related tasks is calculated as the average of 9.5% of Property Managers' time and 14.0% of Assistant Property Managers' time.
[172] Appendix C, Summary – Office Management and Summary – Leasing.
[173] Appendix D, Schedule 1.
[174] https://dcba.lacounty.gov/portfolio/late-fees/#:~:text=Late%20fees%20that%20are%205,more%2C%20contact%20us%20for%20assistance.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

\*\*\*\*\*\*\*\*\*\*

My report, with supporting exhibits, is contained herein, and presents a summary of my opinion and the bases and reasons therefor as of this date. To the extent any additional information is produced by the parties or their experts, I will be prepared to incorporate any such additional information into my report, or otherwise to amend or supplement my report as appropriate.

This report is to be used only for the purpose of this litigation and may not be published or used for any other purpose without prior written consent.

Respectfully submitted,

Mark J. Hosfield
May 10, 2021

**REDACTED**

# EXHIBIT 2

REDACTED

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

---

JAVANNI MUNGUIA-BROWN, ANGELINA MAGAÑA, NORMA RODRIGUEZ, and DAVID
BONFANTI, individually and on behalf of others similarly situated,

Plaintiffs,

v.     Case No. 4:16-cv-01225-JSW

EQUITY RESIDENTIAL, ERP OPERATING LIMITED PARTNERSHIP, EQUITY RESIDENTIAL
MANAGEMENT, L.L.C., EQR-WOODLAND PARK A LIMITED PARTNERSHIP, and EQR-
WOODLAND PARK B LIMITED PARTNERSHIP,

Defendants.

---

SUPPLEMENTAL EXPERT REPORT AND DISCLOSURE

OF MARK J. HOSFIELD

Submitted August 13, 2021

CONFIDENTIAL

**REDACTED**

United States District Court for the Northern District of California, Oakland Division
Case No. 4:16-cv-01225-JSW

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

**Table of Contents**

I.      Introduction ..................................................................................................................... 1

II.     Eviction, Interest and Employee Costs ............................................................................ 1

III.    Updated Charts ................................................................................................................. 6

IV.     Conclusion ..................................................................................................................... 15

Updated Exhibit 1:     Curriculum Vitae of Mark J. Hosfield

Updated Exhibit 2:     Index to Documents Relied Upon in Forming Opinions

Updated Exhibit 3.1:   Comparison of Equity's Cost Savings per Late Fee and Average Late Fee

Updated Exhibit 3.2:   Comparison of Cost to Equity per Late Fee and Average Late Fee

Updated Exhibit 4.1:   Calculation of Equity's Employee Cost Savings Related to Rent Delinquency

Updated Exhibit 4.2:   Calculation of Equity's Employee Costs Related to Rent Delinquency

Updated Exhibit 5:     Calculation of Eviction Costs Incurred by Equity

Exhibit 6:             Calculation of Collection Costs Incurred by Equity

Updated Exhibit 7:     Calculation of Interest Costs on Late Rent

Exhibit 8:             Calculation of Equity's WACC


Updated Appendix A:    Summary of Late Fees

Updated Appendix B:    Employee Costs by Job Title

Appendix C:            Employee Time by Job Function

Appendix D:            Reductions in Staffing if All Residents Paid Their Rent on Time

Appendix E:            Interview Quartile Analysis

CONFIDENTIAL

**REDACTED**

## I. Introduction

Having reviewed the Supplemental and Rebuttal Expert Report of David Breshears dated July 9, 2021 ("Breshears Report"), the Expert Rebuttal Report of Michael Childers dated July 9, 2021, the Expert Rebuttal Report of Andrew D. Schwarz dated July 9, 2021, and the Rebuttal Report of Christian Tregillis dated July 9, 2021 ("Tregillis Report"), I submit the following supplemental expert report to correct certain calculations in my initial Expert Report and Disclosure ("Hosfield Report") regarding Equity's eviction costs, interest costs and employee costs.

## II. Eviction, Interest and Employee Costs

### A. Eviction Costs

The Breshears Report states that "it appears that SODA court fees incurred [in the Hosfield Report] are double counted, as they may already be included in the expended legal fees."[1] I have confirmed that SODA court fees are included in the invoices sent by law firms to Equity, so I have recalculated Equity's eviction costs to remove the double-counting of SODA court fees already included in the invoices. The corrected eviction costs are summarized below:

Standard Late Fee Class[2]

| Summary of Eviction Costs | |
| --- | --- |
| | **Total** |
| Eviction Costs Before Adjustment Adjustment | $ ███████ |
| **Eviction Costs After Adjustment** | $ ███████ |

---

[1] Supplemental and Rebuttal Expert Report of David Breshears, CPA/CFF, dated July 9, 2021, p. 19.
[2] Expert Report and Disclosure of Mark J. Hosfield, dated May 10, 2021, Exhibit 5, Schedule 1A; Updated Exhibit 5, Schedule 1A.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

Woodland Park Preexisting Lease Class[3]

| Summary of Eviction Costs | |
| --- | --- |
| | **Total** |
| Eviction Costs Before Adjustment Adjustment | $ █████████ |
| **Eviction Costs After Adjustment** | $ █████████ |

### B. Interest Costs

The Breshears Report states that "Mr. Hosfield's calculation includes interest based on RNT transactions that occur after the related vacate date."[4] In the Hosfield Report, I calculated daily interest on each resident's running rent balance through the date of their last rent transaction in an attempt to account for apparent errors in the vacate dates.[5] However, to eliminate this controversy, I have updated my calculations of interest on late rent before residents move out to match Mr. Breshears' assumption by only including interest through a resident's stated vacate date (even when the ledger shows rent transactions after the vacate date). The resulting interest costs are summarized below:

---

[3] Expert Report and Disclosure of Mark J. Hosfield, dated May 10, 2021, Exhibit 5, Schedule 1B; Updated Exhibit 5, Schedule 1B.

[4] Supplemental and Rebuttal Expert Report of David Breshears, CPA/CFF, dated July 9, 2021, pp. 15-16.

[5] Expert Report and Disclosure of Mark J. Hosfield, dated May 10, 2021, Exhibit 7, Schedules 1A and 1B.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

Standard Late Fee Class[6]

| | Interest on Late Rent Through Resident Move Out | Interest on Late Rent Through Two Years in Collections | Interest on Late Rent Through Collections |
|---|---|---|---|
| **Summary of Interest Costs** | | | |
| Interest Costs Before Adjustment | $ 2,365,439 | $ 5,441,141 | $ 9,657,474 |
| Adjustment | (261,626) | (261,626) | (261,626) |
| **Interest Costs After Adjustment** | **$ 2,103,813** | **$ 5,179,515** | **$ 9,395,848** |

Woodland Park Preexisting Lease Class[7]

| | Interest on Late Rent Through Resident Move Out | Interest on Late Rent Through Two Years in Collections | Interest on Late Rent Through Collections |
|---|---|---|---|
| **Summary of Interest Costs** | | | |
| Interest Costs Before Adjustment | $ 39,875 | $ 80,143 | $ 99,978 |
| Adjustment | (1,303) | (1,303) | (1,303) |
| **Interest Costs After Adjustment** | **$ 38,572** | **$ 78,840** | **$ 98,675** |

## C. Employee Costs

The Tregillis Report states that

> [I]n his summary of payroll costs for the Standard Late Fee Class, Mr. Hosfield included positions
> such as Manager Operations Initiatives, Regional Facilities Manager, Other Office Administrative,
> Service Manager, and Manager Sales Initiatives in his calculations of total EQR employee costs for
> Office Management employees, but he did not demonstrate in his discussion of his interviews or any
> other analysis that these employee positions are involved in the collection of late rent, or if they are,
> to what extent.[8]

---

[6] Expert Report and Disclosure of Mark J. Hosfield, dated May 10, 2021, Exhibit 7, Schedules 1A, 2A, 3A, and 4A; Updated Exhibit 7, Schedules 1A, 2A, 3A, and 4A.

[7] Expert Report and Disclosure of Mark J. Hosfield, dated May 10, 2021, Exhibit 7, Schedules 1B, 2B, 3B, and 4B; Updated Exhibit 7, Schedules 1B, 2B, 3B, and 4B.

[8] Rebuttal Report of Christian Tregillis, CPA, ABV, CFF, CLP, dated July 9, 2021, pp. 28-29.

**REDACTED**

I understand that all property employees have some involvement with the collection of delinquent rent at times. The Tregillis Report questioned the appropriateness of certain job titles included in my employee costs. I have reviewed all the job titles included within Equity's payroll summary. To narrow the dispute regarding this issue, I have removed the payroll costs associated with the Manager Operations Initiatives, Manager Sales Initiatives, Regional Facilities Manager, Residential Financial Specialist, Area Manager and Service Manager job titles as they are less likely to spend significant time on the collection of delinquent rent.[9] I have made this adjustment to both the Costs Incurred Method and the Cost Savings Method, *i.e.*, the cost savings that Equity would have achieved if all residents paid their rent on time. The resulting employee costs are summarized below:

Standard Late Fee Class[10]

| Summary of Employee Costs | | | | |
|---|---|---|---|---|
| | Costs Incurred Method | | Cost Savings Method | |
| Employee Costs Before Adjustment | $ | 17,249,780 | $ | 20,504,378 |
| Adjustment | | (12,519) | | (9,939) |
| **Employee Costs After Adjustment** | **$** | **17,237,261** | **$** | **20,494,439** |

Woodland Park Preexisting Lease Class[11]

| Summary of Employee Costs | | | | |
|---|---|---|---|---|
| | Costs Incurred Method | | Cost Savings Method | |
| Employee Costs Before Adjustment | $ | 354,177 | $ | 345,709 |
| Adjustment | | - | | - |
| **Employee Costs After Adjustment** | **$** | **354,177** | **$** | **345,709** |

---

[9] Updated Appendix B, Schedules 5A and 5B.

[10] Expert Report and Disclosure of Mark J. Hosfield, dated May 10, 2021, Exhibit 4.1, Schedule 1A and Exhibit 4.2, Schedule 1A; Updated Exhibit 4.1, Schedule 1A and Updated Exhibit 4.2, Schedule 1A.

[11] Expert Report and Disclosure of Mark J. Hosfield, dated May 10, 2021, Exhibit 4.1, Schedule 1B and Exhibit 4.2, Schedule 1B; Updated Exhibit 4.1, Schedule 1B and Updated Exhibit 4.2, Schedule 1B.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

## D. Total Costs – Costs Incurred Method

Standard Late Fee Class[12]



| Summary of Total Costs - Costs Incurred Method | | |
|---|---|---|
| | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections |
| Employee Costs | $ | $ |
| Eviction Costs | | |
| Collection Costs | | |
| Interest Costs | | |
| **Total Costs** | **$ 25,359,583** | **$ 29,767,605** |

Woodland Park Preexisting Lease Class[13]

| Summary of Total Costs - Costs Incurred Method | | |
|---|---|---|
| | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections |
| Employee Costs | $ | $ |
| Eviction Costs | | |
| Collection Costs | | |
| Interest Costs | | |
| **Total Costs** | **$ 699,038** | **$ 746,356** |

---

[12] Updated Exhibit 3.2, Schedules 1A and 2A. For the Standard Late Fee Class, Equity's costs incurred and cost savings are calculated for the period September 3, 2010 through February 29, 2020.
[13] Updated Exhibit 3.2, Schedules 1B and 2B. For the Woodland Park Preexisting Lease Class, Equity's costs incurred and cost savings are calculated for the period December 1, 2011 through February 29, 2016.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

## E. Total Costs – Cost Savings Method

Standard Late Fee Class[14]

| Summary of Total Costs - Cost Savings Method | | |
|---|---|---|
| | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections |
| Employee Costs | $ ███████ | $ ███████ |
| Eviction Costs | | |
| Collection Costs | | |
| Interest Costs | | |
| **Total Costs** | $ 28,616,761 | $ 33,024,783 |

Woodland Park Preexisting Lease Class[15]

| Summary of Total Costs - Cost Savings Method | | |
|---|---|---|
| | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections |
| Employee Costs | $ ███████ | $ ███████ |
| Eviction Costs | | |
| Collection Costs | | |
| Interest Costs | | |
| **Total Costs** | $ 690,570 | $ 737,888 |

## III. Updated Charts

In his May 10, 2021 report, Mr. Breshears calculates restitution and interest for the Standard Late Fee Class "based on the late fee payments in the Standard Late Fee RMLEDG data file,"[16] and for the Woodland Park Preexisting Lease Class "based on the late fee payments in the Woodland Park Preexisting Lease RMLEDG data file."[17] For purposes of my calculations, I have adopted Breshears' corrected/supplemental calculations

---

[14] Updated Exhibit 3.1, Schedules 1A and 2A.
[15] Updated Exhibit 3.1, Schedules 1B and 2B.
[16] Expert Report of David Breshears, CPA/CFF, dated May 10, 2021, p. 2.
[17] Expert Report of David Breshears, CPA/CFF, dated May 10, 2021, p. 3.

REDACTED

of the "late fee payments" for both classes (reflected in his supplemental report dated July 9, 2021) to determine recovery percentages for late fees charged by Equity.[18, 19]

| | Late Fee Recovery Percentage | | |
| --- | --- | --- | --- |
| | Standard Late Fee Class | | Woodland Park Preexisting Lease Class |
| Amount of Late Fees Paid Amount of Late Fees Charged | $ ███████ | | $ ███████ |
| Late Fee Recovery Percentage | ███████ | | ███████ |

Using these updated numbers, I show Equity's average costs under both the Costs Incurred Method and Cost Savings Method and compare those costs to the average late fee charged and average recovery per late fee charged to Standard Late Fee Class and Woodland Park Preexisting Lease Class members, respectively.

### A. Costs Incurred Method

<u>Standard Late Fee Class</u>
*Through Two Years in Collections*
On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee through two years in collections was approximately 4% greater than Equity's average late fee charged:[20]

| Comparison of Average Costs Incurred per Late Fee and Average Late Fee Charged Costs Through Two Years in Collections | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
| Avg Costs Incurred per Late Fee | $ 70.37 | $ 64.48 | $ 67.74 | $ 81.29 | $ 86.35 | $ 91.80 | $ 94.17 | $ 110.51 | $ 121.23 | $ 128.07 | $ 118.27 | $ 88.03 |
| Avg Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 101.28 | 102.48 | 105.54 | 104.68 | 85.00 |
| **Difference** | $ 2.34 | $ (5.64) | $ (3.39) | $ 7.03 | $ 3.36 | $ 1.16 | $ (2.53) | $ 9.23 | $ 18.75 | $ 22.53 | $ 13.59 | $ 3.03 |

---

[18] Supplemental and Rebuttal Expert Report of David Breshears, CPA/CFF, dated July 9, 2021, Exhibits 3 and 4.
[19] Updated Appendix A, Schedules 6A and 6B.
[20] Updated Exhibit 3.2, Schedule 1A.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee through two years in collections was approximately 28% greater than Equity's average recovery per late fee:[21]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Comparison of Average Costs Incurred per Late Fee and Average Recovery per Late Fee Costs Through Two Years in Collections | | | | | | | | | | | |
| Avg Costs Incurred per Late Fee | $ 70.37 | $ 64.48 | $ 67.74 | $ 81.29 | $ 86.35 | $ 91.80 | $ 94.17 | $ 110.51 | $ 121.23 | $ 128.07 | $ 118.27 | $ 88.03 |
| Avg Recovery per Late Fee | 54.27 | 57.42 | 57.15 | 59.36 | 66.43 | 71.77 | 76.98 | 82.81 | 86.56 | 87.94 | 101.29 | 68.71 |
| Difference | $ 16.10 | $ 7.06 | $ 10.59 | $ 21.93 | $ 19.92 | $ 20.03 | $ 17.19 | $ 27.70 | $ 34.67 | $ 40.13 | $ 16.98 | $ 19.32 |

*Through Each Resident's Move-Out Date*

On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee through each resident's move-out date was approximately 12% less than Equity's average late fee charged:[22]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Comparison of Average Costs Incurred per Late Fee and Average Late Fee Charged Costs Through Resident Move Out | | | | | | | | | | | |
| Avg Costs Incurred per Late Fee | $ 67.48 | $ 59.95 | $ 59.98 | $ 69.24 | $ 74.43 | $ 80.59 | $ 80.88 | $ 91.17 | $ 90.58 | $ 91.36 | $ 93.40 | $ 74.99 |
| Avg Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 101.28 | 102.48 | 105.54 | 104.68 | 85.00 |
| Difference | $ (0.55) | $ (10.17) | $ (11.15) | $ (5.02) | $ (8.56) | $ (10.05) | $ (15.82) | $ (10.11) | $ (11.90) | $ (14.18) | $ (11.28) | $ (10.01) |

On average, as it relates to the Standard Late Fee Class, Equity's average cost per late fee through each resident's move-out date was approximately 9% greater than Equity's average recovery per late fee:[23]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Comparison of Average Costs Incurred per Late Fee and Average Recovery per Late Fee Costs Through Resident Move Out | | | | | | | | | | | |
| Avg Costs Incurred per Late Fee | $ 67.48 | $ 59.95 | $ 59.98 | $ 69.24 | $ 74.43 | $ 80.59 | $ 80.88 | $ 91.17 | $ 90.58 | $ 91.36 | $ 93.40 | $ 74.99 |
| Avg Recovery per Late Fee | 54.27 | 57.42 | 57.15 | 59.36 | 66.43 | 71.77 | 76.98 | 82.81 | 86.56 | 87.94 | 101.29 | 68.71 |
| Difference | $ 13.21 | $ 2.53 | $ 2.83 | $ 9.88 | $ 8.00 | $ 8.82 | $ 3.90 | $ 8.36 | $ 4.02 | $ 3.42 | $ (7.89) | $ 6.28 |

---

[21] Updated Exhibit 3.2, Schedule 1A.1.
[22] Updated Exhibit 3.2, Schedule 2A.
[23] Updated Exhibit 3.2, Schedule 2A.1.

REDACTED

Woodland Park Preexisting Lease Class

*Through Two Years in Collections*

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee through two years in collections was approximately 22% greater than Equity's average late fee charged:[24]

| Comparison of Average Costs Incurred per Late Fee and Average Late Fee Charged Costs Through Two Years in Collections | | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Costs Incurred per Late Fee | $ 52.09 | $ 81.64 | $ 69.27 | $ 56.00 | $ 62.36 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | **$ 1.43** | **$ 29.92** | **$ 16.40** | **$ 6.37** | **$ 11.31** |

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee through two years in collections was approximately 176% greater than Equity's average recovery per late fee:[25]

| Comparison of Average Costs Incurred per Late Fee and Average Recovery per Late Fee Costs Through Two Years in Collections | | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Costs Incurred per Late Fee | $ 52.09 | $ 81.64 | $ 69.27 | $ 56.00 | $ 62.36 |
| Avg. Recovery per Late Fee | 25.94 | 17.61 | 26.45 | 18.68 | 22.56 |
| **Difference** | **$ 26.15** | **$ 64.03** | **$ 42.82** | **$ 37.32** | **$ 39.80** |

---

[24] Updated Exhibit 3.2, Schedule 1B.
[25] Updated Exhibit 3.2, Schedule 1B.1.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.


*Through Each Resident's Move-Out Date*

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee through each resident's move-out date was approximately 14% greater than Equity's average late fee charged:[26]

| Comparison of Average Costs Incurred per Late Fee and Average Late Fee Charged Costs Through Resident Move Out | | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Costs Incurred per Late Fee | $ 50.58 | $ 74.15 | $ 62.69 | $ 53.44 | $ 58.41 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | $ (0.08) | $ 22.43 | $ 9.82 | $ 3.81 | $ 7.36 |

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost per late fee through each resident's move-out date was approximately 159% greater than Equity's average recovery per late fee:[27]

| Comparison of Average Costs Incurred per Late Fee and Average Recovery per Late Fee Costs Through Resident Move Out | | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Costs Incurred per Late Fee | $ 50.58 | $ 74.15 | $ 62.69 | $ 53.44 | $ 58.41 |
| Avg. Recovery per Late Fee | 25.94 | 17.61 | 26.45 | 18.68 | 22.56 |
| **Difference** | $ 24.64 | $ 56.54 | $ 36.24 | $ 34.76 | $ 35.85 |

---

[26] Updated Exhibit 3.2, Schedule 2B.
[27] Updated Exhibit 3.2, Schedule 2B.1.

CONFIDENTIAL

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

## B. Cost Savings Method

Standard Late Fee Class

*Through Two Years in Collections*

On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee through two years in collections was approximately 15% greater than Equity's average late fee charged:[28]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Comparison of Average Cost Savings per Late Fee and Average Late Fee Charged** | | | | | | | | | | | | |
| **Costs Through Two Years in Collections** | | | | | | | | | | | | |
| Avg Cost Savings per Late Fee | $ 78 88 | $ 72 10 | $ 75 71 | $ 90 27 | $ 96 59 | $ 102 65 | $ 105 15 | $ 120 54 | $ 131 65 | $ 139 80 | $ 131 69 | $ 97 66 |
| Avg Late Fee Charged | 68 03 | 70 12 | 71 13 | 74 26 | 82 99 | 90 64 | 96 70 | 101 28 | 102 48 | 105 54 | 104 68 | 85 00 |
| **Difference** | $ 10.85 | $ 1.98 | $ 4.58 | $ 16.01 | $ 13.60 | $ 12.01 | $ 8.45 | $ 19.26 | $ 29.17 | $ 34.26 | $ 27.01 | $ 12.66 |

On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee through two years in collections was approximately 42% greater than Equity's average recovery per late fee:[29]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Comparison of Average Cost Savings per Late Fee and Average Recovery per Late Fee** | | | | | | | | | | | | |
| **Costs Through Two Years in Collections** | | | | | | | | | | | | |
| Avg Cost Savings per Late Fee | $ 78 88 | $ 72 10 | $ 75 71 | $ 90 27 | $ 96 59 | $ 102 65 | $ 105 15 | $ 120 54 | $ 131 65 | $ 139 80 | $ 131 69 | $ 97 66 |
| Avg Recovery per Late Fee | 54 27 | 57 42 | 57 15 | 59 36 | 66 43 | 71 77 | 76 98 | 82 81 | 86 56 | 87 94 | 101 29 | 68 71 |
| **Difference** | $ 24.61 | $ 14.68 | $ 18.56 | $ 30.91 | $ 30.16 | $ 30.88 | $ 28.17 | $ 37.73 | $ 45.09 | $ 51.86 | $ 30.40 | $ 28.95 |

*Through Each Resident's Move-Out Date*

On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee through each resident's move-out date was approximately 0.4% less than Equity's average late fee charged:[30]

| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Comparison of Average Cost Savings per Late Fee and Average Late Fee Charged** | | | | | | | | | | | | |
| **Costs Through Resident Move Out** | | | | | | | | | | | | |
| Avg Cost Savings per Late Fee | $ 75 99 | $ 67 57 | $ 67 94 | $ 78 22 | $ 84 66 | $ 91 44 | $ 91 86 | $ 101 21 | $ 101 00 | $ 103 08 | $ 106 82 | $ 84 62 |
| Avg Late Fee Charged | 68 03 | 70 12 | 71 13 | 74 26 | 82 99 | 90 64 | 96 70 | 101 28 | 102 48 | 105 54 | 104 68 | 85 00 |
| **Difference** | $ 7.96 | $ (2.55) | $ (3.19) | $ 3.96 | $ 1.67 | $ 0.80 | $ (4.84) | $ (0.07) | $ (1.48) | $ (2.46) | $ 2.14 | $ (0.38) |

---

[28] Updated Exhibit 3.1, Schedule 1A.

[29] Updated Exhibit 3.1, Schedule 1A.1.

[30] Updated Exhibit 3.1, Schedule 2A.

**REDACTED**

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

On average, as it relates to the Standard Late Fee Class, Equity's average cost savings per late fee through each resident's move-out date was approximately 23% greater than Equity's average recovery per late fee:[31]

| | Comparison of Average Cost Savings per Late Fee and Average Recovery per Late Fee Costs Through Resident Move Out | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 9/3/10 - 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 1/1/20 - 2/29/20 | Total |
| Avg Cost Savings per Late Fee | $ 75.99 | $ 67.57 | $ 67.94 | $ 78.22 | $ 84.66 | $ 91.44 | $ 91.86 | $ 101.21 | $ 101.00 | $ 103.08 | $ 106.82 | $ 84.62 |
| Avg Recovery per Late Fee | 54.27 | 57.42 | 57.15 | 59.36 | 66.43 | 71.77 | 76.98 | 82.81 | 86.56 | 87.94 | 101.29 | 68.71 |
| **Difference** | **$ 21.72** | **$ 10.15** | **$ 10.79** | **$ 18.86** | **$ 18.23** | **$ 19.67** | **$ 14.88** | **$ 18.40** | **$ 14.44** | **$ 15.14** | **$ 5.53** | **$ 15.91** |

## Woodland Park Preexisting Lease Class

*Through Two Years in Collections*

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee through two years in collections was approximately 21% greater than Equity's average late fee charged:[32]

| | Comparison of Average Cost Savings per Late Fee and Average Late Fee Charged Costs Through Two Years in Collections | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Cost Savings per Late Fee | $ 52.31 | $ 80.96 | $ 67.71 | $ 54.57 | $ 61.66 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| **Difference** | **$ 1.65** | **$ 29.24** | **$ 14.84** | **$ 4.94** | **$ 10.61** |

---

[31] Updated Exhibit 3.1, Schedule 2A.1.
[32] Updated Exhibit 3.1, Schedule 1B.

**REDACTED**

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee through two years in collections was approximately 173% greater than Equity's average recovery per late fee:[33]

| Comparison of Average Costs Savings per Late Fee and Average Recovery per Late Fee Costs Through Two Years in Collections | | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Cost Savings per Late Fee | $ 52.31 | $ 80.96 | $ 67.71 | $ 54.57 | $ 61.66 |
| Avg. Recovery per Late Fee | 25.94 | 17.61 | 26.45 | 18.68 | 22.56 |
| Difference | $ 26.37 | $ 63.35 | $ 41.26 | $ 35.89 | $ 39.10 |

*Through Each Resident's Move-Out Date*

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee through each resident's move-out date was approximately 13% greater than Equity's average late fee charged:[34]

| Comparison of Average Cost Savings per Late Fee and Average Late Fee Charged Costs Through Resident Move Out | | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Cost Savings per Late Fee | $ 50.80 | $ 73.47 | $ 61.14 | $ 52.01 | $ 57.70 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| Difference | $ 0.14 | $ 21.75 | $ 8.27 | $ 2.38 | $ 6.65 |

---

[33] Updated Exhibit 3.1, Schedule 1B.1.
[34] Updated Exhibit 3.1, Schedule 2B.

REDACTED

On average, as it relates to the Woodland Park Preexisting Lease Class, Equity's average cost savings per late fee through each resident's move-out date was approximately 156% greater than Equity's average recovery per late fee:[35]

| Comparison of Average Costs Savings per Late Fee and Average Recovery per Late Fee Costs Through Resident Move Out | | | | | |
|---|---|---|---|---|---|
| | 12/1/2011 - 12/31/2012 | 2013 | 2014 | 1/1/2015 - 2/29/2016 | Total |
| Avg. Cost Savings per Late Fee | $ 50.80 | $ 73.47 | $ 61.14 | $ 52.01 | $ 57.70 |
| Avg. Recovery per Late Fee | 25.94 | 17.61 | 26.45 | 18.68 | 22.56 |
| **Difference** | **$ 24.86** | **$ 55.86** | **$ 34.69** | **$ 33.33** | **$ 35.14** |

### C. Comparison of Equity's Costs to Late Fees Collected

The following charts contain a comparison of Equity's costs to the amount of late fees collected/paid:

Standard Late Fee Class[36]

| Comparison of Costs to Amount of Late Fees Paid | | | | | |
|---|---|---|---|---|---|
| | Costs Incurred Method | | Cost Savings Method | | |
| | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections | |
| Total Costs | $ 25,359,583 | $ 29,767,605 | $ 28,616,761 | $ 33,024,783 | |
| Amount of Late Fees Paid | 23,297,646 | 23,297,646 | 23,297,646 | 23,297,646 | |
| **Excess of Costs Over Late Fees Paid** | **$ 2,061,937** | **$ 6,469,959** | **$ 5,319,115** | **$ 9,727,137** | |

---

[35] Updated Exhibit 3.1, Schedule 2B.1.
[36] Updated Exhibit 3.2, Schedules 1A and 2A; Updated Exhibit 3.1, Schedules 1A and 2A; Updated Appendix A, Schedule 5A.

REDACTED

Woodland Park Preexisting Lease Class[37]

| | Costs Incurred Method | | Cost Savings Method | |
|---|---|---|---|---|
| | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections | Total Costs Through Resident Move Out | Total Costs Through Two Years in Collections |
| Total Costs | $ 699,038 | $ 746,356 | $ 690,570 | $ 737,888 |
| Amount of Late Fees Paid | 270,021 | 270,021 | 270,021 | 270,021 |
| Excess of Costs Over Late Fees Paid | $ 429,017 | $ 476,335 | $ 420,549 | $ 467,867 |

Comparison of Costs to Amount of Late Fees Paid

## IV. Conclusion

In conclusion, Equity's late fee charged roughly approximates Equity's costs related to collecting delinquent rent. Under both the costs incurred method and the cost savings method, Equity's costs exceed the amount of late fees collected.

I hold these opinions to a reasonable degree of certainty. If additional information becomes available after the date of my report that may influence the opinions I have rendered, I will supplement my report accordingly.

**********

My supplemental report, with supporting exhibits, is contained herein, and presents a summary of my opinions and the bases and reasons therefor as of this date. To the extent any additional information is produced by the parties or their experts, I will be prepared to incorporate any such additional information into my supplemental report, or otherwise to amend or supplement my supplemental report as appropriate.

This supplemental report is to be used only for the purpose of this litigation and may not be published or used for any other purpose without prior written consent.

---

[37] Updated Exhibit 3.2, Schedules 1B and 2B; Updated Exhibit 3.1, Schedules 1B and 2B; Updated Appendix A, Schedule 5B.

REDACTED

Javanni Munguia-Brown, et al. v. Equity Residential, et al.

Respectfully submitted,

Mark J. Hosfield

August 13, 2021

**REDACTED**

**EXHIBIT 3**

UNITED DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

-------------------------------------------------- x

JAVANNI MUNGUIA-BROWN,
ANGELINA MAGAÑA, NORMA
RODRIGUEZ, and DAVID BONFANTI
individually and on behalf of others similarly
situated,

       Plaintiffs,

vs.

EQUITY RESIDENTIAL, a real estate
investment trust, ERP OPERATING
LIMITED PARTNERSHIP, a partnership,
EQUITY RESIDENTIAL MANAGEMENT,
L.L.C., EQRWOODLAND PARK A
LIMITED PARTNERSHIP, and EQR-
WOODLAND PARK B LIMITED
PARTNERSHIP,

       Defendants.

-------------------------------------------------- x

:
:
:
:
:
:
:
:
:
:
:

Case No.: 4:16-cv-01225-JSW-TSH

**EXPERT REBUTTAL REPORT OF
ANDREW D. SCHWARZ**

# Contents

**1. Qualifications** ........................................................................................................ **1**

**2. Assignment and Assumptions** ................................................................................ **1**

**3. Summary of Opinions** ............................................................................................ **6**

3.1  The Hosfield Report Has Failed to Focus on the Definition of "Actual Damages," Based on the *Garrett/Beasley* Standard. .................................................................................................................... 6

3.2  The Hosfield Report Inappropriately Commingles Costs from Valid and Invalid Time Periods in Ways that Cannot Be Fully Disaggregated ........................................................................................ 7

3.3  Mr. Hosfield's First Personnel Costs Analysis is Based on Non-Probability Sampling Which Renders His Extrapolation from the Sample to the Full Population Invalid. ............................................... 8

3.4  The Hosfield Report Does Not Calculate Costs on an Individual Tenant Basis. ........................... 9

3.5  Lack of Replicability/Falsifiability Renders Mr. Hosfield's Second Methodology Unscientific and Unreliable ....... 9

3.6  There Exist Reasonable Class-Wide Methods to Measure Costs on a Tenant-specific Basis, Which Are Reliable and Formulaic .................................................................................................................. 10

**4. Summary of the Hosfield Report** ........................................................................ **11**

4.1  Eviction Costs, Collection Costs, and Interest Costs ................................................................ 11

4.2  Employee Costs .......................................................................................................................... 12

**5. The Hosfield Report Has Failed to Focus on the Definition Of "Actual Damages," Based on the *Garrett/Beasley* Standard.** .......................................................... **14**

5.1  Mr. Hosfield's First Method for Calculating Personnel Costs Inappropriately Includes Fixed Costs and Costs Unrelated to Late Rent. ........................................................................................... 18

5.1.1  *Illustration of the Inflation of Damages caused by the Hosfield Report's Miscalculation of the Base Compensation underlying Employee Costs.* ....................................................................... 26

5.1.1.1  Categories of Pay that are not Marginal to Late-Paid Rent. ............................... 27

5.1.1.2  Categories of Employees Whose Compensation is not Marginal to Late-Paid Rent ......... 39

5.2  Hosfield's Second Method for Calculating Personnel Costs Relies Entirely on Eliminating Fixed Costs and is Untethered from the "Actual Damages" Caused by an Individual Tenant ...................... 48

**6. The Hosfield Report Inappropriately Commingles Costs from Valid and Invalid Time Periods in Ways that Cannot Be Fully Disaggregated** ........................... **51**

6.1  Employee Costs .......................................................................................................................... 54

6.2  Eviction Costs and Collection Costs ......................................................................................... 56

6.3  Interest Costs ............................................................................................................................. 56

**7. Mr. Hosfield's First Personnel Costs Analysis Is Based On Non-probability Sampling, Which Renders His Extrapolation from the Sample to the Full Population Invalid.** ........................................................................................... **58**

7.1  Mr. Hosfield's Sampling Methodology Created a Biased Estimate of the True Percentage of Time Relevant Employee Categories Spend Collecting Late Rent ............................................................... 64

**8. The Hosfield Report Does Not Calculate Costs on an Individual Basis.** ........... **68**

8.1  There is Strong Evidence that Every Late Paying Tenant Does Not Impose Identical Costs on Defendants in a Given Month. ...................................................................................................................... 71

**9. Lack of Replicability/Fasifiability Renders Mr. Hosfield's Second Methodology Unscientific and Unreliable.** ..................................................................................... **73**

**10. There Exist Reasonable Class-wide Methods to Measure Costs on a Class-member Basis, Which are Reliable and Formulaic** ..................................................... **76**

10.1  A Multiple Regression Model of Payroll Costs ....................................................................... 81

10.1.1  *Regression on Overtime/Double-time Pay* ...................................................................... 93

10.1.2  *Regression on Regularly Hourly Pay* ............................................................................. 99

10.1.3  *Regression on Salaried Pay* .......................................................................................... 102

10.1.4  *Regression on Salaried Personnel Count* ..................................................................... 103

10.2  Implications of the Regressions for the Question of "Actual Damages" ............................... 105

10.2.1  *Over 97 Percent of Class Members Who Paid Late Fees Have Net Positive Restitution* ........ 108

10.2.2  *Defendants' Late Charges are Disproportionate to Their "Actual Damages"* ................... 110

**11. Signature** ........................................................................................................... **113**

## 1. QUALIFICATIONS

1.       My name is Andrew D. Schwarz.  I am a Member of OSKR, LLC, an economic consulting and research firm specializing in the application of economic analysis to complex legal issues.  I received a Master's Degree in Business Administration from the Anderson School at UCLA in 1994, a Master's Degree in History from the Johns Hopkins University in 1990, and studied Ph.D.-level economics and marketing at UCLA and UC Berkeley from 1995 through 1997, before starting work as an economist.  I then spent ten years with LECG, an international economic consulting firm.  In 2007, I co-founded OSKR.  I have also worked as a financial analyst for Hewlett-Packard.  In my educational background, as a financial analyst, and in more than two decades of analyzing markets and the economic issues surrounding litigated disputes, I have had the opportunity to apply many economic and statistical procedures in the course of my work to questions relevant to the calculation of economic damages.

2.       A copy of my C.V. is attached as Appendix A.  My C.V. includes all cases in which I have testified as an expert witness at deposition and trial, stretching back more than four years, as well as my complete list of publications.  A list of documents reviewed in connection with this report is attached as Appendix B.  For my work on this matter, I am being compensated at an hourly rate of $550 per hour, plus reimbursement of expenses.  The billing rates of my staff working on this matter at OSKR range from $225 to $300 per hour.  I have been assisted in this matter by OSKR staff working under my direct supervision and control.  I have no financial interest in the outcome of this matter.

## 2. ASSIGNMENT AND ASSUMPTIONS

3.       I was asked by Class Counsel in this action to assess the Expert Report and Disclosure of Mark J. Hosfield that Defendants submitted in this case on May 10, 2021 ("Hosfield

Report") and assess whether the economic assertions made in that report, specifically focused on the question of Defendants' claimed damages (as offsets to Plaintiffs' claimed restitution), were economically accurate and reliable, and to the extent I found the Hosfield Report to be lacking on those dimensions, to develop examples of alternatives for modeling Defendants' costs directly tied to their efforts to collect late rent from individual tenants.

4.    I am an economist, not a lawyer, and I do not purport to present a legal opinion. However, in order to properly fit my economic analysis within the framework of a legal action, I am often required to adopt certain assumptions on instruction of counsel. For the purposes of my assignment in this matter, Class Counsel instructed me to make the following legal assumptions.

a)  I have assumed that the appropriate standard for Defendants damages in this case come from *Garrett v. Coast & So. Fed. Sav & Loan Assn.*[1] (hereinafter "*Garrett*"), which says that even if a late fee is determined invalid, a consumer who pays late "remains liable for the actual damages resulting from his default," which I understand to mean that each individual class member is only liable to Defendants for the "actual damages" that tenant caused by paying rent late (i.e., the default stated in Defendants' California residential lease agreements). Further, I have assumed that the legal standard for which personnel costs that Defendants may claim under the "actual damages" standard listed above is limited to costs that went up <u>directly</u> because of each plaintiff's and class member's breach (i.e., paying rent late). I understand this assumption is based on the Court's Summary Judgment Order in the current matter,[2] *Beasley v. Wells Fargo Bank*[3] (hereinafter "Beasley") and the contract damages principles on which both rely. This means that Defendants cannot

---

[1]   Garrett v. Coast & So. Fed. Sav & Loan Assn., 9 Cal.3d 731, 741 (1973).
[2]   ECF 142, Order Denying in Part and Granting in Part Motion for Summary Judgment ("Summary Judgment Order"), at 7.
[3]   *Beasley v. Wells Fargo Bank*, 235 Cal.App.4th 1402-03 (1991).

claim overhead and personnel costs as damages from late rent unless they are "able to demonstrate that certain overhead and personnel costs are affected by Plaintiffs' late payments."[4] Hence, "Overhead and personnel costs [that] are fixed and unaffected by the late payment of rent" cannot be recovered as damages.[5] Collectively, I will refer to these assumptions as the *Garrett/Beasley* standard.

As I understand the *Garrett/Beasley* standard, "actual damages" must relate directly to the actual damages each specific class member generated in a way that corresponds to the economic concept of "marginal cost," i.e., the costs generated by one additional unit of production, one additional sale, or as in this case, one additional late-paying tenant. In many respects, the concept of marginal cost corresponds to the "but-for" standard used in many damages situations, that is, but-for a single class member's late-payment(s), how would Defendants' costs change, holding constant the conduct of all other class members and non-class members alike. This is very different from what Mr. Hosfield has done, as I lay out below.

b) As I understand it, there is a dispute among the parties as to when "late rent" collection expense ends and expenses recoverable under the "default remedies" provision of the lease that Defendants have with their California residential tenants ("the Standard Lease") begins. Class Counsel has asked me to make three alternative assumptions.

   i) The first is consistent with my understanding of Plaintiffs' view that, as a matter of law, the relevant offsets to gross restitution related to the collection of late rent are limited to costs incurred between (a) the point at which the contractual grace period on late rent ends, which I understand to be (in most cases) just after

---

[4] Summary Judgment Order (ECF 142), pp. 7-8.
[5] Summary Judgment Order (ECF 142), pp. 7-8.

midnight on the fifth day of a lease-month,[6] and (b) the point at which the late tenant's file is first referred out for eviction proceedings.[7] As I understand this assumption, Plaintiffs contend that once a case is put into the eviction process, it either ends in eviction, in which case all of the costs incurred from point (b) onward are considered eviction costs, rather than costs related to the collection of late rent, or ends in a settlement, whereby the tenant is not evicted, but Defendants agree to waive legal claims against the tenant in exchange for receipt of some consideration from the tenant, typically payment of rent, either in part or in whole. Thus, Class Counsel has asked me to assume here that inclusion of costs before point (a) and beyond point (b) in Defendants' claimed damages related to any tenant referred out for evictions proceedings (whether evicted or not) is inappropriate, either because they related to a different breach of the lease (non-payment of rent resulting in eviction rather than late payment of rent) or because Defendants' claim for those costs have been waived. In my work below, I refer to this as Plaintiffs' Relevant Cost Period or assumption (4b)(i).

ii)  The second version is an alternative scenario proposed by Plaintiffs, for which Defendants' costs that occur after eviction proceedings have begun are eliminated only for those tenants who were actually evicted or who vacated their apartment during the eviction proceedings. For any tenants who paid off their balance and remained in their apartment after the eviction proceedings began, in this scenario, I assume Defendants' recoverable late-rent damages continue until the non-evicted tenants paid the outstanding balances. Costs before point (a) are excluded for all, as above. In my work below, I refer to this as Plaintiffs' Alternative Cost Period or assumption (4b)(ii).

---

[6]  That is, at approximately 12:00:01am on the fifth day of the month.

[7]  In the data, this occurs on almost every day of the month, but the most common date is the fifteenth day of a month in which the tenant failed to pay rent before the fifth day of the month.

iii) The third version is consistent with my understanding of what Mr. Hosfield has done, which is to include all of Defendants' costs for any tenant, whether evicted or not, for time including prior to the fifth day of the month as well as after the tenant has been referred out for eviction. In my work, I refer to this as Defendants' Relevant Cost Period or assumption (4b)(iii).

c) Class Counsel has asked me to assume that as a matter of law, legal expenses related to evictions and collections are invalid expenses to include in any calculation of damages related to the collection of late rent. I have adopted this assumption throughout this report, and thus I exclude the "Eviction Costs" and "Collection Costs" line items in the Hosfield Report in my work, other than when contrasting my results with those of Mr. Hosfield.

d) I understand from *Garrett* and *Ridgely v. Topa Thrift & Loan Ass'n*,[8] that a late fee amount that is "disproportionate to the anticipated damages is termed a 'penalty'" and is invalid.[9]

5.  As a non-lawyer, I do not have any opinion as to whether these assertions of matters of law are correct or not. Rather, I take them as part of my assignment and adopt them in my analysis of the Hosfield Report and in my presentation of alternative means of assessing Defendants' costs specifically tied to late rent. Thus, in part, my assignment involves pointing out where the Hosfield Report has deviated from these assumptions.

6.  Finally, I also understand that as a matter of law, the late rent payments made by class members deemed to be recoverable in this matter are considered Plaintiffs' and class members' restitution,[10] and that the law makes allowance for Defendants to offset each

---

[8]   17 Cal. 4th 970 (1998).

[9]   *Id.* at 977; *see also Garrett*, 9 Cal.3d at 741 ("[T]he characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract.").

[10]   As I understand it, Plaintiffs produced an expert report from Mr. David Breshears which determined Class members' late fees (i.e., their gross restitution) on a class member by class member basis. I also understand that Mr. Hosfield's aggregate values broadly correspond with the total of Mr. Breshears individual calculations.

Plaintiff's and class member's claimed restitution with certain costs (introduced above and discussed below in more detail) that are considered to be Defendants' "actual damages" related to each specific Plaintiff and class member to reach a net restitution value for each such Plaintiff and class member, net of those specific "actual damages." In this report, I will make an effort to be clear when I am discussing the late rent fees themselves (the alleged gross restitution), the relevant costs incurred by Defendants in collecting late rent (the alleged "actual damages"), and the combined total for a given tenant (the alleged "net restitution" or "restitution net of actual damages"). [11]

## 3. SUMMARY OF OPINIONS

7.     In my opinion, the Hosfield Report is flawed for a variety of reasons. These flaws render the opinion unreliable as a means of determining Defendants "actual damages" from late rent which could be offset against Plaintiffs' and class members' restitution. I have six primary critiques, which I summarize in the remainder of this section.

### 3.1   THE HOSFIELD REPORT HAS FAILED TO FOCUS ON THE DEFINITION OF "ACTUAL DAMAGES," BASED ON THE *GARRETT/BEASLEY* STANDARD.

8.     The Hosfield Report has failed to focus on the definition of "actual damages," based on the *Garrett/Beasley* standard. It contains zero analysis designed to demonstrate what the specific costs are (whether salary, hourly pay, overtime, overhead, or any other expense) that flow from a single tenant's late rent.

9.     Mr. Hosfield has not undertaken an analysis to determine a reasonable estimate of the costs Defendants incurred in collecting late rent for any individual class member, but instead has commingled marginal costs (i.e., those that change when a tenant is late) with

---

[11]  To be clear, I am not suggesting that restitution captures all injury addressed by this lawsuit. As an economic matter, imposing a fee can constitute economic harm even if the fee is not paid. A tenant with an unpaid fee on EQR's books may face collection efforts or adverse credit consequences, and in any event may be considered to have a debt that is capable of being wiped out by a ruling that the fee is unlawful.

inframarginal costs (i.e., those which do not change when an individual tenant is late).[12] Hence, he has included Defendants' costs that do not vary with an additional occurrence of late-paid rent, which in total far outstrip the costs that do vary, in his total pool of Defendants' damages. By failing to assess this distinction, the Hosfield report provides no evidence that even a dollar of Defendants payroll costs tie specifically to costs imposed by any tenants' late payment of rent; instead the Hosfield Report merely tallies up a subset of Defendants costs and assumes, rather than demonstrates, that they are "actual damages." The result is that the aggregate pool of damages he assesses is far larger than the simple sum of Defendants "actual damages" caused by each class member because it includes costs that do not vary with an additional occurrence of late-paid rent.

## 3.2 THE HOSFIELD REPORT INAPPROPRIATELY COMMINGLES COSTS FROM VALID AND INVALID TIME PERIODS IN WAYS THAT CANNOT BE FULLY DISAGGREGATED

10. In calculating his numbers, Mr. Hosfield has commingled costs that inappropriately include costs Defendants incurred for activities not considered to be late rent collection, as defined under two of the three assumptions I have been asked to adopt, namely (4b)(i) – the Plaintiffs' Relevant Cost Period – and (4b)(ii) – Plaintiffs' Alternative Cost Period. These costs include the purported damages related to late-paid rent incurred prior to the end of the grace period in the Standard Lease (days 1 through 4 of the month) as well as the purported damages incurred after tenants' files were referred for eviction and/or for those who were ultimately evicted. For the bulk of the costs that comprise Mr. Hosfield assessment of damages – his "Employee Costs"[13] – it is not possible for any objective third-party to revise the conclusions of the Hosfield Report to exclude costs incurred outside of

---

[12] Terminologically, just as a fixed cost can be contrasted with a variable cost, a marginal cost can be contrasted with an "inframarginal" cost, i.e., one that does not vary on the margin.

[13] In his primary methodology (as shown in Hosfield Report, p. 26 of 49, first table), "Employee Costs" constitutes 53% of Mr. Hosfield's purported damages total for the Standard Late Fee Class.

Plaintiffs' Relevant Cost Period or Plaintiffs' Alternative Cost Period.[14] This is because his employee interview methodology failed to distinguish among the types of work Defendants' employees do, which is necessary if one wishes to identify only those hours spent on tasks which fall within assumption (4b)(i) or (4b)(ii).[15] Thus, unless every single task over the entire month is considered relevant [a la assumption (4b)(iii)], Mr. Hosfield's estimates are upwardly biased.[16] Therefore, to the extent that Plaintiffs are correct (under either set of assumptions) as to which costs are relevant to Defendants' damages from tenants' late payment of rent, Mr. Hosfield's work cannot be relied upon, and the errors are not reparable given the current record.

### 3.3 MR. HOSFIELD'S FIRST PERSONNEL COSTS ANALYSIS IS BASED ON NON-PROBABILITY SAMPLING WHICH RENDERS HIS EXTRAPOLATION FROM THE SAMPLE TO THE FULL POPULATION INVALID.

11. The nature of Mr. Hosfield's analysis appears to be statistical, in that he is estimating a proportion (the percentage of time employees spend on collecting late rent) from a sample drawn from a population of employees. However, the nature of his sampling is non-random and therefore non-probabilistic, which renders his extrapolation from the sample to the full population invalid. Moreover, even if one were to assume the sample has been the result of a valid random process, the sample was improperly constructed to allow for extrapolation to the full set of Defendants' California employees in the relevant job categories. In addition, the computations Mr. Hosfield performed to generate his averages are biased, because the subgroupings he samples are improperly weighted. This also renders his results unreliable.

---

[14] To the extent Plaintiffs are correct vis-à-vis assumption (4b)(i), the Eviction Costs and Collection Costs are easily discarded in their entirety. With respect to interest costs, it may be possible for a neutral party to disentangle the irrelevant costs from the relevant ones. My critique here is focused on the single biggest line item in Mr. Hosfield's work, the Employee Costs figure.

[15] Because of the nature of Mr. Hosfield's interviews, where he appears to have asked questions of Defendants' employees designed to elicit answers related to the portion of their time the spent dealing with all elements of their jobs, including collecting late rent, but not in a way that allows for any independent verification of his conclusions, there is no way to verify the results against different assumptions.

[16] This is distinct from my critique, below, that there are statistical errors in Mr. Hosfield's work that cause his estimates to be biased.

### 3.4 THE HOSFIELD REPORT DOES NOT CALCULATE COSTS ON AN INDIVIDUAL TENANT BASIS.

12.     Separate from overstating total damages, the Hosfield Report also applies a pooled & allocated damages methodology, which I understand is invalid under the *Garrett/Beasley* standard,[17] and as a result it provides an unreliable estimate of either total damages or individual class member damages.  Under that standard, it is incorrect to pool together costs related to higher- and lower-cost tenants together, and then over-assign some of those costs to the lower-cost tenants.  By doing so, the Hosfield Report has failed to assess each class member's "actual damages" and instead uses a misrepresentative allocation.  Because of the distribution of late-paying tenants (where most pay their late rent within the first ten days of the month, but a smaller portion of late-paying tenants take much more time and involve additional tasks), the incorrect assumption that everyone who is late in a given month imposes identical costs on Defendants creates the false impression that each class member's claimed restitution is entirely offset by Defendants' claimed damages.  This, however, is not the case for the vast majority of class members.  In fact, as I show below, well over 95% of class members have net positive restitution even after imposing offsets for Defendants' damages.  Mr. Hosfield has generated a cost estimate, but that number is untethered from Defendants "actual damages" because his calculations are not tied to the harm imposed by each class member.

### 3.5 LACK OF REPLICABILITY/FALSIFIABILITY RENDERS MR. HOSFIELD'S SECOND METHODOLOGY UNSCIENTIFIC AND UNRELIABLE

13.     Mr. Hosfield's analysis of the purported cost savings that Defendants could achieve in a world without any late rent (his "Cost Savings Method") is based on assertions made by four upper-level management employees of Defendants, which Mr. Hosfield simply repeats

---

[17]     In testimony Mr. Hosfield gave in a case in Massachusetts, he explained that failing to tie a calculation of costs to the specific act that caused harm is not damages, but rather just numbers. "His calculation is not a damage analysis. It is just math done on numbers that have nothing to do with the claim here."  Deposition of Mark Hosfield (in *Baker and Dittmann v. Equity Residential Management L.L.C. and EQR-Walden Park*, LLC, Case No. 1:18-cv-1175), p. 74.  That is essentially the problem with what Mr. Hosfield has done here.

and sums up without vetting for accuracy, analysis or critique. It is not a valid theory, as it offers no possibility of being falsified through testing of different counterfactuals. This work lacks scientific rigor, specifically because the results cannot be independently replicated, nor can the conclusions be tested and potentially falsified.

## 3.6 THERE EXIST REASONABLE CLASS-WIDE METHODS TO MEASURE COSTS ON A TENANT-SPECIFIC BASIS, WHICH ARE RELIABLE AND FORMULAIC

14.     Most fundamentally, Mr. Hosfield is incorrect when he assumes that Defendants' costs of class members' late payment of rent cannot be accurately estimated at the tenant level. He is incorrect to assert that "[b]ecause of the extensive analysis required to calculate these damages, and the frequency with which tenants fail to timely pay rent, it would be impracticable to calculate actual damages each time a resident failed to timely pay rent."[18] The field of economics has many tools for assessing the costs of complex activities and modeling them, such that reasonably reliable estimates of costs can be developed, and that general conclusion applies specifically in this case. While Mr. Hosfield may be correct that "the activities and amount of time required to account for and collect late rent varies widely,"[19] that does not excuse failing to calculate individual costs where the data permit a reliable methodology to assess the cost of time spent on late rent collection, as is the case here. In this report I lay out a rigorous econometric method designed to identify the "actual damages" to Defendants, caused by each incident of a given tenant being late in a given month, which shows that (a) such a calculation is possible, and (b) only a small fraction – on the order of two to three percent of the members of the class who paid a late fee caused "actual damages" in excess of their late fees paid.[20]

---

[18]    Hosfield Report, p. 11 of 49.

[19]    Hosfield Report, p. 11 of 49.

[20]    Note that these calculations include class members for whom, in some instances, the data shows a late fee having been charged for which no specific payment can be identified. This results in no restitution being included for that month in my calculation of net restitution, even if they did, in fact, pay that late fee. This tends to increase the percentage of class members who show total net negative restitution.

15.     In the remainder of this report, I lay out in detail the bases for these opinions and provide a detailed example of how, with an appropriate amount of effort, one can avoid a pooled damages methodology, such as the one employed in the Hosfield Report and thus tie Defendants' payroll costs, which form the basis of Mr. Hosfield's claimed "Employee Costs"[21] damages, to the actual expenses associated with each individual tenant paying late rent.

## 4.  SUMMARY OF THE HOSFIELD REPORT

16.     The Hosfield Report develops damages by estimating four categories of expenses. The first of these is Employee Costs and it is the focus of most of my critique below.  The other three ("Eviction Costs," "Collection Costs," and "Interest Costs") can be described and dispatched with more concisely.

### 4.1   EVICTION COSTS, COLLECTION COSTS, AND INTEREST COSTS

17.     Mr. Hosfield's Eviction Costs focuses on expenditures to third parties for the legal processes of eviction proceedings.  It does not include any estimate of Defendants' own employee costs related to these activities, which instead are handled in Mr. Hosfield's Employee Costs category.  Mr. Hosfield's Collection Costs focuses on the net payments made to third-party debt collectors.  As mentioned above in paragraph (4c), I have been instructed by Class Counsel that neither of these categories of legal expenses is a valid form of damages in this matter, and thus, to the extent Class Counsel is correct, Mr. Hosfield's calculation has overstated Defendants' damages.  These erroneously included figures are easily removed from his totals (unlike other errors, which I discuss below).

18.     Mr. Hosfield's Interest Cost is based on a calculation of interest on a daily basis for all rent payments not paid on the first day of each lease month.  Class Counsel informs me that

---

[21]     In the body of this report, to avoid excessive use of quotation marks, when I am referring to the four major categories of damages in the Hosfield Report, after the first references, I will use capital letters but no quotation marks.  So Eviction Costs, with capital E and C, refers to Mr. Hosfield's use of that term, while eviction costs is a more generic usage of the term.

Plaintiffs' experts David Breshears and Christian Tregillis have been tasked with performing a detailed analysis of Mr. Hosfield's work with respect to any damages from late rent related to Defendants' lost use of funds (i.e., forgone interest on late rent), if any, and that those reports provide the detailed support for those calculations. In this report, I simply adopt those numbers and include them when I assess the grand total Defendants' of "actual damages" offset.

19.     In the course of my assessment of the Hosfield Report, I offer a critique of Mr. Hosfield's interest cost, separate from the incorrect calculation, focused on Mr. Hosfield's decision to ignore his own calculation of a tenant-by-tenant interest expense, and instead to aggregate those dollars and then redistribute them in a way that is not proportional to the interest damages caused by individual late-paying tenants. My opinions on interest expenses should not be seen as a substitute for the actual numerical assessment performed by Mr. Breshears and Mr. Tregellis.

## 4.2   EMPLOYEE COSTS

20.     With Employee Costs, Mr. Hosfield's method is more difficult to explain, but more important to understand because the work contains flaws which render it unreliable. Mr. Hosfield advances two methods for estimating Employee Costs that qualify, in his opinion, as damages. The first focuses on a survey of 59 of Defendants' employees, using what appears to be a non-random sample. Mr. Hosfield asked these employees to remember their work a year or two prior to the interview and to provide a ballpark estimate for the time they spent engaged in what he calls "Collection Of Rent And Money Owed By Tenants, Including Evictions And Tenant Lawsuits Over Rent."[22]

21.     Once Mr. Hosfield calculates a non-weighted average of his survey results (despite his having drawn them from separate subsamples), he then extrapolates the combined results of that group to Defendants' entire compensation pool for the two job categories he

---

[22]    See Cell B9 of most of the tabs of EQR_Expert_000211.xlsx, e.g., Cell B9 of the tab "Alex Sakr"

studied, Office Management and Leasing, without concern for whether the pool of compensation includes the pay of employees who were not covered by his sampling methodology or who never entered any time into the portion of Defendants' property management database called "RMNotes." This database contains records reflecting employees' late-rent collection work. Additionally, in the compensation pool, Mr. Hosfield includes salary, hourly pay, as well as variety of employee benefits such as health insurance and paid time off.

22.     Mr. Hosfield calculates annual totals for each year in his analysis. Those costs are then allocated to individual class members by assigning to each tenant who is late in each month in a given year an equal share of that year's total calculated expense. Mr. Hosfield also allocates the other three categories of costs in the same fashion, so that a tenant that is late by one day in a month is charged Eviction Costs and Collection Costs, even if the tenant was not evicted and did not have any funds sent out for collections, and is charged the same amount of employee costs and interest costs as a tenant who was late by more than a month in that same year.

23.     Mr. Hosfield concludes with an alternative estimate of Employee Costs based on a hypothetical scenario in which all rent was paid on time. This alternative estimate is based on a speculative projection of how Defendants would reorganize their entire California operations' employment structure if they were guaranteed that no tenant, whether in the class or not, would ever pay rent late. Taking this Defendant-generated analysis, Mr. Hosfield totals the savings and then allocates an equal portion to each tenant in each year for each month the tenant was late in paying rent. His expertise is limited to this tally and allocation; the rest of the work was done by Defendants specifically for this litigation.

**5. THE HOSFIELD REPORT HAS FAILED TO FOCUS ON THE DEFINITION OF "ACTUAL DAMAGES," BASED ON THE *GARRETT/BEASLEY* STANDARD.**

24. As I understand the *Garrett/Beasley* standard, the damages Mr. Hosfield has been tasked by Defendants to calculate must relate directly to the actual damages each specific class member generated alone. This corresponds to the economic concept of "marginal cost," i.e., the costs generated by one additional unit of production, one additional sale, or in this case, one additional late-paying tenant. In many respects, the concept of marginal cost corresponds to the "but-for" standard used in many damages situations, that is, but-for a single Plaintiff's or class member's late-payment(s), how would Defendants' cost change, holding constant the conduct of all other class members and non-class members alike. Marginal cost is also similar, though not precisely identical to the accounting concept of variable costs,[23] but all of these concepts get at the heart of the issue, which is that in order to understand the cost of one additional increment (one more late-paying tenant, in this case), one needs to isolate the costs that change with that single increment, exclusively, and not include the impact of other changes. This is very different from what Mr. Hosfield has done.

25. Mr. Hosfield's two methodologies are based on an allocation of inframarginal costs, which is essentially the 180° opposite of my understanding of what the *Garrett/Beasley* standard requires. He has included all costs, whether marginal or inframarginal, with the unsupported (and incorrect) claim that "… the employee costs included in my calculations are not fixed costs." His thesis is that because he was told by Defendants' employee Debra Rivera that "Equity is constantly looking for ways to reduce its employee costs,"[24] and that "Equity has a history of reducing headcount when changes in the environment or technology, such as new software or process management, reduces needs or increases

---

[23] "A **variable cost** is a cost that changes *in total* in proportion to changes of a cost driver." Horngren, Charles T., *et al.*, "Cost Accounting" (Eighth Edition), Prentice Hall (1994), pp. 29-30. (Bold and italics in original).

[24] Hosfield Report, p. 31 of 49.

efficiency,"[25] that therefore, in the long-run, Equity could essentially fire or demote anyone it employs, which renders these costs as variable. The standard definition of variable and fixed costs, in the context of cost accounting, is that "A **variable cost** is a cost that changes *in total* in proportion to changes of a cost driver. A **fixed cost** is a cost that does not change *in total* despite changes of a cost driver."[26] Specifically "costs are defined as variable or fixed with respect to specific cost objects,"[27] which in this case is the fact of a specific tenant paying rent late. Based on my understanding of these standard definitions of fixed versus variable cost, it appears Mr. Hosfield has stretched his definition of variable costs to cover any cost that might vary in a hypothetical world and has stretched the cost driver from a single tenant's late payment of rent to the universe of all possible tenants who might ever pay late rent, over an undefined time frame.[28] This redefinition of the concept of fixed costs would essentially make *all* costs variable, including very standard fixed costs such as rent, depreciation, or property taxes.[29] Mr. Hosfield says nothing about the impact of one tenant,

---

[25]  Hosfield Report, p. 31 of 49.

[26]  Horngren, Charles T., *et al.*, "Cost Accounting" (Eighth Edition), Prentice Hall (1994), pp. 29-30. (Bold and italics in original).

[27]  Horngren, Charles T., *et al.*, "Cost Accounting" (Eighth Edition), Prentice Hall (1994), p. 30.

[28]  As Horngren, *et al.* (p. 31), explain, when assessing whether costs are variable or not, "a time span must be specified," but when Mr. Hosfield pronounces that no Defendants salary costs are fixed, he is quite vague as to the time span, discussing a hypothetical long-run in some distant future: "It is important to note that the employee costs included in my calculations are not fixed costs. Instead, they are community-level costs which are management-controllable, i.e., positions can be eliminated or changed at the discretion of management. I understand from discussions with Debra Rivera, Vice President – Property Management for Equity, that Equity is constantly looking for ways to reduce its employee costs, which is one of Equity's largest expenses. Specifically, I understand from Ms. Rivera that Equity has a history of reducing headcount when changes in the environment or technology, such as new software or process management, reduces needs or increases efficiency." (Hosfield Report, p. 17 of 49.) One is reminded of the John Maynard Keynes quip that "in the long run, we are all dead," which while true does not provide a meaningful timeframe to assess whether costs are fixed or not.

[29]  Under the Hosfield definitions, even (literal) textbook examples of fixed costs such as rent and property taxes can be declared "not fixed" since a firm could potentially renegotiate its rent if business slows down and a property tax appraisal can be appealed and reduced. Holmgren, *et al.* (p. 30), list "**property taxes**, executive salaries, **rent**, and insurance" (my emphasis) as example of fixed costs because they are "costs that remain unchanged in total over a designated range of the cost driver during a given time span." However, because Mr. Hosfield expands the cost driver beyond just a given tenant's late rent payments to include all possible late-paying tenants and expands the time span from a tenant's tenancy to an indefinite, perhaps infinite, period, he has essentially developed an ad hoc definition that can find any cost not to be fixed if management just tries hard enough to lower these costs in the future.

even an egregiously late tenant, on employment costs, nor does he provide any evidence of a specific layoff or reduction in hours of any employee because of a change in any individual tenant's late rent behavior. Moreover, he provides no citation to any accounting authority for the definition of fixed costs he has applied.

26.    On the margin, the impact of a single tenant, even one who is late multiple times in the same year, is not equal to a tenant's average share of all costs related to the tasks Mr. Hosfield aggregates into Employee Costs. As I show below (in Section 10) using a multiple regression model, the actual marginal cost impact of the median class member paying rent late in a single month is just under $14 , nowhere near the $63.86[30]- $263.86[31] per month in the Hosfield Report.

27.    Though the most effective way to assess this question holistically is by means of the econometric tool known as multiple regression (which I demonstrate in Section 10 below), it is easy to see how Mr. Hosfield's view is inconsistent with the facts of Defendants' business by means of a simple example. If the portion of payroll that Mr. Hosfield posits is variable with late rent were, in fact, truly variable, then in a month in which a given community had no late rent payments, we should see notably lower payroll expenses than in months in which that community had some late rent payments. However, that is not the case, as can be seen in an example from Defendants' data on salaried payroll and late rent payments.

28.    For three consecutive months in 2011, there were no late rent payments (among class members) in the Southwood community. And yet salaried payroll did not meaningfully change[32] in those months compared to the months before or after, as shown in Exhibit 1 below.

---

[30]    Hosfield Report, p. 41 of 49. See the 2011 and 2012 figures in the first table.
[31]    See Hosfield Report, Exhibit 3.2, Schedule 3A. See the 2020 figure.
[32]    Payroll actually rose in the first month in which there were no late paying tenants, but this appears to have coincided with newly given annual raises.

Exhibit 1. Southwood Property Incidence of Lateness vs Salaried Payroll



29.     This is just a single office, but it illustrates the point the regression analysis I perform in Section 10 is designed to assess rigorously, i.e., whether salaried pay is (or is not) affected on the margin, when a tenant is late in paying rent (and depending on how long the rent remains outstanding). This example illustrates the general rule confirmed by the regression—which is that the incidence of late payments has no effect on salaried pay.

30.     Because the question of whether these costs vary when a single tenant pays rent late is central to the *Garrett/Beasley* standard, the complete absence of any analysis or evidence in support of this assertion by Mr. Hosfield is a glaring omission that renders him incapable of providing any reliable opinion that these costs are not fixed vis-à-vis individual tenants' late rent. His say-so is insufficient in the face of counterevidence.

31.     Moreover, as I show below, a rigorous analysis actually proves the opposite, which is that Mr. Hosfield has included wide swaths of employee costs for payroll items that are clearly not marginal to a given tenant's late payment of rent.  One of the key conclusions of that analysis is that the <u>salary</u> component (in contrast to hourly pay) of Defendants' payroll has no positive relationship with the frequency of late paid rent.  In the face of this evidence to the contrary, there is no basis to rely on Mr. Hosfield's unsupported, untested, conclusory statement.

32.     The rest of this section lays out the different categories of inframarginal costs that Mr. Hosfield has included, and estimates the overstatement of "actual damages" this error has caused.  I focus first on Mr. Hosfield's first method (based on interviews and extrapolation, which he refers to as his "Costs Incurred Method"), and then turn to his second method (in which he assumes no rent is ever paid late and calculates the reduction in costs Defendants might save, which he refers to as his "Cost Savings Method").

33.     In what follows, I adopt as a starting point Mr. Hosfield's numbers, but only for the sake of illustrating the magnitude of the errors discussed.  None of this should be seen as an affirmative endorsement of Mr. Hosfield's methodologies or numerical results.  Rather, my goal is to show that even if the Court were to adopt Mr. Hosfield's methodology, it should not adopt his numerical results, as they overstate damages and should be scaled down substantially.

## 5.1    Mr. Hosfield's First Method for Calculating Personnel Costs Inappropriately Includes Fixed Costs and Costs Unrelated to Late Rent.

34.     Mr. Hosfield's first methodology for calculating the purported Employee Costs related to the collection of late-paid rent is based on an interview of 59 of Defendants' employees, which Mr. Hosfield uses to calculate the purported average percentage of time spent by an employee in the "Office Management" job category on the one hand, and by an employee in the "Leasing" job category on the other hand.  The specific values he calculates

are 12.32% for the Office Management category and 4.45% for Leasing Management.[33] He then extrapolates those percentages across all of Defendants' employees in those two job categories, and multiplies by each employee's total compensation (including bonuses, benefits, "Overhead," etc.) to come up with an estimate of what Mr. Hosfield labels Employee Costs.

35.    This methodology is flawed.  One major set of flaws relates to issues of statistical sampling, and I defer that discussion to Section 7 of this report; suffice it to say for the moment the sampling methodology employed by Mr. Hosfield renders his sample statistically invalid for the purpose of extrapolating his results to the population of Defendants' relevant employees, and also biases upwards the costs calculated.

36.    Separate from those statistical flaws, however, is the fact that Mr. Hosfield's first methodology, includes by design inframarginal costs and costs unrelated to late rent at all [at least under assumptions (4b)(i) and (4b)(ii)], and thus is an unreliable estimate of the "actual damages" caused by each class member under my understanding of the *Garrett/Beasley* standard.  This lack of reliability flows out of several errors made by Mr. Hosfield, including his decision to include costs related to employee compensation that do not vary with the frequency/duration of late-paid rent; these include but are not limited to insurance costs, bonus pay, commissions, and paid time off.  In addition, he includes in his analysis the time cost related to employees for whom there is no evidence that their pay varied because of the increase in work generated by any individual Plaintiff's or class member's late payment of rent, including Defendants' Office Management employees whose RMNotes records show no evidence of ever having worked on the collection of late rent, and salaried employees for whom the economic evidence shows their compensation does not increase with additional incidences (or the duration) of tenants paying rent late.

---

[33]    See Hosfield Appendix C, Schedule 1A.

Economically, these are not marginal costs vis-à-vis late rent, in that they do not vary based on whether any individual plaintiff or class member does, or does not, pay rent on time.

37.     As I understand the *legal* standard, to qualify as "actual damages" arising from each specific tenant's late rent payment(s), Defendants' costs must be marginal to each specific tenant's lateness.  If the payroll costs in a rental community, but-for the total late payment(s) of rent of one resident of that community, are unchanged relative to the payroll costs that would exist without that late payment, then those costs are not valid "actual damages" for that tenant because they did not change due to that tenant's lateness.  In other words, they are inframarginal to that tenant's late rent payment(s). Even if one could find an accounting standard that allows one to relabel the inframarginal portion of an employee's typical week as a variable cost, this does not demonstrate economically that an additional class member's late payment of rent would lead to a change in any or all of employees' salaries, vacation benefits, retirement account, health insurance, year-end performance bonus, etc.  Yet this assumption – that all of these costs are 100% marginal -- is a pervasive error present throughout Mr. Hosfield's first method.[34]

38.     Mr. Hosfield's own interview notes demonstrate that it is impossible for all employee compensation related to work they themselves consider to be related to the "Collection Of Rent And Money Owed By Tenants, Including Evictions And Tenant Lawsuits Over Rent" to be marginal, because these employees discuss doing work *in anticipation of the potential of tenants being late, prior to the end of the grace period.*  That prep work cannot be marginal to a specific tenant (or even all tenants) because the cost of this prep work in a given month cannot change based on the number of tenants who are late, as it is incurred prior to that value being known.

---

[34]     The same applies to Mr. Hosfield's second method.  The fact that one might be able to reduce a given worker's hours under a hypothetical scenario in which many tenants change their payment timing is not a sign that compensation is marginal to a given tenant's conduct with respect to late-paid rent.

39. For example, the Defendant community property Marina 41 had 11 class-member tenants who generated late rent fees in October 2019.[35] Mr. Hosfield interviewed Melissa Levix, a salaried employee with the title of General Manager at Marina 41, and determined that she spent 14.44% of her time (6.5 hours per week out of a 45-hour week) on what Mr. Hosfield says was the "Collection Of Rent And Money Owed By Tenants, Including Evictions And Tenant Lawsuits Over Rent"[36] the bulk of which (18 hours, or 69% of her total time in this category) was in the first week of a typical month.[37] In October 2019 one class-member tenant with the resident ID "29838-07-0307-1" paid rent on October 5, 2019, the same day as the late fee had been issued. If that tenant had paid rent 3 days earlier, there is no evidence whatsoever that Ms. Levix's salary, benefits, bonus, or any form of economic compensation would have been reduced. Ms. Levix was paid a salary that did not change between October 2019 when "29838-07-0307-1" was late, and the following month, when that tenant was not late.

40. Moreover, because she specifically explained to Mr. Hosfield when interviewed that she spent most of her time that week *prior* to the fifth of the month getting ready in case "29838-07-0307-1" and all other tenants (even non-class members) might be late, the fact that "29838-07-0307-1" turned out to be late in paying rent would not have reduced Ms. Levix's prep time. And leaving aside whether it is even possible to establish any of this time is marginal, it is clear Mr. Hosfield's analysis has not done so; he has not demonstrated quantitatively that even a minute of this time is actually marginal (or even variable) to the specifics of the tenants' (in Ms. Levix's community) payment timing. Thus, in October 2019, when 11 class-member tenants were late, Mr. Hosfield's methodology concludes that

---

[35] Because Levix worked at Marina 41 during the post-class period, the number of class-member tenants generating late fees is lower than the total number of late fees generated during that time at Marina 41. Comparing the number of late fees in months during the post-class period is somewhat imprecise. However, Mr. Hosfield assigns the same annual conversion factor to calculate post-class costs, thereby assuming that each year has uniform internal variability; I've adopted his assumption for the purposes of this example.

[36] See EQR_Expert_000211.xlsx, Tab: "Melissa Levix"

[37] See EQR_Expert_000211.xlsx, Tab: "Melissa Levix"

Ms. Levix spent an identical amount of time on work related to the collection of late rent from class members, including an identical amount of time preparing for late rent prior to any tenant's rent actually being late as she did in November 2019 when only six class-member tenants were late.

41.    Without an analysis based on evidence that Ms. Levix's time varies when the quantity or duration of late-paid rent varies, there is no way for Mr. Hosfield to prove that 1%, let alone 12.32% of Ms. Levix's compensation was driven by work, on the margin, related to a specific tenant's late-paid rent.  Indeed, the notes from Ms. Levix's interview make it clear that working on late-paid rent is part of the basic fabric of her monthly routine and because so much of the time is spent *preparing* for rent to be late even before it is, there is no evidence that the time she spends of late rent it is contingent on, or proportional to, each/any specific tenant's specific lateness in a given month.

42.    Similarly, Mr. Hosfield claims that Grace Balahadia spends 21 hours in the first week of each month on tasks that Mr. Hosfield classifies as related to the collection of late-rent, although the notes from Ms. Balahadia's interview indicate that a portion of this time was work on the first through fourth of the month, prior to rent being late.[38] Mr. Hosfield appears to have assigned three hours to each of these days.[39]  Mr. Hosfield writes that Ms. Balahadia confirmed that when she was a Leasing Administrator for Equity, "she would 'contact residents between the 1st and the 4th of the month to remind them if they had not paid their rent by the 1st.'"[40]  (It is also worth noting that these notes only discuss activities on days one through five, but Mr. Hosfield has also added three hours of late-rent-related work to days six and seven as well, turning fifteen hours into 21.)

43.    As with Ms. Levix's prep time, the twelve hours of Ms. Balahadia's first week associated with the first four days of each month are very clearly not marginal to any

---

[38]    EQR_Expert_000183.

[39]    See EQR_Expert_000183 which indicates "3 hours" and EQR_Expert_000211.xlsx, Tab "Grace Balahadia" showing 21 hours for "Week One Posting 3 day notice and demand letter."

[40]    Hosfield Report, p. 9 of 49.

specific tenant's timeliness or lateness as that time is incurred even in a month where everyone ultimately pays before the fifth of the month. For example, in 2014, the Park Hacienda property ranged between a minimum of 24 late fees charged in a single month to maximum of 50, varying by as much as a factor of two, but the Hosfield methodology concludes Ms. Balahadia spent twelve hours prepping in both cases.[41] By being proactive, Ms. Balahadia may be exercising good business judgment, but she is not incurring costs specific to anyone's failure to pay before the 4th, and the costs Mr. Hosfield attributes to her for the first four days is identical regardless of how many tenants are actually late. Mr. Hosfield even includes the "3 hours" Ms. Balahadia spends on the <u>first</u> of the month, a day on which even Defendants acknowledge rent is not yet late.

44.     Consider Park Hacienda Tenant "29860-01-17202-1" who paid the owed rent for the month of October 2014 (and a late fee) on October 5, 2014, but appears to have been on time in all other months, since this was the only late fee incurred by this tenant. In that one month, that tenant, as well as all late-paying tenants in all of Defendants' communities, is assessed a charge for Ms. Balahadia's work on the first, second, third, and fourth of the month. All late tenants in all other months are also assessed a charge for Ms. Balahadia's prep work. But that work was not marginal to Tenant "29860-01-17202-1" having been late that month; if that tenant had paid the rent a day earlier in October, there is no evidence whatsoever that Ms. Balahadia's time on the first four days of the month would have changed in any way, and consequently, no evidence that her salary, benefits, bonus, commissions, or any form of economic compensation would have been reduced.

45.     These are just examples but as a general matter, most of the costs that make up Mr. Hosfield's Employee Cost cannot simply be redefined into compliance with the *Garrett/Beasley* standard of "actual damages." At core, the problem is that the wrong questions were asked of these employees, because what matters for the "actual damages" is

---

[41]     See "text_cites.xlsx", tab "Balahadia".

not how much time Defendants' employees spend on late rent overall, but how much that amount of time changes when an additional late tenant is added to the mix. Mr. Hosfield's interview questions are incapable of providing that kind of answer. Other than the direct compensation provided to hourly employees who actually work an additional hour because they are collecting late rent, Mr. Hosfield's Employee Costs are mostly inframarginal to the occurrence of an additional tenant's late-paid rent. Mr. Hosfield provides no analysis to the contrary to establish an economic basis for the claim that they are marginal.

46.     That said, it is possible, even likely, that there are <u>some</u> marginal costs associated with the late payment of rent by specific class members. Some portion of Defendants' non-salaried employees with variable hours might have worked late on a specific evening on a specific late-paying tenant's rent, and received overtime pay that Defendants would not otherwise needed to pay. An hourly employee who often works only 35 hours per week might have worked 38 hours in a given week because of late rent. Situations like these generate marginal costs and meet my understanding of the *Garrett/Beasley* standard; hence they are appropriate to consider as potentially marginal to a single tenant's late rent. However, Mr. Hosfield's interview notes are incapable of providing answers to the questions needed to assess whether the costs are marginal or not. He asked exclusively inframarginal questions regarding how much time, on average, an employee spent on tasks in a given week. He did not ask the but-for-style of question needed to assess "actual damages." Those questions would have included, for example, questions like this: "how much less would you work in a typical month if Tenant X always paid the rent on time, where Tenant X is commonly late in paying rent?"[42] Absent that sort of interview, knowing an employee's average time spent on late rent collection per month provides virtually no insight into the marginal impact of a tenant's late rent.

---

[42] The questions should also investigate whether an employee works a set schedule (e.g., in order to be available to provide customer service during standard business hours), so that additional tasks might not generate additional hours worked.

47.     The nature of Defendants' payroll data produced in discovery is that they do not typically identify whether a given employee's time for a given period (whether hour, day, week, etc.) is, or is not, marginal, i.e., whether any portion is time that would not have been worked but for the work needed to collect and account for a given tenant's late rent. This makes it impossible for anyone, including Mr. Hosfield, to take information regarding the time an employee spent collecting late rent and directly translate the associated costs on a one-to-one basis into costs that are actually marginal to late rent payments. It is not that economic tools do not exist to take such data and tease out the marginal costs (again, see Section 10 for a demonstration). Rather, faced with data requiring disentanglement, Mr. Hosfield elected not to undertake any such analysis and instead focused on the economically irrelevant task of identifying and doling out inframarginal activity/costs. This renders his entire Employee Cost calculations invalid, unreliable, and overstated.

48.     Thus, while it is possible that a well-designed survey of employee costs[43] could have produced a reasonable estimate of the "actual damages" as defined under the *Garrett/Beasley* standard, an econometric approach is also available for the task. In contrast, the work underlying the opinions in the Hosfield Report is insufficient for the task, and produces inflated results, overstating the correct value for "actual damages." Moreover, Mr. Hosfield's calculations cannot be fully corrected within his framework.

49.     Among the categories of costs for which Mr. Hosfield has presented no evidence that they are marginal to an incidence of late-paid rent are (1) "Allocable Costs," (2) health insurance, (3) bonus pay, (4) commissions, (5) paid time off, (6) the time of salaried personnel and (7) the time of Office Management personnel who do not work on late rent cases.

---

[43]   As I discuss below, the inclusion of inframarginal activities is not the only flaw in the Hosfield survey. I am merely saying that *arguendo* an appropriate survey could have been developed, not that the Hosfield survey meets that standard.

50.     As I lay out below, it is possible to develop an accurate estimate of the overstatement that Mr. Hosfield's inclusion of these sorts of costs causes, but in other cases, because Mr. Hosfield's interviews did not segregate marginal from inframarginal tasks, there is no accurate way to assess what portion, if any, of the costs are appropriate.  In what follows, I will note where the costs can, or cannot, be disaggregated.  Where they cannot, there is no accurate way to estimate the quantum of Mr. Hosfield's error.

51.     Finally, I should note that my use of Mr. Hosfield's estimated percentage of time Defendants' employees spend on tasks relevant to let rent in this analysis that follows is not intended as my agreement with those figures.  Despite claiming that he has taken a conservative position, from Defendants' point of view, Mr. Hosfield's inclusion of intermingled inframarginal costs in calculation those percentages is not conservative.  Rather, it is economically inappropriate, because it adds costs that are not tied to the "actual damages" caused by Plaintiffs' and class members' late rent payment.  Nevertheless, in the final step of my analysis, I apply his stated percentages, not as an acceptance of the accuracy, but rather simply to demonstrate the impact of the inflated base against which he applies those percentages, even if one were to accept those percentage calculations.

### 5.1.1   Illustration of the Inflation of Damages caused by the Hosfield Report's Miscalculation of the Base Compensation underlying Employee Costs.

52.     Despite the general irreparability of the flaws in Mr. Hosfield's methodology, it is nevertheless possible to illustrate, conservatively,[44] how inflated Mr. Hosfield's base compensation cost estimates (upon which his Employee Costs estimate rest) are, by undertaking a partial correction of the Hosfield Report.  In the remainder of this section, I work through the sets of costs that I have identified as being inframarginal rather than marginal, i.e., not varying based on whether any specific class member was, or was not, late

---

[44]  Recognize that from Plaintiffs' perspective a conservative estimate will tend to overstate Defendants' damages, but from Defendants' perspective that same analysis would not be conservative – it inflates any affirmative assertion of damages and is thus unreliable.

with his/her rent. As my starting point, I take Mr. Hosfield's Appendix B data, and for ease of exposition I include the impact of the reduction for both classes, i.e., including Woodland Park (to work with a single combined total).[45] Mr. Hosfield's Appendix B, Schedules 1A-2B, presents a combined total for payroll for all Defendants' employees in California in the stipulated job categories across the period Nov 2011- Feb 2020[46] is $235.7 million, broken down as follows.

Exhibit 2a.

|  | Nov. 1, 2011 - Feb. 29, 2020 |
| --- | --- |
| Hosfield Total (including Woodland Park) | |
| OfficeManagement | $114,984,647 |
| Leasing | $120,727,927 |
| Total | $235,712,574 |

53.     Working from this initial base, I deduct the various categories of inframarginal costs that Mr. Hosfield has erroneously included in his calculation of Defendants' damages from Employee Costs related to the collection of late rent, and demonstrate, both individually and in aggregate, the substantial impact these errors have in inflating the results in the Hosfield Report.

## 5.1.1.1 <u>Categories of Pay that are not Marginal to Late-Paid Rent.</u>

### 5.1.1.1.1 *"Allocable Costs"*

54.     Mr. Hosfield includes "Allocable Costs" – a line item from Defendants' expenses – in his tally of Employee Costs that are purportedly variable to each increment of late-paid rent.

---

[45] The primary sources for payroll data are community level cost data used by Hosfield in his Appendix B (WP004068, WP008806), with relevant expenses identified through Hosfield's list of relevant positions in Appendix B, schedule 5A, as well as PeopleSoft and Fusion individual level payroll data (WP008042, WP004859, and PeopleSoft data produced by Paul French (see Data Appendix E), with relevant expenses identified through job codes listed in the Joint Stipulation Regarding the Electronic Personnel Data Produced by Defendants in this Action ("Personnel Data Stipulation") *See* Personnel Data Stipulation, ¶¶ 11-13.

[46] Mr. Hosfield presents calculations for the period from Nov 2011-Feb 2020 based on Defendants' data. He then estimates 2010 and early 2011 figures based on Nov 2011-Feb 2020. For the purposes of this exercise, I omit Mr. Hosfield's estimates of 2010 and early 2011 to ensure comparability. Because of Mr. Hosfield's methodology, changes to these estimates would be proportional to any changes to Nov 2011-Feb 2020 calculations.

When an element of compensation requires allocation, that means there is no direct way of identifying which employees are responsible for that cost. As such, there is also no direct way of attributing it to any employee's time focused exclusively on late rent, and thus certainly no way to determine how much lower those employees' costs would have been but-for a given tenant's late rent history.

55.     While accounting terms can differ in nuance from marginal costs, in this case, the fact that the accounting system on which Mr. Hosfield relies has to allocate these costs is a strong indication they are not marginal to an additional increment of a specific person's work. Mr. Hosfield's appendices provide an explanation of the sort of items included in "allocable costs" and make clear there is no causal link between these allocated elements of compensation and one tenant's pattern of paying rent late. Examples include: "Vacation/Trading Day Expense," "ESPP," and "Performance Bonus."[47] Unless a tenant paying rent late is triggering vacation days, direct contributions to the Employee Stock Purchase Plan, or result in on-the-spot performance bonuses, all of which would be perverse incentives that would encourage employees to *increase* the frequency of late payment of rent if they cannot be tied to a specific employee, then there is no hypothesis under which these sorts of expenses vary based on tenants' late rent, and certainly there has been no showing by Mr. Hosfield of any evidence that they are.

56.     In the absence of any evidence (or even theoretical basis for hypothesizing) that these costs are marginal to late rent, I correct Mr. Hosfield's calculation of the base of compensation from which Employee Costs is calculated by removing these inframarginal costs. The impact on his calculation is shown below, in Exhibit 2b.

---

[47]     Hosfield Report, Appendix B, Schedule 5A.

Exhibit 2b.

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent Reduction | Percent Remaining |
|---|---|---|---|
| **Hosfield Total (including Woodland Park)** | | | |
| OfficeManagement | $114,984,647 | | |
| Leasing | $120,727,927 | | |
| Total | $235,712,574 | | |
| | | | |
| **Hosfield Allocable Costs (including Woodland Park)** | | | |
| OfficeManagement | $6,026,779 | | |
| Leasing | $6,551,330 | | |
| | | | |
| **Hosfield Total Less Allocable Costs** | | | |
| OfficeManagement | $108,957,868 | 5.2% | 94.8% |
| Leasing | $114,176,597 | 5.4% | 94.6% |

57.     In total, removing the allocable costs lowers the compensation base on which Mr. Hosfield calculates Defendants' Employee Costs by more than five percent. Because Employee Costs damages are based on a percentage of this base, the arithmetic of percentages means that a greater-than-five-percent decrease in the base will lower Mr. Hosfield's Employee Costs by more than five percent as well.

58.     Note that as a technical matter, the Defendants' cost data on which Mr. Hosfield and I base our analyses differ in small ways based on whether one consults the monthly or annual totals of Defendants' database. The analysis I subsequently undertake from this point onward is more internally consistent when summing up the monthly data to arrive at annual totals, rather than sometimes using annual data and sometimes summing up monthly data, as Mr. Hosfield has done. Therefore in what follows, I have ported the analysis into my preferred framework. My analysis still relies on Defendants' data, and while the annual and monthly sources differ, they do so quite trivially in total, with my monthly source slightly larger in magnitude.[48]

---

[48]     While the difference is trivial, by using a slightly larger value, my work is conservative as it will tend, *ceteris paribus*, to increase damages.

Exhibit 2c.

| | | Nov. 1, 2011 - Feb. 29, 2020 | Percent Discrepancy |
|---|---|---|---|
| Hosfield Total Less Allocable Costs | | | |
| | OfficeManagement | $108,957,868 | |
| | Leasing | $114,176,597 | |
| | | | |
| Hosfield Total (alternative source) | | | |
| | OfficeManagement | $109,173,418 | 100.20% |
| | Leasing | $114,235,062 | 100.05% |

59.     In what follows, I will base my percentages on the alternative source of Defendants' total (net of allocable costs), though the difference of 0.05% - 0.2% will not make a material difference in the percentage reductions that I calculate.

*5.1.1.1.2   Health Insurance and Employment Benefits*

60.     Mr. Hosfield has included the cost of insurance (i.e., health insurance and other employment benefits) in the compensation base that forms the foundation of his Employee Costs measure.[49] The line item for insurance may also include other employment benefits, though based on Mr. Hosfield's backup files, I infer that these may appear as "Other Overhead," which I discuss in Section 5.1.1.1.5. Nevertheless, the same analysis would apply to any of these types of insurance benefits, where the price of the policy does not vary with hours worked.

61.     These costs are improperly included because there is no basis for believing that the price of a health or dental insurance policy, for example, would vary based on hours worked in a given week.[50] My understanding of typical healthcare policies and other standard employment benefits is that the cost of such a policy does not vary based on the number of

---

[49]   Defendants provided a table in the file "EQR_MB_Payroll Data Corresponding Tables", which provides a way to link line items found in Hosfield's Appendix B property level data (WP004068, WP008806) to similar items in other property level data (WP004065, WP003797, and WP003890), which are in turn described in the MRI stipulation which defines the insurance costs in the MRI Stip. ¶ 35.bb. as reflecting "Defendants' total administrative payroll health and other insurance/benefits expense."

[50]   Contrast this with costs like payroll taxes such as FICA or FUTA, or items such as Workers Compensation Insurance, which can and typically do rise as payroll rises. As discussed in Section 5.1.1.1.5, Defendants' data classify these sorts of payroll-driven expenses separately, and I include these in my assessment of costs that are marginal.

hours covered employees work from one week to another. They do not vary based on whether an employee spends all of his/her time on collecting late rent or none, nor do they increase if, say, a full-time hourly employee were to very explicitly work five overtime hours dealing with late-paid rent that he/she otherwise would not have done. Thus, none of these are marginal costs based on tenants' late payment of rent.

62.     Relative to the revised compensation figures from the previous sections (i.e., after the removal of allocable costs and the database adjustment discussed above), removing these insurance expenses from Mr. Hosfield's calculation further reduces the total costs he includes in his aggregate damages calculations by over 7% as shown below in Exhibit 2d.

Exhibit 2d.

|  |  | Nov. 1, 2011 - Feb. 29, 2020 | Percent Reduction | Percent Remaining |
|---|---|---|---|---|
| Hosfield Total (alternative source) |  |  |  |  |
|  | OfficeManagement | $109,173,418 |  |  |
|  | Leasing | $114,235,062 |  |  |
|  |  |  |  |  |
| Insurance |  |  |  |  |
|  | OfficeManagement | $8,110,532 |  |  |
|  | Leasing | $8,384,236 |  |  |
|  |  |  |  |  |
| Total Less Insurance |  |  |  |  |
|  | OfficeManagement | $101,062,885 | 7.4% | 92.6% |
|  | Leasing | $105,850,826 | 7.3% | 92.7% |

*5.1.1.1.3   Bonus Pay*

63.     Another example of Defendants' costs for which there is no evidence that compensation is marginal to each additional late rent payment is bonus pay. Having reviewed Defendants' "Annual Compensation Guide for Managers," that was recently produced in this matter,[51] it is my understanding that these bonuses are provided at the discretion of management, and are not based on an hours-worked basis. Further, it is my understanding that nothing in Defendants' bonus plan is in anyway tied to the presence or

---

[51]   WP011501-524.

frequency of late-paid rent, and if it were that would create perverse incentives for employees to encourage tenants to pay their rent late so they could claim more bonus pay.

64.     Moreover, based on correspondence produced between Defendants and Mr. Hosfield (and his staff),[52] it appears that Defendants base their employee bonuses on a standard monthly accrual, which does not vary from month to month within a given year, and then the total bonus is determined based on a year-end "True Up."[53]  Nothing in that discussion suggests that bonus compensation, in total or at the individual employee level, varies based on the amount of time that employees work on late-rent (or any specific activity).  Instead Defendants' total expense related to bonuses is estimated prior to the start of the year and then apparently adjusted based on overall business conditions at Defendants' discretion.

65.     Thus, because the evidence suggests that Defendants do not pay their employees a bonus every time tenants pays rent late, nor that bonuses are tightly linked to time-worked (or to time-worked over some threshold), I see no factual basis for including bonus compensation as an incremental cost associated with any given tenant's late payment of rent.[54]

66.     Moreover, Mr. Hosfield has provided no evidence that any bonus expense increases when tenant pays her/his rent late.  Under my understanding of the *Garrett/Beasley* standard, such evidence is necessary for a cost to be included as "actual damages."  Nevertheless, he has included all of these bonuses in the base compensation from which he then allocates 12.32% or 4.45% (depending on job category) to each employee.  There is no

---

[52] See EQR_Expert_000862, EQR_Expert_000857, and EQR_Expert_000863.

[53] From the evidence I have seen, the "True Up" can vary greatly but is not pegged to specific employee conduct. See for example, EQR_Expert_000862 where 2018 Bonus ended up $40,000 higher than budget and 2019 Bonus ended up $58 less, but the monthly entries are either steady, small amounts, or very large single-month adjustments incompatible with any estimate of a purely late-rent-collection related expense (or benefit).

[54] If anything, it may be the case that bonuses are negatively correlated with late rent.  Because these bonuses appear to be discretionary, if the cost of collecting late rent suddenly rose and had a dramatic impact on Defendants' profits, bonuses could be reduced.  To the extent this is true, bonus pay would actually be negatively correlated with late rent and would behave in the opposite way required in my understanding of the *Garrett/Beasley* standard.

basis for this. Bonuses should be excluded from the calculation of Defendants' employee costs caused by class members' late rent payments.

67.     As a practical matter, the bonus compensation provided to the employees occupying positions identified in community-level cost data in the time period in question is relatively low, less than $700,000 in total. Removing this amount results in a further reduction of a little under half of one percent.

Exhibit 2e.

|  |  | Nov. 1, 2011 - Feb. 29, 2020 | Percent Reduction | Percent Remaining |
|---|---|---|---|---|
| Total Less Insurance |  |  |  |  |
|  | OfficeManagement | $101,062,885 |  |  |
|  | Leasing | $105,850,826 |  |  |
|  |  |  |  |  |
| Bonus |  |  |  |  |
|  | OfficeManagement | $395,813 |  |  |
|  | Leasing | $303,380 |  |  |
|  |  |  |  |  |
| Total Less Insurance & Bonus |  |  |  |  |
|  | OfficeManagement | $100,667,072 | 0.4% | 99.6% |
|  | Leasing | $105,547,446 | 0.3% | 99.7% |

*5.1.1.1.4   Commissions*

68.     Commissions are variable compensation provided to employees as a percentage of some form of revenue generation. According to documents produced by Defendants, commissions are paid for success in leasing units to new tenants.[55] Thus, there is no causal link between these two items (commissions and a tenant paying rent late), even conceptually. Nor does Mr. Hosfield attempt to demonstrate that such a causal link exists. As the costs of commissions are not marginal to late rent, I remove these commission expenses from Mr. Hosfield's base compensation. The result, as seen below in Exhibit 2f is that base compensation further declines by over 4% for Office Management personnel and

---

[55]   Equity Residential Leasing Commission Agreement (WP008183) at p. 1: "Employees earn commissions based on the number of move-ins achieved during each measurement period".

over 18% for Leasing personnel. The difference in results between the two job categories is logical, since Leasing personnel would presumably be primarily responsible for leasing units.

Exhibit 2f.

|  | | Nov. 1, 2011 - Feb. 29, 2020 | Percent Reduction | Percent Remaining |
|---|---|---|---|---|
| Total Less Insurance & Bonus | | | | |
| | OfficeManagement | $100,667,072 | | |
| | Leasing | $105,547,446 | | |
| | | | | |
| Commissions | | | | |
| | OfficeManagement | $4,142,802 | | |
| | Leasing | $19,180,786 | | |
| | | | | |
| Total Less Insurance, Bonus & Commissions | | | | |
| | OfficeManagement | $96,524,270 | 4.1% | 95.9% |
| | Leasing | $86,366,660 | 18.2% | 81.8% |

*5.1.1.1.5  Discussion of "Overhead" versus "overhead"*

69.    Defendants' data, and Mr. Hosfield's analysis, use a category of expenses labelled as "Overhead" to cover a variety of payroll taxes such as Medicare and Social Security (a.k.a. "FICA") and unemployment insurance ("FUTA" or "SUTA"), as well as other pay-driven expenses like Workers Compensation insurance (where typically rates are based on the size of a firm's payroll in each insurance rating category). I am not deducting those line items from Mr. Hosfield's base compensation because conceptually, if a tenant's late payment of rent results in a marginal hour of hourly work, it will also result in a marginal increase in items like FICA taxes.

70.    I mention this here to clarify a potentially confusing item. Terminologically, the bulk of the items in the "Overhead" line in Defendants' payroll database refers to different costs than the more common use of "overhead" in economics and business, where it is used to refer to costs that cannot be directly attributed to a specific business activity, such as the rent a firm pays to lease its headquarters offices. What one calls an expense does not change its economic essence, so in some sense the labels do not matter. Thus, while the term

"overhead" was used in by the Court in the Summary Judgment Order that "…because there is a dispute of fact regarding whether the overhead and personnel costs are or are not affected by the collection of late rental payments, the Court cannot grant summary adjudication on this offset issue,"[56] I did not understand the Court to be asking whether FICA taxes on overtime pay, which very much are marginal to an extra hour of overtime worked, vary with time worked, since they obviously do. Rather, my understanding is that the small-o "overhead" in the Summary Judgment Order is a different category of expenses than those expenses labelled as capital-O "Overhead" in Mr. Hosfield's analysis.

71.     To complicate matters further, it appears that for a short period of time, Defendants did include a subcategory of "Overhead" called "Other Overhead" which is more consistent with my understanding of the Court's use of that term. These include forms of insurance provided to employees as compensation, such as "Long-Term Disability, Life Insurance, Accidental Death & Dismemberment, S-T Disability."[57] The quantum of these costs is quite small relative to the rest of "Overhead" and they are not tracked consistently throughout the period. However, given the negligible impact of removing "Other Overhead,"[58] I have conservatively chosen to make no adjustment to Mr. Hosfield's damages based on the "Overhead" category.

*5.1.1.1.6    Paid Time Off*

72.     Mr. Hosfield also includes compensation to employees for "Paid Time Off" (PTO) in his calculation of Defendants' Employee Costs from tenants' late payment of rent. Namely, the "salary" line item in the personnel costs spreadsheets that Mr. Hosfield uses in his calculations includes "both salaried employees' and hourly employees' regular wages*, as well as compensation for paid time off, such as vacation, sick leave, parental leave, and other paid*

---

[56]    Summary Judgment Order (ECF 142), pp. 7-8.

[57]    See EQR_Expert_000847 CONFIDENTIAL.xlsx.

[58]    These expenses are not marginal to tenants' late rent, so failing to remove them from Mr. Hosfield's base compensation is conservative.

*leave.*[59] As part of the "salary" line item, PTO represents the pay employees receive for days on which they do not work. When an employee is paid for time he/she did not work, that employee is not at work, and thus not involved in the collection of late rent. If a tenant pays rent late when an employee is using PTO, that employee's pay neither increases nor decreases. When a tenant is late in paying rent, employees engaged in paid time off do not get involved. There is simply no causal link between an occurrence of a late rent payment by a given class member while an employee was off on vacation and the dollar value of that employee's PTO.

73. While it is possible that one could demonstrate that the process of *accruing* PTO is marginal to time worked, and therefore each additional hour of work on late rent would accrue an additional fraction-of-an-hour of paid-time off,[60] to my knowledge, no evidence exists in the record as to whether Defendants' paid-time off is awarded hourly, nor as to the rate at which that pay accrues. In the absence of such evidence, there is no basis to say Defendants' compensation costs increase due to PTO when a given tenant is late in paying rent. And again, it is clear that whether such evidence exists or not, Mr. Hosfield undertook no such analysis to demonstrate the relationship between late rent and any PTO accrual data that may exist in the discovery record.

74. More importantly, even if that evidence were to become available, all of the same caveats related to cash compensation would apply to determining which portion, if any, of the accrual of vacation time was marginal to late-paid rent. For example, if salaried employees accrue vacation time on a steady annual basis, there is no marginal impact to paid-time-off expenses from a salaried worker working extra time collecting a specific class members' late rent. In any event, such speculation as to what one could do with a different discovery record is moot. Given the current record, there is no evidence that even an hour

---

[59] MRI Stipulation, ¶ 35(v); EQR_MB_Payroll Data Corresponding Tables 6.30.21.docx (provided by defense counsel to Plaintiffs via email on June 30, 2021).

[60] If so, it would still need to be shown that the late payment of rent led to additional time worked to generate an additional PTO accrual.

of accrued paid-time off was driven by class members' late-payment of rent, and thus no basis for Mr. Hosfield to have included paid-time off, (whether as-accrued or as-used) as an element of Defendants' "actual damages" directly related to a specific class member's conduct.

75.     Given the absence of any evidence that paid time off increases based on any individual tenant's late payment of rent, I have removed the paid-time-off expenses from Mr. Hosfield's calculation of base compensation.  Because the spreadsheets that Mr. Hosfield relies on do not provide a means of eliminating PTO (or the remaining items discussed below), I turned to the more detailed payroll data produced by Defendants in discovery.[61] Removing PTO reduces the total Leasing costs by another 11.2%.[62]

---

[61]    For this purpose I relied in part on a formatted version of the data produced by Defendants from their PeopleSoft databases, which I received from Paul French. (See "WP004859 with PeopleSoft Data_20210519.csv"; "WP008042_Exempt Hours_20210519.csv"; "WP008042_Hours for Those on Leave_20210519.csv"; "WP008042_Nonexempt Hours and PTO_20210519.csv") His work in creating the databases I have used in this Report is described in his expert report disclosed on May 10, 2021 and as updated in his July 9, 2021 expert report.  I also relied directly on databases produced by Defendants as extractions of their Fusion payroll database. (See WP008042, WP004859)

[62]    To do this I output figures based on Regular and Overtime Hourly, and Salary, payroll from PeopleSoft and Fusion for the same years and job titles. There exists a small discrepancy in PTO between Hosfield's property-level data used in his Appendix B, and PeopleSoft and Fusion databases used in this step. I estimate this discrepancy to be approximately 20% of total PTO (i.e., the values in the PeopleSoft and Fusion sources are 20% lower than the imputed amount in Mr. Hosfield's work). I therefore conservatively adjust PTO identified through moving from one data source to another by a factor of .8, thereby increasing damages.  Mr. Hosfield's staff have also pointed out the existence of discrepancies across data sets that, while small, could not be ironed out.  See EQR_Expert_000879.pdf.

Exhibit 2g.

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent Reduction (Increase) | Percent Remaining |
|---|---|---|---|
| Total Less Insurance, Bonus & Commissions | | | |
| OfficeManagement | $96,524,270 | | |
| Leasing | $86,366,660 | | |
| | | | |
| Paid Time Off (And Database Adjustment Factor) | | | |
| OfficeManagement | -$539,908 | | |
| Leasing | $9,652,185 | | |
| | | | |
| Total Less Insurance, Bonus, Commissions & PTO | | | |
| OfficeManagement | $97,064,178 | -0.6% | 100.6% |
| Leasing | $76,714,475 | 11.2% | 88.8% |

*To account for database differences I adjust Paid Time Off by a factor of .8, thereby increasing damages.

*5.1.1.1.7   The Cumulative Impact of Removal of Inframarginal Categories of Pay is Substantial*

76.      In the exposition above, I laid out each category as a percentage decrease from the revised total based on the revisions that had preceded it.  When doing so, one cannot simply add the percentages to get the cumulative effect.  To provide that information, I have summarized these changes into a subtotal, accumulating all of the foregoing revisions and calculating percentages off of a common base.  Exhibit 2h lays this out in total and shows that for Office Management Employee Costs, the total reduction of base compensation due to the above-listed revisions is 16% and the equivalent reduction of Leasing Employee Costs is 37%, and this also represents the proportionate impact on Mr. Hosfield's claimed Employee Cost damages.  In total, the cumulative reduction in the base compensation is $61.9 million, or 26% of Mr. Hosfield's total.

Exhibit 2h.

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent of Total | Cumulative Reduction |
|---|---|---|---|
| Hosfield Total (Office Management) | $114,984,647 | | |
| *Less* | | | |
| Hosfield Allocable Costs | $6,026,779 | 5.2% | 5.2% |
| Impact of Alternative Source | -$215,550 | -0.2% | 5.1% |
| Insurance | $8,110,532 | 7.1% | 12.1% |
| Bonus | $395,813 | 0.3% | 12.5% |
| Commissions | $4,142,802 | 3.6% | 16.1% |
| Paid Time Off (And Database Adjustment Factor) | -$539,908 | -0.5% | 15.6% |
| Subtotal After Excluding Costs Listed Above | $97,064,178 | | |

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent of Total | Cumulative Reduction |
|---|---|---|---|
| Hosfield Total (Leasing) | $120,727,927 | | |
| *Less* | | | |
| Hosfield Allocable Costs | $6,551,330 | 5.4% | 5.4% |
| Impact of Alternative Source | -$58,465 | 0.0% | 5.4% |
| Insurance | $8,384,236 | 6.9% | 12.3% |
| Bonus | $303,380 | 0.3% | 12.6% |
| Commissions | $19,180,786 | 15.9% | 28.5% |
| Paid Time Off (And Database Adjustment Factor) | $9,652,185 | 8.0% | 36.5% |
| Subtotal After Excluding Costs Listed Above | $76,714,475 | | |

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent of Total | Cumulative Reduction |
|---|---|---|---|
| Hosfield Total | $235,712,574 | | |
| *Less* | | | |
| Hosfield Allocable Costs | $12,578,109 | 5.3% | 5.3% |
| Impact of Alternative Source | -$274,015 | -0.1% | 5.2% |
| Insurance | $16,494,769 | 7.0% | 12.2% |
| Bonus | $699,193 | 0.3% | 12.5% |
| Commissions | $23,323,588 | 9.9% | 22.4% |
| Paid Time Off (And Database Adjustment Factor) | $9,112,277 | 3.9% | 26.3% |
| Subtotal After Excluding Costs Listed Above | $173,778,653 | | |

## 5.1.1.2 Categories of Employees Whose Compensation is not Marginal to Late-Paid Rent

### 5.1.1.2.1 Salaried Personnel

77.     Typically, a salaried employee's pay is fixed on a weekly, monthly, or annual basis, and does not vary based on fluctuations in hours worked.  As an example, in the documents Mr. Hosfield produced, it appears that Kristin Stevens indicated she works a 58.25-hour

work week, but Mr. Hosfield was comfortable prorating her time as if she worked a 38.83-hour schedule,[63] indicating that he was unconcerned with the impact of those extra 19-plus hours of her time on Defendants' costs.[64] This suggests, as is typical for salaried employees, that Defendants sometimes ask their salaried employees to work more than 40 hours but do not promise or automatically provide additional pay for that additional effort.

78.     Other employees also indicated they tended to work more than 40 hours regularly. For example, Michelle Grubbs listed over 50 hours of work per week and Irina Garland worked over 49 hours per week.  Both were salaried employees.  In each case, Mr. Hosfield's analysis treats this time the same, in terms of its influence on the average of all employees, as a 40-hour employee. The same appears to be true for employees such as Jennifer Phommavongsa, a salaried community manager who only indicated she averaged 34 hours per week, and yet she is included in Mr. Hosfield's Office Manager Average with equal hourly weight as the 40-hour or greater-than-40-hour employees.

79.     From this, it appears Defendants' salaried employees are compensated in this typical fashion, where whether they work 34 or 59 hours, their salary is unchanged.  It also appears that Mr. Hosfield was fully aware these employees' extra work (beyond 40 hours) generated no additional cost to Defendants.  And yet he disregarded the obvious conclusion that when these salaried employees take, say, twenty minutes to print out a specific class member's three-day notice and walk to the tenant's apartments to affix the notices to the doors, their salary is unchanged, as are other elements of their compensation such as contributions to a 401k, healthcare, etc.  And even though Mr. Hosfield asserts that if the entire class of tenants, as well as all non-class members from 2014 forward were to stop paying rent late, that some of these salaried employees might be laid-off or converted to part-time

---

[63]    See "EQR_Expert_000211," tab "Kristin Stevens."  The work papers indicate that Ms. Stevens's time was "was prorated by 2/3 to knock it down to a 40 hr week" and the tally shows 38.83 hours, which when scaled up by 3/2 equals 58.25.

[64]    The Fusion database ("Fusion Data WP008042 CONFIDENTIAL.XLSX") corroborates that salaried (i.e., "Exempt") personnel are indeed paid the same biweekly amounts (which increase after some period to a higher level, indicating a raise).

employees, this says nothing about the marginal (or but-for) impact of any one specific class member on some or all salaried employees' pay. There is no evidence, nor can it be reliably asserted as self-evident, that the timeliness of any one class member's rent payments affected (or even could theoretically affect) the employed/salaried status of any employee, and thus no salaried employees' costs are marginal to a given tenant's timeliness of payment of rent. While this should be obvious from the fact that these employees' paychecks do not vary from month to month unless they get a raise, I also formally demonstrate the absence of a positive relationship between employee salary and tenants' late rent in Section 10, below.

80. Removing the compensation provided to salaried employees[65] from Mr. Hosfield's calculation reduces the base compensation on which he calculates damages for Office Management personnel by 81% (off of the subtotal from the calculations above, it is a smaller percentage of the total) but has a *de minimis* effect on Leasing compensation.

Exhibit 2i.

|  |  | Nov. 1, 2011 - Feb. 29, 2020 | Percent Reduction | Percent Remaining |
|---|---|---|---|---|
| Subtotal from Section 5.1.1.1 |  |  |  |  |
|  | OfficeManagement | $97,064,178 |  |  |
|  | Leasing | $76,714,475 |  |  |
|  |  |  |  |  |
| Salaried Pay (Plus apportioned "Overhead") |  |  |  |  |
|  | OfficeManagement | $78,230,150 |  |  |
|  | Leasing | $6,553 |  |  |
|  |  |  |  |  |
| Subtotal from Section 5.1.1.1 less Salaried Pay |  |  |  |  |
|  | OfficeManagement | $18,834,028 | 80.6% | 19.4% |
|  | Leasing | $76,707,922 | 0.0% | 100.0% |

---

[65] For these salaried employee calculations, I have already removed the elements of compensation related to health insurance/benefits, bonus pay, commissions, and paid time off prior to this step. This avoids any duplication with the prior deductions and allows them to be added together for a cumulative total.

*5.1.1.2.2 Hourly Office Management Personnel Not Involved in Collecting Late Rent*

81.     Methodologically, Mr. Hosfield has surveyed a non-random sample of 59 of Defendants' employees (after removing twelve property-level personnel for non-statistical reasons[66]), and then extrapolated across a larger population than that from which the sample was drawn.  In Section 7 below, I focus on the statistical problems this non-probability sample creates which render this extrapolation flawed and unreliable as a matter of statistics.  However, distinct from those technical flaws, on a simple factual level, it is clear that the sample used by Mr. Hosfield is skewed towards employees who tended to work on late rent collection, specifically with respect to the Office Management job category.  All of the 26 Office Management employees' interview notes indicate they worked on some form of late rent collection activities during a typical month, with percentages ranging from 2.67% to 23.74% and an unweighted average of 12.32%.  However, Defendants' RMNotes records make clear that some employees with the job titles that classify them as Office Management never once entered any time records related to late-rent collection.[67]

---

[66]    Mr. Hosfield disregards the results of his interviews with Angelica Garcia, Leasing Consultant (Canyon Ridge) [EQR_Expert_000032-206]; Erica Ceballos, Community Manager (Geary Courtyard and The Terraces) [EQR_Expert_000032-206]; Jeff Shelton, Community Manager (Kelvin Court) [EQR_Expert_000032-206]; Jennifer Davidson, Community Manager (Montierra) [EQR_Expert_000032-206]; John Waldum, Manager (Acappella) [EQR_Expert_000740]; Meaghan Thompson, General Manager (Summit at Sausalito) [EQR_Expert_000740]; Stephanie Crawford, Community Manager (Eagle Canyon) [EQR_Expert_000032-206]; Victoria Pelayo, Community Manager (Vantage Hollywood) [EQR_Expert_000032-206]; Pamela Morales, Community Manager (Laguna Clara) [EQR_Expert_000740]; and Rachel Belcher, Community Manager (Eleve) [EQR_Expert_000211].  Also Melinda Friedman, Senior Leasing Consultant (Promenade at Town Center) [EQR_Expert_000211] and Mike DeCosta, Senior Leasing Consultant (The Alton) [EQR_Expert_000211] were "no shows" to their interviews.

[67]    The impact of excluding employees who did not enter DELQ notes into RMNotes is much larger in the Leasing category of employees, however I am not deducting these employees from the analysis because, if the sample Mr. Hosfield had drawn had been random, I do not think it would be inherently inappropriate to extrapolate from the Leasing sample to the full Leasing population.  As I discuss below in Section 7, I do not believe these were drawn randomly, but that is a different critique than my focus here, which is simply to say that the Office Management population seems to have been limited to employees who performed late rent activities, and thus, even if it had been randomly drawn from that smaller population, it would not be appropriate to extrapolate to employees excluded from that smaller population.  However, had I excluded Leasing Employees whose RMNotes include no entries related to DELQ, it would lower Defendants' base compensation by another $4.7mm over the Nov 2011 – Feb 2020 time period (see backup to Exhibit 2, tab "annual_by_cat_PAYROLL").

82.     Working with my staff, I used the RMNotes database[68] produced by Defendants to identify a list of Defendants' employees who make entries in the RMNotes database, but entered no notes categorized as "DELQ" (related to class members), i.e. notes dealing with the collection of late rent.[69]  I then matched these employees to their records in Defendants' payroll (Fusion and PeopleSoft) databases (which, according to the Personnel Data Stipulation, contain all existing payroll records for Defendants' relevant California employees for the period covered by this case[70]), to see whether Mr. Hosfield was extrapolating his results to Office Management employees whose records show no evidence of ever working on the collection of late rent.  From this analysis, I see that at least ten salaried employees in the Office Management category did not enter DELQ-categorized notes into RMNotes, while at least 45 hourly Office Management employees never entered such notes, out of a total of 500.[71]

83.     Extrapolating a sample of Office Management employees who perform late rent activities to similarly titled employees who do not is illogical and inconsistent with established statistical principles.  It is notable that among the communities where an Office Management employee was sampled by Mr. Hosfield, he never sampled two such Office Management employees, which is highly unlikely to have occurred randomly and thus creates a bias in how Mr. Hosfield applied his average.  These DELQ records reveal that in offices with more than one Office Management employee working during the same months, it can be the case that at least one of the other employees does not deal with late rent collection, as defined by their lack of entry of DELQ-categorized notes into RMNotes.

84.     For example, Jackie LaFace, an Office Management employee at Mill Creek, worked alongside another such employee at that property (employee ID 66277) who entered zero

---

[68]   WP007998, WP007999, and WP008000.

[69]   I understand that no notes were produced relating to non-class members. See MRI Stipulation ¶22.b.

[70]   Personnel Data Stipulation ¶¶ 7-13.

[71]   See text_cites.xlsx, tab "num_hourly_noDELQ".

DELQ notes during that period. LaFace entered as many as nineteen such notes per month. Mr. Hosfield's work indicates that Ms. LaFace spent 33 hours per month, or 21.7% of her time, working on "Collection of Rent and Money Owed by Tenants, Including Evictions and Tenant Lawsuits Over Rent"[72] and then he extrapolates the numbers he generates from Ms. LaFace (and every other interviewed Defendants' employee) onto "66277" despite the evidence that Ms. LaFace doing this work meant "66277" had no need to make any DELQ entries.

85.      Because Mr. Hosfield only sampled one Office Management employee per office and always chose to interview an Office Management employee who <u>does</u> deal with late rent, his methodology led him to miss all of the zero-time Office Management employees, creating a bias.  In essence, the Office Management workers in a given office are substitutes for each other, not complements, so Mr. Hosfield's assumption that because one Office Management worker in a specific office worked on late-rent collection, all other Office Management workers in that same office did as well, is contrary to the evidence.  There is no basis to assume the non-sampled workers in an office are well-represented by a sample that includes their officemates.

86.      As I discuss below, Mr. Hosfield's sample does not even appear to be a probability sample at all, which by itself renders the results statistically invalid for extrapolation to the entire population of Defendants' relevant employees.  However, even if Mr. Hosfield had randomly sampled among a subset of Office Management personnel limited to those who work on late rent, it would still be inappropriate to extrapolate that result to the entire population that includes those who do not work on late rent.  His having done so renders that extrapolation invalid.

87.      Had the sample been drawn randomly from the set of Office Management employees who do show up in the RMNotes database as having spent time collecting late rent, one

---

[72]      See the "Jackie LaFace" tab of EQR_Expert_000211.xlsx.

could potentially salvage that sample by restricting its use to a more appropriate population. For example, assuming *arguendo* that over-extrapolation were the only flaw in Mr. Hosfield's sampling work, one could apply the sample result to the set of employees whose time-keeping records indicate they *did* engage in activities related to the collection of late rent. This would not solve all of the problems – e.g., the sample was likely not drawn randomly even among this smaller population of employees – but if one assumes, *arguendo*, that were the only flaw, one could calculate an alternative figure to get a sense of the magnitude of the impact of this error.

88.    To illustrate this magnitude, I have done just this – identifying all hourly-paid[73] Office Management personnel whose time-keeping records show no evidence of any time spent collecting late rent, and removing them from the population against which Mr. Hosfield's average time calculations are applied. The result is a downward adjustment in the estimate of the base compensation of Office Management personnel relevant to Mr. Hosfield's analysis of Employee Costs.

89.    As shown below in Exhibit 2j, focusing the sampled result on a more appropriate population reduces the estimate of base compensation for hours spent by Office Management personnel by 4% of the running subtotal (or 1% of the original). Leasing compensation is unaffected, and total compensation is reduced by 1% of the running subtotal (less than 1% of the original).

---

[73] In this stage of the calculation, I do not include the dollar figure that would result from eliminating salaried Office Management personnel who have not entered a DELQ note because I have already removed all salaried personnel in the prior step, and the goal of this exposition is to make mutually exclusive corrections. Nonetheless, I note that the salary pay for those individuals for the relevant period totals $838,639. (See "Exhibit 2.xlsx", tab "annual_by_cat_PAYROLL")

Exhibit 2j.

| | | Nov. 1, 2011 - Feb. 29, 2020 | Percent Reduction | Percent Remaining |
|---|---|---|---|---|
| Subtotal from Section 5.1.1.1 less Salaried Pay | | | | |
| | OfficeManagement | $18,834,028 | | |
| | Leasing | $76,707,922 | | |
| | | | | |
| Hourly Personnel not Entering DELQ RMnotes | | | | |
| | OfficeManagement | $688,233 | | |
| | Leasing | N/A | | |
| | | | | |
| Grand Total | | | | |
| | OfficeManagement | $18,145,795 | 3.7% | 96.3% |
| | Leasing | $76,707,922 | 0.0% | 100.0% |

*5.1.1.2.3  The cumulative impact of each of these changes is substantial.*

90.     By construction, each of the analyses in this section was designed to be mutually exclusive, so that they can be added together, and to the extent any one of them is determined by the Court to have met the *Garrett/Beasley* standard, it could be retained as an element of Defendants' damages.  Therefore, I have designed Exhibit 2k below to ensure it is possible to sum any subset of the impacts together as the Court deems appropriate.

91.     Exhibit 2k below shows the impact of all changes made in this section.  The cumulative effect on the Office Management category of removing the categories of pay from Section 5.1.1.1 sums to a 15.6% reduction.  On top of this, removing Salaried employees reduces the total by 68% and removing Office Management personnel because of an absence of RMNotes entries reduces the total a further 0.6%.  Thus in total, these corrections to Mr. Hosfield's work result in an 84.2% reduction in Mr. Hosfield's calculated base compensation for Office Management.  The corrections from section 5.1.1.1 for Leasing personnel calculations reduce that base compensation by 36.5%.  The changes from section 5.1.1.2 have no impact on this Leasing total.

Exhibit 2k.

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent of Total | Cumulative Reduction |
|---|---|---|---|
| Hosfield Total (Office Management) | $114,984,647 | | |
| *Less* | | | |
| Total Reductions from Section 5.1.1.1 | $17,920,469 | 15.6% | 15.6% |
| Salaried Pay (Plus apportioned "Overhead") | $78,230,150 | 68.0% | 83.6% |
| Hourly Personnel not Entering RMnotes | $688,233 | 0.6% | 84.2% |
| Grand Total | $18,145,795 | | |

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent of Total | Cumulative Reduction |
|---|---|---|---|
| Hosfield Total (Leasing) | $120,727,927 | | |
| *Less* | | | |
| Total Reductions from Section 5.1.1.1 | $44,013,452 | 36.5% | 36.5% |
| Salaried Pay (Plus apportioned "Overhead") | $6,553 | 0.0% | 36.5% |
| Hourly Personnel not Entering RMnotes | N/A | 0.0% | 36.5% |
| Grand Total | $76,707,922 | | |

| | Nov. 1, 2011 - Feb. 29, 2020 | Percent of Total | Cumulative Reduction |
|---|---|---|---|
| Hosfield Total | $235,712,574 | | |
| *Less* | | | |
| Total Reductions from Section 5.1.1.1 | $61,933,921 | 26.3% | 26.3% |
| Salaried Pay (Plus apportioned "Overhead") | $78,236,703 | 33.2% | 59.5% |
| Hourly Personnel not Entering RMnotes | $688,233 | 0.3% | 59.8% |
| Grand Total | $94,853,717 | | |

92.    In total, across the two job categories, these corrections result in a cumulative reduction in Mr. Hosfield's base compensation level of 59.8%, reducing the total from $235.7 million to $94.9 million.  As stated above, generally the percentage reduction in base compensation translate proportionally into a reduction in Mr. Hosfield's calculation of Employee Costs damages.  Using the table in Appendix D, one can verify this impact on damages is proportional.

93.    To be clear, these figures do not represent my assessment of the correct costs to serve as Defendants' damages (offsets) from plaintiffs' and class members' late rent.  I perform that calculation in Section 10, where I focus on marginal changes in cost due to tenants who made late rent payments.  Here my work is merely to illustrate the substantial inflation of

Mr. Hosfield purported damages figure that is introduced by his failure to exclude entire categories of Office Management and Leasing employee compensation for which there is no evidence of any marginal variance when a given tenant is late. Thus my opinion is not that the numbers in Exhibit 2k are correct, but rather that, even if one were to adopt Mr. Hosfield's first method for calculating the Employee Cost component of Defendants' damages from late rent payments, one would need to make substantial reductions in the estimate of marginal payroll prior to calculating those damages by that method.

## 5.2 Hosfield's Second Method for Calculating Personnel Costs Relies Entirely on Eliminating Fixed Costs and is Untethered from the "Actual Damages" Caused by an Individual Tenant

94.     Mr. Hosfield ends his report with a second approach to estimating costs, one in which he asked Defendants to identify staffing changes they would make if no tenant (whether class member or not) were ever late with rent payments. He calls this his "Cost Savings Method." This approach is problematic for several reason, but here I focus on the one most relevant to the *Garrett/Beasley* standard. Leaving aside (for now) the fact that all Mr. Hosfield has done in this second method is to transcribe a hypothetical exercise performed by four high-level EQR employees (Debra Rivera, Shanna Dion, Alla Feldman, and Jesse Jennell)[74] and to label it as his own opinion, the major flaw in this analysis is that it is explicitly inframarginal in its approach, focused not on eliminating the very last late-rent payments on the margin, but instead focusing on the savings from eliminating the very first late-rent payment, the unit that generates all of the truly fixed costs needed to operate a business where there is the potential for late-paid rent. This is the quintessence of an inframarginal cost.

---

[74]     Hosfield Report, p. 28 of 49.

95.     To provide Mr. Hosfield with the opinion he adopts as his second method, those four EQR employees needed to make an extreme assumption: that there would never be a single rent late payment ever.  The moment the system has to account for the possibility of some late payments, the savings would shrink dramatically, and perhaps evaporate entirely. Hence, the very nature of this analysis makes clear that the EQR opinion adopted by Mr. Hosfield is entirely divorced from the "actual damages" caused by each Plaintiff or class member under the *Garrett/Beasley* standard.  The high-level EQR employees were asked to estimate the hypothetical cost of all late-rent in California, rather than being asked to think about the marginal impact of each tenant's late-paying behavior on Defendants' costs.

96.     To the extent it is appropriate to rely on four EQR employees' judgment as the sole evidentiary basis for an expert opinion, a more appropriate question would have been to show them a specific tenant's pattern of late rent payments, and then ask them how many staff they could lay off, demote, or otherwise reduce their compensation if that one tenant, and only that tenant, had always paid his/her rent on time.  Without a focus on the incremental change in staffing from a single tenant, the analysis cannot focus on the margin, and it is clear that the savings EQR envisioned from having no late rent is not the same as the savings envisioned from having one fewer tenant paying rent late.  It is possible that in some limited number of egregious cases, a fact witness like Ms. Rivera or any of the other EQR employees who assisted her might have made a plausible argument for a modest reduction in relevant hours related to a tenant with chronic late-payment issues.  It is hard to imagine that a tenant with occasional months of being late for a matter of days would generate many, if any, such savings.

97.     Mr. Hosfield did not ask any of Defendants' employees that more relevant hypothetical, nor did he ask about a tenant like "29102-016-175-2", who over the course of the class period generated a late rent fee once, paying on the September 5, 2017, the day the late fee was assessed.  Given a case like this, where the probability of "29102-016-175-2" paying rent late was extremely low in any given month, though greater than zero, there is

virtually no way that Defendants could have changed their staffing if they had known "29102-016-175-2" was not going to be late this one time.

98.      To focus on the "actual damages" caused by a specific tenant, it may be helpful to envision a scenario in which a single tenant asserted individual claims against Defendants. In that situation, the correct economic approach for determining the costs that one tenant imposed on Defendants would not be to ask a finder of fact to imagine a world where no one ever paid rent late, then to think of all the layoffs and reductions in hours that Defendants would engage in, and then assign this individual Plaintiff or class member some share of the would-be savings.  (Instead, the correct question for a single tenant would be whether staff would have been laid off or demoted, absent that single tenant's late payment of rent).  And since Mr. Hosfield is not using the correct economic approach for an individual tenant, the method cannot be transformed into the correct economic approach for a class of tenants whose claims are being adjudicated in a single proceeding.

99.      Leaving aside my suggested hypothetical approach of going one-by-one through all of the class members records and asking Ms. Rivera or her colleagues to estimate the labor savings from each (individually) becoming a perfectly prompt payer, another more appropriate question Mr. Hosfield could have asked is, if the number of late-paying tenants were to decrease by a small but significant amount, for an extended period of time, what would the savings had been?  Essentially, this line of reasoning would parallel antitrust economics, where markets are defined, not by imagining a complete elimination of the product, but rather assessing the impact of what is known as a SSNIP, a small but significant non-transitory increase in price.  In the case of an input market, the equivalent of a SSNIP is a SSNDC (a small but significant non-transitory decrease in the cost of an input).  The latter version parallels the situation here.  By assessing the impact of a smaller change in the late-paying environment, one could potentially get closer to the correct question, i.e., what cost does each tenant impose on the system?

100.     The first and most obvious conclusion of such a SSNIP-style analysis is that if one were to hypothesize 90% of the actual-world late-paying activity, Defendants would experience very few, if any, of the supposed savings from the reorganization proposed by EQR.  Clearly most of the savings are driven by the elimination of the last 10% of late payers, not the first 10%.  The full-scale organization shakeup EQR proposes, which Mr. Hosfield then tabulates, assumes all late rent vanishes.  Yet in a world in which Defendants still anticipated a sizable, yet smaller, level of late payments, the staffing and expertise currently in the system would remain necessary.

101.     Thus, by its very nature, Mr. Hosfield's second methodology is even less focused on marginal cost than his first methodology.  Mr. Hosfield is quite explicit that it is driven by an assessment of total costs that are then merely allocated arbitrarily, in a fashion unrelated to the costs imposed on Defendants by each individual Plaintiff's or class members' conduct.  Mr. Hosfield's two methodologies share this flaw: calculating Defendants' damages without regard for the costs each tenant's late payments impose on Defendants.

## 6.  THE HOSFIELD REPORT INAPPROPRIATELY COMMINGLES COSTS FROM VALID AND INVALID TIME PERIODS IN WAYS THAT CANNOT BE FULLY DISAGGREGATED

102.     In the previous section, I explained that the Hosfield Report includes costs that are not causally linked to each class member's impact on Defendants' employee costs, so that there is no basis for any of Mr. Hosfield's conclusions that the time spent on the activities discussed, even by the employees he interviewed, was truly marginal to each tenant's late rent payments.  In addition to this first error – a confusion of marginal and inframarginal costs – Mr. Hosfield's estimates also erroneously include costs that, under either of Plaintiffs' assumptions in (4b) with respect to when late rent-collection ends and other activities begin, should not be included.  This second major flaw consists of applying the damages methodology to the wrong time periods and in some cases, the wrong tenants, as explained further below.

103.     Based on instructions from Class Counsel, my understanding is that only a specific subset of Defendants' personnel costs is relevant as "actual damages," i.e., offsets to each Plaintiff's or class member's restitution of late fees.  For example, under assumption (4b)(i) costs incurred prior to the expiration of the grace period, and costs incurred after the tenant moved from being late to being in the process of eviction, or actually evicted, would not be included in Defendants' damages specific to the collection of late rent.

104.     I understand that Plaintiffs contend that under Defendants' lease terms, the interest Defendants lose during the grace period is not a cost related to collection of *late* rent.  This is because rent is not considered late, for the purposes of Defendants' damages, until the expiration of the grace period.  Hence, whether a tenant pays rent on the fourth day of the month, any costs related to Defendants being deprived of the ability to earn interest on the first through third day of the month are not relevant offsets from restitution owed to class members.  Instead, that lost interest is a cost that Defendants have decided to bear as a business decision to give their tenants a grace period.

105.     For the same reason, I understand that under Plaintiffs' legal theory behind (4b)(i), Defendants are barred from claiming the personnel costs related to the *eviction* process as damages from the late-payment of rent because eviction and collection of late rents are considered legally distinct processes, governed by separate clauses of Defendants' lease.  Class Counsel has instructed me to assume under one set of assumptions that any charges related to the collection of late rent end the moment a tenant's file is referred out to Defendants' legal counsel for eviction.  From Defendants' data, I am able to approximate this date on a per class-member basis for every given month.  Under the (4b)(ii) assumption, the same applies, but only for tenants who end up leaving while under eviction notice (either because they are evicted or because they leave during the pendency of the eviction process).

106.     As a general matter, the Hosfield Report makes no effort to segregate these grace period and eviction costs within his calculation of Employee Costs.  For example, his

Employee Costs explicitly include work Defendants' employees perform after the eviction process has started:

> "If a defaulting resident does not reach a payment agreement with the community, community team members will forward the defaulting resident's files to legal counsel to commence eviction proceedings. A resident can pay his/her rent and become current any time before the court officially enters the eviction order. Once the court rules on eviction, the resident receives a notice to vacate the community. During this time, community team members fill out paperwork for the sheriff and answer any questions the resident has prior to eviction."[75]

107.    As a result, any accurately applied costs are intractably enmeshed with invalidly included costs, unless assumption (4b)(iii) applies (under which 100% of these costs are considered "actual damages" specifically attributable to late rent). Thus, under assumption (4b)(i) or (ii), Mr. Hosfield's Employee Costs figures are entirely unreliable as an economic assessment of Defendants' valid "actual damages" based on my understanding of the *Garrett/Beasley* standard.

108.    With respect to the other three categories of costs in the Hosfield Report, i.e., Eviction Costs, Collection Costs, and Interest Costs, the errors in the Hosfield Report are correctable. For example, to the extent Mr. Hosfield's Eviction and Collection Costs (which do not include Employee Costs related to those tasks), are determined not to be relevant as a matter of law, those figures can simply be omitted. And with interest costs, though Mr. Hosfield has commingled interest costs from before, during, and (depending on the assumption one makes) after the relevant period, those categories could be disentangled based on Mr. Hosfield's backup materials, though he has not performed that work to date. Thus, in what follows below I explain the irrevocably commingled costs that cannot be disentangled from Mr. Hosfield's Employee Costs and then briefly address the Eviction Costs, Collection Costs, and Interest Costs.

---

[75] Hosfield Report, p. 10 of 49. Internal footnotes omitted. Mr. Hosfield's interview notes reveal that some employees included time working on evictions, such as Ms. Melendez and Mr. Robles.

## 6.1   EMPLOYEE COSTS

109.     Even for the specific employees he interviewed, and even to the extent one could demonstrate that some of the time discussed was truly related to marginal costs incurred because of a class member's late rent (though Mr. Hosfield has not made that showing), the nature of Mr. Hosfield's interviews would still render those calculations unreliable for the purposes at hand because he does not appear to have made any effort to exclude time spent working on portions of the process that fall outside of the collection of late rent category, as defined in two of the periods I was asked to assume and assess.[76] Mr. Hosfield quite explicitly combined "Collection of Rent and Money Owed by Tenants, Including Evictions and Tenant Lawsuits Over Rent"[77] into a single category in his interviews. To the extent Mr. Hosfield is correct that the time spent working with a sheriff on evicting a tenant (who was then, in fact, evicted) or time spent working with a collections agency for tenants who have already vacated a building is a valid expense related to the collection of late rent, then this specific critique may not apply, but under my understanding of Plaintiffs' view of the law (as well as an alternative interpretation they have asked me to assess, *arguendo*), this will inflate the percentage of time these employees spent on collecting late rent, and thus overstate Defendants' employee cost damages.

110.     From Mr. Hosfield's Appendix C and the questionnaires and interview notes he produced, it is evident that he included costs which, under Plaintiffs' primary (or alternative) view of the legal standard, should be excluded.  For example, as I understand Mr. Hosfield's work, his interview subjects included time they spent trying to collect unpaid rent after a tenant vacates the rental unit, which I understand Defendants' property-level employees continue to do for 45 days after that date.[78] If either of Plaintiffs' cost period assumptions are correct, then time spent collecting money from tenants who have already

---

[76]   For the three categories, see Section 2 on assumptions, specifically, paragraph 4(b).

[77]   See Cell B9 of most of the tabs of EQR_Expert_000211.xlsx, e.g., Cell B9 of the tab "Alex Sakr"

[78]   See WP003735A, which explains that "after 45 Days," Defendants' employees should "send the account to our outside collection agency, FCO, if you do not collect the amount due within 45 days of move-out."

vacated (i.e., "unpaid rent" rather than "late rent") must be excluded and the nature of Mr. Hosfield's interview process has overstated employee time in a way that cannot be revised, short of completely redoing the interviews.

111. This flaw – asking questions in interviews that prevent the Court from disaggregating Defendants' damages due to late rent from Defendants' costs related to other activities like collection of unpaid rent – is pervasive throughout the Hosfield Report. The work product Mr. Hosfield has produced makes it quite clear that his results have entangled employee costs related to eviction within his estimates of Employee Costs, and there is no remedy, short of starting from scratch and performing different, more focused interviews.

112. Mr. Hosfield's notes of his interviews with several employees specifically mention time spent working on evictions, and Mr. Hosfield includes that time as an Employee Cost in his analysis of Defendants' damages. As an example, Martha Melendez, a Leasing Administrator at the Residences Westgate community, is listed as having spent 17.4% of her month on "Collection of Rent and Money Owed by Tenants, Including Evictions and Tenant Lawsuits Over Rent." Her interview notes[79] say her colleague (Brandon Robles) spends a steady 30 minutes per day over the first 15 days, and then half as much time thereafter working on "tenets [sic] sent to the attorneys" which I interpret as eviction-related work. The notes also indicate that Ms. Melendez is the one who goes to court to participate in evictions proceedings. Thus, to the extent eviction work is distinct from work collecting late rent, the Hosfield method has commingled the two in a way one cannot disentangle without re-interviewing Ms. Melendez and Mr. Robles.[80]

113. It is important to note that the costs related to eviction at issue here *are not* the same costs that Mr. Hosfield has labelled as "Eviction Costs" in his report. According to the

---

[79] EQR_Expert_000740.pdf, starting at EQR_Expert_000747.

[80] It is not clear to me if Mr. Robles was present at the Ms. Melendez's interview and answered for himself, or whether Ms. Melendez provided her own estimates of his work. If the latter, this is an unusual deviation from typical sampling protocol, given that it does not appear this was done for any other interview.

Hosfield Report, those costs pertain to "Equity's expended legal fees and SODA court fees," less "any eviction costs that were paid by class members."[81]  To be clear my discussion in this section (Section 6.1) is focused on Mr. Hosfield's interviews, where his notes indicate he asked his interview subjects to combine their time for the following categories "Collection of Rent and Money Owed by Tenants, Including Evictions and Tenant Lawsuits Over Rent" to generate a single, aggregate estimate of Employee Costs.  These costs related to eviction proceedings that are embedded within Employee Costs cannot be disaggregated in a ministerial way.

## 6.2    EVICTION COSTS AND COLLECTION COSTS

114.    As discussed in Paragraph (4c), I have been asked to assume that legal costs related to evictions and collections proceedings are not appropriately included in the analysis of the employee costs attributable to Plaintiffs' and class members' late rent payments.  To the extent Plaintiffs' instruction that these be excluded is correct, it is my opinion that this error in the Hosfield Report could be corrected based on the existing record.  As long as the question is whether to include or exclude them *in toto*, Mr. Hosfield has provided the basis to make that correction.  However, Mr. Hosfield provides no reliable estimate of anything other than the value if all of these expenses are valid or if none of them are.  That said, since my assumption from Class Counsel is that these are never valid, for me the correction is simple – I exclude them.

## 6.3    INTEREST COSTS

115.    I understand that Mr. Breshears and Mr. Tregillis have been tasked with a detailed analysis of Mr. Hosfield's work with respect to any damages from late rent related to Defendants' lost use of funds (i.e., forgone interest on late rent).  My opinion should not be seen as a substitute for that.  Instead I merely note that Mr. Hosfield has included the cost of

---

[81]    Hosfield Report, p. 18 of 49.

Defendants' having forgone the use of late-paid rent in a way that sweeps in costs that are outside late rent damages under either assumption (4b)(i) or (4b)(ii). That is, the Hosfield Report calculates an interest expense on rent that is paid prior to the expiration of the grace period even when that payment is timely and does not give rise to a late fee, and also seeks to recover that expense from class members who paid the late fee. As I understand the *Garrett/Beasley* standard, unless a particular tenant's conduct in a specific month gives rise to a late fee, Defendants cannot use the invalidation of the late fee to claim "actual damages" from that tenant for that month. By calculating lost use of funds for payments that were made during the grace period contained in the lease, Mr. Hosfield is essentially padding the damages offset with costs that Defendants have already agreed to bear under the lease and which are, moreover, entirely irrelevant to the breaches that gave rise to the late fees.

116.     Further, Mr. Hosfield fails to assign lost-use-of-funds damages to class members based on the damages each class member directly caused, although such a calculation could be easily completed. Indeed, it is also noteworthy that the detailed nature of Mr. Hosfield's interest calculations[82] makes clear that he is precisely aware of which tenant caused which interest revenue to be forgone by Defendants, under whatever assumption one wishes to make about when to start or stop the tally. Despite that knowledge, Mr. Hosfield instead aggregates the interest costs identified at the individual tenant level into a single yearly total, and then attributes an identical portion of that annual total for each occurrence of late rent in that month. He uses this reapportioned interest cost, rather than the actual interest he himself calculates that tenant to be responsible for. Moreover, his interest calculations include interest on tenants who were never late in a given year.[83] As a matter of economics, there is no way to justify Mr. Hosfield's decision to ignore tenant-by-tenant calculations in favor of a pooled-and-reallocated method, especially in light of a specific legal standard that

---

[82]    See, for example EQR_Expert_000020, where he performs such a calculation for a portion of the 2014 year.

[83]    Mr. Hosfield calculates this interest stating on Day 2 of the month. If a tenant is late in 2012, but not in 2013, Mr. Hosfield nevertheless calculates interest for that tenant who was not late in 2013, for interest on the grace period, and then distributes it to the tenants who were late in 2013.

requires tying Defendants' "actual damages" to each individual tenant who is responsible for those damages.

117.    I have not calculated the dollar-value of these errors because I understand Mr. Breshears has performed that work.  In my assessments, I include Mr. Breshears' totals for lost-use-of-funds damages after my own totals in order to reach a grand total offset.  The lost-use-of-funds calculation is his; I merely include it and provide a sum.

## 7.    MR. HOSFIELD'S FIRST PERSONNEL COSTS ANALYSIS IS BASED ON NON-PROBABILITY SAMPLING, WHICH RENDERS HIS EXTRAPOLATION FROM THE SAMPLE TO THE FULL POPULATION INVALID.

118.    As I explained in the prior two sections of this report, it is clear that Mr. Hosfield's Employee Costs analysis has failed to distinguish between marginal and inframarginal costs, and has failed to distinguish between costs related to late rent versus other expenses like eviction expenses which are related to non-payment of rent.  But even if these errors were capable of being fixed, Mr. Hosfield has a fatal error in his interview methodology (which underpins his first analysis of Employee Costs, which he calls his "Costs Incurred Method") arising from his sampling methodology.  As discussed above, Mr. Hosfield relies on a series of interviews with 59 of Defendants employees to estimate the portion of each month that a purportedly average employee spends working on the collection of late rent.  As I describe further below, it appears that Mr. Hosfield did not perform a random sample, but rather has conducted what is known in the statistical literature as a non-probability sample.  As Statistics Canada, the Canadian national office for statistics, explains:

> "In non-probability sampling, since elements are chosen arbitrarily, there is no way to estimate the probability of any one element being included in the sample. Also, no assurance is given that each item has a chance of being included, making it impossible either to estimate sampling variability or to identify possible bias. Reliability cannot be measured in non-probability sampling; the only way to address data quality is to compare some of the survey

results with available information about the population. Still, there is no assurance that the estimates will meet an acceptable level of error."[84]

119.     Using non-probability sampling where the goal is a reliable extrapolation from a sample to a population under study (such as sampling 59 Defendant employees to make a statement about all relevant Defendant employees' time) is fatally flawed because when using these methods, "it is not possible to make statistical inferences from the sample to the population."[85]  One of the reasons that one cannot reliably extrapolate from a non-probability sample to the full population is that there is no theoretical justification to assume a non-probability sample generates an unbiased result. Unbiasedness in the statistical sense can be thought of as a synonym for reliable, in that an unbiased estimator will tend, in repeated sampling, to give a result that accurately matches the true value in the full population.[86]  In contrast, a biased estimator will get the answer wrong – in repeated sampling it will generate an inaccurate result that does not center on the correct answer, so a biased sampling average tends to tell you the wrong value for the population average you're trying to learn.

120.     Consider the entirety of Mr. Hosfield's explanation of his sampling methodology, provided in his report:

> "To generate a list of representative interviewees, I categorized Equity's communities in California using two criteria: the number of units at each community and the number of late fees charged per month per unit at each community. Next, I ranked each of the two criteria into quartiles. Quartile One reflects the highest 25% in each criterion continuing through Quartile Four, which reflects the lowest 25% in each criterion. I then selected interviewees working

---

[84]     Statistics Canada, https://www150.statcan.gc.ca/n1/edu/power-pouvoir/ch13/nonprob/5214898-eng.htm.  The quote continues, saying: "Statisticians are reluctant to use these methods because there is no way to measure the precision of the resulting sample."  (The office then describes the limited situations in which non-probability sampling can be adequate, which I explain later in this section do not apply here).

[85]     See Laerd Dissertation (Lund Research), available at https://dissertation.laerd.com/quota-sampling.php.

[86]     That is, an unbiased estimator of a percentage of time spent on a task ensures an accurate estimate of the true value in the full population in repeated sampling.  A biased estimator does not.

59

at communities that would provide representation for each quartile."[87]

121.    The final sentence quoted above appears to indicate that Mr. Hosfield simply hand-picked (non-randomly) some number of people from each of these eight overlapping quartiles.  On the surface, this looks to be an attempt to generate what is known as a stratified random sample.  In a stratified random sample a population is divided into some number of mutually exclusive groups (each is known as a "stratum," collectively as "strata"), then a random sample is conducted within each stratum, and then the <u>weighted</u> average of the strata's means constitutes an unbiased estimator of the population mean.  When properly weighted, this unbiased estimate is appropriate as a means of extrapolating from the sample's result for a given value to a quantitative prediction of the true population value (with some margin of error based on the sample variance).[88]  In the terminology of this case, that would mean that a properly designed stratified random sample could then give a <u>weighted</u> average of the percentage of time a relevant category of Defendants' employees spent working on the collection of late rent, and this in turn would be a valid number to use to extrapolate to estimate the average amount of time spent by all personnel in that job category i.e., for employees in the Office Management or Leasing job categories.

122.    But despite a surface-level appearance of rigor, what Mr. Hosfield describes in the quotation above is not a stratified random sample, because under a valid stratification methodology, each stratum needs to be sampled randomly, rather than being selected based on some other criteria like availability or cooperativeness of interview subjects.[89]  Instead, it appears that what Mr. Hosfield did fits into the non-probabilistic category of sampling, where one simply identifies the units to study (in this case the employees he chose to

---

[87]    Hosfield Report, p. 13 of 49.
[88]    See Thompson. M.E., "Theory of Sample Surveys," Chapman & Hall (1997), pp. 14-15.
[89]    Although I am not sure of the context, Mr. Hosfield's staff was instructed by Defendants to "cherry pick" his data points in at least one case.  See EQR_Expert_000876.pdf.

interview) and then selects them by non-random criteria.[90] Among other things, the fact that some of the chosen interview subjects failed to show up for being interviewed, would by itself preclude the sample from being truly random.[91] Thus, rather than performing a scientifically valid stratified random sample, what Mr. Hosfield has done constitutes a non-random "quota sample."[92] As one guide for dissertating students explains, quota sampling "is the non-probability based equivalent of the stratified random sample."[93]

123.    Quota sampling infamously led the Gallup organization (and others) to predict a victory for Thomas Dewey over Harry Truman in the 1948 U.S. Presidential Elections and contributed to the notorious "Dewey Defeats Truman" headlines.[94] While Mr. Hosfield's description of his methodology has a veneer of statistical rigor to it, upon inspection it appears to fit directly into the quota sample methodology, which has exactly this feature:

---

[90]    It is important to distinguish between a method that is statistically random and one that is merely haphazard. Even if the employees who were interviewed were not hand-picked because they work on late-rent collection, any arbitrary but non-random means of selection that is not based on a valid sampling methodology, will cause the results to be non-extrapolatable. Haphazard or arbitrary are not synonyms of "random" in the important sense needed to undertake a probability-based sampling process.

[91]    Per EQR_Expert_000177, Mike DeCosta, a senior leasing consultant at the Acton community was a "No Show." Per EQR_Expert_000192, Melinda Friedman, a senior leasing consultant at the Town Center community was a "No Show."

[92]    For a discussion of the bias inherent in quota sampling see the following from Statistics Canada, the national statistics office of the Canadian federal government (available at: https://www150.statcan.gc.ca/n1/edu/power-pouvoir/ch13/nonprob/5214898-eng htm): "Quota sampling is somewhat similar to stratified sampling in that similar units are grouped together. However, it differs in how the units are selected. In probability sampling, the units are selected randomly while in quota sampling it is usually left up to the interviewer to decide who is sampled. **This results in selection bias**." (Emphasis added.) See also Cochran, William, "Sampling Techniques" (Third Edition), pp. 135-6. John Wiley & Sons, 1977. "… in general, quota sampling may be described as stratified sampling with a more or less nonrandom selection of units within the strata. For this reason, **sampling-error formulas cannot be applied with confidence to the results of quota samples**. … The quota method seems likely to produce samples that are biased on characteristics such as income, education, and **occupation**…." (Emphases added.)

[93]    Laerd Dissertation (Lund Research), available at https://dissertation.laerd.com/quota-sampling.php. See also Freund, John E., "Modern Elementary Statistics," Prentice Hall (1998), p. 252: "In stratified sampling, the cost of taking random samples from the individual strata is often so expensive that interviewers are simply given quotas to be filled from different strata, with few (if any) restrictions on how they are to be filled. … This is called **quota sampling** … but as it is often executed, the resulting samples do not have the essential features of random samples. … and inferences based on such samples do not lend themselves to any sort of formal statistical evaluation."

[94]    See Utts, Jessica M., "Seeing Through Statistics," (Third Edition), Brooks/Cole (2005), pp. 75-76. See also Freedman, David, et al., "Statistics" (Fourth Edition), W.W. Norton & Company (2007), pp. 337-339.

"From a common-sense point of view, quota sampling looks good. It seems to guarantee the sample will be like the … population with respect to all the important characteristics…. But the 1948 experience shows this procedure works very badly."[95]

124.     One textbook explains:

> "In quota sampling, the sample is hand-picked to resemble the population with respect to some key characteristics. The method seems reasonable, but does not work very well. The reason is unintentional bias on the part of the interviewers. The quotas in quota sampling are sensible enough, although they do not guarantee success – far from it. But the method of filling the quotas, free choice by the interviewers, is disastrous. The alternative is to use objective and impartial chance mechanisms to select the sample."[96]

125.     Quota samples can be useful in limited situations, but the use to which Mr. Hosfield has put it is not one of those situations. Specifically, quota samples are well suited when a true random sample, such as a stratified random sample, is impossible for logistical reasons, and when there is no specific need to get a quantified, reliable estimate of implications of the sample for the full population. Neither of these is true here. A randomized sample was entirely possible, even if stratification was seen as necessary; a simple random sample was also quite possible. The steps Mr. Hosfield took to create quartiles has the hallmarks of the *beginning* of a statistically valid stratified random sample, but then at his final step, when he opted not to randomly sample employees from his quartiles, the statistical rigor of the methodology petered out. That last step was not substantially more difficult than hand-picking 59 subjects; it might have been simpler to do it randomly. A statistically valid sample was entirely possible here, at virtually the same level of effort, and thus this specific justification for having resorted to a non-probability-based equivalent fails.

126.     The second situation in which quote sampling is acceptable – when one is not interested in making a quantitative extrapolation of the sample to the full population – is

---

[95]     Freedman, David, *et al.*, "Statistics" (Fourth Edition), W.W. Norton & Company (2007), pp. 337-339. The 1948 experience mentioned is the "Dewey Defeats Truman" debacle.

[96]     Freedman, David, *et al.*, "Statistics" (Fourth Edition), W.W. Norton & Company (2007), p. 339.

irrelevant here too. It should be obvious that Mr. Hosfield very much developed this sample for the express purpose of performing quantitative extrapolation of the sample results. The reason quota sampling is reserved for situations in which there is no need for extrapolation is because "the resulting samples do not have the essential features of random samples."[97] Quota sampling is thus a tool for studies where the goal is <u>not to extrapolate</u> to a larger population.

127. The impossibility of performing an unbiased extrapolation from a quota sample comes from the lack of random selection. When Mr. Hosfield hand-picked his set of Office Management and Leasing employees, he employed judgment, rather than chance. "*Quota samples* are thus essentially **judgment samples**, and inferences based on such samples *do not lend themselves to any sort of formal statistical evaluation*."[98] This means it is statistically invalid to use it to estimate a population-wide result, which is the entire point of Mr. Hosfield's use of sampling.

128. Essentially, quota sampling has the same relationship to stratified sampling as fool's gold has to real gold, in that it looks to be the real thing, but it is worthless for the purposes of statistical extrapolation. Thus, while non-probability samples can make sense in some situations, they are inappropriate for the exact use to which Mr. Hosfield puts his sample results in the Hosfield Report: extrapolating from his samples (of Office Management and Leasing employees) to the equivalent entire populations. For such a task, any form of non-probability sampling is inappropriate because, "[u]nlike probability sampling, the goal is *not to achieve objectivity* in the selection of samples, **or necessarily attempt to make generalisations (i.e., statistical inferences) from the sample being studied to the wider population of interest**."[99]

---

[97] Freund, John E., "Modern Elementary Statistics," Prentice Hall (1998), p. 252.

[98] Freund, John E., "Modern Elementary Statistics," Prentice Hall (1998), p. 252. (Bold in original, bolded italics added for emphasis).

[99] See Laerd Dissertation (Lund Research), available at: https://dissertation.laerd.com/non-probability-sampling.php. Emphasis added.

## 7.1 MR. HOSFIELD'S SAMPLING METHODOLOGY CREATED A BIASED ESTIMATE OF THE TRUE PERCENTAGE OF TIME RELEVANT EMPLOYEE CATEGORIES SPEND COLLECTING LATE RENT

129.    Even if the specific sample Mr. Hosfield handpicked had been generated randomly (for which there is no evidence, and the samples strongly suggest otherwise), it still would not be the correct sample to perform the statistical calculations Mr. Hosfield performs.  That is, if one assumes, *arguendo*, that the 59 employees Mr. Hosfield selected had been chosen via a valid random process, so that the Hosfield sample qualified as a stratified random sample, Mr. Hosfield's use of those data is inconsistent with the proper use of a stratified random sample.  When done correctly, the method of creating mutually exclusive strata and then combining them for analysis creates a series of sample results that must be weighted to yield an unbiased estimate of the measured statistic for the whole population.[100]  One cannot assess a population average by calculating unweighted statistics (like the percentages Mr. Hosfield uses in his work) across the strata as if they had been drawn from a simple random sample.[101]  Moreover, because Mr. Hosfield created two distinct stratifications of the sample

---

[100]    As a simple example, if you have two strata and one has triple times the population of the other, the sample value of the larger stratum needs to have triple the weight of the smaller.  If the larger stratum's mean is 10 and the smaller stratum's mean is 20, the correct average is not $(10+20)/2=15$, but rather $(3*10+20)/(1+3)=12.5$.

[101]    There is one exception to this need to perform a weighting, and that is when the size of the sample drawn from each stratum is proportion to the size of the population of each sample (which is not the case here). I.e., if a stratum comprises 25% of the population then the sample from that stratum must comprise 25% of the total sample.  In that limited case, one can determined the full-sample average simply by averaging each unweighted observation. As a simple example, consider the proof of this for just two strata.  Consider a population of N, divided into two strata of size $N_1$ (consisting of observations $x_1, x_2, \ldots x_{N1}$) and $N_2$ (consisting of observations $y_1, y_2, \ldots y_{N1}$)

If we sample proportionally from each stratum, i.e., we draw n1 from N1 and n2 from N2, such that $n1/N1=n2/N2 = (n1+n2)/(N1+N2) = n/N$, then the weighted average of the two strata,

$\frac{(x_1+x_2+ \ldots +x_{n1})}{n_1} * \frac{n_1}{(n_1+n_2)} + \frac{(y_1+y_2+ \ldots +y_{n2})}{n_2} * \frac{n_2}{(n_1+n_2)}$, is equal to the straight average of the observations of the strata combined together, $\frac{(x_1+x_2+ \ldots +x_{n1}+y_1+y_2+ \ldots +y_{n1})}{n}$, as shown below:

$\frac{(x_1+x_2+ \ldots +x_{n1})}{n_1} * \frac{n_1}{(n_1+n_2)} + \frac{(y_1+y_2+ \ldots +y_{n2})}{n_2} * \frac{n_2}{(n_1+n_2)} =$

$\frac{(x_1+x_2+ \ldots +x_{n1})}{n_2} * \frac{n_1}{(n_1+n_2)} + \frac{(y_1+y_2+ \ldots +y_{n2})}{n_2} * \frac{n_2}{(n_1+n_2)} =$

$\frac{(x_1+x_2+ \ldots +x_{n1})}{(n_1+n_2)} + \frac{(y_1+y_2+ \ldots +y_{n2})}{(n_1+n_2)} =$

$\frac{(x_1+x_2+ \ldots +x_{n1})+(y_1+y_2+ \ldots +y_{n1})}{(n_1+n_2)} =$

population, such that each observation appears in two strata, the results are not mutually exclusive (nor poolable) unless one recasts the two strata as a two-dimensional sample (i.e., not two separate 4 x 1 strata, but instead a 4 x 4 square, where any given observation is in only 1 of the resulting 16 strata). So, for example, rather than saying that the Mill Creek community is in the first quartile for the number of units and the second quartile for number of late rent payments, one can think of that office falling into stratum {1, 2} in a 4 x 4 matrix.

Exhibit 3a. Hosfield's Strata

|  |  | Late Payments | | | |
|---|---|---|---|---|---|
|  |  | First Quartile | Second Quartile | Third Quartile | Fourth Quartile |
| Units | First Quartile | {1,1} | {2,1} | {3,1} | {4,1} |
|  | Second Quartile | {1,2} | {2,2} | {3,2} | {4,2} |
|  | Third Quartile | {1,3} | {2,3} | {3,3} | {4,3} |
|  | Fourth Quartile | {1,4} | {2,4} | {3,4} | {4,4} |

130. Focusing on just Mr. Hosfield's sampling of employees in the Office Management group, the first and most striking flaw is that he has only sampled Office Management employees from eleven of these sixteen strata (he omitted the five[102] shaded boxes above). The omission of those five strata creates a fatal problem for his estimate of the true percentage of time Office Management staff spend on collecting late rent, because

$$\frac{(x_1 + x_2 + \ldots + x_{n1} + y_1 + y_2 + \ldots + y_{n1})}{n}$$

The same holds for any number of strata, though that general proof is a bit too complex to illustrate in a footnote. In any event, this exception does not apply to the Hosfield Report, as his strata were not sampled in proportion to the size of their underlying populations.

[102] Mr. Hosfield interviewed several employees working at two or more properties. While these properties (e.g., Schooner Bay I and II) share a single cost center, Hosfield treats them as separate in his sampling. So, Schooner Bay I is classified as a {4, 4} strata, while Schooner Bay II is {3, 4} - it is therefore impossible to definitively identify the stratum of the one interviewee who Hosfield lists as working at "Schooner Bay I and Schooner Bay II." I opted to allocate this person to Schooner Bay I and {4, 4} - since this is the cost center of the Schooner Bay properties. If this employee were to be instead allocated to Schooner Bay II, the {3, 4} strata would be populated with a single person sample, lowering the number of non-sampled strata, but increasing the number of strata with a single observation and thus no variance. Either way, the conclusion that only eight strata remain is unchanged.

stratification with non-sampled strata creates a problem known as "non-measurability," which means there is no valid way of putting a confidence interval around the estimate.[103] Moreover, for another three there is only a single data point sampled from those strata, meaning it is impossible to calculate a margin of error because there is no intra-stratum variance. Thus eight of the sixteen potential strata cannot be used in a statistically sound fashion to estimate any finite margin of error for the percentage estimates on which Mr. Hosfield's analysis relies for Office Management. By itself, this renders the results invalid, but even if one were to assume, *arguendo*, that the study was not designed to look at any of the communities in those five omitted strata or three single sample strata, in order to make the survey design measurable, then at best, one could only use Mr. Hosfield's results for the remaining eight strata, meaning fully 50% of Defendants' communities in California could not be included in his analysis of Office Management employee costs, even with these generous *arguendo* assumptions.

131. Even then, however, it is clear the remaining eight strata were not properly weighted to be proportional to the size of the underlying strata populations. Consider the full population of Office Management employees across Mr. Hosfield's implicit sixteen-part stratification.

Exhibit 3b. Full Population – Average Number of Office Management Employees by Stratum

| | | Late Payments | | |
| | | First Quartile | Second Quartile | Third Quartile | Fourth Quartile |
|---|---|---|---|---|---|
| Units | First Quartile | 12.1 | 12.0 | 25.2 | 15.7 |
| | Second Quartile | 21.3 | 8.1 | 11.1 | 8.0 |
| | Third Quartile | 9.5 | 13.5 | 5.9 | 9.3 |
| | Fourth Quartile | 4.0 | 6.0 | 2.0 | 8.4 |

---

[103] See Thompson. M.E., ""Theory of Sample Surveys," Chapman & Hall (1997), p. 16: "A design for which $\pi$jk >0 for all j,k is sometimes called *measurable*. … It is possible to show that generally no unbiased estimator of Var(Ty) exists if the design is non-measurable, that is if some $\pi$jk =0." (Italics in original.)

132.    These are not the proportions by which Mr. Hosfield sampled, as can be seen by comparing Quartile {2, 1}[104] with Quartile {3, 2}.  From the exhibit above, one can see that Quartile {2, 1} has more employees (21) than Quartile {3, 2} (13.5) but from the exhibit below Mr. Hosfield samples only three from {2, 1} versus five from {3, 2} as shown in the exhibit below.

Exhibit 3c. Sample – Office Management Employees by Stratum

|  | | Late Payments | | | |
|---|---|---|---|---|---|
|  | | First Quartile | Second Quartile | Third Quartile | Fourth Quartile |
| Units | First Quartile | 2 | 1 | 4 | 1 |
| | Second Quartile | 3 | 2 | 2 | 0 |
| | Third Quartile | 0 | 5 | 1 | 3 |
| | Fourth Quartile | 0 | 0 | 0 | 2 |

*Note: Unsampled strata in red, single observation strata in gray.*

133.    The result is that when Mr. Hosfield erroneously uses a straight average of all employees he interviewed (leaving aside that those interviews overstate employee time by including irrelevant work activities, and leaving aside that the interviewees were not randomly selected), he biases his results.  Using the same example, he overweighs the experience of employees in stratum {3, 2} and underweights the experience of employees in stratum {2, 1}.

134.    In sum, Mr. Hosfield's sample does not appear to have been drawn randomly.  Even if it was drawn randomly, the stratification was done incorrectly.  Even if the stratification had been done correctly, it would not apply to the omitted or single-observation strata (which for the Office Management category comprises eight of the sixteen strata in the stratification.  Even if one were to ignore all of those flaws, Mr. Hosfield's calculated average for the time Office Management and Leasing employees spent on late rent collection would still be biased and invalid because of the failure to weight his results.[105]

---

[104]    I follow the convention of listing the cells as {vertical, horizontal}.

[105]    This illustration has focused on Office Management employees, but Mr. Hosfield also failed to sample strata in his Leasing employee sample work.

## 8. THE HOSFIELD REPORT DOES NOT CALCULATE COSTS ON AN INDIVIDUAL BASIS

135.    As I understand it, the law as laid out under the *Garrett/Beasley* standard states that it is legally inappropriate to calculate only aggregate damages and then allocate those damages to individual class members on an average per-late fee basis.  Doing so would lead to a situation in which individual Class Member A, who is owed some level of gross restitution, would fail to recover that restitution simply because Class Member B may have caused a greater degree of offsetting damage to the same Defendants.

136.    Mr. Hosfield claims that in aggregate, across all class members, total Employee Costs incurred in collecting late rent (which as I have explained above is inflated) is $17.2 million from Sept 2010 to Feb 2020, as well as additional expenses between $10.7 million and $19.3 million, depending on the particular version of his model one chooses.  Further, he divides each year's late fees by the number of late fees charged to get an average fee, and divides the year's costs (as he calculates them) by the number of late fees charged to get an average cost per fee.  He claims the total costs he calculates exceed the total late fees charged to all class members in aggregate, and also that for most of the years of the class period the same holds for the annual average – that is, average late fees charged for all years except 2011 (in his primary model, which I understand to be Exhibit 3.2 Schedules 1A and 1B) are less than the average costs (per late fee) he claims were incurred by Defendants in the course of collecting late rent.  As discussed above, he uses averages even where his analysis generates precise costs per tenant; Mr. Hosfield disregards those values and replaces them with less accurate average values.  This very explicitly assigns pooled costs to each class member in each month they are late, based solely on the frequency with which they are late in a given year, completely independent of the work a given tenant imposes on Defendants' employees, or the interest charges they generate, or for that matter, whether they were responsible for even a penny of the fees Mr. Hosfield considers to be Eviction Costs or Collection Costs.  He thus treats a tenant who is late in December of a given year, forces

substantial overtime work by many Defendant employees in a futile attempt to collect rent, whose file is then sent out for eviction proceedings, and is ultimately evicted after a prolonged and expensive legal fight, and who then causes substantial collection fees in an effort to collect the unpaid rent, as causing identical damages as a tenant who paid rent on time every month but one, and in that one month paid on the same day the late rent notice was generated.

137.    Thus, what the Hosfield Report does is exactly what I understand to be prohibited under the *Garrett/Beasley* standard, namely it generates an aggregate damages figure (which as explained above is invalid for numerous reasons as well as inflated) and then ladles them out in a non-economic fashion to class members.  This problem is then exacerbated by costs associated with payments made after the first but before the fifth, for which a late fee was not even imposed.[106]  The formula for per-class member damages in the Hosfield Report for Class Member A requires knowledge of the damages caused by Class Members B, C, and D's (etc.), and also costs attributable to "late" payments that were not in violation of the lease at all, and for which Defendants never charged or collected late fees.  The result is that Class Member A sees her restitution reduced inappropriately simply because Class Member B may have caused late-rent (or other types of) damages to Defendants, and both see their restitution reduced inappropriately because Mr. Hosfield's cost figures include work Defendants' employees did to prepare for non-class-members' potential late rent.

138.    The Hosfield Report is devoid of any quantitative analysis designed to demonstrate that the costs he uses are "actual damages" nor does it provide any hint as to whether any particular class member ever imposed on Defendants the specific cost per late-fee he

---

[106]    Mr. Hosfield's data only contains late fees paid by class members, but his calculation of costs includes time spent by Defendant employees, sometimes substantial amounts of time, working on "Collection of Rent and Money Owed by Tenants, Including Evictions and Tenant Lawsuits Over Rent" even before the fifth of the month. These costs are included in his Employee Costs which make up the bulk of his calculation of Defendant damages.  **Since many tenants who are not class members would be among the set of tenants still owing rent on, say, the 2nd of the month, some of this time is devoted to non-class members.**  Mr. Hosfield makes no attempt to disaggregate that non-class member time from the time spent on collecting rent from class members.

calculates.  He simply assumes all costs are relevant and each incidence of late rent in a given year imposes an identical cost on Defendants.  As discussed above, the absence of a direct link in Mr. Hosfield's analysis to the costs caused by each Plaintiff's or class member's late rent payment can be seen from the fact that because annual costs are doled out proportional to the number of late fees charged, the formula to calculate the damages allegedly caused by Class Member A gives different results based on how frequently Class Member B is late in the same year.

139.  Economically, the assumption that every time a tenant is late, regardless of how long the rent remains late, Defendants incur an identical cost in any given year, is equivalent to claiming 100% of Defendants costs are incurred in the first second in which a tenant is late, and no additional costs are generated over the rest of the month or beyond.  Mr. Hosfield makes no effort to demonstrate that the simple act of flagging a tenant as being late – which I understand is done by a computer just after midnight in the early morning of the fifth of each month – drives all of Defendants' costs.  But that is how the Hosfield Report assigns his estimate of Defendants' annual costs to each late-paying tent each month they are late.

140.  This allocation thus flatly contradicts the rest of the Hosfield Report, which is explicitly premised on interview notes showing that costs are mostly incurred beyond the first minute after the grace period expires.  For example, hourly employees spend time working on late-rent collection after the fifth of the month, interest costs accrue over time, and expenses related to evicting tenants or from using a collection agency for tenants who moved out all happens after the fifth of the month and only for a subset of late-paying tenants.  Although I understand legal fees for eviction proceedings and collection agency expenses to be legally irrelevant here, their inclusion by Hosfield nicely illustrates the fundamental error of his method.  A tenant who pays on the sixth day of the month has not caused Defendants to spend even a penny on eviction proceedings or collection agency costs.  Yet Mr. Hosfield's method assigns a portion of those costs to such a tenant, one that is

equal to the portion he assigns to a tenant who was evicted or whose file was sent to collections.

**8.1    THERE IS STRONG EVIDENCE THAT EVERY LATE PAYING TENANT DOES NOT IMPOSE IDENTICAL COSTS ON DEFENDANTS IN A GIVEN MONTH.**

141.    Mr. Hosfield is very clear in his report that "the activities and amount of time required to account for and collect late rent varies widely."[107] Despite this, his entire damages allocation rests on the assumption that the prior statement is false, and that instead every tenant in every month in any year imposes identical cost burdens on Defendants from paying rent late.  Mr. Hosfield's words are correct, his damages assumption is not.

142.    On average, most tenants who are late in paying their rent nonetheless pay within 6 days of the end of the grace period, i.e., on or before the tenth day of the month for a typical lease that starts on the first of the month.[108] Since most late rent is paid within this ten-day window, the result of Mr. Hosfield's pooled damages methodology is a upwardly biased estimate of the late-rent "actual damages" most class members impose on Defendants, and thus is a downwardly biased estimate of most class members net restitution.  It would clearly not be a valid methodology if a single member of the class with damages based on a lateness pattern of this nature were suing on their own behalf.

143.    For example, consider the case of class member with resident ID "29102-014-151-7" who paid rent late only once in 2013 and incurred a late rent fee of $78.50.[109] As a first matter, when Mr. Hosfield looks to see whether this tenant has net positive or negative restitution, he ignores the specific late fee charged, and instead uses $74.26 which is the average late fee for that year.[110] Next, he compares that average to his calculated average

---

[107]    Hosfield Report, p. 11 of 49.
[108]    See text_cites.xlsx, tab "original_dayslate".
[109]    See text_cites.xlsx, tab "example".
[110]    See Hosfield Report, Exhibit 3.2, Schedule 2A.

"damages" figure, which according to Mr. Hosfield's calculations was $72.27 that year (with costs cut off as of the resident's move out date)[111] or $84.31 (with no cost cut-off for move outs and interest on two-year worth's of collections)[112] or $85.89 (with no cost cut-off for move outs and interest through collections.[113] These costs consist of a full blend of Mr. Hosfield's Employee Costs, Eviction Costs, Collection Costs,[114] and Interest Costs. But because Mr. Hosfield treats all tenants who were late that month equally, he concludes that "29102-014-151-7," like every other tenant that year, caused damages that exceeded the late fee charged, without identifying any specific costs for any specific tenant.

144. The method by which Mr. Hosfield arrives at the $72.27 or $84.31 or $85.89 is demonstrably false for "29102-014-151-7." This tenant was not evicted and did not have any unpaid rent sent to a collection agency, so rolling in an eviction cost and a collection cost for this tenant makes no economic sense. The tenant paid the late rent on the first day after the expiration of the grace period, so any interest, whether calculated on one or four days (the latter would include the grace period) was *de minimis*, rather than equal to the interest paid by the average late tenant that year. This leaves only the Employee Costs to even possibly apply to "29102-014-151-7." But even here Mr. Hosfield's amount, based on the full range of activities that all Defendants' employees conduct in all communities, is hardly appropriate to apply to someone like this tenant who paid the rent mere hours after the late fee was assessed. The offsets that the Hosfield Report doles out to "29102-014-151-7" have virtually nothing to do with the impact "29102-014-151-7" had on Defendants' costs. There is no way conclude this tenant caused the $72.27 or $84.31 or $85.89 Mr. Hosfield assigns to

---

[111] See Hosfield Report, p. 41 of 49, first table.

[112] See Hosfield Report, p. 40 of 49, second table.

[113] See Hosfield Report, Exhibit 3.2, Schedule 3A. As best I can tell, Mr. Hosfield didn't actually discuss this version in his report.

[114] As I understand it, Mr. Hosfield omits the Collection Costs line item from his alternative damages that terminate on a tenant's move-out date.

this tenant as damages. To the contrary, there is strong economic evidence that this tenant did not cause these damages.

145. There are approximately 7,000 such resident IDs (class members) in the data – i.e., renters who were only late once, and paid on the same day as the late fee was assessed.[115] As with the example above, it is economically incorrect to apply Mr. Hosfield's calculated the average cost per late fee to these tenants as if that average reflected their actual impact on Defendants' costs of late rent collection. Although these 7,000 tenants constitute the most egregious example, much the same could be said for thousands of other resident IDs who paid one or several late fees within a few days of the end of the grace period. In each case, Mr. Hosfield has upwardly biased the assessment of Defendants' damages with the effect of improperly reducing class members' restitution.

## 9. LACK OF REPLICABILITY/FASIFIABILITY RENDERS MR. HOSFIELD'S SECOND METHODOLOGY UNSCIENTIFIC AND UNRELIABLE

146. After Mr. Hosfield explains his survey-based analysis of Defendants' purported Employee Costs related to late rent, the Hosfield Report pivots to an entirely different analysis, one for which he has provided no backup his contribution of any expertise other than arithmetic.

147. He describes this work as follows:

> To determine how staffing would change in an environment where there was no more delinquent rent, I had interviews with Equity leadership, specifically Ms. Rivera, Shanna Dion, Vice President – Property Management, Alla Feldman, Senior Regional Manager, and Jesse Jennell, Senior Regional Manager. I asked them to consider the following question specific to the area that they manage: "If all residents paid their rent on time, how would Equity's staffing needs change?" We built a model for each region based on data I directed Equity to produce which details the total annual cost of Equity's employees that are involved in the delinquency process in the following California markets: Los Angeles, San Francisco, Orange County, and San Diego. Within the

---

[115] See text_cites.xlsx, tab "1time_1day_late"

> model, communities were combined into groups based on
> geography and the ability to share staff. Ms. Rivera, Ms. Dion, Ms.
> Feldman, and Mr. Jennell then reviewed the employee lists in the
> markets for which they were responsible and determined how
> staffing would change if all residents paid their rent on time."[116]

148.     Despite Mr. Hosfield's use of the word "we," the expertise for this comes from

Defendants' upper-management employees. This is not Mr. Hosfield's trained staff working

under his direction and control, assessing documents produced by Defendants during the

regular course of business outside of litigation.  Instead, Mr. Hosfield has merely asked

Defendants to generate a made-for-litigation analysis (which Defendants do not appear to

perform in the regular course of business), for which no independent evidence exists as to

its reliability.  Mr. Hosfield merely tabulated the data Defendants produced and performed

simple arithmetic to arrive at a total.  For example, Mr. Hosfield does not come up with the

estimates of the staffing or compensation changes Defendants would experience in his

hypothetical.  Rather, as he explains, he asked "… Ms. Rivera, Ms. Dion, Ms. Feldman, and

Mr. Jennell to provide me the midpoint salary for the updated position. To convert that

salary into an annual cost, I calculated salary as a percentage of annual cost for Equity

employees by position and market."  In other words, Mr. Hosfield's work consisted of asking

for the answer and dividing the new values by the old to determine a percentage reduction.

149.     Thus, as Mr. Hosfield explains, his work primarily consists of "…accounting for the

various staffing changes [determined by Defendants] and performing the calculations

described above." He thus he concludes that "if all residents paid their rent on time, Equity

would reduce its costs for employees involved in the delinquency process by 9.78%."[117]  In

Section 5.2 above, I have explained why this question – what would happen if no one ever

paid rent late – is incompatible with my understanding of the "actual damages" requirement

---

[116]   Hosfield Report, p. 29 of 49.
[117]   Hosfield Report, p. 30 of 49.

of the *Garrett/Beasley* standard. This is a classic example of inframarginal costs being allocated, rather than marginal costs being calculated.

150. But separate from that fatal flaw, Mr. Hosfield's analysis is also unscientific because it offers no means of being tested. Imagine the Court were curious as to whether the savings Defendants told Mr. Hosfield could be achieved were really possible. Mr. Hosfield can provide no evidence other than to say it is what he was told. If the Court wishes to know how sensitive this result is to Defendants' underlying assumptions, Mr. Hosfield has provided no means to assess the robustness of the model. It is essentially just a pronouncement with no factual foundation to test.

151. Contrast this "Cost Savings Method" with the work Mr. Hosfield's undertook to estimate Defendants' hypothetical forgone interest. When calculating interest, Mr. Hosfield presents detailed spreadsheets to demonstrate his methodology for inferring Defendants' weighted average cost of capital ("WACC") and then applies that WACC on a day by day basis to tenant balances whenever there is an indication of rent being late. I am not expressing an opinion of the accuracy of those calculation, but regardless of whether one agrees with the specifics of his calculations or not, he has made his model replicable and falsifiable. One can attempt to replicate his analysis and see if the calculations are correct. In contrast, there is no way to determine whether Defendants have accurately determined that in the absence of late rent, employee with the employee ID "66764" would accept a demotion to part-time status from Community Manager to Assistant Community Manager, or whether, in fact, the community Versailles (K-Town) would be able to function with the reduced staff in place.[118]

152. Similarly, if one wants to test what happens to Mr. Hosfield's conclusion related to interest costs under a different set of assumptions (e.g., if one assumes interest costs do not accrue during the grace period), one can simply use his model to assess the alternative

---

[118] See Hosfield Appendix D, Schedule 3. EQR_Expert_000739.

hypothesis, and determine the impact of the counterfactual or alternative assumptions. In contrast, there is no way to assess what would happen to the "Cost Savings Model" developed by the four employees if, say, the time Defendants' employees could save from the absence of rent was only 90% as great as imagined, or 70%, or 50%. There isn't even a formula to adjust. One cannot determine which employees would be needed under these alternative scenarios. The finder of fact must either simply take on faith that Mr. Hosfield's answer is correct, or not, but no rational assessment of the model's objective conclusions is possible. Valid economic analysis, as with all work conducted within the sciences and social sciences, must be testable, and capable of being found incorrect by means of those test (this is what "falsifiability" means). Otherwise an analysis lacks scientific rigor, and is thus is invalid and unreliable. For these reasons, specifically because the results cannot be independently replicated nor can the conclusions be tested and potentially falsified. Mr. Hosfield's second methodology is very clearly in the latter category: invalid and unreliable.

## 10. THERE EXIST REASONABLE CLASS-WIDE METHODS TO MEASURE COSTS ON A CLASS-MEMBER BASIS, WHICH ARE RELIABLE AND FORMULAIC

153.     Based on the foregoing, is it clear that what Mr. Hosfield did in this case is insufficient to determine Defendants' "actual damages" as relates to any individual Plaintiff or class member, let alone for all of them. The remaining question is whether an expert possibly could estimate Defendants' "actual damages" from Plaintiffs' and class members' late rent, or if instead the task is impossible/impracticable, such that no objective assessment of these "actual damages" is realistically feasible. This is a fundamental premise of the Hosfield Report, i.e., that it is "impracticable" to perform an economically reasonable assessment of the cost each late-paying tenant imposes on Defendants. But that is false.

154.     Practicable methods exist for determining, on a tenant-by-tenant basis, a reasonable estimate of Defendants' marginal costs associated with each tenant's late payment of rent. Moreover, there are systems Defendants could employ to track those costs in real-time.

155.     For example, virtually everyone involved in litigating this case, including Mr. Hosfield himself, is very comfortable with recording the time spent performing specific tasks for specific clients, down to the fraction of an hour. Had Defendants put such a method into place at the start of the class period, the answer to the employee-cost damages question could be as simple as running a print-out from the time-keeping software. If Defendants had implemented a time-keeping regime in 2014, we would have extremely high-quality data that would have made the exercise of extrapolating backwards to earlier pay periods a fairly simple exercise.

156.     The fact that Defendants opted not to install such a protocol for their employees does not render the exercise inherently impracticable *ex ante*. Nor has it become impracticable *ex post*. While it is more difficult after the fact, there exist reasonable methods to reliably assess the employee costs involved in late-rent collection in a way that is not a naïve allocation of a pool of costs via a method unrelated to the costs any specific tenant imposed on Defendants by paying late rent. Mr. Hosfield's choice to declare this task too difficult and then fall back on an erroneous allocation method does not mean it is actually too difficult to estimate damages, nor that he had no other options but his inappropriate methodological choice.

157.     The supposed difficulty of creating an accurate model is not a valid economic excuse to resort to broad averages and generalizations. For example, Mr. Hosfield declares, without support or citation, that "It is appropriate to compare Equity's average cost per late fee to the average late fee charged given Equity considers its costs related to rent delinquency when assessing late fees,"[119] but this claim has no economic basis. If the goal is to link together the

---

[119]   Hosfield Report, p. 33 of 49.

fees charged to a tenant and the "actual damages" that tenant has caused in return, which it must be for a cost model to become a valid damages model, it is very much *not* appropriate to simply compare the average inframarginal cost per late fee to the average late fee charged. As laid out above in great detail, most class members' late payment of rent imposes on Defendants far less than the cost Mr. Hosfield assigns via his allocation method, both because he has commingled marginal and inframarginal costs, but also because his comparison intentionally commingles costs across class members, charging less-late tenants for the costs associated with the egregiously late, even to the point of charging tenants whose files were never referred out for eviction a share of Defendants' eviction expenses and collection expenses to those who never generated the need for collections.

158.    Even the decision to ignore the actual late fees charged on a per-tenant basis, and to replace to-the-tenant data with less informative averages skews the results away from a valid comparison of the class member's actual harm in comparison to Defendants' "actual damages" from that class member's late rent payments.

159.    The field of economics has many tools for assessing the costs of complex activities and modeling them, such that reasonable and reliable estimates of costs can be developed. That general conclusion applies specifically in this case with respect to estimating the cost that a single tenant imposes on Defendants when the tenant pays rent late.  While Mr. Hosfield may be correct that "the activities and amount of time required to account for and collect late rent varies widely,"[120] that is not a valid excuse not to perform an accurate and reliable assessment of the employee costs directly attributable to class members' late rent payments, particularly with respect to proving "actual damages" under the *Garrett/Beasley* standard.  As I show in this section, a properly specified econometric model can provide a reasonable estimate of those "actual damages" and doing so makes clear that Defendants'

---

[120]    Hosfield Report, p. 11 of 49.  Ironically, Mr. Hosfield's damages model ignores this fact and assumes all late payments in a given year require an identical amount of time, activities, and cost.

actual damages from Plaintiffs' and class members' late rent payments are a small fraction of Mr. Hosfield's calculated average costs for all years in question.

160.     One key fact to keep in mind is that Mr. Hosfield's notes of his interviews with Defendants' employees make it very clear that the longer a given tenant's rent is outstanding, the more time Defendants' employees spend working to collect it.  This may be obvious, but it bears repeating, because this argues that tenants who pay late, but within the first week of the month, impose fewer costs on Defendants (and thus cause lower "actual damages" as I understand the *Garrett/Beasley* standard) than do tenants who are two or three weeks late (or longer).  Thus, a methodology such as that used in the Hosfield Report, in which all tenants who pay rent late in a given year are assigned the same arbitrary cost number for each late month regardless of the duration of the tardiness, is incompatible with the actual costs, if any, each tenant generates by paying rent late, which is clear from Mr. Hosfield's own study of Defendants' employees' work patterns.

161.     As just one example, the notes of Mr. Hosfield's interview with Martha Melendez[121] indicate that her colleague (Brandon Robles) spends a steady 30 minutes per day over the first 15 days of each month and then 15 minute per day thereafter on tasks Mr. Hosfield considers to be relevant to the employee cost of collecting late rent.  There is no evidence this time was at all marginal; Mr. Robles might reported to work for the same amount of time on some of those days even if fewer tenants had been late in paying rent, and he certainly might have provided the same estimate when asked by Mr. Hosfield.  However, even if, *arguendo*, every minute of Mr. Robles's time were marginal (which is likely not true), that would then imply that a tenant who paid on the 6th of the month (two days beyond the grace period) would have been responsible for a portion of one hour of Mr. Robles time, while someone who paid on the 24th (twenty days beyond the grace period) would have been responsible for a portion (and indeed, an increasingly large portion as

---

[121]     EQR_Expert_000740.pdf, starting at EQR_Expert_000747.

other tenants paid their rent over the month) of 7.75 hours of his time. Yet Mr. Hosfield's method arbitrarily treats these two tenants identically, assigning them each the same average portion of Mr. Robles time spent on collecting late rent. That is not an "appropriate" economic assessment of the actual costs each tenant imposed on Defendants by their late rent payments.

162.     In contrast to Mr. Hosfield's approach, the methodology I employ below does not assume all late-rent payments in a given year have the identical cost, because that assumption does not appropriately match the facts of the business. Instead, the model is designed to test whether this is true, or whether each additional day a tenant is late tends to drive up elements of the employee cost of collecting late rent. In the model I have developed, I allow the data to explain for itself what portion of Defendants' monthly employee compensation is driven by whether its tenants are late, how many days those tenants are late, and how many, if any, of the tenants were evicted that month.[122] The model also controls for other key drivers of employee costs, such as the baseline payroll levels of each office, changes in firm-wide costs over time, and the possibility of substituting hourly workers for salaried or vice versa. To handle the question of inflation, I run the model using deflated dollars, i.e., I convert the nominal dollars to real dollars prior to the regression, using the St. Louis Federal Reserve Consumer Price Index for All Urban Consumers,[123] and then after estimating the regression equation, convert the resulting estimates back to real dollars using the same inflation factors.

163.     In the remainder of this section, I develop the basis for this rigorous econometric model of the drivers of Defendants' costs, and show that when properly specified, it is entirely practicable to identify the impact of each tenant's late rent payments have on

---

[122]   As discussed below, I also tested various alternatives, such as whether an eviction the following month drove up costs in the current month, to demonstrate the robustness of the model to alternative specifications.

[123]   The data are available at https://fred.stlouisfed.org/series/CPIAUCSL. The process of "deflating" nominal dollars simply means to remove the impact of inflation. For example, one could put money from 2020 and 1990 on equal footing by deflating the 2020 dollars using the CPI (consumer price index) to determine that $1 in 2020 dollars is the equivalent of 49¢ in 1990 dollars.

Defendants' personnel costs, based on whether, and for how long, that tenant was late. This model shows that Defendants' overtime pay for hourly California Office Management and Leasing employees is driven by both factors (tenants' payments being late and for how long), and that regular hourly pay is driven by tenants' late payments (though the length of the lateness, while showing a positive relationship to regular hourly pay, does not do so in any statistically significant way). The same model shows that salaried compensation does not increase when the number of tenants paying rent late increases, consistent with the fact that salary does not vary based on hours worked. Finally, this model demonstrates, by focusing on just the marginal costs, that the "actual damages" caused by each tenant's late rent in a given month is a small fraction of Mr. Hosfield's calculation of Defendants' average costs of collecting late rent.

## 10.1   A MULTIPLE REGRESSION MODEL OF PAYROLL COSTS

164.    Multiple regression is a statistical method to assess the relationship among multiple variables, relying on the variance among observations to identify the expected marginal change experienced by one specific variable (known as the "y" variable or the dependent variable) with a marginal change in (i.e., adding one single increment of) some other variable, controlling for other variables that might potentially influence the dependent variable (all of these other variables are the "x" variables, or independent variables).

165.    To put this technical language into context, multiple regression is a way to assess the relationship between Defendants' payroll and (a) whether tenants pay their rent late, (b) how long their rent remains late, and (c) whether they are evicted or not, while also controlling for other reasons why payroll might vary from month to month or office to office. When I say a regression relies on the variance among observations, I just mean that a regression investigating whether the number of people paying rent late affects monthly overtime pay requires the monthly overtime values to vary from month to month, and for

the number of tenants paying rent late to vary as well. The regression is a mathematical way to identify the pattern to best explain this month-to-month variation.

166. The advantage of multiple regression over other statistical approaches like correlation is that because one can estimate the marginal impact of multiple x variables at the same time, the results allow a researcher to make statements about the impact of one or more of the independent variables, holding all of the other variables constant.

167. As Professor Daniel Rubinfeld explains in the *Reference Guide on Multiple Regression*[124]:

> "Multiple regression analysis is sometimes well suited to the analysis of data about competing theories for which there are several possible explanations for the relationships among a number of explanatory variables. Multiple regression typically uses a single dependent variable and several explanatory variables to assess the statistical data pertinent to these theories. … More generally, multiple regression may be useful (1) in determining whether a particular effect is present; (2) in measuring the magnitude of a particular effect; and (3) in forecasting what a particular effect would be, but for an intervening event."[125]

168. Multiple Regression (or simply "regression" as a common shorthand) is thus a tool well suited for the question at hand, because the *Garrett/Beasley* standard, as I understand it, requires Defendants to identify the incremental impact of each tenant's late payment of rent, isolating those costs from other factors that drive Defendants' costs, such as the individual variation in payroll costs across Defendants' California properties or whether the presence of more salaried employees tends to lower the need for hourly employees (or vice versa).

169. Another advantage of multiple regression is that it allows one to set up a null hypothesis and potentially reject that null hypothesis using the concept of statistical

---

[124] Professor Rubinfeld's chapter is part of the "Reference Manual on Scientific Evidence," developed specifically to assist judges in their assessment of scientific evidence. It can be found on the Federal Judicial Center's website, at https://www.fjc.gov/sites/default/files/2015/SciMan3D01.pdf

[125] Daniel L. Rubinfeld, "Reference Guide on Multiple Regression," pp. 305-6, internal footnotes omitted.

significance.  Whenever a valid statistical estimate is made, the point estimate generated (e.g., an average) has a margin of error associated with it.[126]  The estimate is said to be statistically significant (or more accurately, statistically significantly different from zero) when the entire range of the full margin of error (also known as a "confidence interval" because you can be very confident the actual value falls somewhere in that interval) is entirely above or below zero.  Hypothesis testing asks whether the entire confidence interval based on the margin of error around the value observed is so different from some other hypothesized value, that you can reject the basic hypothesis that they are the same.

170.    For example, one could examine whether each incidence of late-paid rent tends to correspond to an increase in overtime pay at a given property by setting up a null hypothesis that there is no positive relationship between late-paid rent and overtime pay.[127]  Then one can run a regression using monthly overtime pay for a property as the dependent (y) variable, and the monthly frequency of late-paid rent as one of the independent (x) variables, along with other control variables, and test this hypothesis in a robust way.  If the regression provides a coefficient[128] on "late-paid rent" that is positively statistically significantly different from zero, so that after controlling for the other factors, one can be 95% confident that there is a positive statistical relationship between the two variables, then one can reject that null hypothesis (that there is no positive relationship) and instead conclude that yes, the two variables are related.[129]  In contrast, if the coefficient is not

---

[126]    As discussed above, one of the flaws of Mr. Hosfield's sampling is that he adopted a method that essentially has an infinitely large margin of error.

[127]    That is, if you want to test whether overtime pay rises when an additional tenant is late in paying rent, then the null hypothesis would be either that overtime payroll is unaffected by increase in the number of tenants who pay rent late, or that it declines.  If this null hypothesis can be rejected at the 5% significance level, then we can say with 95% confidence that overtime payroll increases when an additional tenant is late in paying rent.  If the null hypothesis cannot be rejected, then there is insufficient statistical evidence to conclude that there is a positive relationship.

[128]    A coefficient is a number you multiply another number by in an algebraic expression.  In the expression $y = \beta x$, $\beta$ is the coefficient on the x term.

[129]    In this example, it would also be important for the coefficient on late-paid rent to be positive, so that the relationship identified corresponded with the economic theory being tested, that an increase in the frequency of

statistically significant (or if the coefficient is negative and significant), then one cannot reject the null hypothesis – in other words, the model says the evidence is not sufficient to rule out the possibility that there is no relationship between the two variables.[130]  In this case, failing to reject the null hypothesis is the equivalent of saying that the evidence is insufficient to conclude that when a tenant pays rent late, Defendants' overtime pay actually increases.  The same tests can be done for other forms of compensation, such as salaried payroll, and can likewise provide a portion of the answer needed to estimate Defendants' "actual damages" from late rent as required under the *Garrett/Beasley* standard.

171.     Working with my staff at OSKR, I have developed a multiple regression model to estimate and test the hypothesized relationships necessary to assess the "actual damages" that a given tenant's late-rent payments imposed on Defendants' compensation for employees involve in late-rent collection.  I developed a common model to explain the three primary components of Defendants' employee expenses.  The first is salaried payroll, the second is regular hourly payroll (which excludes overtime and double-time pay)[131], and the third is overtime hourly payroll (which includes standard overtime and double-time pay).[132]  For each of these dependent variables, the economic question is whether or not increases in various measures of late-payment conduct tend to correspond to increases in payroll (of the three types laid out above): that is, does payroll increase when (a) more tenants pay rent late, (b) when the length of time tenants remain late in paying rent increases, and (c) when more tenants get evicted.  The null hypothesis is that there is no

---

late-paid rent *increased* overtime pay.  In this case a negative coefficient would not reject the null hypothesis, even if the negative coefficient was statistically significant.

[130]   In the case of a negative and significant result, one can go a step further and explicitly reject the conclusion that there is a positive relationship between the two variables, rather than merely being unable to prove that there is.

[131]   Note that regular hourly payroll also includes such hours classified as CA Lunch Penalty and On Call Time, which are potentially marginal to collection of late rent.

[132]   As discussed below, these were estimated in a way to include gross pay, so these measures of compensation include the amounts an employee may opt to defer, such as via a 401K or an ESPP.  As discussed below, I account for the cost impact on Defendants of payroll taxes driven by these measures of payroll outside of the regression framework when assessing "actual damages."

positive relationship. A positive and significant coefficient on the dependent variables designed to capture any of these three measures of tenant conduct (being late, being late longer, or being evicted) allows one to reject that null hypothesis and conclude that an increase in any one (or a combination) of the three measures of tenant conduct does lead to an increase in the payroll being tested.[133] Furthermore, the regression then provides the best point estimate of how much payroll increases when one additional tenant pays rent late. A negative or insignificant result indicates there is insufficient statistical evidence to conclude that the particular form of payroll in question increases at all when an additional tenant is late paying rent.[134]

172. The models for the three types of payroll are essentially the same. Each model takes the following form (with definitions provided following the equation):

$$
\begin{aligned}
MonthlyPayroll \\
&= \alpha + \beta_1(TotalDaysLate) + \beta_2(IncidenceOfLateness) + \beta_3(Evictions) \\
&+ \beta_4(SubstitutablePayroll) + \beta_5(TimeTrend) + \boldsymbol{\Gamma}(Fixed\ Effects) + \varepsilon
\end{aligned}
$$

173. The unit of observation is a single one of Defendants' communities[135] for a single month.

---

[133] Note that a regression, by itself, can never make a causal conclusion. That is, if the coefficient on "days late" is positive in a regression using overtime payroll as the dependent variable, one can say that one additional day late corresponds to a dollar increase equal to the coefficient on days late, but one cannot conclude, without other work, that the act of being one more day late actually *caused* the increase. Nevertheless, in the work I am performing, I accept that if a statistical relationship exists, I will consider that overtime increase to have been caused by late rent and count it toward Defendants' "actual damages" under the *Garrett/Beasley* standard. That is, I conservatively accept a statistically significant (and positive) relationship as sufficient, in this case, to confirm Defendants' contention of a causal relationship, even though the result merely corroborates the claim, rather than proving it.

[134] To repeat, if the coefficient is negative and significant, we can reject the hypothesis that the payroll in question increases when an additional tenant is late in paying rent.

[135] Defendants' payroll data sometimes allocate personnel costs from across several communities to a single community in a way that is difficult to account for in a regression equation. To address this, I roll up these communities into larger super-communities. An example would be Acton Place, and several other Berkeley, CA properties, which use the name "Berkleyan" as a cost center and therefore do not appear on their own in the payroll data. In my regression analysis, I rolled up all late fee data for those Berkeley properties to match the "Berkeleyan" designation in the payroll data. (See Email from Karen Alexander to Class Counsel "RE: Payroll Data" (July 1, 2021) & attachment entitled "EQR_MB_EQR responses to Plaintiffs_payroll data chart 7.1.21.xlsx; Email from Anne Bellows to Counsel for Defendants "RE: Payroll data" (June 24, 2021) &

174. The model is run three times with respect to payroll, once for Salaried Payroll, once for Regular Hourly Payroll, and once for Overtime/Double-time Payroll.[136] In the descriptions below, therefore, I include alternate descriptions in any definition where the definition varies across the different dependent variables.

a) *MonthlyPayroll* is defined as the total salaried (or regular hourly, or overtime & double-time) payroll for a given community in a given month. It is expressed in real dollars which have been adjusted for inflation using the St. Louis Federal Reserve Consumer Price Index for All Urban Consumers.[137] I have calculated monthly payroll by determining the pay periods worked by each employee reflected in Defendants' Fusion and PeopleSoft databases (monthly for salaried employees,[138] hourly for hourly) and then multiplying that number by the pay-per-period for that employee. The value I have computed is therefore gross payroll, prior to any deductions.[139]

b) **α** (alpha) is the symbol for the constant in a regression, which captures the average (base) payroll value, after controlling for impact on payroll of the other variables, including the measures of late-paying conduct, for one specific office. It captures the

---

attachment entitled "missing payroll update.xlsx"; Email from Anne Bellows to Counsel for Defendants "Payroll data" (June 23, 2021) & attachment entitled "missing payroll months.xlsx")

[136] I also run it a fourth time using the count of salaried employees as the dependent variable, as a test for whether increases in the frequency or duration of late rent, or incidences of eviction lead directly to an increase in the number of salaried employees working at an office. That work shows no significant increase in the number of salaried employees and is laid out in Section 10.1.4.

[137] https://fred.stlouisfed.org/series/CPIAUCSL

[138] Generally, Defendants' pay periods in the payroll data are either bi-weekly or annual. For bi-weekly data, I first scale the data to annual by multiplying by 26. Then for all annual (or annualized) data, I divide by 12 to get the monthly pay that corresponds to the month in question. In some cases, where salary pay is only reported on an hourly basis, I annualize it assuming a 2080-hour full-time year.

[139] It does not, however, include the employers' portion of payroll taxes such as FICA or the other payroll-driven items that Mr. Hosfield includes in his measure of "Overhead." As discussed in section 5.1.1.5, Mr. Hosfield's "Overhead" appears to be comprised primarily of elements of payroll that rise and fall in proportion to pay, such as FICA, FUTA/SUTA, and workers compensation insurance. My analysis of WP004068 and Mr. Hosfield's work in "hosfield.xlsx" leads me to conclude that these payroll-driven expenses such as FICA, accounted for just under 20% of total "Salary" (including paid time off). I have conservatively included the impact of these items on Defendants costs by scaling up the regression results by 20%.

average among the data points that cannot be systematically explained by the independent variables. While traditionally the "$\alpha$" term comes first in a regression equation, it is often the least interesting estimate the regression provides. The variables with $\beta$'s in front of them are where the action is.

c) $\beta_1$ is the first regression coefficient the model estimates. It is designed to capture the relationship between *TotalDaysLate* (see below) and *MonthlyPayroll*.

d) ***TotalDaysLate*** is the sum of the number of days all late-paying tenants at the community in question failed to pay rent beyond the grace period. A tenant who pays rent before the end of the grace period (generally on or before the fourth of the month) would show up as a zero in this tally. Those who pay on the day late fees are assessed (generally the fifth of the month) show up as a one, on the day after as a two, etc.[140] Each tenant's tally for a given month is then summed to get the community-level tally for the whole month.

There is one further complication, which is that in a number of cases (40,270 out of 271,031 late fee transactions[141]), tenants show up in the Defendants' data with long periods prior to a given month's late rent being recorded as paid, more than a month and sometimes hundreds of days later.[142] Unless one truncates these long-lived late statuses, the regression will assign a great deal of the costs to this minority of cases, which has the potential to artificially lower the estimated damages caused by most class members, as well as tending to artificially lower the estimated per-day

---

[140] If the period of lateness extends into the next month, the number of days late can exceed the length of a single month.

[141] text_cites.xlsx, tab "original_dayslate".

[142] I am operating under the assumption that by the time a tenant pays a late fee, the tenant has also paid all other monies owed to the Defendants. According to Mr. Breshears' October 16, 2020 declaration in this case "the records show that Defendants do not allocate any funds to late fees charged, unless all of the other obligations for that ResidentID have been satisfied first." See Breshears Declaration, p. 5 ¶13.

cost to Defendants' (because so much cost is spread over hundreds or thousands of days). From the perspective of Plaintiffs, using these long-tailed measures of days-late would not be a conservative assumption;[143] therefore, prior to running the regression I truncate any tenant with days-late in excess of 42 to equal 42.[144] Because failing to truncate would tend to lower the calculated value of Defendants' damages caused by most class members, this truncation is conservative, and it serves to make my estimate a lower bound on the number of class members showing net positive restitution. Nevertheless, as a robustness check, I have run the same model without performing this truncation. As shown in Appendix C.4, the non-truncated regression, as expected, lowers the estimated damages calculated for most class members, but are less supportable as a matter of econometrics.

e) $\beta_2$ is the second regression coefficient the model estimates. It is designed to capture the relationship between *IncidenceOfLateness* (see below) and *MonthlyPayroll*.

f) *IncidenceOfLateness* is a measure of how many tenants were late in a single month, with an important adjustment for technical econometric issues. This variable is calculated by a two-stage process. First, for each community, for each month, I calculate a simple tally of the number of tenants who are late. However, this basic tally variable is collinear[145] with the *TotalDaysLate* variable discussed in (d) above. Thus, it is necessary to identify the uncorrelated portions of this variable in order to

---

[143] That is, allowing these few tenants to appear to be responsible for all of the costs would create the false impression the other tenants caused little or no costs, even if they had.

[144] I chose this value because for 42 days after the fourth day of a month with 31 days would correspond to the fifteenth of the following month, and my understanding is that would mean that for the standard process of referring tenant's files out for eviction on the fifteenth of the month, this would mean an entire month had passed without the tenant having paid. These results are robust to other similar truncation rules.

[145] Collinearity just means that two variables tend to move in sync with each other. Because regression is based on variance between variables, if two explanatory variables always move in sync, it becomes difficult for the regression to identify which of the two is responsible for any observed effects. As I discuss in this section, I perform a mathematical transformation to eliminate the collinearity between *IncidenceofLateness* and *TotalDaysLate* to avoid this issue and allow for distinct conclusions to be made about each variable.

avoid the econometric and interpretive downsides of "multicollinearity,"[146] i.e., having two or more variables of interest be collinear.[147]

To address this technical issue, I have performed a standard transformation known as orthogonalization,[148] which in this case involves regressing the count of late tenants on the count of days late, and then identifying the uncorrelated portions of the count of late tenants (known as the "residuals" of this additional regression).[149] This vector is then used as the measure of the *IncidenceOfLateness* in each iteration of the primary regression. Interpreting a transformed variable can be tricky in some situations, but as it happens in the current case, as long as one is careful to describe this variable as only representing the *uncorrelated* impact[150] of an increase in the

---

[146] See Kennedy, Peter, "A Guide to Econometrics" (Third Edition), The MIT Press (1997), p. 176: "Although the estimation procedure does not break down when the independent variables are highly correlated (i.e., approximately linearly related), severe estimation problems arise. *Multicollinearity* is the name given to this phenomenon." (Italics in original.) See also Goldberger, Arthur, "A Course in Econometrics," Harvard University Press (1991), p. 245: "*Multicollinearity*, or simply *collinearity*, refers to correlation among the explanatory variables in multiple regression." (Italics in original.)

[147] See Greene, William H., "Econometric Analysis" (Fourth Edition), Prentice Hall (2000), pp. 255-6, here p. 256: "The problem faced by applied researchers is usually not the identification issue above [when two or more variables are perfectly correlated] but that the regressors are highly, although not perfectly correlated. In this instance the following symptoms are typically observed:

- Small changes in the data produce wide swings in the parameter estimates.
- Coefficients may have very high standard errors and low significance levels even though they are jointly significant and the R2 for the regression is quite high.
- Coefficients may have the 'wrong' sign or implausible magnitudes."

[Note: a "regressor" is just another term for the x variables in a regression equation]

However, as Arthur Goldberger explains in "A Course in Econometrics" at pp. 245-253, some textbooks overstate the perils associated with multicollinearity. Multicollinearity matters a great deal if the question under study is the size and significance of the specific "β" term(s) associated with the variable(s) "j" being studied, because "our best estimate of $β_j$ will not be very good, and the sample will have told us very little about the true value of $β_j$" (p. 246). But this problem much less worrisome if the collinear terms are not included specifically to learn the value or significance of $β_j$ What this argues for is that while multicollinearity among control variables may lead to counterintuitive results, it is generally tolerable, but when there is multicollinearity among the variables of interest, where the sign of the coefficient is important to the research and the question of whether the variables' impacts are significant or not, it is important to avoid high levels of multicollinearity. Because the collinearity here is among the variables related to lateness, it is necessary to address the collinearity head on.

[148] Two lines are "orthogonal" when they are at a right angle to each other.

[149] See Ruud, Paul, "An Introduction to Classical Econometric Theory, Oxford University Press, 2000, Chapter 2.6, pp. 37-41. "The consequences of this geometric relationship are that the OLS fitted values are unique and the OLS fitted residuals are orthogonal to the explanatory variables…."

[150] Vis-à-vis the length of time those tenants are late.

number of late paying tenants, then the coefficient on this variable represents that expected marginal effect.

g) $\beta_3$ is the third regression coefficient the model estimates. It is designed to capture the relationship between *Evictions* (see below) and *MonthlyPayroll*.

h) ***Evictions*** is a count of the number of evictions (not eviction checks) at a given community in a given month.[151] As a robustness check, I also tested whether the results differed significantly by leading this variable by one month, i.e., testing whether the costs in month 1 were higher if someone was evicted a month later, in month 2, since one might surmise that the bulk of those expenses (at the office level) could have occurred prior to the actual eviction. The results of this alternative specifications are not substantively different.

i) $\beta_4$ is the fourth regression coefficient the model estimates. It is designed to capture the relationship between *SubstitutablePayroll* (see below) and *MonthlyPayroll*.

j) ***SubstitutablePayroll*** is a measure of the payroll paid to the other type of employee (exempt vs non-exempt) in the same office in the same month. That is, in the regression on Salaried Payroll, *SubstitutablePayroll* captures total pay to hourly employees in that same month for that same apartment community. For the regressions on hourly pay, *SubstitutablePayroll* captures total payroll to salaried employees. This variable is designed to capture the impact, if any, on Defendants' costs due to the fact that salaried and hourly employees are potential substitutes for each other with respect to office tasks, including the collection of late rent.[152] If an office's hourly payroll declines because more salaried employees were brought on to

---

[151] This is measured as the actual number of persons vacating the property with vacancy reason of "17," as reported in RMLEASE documents produced by Defendants. See MRI Stipulation ¶ 32(e)(i).

[152] In fact, in all three regressions, the results confirm that these are substitute forms of labor, i.e., the coefficient on this variable is always negative and significant.

work that month, failing to control for that might suggest the office's payroll expenses went down, when all they did was shift to a different category of employee. Using this variable avoids that error and allows the regression to attribute that sort of shift not as a reduction in work (or attendant employee costs), but rather as a change in who is doing the work.

k) $\beta_5$ is the fifth regression coefficient the model estimates. It is designed to capture the relationship between *TimeTrend* (see below) and *MonthlyPayroll*.

l) *TimeTrend* is simply the year in which the observation occurs. Although the data I am using have been "deflated" to represent real dollars (by dividing by an inflation measure known as the Consumer Price Index for All Urban Consumers), this time trend variable allows the model to account for company- or industry-specific factors that may be leading to higher or lower wage growth over time. A positive coefficient represents the increase in the average monthly office payroll from one year to the next, controlling for the other variables in the equation. A negative coefficient represents a decrease.

m) $\Gamma$ (capital gamma). This is a short-hand to capture all of the remaining coefficients that the regression estimates, on the **Fixed Effects** variables (described below). I represented these coefficients as a vector[153] of gammas, using a single capital gamma ($\Gamma$) to summarize a series of lower case gammas ($\gamma$). I chose gamma, rather than using more betas, simply to indicate this term represents 145 distinct variables rather than just one additional one, and to distinguish the coefficients on the Fixed Effects variables from the other independent variables.

n) *FixedEffects* is a vector of indicator variables corresponding to each of Defendants' communities. The Indicator variables take on the value of 1 when the observation

---

[153] A vector in this sense is simply a single row or column of data.

relates to that community, and zero otherwise. Fixed Effects variables are useful for identifying the baseline costs of a given property, unrelated to late-rent behavior. They also create the conditions for the regression to focus on within-group variance, which here means that the focus of the lateness coefficients is on month-to-month changes within each community, rather than across different communities. The coefficients on these Fixed Effects variables represent the average payroll of each community, controlling for all the other factors. Along with the *Time Trend*, the *Fixed Effects* variables capture the inframarginal average costs of each apartment community, and control for the factors unrelated to late-paid rent, allowing the other variables in the model to measure the effect, if any, from late-rent paying tenants' number of days late, the incidences of lateness, and the number of evictions at each community.

o) $\varepsilon$ is the symbol for the error term in a regression, capturing the portion of variation among the data points that cannot be systematically explained by the independent variables. Under the standard assumptions of econometric theory, the error term is set to average zero across the observations and the regression's mathematics ensures this to be true in practice. Thus the positive errors observed (when the actual value is larger than the predicted value) are balanced out by the negative errors observed (when the actual value is smaller than the predicted value) to sum to zero. Thus, once a regression is estimated, the error terms can be disregarded with respect to generating "fitted values" (i.e., the value the regression predicts for any given set of inputs) because, on average, the error term is zero by construction.

175. As stated above, I ran this regression for three separate dependent (y) variables for payroll: Salaried Payroll, Regular Hourly Payroll, and Overtime/Double-time Payroll, and then ran a fourth version on the count of salaried employees. The full results of each of

these four regressions appears in Appendix C.  A summary, along with a discussion of the implication of each, appears below.

### 10.1.1  Regression on Overtime/Double-time Pay

176.     Conceptually as a matter of economic theory, the link between a given tenant paying rent late and an increase in Defendants' costs is clearest when thinking about overtime and double-time pay (which I will refer to in this section simply as "overtime").  If an hourly employee has already worked 40 hours in a week, then any additional work that employee does to collect late rent generates overtime pay; the overtime worked because a tenant pays rent late (and the related increase in payroll) is thus, in fact, marginal.  The same would hold even if the late rent collection happened during regular business hours, as long as the additional work on rent collection led to additional overtime before the end of the overtime period.[154]  Even hourly employees who are scheduled to work 40 hours consistently, such that extra work during a slow period may not generate any additional pay, will be paid more if their time exceeds 40 hours.  Therefore, a properly specified regression would be expected to show a positive and significant coefficient on some or all of the measures of late-rent payment (i.e., the measures of incidence, duration, eviction), to capture the marginal impact of one more late-rent payment on overtime payroll expenses.

177.     The results of this regression on overtime are consistent with that expectation, as see below in Exhibit 4a.

---

[154] Using the but-for approach makes this clear.  If an employee works 45 hours in a week, and the first four were spent working on collecting late rent, then but-for that time, the overtime pay would only have been for one hour, but instead it was for five hours.  Therefore, all four hours of that specific overtime pay are marginal to late-paid rent and would qualify as "actual damages" as I understand the term, even if the literal final four hours of the week were not devoted to rent collection.

Exhibit 4a. Hourly Overtime

|  | Monthly Payroll (Hourly Overtime) | 95% CI |
|---|---|---|
| Total Days Late | .1876061*** | [0.089,0.287] |
|  | (0.000) |  |
| Incidence Of Lateness | 2.01116* | [0.384,3.639] |
|  | (0.015) |  |
| Evictions | 6.550736 | [-3.569,16.670] |
|  | (0.205) |  |
| Substitutable Payroll | -.0094625** | [-0.015,-0.004] |
|  | (0.001) |  |
| Time Trend | -7.737026*** | [-10.931,-4.543] |
|  | (0.000) |  |
| Fixed Effects | (Supressed) |  |
|  |  |  |
| Constant | 16009.79*** | [9564.431,22455.147] |
|  | (0.000) |  |
| N | 8884 |  |
| R-sq | 0.554 |  |
| adj. R-sq | 0.547 |  |

p-values in parentheses
* p<0.05, ** p<0.01, *** p<0.001

Excluded fixed effect - Vantage Hollywood.
CPI-deflated dollars

178.     Notably, the coefficients on both *IncidenceOfLateness* and *TotalDaysLate* are positive and significant, indicating that each additional tenant who is late, and each additional day a tenant remains late in paying rent, both generate additional costs for Defendants, on top of their overtime payments unrelated to these measures of lateness.  The magnitude of the coefficients provides an estimate of the dollar impact, so the 2.011 coefficient on *IncidenceOfLateness* indicates that, across the entire period analyzed, when one more tenant is late paying rent, Defendants' overtime payroll went up by $2.01 in real dollars.  To get the nominal-dollar impact, one would then simply re-inflate this $2.01 by the appropriate inflation factor.  This 2.011 coefficient is statistically significant at the 1% level, meaning there is at least a 99% chance the true value of this coefficient is greater than

zero. Using the standard errors, estimated by the regression, the 95% confidence around this estimate ranges from $0.38 to $3.64.

179. Similarly, the *TotalDaysLate* variable has a coefficient of 0.188, meaning that for every day past the fourth of the month that a given tenant remains late in paying rent, Defendants' overtime payroll rose by 19 cents. This is a per-day value, so one day adds 19 cents, 2 days adds 38 cents, etc. The coefficient of 0.188 is an order of magnitude smaller than the coefficient on *IncidenceOfLateness* but the cumulative effect of multiple days can mean that the total impact of *TotalDaysLate* can exceed the impact of *IncidenceOfLateness* as the duration of lateness grows longer. For a single tenant, *IncidenceOfLateness* takes a value of either zero (when the tenant pays within the grace period) or 1 (when the tenant pays late), resulting in a value of $0 or $2.01. In contrast, *TotalDaysLate* can take on a value between 1 and 42 when a tenant is late,[155] resulting in a dollar value ranging from a minimum of 19¢ for tenants who paid one day late to $7.98 for tenants who paid 42 or more days late. This implies that the daily costs (vis-à-vis overtime) of working to collect late rent begin to exceed the one-time impact of simply being late around the fifteenth of the month (when 11 days of this expense have been incurred), since 11*19¢=$2.09, which is greater than the initial $2.01. This happens to be the day Defendants typically begin sending out cases for eviction, indicating that they are doing so at the point where the overtime expenses related to that tenant have more-or-less doubled in the time between the initial impact of being late and the start of the eviction process. This variable is significant at the 0.1% level, meaning there is at least a 99.9% chance the true value of this coefficient is greater than zero. Using the standard errors, estimated by the regression, the 95% confidence around this estimate ranges from 9¢ to 29¢.

---

[155] Of course, the regression is run on office level data, so no specific tenant with zero days late is explicitly included in the regression (adding in zeroes won't change the counts). At the office level, both variables have a minimum value of zero, and have a potential maximum equal to 42 times the number of late tenants in that month.

180.    Notably, however, while the coefficient on *Evictions* is positive in this regression, it is not statistically significant, meaning that while, on average, the months with one additional eviction are associated with $6.55 more in overtime pay than otherwise, the error term is so wide that one cannot rule out (at a reasonable level of confidence) that the true value across the full population is actually zero (i.e., that the $6.55 is just noise).  Statistical significance is a function of, *inter alia*, the number of observations that vary, and since an actual eviction is a fairly uncommon event (occurring only 4,575[156] times, compared to the hundreds of thousands of observations in the total regression), this works against the regression's ability to ascertain that the cost effect is statistically significant.  Traditionally, in econometric work, one drops variables that are not statistically significantly different from zero when working with the resulting estimated equation.

181.    Recognizing that there is a dispute between the parties as to whether personnel costs incurred related to the eviction process even belong in the calculations at all, when I provide values consistent with my assumption (4b)(iii) which includes personnel costs associated with evictions, I use two alternatives.  The first adopts the standard convention that insignificant variables are dropped when estimating fitted values from a regression,[157] and the second adopts a conservative alternative to my primary results regarding the "actual damages" each tenant generates, where I include positive, but insignificant measures, of late-rent related variables such as *Evictions*.[158]  In my exhibits, I refer to the standard calculation as (4b)(iii)(a) and the conservative version as (4b)(iii)(b).  Including insignificant coefficients is not the accepted method, nor is it my personal practice.  Rather I provide this result simply to illustrate that even under this unusual assumption, these costs do not suffice

---

[156]    See text_cites.xlsx, tab "count_evictions".

[157]    This simply means that I omit any variable from the equation if the regression determined that the variable's coefficient was not significantly different from zero.  For example, the coefficient on *Evictions* is insignificant, so regardless of whether someone was evicted or not, the impact is zero.

[158]    In contrast to the previous alternative, in this version, I include the *Evictions* variable in the equation, even though it is not statistically significant.  Thus, each tenant who was evicted increases the estimated costs in the month of the eviction.

to turn a substantial additional percentage of tenants' net restitution negative. As shown below, the additional class members whose restitution turns negative because of this conservative assumption – (4b)(iii)(b) – is less than 2% of the total.

182.     The other coefficients are interesting in their own right but play no direct role in determining Defendants' actual damages.[159] The coefficient on *SubstitutablePayroll* is negative and significant, as expected. This means that, all else equal, the more salaried payroll a given office has, the lower the amount of overtime paid (and vice versa). This is what economic theory would predict, because salaried personnel will likely absorb some of the work that would have caused overtime had it been performed by hourly personnel. The coefficient on *TimeTrend* is negative and significant, which this speaks to is the fact that, all else equal, Defendants used a little less overtime pay each year over the period covered by this case, with the per-office monthly overtime expense decreasing by $7.74 each year.

183.     The constant term captures the average (base) overtime costs, after controlling for impact on overtime of the other variables, including the measures of late-paying conduct, for one specific office. Which office one chooses is unimportant, but for technical reasons it is important that one office's fixed effect (discussed below) be omitted, and then the constant term takes on the value of that office's average. In the case of these regressions, the omitted community is Vantage Hollywood,[160] and so the constant term expresses the fact that Vantage Hollywood had an average monthly overtime expense, after taking into account the impact of all other variables, of $16,009.79. This number can be deceptive, in that the office likely did not ever experience this specific overtime pay, because there is no month is which all of the other variables in the equation would be zero. For example, the *TimeTrend* variable is negative and ranges from 2010 to 2017, meaning that that $16,009.79 needs to be reduced by a value that is greater than 2,000 multiplied by the *TimeTrend* coefficient for any given year. In 2012, for example, the downward impact of just the

---

[159]     Other than their intended role as control variables.

[160]     The necessary omission is automatically performed by STATA based on alphanumeric sorting of property IDs.

*TimeTrend* is -$15,566.90, which says that, all else being equal the Vantage Hollywood community only incurred $442.89 dollars of overtime pay, on average, that year.

184.    Finally, there are the Fixed Effects variables, which do not appear in the summary above, but which are in Appendix C.  When combined with the constant term, the Fixed Effects variables represent the same thing that the constant term alone does for Vantage Hollywood: it is the average base overtime payroll of each office across time, after taking out the impact on overtime of the other variables, including the measures of late rent-paying conduct.  Again, one should recognize that this value is highly offset by the *TimeTrend* for any specific observation.

185.    One thing to note about the Fixed Effects variables is that they can, and generally should, be a mix of positive and negative coefficients, and whether or not many are statistically significant is not important.  This is because econometrically, the coefficient on a Fixed Effects variable for given office represents its difference from the office whose Fixed Effect variable has been omitted, in this case, Vantage Hollywood.  When a Fixed Effects coefficient is negative, that indicates that a given office's average overtime was below the average for Vantage Hollywood, and when it is positive, then that office's average was higher.  If the coefficient is not significant, that indicates that while the two offices differed, the difference was not so great that one can rule out the possibility that the true long-run averages are the same, so that the observed differences are just noise, whereas when they are significant, it indicates a high level of confidence that these values are truly different.  So, for example, one of the largest communities in terms of total employees, La Mirage,[161] has a positive and significant Fixed Effects coefficient.  This indicates that on average over time, it tended to pay a higher amount of overtime than Vantage Hollywood, which makes sense because it employs more hourly employees.

---

[161] Listed in Appendix C as variable code 27.prop.

### 10.1.2  Regression on Regularly Hourly Pay

186.     As with overtime pay, there is some reason to think that hourly employees' base pay *might* increase when a given tenant is late in paying rent.  On the other hand, this is not an economic theoretical certainty, since many hourly employees may tend to work a standard eight-hour day whether or not there is productive work to be done every hour.  To the extent that work on late-rent collection replaces non-productive time, there would be no expectation that an additional late-paying tenant would have a marginal impact on Defendants' costs.  On the other hand, for example, part-time employees may increase their hours in a given week due to late rent activity without qualifying for overtime pay, which would have a marginal impact on regular hourly payroll.  To test whether and to what degree regular hourly pay is tied to late rent, I ran the same regression equation with Regular Hourly Payroll as was run for Overtime Payroll.  Other than the change in the y variable, the equation is identical.  The results, however, presented below in Exhibit 4b, differ somewhat, reflecting the different impact that late-paying tenants have on Defendants' regularly hourly pay as opposed to overtime pay.

Exhibit 4b. Hourly Regular

|  | Monthly Payroll (Hourly Regular) | 95% CI |
|---|---|---|
| Total Days Late | .1879011 | [-0.156,0.532] |
|  | (0.285) |  |
| Incidence Of Lateness | 7.700667** | [2.114,13.288] |
|  | (0.007) |  |
| Evictions | 17.04975 | [-24.066,58.166] |
|  | (0.416) |  |
| Substitutable Payroll | -.0615509*** | [-0.090,-0.033] |
|  | (0.000) |  |
| Time Trend | 122.3314*** | [107.206,137.457] |
|  | (0.000) |  |
| Fixed Effects | (Supressed) |  |
|  |  |  |
| Constant | -241584*** | [-272101.130,-211066.864] |
|  | (0.000) |  |
| N | 8884 |  |
| R-sq | 0.883 |  |
| adj. R-sq | 0.881 |  |

p-values in parentheses
* p<0.05, ** p<0.01, *** p<0.001

Excluded fixed effect - Vantage Hollywood.
CPI-deflated dollars

187.    First, *TotalDaysLate* is positive, but not statistically significant.  This indicates that there is an observed correlation between regular hourly employee pay and one additional day of a given tenant at a given office being late in their rent payment (controlling for the other independent variables), but that the data vary too much relative to the estimated effect to definitively say this result is anything other than noise.  Unlike with *Evictions*, below, this is not because of a small number of observations or limited variation, since the number of days late per month per office varies greatly across the data.  Econometrically, the proper use of this result is to conclude there is insufficient evidence to rule out the null hypothesis that each day of late rent does *not* increase regularly hourly pay.  This indicates

that Mr. Hosfield does not have sufficient evidence to conclude these hours are marginal. Conversely from my perspective it is not definitive proof they are not marginal. Therefore, while I have followed the econometric convention of omitting insignificant variables when I estimate "actual damages" using assumption (4b)(iii), I have also generated a conservative set of estimates – (4b)(iii)(b) – in which I include the 18.8¢ per day in regular hourly payroll implied by the coefficient on *TotalDaysLate* (as I also do with the positive but insignificant coefficients on *Evictions*), simply to assess the *arguendo* impact of these insignificant variables.

188.    In contrast, the variable on *IncidenceOfLateness* remains positive and significant in this equation, at $7.70. This suggests that for each tenant who pays their rent late, no matter how long they remain late, a given office incurred an additional $7.70 in regular hourly pay.

189.    Again, the coefficient on *Evictions* remains positive but insignificant, with an average value of $17.05. As above, there are good econometric reasons to omit this variable, but when I adopt assumption (4b)(iii)(b), which aims to comport with Mr. Hosfield's view that evicted tenants are appropriate to include in the calculation of costs, I have included this value nevertheless. Again, this is not standard, but rather is being done purely *arguendo*, to illustrate the outer limits of a plausible measure of Defendants' "actual damages" from these evicted tenants.

190.    The other variables, i.e., those unrelated to late-rent payment, remain qualitatively similar. Hourly pay decreases, as expected, as salaried payroll rises. *TimeTrend* indicates that costs (in real dollars) rise over time. Combined with the findings of the regression for overtime pay, this suggests a moderate shift in Defendants' workflow, with slightly more regular hours replacing overtime pay overtime. Both effects are statistically significant, but the economic significance of these changes is difficult to assess (as well as outside the focus of this report).

### 10.1.3 Regression on Salaried Pay

191.    Economically, there is much less conceptual support for the idea that a given tenant's late payment would drive up Defendants' salaried payroll expenses. Salary, by its nature, is designed not to vary based on the hours a salaried employee works. Furthermore, as discussed above, Mr. Hosfield's interview notes provide evidence of employees working more than 40 hours per week without an increase in pay. Salaried pay for a given office varies very little over time when offices experience changes in the number of late-paying tenants, an example of which can be seen in Exhibit 1 above, which illustrates why there is little conceptual room for any marginal impact on salary as the number of late-paying tenants fluctuates.

192.    The salaried payroll regression formalizes the test of whether salaried pay shows incremental growth when an additional tenant is late in paying rent or is late for an additional day. Once one controls for other factors (including the presence of hourly paid employees), the impact of one additional late tenant, and one additional day of being late, are both negative (and *TotalDaysLate* is significantly so). This shows there is no evidence for Mr. Hosfield's unsupported assertion that all salaried employees pay is positively related to additional late rent payment, and flatly rejects related hypothesis that an additional day of late rent raises salaried payroll. One can see why this is the case by means of the example provided above in Exhibit 1. As shown there, when there were no late rent payments (among class members) in the Southwood community, salaried payroll did not decline in those months compared to the months before or after. This is just a single office, but it illustrates the point the regression results confirm for Defendants' salary data as a whole, which is that on the margin, when a tenant is late in paying rent (and regardless of how long the rent remains outstanding), salaried pay is unaffected.

Exhibit 4c. Salary pay

|  | Monthly Payroll (Salary) | 95% CI |
|---|---|---|
| Total Days Late | -.4121142** | [-0.668,-0.156] |
|  | (0.002) |  |
| Incidence Of Lateness | -3.589477 | [-8.318,1.139] |
|  | (0.137) |  |
| Evictions | -.6425862 | [-34.121,32.835] |
|  | (0.970) |  |
| Substitutable Payroll | -.0273026* | [-0.049,-0.005] |
|  | (0.016) |  |
| Time Trend | 103.3928*** | [91.549,115.236] |
|  | (0.000) |  |
| Fixed Effects | (Supressed) |  |
|  |  |  |
| Constant | -202751.1*** | [-226636.328,-178865.775] |
|  | (0.000) |  |
| N | 8215 |  |
| R-sq | 0.529 |  |
| adj. R-sq | 0.520 |  |

p-values in parentheses
* p<0.05, ** p<0.01, *** p<0.001

Excluded fixed effect - Vantage Hollywood.
CPI-deflated dollars

### 10.1.4   Regression on Salaried Personnel Count

193.    As an additional check on theoretical ways in which tenants' payment of late rent could conceivably increase Defendants' employee costs, I modified my payroll regression equation to test whether salaried headcount tended to change with incremental occurrences (or duration) of late rent or evictions.  Conceptually, while there is little reason to think more work by a set number of salaried employees would increase Defendants' costs, to the extent that Defendants had to hire more salaried personnel to handle additional late-paying tenants, then there would be economic evidence of a marginal impact on costs.

194.    The equation is essentially the same, though now the dependent variable is head count, not a form of payroll.  The equation is as follows:

$$MonthlySalariedHeadcount$$
$$= \alpha + \beta_1(TotalDaysLate) + \beta_2(IncidenceOfLateness) + \beta_3(Evictions)$$
$$+ \beta_4(SubstitutablePayroll) + \beta_5(TimeTrend) + \boldsymbol{\Gamma}\ (Fixed\ Effects) + \varepsilon$$

195.    The results are similar to the salaried payroll regression.  The variables of interest are either negative and significant (for *TotalDaysLate*) and negative and insignificant (for *IncidenceOfLateness*) or positive and insignificant (for *Evictions*).  As with the payroll regression, the headcount regression rejects the hypothesis that Defendants hired more salaried employees as a result of the length of time tenants are late in the payment of their rent and provides insufficient to conclude they hired more salaried personnel with each additional incidence of lateness or each additional eviction.

Exhibit 4d. Salary Headcount

| | Monthly Headcount (Salaried Employees) | 95% CI |
|---|---|---|
| Total Days Late | -.0000698** | [-0.000,-0.000] |
| | (0.005) | |
| Incidence Of Lateness | -.0007274 | [-0.002,0.000] |
| | (0.100) | |
| Evictions | .0029431 | [-0.003,0.009] |
| | (0.349) | |
| Substitutable Payroll | -9.55e-06*** | [-0.000,-0.000] |
| | (0.000) | |
| Time Trend | -.0039243*** | [-0.006,-0.002] |
| | (0.001) | |
| Fixed Effects | (Supressed) | |
| | | |
| Constant | 8.980143*** | [4.415,13.545] |
| | (0.000) | |
| N | 8215 | |
| R-sq | 0.184 | |
| adj. R-sq | 0.170 | |

p-values in parentheses
* p<0.05, ** p<0.01, *** p<0.001

Excluded fixed effect - Vantage Hollywood.
CPI-deflated dollars

## 10.2   IMPLICATIONS OF THE REGRESSIONS FOR THE QUESTION OF "ACTUAL DAMAGES"

196.    The estimated coefficients of the three payroll regressions provide a means of calculating, on a tenant-by-tenant basis, the "actual damages" each class member is responsible for under each of the three assumptions I was asked to adopt by Plaintiffs (described above in paragraph (4b)).  The procedure is similar for each assumption, with slight modifications; using the significant coefficients of the regressions on overtime pay and regular hourly pay, one compares the actual fitted result for each tenant for each month to a

"but-for" result,[162] where *TotalDaysLate* are reduced by the number of days late the specific tenant was responsible for and *IncidenceOfLateness* is decremented by 1 in each month that tenant was late. The previous sentence is phrased to describe the impact of one tenant on a given office, but the algebra works out such that this equates to a simpler equation, focused on the individual tenant, where the monthly incremental cost impact on Defendants of a given tenant who was late is given by the formula:

Monthly Damages=
$$\widehat{\beta_{1_{O/T}}} * (TotalDaysLate) + (\widehat{\beta_{2_{O/T}}} + \widehat{\beta_{2_{RegHour}}}) * (IncidenceOfLateness)$$

where the $\hat{\beta}$ terms (pronounced "beta hat") represent the coefficients estimated from the overtime (subscripted as "*O/T*") or regular hourly (subscripted as "*RegHour*") regression. Specific to the regression run on these data, the formula simplifies further to $0.188*(*TotalDaysLate*) + $9.71. Each monthly calculation for a given tenant is summed up to get Defendants' total damage from that tenant's late rent payments.

    i) For assumption (4b)(i) – Plaintiffs' Relevant Cost Period – this is run for a every class member using a value for *TotalDaysLate* equal for the number of days late (in a given month, with the standard 42 day truncation if necessary), but tenants whose files were sent out for eviction have their *TotalDaysLate* reduced to the date the file was sent out for eviction (if that date is earlier than the calculated value of days late).[163]

    ii) For assumption (4b)(ii) – Plaintiffs' Alternative Cost Period – the process is the same as (4b)(i), except only tenants who were evicted have their TotalDaysLate

---

[162] The fitted result of a regression is simply the numerical value the regression equation gives for a specific data point. For data on which the regression coefficients were calibrated, the fitted value will vary, by construction, from the actual value by the quantum of the error term specific to each observation. Comparing the actual data point to a but-for value, rather than using the fitted value of the actual point, will conflate the observed but-for effect with the error term and should thus be avoided as a methodological choice.

[163] This eliminates costs that accrue outside of the relevant time period per assumption (4b)(i).

reduced to the date the file was sent out for eviction (if that date is earlier than the calculated value of days late).[164]

    iii) For assumption (4b)(iii) all tenants are assessed for their full length of lateness (up to 42 days) regardless of eviction status.

197.    There is one additional complication, which is that it is necessary to scale these values up by approximately 20%,[165] to account for the fact that Defendants incur payroll-driven costs that rise or fall in proportion to payroll. These are discussed above in section 5.1.1.1.5 and include items like FICA and FUTA/SUTA. As discussed above, these costs are not in my regression, but by scaling the result of the formula above up by 20% (i.e., by multiplying each result by 1.2), I incorporate these costs in an equivalent way to having included them in the regression.[166] Hence the final formula for each month in which a given tenant is late is $1.2 *(\$0.188*(TotalDaysLate)+\$9.71)$

198.    As discussed above, in order to explore the outer limits of possible damages, I have also generated a fourth version of these calculations, using assumption (4b)(iii) – Defendants' Relevant Cost Period – but also including impact of the positive but insignificant coefficients from the overtime and regular hourly regressions. The formula for this conservative alternative estimate – (4b)(iii)(b) – is thus:

$$\text{Monthly Damages} = (\widehat{\beta_{1_{O/T}}} + \widehat{\beta_{1_{RegHour}}}) * (TotalDaysLate) + (\widehat{\beta_{2_{O/T}}} + \widehat{\beta_{2_{RegHour}}}) * (IncidenceOfLateness) + (\widehat{\beta_{3_{O/T}}} + \widehat{\beta_{3_{RegHour}}}) * Eviction$$

---

[164] This eliminates costs that accrue outside of the relevant time period to the smaller set of evicted tenants per assumption (4b)(ii).

[165] While the actual aggregate percentage of Overhead as a percent of Salary plus Overtime is 17.9%, there is some variation from year to year, so to ensure my results are conservative, I have adopted 20% as an adjustment factor.

[166] As a matter of algebra, scaling up the dependent variable by 20% prior to regressing will scale up the coefficients by 20%, which is the equivalent of what I am doing here. Thus, whether these costs are included in the regression or adjusted for afterwards, the quantitative result is the same.

199.    The difference in this implementation of the regression results is that I am now using the coefficient on *TotalDaysLate* from the regular hourly regression, which is positive but not significant, and, if the tenant was evicted, also using the hourly pay regressions' coefficients for *Evictions*, which are also positive but not significant in those regressions.[167] This formula simplifies (after accounting for the 20% scaling for payroll taxes, etc.) further to 1.2 *(($0.376)*(TotalDaysLate)+$9.71 + IF Evicted($23.59)).

### 10.2.1  Over 97 Percent of Class Members Who Paid Late Fees Have Net Positive Restitution

200.    I calculate the individual tenant-by-tenant employee costs tallies, where each ResidentID has four values calculated for "actual damages," one for each of the different assumptions I adopt, and I add to each Mr. Breshears' loss of funds value to arrive at total "actual damages" that each class member generates under each assumption.[168] I have summarized these results below, focusing on the distribution of those damages at the per class-member level for a single month.

Exhibit 5a. Damages Percentiles, with Lost Use of Funds, Without Prejudgment Interest

| Damages Percentile | Assumption (4b)(i) | Assumption (4b)(ii) | Assumption (4b)(iii)(a) | Assumption (4b)(iii)(b) |
|---|---|---|---|---|
| 5th | $12.68 | $12.68 | $12.68 | $13.43 |
| 10th | $12.88 | $12.88 | $12.88 | $13.67 |
| 25th | $13.23 | $13.23 | $13.23 | $14.22 |
| 50th | $13.89 | $13.89 | $13.89 | $15.51 |
| 75th | $15.35 | $15.39 | $15.41 | $18.49 |
| 90th | $17.17 | $17.37 | $17.43 | $23.10 |
| 95th | $18.45 | $18.68 | $18.74 | $26.37 |

201.    As can be seen from above, my regression model shows that half of all class members have imposed monthly costs on Defendants from their late payment of rent in an amount of less than $14 to $16 (depending on assumption), and 90% of these monthly "actual damages"

---

[167]    I have not included the coefficient on salaried evictions because that coefficient is itself negative (albeit insignificant) so including it would not be conservative.

[168]    These tenant-by-tenant figures are in the backup to Exhibit 5. They represent totals for each class member across all incidences of lateness. In Exhibit 5a, I present each class member's monthly value, i.e., each individual class member's total divided by the number of times that class member paid rent late.

figures fall within the range of $12.88 to $17.17 under (4b)(i) or a range of $13.67 to $23.10 under (4b)(iii)(b). This is a very different picture than the mistaken one painted by the Hosfield Report, which claims the average class member is responsible for between $63.86[169]- $263.86[170] per month in damages to Defendants.

202.    While looking at monthly "actual damages" in a vacuum has some merit, it is more informative to assess the magnitude of each class member's total value for Defendants' "actual damages" in comparison to each class member's total gross restitution, and then to assess the resulting net restitution. To this end, I have used the restitution figures calculated by Mr. Breshears and compared each class member's restitution to that class member's corresponding value for Defendants' "actual damages" derived from my regressions.

Exhibit 5b. Class Members with Net Positive Restitution

| | With Lost Use of Funds, Without Prejudgement Interest | | | |
| | Assumption (4b)(i) | Assumption (4b)(ii) | Assumption (4b)(iii)(a) | Assumption (4b)(iii)(b) |
|---|---|---|---|---|
| Class Members with Net Positive Restitution | 64,441 | 64,419 | 64,405 | 63,594 |
| *% of Total* | 97.4% | 97.4% | 97.4% | 96.1% |
| Median Net Resitution | $127.08 | $126.87 | $126.79 | $120.21 |

| | With Lost Use of Funds and Prejudgement Interest | | | |
| | Assumption (4b)(i) | Assumption (4b)(ii) | Assumption (4b)(iii)(a) | Assumption (4b)(iii)(b) |
|---|---|---|---|---|
| Class Members with Net Positive Restitution | 64,476 | 64,448 | 64,436 | 63,649 |
| *% of Total* | 97.5% | 97.4% | 97.4% | 96.2% |
| Median Net Resitution | $193.40 | $193.22 | $193.20 | $183.75 |

Note: these figures include a 20% adjustment for "Overhead" (i.e. FICA, Medicare, Unemployment Insurance, etc.)

203.    As can be seen, under all three of my standard assumptions, 97.4% of class members have restitution that exceeds Defendants' "actual damages" figures determined by the regressions. For the more conservative value of assumption (4b)(iii)(b), the figure drops by less than 1.5 percentage points, to 96.1%. Aside from this 2.6% to 3.9% of the class, all other class members show net positive restitution.

---

[169]    Hosfield Report, p. 41 of 49. See the 2011 and 2012 figures in the first table.
[170]    See Hosfield Report, Exhibit 3.2, Schedule 3A. See the 2020 figure.

**10.2.2    Defendants' Late Charges are Disproportionate to Their "Actual Damages"**

204.    Finally, the regression results also allow me to assess whether Mr. Hosfield is correct when he concludes that "Equity's average costs related to tenant delinquency generally exceeded the average late fees charged during the relevant period."[171]  As this report has shown in great detail, Mr. Hosfield's estimates that underlie his assertion are unreliable and his estimates of Defendants' costs are far overstated.  To reach his conclusion, Mr. Hosfield relied on inflated personnel costs and interest costs and has included collections and eviction costs that I understand to be legally irrelevant, including them even when a given tenant was not evicted or never had a collections agency involved in collecting that tenant's rent.  They are incorrect in qualitatively important ways.

205.    To get an accurate assessment of this question, I rely on the results of the regressions summarized above.  From this evaluation, it is clear that the Defendants' late fees do not bear a proportional relationship to Defendants' damages from late rent, as I show that, even under the most conservative of my assumptions, more than 96% of class members paid more in late fees than the value I calculate for Defendants' "actual costs" for that same class member.

206.    Another way to think about the relative value of late fee vs. Defendants' costs is to look at the ratio of the two on an individual level.  If a class member's late fee is larger than Defendants' corresponding costs, this ratio will be greater than 1.0.  If they are more than double, this ratio will be 2.0, etc.  From the exhibits above, it's clear that more than 96% of class members had a ratio greater than 1.0, but this does not illustrate how large the gap actually is.  Under Plaintiffs' Relevant Cost Period (assumption (4b)(i)), for 92.5% of ResidentIDs entitled to gross restitution (i.e., those who paid late fees), the late fees they

---

[171]    Hosfield Report, p. 37 of 49.

paid are more than double the costs they created, and for 84.5% of ResidentIDs the late fees are more than triple the amount of costs they created.[172]

207.    A third way to think about the relative size of class members' gross restitution versus Defendants' "actual damages" is to contrast the total restitution that Mr. Breshears calculated with my calculation of Defendants' total "actual damages." To be clear, these totals are bottom-up calculations, based on each individual class member's individual value for gross restitution and corresponding value for Defendants' "actual damages"; I am not adopting a pooled damages methodology like Mr. Hosfield has done.[173]

Exhibit 5c. Total Positive Net Restitution.

| | With Lost Use of Funds, Without Prejudgement Interest | | | |
| --- | --- | --- | --- | --- |
| | Assumption (4b)(i) | Assumption (4b)(ii) | Assumption (4b)(iii)(a) | Assumption (4b)(iii)(b) |
| Total Positive Net Restitution | $18,573,384 | $18,548,498 | $18,543,419 | $17,650,576 |
| | | | | |
| Gross Resitution | $23,298,438 | $23,298,438 | $23,298,438 | $23,298,438 |
| Total Damages | $4,826,680 | $4,853,845 | $4,859,495 | $5,848,527 |

| | With Lost Use of Funds and Prejudgement Interest | | | |
| --- | --- | --- | --- | --- |
| | Assumption (4b)(i) | Assumption (4b)(ii) | Assumption (4b)(iii)(a) | Assumption (4b)(iii)(b) |
| Total Positive Net Restitution | $27,459,221 | $27,422,916 | $27,415,438 | $26,122,949 |
| | | | | |
| Gross Resitution | $34,507,691 | $34,507,691 | $34,507,691 | $34,507,691 |
| Total Damages | $7,195,222 | $7,234,795 | $7,243,109 | $8,675,730 |

Note: these figures include a 20% adjustment for "Overhead" (i.e. FICA, Medicare, Unemployment Insurance, etc.)
Total Damages include damages from class members with net negative restitution.

208.    In the top row of the exhibit, I assess net restitution at the individual class member level (so that the small percentage of class members with net restitution are set to zero, rather than to a negative value) first and then tally the resulting values. In aggregate, the net restitution (without prejudgment interest) sums to between $17.6 million and $18.6 million dollars. I repeat these same calculations for values that include an estimate of the prejudgment interest on the net restitution. In order to estimate the prejudgment interest

---

[172]    For damages not including prejudgment interest. The percentages are similar when prejudgment interest is included. See backup to Exhibit 5, tab "ratios".

[173]    Note that these aggregate values do not correspond exactly to the aggregated net amount because the net calculations do not include any values for net restitution that are negative, replacing them, instead, with zero, since no individual class members' damages offset can exceed that class member's gross restitution.

on net restitution, I apply prejudgment interest to both the gross restitution Mr. Breshears has calculated and on the "actual damages" I have calculated,[174] which causes the range to shift upwards to span from $26.1 million to $27.5 million.[175] Either version (with or without prejudgment interest) results in a ratio of gross restitution to total "actual damages" of 4.8 to 1. Under my more conservative assessment of (4b)(iii)(b), the ratio for Defendants' Relevant Cost Period reduces to 4.0 to 1.

209.     A comparison like this gives a good sense that in aggregate, the late fees paid by class members were four to five times the size of the "actual damages" Defendants experienced. This is a stark contrast to Mr. Hosfield's pooled damages methodology, which concludes that every class member owes more in purported damages than that class member's gross restitution. The difference is the result of the major flaws in the Hosfield Report that I have analyzed in this report, specifically his inclusion of inframarginal costs, his use of an inflated total damages pool, and his damages allocation method, which assigns damages per month of lateness equally to all tenants who are late in a given year.

210.     As a final note, recognize that because I have included in my calculation of Defendants' gross "actual damages" the costs incurred by Defendants for late fee charges that were not actually paid by a given ResidentID, these numbers are conservative as an evaluation of the degree to which Defendants' late fees are proportional to Defendants' actual damages. As an example, if a ResidentID paid two late fees, and then did not pay a third and final late fee, this analysis does not include the dollar value of that third fee in the comparison of late fees paid to the "actual damages" caused to Defendants for all three of the fees. A direct comparison of Defendants' costs compared to late fees charged, without regard to whether the fees were paid, would show that even more late fee amounts were

---

[174] Algebraically, this is equivalent to calculating prejudgment interest on gross restitution less the actual damages I have calculated, but it is simpler to do for technical reasons.

[175] As can be seen, the spread between the two figures widens slightly, as is to be expected – since the injuries alleged occur at approximately the same time and the gross restitution is larger than the "actual damages," the interest on the former will tend to be larger than the interest on the latter.

greater than the associated damages to Defendants, i.e., more than the 96.1% to 97.4% figures based on net restitution. It would also show a higher percentage of tenants who were charged a late fee that was double or triple the "actual damages" arising from their late rent payment. Based on these results, it is my opinion that Defendants' late fees are not proportional to Defendants' costs.

## 11. SIGNATURE

Executed this 9th day of July, 2021, at Lafayette, California.

Andrew D. Schwarz

# EXHIBIT 4

REDACTED

**REBUTTAL REPORT OF**
**CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP**


**IN THE MATTER OF:**

**JAVANNI MUNGUIA-BROWN, ET AL.**
**v.**
**EQUITY RESIDENTIAL, ET AL.**


**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**


**CASE NO. 4:16-CV-01225-JSW-TSH**


**JULY 9, 2021**


*CONFIDENTIAL*




REDACTED



## 1.    INTRODUCTION

1.    As described in my expert report dated May 10, 2021 (the "Tregillis May 10 Report"),[1] which I incorporate by reference, I have been engaged by Class Counsel to analyze economic, accounting, and related issues pertaining to claims by Plaintiffs against Defendants, for violation of California Civil Code § 1671(d) and related causes of action.

2.    In the Tregillis May 10 Report I described multiple ways in which the 1998-1999 PwC Study is flawed for its use to justify the Standard Late Fee EQR implemented in 2008 as well as the Woodland Park Late Fee. I also described how EQR could have made a reasonably accurate estimate of its costs incurred due to its California tenants' late rent payments, and that a late fee based on a percentage of rent does not align with costs EQR incurred because of tenants' late payment of rent.[2]

3.    On May 10, 2021, EQR submitted an Expert Disclosure in this case and attached the Expert Report and Disclosure of Mark J. Hosfield (the "Hosfield May 10 Report"). In his report, Mr. Hosfield examined the costs EQR alleges it incurred related to its California residential tenants' late rent, as well as the potential cost savings EQR states it would have experienced in the absence of late rent, and annually compared each of these figures to average late fees EQR charged to California residential tenants from September 3, 2010, through February 29, 2020.[3] Mr. Hosfield opined that both EQR's average costs and average hypothetical cost savings per late fee charged exceeded the average late fee charged for both the Standard Late Fee and Woodland Park classes certified in this case.[4]

4.    The purpose of this report is to express my rebuttal opinions, and the bases of these opinions, to those contained in the Hosfield May 10 Report.

5.    Should additional information become available, including any criticism of my analysis offered by EQR, EQR's counsel, or any of EQR's experts, I may supplement my opinions.

6.    My qualifications have not meaningfully changed since May 10, 2021. The rates at which Hemming is paid for my work and the work of my support staff in this case have also not changed from those reflected in the Tregillis May 10 Report. Since May 10, 2021, I have testified in the following matters.

---

[1] Tregillis May 10 Report.
[2] Tregillis May 10 Report.
[3] Hosfield May 10 Report.
[4] Hosfield May 10 Report, pp. 11-49.

**REDACTED**



| Plaintiff(s) | Defendant(s) | Venue | Deposition | Trial | Other Hearing |
|---|---|---|---|---|---|
| Michael Parekh, et al. | Alpha Edison Partners, LLC, et al. | US District Court - Central District of California | X | | |
| Corbrus, LLC | 8th Bridge Capital, Inc., et al. | US District Court - Central District of California | X | | |
| Monster Energy Company | Vital Pharmaceuticals, Inc., et al. | US District Court - Central District of California | X | | |

Note: My client is counsel for the underlined party/parties.

7.      Section 2 and its subsections contain a discussion of background and facts relevant to my rebuttal opinions, which are detailed in Section 3 and its subsections.  Appendix A contains a listing of the documents and information reviewed and/or relied upon in my rebuttal analysis, in addition to the documents and information listed in Appendix A of the Tregillis May 10 Report.  Appendix B contains a schedule prepared in the course of my analysis.

## 1.1    Summary of Opinions

- Mr. Hosfield has improperly included costs related to the time-period after a tenant vacates the property, in his calculation of EQR's costs incurred and potential cost savings related to the late fees paid by members of the Standard Late Fee Class and Woodland Park Class.

- Mr. Hosfield has improperly included employee and interest costs incurred from the first of the month through the fourth of the month.

- Mr. Hosfield has made no attempt to separate costs attributable to actual payers of late fees from costs attributable to any tenant who paid rent late but may have had late fees waived or written off.

- Mr. Hosfield did not evaluate if or adduce evidence that employee costs are incremental/caused by late rent, and he improperly included employee costs that are part of in-place infrastructure.

- Mr. Hosfield improperly calculated EQR's "interest cost" without linking it to relevant facts and improperly used EQR's weighted average cost of capital in his calculations.

  o   While the facts show that EQR has not suffered interest as a cost, if one were to include interest as a cost of class members' late rent payments, the rate should be at the rate of EQR's unsecured borrowing rate, not the WACC.

- Mr. Hosfield used a flawed sampling process for his interviews of EQR employees that did not create a representative sample, and Mr. Hosfield incorrectly applies his interview results to the total population.

- Mr. Hosfield did not provide adequate support to justify his application of interview time estimates of employee time in 2020 and 2021 to estimate employee time spent on late rent collection from September 2010 through February 2020.

**REDACTED**



- Mr. Hosfield's calculation of EQR's potential savings on employee costs in the absence of delinquent rent lacks support and evidence and is inconsistent with his interviews with EQR personnel.

- Mr. Hosfield's comparison of EQR's average cost per late fee incurred/saved to the average late fee charged is improper and cannot be used to assess the reasonableness of Equity's late fees.

- Mr. Hosfield's statement that a percentage late fee is economically sound is flawed and unsupported.

## 2. BACKGROUND AND OVERVIEW

8. I incorporate by reference the Background and Overview section and its subsections of the Tregillis May 10 Report.

### 2.1 The Hosfield May 10 Report

9. In the Hosfield May 10 Report, Mr. Hosfield took two approaches to calculating EQR's costs from its California tenants' late rent payments with respect to each Class. Each approach generally follows the broad methodology employed by PwC: a comparison of the revenues from late rent fees from EQR's California tenants generally with costs associated with collection of late rent from California tenants. For one of his approaches, Mr. Hosfield calculated costs EQR allegedly incurred related to late payments of rent; for the other approach, Mr. Hosfield calculated the cost savings EQR would have hypothetically experienced if all EQR California residential tenants paid rent on time. Within each approach, Mr. Hosfield presented two calculations: one including all costs incurred/saved and one calculating the costs incurred/saved only through tenants' move out dates (*i.e.*, excluding costs incurred thereafter).[5]

10. For example, below is an excerpt of Mr. Hosfield's Exhibit 3.1, Schedule1A (the excerpt showing a partial year for 2010 and full years for 2011 and 2012).

---

[5] Hosfield May 10 Report, pp. 27, 32.

**REDACTED**



| | Sep. 3, 2010 - Dec. 31, 2010 | 2011 | 2012 |
|---|---|---|---|
| Employee Cost Savings Related to Rent Delinquency [A] | $ 596,983 | $ 1,846,425 | $ 2,077,571 |
| Eviction Costs Paid by Equity [B] | 250,109 | 823,678 | 855,803 |
| Collection Costs Related to Rent Delinquency [C] | 29,820 | 104,808 | 145,011 |
| Interest on Late Rent Before Residents Move Out [D] | ████ | ████ | ████ |
| Interest on Late Rent After Resident Move Out and Before Collections [E] | ████ | ████ | ████ |
| Interest on Late Rent for Two Years in Collections [F] | ████ | ████ | ████ |
| **Equity's Cost Savings Related to Rent Delinquency** | $ 932,179 | $ 3,016,759 | $ 3,474,419 |
| Number of Late Fees Charged [G] | 11,480 | 39,692 | 43,655 |
| **Equity's Cost Savings per Late Fee** | $ 81.20 | $ 76.00 | $ 79.59 |
| Average Late Fee [G] | $ 68.03 | $ 70.12 | $ 71.13 |
| **Difference between Equity's Cost Savings per Late Fee and Average Late Fee** | $ 13.17 | $ 5.88 | $ 8.46 |

Sources:
[A] Exhibit 4.1, Schedule 1A.
[B] Exhibit 5, Schedule 1A.
[C] Exhibit 6, Schedule 1A.
[D] Exhibit 7, Schedule 1A.
[E] Exhibit 7, Schedule 2A.
[F] Exhibit 7, Schedule 3A.
[G] Appendix A, Schedule 1A.

11.     By comparison, below is the PwC Report's Summary schedule, for the year 1997, with similar lines for personnel/employee costs, interest/use of funds, and collection agency expense (although the PwC Report also included RIS and WIZ costs, which were not in the Hosfield May 10 Report).[6]

**Summary of Collection Costs, Damages & Other Recoverable Losses Applicable To Late Fees - CY 1997**
**Incremental Cost Analysis**

| | | Source |
|---|---|---|
| Net Fees at Issue | $235,370 | Schedule A |
| **Collection Costs, Damages & Other Recoverable Losses** | | |
| Lost Use of Funds | 95,634 | Schedule B |
| On-Site Collections Personnel Costs | 182,966 | Schedule C |
| Collection Agency Expense | ████ | Schedule D |
| RIS & WIZ Costs | 16,379 | Schedule E |
| **Total Collection Costs, Damages & Other Recoverable Losses Applicable to Late Fees** | ████ | |
| **Total Costs in Excess of Revenue** | $134,579 | |

---

[6] PwC Report, Summary schedule.

**REDACTED**



### 2.1.1   Mr. Hosfield's Cost Incurred Method

12.      As referenced above, to calculate the costs EQR incurred related to the late payment of rent, Mr. Hosfield calculated total costs in the following categories: employee costs, eviction costs, collection costs, and interest costs.[7]

13.      To calculate employee costs, Mr. Hosfield conducted interviews with EQR personnel, in what appears to be a manner similar to that employed by PwC for its study.[8]  Mr. Hosfield stated that he instructed each employee to estimate the amount of time the employee typically spent performing tasks within nine pre-defined categories, prior to the COVID-19 pandemic.[9]  Questionnaires and notes from interviews show three different sets of questions: EQR_Expert_000657-59, EQR_Expert_000771-76, and EQR_Expert_000777-79.  In the following discussion, I refer to each questionnaire by the Bates label on its first page.

14.      EQR_Expert_000657 is a two-page questionnaire, with three sections: Personal Data, Job Functions, and Eviction Process.  EQR_Expert_000771 is a six-page questionnaire, with six sections: Personal Data, Job Functions, Interfacing with Tenants, Rent Collection, Eviction Process, and General. EQR_Expert_000777 is a three-page questionnaire, with five sections: Personal Data, Job Functions, Interfacing with Tenants, Eviction Process, and General.  EQR_Expert_000777 does not have a Rent Collection section and its questions are not as lengthy as EQR_Expert_000771, although EQR_Expert_000777 includes questions about rent collection activities by week.

15.      For example, the Interfacing with Tenants section from EQR_Expert_000771 contains almost a page of questions, as seen below.

---

[7] Hosfield May 10 Report, pp. 12-13.
[8] PwC Report, Schedule C.
[9] Hosfield May 10 Report, pp. 13-14.  This contention by Mr. Hosfield appears to be inconsistent with the interview questionnaire he utilized for interviews conducted from May 2020 to sometime in July 2020.  See Interview Questionnaire labeled EQR_Expert_000771-776, and interview notes labeled EQR_Expert 000740-761, and contrast with Interview Questionnaires labeled EQR_Expert_000777-779 and EQR_Expert_00657-659, and interview notes labeled EQR_Expert_000032-206.

**REDACTED**



III.     **INTERFACING WITH TENANTS**

- When You Communicate With Existing Tenants About Something, How Much Of The Time (i.e. %) Are Those Communications:

    •• Face-To-Face?

    •• On The Phone?

    •• By Text Message?

    •• By Email?

    •• By Letter Or Note?

- When A Tenant Initiates A Communication With You, How Often (i.e. %) Are You Able To Respond Without Consulting With Someone Else At EQR?

- Experts Say That An Average American Office Worker Receives Approximately 120 Work Emails Every Workday.[1]  What Do You Think Your Average Is?

    •• How Many Of Your Emails Go To Or Come From A Tenant?

    •• Experts Also Say That Every Email Takes An Average Of 1.1 Minutes.  Do You Think You Take More Or Less Time With A Tenant Email?

    •• What About Text Messages With Tenants – How Much Time Do You Think You Spend On An Average Day Texting With Tenants?

    •• How About Phone Time Each Day With Tenants?

    •• What About Face-To-Face Time In An Average Day (or Week) With Tenants?

    •• What About The Amount Of Time Each Day You Spend Dealing With Notes Or Letters Sent By Tenants?

---

[1] https://hbr.org/2019/01/how-to-spend-way-less-time-on-email-every-day.

    •• How Often (i.e. %) Do You Bring Others In The Office Into Your Dealings With Tenants?  Why?

    •• How Often (i.e. %) Are You Included In Other People's Dealings With Tenants?  Why?

    •• How Often Each Week Are There Meetings At Work Where Specific Tenants Are Discussed?

        ••• How Much Time Do You Think You Spend Going To Meetings And Preparing For Them Each Week?

        ••• How Much Meeting Time Each Week Is Spent On Specific Tenants?

16.     By comparison, the Interfacing with Tenants section from EQR_Expert_000777 is shown below.

---

**REDACTED**



III.    **INTERFACING WITH TENANTS**

•• Do You Consider Chasing Tenants For Rent To Be A Time-Suck For You?

•• Do You Have Other Things You Could Be Doing Instead?

•• Like What?

17.    The three questions from the Interfacing with Tenants section from EQR_Expert_000777 were included at the end of the Rent Collection section in EQR_Expert_000771, which section also contained questions such as "Describe The Worst Rent Collection Episode You Can Remember."

IV.    **RENT COLLECTION**

- On Average Each Month, How Many Tenants At Your Property Do Not Pay Their Rent On Time?

- Do You Consider This Number To Be High, Low Or Average?

- Is The Number Fairly Consistent Each Month?

- Are The Tenants Who Do Not Pay On Time Usually The Same Ones Month-After-Month, Or Do They Vary?

- Describe How And When You Might Get Involved In Collecting The Rent From A Tenant.

       •• For Tenants Who Do Not Pay On Time, Describe Your Understanding Of The "Process" Used To Try And Collect The Rent.

       •• What Have You Been Asked To Do When You Are Involved In The "Process?"

       •• Do You Think Rent Collection Is A Team Effort At The Property Or A Job Done By Just One Person? Who?

- Describe The Worst Rent Collection Episode You Can Remember.

- How Often Are You Asked To Engage A Particular Tenant About Paying His/Her Rent?

       •• What Do You Typically Do To Get Someone To Pay?

       •• Is This A Part Of Your Average Week?

**REDACTED**



        •• How Much Of Your Time Do You Estimate You Spend Trying To Get People To Pay In An Average Week?

        •• Are You Usually Successful?

        •• How Many Tenants Are You Dealing With At Once?

        •• Who Is Dealing With The Other Non-Payors?

        •• How Many Days Does It Usually Take After The 4th Of The Month Before A Tenant Pays The Rent?

    • Is Some Aspect Of Collecting Rent Always Been A Part Of Your Job?

        •• Do You Consider Chasing Tenants For Rent To Be A Time-Suck For You?

        •• Do You Have Other Things You Could Be Doing Instead?

        •• Like What?

18.    Mr. Hosfield's notes from interviews were produced as well. For example, below is an excerpt of EQR_Expert_000740, which summarized 10 interviews performed between May 18, 2020, and May 21, 2020. This excerpt relates to an interview with Alex Sakr, the Acting Manager of the SoMa Square property.

**Equity Residential**
**Interviews of Equity Personnel in California Regarding Time Spent During Workday**

**Alex Sakr – SoMa Square (Acting Manager) – 5/18/2020 at 12pm CST**

- Assistant manager at SoMa Square (been there for about a year) – was former Leasing Consultant at 340 Freemont (2.5 years there)
- Formerly also worked at Hampshire Place and Reside Korea Town in the Los Angeles area (worked for 1 year there)
- Started with Equity in July 2015
- From New York
- Equity has currently put a freeze on late fees given the current COVID situation
- SoMa Square has 410 total apartment units
- He is Acting Manager
  - Leasing Consultant – Jose Alvarado
  - Floating Assistant Manager – Patrick Mariolle
    - He will go to a couple of different properties based on need
  - Leasing Consultant – Pia LaDeza
- The above is the full office staff in a non-COVID environment
- There is currently an Assistant Manager position open
- Number of on-site work hours – standard 8 hours (true for the other staff members as well)
  - They have a 3rd party concierge service at night

. . .

**REDACTED**

**JAVANNI MUNGUIA-BROWN, ET AL. V. EQUITY RESIDENTIAL, ET AL.**
**REBUTTAL REPORT OF CHRISTIAN TREGILLIS, CPA, ABV, CFF, CLP - JULY 9, 2021**



- If you assume 100% of his time is spent on the things we just talked about –
  - Overall walking around / inspecting – 5 hours per week (out of 40/45)
  - Report records, company programs, etc. – mandatory ones every other month (more like 3-4 hours every month total)
  - Reports – 10 hours per week (out of 40/45)
  - Collection of Rent, Evictions, Late Payments – 5-7 hours per week – this one really depends (there is contacting, creating notices) but every building
    - Has frequent offenders they know to contact, there is negotiating with them, emailing back and forth, so at least 1 hour per day
    - When they get noticed to pay rent – most of them have to be called several times, given a 3-day notice – 20-30% is sorry I forgot they'll pay right now, the other 70% is chasing people down
  - Managing Budget Issues / Financial Reporting – probably also about 5 hours per week
  - Supervision of Property Maintenance and Repairs – probably 4-5 hours per week
  - Resolving Tenet Complaints / General Inquiries – proablby 2-3 hours per day (10-15 hours per week)
  - Addressing tenet move-ins/move-outs – 30 a day so 2.5 hours per week
  - Filling vacant apartments by attracting new tenets – he doesn't really do that too much – for the leasing consultants it is at least 5 hours per day – but for him only about 30 minutes
- 20% in person / 50% email / 30% by phone for tenet communications – personally picks up the phone a lot
- When it comes to delinquency / rent payments – he usually goes it alone w/o his co-workers help unless he isn't in the office – Equity wants one manager on delinquency issues because wants the LC's to be focused on
- No. of emails that he cannot ignore – 30-50 a day (sometimes more) – also sending out about 50 a day
  - Maybe 5 hours a day = emailing – that is the vast majority of his time
- Hours spent (asked again)
  - Filling Vacant Apartments / Help Negotiate Leases = more oversees the process
  - Addressing Tenet Move-Ins / Outs = closer to 10% combined between this and the above (4 hours per week) – mostly checking on pricing, collecting data, etc.
  - Records / Financials /Company Programs = reports are budget / spending reports, what maintenance is doing – comes out to more like 1+ hour a day – so 5-10 hours per week
  - Resolving Complaints/Inquiries = 3-4 hours a day – 15-20 hours per week (the majority of his day is resident relations)
  - Supervision of Property Repairs = 1 hour per day – 5 hours per week
  - Delinquency / Late Rent = 1 hour per day – but concentrated that week after rent is posted – would spend a couple of days initially and then doing a lot of follow up after that
    - Most tenants pay their rent in a few days
    - 7-8 hours a month total, about an 2 hours per week – differs by property – it is probably 2 hours per day after rent is posted, but ultimately ends up being about 7-8 hours per month in total

19.    The interview notes were not kept in a consistent manner, though. Below is an excerpt of interview notes from the note set beginning on EQR_Expert_000032, with this excerpt relating to the August 28, 2020, interview of Alexandra Keesling, of the Teresina property.[10]

---
[10] EQR_Expert_000049-50.

**REDACTED**



> **Alexandra Keesling – Leasing Consultant at Teresina, August 28th 2020, 2 PM CT**
>
> X.    <u>**PERSONAL DATA**</u>
>
> - Current Position/Property?
>   - How long? (Class Period = 9/3/10 – 10/23/17)
>
>   - Leasing Consultant for 2 years
>
> - Prior Positions At EQR CA Properties?
>   - Title/Property/Duration
>   - 2 years Consultant at Teresina
>
> - Number Of Apartments At Current Property?
>
> 440 Units
>
> - Names & Titles Of Current Office Co-Workers?
>
> 5 in the sales department, 5 in the maintenance department – 1 Community Manager, 1
> Cust Support Assistant, 1 Leasing Manager, 2 Leasing Consultants
>
> - Fully Staffed At Present?
>
> Yes
>
> - Any Pay For Overtime?
>
> Everyone except for the manager are hourly – a few times that Alexandra has had to
> work overtime
>
>
> XI.    <u>**JOB FUNCTIONS (time should be given pre-COVID)**</u>

20.    The interviews with notes contained in EQR_Expert_000032-206 appear to have taken place between July 2020 and some point in 2021, though for the majority of the interviews the dates were not provided.[11]

21.    As can be seen in the excerpt shown above, it appears that the EQR_Expert_000777 questionnaire was used in the interview of Ms. Keesling (that questionnaire was contained in the interview notes, with answers interspersed between the questions).  The same questionnaire appears to have been used in all of the interviews with notes found in EQR_Expert_000032-206, as there are notes on questions related to rent collections efforts for weeks one, two, three, and four in each of the interview notes (even those that do not contain the questionnaire, with answers interspersed), whereas those questions were not part of EQR_Expert_000771.[12]

---

[11] EQR_Expert_000032 references an interview performed in July 2020, whereas EQR_Expert_000091 references an interview performed in February 2021.
[12] See, for example, notes of interview with Tara O'Connell, at EQR_Expert_000032.

**REDACTED**


22.     Mr. Hosfield then used the information provided in the interviews to fill in interview templates, with tasks bucketed into nine categories.  Below is the interview template for Mr. Sakr.[13]

**Javanni Munguia-Brown, et al. v. Equity Residential, et al.**
**Interview of Alex Sakr, Acting Manager at SoMa Square Apartments (5/18/2020)**

| Job Function | Hours per Week | Percentage |
|---|---|---|
| Filling Vacant Apartments by Attracting/Screening New Residents | - | 0.00% |
| Negotiating New and Renewal Leases | - | 0.00% |
| Addressing Resident Move-Ins and Move-Outs | 4.00 | 9.76% |
| Resolving Resident Complaints and Enforcing Community Rules | 20.00 | 48.78% |
| Supervision of Community Maintenance and Repairs | 5.00 | 12.20% |
| Collection of Delinquent Rent | 2.00 | 4.88% |
| Managing Budget Issues and Financial Reporting | - | 0.00% |
| Preparing Required Reports and Records and Participating in Required Company Programs | 10.00 | 24.39% |
| Other Tasks Not Captured by Any of the Above | - | 0.00% |
| **Total** | **41.00** | **100.00%** |

23.     Accumulating and averaging the interview results, Mr. Hosfield estimated that EQR's office management employees spent 12.32% of their time on tasks related to California tenants' late payment of rent, and leasing employees spent an estimated 4.45% of their time on these tasks.[14]  He then applied those percentages to the fully burdened payroll costs, including all employee compensation, including bonuses, insurance, commissions, and benefits, for the EQR employees within these two groups, throughout the period from September 3, 2010, to February 29, 2020, for the Standard Late Fee Class, and throughout the period from December 1, 2011, to February 29, 2016, for the Woodland Park Preexisting Lease Class.[15]  The results of Mr. Hosfield's calculations are shown below.[16]

---

[13] Hosfield May 10 Report, Appendix C, Schedule 3.
[14] Hosfield May 10 Report, p. 14.
[15] Hosfield May 10 Report, Appendix B, Schedule 6.
[16] Hosfield May 10 Report, p. 17.

**REDACTED**



Standard Late Fee Class

| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ 14,873,999 | $ 2,375,781 | $ 17,249,780 |

Woodland Park Preexisting Lease Class

| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ 105,610 | $ 82,897 | $ 74,640 | $ 91,030 | $ 354,177 |

24.     Mr. Hosfield calculated eviction costs by summing EQR's expended legal fees and SODA court fees that EQR attributes to the two classes, claiming to have removed eviction costs paid by class members, to arrive at the following totals for these costs.[17]



Standard Late Fee Class

| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Eviction Costs | $ ██████████ | | |

Woodland Park Preexisting Lease Class

| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Eviction Costs | $ ██████████ | | | | |

25.     Mr. Hosfield estimated EQR's collection costs in two steps.  First, Mr. Hosfield calculated the collection fees paid to FCO and KTS, as defined in the Hosfield May 10 Report, for collecting what he stated he assumed are the unpaid account balances of each class.  He then multiplied the total collection fees paid by the percentage of rent balances he attributes to each class, to arrive at his figure for the collection costs related to rent delinquency.[18]

---

[17] Hosfield May 10 Report, p. 18.
[18] Hosfield May 10 Report, p. 19 and Exhibit 6.

**REDACTED**


26.     To calculate EQR's interest costs related to late payment of rent, Mr. Hosfield calculated the interest on late rent in three distinct time periods:[19]

- Before the tenants move out;

- After the tenants move out and before their accounts are sent to collections;

- After the tenants' accounts are sent to collections.

27.     Mr. Hosfield stated that, for this calculation, rent is considered late if not paid in full on the first of the month.[20]

28.     For each of the three time periods, Mr. Hosfield calculated each resident's running rent balance for the first time period and average late rent balance for time periods two and three. Then Mr. Hosfield used EQR's weighted average cost of capital as the interest rate to calculate EQR's total interest costs incurred (as did PwC in its analysis).[21]

29.     Combining these four cost categories, Mr. Hosfield calculated the following as EQR's total costs incurred related to late payment of rent by the members of the two certified classes in this case.[22]

*Standard Late Fee Class*



| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $      14,873,999 | $      2,375,781 | $      17,249,780 |
| Eviction Costs | | | |
| Collection Costs | | | |
| Interest Costs | | | |
| Total Costs | $ | | |

---

[19] Hosfield May 10 Report, p. 20.
[20] Hosfield May 10 Report, p. 21.
[21] Hosfield May 10 Report, p. 20. PwC Report, Schedules B, B-2.
[22] Hosfield May 10 Report, p. 26.

**REDACTED**


### Woodland Park Preexisting Lease Class



| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ 105,610 | $ 82,897 | $ 74,640 | $ 91,030 | $ 354,177 |
| Eviction Costs | | | | | |
| Collection Costs | | | | | |
| Interest Costs | | | | | |
| Total Costs | $ | | | | |

30.　　As referenced above, Mr. Hosfield also made an alternative time-limited calculation, in which he only included costs through each class member-resident's move out date. The results of this calculation are shown below.[23]

### Standard Late Fee Class



| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ 14,873,999 | $ 2,375,781 | $ 17,249,780 |
| Eviction Costs | | | |
| Interest Costs | | | |
| Total Costs | $ | | |

### Woodland Park Preexisting Lease Class



| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ 105,610 | $ 82,897 | $ 74,640 | $ 91,030 | $ 354,177 |
| Eviction Costs | | | | | |
| Interest Costs | | | | | |
| Total Costs | $ | | | | |

### 2.1.2　Mr. Hosfield's Cost Savings Method

31.　　In his "cost savings" method, Mr. Hosfield's key assumption is that in the hypothetical world all EQR tenants would have paid their rent on time.　Based on this assumption, Mr. Hosfield concluded that the same eviction costs, collection costs, and interest costs calculated in the first method would have also been saved.[24]

---

[23] Hosfield May 10 Report, p. 27.
[24] Hosfield May 10 Report, pp. 31-32.

**REDACTED**


32.     To calculate the employee costs EQR would have saved under this assumption, Mr. Hosfield relied on conversations with four EQR leadership personnel who hypothesized how EQR's staffing might have changed if all tenants had paid all rent on time, including whether that would eliminate a position, an employee would be reduced from full-time to part-time, an employee would be shared between multiple properties, or the title and responsibilities of a position would change.[25]  For each of these categories of staffing changes, Mr. Hosfield performed calculations to estimate what quantum of employee-related costs would be saved.[26]

33.     For example, in the category in which the title and responsibilities of an employee changed, Mr. Hosfield obtained the midpoint salary for the updated position from EQR, then divided this salary figure by the percentage of EQR's salary costs to total employee costs–which includes "all benefits" such as Medicare, FICA, FUTA, SUTA, and Worker's Compensation, and bonuses–by position and market, to convert the salary for the updated position into a total annual cost.[27]

34.     Mr. Hosfield calculated that, in total, EQR would have been able to reduce its employee costs by 9.78% were all class members to have paid their rent on time.[28]

35.     Summing all the potential cost savings to EQR that he identified, Mr. Hosfield estimated the following cost savings, for each class, using his "cost savings" method.[29]

### Standard Late Fee Class



| | Standard Late Fee Class Period Sep. 3, 2010 – Oct. 23, 2017 | Post Class Period Oct. 24, 2017 – Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ 17,739,414 | $ 2,764,964 | $ 20,504,378 |
| Eviction Costs | | | |
| Collection Costs | | | |
| Interest Costs | | | |
| Total Costs | | | |

---

[25] Hosfield May 10 Report, pp. 28-29.
[26] Hosfield May 10 Report, pp. 28-30.
[27] Hosfield May 10 Report, p. 29 and Appendix D, Schedule 5.
[28] Hosfield May 10 Report, p. 30.
[29] Hosfield May 10 Report, pp. 31-32.

**REDACTED**


### Woodland Park Preexisting Lease Class



| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ 106,568 | $ 81,229 | $ 71,085 | $ 86,827 | $ 345,709 |
| Eviction Costs | | | | | |
| Collection Costs | | | | | |
| Interest Costs | | | | | |
| Total Costs | $ | | | | |

36.    Mr. Hosfield performed the same alternative calculation as he did for the Cost Incurred Method, only including costs through each resident's move out date, the results of which are shown below.[30]

### Standard Late Fee Class



| | Standard Late Fee Class Period Sep. 3, 2010 - Oct. 23, 2017 | Post Class Period Oct. 24, 2017 - Feb. 29, 2020 | Total |
|---|---|---|---|
| Employee Costs | $ 17,739,414 | $ 2,764,964 | $ 20,504,378 |
| Eviction Costs | | | |
| Interest Costs | | | |
| Total Costs | | | |

### Woodland Park Preexisting Lease Class



| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Employee Costs | $ 106,568 | $ 81,229 | $ 71,085 | $ 86,827 | $ 345,709 |
| Eviction Costs | | | | | |
| Interest Costs | | | | | |
| Total Costs | | | | | |

### 2.1.3    Mr. Hosfield's Comparison of Costs to Late Fees, per Late Fee

37.    To evaluate the late fees EQR charged its residents on a per-late-fee basis, Mr. Hosfield compared the average cost per late fee and average cost savings per late fee to the average late fee charged for both classes.  Mr. Hosfield also made this comparison for his time-limited alternative calculations, using both cost approaches (costs incurred and costs saved).[31]

---

[30] Hosfield May 10 Report, pp. 32-33.
[31] Hosfield May 10 Report, pp. 33-37.

**REDACTED**



38.     To calculate the average late fee charged, Mr. Hosfield divided the total late fees charged to each class's members by the total number of late fees charged to the class's members, respectively.[32]  The results of Mr. Hosfield's comparison of EQR's average cost per late fee to the average late fee charged, in which he calculated the Average Costs Incurred per Late Fee to exceed the Average Late Fee Charged by $10.67 and $16.61 for the Standard Late Fee Class and Woodland Park Preexisting Lease Class, respectively, can be seen below.[33]

### Standard Late Fee Class

| | 9/3/10 – 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 – 10/23/17 | 10/24/17 – 12/31/17 | 2018 | 2019 | 1/1/20 – 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Post-Class Period | | | | | |
| Avg. Costs Incurred per Late Fee | $ 72.69 | $ 68.39 | $ 71.62 | $ 84.31 | $ 90.77 | $ 101.33 | $ 106.44 | $ 121.50 | $ 139.48 | $ 132.19 | $ 138.07 | $ 125.59 | $ 95.67 |
| Avg. Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| Difference | $ 4.66 | $ (1.73) | $ 0.49 | $ 10.05 | $ 10.78 | $ 10.69 | $ 9.74 | $ 20.53 | $ 36.05 | $ 29.71 | $ 32.53 | $ 20.91 | $ 10.67 |

### Woodland Park Preexisting Lease Class

| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Costs Incurred per Late Fee | $ 62.38 | $ 81.63 | $ 69.64 | $ 62.23 | $ 67.66 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| Difference | $ 11.72 | $ 29.91 | $ 16.77 | $ 12.60 | $ 16.61 |

39.     Mr. Hosfield also performed this comparison for his alternative calculation of EQR's costs incurred, only including his calculated costs through each resident's move out date.  Mr. Hosfield calculated that EQR's alternative average costs incurred per late fee exceeded the average late fee charged by $2.37 for the Standard Late Fee Class, and the alternative average costs incurred per late fee exceeded the average late fee charged by $12.66 for the Woodland Park Preexisting Lease Class.[34]

### Standard Late Fee Class – Alternative Calculation

| | 9/3/10 – 12/31/10 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 1/1/17 – 10/23/17 | 10/24/17 – 12/31/17 | 2018 | 2019 | 1/1/20 – 2/29/20 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Post-Class Period | | | | | |
| Avg. Costs Incurred per Late Fee | $ 69.80 | $ 63.86 | $ 63.86 | $ 72.27 | $ 83.84 | $ 90.12 | $ 93.15 | $ 103.82 | $ 112.28 | $ 101.54 | $ 101.36 | $ 100.72 | $ 82.63 |
| Avg. Late Fee Charged | 68.03 | 70.12 | 71.13 | 74.26 | 82.99 | 90.64 | 96.70 | 100.97 | 103.43 | 102.48 | 105.54 | 104.68 | 85.00 |
| Difference | $ 1.77 | $ (6.26) | $ (7.27) | $ (1.99) | $ (1.15) | $ (0.52) | $ (3.55) | $ 2.85 | $ 8.85 | $ (0.94) | $ (4.18) | $ (3.96) | $ (2.37) |

---

[32] Hosfield May 10 Report, pp. 33-34.
[33] Hosfield May 10 Report, pp. 34-35.
[34] Hosfield May 10 Report, p. 35.

**REDACTED**


### Woodland Park Preexisting Lease Class – Alternative Calculation

| | 12/1/2011 – 12/31/2012 | 2013 | 2014 | 1/1/2015 – 2/29/2016 | Total |
|---|---|---|---|---|---|
| Avg. Costs Incurred per Late Fee | $ 60.88 | $ 74.14 | $ 63.07 | $ 59.67 | $ 63.71 |
| Avg. Late Fee Charged | 50.66 | 51.72 | 52.87 | 49.63 | 51.05 |
| Difference | $ 10.22 | $ 22.42 | $ 10.20 | $ 10.04 | $ 12.66 |

40.     Mr. Hosfield also performed these comparisons for his estimated potential cost savings scenario. Under the hypothetical in which all tenants paid their rent on time, Mr. Hosfield calculated that EQR would have saved on average $20.29 more than the average late fee charged to the Standard Late Fee Class, and $15.91 per late fee for the Woodland Park Preexisting Lease Class.[35]

41.     Mr. Hosfield repeated this comparison using his alternative cost savings model with the modification of including only the cost savings applicable through each resident's move out date.[36]  He calculated that, under this assumption, EQR's average cost savings per late fee exceeded the average late fee charged by $7.26 for the Standard Late Fee Class and by $11.95 for the Woodland Park Preexisting Lease Class.[37]

### 2.1.4     Summary of Hosfield Scenarios

42.     Below is a summary of Mr. Hosfield's scenarios.

**Summary of Hosfield Scenarios: Late-Rent-Related Costs in Excess of Late Fee Revenue**

**Standard Late Fee - Total $**

| | Costs Incurred | Cost Savings |
|---|---|---|
| All Costs | $32,351,531 | $35,606,129 |
| Costs Through Tenant Departure | $27,943,509 | $31,198,107 |

**Woodland Park - Total $**

| | Costs Incurred | Cost Savings |
|---|---|---|
| All Costs | $809,794 | $801,326 |
| Costs Through Tenant Departure | $762,476 | $754,008 |

**Standard Late Fee - Per Late Fee**

| | Costs Incurred | Cost Savings |
|---|---|---|
| All Costs | $10.67 | $20.29 |
| Costs Through Tenant Departure | -$2.37 | $7.26 |

**Woodland Park - Per Late Fee**

| | Costs Incurred | Cost Savings |
|---|---|---|
| All Costs | $16.61 | $15.91 |
| Costs Through Tenant Departure | $12.66 | $11.95 |

**Notes and Sources:**
[1]   Hosfield May 10 Report, pp. 26-37.

## 3.     REBUTTAL OPINIONS

43.     I understand EQR has proffered the Hosfield May 10 Report to demonstrate EQR's costs related to class members' rent delinquency.  Mr. Hosfield's report and underlying calculations contain many flaws similar to those in the 1998-1999 PwC Study, which problems were described in the Tregillis May 10 Report.

---

[35] Hosfield May 10 Report, p. 36.
[36] Hosfield May 10 Report, p. 36.
[37] Hosfield May 10 Report, pp. 36-37.

**REDACTED**


In this section, I describe my rebuttal opinions to those expressed in the Hosfield May 10 Report, as well as the bases for my rebuttal opinions.

**3.1    Mr. Hosfield has improperly included costs related to the time-period after a tenant vacates the property, in his calculation of EQR's costs incurred and potential cost savings related to the late fees paid by members of the Standard Late Fee Class and Woodland Park Class.**

44.    As an initial matter, Mr. Hosfield's primary calculations of EQR's "costs incurred" related to the late payment of rent, as well as the "potential cost savings" to EQR if all tenants paid rent on time, include costs EQR incurs after the move-out date of the tenant.  As noted in the Tregillis May 10 Report in its critique of the PwC Report's similar analysis, I understand that costs incurred after the tenant's move-out date are governed by a provision of the lease that renders them improper for inclusion in the costs related to collecting and accounting for late rent.[38]

45.    Mr. Hosfield, in both of his approaches, performed an alternative calculation that only includes costs through each tenant's move out date.  While I do not hold myself out to be offering legal opinions or to be a fact-finder, assuming that the Court's Order Denying in Part & Granting in Part Motion for Partial Summary Judgment is to be followed, that dictates that Mr. Hosfield's primary calculations are improper.  A comparison of Mr. Hosfield's primary and alternative calculations demonstrates that he, too, appears to understand that his inclusion of costs incurred after the tenant moves out (whether for eviction or other reason) overstates EQRs costs incurred/saved related to late rent.  For example, for the "costs incurred" by EQR for the Standard Late Fee Class, Mr. Hosfield's inclusion of costs related to the period after each tenant moved out overstates total costs incurred by 16%, as can be seen below.



Overstatement of EQR's Costs Incurred for the Standard Late Fee Class

| | A | | | B | | | C=(A-B)/B | | |
|---|---|---|---|---|---|---|---|---|---|
| | **Primary Approach** [1] | | | **Alternative Calculation** [2] | | | **Primary Approach Overstatement over Alternative Calculation** | | |
| | Standard Late Fee Class Period 9/3/10 - 10/23/17 | Post Class Period 10/24/17 - 2/29/20 | Total | Standard Late Fee Class Period 9/3/10 - 10/23/17 | Post Class Period 10/24/17 - 2/29/20 | Total | Standard Late Fee Class Period 9/3/10 - 10/23/17 | Post Class Period 10/24/17 - 2/29/20 | Total |
| Employee Costs | $14,873,999 | $2,375,781 | $17,249,780 | $14,873,999 | $2,375,781 | $17,249,780 | 0% | 0% | 0% |
| Eviction Costs | | | | | | 0 | 0% | 0% | 0% |
| Collection Costs | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | 100% | 100% | 100% |
| Interest Costs | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | 110% | 217% | 130% |
| Total Costs | ▉ | ▉ | ▉ | ▉ | ▉ | ▉ | 13% | 31% | 16% |

Notes and Sources:
[1]  Expert Report and Disclosure of Mark J. Hosfield, May 10, 2021, Exhibit 3.2, Schedule 1A.
[2]  Expert Report and Disclosure of Mark J. Hosfield, May 10, 2021, Exhibit 3.2, Schedule 2A.

---

[38] Tregillis May 10 Report, p. 41; ECF 142, Order Denying in Part & Granting in Part Mot. for Partial Summary Judgment, p. 7.

**REDACTED**



### 3.1.1    Collection Agency Costs

46.     In addition to the improper inclusion of costs incurred post-tenant-move-out, I understand from Class Counsel that, under California law, percentage-based collection costs (*i.e.*, those in which the collection agency is paid a percentage of rent collected) cannot be included in the calculation of either a reasonable late fee or a landlord's costs of late rent collection that may be offset against any late fees that should be restored to tenants, as described in the Tregillis May 10 Report.[39]    Assuming Class Counsel's representation to be accurate, Mr. Hosfield's inclusion of collection agency costs in his primary approaches is therefore improper and makes his primary approaches inappropriate as a basis for estimating EQR's actual damages from its California tenants' late rent payment (*i.e.*, a landlord's costs of late rent collection that may be offset against late fees that should be restored to tenants).

### 3.2    Mr. Hosfield has improperly included employee and interest costs incurred from the first of the month through the fourth of the month.

47.     Mr. Hosfield noted in the Hosfield May 10 Report that EQR considers that "rent not paid in full by the first day of the month is late."[40]   He also noted that, "[b]eginning on the second day of the month, Equity begins to incur employee costs related to delinquent rent," and "Equity also begins to incur interest costs on late rent."[41]

48.     In addition, as described above, Mr. Hosfield's interviews with property managers in some instances involved questioning about what rent-collection activities occur by week, but Mr. Hosfield's calculations include costs related to all rent-collection activities from all days of the month (*e.g.*, see the interview notes and summary figures for Alex Sakr, described above, showing that rent-collection-related activities are included for all of the month, with no exclusion related to work done during the grace period from the first through the fourth of the month, and/or with tenants who did not get assessed late fees). Similarly, Mr. Hosfield's calculation of interest costs include costs related to interest from days 1 - 4 of the month, when there are large amounts of outstanding rent owed, but those amounts are not subject to a late fee (this issue is discussed in greater detail in report Section 3.6, below).

---

[39] Tregillis May 10 Report, p. 40.
[40] Hosfield May 10 Report, p. 9.
[41] Hosfield May 10 Report, p. 9.

**REDACTED**



49.     However, Mr. Hosfield also recognized, citing a 2014 EQR lease with David Bofanti II, that if EQR does not receive payment of rent and other recurring charges by the end of the fourth day of the month, the tenant will be charged a late fee of 5% of the amount owed on the fifth of the month, with a minimum of $50.[42]

50.     Under this lease term and the Standard Late Fee, EQR grants its tenants a grace period from the first through the fourth of the month, during which time tenants can pay rent without being charged a late fee.  Before the fifth of the month, regardless of whether EQR considers unpaid rent to be late, rent is effectively not late, as EQR does not charge tenants a late fee until then.  In other words, the late fee structure set up by EQR does not treat rent as late until the fifth of the month.  As a result, it is improper to include, as Mr. Hosfield has in his revenue vs. costs comparisons, any costs related to the days from the first to the fourth of the month (either related to personnel or interest costs).

51.     This is especially improper when considering that there are many tenants who pay their rent on the first through the fourth of the month (as discussed in detail in section 3.6 of this report).  Because these tenants are not charged a late fee, including a cost related to those rent payments wrongly inflates the cost totals Mr. Hosfield calculates for his revenue vs. cost comparisons.  It is inappropriate for Mr. Hosfield to include these costs in his calculation, lumped in with costs incurred after the fourth of the month, when late fees are assessed, given that the costs incurred before the late fees are assessed are not costs as a result of or caused by the event that results in the late fee for late payment of rent: *not paying rent by the end of the fourth day of the month*.[43]  *See* California Civil Code section 3300 ("For the breach of an obligation arising from contract, the measure of damages, except where otherwise expressly provided by this Code, is the amount which will compensate the party aggrieved for all the detriment *proximately caused thereby*, or which, in the ordinary course of things, would be likely to result therefrom.") (emphasis added); *Crossroads Inv'rs, L.P. v. Fed. Nat'l Mortg. Ass'n*, 13 Cal. App. 5th 757, 792 (2017) ("It is essential to establish a causal connection between the breach and the damages sought.").  *See also Beasley*, 235 Cal. App. 3d at 1403 (holding that evidence proving offset damages under *Garrett* must establish "a direct causal link between the breaches underlying the litigation and the actual damages caused by those breaches.").

---

[42] Hosfield May 10 Report, pp. 7-8.
[43] ECF 142, Order Denying in Part & Granting in Part Motion for Partial Summary Judgment, p. 7; *Garrett v. Coast & Southern Fed. Sav. & Loan Assn.*, 9 Cal.3d 731 (1973).

**REDACTED**



52.     As described in the Tregillis May 10 Report, the four-day grace period before tenants are charged a late fee is a benefit EQR provides to its tenants as a term in their leases, and thus the interest costs on late rent and employee costs related to unpaid rent incurred during this time are a cost of doing business unrelated to late fees.[44]

**3.3     Mr. Hosfield has made no attempt to separate costs attributable to actual payers of late fees from costs attributable to any tenant who paid rent late but may have had late fees waived or written off.**

53.     Mr. Hosfield, like PwC did in the PwC Study, has made no attempt to make an attendant reduction to account for costs related to late fees waived or late fees written off.  This is an issue I described in the Tregillis May 10 Report:[45]

> I understand that late fees charged are required by law to relate to the damage caused by the offending late payment of rent. Specifically, I understand that a late fee must reflect a reasonable effort to estimate a fair average compensation for its damages from a late payment. *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 739 (1973). In turn, California Civil Code section 3300 requires that any costs to be counted in calculating damages resulting from the issue that gives rise to a late fee must be "the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Civ. Code § 3300; *see also Crossroads Inv'rs, L.P. v. Fed. Nat'l Mortg. Ass'n*, 13 Cal. App. 5th 757, 792 (2017) ("It is essential to establish a causal connection between the breach and the damages sought.").

54.     Without the reduction for costs associated with late fees waived, written off, or otherwise not paid, Mr. Hosfield's calculations overstate EQR's employee costs, eviction costs, and interest costs *related to the late payment of rent by tenants who paid late fees*.  As described in the previous report section, it is inappropriate to burden the payers of late fees (*i.e.*, class members to whom EQR may owe restitution) with costs associated with tenants who did not pay late fees or rent payment events that did not result in late fees.  Examples of this problem for each of three cost categories are detailed below.

**3.3.1     Employee Costs**

55.     Like the flaw with PwC's personnel study, Mr. Hosfield's interviews with EQR personnel only asked the interviewees to estimate the time they spend on tasks related to the collection of delinquent rent, with no distinction between time spent on efforts collecting late rent for those tenants that paid a late fee, versus those who did not pay a late fee, or had the late fee waived/written off.[46]

---

[44] Tregillis May 10 Report, p. 35.
[45] Tregillis May 10 Report, p. 32.
[46] Hosfield May 10 Report, pp. 13-14.  *See also* Interview Questionnaires labeled EQR_Expert_657, 771 and 777.

**REDACTED**


56.     In addition, as referenced above, Mr. Hosfield did not clearly distinguish or exclude time that interviewees spent on rent collection during the first four days of the month, but instead included time spent during "week one" of the month.[47] Nor did he distinguish or exclude time that interviewees spent evicting tenants who never paid late fees, or working on late rent "collections" for tenants who have vacated the property, which I understand the Court in this case stated is a different breach, covered by a separate provision of the lease.[48] Further supporting this logic, EQR does not apply any payments from tenants toward a late fee charged unless all other obligations for the tenant have been satisfied first.[49] As such, for a tenant who was evicted for failure to pay rent (and, thus, failure to pay a late fee), it is improper to include the employee costs caused by that tenant, and similar tenants, within the calculation of EQR's costs that are to be offset from any late fee restitution owed to class members.

57.     As similarly described in the Tregillis May 10 Report, these flaws in Mr. Hosfield's calculation of costs improperly include certain costs and overstate the costs caused by class members who were charged and paid late fees, which Mr. Hosfield has opined are costs to be offset against late rent fees to be reimbursed to Plaintiffs.[50]

### 3.3.2   Eviction Costs

58.     I understand from Class Counsel that EQR's actual damages are limited to those damages that have been "liquidated" or replaced by the late fee. Under this standard, Mr. Hosfield's inclusion of eviction-related legal fees and costs is inappropriate because, as Mr. Hosfield acknowledged, EQR already charges those fees to tenants and has in fact collected eviction costs from class members, demonstrating that those costs have not been liquidated by the late fee.[51]

59.     Moreover, continuing with the logic detailed above regarding employee costs related to evicted tenants, Mr. Hosfield's inclusion of eviction costs–consisting of EQR's expended legal fees and SODA court fees–is improper to include in the calculation of EQR's costs attributable to class members' late rent payment because the evicted tenant *did not pay a late fee* for the month giving rise to the eviction, despite

---

[47] Hosfield May 10 Report, pp. 13-14.  *See also* EQR_Expert 737.xlsx.
[48] ECF 142, Order Denying in Part & Granting in Part Motion for Partial Summary Judgment, p. 7.
[49] ECF 194-2, Declaration of David Breshears in Support of Motion to Dismiss Defendants' Debt Collection Set-Off Claims p. 5.
[50] Tregillis May 10 Report, pp. 32-36.
[51] Hosfield May 10 Report, p. 18.

**REDACTED**



the late fee being charged.[52]  Additionally, EQR incurs the costs related to an eventual eviction as a result of the evicted tenant's *non-payment* of rent, rather than their *late payment* of rent, which I understand to be a different breach, and thus not linked to the breach at issue in this case: the *late payment* of rent by class members.[53]  Also, assuming *arguendo* that any portion of EQR's eviction-related legal fees and costs may be included in its offset, it appears that Mr. Hosfield has not adequately reduced the legal costs that he included in his offset calculation.  I understand from Class Counsel that EQR often recovers from individual tenants or agrees to compromise the legal fees it incurs in proceedings to evict those tenants.  While Mr. Hosfield stated that he excluded from his calculation those legal fees that individual tenants have paid,[54] there is no indication that Mr. Hosfield similarly excluded from his calculation of EQRs eviction costs legal fees that EQR agreed to compromise in individual eviction settlements or judgments, which should not be charged to class members.

60.      In addition, I understand that another of Plaintiffs' experts, David Breshears, has compared records of Defendants' tenant ledger data with evidence regarding certain of Defendants' legal invoices and settlement agreements related to eviction of tenants and concluded that there is or may be a double-counting of costs in Mr. Hosfield's analysis, as well as attribution of costs to class members when there is insufficient evidence as to whether class members actually caused Defendants to incur those costs.  I have not investigated and have no opinion on this issue.

### 3.3.3    Interest Costs

61.      As with EQR's employee costs, Mr. Hosfield made no attempt to distinguish interest costs EQR incurred on late rent for those tenants who paid late fees (i.e., class members) versus interest costs EQR incurred on late rent for tenants whose late fees were waived or written off, nor those who were evicted and thus never paid late fees charged.  Like with the employee costs associated with tenants whose late fees were waived, written off, or never paid, it is inappropriate for Mr. Hosfield to burden the tenants who paid late fees (class members to whom EQR may owe restitution) with interest costs associated with this other group of tenants and their late rent payments.

---

[52] I understand EQR applies tenant payments in a particular order of priority, whereby payments are applied to rent before they are applied to late fees.  Thus, if a tenant has not paid rent, they also have not paid the associated late fee.  Joint Stipulation Regarding MRI Data § III.B.19.d.xiii.
[53] *Beasley*, 235 Cal. App. 3d at 1403.  *See also* Tregillis May 10 Report, p. 41.
[54] Hosfield May 10 Report, p. 18.

**REDACTED**



**3.4    Mr. Hosfield did not evaluate if or adduce evidence that employee costs are incremental/caused by late rent, and he improperly included employee costs that are part of in-place infrastructure.**

62.    As described above, I understand that in order to offset its costs of late rent collection against any restitution that it may owe to the class, EQR must establish a causal connection between EQR's costs incurred and late payment of rent by those charged late fees (i.e., class members).  *See* California Civil Code section 3300; *Crossroads Inv'rs, L.P. v. Fed. Nat'l Mortg. Ass'n*, 13 Cal. App. 5th 757, 792 (2017) ("It is essential to establish a causal connection between the breach and the damages sought.").  As described in Section 3.1.9 of the Tregillis May 10 Report, I believe that, when calculating employee costs incurred because of the late payment of rent, incremental costs are the appropriate issue and question to be evaluated.[55]

63.    As described above, EQR's employee costs incurred make up the largest portion of Mr Hosfield's calculation of EQR's total costs incurred related to delinquent rent.  Also described above, Mr. Hosfield's process for calculating the employee costs incurred began with a survey of EQR office management and leasing personnel in which he asked each employee to estimate the amount of time spent on nine predetermined task categories.[56]

- Filling vacant apartments by attracting and screening new residents;
- Negotiating new and renewal leases;
- Addressing resident move-ins and move-outs;
- Resolving resident complaints and enforcing community rules;
- Supervision of community maintenance and repairs;
- Collection of delinquent rent;
- Managing budget issues and financial reporting;
- Preparing required reports and records and participating in required company programs; and
- Other tasks not captured by any of the above categories.

64.    Mr. Hosfield then took the percentage of time he calculated that these EQR personnel spent on the collection of delinquent rent and multiplied that percentage by EQR's costs for office management and leasing employees – categories of personnel that Mr. Hosfield concluded are involved in the delinquency

---

[55] Tregillis May 10 Report, p. 43.
[56] Hosfield May 10 Report, pp. 13-14.

**REDACTED**


process, throughout the period of September 2010 through February 2020 for the Standard Late Fee Class, and December 2011 through February 2016 for the Woodland Park Preexisting Lease Class.[57] Mr. Hosfield explained that he used EQR's employee costs, including salaries, commissions, bonuses, and benefits, and stated that he limited the costs included in his calculations to "the costs for Equity employees who are resident-facing and directly involved in the rent delinquency process."[58]

65.    Mr. Hosfield's explanation of his calculation of the employee costs incurred related to delinquent rent suggests that he may also believe that incremental costs incurred related to the late payment of rent by payers of late fees is the relevant measure. In his report, Mr. Hosfield stated, "It is important to note that the employee costs included in my calculations are not fixed costs," and that employee costs "are community-level costs which are management-controllable, i.e., position can be eliminated or changed at the discretion of management."[59] This statement implies that he believes EQR's employee costs are incremental and would vary/fluctuate with the number of tenants who pay rent late.

66.    However, in Mr. Hosfield's calculations, even in the most general sense, he made no attempt to determine if the employee costs related to the late payment of rent are actually incremental and vary with more or fewer late rent payments. As can be seen above, within the task categories used in his interviews, "collection of delinquent rent" is a catch-all time bucket that does not allow for Mr. Hosfield, nor anybody else, to identify the tasks within this category that are affected by more or fewer tenants paying rent late, as distinguished from the tasks that are unaffected by changing numbers of tenants who pay rent late.[60]

67.    Moreover, for EQR's employee costs used as the basis for his calculation, Mr. Hosfield, for the positions included, does not make any distinction between salaried and non-salaried positions. But this information is easily determinable. For example, the position of Community Manager is and has been a salaried position since at least September 2010.[61] As described in the Tregillis May 10 Report, "salary costs are fixed and would not increase because of any given late payment. Instead, they are more appropriately considered overhead and should be excluded from the analysis".[62] Salaried positions, such

---

[57] Hosfield May 10 Report, p. 16, Exhibit 4.2 Schedules 2A and 2B.
[58] Hosfield May 10 Report, p. 16, Appendix B, Schedule 6.
[59] Hosfield May 10 Report, p. 17.
[60] Nor does his analysis distinguish between late rent payment generally vs. payers of late fees, as described above.
[61] Defendants' Responses to Plaintiff Munguia-Brown's Request for Admission No. 91.
[62] Tregillis May 10 Report, p. 43.

**REDACTED**



as Community Manager, also account for the majority of EQR's employee costs that Mr. Hosfield uses in his calculation,[63] thus overstating the employee costs incurred because of any given late payment of rent, absent proof that the salary expense at issue would decrease without the late payment of rent by those paying late fees.

68.      For hourly positions, Mr. Hosfield did not conduct any analysis demonstrating that these employees would work less than full-time in the absence of delinquent rent (or, more accurately, delinquent rent paid by late-fee-payers).  The evidence suggests that the schedules of those with hourly positions are not set by the volume of work on a given day, but instead by EQR's pre-determined office hours.  Debra Rivera, the person designated by EQR to testify on EQR's behalf about how EQR staffs its California properties, testified in deposition that both office management and leasing employees were expected to be at work during "office hours," corresponding to full-time work schedules.[64]

69.      This is corroborated by Mr. Hosfield's survey results.  Of the EQR personnel Mr. Hosfield interviewed, all but four of the Office Management employees have salaried positions, while all the Leasing employees have hourly positions.[65]  On average, the 33 Leasing employees reported that they worked 40.06 hours per week, which is equivalent to a standard full-time schedule.[66]  Using Mr. Hosfield's estimate that these employees spent 4.45% of their time on collection of delinquent rent, this means that Leasing employees spend an average of 1.78 hours per week on activities related to the collection of delinquent rent.[67]  Aside from unsupported statements from EQR representatives, as referenced in Mr. Hosfield's "cost savings" calculations, there is no evidence that any of these employees would work any less if payers of late fees did not pay their rent late.[68]

70.      The conclusion that these employees typically work full-time schedules is also consistent with Ms. Rivera's deposition testimony that she has worked for EQR since 1998 and could only recall two instances at two California properties in which rent delinquency was one of many factors that impacted staffing.[69]  In

---

[63] Hosfield May 10 Report, Appendix B Schedule 5A and 5B.
[64] Deposition of Debra Rivera, April 5, 2021 ("Rivera Deposition"), pp. 71-72.
[65] Hosfield May 10 Report, Appendix C; Defendants' Responses to Plaintiff Munguia-Brown's Request for Admission Nos. 83-91.
[66] Hosfield May 10 Report, Appendix C.
[67] Hosfield May 10 Report, Appendix C.
[68] Hosfield May 10 Report, Appendix D, Schedule 4.
[69] Rivera Deposition, pp. 13, 44-51.

**REDACTED**



both instances, Ms. Rivera noted a single customer support assistant was upgraded to the position of assistant community manager, and that rent delinquency was only one of many factors leading to the staffing change.[70]   To my knowledge, EQR has produced no evidence that it has ever reduced an employee's work hours on an ad hoc basis because more tenants than expected paid their rent on time in any particular month, week, or day.   Instead, all the evidence I have reviewed shows that EQR's regular pay to its full-time employees is a fixed, rather than incremental, cost.[71]

71.      In the calculation of EQR's total employee costs, Mr. Hosfield, as described above, included salary, bonuses, commissions, and benefits costs for the positions he determined to be resident-facing and directly involved in the rent collection process.[72]   In addition to the problems outlined above regarding these employees' salaries and compensation, it is inappropriate for Mr. Hosfield to include these elements of employee compensation in his basis for EQR's total employee costs because, like the salaries of salaried positions, these costs are fixed and there is no evidence of an increase in those as a result of the late payment of rent by late-fee-payers (*e.g.*, there is no evidence that these employees had higher health care or life insurance costs for EQR as a result of the late payment of rent by late-fee-payers), other than the unsupported estimates of positions that would be eliminated or reclassed, as reflected in Mr. Hosfield's "cost savings" calculations.[73]

72.      Another issue with the total employee costs Mr. Hosfield uses in his calculation is he has been overinclusive in which positions to include as positions that "are resident-facing and directly involved in the rent delinquency process."[74]   For example, in his summary of payroll costs for the Standard Late Fee Class, Mr. Hosfield included positions such as Manager Operations Initiatives, Regional Facilities Manager, Other Office Administrative, Service Manager, and Manager Sales Initiatives in his calculations of total EQR employee costs for Office Management employees, but he did not demonstrate in his discussion of his

---

[70] Rivera Deposition, pp. 44-51.
[71] Ms. Rivera's testimony that there were only two instances in which an employee was promoted to a higher position in part due to rent delinquency does not establish any sort of historical pattern across the many EQR properties to evidence that EQR's employee costs as calculated by Mr. Hosfield are not fixed costs, or that they are not incurred as a result of the late payment of rent by late-fee-payers.
[72] Hosfield May 10 Report, Appendix B, Schedule 6.
[73] Hosfield May 10 Report, Appendix D, Schedule 4.
[74] Hosfield May 10 Report, p. 16.

REDACTED



interviews or any other analysis that these employee positions are involved in the collection of late rent, or if they are, to what extent.[75]

73.     Finally, the estimated figure of time EQR employees spend on tasks related to the collection of delinquent rent is over-broad and includes time spent on tasks that are part of EQR's normal business, unrelated to rent paid on the fifth of the month or later, by late-fee-payers.  As described above in Section 3.2, the employee costs for time spent contacting residents about rent payments from the first of the month through the fourth of the month are a cost of doing business because EQR provides tenants a grace period in its leases before a late fee is charged.  Likewise, employee costs for time spent attempting to collect late rent from tenants who paid rent on time or whose late fees were waived, written off, or not paid would be similarly classified as a cost of doing business unrelated to the late payment of rent by those who paid late fees.[76]  Additionally, as discussed above, Mr. Hosfield's calculations of employee costs based on percentages of time interviewees estimated they have spent on "collection of delinquent rent" include activities that are not considered liquidated by late fees, such as taking possession of a unit when a tenant is evicted, and working on late rent "collections" from tenants who have vacated the property.

**3.5     Mr. Hosfield improperly calculated EQR's "interest cost" without linking it to relevant facts and improperly used EQR's weighted average cost of capital in his calculations.**

74.     In his calculation of EQR's interest costs caused by the late payment of rent, Mr. Hosfield multiplied rent outstanding by EQR's weighted average cost of capital (WACC), as estimated by Mr. Hosfield, at between 6.36% and 8.75%.[77]  As described by Mr. Hosfield, he used "the cost of capital (discount rate) determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure," stating, "Equity's cost of capital is relevant to my calculations of the interest cost of late rent to Equity, because it captures both the interest expense Equity incurs as well as the interest revenue Equity loses from not collecting rent payments on time."[78]

75.     As did PwC in its study, which was the subject of my criticism in Section 3.1.11 of the Tregillis May 10 Report, Mr. Hosfield made no analysis of the "but-for world," in which all of the late rent events that are

---

[75] Hosfield May 10 Report, Appendix B Schedule 5A.
[76] This categorization for employee costs for time spent on tasks related to the collection of late rent for tenants whose late fees were waived, written off, or not paid would also apply to interest costs Mr. Hosfield calculates related to this group of tenants.
[77] Hosfield May 10 Report, pp. 20-26.
[78] Hosfield May 10 Report, p. 20; https://sub.bvresources.com/defaulttextonly.asp?f=bvglossary.

**REDACTED**



at issue would have instead been paid in time to avoid the imposition of a late fee.  A proper analysis of the economic loss to EQR resulting from the late rent payment events at issue in this case requires clear and specific inquiry into those events, comparing what happened with what would have happened in the "but-for world."  But that is not what Mr. Hosfield did.

76.     What Mr. Hosfield did was to generally assign a cost that accounted for a mix of some debt and some equity financing that he presumes EQR has had to incur (in the case of interest cost on debt) or stock that he presumes EQR has had to issue, with an assumed mix of debt and equity that maps to the total market capitalization of EQR, which is more than $30 billion as of market close on July 9, 2021,[79] and its total debt, which was $8.4 billion as of December 31, 2021.[80]  But the evidence available shows that these are irrelevant figures in this context.

77.     As an initial matter, a proper analysis begins with an evaluation of how the but-for world differs from the actual world.  I have prepared the graph below to depict the cash fluctuation associated with outstanding rent of those tenants Mr. Hosfield considers to be class members.  As described above, I understand that Mr. Hosfield's approach has been overly inclusive in that it includes rent owed related to tenants who were evicted or whose accounts went to collections.  But for purposes of my analysis, I conservatively use Mr. Hosfield's figures, as per EQR_Expert_000025.

---

[79] https://finance.yahoo.com/quote/EQR?p=EQR&.tsrc=fin-srch.
[80] https://finance.yahoo.com/quote/EQR/balance-sheet?p=EQR.

**REDACTED**




Rent Outstanding on Class Members, by Day of the Month, 2018

**Notes and Sources:**
[1] EQR_Expert_000025.

78.     The chart above shows graphically the average rent outstanding, by the day of the month, for all of those Mr. Hosfield considers to be class members,[81] for the year 2018 (as a sample year).[82]   In implementation, then, for example, the $17 million on the second of the month represents an average of the second day of each month in the year 2018.  As can be seen above, at the beginning of the month the rent outstanding balance spikes up to an average of $17 million, and then in the first four days of the month, during the grace period, that balance is paid down to just under $9 million on the fifth of the month.  That is depicted in the orange spike and decline, which is a normal part of the business of EQR: large rent outstanding, which is paid down significantly in the grace period.

79.     The graph also shows a blue area, which depicts the actual average of how much rent was paid by tenants in the days from day 5 to day 31, reducing the outstanding balance from just under $9 million to $3 million.  In the but-for world, there would be no late fees, as well as no rent paid late in a manner to trigger a late fee.  In other words, all rent would be paid by the end of the grace period, on the fourth of the month.

---

[81] As described above, Mr. Hosfield includes in his calculations amounts related to evicted tenants and those whose past-due rent went to collection, which I understand that Court has deemed improper to include in this calculation.
[82] These data are from EQR_Expert_000025, which contains RMLEDG data used by Mr. Hosfield in his lost use of funds calculation.

**REDACTED**


Thus, the blue area represents time each month and rent that would have been paid earlier in the but-for world. That is the time and rent at issue in this matter.

80.     One problem with Mr. Hosfield's analysis is that he calculates interest costs on not just the blue area, but also the orange area, assuming that in the but-for world all outstanding rent would have been paid by 12:00 a.m. on the first of the month, and there would be no such thing as outstanding rent (at least not related to class members). In particular, I understand that there must be a link between the acts that give rise to the late fee and the costs associated with those acts, and those acts are the payment of rent *after the grace period, not after the last day of the prior month* (which is particularly at odds with facts since, as I understand it, rent is not due until the end of the 1st, not the 30th or 31st). As a result, it is wrong to include costs associated with grace period days since payment of rent on the fourth of the month does not incur a late fee, but it does create an interest cost that is included by Mr. Hosfield, by virtue of him including the "orange" days in his calculation.

81.     Also relevant is an understanding of how the but-for world differs in terms of the swings of outstanding rent balances. In the but-for world, like the actual world, the peak is reached on the second of the month, at $17 million. And it would fall by just over $8 million in the during the grace period. And it would arguably fall to the same minimum at the end of the month, $3 million. But the difference is that all of the rent that was paid on the "late" days from the 5th to the 31st would have been paid on time to avoid a late fee. In other words, the blue area would be avoided, and the balance would drop to the top of the green area, at $3 million.[83]

82.     The outstanding rent depicted with the green area, which appears to generally relate to collections and evicted tenants, which I understand are not at issue. Thus, one could arguably lower all of the balances by the $3 million that is not paid by the end of the month, which leaves the extent of the orange and blue outstanding rent fluctuations unaffected ($8 million decline in the orange period and $6 million in the blue period). Or even if one were to include the green area, that would mean a one-time reduction of $3 million, but the point is the same: there is a large $14 million spike to a total of $17 million when the month starts,

---

[83] I graphically depicted the last two days of the month, rolling into the first of the month, at the start/left side of the graph, and then again rolling forward into the new month with days one and two appearing on the right side of the graph, to show the cycle.

**REDACTED**


then there are large amounts paid down on that outstanding rent during the grace period, and then there are subsequent payments against outstanding rent after the grace period.

83.      The key point this demonstrates is that paying rent on the 4th of the month instead of the 10th or 20th of the month does not affect the peak or the trough of the fluctuations in rent outstanding.  There is a change in the shape, but the high still has the same fluctuation/spike, because all rent becomes due each month as a part of EQR's business, separate and apart from the payment of rent triggering a late fee.  But Mr. Hosfield's analysis of EQR's lost use of funds includes an interest charge for all outstanding rent due, even at the peak, in the first few days of the month, during the grace period granted as part of EQR's leases.  In other words, the peak is not reached because of activity related to late fees, as the peak occurs during the grace period.  As a result, it is not as if the peak would be lower or there would not be a large increase in rent outstanding each month, absent the triggering of a late rent fee by not paying rent by 11:59 pm on the fourth of the month  That is, Mr. Hosfield has calculated interest costs on rent outstanding spikes that occur regardless of late fee activity, and as a result his calculation is not linked to that activity.  In terms of the graph shown above, the orange spike would still happen each month, while the blue (and arguably green) sections could be eliminated absent late payment of rent by class members.  That is not to say that this would eliminate all late payment of rent by non-class-members, as I understand that they, and late rent related to them, are not at issue in this case.

84.      Furthermore, compared to EQR's outstanding unsecured debt balance at the end of 2018 of $499 million, $6 million dollars only represents 1.2% of EQR's unsecured debt.[84]

85.      Another problem is found in investigation of what EQR actually does with the monies it receives in rent from its tenants.  This was a topic of recent testimony by a representative designated by EQR under Federal Rule of Civil Procedure 30(b)(6), but it was not a topic investigated by Mr. Hosfield.

86.      EQR's Rule 30(b)(6) deponent regarding the lost use of funds attributable to its California residential tenants' late payment of rent, Collin Glancy, testified that rent payments are deposited into various EQR deposit accounts.  Those deposit accounts are regularly (as often as daily or perhaps as

---

[84] EQR_Expert_002923 – EQR_Expert_003082 at '2990; EQR_Expert_000025.

**REDACTED**


infrequently as weekly) swept into EQR's main operating account, which is used to pay for property operating expenses: but these accounts are not interest-bearing.[85]

> Q. Do you know if any of the deposit accounts that hold tenant rent payments are interest-bearing accounts?
>
> Mr. Winn: Objection. Exceeds the scope of the deposition topic. Vague.
>
> A: I don't believe our deposit accounts are interest bearing.

87.     Additionally, Mr. Glancy testified that EQR has sufficient cash on hand to meet its operating obligations:[86]

> Q: Okay. Now, that section states:
>
> The company generally expects to meet its short-term liquidity requirements, including capital expenditures related to maintaining its existing properties and schedules unsecured note and mortgage note repayments, through its working capital, net cash provided by operating activities and borrowing under the Company's revolving credit facility and commercial paper program.
>
> Did I read that correctly?
>
> A: It appears so.
>
> Q: And do you agree with that statement?
>
> A: Generally speaking, yes.
>
> Q: And it's also true that:
>
> The company considers its cash provided by operating activities to be adequate to meet operating requirements and payment of distributions.
>
> Right?
>
> A: Yes. It says that as well.
>
> Q: And do you agree with that statement?
>
> A: Generally speaking, yes.
>
> Q: Have these statements ever been untrue, meaning there came a time when the company did not expect to meet its short-term liquidity requirements or did not consider its cash provided by operating activities to be adequate to meet its operating requirements?
>
> A: I'm not certain.

---

[85] Deposition of Collin Glancy, June 29, 2021, pp. 21-28, 35-37, 42-43.
[86] Deposition of Collin Glancy, June 29, 2021, pp. 77-79.

**REDACTED**



Q: Well, has that ever happened, to your knowledge?

A: Not to my knowledge.

88.     Additionally, Mr. Glancy provided deposition testimony that EQR does not utilize the cash from rent payments to practice active cash management to pay down its debt as cash comes in, and then have the line of credit rise back up when checks are written for operations.[87]  Rather than cash managing by having the line of credit rise and fall, EQR makes payments on debts once per month, when payments are due.[88]

Q: Does Equity Residential use the monthly rent money to pay off debts?

A: We do use money from the main operating account to pay off debts.

Q: Which debts or which kinds of debts?

A: We pay off debt when it is due.

89.     Even when EQR has made debt payments, Mr. Glancy could not recall any time when EQR did not use the main operating account for daily operations.[89]

> A: [W]e use our main operating account to run the business which includes making payments of debt.
>
> Q: Has it ever been the case that you're aware of that the main operating account didn't have enough money to meet the current debt payments that were due at the time?
>
> A: That would be very bad. I am not aware of that having occurred.

90.     This further demonstrates that EQR does not suffer harm from lost-use-of-funds resulting from the late payment of rent.

91.     In summary:

- EQR experiences fluctuations in its main operating account, with the flow of rent coming in and expenses paid from the account, but the effect is generally one of a part of the rent outstanding being delayed each month, leaving the peaks and valleys generally unaffected.

- Unsecured debt (e.g., a line of credit) is in place, but it is not used to pay operating expenses and the balances are not affected by rent payment timing.

- There is no interest paid to EQR on its main operating account or other accounts into which rent from its California tenants is deposited.

---

[87] Deposition of Collin Glancy, June 29, 2021, p. 46.
[88] Deposition of Collin Glancy, June 29, 2021, p. 46.
[89] Deposition of Collin Glancy, June 29, 2021, pp. 47-48.

**REDACTED**



92.     As a result, the evidence shows that EQR has not lost interest income as a result of the late rent payment events at issue in this case.  The evidence also shows that EQR has not incurred higher interest costs related to debt that has been incurred or not paid down because of late rent payments at issue in this case.

93.     One other component of Mr. Hosfield's analysis relates to the idea of stock that has been issued as a result of late rent payment, since the cost of equity is part of the WACC.  But there is no evidence that having outstanding rent that could have been lower by $6 million for a period of weeks each month has led EQR to issue stock.  Nor would it make sense for EQR to issue stock in a month and then buy it back as late rent was paid during that month, only to reissue the stock again the next month.  As a result, Mr. Hosfield's use of a WACC is contradicted by facts.

94.     In addition, Mr. Hosfield's WACC calculation did not include a deduction for taxes, which is part of the formula for the WACC.[90]  This results in his WACC being inflated.

> Depending on the quantity and quality of available data, any one of the models previously set forth may be used to derive the cost of equity capital used in the WACC. The cost of debt capital is often derived based on the weighted-average interest rate that the company actually pays on its interest-bearing debt or on the specific cost of debt associated with the project at issue. The formula for computing the WACC is presented as follows:
>
> $$WACC = We(Ke) + Wd[Kdpt(1 - t)]$$
>
> $We$ = Weight of equity in the capital structure
>
> $Ke$ = Cost of equity, based on one of the models previously described
>
> $Wd$ = Weight of debt in the capital structure
>
> $Kdpt$ = Pre-tax cost of debt
>
> $t$ = Income tax rate [fn 9]
>
> _____
>
> [fn 9]  This input is used to tax effect the cost of debt to capture the income tax benefit associated with the deductibility of interest. Although damages awards are typically treated as taxable income, which normally results in damages calculations being performed pre-tax, this does not mean that the weighted average cost of capital (WACC), even if used in a damages calculation, should not include consideration of the tax effect on the debt component of the WACC.

### 3.5.1   While the facts show that EQR has not suffered interest as a cost, if one were to include interest as a cost the rate should be at the rate of EQR's unsecured borrowing rate, not the WACC.

95.     As described immediately above, Mr. Hosfield used his estimated WACC, at between 6.36% and 8.75% from 2010 to 2020, in his calculation of interest costs incurred by EQR, which I believe is contradicted by the facts of this case.  Moreover, I believe that the effect of the late payment of rent at issue in this case, by class members, is seen in a but-for main operating account balance that would have been higher on

_____
[90] *Discount Rates, Risk, and Uncertainty in Economic Damages Calculations*, American Institute of Certified Public Accountants, p. 21. Note: I was the lead author of this publication.

**REDACTED**



certain days of the month, in the but-for world. But that account and the other deposit accounts do not bear interest, according to Mr. Glancy.

96.     If one were to apply an interest cost, notwithstanding these facts, the rate would not be the WACC, which is based on the issuance of stock. As described above, first, that does not match the nature of the cash balance changes EQR would have experienced without the late payment of rent at issue in this case. Second, there is no evidence that EQR would have issued less stock or engaged in a buyback of stock with the monies at issue, only to reissue stock each month, and not of an amount on the scale of what is at issue in this case (an approximately $6 million outstanding rent balance swing each month, compared to total equity of over $30 billion, as of market close on July 9, 2021).[91]

97.     As a result, the better alternative would be to look at EQR's cost of debt. Mr. Hosfield looked at the totality of EQR's debt when he estimated EQR's WACC, but the WACC is based on a weighted average of all of EQR's debt and equity, not the accounts that would be affected by the rent payments in question. The nature of the balances at issue (swinging each month) does not agree with the prepayment of mortgages on properties, as pre-paying a mortgage and then needing that money again next month due to the recurrent cash swing (that is normal and not related to the late payment of rent at issue in this case) would require monthly refinancings. Rather, the best rate would be the rate of EQR's unsecured borrowing, which was a line of credit until EQR set up a commercial paper program in 2015, and shifted its line of credit balance to commercial paper by February of 2016.[92] Below is a chart I created showing the rates, by month, of EQR's line of credit, which has been at the London InterBank Operating Rate (LIBOR) + 77.5 basis points,[93] and EQR's commercial paper program, which Mr. Glancy testified has averaged 30 basis points over the past five years, during its use.[94] In my opinion, using these rates is far more appropriate than the WACC for calculating EQR's lost use of class members' late rent.[95] A graph showing those rates over the period at issue in this case is below.

---

[91] https://finance.yahoo.com/quote/EQR?p=EQR&.tsrc=fin-srch.
[92] EQR 2015 Form 10-K, p. 11.
[93] Deposition of Collin Glancy, June 29, 2021, p. 49.
[94] Deposition of Collin Glancy, June 29, 2021, p. 56.
[95] I provided the data used to create the chart below to Plaintiffs' expert David Breshears for use in his calculations.

**REDACTED**




**Notes and Sources:**
[1] https://fred.stlouisfed.org
[2] Deposition of Collin Glancy, June 29, 2021, p. 49.
[3] Deposition of Collin Glancy, June 29, 2021, p. 56.  As of February 16, 2016, there was no outstanding balance on the line of credit.  EQR 2015 Form 10-K, p. 11.

**3.6** **Mr. Hosfield used a flawed sampling process for his interviews of EQR employees that did not create a representative sample, and Mr. Hosfield incorrectly applies his interview results to the total population.**

98.      Mr. Hosfield described that his process to calculate employee costs related to rent delinquency started with interviews he conducted with "over 50 employees working at a sample of Equity's communities throughout California."[96]  As described in the report excerpt below, Mr. Hosfield claimed to have selected "representative interviewees," by ranking EQR's California communities using two criteria: number of units in the community and number of late fees charged per month per unit, sorted into quartiles, and then selecting interviewees from properties that would provide representation for each group.[97]

---

[96] Hosfield May 10 Report, p. 13.
[97] Hosfield May 10 Report, p. 13.  It should also be noted that Mr. Hosfield states that the list of EQR employees he interviewed can be found in his Appendix C. However, in Appendix C, he did not include all EQR employees he conducted or attempted to conduct interviews with. Mr. Hosfield dropped interview results from 10 employees who may be class members and had 2 potential interviewees no-show. *See* EQR_Expert_000211.xlsx.

**REDACTED**



*The process for determining Equity's employee costs related to rent delinquency*

To determine the employee costs related to rent delinquency, I conducted interviews of over 50 employees working at a sample of Equity's communities throughout California. To generate a list of representative interviewees, I categorized Equity's communities in California using two criteria: the number of units at each community and the number of late fees charged per month per unit at each community. Next, I ranked each of the two criteria into quartiles. Quartile One reflects the highest 25% in each criterion continuing through Quartile Four, which reflects the lowest 25% in each criterion. I then selected interviewees working at communities that would provide representation for each quartile.[48] A list of the employees I interviewed is provided above and in Appendix C.

99. As stated by the California Supreme Court in *Duran v. US Bank*, "Sampling is a methodology based on inferential statistics and probability theory. 'The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole.' (*In re Chevron U.S.A., Inc.* (5th Cir.1997) 109 F.3d 1016, 1019–1020.) Whether such inferences are supportable, however, depends on how representative the sample is. '[I]nferences from the part to the whole are justified only when the sample is representative.' (Kaye & Freedman, Reference Guide on Statistics, in Reference Manual on Scientific Evidence (3d ed. 2011) 211, 216–217.)." *Duran v. US Bank National Assn,* 59 Cal. 4th 1, 38 (2014). For reasons to be described below, Mr. Hosfield's sample fails this test because it is not representative of the population for which he seeks to apply the results of his interviews.

100. From his description, it appears that Mr. Hosfield has attempted to perform a stratified sample. As described in the chapter "Reference Guide on Survey Research" in the *Reference Manual on Scientific Evidence*, stratified sampling can be done two different ways, each requiring its own application of the results to the population, as shown below.[98]

> Stratified probability sampling can be used to obtain more precise response estimates by using what is known about characteristics of the population that are likely to be associated with the response being measured. Suppose, for example, we anticipated that more-experienced and less-experienced dentists might respond differently to Goldgate toothpaste, and we had information on the year in which each dentist in the population began practicing. By dividing the population of dentists into more- and less-experienced strata (e.g., in practice 15 years or more versus in practice less than 15 years) and then randomly sampling within experience stratum, we would be able to ensure that the sample contained precisely

---

[98] Diamond, Reference Guide on Survey Research, *Reference Manual on Scientific Evidence* (3d ed. 2011) 381-382.

**REDACTED**


> proportionate representation from each stratum, in this case, more- and less-experienced dentists. That is, if 60% of dentists were in practice 15 years or more, we could select 60% of the sample from the more-experienced stratum and 40% from the less-experienced stratum and be sure that the sample would have proportionate representation from each stratum, reducing the likely sampling error.[99]
>
> In proportionate stratified probability sampling, as in simple random sampling, each individual member of the population has an equal chance of being selected. Stratified probability sampling can also disproportionately sample from different strata, a procedure that will produce more precise estimates if some strata are more heterogeneous than others on the measure of interest.[100] Disproportionate sampling may also be used to enable the survey to provide separate estimates for particular subgroups. With disproportionate sampling, sampling weights must be used in the analysis to accurately describe the characteristics of the population as a whole.

[footnotes omitted]

101.    Because of Mr. Hosfield's use of quartiles as strata, there should be an appropriate sample of the properties from each stratum, using both criteria, in a 4x4 array, for 16 total strata, which I have depicted graphically below, including an indication of how many properties in the survey were from each stratum (considering surveys of both office management and leasing employees).

**EQR Property Sampling Distribution in Office Management and Leasing Employees Interviews**

|  | Quartile | Number of Late Fees Charged per Unit per Month | | | | Total |
|  |  | 1 | 2 | 3 | 4 |  |
| Number of Units | 1 | 3 | 1 | 6 | 1 | 11 |
|  | 2 | 4 | 2 | 3 | 2 | 11 |
|  | 3 | 1 | 7 | 2 | 3 | 13 |
|  | 4 | 1 | 0 | 1 | 4 | 6 |
|  | Total | 9 | 10 | 12 | 10 | 41 |

Source: Expert Report and Disclosure of Mark J. Hosfield, May 10, 2021, Appendix E.

102.    The unequal and small sampling seen above (with one stratum having no respondents who are either office management or leasing employees) raises concerns, with no indication of the number of properties in each of the strata (from which the sample was selected), how the samples were selected, how the sample (out of the total population of properties in each stratum) provides a sufficient number to yield a reliable result, or what degree of confidence or range of error there is for and with these samples.

103.    If one were to perform the same analysis of how many properties were from each stratum, focusing only on the EQR *Office Management employees* interviewed by Mr. Hosfield (the EQR employees Mr. Hosfield asserts spend the most time on collection of delinquent rent), the sampling raises similar concerns (with four strata having no respondents who are office management employees). I have graphically depicted this issue below.

**REDACTED**


**EQR Property Sampling Distribution in Office Management Interviews**

| | | Number of Late Fees Charged per Unit per Month | | | | |
|---|---|---|---|---|---|---|
| | Quartile | 1 | 2 | 3 | 4 | Total |
| Number of Units | 1 | 2 | 1 | 4 | 1 | 8 |
| | 2 | 3 | 2 | 2 | 0 | 7 |
| | 3 | 0 | 6 | 1 | 3 | 10 |
| | 4 | 0 | 0 | 1 | 2 | 3 |
| | Total | 5 | 9 | 8 | 6 | 28 |

Source: Expert Report and Disclosure of Mark J. Hosfield, May 10, 2021, Appendix C Summary - Office Management and Appendix E.

104. Nor did Mr. Hosfield take the results of his survey and apply the information from the strata to make inferences about the total population. Specifically, a stratified sample requires that the results of each stratum are weighted according to the size of that sub-population. For example, if two strata each have four respondents, but the first stratum has twice as many members in the general population, then the first stratum's survey results are to be doubly-weighted, even if the two strata are tested with the same number of respondents. This is not what Mr. Hosfield did. As a result, Mr. Hosfield has not provided a basis to conclude that his sample is representative.

105. Mr. Hosfield also does not describe how he selected which employees to interview. From the 41 properties selected, Mr. Hosfield's 59 interviews–26 office management, 33 leasing employees–show he did not interview EQR employees from both employee categories at each sample property.[99] He also made no reference to any attention to random selection of his sample.

106. This issue is further demonstrated by Mr. Hosfield not conducting additional interviews to replace the interview results he dropped due to interviewees potentially being class members and the two interviewees that did not show up for their interviews. Of the 11 interviews or attempted interviews, Mr. Hosfield's attempted sample of EQR properties dropped from 49 potential properties in the sample to 41 properties.[100] While I do not disagree with Mr. Hosfield's choice to drop the interview results from those interviewees that may be class members, Mr. Hosfield did not address the effect of the excluded responses and nonresponses.[101]

---

[99] Hosfield May 10 Report, pp. 3-4.
[100] Hosfield May 10 Report, Appendix C; EQR_Expert_000211.xlsx.
[101] Diamond, Reference Guide on Survey Research, *Reference Manual on Scientific Evidence* (3d ed. 2011) 383.

**REDACTED**



107.    Mr. Hosfield also did not explain how his 26 office management interviews provided him with information on the 18 office management positions to which he applied his survey results, nor how his survey aligns with how much of each of these specific costs are associated with the late payment of rent (or the late payment of rent by late-fee-payers):[102]

| Office Management Job Title Costs | Allocable Costs Related to Office Management Job Titles [2] | | Leasing Job Title Costs |
|---|---|---|---|
| General Manager | Contract Leasing | $ | Leasing Consultant |
| Other Office Administrative | Bonus Reserve | | Admin Role Unknown [1] |
| Admin Role Unknown [1] | Temporary Agency Expenses | | Leasing Manager |
| Manager | ESPP | | Senior Leasing Consultant |
| Assistant Manager | 401K | | Area Leasing Consultant |
| Community Manager | Vacation/Trading Day Expense | | Leasing Administrator |
| Community Administrator | Independent Contractors | | Affordable Leasing Administrator |
| Customer Support Assistant | Performance Bonus | | Total |
| Assistant Community Manager | | | |
| Service Manager | | | Allocable Costs Related to Leasing Job Titles |
| Residential Financial Specialist | | | Contract Leasing |
| Area Manager | | | Bonus Reserve |
| Manager Sales Initiatives | | | Temporary Agency Expenses |
| Berkeley Resident Manager | | | ESPP |
| Floating Community Manager | | | 401K |
| Senior Community Administrator | | | Vacation/Trading Day Expense |
| Regional Facilities Manager | | | Independent Contractors |
| Manager Operations Initiatives | | | Performance Bonus |
| | | | Total |
| | | | Total Leasing Job Title Costs |

Notes:
[1] I allocated Admin Role Unknown Job Title costs to Office Management by multiplying the Admin Role Unknown Job Title costs by the Office Management Portion of Total Payroll Costs (see Appendix B, Schedule 4A).
[2] I allocated Allocable Costs to Office Management by multiplying Allocable Costs by the Office Management Portion of Total Payroll Costs (see Appendix B, Schedule 4A).

108.    In addition, there is no indication of what feedback was given to respondents who asked questions or did not understand the questions posed to them, or what information was provided to the respondents in advance of their response to the questions.

109.    Finally, as described in the Background and Overview section of this report, Mr. Hosfield used either two or three different surveys, with no explanation of whether that was appropriate or the effect of the differences or reasons for change in the survey questions.  Nor did he explain or consider how questions and points discussed prior to the questions with answers used in his cost calculations (*e.g.*, how many hours spent on rent collection) might affect the interviewees' responses to his questions that were relevant to his calculations.  These included questions such as whether the respondent thought that rent collection was a "time suck,"[103] "Experts Say That an Average American Office Worker Received Approximately 120

---

[102] Hosfield May 10 Report, Appendix B, Schedules 1A, 2A.
[103] EQR_Expert_000771 and EQR_Expert_000777.

**REDACTED**



Work Emails Every Workday, What Do You Think Your Average Is?",[104] and "Describe The Worst Rent Collection Episode You Can Remember."[105]  Mr. Hosfield also did not describe how he reconciled inconsistent answers when he recapped and reviewed the questions and answers with respondents.

110.     Specifically, according to Mr. Hosfield, at the end of each interview, he read back the interviewee's responses to allow the interviewee to review for accuracy.[106]  The inclusion of rent collection follow-up questions, and especially in the context of leading questions such as those described above, may have affected interviewees to increase their estimated time spent on collection of late rent upon review.

111.     The examples above are types of response bias, which is seen when a respondent is/has been given a response that reflects intentional or unintentional bias as a result of the form of the survey.  For example, demand bias can be seen when a respondent is aware that they are part of a study, so they give answers that are altered because the questions are about a specific topic, and the respondent may think they know why they are being asked these questions.  Below are examples of response bias in surveys.[107]

---

[104] EQR_Expert_000771.
[105] EQR_Expert_000771.
[106] Hosfield May 10 Report, p. 14.
[107] https://www.nextiva.com/blog/response-bias.html.

**REDACTED**


## 1) Demand Characteristics

One of the more common types of response bias, demand bias, comes from the respondents being influenced simply by being part of the study.

This happens as respondents actually change their behavior and opinions as a result of taking part in the study itself. This can happen for several reasons, but it is important to understand each to be able to deal with each form of this response bias problem.

**Participants who look to understand the purpose of the survey**

For instance, if the survey is looking into a user experience of a website, a participant may see that the aim is to gather data to support making changes to layout or content.

The participant may then answer in a way that supports those changes, rather than as they really think, resulting in untruthful or inaccurate responses.

**The setting of the survey or study**

This is more applicable to surveys carried out in person, where researchers conducting the survey can have an influence on the respondents, but it can apply to digital surveys too.

**Interaction between researcher and respondent**

This can influence how the survey is approached. Note that if it's a digital survey that researcher-to-respondent interaction is still possible, occurring in the email or message used to invite the respondent to participate.

**Wording bias can come into effect here as well**

This type of bias influences the entire gamut of responses from individual or multiple participants. For instance, if the researcher knows the participant personally, even greeting them in a friendly manner can have a subconscious effect on the responses.

This is as true in an email as it is in person, so by retaining a formal approach to all participants regardless of who they are you can ensure a uniform response from all participants.

**Prior knowledge of the survey**

Whether the questions themselves, or the general aims of the survey, or how it is being put together, prior knowledge of some aspects of the survey deliver response bias.

This is because the participants can become preoccupied with the survey itself, resulting in those participants second-guessing their own answers and providing inaccurate responses as a result.

## 5) Acquiescence Bias



Acquiescence bias is a form of response bias where participants respond in agreement with all questions within the survey. In most cases, if your survey is well designed, that results in the participant agreeing with at least two contradictory statements. The answers provided this way are then no longer accurate or truthful.

The reality is that all of us have our unique view of the world, and it is highly unlikely anyone will agree with everything on a survey. To figure out how to combat this type of bias, let's look first at how this kind of bias occurs.

There has been much research carried out on this kind of response. American educational psychologist Lee Cronbach theorized that it is a result of the participant looking at the question and actively searching for information from their own experiences to support it. Others have suggested it stems from a need to please researchers, but Cronbach's approach is considered the most relevant.

As an example of this, a survey may contain two questions:

- "Are you outgoing and social?"
- "Which do you prefer: a quiet night in or a raging party?"

A respondent could answer yes to the first question, because we all like to think of ourselves as likeable, social people.

However, when faced with the second question, they may remember a nice night in they had enjoyed recently and answer with that. Those two answers may seem to contradict each other. Both, however, would be genuine, truthful answers from the participant's perspective.

112.     These problems undermine the integrity of not only the sample procedure and whether the sample was representative of the whole of the employee costs Mr. Hosfield allocated to rent collection,[108] but also the accuracy of data used, which is further complicated by Mr. Hosfield providing no discussion of which survey he used for which respondents and why the different questionnaires could be used interchangeably. *See also Duran v. US Bank*, 59 Cal. 4th 1, 42-49 (2014) (describing errors that will make a sample unreliable, including where the size of the sample is too small, the sample is not random, and the margin of error is "intolerably large.").

---

[108] Kaye and Freedman, Reference Guide on Statistics, *Reference Manual on Scientific Evidence* (3d ed. 2011) 383

**REDACTED**


**3.7 Mr. Hosfield did not provide adequate support to justify his application of interview time estimates of employee time in 2020 and 2021 to estimate employee time spent on late rent collection from September 2010 through February 2020.**

113.    In the interviews Mr. Hosfield conducted with EQR employees regarding their time, Mr. Hosfield instructed his interviewees to estimate their time spent on tasks performed as part of their work, before the COVID-19 pandemic hit in March 2020.[109]  However, as described above, Mr. Hosfield's interview process was flawed.  For example, the pre-COVID instruction did not appear until the EQR_Expert_000777 version of Mr. Hosfield's questionnaire, which appears to have been used for interviews conducted in July 2020 and thereafter but not to those conducted in May or June 2020.[110]  The following excerpts from EQR_Expert_000771 and EQR_Expert_000777 demonstrate this difference.

> II.    **JOB FUNCTIONS**
>
> •    If Property "Management" Includes The Following General Tasks, Which Ones
>      Do You Do At Work?:

> II.    **JOB FUNCTIONS (time should be given pre-COVID)**
>
> •    If Property "Management" Includes The Following General Tasks, Which Ones
>      Do You Do At Work?:

114.    The lack of inclusion of the pre-COVID time estimate instruction in some of the interviews potentially impacts the accuracy of Mr. Hosfield's calculation of employee time spent on collecting late rent during the class period, as financial hardships during the COVID-19 pandemic may have caused more tenants to pay rent late, given governmental protections enacted, including the moratorium on evictions and suspension of charging late fees to tenants who signed a COVID-19 declaration.[111]

115.    Mr. Hosfield stated he believes his process is conservative "because the percentage of time Equity employees spend on rent delinquency is driven by the proportion of the population that is delinquent in paying their rent," and "the data shows that rent delinquency in the years 2011 through 2017 was generally

---

[109] Hosfield May 10 Report, pp. 14-15.
[110] EQR_Expert_000771 – EQR_Expert_000776 at '772; EQR_Expert_000777 – EQR_Expert_000779 at '777.
[111] https://www.jdsupra.com/legalnews/california-extends-covid-19-eviction-8371553/.  Moreover, as discussed above, the inconsistent and unsystematic way that Mr. Hosfield asked his questions affects the reliability of his results and undercuts his assertion that the survey responses are representative of the broader population.

**REDACTED**


greater than in 2018 and 2019."[112]  As visual support, Mr. Hosfield created a graph that details the number of late fees charged by EQR from 2011 through 2019, shown below.[113]



116.    Additionally, Mr. Hosfield stated that he understands there have not been technological advances that have impacted the delinquent rent collection process since 2013, a point he references to justify his use of 2018-2019 time estimates as a proxy for employee time from September 2010 through February 2020.[114]

117.    The support Mr. Hosfield provided for his employee time calculation process is insufficient and improper.  First, while Mr. Hosfield referenced data from 2018 and 2019 as justification for his use of his survey, his survey was performed in 2020 and 2021, as discussed above, and during the economic turmoil of the COVID-19 pandemic.

118.    In addition, Mr. Hosfield stated that employee time spent on rent delinquency is driven by the *proportion of the population that pays rent late*.  To make this point, then, Mr. Hosfield should have looked at the *percentage of tenants who pay rent late*.  But the data Mr. Hosfield describes and charts in his graph only examine the *total number of late fees charged*.  Mr. Hosfield's data is therefore inapt to support his position.

---
[112] Hosfield May 10 Report, p. 15.
[113] Hosfield May 10 Report, p. 15.
[114] Hosfield May 10 Report, p. 16.

**REDACTED**



119.    Moreover, Mr. Hosfield's position is flawed.  For example, it is possible that at one property, the proportion of the tenants who pay rent late is small, but those tenants require a lot handholding from EQR employees to cause them to pay rent, thus demanding a large share of the employee's time to collect rent, while at another property, the proportion is large, but the tenants at this other property only need an automated reminder from MRI to eventually pay their rent, thus occupying little to no employee time.

120.    In addition, as described above, EQR's data show EQR waives or writes off some amount of late fees charged, so the total number of late fees *charged* is not the delinquent rent at issue when considering the costs that may be offset from class members' restitution in this matter—it is the late fees *paid*.

121.    Moreover, there are numerous factors that can change the proportion of the tenant population that is delinquent in paying rent, while the total number of late fees charged remains constant, and Mr. Hosfield does not account for or address any of these factors.  Factors that could impact the proportion that drives the percentage of employee time spent on delinquent rent include, but are not limited to, the number of EQR's California properties, occupancy rates at each property, and the total number of tenants.  Without accounting these factors, Mr. Hosfield has not analyzed what he states is the driver of employee time spent on delinquent rent, nor does the analysis he has presented support his conclusions.  Based on the information available to and received by Mr. Hosfield, he could have performed the requisite supporting analysis, but did not.[115]

122.    Mr. Hosfield also did not address the fact that consumer technology has become more affordable and available, which has likely to led to an increase a tenant's ability to receive electronic communications with reminders to pay rent, as well as pay rent electronically, rather than with physical checks.  This change, which I referenced in the Tregillis May 10 Report,[116] has simplified and facilitated contacting tenants who pay rent late, as well as efficiency in the collection of late rent, from 1997 (the year that was the primary focus of the PwC Report) to 2008 (the year EQR adopted the Standard Late Fee), to the present.

---

[115] Hosfield May 10 Report, Exhibit 2; Chart.pdf.
[116] Tregillis May 10 Report, p. 27.

**REDACTED**



**3.8  Mr. Hosfield's calculation of EQR's potential savings on employee costs in the absence of delinquent rent lacks support and evidence and is inconsistent with his interviews with EQR personnel.**

123.    As described above, Mr. Hosfield performed an alternative calculation of a reasonable late fee by calculating EQR's potential cost savings if all tenants paid rent on time.  To calculate the potential cost savings in regards to employee costs, Mr. Hosfield conducted interviews with four EQR leadership personnel, who reviewed EQR employee lists for various California markets and hypothesized how staffing would change in the absence of delinquent rent.[117]  Mr. Hosfield, as described above, calculated that EQR would hypothetically reduce its employee costs by 9.78% by eliminating, reducing, or sharing among properties certain employees involved in the collection of delinquent rent.[118]  Mr. Hosfield stated that this percentage reduction is based on 2017 data, and he learned from EQR leadership personnel that EQR would expect "a similar percentage reduction in staffing any year from September 2010 through February 2020 if all residents paid their rent on time."[119]

124.    The foundational premise of this analysis is not substantiated with evidence.  The primary support Mr. Hosfield offers for these theoretical savings is a statement from Debra Rivera, Vice President - Property Management for EQR, who said (apparently to Mr. Hosfield) that "Equity is constantly looking for ways to reduce its employee costs," and "Equity has a history of reducing headcount when changes in the environment or technology, such as new software or process management, reduces needs or increases efficiency."[120]  Mr. Hosfield did not perform any calculations or cite any figures that test or support Ms. Rivera's claim that EQR has a history of reducing headcount when possible.  For example, Mr. Hosfield could have asked questions such as: Which employees have been terminated, or had their hours reduced, or been demoted when rent was not paid late in a month or in a longer period of time at EQR properties?

125.    Data regarding this issue were available to Mr. Hosfield, but not analyzed or referenced.  For example, WP004065 CONFIDENTIAL.xls contains information about which properties had how much late fee activity and the amount of late fees, per month.  Below is an excerpt of that schedule, showing a decrease in early 2006 of late fee activity at Greenhaven.[121]

---

[117] Hosfield May 10 Report, pp. 28-29.
[118] Hosfield May 10 Report, p. 30.
[119] Hosfield May 10 Report, p. 30.
[120] Hosfield May 10 Report, p. 31.
[121] WP004065 CONFIDENTIAL.xls.

**REDACTED**


| | Late Charges Feb | Late Charges Mar | Late Charges Apr | Late Charges May | Late Charges Jun | Late Charges Jul | Late Charges Aug | Late Charges Sep |
|---|---|---|---|---|---|---|---|---|
| | Property Level | Property Level | Property Level | Property Level | Property Level | Property Level | Property Level | Property Level |
| | Actual (2006) | Actual (2006) | Actual (2006) | Actual (2006) | Actual (2006) | Actual (2006) | Actual (2006) | Actual (2006) |
| Greenhaven | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ | ▮ |

126.    But in those same months there was no decrease in P/R-Admin salaries evidencing the purported cost savings.[122]

| | February | March | April | May | June | July | August | September |
|---|---|---|---|---|---|---|---|---|
| | P/R-SALARY-Admin | P/R-SALARY-Admin | P/R-SALARY-Admin | P/R-SALARY-Admin | P/R-SALARY-Admin | P/R-SALARY-Admin | P/R-SALARY-Admin | P/R-SALARY-Admin |
| | Property | Property | Property | Property | Property | Property | Property | Property |
| | Actual 2006 | Actual 2006 | Actual 2006 | Actual 2006 | Actual 2006 | Actual 2006 | Actual 2006 | Actual 2006 |
| Greenhaven | $9,544.18 | $9,596.18 | $11,515.76 | $7,516.18 | $7,840.18 | $10,332.42 | $6,901.78 | $7,271.68 |

127.    Similar examples can be found in WP003890 CONFIDENTIAL.xlsx, which contains the same information as WP004065 CONFIDENTIAL.xls, but for the time-period October 2017 through February 2020.  Below are two excerpts from WP003890, showing a decrease in late fee charges from August 2018 through May 2019 at Westside Barry and a decrease in late fee charges at Del Mar Ridge from August 2019 through December 2019.[123]

| | | PROP EQ504510 Late Charges Actual (2018) Aug | PROP EQ504510 Late Charges Actual (2018) Sep | PROP EQ504510 Late Charges Actual (2018) Oct | PROP EQ504510 Late Charges Actual (2018) Nov | PROP EQ504510 Late Charges Actual (2018) Dec | PROP EQ504510 Late Charges Actual (2019) Jan | PROP EQ504510 Late Charges Actual (2019) Feb | PROP EQ504510 Late Charges Actual (2019) Mar | PROP EQ504510 Late Charges Actual (2019) Apr | PROP EQ504510 Late Charges Actual (2019) May |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westside Barry | 24222 | ▮ | ▮ | | ▮ | | ▮ | | ▮ | | ▮ |

| | | PROP EQ504510 Late Charges Actual (2019) Aug | PROP EQ504510 Late Charges Actual (2019) Sep | PROP EQ504510 Late Charges Actual (2019) Oct | PROP EQ504510 Late Charges Actual (2019) Nov | PROP EQ504510 Late Charges Actual (2019) Dec |
|---|---|---|---|---|---|---|
| Del Mar Ridge | 29189 | ▮ | ▮ | | ▮ | ▮ |

128.    Like with the Greenhaven example above, in those same months, there was no decrease in P/R-Admin salaries.[124]  In fact, the P/R-Admin salaries increased during the respective time periods at both Westside Barry and Del Mar Ridge.[125]

| | | PROP P/R-Salary-Admin Actual (2018) Aug | PROP P/R-SALARY-Admin Actual (2018) Sep | PROP P/R-SALARY-Admin Actual (2018) Oct | PROP P/R-SALARY-Admin Actual (2018) Nov | PROP P/R-SALARY-Admin Actual (2018) Dec | PROP P/R-SALARY-Admin Actual (2019) Jan | PROP P/R-SALARY-Admin Actual (2019) Feb | PROP P/R-SALARY-Admin Actual (2019) Mar | PROP P/R-SALARY-Admin Actual (2019) Apr | PROP P/R-SALARY-Admin Actual (2019) May |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Westside Barry | 24222 | $972.81 | $949.87 | $964.69 | $963.26 | $740.61 | $1,410.25 | $1,057.26 | $1,045.94 | $1,043.15 | $1,048.72 |

| | | PROP P/R-SALARY-Admin Actual (2019) Aug | PROP P/R-SALARY-Admin Actual (2019) Sep | PROP P/R-SALARY-Admin Actual (2019) Oct | PROP P/R-SALARY-Admin Actual (2019) Nov | PROP P/R-SALARY-Admin Actual (2019) Dec |
|---|---|---|---|---|---|---|
| Del Mar Ridge | 29189 | $6,658.53 | $8,244.50 | $8,271.22 | $8,215.54 | $8,069.39 |

---

[122] WP004065 CONFIDENTIAL.xls.
[123] WP003890  CONFIDENTIAL.xlsx.
[124] WP003890  CONFIDENTIAL.xlsx.
[125] WP003890  CONFIDENTIAL.xlsx.

**REDACTED**


129.    Did EQR act as Ms. Rivera indicated?  Was anyone added or let go or hours reduced when there was little or no late rent to collect?  Mr. Hosfield appears to have made no investigation of this, although objective data were available to him.

130.    In addition to not performing any analysis of examples of actual historical staffing changes, Mr. Hosfield did not provide nor state that he reviewed any contemporaneous correspondence or analysis in the normal course of business, conducted by EQR's leadership personnel, in which EQR concluded whether a position could be eliminated, or have its titles and responsibilities changed, or if an employee could be shared by properties or cut from full-time to part-time, all of which are important components in Mr. Hosfield's analysis and are the gravamen of the cost savings that he claimed to be possible.

131.    In addition, as described above, despite Ms. Rivera's discussions with Mr. Hosfield in which she stated EQR has constantly looked to reduce, and has a history of reducing, headcount and employee costs when possible, her representations are contradicted by her Rule 30(b)(6) deposition testimony.  As described above, Ms. Rivera stated in her deposition that she could only recall two instances in which staffing at EQR's California properties was impacted (and it was only in part) by the late payment of rent, and in both instances a single employee position was upgraded to the level of assistant community manager.[126]

132.    Ms. Rivera did not recall any instance in which EQR reduced staffing related to variations in the late payment of rent.  Additionally, Ms. Rivera stated that EQR conducts staffing level assessments at its California properties multiple times per year and EQR does not keep official records of these positional management reviews.[127]

133.    As a result, even though EQR may state it has a historical track record of reducing headcount when possible, this position is unsupported and contradicted by the information available.

134.    Furthermore, Mr. Hosfield's results are inconsistent with the results from his EQR employee interviews, assuming, for argument's sake, that the time estimates are accurate.  As described above, based on the interview results Mr. Hosfield reported, the leasing employees, all hourly employees, that Mr. Hosfield interviewed worked an average of 40.06 hours per week and spend 1.78 hours per week on late-

---

[126] Rivera Deposition, pp. 44-56.
[127] Rivera Deposition, pp. 42-44.

**REDACTED**



rent-related tasks.  The results from Mr. Hosfield's interviews demonstrate that if there was no delinquent rent, leasing employees would still be working essentially full-time work weeks, and there would be no reduction in staffing in this department.

135.     Conducting the same analysis using the reported interview responses of the office management employees Mr. Hosfield interviewed, and again assuming for argument's sake that the time estimates are accurate, office management employees worked an average of 42.65 hours per week, 5.32 hours of which were spent on late-rent-related tasks.  The straight removal of these tasks would mean office management employees work an average of 37.33 hours per week, which is also essentially full-time.  I also note that almost all the office management personnel Mr. Hosfield interviewed hold salaried positions, whose compensation is apparently unaffected by the number of hours an individual works.

**3.9**     **Mr. Hosfield's comparison of EQR's average cost per late fee incurred/saved to the average late fee charged is improper and cannot be used to assess the reasonableness of Equity's late fees.**

136.     As described above, Mr. Hosfield divided his total revenue and cost figures to arrive at EQR's average revenue per late fee vs. average cost per late fee, which he used to support his position that EQR's costs attributable to late rent exceed the late fees paid by class members.[128]

137.     As described above, Mr. Hosfield's calculations of EQR's costs incurred categorically include improper and unsubstantiated costs (*e.g.*, 1. interest costs based on an improper use of a WACC, when the evidence shows additional rent monies would have sat in non-interest-bearing accounts, 2. personnel costs not demonstrated to be incremental and the subject a faulty survey analysis, 3. costs related to rent collection and interest costs from the grace period or waived or written off late fees, and 4. costs related to late fee events defined by the Court to be improper for inclusion as a cost offset in this matter).  These overstatements of costs incurred flow through to the average cost incurred per late fee.  This makes the figures Mr. Hosfield calculates for EQR's average cost per late fee inaccurate as a point of comparison to determine whether EQR suffered a net loss from class members' late payment of rent.

138.     As also detailed above, Mr. Hosfield's calculations of EQR's potential cost savings if all tenants paid rent on time are unsupported and inconsistent with his other calculations and findings—especially

---

[128] Hosfield May 10 Report, p. 33.

**REDACTED**


those relating to potentially saved employee costs. They are also inconsistent with the testimony of Ms. Rivera and do not account for EQR's actual history of staffing and expense levels, which have been shown to be unaffected by the amount of late fees. For these reasons as well, it is improper to use the average hypothetical cost savings per late fee as a comparison point to determine whether EQR's costs of class members' late rent payments exceed the amount of late fees class members have paid to EQR, including as part of a per-late-fee calculation.

139. Mr. Hosfield's use of average late fees charged as the other point of comparison is also improper because it is inaccurate and does not reflect EQR's revenues at issue (late fees charged and *paid* by class members), as described in the Tregillis May 10 Report.[129]

140. First, the dollar amount and number of late fees charged does not reflect EQR's revenues at issue because the figure does not account for late fee reversals, late fees waived, or late fees not paid. Mr. Hosfield noted that there are reversals of late fees charged but he did not account for the reversals of some late fees charged, in his final comparison.[130] Using the late fees charged figures related to members of the Standard Late Fee Class, as calculated by Mr. Hosfield, accounting for reversals of late fees, leads to an increase in the average late fee charged from $85.04 to $87.92, as can be seen below.



Sources:
[1] Expert Report and Disclosure of Mark J. Hosfield, May 10, 2021, p. 12.

141. Moreover, Mr. Hosfield's comparison is inappropriate because it does not follow the standard established under *Beasley* and *Garrett*. *See Beasley*, 235 Cal. App. 3d at 1403 (holding that evidence proving offset damages under *Garrett* must establish "a direct causal link between the breaches underlying the litigation and the actual damages caused by those breaches."). Mr. Hosfield compared the late fees *charged to the class members* to EQR's costs *caused by late rent payers*. The aggregation of EQR's costs incurred because of all late payers of rent includes costs EQR incurred because of late rent payers who are not class members. For example, in Mr. Hosfield's calculation of EQR's employee costs incurred, he

---

[129] Tregillis May 10 Report, p. 33.
[130] Hosfield May 10 Report, pp. 12, 33.

**REDACTED**


did not break out those costs attributable only to class members who paid rent late, nor did he offer an explanation how his results would be affected by this. For this reason, the costs Mr. Hosfield concluded that EQR incurred are not all caused by the breaches by class members at issue in this matter.

142. For these reasons, Mr. Hosfield's comparisons cannot be used to accurately evaluate the reasonableness of EQR's late fees at issue in this matter.

**3.10** **Mr. Hosfield's statement that a percentage late fee is economically sound is flawed and unsupported.**

143. At the end of his report, Mr. Hosfield asserted that a "percentage late fee, such as Equity's 5% late fee, is economically sound in that it tracks with inflation, i.e., as rents and costs increase, so does the late fee."[131] In support of this claim, the only analysis Mr. Hosfield offered is the charts he provided earlier in his report, indicating that EQR's costs related to the late payment of rent have generally increased over time.[132]

144. Had Mr. Hosfield conducted any analysis or researched if percentage late fees track with inflation, he would have found information contradictory to his assertion, especially as the argument pertains to California. Published at the end of 2019, RENTCafé released a report in which it analyzed housing trends in the U.S. from 2010 to 2019, utilizing data from the U.S. Census Bureau, Yardi Matrix, PropertyShark, and U.S. News & World Report.[133] A key finding in this report is shown below, where for many major California cities, the percent change in rent from 2010 to 2019 far outpaced the percent change in median household income.[134] For example, in Los Angeles, average rent increased 65% over this time period while the median household income only increased 36%.[135]

---

[131] Hosfield May 10 Report, p. 48.
[132] Hosfield May 10 Report, p. 48.
[133] https://www.rentcafe.com/blog/rental-market/market-snapshots/renting-america-housing-changed-past-decade/.
[134] https://www.rentcafe.com/blog/rental-market/market-snapshots/renting-america-housing-changed-past-decade/.
[135] https://www.rentcafe.com/blog/rental-market/market-snapshots/renting-america-housing-changed-past-decade/.

**REDACTED**



| City | Average Rent 2019 | % Change Average Rent | Median Home Price 2019 | % Change Median Home Price | Median Household Income 2019 | % Change Median Household Income |
|---|---|---|---|---|---|---|
| Los Angeles | $2,527 | 65% | $774,000 | 96% | $64,036 | 36% |
| Phoenix* | $1,113 | 71% | $256,148 | 144% | $59,406 | 41% |
| San Diego | $2,225 | 54% | $610,000 | 79% | $81,637 | 36% |
| San Jose | $2,697 | 74% | $975,000 | 124% | $115,862 | 51% |
| Jacksonville* | $1,098 | 46% | $171,790 | 41% | $55,626 | 22% |
| San Francisco | $3,680 | 70% | $1,300,000 | 95% | $115,185 | 61% |
| Seattle* | $2,124 | 77% | $716,475 | 95% | $95,818 | 59% |
| Denver* | $1,660 | 85% | $430,500 | 104% | $70,086 | 55% |
| Washington, D.C.* | $2,235 | 31% | $663,175 | 60% | $87,333 | 43% |
| Portland | $1,536 | 59% | $365,000 | 67% | $74,924 | 59% |
| Las Vegas* | $1,111 | 49% | $267,818 | 93% | $54,914 | 8% |
| Baltimore | $1,266 | 32% | $115,000 | 26% | $52,275 | 36% |
| Tucson | $893 | 40% | $189,065 | 44% | $44,768 | 23% |
| Sacramento | $1,439 | 69% | $347,000 | 128% | $66,672 | 43% |
| Mesa* | $1,085 | 76% | $262,400 | 112% | $59,703 | 33% |
| Long Beach* | $2,103 | 57% | $585,000 | 89% | $63,150 | 23% |
| Atlanta* | $1,474 | 65% | $251,125 | 98% | $66,979 | 61% |
| Virginia Beach* | $1,221 | 21% | $265,219 | 18% | $78,985 | 23% |
| Colorado Springs* | $1,187 | 72% | $297,249 | 64% | $66,964 | 34% |

145.    This report provides evidence that a percentage late fee does not track with inflation, and especially in the California market–where EQR's properties at issue in this matter are located–thus invalidating Mr. Hosfield's argument that EQR's percentage-based late fee is economically sound.

146.    Additionally, even if EQR's late fee were "economically sound" by tracking inflation, that is beside the point.  Following the standard set in *Beasley* (holding *Garrett*), *Crossroads*, and Cal. Civ. Code § 3300, in order to be lawful in California, any late fee charged still must be directly linked to the harm caused by the breach at issue, the late payment of rent.

Submitted this 9th day of July, 2021.

Christian Tregillis, CPA, ABV, CFF, CLP

**REDACTED**

# EXHIBIT 5

REDACTED

# UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

JAVANNI MUNGUIA-BROWN, ANGELINA MAGANA, NORMA RODRIGUEZ, and DAVID
BONFANTI individually and on behalf of others similarly situated

vs.

EQUITY RESIDENTIAL, ERP OPERATING LIMITED PARTNERSHIP, EQUITY
RESIDENTIAL MANAGEMENT, L.L.C., EQR-WOODLAND PARK A LIMITED PARTNERSHIP,
and EQR-WOODLAND PARK B LIMITED PARTNERSHIP

Case 4:16-cv-01225-JSW-TSH

SUPPLEMENTAL AND REBUTTAL EXPERT REPORT OF DAVID BRESHEARS, CPA/CFF

July 9, 2021

**REDACTED**

## I.     Introduction

1.  The opinions expressed in this report are my present opinions subject to the following reservations. Amendments or additions to this report may be required as a result of developments prior to or at trial, including, but not limited to, the discovery of new evidence, expert discovery, and/or the testimony of any other witness in deposition or at trial.

2.  I anticipate using at trial selected exhibits attached to this report, documents reviewed in connection with their preparation, enhanced graphic versions of selected exhibits included in this report (i.e., redrafted to improve their presentation quality) and additional graphics illustrating concepts described in this report.

## II.    Assignment

3.  I have been retained by Class Counsel in the matter of *Javanni Munguia-Brown, et al. vs. Equity Residential, et al.* Plaintiffs, who have resided in Defendants' California rental properties, allege that Defendants have a policy and practice of charging fees for late payment of rent that are unlawful and excessive. I previously issued a declaration, dated October 16, 2020, in support of Plaintiffs' motion to dismiss Defendants' debt collection set-off claims (ECF No. 194-2) and an expert report, dated May 10, 2021, where I reviewed the records from Defendants' MRI residential property management database as they relate to Standard Late Fee Class Members and Woodland Park Preexisting Lease Class Members' allegations.

4.  Standard Late Fee Class Members are current and former tenants of Defendants' California rental properties who were charged one or more late fees under the Standard Late Fee provision of their leases (5% of their outstanding balances, minimum of $50, for late rent payments, which I refer to as the "Standard Late Fee") between September 3, 2010 and October 23, 2017. Woodland Park Preexisting Lease Class Members are those tenants who lived in Defendants' Woodland Park property from December 1, 2011 until February 18, 2016[1] and were charged a $50 late fee under Defendants' policy of charging a flat $50 late fee to tenants on pre-existing leases that Defendants assumed when they took ownership of the property (the "Woodland Park Late Fee").

5.  It is my understanding that, as of the date of this report, the Court has not ruled on Plaintiffs' motion to add two categories of Defendants' California tenants to this case: a) tenants who were charged and/or who paid the Standard Late Fee for the first time after October 23, 2017, and b) tenants who were not themselves charged a late fee but paid one or more Standard Late Fees or Woodland Park Late Fees charged to their roommates. I also understand that if the Court grants Plaintiffs' motion, Defendants have agreed to produce from their MRI system additional tenant ledger data, including late fee charges and payments, for those tenants who moved into Defendants' California rental

---

[1] I am aware that the Court's order certifying this case as a class action defined the Woodland Park Preexisting Lease Class as including those tenants who lived in the Woodland Park property through the date that Defendants sold the property in February 2016. I understand from Class Counsel that Defendants have clarified that they ceased ownership of the Woodland Park property on February 18, 2016. The MRI data that I reviewed and upon which I base this report contains no records of late fee activity for Woodland Park tenants after February 18, 2016.

**REDACTED**

properties after October 23, 2017 and were thereafter charged and or paid the Standard Late Fee. If additional information is provided for these tenants, I can update my analysis according to the methodology described in this report.  As described further in paragraph 36 and footnotes 18 & 19, below, the MRI data that I possess and have analyzed includes records of late fee payments made by roommates of current Standard Late Fee and Woodland Park Class Members.

6.  I understand that Defendants maintain tenant ledger data in the RMLEDG table of the MRI database and that the RMLEDG MRI table contains charges to and payments by Defendants' California tenants.  I understand that Defendants' MRI database also contains the RMLease and EQR_Legal tables.  I understand that the Parties have stipulated to the meanings of fields and codes appearing in the RMLEDG, RMLease, and EQR_Legal tables, and I have reviewed the Parties' Joint Stipulation Regarding the Electronic MRI, Property Management, and Financial Management Data Produced by Defendants in This Action ("MRI Stipulation").

7.  For purposes of this report, I have been asked to review additional records from Defendants' MRI residential property management database,[2] as they relate to Standard Late Fee Class Members and Woodland Park Preexisting Lease Class Members' allegations.  I have also been provided with the Expert Report and Disclosure of Mark J. Hosfield, submitted May 10, 2021 ("Hosfield Report"), as well as an Excel file "Interest Rates" by Plaintiffs' expert Christian Tregillis on July 5, 2021.


### III.  Summary of Expert Qualifications

8.  I am a Certified Public Accountant, licensed in the State of California, and Certified in Financial Forensics.  I am currently a partner at Hemming Morse, LLP, CPAs, Forensic and Financial Consultants.  My work in the accounting profession includes experience as an auditor and as a consultant.  My expert qualifications, including my testimony, are described in **Exhibit A** hereto.

9.  I have been a forensic and financial consultant for over 20 years, specializing in litigation consulting, economic and financial research, and database analysis.  I have consulted on and/or testified in over 350 matters involving class action-related disputes, including those arising under state and federal law.  I have performed analyses for large and small companies in the private sector, public companies, and government agencies.  These have involved reviewing contemporaneous cost accounting systems and their structures, as well as analyzing voluminous system generated records as they relate to the facts at issue in each case.

10. My firm has been compensated for my review and analysis in this matter at my standard hourly rate of $510 per hour.  Others have assisted me in my work and my firm has been compensated for their work at their standard hourly rates of $270 - $375.


### IV.  Summary of Opinions

11. I have calculated, based on the late fee payments in the Standard Late Fee RMLEDG data files, the following restitution and interest through December 31, 2021 for 140,063

---

[2] I.e., WP0014498.

**REDACTED**

Class Members as well as 771 other tenants who shared a lease with a Standard Late Fee Class Member. The table below updates the table in paragraph 10 of the expert report I issued in this case on May 10, 2021, which I derived from the evidence I received after I submitted my initial report, as further described in paragraph 22, below.

| Year | Restitution | Interest |
|------|-------------|----------|
| 2010 | | |
| 2011 | | |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| 2015 | | |
| 2016 | | |
| 2017 | | |
| 2018 | | |
| 2019 | | |
| 2020 | | |
| 2021 | | |
| Total | | |

12. I have calculated, based on the late fee payments in the Woodland Park Preexisting Lease RMLEDG data file, the following restitution and interest for 1,141 Woodland Park Preexisting Lease Class Members.

| Year | Restitution | Interest |
|------|-------------|----------|
| 2011 | | |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| 2015 | | |
| 2016 | | |
| Total | $ | $ |

13. I understand that Defendants are claiming damages as an offset from the restitution that may be owed to the classes in this case. One element of Defendants' claimed damages is from lost use of rent that was paid late or unpaid.[3] As Mr. Hosfield acknowledges, EQR only charges late fees "[i]f rent has not been paid by the fifth day of the month," see Hosfield Report at p. 9. Accordingly, I have calculated interest on Defendants' lost use of funds to account for the 4-day grace period that Defendants provide to their California tenants every month as a term of their leases. I have alternatively applied a 0-day grace

---

[3] Hosfield Report, p 20.

REDACTED

period to reflect Defendants' position in the Hosfield Report,[4] that rent is due on the first of the month, notwithstanding the grace period stated in class members' leases.

14. I have calculated, based on the outstanding rent balances in the Standard Late Fee RMLEDG data files, the following as Defendants' lost use of funds from Standard Late Fee Class members' late payment of rent.

| | Defendants' Lost Use of Funds Based on Pos. Rent Balance | |
|---|---|---|
| Year | 4 Day Grace Period[5] | Zero Days Grace Period |
| 2010 | ■ | ■ |
| 2011 | | |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| 2015 | | |
| 2016 | | |
| 2017 | | |
| 2018 | | |
| 2019 | | |
| 2020 | | |
| Grand Total | ■ | ■ |

15. Similarly, I have calculated, based on the outstanding rent balances in the Woodland Park Preexisting Lease RMLEDG data file, the following as Defendants' lost use of funds from Woodland Park Preexisting Lease Class members' late payment of rent.

| | Defendants' Lost Use of Funds Based on Pos. Rent Balance | |
|---|---|---|
| Year | 4 Day Grace Period[6] | Zero Days Grace Period |
| 2011 | ■ | ■ |
| 2012 | | |
| 2013 | | |
| 2014 | | |
| 2015 | | |
| 2016 | | |
| Grand Total | ■ | ■ |

---

[4] Hosfield Report, p. 21.

[5] Under a 3-day grace period, Defendants' lost use of funds from Standard Late Fee Class members' late payment of rent is $113,533.

[6] Under a 3-day grace period, Defendants' lost use of funds from Woodland Park Preexisting Lease Class members' late payment of rent is $3,363.

**REDACTED**

16. Defendants' policy and practice of charging tenants eviction-related legal costs separate and apart from the late fees at issue in this case is evident in MRI database transactions that I have reviewed.

17. Mr. Hosfield's calculations of expended legal fees and SODA court fees are unsupported, as it is not known which resident IDs they relate to and may be inconsistent with other sources of data.

18. Mr. Hosfield's calculation of net SODA court fees of $███████ for the Standard Late Fee Class and $█████ for the Woodland Park Preexisting Lease Class appears to be double counting, as SODA court fees incurred may already be included in the expended legal fees.

19. Mr. Hosfield's calculations of interest on late rent before residents move out are overstated, as they include interest on late rent after vacate dates (an overstatement of approximately $250,000 for the Standard Late Fee Class and of $1,200 for the Woodland Park Preexisting Lease Class) and do not account for a grace period (an overstatement of an additional $1,000,000 for the Standard Late Fee Class and of $18,200 for the Woodland Park Preexisting Lease Class, assuming a four day grace period).

20. While it is a legal determination as to whether any restitution due to class members would need to be reduced by their outstanding account balances, Mr. Hosfield's statement that there was $44,625,846 in total outstanding account balance for all Standard Late Fee Class members and $565,332 for all Woodland Park Preexisting Lease Class members is misleading. Many class members do not have outstanding balances, and for those that do, any reduction would be based on their related restitution, limiting the potential outstanding balances that could be applied to $███████ for Standard Late Fee Class members and $█████ for Woodland Park Preexisting Lease Class members. This reduction may be further limited if it is based on outstanding rent balances.

## V.    Evidence Considered

21. In undertaking my assignment, I have considered information from a variety of sources, each of which is of a type that is reasonably relied upon by experts in my field. Those sources are identified throughout this report, as well as in **Exhibit B** to my May 10, 2021 expert report in this case.

22. Since my prior expert report, I have reviewed WP0014498, which I understand reflects transactions from June 26, 2020 through January 31, 2021 in the RMLEDG table in MRI for all Standard Late Fee Class Members, as well as any other tenants who shared a lease with a Standard Late Fee Class Member, in order to fully capture charges and payments on the account. It is also my understanding that each group of tenants that share or shared a lease is identified in Defendants' MRI data by a unique field called "ResidentID" and that each tenant is identified in the RMLEDG data by a unique field called "NameID".

23. Like the Standard Late Fee and Woodland Park Preexisting Lease RMLEDG files discussed in my prior expert report (i.e., Standard Class Ledger Data_20200625 and WP008044, respectively),[7] this Standard Late Fee RMLEDG file contains, among others, the following information: (a) transaction ID, (b) name ID, (c) resident ID, (d) transaction date, (e) charge code, (f) source code, (g) transaction amount, (h) open amount, and (i)

---

[7] May 10, 2021 Expert Report of David Breshears: paragraphs 13 – 17.

**REDACTED**

reference number.  It appears that charges in MRI, which increase a resident ID's balance, are reflected as positive transaction amounts, while payments and credits in MRI, which decrease a resident ID's balance, are reflected as negative transaction amounts.

24. For purposes of this report, my analysis of Defendants' tenant ledger data is based on the transactions in the Standard Class Ledger Data_20200625, WP008044, and WP0014498 RMLEDG files.

25. I have reviewed portions of the deposition testimony, dated March 25, 2021, by Defendants Rule 30(b)(6) witness Denise Beihoffer ("2021 Beihoffer 30(b)(6) Dep.") and exhibits to her deposition related to Defendants' eviction policies and practices.

26. I have also reviewed WP003921 – WP003929, which I understand reflect lease-level information in the RMLease table in MRI for Standard Late Fee Class Members.  See MRI Stipulation Section III.E.30.  These RMLease files include the vacate date (if any) of the lease group as a whole (i.e., Resident ID), as well as the vacate reason and whether the tenant has been subject to eviction proceedings.  See MRI Stipulation Section III.E.29, 32.e-f, and 32.j.

27. I have also reviewed WP003912 – WP003920, which I understand reflect information from Defendants' EQR_Legal MRI table relating to class members.  See MRI Stipulation Section III.D.25-26.  I understand the EQR_Legal table contains, among other information, whether the tenant was subject to eviction, whether the action resulted in a judgment, the judgment amount, and whether interest was awarded as part of a judgment.  See MRI Stipulation III.D.28.

28. I have also reviewed WP004451 – WP004685 and WP004686 – WP004858, which I understand are examples of Defendants' "pre-eviction settlement agreements" and "stipulation agreements," respectively.  Ms. Beihoffer explained that "pre-eviction settlement agreements" are internal EQR documents, while "stipulation agreements" are formal documents approved by a court.  See 2021 Beihoffer 30(b)(6) Dep. at 27-28 and 32.

29. Since my prior expert report, I have been provided with the Expert Report and Disclosure of Mark J. Hosfield, submitted May 10, 2021, and with various supporting files.[8]

30. I have also been provided with WP011498,[9] which Mr. Hosfield describes as collections data for accounts sent to Fair Collections & Outsourcing, Inc. ("FCO") and Kimball, Tirey & St. John LLP ("KTS").[10]  This collection file contains, among others, the following information: (a) property ID, (b) resident ID, (c) vacate date, (d) open balance, (e) rent balance, (f) DCI balance,[11] (g) collection payments, (h) collection adjustments, (i) collection "xncl", and (j) current balance.  It also contains a sheet called "Field Descriptions."  It appears that rent balance and DCI balance are subsets of open balance

---

[8] I.e., EQR_Expert_000001 - 000212, 000265, 000267, 000269 - 000271, 000273, 000275, 000277, 000734 - 000740, 000762 - 000771, 000777, 000780 - 000782, 000802, 000805, 000808, 000815, 000821, 000823, 000825 - 000827, 000830, 000832 - 000840, 000844 - 000854, 000857, 000862 - 000863, 000865, 000867, 000871 - 000873, and 000875 - 000879.

[9] I understand that Class Counsel object that Defendants' May 10, 2021 production of this data was untimely and that they did not have the opportunity to conduct formal discovery on this data prior to the February 3, 2021 fact discovery cutoff.

[10] May 10, 2021 Expert Report and Disclosure of Mark J. Hosfield: p. 22.

[11] This field is described as the "current open balance for the charge code DCI Debt Collection Interest. In RMLEDG, "DCI" is the charge code for "debt collection interest."  See MRI Stipulation III.B.19.d.xvii.

REDACTED

and that current balance reflects open balance, collection payments, collection adjustments, and collection "xncl".

31. On July 5, 2021, I was provided with an Excel file "Interest Rates" by Plaintiffs' expert Christian Tregillis, which contains interest rates on EQR unsecured debt by month from September 2010 through October 2021.  I understand that Mr. Tregillis determined these rates based on testimony by Defendants' Rule 30(b)(6) witness testimony on the topic of Defendants' lost use of funds.  I understand that from September 2010 through February 2016, Defendants earned interest on a line of credit at a rate of 1-Month LIBOR plus 77.5 basis points.  I further understand that since March 2016, Defendants have held commercial paper subject to a .300% interest rate (or 33 basis points).

32. On July 7, 2021, I was provided a table from Class Counsel summarizing the produced pre-eviction settlement agreements and stipulation agreements (i.e. WP004451 – WP004858).  As explained further in paragraph 58 below, the table included e.g. the date of the agreement, tenant information, and whether the agreement included reference to Defendants' legal costs.  At Class Counsel's request, I added fields reflecting eviction-related data from the MRI RMLEDG table.


## VI.  Basis of Opinions

### A.  *Supplemental – Class Restitution and Interest*

33. For purposes of this report, I have reviewed tenant ledger transactions with a charge code of "LAT" (i.e., reflecting a late-fee transaction) from September 3, 2010 through January 31, 2021 in the Standard Late Fee RMLEDG files and from December 1, 2011 through February 18, 2016 in the Woodland Park Preexisting Lease RMLEDG file.  The source code field reflects the type of transaction: "CH" reflects charges; "CR" reflects cash receipts (i.e., payments), "NC" reflects non-cash credits, "NS" reflects insufficient funds, and "RF" reflects refunds.  (See MRI Stipulation at Section III.B.18.f.)

34. RMLEDG transactions with a charge code of "LAT" and a source code of "CH" (i.e., charge) reflect late fee charges assessed by Defendants.  I have summarized the transaction amounts for each LAT transaction with a source code of "CH" by year (based on its transaction date).  The late fees assessed by Defendants (i.e., LAT transactions with a source code of "CH") total approximately $⬛⬛⬛⬛[12] in the Standard Late Fee RMLEDG files and $⬛⬛⬛ in the Woodland Park Preexisting Lease RMLEDG file.[13]  (See **Exhibit 1** and **Exhibit 2** for a breakdown of the amount and number of late fee charges

---

[12] This is an increase from the approximately $⬛⬛⬛⬛ figure stated in paragraph 23 of my May 10, 2021 report.

[13] I have also noted that there are LAT transactions with a source code of "NC" (i.e., non-cash credits), which appear to reduce, waive, or reverse late fee charges.  Updating the Standard Late Fee figure in footnote 4 of my May 10, 2021 report, the LAT transaction amounts with a source code of "NC" total approximately $⬛⬛⬛ in the Standard Late Fee RMLEDG table and $⬛⬛⬛ in the Woodland Park Preexisting Lease RMLEDG table.  These LAT transaction amounts with a source code of "NC" are the same as Mr. Hosfield's amounts, which can be seen in his Appendix A - Schedule 4A and Appendix A – Schedule 4B, respectively.  Any difference is due to rounding only.

REDACTED

assessed in the Standard Late Fee RMLEDG files[14] and in the Woodland Park Preexisting Lease RMLEDG file,[15] respectively, by year.)

35. Updating the figures in paragraph 24 of my May 10, 2021 report, I have also summarized the amount of late fee charges (i.e., LAT transaction amounts with a source code of "CH") greater than $50, equal to $50, and less than $50.

   a. Of the $▮▮▮▮▮ related to 338,889 late fee charges assessed by Defendants in the Standard Late Fee RMLEDG files, $▮▮▮▮▮ relate to 260,058 late fee charges greater than $50, $3,462,050 relate to 69,241 late fee charges of $50, and $▮▮▮▮ relate to 9,590 late fee charges less than $50.[16]  (See **Exhibit 1** for a breakdown of the amount and number of late fee charges assessed in the Standard Late Fee RMLEDG files by year and amount category.)

   b. Of the $▮▮▮ related to 11,968 late fee charges assessed by Defendants in the Woodland Park Preexisting Lease RMLEDG file, $▮▮▮ relate to 972 late fee charges greater than $50, $▮▮▮▮ relate to 9,962 late fee charges of $50, and $▮▮▮ relate to 1,034 late fee charges less than $50. (See **Exhibit 2** for a breakdown of the amount and number of late fee charges assessed in the Woodland Park Preexisting Lease RMLEDG file by year and amount category.)

36. The late fee charges described above represent the amounts assessed to tenants; however, in some situations, less than the full amount of the late fee charge was paid by the tenant (as the result of a partial no-charge, waiver of charges, or less than full payment).  RMLEDG transactions with a charge code of "LAT" and a source code of "CR" (i.e., cash receipt) reflect monetary payments of late fees by tenants against the charges described in paragraphs 34 - 35 above, and as such, the **restitution** of late fees Defendants have collected that class members and any other tenants who shared a lease with a class member may be entitled to.  I have summarized the transaction amounts of each LAT transaction with a source code of "CR" by year.[17]  Updating the figures in paragraph 25 of my May 10, 2021 report, the late fee payments collected by Defendants (i.e., LAT transaction amounts with a source code of "CR") total approximately

---

[14] My breakdown of the amount and number of late fee charges assessed in the Standard Late Fee RMLEDG files by year is the same as Mr. Hosfield's breakdown, which he discusses on p. 12 of his expert report/disclosure and can be seen in his Appendix A - Schedule 1A.  The minor difference in amount is due to rounding only.

[15] My breakdown of the number of late fee charges assessed in the Woodland Park Preexisting Lease RMLEDG file by year is the same as Mr. Hosfield's breakdown, which he discusses on p. 12 of his expert report/disclosure and can be seen in his Appendix A - Schedule 1B.  The minor difference in amount is due to my inadvertently omitting the transaction amount of $22 related to transaction ID 200536904 in 2012.

[16] The counts of late fee charges are based on each LAT transaction with a source code of "CH".

[17] I adjusted the transaction amount of each LAT transaction with a source code of "CR" for any related payment reversals (e.g., insufficient funds) – that is, by the transaction amount of a LAT transaction with a reference number that is the same as the transaction ID of the cash receipt.  For example, resident ID 24012-1-106-2 has a LAT transaction, dated September 12, 2019, with a source code of "NS" (i.e., non-sufficient funds), a reference number of 297632234, and a transaction amount of $96.45.  This resident ID also has a LAT transaction, dated September 5, 2019, with a source code of "CR", a transaction ID of 297632234 (which is the same as the aforementioned reference number), and a transaction amount of -$96.45 which I have adjusted to $0 due to non-sufficient funds for payment.

**REDACTED**

$█████ in the Standard Late Fee RMLEDG file[18] and $████ in the Woodland Park Preexisting Lease RMLEDG file[19].[20] (See **Exhibit 3** and **Exhibit 4** for a breakdown of the amount and number of late fee payments reflected in the Standard Late Fee RMLEDG files and in the Woodland Park Preexisting Lease RMLEDG file, respectively, by year.)

37. I have also summarized the amount of late fee payments (i.e., LAT transaction amounts with a source code of "CR") greater than $50, equal to $50, and less than $50.

    c. Of the $██████ related to 273,705 late fee payments (towards 338,889 charges) reflected in the Standard Late Fee RMLEDG file, $██████ relate to 215,356 late fee payments greater than $50, $██████ relate to 48,990 late fee payments of $50, and $██████ relate to 9,359 late payment fees less than $50.[21] (See **Exhibit 3** for a breakdown of the amount and number of late fee payments reflected in the Standard Late Fee RMLEDG files by year and amount category. Late fee payments can also be broken down by class member – i.e., by name ID – but, due to the voluminous nature, that breakdown has not been included in the exhibits in this report.)

    d. Of the $██████ related to 5,981 late fee payments (towards 11,968 charges) reflected in the Woodland Park Preexisting Lease RMLEDG file, $██████ relate to 242 late fee payments greater than $50, $██████ relate to 4,511 late fee payments of $50, and $██████ relate to 1,228 late payment fees less than $50.[22] (See **Exhibit 4** for a breakdown of the amount and number of late fee payments reflected in the Woodland Park Preexisting Lease RMLEDG file, respectively, by year and amount category.)

---

[18] Of the $██████ in late fee payments made in the Standard Late Fee RMLEDG file, $██████ relate to name IDs in the Standard Late Fee Class list (as discussed in paragraph 21 of my prior expert report) and $██████ relate to name IDs not in the Standard Late Fee Class list.

[19] Of the $████ in late fee payments made in the Woodland Park Preexisting Lease RMLEDG file, $██████ relate to name IDs in the Woodland Park Preexisting Lease Class list (as discussed in paragraph 21 of my prior expert report).

[20] I have also noted that there are a small number of instances where late fees may have been paid by tenants prior to their subsequent reduction, waiver, or reversal, and that these payments may have been reapplied to other charge codes such as "RNT" (i.e., monthly apartment rent).

[21] The counts of late fee payments are based on the reference number of LAT transactions with a source code of "CR", as the reference number identifies the related transaction to which the cash receipt applies. That is, when the reference number of cash receipts are the same, the multiple cash receipts are counted as one late fee payment. When there is no reference number, each transaction is considered to be one late fee payment. These counts do not include LAT transactions with a source code of "CR" where the transaction amount has been adjusted to $0 due to insufficient funds. The year of each late fee payment is based on its transaction date or the earliest transaction date when multiple cash receipts are counted as one late fee payment.

[22] It appears that some of the late fee payments less than $50 may be multiple partial payments towards a $50 late fee but have different reference numbers (as described in footnote 10 above). For example, resident ID 29402-210-201-1 has a LAT transaction, dated November 1, 2014, with a source code of "CR", a reference number of 224625003 (which is the same as the transaction ID of a $50 late fee charge), and a transaction amount of $49.83. This resident ID also has a LAT transaction, dated October 2, 2014, with a source code of "CR", a reference number of 221517942 and a transaction amount of $0.17. Because these two cash receipts have different reference numbers, they have been counted separately for purposes of this analysis, but when combined, they result in a payment equal to the $50 late fee.

**REDACTED**

38. I am informed by Class Counsel that, if Defendants are found liable for imposing a late fee that violates California Civil Code section 1671(d) and therefore violates the Unfair Competition Law (Business & Prof. Code section 17200, et seq.), Defendants may also be subject to pre-judgment interest based on the restitution of late fees collected. I also am informed by Class Counsel that article XV, section 1 of the California Constitution authorizes a court to award interest at the rate of 7 percent per annum, unless another rate is specified for claims of a particular type. I therefore have calculated simple interest at 7%, from the related transaction date through December 31, 2021. Pre-judgment interest totals approximately $███████ for the Standard Late Fee RMLEDG files[23] and $██████ for the Woodland Park Preexisting Lease RMLEDG file[24]. I understand that the Court has vacated the previously scheduled trial date of October 18, 2021, and there is no current trial date. Once the Court sets a new trial date, I will supplement this report with an updated pre-judgment figure that projects such interest through judgment.

B. *Rebuttal – Restitution*

39. Based on the tenant ledger data, the majority of late fee payments (and therefore the associated late-rent payments[25]) are made shortly after Defendants charge the Standard Late Fee each month. I have created a table showing the distribution of all late-fee payments in the tenant ledger data from September 1, 2010 through January 2021 according to the number of days between the late fee charge (i.e. the expiration of the grace period) and the late fee payment (again, which signifies that the late rent had also been paid by then). The table specifies the total dollar values of late-fee payments made by class members per day-since-charge for each of the first 60 days after the expiration of the grace period, and then shows the total dollar value of late-fee payments made by class members between 61-90 days since charge, 91-120 days since charge, and more than 120 days since charge. See **Exhibit 5**.

40. The following graphs illustrate this distribution:

---

[23] Of the $███████ in interest for the Standard Late Fee RMLEDG file, $███████ relate to name IDs in the Standard Late Fee Class list and $█████ relate to name IDs not in the Standard Late Fee Class list.

[24] Of the $█████ in interest for the Woodland Park Preexisting Lease RMLEDG file, █████ relate to name IDs in the Woodland Park Preexisting Lease Class list.

[25] As described in my May 10, 2021 report at paragraph 19-20, because LAT has the highest priority code of 99, it is processed after all other charge codes with priority code less than 99, including RNT. See also MRI Stipulation at III.B.19.d.xiii ("In general, because LAT has the lowest priority code, if a late-fee is paid (i.e. CHGCODE "LAT" has SRCCODE "CR"), then all other higher priority charges from the month in which the late-fee was charged (i.e. CHGCODE "LAT" has SRCCODE "CH") have been paid.").

**REDACTED**



Late Fee Payment Amounts by No. of Days from Late Fee Charge in Standard Late Fee RMLEDG

**REDACTED**



REDACTED



Late Fee Payment Amounts by No. of Days from Late Fee Charge in Standard Late Fee RMLEDG

Total Late Payments Per Day

Cumulative Late Payment Amount

Days from Late Fee Charge to Late Fee Payment

■ Late Fee Payment Amounts by Day     ▬ Running Total of Late Fee Payments

41. The bars reflect the total late-fee payment amounts by day, while the curve illustrates the cumulative total of late-fee payments over time.

42. As these graphics demonstrate, the majority (52%) of late fee payments (totaling $12,149,863) are made within six days of the expiration of the grace period, with 17% of payments (totaling $3,936,006) being made the same day they were charged, i.e. immediately following the expiration of the grace period.

C. _Rebuttal – The Effect of a 5% Late Fee_

43. Mr. Hosfield states that a "percentage late fee, such as Equity's 5% late fee is economically sound in that it tracks with inflation, i.e. as rents and costs increase, so does the late fee." See Hosfield Report at p. 48. However, even where tenants are charged and pay late fees at the same property at the same time, they might be subject

REDACTED

to two vastly different late fee amounts based solely on their paying different rent amounts and potentially causing only minor increases in Defendants' lost use of funds.

44. My review of the Standard Late Fee RMLEDG files reveals countless instances where different late fee amounts were assessed on the same date to different resident IDs at the same rental property and the different resident IDs paid the late fee amounts on the same date. Below are three examples of tenants with different late fees assessed and paid on the same dates, who live at properties that were the subject of Mr. Hosfield's employee cost survey.

   a. At rental property 29319 (i.e, Westgate[26]) on December 5, 2016, resident ID 29319-7-4102-3 was assessed a late fee of $177.25 while resident ID 29319-9-4065-3 was assessed a late fee of $76.70. On December 6, 2016, resident ID 29319-7-4102-3 paid its late fee of $177.25 and resident ID 29319-9-4065-3 paid its late fee of $76.70. I have conservatively calculated Defendants' lost use of funds on the related outstanding rent balance (which only reflected December 2016 rent) at five days between when rent was charged and when it was paid in full, which results in $0.15 for resident ID 29319-7-4102-3 and $0.08 for resident ID 29319-9-4065-3.

   b. At rental property 29677 (i.e., Hesby[27]) on March 5, 2018, resident ID 29677-1-341-3 was assessed a late fee of $61.52 while resident ID 29677-1-657-4 was assessed a late fee of $211.80. On March 5, 2018, resident ID 29677-1-341-3 paid its late fee of $61.52 and resident ID 29677-1-657-4 paid its late fee of $211.80. I have conservatively calculated Defendants' lost use of funds on the related outstanding rent balance (which only reflected March 2018 rent) at four days between when rent was charged and when it was paid in full, which results in $0.10 for resident ID 29677-1-341-3 and $0.14 for resident ID 29677-1-657-4.

   c. At rental property 51020 [i.e., Canyon Creek (CA)[28]] on October 5, 2018, resident ID 51020-030-3024-6 was assessed a late fee of $52.75 while resident ID 51020-031-3113-11 was assessed a late fee of $153.10. On October 5, 2018, resident ID 51020-030-3024-6 paid its late fee of $52.75 and resident ID 51020-031-3113-11 paid its late fee of $153.10. I have conservatively calculated Defendants' lost use of funds on the related outstanding rent balance (which only reflected October 2018 rent) at four days between when rent was charged until it was paid in full, which results in $0.06 for resident ID 51020-030-3024-6 and $0.10 for resident ID 51020-031-3113-11.

D. _Rebuttal – Defendants' Lost Use of Funds_

45. For purposes of this report, I have been asked to calculate Defendants' lost use of funds as interest on the outstanding balance of unpaid rent. My calculation is based on transactions in the RMLEDG files with a charge code of "RNT" (i.e., monthly apartment rent transaction). For each RNT transaction in the RMLEDG files, I first determined the

---

[26] Mr. Hosfield interviewed a general manager and a leasing administrator at this rental property, which he discusses on pp. 3 - 4 of his expert report/disclosure.

[27] Mr. Hosfield interviewed an assistant community manager and a leasing consultant at this rental property, which he discusses on pp. 3 - 4 of his expert report/disclosure.

[28] Mr. Hosfield interviewed a community manager and a leasing consultant at this rental property, which he discusses on pp. 3 - 4 of his expert report/disclosure.

**REDACTED**

related resident ID's running rent balance, taking into account the current RNT transaction.[29]  I then determined the number of days from the current RNT transaction date to the resident ID's next RNT transaction date.[30] When there is no following RNT transaction, I have assumed the lesser of the number of days from the current RNT transaction date to the related vacate date, as discussed above in paragraph 30, or 45 days.[31]

46. For each RNT transaction from September 1, 2010[32] through February 29, 2020 in the Standard Late Fee RMLEDG files and from December 1, 2011 through February 18, 2016 in the Woodland Park Preexisting Lease RMLEDG file, I have calculated Defendants' lost use of funds as simple interest based on the related outstanding rent balance (if any) at the related interest rate on EQR unsecured debt (as discussed above in paragraph 31) for the number of days as discussed above in paragraph 45.

47. For purposes of this report, I have not calculated any lost use of funds for RNT transactions on or after the related resident ID's vacate date.[33]

48. I have calculated Defendants' lost use of funds by allowing for a grace period of four days after RNT transactions with a source code of "CH" charged on the first of the month.  Defendants' lost use of funds, allowing for a grace period of four days, totals approximately $███████ for the Standard Late Fee RMLEDG files and $█████ for the Woodland Park Preexisting Lease RMLEDG file.[34]

49. I have alternatively calculated Defendants' lost use of funds applying a zero-day grace period to consider the effect of Mr. Hosfield's view that lost use of funds begin to accrue notwithstanding the grace period stated in class members' leases.  Defendants' lost use of funds, applying no grace period, totals approximately $███████ for the Standard Late Fee RMLEDG files and $█████ for the Woodland Park Preexisting Lease RMLEDG file.

50. In addition to using an inflated interest rate for his lost use of funds calculation, Mr. Hosfield's calculation of interest on late rent before residents move out of $████████ for the Standard Late Fee Class[35] is overstated for other reasons.  First, Mr. Hosfield's

---

[29] A resident ID's running rent balance may be, in some instances, too high, as payments or non-cash credits related to rent were applied to other charge codes.  For example, the running rent balance for resident ID 29107-1-1205-2 climbed to over $50,000 because its related non-cash credits were applied to a charge code of "C02" (i.e., conc employee).  For purposes of this report, similar to Mr. Hosfield, I have calculated Defendants' lost use of funds based on the outstanding balance of rent.  I may update my analysis to account for such situations.

[30] If the resident ID's next RNT transaction date is after February 29, 2020 in the Standard Late Fee RMLEDG files or after February 18, 2016 in the Woodland Park Preexisting Lease RMLEDG file, I have assumed no days.

[31] Because rent is charged on a monthly basis, the lack of a subsequent rent transaction within 45 days suggests that the tenant has vacated the unit despite their not having a vacate date.  This might be due to my using vacate date information from Defendants' RMLease files produced on July 20, 2020, which would not reflect vacate dates subsequent to that date.

[32] I have conservatively used September 1, 2010, as rent is charged on the first of the month.

[33] I have also not calculated any lost use of funds for RNT transactions followed by a RNT transaction with a source code of "NC" (i.e., non-cash credits) and a running rent balance of $0.00.

[34] Defendants' lost use of funds, allowing for a grace period of three days, totals approximately ████████ for the Standard Late Fee RMLEDG files and ██████ for the Woodland Park Preexisting Lease RMLEDG file.

[35] Related discussion is on p. 21 of Mr. Hosfield's expert report/disclosure and his calculation can be seen in EQR_Expert_000015 – 000027, 000029, and 000207 – 000210.

REDACTED

calculation includes interest based on RNT transactions that occur after the related vacate date. Excluding this interest based on RNT transactions that occur after the related vacate date (as discussed above in paragraph 26), his calculation of interest on late rent before residents move out for the Standard Late Fee Class would decrease by approximately $250,000.

51. Second, Mr. Hosfield's calculation assumes that rent not paid in full by the first day of the month is late and begins to incur interest. If he had allowed for a grace period of four days based on when Defendants would assess a late fee, Mr. Hosfield's calculation of interest on late rent before residents move out for the Standard Late Fee Class would further decrease by approximately $1,000,000.[36]

52. Mr. Hosfield's calculation of interest on late rent before residents move out of $39,875 for the Woodland Park Preexisting Lease Class[37] is similarly overstated. Excluding interest based on RNT transactions that occur after the related vacate date (as discussed above in paragraph 26), his calculation of interest on late rent before residents move out for the Woodland Park Preexisting Lease Class would decrease by approximately $1,200.

53. If he had allowed for a grace period of four days based on when Defendants would assess a late fee, Mr. Hosfield's calculation of interest on late rent before residents move out for the Woodland Park Preexisting Lease Class would further decrease by approximately $18,200.[38]

E. _Rebuttal – Defendants' Eviction Legal Costs_

54. I understand that Defendants seek to offset the restitution owed to class members by the amount of eviction-related legal costs incurred by Defendants that were not subsequently paid by tenants.[39] I understand that Plaintiffs contend that Defendants cannot claim these eviction legal costs as among the "actual damages" liquidated by the late fee because Defendants' classwide policy and practice has been to attempt to recover these costs directly from tenants whenever permitted by law – separate from and in addition to the late fee.[40] Class Counsel requested that I examine Defendants' MRI database to determine whether and to what extent Defendants charge eviction legal costs directly to tenants.

55. The RMLEDG table in MRI records eviction legal costs in two charge codes: (1) "EVI" reflects eviction-related legal costs charged to or collected from current tenants; and (2) "S05" (SODA Court/Evict Fees) contains eviction-related legal costs charged to or collected from former tenants. See MRI Stipulation Section III.B.19.v, xiv. Through February 29, 2020, the Standard Late Fee RMLEDG file contains 24,473 EVI transactions relating to 5,767 unique resident IDs (made up of 6,158 class members by name ID) and

---

[36] If he had allowed for a grace period of three days, Mr. Hosfield's calculation of interest on late rent before residents move out for the Standard Late Fee Class would decrease by approximately $895,700.
[37] Related discussion is on p. 21 of Mr. Hosfield's expert report/disclosure and his calculation can be seen in EQR_Expert_000031.
[38] If he had allowed for a grace period of three days, Mr. Hosfield's calculation of interest on late rent before residents move out for the Standard Late Fee Class would decrease by approximately $15,200.
[39] Hosfield Report at p. 18.
[40] See, e.g., 2021 Beihoffer 30(b)(6) Dep. at 25-34, and Exhibit 2 (WP003771-WP003775, "Eviction Policy" document states legal "[c]osts should always be charged to the resident's account where permitted by law."

**REDACTED**

8,608 S05 transactions relating to 3,324 unique resident IDs (3,334 name IDs).  In total, the legal fees assessed under these charge codes (i.e., EVI or S05 transactions with a source code of "CH") are approximately [REDACTED] ([REDACTED] in EVI charges and $[REDACTED] in S05 charges).[41]

56. I understand that the EQR_Legal table is populated when a tenant is "marked for eviction" in MRI.  See MRI Stipulation at III.D.25.  The class member EQR_Legal files produced by Defendants contain 5,046 eviction records (i.e. field TYPE is coded "eviction") relating to 5,016 unique Resident IDs (or 3.6% of the 140,063 total class member Resident IDs).  Of the 5,046 eviction records,

   a. 351 evictions relating to 349 Resident IDs resulted in a monetary judgment (JUDGMENT field is coded "MO").  Of these 349 Resident IDs, 319 (or 90.9%) had EVI and/or S05 charges in the Standard Late Fee RMLEDG data totaling $[REDACTED].

   b. 1,045 evictions relating to 1,045 Resident IDs resulted in a judgment to return possession (JUDGMENT field is coded "PO").  Of these 1,045 Resident IDs, 922 (or 88.2%) had EVI and/or S05 charges in the Standard Late Fee RMLEDG data totaling $[REDACTED]

   c. 2,966 evictions relating to 2,949 Resident IDs resulted in a monetary judgment and a judgment to return possession (JUDGMENT field is coded "PM").  Of these 2,949 Resident IDs, 2,683 (or 90.5%) had EVI and/or S05 charges in the Standard Late Fee RMLEDG data totaling $[REDACTED]

   d. 684 evictions relating to 677 Resident IDs did not result in a judgment (JUDGMENT field is blank).  Of these 677 Resident IDs, 454 (or 66.4%) had EVI and/or S05 charges in the Standard Late Fee RMLEDG data, totaling $[REDACTED]

57. I understand that there are two fields in the RMLEASE MRI table that indicate a tenant may have been subject to eviction: (1) if the field DISPOSSE is marked "Y," then the tenant has been marked for eviction, see MRI Stipulation at III.E.32.j; and (2) if the field VREASON is coded "17" then the tenant vacated the EQR residential property due to eviction, see MRI Stipulation at III.E.32.e.

   a. There are 1,305 records for 742 unique Resident IDs where the field DISPOSSE is marked "Y," indicating the tenant has been marked for eviction as of the date that the data was pulled.  Of these 742 Resident IDs, 615 (or 82.9%) had EVI and/or S05 charges in the RMLEDG data totaling $[REDACTED]

      i. Of the 737 Resident IDs also appearing in EQR_Legal, 613 (83.2%) had EVI and/or S05 "CH" in RMLEDG data, totaling $[REDACTED]

   b. There are 7,953 records for 4,577 unique Resident IDs where the "Vacate Reason" (field VREASON) is coded "17," indicating the tenant vacated due to eviction.  Of these 4,577 Resident IDs, 4,327 (or 94.5%) had EVI and/or S05 charges in the RMLEDG data totaling [REDACTED].

      ii. Of the 3,794 Resident IDs also appearing in EQR_Legal, 3,614 (95.3%) had EVI and/or S05 "CH" in RMLEDG data, totaling [REDACTED] in CH charges.

---

[41] Transactions with a source code of "NC" (i.e., non-cash credits) appear to reduce, waive, or reverse the EVI and S05 charges (i.e., source code "CH").  The EVI transaction amounts with a source code of "NC" total approximately [REDACTED], and the S05 transaction amounts with a source code of "NC" total approximately $[REDACTED]

**REDACTED**

58. Class Counsel also requested that I examine the RMLEDG data related to tenants whose "pre-eviction settlement agreements" or "stipulation agreements" (collectively "settlement agreements") were produced in discovery to determine how the legal costs addressed in the agreements are reflected in the tenant ledger data. Defendants produced 248 agreements in discovery at WP004451-WP004685 (220 pre-eviction settlements) and WP004686-WP004858 (28 stipulation agreements). Class counsel prepared a summary of the 248 agreements listing: the date of the agreement; information about the tenant(s); information about the unit and property; the total amount due under the agreement; whether the tenant agreed to stay or vacate; whether the agreement addressed late fees owed; whether the agreement addressed EQR's legal costs; and the law firm representing EQR.

59. Because the settlement agreements do not themselves list unique resident identifiers (i.e. Name IDs or Resident IDs), in order to compare the agreements to the RMLEDG data, I understand that Class Counsel first compared the agreements to the class list. Where a class member matching the name of the tenant listed on the agreement lived at the property and unit specified during the time period the agreement was entered into, then Class Counsel added the tenant's Name ID information as well as the related Resident ID.[42] In all, Class Counsel provided Name ID and Resident ID information for 206 of the 248 agreements.

60. I then imported RMLEDG data relating to EVI and S05 charge codes for each Resident ID listed in the summary chart, according to two scenarios: (1) EVI and S05 transactions within 45 days of the date of the settlement agreement; and (2) all EVI and S05 transactions.

61. I understand that all 248 settlement agreements addressed Defendants' eviction legal fees in some manner: 245 of the agreements indicated that legal fees were included, and the remaining 3 waived the legal fees (either specifying $0 charges or that parties would bear their own fees and costs).

62. Of the 206 agreements that could be linked to the RMLEDG Data, 179 (or 88%) of the associated Resident IDs had EVI charge-code activity within 45 days of the settlement agreement; 21 (or 10%) had some EVI or S05 RMLEDG activity; and only 4 (or 2%) did not have corresponding EVI or S05 charge-code activity.[43] The 179 agreements with EVI charge-code activity within +/-45 days corresponded with $▉▉▉▉▉▉ total EVI charges, with the average charge being $▉▉▉▉

63. 181 of the 206 agreements that could be linked to the RMLEDG Data are pre-eviction settlement agreements. Of these 181 pre-eviction settlement agreements that could be linked to Resident IDs in the RMLEDG Data, 170 (or 94%) of the Resident IDs had EVI charge-code activity within 45 days of the agreement date, totaling $▉▉▉▉ in EVI charges, or $▉▉▉ on average.

64. In sum, the exemplar settlement agreements address Defendants' eviction-related legal costs as distinct from their late fees, and corresponding RMLEDG data indicates the eviction legal costs are passed on to tenants in the EVI and/or S05 charge codes – wholly

---

[42] Where Class Counsel could not match the information in the agreement to information on the class list, I understand they listed "N/A."

[43] All four of these agreements concerned Standard Late Fee Class Members who resided at Woodland Park (i.e. who moved to the Woodland Park property after Defendants acquired it and so were subject to the Standard Late Fee).

**REDACTED**

distinct from the LAT charge codes forming the basis for Plaintiffs' claimed restitution in this action. Thus, it appears that Defendants treat the eviction-related legal costs as outside the scope of their late fee.

65. Even if Defendants were entitled to claim eviction legal costs as part of their offset, Mr. Hosfield's sources and methods for calculating those costs are problematic and tend to overstate the costs. First, Mr. Hosfield's calculation of expended legal fees[44] is based on invoices per vendor history ledgers for Kimball, Tirey & St. John LLP; Law Office of Hollenbeck & Cardoso LLP, and Todd B. Rothbard, which reflects $██████ in such costs expended. Of this $██████ Mr. Hosfield allocates $██████ for the Standard Late Fee Class and $██████ for the Woodland Park Preexisting Lease Class. (He assumes that the remaining $██████ relates to non-Standard Late Fee Class Members from October 24, 2017 through February 29, 2020.) However, as they appear to have been redacted, it is not known which resident IDs these invoice amounts relate to, and thus, whether those are attributable to class members. Nor do the redacted invoices establish that the legal costs relate to class members' late payment of rent.

66. Also, while his calculation of expended legal fees reflects deductions to costs incurred for amounts paid based on RMLEDG transactions with a charge code of "EVI" and a source code of "CR", "NS", or "PR", Mr. Hosfield fails to note that amounts charged based on RMLEDG transactions with a charge code of "EVI" and a source code of "CH", "NC", or "RF" are only $██████ in the Standard Late Fee RMLEDG files and $██████ in the Woodland Park Preexisting Lease RMLEDG file.

67. Mr. Hosfield's calculation of SODA court fees[45] is based on the "EQ505025 SODA – Court Evic Fees" tabs in WP003797 and WP003890, which reflects $██████ in such costs incurred. Of this $██████ he allocates $██████ for the Standard Late Fee Class and $██████ for the Woodland Park Preexisting Lease Class. (He assumes that the remaining $██████ relates to non-Standard Late Fee Class Members from October 24, 2017 through February 29, 2020.) However, as the tabs only show monthly amounts by property ID, it is not known which resident IDs they relate to, and thus, whether those are attributable to class members. Nor is there enough information to determine whether the SODA court fees are attributable to class members' late payment of rent.

68. Also, while his calculation of SODA court fees reflects deductions to costs incurred for amounts paid based on RMLEDG transactions with a charge code of "S05" and a source code of "CR", "NS", or "PR", Mr. Hosfield fails to note that amounts charged based on RMLEDG transactions with a charge code of "S05" and a source code of "CH", "NC", or "RF" are only $██████ in the Standard Late Fee RMLEDG files and $██████ in the Woodland Park Preexisting Lease RMLEDG file. Of the $██████ I have noted that there are 1,857 charges of $██ each with a description of "estimated legal fees", totaling $██████.

69. Furthermore, based on a comparison of monthly costs by property of Mr. Hosfield's SODA court fees incurred and expended legal fees, it appears that SODA court fees incurred are double counted, as they may already be included in the expended legal fees. This appearance arises from Mr. Hosfield's reliance upon the attorney invoices which are not

---

[44] Related discussion is on p. 18 of Mr. Hosfield's expert report/disclosure and his calculation can be seen in Schedules 1A, 1B, 2A, 2B, 4A, and 4B of his Exhibit 5, as well as EQR_Expert_000767.
[45] Related discussion is on p. 18 of Mr. Hosfield's expert report/disclosure and his calculation can be seen in Schedules 1A, 1B, 2A, 2B, 3A, and 3B of his Exhibit 5, as well as EQR_Expert_000767.

REDACTED

clearly limited to EVI or S05 charges, rather than using other sources that may tie the legal fees specifically to a resident ID and/or class member, or even e.g. the "EQ634010 Legal Exp" tabs in WP003797 and WP003890 which are at least mapped to the EVI charge code (see MRI Stipulation IV.35.s), though also not tenant-specific. I have noted the following examples where (a) the SODA court fees incurred are the same amount as the expended legal fees and there are no related amounts in the "EQ634010 Legal Exp" tabs in WP003797 and WP003890 or (b) the SODA court fees incurred and the related amounts in the "EQ634010 Legal Exp" tabs are the same amounts as the expended legal fees.

| Property ID | Property Name | Period | Hosfield's Expended Legal Fees | Hosfield's SODA Court Fees Incurred | EQ634010 Legal Exp Amounts |
|---|---|---|---|---|---|
| 29121 | Reserve at Empire Lakes | Jul-17 | ███ | | ███ |
| 29131 | Park West (CA) | Aug-13 | | | |
| 29168 | Parkside | Dec-12 | | | |
| 29169 | Skylark | Oct-14 | | | |
| 29177 | Siena Terrace | Oct-13 | | | |
| 29179 | Alborada | Sep-12 | | | |
| 29212 | Mill Creek | Jan-12 | | | |
| 29237 | Kelvin Court | Apr-12 | | | |
| 29247 | Kenwood Mews | Mar-11 | | | |
| 29248 | Avanti | Sep-11 | | | |
| 29624 | Avenue Two | Aug-12 | ███ | | ███ |

F. *Rebuttal – Outstanding Balances as Extraneous Offsets*

70. I understand that Defendants are seeking to set off any restitution to class members with amounts allegedly owed by some class members which are unrelated and extraneous to late fees. I understand that Plaintiffs contend these extraneous debts cannot be used as a set off against restitution in this case, and that Plaintiffs' motion to dismiss these debt collection set off claims remains pending. Class Counsel asked me to analyze the MRI data applicable to the Standard Late Fee Class and Woodland Park Preexisting Lease Class to test the accuracy of Mr. Hosfield's assertion that the lump sums of $███ and $███ would need to be deducted from restitution to the Standard Late Fee and Woodland Park classes, respectively.[46]

71. As discussed in paragraph 10 of my declaration in support of Plaintiffs' motion to dismiss Defendants' debt collection set-off claims, the "Open Am[oun]t" field in the RMLEDG files reflects the open and unpaid amount of the related charge(s) for the specific resident ID. It is also my understanding that, payments made after a former resident has been sent to collections are not applied to specific charge codes and do not appear in the resident's ledger. As a result, if a tenant makes a payment to a collections agency after they move out, their resident ledger may still show open amounts even if the balance is paid. (See MRI Stipulation at Section ¶¶ 14, 17(i).)

---

[46] Hosfield Report at 37.

REDACTED

72. For purposes of this report, I have summarized, for the 14,535 resident IDs with a vacate date and at least one late fee payment, the number of related resident IDs with open amounts by charge code from September 3, 2010 in the Standard Late Fee RMLEDG files.  (See **Exhibit 6**.)  For example, the following table lists the 15 charge codes with the highest number of resident IDs (as described above) showing open amounts related to these charge codes.

| ChgCode | Description |
|---------|-------------|
| S01 | SODA Cleaning |
| S02 | SODA Painting |
| RU4 | RUBS Billing Fee |
| RU2 | RUBS Sewer |
| RU3 | RUBS Trash |
| RU1 | RUBS Water |
| LAT | Late Fee |
| RNT | Monthly Apartment Rent |
| S08 | SODA Rent- Early Term |
| S03 | SODA Carpet Clean/Repair |
| S15 | SODA Carpet Replacement |
| S14 | SODA Other Phys Damages |
| RU5 | RUBS Gas/Central Boiler |
| S05 | SODA 'Court/Evict Fees |
| EVI | Legal Fees |

73. In the section of his report regarding class members' outstanding balances (which I understand from Class Counsel may be irrelevant depending on how the Court rules on Plaintiffs' pending Motion to Dismiss Defendants' Debt Collection Set-Off Claims), Mr. Hosfield asserts that "many Standard Late Fee Class members and Woodland Park Preexisting Lease Class have outstanding account balances with Equity," and that any restitution owed to those class members "would need to be reduced by their outstanding account balances."[47]  However, Mr. Hosfield does not identify the relevant tenants, who are those tenants that have both paid late fees and who allegedly owe outstanding balances, nor the amount of restitution that is at issue for those tenants.  Instead, Mr. Hosfield merely states the "total outstanding balance[s]" for all members of the Standard Late Fee Class and Woodland Park Class respectively.

74. Mr. Hosfield states that, as of May 7, 2021, the total current balance for all Standard Late Fee Class members who have vacated was $█████.[48]  Based on WP011498 and the RMLEDG data, I have determined that only $███████ (of the $███████ total) is attributable to resident IDs that have positive restitution amounts, *i.e.*, have made late fee payments that have not been reversed.  Specifically, the ███████ relates to

---

[47] May 10, 2021 Expert Report and Disclosure of Mark J. Hosfield: p. 37.
[48] May 10, 2021 Expert Report and Disclosure of Mark J. Hosfield: p. 37.

**REDACTED**

8,026 resident IDs[49] for whom I have calculated positive restitution amounts.[50] Collectively, the total restitution that I have calculated for this group is $██████.

75. Some of the outstanding balances allegedly owed are less than the restitution due to the related resident ID. As a result, the entire $██████ would not be set off if it is found that any resident ID's restitution would need to be reduced by its related current balance (but not below $0). Rather, only $████████ out of the total $████████ cited by Mr. Hosfield (or 8.5%) could be used as a potential offset, depending on how the Court rules on Plaintiffs' pending motion to dismiss.

76. In addition, as the total current balance reflects open balances, collection payments, collection adjustments, and collection "xncl" (as discussed above in paragraph 30), it appears that 40.5% of the open balances relate to rent, 2.5% relates to debt collection interest, and 57.0% would relate to other charge codes. This is consistent with my review of the open amounts in the Standard Late Fee RMLEDG files, which would suggest that approximately 60% of the open balances do not relate to rent owed by class members.

77. Mr. Hosfield states that, as of May 7, 2021, the total current balance for all Woodland Park Preexisting Lease Class members who have vacated was $██████[51] Based on WP011498 and the RMLEDG data, I have determined that only $██████ (of the $██████ total) is attributable to resident IDs that have positive restitution amounts, *i.e.*, have made late fee payments that have not been reversed. Specifically, the $██████ relates to 145 Resident IDs for whom I have calculated positive restitution amounts.[52] Collectively, the total restitution that I have calculated for this group is $██████.

78. Some of the outstanding balances allegedly owed are less than the restitution due to the related resident ID. As a result, the entire $██████ would not be offset if it is found that any resident ID's restitution would need to be reduced by its related current balance (but not below $0). Rather, only $██████ out of the total $██████ cited by Mr. Hosfield (or 6.0%) could be used as a potential offset.

## VII. Summaries of RMLEDG Data Prepared for Plaintiffs' Expert Andrew Schwarz

79. As part of my analysis of the RMLEDG data described through this report, I have prepared various data extracts or data summarization schedules that relate to my work described above that I am informed will be used by other experts. The following describe each of the files prepared at the request of counsel.[53]

80. I have prepared the following three files which summarize the various RNT payments found within the RMLEDG database, by Resident ID and month, as well as provide information about amount of RNT Charges (net of CH, CN, and NC entries) and the amount of Payments made by Resident ID (net of CR, NS and PR codes). These records

---

[49] I.e., those resident IDs with non-zero outstanding account balances.
[50] I.e., and those resident IDs with outstanding account balances.
[51] May 10, 2021 Expert Report and Disclosure of Mark J. Hosfield: p. 37.
[52] I.e., and those resident IDs with outstanding account balances.
[53] Due to the row limitations in Microsoft Excel, the RMLEDGE monthly RNT charges were split into three files, but the same methodology in summarizing the data was used for each file.

REDACTED

also include a calculation of the running RNT balance and the running rent balance by day from when the RNT was charged to when the rent was paid.

    a.   RNT Group 1 to Expert.xlsx

    b.   RNT Group 2 to Expert.xlsx

    c.   RNT Group 3 to Expert.xlsx

81. I have prepared a file, titled "LateFeeChart-Payments and Counts with First Payment and ChargeTranID.xlsx", which summarizes all LAT entries found within the RMLEDG database, by Resident ID and month. In addition, the file includes a breakdown of the amount of Late Fees paid and the associated number of days from when the Late fee was charged to when LAT was paid.

82. I have prepared a file, titled DRAFT-Restitution by Resident ID.xlsx, which provides a summary of the calculated restitution, prejudgment interest, and related cost of fund offset, for each Resident ID that contains a Late Fee Payment within the RMLEDG data.

83. I have prepared a file, titled "NameID ResidentID List.xlsx", which provides a list of all unique Resident ID and Name ID combinations found within the RMLEDG data and the corresponding Woodland Park ledger data contained in the "WP008044_CONFIDENTIAL Woodland Park New Ledger" file.

84. I have prepared a file, titled "All LAT Transactions.csv", which contains a data extract for all transactions with a ChgCode of "LAT" found in the Standard Late Fee Class RMLEDGE data.


I declare under penalty of perjury under the laws of the State of California and the United States that the foregoing is true and correct.


Dated: July 9, 2021
Concord, CA


David Breshears

REDACTED

**EXHIBIT 6**

1           UNITED STATES DISTRICT COURT

2           NORTHERN DISTRICT OF CALIFORNIA

3                   OAKLAND DIVISION

4

5    JAVANNI MUNGUIA-BROWN, et al.,      ) Case No.

6             Plaintiffs,               ) 16-cv-01225-JSW

7          v.                           )

8    EQUITY RESIDENTIAL, a real estate  )

9    investment trust, ERP OPERATING    )

10   LIMITED PARTNERSHIP, a partnership,)

11   EQUITY RESIDENTIAL PROPERTIES      )

12   MANAGEMENT CORPORATION, and        )

13   DOES ONE through TWO HUNDRED       )

14   AND FIFTY inclusive,               )

15             Defendants.              )

16   _____)

17

18        REMOTE DEPOSITION BY VIRTUAL ZOOM OF

19                CHRISTIAN TREGILLIS

20           TUESDAY, SEPTEMBER 21, 2021

21

22

23   Reported by:  Ashala Tylor, CSR #2436, CLR, CRR, RPR

24   JOB NO. 4812264

25
                  Veritext Legal Solutions
                     866 299-5127

```
 1                UNITED STATES DISTRICT COURT

 2              NORTHERN DISTRICT OF CALIFORNIA

 3                     OAKLAND DIVISION

 4

 5   JAVANNI MUNGUIA-BROWN, et al.,      ) Case No.

 6           Plaintiffs,                 ) 16-cv-01225-JSW

 7          v.                           )

 8   EQUITY RESIDENTIAL, a real estate   )

 9   investment trust, ERP OPERATING     )

10   LIMITED PARTNERSHIP, a partnership,)

11   EQUITY RESIDENTIAL PROPERTIES       )

12   MANAGEMENT CORPORATION, and         )

13   DOES ONE through TWO HUNDRED        )

14   AND FIFTY inclusive,                )

15           Defendants.                 )

16   _____)

17

18        Remote deposition of CHRISTIAN TREGILLIS, taken

19   via virtual Zoom, commencing at 10:13 a.m. and ending

20   at 3:47 p.m., on Tuesday, September 21, 2021, before

21   Ashala Tylor, CSR No. 2436, RPR, CRR, CLR.

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

```
 1    APPEARANCES OF COUNSEL:

 2    FOR THE PLAINTIFFS:

 3           NICHOLAS & TOMASEVIC, LLP

 4           BY:  ALEX TOMASEVIC, ESQ.

 5           225 Broadway, 19th Floor

 6           San Diego, California  92101

 7           619.325.0492

 8           alex@nicholaslaw.org

 9

10    FOR THE PLAINTIFFS:

11           GOLDSTEIN, BORGEN, DARDARIAN & HO

12           BY:  KATHARINE FISHER, ESQ.

13               ANDREW P. LEE, ESQ.

14               ANNE P. BELLOWS, ESQ.

15           155 Grand Avenue, Suite 900

16           Oakland, California  94612

17           510.763.9800

18           kfisher@gbdhlegal.com

19           alee@gbdhlegal.com

20           abellows@gbdhlegal.com

21

22

23

24

25
```

```
1   A P P E A R A N C E S (continued)

2   FOR THE DEFENDANTS:

3          DUANE MORRIS LLP

4          BY:  AARON T. WINN, ESQ.

5          750 B Street, Suite 2900

6          San Diego, California  92101-4681

7          619.744.2200

8          atwinn@duanemorris.com

9

10  Also Present:

11         Helen Din, In-House Counsel for Equity

12                    Residential

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Veritext Legal Solutions
866 299-5127

1     compromise the reliability of the data by not

2     selecting your sample correctly, then that's a

3     problem, that's a violation.

4         Q.   Understood.  Do you agree that at least

5     for some class members, Equity's costs exceeded the

6     late fee paid?

7         A.   That would not surprise me.  I think

8     that's probably the case.

9         Q.   Do you have an opinion on how much time on

10    average it takes to collect -- for Equity to collect

11    delinquent rent?

12           MR. TOMASEVIC:  Vague and ambiguous.

13           THE WITNESS:  I would say that my -- I

14    have several opinions that relate to that area

15    generally.  But it's a pretty general topic that you

16    just described.

17         So, for example, I have opinions that

18    relate to the manner in which that has been

19    estimated by Mr. Knudsen and Mr. Hosfield.

20         I also have in my rebuttal opinion report

21    expressed opinions about whether that information --

22    whether that -- that time is truly incremental.

23         So I think I have a lot of opinions about

24    that that are included in my reports.

25    BY MR. WINN:

```
 1                  CERTIFICATE OF REPORTER

 2        I, ASHALA TYLOR, CSR No. 2436, in and for the State

 3   of California, do hereby certify:

 4        That the foregoing proceedings were taken before me

 5   at the time and place herein set forth; that any

 6   witnesses in the foregoing proceedings, prior to

 7   testifying, were placed under oath; that a verbatim

 8   record of the proceedings were made by me using machine

 9   shorthand which was thereafter transcribed under my

10   direction; further that the foregoing is an accurate

11   transcription thereof.

12        That before the completion of the deposition,

13   review of the transcript was requested.

14        I further certify that I am neither financially

15   interested in this action nor a relative or employee of

16   any attorney or any of the parties hereto.

17        In compliance with Section 8016 of the Business and

18   Professions Code, I certify under penalty of perjury

19   that I am a Certified Shorthand Reporter with

20   California License No. 2436 in full force and effect.

21   WITNESS my hand this 7th day of October, 2021.

22

23

24

25        Ashala Tylor, CSR #2436, RPR, CRR

                                                  Page 195
```

| Page | Line | Transcript Reads | Transcript Should Read | Reason for Change |
|------|------|------------------|------------------------|-------------------|
| 7 | 9 | economic | economic, | Transcription error. |
| 14 | 16 | financial | financial, | Transcription error. |
| 16 | 3 | was the | was | Transcription error. |
| 23 | 16 | 50 | 5 | Transcription error or I misspoke. |
| 40 | 20 | depositions | deposition | Transcription error. |
| 40 | 21 | them | it | Transcription error. |
| 47 | 22 | interview | interviews | Transcription error. |
| 62 | 15 | data | data, | Transcription error. |
| 66 | 17 | of comparison | or comparison | Transcription error. |
| 70 | 17 | that | the | Transcription error. |
| 72 | 24 | them | a | Transcription error. |
| 82 | 10 | deficiencies | efficiencies | Transcription error. |
| 85 | 10 | efficiency | efficiency, | Transcription error. |
| 86 | 11 | smartphones.  So | smartphones, so | Transcription error. |
| 86 | 25 | electronically, EQRs | electronically.  EQR | Transcription error. |
| 88 | 23 | EQRs | EQR's | Transcription error. |
| 99 | 25 | reliable | and reliable | Transcription error. |
| 100 | 3 | problem, that's | problem -- that's | Transcription error. |
| 106 | 13 | was | were | I misspoke. |
| 107 | 24 | costs | cost | Transcription error. |
| 114 | 25 | late rent | late rent, | Transcription error. |
| 115 | 8 | orders | order | Transcription error. |
| 115 | 21 | I | They | Transcription error. |
| 117 | 11 | consultants, | consultants -- | Transcription error. |
| 120 | 21 | Garrett | Garrett, | Transcription error. |
| 127 | 24 | costs | question | Transcription error or I misspoke. |
| 137 | 24 | upfront | up front | Transcription error. |
| 144 | 18 | and the | to the | Transcription error. |
| 145 | 5 | in | in my | Transcription error. |
| 148 | 17 | on | in | Transcription error. |
| 159 | 1 | customization | customization, | Transcription error. |
| 164 | 2 | lost | loss | Transcription error. |
| 265 | 23 | just not | not just | Transcription error or I misspoke. |
| 175 | 22 | motion. And | motion, and | Transcription error. |
| 175 | 23 | payments." And | payments," and | Transcription error. |
| 176 | 2-3 | breaches." And | breaches," and | Transcription error. |
| 176 | 5 | rent." That | rent," that | Transcription error. |
| 176 | 6 | frequently, I | frequently. I | Transcription error. |
| 188 | 6 | noninterest-bearing | non-interest-bearing | Transcription error. |
| 188 | 14-15 | Rates" and -- and the time value of money in pre -- in economic damages calculations. | Rates and -- and the time value of money in pre -- in economic damages calculations." | Transcription error. |
| 190 | 11 | cost | costs | Transcription error. |

I, Christian Tregillis, hereby declare under the penalties of perjury of the laws of the United States that the foregoing is true and correct, subject to the errata identified above.  Executed this 5th day of November, 2021, at Manhattan Beach, California.

Christian Tregillis

**EXHIBIT 7**

```
 1        UNITED STATES DISTRICT COURT
         NORTHERN DISTRICT OF CALIFORNIA
 2              OAKLAND DIVISION
    _____
 3  JAVANNI MUNGUIA-BROWN,
    ANGELINA MAGAÑA, NORMA
 4  RODRIGUEZ, and DAVID BONFANTI,
    individually and on
 5  behalf of others similarly
    situated,
 6
            Plaintiffs,
 7                           Case No.
    vs.             4:16-cv-01225-JSW-TSH
 8
    EQUITY RESIDENTIAL, a real
 9  estate investment trust, ERP
    OPERATING LIMITED PARTNERSHIP, a
10  partnership, EQUITY RESIDENTIAL
    MANAGEMENT, L.L.C., EQR-
11  WOODLAND PARK A LIMITED
    PARTNERSHIP, and EQR-WOODLAND
12  PARK B LIMITED PARTNERSHIP,
13          Defendants.
    _____)
14
            REMOTE DEPOSITION OF ANDREW
15  SCHWARZ, Deponent testifying from
    Lafayette, California, on Thursday,
16  September 30, 2021, Volume I.
17  Stenographically Reported By:
18     Belle Vivienne, RPR, CRR
       WA/UT/CO/NM/NJ-CCR
19     CERTIFIED STENOGRAPHIC REALTIME
       COURT REPORTER
20     Job No. 4812291
       PAGES 1 - 207
21     Veritext Legal Solutions
       866 299-5127
22
23
24
25
```

                                        Page 1

```
 1   APPEARANCES:
 2   For Plaintiffs and the Certified Classes:
 3      GOLDSTEIN, BORGEN, DARDARIAN & HO
         BY:   ANNE BELLOWS
 4             ANDREW LEE
               KATHARINE FISHER
 5      Attorneys at Law
        155 Grand Avenue, Suite 900
 6      Oakland, California 94612
        510.763.9800
 7      abellows@gbdhlegal.com
        kfisher@gbdhlegal.com
 8
 9   For Defendants:
10      DUANE MORRIS
        BY:   AARON WINN
11            AYAD MATHEWS, Law Clerk
        Attorney at Law
12      190 S. LaSalle Street, Suite 3700
        Chicago, Illinois 60603
13      312.499.6700
        415.957.3079
14      awinn@duanemorris.com
15   ALSO PRESENT:
16      Helen Din, Esq.
        In-House Counsel for Equity
17      Residential
18
19
20
21
22
23
24
25
```

Page 2

```
 1    that you have to offset positive          11:04:07

 2    restitution, you can't offset zero         11:04:09

 3    restitution, then Mr. Hosfield's work      11:04:11

 4    can't work there.  They can't give you the 11:04:14

 5    right answer.                              11:04:17

 6         Q.    I think I understand your --    11:04:27

 7    well, let me back up.                      11:04:29

 8              Do you agree that the costs      11:04:31

 9    associated with collecting late rent may   11:04:35

10    vary substantially from one tenant to      11:04:38

11    another?                                   11:04:43

12         A.    I think it depends on how you   11:04:44

13    define "substantial," but certainly my     11:04:46

14    model shows that costs vary across         11:04:48

15    individual plaintiffs, yes.                11:04:51

16         Q.    And I think you'd agree with me 11:04:52

17    that, for at least some portion of the     11:04:58

18    plaintiffs, even under your model,         11:05:01

19    Equity's costs exceed the amount of any    11:05:04

20    late fee they paid?                        11:05:09

21         A.    Yeah, yes.  My model shows that 11:05:12

22    something on the order of about I want to  11:05:13

23    say 2 to 3 to 4 percent, that ballpark,    11:05:16

24    depending on which assumption I use, that  11:05:19

25    they imposed costs related to their late   11:05:21
```

Veritext Legal Solutions
866 299-5127

CERTIFICATION

1               CERTIFICATION

2

3       I, BELLE VIVIENNE, a Nationally

4   Certified Realtime Reporter, do hereby

5   certify:

6       That the witness whose testimony as

7   herein set forth, was duly sworn by me;

8   and that the within transcript is a true

9   record of the testimony given by said

10  witness.

11      I further certify that I am not

12  related to any of the parties to this

13  action by blood or marriage, and that I am

14  in no way interested in the outcome of

15  this matter.

16      IN WITNESS WHEREOF, I have hereunto

17  set my hand this 13th day of October 2021.

18

19

20

21          *Belle Vivienne*

22          BELLE VIVIENNE, CRR, CCR, RPR

23

24

25

Veritext Legal Solutions
866 299-5127