Margaret McBride (SBN 294066)
mmcbride@clsepa.org
COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
1861 Bay Road
East Palo Alto, CA 94303
Tel:  (650) 326-6440
Fax:  (866) 688-5204

Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
Andrew P. Lee (SBN 245903)
alee@gbdhlegal.com
Anne P. Bellows (SBN 293722)
abellows@gbdhlegal.com
Katharine L. Fisher (SBN 305413)
kfisher@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel:  (510) 763-9800
Fax:  (510) 835-1417

Attorneys for Plaintiffs and the Certified Classes
(*Additional Counsel for Plaintiffs and the
Certified Classes listed on following page*)

UNITED DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, ANGELINA MAGAÑA, NORMA RODRIGUEZ, DAVID BONFANTI, and SHANNAH SMITH individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>EQUITY RESIDENTIAL, a real estate investment trust, ERP OPERATING LIMITED PARTNERSHIP, a partnership, EQUITY RESIDENTIAL MANAGEMENT, L.L.C., EQR-WOODLAND PARK A LIMITED PARTNERSHIP, and EQR-WOODLAND PARK B LIMITED PARTNERSHIP,<br><br>        Defendants. | **CLASS ACTION**<br><br>Case No.: 4:16-cv-01225-JSW-TSH<br><br>**NOTICE REGARDING PARTIES' DEPOSITION DESIGNATIONS; [PROPOSED] ORDER**<br><br>Dept:      Courtroom 5<br>Before:   Hon. Jeffrey S. White<br><br>Trial Date:    June 8, 2023 |

872860.5

Craig Nicholas (SBN 178444)
craig@nicholaslaw.org
Alex Tomasevic (SBN 245595)
alex@nicholaslaw.org
NICHOLAS & TOMASEVIC, LLP
225 Broadway, 19th Floor
San Diego, CA 92101
Tel:   (619) 325-0492
Fax:  (619) 325-0496

Attorneys for Plaintiffs and the Certified Classes

872860.5

Pursuant to the Court's instructions during trial (Trial Tr. At 810:18-14), the Parties hereby submit the following deposition designations that have been offered into evidence at trial.  The Parties have jointly prepared excerpts of the deposition transcripts that contain their designated testimony and interlineating trial exhibit numbers and any deposition errata.  The transcripts are attached in alphabetical order as follows, with Plaintiffs' designations highlighted yellow and Defendants' designations highlighted blue.

- <u>Exhibit 1</u>: Grace Balahadia
- <u>Exhibit 2</u>: Mickey Cummings, subject to objections below
- <u>Exhibit 3</u>: Collin Glancy, subject to objections below
- <u>Exhibit 4</u>: Carina Gomes
- <u>Exhibit 5</u>: Bruce Lavine
- <u>Exhibit 6</u>: Chris Jenkins, subject to objections below
- <u>Exhibit 7</u>: Chad Johnson
- <u>Exhibit 8</u>: David Santee, subject to objections below
- <u>Exhibit 9</u>: Jamie Sternberg, subject to objections below and with confidential portion filed conditionally under seal
- <u>Exhibit 10</u>: Frederick Tuomi, subject to objections below
- <u>Exhibit 11</u>: Susan Zumph, subject to objections below

The Parties previously each filed the unresolved objections to designated deposition testimony at ECF Nos. 419 and 423.  To the extent those objections remain unresolved, the Parties have identified them in a single table with a space for the Court's ruling below.  For the Court's convenience, copies of ECF Nos. 419 and 423 are attached here to as <u>Exhibits 12 and 13</u>, respectively.

Finally, Plaintiffs offered designated testimony of Fed. R. Civ. Proc. Rule 30(b)(6) witness Collin Glancy on Thursday, June 15, 2023, after learning that day Defendants would not be calling him to testify live at trial that day.  Defendants have objected to certain of those designations and offered counter-designations.  The Parties' argument regarding these designations is described in <u>Exhibit 14</u>. Equity objects that this testimony is not proper rebuttal, and further contends it would also be improper testimony in Plaintiffs' case-in-chief as it was not timely designated or introduced into evidence.

Plaintiffs, however, offer Mr. Glancy's testimony as rebuttal to Equity's claim of lost use of funds from late rent payments and Mr. Hosfield's use of weighted cost of capital as the appropriate measure of that lost use of funds.  Plaintiffs' expert Christian Tregillis has long cited to Mr. Glancy's testimony to support his opinions on these topics as set forth in his rebuttal expert report, *e.g.* at Trial Ex. 261-39 and 261-40 (footnotes).

| Unresolved Objections to Deposition Designations | | | |
|---|---|---|---|
| **Witness** | **Designation** | **Objection**[1] | **Court's Ruling** |
| Cummings | 52:19-55:2 | Fed. R. Evid. 602 | |
| Glancy | (entire designation) | Not rebuttal; not timely | |
| Glancy | 37:9-25 | vague; scope (scope = beyond scope of 30 (b)(6) topics) | |
| Glancy | 40:1-16 | vague, foundation, scope | |
| Glancy | 68:1-6; | scope; | |
| | 68:7-13 | vague, foundation, scope | |
| Glancy | 78:15-22 | vague, scope | |
| Glancy | 90:2-24 | vague, scope, foundation | |
| Glancy | 98:16-20 | scope | |
| Glancy | 105:17-25 | scope, vague | |
| Glancy | 106:1 | scope, vague | |
| Glancy | 106:2-9 | scope, vague, foundation | |
| Glancy | 106:11-25 | scope, vague | |
| Glancy | 107:1-3 | scope, vague | |
| Jenkins | 17:7-17 | Fed. R. Evid. 602 | |
| Jenkins | 22:23-23:5 | Fed. R. Evid. 602 | |
| Jenkins | 29:15-20 | Fed. R. Evid. 106, 602 | |
| Santee | 58:23-59:25, 60:4-10 | Fed. R. Evid. 106, 403, 602, 801-802.  *See generally* Plaintiffs' | |

[1] The Parties' arguments regarding objections and responses thereto can be found in ECF Nos. 419 and 423, attached hereto as Exhibits 12 and 13, respectively.

872860.5

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

| Unresolved Objections to Deposition Designations | | | |
|---|---|---|---|
| **Witness** | **Designation** | **Objection**[1] | **Court's Ruling** |
| | | Mot. in Limine No. 1. | |
| Santee | 62:4-13 | Fed. R. Evid. 106, 401-402, 403, 602, 801-802. *See generally* Plaintiffs' Mot. in Limine No. 2. | |
| Santee | 73:16 | Fed. R. Evid. 602 | |
| Santee | 133:4-10 | Fed. R. Evid. 106, 602 | |
| Santee | 133:17-135:9 | Fed. R. Evid. 106, 602, 401-402, 403 | |
| Santee | 141:12-15 | Fed. R. Evid. 106, 602 | |
| Santee | 152:8-153:8, 153:14-154:1 | Fed. R. Evid. 106, 801-802 | |
| Santee | 177:11-22 | Fed. R. Evid. 602 | |
| Tuomi | 50:18-51:23 | Fed. R. Evid. 602 | |
| Zumph | 45:19-47:2 | Fed. R. Evid. 602, 401-402, 403, 801-802 | |
| Zumph | 50:17-52:16 | Fed. R. Evid. 602, 801-802 | |
| Zumph | 60:1-66:25 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 67:18-70:1 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 75:6-80:9 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 81:25-83:15 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 86:4-93:15 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 95:23-97:21 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 99:17-100:12 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 101:4-106:7 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 124:5-125:11 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 133:5-136:11 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 154:23-157:19 | Fed. R. Evid. 403, 602, 801-802 | |
| Zumph | 163:21-164:1 | Fed. R. Evid. 401-402, 403, 602 | |
| Zumph | 165:10-195:20 | Fed. R. Evid. 401-402, 403, 602, 801-802. *See also Pooshs v. Philip Morris USA, Inc.*, No. 04- | |

3

872860.5

| Unresolved Objections to Deposition Designations | | | |
|---|---|---|---|
| Witness | Designation | Objection[1] | Court's Ruling |
|  |  | cv-1221-PJH, 2016 WL 860985, **1-2 (N.D. Cal. 2016) (striking the block designation of pages of testimony as "unusable"). |  |
| Zumph | 196:21-202:13 | Fed. R. Evid. 403, 602, 801-802 |  |
| Zumph | 205:17-210:6 | Fed. R. Evid. 401-402, 403, 602, 801-802 |  |
| Zumph | 214:11-221:25 | Fed. R. Evid. 403, 602, 801-802 |  |

Dated: June 20, 2023                 Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

_/s/ Katharine Fisher_
Katharine Fisher

Counsel for Plaintiffs and the Certified Classes

Dated: June 20, 2023                 DUANE MORRIS LLP

_/s/ Karen L. Alexander_
Karen L. Alexander

Counsel for Defendants

## SIGNATURE ATTESTATION

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatories on this e-filed document.

Dated: June 20, 2023                 _/s/ Katharine Fisher_
Katharine Fisher

Counsel for Plaintiffs and the Certified Classes

4

1

2

3                        **[PROPOSED] ORDER**

4          The Court receives into evidence the designated deposition testimony attached hereto, subject

5    to the Court's rulings on the Parties' objections described above.  The Parties are ordered to prepare

6    updated transcripts reflecting the Court's rulings to be appended to the record.

7

8    Dated: June __, 2023              _____

9                                      Hon. Jeffrey S. White

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

872860.5

Exhibit 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

_____ )
JAVANNI MUNGUIA-BROWN, ANGELINA )
MAGANA, NORMA RODRIGUEZ, and    )
DAVID BONFANTI, individually and)
on behalf of others similarly  )
situated,                       )
                                )
          Plaintiffs,           )
                                )
     v.                         )  Case No.
                                )  4:16-cv-01225-JSW-TSH
EQUITY RESIDENTIAL, a real      )
estate investment trust, ERP    )
OPERATING LIMITED PARTNERSHIP, a)
partnership, EQUITY RESIDENTIAL )
MANAGEMENT, L.L.C., EQR-WOODLAND)
PARK A LIMITED PARTNERSHIP, and )
EQR-WOODLAND PARK B LIMITED     )
PARTNERSHIP,                    )
                                )
          Defendants.           )
_____)

VIDEOCONFERENCE DEPOSITION OF
GRACE BALAHADIA
Tuesday, February 23, 2021
Appearing from Santa Clara, California

Reported by:  Keren M. Guevara, CSR No. 12478

```
 1           TUESDAY, FEBRUARY 23, 2021, 10:02 A.M.

 2        REPORTED REMOTELY FROM SAN DIEGO, CALIFORNIA

 3

 4                    GRACE BALAHADIA,

 5      having first been duly sworn, testified as follows:

 6

 7                        EXAMINATION

 8  BY MR. LITNEY:

 9      Q    Good morning, Ms. Balahadia.

10           Am I saying your name correctly?

11      A    Yes.

12      Q    Okay.  I appreciate you clarifying that.

13           Would you mind please stating your name and

14  spelling it for the record?

15      A    Sure.  My name is Grace Balahadia.  It's

16  spelled as G for boy[sic], R for Robert, A for apple, C

17  for Charlie, E for echo, B for boy, A for apple, L for

18  Larry, A for apple, H as in Harry, A for apple, D for

19  David, I for India, A for apple.

20      Q    I'm very impressed.  When I've always tried to

21  spell something out, you know, using that sort of

22  military lingo, I always mess it up halfway through, so

23  very impressive.

24      A    Thank you.

25      Q    My name is Ethan Litney.  I think I
```

Grace Balahadia                                    February 23, 2021

1  community, which is 175 units, and then it jumped up to
2  a dual property site because they built a new one in
3  Emeryville.  And then they offered me another job, which
4  was a new property in Pleasanton, which is also a dual
5  site, so yeah.
6       Q    And when you say "dual site," what exactly
7  does that entail?
8       A    It means two communities being managed by the
9  same community manager and -- I mean, same staff.  Yeah.
10      Q    Got it.
11           So when you worked for Essex Property Trust,
12  in that time when you were -- had a, you know, dual
13  property, did you have an office at one property or the
14  other, or did you move back and forth?
15      A    We have an office in both communities.  So,
16  you know, there are days that I would be -- I have my
17  own office at one community that I can work at, and then
18  I could also work on the other community.
19      Q    Got it.
20           Did you work in any other positions between
21  Essex Property Trust and your time at Equity?
22      A    No.
23      Q    Okay.  So how did you first learn about this
24  lawsuit?
25      A    It was actually just two weeks ago.  You know,

Grace Balahadia                                          February 23, 2021

```
 1    I'm very clueless.
 2         Q    Okay.
 3         A    It was a call that I got from Karen.
 4         Q    Okay.  Ms. Alexander?
 5         A    Yes.  Karen Alexander.
 6         Q    Got it.
 7              So have you had any other calls with anyone,
 8    including attorneys, regarding the lawsuit since that
 9    first call with Ms. Alexander two weeks ago?
10         A    No.
11         Q    Okay.  Have you reviewed any documents to
12    prepare for this deposition?
13         A    No.
14         Q    Okay.  How long was that call with
15    Ms. Alexander two weeks ago?
16              Can you give me your best estimate?
17         A    I do believe it was, like, you know -- I'm
18    thinking like that was before Valentine's Day, I think.
19    Yeah.  That was the week before Valentine's Day.  That's
20    how I could remember it.  I think it's a midweek
21    either a Tuesday or Wednesday when I got her call.
22         Q    Got it.
23              And I don't want to know the contents of
24    anything you discussed with Ms. Alexander, but to the
25    best of your recollection, was it closer to, like, say,
```

Grace Balahadia                                         February 23, 2021

1    a five minute call or, like, a two hour call?  You know,
2    somewhere between?
3         A    It's just like a ten minute call, just
4    explaining -- yeah, just letting me know.  Yeah.
5         Q    Okay.  Great.
6              So I'd like to jump to your time at Equity.
7              How did you first hear about the position at
8    Equity?
9         A    One of the hiring managers saw my profile in
10   LinkedIn and, basically, offered me a job.
11        Q    And what job was that?
12        A    It was the leasing administrator for Park
13   Place San Mateo.
14        Q    For Park Place San Mateo?
15        A    Yes.
16        Q    And how long were you a leasing administrator
17   at Park Place San Mateo?
18        A    I've been a leasing administrator with them
19   for about two years.
20        Q    And approximately when did you start working
21   as a leasing administrator?
22        A    That would be January of 2017.
23        Q    And are you still leasing administrator now?
24        A    No.
25        Q    Okay.  Do you still work for Equity now?

Grace Balahadia                              February 23, 2021

```
 1        A    Yes.
 2        Q    Okay.  What's the -- so let's -- starting from
 3   the leasing administrator, what was the next job you
 4   took with Equity?
 5        A    It's still a lateral move.  I made a lateral
 6   move.  I work as a leasing administrator for Park
 7   Hacienda, which is in Pleasanton.
 8        Q    Could you -- would you mind spelling the name
 9   of that property out to me?
10        A    Sure.  Park Hacienda is P-A-R-K, and then
11   Hacienda is H-A --
12        Q    Ah.
13        A    -- C-I-E-N-D-A.
14        Q    Thank you.  I apologize.
15             So in what time was that that you lateralled
16   over to Park Hacienda?
17        A    So it was overlapping because I still have to
18   do my job in between with -- you know, with Park Place.
19   I officially started with them July -- July of 2019.
20        Q    Okay.  And is that what you're currently doing
21   now, or have you taken another position with Equity?
22        A    I have taken another position with Equity.
23        Q    Okay.  So what's that position?
24        A    I'm now an area assistant manager.  It's
25   basically a floating assistant community manager.
```

Grace Balahadia                                          February 23, 2021

1          Q   Okay.  And when did you start working as an

2   area assistant manager?

3          A   It started March of 2020.

4          Q   And did you go straight from working at Park

5   Place and Park Hacienda overlapping, you know, in

6   July 2019 to working as an area assistant manager, or

7   was there a job in between those?

8          A   Oh.  Can you repeat that question?  So sorry.

9          Q   Sorry.  That was a horrible question.

10         So other than the jobs you already described

11   to me, have you done any other work for Equity, any --

12   held any other positions?

13         A   No.

14         Q   Okay.  So have you ever worked as a leasing

15   consultant for Equity or any other, you know, similar

16   company?

17         A   No.

18         Q   Okay.  And maybe you can help me kind of

19   understand a few things and maybe you can't.

20         Do you understand what the difference between

21   a property administrator and a general manager is at

22   Equity?

23         A   Yes.

24         Q   Okay.  What's your understanding of the

25   difference between those two positions?

Grace Balahadia                                    February 23, 2021

1    the deposition and avoid, you know, any other

2    communications with third parties.  Is that fair?

3         A    Yes.

4         Q    Okay.  And is that the situation you're in

5    right now, everything else is closed?

6         A    Yes.  My cell phone is in my purse, you know.

7    Nothing is, you know, in front of me.

8         Q    Yeah.  That's fine.

9         A    Yeah.  Yeah.

10        Q    Okay.  So let's go to your time when you

11   started as a property manager at Essex Property --

12   excuse me, a property -- excuse me, a leasing

13   administrator at Park Place San Mateo.

14        A    Yes.

15        Q    Okay.  So what were your job duties as a

16   leasing administrator?

17        A    Well, my first and foremost job description is

18   to manage the BMR program.  The BMR program is the Below

19   Market Rate program that we participate with the

20   local -- or City of San Mateo for affordable housing.

21             It's not limited to just managing that, but,

22   basically, also in charge of, like, you know, helping

23   out with leasing as an overflow, doing administrative,

24   you know, duties, like move-out statement, posting

25   checks, and so and so forth.[sic]

Grace Balahadia                                           February 23, 2021

1   letter with the information of what is the next step

2   that they have to do along with the lease agreement.

3           Q    Got it.

4           And how does the lease agreement get

5   populated?

6           A    It's electronically.

7           Q    Okay.

8           A    It's sent to them via DocuSign.

9           Q    Got it.

10           And what program creates the lease agreement?

11           And we're talking about back when you were at

12   Park Place in, I believe, January of 2017.  That

13   position.

14           A    Sure.  It's the property management system

15   that we're using, as well.  It's MRI.

16           Q    MRI.

17           Okay.  So while I don't want to oversimplify

18   this, essentially you press some sort of button in the

19   MRI and it pops out electronically or otherwise a lease

20   agreement for a potential tenant?

21           A    Is that correct.

22           Q    Fair enough.

23           Okay.  Do you have any understanding about how

24   MRI populates a monthly rent value?

25           A    No.

Grace Balahadia                                    February 23, 2021

1           So when you were working at Park Place, you

2    would be informed directly by the community manager of

3    any changes to the price of rent.  Is that fair?

4        A    Yes.  And we can also pull up a report for

5    pricing on MRI.  We have access to that as an associate.

6        Q    Got it.

7           So -- and I understand if you may not know,

8    but does the community manager have the authority to

9    unilaterally set the rent prices, or is that something

10   that happens through MRI?

11       A    I don't know.

12       Q    Okay.

13       A    Yeah.  I'm so sorry.  I don't know.  Yeah.

14       Q    No.  No.  That's totally fine.

15          Have you ever known your community manager to

16   just decide to, on a one-off, change the rent for an

17   available unit?

18       A    No.

19       Q    So the best to your knowledge, the rent for

20   any particular unit always conforms to what's listed in

21   MRI.  Is that fair?

22       A    That is correct.

23       Q    Okay.  Thank you.  I really appreciate the

24   clarification.  Sorry for all the questions there.

25          So other than that hypothetical I mentioned,

Grace Balahadia                                    February 23, 2021

1   statement, you know, has been mailed out.  If former

2   residents have question, I need to respond to that.

3   Things like that.

4        Q    So, correct me if I misheard you, but I

5   believe you said that one of your duties was making sure

6   the delinquency percentage is low?

7        A    Yes.

8        Q    Is that right?

9        A    Yes.

10       Q    So how did you go about doing that?

11            MS. ALEXANDER:  Sorry.  Just to clarify, we're

12   still talking about in the same apartments?

13            MR. LITNEY:  Still talking about Park Place --

14   yeah.  Thank you.

15   BY MR. LITNEY:

16       Q    Still talking about when you were acting as a

17   property administrator at Park Place.

18       A    Sure.  So ensuring that the rent payments are

19   posted on a timely manner, any balances from current

20   tenant or past tenant is being collected.

21       Q    Okay.

22       A    So that's how I, you know, ensure that, you

23   know, the delinquency low.

24       Q    Okay.  I see what you're saying.

25            So what other -- okay.  So you mentioned that

Grace Balahadia                                    February 23, 2021

```
 1   making sure that delinquency notices were mailed out.
 2   What exactly does that entail?
 3        A    That is right.  The delinquency notice -- I
 4   didn't -- so I just want to clarify.  I didn't say that
 5   the delinquency notice out.  I didn't say that --
 6        Q    Oh.  My apologies.
 7        A    -- earlier.
 8        Q    Okay.  I'm sorry.
 9        A    Yeah.
10        Q    So I think I --
11        A    Yeah.
12        Q    -- missed about something being mailed out.
13   If not the delinquency notice, what was that?
14             Or maybe I'm completely incorrect about what
15   you might have said.
16        A    Sure.  I'm in charge -- so part of the
17   delinquency process is, like, for people who didn't make
18   payments.  Of course, we have to post three-day notices.
19   So that's the part, maybe, what you're trying to say,
20   that I'm mailing out notices.
21             MS. ALEXANDER:  And if it's helpful, I was
22   going to go say I think she also said "SODA," which is
23   an acronym, S-O-D-A.
24             MR. LITNEY:  Oh.  See, I did not -- I did not
25   hear that, so I appreciate that clarification.
```

Grace Balahadia                                          February 23, 2021

1   BY MR. LITNEY:

2        Q    Ms. Balahadia, what does the acronym "SODA"

3   stand for, to the best of your knowledge?

4        A    It's Statement of Deposit.

5             You know, I'm going to be honest with you.  I

6   forgot what "A" stands for, but I know it's the

7   Statement of Deposit.

8        Q    And what exactly is a Statement of Deposit?

9        A    It's when somebody moves out basically letting

10  them know -- it's giving them the breakdown of what

11  charges has been deducted, you know, out of their

12  security deposit, if there was any charges.

13       Q    Okay.  So when someone moves out, you're

14  letting them know what charges, if any, have been taken

15  out of their security deposit.  That's what you're

16  talking about?

17       A    That is correct.

18       Q    Okay.  Okay.  And did your job duties stay the

19  same as we previously discussed until approximately July

20  of 2019 when you started working in Park Hacienda, as

21  well?

22       A    Yes, pretty much.

23       Q    Pretty much?

24            Anything you can think of that kind of made

25  you hesitate a little bit there?

Grace Balahadia                                    February 23, 2021

 1        A    Well, because with Park Hacienda it was more

 2   the job, when they offered it to me, the focus is more

 3   about the affordable program.  I need -- there is a big

 4   project that I need to fix for the affordable housing

 5   program, so I -- you know, I pretty much say that it

 6   stays the same, but most of my work -- workload is

 7   there, focused on that part.

 8        Q    Got it.

 9             So most of your time was spent working on the

10   BMR program.  Is that the program we're talking about?

11        A    That is correct.

12        Q    Okay.  So I -- you know, I know it's been a

13   little while, but I'd like to get your best estimate, if

14   possible, if you could break down, essentially, the

15   proportions of time you spent dedicated to these various

16   activities that you've discussed with me.

17             So you've mentioned that, you know, you spent

18   a great deal of your time on the BMR program.  You know,

19   between January of 2017 and July of 2019, approximately

20   how much time per week would you dedicate to working

21   with the BMR program?

22             MS. ALEXANDER:  Objection to the extent it

23   conflates the two properties.

24             You can answer to the extent you understand

25   the question.

Grace Balahadia                                        February 23, 2021

1              (Reporter clarification.)

2          MS. ALEXANDER:  Objection to the extent the

3   question conflates the two properties, so compound.

4   BY MR. LITNEY:

5       Q    And let me just clarify, you know,

6   Ms. Balahadia, my understanding is -- and I could have

7   just completely misheard you or misunderstood it that

8   you were only working at Park Place until July of 2019,

9   at which time you started working overlapping with Park

10  Hacienda.  Is that accurate?

11      A    Yes.

12      Q    Okay.  And then in March of 2020, you started

13  floating at additional properties.  Is that right?

14      A    Yes.  It started as a floating assistant

15  manager and no longer as a leasing administrator at Park

16  Hacienda.  Park Hacienda has been sold.

17      Q    Oh, I see.  Okay.

18           So okay.  So, again, my question is I'm trying

19  to, essentially, discuss these previous job duties that

20  you've described to me from the period of time when you

21  were working solely at Park Place San Mateo between

22  approximately January of 2017 and approximately July of

23  2019.  Again, I believe you mentioned that you spent a

24  lot of your time dealing with the BMR program.

25           Approximately how much of your weekly working

Grace Balahadia                                    February 23, 2021

```
 1   time would be spent working with the BMR program?
 2        A    I cannot give you an exact, you know, time.  I
 3   could probably give you a percentage.
 4        Q    That's fine.
 5        A    Just to give you an average of how -- yeah.
 6             So, like, if you're stating to me 40 percent
 7   of, you know, my time is dedicated to the BMR, to the
 8   affordable housing program.
 9        Q    Got it.
10             How much of your time would be dedicated to
11   helping with leasing and overflow?
12        A    Ten percent.
13        Q    Ten percent.
14             How much time would you spend doing
15   administrative duties relating to moving out statements
16   and posting checks?
17        A    So that would be 20 percent.
18        Q    Twenty percent?
19             How much time would you spend working on
20   delinquencies?
21        A    Thirty percent.
22        Q    Thirty percent of your time?
23             So that -- you know, I'm very bad at math, but
24   you've given me a 40 percent, a 10 percent, a
25   20 percent, a 30 percent, and that adds up to 100.
```

Grace Balahadia                                    February 23, 2021

1          Is there anything outside of these four

2    categories of duties that you can think of that we

3    haven't already discussed that you performed at Park

4    Place?

5         A    No.

6         Q    Okay.  So you mentioned you spent 30 percent

7    of your time on delinquencies.  I would like to break

8    down kind of what that entails.  You know, how much time

9    you're spending on doing what relating to delinquencies.

10         So the first question I have is, you said you

11   had to post three-day notices.  Approximately how much

12   of your time spent on delinquencies was focused on

13   three-day notices?

14        A    It's -- kind it of varies.  It's hard for me

15   to give you an exact amount of time as --

16        Q    Got it.

17        A    -- you know -- yeah.  As I said, you know, I

18   have other duties rather, you know, than this, so --

19        Q    Sure.

20        A    -- it all depends.  Yeah.

21        Q    Okay.  So now that makes sense.

22         So I guess let's talk about the three-day

23   notices themselves.  What does that process entail,

24   posting a three-day notice?  What do you need to do,

25   first step?

Grace Balahadia                                    February 23, 2021

```
 1            MS. ALEXANDER:  And objection.  We're still --
 2            THE WITNESS:  Sure.
 3            MS. ALEXANDER:  -- talking about Park Place?
 4            MR. LITNEY:  Still talking about Park Place.
 5            THE WITNESS:  Okay.  So just as a process, you
 6   know, on the 5th of the month I post checks first,
 7   making sure that -- you know, to get an accurate
 8   reporting of who are the people who still has a balance,
 9   who has a delinquent account.
10   BY MR. LITNEY:
11       Q   Uh-huh.
12       A   Once, basically, you know, I have the correct
13   number of people who has delinquent account, then I
14   generate or, you know, populate the report for the
15   three-day notice.
16            The three-day notice, then, I would have to
17   gather those notices and post them -- attempt to post.
18   Attempt to deliver first and then post on the door of
19   the resident.  I cannot just post them.  I have to
20   knock.  If the resident did not respond, then that's a
21   time I post the notice.
22            And then, when I get back to the office, I
23   have to file one copy, and then I have to mail the other
24   copy for the household.
25       Q   Got it.
```

Grace Balahadia                                    February 23, 2021

1        Q    Uh huh.

2        A         as I cannot give you a definite number

3    or    you know, so

4        Q    Sure.

5        A    -- for -- for posting -- attempting to deliver

6    and post the notices, it could take, you know, an hour

7    to two and a half hours.

8        Q    What does that exactly entail?

9             Are you walking around the property itself,

10   knocking on doors, taping paper to doors?

11       A    Yes.  So I just want to clarify.  Park Place

12   is 575 apartment complex.  And I'm, basically, just

13   walking.  No golf carts.  And the buildings, basically,

14   has four, like, levels.  So just want to, you know, let

15   you know why it's taking longer.

16       Q    Sure.  No.  I appreciate the clarification.

17            Were there any golf carts on the premises?

18       A    No.

19       Q    Okay.  Were there any golf carts on any of the

20   apartments you worked for    or worked for and currently

21   at Equity?

22       A    Ethan, let me correct that.

23            Okay.  There is a golf cart only for the

24   service team member, but it's not for the leasing team.

25       Q    So let me ask you, we're talking about Park

Grace Balahadia                                        February 23, 2021

```
 1        Q    Yeah.  Not a problem at all.
 2             So what we've just described, that would be
 3   populating the report and gathering the notices,
 4   attempting to deliver and attempting to post the notice,
 5   filing one copy and mailing another copy of the notices.
 6   Those are all the tasks that you recall relating to
 7   handling delinquencies during your time at Park Place
 8   between January 2017 and approximately July 2019.
 9        A    Yes.  But I think it's not only limited to
10   that.
11        Q    Okay.  So what else -- what else did you do
12   relating to delinquencies?
13        A    Well, aside from that, if, you know, after
14   posting, if it's past that three days, I'm also in
15   charge of sending it to the legal to process it --
16        Q    Okay.
17        A    -- for eviction.
18             I also am the one in charge of collecting
19   payments.  So part of the delinquency when you say, you
20   know, delinquency, you call and attempt to collect the
21   payment from the resident.
22        Q    I see.  No.  I appreciate you clarifying that.
23             So when do you send information to legal?
24             And I'm assuming that means an attorney.  I
25   could be wrong.  I guess, let me strike all that.
```

Grace Balahadia                                    February 23, 2021

1              So who is "legal" in the context of your last
2    answer?
3         A    It's the -- it's the attorney that we work
4    with when we --
5         Q    Okay.
6         A    -- file the evictions.
7         Q    Got it.
8              And which attorneys did you work with when you
9    filed evictions between January of 2017 and
10   approximately June of 2019 at Park Place?
11        A    Sure.  From the time that I was working, we
12   were working with KTS, Kimball -- Kimball Tirey.
13        Q    Okay.  Any other attorneys or law firms?
14        A    No.
15        Q    Okay.  And when did you send tenant files to
16   KTS?
17        A    So after three business days from the time
18   that I posted the notice, if there was no response from
19   the resident, then I submit it -- I send it over to our
20   attorney.
21        Q    Got it.
22             And what does submitting it to the attorney
23   entail?
24        A    It's basically notifying them via email,
25   scanning all the documents that I need to provide to

Grace Balahadia                                    February 23, 2021

1   them, and then calling them to ensure that, you know,

2   the confirmation of receipt on their end.

3        Q   So what documents need to be scanned,

4   typically, when you're sending documents to KTS?

5        A   So documents needed to be scanned or sent over

6   to the attorney is the ledger -- the current ledger of

7   the resident, the lease agreement of the resident, the

8   notices that I post, and the form that I filled out when

9   I posted that notice, any correspondence that I emailed

10  to the resident --

11       Q   Got it.

12       A   -- the IDs of the resident, if we have copies

13  of that -- yeah -- and their application.

14       Q   Are all those documents already electronically

15  available on Equity's system on MRI or otherwise --

16       A   No.

17       Q   -- prior to sending them to KTS?

18       A   No.

19       Q   Okay.  So which of those documents are not

20  available electronically prior to sending them to KTS?

21       A   The ID, the -- electronically -- so some of

22  them are still paper.

23       Q   Okay.  Anything else?

24       A   And then -- oh, sorry.  And then, you know,

25  any correspondence, it's not in MRI because it's on my

Grace Balahadia                                    February 23, 2021

1   email, so I have to print it down[sic].

2        Q    Got it.

3             Do you, you know, drag or forward the emails

4   to KTS, or do you print them out on paper and then scan

5   them?  Or something else --

6        A    I print them --

7        Q    -- entirely?

8        A    -- because I want it to be organized, so I

9   compile them all together and scan them and send them as

10  one document.

11       Q    And so even the documents that are

12  electronically available, those get printed out and

13  scanned together before sending them to KTS.  Is that

14  correct?

15       A    Yes.

16       Q    And do you send the -- via email?

17            (Technical interruption.)

18            (Reporter clarification.)

19            THE WITNESS:  Yes

20  BY MR. LITNEY:

21       Q    Even if for a PDF, you are going to print that

22  out, scan it together with all the other documents you

23  previously --

24            (Reporter clarification.)

25

Grace Balahadia                                    February 23, 2021

 1   BY MR. LITNEY:

 2   ·  ·Q·  ·Okay.  So just to clarify, for both documents

 3   relating to the tenant that are both already available

 4   in electronic form and those that aren't you are going

 5   to print them out -- all out, regardless, scan them, and

 6   then send that attachment of scanned documents to KTS

 7   via email, correct?

 8   ·  ·A·  ·Yes.

 9   ·  ·Q·  ·Even if you had a PDF of, for example,

10   someone's lease that was already available on your

11   system, you would not just attach that as a separate

12   attachment.  You would print it, scan it, and email it

13   to KTS.

14   ·  ·A·  ·Yes.

15   ·  ·Q·  ·Correct?

16   ·  ·  ·  ·Okay.  And is it your understanding that

17   everyone involved in these sorts of duties at Park Place

18   between January, you know, 2017 and approximately July

19   of 2019, you know, performed this the same way, print

20   them all out, scan them together, and send them to KTS?

21   ·  ·A·  ·I wouldn't know because, just to clarify,

22   Ethan, none of my leasing staff does this job.  It's

23   basically me.  If I'm not in the office, it would be the

24   community manager or the senior leasing, so I wouldn't

25   know how their process is.  But this is my process that

Grace Balahadia                                    February 23, 2021

1   that what you're saying?

2        Q    Yeah.

3        A    Yes.

4        Q    Yup.  Okay.

5        A    Yes.

6        Q    So I want to talk about the MRI system for

7   just a second.

8             Are any of these activities that you've

9   discussed to me related to delinquencies, are they

10  tracked on the MRI system?

11       A    If it was -- if it was tracked?  Is that what

12  you're saying?

13       Q    Yes.  That's what I was trying to say.

14       A    Like, meaning, if I'm printing the report, it

15  would track on MRI?  Is that what you're saying?

16       Q    Yeah.  Yeah.  What I'm trying to figure out is

17  which of these tasks you've discussed -- you know,

18  populating the report; preparing the notices; you know,

19  attempting to deliver them -- what is tracked

20  electronically relating to this work?

21       A    So the one that's tracked in the MRI is,

22  basically, the report and also the delinquency or, like,

23  the three-day notices.

24       Q    Got it.

25            So let me take a step back here for a second.

Grace Balahadia                                              February 23, 2021

1        Q    And you punched back in when you got back from
2   lunch, generally?
3        A    Yes.
4        Q    And then you punched out again when you left
5   for the day?
6        A    Yes.
7        Q    Okay.  Did you ever put any other information
8   in Chronos?  For example, you know, what you were
9   working on at any particular time.
10       A    Yes.  If we did overtime, you have to put
11  notes.
12       Q    I see.  And those would not be tracked --
13  those would be tracked in the Chronos system, correct,
14  not the MRI system?
15       A    Yes.  It's -- it's going to be
16       Q    Okay.
17       A    -- tracked on whatever application we're
18  using.
19       Q    Understood.  I appreciate that.
20            So other than what you've mentioned regarding
21  the report and preparing the three-day notices, what is
22  tracked relating to your work on delinquencies in the
23  MRI system?
24            And when I mean "tracked," I mean there's some
25  record of what work you were performing, to the best of

Grace Balahadia                                    February 23, 2021

1   your knowledge.

2         A    Posting the checks, you know, it's tracked on

3   the MRI system because when you post something it would

4   create the report.

5         Q    Got it.

6              Anything else you can think of?

7         A    Notes that we would --

8              (Technical interruption.)

9              (Reporter clarification.)

10             THE WITNESS:  For notes that we would put for

11  any conversation or, you know, activity that I wanted to

12  notate regarding a resident.

13  BY MR. LITNEY:

14        Q    I understand.

15             Did you typically create a note for every

16  resident interaction you had?

17        A    I try my best, but, you know, I cannot say

18  100 percent.

19        Q    Sure.

20             What's your general estimate of how many of

21  your interactions with residents were captured in the

22  notes?

23        A    I honestly wouldn't know.  It's kind of hard.

24  It varies.

25        Q    Okay.

1    A    So --

2         Q    No.  No.  I get it.  And I'm going to be a

3    little annoying here.  I'm going to ask for your best

4    estimate, and I'll just see what we can do here.

5              Would it be more than 10 percent of the

6    interactions would be recorded in notes?

7         A    I believe so.

8         Q    Would it be more than 20?

9         A    Let's just make a range.  I would say about 10

10   to 25 percent of the time I'm able to put the notes in.

11        Q    Uh-huh.  Got it.

12             So, to the best of your knowledge, at this

13   time there's no record of those other 80 percent of the

14   calls you may have taken or resident interactions you

15   may have had.  Is that fair?

16        A    No, because some of those communications that

17   I have with the resident may be in the email form, and

18   even if I don't put the notes in, I have the email.  I

19   never delete email conversation with my residents.

20        Q    That sounds like a good policy.  So that's

21   fair.

22             Other than those conversations that are

23   memorialized in emails and the ones that you record, the

24   10 to 20 percent that you record, is there any other

25   record that you know of for the remainder of the

Grace Balahadia                                    February 23, 2021

1   80 percent?

2        A    I'm not so sure.  I don't know.  Yeah.

3        Q    Okay.  That's fine.

4             Regarding your work of, you know, kind of

5    pounding the pavement and trying to, you know, provide

6    those notices, those three day notices to residents, did

7    you ever take any notes about that?

8             For example, Hey, I spent, you know, one and a

9    half hours today putting up notices?

10       A    No.

11       Q    Okay.  So to the best of your knowledge, there

12   wouldn't be any record of exactly how much time you

13   spent performing that sort of task.  Is that fair?

14       A    Yes.

15       Q    Got it.

16            Regarding delinquencies, I'm just -- as I'm

17   thinking about this, you know, rent is -- I'm assuming

18   rent is due on the 1st of the month for all residents?

19       A    Yes.

20       Q    Okay.  I'm assuming you didn't perform any

21   delinquency-related work on the 1st of the month.  Is

22   that fair?

23       A    I still do.

24       Q    Okay.  Please, I appreciate you clarifying

25   that because I'm not quite sure I understand.

Grace Balahadia                                    February 23, 2021

1         A    First to the 4th of the month is when heavily

2    we -- you know, we try to collect the money from the

3    resident because that's when rent is due.

4              So it's not just posting checks.  As a

5    courtesy, I would email my resident and remind them that

6    rent is due already.  Even though there is an automated

7    email sent out by the company already to residents that

8    the rent is due, I would still email my resident.  I

9    would call them heavily on the 4th if I see that they --

10   nobody responded to my email.

11        Q    Got it.

12             On an average -- now, I know this probably

13   varied a little bit -- but on an average month when you

14   were working at Park Place when I believe you said there

15   were 575 apartments, approximately how many would be

16   delinquent -- yeah.  How many would pay their rent

17   delinquent on an average basis?

18        A    Okay.  When you say "delinquent," are you

19   talking about how many was sent over ready for eviction

20   or they just -- you know, we're just talking from the

21   5th of the month wherein you're trying to estimate and

22   gauge how many people didn't pay rent?

23        Q    Yeah.  So that -- I appreciate that.

24             What I'm trying to figure out is you just

25   mentioned that you would email residents regardless of

1  on average?

2          MS. ALEXANDER:  And since we're back from a

3  break, I'm just going to clarify we're going to limit

4  our questions now to Park Place until Ethan tells us

5  otherwise.

6          And you may answer.

7          THE WITNESS:  Just to -- just to answer your

8  question, I do believe I did answer this earlier, and I

9  gave you a range only.  I said that, depending on the

10 number of residents that I would have to file to KTS, it

11 would take me about an hour, an hour and a half to send

12 it over to KTS.  Again, it all depends on the number of

13 residents that, you know, I'm sending over for the

14 month.

15 BY MR. LITNEY:

16      Q    Understood.

17           And -- okay.  So my question now is finally

18 going to move forward to Hacienda.

19           When you started work at Hacienda, as well, in

20 July of 2019, did the amount of time you spent on

21 delinquencies change?

22      A    Yes and no.

23      Q    Okay.  I'm going to ask you for clarification

24 of that answer, if I could.

25      A    Yes.  Because for the first few months, as I

```
 1  was transitioning, it was heavily focused -- you know, I
 2  still have some adjustment.  So I heavily focused more
 3  on the BMR, and I worked hand in hand -- they have an
 4  assistant manager there.  So there is an assistant
 5  manager, there is myself as a property or leasing
 6  administrator, and then there's a community manager.
 7          So because we know the tasks that I need to
 8  work on for the BMR, you know, it's somewhat split.
 9  They split the delinquency responsibility between me and
10  the assistant manager.
11      Q    I understand.
12          Approximately how long was that, kind of,
13  on-boarding transition phase where this was going on?
14      A    I would say about a month.
15      Q    A month.  Okay.
16          So after that initial month, was it pretty
17  much business as usual in terms of how much time you
18  spent on delinquencies for both Park Place, as well as
19  Hacienda?
20      A    Yes.  Yes.  It's both the same time, but, you
21  know, there's a big difference between the two
22  properties in terms of the delinquency.  So even though
23  I work hand in hand with an assistant manager, there's
24  more delinquent accounts over at Park Hacienda.
25      Q    I'm sorry.  I apologize.  It cut out for a
```

Grace Balahadia                                    February 23, 2021

```
 1   second.  Could you repeat that one more time?
 2        A    Okay.  So I was just informing you that, even
 3   though I worked hand in hand, we split the delinquency
 4   responsibility with the assistant manager, because of
 5   the big difference in the delinquency accounts of Park
 6   Hacienda compared to Park Place, you know, it's pretty
 7   much, you know -- you spend more time also on the, you
 8   know, collecting, trying to collect, and, you know,
 9   settle delinquent accounts, rather than, you know,
10   making it easy for me.  I mean, it's basically the same,
11   I think.  Yeah.  The same or more, more time spent.
12        Q    Okay.  So more time spent.
13             You know, to the best of your understanding,
14   why was it more difficult, you know, at Park Hacienda in
15   terms of, you know, collecting delinquencies?
16        A    I really don't know why, but, like, what I was
17   just explaining to you, I just notice that there is more
18   delinquent accounts.  More people are not paying rent at
19   that property compared to Park Hacienda.
20        Q    Got it.
21        A    So there's more tasks and work to do.  That's
22   what I'm just trying to explain to you.
23        Q    Okay.  During that time period -- I mean, we
24   mentioned previously that you were doing the vast
25   majority of the delinquency work when it was in Park
```

Grace Balahadia                                    February 23, 2021

1        A    Yes.

2        Q    Okay.  How

3        A    She got promoted.

4        Q    Oh.  She got promoted.  Okay.

5             So from that time up until the time you took

6    your most recent position, you were still handling

7    almost all of the delinquency work at Hacienda as well

8    as Park Place.  Is that accurate?

9        A    Yes.

10       Q    I see.  Okay.

11             Are you familiar with the late fee utilized by

12   Equity?

13             (Reporter clarification.)

14             THE WITNESS:  I'm familiar.

15   BY MR. LITNEY:

16       Q    The late fee.

17       A    Yes.

18       Q    Okay.  What is the late fee?

19       A    So late fee is, basically, as stated on the

20   contract.  It's 5 percent and minimum of $50 on the 5th

21   of the month.  It's going to assessed if you didn't pay

22   your rent.

23       Q    Is that amount, that $50 or 5 percent, is that

24   automatically assessed by MRI or some other automated

25   process?

Grace Balahadia                                    February 23, 2021

1       A    It is.

2       Q    Okay.  So in a hypothetical -- you know, I

3    rented not too long ago, and I remember getting a late

4    fee.  Not that I failed to pay my rent but because I

5    think I failed to pay my utility bill.  So I was, like,

6    you know, like 50 bucks over, and I got a late fee.

7            Is that -- is that similar to how it would be

8    at Equity?  Meaning, if there's not -- you know, if they

9    pay part of their rent, you know, they might get charged

10   that $50 instead of 5 percent of their total rent?

11      A    I really don't want to answer that question.

12   What I meant was I'm not really involved on how they

13   assess the late fee or, you know, what's the protocol in

14   that matter.

15           I know it's automatically populated by the

16   system, but I don't know how it's being computed or

17   how --

18      Q    Got it.

19      A    -- it's generated.  So I don't want to make

20   any, you know -- or state any fact that is, you know,

21   incorrect.

22      Q    Okay.  Well, I appreciate that.

23           So have you ever seen, you know, late fees

24   charged on tenant's ledgers or, you know, on letters to

25   tenants?

Grace Balahadia                                    February 23, 2021

1    they'd be charged 5 percent of the --

2         A    5 percent or $50.  Yeah.  Yes.

3         Q    So   yeah.  And that's kind of my question.

4              So if everyone's rent is over $2,000, what's

5    circumstances, if any, that you can recall would result

6    in a $50 late fee?

7         A    I don't know.  So like what I said, I know for

8    a fact it's based on 5 percent of the total balance

9    owed, or the minimum charge late fee would be $50.

10        Q    Got it.  Okay.

11             So, for example, if for whatever reason

12   someone paid part of their rent, they would still get a

13   notice out for the remainder.  Is that fair?

14        A    Yes.

15        Q    And the late fee is based on not the monthly

16   rent but the actual amount that's owed.  Is that fair,

17   or am I wrong about that?

18        A    As I stated earlier, I don't know how they do

19   the computation of the late fee.  So I wouldn't be able

20   to, you know, comment on that part.

21        Q    Got it.

22             And the late fee was -- okay.

23        A    Yeah.

24        Q    Thank you.

25             And, again, I think you mentioned that the

Grace Balahadia                                    February 23, 2021

1    late fee is automatically populated by MRI.

2         A    That is correct.

3         Q    Okay.  Did you or any other employees    and

4    this is for the time when you were both at Park Place

5    and Park Hacienda up until about 2020, I think you

6    said -- did you or any other employee ever change a late

7    fee?

8         A    What do you mean by "change the late fee"?

9    Can you explain?

10        Q    Sure.

11             So you mentioned that MRI automatically

12   populates the late fee.  Were there any instances where

13   you changed the amount of late fee, you or any other,

14   you know, personnel working for Equity at the complex,

15   community manager or anyone?

16        A    Not that I know of.  I don't have any

17   recollection.

18        Q    And did you believe that you had the

19   discretion to change the late fee, if you wanted to?

20        A    No.

21        Q    Okay.  Do you have any idea how the late fee

22   was set?

23        A    Again, I don't have any idea how the late fee

24   is set because I was not involved in the process of how

25   they determined the formula for that.  All my knowledge

Grace Balahadia                                    February 23, 2021

1   is just pertaining to the lease agreement that we sent

2   out to the tenant.

3        Q    Understood.  Thank you.  And I apologize for

4   that, but I appreciate your clarification.

5             Was the late fee the same in both the Park

6   Place and the Park Hacienda properties?

7        A    Yes.

8        Q    Okay.  When you worked at Park Hacienda, what

9   was the  -- you know, you gave me a range earlier for the

10  Park Place rent.  Can you give me a similar range for

11  Park Hacienda in 2017 when you started working there --

12  2019, excuse me, July 2019?

13       A    Yes.  So with Park Hacienda, their market rate

14  for one bedroom is much cheaper because they're not on

15  the peninsula area.  So theirs is, like, around -- it

16  ranges, probably, from 2,000 to 2,400 for a one-bedroom.

17       Q    And I should have asked this question earlier.

18            You know, by the time you stopped working at

19  Park Place, how much did the rate increase, you know, on

20  average over that time period?

21       A    Honestly --

22       Q    I'm assuming it went up and not down.

23       A    Yeah.  It's hard for me to, you know, give you

24  the exact amount because, you know, rent would

25  fluctuate, and I don't know how -- you know, what

1   periods, just to kind of figure out exactly what was

2   done at what time of the month.  And I know this is

3   typically.  I mean, maybe there's some exceptions.

4           But, generally, on, you know, the first of the

5   month, anything -- you know, any work performed relating

6   to delinquent rent?

7           MS. ALEXANDER:  Objection.

8           THE WITNESS:  Yes.

9           MS. ALEXANDER:  Request for clarification.

10          Can we clarify either the time period or the

11  property or at least pre- or post Covid?

12          MR. LITNEY:  Yeah.  Fair enough.

13  BY MR. LITNEY:

14     Q   Okay.  So I'll ask this question:  In terms of

15  what work is performed during what period of the month

16  relating to delinquent rent, did that vary from property

17  to property?

18     A   No.

19     Q   Okay.  And did that vary pre- or post Covid?

20     A   The duties for month to month regarding

21  delinquency?

22     Q   Correct.

23     A   No.

24     Q   Okay.  So, yeah.  I'm going to be asking about

25  all properties that you're familiar with based on your

1   time both working at Park Place, at Hacienda, as well as

2   the properties that are currently within your purview in

3   the Bay Area to the extent you know.

4         And, essentially, what I'd like to know is

5   what work is performed relating to delinquencies on the

6   first of the month?

7      A   Okay.

8      Q   If any.

9      A   Okay.  Let me start.

10        First to the 4th of the month is heavily on

11  posting checks for the people who's dropping off, you

12  know, their personal checks, money order.  It's also

13  heavily on calling, reminding the residents that rent is

14  due.

15     Q   Uh-huh.

16     A   It's, you know, creating or making sure that

17  move-out statements is mailed on a timely manner.

18  Again, for the SODA, it's a Statement of Deposit of

19  Accounts.  That's what "A" stands for.  Sorry.

20     Q   Ah.  There we go.  Thank you.

21     A   Yeah.  So -- so we still have to do that in

22  between posting checks and sending notices to -- I mean,

23  sending reminders to the residents via phone call or via

24  email about rent is due.

25        By the 5th of the month, that's the time after

 1   posting checks you pull out the delinquency report.  And

 2   then, once you see already who are the people that's

 3   delinquent, you basically prepare a printout of the

 4   three-day notices that need to be, you know, delivered,

 5   attempt to deliver, or post on the door of the resident.

 6   That's on the 5th of the month.

 7       Q    Okay.  So the three-day notices go out on the

 8   5th?

 9       A    Yes.

10       Q    And is that, then, the same during your tenure

11   at Equity at all properties?

12       A    Yes.

13       Q    Okay.  So what happens after the 5th of the

14   month?

15            What other delinquency-related tasks are

16   performed after the 5th of the month?

17       A    Basically -- so, you know, basically, like

18   what I mentioned to you earlier.  You file the copies

19   of, you know, what you've posted, mailed them, call the

20   resident.  The ones who respond to you, basically, you

21   know, you post those checks again.

22            And then, after the 10th -- after three days

23   from the time that you posted the eviction notice,

24   that's when you check again your delinquency report, and

25   whoever did not respond, then you send that over to your

Grace Balahadia                                    February 23, 2021

```
 1   attorney to process for eviction.
 2        Q    Okay.  And what date is the date that it gets
 3   sent out to the attorneys, generally?
 4        A    It varies.  So like what I said, as long as if
 5   you post the three-day notice on the 5th, after three
 6   business days, if -- you know, it states on the notice
 7   that you posted.  That's when you, you know, send it
 8   over to the attorneys.  So I cannot exactly pinpoint to
 9   you if it's the 10th, if it's -- you know.
10        Q    Got it.
11             So after, you know, the information gets
12   passed on to the attorney, do you perform any other work
13   during that month relating to delinquent rent?
14        A    Yes.  You still continue to perform new
15   collections for the previous residents that had moved
16   out and they have balances, move-out balances.  You try
17   to collect that before it goes to collections -- to a
18   third-party collection agency.
19        Q    And what kind of actions do you take to try to
20   collect the unpaid rent?
21        A    I -- if it's pertaining -- I just want some
22   clarification, Ethan.  Is this --
23        Q    Of course.
24        A    -- pertaining to the move-out, the resident's
25   moving-out -- move-out balance, or the current residents
```

Grace Balahadia                                    February 23, 2021

 1   who has a balance?

 2        Q    That's -- thank you for that clarification.

 3             It's the latter, a current resident who has a

 4   balance.

 5        A    Okay.  Current resident who has a balance, if

 6   it's been sent out to the attorney already, I don't

 7   really have to do anything.  But if they, basically,

 8   reach out to me and try to settle, then that's the time

 9   I have to perform and draft the settlement agreement;

10   reach out to the attorney, basically ask, you know, what

11   are the legal fees so that we could settle the balance

12   of the resident before it goes to eviction.

13        Q    And what do you mean by "legal fees" in this

14   context?

15        A    Legal fees incurred, you know, in the

16   attorneys -- the attorneys' fees --

17        Q    I see.

18        A       for processing eviction.

19        Q    Got it.

20             How do you determine the amount of attorney's

21   fees in these contexts?

22        A    I wouldn't know.  That's why I call the

23   attorney, because they are the ones who would give me

24   the number.

25        Q    Got it.

Grace Balahadia                                        February 23, 2021

1        A    That doesn't include, you know, not rent

2   related, like late fee.

3        Q    Okay.  Have you ever had any tenants complain

4   about the late fee to you directly?

5        A    Yes.

6        Q    You know, to the best of your recollection,

7   how often does that occur?

8        A    Every now and then.

9        Q    Every now and then?

10            You know, if you can recall any particular

11  instances, what did tenants complain about?

12       A    That it's their first time being late, and,

13  you know, if they want us to waive the late fee.

14       Q    Got it.

15       A    They've already

16       Q    I think you mentioned earlier that's not

17  something you guys do, right?

18       A    I'm sorry.  What was that?  I'm sorry.

19       Q    Yeah.  I think you said earlier   no.  It's

20  okay.  I'm sorry for speaking over you.  The court

21  reporter is going to kill me here.

22            So I think you said earlier that, again,

23  that's something that Equity doesn't do, it doesn't

24  waive late fees.

25       A    Okay.  I just want to clarify on something on

Grace Balahadia                                    February 23, 2021

1  that matter.

2  · · · Q· · Sure.

3  · · · A· · The late fees are only waived when there was a

4  technical glitch on the resident portal.· If it was a

5  mistake on the, you know, system, then, of course, we

6  have to waive that.· If it was just an error on our

7  part, we have to waive it.

8  · · · Q· · Where did you learn about that· · that policy?

9  · · · A· · What do you mean where did I learn that

10  policy?

11  · · · Q· · Sure.· So who told you that you can waive late

12  fees when it's Equity's fault that a late fee was

13  charged?

14  · · · A· · It was not· · it's· · they didn't tell me,

15  but, basically, the community manager has the authority

16  to waive late fees if it was just an error.· They

17  have -- the resident needs to present, you know, a proof

18  that they did pay on time.· And, basically, if it was an

19  error on our part· · computer gets glitches.· Why would

20  we charge the resident a late fee when, you know, it was

21  not their fault, right?· It was just a computer error.

22  Yeah.

23  · · · Q· · Got it.

24  · · · · · So these complaints that you received, were

25  they in an email form?· Were they via telephone?· Were

Grace Balahadia                                    February 23, 2021

1    the notices, attempting to deliver the notices, and

2    attempting to post them, if not available.  Filing the

3    one copy of the notice, mailing the other copy of the

4    notice, and then, if necessary, sending to legal to, you

5    know, get that process rolling.  Is that right?

6         A    That is correct.

7         Q    Okay.  That's -- that's -- that's the work

8    performed relating to delinquencies, correct?

9         A    That is correct.

10             MR. LITNEY:  Okay.  All right.  I don't

11   think -- sorry, just one last thing.

12             Okay.  I don't have any other questions.

13             Ms. Alexander, do you have any?

14             MS. ALEXANDER:  I have a few clarification

15   questions or a few follow up questions.

16

17                    EXAMINATION

18   BY MS. ALEXANDER:

19   · · · Q · · Returning to the topic Ethan just went over

20   regarding the duties that you performed at Park Hacienda

21   and comparing them to the duties you performed at Park

22   Place relating to delinquencies, you had told us earlier

23   today that it was your practice at Park Place to contact

24   residents between the 1st and the 4th of the month to

25   remind them if they had not paid their rent by the 1st.

Grace Balahadia                                    February 23, 2021

```
 1          Do you remember when you talked about that
 2   earlier today?
 3        A    Yes.
 4        Q    Did you also do that at Park Hacienda?
 5        A    Yes.
 6        Q    If you are able to provide a range or an
 7   estimate, approximately how much time do you estimate
 8   that you spent in a typical month at Park Hacienda
 9   performing that particular duty?
10        A    Just emailing and calling residents?
11        Q    Yes.
12        A    It takes me about -- the average, you know,
13   minimum would be an hour and a half to two hours.
14   That's the maximum.
15        Q    You had also said that when you were at Park
16   Place you would have conversations with residents
17   between the 1st and the 4th who would reach out to you
18   after receiving your email.  Is that right?
19        A    Yes.
20        Q    Did you also do that at Park Hacienda?
21        A    Yes.
22        Q    Approximately how much time do you anticipate
23   you spent as far as a range or an estimate in a typical
24   month at Park Hacienda communicating, emailing, or
25   speaking to residents who reached out to you between the
```

```
 1  1st and the 4th of the month?
 2       A   It really varied, but just to give you a range
 3  for Park Hacienda, it would take me -- like,
 4  conversation that I had with them would take, you
 5  know -- fastest would probably be, you know, 15 minutes,
 6  and then longest would be, like, 45.  Yeah.  For one
 7  single resident.
 8       Q   You had also told us earlier today that at
 9  Park Place one of your job duties was communicate with
10  residents, answer questions, field phone calls between
11  the 5th of the month and the end of the month.
12           Do you remember that testimony?
13       A   Yes.
14       Q   Is that also a duty that you performed at Park
15  Hacienda?
16       A   Yes.
17       Q   Can you give us a range or an estimate of how
18  long one of those conversations might take -- and I
19  understand there's probably a broad range -- while you
20  were working at Park Hacienda to field an incoming call,
21  email, or communication from a resident at --
22       A   It would take, you know, 30 to an hour,
23  depending on the conversation, how the conversation goes
24  with that particular resident, and this is just one
25  resident.
```

Grace Balahadia                                    February 23, 2021

 1        Q    And would the time you spent total each month

 2   on that duty vary depending on how many residents you

 3   had to speak with?

 4        A    Yes.

 5        Q    Okay.  I'm going to switch to a different set

 6   of questions entirely.

 7             You had mentioned when you were at Park

 8   Hacienda that you shared delinquency duties with other

 9   employees in the office, right?

10        A    With the assistant manager when she was there.

11        Q    The time estimates that you provided to

12   Mr. Litney as far as the time you spent posting notices

13   and filing, were those time estimates based on your half

14   of the resident files when you were splitting your

15   duties?

16        A    No.  That was based on the time that she left

17   because she only stayed there when I was new for, you

18   know, a month or two.  She did not stay longer.  So I

19   was basically all by myself afterwards.

20        Q    And during that time period after the

21   assistant manager had left, were there ever any tasks

22   related to delinquency that were performed by others in

23   the office?  For example, posting texts or helping to

24   post notices, did anyone else ever help?

25        A    Yes.  When the community manager decided,

Grace Balahadia                                         February 23, 2021

1   because of how overwhelming it is for me to do the

2   project for the BMR or the affordable plus the

3   delinquency tasks, she basically delegated it to the

4   leasing team to assist me on, you know, eventually

5   posting notice -- you know, the three-day notice on the

6   apartment.  And then for posting checks they would also

7   help, as well.

8        Q   Do you know with certainty today how much time

9   those individuals spent on delinquency tasks or no?

10        A   I wouldn't know.

11             MR. LITNEY:  Objection.  Vague.

12             THE WITNESS:  Because they usually do it

13   towards the end of the day as their main priority during

14   daytime is do the sales.

15             (Reporter clarification.)

16             MR. LITNEY:  Oh, just vague and compound.

17   BY MS. ALEXANDER:

18        Q   I'm going to go to my final question.

19             You had   at the very beginning of today,

20   Mr. Litany had asked if you and I had had any phone

21   calls to prepare for today, and you recalled a phone

22   conversation that we had around the week of Valentine's

23   Day.

24             Do you remember that portion of your

25   testimony?

```
 1                    REPORTER CERTIFICATE

 2   COUNTY OF SAN DIEGO,  )

 3   STATE OF CALIFORNIA,  )

 4

 5          I, Keren M. Guevara, Certified Shorthand

 6   Reporter licensed in the State of California,

 7   License No. 12478, hereby certify that the foregoing

 8   proceeding was reported by me and was thereafter

 9   transcribed with Computer-Aided Transcription; that the

10   foregoing is a full, complete, and true record of said

11   proceeding; that request:  [ ] was    [X] was not made

12   to read and correct said deposition.

13          I further certify that I am not of counsel or

14   attorney for either or any of the parties in the

15   foregoing proceeding and caption named or in any way

16   interested in the outcome of the cause in said caption.

17          The dismantling, unsealing, or unbinding of

18   the original transcript will render the reporter's

19   certificates null and void.

20          In witness whereof, I have hereunto set my

21   hand this day:  March 15, 2021

22

23

24   _____

25              KEREN M. GUEVARA
                 CSR No. 12478
```

Exhibit 2

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3

 4   JAVANNI MUNGUIA-BROWN, ANGELINA)
     MAGAÑA, NORMA RODRIGUEZ, and   )
 5   DAVID BONFANTI, individually   )
     and on behalf of others        )
 6   similarly situated,            )
                                    )
 7                   Plaintiffs,    )  Case No.
                                    )  4:16-CV-01225-JSW
 8   vs.                            )
                                    )
 9   EQUITY RESIDENTIAL, a real     )
     estate investment trust,       )
10   et al.,                        )
                                    )
11                                  )
                     Defendants.    )
12   _____)

13

14

15                   DEPOSITION OF

16                  MICKEY CUMMINGS

17              COSTA MESA, CALIFORNIA

18              THURSDAY, JULY 6, 2017

19

20

21

22

23
     Reported by:
24   DENISE HESS
     CSR NO. 7564 RPR
25   17-54401
```

```
 1            COSTA MESA, CALIFORNIA; JULY 6, 2017

 2

 3    ·  ·  ·  ·  ·  ·      MICKEY CUMMINGS,

 4    having been first duly sworn, was examined and

 5    testified as follows:

 6

 7                     EXAMINATION

 8

 9    BY MR. TOMASEVIC:

10         Q   Good morning, again, Mr. Cummings.

11         A   Good morning.

12         Q   My name is Alex Tomasevic.  We met briefly

13    before we went on the record here today, but do me a

14    favor and for our record please state and spell your

15    full name.

16         A   Sure.  Albert Francis Cummings, III,

17    A-L-B-E-R-T, F-R-A-N-C-I-S, Cummings, C-U-M-M-I-N-G-S,

18    the third.

19            Would prefer to be called Mickey,

20    M-I-C-K-E-Y, during the testimony.

21         Q   I will call you Mickey.  And you can call me

22    Alex if you like.

23         A   Yes.

24    ·  ·      Q   You used to be a senior vice president for

25    Equity Residential, right?
```

```
 1           A    Yeah, both senior vice president, executive
 2   vice president.   Those job titles are used
 3   interchangeably probably.
 4           Q    Got it.  We're going to go through some of
 5   that.  I just want to make sure for the record we got
 6   the right person in the right chair today.
 7           A    Okay.
 8           Q    I see you brought with you a copy of the
 9   subpoena.  You're here pursuant to the subpoena we
10   served on you to testify in this case, correct?
11           A    Correct.
12              MR. TOMASEVIC:  Let me go ahead and just mark
13   that.  We already premarked one.  Let's just mark
14   Mickey's as Exhibit 33.
15              Can you stamp it?
16              (Whereupon the document referred to
17        is marked by the reporter as Exhibit 33 for
18        identification and is attached hereto.)
19              MR. TOMASEVIC:  We are marking as Exhibit 33
20   to the transcript the subpoena and the copy we have
21   here today.
22   BY MR. TOMASEVIC:
23           Q    I want to explain a little more about myself.
24   As I said earlier, I represent the plaintiffs in this
25   lawsuit.
```

1          A    Uh-huh.

2          Q    Happens all the time.  So maybe try to slow

3    it down a little bit and give Aaron here maybe a chance

4    to interject if he has an objection or a comment of

5    some kind.  Maybe take a beat after I finish asking my

6    question, and hopefully that will make for a smoother

7    record here today.

8               Is that okay?

9          A    Yes.

10         Q    All right.  Great.

11              Have you done anything to prepare for your

12   deposition today?

13         A    Just -- yes.  Just a good night's sleep.

14         Q    Did you meet with the attorneys for Equity

15   Residential or Aaron Winn?

16         A    No, I did not meet with the attorneys.  I did

17   have a short phone call, just to confirm my attendance

18   at the deposition.

19         Q    And with whom was that?

20         A    I believe Aaron was on the telephone.  And

21   there was -- and I could be incorrect.  And there was a

22   gal, another woman.  I don't remember her name.

23         Q    Another attorney?

24         A    Yes, yes.  And I think what it was, the

25   attorney called me, got Aaron on the line real quick,

```
 1   just introduced ourselves, just want to confirm that
 2   you'll be in Costa Mesa on such and such a date, you
 3   know, please tell the truth, and we'll see you there.
 4        Q   Was there any other substance to the
 5   conversation?
 6        A   None whatsoever.
 7        Q   Did you guys go over the history or what the
 8   intended questions might be?
 9        A   No.
10        Q   Or try to reminisce about your time at EQR at
11   all?
12        A   No.
13        Q   Did you talk with anyone else at all about
14   this deposition?
15        A   No.
16        Q   Did you look at any documents or try to do
17   any research to prepare for this deposition and refresh
18   your recollection?
19        A   No.
20        Q   So is the subpoena the only document you have
21   ever reviewed in connection with this case?
22        A   Yes.
23        Q   Did you exchange any e-mails with Mr. Winn or
24   anyone from his office?
25        A   Who -- I'm sorry, who is Mr. Winn?
```

```
 1          Q   He's the gentleman here seated to your right.
 2          A   No, did not.  Not to my recollection, no.
 3          Q   Or with anyone representing EQR or from EQR?
 4          A   No.
 5          Q   I have said a couple of things today.  When
 6   referring to the defendants, I have said EQR, I have
 7   said Equity Residential.
 8              Let me just ask you.  Who did you work for
 9   exactly?
10          A   Both are interchangeable.
11          Q   EQR --
12          A   EQR in essence is the ticker, you know, the
13   stock exchange ticker symbol.  Equity Residential
14   Properties Trust at that time would have been the
15   employer.
16          Q   Okay.
17          A   But EQR for the purposes of the deposition is
18   just fine.
19          Q   If I say EQR, Equity Residential, is that
20   going to be fine for you?
21          A   Synonymous, yes.
22          Q   Okay.  And if at any point in time like I
23   said, if you're not sure on who I'm talking about, or
24   if the distinction becomes important because of
25   something in my question or it makes it important, you
```

1            A   I actually went to work for a very short

2    period of time for a company called Boston Financial,

3    for really a period of 90 days.  But I choose not to

4    put that on my LinkedIn profile, as I ended up right

5    over at Equity Residential, very, very quickly.

6            So I -- anyway.

7            Q   What did you do during that stint at Boston

8    Financial?

9            A   I was a senior vice president for the

10   Property Management Division for about 90 days.  And

11   then, quite frankly, a substantially better offer came

12   from Equity Residential in that period of time, a

13   company that I had interviewed with previously.  And I

14   made the jump to Equity Residential before I was too

15   far ingrained in the Boston Financial operation.

16           Q   When you made the jump to Equity Residential,

17   what was the first job or position you received?

18           A   Area vice president of the Southeast Region.

19           Q   Is this in December of '97?

20           A   Correct.

21           Q   I saw a note somewhere in the documents that

22   you may have started in Equity in November of '95.

23               Is that wrong?

24           A   I did not bring my resume with me,

25   so -- well, the dates look correct to me in terms of

```
 1    December '97 through December 2008 on my LinkedIn
 2    profile.  And I know the stint was for 11 years.
 3        Q   Got it.
 4            When you were the area vice president, what
 5    was generally your job description?
 6        A   You know, I had 10,000 property units, the
 7    lead operations manager for 10,000 units in Georgia,
 8    Florida, and Tennessee.
 9            And that would also constitute seven regional
10    managers reported to me, and below them, their property
11    managers, et cetera.
12        Q   Besides managing other employees and
13    responsibility for these 10,000 units, what else did
14    you do?  Are we talking about financials?
15        A   Financial reviews, policies, implementing and
16    enforcing policies and procedures, quality control,
17    customer service, you know, initiatives.  Really
18    everything to do if you -- an apartment building is
19    very much like a retail store, if you think of it that
20    way.
21            So you have sales, operations, maintenance,
22    customer service, you know, collecting rents, you know,
23    payable systems and all those -- you know, those
24    processes and systems might be centralized.  The
25    operations team is always responsible for executing the
```

1    business in general.

2         Q    Now, when you worked toward these goals and

3    worked in financials, was one of your goals to monitor

4    revenue, develop initiatives to increase revenue,

5    profits and things of that nature?

6         A    Yes.

7         Q    How long were you one of these Southeast

8    Region area vice presidents?

9         A    Three months.

10        Q    And what was your next position?

11        A    Divisional -- let's see -- executive vice

12    president, Arizona Region.

13        Q    And am I correct in assuming that the Arizona

14    Region at that point was within the state of Arizona?

15        A    That is correct.

16        Q    And --

17        A    It was the result of a merger between Equity

18    Residential and Evans Withycombe.  And the first year

19    of that position was tied to ensuring the merger was

20    successful and incorporating all of their properties

21    and their people into our operation.

22            And then the position expanded to include

23    other regions of the country, so other -- as an

24    example, area vice president that I referenced for

25    Atlanta, that type of position would report in to me,

```
 1  but over in the -- in the Southwest area.
 2        Q   Got it.
 3        A   Would you like me to clarify further?
 4        Q   Go for it.
 5        A   Okay.  So as an example, over a period of
 6  time, so as an executive VP, and over time a senior
 7  VP -- and those job titles again were interchangeable
 8  and flopping back and forth at Equity.
 9            But over that ten-year span, at that time I
10  would have had AVPs reporting to me from Colorado, from
11  Southern California, from -- two from Texas, you know,
12  maybe one from Georgia, two from Florida.  And those
13  could be interchangeable at any particular point in
14  time.
15        Q   For how long did you have the title executive
16  vice president of the Arizona Region?
17        A   You know, I would say out of the ten years
18  really associated with Arizona, I would say half the
19  time senior vice president, half the time executive
20  vice president.
21        Q   Was senior --
22        A   Job titles in our culture at that time were
23  not particularly important.  It was more the other
24  parts of the job that were, you know, a little more
25  valuable to -- to people.  Meaning, you know,
```

1   authority, compensation, benefits, that type of stuff.

2        Q   Understood.

3        A   Okay.

4        Q   For how long did you have this role before

5   you moved on to your next role?

6        A   Well, that was the same role, AVP and SVP,

7   again, on and off with that job title.  But

8   essentially, you know, it's the same role for that

9   ten-year span.

10       Q   Did that take us until the end of your ten

11   years?

12       A   Yes.

13       Q   Okay.

14       A   So that was all large portfolio management.

15   So the other way to define it would be every year I

16   would have somewhere between 20- and 40,000 apartment

17   units in regions supervised by my AVP, up reporting

18   through me.

19       Q   And that's true until you left?

20       A   That is correct, yeah.

21       Q   The number of appointments and the amount of

22   people you were managing may have increased over time,

23   but the job was generally the same?

24       A   Yes, that's a good way to describe it.

25            Again, the number of units could change year

1    to year based on dispositions or based upon -- an

2    example of that would be, Hey, Mickey, you know, we're

3    having -- we just moved somebody out of the southeast.

4    We're having trouble.  We would like you to take on,

5    you know, Texas and the state of Florida.

6            And in exchange, we would like you to

7    basically -- to turn over Southern California to your

8    counterpart based in Seattle, Bruce Lavine, for these

9    next two years while you address Arizona and the

10   southeastern United States.  So it was not uncommon to

11   flip portfolios, ADP portfolios amongst the senior vice

12   president, executive vice president level.

13        Q   When were the times that you had

14   responsibility for California apartments?

15        A   I think it would be fair to say that out of

16   that ten-year period, about half the time I would have

17   had a Southern California portfolio.

18            I know that pretty -- from the best of my

19   recollection, in 2007 and 2008 I do believe I had

20   Southern California back as a direct report of mine at

21   that point in time.

22            I don't remember the previous seven years,

23   the ins and outs.

24        Q   Who was the direct report while you were

25   working within Southern California?

```
 1          A    Right.  That is correct.

 2          Q    Was it that way when you left?

 3          A    Yes.

 4               Now, again, to clarify those two divisions

 5    could have been run by Bruce Lavine or could have been

 6    split between myself and Bruce Lavine, depending on the

 7    year.

 8          Q    Was there ever a third person that might have

 9    taken on those responsibilities?

10          A    No.

11          Q    Or a fourth person?

12          A    No.

13          Q    So if I want to talk to the person who was

14    leading the Southern California or Northern California

15    Regions during your tenure, it would be you or

16    Mr. Lavine?

17          A    Correct.

18          Q    And who did you gentlemen report to?

19          A    Fred Tuomi.

20          Q    And can you spell Tuomi?

21          A    Yeah, T-U-O-M-I.

22          Q    And what was Mr. Tuomi's title at the time?

23          A    Usually it was president of the Western

24    Division when he was in the field.  So he was in the

25    field with us half the time based in Aliso Viejo
```

BY MR. TOMASEVIC:

 2      Q   When he objects, you still answer unless

 3  someone instructs you not to answer.

 4      A   Okay.

 5      Q   Which should be relatively rare.

 6          Sorry about that.

 7      A   Okay.  Would you ask the question again?

 8      Q   Certainly.

 9          We had talked earlier about how one of your

10  jobs or goals was to make sure the properties perform

11  well, right?

12      A   Right.

13      Q   That revenue is maximized, correct?

14      A   Correct.

15      Q   Profits are maximized?

16      A   Yes.

17      Q   Including profits to the shareholders?

18      A   Yes.

19      Q   Okay.  Part of that would include being

20  efficient with costs, right?

21      A   Yes.

22      Q   We're talking about the financial health of

23  the California properties?

24      A   Yes.  And again, in terms of revenue or

25  profit maximization, this is a company, Equity

1   Residential company, a long-term holder of real estate.

2   So it was not a flip company.

3          So what that means is from an asset

4   preservation perspective, we're going to maintain our

5   buildings in the appropriate shape from a reputation

6   management perspective.  We're going to try to do every

7   time what's right for the customer.  All right?  Or

8   from a customer service perspective, we're trying to

9   build a brand of value, not create a weak brand, but to

10  build a strong brand.

11         So with all those things involved in -- you

12  might call profit management, never really had a profit

13  goal.  We were always to do, you know, the right thing

14  for the customer and for the company, and let the chips

15  fall where they may.  That was kind of one of our

16  overriding philosophies.

17      Q   One of your corporate cultures or mantras?

18      A   Yes.

19      Q   Understood.

20         But it's a for-profit business that owes a

21  duty to the shareholders?

22      A   Yes.

23      Q   So I just want to focus on the aspect of the

24  revenues, profits and costs.

25      A   Sure.

~~1         Q   And how that intersected, if at all, with~~

~~2    your skill.~~

~~3         A   Sure, sure.~~

4         Q   So what did you do as part of your job to

5    monitor the revenues and the costs at the California

6    apartments?

7         A   Okay.  So outside of rental income, let's

8    talk about everything else but.  All right?

9              So there are a number of income lines on an

10   apartment building financial statement.  And you might

11   call every one of these, you know, generally other

12   income.  All right?

13             So other income on a percentage basis tends

14   to be very small percentage of a property -- property

15   income, but they are income-wide.

16             So they would include, you know, parking

17   revenue, you know, late charges, cable TV, you know,

18   party room rentals, you know, et cetera.

19             Some of the other income lines were master

20   contract-type lines from vendors, like a Cox that might

21   have paid to have access into the building.  So that

22   might have been what we call a contract or plug-in

23   revenue line.  And some of them we might have been

24   responsible.

25             So we would be responsible for parking

```
 1   revenue at a building.  So we would know the number of
 2   spaces.  We would know occupancy.  We have a rate, and
 3   we would budget that number as a number we should hit.
 4           Late fees, same thing on late fees.  We would
 5   have a -- typically a late fee history.  You know, we
 6   look at -- very often when you do budgets, you just
 7   look at your end year numbers; you know what was the
 8   late fee number for this building, you know, paid
 9   in -- for example -- 2004 and 2005.  And is there
10   anything that we would think that would make those
11   numbers go up or down in 2006.
12           And we would lay out a budget number, you
13   know, based on that, in terms of budgeting, you know,
14   for a revenue line.
15           So, you know, I think historical data would
16   play a large role in a future budget line when it comes
17   to other income.
18           And finally, we would compare property to
19   property.  So we would, you know, look at, you know,
20   this 200-unit building on my left in Costa Mesa.  And
21   this 200-unit building five miles away maybe in Tustin.
22   They are both 200-unit buildings.  They are both
23   relatively the same age.  And we might look at
24   comparisons on every line and ask the question what's
25   different about this building than this building, as a
```

```
 1   checks and balances.
 2          The reason we would do that is Equity
 3   Residential was so large we had our own data, our own
 4   database, our own comparables and our own portfolio and
 5   we could ask those questions, why here but not here and
 6   vice versa.
 7          Q   Great.  Thanks for that.
 8          A   Sure.
 9          Q   You got a lot into that answer.  And I'm just
10   a stupid lawyer with -- who is going to be representing
11   laypeople.  So let me unpack that a little bit.
12          A   Yeah.
13          Q   And see if I can understand it a little
14   better if you don't mind, Mickey.
15          So if I heard you correctly, late charges
16   were characterized as income or part of the income line
17   at Equity Residential, correct?
18          A   Yes.
19          Q   And that goes for the California properties,
20   right?
21          A   Yes.
22          Q   And it would be lumped in as, quote, other
23   income, end quote; is that right?
24          A   Yes, but to be clear -- so other income might
25   be defined as a major category heading.  And there may
```

1      Q   So when the budget and pricing people are
2  looking to do their job with respect to these master
3  contracts, what are they looking at?  What are they
4  looking to do?
5      A   They are given a fee from what's called an
6  ancillary revenue department that negotiated those
7  contracts.  And we just get a fee, Here is your budget
8  number, put it in the budget, and let's move on.
9      Q   Now, the late fees, what were the people on
10  your team responsible for with respect to late fees?
11      A   Late fees, again, we would look at what we
12  had been doing for late fees, the previous, you know,
13  year or two, and generally budget a number similar to
14  that.
15      Q   When you say you were looking at what you had
16  been doing, you mean what you had been collecting in
17  the past?
18      A   Yes, yes.
19      Q   The budget line item for late fees in these
20  financials, was that for late fees paid or late fees
21  charged?
22          MR. WINN:  Objection; vague.
23          THE WITNESS:  That's a good question.
24          I don't -- you know, I don't recall.
25          When we budgeted --

```
 1              You know, I don't recall.  I don't recall.
 2    Let me -- give me a moment just to kind of think it
 3    through.  You know, I don't remember.  I honestly
 4    don't.  Shoot.
 5    BY MR. TOMASEVIC:
 6        Q   Correct me if I'm wrong, but if you counted
 7    it as income, wouldn't it be late fees paid?
 8              MR. WINN:  Objection; calls for speculation,
 9    vague.
10              THE WITNESS:  Well, yes.  But remember, you
11    can have a boatload of income accounts that are both
12    charges and you can have offsets, accounting offsets,
13    still within your income accounts.
14              So let's say I wanted to get to my late
15    fees -- it's all up in the same section of the
16    financial.  So let's say we charged $1,000 of late fees
17    during the month.  And let's say we collected 700.  So
18    we might see a charge of a thousand and a credit of
19    300, the net being the 700 we collected.
20              I do remember seeing accounting of that sort,
21    but I also do remember that we would also budget based
22    on what we believed we had received.  So I just don't
23    remember the accounting -- the Equity Residential
24    accounting.
25              But I will tell you, because I remember bad
```

1    debt in that way.  So bad debt could be charged as an

2    income item, and then in the same income section you

3    might see a bad debt charge for $2,000, and you might

4    see a credit against bad debt, you know, of the same

5    2,000, which meant your actual bad debt ended up being

6    zero.

7    BY MR. TOMASEVIC:

8         Q    Let me try to unpack what sort of an

9    estimated or educated guess versus something that you

10   know and remember specifically.

11        A    Okay.

12        Q    Do you know whether Equity Residential in its

13   financial reports that you had reviewed, in the line

14   item for late fees, it included charged but unpaid late

15   fees?

16        A    I don't recall.  I just don't recall.

17        Q    Who would know the most about that?

18        A    Probably our budget analyst.  Somebody that

19   stuck with the company longer than 2008 probably would

20   remember better than me.

21        Q    Understood.

22             Are you thinking of a particular person?

23        A    Well, Stephanie I think was around another

24   few years.  You know, Gerry, Gerry retired come to

25   think of it, before I left, Gerry Spector.  Fred Tuomi

1   left two years after I did.  Bruce Lavine was around

2   three, four years longer, I think, than me.

3   · · · Q   When you and your team were analyzing and

4   budgeting late fees, did you consider late fees charged

5   by the competition?

6   · · · · MR. WINN:  Objection; vague, misstates

7   testimony, calls for speculation.

8   · · · · THE WITNESS:  No, not when we were budgeting.

9   But when -- this goes to the setting of a late charge

10  policy.  We would have a process in order to set and

11  justify the right charge for a late fee.  All right?

12  · · · · And that process -- and I don't remember the

13  particular numbers, but that process would include, you

14  know, what's being done through the apartment, what's

15  common in the apartment association.  What's -- what's

16  happened in court cases, unlawful detainers, anything

17  that's occurred with any company in California

18  regarding late fees and charges and approach.

19  · · · · What are our competitors doing.  You know,

20  what's Archstone Properties charging for late charges.

21  · · · · So, you know, we would gain -- we would go

22  around and collect as much information and data as

23  possible to charge what we felt was the correct and

24  defensible and common late fees, according to all of

25  those components.

1          So again, we were never trying to be a market

2     leader.  But we wanted to comply with common approaches

3     to business as reflected in the data that we received

4     from all of those data points that I mentioned.

5          So that would be a -- so we would be process

6     orientated and research orientated to set up a legally

7     defensible and appropriate late charge fee.  And -- and

8     hopefully being in line with our competitors at the

9     same time.

10    BY MR. TOMASEVIC:

11        Q   When setting up a late charge fee at

12    California Equity Residential apartments, one of the

13    data points Equity Residential looked at was what the

14    competition is charging for late fees?

15          MR. WINN:  Objection; lacks foundation, calls

16    for speculation, vague.

17          THE WITNESS:  I would say yes.  And the

18    reason is -- and not every competitor, but, you know,

19    we had valued competitors that we had relationships

20    with that were professional organizations that would

21    have done independently their own analysis and legal

22    research.  So at that time DRE existing, the California

23    company, he is six properties trust still in existence,

24    big California REIT, UDR.  So we would look at what

25    they had done and often converse with them just in

```
 1   terms of understanding their approach to -- to late

 2   charges and -- and determining -- just as information

 3   for us to make our decision.

 4   BY MR. TOMASEVIC:

 5        Q   So EQR was looking at what particular

 6   competitors were charging in the arena of late fees

 7   when deciding to set its own late fees?

 8            MR. WINN:  Objection; lacks foundation, calls

 9   for speculation.

10            THE WITNESS:  I would say yes as a data as

11   one point of consideration in developing a late charge

12   policy.

13   BY MR. TOMASEVIC:

14        Q   Right.  I don't mean to wall you off.

15        A   Yeah.

16        Q   I'm not going to go into court and say look

17   at this.  That's all he looked at.

18        A   Yes.

19        Q   Let me make sure I have the list.

20        A   Yeah.

21        Q   I'm a lawyer.  I'm trying to think in lists

22   and think in lay terms whenever possible.  And I'm just

23   plain old, don't have a long attention span.  So I got

24   to break it into lists.

25            Let me see if I can get a list.  Okay?
```

```
 1          A    Okay.
 2          Q    One of the important data points that Equity
 3   Residential assessed in setting its own late fee was
 4   the late fee charged by certain competitors, right?
 5               MR. WINN:  Objection; calls for speculation,
 6   lacks foundation, vague.
 7               THE WITNESS:  Yes.
 8   BY MR. TOMASEVIC:
 9          Q    And another major data point that EQR looked
10   at when setting California late fee policies was
11   whether or not it was defensible?
12               MR. WINN:  Objection; calls for speculation,
13   lacks foundation, vague.
14               THE WITNESS:  I would say no.
15   BY MR. TOMASEVIC:
16          Q    Earlier I got the word "defensible" from you.
17   I wrote it down.  That's what I want to know, what you
18   meant by that.
19          A    Let me clarify.
20               So we would look at what had happened
21   legally -- you know, are there laws in the state of
22   California about late fees.  All right?  What rulings
23   have come through, if any, and what jurisdictions have.
24   I mean, as a good and prudent company, we would look at
25   what's the law or what's the -- what have any
```

1   recent -- what has happened in terms of any recent

2   court decisions in the apartment industry that a

3   prudent company would take in consideration when

4   establishing a late charge policy.

5        Q   So what can we call it?  Can we call that

6   legally defensible?

7        A   I call it legal research, but yeah.

8        Q   Okay.

9        A   Yeah.

10       Q   So Equity Residential in setting its late fee

11  policies for its California apartments looked at the

12  late fee policies of certain competitors, true?

13       A   Yes.

14       Q   And Equity Residential, when setting its late

15  fee policies for its California apartments, also looked

16  to see if it was legally defensible or frankly legal

17  according to the legal research?

18       A   I don't like the term "legally defensible,"

19  but we did legal -- you know, I don't think

20  that's -- of course that rubs me the wrong way, not

21  that that means anything.

22           I would say we looked at legal precedence.

23  We looked at what was already law.  And we looked at

24  any court cases about the subject matter that would

25  lead us to -- really to make a decision to put in place

1   the right late charge policy for a market, regardless

2   if it was California or anybody -- anywhere else.

3          We're very concerned with -- with setting

4   up -- if you do it right, it's legally defensible,

5   generally speaking, you know, we're following the law.

6   And that's what we try to do.  We try to follow the law

7   and any information associated with the law that may

8   have come out since the last time we looked at it.

9          You figure on a local basis we have some

10  unlawful detainer lawyers that would be very active in

11  a company in our size, just based on the volume.  They

12  would also be another data point in terms of what they

13  are seeing and hearing from their experience with us

14  and our clients as they go to court and listen to the

15  judges.

16      Q   So Equity Residential looked at the

17  legalities of the late fee policies?

18      A   Yes, yes.

19      Q   And Equity Residential looked at the

20  competition in crafting a late fee policy in

21  California?

22          MR. WINN:  Objection; calls for speculation,

23  lacks foundation, vague.

24          THE WITNESS:  So, yes, Equity Residential

25  looked at the competition, but we looked -- to be

```
 1    clear, we looked at competition that we also felt were
 2    independently researching and evaluating the
 3    appropriate position that they were going to take
 4    regarding late fees in the market.
 5              So, you know, we have the value on certain
 6    competitors that we think that they are good companies
 7    that do things the right way, that vet the decisions
 8    that they are going to make.  And because of that, you
 9    know, we're also going to look at some things that they
10    do as part of our decision-making process.
11              But not all competition -- there is hundreds
12    of competitors, and not everybody is as valuable in
13    terms of their approach to doing things.  Okay?
14    BY MR. TOMASEVIC:
15        Q   When looking into the legalities, what did
16    you and your team do, if anything?
17        A   Well, we talk with our -- the people that we
18    had the most contact with on a local basis.
19              You know, all of our people join apartment
20    associations, so on a social basis, you know, people
21    exchange information socially when asked, Hey, how is
22    everything going there, you know, blah, blah, blah,
23    what are you guys up to these days?
24              But -- I'm sorry, I just kind of strayed from
25    the question.
```

1          Could you restate your question?

2      Q   Let me ask it a different way.

3          Did the people on your team participate in

4   this analysis of the legalities in setting late fees?

5          MR. WINN:  Objection; vague.

6          THE WITNESS:  I would say, yeah, yeah, we had

7   a -- we had a role in participating in the collection

8   of information in order to determine an overall policy,

9   but our policies were not determined by local people

10  alone, but would be, you know, the sum of everything

11  that we put together with our legal team and

12  determining, you know, what -- in our opinion, what to

13  be the right approach and fee structure for a market.

14  BY MR. TOMASEVIC:

15      Q   Your team looked at those select competitors,

16  right?

17      A   Uh-huh, as a data point, yes.

18      Q   As a data point?

19      A   Yeah.

20      Q   All right.  Your team, at least the people

21  reporting in budget and pricing to you -- or eventually

22  to you -- did that include lawyers, or are we talking

23  about budget analysts, pricing analysts, something

24  else?

25          MR. WINN:  Objection; vague.

```
 1              THE WITNESS:  Lawyers -- no, lawyers did
 2   not report to me, no.   They were a part of our
 3   decision-making team at a corporate level.
 4   BY MR. TOMASEVIC:
 5         Q   So when you say that your team participated
 6   in the setting of the late fee policies, does that mean
 7   that your role was exclusively to provide this analysis
 8   of the competitors?
 9              MR. WINN:  Objection; misstates testimony,
10   argumentative, compound, vague.
11              THE WITNESS:  Yeah, I would say the final
12   decision on -- on what to charge for fees in a market
13   based on all the data, the various data points provided
14   would end up being a collaborative decision between a
15   local market ADP, in the case of Southern California,
16   might be Jeff Bailey.
17              As an example, myself, my boss, so Fred
18   Tuomi, and our EQR legal in-house attorneys assigned to
19   our area, assigned to let's say the Western Division.
20   All was part of a collaborative basis based on
21   everything that we had serviced and had discussed and
22   had looked at.
23   BY MR. TOMASEVIC:
24        Q   Sure.  That's the who.  But let me figure out
25   the what first.
```

1          A   Okay.

2          Q   And I appreciate that.

3              One of the data points that your team

4    analyzed as part of setting a late fee policy was the

5    late fees by these select competitors, right?

6              MR. WINN:  Objection; misstates testimony,

7    vague.

8              THE WITNESS:  I mean, all I can say is, yes,

9    certain competitors' data, we valued more than other

10   competitors, and we would look at that data as part of

11   the analytical approach to setting a late charge

12   policy.

13   BY MR. TOMASEVIC:

14         Q   And your team, what other things did they

15   look at as part of that?

16         A   We -- again, to restate, we looked at what is

17   allowable by law, you know, either in the state or in a

18   city or a county.  What court cases had popped up.

19         Q   Is that people on your team looking up court

20   cases?

21         A   No, our legal -- our EQR in-house attorneys.

22         Q   Okay.

23         A   In conjunction with their contacts locally.

24   So we would look at, you know, what has happened,

25   what's sitting on the books, what's currently law,

```
 1    what's happened in terms of any court cases.
 2              Again, we are very data driven.  So we would
 3    absorb as much data as we could get, real life data, on
 4    these situations to determine, you know, from a legal
 5    perspective, you know, what should your late policy be.
 6         Q   And that data included the competitor
 7    information and the court cases, right?
 8              MR. WINN:  Objection; misstates testimony,
 9    vague.
10              THE WITNESS:  It would include what some
11    competitors were -- were charging, what -- what's the
12    current existing law, and what current court cases may
13    have arisen concerning that subject.
14    BY MR. TOMASEVIC:
15         Q   Okay.  So I think that's three things?
16         A   Yeah.
17         Q   Okay.  Equity Residential in setting a late
18    fee policy in California was looking to what some
19    competitors were charging, right?
20         A   Yes.
21              MR. WINN:  Objection; misstates testimony,
22    vague.
23    BY MR. TOMASEVIC:
24         Q   What the current law says?
25              MR. WINN:  Same objections.
```

```
 1             THE WITNESS:  Yes.
 2    BY MR. TOMASEVIC:
 3        Q   And what are the court cases out there that
 4    discuss that law?
 5             MR. WINN:  Same objections.
 6             THE WITNESS:  Yes.
 7    BY MR. TOMASEVIC:
 8        Q   Have you now told me all the things that
 9    Equity Residential looked at in setting a late fee
10    policy at least during your tenure?
11             MR. WINN:  Objection; lacks foundation,
12    vague, calls for speculation.
13             THE WITNESS:  Yes, that's all I can
14    recall -- oh, no, number four, you know, what are --
15             Okay.  So apartment associations -- let me
16    explain.  So we would look at the local apartment
17    associations.  You will ask me why.
18             Apartment associations usually provide
19    standard lease agreements, because a lot of apartment
20    owners are mid- to small-size owners, right?
21             So they provide --
22             Apartment associations typically provide
23    vetted forms and leases and all that type of stuff.
24             So we would also look at the local apartment
25    association data in terms of what their standard lease
```

1   agreements would say about late charges.  And some of

2   those would be filled in, and some of those lines, of

3   course, would be blank.

4   BY MR. TOMASEVIC:

5       Q   Got it.

6       A   Okay.

7       Q   All right.  Just to summarize --

8       A   So four data points.

9       Q   Four data points.

10          Equity Residential would look at four data

11  points in setting a late fee policy including for its

12  California apartments.  And those data points were,

13  one, what some of the competitors were charging, right?

14          MR. WINN:  Objection; lacks foundation,

15  misstates testimony.

16          THE WITNESS:  Yes.

17  BY MR. TOMASEVIC:

18      Q   What the current law is?

19          MR. WINN:  Same objections.

20          THE WITNESS:  Yes.

21  BY MR. TOMASEVIC:

22      Q   What the cases are interpreting that law?

23          MR. WINN:  Same objections.

24          THE WITNESS:  Yes.

25

```
 1   BY MR. TOMASEVIC:
 2        Q   And then information and data coming from
 3   apartment associations including their forms and
 4   standard lease agreements.
 5            MR. WINN:  Same objections.
 6            THE WITNESS:  Yes.
 7   BY MR. TOMASEVIC:
 8        Q   And that's it?
 9        A   That's all I can recall.  And again, to
10   clarify, those are -- again, that I recall, check data
11   points and research points.
12        Q   Understood.
13            We have been going for a little over an hour.
14   Do you want to take a break?
15        A   No.
16        Q   Well, I do.
17        A   Okay.
18        Q   That was a rhetorical question.
19        A   Sure, yes.
20            MR. TOMASEVIC:  Let's go off the record.
21            (Brief recess.)
22   BY MR. TOMASEVIC:
23        Q   You realize you're still under oath?
24        A   Yes.
25        Q   And I don't need to resister it at the
```

1    ~~beginning of every break or whatever, so just remember~~
2    ~~you're still under oath.  Okay?~~
3         ~~A   Yes.~~
4         ~~Q   Did you and Aaron here get a chance to~~
5    ~~conference during a break at all?~~
6         ~~A   No.~~
7         ~~Q   Did you guys talk about the deposition?~~
8         ~~A   No.~~
9         ~~Q   Are you reporting back to anyone about the~~
10   ~~deposition here today?~~
11        ~~A   No.~~
12        Q   Is it fair to say that in 2008 the economic
13   downturn presented challenges to EQR's business?
14            MR. WINN:  Objection; vague, calls for
15   speculation.
16            THE WITNESS:  Well, yes.
17            However, I would say this, though.  In 2008,
18   you know, Equity Residential had many markets, almost
19   like a mutual fund, if you will, of apartment
20   locations.
21            So the beauty of that was, you know, in areas
22   that may have been at any point in time in the business
23   cycle, there are areas that tend to do really, really
24   well, markets or submarkets, and there are areas that
25   aren't doing so well.

```
 1            So as an example, when Arizona was getting
 2    battered at certain points, because it does a lot in
 3    cycles, very, very big swings, then, you know,
 4    California and Florida might be rosy and consistent.
 5            And for us with multiple markets -- and you
 6    got some are up, some are down, but when you roll it
 7    up, it all rolls up into a nice, you know, balance
 8    sheet and financial statement as a public company,
 9    because of your diversity, the location of your real
10    estate.
11            So that's why your question is both a yes and
12    a no.
13    BY MR. TOMASEVIC:
14        Q   Sometimes I forget how massive and
15    sophisticated EQR was, but let me see if I can
16    understand it a little better.
17            In general was EQR worried about the
18    financial downturn in 2008 as a company?
19            MR. WINN:  Objection; overbroad, calls for
20    speculation.
21            THE WITNESS:  No.
22    BY MR. TOMASEVIC:
23        Q   Were you as part of your job worried about
24    what the downturn in the economy in 2008 might mean for
25    EQR's business?
```

1    A   No.  Trust administrated would be a better

2  word.

3    So to explain, EQR has no debt on its

4  properties.  So generally speaking what that means is

5  that you can survive anything.  And there is only so

6  much that you can do.

7    So as an operator, when things aren't going

8  well, so -- so you might ask me, Well, then, what's

9  your benchmark?  What is your report card?  And the

10  report card is very common in every public industry, is

11  we'll look at our competitors on a quarterly basis,

12  when they publish their results, see how they are doing

13  market by market.

14    As an example, let's say that things are

15  going poorly in Arizona.  And your revenue dropped

16  6 percent this quarter, which is the same period last

17  year, so year-to-year comparisons, and public entities

18  are big numbers.  So we go down 6 percent, so that

19  sounds crappy, right, but our competitors, maybe they

20  went down 8 percent.  So we win, you know, internally,

21  that's how we rate our people.

22    You know, what's the data out there telling

23  you, and how are you performing against that data.

24    Q   Understood.

25    A   Okay.

```
 1            Q    Let's speak a little less in generalities and
 2    more specifics as to EQR in California in 2008.
 3                 What was the rental market like at that
 4    point?
 5                 MR. WINN:  Objection; overbroad, calls for
 6    speculation, lacks foundation.
 7                 THE WITNESS:  You know, I don't recall, and
 8    only because I had other areas of the country that
 9    seemed to be garnishing my attention much more so than
10    Southern California.
11    BY MR. TOMASEVIC:
12            Q    Can you tell me whether the rental market was
13    moving in any direction in or around 2008 in
14    California?
15            A    I don't -- you know, I just don't recall.  I
16    don't recall which way it was going.  But the only
17    thing I can recall, it was not a problem on my radar
18    screen, as I had other areas that were really
19    fluctuating really pretty badly.
20            Q    For those areas that are affected, I believe
21    in one of your prior answers you mentioned that you
22    want to look at how Equity Residential is doing
23    relative to its competitors?
24            A    Yes.
25            Q    Is that a fair assessment?
```

1              But as an example, if you buy properties in
2    New York and you -- you know, you go through a
3    downturn, you're not likely to sell them, because you
4    know -- you believe there is always a correction.  Some
5    markets are like that.  Some markets are not.
6         Q   Sure.  But when looking at a snapshot in time
7    one of the metrics that EQR would look at would be how
8    is it doing relative to its competitors?
9         A   Yes, that's fair.
10        Q   And we would do positively if the competitors
11   on average were losing, say, 8 percent but equity was
12   only losing 6?
13        A   No.  I would say it would be considered
14   favorable if your numbers were better than your
15   competitor's, regardless of the raw number.
16        Q   Understood.
17              To stay ahead of the competitors and keep a
18   better relative number regardless of the raw number --
19        A   Right.
20        Q   -- does it become more important to be
21   efficient with costs and to maximize revenue?  Is that
22   how you beat the competitors?
23              MR. WINN:  Objection; calls for speculation,
24   vague, overbroad.
25              THE WITNESS:  No.  So the way apartment

1    financials generally work is revenue -- the operating

2    margins are in the mid-60s, which means that revenue on

3    a financial statement is generally twice as valuable as

4    an expense savings.  Okay?

5            So although -- so -- and some people have

6    trouble with that concept.  But for us, more than

7    anything else -- because on the expense side, you can

8    make decisions to invest or not invest a little bit

9    more at an expense level, because you believe that's

10   the right thing to do for that asset in the long run.

11           So we weren't above, you know, overinvesting,

12   because it was the right thing to do from an asset

13   perspective.

14           But the real measure was really looking at,

15   you know, rental revenue gains, because that told you a

16   lot about your operation; you know, how fast can you

17   fill vacancies?  Are you managing vacancy loss?  Are

18   your turn times quick?  Are you turning out a quality

19   product as fast as possible and getting it released and

20   off the pipe as fast as possible?

21           So again, there is a lot of components to

22   minimizing vacancy, including renting it at a rate

23   someone is going to rent it at on a rerent basis.

24           So how you -- you know, how you do that tells

25   an awful lot about your success.

1   BY MR. TOMASEVIC:

2   · · · Q · So does it become more important to maximize

3   the revenue during a difficult economic period like we

4   experienced in 2008?

5   · · · · · MR. WINN:  Objection; vague, overbroad, calls

6   for speculation.

7   · · · · · THE WITNESS:  I would say no.  I would say as

8   a public company, you know, and, it's important for us

9   to maximize our revenue regardless of the economic

10  situation, to do your best regardless of the economic

11  situation.

12  BY MR. TOMASEVIC:

13  · · · Q · So if I understand you correctly, it's always

14  the goal to do your best and maximize the revenue,

15  right?

16  · · · A · Yes, yeah.

17  · · · Q · Are you telling me that the economic

18  conditions of 2008 had no effect on those

19  revenue-generating operations, did not change goals, no

20  one running around saying, Hey, guys, this is a

21  difficult time, let's make sure we're doing this, this

22  and this, let's focus on in this and this.  We got to

23  be nimble, we got to do these other things?

24  · · · · · MR. WINN:  Objection; compound, calls for

25  speculation, overbroad, argumentative.

1          THE WITNESS:  I would say no.

2          So when times are more difficult, most good

3  operations like EQR would put an emphasis on blocking

4  and tackling of what things are more difficult.

5          So meaning, Hey, you know, let's make sure

6  when people show up to view an apartment that might be

7  a renter, you know, don't rush them through the

8  process, give them a good tour of the facility.  Return

9  every phone call, every lead.  Every Internet lead is

10 important as every phone call.

11         It's just a laundry list of things to do, you

12 know, to -- to make sure that you, in more difficult

13 times, or challenging times, that you dot your I's and

14 cross your T's, and you block and tackle better.

15         Because when things are good -- human nature

16 and a lot of  businesses -- you're not as crisp in many

17 areas, because you know, you're deficiencies could be

18 covered by a good market.

19 BY MR. TOMASEVIC:

20    Q   What were some of the suggestions of you or

21 your team in 2008 to maintain or maximize revenue

22 during the downturn, or to block and tackle, as you

23 said.

24         MR. WINN:  Objection; compound, vague.

25         THE WITNESS:  So an example, I believe that

1    at some buildings we extended office hours so we could

2    come in -- you know, building might typically close at

3    5:00 or 6:00 at night.  We may have extended office

4    hours two nights a week at certain locations to

5    8:00 p.m. to allow people to come in and see apartments

6    and other things.

7          That would be an example of some things we

8    might do that would be a little different in that

9    operating environment.

10   BY MR. TOMASEVIC:

11        Q   Anything else?

12        A   Yes, your marketing programs change

13   immensely.  You will throw more signs, more balloons

14   out front.  You will advertise more to get more people

15   in the door.  You know, when there is more vacancy, you

16   tend to spend more money on attracting traffic.  You

17   tend to spend more time with the residents to get them

18   to renew their leases.  You know, again, you tend to

19   put in more labor and effort to the things that you

20   normally should be doing, because, you know, occupancy

21   is a little more challenging.

22        Q   During the 2008 time frame, what reports were

23   you looking at as part of your job duties to monitor

24   the revenues and costs at California apartments?

25        A   Honestly, the same reports that I would look

1    at in any other time.

2          Q   What are those called?

3          A   You know, financial statements, variance

4    analysis, you know, maintenance efficiency reports,

5    capital expenditure reviews and value -- rehab and

6    value creation reports.

7          Q   Were these all the titles of particular

8    reports you had looked at?

9          A   Close enough.

10         Q   Financial statements, that's like income?

11         A   Yes.

12         Q   Expenses?

13         A   Yes.

14         Q   Gross profit, net profit, standard financial

15   reports?

16         A   Yes.

17         Q   Balance sheet, income statement, P&L?

18         A   No.  So as operators -- and I'm not really

19   concerned with balance sheets.  That's more in that

20   environment, more corporate.  You know, I'm concerned

21   with a financial statement, operating statement, not a

22   balance sheet.

23         Q   When you look at the operating statements,

24   were they specific to particular regions or to your

25   scope or were they companywide, or something else?

1          A    All of the above.

2          Q    So did you have operating statements that you

3    regularly reviewed for California apartments?

4          A    Yes.  And again, to be specific, I could look

5    at an operating statement for each individual building.

6    I could roll it up for an individual subject market,

7    like San Diego only.  And I could roll them up for all

8    of Southern California.

9               So I can cut and paste data -- not paste.  I

10   can cut and review data any way that I want to review

11   data.

12         Q    And that would include late fees?

13         A    Yes.  Every account.

14         Q    Okay.

15         A    Yes.  Every financial statement account.

16         Q    Okay.

17         A    I could extract just that account if I wanted

18   to take a look.

19         Q    So as part of your job duties, you could have

20   looked at late fees on a building-by-building level, if

21   you wanted to?

22         A    Yes.

23         Q    How about apartment unit by apartment unit?

24         A    No.  I couldn't on a financial statement

25   basis.  I would have to, on that apartment unit

1    and -- and score them ourselves.  So those survey

2    scores, employee engagement scores, employee turnover.

3    So there were a number of components.

4            But it would be fair to say that, you know,

5    everything financial might have encompassed, you know,

6    60 -- 65 percent of a performance grid associated with

7    my position.

8            There is a lot that goes under financial.

9        Q   65 percent of what you were evaluated on for

10   your job performance was --

11       A   Might be financially related.  Sorry about

12   that, yeah, yeah.

13       Q   Meaning the growth of all revenue line items?

14       A   Being one large component of that financial

15   section.

16       Q   Let's go through our next exhibit.  This was

17   previously marked as Exhibit 13.  It's an e-mail chain

18   in May and June of 2008 Bates labeled WP3615 through

19   -3617.  I'll omit the leading zeros.

20           MR. WINN:  Do you have a copy, Alex?

21           MR. TOMASEVIC:  This will be the first

22   surprise of the day.

23           MR. WINN:  Exhibit 13.

24           MR. TOMASEVIC:  It was previously marked as

25   Exhibit 13.  I want to ask the witness about it.

```
 1   BY MR. TOMASEVIC:
 2           Q    Now, this is an e-mail string.
 3                I want you to turn to the last page,
 4   Mr. Cummings.
 5           A    Yes.
 6           Q    Or Mickey.
 7                That's -3617.  That's the control number on
 8   the bottom right corner.  We call that Bates number.
 9           A    -3617.
10           Q    Yeah.  That's how we keep track of the pages
11   and documents.
12           A    Okay.
13           Q    So do you see your name referenced at the top
14   of this e-mail dated May 30?
15           A    Yes.
16           Q    I'm talking about the one sent Friday,
17   May 30, 2008.
18                Are we on the same page?
19           A    Yes.
20           Q    Importance marked here as high, right?
21           A    Yes.
22           Q    You sent this e-mail, marked it high
23   importance and sent it to the people on this
24   distribution list, correct?
25           A    Okay, yeah.
```

```
1        Q   Now, let me see if I can get some background
2   on who these other folks are, test your memory a little
3   bit.
4        A   Okay.
5        Q   Who was Allison Brown at the time?
6        A   She was a member of what we call the RS team.
7   So regional support.  So she was -- you know, the best
8   way to -- anything that we would change in our computer
9   systems in our software, in our policies and
10  procedures, she kind of -- was kind of a catch-all
11  position.
12       Q   Sort of an IT function?
13       A   No.
14       Q   What was her title?
15       A   Regional support.  Really was very broad
16  position.
17       Q   Why were you including her on this e-mail?
18       A   Well, because she -- she would -- if we
19  downloaded a program change into MRI, then she would
20  have been responsible for ensuring that we got that
21  into MRI, and that it stuck, and that she -- you know,
22  made sure the program change occurred.
23       Q   Daniel Bayless -- or Danielle Bayless.
24       A   Yeah, regional manager, San Diego.
25       Q   Why was she being included on this e-mail?
```

```
 1         A    Well, she worked in Southern California.

 2         Q    Dawn Bridges?

 3         A    Regional manager, Orange County.

 4         Q    John Rials?

 5         A    John Rials was an ADP in Arizona.

 6              We were thinking of -- we were starting to

 7    expose John to Southern California, so we were starting

 8    to just copy him on Southern California issues.

 9         Q    Larry Galistot?

10         A    Regional manager up in L.A. County.

11         Q    Monique Holden?

12         A    Regional manager up in L.A. County.

13         Q    Sean OShea?

14         A    Regional manager up in L.A. County.

15         Q    Terry Best?

16         A    Regional manager, Orange County.

17         Q    Terry Kaye?

18         A    ADP at that time in Southern California,

19    prior to Jeff Bailey.

20         Q    Vanessa Magnum?

21         A    Regional manager, Orange County.

22         Q    And finally, Yvonne Hill?

23         A    Regional -- area manager San Diego.

24         Q    Who had responsibility for more units, the

25    area managers or the regional managers?
```

```
1          A    Regional managers.
2          Q    And then who was directly above the regional
3    manager?
4          A    In this case Terry Kaye.
5          Q    What was that person's title?
6          A    Area vice president.
7               And John Rials, although none of these people
8    reported to John.  He was my ADP for Arizona.
9          Q    You start this e-mail by saying, We would
10   like to change our late fee on new leases to 5 percent
11   of the amount due?
12         A    Yes.
13         Q    And there is a parenthetical there.
14              Did you write that?
15         A    Yeah.  This looks like it's from me.
16         Q    Now, who was it that made the decision to
17   change the late fee to 5 percent of the amount due at
18   this time?
19              MR. WINN:  Calls for speculation.
20              THE WITNESS:  Yeah.
21              So I don't recall where I would have received
22   that information.  So I don't know -- I don't have the
23   e-mail prior to this.  So I mean, I don't recall.  All
24   I know is that, you know, if I -- that I would have had
25   the data and the decision in conjunction with other
```

```
 1   people that we may want to go this route.  So that's
 2   all I -- that's all I really remember about it.
 3   BY MR. TOMASEVIC:
 4        Q   Before this it's true that EQR was charging a
 5   flat $50; is that right?
 6             MR. WINN:  Objection; vague, calls for
 7   speculation.
 8             THE WITNESS:  I don't remember.
 9   BY MR. TOMASEVIC:
10        Q   At some point in 2008, in May of 2008, the
11   decision was made to change the late fee, right?
12             MR. WINN:  Objection; vague, calls for
13   speculation.
14             THE WITNESS:  For me, I don't recall.  So I'm
15   really relying on this e-mail.
16   BY MR. TOMASEVIC:
17        Q   Got it.
18             Who was part of the team that was part of
19   that decision-making process?
20             MR. WINN:  Objection; asked and answered,
21   calls for speculation.
22             THE WITNESS:  I mean, again, as I mentioned
23   before, I went through those data points that you have
24   a list of.  And the other process involved outside of
25   those data points would have been myself, the AVPs,
```

```
 1   Fred Tuomi and our -- Denise or whoever was in charge
 2   of the Western Division from our in-house legal team.
 3            You know, again, considering everything that
 4   I have gone through on that previous list.
 5   BY MR. TOMASEVIC:
 6        Q   Where did the decision or idea originate?
 7        A   Which idea are you referring to?
 8        Q   Changing the late fee to this 5 percent fee.
 9        A   It would have come from those data points.
10            And I don't -- and again, I don't remember
11   which one, but that would have been the -- I can't
12   remember the details, but I can remember the process.
13   And that would have been the process that led us down
14   the road to making a decision, whether it was a
15   percentage or a flat fee or whatever we have decided to
16   do at this time.  That would have been the process.
17        Q   Let's move from process to people.
18        A   Okay.
19        Q   And I want to know who was it that first came
20   up with the idea.
21            MR. WINN:  Objection; asked and answered,
22   calls for speculation.
23            THE WITNESS:  I don't recall.
24   BY MR. TOMASEVIC:
25        Q   Was it you?
```

1          A    Doubtful.  Again, I would have been

2     responding to data points and had discussions with

3     people that were providing those data points.

4          Q    Who was responding to data points and

5     assessing late fees at that time?

6               MR. WINN:  Objection; vague, calls for

7     speculation, overbroad.

8               THE WITNESS:  I don't know how to answer that

9     based on what I have honestly said before.

10    BY MR. TOMASEVIC:

11         Q    Well, we agree insofar as a decision was

12    made?

13         A    Right.

14         Q    Sometime in 2008 to change the late fee

15    structure, right?

16              MR. WINN:  Objection; misstates testimony,

17    calls for speculation.

18              THE WITNESS:  Yeah, again, from looking at

19    this e-mail, it would appear to be, yes.

20    BY MR. TOMASEVIC:

21         Q    Who would have been the people who could have

22    first come up with an idea or made that decision?

23              MR. WINN:  Objection; calls for speculation,

24    overbroad, vague.

25              THE WITNESS:  Okay.  So anybody on this

1    e-mail could have surfaced that concept.  Anybody on

2    this e-mail could have talked to their friends and

3    competitors and asked what they were doing.  Anybody on

4    this e-mail, you know, could have gotten that type of

5    competitor information or thought process.

6             Anybody on this e-mail could have talked to

7    our local attorneys to find out what -- what, if

8    anything -- what the law was and what -- if anything

9    happened in court cases in the past year or two.

10            Because I don't know prior to this when the

11   last time late charges had been reviewed or -- in terms

12   of policy.  That I don't know.

13            And then Denise, our Western Division

14   in-house counsel at that time, would have done her own

15   independent legal review of late charge appropriateness

16   in the state of California.

17   BY MR. TOMASEVIC:

18        Q   Who or what set of people would have been

19   most likely to first come up with the idea?

20            MR. WINN:  Objection; calls for speculation,

21   asked and answered.

22            THE WITNESS:  Again, it's a very --

23            I would say it's a very collective process or

24   collaborative process.

25            We have people reporting directly to me that

```
 1    are out gathering information.  We're asking for proof
 2    of it.  It's a very tight layer of people in terms of
 3    management structure that are involved in -- in this
 4    stuff.
 5              The last thing that we would do as a
 6    organization is make decisions at the top without, you
 7    know, without involving our field people and you
 8    know -- in issues that they would -- that would impact
 9    them more frequently on a day-to-day basis than it
10    would us.
11    BY MR. TOMASEVIC:
12         Q   Well, would the decisions start in the
13    business or operations team, or would it start in
14    legal?  I just want to know where something like this
15    would have originated.
16              MR. WINN:  Objection -- hold on.
17              THE WITNESS:  Okay.
18              MR. WINN:  Objection; calls for speculation,
19    asked and answered, argumentative.
20              THE WITNESS:  So, you know, the operations
21    people -- unless, you know, we were aware of a legal or
22    a court case that might have come from our legal rep or
23    our local attorney says, Hey, here is what is
24    happening, you guys need to take a look at your late
25    charge policies and make sure they comply with the
```

```
 1    following.
 2             So unless that occurred, then the only other
 3    way this would have surfaced is we would, from an
 4    operational perspective, we would have decided for
 5    whatever reason at the time, Hey, it's been a while
 6    since we reviewed our late fee program.  Let's see
 7    what's out there.  We would have started our review.
 8    We would have notified our in-house legal rep, and we
 9    would have gone through the process and evaluating
10    what's going on.
11    BY MR. TOMASEVIC:
12         Q   So most likely would have started within the
13    operations team.
14             MR. WINN:  Objection; misstates testimony.
15             THE WITNESS:  Operations or legal, one of two
16    places.  If you want me to guess, more likely it was an
17    operational review that we brought our legal team into,
18    versus the other way around, but I can't be positive.
19    BY MR. TOMASEVIC:
20         Q   Why was the decision made to change the late
21    fee to the 5 percent structure at this time?
22             MR. WINN:  Objection; calls for speculation,
23    lacks foundation, vague.
24             THE WITNESS:  I don't recall specifically why
25    we made that change.  But I know from our corporate
```

1  philosophy that we wouldn't have been the first, and we
2  would have had -- again, by those data points, we would
3  have felt we had justification to put that program into
4  effect for, you know, for whatever reason.
5  BY MR. TOMASEVIC:
6  · · ·Q· So you don't know why, but you know you
7  wouldn't have been the first, because you want to look
8  to see that other competitors are acting consistently
9  with that, right?
10  · · ·A· Yeah, too, that there was a -- a consistent
11  thought process towards late fees in the industry.
12  · · · · · We don't want to be the outlier -- outlier.
13  We don't want to do anything that is unfair to
14  our -- in your opinion, to our customers.  And we want
15  to comply, you know -- bottom line, we also want to
16  comply with the law, you know.
17  · · · · · Again, late charge in the scheme of things,
18  late charge revenue is an extremely small component of
19  property revenue.  It virtually doesn't move the meter.
20  But the ramifications for getting these types of
21  charges wrong are large.
22  · · · · · It's -- you know, late fees are not a
23  positive relationship-building aspect that you have
24  with your customer.  And we all know that.
25  · · · · ·Q· Do you know how the decision was ultimately

```
 1   made?
 2        A    No.   I know what our process would have been,
 3   but it was not my decision alone to make, that we had
 4   process and data points that we would have had to bring
 5   everybody involved in it.   There is a good chance that
 6   Bruce Lavine since he managed Northern
 7   California -- and I can't tell from this -- if this is
 8   all California late fee, then Lavine would have had to
 9   have been brought into the equation, because he had
10   Northern California.
11            So it would have been a collective decision,
12   you know, made based upon recommendations, based upon
13   facts that we brought to the table and said, This
14   appears to be what we should -- the approach that we
15   should take.
16        Q    These decisions and discussions, did they
17   take place in person, over the phone, through these
18   e-mails?   What do you recall?
19            MR. WINN:   Objection, vague, calls for
20   speculation.
21            THE WITNESS:   Yeah, I don't recall.   I mean,
22   you know, they would have been by e-mail, by -- by
23   conference call.   And we wouldn't have necessarily
24   forced out a meeting to get together in person just to
25   discuss late charges.   We could all very well get on a
```

```
 1   call or in several calls depending what was necessary
 2   to make the correct decision.
 3   BY MR. TOMASEVIC:
 4        Q   Do you know how much time was spent on
 5   evaluating this decision?
 6        A   No, I don't -- I don't remember.  I can only
 7   speak to the process.  And the process does take a
 8   little bit of time.
 9        Q   But considering that it was ultimately a
10   smaller piece of the overall revenue, could you suspect
11   it took what you would consider to be a long amount of
12   time, a short amount of time, or how can you --
13           MR. WINN:  Objection; argumentative, calls
14   for speculation, vague.
15           THE WITNESS:  My answer to that would
16   be -- so, since late charges directly affect your
17   relationship with your customer, and it's not a
18   positive charge, it's not a relationship-building
19   aspect of business, so we would have taken the
20   appropriate amount of time to make what we felt was a
21   quality decision.
22   BY MR. TOMASEVIC:
23        Q   Can you --
24        A   And I don't know what that is, but it
25   probably took a lot more time than figuring out parking
```

```
 1   revenue.
 2         Q   Can you tell me how many meetings you
 3   had -- in-person meetings to discuss the late fee
 4   change?
 5         A   No, I cannot.
 6         Q   Or if there were any in-person meetings?
 7             MR. WINN:  Objection; vague.
 8             THE WITNESS:  Well, I would say yes, there is
 9   a likelihood that we had in-person meetings with
10   certain members of this team while others were on the
11   phone.  But since in essence, this was my area of the
12   country.  You know, I'm seeing these people very, very
13   often as is.  The idea that an in-person meeting would
14   be necessary when we have video calls and all that
15   stuff or we know each other, you know, is to
16   me -- doesn't really matter.
17   BY MR. TOMASEVIC:
18         Q   Well, as you sit here right now, can you
19   remember any in-person meetings being convened to talk
20   about this issue?
21             MR. WINN:  Objection; vague.
22             THE WITNESS:  I don't remember.
23   BY MR. TOMASEVIC:
24         Q   As you sit here right now, can you recall any
25   conference calls being set up to talk about this late
```

1   fee issue?

2        MR. WINN:  Objection; vague.

3        THE WITNESS:  I don't recall.

4   BY MR. TOMASEVIC:

5        Q   And I have got a couple of e-mails discussing

6   this issue, but can you -- can you remember any

7   specific e-mails that were exchanged during this time

8   period we're talking about?

9        A   No, I can't remember any e-mail at this

10  point, at this juncture.

11       Q   Do you know if any memos were written about

12  the basis for the decision?

13       MR. WINN:  Objection; calls for speculation,

14  vague.

15       THE WITNESS:  I don't know.

16  BY MR. TOMASEVIC:

17       Q   As you sit here right now --

18       A   And I don't know that a memo -- the way you

19  have termed it, would have -- would have been

20  appropriate.

21       You know, somebody might have summarized it

22  by e-mail, but I just don't recall.

23       Q   So we know the change was made.  We know it

24  happened in around 2008, but can you tell me any of the

25  other people that may have been involved other than the

1    people on this e-mail chain, Mr. Lavine, and Mr. Tuomi?

2              MR. WINN:  Objection; misstates testimony,

3    compound, asked and answered.

4              THE WITNESS:  Yeah.  I would say, again, in

5    addition to the people on this e-mail, you know, our

6    Western Division in-house legal rep which may have been

7    Denise Beihoffer, and the only reason I remember her

8    name is I see it on the front of this e-mail -- and our

9    local representation -- our local legal -- local

10   attorneys that I do not remember their names

11   representing us in Southern California, those would be

12   the other people whose input would have led to our

13   decision.

14   BY MR. TOMASEVIC:

15        Q   What about Dawn Bridges?  Do you recognize

16   her name?

17        A   Yeah, you asked me previously about her,

18   yeah.  She was an AVP in Orange County.

19        Q   Was she listed there?

20        A   Yes.

21        Q   That's right.  I flipped the page.  I'm going

22   to the next e-mail.

23             Do you see David Santee cc'd on the June 2nd

24   e-mail?

25        A   Which page?

```
 1        Q    -3646.  Page 2 of 3.

 2        A    Yes.

 3        Q    What was his role at the time?

 4        A    So Dave went from -- David went from senior

 5   VP position in the Southeast Region to Chicago for a

 6   property operations position.  So he started taking

 7   some of these departments off of Gerry Spector's plate

 8   and started to work with them in terms of supervising

 9   those departments.

10             So we're kind of at a point where David

11   started to be involved in 2008 in a number of areas,

12   both from just an educational perspective and a direct

13   report perspective.

14             So he was very often becoming a special

15   projects guy and redid our accounts payable system, a

16   number of other things at that time.

17        Q    What was Chris Jenkins's role at the time?

18        A    Chris was the guy that ran all of those

19   regional support people.  So his job title was most

20   probably vice president of regional support.  So people

21   like Allison Brown that you asked me about, would have

22   reported to him, but worked on my Southern California

23   portfolio.

24        Q    What about Dana Murphy?

25        A    Dana Murphy?  I don't recall.
```

1          Q   When you wrote this e-mail, you established

2     it as a high importance e-mail.  Why did you do that?

3          MR. WINN:  Objection; calls for speculation.

4          THE WITNESS:  Because of the subject matter,

5     and I think there are two reasons, just by looking, if

6     I can reference it.

7          One would be the subject matter.  Again,

8     anything, a late fee impacts residents and it has a

9     legal impact.  So I want people to pay attention to it.

10         Secondly, you know, if I had felt -- and I

11    don't recall, but if I had felt that we had made the

12    decision at the time of this e-mail, I would have

13    wanted to get it in to MRI before the end of the month

14    so everything would be updated appropriately in the

15    system.  So I think a combination of timing and -- and

16    a good chance this is not the first time we had talked

17    about late charges.

18    BY MR. TOMASEVIC:

19         Q   Other than the fact that other competitors

20    may have been implementing a similar fee structure, can

21    you tell me any other reason why Equity Residential

22    would have changed the free structure in 2008 to the

23    5 percent late fee?

24         MR. WINN:  Objection; calls for speculation,

25    lacks foundation, vague.

1    · · · · · THE WITNESS:  So I have a hard time

2    recalling, but again, as I mentioned before, had we not

3    detected something either from what was already legally

4    valid or court cases that had come down, you know, had

5    those boxes not generally been checked, you know, we

6    would not have done anything.

7    · · · · · We would not have devised a late charge

8    policy that was not supported by law.  That's probably

9    the best way I can say that.

10   BY MR. TOMASEVIC:

11   · · · Q   Well, you're answering my question in a

12   negative.  I want to know what specific reasonings or

13   justifications can you remember considering other than

14   the fact that other people at the time may have been

15   charging -- other competitors at the time may have been

16   charging that fee?

17   · · · · · MR. WINN:  Objection; argumentative, asked

18   and answered, calls for speculation, lacks foundation,

19   vague.

20   · · · · · Did I miss any?

21   · · · · · THE WITNESS:  I can't remember anything

22   specific.  I can only again direct you to the process

23   that I have outlined on how we would have made the

24   decision.

25

```
 1   BY MR. TOMASEVIC:

 2        Q   How about in terms of why the decision was

 3   made at that time, meaning mid-2008?

 4            MR. WINN:   Objection; lacks foundation that

 5   any decision was made.   Calls for speculation.

 6   BY MR. TOMASEVIC:

 7        Q   Or why the decision was being considered at

 8   that time?

 9        A   I don't know.   Honestly, I don't know why May

10   instead of January.   I just don't know.   I don't know

11   the timing.

12        Q   Or 2008 versus 2009?

13        A   Yeah.

14        Q   Or how about why 5 percent as opposed to

15   6 percent?

16        A   There you go.

17        Q   Do you know?

18        A   No, I don't know the specifics.   I just know

19   the process.

20        Q   Or 5 percent as opposed to $100 flat?

21        A   I don't remember the particulars of it.   I

22   just remember the process that we would have gone

23   through to get to that number.

24        Q   Was one of the reasons that Equity

25   Residential changed the late fee to 5 percent to
```

1  incentivize tenants to pay rent on time?

2         MR. WINN:  Objection; lacks foundation, calls

3  for speculation.

4         THE WITNESS:  Well, I don't know --

5         My answer would be this.  Obviously, you

6  know, late charges are to incent people to pay on time

7  and to cover costs associated with the process of

8  collecting that income while it's late.  And those

9  processes can be very wide and very time consuming and

10  expensive.

11         The -- whether it's a flat fee or a

12  percentage, I don't know if that changes the approach

13  of the late charges, you know, in terms of your

14  question.

15  BY MR. TOMASEVIC:

16     Q   I understand your testimony as to what the

17  process might be or what a late fee might be.  I want

18  to drill down into this particular decision in 2008 or

19  around that time.

20     A   Sure.

21     Q   Do you specifically remember considering

22  incentivizing people to pay rent on time incenting on a

23  late fee policy?

24         MR. WINN:  Objection; vague, calls for

25  speculation.

```
 1           THE WITNESS:  No.  I don't remember the
 2  concept of incenting people to pay on time to be part
 3  of the -- of the change in the late charge policy.
 4  BY MR. TOMASEVIC:
 5      Q   Did Equity Residential change the late fee to
 6  5 percent in order to increase revenue?
 7           MR. WINN:  Objection; lacks foundation, calls
 8  for speculation.
 9           THE WITNESS:  I would say not the -- the
10  intention -- I would say, no.
11           The intention of the late charge number was
12  to incent people to pay on time, to recover charges
13  associated with the late collection of that rent, and
14  to comply with appropriate approaches as provided by
15  law.
16           And again, you know, late charges are just
17  not a significant percentage of a property's income.
18  BY MR. TOMASEVIC:
19      Q   Well, the effect here was to increase
20  revenue, right?
21           MR. WINN:  Objection; lacks foundation, calls
22  for speculation.
23           THE WITNESS:  Depends on the rental rate.
24  You can argue if we were charging $50 a month and the
25  rent was 5,000 a month, and then we changed it to
```

```
 1    5 percent of revenue, the net effect of that, if

 2    somebody did not pay on time, you could -- you know,

 3    anybody could make that argument.  It's not the

 4    intent -- not the intent of the late charge, as I have

 5    stated.

 6    BY MR. TOMASEVIC:

 7         Q   The net effect of a late charge in California

 8    where rents are typically high compared to most of the

 9    rest of the country, it would have been to increase

10    rent, right?

11             MR. WINN:  Objection; misstates testimony,

12    lacks foundation.

13             THE WITNESS:  It's a numbers game, right.  If

14    you had ten people paying late before because it was at

15    50 bucks, right, and now you have three people pay late

16    because it's 5 percent of rent, you may end up worse

17    off.  So it's not -- it can be very variable.  It can

18    be very variable.

19    BY MR. TOMASEVIC:

20         Q   Well, part of your job was to look at the

21    financials in 2007, right?

22         A   Yes.

23         Q   And it was part of your job to look at

24    financials in 2008, correct?

25         A   Correct.
```

1              THE WITNESS:  Okay.

2    BY MR. TOMASEVIC:

3         Q   You can answer if you can respect his

4    instruction.

5         A   Would you restate the question?

6         Q   You wrote in this e-mail that this is okay

7    with California law, meaning the changing the late fee

8    on new leases to 5 percent of the amount due, right?

9         A   (No audible response.)

10        Q   You wrote that?

11        A   Yes.

12        Q   How did you come up with that?

13        A   Again, I have to refer you back to the

14   process.  And that's all I remember.

15        Q   Well, you are talking about specifically

16   California law here.  What did you do to apprise

17   yourself of California law at that time, if anything?

18             MR. WINN:  Objection; asked and answered,

19   argumentative.

20             THE WITNESS:  Again, I got to send you back

21   to the process that we followed.  Again, we use the

22   process to make sure that we don't -- in our opinion,

23   that we don't make mistakes and that we're thorough in

24   terms of our approach to those types of decisions.

25             So although I don't -- I apologize, I don't

     1   remember the particulars because of the -- you know,

     2   the decade that's passed, but at the same time I really

     3   am very clear on the process because there is risks for

     4   us.  At that time it was a public company and a good

     5   target.

     6              In our opinion there was risk for us to not

     7   have a process that was appropriate and procedures and

     8   guidelines and -- and leases that were, you know,

     9   appropriate and legally, you know, legally approved by

    10   our in-house --

    11   BY MR. TOMASEVIC:

    12        Q   The question is a little different.

    13            I want to know if you can remember doing

    14   anything in particular to satisfy yourself that this

    15   change was okay with California law.

    16            MR. WINN:  Objection; asked and answered.

    17            THE WITNESS:  I just don't remember at this

    18   time.

    19   BY MR. TOMASEVIC:

    20        Q   Or why you wrote this at this time, what you

    21   did before this time to comfortably write this sentence

    22   here?

    23            MR. WINN:  Objection; vague, asked and

    24   answered.

    25            THE WITNESS:  Yes, all I remember is the

1    process.  I don't remember the particulars.

2    BY MR. TOMASEVIC:

3         Q   And I want to focus more on what you did.

4         A   Okay.

5         Q   Did you Google something?

6              MR. WINN:  I don't remember if 2008 -- if

7    Google existed.  Strike all that.

8    BY MR. TOMASEVIC:

9         Q   You wrote the sentence.  I just want to know

10   what you did before you wrote it.  Did you Google

11   something?  Did you remember picking up the phone and

12   calling a lawyer for the California Apartment

13   Association?

14             What did you do?

15             MR. WINN:  Objection; asked and answered,

16   calls for speculation, lacks foundation.

17             THE WITNESS:  Yeah, so, yes, so I can

18   remember following a process collectively to make this

19   recommendation.

20   BY MR. TOMASEVIC:

21         Q   So it was your recommendation to change the

22   late fee to 5 percent.

23             MR. WINN:  Objection; misstates testimony.

24             THE WITNESS:  I would say no.  And I don't

25   recall it being my recommendation alone.

1      However, I do recall it being my

2 recommendation as a synopsis of all the information we

3 had provided and gotten with clearance and approval

4 from our in-house legal department.

5 BY MR. TOMASEVIC:

6      Q   So you already --

7      A   So I would not -- I nor anybody including

8 Fred Tuomi, would not have set a -- approved and

9 implemented a program like this without in-house

10 counsel having been involved in vetting it, if you

11 will, to make sure that it was appropriate.

12 BY MR. TOMASEVIC:

13      Q   What information -- did you look at any

14 documents?

15      MR. WINN:  Objection; asked and answered,

16 lacks foundation, vague.

17      MR. TOMASEVIC:  Strike that.

18 BY MR. TOMASEVIC:

19      Q   Other than saying you would have followed a

20 process that involved in-house counsel, can you recall

21 doing anything --

22      A   That's not correct.

23      Q   Okay.

24      A   I would have followed a process that included

25 looking at companies that we valued, and the

 1   competitors in the marketplace, and looked at the types

 2   of things that they were doing or considering.  We

 3   would have looked at the local Apartment Association

 4   and what they were doing or recommending for those

 5   areas.  That we would have looked at current court

 6   cases and rulings to see if there was any information

 7   there that we should consider as part of our

 8   decision-making process, and that we would have looked

 9   at the law on the books currently.

10         And all those things combined would have led

11   us down a road to where we made that decision, and we

12   felt comfortable with that decision.

13         Q   But what specifically did you look at?

14         A   I don't recall.

15             MR. WINN:  Objection; asked and answered.

16             THE WITNESS:  Yeah, I don't recall at this

17   point in time.

18   BY MR. TOMASEVIC:

19         Q   Then what specifically did the people who

20   reported to you either in the budget or pricing arena,

21   what did they look at?

22             MR. WINN:  Objection; calls for speculation.

23             THE WITNESS:  They would not have had a say

24   in this.  It wasn't their purview to make a decision

25   regarding late charge policy.

```
 1    BY MR. TOMASEVIC:

 2         Q   So did you even consult them?

 3              MR. WINN:  Objection; misstates testimony.

 4              THE WITNESS:  I would say no.  I mean, again,

 5    the pricing people and the regional support people are

 6    implementers of decisions that were made.  They would

 7    not have been consulted about a debate and a review of

 8    late charge policy.

 9    BY MR. TOMASEVIC:

10         Q   So besides lawyers, who would you have

11    consulted at the time?

12              MR. WINN:  Objection; calls for speculation.

13              THE WITNESS:  So again, we would have -- and

14    me personally, we would have talked to others in the

15    industry.  Would have talked to my representatives at a

16    local -- at the local Apartment Association.  Many of

17    them that may have also been a competitor and a board

18    member at the same time.

19              I would not have spoken with local attorneys.

20    I would have ensured that our EQR in-house attorney

21    spoke with local attorneys and did the -- did the law

22    research.  And that's the process that we would have

23    used.

24    BY MR. TOMASEVIC:

25         Q   Do you remember specifically doing any of
```

```
 1   that, picking up the phone, talking to the association
 2   folks?
 3        A   I don't recall that.
 4        Q   Or looking at a report of competitor late
 5   fees or anything like that?
 6        A   You know what?  I don't remember ever seeing
 7   a consolidated report of any of that stuff.  And I
 8   remember it being a little bit more informal, like,
 9   Hey, you know, what's --
10           And again, your competitors may share
11   information with you, but that doesn't mean they always
12   tell you the truth.  So you just try to get a feel on
13   some of that stuff.
14           MR. TOMASEVIC:  Let's mark our next in line,
15   Exhibit Number 36.
16           We're not going to re-mark this.  This was
17   Exhibit Number 11.  It's Bates labeled WP3438.  It's a
18   single page of e-mails.  I'm just going to put an 11 on
19   this sticky here.
20           I got one for you, too.
21           MR. WINN:  Thank you.
22   BY MR. TOMASEVIC:
23        Q   I see your name on this e-mail chain here.
24        A   Okay, yeah.
25           What's the date of this?
```

1          Okay.  So June 4th, all right.

2          Q   Now, can you --

3              Of the people we didn't already identify, can

4    you tell me what the roles of these people were?

5          A   Here we go.

6              Kelly Neilsen, don't recall.

7              Connie Kochems, RS support in Atlanta.  No, I

8    take that back.  I don't recall Connie Kochems.

9              Bruce Lavine, my counterpart for Northern

10   California, Pacific Northwest.

11             Bruce Salter, an AVP in Northern California.

12             Terry Kaye was the ADP in Southern

13   California.

14             Rebecca Ballinger, that's Rebecca's last

15   name, Ballinger, the head of the budget analyst.  You

16   just call her VP or budget services for lack of a

17   better title.

18         Q   The Rebecca we talked about earlier?

19         A   Yes.

20         Q   Okay.

21         A   Carol Bennett, I don't remember.

22             Karen Zions, IT gal based in Tampa.

23             Trish Allmand, I don't recall.

24             Sarah Gunderson, I don't recall her, what she

25   was doing at that time.

1           ~~Amanda Betty, don't recall.~~

2           ~~Ann Patton, don't recall.~~

3           ~~Brooke -- the only one -- no.~~

4           ~~Denise Beihoffer, in-house attorney.  And~~

5     ~~that's all I -- I recall.~~

6           ~~Q   This e-mail says that the late fee change for~~

7     ~~the California properties took effect as of June 4,~~

8     ~~right?~~

9           ~~A   I'm just reading the whole thing first.  So~~

10    ~~give me a minute.~~

11          ~~Back to your question.~~

12          Q   Is it true that the late fee change for the

13    California properties where they changed to a

14    5 percent, that was effected as of June 2008?

15          MR. WINN:  Objection; misstates the document,

16    calls for speculation, lacks foundation.

17          THE WITNESS:  I would say, yes.  My reading

18    of this document would make me assume that June 4th was

19    the effective date.

20    BY MR. TOMASEVIC:

21          Q   Now, the earlier string of e-mails that we

22    looked at, the last exhibit, it seems like your e-mail

23    is from about four, five days earlier, May 31st?

24          A   Yes.

25          Q   So is it your understanding that the whole

1  process of implementing decision took about four, five

2  days?

3          MR. WINN:  Objection; misstates testimony.

4          THE WITNESS:  No.  The process of reviewing

5  the late charge, the decision to make a change in the

6  late charge most likely involved a month or so at

7  least.

8  BY MR. TOMASEVIC:

9      Q   Do you know what started it?

10     A   No, I don't recall.

11     Q   Okay.  The late fee that included

12  the -- well, let's just -- my understanding of the late

13  fee change in 2008 was that it became a late fee of

14  5 percent of the outstanding balance or $50, whichever

15  is greater, but subject to a cap of 5 percent of the

16  recurring monthly charges.  That's rent, parking,

17  storage, pet rent, et cetera.

18         Is that right?

19     A   Yes.

20     Q   Is that the way it stayed until you left in

21  2013?

22     A   I left at the end of 2008.

23     Q   Sorry?

24     A   I'm not aware of any other -- just like I

25  wasn't aware of this based on history, but I'm not

1   something tied to the affordable units that most

2   probably from a legal perspective would lead you to a

3   certain number that was appropriate and checking with

4   your competitors would not be on that list when dealing

5   with affordable.  You would probably be looking at the

6   documents of the deal.

7   BY MR. TOMASEVIC:

8        Q   And my question was maybe more simple but

9   admittedly vague.

10            Who in terms of the organization was

11   responsible for that sort of exercise?

12        A   Same concept, the legal team would be

13   responsible for making sure that the operational people

14   didn't mess up anything that was out of the ordinary.

15        Q   If EQR bought a property that had tenants

16   with preexisting leases, how would it determine the

17   late fee?

18            MR. WINN:  Objection; calls for speculation,

19   vague, overbroad.

20            THE WITNESS:  Well, as for everything, this

21   is more than a late fee answer.  So, you know, things

22   proceed according to their existing leases.  As new

23   residents move in, they are on our leases, our approved

24   leases.

25            And as current residents renew, they move

1    over to a new EQR lease.  So I guess the word is things

2    transition from the old property leases to the buyer or

3    the owner's leases, in this case EQR, on a new resident

4    or a renewal basis.

5    BY MR. TOMASEVIC:

6         Q   Okay.

7         A   So EQR would not purchase a property, go in

8    and adjust an existing lease.  That would not occur.

9         Q   But the adjustment would take place as soon

10   as the lease was renewed?

11             MR. WINN:  Objection; lacks foundation, calls

12   for speculation.

13             THE WITNESS:  The answer would be, yes.

14   Whatever lease that we put into effect would start at

15   renewal or upon vacancy and a new resident.

16   BY MR. TOMASEVIC:

17        Q   Do you know how many properties within

18   California had a late fee structure that was different

19   than the default or majority structure at EQR?

20             MR. WINN:  Objection; vague, calls for

21   speculation.

22             THE WITNESS:  I have no idea.

23   BY MR. TOMASEVIC:

24        Q   Do you think it would be consistent with that

25   1 percent of the portfolio number; it would be

1  properties that had a small number of units in that
2  property that might have been subject to a different
3  fee, but I don't really recall any more than that.
4          MR. TOMASEVIC:  Off the record.
5          (Brief recess.)
6  BY MR. TOMASEVIC:
7      Q   Remind me what your role was at the company
8  in 1997.
9      A   I started as an area vice president in
10 Atlanta, Georgia for the Southeast Region for about
11 three months.  And then I was promoted to EVP in the
12 Arizona Region and relocated.
13     Q   Do you recall a lawsuit filed by the Consumer
14 Justice Foundation in 1998 against Equity Residential
15 in San Diego and regarding late fees?
16     A   No.
17     Q   Do you recall any time in 1997 or thereabouts
18 a report being generated by the accounting firm
19 PricewaterhouseCoopers for a study meant to evaluate
20 late fees?
21     A   No.
22     Q   Do you recall ever working with PWC on a
23 report regarding late fees?
24     A   No.
25     Q   Or is this the first time that you have heard

1    that there was even such a report or a study done

2    involving PricewaterhouseCoopers?

3         A   Yes, this is the first time I have heard of

4    it.

5         Q   Have you ever heard of Equity Residential

6    ever going outside the organization for a report or a

7    study specific to late fees?

8              MR. WINN:  Objection; vague, calls for

9    speculation.

10             THE WITNESS:  No.

11   BY MR. TOMASEVIC:

12        Q   I want to go back to the MRI system.

13        A   Okay.

14        Q   Now, when did Equity Residential start using

15   that?

16        A   This would be a guess.  I'm guessing the

17   2005, 2006 time period.

18        Q   And was it still in use by the time you left?

19        A   Yes.

20        Q   Do you know if even after you left they

21   started using something else?

22        A   I don't know.  I just don't know.

23        Q   Do you know if the MRI system keeps -- well,

24   strike that.

25             What would be your summary of what the MRI

1   ~~MRI uniformly once it was deployed?~~

2       ~~A   Yes.~~

3       Q   Let's talk about steps taken to collect rent

4   from beginning to end, including if there is an

5   eviction or something like that.

6           That process, is that the same uniform

7   process throughout all California apartments for EQR?

8           MR. WINN:  Objection; calls for speculation,

9   vague.

10          THE WITNESS:  Unless -- I would say, yes, it

11  should be, unless there is a local law that would

12  require us to do something different.  But --

13  BY MR. TOMASEVIC:

14      Q   And as you sit here right now, can you recall

15  any --

16      A   I can't recall any reason it would be

17  different.

18      Q   If a tenant doesn't pay monthly rent by the

19  due date, what are the steps that are taken by EQR,

20  Equity Residential, to collect that rent?

21          MR. WINN:  Objection; calls for speculation,

22  lacks foundation, vague.

23          THE WITNESS:  You know, so at this point in

24  time, I would be guessing about the process.  So I

25  would be happy to guess based on what I slightly recall

1    if you would like.  It's your call.

2    BY MR. TOMASEVIC:

3        Q   Well, I just want you to tell me what you

4    recall, even if it's an educated guess.

5        A   Okay.  So I would recall that -- that a

6    notice would go out when they -- when a resident was

7    late delivered to their door, but -- but before the

8    late charge would automatically be assessed.  And then

9    at a period of time after the late fee was assessed and

10   after that first notice, a pay or quit would be

11   generated at that time, basically demanding pay or quit

12   demanding the rent, any other fees or possession of the

13   apartment.  That's kind of all I remember on the

14   process until all those things expired and it

15   eventually went to unlawful detainer status.

16       Q   So it starts with a notice?

17       A   Yes.

18           MR. WINN:  Objection; calls for speculation.

19           THE WITNESS:  From what I recall, it starts

20   with a notice.

21   BY MR. TOMASEVIC:

22       Q   Of the percentage of people who -- strike

23   that.

24           Is the notice automatically generated as soon

25   as the due date lapses?

1        MR. WINN:  Objection; lacks foundation, calls

2   for speculation, vague.

3        THE WITNESS:  From what I -- again, from what

4   I recall, you know, we were able to in essence press a

5   button and pull those -- have those notices printed for

6   anybody that had not paid rent by such and such a

7   date -- and I don't mean the pay or quits.  I am just

8   referring to the reminder notices -- and issue them.

9   BY MR. TOMASEVIC:

10        Q   This was a notice that went out before the

11   end of the grace period?

12        A   Yeah, rent is late.

13        MR. WINN:  Hold on.

14        Objection; vague, calls for speculation,

15   lacks foundation.

16        THE WITNESS:  Okay.  So again, from what I

17   recall, because it's been a while, you know, notice

18   went out reminding them that their rent was late and

19   they would be subject to a late charge and blah, blah,

20   blah if not paid by whatever date their payment would

21   have -- the date that the trigger was -- that was

22   before the pay or quit.  So it was like -- I don't know

23   if I would call it a friendly reminder, but it was a

24   reminder notice.

25

BY MR. TOMASEVIC:

        Q   Let's focus on the reminder notice.

        A   Yes.

        Q   Do you know, if assuming rent was due on the 1st, when that reminder notice would be generated?

        A   I would be guessing -- I don't recall if it was the 3rd or the 4th.

        Q   But it would be sometime within the grace period before the late fee was actually charged?

        A   From what I recall, yes.

        Q   What percentage of people paid their rent -- well, strike that.

            What are the names of the job titles of people who would be responsible for this reminder notice?

        A   The property manager and the assistant manager at each property.

        Q   And they would essentially push a button and then send the notices out?

        A   Yes.

        Q   Okay.

        A   When you say --

            Well, I said send the notices out, but I don't want to put words in your mouth.

            Did they slip it under the door?  Post it on

1    the door?

2             MR. WINN:  Calls for speculation, lacks

3    foundation.

4             THE WITNESS:  Yeah.

5             From what I recall, they would put it in an

6    envelope and place it on the door.  This is back in

7    those days.

8    BY MR. TOMASEVIC:

9         Q   This was in 2- --

10        A   Prior to 2008 or 2008 and prior.

11        Q   Do you know how Equity Residential does it

12   now?

13        A   No, I do not.

14        Q   Do you know how they did it in 2009?

15        A   No, I do not.

16        Q   Or how they did it at all after you left?

17        A   No.

18        Q   So for when the notice or reminder notice was

19   posted, it would be the responsibility of the property

20   manager and the assistant manager?

21        A   Yeah, to generate them and then somebody

22   would walk and distribute them.  That could be a

23   security officer after hours.  Could have been whoever

24   they needed to do that with.

25        Q   Who is pushing the button to generate the

1    not.  A security officer might.  And the reason is two,

2    just reporting of time in a log, how did they spend

3    their time, or number two, there were some properties

4    that had these security check-in plates, you know, so

5    you had to go by and whatever you stuck in it to get

6    credit for it.  So there were -- there were mechanisms

7    that would allow you to reasonably track the amount of

8    time spent in that, but not without holes.

9    BY MR. TOMASEVIC:

10        Q   Well, was it a director of EQR, Equity

11   Residential, where they required employees to track the

12   amount of time they spent putting out these reminder

13   notices?

14        A   No, there was not a directive to do that.

15            MR. WINN:  Objection; vague, calls for

16   speculation, lacks foundation.

17   BY MR. TOMASEVIC:

18        Q   Then the next step after the reminder notice

19   if someone didn't pay, would be the distribution of a

20   pay or quit?

21        A   Yes, somewhere on that process, the pay or

22   quit.  Might be seven days after rent is due.  Might

23   slip a little.  But right around that period of time.

24        Q   And the generation of this pay or quit

25   notice, was that also another one of these buttons you

1   could push and generate the notice like with the

2   reminder notice?

3              MR. WINN:  Objection; calls for speculation.

4              THE WITNESS:  From what I recall, yes,

5   because you could -- property management company could

6   issue -- legally issue pay or quits, so they are done

7   correctly because they are the first step in the legal

8   process.  So we would program our MRI system to -- to,

9   you know, to issue the pay or quits correctly with the

10  correct due date and the correct residence from the

11  lease, everything set up.  So you could print those

12  forms, have them ready to go for -- for distribution.

13  BY MR. TOMASEVIC:

14       Q   And this would be again a function of the

15  property manager, the assistant manager, and whoever

16  was actually out in the field displaying or posting the

17  notices?

18       A   Yeah, from when I recall --

19              MR. WINN:  Objection; calls for speculation,

20  vague.

21  BY MR. TOMASEVIC:

22       Q   Is it the same people that were responsible

23  for the reminder notice responsible for distributing

24  the pay or quits?

25       A   Yes.

```
 1           MR. WINN:  Objection, lacks foundation, calls
 2  for speculation, vague.
 3  BY MR. TOMASEVIC:
 4      Q   So did EQR ever track the amount of time
 5  spent by any employees in distributing or printing
 6  these pay or quit notices?
 7           MR. WINN:  Objection; calls for speculation,
 8  vague, lacks foundation.
 9           THE WITNESS:  Not that I'm aware of.
10  BY MR. TOMASEVIC:
11      Q   And then the eviction process.  After the pay
12  or quit, what happens?
13      A   It's -- if they don't pay, everything is
14  given to the attorney, and then that process begins.
15      Q   Can you tell me what percentage of all
16  appointments require the generation of a reminder
17  notice?
18           MR. WINN:  Objection; vague, calls for
19  speculation.
20           THE WITNESS:  No.
21  BY MR. TOMASEVIC:
22      Q   And if not all apartments, what about in
23  California or any apartments that you're familiar with?
24           MR. WINN:  Objection; calls for speculation,
25  vague.
```

1    people that just run out on their lease after you pay

2    or quit them.  And they just don't pay and they just

3    run.

4            So collections, you know, if you can keep

5    collections -- or I guess I would call it bad debt

6    would be a category that included both those.  When all

7    is said and done, if you could keep that below

8    one-and-a-half percent, that's a pretty good number.

9    That was not uncommon.

10           Q   Let me ask you a slightly different question.

11           A   Yes.

12           Q    Under what scenarios would an outside

13   collection agency be utilized?

14            MR. WINN:  Objection; calls for speculation,

15   vague.

16            THE WITNESS:  If there was -- if there was

17   unusual property maybe to be -- to have a lien put on

18   or security, perhaps using an outside service with your

19   attorney might make more sense, but I'm not aware that

20   we did much -- again, having brought the collections

21   process.

22            So a lot of collection agencies we found at

23   either both ends of the pendulum, either being very

24   weak in terms of their collection activity, sending a

25   couple of letters and that was it, or being aggressive

1   to the point that you are uncomfortable with an outside

2   agency representing you.   Still representing your

3   company, and you still want things to be done in a

4   manner that's consistent with the way you want to

5   project your business.

6   · · · · · · So that's why we brought checks primarily

7   in-house and handled it ourselves.

8   BY MR. TOMASEVIC:

9   · · · · Q   When a tenant moved out of the property and

10  left a balance owed, would Equity Residential typically

11  try to collect that balance in-house?

12  · · · · A   Yes, through the property for maybe three

13  weeks or so, three or four weeks after move-out, and

14  then would turn it over to the in-house collections

15  team after that.

16  · · · · Q   The in-house collections team, was that a

17  particular division or office?

18  · · · · A   Yeah.

19  · · · · Q   Did it have a name?

20  · · · · A   Yeah.   Collections.   EQR collections, yeah.

21  · · · · Q   And then EQR collections, would they handle

22  that from cradle to grave, or would they eventually

23  sell it, or what?

24  · · · · · · MR. WINN:   Objection; vague, calls for

25  speculation, lacks foundation.

1    that clarification.

2            How many times did you speak to someone from

3    Alex's office?

4            A    I believe I got the first call from Alex's

5    office from a gal that was just trying to ascertain

6    when I was at EQR, if I was involved in Southern

7    California in 2008, some other general questions.  And

8    I don't really remember -- and I do remember telling

9    her, Hey, I'm sorry, as we get into this, you're going

10    to get about a thousand I don't recalls, it's been

11    forever, but I would be happy to be part of it if you

12    need it.

13            That's all I remember.  Then a follow-up call

14    before this meeting just real quick, you know, with

15    Alex on the line and a gal from the office.  And again,

16    you know, just tell the truth the best you remember it.

17    We'll see you there.  And that was really it.

18            Q    Do you recall them telling you anything about

19    the case?

20            A    No.

21            I think I remember asking the question.  And

22    they politely declined to be appropriately

23    uninformative.

24            Q    We saw a few e-mails here that had your names

25    on them.

1           Do you recall actually writing any e-mails,

2     these e-mails that you reviewed today?

3           A    Well, I don't recall writing them, but I

4     don't dispute their authenticity at the same time.

5           Q    We also saw an e-mail about a late fee

6     change?

7           A    Yes.

8           Q    Separate from that document, do you actually

9     recall anything about the specifics of the late fee

10    change?

11          A    No.  Just the process to get there, but not

12    the specifics behind it, no.

13          Q    Do you recall what the late fee policy was in

14    2007?

15          A    No.

16          Q    Did you ever oversee Northern California?

17          A    No.

18          Q    So at times today you were provided -- you

19    were asked questions about California.  Were your

20    answers limited to Southern California?

21               MR. TOMASEVIC:  Vague, overbroad, compound.

22               THE WITNESS:  Not necessarily.  You know,

23    particularly a policy like late charges, you know,

24    would have impacted the entire state perhaps.  So, you

25    know, I cannot say that we only considered Southern

```
 1    California in its own vacuum.
 2    BY MR. WINN:
 3         Q    Did you ever personally chase down someone
 4    that did not pay their rent?
 5              MR. TOMASEVIC:  Vague.
 6    BY MR. WINN:
 7         Q    And by chase down, I don't mean physically
 8    chase them down in the street.  I mean did you go
 9    through the process of sending the notice, talking to
10    the tenant, whatever the steps are involved trying to
11    collect late rent from someone who had not paid?
12         A    No, not at EQR.  In my younger days in the
13    industry, I was more hands on.
14         Q    Well, while at EQR, did you ever interview
15    the property manager or system property manager to
16    discuss the specific steps they would take to try to
17    collect rent that's not been paid?
18         A    No, I did not specifically interview
19    individual property managers.
20         Q    At one point in your testimony today, you
21    were asked to estimate percentages of tenants who don't
22    pay on time and how many of those go to court, that
23    sort of -- that line of questioning.
24              Do you recall that?
25         A    Yes.
```

```
 1        I, DENISE HESS, a Certified Shorthand Reporter of

 2   the State of California, do hereby certify:

 3        That the foregoing proceedings were taken before me

 4   at time and place herein set forth; that any witnesses

 5   in the foregoing proceedings, prior to testifying, were

 6   administered an oath; that a record of the proceedings

 7   was made by me using machine shorthand which was

 8   thereafter transcribed under my direction; that the

 9   foregoing transcript is a true record of the testimony

10   given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal case,

13   before completion of the proceedings, review of the

14   transcript [X] was [ ] was not requested.

15        I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any party to this action.

18        IN WITNESS WHEREOF, I have this date subscribed my

19   name.

20

21   Dated:  7/11/17

22

23   _____

24                    DENISE HESS
                      CSR No. 7564
25
```

Exhibit 3

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, ANGELINA MAGANA, NORMA RODRIGUEZ, and DAVID BONFANTI individually and on behalf of others similarly situated, | Case No. |
| | 4:16-cv-01225-JSW-TSH |
| Plaintiffs, | |
| vs. | |
| EQUITY RESIDENTIAL, a real estate investment trust, ERP OPERATING LIMITED PARTNERSHIP, a partnership, EQUITY RESIDENTIAL MANAGEMENT, L.L.C., EQR-WOODLAND PARK B LIMITED PARTNERSHIP, | |
| Defendants. | |

_____

VIDEOCONFERENCED DEPOSITION OF COLLIN GLANCY

TUESDAY, JUNE 29, 2021

9:29 A.M.

APPEARING REMOTELY VIA ZOOM FROM

CHICAGO, ILLINOIS


REPORTED BY:  Stephani L. Loder, CSR No. 13884

Collin Glancy                                          June 29, 2021

1                    CHICAGO, ILLINOIS;

2                 TUESDAY, JUNE 29, 2021;

3                       9:29 A.M.

4

5                    COLLIN GLANCY,

6  having been first duly sworn, was examined and testified

7                    as follows:

8

9                    EXAMINATION

10  BY MR. TOMASEVIC:

11       Q. Good morning again, Mr. Glancy.  I introduced

12  myself briefly before we went on the record, before the

13  record, and my name is Alex Tomasevic.  I represent the

14  plaintiffs in this matter.

15       Please do me a favor and state and spell your

16  name.

17       A. Collin Glancy.  C-O-L-L-I-N.  Last name

18  G-L-A-N-C-Y.

19       Q. Thank you.  And who do you work for currently?

20       A. Equity Residential.

21       Q. All right.  Are you currently located in

22  Chicago?

23       A. Yes, I am.

24       Q. In your offices?

25       A. Yes.

Collin Glancy                                            June 29, 2021

1      Q. At the Equity Residential headquarters in

2  Chicago?

3      A. Yes.

4      Q. Great.  Are you represented by an attorney in

5  this case?

6      A. Yes.

7      Q. And that would be Mr. Winn?

8      A. Correct.

9      Q. When did you first learn about this lawsuit?

10      A. I first learned about the lawsuit a couple

11  months ago.

12      Q. How did you learn?

13      A. From our in house counsel Matt Koritz.

14      Q. And before we go much further, what is your

15  address?

16      A. My home address?

17      Q. Yes.

18      A. 2219 North Bissell, B I S S E L L, Street,

19  Unit 1 N, as in Nancy, Chicago, Illinois 60614.

20          MR. TOMASEVIC:  Now, Aaron, if I need to serve

21  some kind of subpoena, a trial subpoena, or service of

22  process for Mr. Glancy, can I do that through your

23  office?

24          MR. WINN:  Probably.  Yes.  I mean --

25          MR. TOMASEVIC:  All right.

Collin Glancy                                                June 29, 2021

1    testimony, as you sit here today.  And we can't have you

2    going and looking up the answers or looking up documents

3    or emailing Aaron something like, hey, what's the answer

4    to this question?  Not that anyone expects you to do

5    that.  I just need to lay out the ground rules.

6           Is that fair?

7           A. Understood.

8           Q. Thank you.  Now, you're here to testify on one

9    particular topic, and that is EQR's damages from any

10   lost use of funds attributable to its California

11   residential tenants' late payment of rent.

12          Is that your understanding?

13          A. Yes.

14          Q. And are you prepared to testify on behalf of

15   the company on that topic?

16          A. Yes.

17          Q. Did you do anything to prepare to testify on

18   that topic?

19          A. I had conversations with counsel.

20          Q. When was the first conversation with counsel

21   you had to prepare for your testimony here today?

22          A. Last week.

23          Q. About when was that?

24          A. I believe it was Wednesday.

25          Q. The 23rd of June?

Collin Glancy                                                    June 29, 2021

1   session yesterday?

2        A. No.

3        Q. And what was the next thing you did, if

4   anything, to help prepare for today?

5        A. That was all the prep for today.

6        Q. Have you now told me all the things that you've

7   done to prepare for today's deposition or to gain

8   knowledge on deposition topic No. 1?

9        A. I'm sorry.  Repeat that.

10        Q. Have you now told me all the things you've done

11   to prepare for today's deposition or gain knowledge as

12   to deposition topic No. 1?

13        A. Yes.  The conversations with counsel were all

14   about prep for today's deposition.

15        Q. Let me go back and get some of your background.

16        What's your current title?

17        A. Vice president of treasury.

18        Q. Is that the full title?

19        A. Yes.

20        Q. I've seen a title to the effect of vice

21   president of treasury and capital markets.

22        Does that ring a bell?

23        A. Yes.

24        Q. Did you ever have that title?

25        A. It's not an official title that I've had, no.

Collin Glancy                                               June 29, 2021

1          Q. Okay.  But your official title is vice

2   president of treasury.

3          A. Correct.

4          Q. And what do you do?

5          A. I work on capital markets, and, basically, my

6   job is to manage our -- the company's funding and

7   relationships with capital sources.

8          Q. And who do you report to?

9          A. Our treasurer, Claudio Moreno.

10         Q. Do you have people who report directly to you?

11         A. Yes.

12         Q. And who are they?

13         A. Linda Grogan and Brendan O'Malley.

14         Q. What are their titles?

15         A. Brendan is an analyst, and Linda is a project

16   manager.

17         Q. Do you work at a particular department or

18   division at EQR?

19         A. Yes.

20         Q. What's it called?

21         A. The finance department.

22         Q. And who is the most senior member or who is at

23   the top of the finance department?

24         A. Our chief financial officer, Robert Garechana.

25         Q. Now, you got your bachelor's from the

Collin Glancy                                          June 29, 2021

 1  University of Iowa in 2006; is that right?

 2       A. That's correct.

 3       Q. And then you went to work for a company called

 4  BMO Capital Markets; is that right?

 5       A. Yes.

 6       Q. And when did you start with Equity Residential?

 7       A. I started with Equity Residential in

 8  September 2012.

 9       Q. And what was your first job with Equity

10  Residential?

11       A. My first title was director of corporate

12  finance.

13       Q. And what were your duties?

14       A. My duties were to manage our unsecured capital

15  sources in relationships with banks.  I also managed our

16  derivative portfolio.

17       Q. Anything else?

18       A. Broadly speaking, those were my job

19  responsibilities.

20       Q. What was the next title or role you obtained at

21  Equity Residential?

22       A. Assistant vice president of treasury.

23       Q. And how did your duties or your role change?

24       A. I began to manage our -- the secured debt,

25  capital sources, and relationships in addition to my

Collin Glancy                                          June 29, 2021

1   responsibilities as a director.

2       Q. During what time periods were you an assistant

3   vice president?

4       A. I believe that was 2016 through 2018.

5       Q. And what happened in 2018?

6       A. I was promoted to vice president.

7       Q. And what's the best estimate of the date that

8   you can give me for when your promotion happened?

9       A. December 2018 2017, I believe.

10      Q. And is that when you took on your current title

11  of VP of treasury?

12      A. Yes.

13      Q. And how did your role change when you got your

14  promotion in 2018?

15      A. The role didn't change very much.  I manage our

16  capital market sources, manage relationships, which

17  includes, you know, banks, rating agencies, and other

18  constituents.

19      Q. Have you worked for EQR continuously at all

20  times since 2012?

21      A. Yes.

22      Q. Have those always been full-time positions?

23      A. Yes.

24      Q. Have all of your roles at EQR been at the

25  corporate offices in Chicago?

Collin Glancy                                                    June 29, 2021

1          A. Yes.

2     Q. Let's talk a little bit more specifically about

3  the topic for which you've been designated.

4          First, are you familiar with how or what Equity

5  Residential does with the proceeds it collects from

6  tenants in the form of rent?

7          MR. WINN:  Objection.  Vague.

8          THE WITNESS:  Can you restate the question?

9  BY MR. TOMASEVIC:

10     Q. Yeah.  I understand it's a vague and broad

11  question for someone with your level of knowledge.

12  You'll have to understand that for me, or I, and the

13  people reading this transcript are going to need some

14  help understanding some of these concepts.  And I may

15  ask you to walk us through some remedial and probably

16  simplistic issues for someone such as yourself, but let

17  me take a stab at it.

18          Trying to figure out the flow of a rent dollar

19  from, you know, the minute that it comes in from a

20  tenant.

21          So are you familiar with the flow of the cash

22  or proceeds that comes from the collection of rent,

23  meaning how it's collected at the property level, then

24  what kind of account it goes into, what is then done

25  with that money in the ensuing hours and days,

Collin Glancy                                                    June 29, 2021

1              MR. WINN:  Objection.  Vague.  Exceeds the
2      scope of the deposition topic.
3              You can answer if you know.
4              THE WITNESS:  No, I don't know.
5      BY MR. TOMASEVIC:
6          Q. Do you know if it's most or a small amount?
7      Can you relate it at all for us?
8              MR. WINN:  Objection.  Vague.
9              THE WITNESS:  No.  I don't know.
10     BY MR. TOMASEVIC:
11         Q. So we know that money goes into a deposit
12     account once rent is paid.  We know that much; right?
13         A. Right.
14         Q. And is that true of money that comes in by way
15     of paper check?
16         A. Yes.  That is my understanding.
17         Q. Now, are the deposit accounts that accept the
18     direct deposits or automatic debits the same deposit
19     accounts that accept the paper checks from the tenants?
20         A. I believe we have different deposit accounts
21     for different methods of payment.
22         Q. So an automatic debit of rent will go into one
23     deposit account, but a paper check will go into a
24     different EQR deposit account.
25             Is that your testimony?

Collin Glancy                                    June 29, 2021

1        A. It is my understanding that that is the case,

2    yes.

3        Q. Do tenants in California sometimes pay rent in

4    cash?

5            MR. WINN:  Objection.  Vague.  Exceeds the

6    scope of the deposition topic.

7            THE WITNESS:  I don't know the answer for

8    certain.

9    BY MR. TOMASEVIC:

10       Q. If someone walked into a EQR office at their

11   property and showed up with their rent in cash at the

12   1st of the month, what would happen with that money?

13           MR. WINN:  Objection.  Vague.  Exceeds the

14   scope of the deposition topic.

15           THE WITNESS:  I don't know.  I'm not certain if

16   we accept cash.

17   BY MR. TOMASEVIC:

18       Q. Does Equity Residential accept credit card

19   payments for rent?

20       A. Yes.  It is my understanding we accept credit

21   and debit cards.

22       Q. Do the funds that come from the credit card

23   transaction go into a deposit account?

24       A. Yes.  It is my understanding all rent collected

25   goes to a deposit account.

Collin Glancy                                               June 29, 2021

1        Q. And the deposit account associated with the

2   credit card transactions, is that the same as the

3   account associated with the direct debit from a tenant's

4   bank account?

5            MR. WINN:  Objection.  Vague.  Exceeds the

6   scope of the deposition topic.

7            THE WITNESS:  You're asking if it is a

8   different deposit account depending on the method of

9   payment?

10  BY MR. TOMASEVIC:

11       Q. Right.  And the method of payment this time

12  being, in particular, credit card payments.

13           MR. WINN:  Same objection.

14           THE WITNESS:  Yes.  Yes.  I believe it

15  credit card payments go to a deposit account.

16  BY MR. TOMASEVIC:

17       Q. Is it the same deposit account that accepts the

18  debit card payments or the checks, or is it its own

19  third category of a deposit account or third account?

20           MR. WINN:  Objection.  Vague.  Exceeds the

21  scope of the deposition topic.

22           THE WITNESS:  I don't know that answer for

23  sure.  As I mentioned, I believe the different payment

24  methods end up in different deposit accounts.

25  ///

Collin Glancy                                              June 29, 2021

1   BY MR. TOMASEVIC:

2        Q. Okay.  For how long do the funds that come in

3   by way of direct debit or direct bank account transfer

4   sit in the deposit account before they go on to another

5   account?

6             MR. WINN:  Objection.  Vague.  Exceeds the

7   scope of the deposition topic.

8             THE WITNESS:  I don't know exactly how long

9   they might sit in the deposit account.

10  BY MR. TOMASEVIC:

11       Q. But they sit there for some period of time;

12  right?

13            MR. WINN:  Objection.  Vague and exceeds the

14  scope of the deposition topic.

15            THE WITNESS:  The amount does go into the

16  deposit account for some amount of time, yes.

17  BY MR. TOMASEVIC:

18       Q. And what's your best estimate of the amount of

19  time that it's in that initial deposit account?

20       A. As I mentioned, all the rent payments are put

21  into the deposit accounts depending on the method of

22  payments but, ultimately, are swept regularly into our

23  main operating account.

24       Q. Thank you.  My question, though, was for how

25  long do the monies sit in the deposit account before

Collin Glancy                                                     June 29, 2021

1   being swept into the next account?

2         MR. WINN:  Objection.  Vague.  Exceeds the

3   scope of the deposition topic.

4         THE WITNESS:  I don't know.

5   BY MR. TOMASEVIC:

6      Q. Are we talking about weeks, months, or a matter

7   of a few days?

8         MR. WINN:  Same objection.

9         THE WITNESS:  Again, this is outside of my area

10  of responsibility.

11        I believe the cash might be swept as frequently

12  as daily, if not weekly, but regularly.

13  BY MR. TOMASEVIC:

14     Q. You used the term "cash," but do you really

15  mean to say the money that's in the deposit account that

16  accepts automatic debits from tenants, or did you mean

17  something else?

18     A. Yes.  The money in the deposit account.

19     Q. You think it's either daily or weekly that it's

20  swept?

21     A. I don't know for certain, as I mentioned, but I

22  believe it to be regularly, which could be daily or

23  weekly, yes.

24     Q. You could find that out if you wanted to?

25     A. Yeah.  I could ask Mike Gast.

Collin Glancy                                          June 29, 2021

1            THE WITNESS:  I don't know for certain.  As

2    I've said, I would expect   as you mentioned, a hunch.

3    This is my personal understanding that it is done

4    regularly.  So I would expect it to be daily or weekly.

5    BY MR. TOMASEVIC:

6         Q. Now, you understand that rent is due on the 1st

7    at EQR; right?

8         A. Yes.

9         Q. But there's also a grace period that says that

10   if you get it in by the 4th, it's not considered late;

11   right?

12           MR. WINN:  Objection.  Vague.  Exceeds the

13   scope of the deposition topic.

14           THE WITNESS:  I don't know all the details of

15   our policies about the rent payment timing.

16   BY MR. TOMASEVIC:

17        Q. Do you know what the late fee provision is for

18   California EQR properties?

19        A. No, I don't.

20        Q. Do you know what the grace period is for the

21   payment of rent at EQR's California properties?

22        A. No, I don't.

23        Q. All right.  Well, let me represent to you that

24   rent is due on the 1st, but there's a grace period of a

25   few days.

Collin Glancy                                          June 29, 2021

1           MR. WINN:  Objection.  Vague.  Exceeds the

2    scope of the deposition topic.

3           THE WITNESS:  I don't know which specific banks

4    hold our deposit accounts.

5    BY MR. TOMASEVIC:

6        Q. Do you know if any of the deposit accounts that

7    hold tenant rent payments are interest-bearing accounts?

8           MR. WINN:  Objection.  Exceeds the scope of the

9    deposition topic.  Vague.

10          THE WITNESS:  I don't believe our deposit

11   accounts are interest-bearing.

12   BY MR. TOMASEVIC:

13       Q. Once rent is received from a California tenant,

14   it goes to a deposit account before being swept into the

15   main operating account at EQR; is that right?

16       A. Yes.  The money gets swept from deposit

17   accounts into our main operating account.

18       Q. And when you say "our" main operating account,

19   what company are you referring to?

20       A. Equity Residential.

21       Q. And is the main operating account of Equity

22   Residential a single account that accepts rent from

23   tenants paid all over the country?

24          MR. WINN:  Objection.  Vague.  Exceeds the

25   scope of the deposition topic.

Collin Glancy                                        June 29, 2021

1          THE WITNESS:  Our main operating account is the
2   account that the deposit accounts are swept into.
3   BY MR. TOMASEVIC:
4       Q. Is that for all deposit accounts accepting all
5   rent from all tenants across the country, or is that
6   regional or broken up some other way?
7          MR. WINN:  Objection.  Vague.  Exceeds the
8   scope of the deposition topic.
9          THE WITNESS:  I don't know all the details
10  around accounts, but, as I mentioned, it is my
11  understanding that the deposit accounts are swept into
12  our main operating account, yes.
13  BY MR. TOMASEVIC:
14       Q. What's the purpose of the main operating
15  account?
16          MR. WINN:  Objection.  Vague.  Exceeds the
17  scope of the deposition topic.
18          THE WITNESS:  We use our main operating account
19  to run our business.
20  BY MR. TOMASEVIC:
21       Q. And for someone not familiar with your
22  business, what does that mean in laymen's terms?
23       A. We own and manage apartment properties.
24       Q. So what are some examples of things you would
25  do with the money in the main operating account?

Collin Glancy                                          June 29, 2021

1           MR. WINN:  Objection.  Vague.  Exceeds the
2   scope of the deposition topic.
3           THE WITNESS:  Anything related to running our
4   business.
5   BY MR. TOMASEVIC:
6       Q. So maintenance at properties?
7       A. We do maintenance at properties periodically,
8   yes.
9       Q. Is the main operating account or the funds in
10  the main operating account used to pay payroll?
11          MR. WINN:  Objection.  Exceeds the scope of the
12  deposition topic.  Vague.
13          THE WITNESS:  As I mentioned, this is not my
14  area of expertise, but I understand that all of the
15  activities related to running our business, including
16  payroll, comes from our main operating account.
17  BY MR. TOMASEVIC:
18      Q. Are the funds in the main operating account
19  used to build new apartment buildings?
20          MR. WINN:  Objection.  Exceeds the scope of the
21  deposition topic.  Vague.
22          THE WITNESS:  I believe anything related to our
23  business, any expenses, would come from our main
24  operating account, although that's not my area of
25  expertise.

Collin Glancy                                          June 29, 2021

 1            THE WITNESS:  My best estimate would be a

 2    couple million dollars.

 3    BY MR. TOMASEVIC:

 4         Q. Does the main operating account earn interest?

 5            MR. WINN:  Objection.  Exceeds the scope of the

 6    deposition topic.  Vague.

 7            THE WITNESS:  I don't know for certain, but I

 8    don't believe so.

 9    BY MR. TOMASEVIC:

10         Q. Do any of the cash accounts earn interest?

11            MR. WINN:  Objection.  Vague.  Lacks

12    foundation.  Exceeds the scope of the deposition topic.

13            THE WITNESS:  I don't know for certain.  I

14    don't believe any of the deposit accounts are

15    interest-bearing, and I don't believe our main operating

16    account is interest-bearing.

17    BY MR. TOMASEVIC:

18         Q. How about these other accounts that exist for

19    the principal reserves?

20            MR. WINN:  Objection.  Vague.  Exceeds the

21    scope of the deposition topic.

22            THE WITNESS:  I don't know.

23    BY MR. TOMASEVIC:

24         Q. But you could find that out if you wanted to?

25            MR. WINN:  Objection.  Vague.  Lack of

Collin Glancy                                           June 29, 2021

1    foundation.

2            THE WITNESS:  I could ask, yes.

3    BY MR. TOMASEVIC:

4         Q. So back to our attempt to learn about what

5    happens with rent once it's paid.

6            The summary is that rent is paid by the tenant,

7    and then it is deposited into a deposit account of some

8    kind; right?

9         A. Yes.

10        Q. And that deposit account is not

11   interest-bearing.

12           Correct?

13        A. Is that a question?

14        Q. Yes.

15        A. I believe I answered that, and, no, I don't

16   believe it's interest-bearing.

17        Q. And then after some period of time -- we don't

18   know how long -- the money is swept from a deposit

19   account into the main operating account; right?

20        A. Yes.

21        Q. And is the main operating account

22   interest-bearing?

23        A. I don't believe so.

24        Q. Does all rent collected from California tenants

25   eventually make it into the main operating account?

Collin Glancy                                           June 29, 2021

1    the extent we have any debt payments, I believe it comes

2    from our main operating account.

3    BY MR. TOMASEVIC:

4        Q. And what are you basing that belief on?  Or is

5    that --

6        A. We use --

7        Q.   your gut, your hunch?

8            THE REPORTER:  I'm sorry.  I didn't hear you.

9    BY MR. TOMASEVIC:

10       Q. Or is that your gut or your personal hunch?

11       A. I -- it's not my area of expertise; so that's

12   how I understand.  You know, we use our main operating

13   account to run the business which includes making

14   payments on debt.

15       Q. Has it ever been the case that you're aware of

16   that the main operating account didn't have enough money

17   to meet the current debt payments that were due at the

18   time?

19           MR. WINN:  Objection.  Vague.  Lacks

20   foundation.  Exceeds the deposition topic.

21           THE WITNESS:  That would be very bad.  I am not

22   aware of that having occurred.

23   BY MR. TOMASEVIC:

24       Q. Does Equity Residential have a line of credit?

25           MR. WINN:  Objection.  Vague.  Lacks

Collin Glancy                                                    June 29, 2021

1    foundation.  Exceeds the deposition topic.

2           THE WITNESS:  Yes, we do.

3    BY MR. TOMASEVIC:

4        Q. And is there a balance on that line of credit

5    currently?

6           MR. WINN:  Objection.  Vague.  Exceeds the

7    deposition topic.

8           THE WITNESS:  There's no current balance on the

9    line of credit.

10   BY MR. TOMASEVIC:

11       Q. When Equity Residential wants to dip into that

12   line of credit, what's the cost of doing so?

13          MR. WINN:  Objection.  Vague and exceeds the

14   scope of the deposition topic.

15          THE WITNESS:  Our line of credit has a cost of

16   LIBOR plus 77 and a half basis points, I believe.

17   BY MR. TOMASEVIC:

18       Q. Any other fees associated with that?

19          MR. WINN:  Same objections.

20          THE WITNESS:  Yes.  There is ~~an unused~~ <ins>a facility</ins> fee.

21   BY MR. TOMASEVIC:

22       Q. What's that mean?

23       A. It's an amount that we pay for having access to

24   the line of credit.

25       Q. Is that like a regular monthly fee or

Collin Glancy                                        June 29, 2021

1   something?

2        A. I don't know how often it might be billed, but

3   I believe it's 12 and a half basis points per annum.

4        Q. Basis points assessed against what if there's

5   no balance?  I don't understand.  I'm not a finance guy.

6        MR. WINN:  Objection.  Exceeds the scope of the

7   deposition topic.  Vague.

8   BY MR. TOMASEVIC:

9        Q. Meaning, like, a fraction of a cent on what?

10       MR. WINN:  Same objections.

11       THE WITNESS:  Based on the size of the line of

12  credit.

13  BY MR. TOMASEVIC:

14       Q. Do you know what that size is currently?

15       MR. WINN:  Objection.  Vague.  Exceeds the

16  scope of the deposition topic.

17       THE WITNESS:  Currently our line of credit is

18  two and a half billion dollars.

19  BY MR. TOMASEVIC:

20       Q. When was the last time Equity Residential

21  needed to dip into its two and a half billion dollar

22  line of credit?

23       MR. WINN:  Objection.  Exceeds the scope of the

24  deposition topic.

25       THE WITNESS:  I don't know for certain.

Collin Glancy                                                    June 29, 2021

1   BY MR. TOMASEVIC:

2        Q. Can you recall the last time it happened?

3           MR. WINN:  Same objections.

4           THE WITNESS:  I don't recall specifically, no.

5   BY MR. TOMASEVIC:

6        Q. About when did it happen?

7           MR. WINN:  Same objections.

8           THE WITNESS:  I'm not -- I'm not certain.  I

9   believe we may have used it at some point in the past

10  year for a brief period, but I don't recall

11  specifically.

12  BY MR. TOMASEVIC:

13       Q. Do you know why it was used?

14          MR. WINN:  Objection.  Exceeds the scope of the

15  deposition topic.

16          THE WITNESS:  The purpose of the line of credit

17  is to be used for general corporate purposes.

18  BY MR. TOMASEVIC:

19       Q. And do you know why Equity Residential used it

20  the last time it used it?

21          MR. WINN:  Same objections.

22          THE WITNESS:  For general corporate purposes.

23  BY MR. TOMASEVIC:

24       Q. What does that mean?

25       A. It means we have access to this line of credit

Collin Glancy                                    June 29, 2021

 1   ~~commercial paper.~~

 2   ~~BY MR. TOMASEVIC:~~

 3        Q. What's a current example of one particular

 4   commercial paper obligation at the company?

 5           MR. WINN:  Objection.  Vague.  Exceeds the

 6   deposition topic.

 7           THE WITNESS:  We can borrow anywhere from

 8   overnight to 364 days under the commercial paper

 9   program.

10   BY MR. TOMASEVIC:

11        Q. And at what rates?

12           MR. WINN:  Objection.  Vague.  Exceeds the

13   deposition topic.

14           THE WITNESS:  That would depend on how long

15   we're borrowing for.

16   BY MR. TOMASEVIC:

17        Q. So what's the range?

18           MR. WINN:  Same objections.

19           THE WITNESS:  I believe our average, which

20   would include a variety of ~~tenures~~ [tenors], is approximately

21   30 basis points.

22   BY MR. TOMASEVIC:

23        Q. You said it would include a variety of ~~tenures~~ [tenors]?

24   What's that mean?

25        A. ~~Tenure~~ [Tenor], meaning how long we are borrowing that

Collin Glancy                                                    June 29, 2021

1   specific tranche of commercial paper.

2        Q. Are there other costs or fees associated with

3   using commercial paper?

4        MR. WINN:  Objection.  Vague and exceeds the

5   deposition topic.

6        THE WITNESS:  Yes.  We have to pay a dealer fee

7   to the banks.

8   BY MR. TOMASEVIC:

9        Q. Do you know if there are prepayment penalties

10  associated with paying off the obligations generated by

11  commercial paper?

12       MR. WINN:  Objection.  Vague.  Lacks

13  foundation.  Exceeds the deposition topic.

14       THE WITNESS:  Can you rephrase the question?

15  BY MR. TOMASEVIC:

16       Q. Yeah.  If you issue commercial paper to borrow

17  money for 364 days but it turns out you've come into

18  some cash and you want to pay it off earlier, are there

19  prepayment penalties associated with that?

20       MR. WINN:  Same objection.

21       THE WITNESS:  I'm not certain.

22  BY MR. TOMASEVIC:

23       Q. Some of EQR's debt carries with it penalties

24  for prepayment; right?

25       MR. WINN:  Objection.  Vague.  Lacks

Collin Glancy                                          June 29, 2021

1    categories that generally consist of all of our debt.

2    BY MR. TOMASEVIC:

3         Q. So back to the commercial paper program.  When

4    you said that sometimes Equity would choose to use the

5    line of credit rather than commercial company program,

6    what were some of those reasons why Equity would do so?

7         MR. WINN:  Objection.  Exceeds the deposition

8    topic.  Lacks foundation.  Calls for speculation.

9         THE WITNESS:  We have a billion-dollar

10   commercial paper program; so if we needed more than that

11   on a short-term basis, we would use the line of credit.

12   BY MR. TOMASEVIC:

13        Q. And that happened within the last year

14   according to your prior testimony; right?

15        A. I'm not certain that was the case.

16        Q. What are you certain about?

17        MR. WINN:  Objection.  Vague.  Argumentative.

18        THE WITNESS:  I'm not certain of the timing of

19   the last time we utilized the line of credit.

20   BY MR. TOMASEVIC:

21        Q. Right.  And you're not certain of the reasoning

22   for using the line of credit versus why you didn't use

23   commercial paper; right?

24        MR. WINN:  Objection.  Vague.  Misstates

25   testimony.  Exceeds the deposition topic.

Collin Glancy                                        June 29, 2021

1   Residential is damaged because it loses the ability to

2   use funds it should have.

3           Are you aware, generally, that Equity is making

4   that claim?

5        A. That is the topic that we're here for today;

6   correct?

7        Q. Yes.

8        A. So that's my understanding.

9        Q. So you're aware that   okay.  Great.  Thank

10  you.

11  · · ·    So do you know if Equity has ever attempted to

12  quantify the damages resulting from its inability to use

13  funds or its loss of use of funds brought about by the

14  late payment of rent?

15  ·    A. I don't know for certain.  I have not been a

16  part of any such calculation.

17  ·    Q. Well, do you know if any such calculation has

18  actually been done?

19  ·    A. I don't know.

20  ·    Q. Do you know if anyone has ever tried to

21  quantify on the company's behalf what its damages are

22  from the lost use of funds in connection with the late

23  payment of rent?

24  ·    A. I don't know for certain, no.

25  ·    Q. How about generally?

Collin Glancy                                                    June 29, 2021

1       A. We don't calculate damages at the company as

2   part of our ordinary course of business.

3       Q. Does the company, in its ordinary course of

4   business, attempt to quantify how the late payment of

5   rent affects its ability to meet its ongoing debt

6   obligations?

7       A. I don't know.

8       Q. Have you ever heard of that taking place?

9       A. No.

10      Q. Do you know if the company has ever attempted

11  to quantify how the late payment of rent affects its

12  ability to invest its money back into its own business

13  or at all?

14      A. I don't know.

15      Q. Are you aware of that exercise ever taking

16  place?

17      A. Not for certain, no.

18      Q. How about generally?

19      A. Generally, it is not a calculation that I am

20  aware that we make at the company, no.

21      Q. Or has ever made?

22      A. I don't know for certain.

23      Q. Now, are you familiar with the fact that Equity

24  Residential has a late fee provision in its leases,

25  meaning if someone doesn't pay their rent on time,

Collin Glancy                                                    June 29, 2021

1    there's a -- there's a fee associated?

2          MR. WINN:  Objection.  Exceeds the deposition

3    topic.

4          THE WITNESS:  I am generally aware that late

5    fees for nonpayment of rent are common in the apartment

6    business.

7    BY MR. TOMASEVIC:

8          Q. Well, if I told you that Equity Residential has

9    or imposes late fees for late payment of rent, would

10   that be news to you?  Would that be the first time

11   you're hearing that?

12         A. No.  That wouldn't surprise me.

13         Q. Have you or anyone in your office ever been

14   consulted when EQR was setting the late fee?

15         MR. WINN:  Objection.  Exceeds the deposition

16   topic.

17         THE WITNESS:  I have not been consulted on

18   anything related to late fees.

19   BY MR. TOMASEVIC:

20         Q. Do you know if the company ever consulted

21   anyone in the finance department when deciding what late

22   fee to set?

23         MR. WINN:  Objection.  Vague.  Exceeds the

24   deposition topic.  Calls for speculation.

25         THE WITNESS:  Not that I'm aware of.

Collin Glancy                                                    June 29, 2021

1    BY MR. TOMASEVIC:

2         Q. Can you tell me anything at all about how the

3    late fee was determined or arrived at at EQR?

4              MR. WINN:  Objection.  Exceeds the deposition

5    topic.

6              THE WITNESS:  No.

7    BY MR. TOMASEVIC:

8         Q. Or whether, when setting the current late fee,

9    anyone ever attempted to assess the costs of debt at the

10   company?

11             MR. WINN:  Objection.  Vague.  Lacks

12   foundation.  Exceeds the deposition topic.

13             THE WITNESS:  I'm not aware.

14   ~~BY MR. TOMASEVIC:~~

15   ~~     Q. Do you know what the phrase "weighted cost of~~

16   ~~capital" means?~~

17   ~~          MR. WINN:  Objection.  Vague.~~

18   ~~          THE WITNESS:  Weighted average cost of capital~~

19   ~~is a common finance term.~~

20   ~~BY MR. TOMASEVIC:~~

21   ~~     Q. And explain it to us, please.~~

22   ~~     A. So the weighted average cost of capital is the~~

23   ~~average cost of the various types of capital that we~~

24   ~~have raised to run our business.~~

25   ~~          We have different types of debt, as we've~~

Collin Glancy                                        June 29, 2021

1        Q. And let me know if you've successfully been

2    able to do so.

3        A. Okay.  I see it here.

4        Q. So do you have in front of you the Form 10-K

5    for the fiscal year ended December 31st, 2020 of Equity

6    Residential ERP Operating Limited Partnership?

7        A. Yes.

8        Q. Now I would like to go to -- if we scroll down

9    to the discussion, which has a number -- page numbers at

10   the bottom, in the center of the bottom of the pages.

11   Talking about maybe a third of the way through the whole

12   document on page 34, there's a section entitled

13   "short-term liquidity and cash proceeds."

14        Let me know when you've found that.

15        A. Okay.  I see the section.

16        Q. Okay.  Now, that section states:

17              The company generally expects to meet its

18              short-term liquidity requirements, including

19              capital expenditures related to maintaining

20              its existing properties and scheduled

21              unsecured note and mortgage note repayments,

22              through its working capital, net cash

23              provided by operating activities and

24              borrowings under the Company's revolving

25              credit facility and commercial paper

Collin Glancy                                         June 29, 2021

1              program.

2         Did I read that correctly?

3    A. It appears so.

4    Q. And do you agree with that statement?

5    A. Generally speaking, yes.

6    Q. And it's also true that:

7         The company considers its cash provided by

8         operating activities to be adequate to meet

9         operating requirements and payment of

10        distributions.

11        Right?

12   A. Yes.  It says that as well.

13   Q. And do you agree with that statement?

14   A. Generally speaking, yes.

15   Q. Have these statements ever been untrue, meaning

16   there came a time when the company did not expect to

17   meet its short-term liquidity requirements or did not

18   consider its cash provided by operating activities to be

19   adequate to meet its operating requirements?

20        MR. WINN:  Objection.  Vague.  Exceeds the

21   scope of the deposition.

22        THE WITNESS:  I'm not certain.

23   BY MR. TOMASEVIC:

24   Q. Well, has that ever happened, to your

25   knowledge?

Collin Glancy                                          June 29, 2021

1          A. Not to my knowledge.

2       Q. Let's skip a few pages down to page 36 where

3   you'll see some tables and, in particular, the debt

4   summary as of December 31st, 2020.

5          MR. WINN:  And the way I'm reading this, is I

6   think this is -- the tables are on page 37?  At least

7   that's the way I'm reading the document.

8          MR. TOMASEVIC:  So, yeah.  The 37 number

9   actually goes onto the next page, at the top of the next

10  page.  I don't know if that's an artifice of printing,

11  but it's around 36 or 37.  It's the debt summary as of

12  December 31st, 2020 for the company.

13  BY MR. TOMASEVIC:

14      Q. Let me know, sir, when you're there.

15      A. I see the debt summary.

16      Q. Okay.  Good.  Now, let's try to explain to my

17  unsophisticated brain here what some of these terms

18  mean.

19          So, generally speaking, what is a debt summary

20  for EQR, or what is this debt summary intending to

21  convey?

22          MR. WINN:  Objection.  Exceeds the deposition

23  topic.  Vague.

24          THE WITNESS:  It is a summary of all of the

25  debt that the company holds.

Collin Glancy                                          June 29, 2021

```
 1  to pay off debt.
 2        Q. Now, because rent is typically due around the
 3  1st of the month, does that mean there's a big influx of
 4  cash at the company around the beginning of the month?
 5        MR. WINN:  Objection.  Vague.  Exceeds the
 6  scope of the deposition topic.
 7        THE WITNESS:  Yes.
 8  BY MR. TOMASEVIC:
 9        Q. And then is there some series of events that
10  takes place next, meaning around the beginning of the
11  month, where certain debts are paid off at certain times
12  as a result of that cash coming in?
13        MR. WINN:  Objection.  Vague.  That exceeds the
14  scope of the deposition topic.
15        THE WITNESS:  There are calculations we do
16  around the 1st of the month related to potentially
17  paying off some debt, yes.
18  BY MR. TOMASEVIC:
19        Q. What are those calculations?
20        A. Depending on how much, for example, we may have
21  short-term commercial paper outstanding which can be
22  repaid with funds from collected rent.
23        Q. When was the last time the company did that
24  practice specifically?
25        A. That's part of managing our business, and we do
```

Collin Glancy                                               June 29, 2021

1   it frequently, every month.

2        Q. Are you aware of anyone ever identifying the

3   late payment of rent as a reason for not undertaking a

4   particular investment or paying off a particular debt?

5           MR. WINN:  Objection.  Vague.  Exceeds the

6   scope of the deposition topic and lacks foundation.

7           THE WITNESS:  No, I'm not aware.

8   BY MR. TOMASEVIC:

9        Q. Or have you ever become aware of a time or

10  anyone even talking about how the late payment of rent

11  at a particular time or on a particular month is a

12  reason for not undertaking some kind of capital

13  improvement or undertaking some kind of business

14  decision within the company?

15          MR. WINN:  Objection.  Vague.  Lacks

16  foundation.  Exceeds the scope of the deposition topic.

17          THE WITNESS:  No, I'm not aware.

18  BY MR. TOMASEVIC:

19       Q. Are you aware of the late payment of rent ever

20  precluding a business activity that the company wanted

21  to undertake?

22          MR. WINN:  Objection.  Vague.  Exceeds the

23  scope of the deposition topic.  Lacks foundation.

24          THE WITNESS:  I'm not aware.

25          MR. TOMASEVIC:  All right.  Let's take another

Collin Glancy                                                  June 29, 2021

1   five.  I'm pretty much wrapped up.  I will have a couple

2   of questions, but I'm going to go through the outline,

3   and we're in the homestretch.  And I don't know if Aaron

4   has any questions, but I'll be wrapping up shortly.

5          But let's go ahead and take that five, or we

6   can take as many minutes as you want, but I just need

7   five minutes.

8          MR. WINN:  All right.

9          MR. TOMASEVIC:  Is that okay?

10          THE WITNESS:  Thanks.

11          (Recess taken.)

12   BY MR. TOMASEVIC:

13          Q. So, Mr. Glancy, what internal documents or

14   financial statements would show any of the company's

15   policies or practices with respect to the flow of rent

16   from the deposit accounts to the main operating

17   accounts, if any?

18          MR. WINN:  Objection.  Vague.  Exceeds the

19   scope of the deposition topic.

20          THE WITNESS:  I'm not sure what specific

21   documents might have that detail.

22   BY MR. TOMASEVIC:

23          Q. Let's do -- go back to the 10-K we were looking

24   at.  In particular, I want to look at the consolidated

25   balance sheet, which is about, oh, 60 percent down in

Collin Glancy                                          June 29, 2021

 1    the filing.  If you're looking at it as a roughly

 2    180-page PDF, it's about page 109 of the PDF, if your

 3    PDF viewer has pagination.  It's also at financial

 4    statements or F-16 of the filing.

 5          MR. WINN:  I don't know if we marked this

 6    document as an exhibit.  Do you intend to mark this as

 7    an exhibit?

 8          MR. TOMASEVIC:  Yeah.  We can mark this as

 Trial Ex. 201

 9    Exhibit 1.

                          Trial Ex. 201

10          (Exhibit No. 1 marked.)

11          MR. WINN:  Okay.

12          THE WITNESS:  Okay.  I see it.

13    BY MR. TOMASEVIC:

14         Q. Now, I want to draw your attention to the area

15    where it says cash and cash equivalents of about

16    $42.5 million.

17          Let me know when you see that.

18         A. I see that.

19         Q. Now, is this the cash and cash equivalents held

20    by the entire organization, or is there some additional

21    cash held maybe in operating accounts of the apartments

22    or in deposit accounts?  What is this meant to reflect?

23         A. I'm not an accountant, but it's my

24    understanding it's the cash of the organization.

25         Q. Let's go to the next page.  And, in particular,

Collin Glancy                                                    June 29, 2021

1         A. That's not part of my job description.

2         Q. Is there a business purpose within EQR for

3    calculating late rent balances at a particular time

4    period?

5         A. Yes.

6         Q. And what is that purpose?

7         A. So that we know how much -- you know, we track

8    how much rent we're supposed to be paid, and we track

9    how much we are paid.

10        Q. And so who would I ask what that number is

11   right now?

12        A. I don't know specifically who you would ask.

13   That is not something I've ever had to do.

14        Q. Now, you said that the late payment of rent, to

15   paraphrase, causes damage to EQR.  And one example of

16   that damage might be that EQR did not have money to

17   invest in something it wanted to invest in; is that

18   right?

19        A. Yes.  We could have invested it.  We could have

20   used that money to do any number of things.

21        Q. Well, when was the last time EQR was precluded

22   from doing one of these investments or things because of

23   the late payment of rent?

24        MR. WINN:  Objection.  Vague.  Lack of

25   foundation.

Collin Glancy                                          June 29, 2021

1             THE WITNESS:  As I said, there's always rent
2    that is late.  That's part of our business.  And we have
3    capitalized ourselves to continue running our business
4    even if or when there is late or unpaid rent.
5             MR. TOMASEVIC:  Thank you, but my question was
6    a little different.
7    BY MR. TOMASEVIC:
8        Q. What is the last investment opportunity that
9    EQR missed because of the late payment of rent?
10       A. Cash is fungible; so I couldn't say
11   specifically that there was a specific situation that we
12   missed out on.
13            But if we had all of the money that we were
14   due, all of the rent, if it was paid, we could have used
15   that money for any number of things.
16       Q. But when was the last time you know or you
17   heard that EQR was not able to do something because some
18   rent was paid late?
19       A. There's not a   I can't talk about a specific
20   situation because, as I said, cash is fungible.  We have
21   other sources of cash that we use to run our business
22   and invest in properties.
23       Q. Have you ever heard anyone at EQR say something
24   to the effect of this late payment of rent has precluded
25   us from undertaking this investment?

Collin Glancy                                                    June 29, 2021

```
 1                    REPORTER'S CERTIFICATE
 2           I, Stephani L. Loder, CSR # 13884, licensed
 3   court reporter, do here by certify:
 4           That the foregoing proceedings were taken
 5   before me at the time and place therein set forth, at
 6   which time the witness was put under oath by me;
 7           That the testimony of the witness, the
 8   questions propounded, and all objections and statements
 9   made at the time of the examination were recorded
10   stenographically by me and were thereafter transcribed;
11           That a review of the transcript by the deponent
12   was requested;
13           That the foregoing is a true and correct
14   transcript of my shorthand notes so taken.
15           I further certify that I am not a relative or
16   employee of any attorney of the parties nor financially
17   interested in the action.
18           I declare under penalty of perjury under the
19   laws of Nevada that the foregoing is true and correct.
20           Dated this 1st day of July, 2021.
21
22           _____
23                Stephani L. Loder, CCR #13884
24
25
```

Exhibit 4

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

_____
                                          )
JAVANNI MUNGUIA-BROWN,                    )
ANGELINA MAGAÑA, NORMA                    )
RODRIGUEZ, and DAVID BONFANTI             )
individually and on behalf of             )
others similarly situated,                )      Case No.
                                          )      4:16-cv-01225-JSW-TSH
          Plaintiffs,                     )
                                          )
     vs.                                  )
                                          )
EQUITY RESIDENTIAL, a real                )
estate investment trust, ERP             )
OPERATING LIMITED PARTNERSHIP,            )
a partnership, EQUITY                     )
RESIDENTIAL MANAGEMENT,                    )
L.L.C., EQR-WOODLAND PARK A                )
LIMITED PARTNERSHIP, and                  )
EQR-WOODLAND PARK B LIMITED                )
PARTNERSHIP,                              )
                                          )
          Defendants.                     )
                                          )


          VIDEO RECORDED DEPOSITION OF CARINA GOMES,

commencing at the hour of 9:59 a.m. PST, Tuesday,

January 26, 2021, conducted remotely, before Kaylee

Lachmann, Registered Professional Reporter and

Certified Shorthand Reporter in and for the State of

California.

Carina Gomes                                    January 26, 2021

1           MS. BELLOWS:  Anne Bellows for the plaintiffs

2    and the class.

3           MS. ALEXANDER:  Good morning.  This is Karen

4    Alexander on behalf of defendant Equity.  I'm

5    representing Ms. Gomes for the purpose of this

6    deposition.

7    · · · · · · · · · · CARINA GOMES,

8    having first been duly sworn, was examined and

9    testified as follows:

10          EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

11   BY MR. TOMASEVIC:

12          Q.   Good morning again, Ms. Gomes.

13          A.   Good morning.

14          Q.   And did I say your name right?

15          A.   Yeah, that's correct.

16          Q.   Okay, thanks.

17   · · · · · Do me a favor.  Even though I introduced

18   myself briefly before we began, please state and spell

19   your full name for the record.

20   · · · A.   My full name is Carina Gomes.  It's

21   C-A-R-I-N-A.  Last name is G-O-M-E-S.

22   · · · Q.   Thank you.  Are you currently employed?

23   · · · A.   Yes.

24   · · · Q.·  Who do you work for.

25   · · · A.·  I work for Equity Residential.

Carina Gomes                                          January 26, 2021

1      Q.   And what do you do for them?

2      A.   I am the assistant community manager at Next

3   on Sixth Apartments.

4      Q.   Thank you.  As I said briefly before we

5   began, I represent the plaintiffs in the lawsuit

6   against EQR.  By the way, when I say EQR, I mean Equity

7   Residential and related companies that have been sued.

8   If at any point in time you don't understand what

9   company or companies I'm talking about, just let me

10   know and I'll be happy to clarify, okay?

11      A.   Okay.

12      Q.   You said that you work for which entity

13   exactly?

14      A.   I work for currently Next on Sixth

15   Apartments.

16      Q.   Got it.

17           And you work on-site on Next on Sixth, right?

18      A.   Yeah, that's correct.

19      Q.   And your title is what again?

20      A.   I am the assistant community manager.

21      Q.   Before we go further into your background and

22   your current job, let's talk a little bit more about

23   the deposition process.  First, have you ever had your

24   deposition taken before?

25      A.   No, I have not.

Carina Gomes                                    January 26, 2021

1          Q.   Okay.

2               And you're represented here by counsel and

3     specifically Ms. Alexander?

4          A.   Yes, that's correct.

5          Q.   Do you have a written retainer agreement that

6     you signed with Ms. Alexander or her firm?

7          A.   I haven't signed anything, no.

8          Q.   When did you first learn about this lawsuit?

9          A.   I learned about it maybe two weeks ago.  I

10    just came back from maternity leave, so this is pretty

11    recent to me.

12         Q.   Understood.  And how did you learn about the

13    lawsuit?

14         A.   I received an e-mail from -- from the

15    attorney.

16         Q.   And when did you first learn that you would

17    need to sit for this deposition?

18         A.   So I learned about this last week, I want to

19    say on Thursday.

20         Q.   And from whom did you learn that you were

21    going to have to sit for this deposition?

22         A.   From Karen.

23         Q.   I would normally ask that we put your home

24    address into the record here for service of process

25    down the road in case that's necessary, but if Karen

Carina Gomes                                                January 26, 2021

1              A.   I have not looked at any documents, no.

2              Q.   Or did you look at any documents ever that

3     you believe were related to this lawsuit?

4              A.   I have not.

5              Q.   Have you spoken with any of your coworkers at

6     EQR about this deposition?

7              A.   The only person I spoke to was my community

8     manager, but it wasn't about what the deposition was

9     regarding.  It was just to let her know that I was

10    going to be on the call this morning.

11             Q.   And who is your community manager at Next on

12    Sixth?

13             A.   Her name is Kennia Lindo.

14             Q.   Did you tell anyone else at work about your

15    deposition here today?

16             A.   No, I have not, just Kennia.

17             Q.   Have you talked to anyone else at work about

18    this lawsuit at all ever?

19             A.   No, I have not.

20             Q.   Have you talked to anyone else in the world

21    about this lawsuit or this deposition?

22             A.   No.  Just myself, Karen, and Kennia.

23             Q.   Okay.

24    · · · · · Now let's talk a little bit about the jobs

25    you've had for EQR.  When was the first time you had a

Carina Gomes                                          January 26, 2021

1   job with EQR or any of its related companies?

2       A.   Sure.  My first job was a leasing consultant

3   with EQR back in 2016 when I started, and that was at

4   Pacific Place Apartments.

5       Q.   Remind me where's Pacific Place?

6       A.   That's in El Segundo.

7       Q.   And for how long were you a leasing

8   consultant at Pacific Place?

9       A.   It was approximately about a year.

10      Q.   And what did you do as a leasing consultant

11  at Pacific Place?

12      A.   Are you talking about as far as like work,

13  work related, like, e-mails, daily tasks?

14      Q.   Sure.  What -- how would you describe your

15  job to someone if they wanted to know what a leasing

16  consultant at Pacific Place did during that time?

17      A.   Sure.  So primarily I helped out with

18  customer relations like in regards to e-mails, phone

19  calls.  Also I toured prospects, a lot of prospect

20  communications, processed applications, processed

21  payments, walked apartments, walked the property.  That

22  was my main duty.

23      Q.   Looking at a written job description for a

24  leasing consultant, it mentions sales or sales

25  responsibilities.  What kind of sales responsibilities

Carina Gomes                                               January 26, 2021

1    would you say you had as a leasing consultant?

2        A.   Sure.  So as far as sales, it was touring

3    apartments to prospects and renting to them.  Also

4    phone calls and leads, you know, just responding to

5    those.  So anything in regards to renting out

6    apartments or getting prospects in basically.  Yeah.

7        Q.   When you worked as a leasing consultant at

8    Pacific Place, were you paid on a salary basis or some

9    kind of hourly basis?

10       A.   It was an hourly pay.

11       Q.   You said you were a leasing consultant at

12   Pacific Place for about a year, right?

13       A.   Correct.

14       Q.   What was your next job?

15       A.   My next job was at The Hesby Apartments in

16   North Hollywood.  I actually transferred laterally.  So

17   I was a leasing consultant over there as well.

18       Q.   Were your duties as a leasing consultant at

19   The Hesby the same as your duties as a leasing

20   consultant at Pacific Place?

21       A.   Yeah, roughly they were about the same.

22       Q.   Any significant differences?

23       A.   Not -- I mean, I'm trying to think.  Sorry.

24   It's been such a long time.  No, I wouldn't say there

25   was any significant differences.  It was just a busier

Carina Gomes                                      January 26, 2021

 1   property so it just involved me walking around more and

 2   just more like communications through e-mail, but tasks

 3   were the same.

 4        Q.   And for how long were you a leasing

 5   consultant at The Hesby before you got another job or

 6   title?

 7        A.   Sure.  So I was approximately there for, I

 8   would say, nine -- nine months, maybe ten months as a

 9   leasing consultant before I was promoted to assistant

10   manager at the same property, The Hesby.

11        Q.   So when were you promoted to assistant

12   manager at The Hesby?

13        A.   Hold on.  2016, '17, '18.  So I would say two

14   years into working with the companies.  So I started in

15   2016, '17 -- around 2018 I was promoted.

16        Q.   Would you say that was the beginning of 2018,

17   end of 2018?

18        A.   I'm trying to recall.  So I would say it's in

19   between maybe like February through the April time

20   frame.  Yeah, so towards the beginning of the year.

21        Q.   And what were your duties as an assistant

22   community manager at The Hesby?

23        A.   Sure.  So I was still focused on leasing, so

24   same task as leasing consultant, but I then added more

25   of delinquency to that, collections of any resident

 1    debts or anything like that, and then as well as

 2    meetings, communicating with my team, overseeing a

 3    team.

 4         Q.   Would you say that as a leasing consultant at

 5    Pacific Place, collections and delinquent rent were an

 6    insignificant part of your tasks?

 7         A.   I would say that I did -- I did assist with

 8    it, so for example, you know, if a resident did come

 9    down and want to discuss, you know, they were going to

10    make payments, I did let my assistant manager and my

11    community manager know at the time or I would notate

12    their account, but I wouldn't say it was my primary

13    focus.  So yeah, I did deal with it, but not as much as

14    I do now.

15         Q.   When you dealt with late rent or

16    delinquencies as a leasing consultant at Pacific Place,

17    would you say you spent less than an hour a week on

18    those activities?

19         A.   I would say maybe about an hour -- an hour a

20    day, just depending.  We do have people frequently

21    coming in wanting to talk about maybe the balances they

22    had on their account, if I had to do like a statement

23    breakdown.  So I would say approximately an hour a day

24    as a leasing consultant.

25         Q.   An hour a day doing what exactly?

Carina Gomes                                          January 26, 2021

1          A.    So this is just if they have questions about

2     maybe what their balance on their account is.  So I

3     would have to go through their account, figure out what

4     the fees are coming from, maybe they have a balance of

5     1800, they paid a portion of it, but they don't know

6     what the remaining balance is from.  So then I could go

7     over it with them and have that discussion.  And maybe

8     I have a few residents come in a day, you know,

9     inquiring about their balances.

10         Q.    There were some days though where no

11    residents came in to ask you those questions, right?

12         A.    Yeah.  There could be days where we don't

13    have as many, but I would say it's pretty common for

14    residents maybe to have balances.  We do have typically

15    about over 200 people in the building, so a lot of

16    times resident questions are about maybe utilities or

17    any bills that were charged to their account.

18         Q.    Let me see if I understand your answer

19    correctly.  How many units were at Pacific Place?

20         A.    You know what, I can't recall how many

21    exactly.  It's been a while since I've been at that

22    building, but if I had to guess, it was around 300.

23         Q.    And when you say you spent an hour a day as a

24    leasing consultant at Pacific Place talking to people

25    about their balances and rent, did that include people

Carina Gomes                                           January 26, 2021

 1    a leasing consultant.

 2         A.   Okay.

 3         Q.   I want to separate out time that you spent

 4    reacting to people, asking about their balance, which

 5    you said was about an hour a day typically.

 6         A.   Mm-hmm.

 7         Q.   And the time you spent proactively doing your

 8    own things and tasks with respect to delinquent rent.

 9    Did you spend any time typically trying to collect

10    delinquent rent from people as opposed to responding to

11    their inquiries when they came in?

12         A.   No.  I didn't really spend my time actively

13    collecting delinquent rent.  This is more if somebody

14    comes into the office, as a leasing consultant and as

15    an assistant manager that I'm answering, so yeah, it's

16    only if they came in and inquired.  I wouldn't

17    proactively call them.  We actually had, you know,

18    assistant manager and my community manager in the

19    office at the time.  That's what they would do.  They

20    would contact them.

21         Q.   So the people responsible at Pacific Place

22    for proactively going out and trying to collect late

23    rent were the community managers and assistant managers

24    at Pacific Place, right?

25         A.   Yes.  That's correct.

Carina Gomes                                    January 26, 2021

1    Q.   And not any of the leasing consultants or any

2  other hourly employees in the office at the time?

3    A.   At Pacific Place, correct, yeah.  That wasn't

4  my assigned task, so I didn't proactively call people

5  to collect balances.

6    Q.   Are you aware of anyone at Pacific Place

7  other than the assistant community managers or

8  community managers who proactively tried to collect

9  delinquent rent?

10         MS. ALEXANDER:  Objection.  Vague as to time.

11         You can answer.

12    A.   Okay.  Sure.  So we had a community

13  administrator that also was between our property and

14  another property that would participate but they were

15  only there twice a week.

16    Q.   What did the -- I'm sorry what was the name

17  of that title again?

18    A.   That's a community administrator.

19    Q.   And when you say the community administrator

20  was at Pacific Place twice a week, you mean physically

21  in the office?

22    A.   Correct.  They were physically in the office

23  at Pacific Place about twice a week, but they actually

24  were located at another building we had as well and

25  they worked there the other three days of the week --

Carina Gomes                                              January 26, 2021

1          Q.    And what was that --

2          A.    -- back and forth.

3          Q.    Oh, I'm sorry.

4                COURT REPORTER:  I'm sorry.  I didn't catch

5    the end of your answer.

6                THE WITNESS:  So we had -- we had a community

7    administrator who worked at Pacific Place two days a

8    week and they worked at another building the other

9    three days of the week, so they went back and forth and

10   they would help collect rent at both properties.

11         Q.    The other property that the shared community

12   administrator worked at besides Pacific Place was what?

13         A.    It was called Park West Apartments.

14         Q.    And the shared community administrator that

15   worked at Pacific Place worked two days a week at

16   Pacific Place, right?

17         A.    Correct.

18         Q.    And three days a week at Park West, right?

19         A.    Correct.

20         Q.    When the community administrator worked at

21   Pacific Place, did they work full days, meaning at

22   least eight hour days?

23         A.    Yes.  They worked full days those two days a

24   week that they were there, so full eight-hour days for

25   both shifts.

Carina Gomes                                        January 26, 2021

1    might have spent about an hour a day responding to

2    tenant inquiries about their balances, right?

3         A.   Correct.

4         Q.   But as a leasing consultant at The Hesby, you

5    didn't spend any time yourself proactively trying to

6    collect delinquent rent, right?

7         A.   Correct.  Not as a leasing consultant.  I

8    didn't spend time proactively trying to collect rent.

9         Q.   In about the spring of 2018 though you became

10   an assistant community manager, right?

11        A.   Correct.

12        Q.   And you were an assistant community manager

13   at The Hesby until you left The Hesby, right?

14        A.   Yes.

15        Q.   And when did you leave The Hesby?

16        A.   So I left The Hesby around August of 2020 to

17   go on maternity leave but then when I returned, I came

18   back to Next on Sixth in January.

19        Q.   Congratulations by the way.

20        A.   Oh, thank you.

21        Q.   When did you start back up at Next on Sixth

22   after your maternity leave?

23        A.   It was January 5, 2021.

24        Q.   And you came on and started as an assistant

25   community manager, right?

Carina Gomes                                                January 26, 2021

1        A.    Yes, that's correct.

2        Q.    And you've been an assistant community

3    manager at Next on Sixth ever since, right?

4        A.    Yeah, ever since January 5th.

5        Q.    And it's a full-time job, the assistant

6    community manager position at Next on Sixth?

7        A.    Correct.

8        Q.    Was your job as an assistant community

9    manager at The Hesby a full-time job?

10        A.    Yes, it was a full-time job.

11        Q.    And are you paid on an hourly or salaried

12    basis?

13        A.    It was an hourly pay.

14        Q.    And today as an assistant community manager

15    at Next on Sixth, are you also paid hourly?

16        A.    Yes.  It's an hourly pay as well.

17        Q.    Have you now told me all the jobs or titles

18    you've had working for EQR?

19        A.    Yes, I have.

20        Q.    Have you told me all the properties or

21    communities that you've worked at while working with

22    EQR?

23        A.    So these are all of the positions I've held,

24    but within Equity I have sometimes covered at other

25    properties before.

Carina Gomes                                      January 26, 2021

1    per shared roommate, right?

2        A.   One lease per unit, correct.   They    if

3    there's multiple roommates in one unit, they all have

4    the same lease that they are signing.   They are not

5    separate leases.

6        Q.   What other kinds of units are there at Next

7    on Sixth?

8        A.   Are you    are you asking as far as like

9    studios, one, two bedrooms?   Is that your question?

10       Q.   Correct.

11       A.   Okay.   It's going to be studios, one, and two

12   bedrooms.

13       Q.   And what's the price of a studio currently?

14       A.   So the last time I was in the office, which

15   was on Saturday, studios were starting at around 1680

16   going up to I want to say about the 1800s.

17       Q.   And the one bedrooms?

18       A.   To my knowledge from Saturday, the one

19   bedrooms were starting around like the 2000 range going

20   up to maybe about high 22s, almost 23.

21       Q.   And the two bedrooms?

22       A.   Two bedrooms were starting around 2500 going

23   up to maybe about 27, 2800.

24       Q.   Now, you say this is as of last week because

25   the rents can change on a weekly or even daily basis,

Carina Gomes                                                January 26, 2021

1    right?

2         A.   Yes.  That's correct.  They're subject to

3    change with the market.

4         Q.   Because EQR uses some kind of computer

5    program or service to help set the rent for every

6    available unit individually, is that right?

7         A.   Yes.  That's correct.

8         Q.   Now, at The Hesby, what were the rents

9    charged, high to low?

10             MS. ALEXANDER:  Objection.  Vague as to time.

11        A.   You said --

12        Q.   As far as you're aware.  Yes.  Let me re-ask

13   the question, Ms. Gomes.

14        A.   Okay.

15        Q.   When you were working at The Hesby

16   Apartments, what were the rents?

17        A.   For per apartment what the average rent was?

18        Q.   Right.

19        A.   Sure.  So at The Hesby -- this was -- I mean,

20   it was kind of around pre-COVID, so I know pricing

21   might have dropped a little bit since then, but around

22   the time I was there, it was for studios on average

23   maybe about 1800 to 2200.  It all ranged depending on

24   the view and the square footage.  We did offer

25   penthouses at The Hesby.  One bedrooms were anywhere

Carina Gomes                                          January 26, 2021

1   from about 2100 to 2700.  And then two bedrooms were

2   about 2800 to about 3200.  And then three bedrooms were

3   typically about 3500 to maybe 3700.

4        Q.   Do you know how many units are at the Prado

5   in Glendale?

6        A.   No, I don't.

7        Q.   Or at Versailles in Koreatown?

8        A.   No, I'm not sure.

9        Q.   Or at mooring 41 [sic]?

10       A.   Marina 41.

11       Q.   Marina 41, sorry.

12       A.   I want to say -- because it was really large,

13   I want to say there was between 5 to 600 on average

14   apartments, so it was quite a large building but I

15   don't know the exact number.

16       Q.   At all of the EQR properties that you've

17   worked at, was the late rent structure or fees always

18   the same?

19       A.   Yeah.  The structure was always the same, so

20   it was either 5 percent of late rent or a minimum

21   charge of $50.

22       Q.   Has it ever been anything different at the

23   properties you've worked in?

24       A.   No, never since I've been with Equity

25   Residential.  It's never been different.

Carina Gomes                                    January 26, 2021

1         Q.   And what was the late fee structure or

2    charges at the additional EQR properties you lived at,

3    meaning Prado in Glendale, Versailles, and Marina 41,

4    if you know?

5         A.   It was the same structure.  It's actually --

6    it was stated on the lease, so again, it was -- late

7    rent was equal -- your late fee would be either the 5

8    percent of that late fee -- or of the late rent or a

9    $50 minimum charge.

10        Q.   Do you know if EQR has ever charged any other

11   kind of late rent fee or structure at any of its

12   California properties?

13        A.   To my knowledge, they only charge that late

14   fee.  I've never seen any other late charges.

15        Q.   Do you know how Equity Residential came up

16   with the current late fee structure, meaning the $50

17   minimum or 5 percent?

18        A.   No, I'm not sure how they came up with that.

19   I just know that that was the policy when I started.

20        Q.   Do you know what criteria were looked at or

21   what research was done to come up with that policy?

22        A.   All I know is that the late fee has to be

23   equal to the cost of labor, something along those

24   lines, for -- that would be equal to the cost of labor

25   to be able to charge that amount, but I don't know

1   anything beyond that.

2        Q.   And how do you know that?

3        A.   That's -- I asked that question before to my

4   employer, why it was that amount of money or $50, like

5   what determined that.  And they just said it has to be

6   equal to that, the cost of --

7        Q.   Okay.

8        A.   Because I had -- I've had a resident ask me

9   how do they determine that before.

10        Q.   So at some point during your employment for

11   EQR, you asked your bosses at EQR how they came up with

12   the late fee structure, right?

13        A.   Correct.  I was asked by a resident how that

14   was determined, so I asked my employer and I was given

15   an answer along the lines of it's determined by the

16   amount of labor, something along those lines.

17        Q.   When were you asked by the resident for

18   details on how EQR came up with its late fee?

19        A.   I don't have the exact -- the exact time.

20   It's been a while.  But it was at some point when I was

21   at The Hesby as a leasing consultant.

22        Q.   And who was the resident that asked you?

23        A.   I don't know the name.  From -- it's been

24   such a long time, I can't recall.

25        Q.   Or what unit were they associated with?

Carina Gomes                                                  January 26, 2021

1          A.    I can't recall the unit number, but I could

2    tell you the manager --

3          Q.    Go ahead.

4          A.    -- who was my manager at the time.

5          Q.    Who was that?

6          A.    It was Christina Gudjenova.

7          Q.    I'm sorry.  What was that second name or last

8    name?

9          A.    Gudjenova.

10         Q.    How do we spell that?

11         A.    Do you need me to spell it?

12         Q.    Please, if you know how to.

13         A.    Okay.  It's a hard one.  It's

14    G U D J E N O V A, Gudjenova.

15         Q.    Is she the community manager now at The

16    Hesby?

17         A.    No.  She is no longer at The Hesby.  She's at

18    Westgate Apartments.

19         Q.    Who is the community manager now at The

20    Hesby?

21         A.    It's going to be Jennifer Gonzalez.

22         Q.    So while you were a leasing consultant at The

23    Hesby, a tenant asked you how Equity Residential came

24    up with the $50 late charge, right?

25         A.    They did.

1          Q.   And what did you do next?

2          A.   I told them that I honestly wasn't sure.   I

3     didn't determine that amount.   And so they left and

4     then I asked my manager later, you know, I told her

5     like something along the lines of, you know, a resident

6     asked me this, I didn't really know the answer, so I

7     told them I wasn't sure and I was just wondering if you

8     knew, you know, the answer to this.   And she gave me a

9     general kind of answer.

10         Q.   And what exactly did she say, to the best of

11    your recollection?

12         A.   To the best of my knowledge, she said that

13    the -- it determines on the cost of labor for

14    employees, like something along those lines, how much

15    time we spend working on I think delinquency or -- not

16    delinquency.   I don't remember the exact verbiage she

17    used, but she just said it was labor.

18         Q.   Did she say anything else?

19         A.   Not to my knowledge.   I don't recall.

20         Q.   Did she --

21         A.   It was just along those lines.

22         Q.   Did she tell you --

23              COURT REPORTER:   I'm sorry.   I'm sorry.   What

24    did you say?   You said, not to my knowledge, I don't

25    recall

Carina Gomes                                          January 26, 2021

1           THE WITNESS:  I don't remember what I said
2    after that.  I just said not to my knowledge, I don't
3    recall.  It was just something along those lines.
4           COURT REPORTER:  Okay.
5           THE WITNESS:  I think that's what I said.
6    Sorry.
7           COURT REPORTER:  It's okay.  If you guys
8    could just make sure you leave a pause after one person
9    speaks so you're not cutting out and talking over each
10   other, that would help me.
11          THE WITNESS:  Okay.
12   BY MR. TOMASEVIC:
13        Q.   So the community manager at The Hesby, when
14   explaining how EQR came up with its late fees mentioned
15   labor costs, right?
16        A.   Yeah.  We didn't go into super lengthy
17   detail.  She just gave me kind of a general like this
18   is how it's -- it's determined and I didn't tell the
19   resident anything -- I was just curious for my own
20   knowledge.
21        Q.   Did you relay this information from your
22   community manager back to the resident who asked you
23   the question?
24        A.   I did not.
25        Q.   So a resident asked you how EQR came up with

Carina Gomes                                           January 26, 2021

1    its late fee, but you didn't respond to them, right?

2         A.   No.   I didn't respond because I didn't feel

3    like it was my place to tell them because I didn't

4    determine.   I just shared that with my community

5    manager.

6         Q.   So a tenant at The Hesby asked you as a

7    leasing consultant how the late fee was determined, and

8    you responded truthfully at the time, you didn't know,

9    right?

10        A.   Correct.   I didn't know when they asked me in

11   that time, exact moment.   I said I didn't know what it

12   was.

13        Q.   Fair enough.   And you asked your community

14   manager at the time and she told you that it was

15   related to labor costs in some fashion, right?

16        A.   Yeah.   She said something along the lines of

17   it was related to -- she gave me, you know, better

18   information or better sentence than I gave you, but I

19   can't recall exactly how she said it.   I just kind

20   of

21        Q.   That's fair.

22        A.   -- [inaudible].

23        Q.   I understand.   I understand.

24        COURT REPORTER:   I'm sorry.   You cut out

25   again.   You said, I can't recall exactly how she said

Carina Gomes                                        January 26, 2021

1    it, I just kind of --

2             THE WITNESS:  But I can give you the

3    general -- like the general -- I don't know what I'm

4    trying to say.  Sorry.  I don't have a word.  I can

5    give you the general like idea of what she was saying

6    basically, but I can't tell you exactly the phrase she

7    used.

8        Q.  Can you give me any more details of this

9    conversation?

10       A.  No.  That's all I have is the -- that

11   information that I shared with you.

12       Q.  Did she tell you how exactly labor costs were

13   calculated and then used to come up with the late fee?

14       A.  No.  We didn't go into further details.

15   That's the only information I have.

16       Q.  Has anyone at EQR ever asked you to tell them

17   how much time you've spent on efforts to collect late

18   rent?

19       A.  No.  No, I haven't.  I mean, my -- my manager

20   will say, you know, something along the lines of if you

21   can get to -- if you could do this, dedicate maybe an

22   hour of your time to work on this, but no one's ever

23   asked me to I guess record how long of a time I've

24   spent on a task.

25       Q.  Have you ever recorded any of the time you've

Carina Gomes                                                    January 26, 2021

1    spent trying to collect late rent from tenants?

2         A.    No, I have not.

3         Q.    As an assistant community manager do you

4    clock in and out of a time clock?

5         A.    Yes, I do.

6         Q.    And that tells us when you showed up, when

7    you leave, and when you take any breaks, right?

8         A.    Correct.

9         Q.    Do you at any other time clock anything else

10   in your workday?

11             MS. ALEXANDER:  Objection.  Vague.

12        A.    You said have I ever -- sorry.  Can you

13   repeat that again?

14        Q.    Have you ever clocked any other parts of your

15   workday other than coming, going, and breaks?

16        A.    Oh, no.  I have not.

17        Q.    So do you have any idea if, in fact, EQR is

18   using labor costs to come up with [inaudible] labor

19   cost?

20             COURT REPORTER:  I'm sorry.  Can you repeat

21   that?

22             MR. TOMASEVIC:  I'll have that -- I'm sorry.

23   Who asked that?  I was going to ask the court reporter

24   to repeat it for me, but if it was the court reporter

25   who asked that, then I should just repeat it.

Carina Gomes                                      January 26, 2021

 1            COURT REPORTER:  Yeah, it's me, the court
 2    reporter.  You cut out when you said your question.
 3        Q.   So if according to the community manager at
 4    The Hesby labor costs are used to come up with the late
 5    fee, how does EQR determine what the labor costs are?
 6        A.   You know what, I'm not too sure.
 7        Q.   Let's talk about the late rent collection
 8    process.
 9        A.   Okay.
10        Q.   Is it true that in all the EQR properties
11    you've worked at, rent is due on the first of the
12    month?
13        A.   Correct.
14        Q.   But there is a grace period, right?
15        A.   Yes.  There is a grace period until the 4th.
16        Q.   And so there is no late fee until someone
17    pays after the 4th of the month?
18        A.   Right.  So if you pay between the 1st through
19    the 4th of the month, there is no late fee.  It would
20    be considered late on the 5th of the month.
21        Q.   Is it true that EQR uses a computer system
22    called MRI to track when rental payments come in?
23        A.   Yes.
24        Q.   And the MRI system generates automated
25    reports of tenants who haven't paid their rents on

Carina Gomes                                              January 26, 2021

```
 1   time?
 2        A.   It does.
 3        Q.   MRI also sends automated notices by e-mail to
 4   tenants who didn't pay their rent on time?
 5        A.   I'm so sorry.  You cut out for a second.  Can
 6   you say that again?
 7        Q.   I'm sorry.  MRI also sends out automated
 8   notices by e-mail to tenants who have not paid their
 9   rent on time?
10        A.   Yeah, they do get an automated e-mail if they
11   have a balance on their account.
12        Q.   When do those automated e-mails go out at
13   Next on Sixth?
14        A.   They should be going out on the 5th.
15        Q.   And when do those e-mails --
16        A.   To my knowledge, that's when they go out.
17   Mm-hmm.
18        Q.   And when do those e-mails go out at The
19   Hesby, if you know?
20        A.   The same, on the 5th.
21        Q.   So the first thing that EQR does at Next on
22   Sixth and The Hesby to try and collect late rent is
23   sending an automated e-mail to tenants on the 5th,
24   right?
25        A.   Yes.
```

Carina Gomes                                              January 26, 2021

1        Q.   That e-mail goes out automatically by way of

2    the computer program or MRI, right?

3        A.   Yes.

4        Q.   And then some people respond to this e-mail

5    by paying their rent even if it's a little late, right?

6        A.   Yeah, some could respond by paying their rent

7    even if it's a little late.

8        Q.   What's the next thing at Next on Sixth that

9    happens after the automated e-mails with respect to

10   trying to collect late rent?

11       A.   Well, I can't really speak to Next on Sixth

12   because that process, I haven't done because it's been

13   COVID so it's a little bit different.  So the only

14   thing I can speak to is -- on Hesby, which was when we

15   did this process pre-COVID, is that okay?

16       Q.   Well, I -- the short answer is yes.  What you

17   know is what you know, but let me make sure I'm, you

18   know, covering all the ground I need to cover and then

19   we'll move on -- or move back to The Hesby.

20       A.   Okay.

21       Q.   So do you know what in normal times, meaning

22   pre-COVID, would be the steps for the collecting of

23   late rent at Next on Sixth?

24       A.   Yeah.  I mean, the steps that are at Next on

25   Sixth would typically be the steps that any property

Carina Gomes                                                    January 26, 2021

 1    should be doing for late rent on the 5th.  So I'll give
 2    you kind of general what I believe to be what they did
 3    at Next on Sixth.
 4         Q.   Okay.
 5         A.   Okay.  So on the 5th, the first thing usually
 6    what you would do is you would come in in the morning.
 7    I would -- I would speak to the manager and we would go
 8    over this report that we have called the one-line
 9    balance report, which is going to print off all the
10    accounts that are delinquent for all of the residents
11    in our building and we would spend maybe an hour
12    approximately going through that.
13              So basically what this report is, it shows
14    every single resident, again, that has a balance in the
15    building.  Now, some of these residents do have
16    balances that maybe aren't rent.  Maybe it's utilities.
17    So I do have to go through and determine which ones are
18    actually late rent for that month because I wouldn't be
19    actively contacting the ones that are just utilities at
20    that time.  I'm just right now focusing on the ones
21    that owe rent for that certain month.
22              So I'd go through those residents, typically
23    notate which ones owe rent.  Then I would go into the
24    pay rent or quit notices.  So I would run that demand
25    letter report that we have in our system.  That's going

Carina Gomes                                           January 26, 2021

1    to print all of those notices for those residents.  I

2    would then actively contact all of the residents of --

3    via phone and e-mail to ask them or inquire when they

4    plan to pay rent or what the situation is, why they

5    didn't pay rent.  And then I would notate their account

6    if they did respond or any kind of information that I

7    have regarding that.

8            Then I would print -- I'm sorry, print all of

9    those notices.  I would then sign the notices and then

10   serve the resident the notice.  So I do have to make

11   copies, so one of those copies I do mail out to the

12   residents.  I also make another copy for -- for the

13   file so in general there's three copies, one that goes

14   to the resident and one that we mail out and one that's

15   for the file.  And then that's basically the process.

16   So it's just me contacting them, mailing out those

17   notices.  That typically takes my whole -- my whole

18   day.

19      Q.   Thank you.

20           Now, are we talking about your tenure as an

21   assistant community manager or as some other role?

22      A.   This is as an assistant community manager.

23   This is focusing on -- on the 5th what the process is

24   for collecting balances for late rent.

25      Q.   Understood.

Carina Gomes                                          January 26, 2021

```
 1            And this is what you did as an assistant
 2   community manager at The Hesby, right?
 3       A.   This is what I did at The Hesby, but also
 4   this is just the general procedure for collecting late
 5   rent for relatively any property on the 5th.
 6       Q.   And this includes your practice currently at
 7   Next on Sixth?
 8       A.   Next on Sixth I have not yet, again, because
 9   it's COVID so I haven't -- I haven't done it this way.
10       Q.   So as far as you know, there are no efforts
11   to try and collect late rent between the 1st and the
12   5th?
13       A.   Between the 1st and the 4th we do not.
14   There's no efforts to do that.  It would be on the 5th
15   that we would actively start collecting those -- those
16   late balances.
17       Q.   So then let's start with the 5th.  You say
18   you come in in the morning and you print out the one
19   line balance report, is that right?
20       A.   Yes.
21       Q.   MRI automatically generates a report of the
22   tenants who as of that moment have a delinquent
23   balance, is that correct?
24       A.   Yes.  That's correct.
25       Q.   And then you said you sit down and you go
```

Carina Gomes                                                January 26, 2021

1          Q.    At The Hesby?

2          A.    At The Hesby.

3          Q.    You're saying it can be up to 40 people a

4    month or 40 units a month don't pay their rent on time

5    at The Hesby?

6          A.    Mm-hmm.

7          Q.    Before COVID?

8          A.    This was before COVID, yes.

9          Q.    How did that number compare to any of the

10   other apartments you worked at before COVID, which I

11   guess would just be the one?

12         A.    You know what?  Honestly, I'm not sure.

13   Again, I didn't really work on delinquency at Pacific

14   Place so I didn't print the reports and I couldn't give

15   you an accurate amount of residents.

16         Q.    Do you have any -- strike that.

17   · · · · ·      Do you have any understanding as to whether

18   The Hesby has more or less delinquency than other

19   comparable properties at EQR?

20   · ·   A.   I -- you know what, I'm not sure.  Again,

21   I've only really been an assistant manager at The Hesby

22   and then here at Next on Sixth, but COVID has changed

23   that.  There's a lot more residents that have balances

24   due to COVID and financial hardship, so I really don't

25   have anything to compare it to.

Carina Gomes                                        January 26, 2021

1    that fair?
2         A.   Yeah, I would say that's about accurate.
3         Q.   And then you have to make copies and put some
4    in the file cabinets and mail some copies off, right?
5         A.   Mm-hmm, yes.
6         Q.   And are you the one doing that or is there
7    someone else in the office whose primary responsibility
8    is to do those tasks with the notices?
9         A.   No, I am the one that is sending those out in
10   the mail, filing those, making copies.  I am doing all
11   of that.
12        Q.   And how much time does that take typically on
13   the 5th?
14        A.   So I would say -- are you -- are you
15   including posting them on people's doors and providing
16   them the notice in person or are you just saying to
17   file and mail?
18        Q.   I was just talking about the filing and the
19   mailing and then we were going to move on next to the
20   posting separately.
21        A.   Okay.  So again, it really just depends how
22   many -- how many notices I have.  So it may vary from
23   month to month, but I would say to make copies, you
24   know, depending on -- there's a lot of copies I have to
25   make, so sometimes I have to, you know, put more paper

1    in the printer, so that can take me maybe a few

2    minutes.  And then usually I make one, two -- two

3    copies, so let's say it takes about 15 minutes to go

4    through the stack or, you know, 10 to 15 minutes to go

5    through the stack once, twice.  So there's 30 minutes.

6    And then I have to sign them all, so that will probably

7    take me about another 20 minutes.  And then to mail

8    them out --

9         Q.   It takes you 20 minutes to sign 20 documents?

10   It's like a minute per document signing every document?

11   That sounds like a lot.

12        A.   I guess -- I guess I'm giving you a --

13   because I'm not doing this just sitting there

14   consistently signing them all.  I do have people that

15   come in and I'm on the phone and I'm doing multiple

16   things at once.  So I guess if I were to just sit

17   there -- I don't time myself, so maybe about -- so -- I

18   guess maybe about 10 minutes or -- it's hard to give

19   you a number.  I don't --

20        Q.   I understand.

21        A.   Yeah.  It's just kind of an estimate.

22        Q.   Generally speaking, after you've printed all

23   of the three-day notices, it takes you about 10 minutes

24   to go through them and sign them, right?

25        A.   Mm-hmm.

Carina Gomes                                                    January 26, 2021

1          Q.   That's a yes?

2          A.   Yes.  Sorry.  I keep doing that.

3          Q.   And then there's a few more minutes needed to

4     file away the extra copies into the file cabinet and

5     send them off in the mail, right?

6          A.   Yeah.

7          Q.   Then they have to be posted or served on the

8     tenants at the property, correct?

9          A.   Yes.  That's correct.

10         Q.   And who did that physically at The Hesby?

11         A.   Who served and posted?  That was me.

12         Q.   And again, you were typically the one at The

13    Hesby who did it unless you were not in that day and

14    then it would fall to the community manager to do it

15    typically, right?

16         A.   That is correct.

17         Q.   So about how much time would you need to

18    serve 20 or 30 notices to tenants?

19         A.   Again, it really just depends.  I would knock

20    on their door so it depends if they answered and what

21    that conversation is like.  So maybe if I have 20 to 30

22    notices, maybe, you know, 20 percent of those residents

23    or 25 percent of the residents answer the door.  Maybe

24    it's a five-minute conversation.  Maybe it's a

25    30-minute conversation.  It really just depends.  I

Carina Gomes                                          January 26, 2021

1   would say maybe anywhere from an hour to -- I'm just

2   going to say maybe an hour to an hour and a half, maybe

3   two at the most just depending on if I have

4   conversations with residents or if I'm just posting

5   them on the door and then maybe 20 percent of the

6   residents answer and we have a quick conversation.

7        Q.   Many times when you're posting the three day

8   notice on a resident's door and they answer and engage

9   you in conversation, they want to talk about more

10  things than just the late rent, right?

11       A.   Yes, sometimes they bring up other -- other

12  topics as well.

13       Q.   So after you've served all of the three-day

14  notices on people at the property, you go back to the

15  office, right?

16       A.   Mm-hmm.

17       Q.   Yes?

18       A.   Yes.

19       Q.   And what happens next to try to collect that

20  late rent, if anything?

21       A.   So once I go back to the office, and let's

22  say, you knowing everything's filed, I've done all of

23  the other -- the other tasks we've previously

24  mentioned, then I will notate their accounts.

25  Typically if I've had a conversation with them, if not,

1   then -- well, regardless if I had a conversation with

2   them, I'll typically send them an e-mail saying, this

3   is -- you have a balance on your account, can you

4   please let us know when we can expect payment.  I also

5   do call them as well as send them an e-mail.  That way

6   they have two methods of contact.

7        Q.   So is it your practice to call and e-mail

8   every tenant that you also served a three-day notice?

9        A.   Yes.  I -- I do always strive to call and

10  e-mail.  I can't say that I've done that every single

11  time, you know, confidently, but I can say that that is

12  my best practice and that's what I typically will

13  always try to do.

14       Q.   And when you call or e-mail tenants regarding

15  their late rent, do you reflect it in the MRI system

16  somehow?

17       A.   Yes.  I will typically try to put the note in

18  there if I do e-mail and call them.

19       Q.   So what's an example of a typical note you

20  might make?

21       A.   So a typical note is when I send them the

22  e-mail, I just -- I copy and paste the note in there

23  from the e-mail I sent so that my team can see exactly

24  what the e-mail said that I sent them.  And then if I

25  have a phone conversation, it really just depends what

1    around that time, 12:30, 12:45.  And then after I got

2    back from lunch, that's when I would also send e mails

3    to residents as well.  So   and file typically.  So my

4    process was I would -- I would start, print the

5    notices -- or run the report, print the notices.  Then

6    I would call residents to let them know about the

7    notices and then post them on the door and then when I

8    got back, then I would notate the account and send

9    e mail.  So I would say typically it was like right

10   before 1 o'clock that I would get back to the office.

11        Q.   Thank you.

12             Besides the community manager stepping in

13   when you were out of the office, did any other office

14   employees help you with these tasks at The Hesby?

15        A.   No.  I've never had the leasing consultants

16   help me.  It was just myself and my manager.

17        Q.   So you've posted the notices on people's

18   doors.  You've come back to the office and updated MRI

19   with the notes, and you've also made calls and e mails

20   to the tenants who are delinquent?

21        A.   Mm hmm.

22        Q.   What, if anything, do you do next to try and

23   collect late rent?

24        A.   So following the 5th -- so this was my

25   process on the 5th.  I did all of that.  I would

Carina Gomes                                                    January 26, 2021

 1    continue to check in with the residents, so I would

 2    call them or if they responded to my e-mail, I would

 3    respond back to their e-mail.  So I would just make

 4    further attempts during the week to try to contact them

 5    and give them an update, you know, if you don't pay by

 6    the date, your account will be sent to our legal team

 7    to start the eviction filing process.  So just kind of

 8    give them updates and have a conversation about what's

 9    going on.

10            Also, if residents had asked or inquired

11    about paying for a later date, I would have to talk to

12    my community manager and send an e-mail to my regional

13    manager about plans to pay and see if that would get

14    approved so that they could pay on a later date.

15       Q.   These follow-up contacts that you had with

16    tenants about their late rent, would you reflect those

17    contents in the MRI notes?

18       A.   Yes.  I would always try to put those notes

19    in, to the best of my abilities.

20       Q.   Some people would pay their rent after

21    receiving the three day notice, right?

22       A.   Yes.

23       Q.   And they would pay their rent before the

24    expiration of the three days?

25       A.   Yes, some people would.

Carina Gomes                                                    January 26, 2021

1        Q.   So if the, say, 30 people who received a

2    three-day notice because they hadn't paid by the end of

3    the grace period, how many would then pay their rent

4    before the expiration of the three-day notice?

5        A.   Maybe 10 of those.

6        Q.   How much time would you spend sending

7    follow-up e-mails throughout the week to the people who

8    got the three-day notice other than the same e-mails

9    you sent as a matter of practice on the 5th?

10       A.   Again, that's really, really hard to say

11   because it depends on their conversation.  Maybe they

12   answer the phone and we have a five-minute

13   conversation.  Maybe they answer the phone and we have

14   a 45-minute conversation.  So that's really hard to

15   say.  Also, if they respond to the e-mail and they're

16   asking for a plan to pay, then it involves me asking my

17   manager, then e-mailing my regional, waiting for them

18   to get back to me, contacting the resident back.  So

19   it's really, really hard to say, but I can try to give

20   you an estimate if that works.

21       Q.   Sure.  When -- I imagine that when people are

22   calling to talk to you about their tenancy, sometimes

23   they're mentioning things that are not related to their

24   delinquent rent or their late rent, right?

25       A.   Yeah.  Sometimes they will bring up other

Carina Gomes                                          January 26, 2021

1   about it, give updates to my regional.  So I have to

2   type up those e mails, also having the conversation

3   with the resident, e mailing.  So maybe about, like I

4   said, two hours minimum and maybe -- oh, wait.  That

5   would be per day, though.  So per week -- two, three --

6   per week maybe anywhere from three to six hours.

7        Q.   So you've posted the three day notices.

8   You've sent them all off.  You've updated MRI.  And

9   then you're spending three to six hours a week

10  following up with those delinquent tenants just through

11  e-mail and phone call?

12       A.   Yeah.  Well, I'm thinking about the whole

13  process.  So I'm thinking maybe I speak to them, you

14  know, we have a conversation, they explain what's going

15  on.  Then I'm communicating that with my manager, so

16  that takes, you know, some time.  Then I'm putting

17  those notes in.  And then I'm providing those updates

18  also to my regional manager.  Then I'm following up in

19  an e mail, you know, typically to that resident.  This

20  is what we can do or, you know, this is where we stand.

21  So yeah, I'm putting all the factors of what it takes

22  per each step to communicate through phone and e mail,

23  so yeah, I would say about three to six hours.

24       Q.   Thank you.  And then after that follow-up

25  process is done and all the reporting is done, what

 1   happens next with respect to the collection of late

 2   rent?

 3        A.   Sure.  So once all the follow-up and plans

 4   are done, then there's typically a day that we would

 5   send the accounts over to our attorney for the accounts

 6   that are going to be processed for an eviction.  So

 7   what goes into that is I give the residents typically a

 8   final call and e-mail saying that, you know, we are

 9   going to be sending the account today.  If you're able

10   to make it in, please let me know, you know, what time

11   you can come into the office to drop off payment.

12   Otherwise, you will be processed.  So that takes, you

13   know, some time to call those residents.  Then I do

14   have to put the file together, fill out the document

15   for our attorney, scan those over to the attorney, put

16   in the notes that the resident was sent, mark them

17   under eviction, and then put all that information back

18   in the file.

19        Q.   So in EQR three day notices are generally

20   posted with the tenants on the 5th of the month, right?

21        A.   Yes.

22        Q.   On what day does EQR transfer the file to the

23   eviction lawyers for eviction proceedings?

24        A.   So previously it was on -- around the 15th of

25   the month, but I know that that had changed to a

Carina Gomes                                    January 26, 2021

1    Hesby would be sent to eviction proceedings?

2         A.   On average there was about five.

3         Q.   So you might start with 40 people being late

4    with rent, but the vast majority, 35 of them, give or

5    take, would pay their rent before being sent to

6    eviction, right?

7         A.   Correct.

8         Q.   But there would be a few and sometimes five

9    in a typical month sent to eviction, correct?

10        A.   Correct.

11        Q.   And in order to send those files to eviction,

12   you would put together some materials to send over to

13   the eviction lawyers, is that right?

14        A.   Yes.

15        Q.   That would be the lease, right?

16        A.   Yes.

17        Q.   And what else?

18        A.   Typically it would be the lease, the cover

19   letter page that our attorney had us fill out, and then

20   the resident statement typically.  And then also the

21   rent -- or the notice to pay rent or quit as well.

22             COURT REPORTER:  I'm sorry.  You cut out

23   there.  You said and then also --

24             THE WITNESS:  The notice to pay rent or quit.

25   So it would be the notice to pay rent or quit, the

Carina Gomes                                          January 26, 2021

 1   statement, their lease, and then the cover letter that

 2   the attorney sent to us to complete.

 3        Q.   And you're sending all these materials to the

 4   eviction lawyers electronically?

 5        A.   Through e-mail, yes.

 6        Q.   How long would it typically take you in a

 7   month to put together and e-mail over the five or so

 8   tenant files that were going into eviction?

 9        A.   Sure.  So I would typically have to print

10   those, fill them out, which maybe takes me about, you

11   know, five minutes to fill out that cover letter with

12   all their information, and then print out their

13   notices, and then, you know, go into their page

14   physically, five -- maybe it took me for -- to send

15   over those five notices including like e-mailing them,

16   uploading them in MRI, marking them under eviction,

17   sending the e-mail, maybe a minimum of 30 minutes,

18   maybe up to an hour and a half on average if I had to

19   give you a range.

20        Q.   Why might it take you up to an hour and a

21   half?

22        A.   I'm just talking about putting in notes and

23   then -- so let me kind of tell you the process.  So

24   what I would start with is I would print those notices,

25   fill them out.  I'd have to go into each person's

Carina Gomes                                    January 26, 2021

1    ~~the exact amount of time I spent doing this one file.~~

2        Q.   So then you send off the tenant files to the

3    eviction lawyers and it may be on the 15th or a little

4    bit after that, right?

5        A.   Yes.

6        Q.   And that's the end of your duties with

7    respect to collecting late rent from those tenants who

8    were in eviction?

9        A.   No.  Typically we will have residents that do

10   want to pay out of eviction, so then my duties would be

11   to speak to them, see what they were wanting -- or if

12   they were willing to pay out of eviction.  Then I would

13   have to run that by my community manager, get approval;

14   typically run that by my regional manager, get approval

15   that they're okay to buy out of eviction.  And then I

16   would have to inform the resident.  Then I would have

17   to contact the attorney, get the attorney fees, see how

18   long those attorney fees are good to.  And I know that

19   they increase after certain amounts of time.  Then I

20   would have to tell the resident, this is what the fees

21   are to buy out, this is what you owe, are you willing

22   to come in today.  If they do agree to come in and they

23   drop off payment, then I have to have a letter that

24   they sign saying that they did in fact pay out of the

25   eviction process.  So it's a little bit of a process

Carina Gomes                                    January 26, 2021

 1    after that.
 2         Q.    Thank you.
 3               So you've sent the tenant file to the
 4    eviction lawyers, and sometimes the tenants approach
 5    you about getting out of the eviction and making their
 6    balance current, right?
 7         A.    Yes, that's correct.
 8         Q.    But some tenants don't ever approach you and
 9    they go through the eviction proceedings to the end,
10    right?
11         A.    Correct.
12         Q.    The tenants for whom eviction proceedings are
13    begun and they go all the way through the eviction
14    proceedings, there's no other efforts from EQR to try
15    and collect the late rent at that point, right?
16         A.    Typically we will check in with them to ask
17    them if they are planning to pay -- buy out, what are
18    they planning to do or if they do want to hand over
19    possession.  But yeah, we don't make as many I guess
20    attempts to proactively keep doing -- keep contacting
21    them.  It's just maybe a check-in, check-in call like
22    where are you at with this, are you planning to pay
23    out, what are your thoughts, where are you at, you
24    know.
25         Q.    So if you have five people in a month at The

Carina Gomes                                          January 26, 2021

1          Q.   And it's the process you mentioned earlier,

2     which means getting the details of their payment plan,

3     getting approvals from your superiors, and filling out

4     some forms, right?

5          A.   Correct.

6          Q.   And then hopefully the person has signed the

7     forms and resolved the eviction and can stay in the

8     unit, right?

9          A.   Correct.

10         Q.   Have you now walked me through the entire

11    process of collecting late rent at The Hesby at all

12    times you were an assistant community manager?

13         A.   The only thing I didn't mention was after

14    they fill out that form that they did pay out of

15    eviction, I do have to then contact our attorney, let

16    them know that the resident paid out, upload that

17    document into our MRI system, provide my regional

18    manager with an update that the resident did pay out,

19    mark them as not under eviction anymore and put any

20    notes in.  Yeah.  But other than that, I have provided

21    you with all the information.

22         Q.   And you have to do those steps for two or

23    three people a month at The Hesby, right?

24         A.   Yes.  So for those -- for those individuals

25    that did buy out, mm hmm, it's about roughly  -- you

Carina Gomes                                                    January 26, 2021

1   change your working schedule?

2        A.   No, I have -- I have not had to change my

3   working schedule.  It's the same amount of hours.

4        Q.   Has anyone at Next on Sixth had to change

5   their amount of hours because of the COVID pandemic?

6        A.   Not to my knowledge, no.  We've all had the

7   same amount of hours.

8        Q.   And is that true for all of the EQR

9   properties that you're aware of?

10        A.   That I'm aware of, yes.  That is correct.

11        Q.   Earlier you shared with me a conversation

12   that a tenant had or a question a tenant had about how

13   the late fee was created or calculated at EQR.

14        A.   Mm-hmm.

15        Q.   Have you ever had any other kinds of

16   conversations like that with any other tenants?

17        A.   Not to my knowledge.  It was just that one

18   time.

19        Q.   For example, are you aware of any tenants

20   complaining about the amount of the late fee at EQR?

21        A.   I've had -- I've had tenants complain about

22   getting a late fee, but I haven't had any that have

23   brought up like the amount besides that one that I can

24   recall.

25        Q.   So what's an example of a tenant complaining

Carina Gomes                                          January 26, 2021

1    to you about the late fee?

2         A.   They have complained because maybe they paid

3    on the 5th and it's just one day late and they've asked

4    if they can maybe have a one-time courtesy having that

5    late fee removed.

6         Q.   Any other examples?

7         A.   I'm trying to think.  I mean, I've had people

8    just complain in general that rent is too expensive and

9    they shouldn't be charged late fees, just general, you

10   know, comments like, oh, like, can't you just waive it

11   this one time, or, you know, I won't do it again, can

12   you please waive it.  Those are kind of the gist of

13   what I would receive in regards to the late fees.

14        Q.   When The Hesby tenant asked you how the late

15   fee was calculated at The Hesby, did you reflect that

16   conversation in MRI at any point?

17        A.   You know what?  It's been a while.  I

18   honestly don't remember if I did or not, but I don't

19   recall what that resident's name or apartment number

20   was either so I couldn't -- I couldn't give you the

21   name to look it up, but usually I'm pretty good at

22   putting notes in.

23        Q.   So details of that conversation might be in

24   the MRI system or in the notes section?

25        A.   Yes, it might be in there, but like I said, I

Carina Gomes                                    January 26, 2021

1   ~~don't recall exactly because it was so long ago.~~

2        Q.   Back to the example of a tenant complaining

3   about being assessed a late fee and possibly asking for

4   a courtesy in the form of eliminating the late fee,

5   what would you typically do in that instance?

6        A.   Typically I tell them that the only way we

7   would waive a late fee if it was an error on our end.

8   So for example if the website wasn't working for them

9   to pay rent, you know, it crashed or there was an

10  error, something along those lines, so we would

11  typically only waive those fees if it was an error.

12       Q.   EQR typically only waives late fees if the

13  late fee is charged as a result of an error on EQR's

14  part?

15       A.   Yes, to my knowledge.

16       Q.   To your knowledge, has EQR ever waived a fee

17  or a late fee for a tenant for reasons other than an

18  error an EQR's part?

19       A.   To my knowledge, we have not at my property

20  but I'm not sure about other properties, but I do know

21  typically we do not.

22       Q.   In the past when a tenant has asked you to

23  waive a late fee, would you typically reflect that

24  conversation or note that conversation in MRI?

25       A.   So if they asked me to waive a late fee, I

1  wouldn't say I always -- I always did.  I tried to, but

2  if I'm having the conversation with them, you know,

3  maybe and I'm not sitting at any desk on the computer,

4  maybe I forgot to put it in, but I did always try my

5  best.  So yeah, sometimes it would be in there, but I

6  can't say a hundred percent of the time it was always

7  noted.

8          Q.   I'm going to try and show you a document

9  through the Zoom platform.  Are you aware of the chat

10 function in Zoom?

11         A.   I haven't -- I honestly haven't really used

12 the chat function, but I do see something came up.

13         Q.   Let's go off the record for a second, okay?

14         A.   Okay.

15              (Whereupon, a discussion was held off the

16 record.)

17 BY MR. TOMASEVIC:

18         Q.   Ms. Gomes, what I've shared with you through

19 the chat is the assistant community manager job

20 description, and it was previously produced by EQR in

21 this litigation as WP003706 through 3709.  By the way,

22 that's what we call the Bates numbers, these control

23 numbers in the bottom right-hand corner of every page.

24         A.   Okay.

25              (Whereupon, O'Connell Exhibit 6, previously

Carina Gomes                                    January 26, 2021

1          Q.   You've already described for me all of the

2    activities and the time you spend doing those

3    activities and collecting late rent, right?

4          A.   Yes.

5          Q.   All right.

6               Let's take a couple minutes.  I'm going to go

7    through my outline.  I probably will have a couple

8    follow up questions, but we're wrapping up here, okay?

9          A.   Okay.

10              MR. TOMASEVIC:  Let's go off the record.

11   Thanks.

12              (Whereupon, a recess was taken.)

13   BY MR. TOMASEVIC:

14         Q.   All right, Ms. Gomes, almost done.  Just a

15   couple of follow up questions.

16         A.   Okay.

17         Q.   Do you have the discretion to waive a late

18   fee if you want to for a tenant?

19         A.   No.  I would have to get approval from my

20   community manager.

21         Q.   Earlier you identified a couple of law firms

22   that's you've worked with in terms of evictions.  Do

23   you recall the names of any of the attorneys that

24   you've worked with regarding evictions?

25         A.   I know Scott Spinrad is one of them, and then

```
 1   STATE OF CALIFORNIA

 2   COUNTY OF SAN DIEGO

 3          I, KAYLEE LACHMANN, Certified Shorthand

 4   Reporter, in and for the State of California,

 5   Certificate Number 14348, do hereby certify:

 6          That the witness in the foregoing deposition

 7   was by me first duly sworn to testify to the truth, the

 8   whole truth, and nothing but the truth; that said

 9   deposition was taken before me pursuant to notice, at

10   the time and place therein set forth, and reported by

11   me in shorthand and transcribed, through computer-aided

12   transcription, under my direction, to the best of my

13   ability; and that the above and foregoing pages are a

14   true record of the testimony elicited and proceedings

15   had at said deposition.

16          I do further certify that I am a

17   disinterested person and am in no way interested in the

18   outcome of this action or connected with or related to

19   any of the parties in this action or to their

20   respective counsel.

21          In witness whereof, I have hereunto set my

22   hand this 4th day of February, 2021.

23

24   _____

25   KAYLEE LACHMANN, CSR NO. 14348
```

Exhibit 5

```
 1              UNITED STATES DISTRICT COURT
 2                       FOR THE
 3            NORTHERN DISTRICT OF CALIFORNIA
 4   _____
 5   JAVANNI MUNGUIA-BROWN, ANGELINA )
     MAGANA, NORMA RODRIGUEZ, and    )
 6   DAVID BONFANTI, individually    )
     and on behalf of others         )
 7   similarly situated,             )
                                     )
 8                     Plaintiffs,   )
                                     )
 9      vs.                          )No. 4:16-cv-01225-JSW
                                     )
10   EQUITY RESIDENTIAL, a real      )
     estate investment trust, ERP    )
11   OPERATING LIMITED PARTNERSHIP,  )
     a partnership, EQUITY           )
12   RESIDENTIAL MANAGEMENT, LLC,    )
     EQR-WOODLAND PARK A LIMITED     )
13   PARTNERSHIP, and EQR-WOODLAND   )
     PARK B LIMITED PARTNERSHIP,     )
14                                   )
                      Defendants.    )
15   _____
16            DEPOSITION UPON ORAL EXAMINATION
17                         OF
18                    BRUCE LAVINE
     _____
19
20            Seattle Deposition Reporters
21          600 University Street, Suite 320
22                 Seattle, Washington
23
24   DATE TAKEN:  July 11, 2017
25   REPORTED BY:  CYNTHIA A. Kennedy, RPR, CCR 3005
```

                                              Page 1

```
 1              SEATTLE, WASHINGTON; TUESDAY, JULY 20, 2017
 2                          9:30 A.M.
 3                            oOo
 4    BRUCE LAVINE,             witness herein, having been
 5                             first duly sworn on oath,
 6                             was examined and testified
 7                             as follows:
 8
 9                          EXAMINATION
10    BY MS. RYAN:
11         Q.   Good morning.
12         A.   Good morning.
13         Q.   Would you state and spell your name for the
14    record?
15         A.   Bruce Lavine, L-A-V-I-N-E.
16         Q.   Thank you.
17              And my name is Megan Ryan, and I'm an
18    attorney representing the four plaintiffs in this
19    case, Javanni Manguia-Brown, Norma Rodriguez, Angelina
20    Magana, and David Bonfanti, and we're planning to ask
21    the Court to certify the case on behalf of tenants in
22    California --
23         A.   Okay.
24         Q.   -- as well.  And --
25              MS. FISHER:  I'm Katharine Fisher, also
```

Page 5

 1      Q.    Okay.  What's the engagement survey?

 2      A.    It's a survey that Hewitt & Associates

 3   developed that takes the pulse of your employees'

 4   commitment to the company.

 5      Q.    Hmm.  Interesting.

 6      A.    Yeah.

 7      Q.    And is it your understanding that you're

 8   testifying today pursuant to this subpoena?

 9      A.    Yes.

10      Q.    Great.  Besides looking in the folder of

11   documents that you had pertaining to Equity

12   Residential, have you done anything else to prepare

13   for your deposition today?

14      A.    No.  No, I have not.

15      Q.    Okay.  Have you ever spoken with the

16   attorneys for Equity Residential before?

17      A.    Yes, I have.

18      Q.    Okay.  And when was that?

19      A.    I spoke to Susan immediately upon learning

20   of the case, and I talked with Aaron just a couple

21   days ago.

22      Q.    Okay.  So you spoke with Susan after

23   receiving a phone call from the plaintiffs' attorneys?

24      A.    Correct.

25      Q.    Okay.  And what did you discuss with Susan?

Page 12

```
 1        A.    I asked Susan if she could tell me what the
 2   call was about.  I wasn't aware of what the call was
 3   about.
 4        Q.    Okay.  And what did Susan say?
 5        A.    She indicated that there was a suit and that
 6   it was related to late charges.
 7        Q.    Okay.  Did she say anything else in terms of
 8   how it was relating to late charges?
 9        A.    No, she didn't.
10        Q.    Okay.  And about how long was your
11   conversation with Susan?
12        A.    A couple of minutes at most.
13        Q.    Okay.  Did you just talk to Susan once?
14        A.    I believe I may have called her a second
15   time to ask if there was a followup, if there was
16   anything I needed to do.  And that call lasted less
17   than a minute --
18        Q.    Okay.
19        A.    -- to my recollection.
20        Q.    And what did Susan say when you asked if
21   there was any followup?
22        A.    That there would be someone who would speak
23   with me, and to the extent that I needed to know what
24   was going to be happening, I would be informed.
25        Q.    Okay.  And who was that someone?
```

Page 13

1        A.      That ended up being Aaron, whose name was on

2    the subpoena.

3        Q.      Got it.  And so let me get this straight.

4    So you spoke with Susan twice briefly, and then you

5    spoke with Aaron Winn; is that correct?

6        A.      A few days ago I believe.

7        Q.      Okay.

8        A.      As this was approaching, I called.

9        Q.      You called Aaron?

10       A.      I called Aaron because I had had no contact,

11   and I -- many of the terms you talked about in terms

12   of how this deposition would go, I was a little bit

13   anxious about learning, so...

14       Q.      Okay.  Okay.  And so what was your

15   conversation with Aaron about a few days ago?

16       A.      Aaron actually was telling me a couple of

17   the logistical points that you made with regard to

18   that he may object and that I would give my answers to

19   the best of my ability, and he was not to see his

20   objections as -- I was not to see the objections as

21   anything that should stop me from continuing to answer

22   the questions.  But much as you said, he said the

23   objections were a bookmark so to speak that could be

24   revisited.

25       Q.      Great.  What else did you speak with Aaron

Page 14

```
 1    about?
 2         A.    That was the gist of it.  I did -- there was
 3    another conversation about what we would be
 4    discussing.
 5         Q.    Okay.  No conversation about the subject
 6    matter of the case in relation to late fees?
 7         A.    No.
 8         Q.    Okay.  Have you spoken with anyone else
 9    besides Susan or Aaron in preparation for the
10    deposition?
11         A.    No.
12         Q.    Okay.  Did you have any other conversations
13    with Aaron besides the one a few days ago?
14         A.    No.
15         Q.    Okay.  And I know you said that you searched
16    for documents and could not find any documents in your
17    possession.
18         A.    Correct.
19         Q.    Were you given any documents to review
20    before this deposition?
21         A.    No.
22         Q.    Okay.  Besides the subpoena?
23         A.    Besides the subpoena, correct.
24         Q.    Okay.  So there's a few defendants in this
25    case, and I'd like to use the -- sort of the sort name
```

Page 15

1      Q.      or more.

2      A.      a few thousand.

3      Q.      Okay.  And in your current job, do you have

4   any tasks related to late fees in California?

5      A.   No.

6      Q.    Okay.  When did you first start your

7   employment at Equity Residential?

8      A.    I don't know exactly.  I think it was in

9   '83, '81 to '83.  I don't remember the exact year.

10      Q.    Okay.

11      A.    If you work backwards, I think it was 17 and

12   a half years when I left in September of '13.

13      Q.    Okay.  So I want to go through your history

14   of employment at Equity Residential.

15      A.    Okay.

16      Q.    So let's -- if we can, let's start at --

17   instead of working backwards, let's start at the

18   beginning.

19      A.    Okay.

20      Q.    Do our best to work forwards, and if you

21   don't remember exact dates, I understand.

22      A.    Okay.

23      Q.    Just to get a general sense of what your

24   role was during that time.

25      A.    Sure.

```
 1        Q.     So you started in approximately '83.  And
 2   what was your first position?
 3        A.     My first position -- I believe it may have
 4   been later.  If I left -- if I left in September of
 5   '13 and I was there for almost 18 years, it would have
 6   been in '86 or '87 that I started.  So I may have been
 7   wrong about '83.
 8        Q.     No worries.
 9        A.     My first position was an area vice president
10   position.
11        Q.     In what area were you over?
12        A.     I was hired to oversee Seattle and Portland
13   initially.
14        Q.     Okay.  And what was your next position?
15        A.     I retained the same title, but I took on
16   more markets.  And I don't recall sequentially, but it
17   worked up to being responsible for Seattle and
18   Portland but also Denver and Northern California.
19        Q.     Okay.  Do you remember approximately when
20   you became in charge of Northern California?
21        A.     I don't remember the date, no.
22        Q.     Okay.  Did your title remain the same
23   throughout your time --
24        A.     No.
25        Q.     -- at Equity Residential?
```

Page 20

```
 1          A.    No, it did not.  I had the title of senior
 2    vice president and executive vice president at various
 3    times.
 4          Q.    Okay.  And were your duties as senior vice
 5    president and executive vice president the same or
 6    were they different?
 7          A.    They were similar.  I believe I was actually
 8    an executive vice president and then it was put into a
 9    senior vice president title to be consistent with the
10    titles that were in the corporate office.
11          Q.    Okay.  And when did your title change from
12    area vice president to -- did you say executive or
13    senior?
14          A.    It may have been senior first and then
15    executive back to senior.  I don't recall when the
16    title changes occurred.
17          Q.    Okay.  And when you -- you said you left
18    Equity Residential in September of '13 --
19          A.    Yes.
20          Q.    -- is that right?
21          A.    Yes.
22          Q.    Okay.  And what was your title when you
23    left?
24          A.    Senior vice president.
25          Q.    And when you left in -- well, hold on.
```

1   ~~Strike that.  Let me back it up.~~

2              What were your main duties as an area

3   vice president?

4        A.    I was responsible for day-to-day operations,

5   including personnel, recruitment, development,

6   strategic initiatives.  Bottom line, performance,

7   keeping the apartments full -- or trying to.

8        Q.    And what were your duties as a senior vice

9   president?

10       A.    They were similar.  I -- as time went by, I

11  was involved in more corporate initiative programs,

12  strategic programs.

13       Q.    What does that mean?

14       A.    Well, it means that efforts to -- to become

15  better managers through computer -- use of technology,

16  use of field management, pricing programs,

17  understanding the branding of our company, those types

18  of items.

19       Q.    Okay.

20       A.    Understanding and promoting the branding of

21  our company.

22       Q.    And when you left in September 2013, did

23  your area include Northern California at that time?

24       A.    Yes, it did.

25       Q.    Okay.  Were you ever in charge of Southern

```
 1    California?

 2         A.    Yes, I was.

 3         Q.    Do you remember approximately the dates you

 4    were in charge of Southern California?

 5         A.    I'm sorry, I don't.  It was -- for a portion

 6    of my time in Equity, but I don't remember the exact

 7    dates.

 8         Q.    And when we say Northern California, how did

 9    you at Equity define that geographically?

10         A.    It included homes in the Bay Area primarily.

11    We did not have homes in Mendocino, for example.  Most

12    of the apartments -- switching nomenclature to my

13    current -- but the apartments were in the Bay Area

14    primarily.

15         Q.    Okay.  Do you remember in the late 1990s if

16    either Northern or Southern California was a part of

17    your portfolio?  Was part of your area?

18         A.    In the late 1990s?

19         Q.    Yes.

20         A.    It likely was.  Northern California likely

21    was.

22         Q.    And do you remember if Northern California

23    was a part of your area in 2008?

24         A.    It was.

25         Q.    How were you evaluated as a senior vice
```

Page  23

1          Q.     And did you have more or less similar

2     reporting relationships when you were an area vice

3     president?

4                 MR. WINN:  Objection.  Vague.

5          A.     I believe that I had the same -- I believe

6     that I began reporting to Fred.  Oh, I'm sorry, no.

7     Bruce Salter was the individual that I think I

8     reported to for a short period of time when I hired on

9     and then that transitioned to Fred.

10         Q.     But as an area manager -- sorry, excuse me.

11                As an area vice president, the vice

12    presidents would report to you as well?

13         A.     They were regional managers that were

14    reporting to me as an area vice president, and then,

15    as a senior vice president, I had vice presidents that

16    had regionals in turn reporting to them.

17         Q.     Okay.  Thank you.

18         A.     Sure.

19         Q.     Do you remember a lawsuit filed by the

20    Consumer Justice Foundation in the late 1990s against

21    Equity Residential in Southern California?

22         A.     I don't remember.  No.

23         Q.     Do you remember any lawsuit against Equity

24    Residential in the late 1990s about late fees?

25         A.     No, I don't.

1   ~~the challenges associated with the economy, and we~~

2   ~~needed to take steps to do the best that we could~~

3   ~~financially through those times.~~

4          Q.   Let's talk a little more specifically now

5   about Equity Residential's late fee.  Okay?

6          A.   Okay.

7          Q.   My understanding is that up until mid-2008,

8   Equity Residential's late fee for California tenants

9   was $50 flat; is that correct?

10               MR. WINN:  Objection.  Vague.  Calls for

11  speculation.  Lacks foundation.

12         A.   I don't recall the late fee -- the exact

13  component of a late fee.  I know there was a late fee,

14  but I don't know if it was $50.  I don't recall that

15  that -- if you know that that was it, then I would

16  suppose that's correct.  But I don't recall the actual

17  setting of that fee or what that was.

18         Q.   Okay.  So this is an exhibit that has

19  already been marked in this case and it's Exhibit 13,

20  so I'm just going to hand that directly to you as a

21  copy.

22         A.   Okay.  (Reviewing Exhibit 13.)  Okay.

23         Q.   Okay.  So this is an email chain which at

24  the top is dated Tuesday, June 3rd, 2008.

25               Do you see that?

Page 52

```
 1        A.    I do.
 2        Q.    Okay.  And halfway down the -- well, it's
 3   kind of near the bottom of the first page, there's an
 4   email from Mickey Cummings on June 2nd, 2008 at
 5   12:25 p.m., and it is to Chris Jenkins, David Santee,
 6   Denise Beihoffer, and Bruce Lavine.  Bruce Lavine
 7   being you, correct?
 8        A.    Correct.
 9        Q.    Okay.  And it's entitled "RE late fee change
10   California.  Immediate feedback requested."
11             Do you see that?
12        A.    I do.
13        Q.    Okay.  And who is Mickey Cummings?
14        A.    Mickey Cummings was a counterpart of mine
15   who ran Phoenix and Southern California primarily.
16        Q.    Okay.  In the same position as you but for
17   that area?
18        A.    Correct.
19        Q.    Okay.  If you go to the very last page,
20   where you see the email from Mickey Cummings dated
21   Friday May 30th, 2008, it says "We would like to
22   change our late fee on new leases to five percent of
23   the amount due."
24             Do you see that?
25        A.    I do.
```

Page 53

```
 1        Q.    Do you recall the late fee changing to be

 2   five percent of the amount due in mid-2008?

 3        A.    I didn't recall it.  I see here that there

 4   was communication regarding it and I was copied, but I

 5   didn't recall the actual change.  This appears as

 6   though it was changed.

 7        Q.    Okay.  Does this email refresh your

 8   recollection at all?

 9        A.    I'm noticing that I'm not on the initial

10   email nor the follow-up until something that's

11   redacted that occurred on June 2nd, a few days later.

12              It doesn't help me to remember it, but

13   it does tell me that it occurred.

14        Q.    Okay.  Let's look at two emails sort of

15   simultaneously.  Okay?

16        A.    Okay.

17        Q.    Let's label this exhibit Exhibit 39.

18                    (Whereupon Exhibit 39 was

19                    marked for the record.)

20        A.    And this wasn't labeled?  Because this was

21   38.

22        Q.    Correct.

23        A.    Okay.

24        Q.    It was an exhibit that was used earlier.

25        A.    Got it.
```

Page 54

1        Q.    So we don't have to put the sticker on it

2   again.

3        A.    Okay.

4        Q.    Okay.  Okay.  All right.  Let's just look at

5   this one, too, because here's another email -- let me

6   give you a minute actually to read through it.

7        A.    (Reviewing Exhibit 39.)  Okay.

8        Q.    Okay.  So on Exhibit 39 [Trial Ex. 9], we have another

9   email dated Wednesday, June 4th, 2008.

10            Do you see that?

11       A.    Yes, I do.

12       Q.    Okay.  And I can see your name in the list

13  of names to whom the email is addressed, Bruce Lavine.

14            Do you see that?

15       A.    I do.

16       Q.    Okay.  And the first line of email says

17  "Effective today, June 4th, the application processing

18  fees and late fees for all California properties are

19  changing."

20            Do you see that?

21       A.    I do.

22       Q.    Okay.  If you skip that next paragraph and

23  get down to the one that begins "The late fee," do you

24  see that?

25       A.    I do.

Page 55

```
 1        Q.     So this says "The late fee set up for all

 2    properties has also been changed to reflect the

 3    property default as follows:  A late fee of five

 4    percent of the outstanding balance or $50, whichever

 5    is greater, but subject to a cap of five percent of

 6    the recurring monthly charges (rent, parking, storage

 7    pet rent, etc)."

 8             Do you so that?

 9        A.     Yes.

10        Q.     Okay.  Does this refresh your recollection

11    that the late fee changed to be five percent of the

12    outstanding balance or minimum of $50?

13             MR. WINN:  Objection.  Vague.

14        A.     Again, it doesn't -- it doesn't help me

15    remember it, but it does document that it occurred.

16    So I can see here that this was the communication --

17        Q.     Okay.

18        A.     -- of that change.

19        Q.     Did you recommend the change in late fees in

20    2008?

21        A.     I don't recall if I recommended it.  No, I

22    don't recall.

23        Q.     Were you a part of the decision-making to

24    change the late fee to five percent of the outstanding

25    balance?
```

Page 56

```
 1                    MR. WINN:  Objection.  Vague.
 2        A.    The decisions of the application fee and the
 3   late fee were -- were required to be vetted by our
 4   legal department, and all matrices of fees took into
 5   consideration specific city or state codes.  If I had
 6   felt that there was a problem with it, I would have
 7   voiced that, but I wasn't -- to my recollection, I
 8   wasn't endorse -- I wasn't actively soliciting that
 9   this occur.  So when you say did I recommend it, I
10   don't -- I don't recall.  I may have -- I may have on
11   the basis of being told that this was legally
12   acceptable and correct in California, that this would
13   be something to go to.  I would have not resisted the
14   change, but I don't know that I was -- I don't recall
15   actively soliciting for it.
16        Q.    Do you remember who proposed the change?
17                    MR. WINN:  Objection.  Vague.
18        A.    I did not remember, but from seeing the
19   first email you sent me, I would infer that it was
20   Mickey Cummings, but I don't actually recall if it was
21   him.  It may have come prior to this from another
22   source.
23        Q.    Okay.  Did you and Mickey Cummings have
24   regular communication?
25        A.    "Regular" meaning how frequently?
```

Page 57

1        Q.    I'll ask a better question.  In general, how
2    frequently did you and Mickey Cummings communicate?
3        A.    I think we would speak every couple weeks,
4    and there would be periods where we'd come together
5    for meetings, corporate meetings, where we would see
6    each other for a few days and speak during that time
7    frequently.
8        Q.    Okay.  I understand your comment that the
9    legal department would have to vet certain changes
10   that might occur at Equity Residential.
11              But in general, which position would
12   have been the position to recommend a change in the
13   late fee in California?
14              MR. WINN:  Objection.  Vague.  Lacks
15   foundation.  Calls for speculation.
16       A.    I don't know who would be -- I don't think
17   that that was a responsibility, per se.  I don't
18   honestly know who would have -- who it would have been
19   incumbent on to make that recommendation.
20       Q.    Who would have to approve a change such as
21   changing the late fee in California properties in
22   2008?
23              MR. WINN:  Objection.  Vague.
24       A.    The legal department would need to approve
25   the viability of a change.

                                        Page 58

```
 1        Q.    In 2008, your direct supervisor was Fred
 2   Tuomi?
 3        A.    I believe so, yes.
 4        Q.    And was Fred Tuomi also the supervisor of
 5   Mickey Cummings?
 6        A.    Yes.
 7        Q.    This is a bit of a hypothetical, but it may
 8   be able to get me the answer I'm looking for, which
 9   is:  Theoretically, if you were to recommend a change
10   in the late fee in California, would the protocol be
11   that you recommend it first to Fred Tuomi or go
12   directly to legal or do something else?
13                  MR. WINN:  Objection.  Incomplete
14   hypothetical.  Calls for speculation.  Vague.  Lacks
15   foundation.
16        A.    I would have to speculate.  I don't -- there
17   was not a protocol, per se, so it's difficult to say
18   theoretically what would have occurred.
19                  Ideas, changes were solicited and
20   brought about different ways.  There wasn't a standard
21   protocol with regard to a new idea or change that I
22   can recall.
23        Q.    Hmm.
24        A.    Would you mind if we took a five-minute
25   break?
```

Page 59

1    we're busy enough as we are, or, yeah, we could work

2    with our existing contractors, things of that sort.

3         Q.    Okay.

4         A.    By socialize, I mean preliminary sharing of

5    the idea to get feedback.

6         Q.    Looking back at Exhibit 39, do you remember

7    in June 2008 the application processing fee

8    increasing?

9         A.    I don't remember the actual increase, no.

10         Q.    When you left in 2013, do you remember the

11    late fee being -- the default late fee being five

12    percent of the outstanding balance?

13              MR. WINN:  Objection.  Vague.

14         A.    I don't recall what the late fee was when I

15    left.

16         Q.    What was the purpose of Equity Residential's

17    late fee in Northern California?

18              MR. WINN:  Objection.  Vague.  Lacks

19    foundation.  Calls for speculation.

20         A.    That's an interesting question.  The

21    purpose.  It would be -- it would have been to -- to

22    make -- the late fee would be an incentive for the

23    resident to pay us on time, which would make our

24    administration of processing the monies easier.  And

25    it would -- it would likely also be a reflection of

```
 1    effort that would go into pursuing a resident who had
 2    not paid us promptly.
 3        Q.    Do you remember having any conversations
 4    with anyone about a change in late fees in 2008?
 5        A.    I don't.
 6        Q.    Do you remember seeing any documents
 7    connected to a change in late fees in 2008?
 8        A.    Aside from the one you just showed me, I
 9    have no recollection of any documents regarding the
10    change in late fees.
11        Q.    Do you know if any studies were done in
12    relation to late fees in 2008?
13             MR. WINN:  Objection.  Vague.  Calls for
14    speculation.  Lacks foundation.
15        A.    Studies by our company, or studies by
16    industry, or studies by whom?  I'm not aware of any
17    studies, so I guess it makes no difference, so, no.
18    No.
19        Q.    So you don't recall any studies done of
20    Equity Residential's late fee leading up to the change
21    in 2008?
22        A.    No.
23             MR. WINN:  Objection.  Vague.
24        A.    No, I don't remember a study.
25        Q.    Do you recall any kind of analysis done in
```

Page 62

1   regards to Equity Residential's late fee leading up to

2   mid-2008?

3          MR. WINN:   Objection.   Vague.

4     A.   I don't recall.

5     Q.   Do you recall ever looking to see what

6   Equity's competitors were doing in relation to late

7   fees in early 2008?

8     A.   I don't recall, no.

9     Q.   Do you recall looking to see what Equity's

10  competitors were doing in relation to late fees ever?

11    A.   No.

12    Q.   Do you recall Equity Residential ever

13  conducting an analysis on the cost of its effort to

14  pursue delinquent rent?

15          MR. WINN:   Objection.   Vague.

16    A.   I do not recall, no.

17    Q.   Okay.   So let's look at 39 again.

18    A.   Okay.

19    Q.   All right.   We had read about the change in

20  the late fee, and it then says "The new formula code

21  is CA-LA26 in MRI."

22          Do you see that?

23    A.   I do.

24    Q.   Okay.   And do you know what that means?

25    A.   No.   It's -- it's -- I assume that it is the

Page 63

1    there would have been the same guidance and direction

2    for Woodland Park as there would have been for other

3    properties.

4         Q.   Okay.  So if there was a special

5    circumstance at a property requiring a nondefault late

6    fee, then the guidance for that would come from the

7    legal department.

8         A.   Correct.

9         Q.   Okay.

10        A.   And that -- that may have been in

11   conjunction with local counsel.  Our legal department

12   would have, in many cases, worked with local counsel

13   to formulate our approach.

14        Q.   Take this later time period.  Between 2010

15   and when you left in 2013, do you recall any

16   complaints from tenants about late fees that came up

17   to your level?

18        A.   I don't recall, no.

19        Q.   Well, let me ask you this quickly.

20             Going back to the late 1990s now, a

21   stretch back, you already said that you didn't

22   remember any lawsuit about late fees in Southern

23   California in the late 1990s; is that correct?

24        A.   Yes.

25        Q.   Okay.  Do you remember any study being done

1    connected to late fees at Equity Residential in the

2    late 1990s?

3         A.    No, I don't.

4         Q.    Any study done by the company

5    Pricewaterhouse Coopers?

6         A.    No.

7         Q.    Are you familiar -- well, were you familiar

8    with the process of how to generate renewal leases at

9    Equity Residential in California?

10              MR. WINN:  Objection.  Vague.

11        A.    How to physically generate them to produce

12   the paper or how to plan for the renewal rate?  I'm

13   not quite sure what you mean by "generate."

14        Q.    Let me --

15        A.    I don't recall how -- how the leases were

16   actually printed.  I don't recall that.

17        Q.    That's okay.  Let's take a look at something

18   and --

19        A.    Okay.

20        Q.    -- if you recall, great.  If not...

21              So this is 40.

22                    (The following pages, 71

23                     through 83, are considered

24                     confidential re the Stipulated

25                     Protective Order filed in this

Page 69

1                    (The above confidential

2                    testimony is filed sealed.)

3        Q.    In Northern California between 2010 and

4   2013, what steps were taken by Equity Residential to

5   collect delinquent rent?

6              MR. WINN:   Objection.   Lacks foundation.

7   Vague.

8        A.    There were -- there was a contact made with

9   the resident.   There's a form called a Three-Day Pay

10  or Quit that is issued, and then there's a protocol

11  relative to the response.   I don't -- I should perhaps

12  recall this, but I don't recall the dates and when it

13  would -- when lack of payment would go to the

14  attorney, et cetera, but there was a rigger to it to

15  the process.

16             It began with the Pay or Quit notice.

17  It may have begun with a notice that you were late.

18  There may have been some email communication, but I

19  honestly don't recall the steps involved -- or I

20  recall the steps but not the timetable of steps.

21       Q.    Okay.  But the steps were some kind of

22  contact via email and then a Three Day Pay or Quit

23  Notice?

24       A.    Correct.

25       Q.    And then a referral for an unlawful

1    answered.

2         A.    Yes.

3         Q.    Do you recall some of those Woodland Park

4    tenants being charged a late fee that was different

5    than a late fee on their pre-existing leases?

6         A.    No, I don't recall.  I'm not aware if that

7    occurred.

8         Q.    Do you recall ever monitoring Equity

9    Residential's competition in California to see what

10   the competition was doing in terms of late fees?

11        A.    No, I don't.

12             MS. RYAN:  I don't have any more

13   questions.

14                    EXAMINATION

15   BY MR. WINN:

16        Q.    I have just a couple questions.

17        A.    Oh, okay.

18        Q.    Only a few questions.

19             Earlier we were talking about the

20   budget.  There's a line item called Late Charges.

21        A.    Yes.

22        Q.    There was some questions about Late Charges

23   Collected.

24             Are you sure that that line item refers

25   to late charges collected as opposed to late charges

Page 89

```
 1   assessed?
 2         A.    I'm not sure.
 3               MS. RYAN:   Objection.   Vague.
 4         A.    No, I -- it's a good point.   I am not
 5   certain if that was collected or assessed.   That's
 6   correct.   It may have been adjusted, so I don't recall
 7   if it was assessed or collected.   Good point.   Sorry.
 8         Q.    Did they ever tell you that Equity
 9   Residential wanted to increase late fees so they could
10   increase profits?
11         A.    No.
12         Q.    Did anyone at the company ever discuss the
13   purpose of late fees with you?
14         A.    No.
15         Q.    There were some questions about all of the
16   steps that an assistant manager or others would take
17   to collect delinquent rent.
18               Do you recall that discussion?
19         A.    Yes.
20         Q.    Was your list exhaustive of all the things
21   they might do?
22         A.    No.   It was just what came to my mind
23   quickly.   There may be more that they did.   There may
24   have been cases -- each case differed.   Some were much
25   more difficult than others.   Some took longer than
```

Page 90

```
 1    others.
 2              MR. WINN:  I have no further questions.
 3              MS. RYAN:  I don't either.
 4              THE WITNESS:  All right.  Thank you.
 5                   (Pause in proceedings.)
 6              MS. RYAN:  All right.  So, Bruce Lavine
 7    and I and Aaron Winn just discussed the process for
 8    reviewing the transcript, and we agreed that I, Megan
 9    Ryan, would email Bruce the transcript on July 24th or
10    25th, and that Mr. Lavine would return any changes, if
11    there are any, to us within one week, and I will copy
12    Mr. Winn on that email as well.
13              MR. WINN:  Okay.
14              MS. RYAN:  And that works for you,
15    Bruce?
16              THE WITNESS:  That works for me.
17              MS. RYAN:  Perfect.
18              THE WITNESS:  Thanks.
19                   (Deposition adjourned
20                    at 12:25 p.m.)
21                   (Signature reserved.)
22                    -oOo-
23
24
25
```

Page 91

```
 1                        CERTIFICATE
 2
 3   STATE OF WASHINGTON   )
                           ) ss.
 4   COUNTY OF KITSAP      )
 5
 6           I, the undersigned Washington Certified Court
     Reporter, hereby certify that the foregoing deposition
 7   upon oral examination of BRUCE LAVINE was taken
     stenographically before me on July 11, 2017, and
 8   thereafter transcribed under my direction;
 9           That the witness was duly sworn by me
     pursuant to RCW 5.28.010 to testify truthfully; that
10   the transcript of the deposition is a full, true, and
     correct transcript to the best of my ability; that I
11   am neither attorney for nor a relative or employee of
     any of the parties to the action or any attorney or
12   financially interested in its outcome;
13           I further certify that in accordance with CR
     30(e), the witness was given the opportunity to
14   examine, read, and sign the deposition, within 30
     days, upon its completion and submission, unless
15   waiver of signature was indicated in the record.
16           IN WITNESS WHEREOF, I have hereunto set my
     hand and 20th day of July 2017.
17
18
19                           /s/ Cynthia A. Kennedy, RPR
20
21
22
23
24   NCRA Registered Professional Reporter
     Washington Certified Court Reporter No. 3005
25   License expires November 16, 2017
```

Page 93

Exhibit 6

```
 1                 UNITED DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
        JAVANNI MUNGUIA-BROWN,        ) CLASS ACTION
 5      ANGELINA MAGANA, NORMA        )
        RODRIGUEZ, and DAVID BONFANTI ) Case No.
 6      individually and on behalf of ) 4:16-cv-01225-JSW-TSH
        other similarly situated,     )
 7                                     )
                   Plaintiffs,         )
 8                                     )
        vs.                            )
 9                                     )
        EQUITY RESIDENTIAL, a real     )
10      estate investment trust, ERP  )
        OPERATING LIMITED             )
11      PARTNERSHIP, a partnership,   )
        EQUITY RESIDENTIAL            )
12      MANAGEMENT, L.L.C.,           )
        EQR-WOODLAND PARK A LIMITED   )
13      PARTNERSHIP, and EQR-WOODLAND )
        PARK B LIMITED PARTNERSHIP,   )
14                                     )
                   Defendants.         )
15                                     )
16
          ZOOM VIDEOCONFERENCE DEPOSITION OF CHRISTOPHER JENKINS
17
                      February 9, 2021
18                        11 a.m.
19
20
21      PREPARED BY:
22
23      Toni M. Gehm, RPR, CR
24      Arizona Certified Reporter
25      Certificate No. 50935
```

Page 1

1               CHRISTOPHER JENKINS,

2    called as a witness herein, having been first duly sworn

3    by the Arizona Certified Reporter to speak the whole

4    truth and nothing but the truth, was examined and

5    testified as follows:

6

7                    EXAMINATION

8    BY MR. LEE:

9        Q.   Good morning, Mr. Jenkins.  Can you please state

10   and spell your name for the record.

11       A.   Christopher Jenkins.  C-H-R-I-S-T-O-P-H-E-R.

12   J-E-N-K-I-N-S.

13       Q.   My name is Andrew Lee.  I'm one of the attorneys

14   representing the plaintiffs in the matter of

15   Munguia Brown, et al, versus Equity Residential, et al,

16   which is a certified class action pending in federal

17   district court, the Honorable Jeffrey White presiding.

18   Are you represented by an attorney today?

19       A.   I am represented by Mr. Fields.

20       Q.   Okay.  When did you first learn about this case?

21       A.   I don't exactly recall, but I've been aware of

22   it for several years.

23       Q.   Are you a current employee of Equity

24   Residential?

25       A.   No, I am not.

                                              Page  4

1    reviewed?

2        A.   There were several e-mail documents.  I don't

3    remember exactly how many, but a handful of e-mails.

4        Q.   I see.  You mentioned e-mail documents.  Any

5    others that you can recall reviewing for your deposition?

6        A.   No, nothing else.

7        Q.   Please briefly describe your educational

8    background after high school?

9        A.   My educational background after high school I

10   went to university.  I graduated from the University of

11   Colorado with a degree in economics.

12       Q.   Do you hold any graduate degrees?

13       A.   No.

14       Q.   And you mentioned previously that you're not

15   currently employed by Equity Residential; is that right?

16       A.   That is correct.

17       Q.   Okay.  What were your dates of employment with

18   Equity Residential?

19       A.   It was about 25 years.  I think I started in

20   1994 and I completed -- I left Equity Residential in

21   early 2020.

22       Q.   Can you please identify all the positions you

23   held at Equity Residential by title and provide the

24   approximate time frame when you held those titles?

25       A.   Sure.  I started as a regional accountant for a

Page 10

```
 1   couple of years.  Then I was a regional support
 2   specialist, and a regional support manager, director of
 3   regional support, and then vice president of financial
 4   planning starting approximately 2001.
 5        Q.   And was the vice president of financial planning
 6   the last position you held with Equity Residential?
 7        A.   Yes.
 8        Q.   And vice president of financial planning was the
 9   position that you held in 2008; is that correct?  I'm
10   sorry.  I didn't hear that.
11        A.   Yes.  That's correct.  Vice president of
12   financial planning 2008.
13        Q.   Please provide an overview of your job duties as
14   vice president of financial planning?
15        A.   As vice president of financial planning I worked
16   for the chief operating officer primarily doing
17   operations analytics and decision support for the chief
18   operating officer.
19        Q.   Okay.  Did you say you worked directly for the
20   CEO?
21        A.   No.  I worked directly for the COO, chief
22   operating officer.
23        Q.   Got it.  Did you report directly to the CEO
24   during the time you were vice president of financial
25   planning?
```

Page 11

1    A.   No.  I never reported to the chief executive

2    officer.  I reported to the chief operating officer.

3    Q.   And can you identify all of the chief operating

4    officers that you reported to during the time that you

5    were the vice president of financial planning?

6    A.   Yes.  David Santee and Michael Manelis.

7    Q.   Can you spell Manelis please?

8    A.   M-A-N-E-L-I-S.

9    Q.   And during what period of time did you report to

10   David Santee?

11   A.   I think that was a long time.  I reported to him

12   before he was chief operating officer, so I'd say

13   approximately 2005-6 until 2017 or 2018, whenever he

14   retired.

15   Q.   I see.  Did you report to David Manelis after

16   you reported to David Santee?

17   A.   Michael Manelis after David Santee yes, he was

18   the succeeding chief operating officer.

19   Q.   Thank you.  Yes.  Mike Manelis.  Thank you.  Did

20   you have any direct reports while you were the vice

21   president of financial planning?

22   A.   Not during the time in question, no.

23   Q.   And when you say "during the time in question,"

24   what did you mean by that?

25   A.   Well, I had previously direct reports up until

Page 12

1    2007 or 2006 -- 2007.  Starting around there I did not

2    have any direct reports.

3        Q.   I see.  Okay.  So from 2007 until you left the

4    company in 2020 you did not have any direct reports?

5        A.   That is correct.

6        Q.   Are you currently employed by a different

7    employer?

8        A.   No, I am not.

9        Q.   Do you work for yourself?

10       A.   I'm on sabbatical.

11       Q.   Great.  Very nice.  Well, I'd like to talk to

12   you about the fees charged by Equity Residential for the

13   late payment of rent.  During the time that you were

14   employed by Equity Residential, did you become familiar

15   with the fee Equity Residential charged its tenants for

16   the late payment of rent at its California properties?

17               MR. FIELDS:  Vague and ambiguous.

18               THE WITNESS:  Yes.

19   BY MR. LEE:

20       Q.   As of the time that you left Equity Residential

21   and actually let me back up.  You said you left Equity

22   Residential in the beginning of 2020; is that right?

23       A.   Correct.

24       Q.   Did you leave in January of 2020?

25       A.   I believe my official last day was January 27th

Page 13

1    ~~charged its California tenants a fee for the late payment~~

2    ~~of rent prior to June 4 of 2008?~~

3        ~~A.   To clarify were late fees charged to tenants~~

4    ~~prior to 2008 in any form?~~

5        ~~Q.   Correct.~~

6        ~~A.   Yes.~~

7        Q.   Do you know what the formulation of the late fee

8    was prior to June 4, 2008 for California properties?

9        A.   California -- a very large number.  We had

10   acquired lots of properties in California and they all

11   came with their late fees, so there were bunches of

12   different ones based on existing leases.

13       Q.   I see.  Does a $50 late fee ring a bell at all

14   like a flat $50 fee?

15       A.   Like I said, there were a bunch of different

16   ones, so it varied from property to property and lease to

17   lease.

18       Q.   Did you have any role in <u>the decision</u> to adopt

19   the late fee that is described in ~~Exhibit 2~~ [Trial Ex. 2] in 2008?

20       A.   I do recall having some involvement in some of

21   the analytics.

22       Q.   Okay.  Can you describe what your role was?

23       A.   I don't remember specifically being so long ago,

24   but usually in those types of cases I would be involved

25   in estimating the impacts of changes in fees.

Page 17

```
 1        Q.    I see.  Do you recall the individuals who you
 2   worked with in terms of analyzing the impact of a change
 3   to the late fee in 2008 to be specific?
 4        A.    I'm sure it would have been members of the
 5   property management team, members of the legal team, and
 6   that would be who I generally would have been working
 7   with.
 8        Q.    Can you identify anyone by name?
 9        A.    On a lot of that kind of stuff on the legal team
10   my primary contact was Denise Beihoffer.
11        Q.    Okay.  Can you think of anyone else?
12        A.    The property management team it would have been
13   the chief operating officer, the president of the
14   property management group, and the senior leadership
15   team, so the senior vice presidents, and Fred Tuomi,
16   David Santee.
17        Q.    Thank you.  Do you know who came up with the
18   idea to implement a new late fee in 2008?
19        A.    I don't remember specifically, but I had seen
20   e-mails that I'm assuming came up mid-process after
21   discussions.
22        Q.    Okay.
23        A.    So I don't know who specifically came up.
24        Q.    Do you know the department that came up with the
25   idea to change the late fee in 2008?
```

Page 18

1      A.   I don't specifically, but I would believe it

2   would have come from the property management group.

3      Q.   From your perspective and your experience, can

4   you walk me through the process that was followed in

5   changing the late fee in 2008?

6            MR. FIELDS:  Overbroad.

7            THE WITNESS:  I'm sorry.  Can you repeat

8   that question?

9   BY MR. LEE:

10     Q.   Sure.  Can you read back the question, please?

11           (The requested portion of the record was

12   read by the certified reporter.)

13           MR. FIELDS:  Overbroad and vague and

14   ambiguous.

15           THE WITNESS:  Yeah, the answer would be

16   more in general rather than specific, you know, all these

17   changes would have generated and been reviewed by various

18   people and finally approved by senior leadership of the

19   property management group.

20   BY MR. LEE:

21     Q.   Okay.  Do you know at which point you became

22   involved in the process?

23     A.   Typically I would have been asked to do

24   analytics to review any type of change like that.

25     Q.   Okay.  In the time frame of April to June of

Page 19

1    2008, did you participate in any in-person meetings in

2    which changing the late fee was discussed?  I'm sorry.  I

3    couldn't hear your response.

4         A.   I don't recall.

5         Q.   And during the April to June of 2008 time frame,

6    did you participate in any conference calls in which

7    changing the late fee was discussed?

8         A.   No.

9         Q.   I'm sorry.  Could you repeat your answer?  It

10   didn't come through on my end.

11        A.   Oh, yes.  I don't recall.

12        Q.   Thank you.  Are you familiar with a lawsuit

13   titled The Consumer Justice Foundation vs. Equity

14   Residential Property Trust that was filed in San Diego

15   County Superior Court in 1998?

16        A.   No, I'm not familiar.

17        Q.   Were you ever involved in helping

18   PricewaterhouseCoopers generate a report about the costs

19   associated with the late payment of rent for the case

20   that I just mentioned, The Consumer Justice Foundation

21   vs. Equity Residential Property Trust case?

22        A.   I believe I'm aware that it existed, but I have

23   no specific knowledge of it.

24        Q.   Okay.  So you don't recall working with

25   PricewaterhouseCoopers to generate a report for that

Page 20

```
 1    case?

 2         A.   What was the time frame again on that?

 3         Q.   It would have been in the late '90s like '97

 4    through '99 time frame roughly.

 5         A.   I don't believe in my role at that time that I

 6    would have been involved in it, but if I was I don't have

 7    any memory of it.

 8         Q.   Do you have any recollection of The Consumer

 9    Justice Foundation case being discussed during the late

10    fee adoption process in 2008?

11         A.   I don't know anything about that specifically.

12    No.

13         Q.   Okay.  Let's see.  Plaintiff's will mark their

14    next exhibit which is Exhibit 3. [Trial Ex. 67]

15              (Deposition Exhibit No. 3 [Trial Ex. 67] was marked for

16    identification.)

17    BY MR. LEE:

18         Q.   Okay.  Exhibit 3 [Trial Ex. 67] has been uploaded to the marked

19    exhibit folder now.  And what has been marked as Exhibit [Trial Ex. 67]

20    3 is a single-page document bearing Bates stamp number

21    WP004344.  And it's an e-mail from Denise Beihoffer to

22    Mr. Jenkins dated May 8, 2008.  Do you have Exhibit 3 [Trial Ex. 67] in

23    front of you, Mr. Jenkins?

24         A.   Yes, I do.

25         Q.   Okay.  Do you recognize this e-mail?
```

Page 21

1    A.   I -- well, I mean, I have no specific memory of

2    it, but looking at it I'm sure it's a discussion that

3    Denise and I had.

4    Q.   Am I correct that this e-mail was sent to you by

5    Denise Beihoffer?

6    A.   Yes.

7    Q.   And you said you don't have any specific memory

8    of it.  Do you have any reason to believe that you didn't

9    receive it?

10    A.   No, I have no reason.

11    Q.   And the e-mail reads:

12         We may, repeat may, be in a position

13         to modify our late fee structure in

14         California from a $50 flat fee to a 5

15         percent fee.  Can you run some

16         numbers for me to see what the

17         financial impact might be?  I'm

18         thinking the average rents are more

19         than the $1,000 rent that would

20         result in a $50 charge.  We are still

21         in the midst of our research, so no

22         promises.

23    Mr. Jenkins, do you know why Equity Residential was

24    considering a percentage based late fee for its

25    California residential properties in 2008?

Page 22

1    A.    I have no recollection specifically other than,

2    as I mentioned before, we had acquired a lot of different

3    properties with a lot of different fee structures and

4    there was in general some work being done to standardize

5    to make the administration more efficient.

6    Q.    I see.  Do you know why a percentage based fee

7    was being considered as opposed to simply a flat fee for

8    the standardization?

9    A.    I don't know.  No.

10    Q.    I'll go ahead and mark the next exhibit.  All

11    right.

12                (Deposition Exhibit No. 4 was marked for

13    identification.)

14    BY MR. LEE:

15    Q.    The next exhibit should be uploading now.  And

16    what has been marked as Exhibit 4 is a two-page document
     [Trial Ex. 57]

17    bearing Bates stamp number WP004313 to 4314.  And it is

18    an e-mail chain that includes Mr. Jenkins as well as some

19    other Equity Residential employees.

20                And, Mr. Jenkins, if you could take a look at

21    this document that's been marked as Exhibit 4.
     [Trial Ex. 57]

22    A.    Okay.

23    Q.    If you look at the bottom of page WP4314 it

24    shows the e-mail that we were just discussing.  Do you

25    see that?

Page 23

1          A.   Yes.  I see that.

2          Q.   Okay.  And then right above that e-mail it shows

3     your response, which was on May 14, 2008, and it reads:

4               I do have this on the list.  OPS

5               reviews all week, so it's going to

6               take me a couple of days to get to

7               it.  Next week okay.

8          Do you see that?

9          A.   Yes.

10         Q.   And then if you turn the page to WP4313 it shows

11    Ms. Beihoffer's response.  She says:

12              Absolutely.  Thanks for your help.

13         And then shortly -- well, I should say later on that

14    day you respond to Ms. Beihoffer and you say:

15              Could we do 5 percent with a $50

16              minimum that way it's a slam dunk

17              guaranteed to be better.  (Give them

18              an inch and they take a mile.)

19         Do you see that?

20         A.   Yes.  I see that.

21         Q.   What did you mean when you said "that way it's a

22    slam dunk guaranteed to be better"?

23         A.   You know, I don't recall specifically.  It may

24    be a reference to a conversation that was taking place

25    outside of e-mail.  So I'm not exactly sure.

Page 24

| | |
|---|---|
| 1 | Q.   Do you recall anything about the conversation |
| 2 | outside of e-mail that you're referencing now? |
| 3 | A.   No, that was a very long time ago, so I don't |
| 4 | have any specific recollection of that. |
| 5 | Q.   Now was your proposal of the 5 percent with a |
| 6 | $50 minimum a slam dunk because it would ensure that the |
| 7 | late fee would be $50 or greater? |
| 8 | A.   I really can't recall what that was a reference |
| 9 | to in terms of, you know, that communication. |
| 10 | Q.   Do you have any reason to believe that your |
| 11 | proposal of a 5 percent late fee with a $50 minimum was |
| 12 | not a slam dunk because it ensured that the late fee |
| 13 | would be $50 or greater? |
| 14 | A.   Again, I don't have any recollection of, no. |
| 15 | MR. FIELDS:  Calls for speculation. |
| 16 | THE WITNESS:  That was a long time ago. |
| 17 | BY MR. LEE: |
| 18 | Q.   And if you look above the e-mail we were just |
| 19 | discussing that was from you to Ms. Beihoffer on May 14 |
| 20 | at 5:35 p.m. Central time, there is a message from Denise |
| 21 | Beihoffer to Bruce Strom and Jim Fiffer, and it says: |
| 22 | FYI they do try and get creative. |
| 23 | Do you see that? |
| 24 | A.   Yes, I see that. |
| 25 | Q.   Do you know what that is in reference to? |

Page 25

1              MR. FIELDS:  Calls for speculation.

2              THE WITNESS:  I don't know what that's in

3    reference to.

4    BY MR. LEE:

5         Q.   All right.  Plaintiff's will mark Exhibit 5. `Trial Ex. 65`

6              (Deposition Exhibit No. 5 was marked for `Trial Ex. 65`

7    identification.)

8    BY MR. LEE:

9         Q.   And Exhibit 5 is a two-page document bearing `Trial Ex. 65`

10   Bates stamp number WP004340 through 41.  It is an e-mail

11   chain including Ms. Beihoffer, Mr. Jenkins, and other

12   Equity Residential employees.  Mr. Jenkins, do you have

13   Exhibit 5 in front of you? `Trial Ex. 65`

14        A.   I do.

15        Q.   Okay.  And if I could direct you to, sort of,

16   the middle of the first page there's an e-mail from

17   Ms. Beihoffer to you, David Santee, and Fred Tuomi on May

18   14, 2008 at 12:20 p.m.  Do you see that?

19        A.   Yes.

20        Q.   Okay.  Do you recognize this e-mail?

21        A.   I recognize that it's an e-mail -- I mean, I

22   have no specific recollection, but obviously it's here.

23        Q.   Do you have any reason to believe that you did

24   not receive this e-mail from Ms. Beihoffer?

25        A.   No.

Page 26

```
 1        Q.    And the e-mail reads:

 2              We've been taking a closer look at

 3              application fees and late fees in

 4              California and even if that highly

 5              regulated state there may be blank

 6              and to modify the late fee structure

 7              in that state.  However, we need to

 8              briefly discuss the potential risk

 9              involved in that state before we

10              implement a change.  I have time on

11              Monday or Friday next week and on

12              Thursday morning.  Will one of you

13              ask Paulette to set up a meeting that

14              works for you.  Thanks.

15       Do you see that?

16        A.    Yes.

17        Q.    Did you have a meeting with Denise Beihoffer and

18   David Santee and Fred Tuomi about the late fee after

19   Ms. Beihoffer sent this e-mail on May 14, 2008?

20        A.    I don't recall specifically, no.

21        Q.    Do you recall having any meetings with

22   Ms. Beihoffer, Mr. Santee, and Mr. Tuomi around May 14,

23   2008?

24        A.    We all worked in the office together, so I'm

25   sure we met and discussed things on various issues, but I
```

Page 27

```
 1    don't have any specific recollections of anything

 2    specific.

 3         Q.   As of May 2008 did you work in the same office

 4    as Ms. Beihoffer -- physical location?

 5         A.   That was an interesting time and I don't

 6    remember.  I believe I did, but it was at that time I

 7    believe I was moving from Colorado to Chicago, so I was

 8    back and forth.

 9         Q.   I see.  Do you ever recall discussing the risks

10    of changing the late fee as referenced in Exhibit 5 with

11    anyone at Equity Residential in the April to June 2008

12    time frame?

13         A.   I am -- I have no specific recollection.  I'm

14    sure that I worked with Denise and I'm sure that topic

15    came up at some point.

16         Q.   Do you remember anything about what risks were

17    discussed?

18         A.   No.  I have no recollection.

19         Q.   And do you recall who may have been involved in

20    those discussions about risk?

21         A.   Were me, my primary contact would have been

22    Denise, but again, I don't have any specific

23    recollections of any specific discussions.

24         Q.   And just to be clear do you have any

25    understanding as to why Equity Residential was looking at
```

Trial Ex. 65

Page 28

1   changing the late fee in April to June of 2008?

2              MR. FIELDS:  Asked and answered.

3   BY MR. LEE:

4       Q.   I'm sorry.  I didn't hear your answer.

5       A.   I'm sorry.  Am I answering this question?

6              MR. FIELDS:  Yes, so that's another example

7   where I will object and you're still required to answer

8   the question.

9              THE WITNESS:  Okay.  I'm sorry.  Can you

10  repeat the question?

11  BY MR. LEE:

12      Q.   Can you please read back the question.

13             (The requested portion of the record was

14  read by the certified reporter.)

15             THE WITNESS:  Only in general that we were

16  looking at fee structures and we had, as I stated

17  earlier, a lot of different fee structures from -- it

18  varied property to property, lease to lease and there was

19  some general movement to attempt to standardize for

20  efficiency.

21  BY MR. LEE:

22      Q.   Okay.  And if you look at the same e-mail we've

23  been referencing that was sent by Ms. Beihoffer on May

24  14, 2008 at 12:20 p.m., she starts off by saying this:

25             Hello.  As a follow-up to my below

Page 29

1        A.   No.

2        Q.   Okay.  Let me ask it again.

3        A.   If it could be repeated.

4        Q.   Okay.  Is it correct that Equity Residential was

5   looking for opportunities to increase fee amounts in May

6   of 2008?

7                  MR. FIELDS:  Same objections.

8                  THE WITNESS:  I have no specific

9   recollection of that time frame, so no, I don't

10  have -- other than, you know, the e-mail here.

11  BY MR. LEE:

12       Q.   Do you have any reason to believe that Equity

13  Residential was not looking for opportunities to increase

14  fee amounts in May of 2008?

15                 MR. FIELDS:  Calls for speculation.

16                 THE WITNESS:  No.

17  BY MR. LEE:

18       Q.   Do you have any reason to believe that what

19  Ms. Beihoffer wrote in her May 14, 2008 e-mail at 12:20

20  p.m. is inaccurate in any way?

21       A.   I'm looking again.

22                 MR. FIELDS:  Calls for speculation.

23                 THE WITNESS:  I have no reason to believe

24  it's inaccurate.

25  BY MR. LEE:

                                                      Page 31

1     Q.   All right.  Plaintiff's will mark their next

2   exhibit which is Exhibit 6.  [Trial Ex. 64]

3            (Deposition Exhibit No. 6 was marked for  [Trial Ex. 64]

4   identification.)

5   BY MR. LEE:

6     Q.   And that's been uploaded to the marked exhibit

7   folder.  What has been marked as Exhibit 6 is a two-page  [Trial Ex. 64]

8   document bearing Bates stamp numbers WP004338 and 4339.

9   It is an e-mail exchange between Mr. Jenkins,

10  Ms. Beihoffer, and Mr. Santee as well as -- I think

11  that's it.  Mr. Jenkins, do you have Exhibit 6 in front  [Trial Ex. 64]

12  of you now?

13    A.   Yes, I do.

14    Q.   Okay.  Do you recognize this e-mail that has

15  been marked as Exhibit 6?  [Trial Ex. 64]

16    A.   Yeah, I don't specifically remember it, but I

17  see it.

18    Q.   I see.  And looking at the top of page 4338, it

19  shows that you were the author of this e-mail to Denise

20  Beihoffer and David Santee that was dated May 20, 2008 at

21  5:38 p.m.  Do you have any reason to believe that you did

22  not send this e-mail?

23    A.   No.

24    Q.   And this e-mail appears to be responding to

25  Ms. Beihoffer's request for you to run numbers regarding

Page 32

```
 1    the financial impact of the potential late fee change; is
 2    that right?
 3        A.   That seems correct.
 4        Q.   And you wrote:
 5             As you would suspect this is a slam
 6             dunk.
 7         By using the words "slam dunk" are you telling
 8    Ms. Beihoffer that implementing a 5 percent late fee
 9    would result in greater late fee revenue?
10        A.   I don't believe so, no.
11        Q.   Okay.  What did you mean by the term "slam
12    dunk"?
13        A.   I can't -- I don't specifically remember given
14    the time.
15        Q.   So you don't believe that you were referencing
16    that the 5 percent late fee would result in greater late
17    fee revenue, but you don't recall specifically what you
18    meant by slam dunk; is that right?
19        A.   That's correct.
20        Q.   Okay.  The next line reads:
21             The average rent for all California
22             leases is over $1500 and at 5 percent
23             the average late fee would come in at
24             $75.  Overall you would expect to see
25             a 50 percent increase.
```

Page 33

1      What did you mean when you said that overall you

2   would expect to see a 50 percent increase?

3      A.   It sounds like I was reporting on some

4   initial -- I was bringing Denise into the loop on my

5   initial review of the late fees.  So based on that

6   initial review, it sounds like I was giving her a summary

7   of that initial review.

8      Q.   And did you mean that implementing a 5 percent

9   late fee would increase the aggregate late fee revenue by

10  50 percent?

11     A.   It's not very specific here as what the 50

12  percent increase is in reference to, and I don't

13  remember.

14     Q.   Could it be in reference to the fact that $75

15  what you found to be would be the average late fee under

16  the 5 percent late fee is 50 percent greater than $50

17  flat fee that was in place at the time?

18             MR. FIELDS:  Calls for speculation.

19             THE WITNESS:  I'm sorry.  Can you repeat

20  the question?

21  BY MR. LEE:

22     Q.   Can you read back the question, please.

23             (The requested portion of the record was

24  read by the certified reporter.)

25             MR. FIELDS:  Calls for speculation.

```
 1                    THE WITNESS:  I don't recall that the $50
 2    late fee was a standard practice across California at
 3    that time.  And I -- it seems to make sense that that is
 4    the reference, but I don't recall specifically.
 5    BY MR. LEE:
 6         Q.   Do you have any reason to believe that that was
 7    not the reference?
 8                    MR. FIELDS:  Calls for speculation.
 9                    THE WITNESS:  I don't have any -- I don't
10    have any recollection one way or the other.
11    BY MR. LEE:
12         Q.   Okay.  In your e-mail you state that the average
13    lease amount is $1500 at the time.  Do you see that?
14         A.   Yes.
15         Q.   Do you have any reason to believe that the
16    figure is inaccurate?
17         A.   No.  I have no reason.
18         Q.   Okay.  After you ran these numbers on May 20 of
19    2008, did you ever have occasion to look at the average
20    lease amounts in California again and how they may have
21    changed?
22                    MR. FIELDS:  Assumes facts regarding when
23    he did this, but otherwise go ahead.
24                    THE WITNESS:  I was aware of changes in
25    California.  Rents change all the time.  And I would have
```

                                                    Page 35

```
1    looked at it.

2    BY MR. LEE:

3        Q.   Based on your employment with Equity

4    Residential, did the average rent for California leases

5    increase after you ran these numbers sometime in 2008?

6        A.   Specifically in 2008?

7        Q.   No, just anytime after 2008.

8             MR. FIELDS:  Objection.  Overbroad.

9             THE WITNESS:  In general rents are higher

10   now in California than they were in 2008.

11   BY MR. LEE:

12       Q.   And did you ever determine what the average rent

13   was for California after 2008?

14       A.   I'm sure it was a subject of regular review.

15       Q.   And do you recall any specific numbers at any

16   given point in time?

17       A.   No.

18       Q.   Do you recall the average rent in California

19   ever exceeding $2,000?

20       A.   No.  Again, I have no specific recollection.

21       Q.   Okay.  The remainder of the e-mail reads:

22            About 7 percent of the leases are

23            below 1,000.  Two main categories

24            these fall into Central Valley

25            properties and BMR units.  The BMR
```

Page 36

1        units may be on a unique late fee

2        program anyway?  The change might

3        reduce late fees at some Central

4        Valley properties.  Still wondering

5        if we can do 5 percent with a minimum

6        $50.  And if not, could we do 5

7        percent at some properties and $50 at

8        the properties where the rents are

9        lower.

10      Do you see that?

11      A.    Yes.

12      Q.    What does BMR stand for, if you know?

13      A.    I believe BMR stands for below market rate.

14    They're rent restricted units.

15      Q.    In this e-mail you propose two alternatives to a

16    straight up 5 percent late fee.  A 5 percent with a $50

17    minimum and 5 percent at some properties and $50 at

18    others; is that right?

19      A.    Yes.

20      Q.    Why did you propose these alternatives?

21      A.    I don't recall specifically, but I'm sure as we

22    were reviewing and analyzing potential fee structures

23    that these were proposals to be analyzed.

24      Q.    Did you propose these alternatives to ensure

25    that the amount of late fees would increase?

Page 37

1        MR. FIELDS:  Overbroad.

2        THE WITNESS:  Yeah, I don't recall

3  specifically if I was working with Denise, which it

4  appears I was.  It would be in reference to making sure

5  they were legally acceptable.

6  BY MR. LEE:

7      Q.  Was the content of the e-mail that you wrote on

8  May 20, 2008 at 5:38 p.m., which is included in
   Trial Ex. 64

9  Exhibit 6, accurate at the time you wrote it?

10       MR. FIELDS:  Vague and ambiguous.

11       THE WITNESS:  Is it accurate at the time I

12  wrote it?  What it appears to be is some analytics early

13  stages of analytics and speculation into, you know, into

14  overall outcomes, so I don't recall it not being accurate

15  but accurate for what it was.

16  BY MR. LEE:

17      Q.  And can you identify anything about the content

18  of the e-mail that you wrote that was inaccurate at the

19  time?

20       MR. FIELDS:  Vague and ambiguous.

21       THE WITNESS:  Not having access to the

22  underlying analytics, I have to believe -- and what stage

23  the analytics were in, you know, again, it's a kind of

24  summary discussion of analytics, so.

25  BY MR. LEE:

1    Q.   You're not able to identify anything that's

2    inaccurate about the e-mail?

3                MR. FIELDS:   Asked and answered.  Vague and

4    ambiguous.

5                THE WITNESS:   I don't see anything, but I

6    can't identify one way or the other not having access to

7    the specifics of the analytics.

8    BY MR. LEE:

9    Q.   During the course of your employment with Equity

10   Residential, did you become familiar with the personnel

11   costs of Equity Residential's properties in California?

12   A.   In a general way, yes.

13   Q.   And please describe the familiarity that you had

14   with personnel costs of Equity Residential's properties

15   in California?

16                MR. FIELDS:   Overbroad.

17                THE WITNESS:   Just in general reviewing

18   operations of the business from that perspective.

19   BY MR. LEE:

20   Q.   During the April to June of 2008 time frame, did

21   you provide any information to Denise Beihoffer or anyone

22   else regarding Equity Residential's personnel costs

23   resulting from the late payment of rent?

24   A.   No recollection of that specifically.

25   Q.   And you have no recollection of that just for a

1    clear record.  I think your answer broke up a little bit.

2        A.    Yes.  I have no recollection of that

3    specifically, no.

4        Q.    Thank you.  Do you have any recollection of

5    anyone asking you about Equity Residential's personnel

6    costs resulting from the late payment of rent during the

7    April to June 2008 time frame?

8        A.    I have no specific recollection of anything like

9    that.

10       Q.    Are you aware of anyone else providing

11   information regarding Equity Residential's personnel

12   costs resulting from the late payment of rent during the

13   April to June of 2008 time frame?

14       A.    I'm aware that in general something like that

15   had happened, but I have no specific recollection or

16   knowledge other than generally know that something like

17   that was happening.

18       Q.    Okay.  Can you identify anyone who was involved

19   in providing that information?

20       A.    No.

21             MR. FIELDS:  Vague and ambiguous.

22   BY MR. LEE:

23       Q.    When I say that information I'm referring to

24   personnel costs resulting from the late payment of rent

25   during the April to June 2008 time frame.  You can't

1    identify anyone who provided that information?

2        A.   No.

3        Q.   And can you identify what information was

4    provided?

5              MR. FIELDS:  Vague and ambiguous.

6              THE WITNESS:  No.

7    BY MR. LEE:

8        Q.   During the April to June 2008 time frame, were

9    you familiar with the activities performed by the Equity

10   Residential's employees at the property level to collect

11   late rent from California tenants?

12             THE WITNESS:  Only very generally.  Not

13   specifically.

14   BY MR. LEE:

15       Q.   Not specifically.  And when you say you were

16   familiar with those activities generally, can you tell me

17   what you remember or what you know about them?

18       A.   Only generally given my experience in the

19   property management industry, knowing the process

20   generally but don't have any specific knowledge.

21       Q.   You don't have any specific knowledge about the

22   steps taken or the specific duties performed by Equity

23   Residential's employees at the property level to collect

24   late rent from California tenants?

25       A.   Only in what was essentially standard industry

Page 41

1      A.   Second page.

2           MR. FIELDS:  Did you say 4333?  I think you

3  got the wrong document.

4           MR. LEE:  You know, I think you're right.

5  I must have marked the wrong document.  My apologies.

6  That's okay.  We'll get to that one.  That one is coming

7  next.  Okay.

8  BY MR. LEE:

9      Q.   I went ahead and marked plaintiff's Exhibit 8.   [Trial Ex. 1068]

10          (Deposition Exhibit No. 8 was marked for   [Trial Ex. 1068]

11  identification.)

12  BY MR. LEE:

13     Q.   I will correct the record.  What has been marked

14  as Exhibit 8 as opposed to Exhibit 7 is a three-page   [Trial Ex. 1068]  [Trial Ex. 1068]

15  document bearing Bates stamp number WP004332 through

16  4334.  Mr. Jenkins, do you have Exhibit 8 in front of   [Trial Ex. 1068]

17  you?

18     A.   Yes, I do.

19     Q.   Great.  Now if you could turn to the second

20  page, which is WP004333, in the middle of that page it

21  shows your response to Ms. Beihoffer's questions about

22  the impact of the 5 percent late fee that we had

23  previously discussed.  Do you see that?

24     A.   Yes.

25     Q.   Okay.  And then directing your attention to the

                                                    Page 45

```
 1    first page of the exhibit, which is WP004332, at the

 2    bottom of the page it shows Ms. Beihoffer's response to

 3    your e-mail.  Do you see that?

 4        A.   Yes, I see that.

 5        Q.   And her e-mail reads:

 6             I think it may be tough to defend two

 7             different fee method calculations,

 8             but I'm trying to come up with some

 9             sort of reasonable explanation.  If

10             we elect to go with 5 percent

11             everywhere, it won't require a

12             modification of the lease language

13             e.g. it can be implemented quickly by

14             simply changing the property setup so

15             the term sheet prints out with a

16             percentage rather than a flat fee.

17             If we want to set up a structure

18             where it's the greater of $50 or a

19             percentage, we'll have to do some MRI

20             programming.  David, how quickly do

21             you want to pull the trigger on this.

22        Do you see that?

23        A.   Yes, I see that.

24        Q.   Do you recall receiving this e-mail from

25    Ms. Beihoffer on May 21, 2008 at 8:42 a.m.?
```

Page 46

```
 1        A.   I don't recall that specifically, but I see that
 2    it exists.
 3        Q.   Do you have any reason to believe that you did
 4    not receive this e-mail from Ms. Beihoffer?
 5        A.   No.
 6        Q.   And after Ms. Beihoffer sent this e-mail, we see
 7    a response from David Santee, and he wrote:
 8             The goal is to have all of the fixed
 9             fees back in MRI sometime next week.
10             If we agree to make a change, then we
11             can change anytime.
12       Do you see that?
13       A.   I see that.
14       Q.   And do you have any reason to believe that you
15    did not receive Mr. Santee's e mail?
16       A.   No.
17       Q.   Okay.  And then sometime after Mr. Santee sent
18    his e-mail, you responded also on May 21st, and you
19    wrote:
20             We'll have to catch up on this.
21             There are only six properties where
22             we'd be better off leaving the fee at
23             $50.  We could just change the lease
24             where we'd have two California leases
25             one for the 5 percent and one for the
```

Page 47

```
 1                $50 dollars, so really no harder than

 2                changing everyone to 5 percent.

 3         Do you see that?

 4         A.    Yes.

 5         Q.    What did you mean by "We'll have to catch up on

 6    this"?

 7         A.    I'm sure I was referencing that we should have

 8    some discussion to discuss potential outcomes.

 9         Q.    You also say that:

10                There are only six properties where

11                we'd be better off leaving the fee at

12                $50.

13         Do you see that?

14         A.    Yes.

15         Q.    Does that mean that changing the late fee to 5

16    percent would increase late fees at all but six Equity

17    Residential properties in California?

18         A.    All I can say is what it says here that there

19    are -- yeah, I can't speculate beyond what's written in

20    the e-mail.

21         Q.    Was that statement accurate at the time that you

22    wrote it?

23                MR. FIELDS:  Calls for speculation.

24                THE WITNESS:  I don't have any specific

25    recollection or access to any of the underlying
```

Page 48

1    analytics, so.

2    BY MR. LEE:

3        Q.   Do you have any reason to believe that it was

4    not accurate?

5        A.   No.

6        Q.   And then you propose again implementing two

7    different leases in California one with a 5 percent late

8    fee and one with a $50 flat fee; is that correct?

9        A.   That looks correct.

10        Q.   Did you propose having two leases to ensure that

11    the amount of late fees would increase?

12        A.   It appears that --

13                MR. FIELDS:  Asked and answered.  Sorry.  I

14    didn't mean to interrupt.  Asked and answered.

15                THE WITNESS:  It appears I am proposing

16    potential operational -- operational methods for handling

17    the process.

18    BY MR. LEE:

19        Q.   All right.  We've been going for about an hour.

20    Should we take a quick break?

21                MR. FIELDS:  Sure.  Okay.

22                MR. LEE:  Why don't we go off the record.

23                (Off the record at 12:30 p.m.)

24                (On the record at 12:37 p.m.)

25    BY MR. LEE:

                                              Page 49

1   ~~changes to fee structures would require a new lease, so~~

2   ~~existing leases would maintain existing fee structures.~~

3   ~~Q.   In other words, if there was a change to a 5~~

4   ~~percent late fee, it would only apply to new leases and~~

5   ~~not to existing leases; is that correct?~~

6   ~~A.   Yes.  A new lease agreement would have had to be~~

7   ~~signed for any changes to take effect.~~

8   ~~Q.   And do you have any reason to believe that you~~

9   ~~did not send that e-mail on May 23, 2008 at 1:03 p.m.?~~

10   ~~A.   No.~~

11   Q.   Okay.  Plaintiff's will mark ~~Exhibit 9~~ **[Trial Ex. 54]**.

12       (Deposition ~~Exhibit No. 9~~ **[Trial Ex. 54]** was marked for

13   identification.)

14   BY MR. LEE:

15   Q.   What has been marked as ~~Exhibit 9~~ **[Trial Ex. 54]** is a two-page

16   document bearing Bates stamp numbers WP004288 through

17   4289.  It is another e-mail exchange between Denise

18   Beihoffer and Mr. Jenkins.  Do you have ~~Exhibit 9~~ **[Trial Ex. 54]** in

19   front of you, Mr. Jenkins?

20   A.   Almost there.

21   Q.   Okay.

22   A.   Okay.  I've got it.

23   Q.   Do you recognize the e-mail that has been marked

24   as ~~Exhibit 9~~ **[Trial Ex. 54]**?

25   A.   I recognize that it's an e-mail discussion that

Page 52

1    I was a part of, but again don't specifically have

2    memories other than what's in here.

3        Q.   And if you look at the middle of the first page,

4    WP4288, the e-mail that we just discussed is there.  Do

5    you see that?  And this was where you said where you

6    discussed any changes to the late fees applying only to

7    new leases and not existing leases.  Do you see that?

8        A.   Yes.

9        Q.   And then above that there's an e-mail from

10   Denise Beihoffer to you that was sent on May 23, 2008 at

11   2:52 p.m.  Do you see that?

12       A.   Yes.

13       Q.   Okay.  And here Ms. Beihoffer wrote:

14            You are correct about that.  I'm just

15            not sure it's quite the slam dunk we

16            initially thought it is if the

17            percentage is calculated on the

18            lesser of the outstanding balance or

19            the rental rate unless of course

20            California is like Georgia and won't

21            take partial payments.  I also think

22            we want to make super sure they're

23            being consistent with the comps out

24            there and continuing to remain under

25            the radar of some very aggressive

```
 1              plaintiff's lawyers.
 2         Do you see that?
 3      A.    Yes.
 4      Q.    So when Ms. Beihoffer says:
 5              You are correct about that.  I'm just
 6              not sure it's quite the slam dunk we
 7              initially thought it is if the
 8              percentage is calculated on the
 9              lesser of the outstanding amount or
10              the rental rate.
11         What did Ms. Beihoffer mean by that?
12                  MR. FIELDS:  Calls for speculation.
13                  THE WITNESS:  You are correct about that
14      refers to the fact that any fee changes would require a
15      new lease to be signed, wouldn't affect leasing
16      agreements.  And the rest of that sounds like a proposal
17      for more research and alternate scenarios, so deeper
18      review on potential outcomes.
19      BY MR. LEE:
20         Q.    Was Ms. Beihoffer questioning whether the
21      percentage should be applied to the amount of outstanding
22      rent or the monthly rental rate?
23                  MR. FIELDS:  Calls for speculation.
24      Document speaks for itself.
25                  THE WITNESS:  The only thing I'm seeing
```

Page 54

1   here is that additional research needed to be done to

2   figure out, you know, how late fees were calculated and

3   applied.

4   BY MR. LEE:

5       Q.   I'm sorry.  I didn't hear that last portion of

6   your answer.  You said late fees calculated?

7       A.   Yeah.  Sorry.  I'm out here in the woods, so

8   sometimes my Internet goes wonky.  I'm saying that she is

9   asking -- it appears she's asking and talking about the

10  additional research needed to be done and potentially

11  additional scenarios needed to be looked at that might

12  change some earlier thoughts on it.

13      Q.   Okay.  I'll go ahead and mark plaintiff's next

14  exhibit which is Exhibit 10.                Trial Ex. 1566

15           (Deposition Exhibit No. 10 was marked for       Trial Ex. 1566

16  identification.)

17  BY MR. LEE:

18      Q.   What has been marked as Exhibit 10 is a two-page   Trial Ex. 1566

19  document bearing Bates stamp number WP004315 through

20  4316.  It is an e-mail exchange between Ms. Beihoffer and

21  Mr. Jenkins.  Do you have that up in front of you,

22  Mr. Jenkins?

23      A.   Yes.

24      Q.   Do you recognize the e-mail that has been marked

25  as Exhibit 10?       Trial Ex. 1566

Page 55

1        A.   I recognize that it's an e-mail that I'm sure I

2   received at that point in time.

3        Q.   And this is an e-mail sent by you to Denise

4   Beihoffer; is that correct?

5        A.   It appears so, yes.

6        Q.   Okay.  And it's dated May 27, 2008 at 12:04

7   p.m.?

8        A.   Yeah.

9        Q.   Do you have any reason to believe that you did

10  not write this e-mail?

11       A.   No.

12       Q.   And here you are responding to Ms. Beihoffer's

13  e-mail that we just discussed which was marked as

14  ~~Exhibit 9~~  [Trial Ex. 54] about the 5 percent late fee being applied to

15  the outstanding balance versus the rental rate; is that

16  right?

17       A.   That appears to be correct.

18       Q.   And you respond:

19            Yes, if it's not the full balance

20            then all bets are off.

21       Do you see that?

22       A.   Yes.

23       Q.   What did you mean by that?

24       A.   I can only say that it appears to be that I am

25  agreeing that potential different scenarios will result

Page 56

1    in the initial analysis being incorrect.

2         Q.   Did you mean that your analysis of the impact of

3    the 5 percent late fee was based on applying the 5

4    percent to the full rental rate?

5         A.   It appears from this e-mail that that's what is

6    being said.

7         Q.   And then you go on to say:

8              We are charging on partial balances

9              currently . . .

10        Do you see that?

11        A.   Yes.

12        Q.   What did you mean with that statement?

13        A.   I must be informing Denise that we were only

14   charging late fees on partial balances or that we were

15   charging late fees on partial balances.  Let me correct

16    that.

17        Q.   Plaintiff's will market Exhibit 11.

18             (Deposition Exhibit No. 11 was marked for

19   identification.)

20   BY MR. LEE:

21        Q.   What has been marked as Exhibit 11 is a two page

22   document bearing Bates stamp number WP004308 through

23   4309.  It's another e-mail exchange involving

24   Mr. Jenkins, Ms. Beihoffer, Mr. Santee, and a few other

25   Equity Residential employees.  Do you have Exhibit 8 up

Page 57

1    ~~default late fee or do something different.~~

2        Q.    Plaintiff's will mark ~~Exhibit 12~~. [Trial Ex. 1074]

3            (Deposition ~~Exhibit No. 12~~ [Trial Ex. 1074] was marked for

4    identification.)

5    BY MR. LEE:

6        Q.    What has been marked as ~~Exhibit 12~~ [Trial Ex. 1074] is a two-page

7    document bearing Bates stamp number WP004302 through

8    4304.  It's another e-mail exchange between Mr. Jenkins,

9    David Santee, Denise Beihoffer, Mickey Cummings, and

10   Bruce Lavine.  Do you have ~~Exhibit 12~~ [Trial Ex. 1074] in front of you,

11   Mr. Jenkins?

12       A.    Yes.

13       Q.    And do you recognize the e-mail that has been

14   marked as ~~Exhibit 12~~ [Trial Ex. 1074]?

15       A.    Similar to the other e-mails, I recognize it's

16   an e-mail that I was a part of -- chain that I was a part

17   of, but don't have specific recollections outside of

18   what's in the document.

19       Q.    And this is an e-mail sent by you to Denise

20   Beihoffer, David Santee, Mickey Cummings, Bruce Lavine on

21   June 2, 2008 at 2:37 p.m.; is that right?

22       A.    Yes.

23   ~~    Q.    And do you have any reason to believe that you~~

24   ~~did not write this e-mail?  I'm sorry.  I didn't hear a~~

25   ~~response.~~

                                        Page 60

```
 1                    CERTIFICATE OF REPORTER
 2
 3            I, TONI M. GEHM, a Certified Reporter in the
      State of Arizona, do hereby certify that the foregoing
 4    deposition was taken before me in the County of Maricopa,
      State of Arizona; that an oath or affirmation was duly
 5    administered by me to the witness, CHRISTOPHER JENKINS,
      pursuant to A.R.S. 41-324 (B); that the questions
 6    propounded to the witness and the answers of the witness
      thereto were taken down by me in shorthand and thereafter
 7    reduced to typewriting; that the 74-page transcript is a
      full, true, and accurate record of the proceeding, all
 8    done to the best of my skill and ability; that the
      preparation, production and distribution of the
 9    transcript and copies of the transcript comply with the
      Arizona Revised Statutes and in ACJA 7-206(F)(3); and
10    ACJA 7-206 J(1)(g)(1) and (2); and ACJA 7-206(J)(3)(b).
11            The witness herein, CHRISTOPHER JENKINS,
      requested to read and sign.
12
13            I FURTHER CERTIFY that I am in no way related
      to any of the parties nor am I in any way interested in
14    the outcome hereof.
15            IN WITNESS WHEREOF, I have set my hand in my
      office in the County of Maricopa, State of Arizona, this
16    26th day of February, 2021.
17
18
19            Toni Ghem
20
21            TONI M. GEHM, RPR
22            Arizona Certified Reporter No. 50935
23
24
25
```

Page 74

Exhibit 7

```
 1              UNITED STATES DISTRICT COURT
 2          FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4                    ---oOo---
 5
 6   JAVANNI MUNGUIA-BROWN,      )
     ANGELINA MAGANA, NORMA,     )
 7   RODRIGUEZ, and DAVID        )
     BONFANTI individually and   )
 8   on behalf of others         )
     similarly situated,         )
 9                               )
                 Plaintiffs,     )
10                               )
     vs.                         )No. 4:16-cv-01225-JSW-TSH
11                               )
     EQUITY RESIDENTIAL, a real  )
12   estate trust, ERP OPERATING )
     LIMITED PARTNERSHIP, a      )
13   partnership, EQUITY         )
     RESIDENTIAL MANAGEMENT, LLC,)
14   EQR WOODLAND PARK A LIMITED,)
     PARTNERSHIP, and            )
15   EQR-WOODLAND PARK B LIMITED )
     PARTNERSHIP,                )
16                               )
                 Defendants.     )
17   _____)
18
19          REMOTE ZOOM DEPOSITION OF CHAD JOHNSON
20                CHULA VISTA, CALIFORNIA
21                TUESDAY, JANUARY 5, 2021
22   Stenographically Reported by:  ANDREA M. IGNACIO, CSR,
23   RPR, CRR, CCRR, CLR ~ CSR LICENSE NO. 9830
24   JOB NO. 4392795
25   Pages 1 - 111
```

Page 1

| | | |
|---|---|---|
| 1 | REMOTE ZOOM DEPOSITION | 09:04 |
| 2 | TUESDAY, JANUARY 5, 2021 | 09:04 |
| 3 | 9:32 a.m. | 09:06 |
| 4 | | 09:21 |
| 5 | CHAD JOHNSON, | 09:21 |
| 6 | having been sworn as a witness, | 09:21 |
| 7 | by the Certified Shorthand Reporter, | 09:22 |
| 8 | testified as follows: | 09:22 |
| 9 | | 09:22 |
| 10 | EXAMINATION | 09:22 |
| 11 | BY MR. TOMASEVIC: | 09:22 |
| 12 | Q   Thank you. | 09:32 |
| 13 | Good morning, Mr. Johnson. | 09:32 |
| 14 | A   Good morning. | 09:32 |
| 15 | Q   My name is Alex Tomasevic.  I represent the | 09:32 |
| 16 | plaintiffs, including the certified class, in the case | 09:32 |
| 17 | against EQR that brings you here today for deposition. | 09:32 |
| 18 | Do me a favor, and for the record, please | 09:32 |
| 19 | state and spell your full name. | 09:32 |
| 20 | A   Chad Johnson.  C-H-A-D, J-O-H-N-S-O-N. | 09:32 |
| 21 | Q   Thank you, Mr. Johnson. | 09:32 |
| 22 | And are you currently employed? | 09:33 |
| 23 | A   Yes. | 09:33 |
| 24 | Q   Where do you work? | 09:33 |
| 25 | A   Terracina Apartments in Chula Visita, | 09:33 |

Page 5

| | | |
|---|---|---|
| 1 | California. | 09:33 |
| 2 | Q    Who is your employer? | 09:33 |
| 3 | A    Equity Residential. | 09:33 |
| 4 | Q    Okay.  From time to time, I'll refer to | 09:33 |
| 5 | Equity, or Equity Residential, or maybe even sometimes | 09:33 |
| 6 | the acronym EQR.  I mean the defendant Equity | 09:33 |
| 7 | Residential and your employer, for lack of a better | 09:33 |
| 8 | term; okay? | 09:33 |
| 9 | A    Okay. | 09:33 |
| 10 | Q    If at any point in time you don't understand | 09:33 |
| 11 | what I'm talking about, or we need to draw a | 09:33 |
| 12 | distinction between companies, or you're just unclear, | 09:33 |
| 13 | just ask me, and I'll be happy to clarify; okay? | 09:33 |
| 14 | A    Okay. | 09:33 |
| 15 | Q    Great. | 09:33 |
| 16 | And are you represented by an attorney in | 09:33 |
| 17 | this matter for this deposition? | 09:33 |
| 18 | A    Yes. | 09:33 |
| 19 | Q    And is your attorney Mr. Aaron Nguyen? | 09:33 |
| 20 | MR. FIELDS:  Justin Fields. | 09:33 |
| 21 | MR. TOMASEVIC:  I'm sorry. | 09:33 |
| 22 | Q    Justin Fields? | 09:33 |
| 23 | A    Yes. | 09:34 |
| 24 | Q    Thank you. | 09:34 |
| 25 | Do you have a written retainer agreement with | 09:34 |

Page 6

```
 1    Mr. Fields?                                      09:34
 2           THE WITNESS:  Justin, do I have one now?  09:34
 3           MR. FIELDS:  If you don't mind, the answer is 09:34
 4    no.                                              09:34
 5           THE WITNESS:  No.                          09:34
 6           MR. TOMASEVIC:  Thank you.                 09:34
 7       Q   When did you first learn that you were going 09:34
 8    to be possibly sitting for a deposition in this  09:34
 9    lawsuit?                                          09:34
10       A   I believe it was about three weeks ago.   09:34
11       Q   And when did you first learn that there was 09:34
12    this lawsuit?                                     09:34
13       A   I couldn't say for sure.  Sometime last year. 09:34
14       Q   How did you hear about the lawsuit?       09:34
15       A   A resident had brought it to my attention. 09:34
16       Q   What resident was that?                   09:34
17       A   I don't recall who it was.                09:34
18       Q   What unit did they live in?               09:34
19       A   I don't recall.                           09:34
20       Q   And what did they say?                    09:34
21       A   They said they received something either in 09:35
22    the mail or via e-mail about a -- some type of lawsuit 09:35
23    against Equity Residential.                       09:35
24       Q   Did you ever learn or see what they had   09:35
25    received or what they were talking about?         09:35
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | A   They forwarded me the e-mail that they | 09:35 |
| 2 | received or the paper copy of the mail.  I don't | 09:35 |
| 3 | remember if it was mail or e-mail. | 09:35 |
| 4 | Q   And what was it that was mail or e-mailed | 09:35 |
| 5 | that you saw? | 09:35 |
| 6 | A   It looked like a lawsuit based on late fees | 09:35 |
| 7 | against Equity. | 09:35 |
| 8 | Q   Do you know who the e-mail or the message | 09:35 |
| 9 | came from originally? | 09:35 |
| 10 | A   I don't.  No. | 09:35 |
| 11 | Q   Can you remember any of the content? | 09:35 |
| 12 | A   Specifically, I don't.  I just know the | 09:35 |
| 13 | general lawsuit based on the fairness of late fees. | 09:35 |
| 14 | Q   Thank you.  I appreciate that, and I | 09:35 |
| 15 | appreciate that I'm testing your memory here.  Just a | 09:35 |
| 16 | few more follow-up questions on this issue. | 09:36 |
| 17 | Now, when you say that you saw or understood | 09:36 |
| 18 | what was said to be a lawsuit, when I hear that, and I | 09:36 |
| 19 | hear lawsuit with my lawyer brain, I think a formal | 09:36 |
| 20 | written complaint filed in a court of law.  It's | 09:36 |
| 21 | probably a couple of dozen pages in black and white, | 09:36 |
| 22 | and it's a -- it's called a complaint. | 09:36 |
| 23 | Are you saying that that's what you saw, or | 09:36 |
| 24 | did you see some kind of e-mail or message or | 09:36 |
| 25 | something else? | 09:36 |

Page 8

| | | |
|---|---|---|
| 1 | MS. ALEXANDER:  Argumentative. | 09:43 |
| 2 | MR. TOMASEVIC:  Q.  You can answer. | 09:43 |
| 3 | THE WITNESS:  Still answer? | 09:43 |
| 4 | MS. ALEXANDER:  Yeah. | 09:43 |
| 5 | So when -- if I object and I haven't | 09:43 |
| 6 | instructed you not to answer, oftentimes you'll -- | 09:43 |
| 7 | you'll just answer the question as best you can. | 09:44 |
| 8 | THE WITNESS:  I have access to look up any | 09:44 |
| 9 | e-mail at any time. | 09:44 |
| 10 | MR. TOMASEVIC:  Okay. | 09:44 |
| 11 | Justin, would you mind taking a peak at that | 09:44 |
| 12 | e-mail during the break to confirm that it's a | 09:44 |
| 13 | privileged e-mail, or if you'll let the witness answer | 09:44 |
| 14 | additional questions about it? | 09:44 |
| 15 | MS. ALEXANDER:  I'm fairly confident that | 09:44 |
| 16 | we're talking about privileged communication.  If I | 09:44 |
| 17 | have the opportunity during the break to find the | 09:44 |
| 18 | e-mail that he's referring to, I can relay that to you | 09:44 |
| 19 | at that point. | 09:44 |
| 20 | MR. TOMASEVIC:  Thank you. | 09:44 |
| 21 | Q    Do you still live at Market Street Village? | 09:44 |
| 22 | A    Yes. | 09:44 |
| 23 | Q    And what's your address there? | 09:44 |
| 24 | A    699 14th Street, Apartment 232, San Diego, | 09:44 |
| 25 | California 92101. | 09:44 |

Page 15

| | | | |
|---|---|---|---|
| 1 | Q | How long have you lived there? | 09:44 |
| 2 | A | I think it will be three years this month. | 09:44 |
| 3 | Q | And when -- when is your lease up? | 09:45 |
| 4 | A | I believe in -- sometime in January or | 09:45 |
| 5 | February. | | 09:45 |
| 6 | Q | Do you plan to sign a new lease? | 09:45 |
| 7 | A | Yes. | 09:45 |
| 8 | Q | Have you ever had your deposition taken | 09:45 |
| 9 | before? | | 09:45 |
| 10 | A | Yes. | 09:45 |
| 11 | Q | How many times? | 09:45 |
| 12 | A | One. | 09:45 |
| 13 | Q | Was it while you were at EQR or at a | 09:45 |
| 14 | different -- when you had a different job? | | 09:45 |
| 15 | A | Previous employer. | 09:45 |
| 16 | Q | Did it have to do with your previous | 09:45 |
| 17 | employment? | | 09:45 |
| 18 | A | No. | 09:45 |
| 19 | Q | What was generally that case or that | 09:45 |
| 20 | deposition about? | | 09:45 |
| 21 | A | It was a slip-and-fall incident that I work | 09:45 |
| 22 | at that property. | | 09:45 |
| 23 | Q | This is when you were at Waterton | 09:45 |
| 24 | Residential? | | 09:45 |
| 25 | A | Correct. | 09:45 |

Page 16

| | | |
|---|---|---|
| 1 | conversation that you had with a resident about this | 09:50 |
| 2 | lawsuit, or what was probably this lawsuit, in | 09:50 |
| 3 | connection with a notice that they received and | 09:50 |
| 4 | relayed to you; right? | 09:50 |
| 5 | A   Yes. | 09:50 |
| 6 | Q   Now, have you had any other conversations | 09:50 |
| 7 | with anyone else in the world about this lawsuit? | 09:50 |
| 8 | A   Yes. | 09:50 |
| 9 | Q   Who? | 09:50 |
| 10 | A   My wife. | 09:50 |
| 11 | Q   Anyone else? | 09:50 |
| 12 | A   No. | 09:50 |
| 13 | Q   Have you lived at any EQR properties besides | 09:50 |
| 14 | Market Street Village? | 09:51 |
| 15 | A   No. | 09:51 |
| 16 | Q   Have you ever been charged a late fee while | 09:51 |
| 17 | living at Market Street Village? | 09:51 |
| 18 | A   No. | 09:51 |
| 19 | Q   Now, you attended the University of Illinois | 09:51 |
| 20 | at Urbana Champagne; right? | 09:51 |
| 21 | A   Yes. | 09:51 |
| 22 | Q   And you have a bachelor's degree there in | 09:51 |
| 23 | political science and government? | 09:51 |
| 24 | A   Yes. | 09:51 |
| 25 | Q   Any other degrees or concentrations while at | 09:51 |

Page 21

| | | |
|---|---|---|
| 1 | the University of Illinois? | 09:51 |
| 2 | A   No. | 09:51 |
| 3 | Q   Any other post high school education other | 09:51 |
| 4 | than the University of Illinois? | 09:51 |
| 5 | A   No. | 09:51 |
| 6 | Q   Any licenses other than a driver's license? | 09:51 |
| 7 | A   No. | 09:51 |
| 8 | Q   Ever been convicted of a crime? | 09:51 |
| 9 | A   No. | 09:52 |
| 10 | Q   Charged with a felony? | 09:52 |
| 11 | A   No. | 09:52 |
| 12 | Q   Have you ever worked in apartment leasing or | 09:52 |
| 13 | multi-family residential apartments other than at | 09:52 |
| 14 | Equity and Waterton Residential? | 09:52 |
| 15 | A   No. | 09:52 |
| 16 | Q   When did you first start with Equity | 09:52 |
| 17 | Residential? | 09:52 |
| 18 | A   I think it's six years in March.  So two | 09:52 |
| 19 | months it will be six years. | 09:52 |
| 20 | Q   So about March of 2015 is when you started | 09:52 |
| 21 | with Equity Residential? | 09:52 |
| 22 | A   I believe so, yes. | 09:52 |
| 23 | Q   Did you start as a community manager at | 09:52 |
| 24 | Del Mar Heights Apartments? | 09:52 |
| 25 | A   Yes. | 09:52 |

Page 22

| | | |
|---|---|---|
| 1 | Q    For how long were you there? | 09:52 |
| 2 | A    Approximately two years. | 09:53 |
| 3 | Q    How did you get the job as the community | 09:53 |
| 4 | manager at Del Mar Heights? | 09:53 |
| 5 | A    I responded to -- sorry.  I knew someone who | 09:53 |
| 6 | worked at the Equity corporate office for my time when | 09:53 |
| 7 | I lived in Chicago, and he mentioned that they were | 09:53 |
| 8 | hiring after I had moved out to San Diego. | 09:53 |
| 9 | Q    Was that from Chicago that you moved? | 09:53 |
| 10 | A    Yes. | 09:53 |
| 11 | Q    And so you applied for an open community | 09:53 |
| 12 | manager position at Del Mar Heights Apartments? | 09:53 |
| 13 | A    Yes. | 09:53 |
| 14 | Q    Eventually you got an interview? | 09:53 |
| 15 | A    Yes. | 09:53 |
| 16 | Q    Who did you interview with? | 09:53 |
| 17 | A    Ginger Strutton.  Her last name has changed | 09:53 |
| 18 | now.  But Ginger, who is a regional manager of that | 09:53 |
| 19 | area at the time. | 09:53 |
| 20 | Q    Is Ginger still with the company? | 09:53 |
| 21 | A    Yes. | 09:53 |
| 22 | Q    Do you know what her title is now? | 09:53 |
| 23 | A    Regional manager. | 09:54 |
| 24 | Q    And what's her region? | 09:54 |
| 25 | A    South Orange County, North San Diego. | 09:54 |

Page  23

```
 1        Q   Do you know what Ginger's married last name      09:54

 2    is currently?                                            09:54

 3        A   I can't remember it.  I -- when I worked with    09:54

 4    her, it was always Strutton, and she changed right       09:54

 5    after that and switched regions.                         09:54

 6        Q   And what did you do as a community manager at    09:54

 7    the Del Mar Heights Apartments?                          09:54

 8        A   Managed the assets, managed the team, kept       09:54

 9    apartments full, kept people happy.                      09:54

10        Q   How many units are at Del Mar Heights            09:54

11    Apartments?                                              09:54

12        A   I believe it was 168.                            09:54

13        Q   And what kinds of units are at Del Mar           09:54

14    Heights Apartments?                                      09:54

15        A   Do you mean size of the apartments?              09:55

16        Q   Yeah.  I mean, like, studios, one bedrooms,      09:55

17    two bedrooms.                                            09:55

18        A   One and two bedrooms.                            09:55

19        Q   And what's the cheapest rent at Del Mar          09:55

20    Heights Apartments, as far as you're aware?              09:55

21            MS. ALEXANDER:  Vague as to time.                09:55

22            THE WITNESS:  I -- it's -- it's been so long,    09:55

23    I can't remember.  I'd be guessing.                      09:55

24            MR. TOMASEVIC:  Q.  What's the last rent that    09:55

25    you recall for a one-bedroom apartment at Del Mar        09:55
```

Page 24

| | | |
|---|---|---|
| 1 | Heights? | 09:55 |
| 2 | A   I -- I don't know.  I can't recall. | 09:55 |
| 3 | Q   What -- what was the most expensive rent at | 09:55 |
| 4 | Del Mar Heights? | 09:55 |
| 5 | MS. ALEXANDER:  Vague as to time. | 09:55 |
| 6 | THE WITNESS:  Anywhere from 2,200 to 2,500 | 09:55 |
| 7 | and -- | 09:55 |
| 8 | MR. TOMASEVIC:  Q.  What's your rent -- oh, | 09:55 |
| 9 | I'm sorry.  I cut you off. | 09:55 |
| 10 | A   I'm sorry.  I don't remember specifically. | 09:55 |
| 11 | Q   What kind of apartment units are at Market | 09:55 |
| 12 | Street Village? | 09:56 |
| 13 | A   Studios, one bedroom and two bedrooms. | 09:56 |
| 14 | Q   What kind do you occupy right now? | 09:56 |
| 15 | A   A two bedroom. | 09:56 |
| 16 | Q   And what's your rent? | 09:56 |
| 17 | A   I honestly don't even know that. | 09:56 |
| 18 | Q   Fair enough. | 09:56 |
| 19 | What's the typical -- strike that. | 09:56 |
| 20 | What's the highest rent charged at Market | 09:56 |
| 21 | Street Village, if you know? | 09:56 |
| 22 | A   I don't know that. | 09:56 |
| 23 | Q   Or what does a typical two-bedroom unit rent | 09:56 |
| 24 | cost for Market Street Village? | 09:56 |
| 25 | A   I don't.  I don't know.  I'm not involved in | 09:56 |

Page 25

| | | |
|---|---|---|
| 1 | their pricing. | 09:56 |
| 2 | Q   Do you receive a discount by virtue of your | 09:56 |
| 3 | employment at EQR? | 09:56 |
| 4 | A   Yes. | 09:56 |
| 5 | Q   Meaning a discounted rent? | 09:56 |
| 6 | A   Yes. | 09:56 |
| 7 | Q   Do you know what that discount is? | 09:56 |
| 8 | A   I believe it's 20 percent off the market | 09:56 |
| 9 | rate. | 09:56 |
| 10 | Q   Do you know what any of the rental rates are | 09:56 |
| 11 | for any of the units at Market Street Village? | 09:57 |
| 12 | A   I can guess, but I'd -- just like in my | 09:57 |
| 13 | property, they change day to day, so it's hard to keep | 09:57 |
| 14 | track of them unless I'm looking at their price sheet. | 09:57 |
| 15 | Q   They change?  What do you mean by that? | 09:57 |
| 16 | A   Just like airfare.  Supply and demand | 09:57 |
| 17 | dictates the price, and they change day to day. | 09:57 |
| 18 | Q   You mean literally day to day?  Like an | 09:57 |
| 19 | apartment price could be different from Monday to | 09:57 |
| 20 | Tuesday, and then different again on Wednesday? | 09:57 |
| 21 | A   Correct. | 09:57 |
| 22 | MS. ALEXANDER:  Misstate -- misstates the | 09:57 |
| 23 | testimony as to what he's talking about. | 09:57 |
| 24 | Go ahead. | 09:57 |
| 25 | THE WITNESS:  Correct. | 09:57 |

Page 26

| | | |
|---|---|---|
| 1 | ~~MR. TOMASEVIC:  Q.  Well, how often in the~~ | 09:57 |
| 2 | ~~last month have the rents changed?  Well, strike that.~~ | 09:57 |
| 3 | Is it that a new rental rate is established | 09:57 |
| 4 | for every apartment as soon as it becomes available? | 09:57 |
| 5 | A   Yes. | 09:58 |
| 6 | Q   So are you telling me that an analysis is | 09:58 |
| 7 | done with every individual available apartment at the | 09:58 |
| 8 | time that it becomes available, or at the time it | 09:58 |
| 9 | potentially gets leased? | 09:58 |
| 10 | MS. ALEXANDER:  Calls for speculation; vague | 09:58 |
| 11 | and ambiguous. | 09:58 |
| 12 | THE WITNESS:  We have an automated system | 09:58 |
| 13 | that generates price based on a number of factors, | 09:58 |
| 14 | yes. | 09:58 |
| 15 | MR. TOMASEVIC:  Q.  Well, let's focus on | 09:58 |
| 16 | Terracina, because I imagine that's what you're most | 09:58 |
| 17 | familiar with. | 09:58 |
| 18 | Describe to me the automated system that | 09:58 |
| 19 | dictates the rental rate at Terracina? | 09:58 |
| 20 | MR. FIELDS:  Calls for speculation; | 09:58 |
| 21 | overbroad. | 09:58 |
| 22 | THE WITNESS:  From my understanding, it is | 09:58 |
| 23 | based on the number of vacant apartments, the time of | 09:58 |
| 24 | year, recent renewal rates, recent new lease rates.  A | 09:59 |
| 25 | number of factors go into the pricing. | 09:59 |

Page 27

| | | |
|---|---|---|
| 1 | A   One, two and three-bedroom apartments. | 10:01 |
| 2 | Q   What's the cheapest rent you're aware of | 10:01 |
| 3 | being charged at Terracina? | 10:01 |
| 4 | A   Just under $2,000. | 10:01 |
| 5 | Q   And what's the most expensive? | 10:01 |
| 6 | A   Somewhere between 2,900 to 3,000. | 10:01 |
| 7 | Q   And there are 440 units at Terracina | 10:02 |
| 8 | currently? | 10:02 |
| 9 | A   Yes. | 10:02 |
| 10 | Q   Do you know the specific name or legal name | 10:02 |
| 11 | of the entity that technically employs you? | 10:02 |
| 12 | A   They get -- it's EQR Limited Partnership. | 10:02 |
| 13 | Something like that.  I don't know the last bit. | 10:02 |
| 14 | Q   Understood. | 10:02 |
| 15 | Does this EQR Limited Partnership entity that | 10:02 |
| 16 | you just referenced appear on your pay stub or | 10:02 |
| 17 | electronic pay stub, to your knowledge? | 10:02 |
| 18 | A   It might.  I don't look at my paycheck stubs | 10:02 |
| 19 | that often. | 10:02 |
| 20 | Q   I hear you. | 10:02 |
| 21 | Have you ever heard of the entity Equity | 10:02 |
| 22 | Residential Services LLC? | 10:02 |
| 23 | A   No.  Services LLC, no. | 10:02 |
| 24 | Q   Right.  Okay. | 10:02 |
| 25 | So you became a community manager at | 10:02 |

Page 30

| | | |
|---|---|---|
| 1 | Terracina in February of 2017? | 10:03 |
| 2 | A    Yes. | 10:03 |
| 3 | Q    And that's your current position? | 10:03 |
| 4 | A    Yes. | 10:03 |
| 5 | Q    Have you ever had any jobs or titles at | 10:03 |
| 6 | Equity Residential, other than community manager at | 10:03 |
| 7 | Del Mar Heights and community manager at Terracina? | 10:03 |
| 8 | A    No. | 10:03 |
| 9 | Q    Have your community manager jobs at EQR | 10:03 |
| 10 | always been full-time jobs? | 10:03 |
| 11 | A    Yes. | 10:03 |
| 12 | Q    What was your schedule while a community | 10:03 |
| 13 | manager at Del Mar Heights Apartments? | 10:03 |
| 14 | A    Monday through Friday. | 10:03 |
| 15 | Q    And what about the hours? | 10:03 |
| 16 | A    9:00 a.m. to 6:00 p.m. | 10:03 |
| 17 | Q    And what was your schedule when you first | 10:03 |
| 18 | started at Terracina as a community manager? | 10:03 |
| 19 | A    The same schedule. | 10:03 |
| 20 | Q    What is it today? | 10:03 |
| 21 | A    The same schedule.  9:00 a.m. to 6:00 p.m., | 10:03 |
| 22 | Monday through Friday. | 10:03 |
| 23 | Q    So at all times you were a community manager | 10:04 |
| 24 | for EQR in California, your schedule has always been | 10:04 |
| 25 | 9:00 a.m. to 6:00 p.m., Monday through Friday? | 10:04 |

Page 31

| | | |
|---|---|---|
| 1 | ~~minor repairs. But mostly paint and preparing~~ | 10:17 |
| 2 | ~~apartments for new move-ins.~~ | 10:17 |
| 3 | Q   So when you're fully staffed at Terracina, | 10:17 |
| 4 | how many employees are on site? | 10:17 |
| 5 | A   Ten, including myself. | 10:17 |
| 6 | Q   And when you were fully staffed at Del Mar | 10:17 |
| 7 | Heights, how many employees were on the staff? | 10:17 |
| 8 | A   Four, including myself. | 10:17 |
| 9 | ~~Q   Is it part of your job at Terracina to make~~ | 10:17 |
| 10 | ~~hiring or firing decisions?~~ | 10:18 |
| 11 | ~~A   I would say I wouldn't have the full~~ | 10:18 |
| 12 | ~~authority to do so, but I can make recommendations and~~ | 10:18 |
| 13 | ~~consult with other -- you know, my supervisor, to come~~ | 10:18 |
| 14 | ~~to that decision.~~ | 10:18 |
| 15 | ~~Q   Would your answer be the same for Del Mar~~ | 10:18 |
| 16 | ~~Heights?~~ | 10:18 |
| 17 | ~~A   Yes.~~ | 10:18 |
| 18 | ~~Q   Let's talk a little bit more about your~~ | 10:18 |
| 19 | ~~typical day.~~ | 10:18 |
| 20 | ~~Typically, you show up around 9:00 a.m.; is~~ | 10:18 |
| 21 | ~~that right?~~ | 10:18 |
| 22 | ~~A   Yes.~~ | 10:18 |
| 23 | ~~Q   Are you punching a clock or clocking in at~~ | 10:18 |
| 24 | ~~Terracina?~~ | 10:18 |
| 25 | ~~A   No.~~ | 10:18 |

Page  42

| | | |
|---|---|---|
| 1 | Q   Were you punching a clock at Del Mar Heights | 10:18 |
| 2 | Apartments? | 10:18 |
| 3 | A   No. | 10:18 |
| 4 | Q   Do you know if any logs were ever kept of | 10:18 |
| 5 | your time actually starting work at Terracina or at | 10:18 |
| 6 | Del Mar Heights Apartments? | 10:19 |
| 7 | A   No. | 10:19 |
| 8 | Q   During your employment with EQR, have you | 10:19 |
| 9 | ever kept track of the time you spent performing | 10:19 |
| 10 | particular duties? | 10:19 |
| 11 | A   No. | 10:19 |
| 12 | Q   During your employment with Equity | 10:19 |
| 13 | Residential, do you know if anyone has kept track of | 10:19 |
| 14 | the time that you spent performing any particular | 10:19 |
| 15 | duties? | 10:19 |
| 16 | MS. ALEXANDER:  Vague and ambiguous. | 10:19 |
| 17 | THE WITNESS:  I have no way of knowing that. | 10:19 |
| 18 | There's a lot of employees. | 10:19 |
| 19 | MR. TOMASEVIC:  Q.  Has anyone at Equity | 10:19 |
| 20 | Residential ever asked you to keep track of your time | 10:19 |
| 21 | or to track the time you spend on particular duties? | 10:19 |
| 22 | A   No, not that I recall. | 10:19 |
| 23 | Q   Let's get to the issue of late fees. | 10:20 |
| 24 | What was the late fee or late fee arrangement | 10:20 |
| 25 | charged at Del Mar Heights Apartments? | 10:20 |

Page  43

| | | |
|---|---|---|
| 1 | A   I don't know it specifically. | 10:20 |
| 2 | Q   Was it a percentage of rent, minimum $50? | 10:20 |
| 3 | A   I believe it was a minimum of $50, plus a | 10:20 |
| 4 | percentage of the outstanding rent.  I just don't know | 10:20 |
| 5 | the percentage off the top of my head. | 10:20 |
| 6 | Q   What is the current late fee charged at | 10:20 |
| 7 | Terracina? | 10:20 |
| 8 | A   The same answer.  I don't know that | 10:20 |
| 9 | percentage, but same structure. | 10:20 |
| 10 | Q   So as far as you know, the late fee charges | 10:20 |
| 11 | or structure at Terracina are the same as they were | 10:20 |
| 12 | when you were the community manager at Del Mar | 10:20 |
| 13 | Heights? | 10:21 |
| 14 | A   I don't know if they've changed it since that | 10:21 |
| 15 | time.  I don't know with certainty if it's been | 10:21 |
| 16 | changed between then and now. | 10:21 |
| 17 | Q   Have you ever known there to be anything | 10:21 |
| 18 | other than the one late fee charge arrangement that | 10:21 |
| 19 | you're currently charging at Terracina? | 10:21 |
| 20 | A   I'm sorry.  Can you repeat that? | 10:21 |
| 21 | Q   Has Terracina ever charged a late fee or late | 10:21 |
| 22 | fee structure, other than the one it currently | 10:21 |
| 23 | charges, to your knowledge? | 10:21 |
| 24 | MS. ALEXANDER:  Over -- overbroad as to time. | 10:21 |
| 25 | THE WITNESS:  I don't believe so. | 10:21 |

Page 44

| | | |
|---|---|---|
| 1 | Q   And are the Terracina Apartments on the MRI | 10:22 |
| 2 | system? | 10:23 |
| 3 | A   Yes. | 10:23 |
| 4 | Q   And what is the MRI system? | 10:23 |
| 5 | MS. ALEXANDER:  Calls for speculation as | 10:23 |
| 6 | phrased. | 10:23 |
| 7 | THE WITNESS:  Just that, a property manager | 10:23 |
| 8 | software system. | 10:23 |
| 9 | MR. TOMASEVIC:  Q.  How do you use MRI in | 10:23 |
| 10 | your job as community manager at Terracina? | 10:23 |
| 11 | A   There's -- it's very vague, but I use it to | 10:23 |
| 12 | basically store and house everything related to | 10:23 |
| 13 | residents, leases, statements, contact info. | 10:23 |
| 14 | Q   Does EQR use MRI to generate automatic | 10:23 |
| 15 | reports of tenants and their unpaid balances, if any? | 10:23 |
| 16 | A   I don't know if they have a specific report. | 10:24 |
| 17 | I don't use one of those reports for -- | 10:24 |
| 18 | Q   Sorry about that. | 10:24 |
| 19 | Does MRI send notices or e-mails to tenants | 10:24 |
| 20 | at Terracina? | 10:24 |
| 21 | A   I don't know if MRI initiates any of those | 10:24 |
| 22 | type of e-mails, but I would imagine they start at MRI | 10:24 |
| 23 | and go through an e-mail server and send out e-mails, | 10:24 |
| 24 | yes. | 10:24 |
| 25 | Q   At Terracina, do you know approximately what | 10:24 |

Page 46

| | | |
|---|---|---|
| 1 | percentage or how many of the units pay their rent | 10:24 |
| 2 | after the 1st of the month? | 10:24 |
| 3 | MS. ALEXANDER:  Vague as to time. | 10:24 |
| 4 | THE WITNESS:  I would estimate anywhere from | 10:24 |
| 5 | 40 to 60 percent pay after the first. | 10:25 |
| 6 | MR. TOMASEVIC:  Q.  And how many residents or | 10:25 |
| 7 | tenants at Terracina pay after the 4th?  Meaning, they | 10:25 |
| 8 | have incurred a late fee charge? | 10:25 |
| 9 | ~~MS. ALEXANDER:  Vague as to time.~~ | 10:25 |
| 10 | THE WITNESS:  It can vary month to month, but | 10:25 |
| 11 | the number of apartments that pay after the 4th can | 10:25 |
| 12 | range anywhere from 30 to 60. | 10:25 |
| 13 | ~~MR. TOMASEVIC:  Q.  Out of 440 total~~ | 10:25 |
| 14 | ~~apartments?~~ | 10:25 |
| 15 | ~~A   Yes.~~ | 10:25 |
| 16 | Q   Now, has that range of apartments of tenants | 10:25 |
| 17 | that pay after the expiration of a grace period | 10:25 |
| 18 | changed, in your estimation, over time? | 10:25 |
| 19 | A   Yes. | 10:25 |
| 20 | ~~MS. ALEXANDER:  Vague and ambiguous.~~ | 10:25 |
| 21 | ~~MR. TOMASEVIC:  Q.  How so?~~ | 10:26 |
| 22 | A   COVID has impacted a lot of people.  So we | 10:26 |
| 23 | have been working with a lot of people on payment | 10:26 |
| 24 | arrangements, allowing them to pay late and not get | 10:26 |
| 25 | late fees assessed. | 10:26 |

Page 47

```
 1          MR. TOMASEVIC:  Q.  You've seen that since       10:26
 2   COVID, a greater percentage of people at Terracina are  10:26
 3   paying their rent after the expiration of the grace     10:26
 4   period?                                                 10:26
 5      A   Yes.                                             10:26
 6      Q   So let's talk about pre-COVID.                   10:26
 7          Before COVID, about what percentage or what      10:26
 8   number of tenants at Terracina paid their rent after    10:26
 9   the expiration of the grace period?                     10:26
10      A   The same number I had given you.  I'm sorry.     10:26
11   When you first asked, I was thinking pre-COVID.         10:26
12      Q   Okay.  What's the number today, or               10:26
13   post-COVID?                                             10:26
14      A   Percentage-wise, it's probably over half of      10:26
15   the apartments are paying after the 4th.                10:26
16      Q   Okay.  So let me just clean this up and make     10:27
17   sure that I understand.                                 10:27
18          Before COVID, in a typical month, maybe 30 to    10:27
19   50 out of the 440 units at Terracina would pay their    10:27
20   rent after the expiration of the grace period?          10:27
21          MS. ALEXANDER:  Misstates the testimony.  He     10:27
22   said 30 to 60.                                          10:27
23          THE WITNESS:  Yeah, 30 to 60 typically.  But     10:27
24   again, it could vary.  You know, there's months where   10:27
25   it's always around 60.  There's some months it's more   10:27
```

Page 48

| | | |
|---|---|---|
| 1 | around 30.  It's just a wide range. | 10:27 |
| 2 | MR. TOMASEVIC:  Q.  And since COVID, how have | 10:27 |
| 3 | those numbers changed, if at all? | 10:27 |
| 4 | A   I would say an estimate, anywhere from 40 to | 10:27 |
| 5 | 60 percent of people are paying after the 4th of the | 10:27 |
| 6 | month. | 10:27 |
| 7 | Q   Do you know how that percentage of late | 10:27 |
| 8 | payers is the same or different when compared to other | 10:28 |
| 9 | Equity Residential properties elsewhere in California? | 10:28 |
| 10 | MS. ALEXANDER:  Vague; vague as to time and | 10:28 |
| 11 | overbroad. | 10:28 |
| 12 | THE WITNESS:  Are you referring to COVID | 10:28 |
| 13 | time? | 10:28 |
| 14 | MR. TOMASEVIC:  Right. | 10:28 |
| 15 | THE WITNESS:  So it -- we have a | 10:28 |
| 16 | disproportionately higher number of people paying late | 10:28 |
| 17 | after the 4th compared to most properties in San Diego | 10:28 |
| 18 | I can refer to.  I don't know about the rest of the -- | 10:28 |
| 19 | the region. | 10:28 |
| 20 | MR. TOMASEVIC:  Q.  Do you know why that is? | 10:28 |
| 21 | A   Why I don't know that, or why I -- | 10:28 |
| 22 | Q   I'm sorry.  I'm sorry.  No, no.  That's a | 10:28 |
| 23 | fair question. | 10:28 |
| 24 | Do you know why Terracina is apparently more | 10:28 |
| 25 | impacted by COVID in terms of late rent payments than | 10:29 |

Page 49

| | | |
|---|---|---|
| 1 | other apartments in the San Diego region? | 10:28 |
| 2 | A   I would be speculating.  I have no idea. | 10:29 |
| 3 | Q   Do Equity Residential employees at Terracina | 10:29 |
| 4 | take any action to try to collect unpaid rent between | 10:29 |
| 5 | the 1st of the month and the expiration of the grace | 10:29 |
| 6 | period? | 10:29 |
| 7 | A   You said do employees? | 10:29 |
| 8 | Q   Right. | 10:29 |
| 9 | A   From time to time, we do. | 10:29 |
| 10 | Q   How so? | 10:29 |
| 11 | A   It may include reaching -- sending e-mails | 10:29 |
| 12 | to -- to people who aren't on time, calling them. | 10:29 |
| 13 | When people, you know, call the office asking for | 10:29 |
| 14 | their balance, maybe a reminder, you know, to make | 10:30 |
| 15 | sure you pay by the 4th to avoid a late fee. | 10:30 |
| 16 | Q   So how many residences per month typically | 10:30 |
| 17 | will EQR employees at Terracina reach out to, before | 10:30 |
| 18 | the expiration of the grace period, to try to collect | 10:30 |
| 19 | unpaid rent? | 10:30 |
| 20 | MS. ALEXANDER:  Vague; vague as to time; | 10:30 |
| 21 | overbroad; vague as to time. | 10:30 |
| 22 | THE WITNESS:  There is no way for me to know | 10:30 |
| 23 | everyone else in the office, how many conversations | 10:30 |
| 24 | they have like that.  I can only refer to my time. | 10:30 |
| 25 | MR. TOMASEVIC:  Q.  How much time do you | 10:30 |

Page 50

| | | |
|---|---|---|
| 1 | spend talking to people before the expiration of the | 10:30 |
| 2 | grace period about unpaid rent at Terracina? | 10:30 |
| 3 | MS. ALEXANDER:  Vague as to time; overbroad; | 10:30 |
| 4 | misstates the testimony. | 10:30 |
| 5 | THE WITNESS:  Are you asking in any given day | 10:30 |
| 6 | or any typical month? | 10:31 |
| 7 | MR. TOMASEVIC:  Both. | 10:31 |
| 8 | THE WITNESS:  Well, the day can vary greatly | 10:31 |
| 9 | from, you know, the beginning of the month to the end | 10:31 |
| 10 | of the month.  I'd say in any typical month the amount | 10:31 |
| 11 | of time spent having those conversations before the | 10:31 |
| 12 | 4th is probably five hours, five to eight hours, | 10:31 |
| 13 | depending on time of the month, time of the year it | 10:31 |
| 14 | is. | 10:31 |
| 15 | MR. TOMASEVIC:  Q.  So you're spending an | 10:31 |
| 16 | hour or two a week talking to people whose rent isn't | 10:31 |
| 17 | late enough to generate a late fee? | 10:31 |
| 18 | MS. ALEXANDER:  Argumentive and overbroad. | 10:31 |
| 19 | THE WITNESS:  So yeah, there are a lot of | 10:31 |
| 20 | those conversations that -- that happen.  Some of them | 10:31 |
| 21 | are seven minutes long.  Some of them lead to the | 10:32 |
| 22 | 15-minute long conversations.  So yes, that's why I | 10:32 |
| 23 | gave a big range.  It can range from five to eight | 10:32 |
| 24 | hours on those specific conversations before the 4th. | 10:32 |
| 25 | Q  So I can understand the situation where a | 10:32 |

Page 51

| | | |
|---|---|---|
| 1 | you? | 10:33 |
| 2 | A   No. | 10:33 |
| 3 | MR. FIELDS:  Vague and ambiguous. | 10:33 |
| 4 | MR. TOMASEVIC:  Q.  So how do you know who to | 10:33 |
| 5 | call? | 10:33 |
| 6 | A   You do this long enough, you start seeing the | 10:33 |
| 7 | same names show up on the same list, so you recognize | 10:33 |
| 8 | their names and you recognize them.  You see them out | 10:33 |
| 9 | and about, and you talk with them and encourage them | 10:33 |
| 10 | to -- to make sure to pay on time because, you know, | 10:34 |
| 11 | you don't want to charge them a late fee. | 10:34 |
| 12 | Q   So walk me through your process of contacting | 10:34 |
| 13 | one of these habitual late payers before the | 10:34 |
| 14 | expiration of the late period. | 10:34 |
| 15 | A   The process could be looking up an MRI who | 10:34 |
| 16 | has not yet paid.  There's a screen that shows | 10:34 |
| 17 | everyone that, and contacting them.  Especially if | 10:34 |
| 18 | they're over -- you know, there would be more than one | 10:34 |
| 19 | month past due. | 10:34 |
| 20 | Q   There is a report generated by MRI that tells | 10:34 |
| 21 | you who the habitual late payers are? | 10:34 |
| 22 | MS. ALEXANDER:  Misstates the testimony. | 10:34 |
| 23 | THE WITNESS:  It's not a report in the sense | 10:34 |
| 24 | where I have to put in filters and things like that, | 10:34 |
| 25 | and I click submit, and it prints out a report.  It's | 10:35 |

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | a specific screen within MRI I can click on, and it | 10:35 |
| 2 | will just show me a snapshot of everyone's -- anyone | 10:35 |
| 3 | who owes money. | 10:35 |
| 4 | MR. TOMASEVIC:   Q.   What do you call that | 10:35 |
| 5 | screen? | 10:35 |
| 6 | A   I think it's just delinquency tab. | 10:35 |
| 7 | Q   So you referred to the MRI delinquency tab, | 10:35 |
| 8 | and then what do you do? | 10:35 |
| 9 | A   I would -- I could either send an e-mail or | 10:35 |
| 10 | pick up the phone and call them and have a discussion | 10:35 |
| 11 | and encourage them to pay.  Lay out, you know, | 10:35 |
| 12 | potential next steps. | 10:35 |
| 13 | Q   What criteria do you use to determine whether | 10:35 |
| 14 | you're going to send an e-mail or do a phone call? | 10:35 |
| 15 | A   Depends on my mood.  I don't really have a | 10:35 |
| 16 | criteria laid out. | 10:35 |
| 17 | Q   Fair enough. | 10:36 |
| 18 | And when you're writing an e-mail what would, | 10:36 |
| 19 | a typical e-mail say? | 10:36 |
| 20 | A   I -- if I have to write one our, it would say | 10:36 |
| 21 | something like, you know, hey, your -- this is the | 10:36 |
| 22 | amount of money that's past due from last month, and | 10:36 |
| 23 | to avoid a potential late fee again and getting | 10:36 |
| 24 | further behind, I recommend paying whatever you can to | 10:36 |
| 25 | avoid a higher late fee.  If you are unable to make | 10:36 |

Page 54

```
 1   Their rent is due on the 1st.  And as of the 5th,     10:41
 2   you'll get a late fee and give some instructions on    10:41
 3   different ways they can make those payments.           10:41
 4        Q   And that's an automated e-mail sent           10:41
 5   automatically by the MRI software?                     10:41
 6        A   To my knowledge, it is.  It could be someone  10:41
 7   at our corporate office initiating that e-mail, but I  10:41
 8   know of it because residents have forwarded me that    10:41
 9   e-mail.                                                10:41
10        Q   Do you or your team at Terracina have any     10:41
11   role with respect to sending that e-mail that you just 10:41
12   described?                                             10:42
13        A   No.                                           10:42
14        Q   This is probably a decent time for a break,   10:42
15   so I generally will try to take a break every hour or  10:42
16   so, and we're not going to have many more breaks       10:42
17   because we're not going to have many more hours.  I    10:42
18   promise.                                               10:42
19            But let's a take a quick break, or maybe take 10:42
20   five, or ten, or whatever you guys need, and then      10:42
21   we'll continue; is that okay?                          10:42
22            MS. ALEXANDER:  Sounds good.                  10:42
23            MR. TOMASEVIC:  Thanks guys.                  10:42
24            (Recess taken.)                               10:42
25            MR. TOMASEVIC:  Q.  Mr. Johnson, what did you 10:53
```

Page 58

| | | |
|---|---|---|
| 1 | and your team at EQR do at Del Mar Heights Apartments, | 10:53 |
| 2 | if anything, to try to collect unpaid rent before the | 10:53 |
| 3 | expiration of the grace period? | 10:53 |
| 4 | A   I don't recall doing it nearly as often. | 10:53 |
| 5 | Much smaller property, higher profile area.  We didn't | 10:53 |
| 6 | have nearly as many late payers there. | 10:53 |
| 7 | Q   Did you do anything before the expiration of | 10:53 |
| 8 | the grace period at Del Mar Heights Apartments to try | 10:53 |
| 9 | to collect unpaid rent? | 10:53 |
| 10 | A   Similar outreach from time to time.  But | 10:53 |
| 11 | again, not nearly as frequently as Terracina. | 10:53 |
| 12 | Q   So if it was up to 15 people or so at | 10:53 |
| 13 | Terracina before COVID, who received your outreach | 10:54 |
| 14 | before the -- before the expiration of the grace | 10:54 |
| 15 | period, how many was it at Del Mar Heights Apartments, | 10:54 |
| 16 | typically? | 10:54 |
| 17 | A   Anywhere from three to seven, maybe. | 10:54 |
| 18 | Q   And did you do anything else besides this | 10:54 |
| 19 | same outreach that you do at Terracina to reach out to | 10:54 |
| 20 | Del Mar Heights Apartment owners about their unpaid | 10:54 |
| 21 | rent before the expiration of the grace period? | 10:54 |
| 22 | A   No.  I can recall a few times I sent group -- | 10:54 |
| 23 | I sent e-mails with the tenants, blind-copied just | 10:54 |
| 24 | sending my own in-house reminder that said something | 10:54 |
| 25 | along the lines: | 10:54 |

Page 59

|   |   |   |
|---|---|---|
| 1 | "If you're receiving this e-mail, we haven't | 10:54 |
| 2 | received your rent.  As a reminder, it's due on the | 10:54 |
| 3 | 1st.  Please be sure to pay it before the 5th." | 10:55 |
| 4 | Q   Did the Del Mar Heights Apartment tenants | 10:55 |
| 5 | receive the same automated MRI system e-mails that the | 10:55 |
| 6 | Terracina tenants received? | 10:55 |
| 7 | A   I believe so.  I think that had been in place | 10:55 |
| 8 | during my entire time at Equity. | 10:55 |
| 9 | Q   Let's talk about expiration of the grace | 10:55 |
| 10 | period at Terracina, meaning, the 5th of the month and | 10:55 |
| 11 | thereafter. | 10:55 |
| 12 | What steps are taken at Terracina to try and | 10:55 |
| 13 | collect unpaid rent after the expiration of the grace | 10:55 |
| 14 | period? | 10:55 |
| 15 | MS. ALEXANDER:  Overbroad; vague as to time. | 10:55 |
| 16 | THE REPORTER:  Was there anything after | 10:55 |
| 17 | "vague as to time," Mr. Fields.  You kind of faded | 10:55 |
| 18 | away. | 10:55 |
| 19 | MR. TOMASEVIC:  No, that was it.  Thank you. | 10:55 |
| 20 | MR. TOMASEVIC:  Q.  That's a fair objection. | 10:56 |
| 21 | So let me -- let me clarify. | 10:56 |
| 22 | Before COVID, in a typical month, what steps | 10:56 |
| 23 | were taken at Terracina to try to collect unpaid rent | 10:56 |
| 24 | after the expiration of the grace period? | 10:56 |
| 25 | MS. ALEXANDER:  Vague as to time and | 10:56 |

Page 60

```
 1    overbroad.                                          10:56
```

```
 2         THE WITNESS:  There were a number of steps.    10:56
```

```
 3    On the 5th, we would print all of the late -- people  10:56
```

```
 4    who were late at that point.  We'd have to review each  10:56
```

```
 5    and every one of those late letters for accuracy and  10:56
```

```
 6    make sure we didn't get a payment.                 10:56
```

```
 7         After we printed that list, validated if they  10:56
```

```
 8    should be receiving that letter, they get signed by  10:56
```

```
 9    me.  Then we make copies of one for the file, one that  10:56
```

```
10    gets posted to their door, and another that gets   10:57
```

```
11    mailed to the resident.                            10:57
```

```
12         Then there -- it's typically a flood of phone  10:57
```

```
13    calls and e-mails after those letters go out.  So  10:57
```

```
14    handling all of those e-mails or phone calls, or   10:57
```

```
15    people coming in and asking how they can pay, and just  10:57
```

```
16    those general payment questions.                   10:57
```

```
17         They also include, typically every day,       10:57
```

```
18    you're reviewing the list of people who are still  10:57
```

```
19    late, reaching out to them, reminding them we haven't  10:57
```

```
20    received their rents, encouraging them to pay, at  10:57
```

```
21    least give me a date they would be able to pay.    10:57
```

```
22         Individuals who we don't hear from, we let    10:57
```

```
23    them know deadlines to avoid going through an      10:57
```

```
24    eviction.  And again, more conversations on what that  10:58
```

```
25    process looks like, collecting our processing checks  10:58
```

Page 61

| | | |
|---|---|---|
| 1 | and payments that come in after the 5th.  So those are | 10:58 |
| 2 | all the general steps after the 5th. | 10:58 |
| 3 | Q   Thank you. | 10:58 |
| 4 | Let's talk about these late letters or | 10:58 |
| 5 | notices. | 10:58 |
| 6 | So the grace period expires on the 5th of the | 10:58 |
| 7 | month at Terracina; right? | 10:58 |
| 8 | A   That's when we print -- yeah, yes. | 10:58 |
| 9 | Q   And on the 5th of the month, you will | 10:58 |
| 10 | typically consult MRI to get a list of the people who | 10:58 |
| 11 | still haven't paid their rent; right? | 10:58 |
| 12 | A   At that point, it's actually -- it's a | 10:58 |
| 13 | report -- it's not a report really.  But we can | 10:58 |
| 14 | activate, initiate a printing of every single letter | 10:58 |
| 15 | that needs to go out. | 10:58 |
| 16 | Q   What you're talking about is a letter and | 10:59 |
| 17 | notice to tenants who haven't paid, that they have to | 10:59 |
| 18 | pay within a certain amount of time or they'll be | 10:59 |
| 19 | evicted? | 10:59 |
| 20 | A   Correct. | 10:59 |
| 21 | Q   Is that sometimes referred to as a three-day | 10:59 |
| 22 | notice? | 10:59 |
| 23 | A   Yes. | 10:59 |
| 24 | Q   So on the 5th of the month, your typical | 10:59 |
| 25 | practice at Terracina is to go into MRI and print out | 10:59 |

Page 62

| | | |
|---|---|---|
| 1 | all of the three-day notices for all the people who | 10:59 |
| 2 | have not paid their rent before the expiration of the | 10:59 |
| 3 | grace period; true? | 10:59 |
| 4 | A   Yes. | 10:59 |
| 5 | Q   And in a typical month before COVID, how many | 10:59 |
| 6 | people might that be? | 10:59 |
| 7 | A   We mentioned earlier, but it can range | 10:59 |
| 8 | anywhere from 30 to 60 people. | 10:59 |
| 9 | Q   And it's more now after COVID? | 10:59 |
| 10 | A   Well, we don't -- | 10:59 |
| 11 | MR. TOMASEVIC:  Go ahead. | 11:00 |
| 12 | THE WITNESS:  Sorry. | 11:00 |
| 13 | MS. ALEXANDER:  I was going to say it's vague | 11:00 |
| 14 | as to -- | 11:00 |
| 15 | THE REPORTER:  I cannot hear you, Counsel.  I | 11:00 |
| 16 | did not get that. | 11:00 |
| 17 | MR. TOMASEVIC:  His objection was that it was | 11:00 |
| 18 | vague, and I'm withdrawing the question. | 11:00 |
| 19 | Q   So on the 5th, when these three-day notices | 11:00 |
| 20 | are printed, are you the one typically going into the | 11:00 |
| 21 | system and printing the notices, or do you have one of | 11:00 |
| 22 | your employees do that? | 11:00 |
| 23 | A   It's not always me.  But if it's not me, it's | 11:00 |
| 24 | someone else. | 11:00 |
| 25 | Q   Are you the one doing it most of the time? | 11:00 |

Page 63

| | | |
|---|---|---|
| 1 | A   I would say it's me doing it 50 to 75 percent | 11:00 |
| 2 | of the time. | 11:00 |
| 3 | Q   And if it's not you, who is it typically? | 11:00 |
| 4 | A   It may be the leasing administrator or the | 11:00 |
| 5 | customer support assistant. | 11:00 |
| 6 | Q   And how long would it typically take you to | 11:01 |
| 7 | print all of the three-day notices on the 5th? | 11:01 |
| 8 | A   The act of clicking print and letting them | 11:01 |
| 9 | print, it's probably five minutes. | 11:01 |
| 10 | Q   And then you have to review and sign them; | 11:01 |
| 11 | right? | 11:01 |
| 12 | A   Yes. | 11:01 |
| 13 | Q   How long does that take you? | 11:01 |
| 14 | A   That portion takes a lot longer.  So that can | 11:01 |
| 15 | range anywhere from 30 minutes to over an hour. | 11:01 |
| 16 | Q   And you're making copies of them for the | 11:01 |
| 17 | file, right, and for mailing? | 11:01 |
| 18 | A   Yes. | 11:01 |
| 19 | Q   How long -- | 11:01 |
| 20 | A   Yes. | 11:01 |
| 21 | Q   -- does making copies take? | 11:01 |
| 22 | A   That could -- ten minutes, ten to 20 minutes | 11:01 |
| 23 | depending on if they need to be reordered, and there's | 11:01 |
| 24 | certain sheets that we don't need to make copies and | 11:02 |
| 25 | send out, because we have to separate those, so it | 11:02 |

Page 64

| | | |
|---|---|---|
| 1 | takes a little longer. | 11:02 |
| 2 | Q  You have to put a copy in their file at the | 11:02 |
| 3 | office; right? | 11:02 |
| 4 | A  Correct. | 11:02 |
| 5 | Q  How long does that take you? | 11:02 |
| 6 | A  If all the files are where they're supposed | 11:02 |
| 7 | to be, which is hardly the case, it could go pretty | 11:02 |
| 8 | quick.  It could take 20, 20 minutes.  But rarely | 11:02 |
| 9 | that's the case.  Files are in different locations | 11:02 |
| 10 | depending on the status of that resident, or if | 11:02 |
| 11 | someone has that file, tracking it down could add | 11:02 |
| 12 | quite a bit of time.  So in the low end, 15 minutes. | 11:02 |
| 13 | It could range up to 30, 35 minutes. | 11:02 |
| 14 | Q  And then notices have to be mailed; right? | 11:02 |
| 15 | A  Yes. | 11:02 |
| 16 | Q  How long does it take you to get everything | 11:02 |
| 17 | ready and stamped and put in an envelope for mailing? | 11:02 |
| 18 | A  Probably 30 minutes to an hour. | 11:03 |
| 19 | Q  And of course notices have to be | 11:03 |
| 20 | hand-delivered or posted with the tenant; right? | 11:03 |
| 21 | A  Yes. | 11:03 |
| 22 | Q  And how long does that take? | 11:03 |
| 23 | A  If I was doing all of them, it would probably | 11:03 |
| 24 | take me at least an hour.  Upwards of maybe two hours, | 11:03 |
| 25 | depending on getting stopped for random things, or | 11:03 |

Page 65

| | | |
|---|---|---|
| 1 | what floor.  We have a lot of elevators.  So it's a | 11:03 |
| 2 | lot of up and down. | 11:03 |
| 3 | Q   So an hour to two hours to deliver all of the | 11:03 |
| 4 | notices on site; right? | 11:03 |
| 5 | A   Yes. | 11:03 |
| 6 | Q   But do you sometimes use one of your | 11:03 |
| 7 | teammates or colleagues to help you distribute them? | 11:03 |
| 8 | A   Yes. | 11:03 |
| 9 | Q   So then you're able to get it done faster by | 11:03 |
| 10 | using two people? | 11:03 |
| 11 | A   I mean, faster.  But it's yeah, two people's | 11:04 |
| 12 | timing, yeah. | 11:04 |
| 13 | Q   Okay.  And is it your practice typically to | 11:04 |
| 14 | get all of the three-day notices printed, signed and | 11:04 |
| 15 | posted and mailed on the same day, meaning, the 5th of | 11:04 |
| 16 | the month typically? | 11:04 |
| 17 | A   Yes. | 11:04 |
| 18 | ~~Q   And by the way, if the 5th falls on a Sunday,~~ | 11:04 |
| 19 | ~~do you do these tasks on a different day?~~ | 11:04 |
| 20 | ~~A   No.  It will fall on whoever is working on~~ | 11:04 |
| 21 | ~~Saturday or Sunday.~~ | 11:04 |
| 22 | ~~Q   Got it.~~ | 11:04 |
| 23 | Are there any other postings or mailings or | 11:04 |
| 24 | notices of any kind that go out to tenants who pay | 11:04 |
| 25 | late rent on the 5th, other than the three-day notice | 11:04 |

Page 66

| | | |
|---|---|---|
| 1 | you just described? | 11:05 |
| 2 | A   No. | 11:05 |
| 3 | Q   And then you said you might start receiving a | 11:05 |
| 4 | number of phone calls or e-mail from tenants about the | 11:05 |
| 5 | posting or about the notice? | 11:05 |
| 6 | A   Yes. | 11:05 |
| 7 | Q   If you're printing a few dozen of these | 11:05 |
| 8 | notices in a typical pre-COVID month, how many phone | 11:05 |
| 9 | calls are you getting or e-mails from these tenants? | 11:05 |
| 10 | A   Well -- | 11:05 |
| 11 | MS. ALEXANDER:  Vague; vague as to time. | 11:05 |
| 12 | THE WITNESS:  If we're sending 30 to 60, I | 11:05 |
| 13 | would expect 90 percent of those people to call or | 11:05 |
| 14 | e-mail once they receive that letter on their door. | 11:05 |
| 15 | MR. TOMASEVIC:  Q.  And what are they | 11:05 |
| 16 | typically calling or e-mailing them about or to say? | 11:05 |
| 17 | A   It's a number of different conversations.  It | 11:05 |
| 18 | could be them telling me why they're late.  You know, | 11:06 |
| 19 | they generally have a long-winded answer.  It's never, | 11:06 |
| 20 | hey, I'll pay tomorrow.  It's usually my husband lost | 11:06 |
| 21 | his job, or I lost hours and them letting us know when | 11:06 |
| 22 | they anticipate when they can pay. | 11:06 |
| 23 | It could be to having no idea when they can | 11:06 |
| 24 | pay, and what their options are.  We go down the road | 11:06 |
| 25 | of voluntary -- vacating voluntarily, or what the | 11:06 |

Page 67

| | | |
|---|---|---|
| 1 | eviction process looks like.  It's usually one of | 11:06 |
| 2 | those two:  Them letting us know when they can pay or | 11:06 |
| 3 | understanding their options if they can't pay. | 11:06 |
| 4 | Q   Would you say that you received the majority | 11:06 |
| 5 | of these tenant e-mails or calls within 24 hours of | 11:07 |
| 6 | delivering the notice? | 11:07 |
| 7 | A   I would say we would usually hear from about | 11:07 |
| 8 | half of them that same day.  The other half, maybe | 11:07 |
| 9 | tomorrow at work.  They didn't get the notice until | 11:07 |
| 10 | after we close, and they reach out the next day or | 11:07 |
| 11 | next several days. | 11:07 |
| 12 | Q   And you personally handle some of these phone | 11:07 |
| 13 | calls or e-mails that you get from tenants after they | 11:07 |
| 14 | receive the three-day notice; right? | 11:07 |
| 15 | A   Yes. | 11:07 |
| 16 | Q   Do additional people on your team sometimes | 11:07 |
| 17 | handle these phone calls or e-mails? | 11:07 |
| 18 | A   Yes. | 11:07 |
| 19 | Q   And how is that divided?  Is it divided in | 11:07 |
| 20 | any certain way, or is it just random?  How does that | 11:07 |
| 21 | work? | 11:07 |
| 22 | A   If it's a phone call whoever is free to take | 11:07 |
| 23 | that phone call.  They'll just have that conversation. | 11:07 |
| 24 | They'll relay to me if they're letting them know when | 11:07 |
| 25 | they can pay.  If it's an e-mail, it's sent to our | 11:08 |

Page 68

| | | |
|---|---|---|
| 1 | property e-mail.  Again, whoever is able to answer | 11:08 |
| 2 | that e-mail first. | 11:08 |
| 3 | Q   And at Terracina, who are these people or job | 11:08 |
| 4 | titles that are handling these calls or e-mails? | 11:08 |
| 5 | A   All of the positions that I named that are in | 11:08 |
| 6 | the office. | 11:08 |
| 7 | Q   And just so I understand who is at the office | 11:08 |
| 8 | versus outside of the office, that includes you, the | 11:08 |
| 9 | community manager; right? | 11:08 |
| 10 | A   Yes. | 11:08 |
| 11 | Q   That includes your leasing consultants; | 11:08 |
| 12 | right? | 11:08 |
| 13 | A   Yes. | 11:08 |
| 14 | Q   That includes possibly your leasing | 11:08 |
| 15 | administrator? | 11:08 |
| 16 | A   Yes. | 11:08 |
| 17 | Q   But most of the leasing administrator's time | 11:08 |
| 18 | is focused on 88 affordable housing units? | 11:08 |
| 19 | A   Yes. | 11:08 |
| 20 | Q   The CSA might sometimes help with this | 11:08 |
| 21 | outreach or handling of phone calls and e-mails? | 11:08 |
| 22 | A   Yes. | 11:09 |
| 23 | Q   Anyone else? | 11:09 |
| 24 | A   No. | 11:09 |
| 25 | Q   So the vast majority of the people that have | 11:09 |

Page 69

```
 1    reached out in response of receiving a three-day          11:09

 2    notice are interacting with EQR employees within a day    11:09

 3    or two of receiving that notice; right?                   11:09

 4         A   I would say within the same day or several       11:09

 5    days after, yes.                                          11:09

 6         Q   And how much time is spent during that           11:09

 7    conversation process with the tenants?                    11:09

 8         MS. ALEXANDER:  Overbroad.                           11:09

 9         THE WITNESS:  Are you asking how much on a           11:09

10    typical conversation, or over the course of a month      11:09

11    how much is spent there?                                  11:09

12         MR. TOMASEVIC:  Both.                                11:09

13         MS. ALEXANDER:  Well, compound; vague as to          11:09

14    time.                                                     11:09

15         THE WITNESS:  So it could range quite               11:10

16    drastically.  It could be a simple phone call, Hey,      11:10

17    I'm sorry I'm late.  I'm going to be able to pay this    11:10

18    Friday, and that conversation is a couple of minutes     11:10

19    long.                                                     11:10

20         More times than not though it -- it -- like I       11:10

21    mentioned, it's -- it's their story and, you know, we    11:10

22    provide ourselves on being empathetic and                11:10

23    understanding, and listening to them.  And not just      11:10

24    trying to get out of them what they're trying to tell    11:10

25    us, but letting them know, Okay.  It's okay.             11:10
```

Page 70

| | | |
|---|---|---|
| 1 | You know, after them telling the reasons why | 11:10 |
| 2 | they -- they can't pay, which can also lead into other | 11:10 |
| 3 | topics such as lease questions or neighbor complaints. | 11:10 |
| 4 | So it could range up to like ten, 15, 20 minutes, | 11:10 |
| 5 | depending on the person, if they're a Chatty Cathy or | 11:10 |
| 6 | not. | 11:10 |
| 7 | MR. TOMASEVIC:  Q.  So on the 15th, you'll | 11:10 |
| 8 | probably receive phone calls or e-mails from half of | 11:10 |
| 9 | the people -- I'm sorry.  Strike that. | 11:11 |
| 10 | On the 5th of the month, after receiving the | 11:11 |
| 11 | three-day notices, you'll receive anywhere from ten to | 11:11 |
| 12 | 20 phone calls or e-mails from tenants regarding the | 11:11 |
| 13 | notice; is that fair? | 11:11 |
| 14 | A   If it's half of 30 to 60, probably 15 to 30 | 11:11 |
| 15 | people. | 11:11 |
| 16 | Q   15 to 30; right? | 11:11 |
| 17 | A   Yes. | 11:11 |
| 18 | Q   Okay.  Well, will call you on that first day; | 11:11 |
| 19 | right? | 11:11 |
| 20 | A   Yes. | 11:11 |
| 21 | Q   Well, I thought you said only 90 percent of | 11:11 |
| 22 | the people will call. | 11:11 |
| 23 | A   I'm sorry.  So I was shaving the number a | 11:11 |
| 24 | little bit. | 11:11 |
| 25 | Q   No.  Don't be sorry.  I just want to know | 11:11 |

Page 71

| | | |
|---|---|---|
| 1 | what the truth is. | 11:11 |
| 2 | A   Okay.  So if your question is how many people | 11:11 |
| 3 | call versus e-mail, I -- I don't know the number of | 11:11 |
| 4 | those callers versus e-mails. | 11:11 |
| 5 | Q   You're receiving maybe ten, 20, 25 calls or | 11:11 |
| 6 | e-mails on the 5th with people reacting to the | 11:11 |
| 7 | three-day notice you gave them; right? | 11:12 |
| 8 | A   Yes. | 11:12 |
| 9 | Q   So on the 5th, how much time is spent talking | 11:12 |
| 10 | to these people typically or as a range? | 11:12 |
| 11 | MS. ALEXANDER:  Overbroad. | 11:12 |
| 12 | THE WITNESS:  I mean, it's very difficult to | 11:12 |
| 13 | try to arrange that because, you know, it's random | 11:12 |
| 14 | e-mails, phone calls throughout the day.  But if I had | 11:12 |
| 15 | to put a number on it, I may be totally guessing.  An | 11:12 |
| 16 | estimate would be, I don't know, one to 2½ hours on | 11:12 |
| 17 | that day we deliver those letters of my personal time. | 11:12 |
| 18 | MR. TOMASEVIC:  Got it. | 11:12 |
| 19 | Q   One to 2½ hours covers about half of all of | 11:12 |
| 20 | the people that got the notice? | 11:12 |
| 21 | A   Typically, yes. | 11:13 |
| 22 | Q   Okay.  After these phone calls or e-mails you | 11:13 |
| 23 | get from tenants reacting to the three-day notice, you | 11:13 |
| 24 | and your team will do additional outreach to people | 11:13 |
| 25 | who still haven't paid; right? | 11:13 |

Page 72

| | | |
|---|---|---|
| 1 | A    Yes. | 11:13 |
| 2 | Q    Tell me more about that. | 11:13 |
| 3 | A    So we will generally allow for, you know, | 11:13 |
| 4 | those three days to expire and let them reach out to | 11:13 |
| 5 | us.  And so once the three days have come and gone, | 11:13 |
| 6 | now we are reaching out to -- I typically reach out to | 11:13 |
| 7 | them to get a status, because we need to understand if | 11:13 |
| 8 | they are -- have any intentions on paying so we can | 11:13 |
| 9 | make plans on -- on if they are not responding or not | 11:13 |
| 10 | going to pay. | 11:13 |
| 11 | Q    And about how many people do you have to | 11:13 |
| 12 | reach out to in this manner? | 11:13 |
| 13 | A    A number of people.  Probably anywhere from, | 11:14 |
| 14 | I don't know, ten to 15 maybe. | 11:14 |
| 15 | Q    So are you telling me there's ten to 15 | 11:14 |
| 16 | people a month who don't pay their rent in response to | 11:14 |
| 17 | the three-day notice? | 11:14 |
| 18 | A    There's ten to 15 people who don't respond to | 11:14 |
| 19 | us by the time that three-day expires. | 11:14 |
| 20 | Q    Ten to 15 people a month at Terracina | 11:14 |
| 21 | pre-COVID have not paid their rent typically before | 11:14 |
| 22 | the expiration of the three-day notice? | 11:14 |
| 23 | A    No.  Ten to 15 people who haven't reached out | 11:14 |
| 24 | to us in response to that notice.  There's more than | 11:14 |
| 25 | that that have not paid by the expiration of that | 11:14 |

Page 73

```
 1    notice.                                              11:14
 2        Q   Got it.                                      11:14
 3            How many people haven't paid their rent by   11:14
 4    the expiration of the notice in a typical month at   11:14
 5    Terracina before COVID?                              11:15
 6        A   I would say of the 30 to 60 three days we    11:15
 7    send out, a small percentage end up paying by the time 11:15
 8    it expires.  Around 25 percent.                      11:15
 9        Q   So you still have a couple of dozen people   11:15
10    who, by the 8th or the expiration of the three-day   11:15
11    notice, have still not paid their rent to Terracina? 11:15
12        A   Yeah.  I mean, it can be as high as 40 to 50 11:15
13    of those people, depending on how many there are.    11:15
14        Q   Got it.                                      11:15
15            When you or your staff are having these      11:15
16    conversations with tenants after they receive the    11:15
17    three-day notice, are there notes of those           11:15
18    conversations kept in MRI?                           11:15
19        A   Sometimes, yes.                              11:15
20        Q   Is there anywhere else where we might find   11:15
21    notes of these conversations?                        11:15
22        A   No.  I mean, the -- the -- they would be at  11:16
23    MRI.                                                 11:16
24        Q   So what else do you and your staff do, if    11:16
25    anything, after the expiration of the three-day notice 11:16
```

Page 74

| | | |
|---|---|---|
| 1 | for tenants who still haven't paid their rent? | 11:16 |
| 2 | MS. ALEXANDER:  Vague and ambiguous. | 11:16 |
| 3 | THE WITNESS:  I mean the folks who are | 11:16 |
| 4 | nonresponsive, you know, there's quite a few e-mails | 11:16 |
| 5 | and phone calls that I will initiate to try to elicit | 11:16 |
| 6 | some type of response from them. | 11:16 |
| 7 | MR. TOMASEVIC:  Q.  And you typically do that | 11:16 |
| 8 | yourself personally? | 11:16 |
| 9 | A   Yes. | 11:16 |
| 10 | Q   Okay.  And do you have a typical practice, | 11:16 |
| 11 | like you send an e-mail on the 9th, and then on the | 11:16 |
| 12 | 10th, before the 10th, it goes to the lawyers, or what | 11:16 |
| 13 | can you tell me about it in that regard? | 11:16 |
| 14 | A   It's not a set practice.  But generally the | 11:16 |
| 15 | folks who have not responded when that expires, it's a | 11:16 |
| 16 | reminder e-mail that I send to them directly along the | 11:17 |
| 17 | lines of, As of today, we have yet to received your | 11:17 |
| 18 | rented.  We need to hear from you by the 12th, or | 11:17 |
| 19 | whatever date I decide to give it a few days, and we | 11:17 |
| 20 | encourage them to reach out if they have questions. | 11:17 |
| 21 | And then not everyone responds to those e-mails, and | 11:17 |
| 22 | so at that point it may be a second e-mail and/or | 11:17 |
| 23 | phone calls. | 11:17 |
| 24 | Q   Okay.  And how many people are getting the | 11:17 |
| 25 | first post three-day notice expiration e-mail that you | 11:17 |

Page 75

| | | |
|---|---|---|
| 1 | described? | 11:17 |
| 2 | A   I don't know the number, but those folks have | 11:17 |
| 3 | not responded.  So it's probably 20 to 30 percent of | 11:17 |
| 4 | the three days that went out. | 11:17 |
| 5 | Q   And then sometimes, if necessary, you're | 11:18 |
| 6 | making follow-up phone calls; right? | 11:18 |
| 7 | A   Yes. | 11:18 |
| 8 | Q   Are you making notes in MRI when you place | 11:18 |
| 9 | these phone calls or make these -- send these e-mails? | 11:18 |
| 10 | A   Typically, at that point, we may start | 11:18 |
| 11 | logging notes on our attempts to reach out to them, | 11:18 |
| 12 | yes. | 11:18 |
| 13 | Q   Then what happens next for people who still | 11:18 |
| 14 | haven't paid, despite these follow-up notes, or | 11:18 |
| 15 | e-mails, or calls from you? | 11:18 |
| 16 | A   There will be one final outreach attempt | 11:18 |
| 17 | letting them know we have not heard from you.  We will | 11:18 |
| 18 | be sending your file to eviction on such-and-such | 11:18 |
| 19 | date.  Call me with questions, or if you're able to | 11:18 |
| 20 | pay. | 11:18 |
| 21 | Q   And about how many tenants in a typical month | 11:18 |
| 22 | before COVID were you sending that final e-mail | 11:18 |
| 23 | warning about eviction? | 11:19 |
| 24 | A   Anywhere from three to upwards of ten in some | 11:19 |
| 25 | months. | 11:19 |

Page 76

| | | |
|---|---|---|
| 1 | Q   And then how many of those people finally | 11:19 |
| 2 | wake up and pay their rent to avoid eviction | 11:19 |
| 3 | typically? | 11:19 |
| 4 | A   Half of those. | 11:19 |
| 5 | Q   And the other half you then have to | 11:19 |
| 6 | unfortunately send to eviction; right? | 11:19 |
| 7 | A   Yes. | 11:19 |
| 8 | Q   So we're talking about anywhere from one to | 11:19 |
| 9 | five people in a month at Terracina in a typical | 11:19 |
| 10 | pre-COVID month are getting sent to eviction? | 11:19 |
| 11 | A   Yes. | 11:19 |
| 12 | Q   And so walk me through your process at | 11:19 |
| 13 | Terracina for sending a tenant to the eviction | 11:19 |
| 14 | process. | 11:19 |
| 15 | A   So when I make that decision, I typically ask | 11:19 |
| 16 | the leasing administrator to prepare that file to send | 11:19 |
| 17 | over all the documents and upload them into their | 11:20 |
| 18 | database and ensure that they have everything they | 11:20 |
| 19 | need.  There's usually a back and forth on that point | 11:20 |
| 20 | on something they need clarification on, or if we sent | 11:20 |
| 21 | over the wrong statement, and they'll confirm that | 11:20 |
| 22 | they've received it once they have everything they | 11:20 |
| 23 | need. | 11:20 |
| 24 | Q   Is there a particular leasing consultant that | 11:20 |
| 25 | today you task with those duties or does it rotate? | 11:20 |

Page 77

1        A    No.  It's typically the leasing        11:20

2    administrator, unless it's on a day that she's not    11:20

3    working, and then I'll -- I'll do it.        11:20

4        Q    And when you say that the leasing        11:20

5    administrator typically uploads the file for eviction,    11:20

6    that means uploading electronically a copy of that    11:20

7    tenant's lease; right?        11:20

8        A    Sometimes.  Their -- their website is a    11:20

9    little clunky at times, and we can't always        11:21

10    successfully upload them.  So we may have to scan them    11:21

11    to ourselves and then e-mail it over to their office.    11:21

12        Q    When you say their website is a little    11:21

13    clunky, you're talking about the eviction lawyers?    11:21

14        A    Yes.        11:21

15        Q    Is that the firm of Kimball Tirey & St. John?    11:21

16        A    Yes.        11:21

17        Q    Has it ever been a different law firm, as far    11:21

18    as Terracina evictions are concerned?        11:21

19        A    Not during my time.        11:21

20        Q    How about at Del Mar Heights Apartments?    11:21

21        A    Just during my time, it's always been Kimball    11:21

22    Tirey & St. John.        11:21

23        Q    And what else are you providing to Kimball    11:21

24    Tirey in terms of an eviction file?        11:21

25        A    They need the full lease printed.  They need    11:21

Page 78

| | | |
|---|---|---|
| 1 | a copy of the notice that was delivered, a copy of our | 11:22 |
| 2 | proof of delivery for that notice.  I believe they | 11:22 |
| 3 | need the full resident statement.  And then from time | 11:22 |
| 4 | to time they will ask for other documents, like their | 11:22 |
| 5 | application, or IDs, or certain things like that. | 11:22 |
| 6 | Q   Now, have you already told me your entire | 11:22 |
| 7 | process for trying to collect unpaid rent between the | 11:22 |
| 8 | 1st of the month and the time the file is sent to | 11:22 |
| 9 | eviction? | 11:22 |
| 10 | MS. ALEXANDER:  Overbroad; vague as to time. | 11:22 |
| 11 | THE WITNESS:  I believe so. | 11:22 |
| 12 | MR. TOMASEVIC:  Q.  Like, have you told me | 11:22 |
| 13 | all of EQR steps taken typically pre-COVID to collect | 11:22 |
| 14 | unpaid rent between the first of the month and sending | 11:22 |
| 15 | the file to the eviction attorneys? | 11:22 |
| 16 | ~~MS. ALEXANDER:  Overbroad; and vague as to~~ | 11:22 |
| 17 | ~~time.~~ | 11:23 |
| 18 | THE WITNESS:  In regards to outreach, yes, | 11:23 |
| 19 | there's other internal reporting that we have to do. | 11:23 |
| 20 | ~~MR. TOMASEVIC:  Q.  What is that internal~~ | 11:23 |
| 21 | ~~reporting?~~ | 11:23 |
| 22 | A   We've typically sent -- you know, if someone | 11:23 |
| 23 | is requesting to pay later in the month, I need | 11:23 |
| 24 | approval of that.  If someone is, you know, requesting | 11:23 |
| 25 | some of the late fee to be waived, I have to submit | 11:23 |

Page 79

| | | |
|---|---|---|
| 1 | approval for that.  During our financial reviews, I | 11:23 |
| 2 | have to report on delinquent balances and make | 11:23 |
| 3 | comments on certain balances that are -- that are | 11:23 |
| 4 | higher levels, and why they may not be at eviction | 11:23 |
| 5 | yet. | 11:23 |
| 6 | It's miscellaneous smaller, you know, e-mail | 11:23 |
| 7 | communications or documenting on spreadsheets for my | 11:23 |
| 8 | supervisors so she's in the know of what's going on. | 11:23 |
| 9 | Q  Can we call that internal reporting? | 11:24 |
| 10 | A  Sure. | 11:24 |
| 11 | Q  And so how much time are you spending between | 11:24 |
| 12 | the 1st and sending the file to eviction on this | 11:24 |
| 13 | internal report you just described? | 11:24 |
| 14 | MS. ALEXANDER:  Compound. | 11:24 |
| 15 | THE WITNESS:  So you're asking how much | 11:24 |
| 16 | time -- could you repeat that question? | 11:24 |
| 17 | MR. TOMASEVIC:  Q.  You mentioned that | 11:24 |
| 18 | between the 1st and the sending of the tenant file to | 11:24 |
| 19 | eviction at Terracina there's not only outreach | 11:24 |
| 20 | activities done at EQR but also some internal | 11:24 |
| 21 | reporting; right? | 11:24 |
| 22 | A  Yes. | 11:24 |
| 23 | Q  That internal reporting, for example, could | 11:24 |
| 24 | include asking for approval when a tenant wants more | 11:24 |
| 25 | time to pay their rent late; right? | 11:24 |

Page 80

| | | |
|---|---|---|
| 1 | A   Right. | 11:25 |
| 2 | Q   It also could include you reporting to your | 11:25 |
| 3 | supervisors as to why certain older balances are as | 11:25 |
| 4 | old or as high as they are; right? | 11:25 |
| 5 | A   Right. | 11:25 |
| 6 | Q   And so how much time do you typically spend | 11:25 |
| 7 | between the 1st and the sending of the file to the | 11:25 |
| 8 | eviction lawyers on all of these internal reporting | 11:25 |
| 9 | tasks? | 11:25 |
| 10 | MS. ALEXANDER:  Objection; overbroad and | 11:25 |
| 11 | compound. | 11:25 |
| 12 | THE WITNESS:  I think, depending on the | 11:25 |
| 13 | number of individuals we have, it could be anywhere | 11:25 |
| 14 | from, in a given month, two to five hours. | 11:25 |
| 15 | MR. TOMASEVIC:  Q.  How often in a given | 11:25 |
| 16 | month before COVID would EQR waive a late fee? | 11:25 |
| 17 | MS. ALEXANDER:  At his property? | 11:26 |
| 18 | MR. TOMASEVIC:  Q.  Yes, at your property at | 11:26 |
| 19 | Terracina. | 11:26 |
| 20 | A   On a typical month, it can range anywhere | 11:26 |
| 21 | from none to five to six. | 11:26 |
| 22 | Q   Under what circumstances would EQR typically | 11:26 |
| 23 | waive a late fee charged to Terracina? | 11:26 |
| 24 | MS. ALEXANDER:  Overbroad. | 11:26 |
| 25 | THE WITNESS:  A late fee may have been | 11:26 |

Page 81

| | | |
|---|---|---|
| 1 | generated due to an office area where the person | 11:26 |
| 2 | should not have received the late fee.  We do it from | 11:26 |
| 3 | time to time as a customer service gesture if they | 11:26 |
| 4 | always, for the most part, pay on time.  We may be | 11:26 |
| 5 | able to waive the late fee or a portion of the late | 11:26 |
| 6 | fee to not leave them with a sour taste in their | 11:26 |
| 7 | month, but it usually falls in one of those two | 11:27 |
| 8 | buckets. | 11:27 |
| 9 | MR. TOMASEVIC:  Q.  How many months are you | 11:27 |
| 10 | or EQR waiving the late fee at Terracina to not leave | 11:27 |
| 11 | a sour taste in the person's mouth, meaning, they | 11:27 |
| 12 | rightfully are charged a late fee, but you want to | 11:27 |
| 13 | provide a customer service gesture? | 11:27 |
| 14 | A   I would say 75 percent of those that get | 11:27 |
| 15 | waived are for that reason. | 11:27 |
| 16 | Q   So a couple of times a month? | 11:27 |
| 17 | A   Three, four, yeah. | 11:27 |
| 18 | Q   And then after the file is sent to the | 11:27 |
| 19 | eviction attorneys, what role, if any, do you or your | 11:27 |
| 20 | office have with respect to that eviction? | 11:27 |
| 21 | A   There's still a lot of communication that | 11:27 |
| 22 | goes on between us and the resident at that point. | 11:27 |
| 23 | Q   Tell me about that. | 11:28 |
| 24 | A   You know, eviction is scary for people.  So | 11:28 |
| 25 | they want to know what it is, what it means, how it | 11:28 |

Page 82

| | | |
|---|---|---|
| 1 | impacts their credit, how they can get out of it.  So | 11:28 |
| 2 | there's a number of conversations we might have with | 11:28 |
| 3 | them to help them understand what's in their best | 11:28 |
| 4 | interest if they're not able to pay. | 11:28 |
| 5 | Q   So how many of those conversations a month | 11:28 |
| 6 | are you or your office colleagues having at Terracina | 11:28 |
| 7 | in that regard? | 11:28 |
| 8 | A   I would say every single file that goes to | 11:28 |
| 9 | eviction we are still continuing to try to reach out | 11:28 |
| 10 | to them, give them these options if they are not | 11:28 |
| 11 | reaching out to us. | 11:28 |
| 12 | ~~Q   And so how many of these tenants are we~~ | 11:28 |
| 13 | ~~talking about now?  There's a handful; right?~~ | 11:28 |
| 14 | ~~A   Yeah, one to five.  We have a range.~~ | 11:28 |
| 15 | Q   How much total time is spent with these post | 11:28 |
| 16 | eviction process implementation conversations that | 11:29 |
| 17 | you're describing? | 11:29 |
| 18 | ~~MS. ALEXANDER:  Overbroad.~~ | 11:29 |
| 19 | THE WITNESS:  It can range.  Some folks have | 11:29 |
| 20 | done it before.  They know what to expect.  They just | 11:29 |
| 21 | need to know what's the latest they can pay.  So it | 11:29 |
| 22 | might be a short conversation or short e-mail.  Of the | 11:29 |
| 23 | folks who continue to have questions or need to come | 11:29 |
| 24 | in in person and have a sit-down, so they can talk | 11:29 |
| 25 | about their story and why they're at where they're at, | 11:29 |

Page 83

| | | |
|---|---|---|
| 1 | those conversations, in total, between all the e-mails | 11:29 |
| 2 | and phone calls and sit-downs, I mean, that can range | 11:29 |
| 3 | up to two hours, two to three hours per person. | 11:29 |
| 4 | MR. TOMASEVIC:  Q.  Are you personally | 11:29 |
| 5 | sitting down two to three hours with every person who | 11:29 |
| 6 | is sent to eviction every month? | 11:29 |
| 7 | A   Pre-COVID, no.  But most of them, most of | 11:30 |
| 8 | them will want to come in and talk face-to-face. | 11:30 |
| 9 | Q   Who is the last person you can recall having | 11:30 |
| 10 | a two-hour conversation with about their eviction at | 11:30 |
| 11 | Terracina? | 11:30 |
| 12 | A   I can't recall a specific person. | 11:30 |
| 13 | Q   Can you recall any of their names? | 11:30 |
| 14 | A   I don't, no.  I mean, 440 apartments over a | 11:30 |
| 15 | year ago, it's hard to call specific names. | 11:30 |
| 16 | Q   Can you recall a single person that you | 11:30 |
| 17 | recall you had a two-hour conversation with ever? | 11:30 |
| 18 | A   Two-hour continuous conversation? | 11:30 |
| 19 | Q   Right. | 11:30 |
| 20 | A   No.  I'm sorry.  Maybe I was -- I was saying | 11:30 |
| 21 | in total between the e-mails, the sit-downs, all the | 11:30 |
| 22 | time spent with those particular folks could be as | 11:30 |
| 23 | much as two hours. | 11:30 |
| 24 | Q   Oh, okay.  I'm sorry if I misunderstood you. | 11:30 |
| 25 | Thank for clarifying that. | 11:30 |

Page 84

| | | |
|---|---|---|
| 1 | A   Yeah. | 11:30 |
| 2 | Q   Did you ever have to go testify at eviction | 11:30 |
| 3 | hearings, or did you? | 11:31 |
| 4 | A   Yes. | 11:31 |
| 5 | Q   How many times have you had to do that for | 11:31 |
| 6 | your role as a community manager at Terracina? | 11:31 |
| 7 | A   I don't know the exact number, but typically | 11:31 |
| 8 | it's one every two to three months. | 11:31 |
| 9 | Q   Is it always your responsibility to go speak | 11:31 |
| 10 | at those hearings, or do you sometimes delegate that | 11:31 |
| 11 | to one of your colleagues? | 11:31 |
| 12 | A   At least I go, and sometimes someone else has | 11:31 |
| 13 | to come with me to testify they did, in fact, try to | 11:31 |
| 14 | serve them that notice.  Depending on -- so I'll | 11:31 |
| 15 | clarify that. | 11:31 |
| 16 | So the person signs the declaration, the | 11:31 |
| 17 | Proof of Service that we keep in the file.  Say, if | 11:31 |
| 18 | the 5th falls on a weekend when I'm not here, if | 11:31 |
| 19 | that's the case, then that person goes to eviction. | 11:31 |
| 20 | Kimball Tirey St. John will ask that person who signed | 11:32 |
| 21 | the -- the Proof of Service to also show up in case | 11:32 |
| 22 | they were going to, you know, challenge that they were | 11:32 |
| 23 | served that letter. | 11:32 |
| 24 | Q   Understood. | 11:32 |
| 25 | Do you know what Kimball Tirey St. John | 11:32 |

Page 85

1    charges EQR for its services?                    11:32

2        A   I don't.  It ranges, depending on how much   11:32

3    time they put into each eviction.                11:32

4        Q   So is it a per-hour fee arrangement?     11:32

5            MS. ALEXANDER:  Potentially calls for    11:32

6    speculation.                                     11:32

7            THE WITNESS:  Yeah, I'm sorry.  I don't know   11:32

8    the arrangement.                                 11:32

9            MR. TOMASEVIC:  Q.  When you say it ranges in   11:32

10   charges, what is the range?                      11:32

11           MS. ALEXANDER:  Potentially calls for    11:32

12   speculation.                                     11:32

13           THE WITNESS:  Could be anywhere.  Couple of   11:32

14   hundred dollars on up to 1,000.  Over $1,000.    11:32

15           MR. TOMASEVIC:  Q.  How many people a month   11:33

16   pre-COVID typically are actually evicted from    11:33

17   Terracina?                                       11:33

18       A   The -- typically, every time we go to court   11:33

19   for eviction, we get a ruling in our favor.  So that   11:33

20   same number I gave you, one every two to three months.   11:33

21   I just don't -- I don't know.  Eviction is a broad   11:33

22   word.                                            11:33

23           So typical -- when we go to court, we may   11:33

24   come to an agreement before we go into the courtroom,   11:33

25   that they will move out on X date, if we present it to   11:33

Page 86

| | | |
|---|---|---|
| 1 | the judge, and it's not a true eviction on their | 11:33 |
| 2 | record.  But, you know, of all of the times we go into | 11:34 |
| 3 | court, we almost always get agreement on an eviction | 11:34 |
| 4 | day, whether it's from the judge or that resident. | 11:34 |
| 5 | Q  Is it sometimes your job to run to the bank | 11:34 |
| 6 | to deposit checks provided by tenants who have paid | 11:34 |
| 7 | their rate -- rent rate -- sorry -- rent late? | 11:34 |
| 8 | A  No. | 11:34 |
| 9 | Q  Is that because those are scanned at the | 11:34 |
| 10 | office? | 11:34 |
| 11 | A  Yes. | 11:34 |
| 12 | Q   Do you know if any report or accounting has | 11:34 |
| 13 | ever been done in EQR that attempted to analyze how | 11:34 |
| 14 | much the phenomenon of people paying rent late at EQR | 11:34 |
| 15 | costs EQR? | 11:35 |
| 16 | A   I have no way of knowing that.  I'm sorry. | 11:35 |
| 17 | Q   For example, do you know if an accounting | 11:35 |
| 18 | firm like perhaps PricewaterhouseCoopers has ever | 11:35 |
| 19 | attempted to do an analysis, or accounting, or a | 11:35 |
| 20 | report of the cost to EQR of tenants paying their rent | 11:35 |
| 21 | late? | 11:35 |
| 22 | A   I have never heard of that.  It's way above | 11:35 |
| 23 | my pay grade. | 11:35 |
| 24 | Q  Understood.  Understood. | 11:35 |
| 25 | Within MRI, are you aware of an area or a | 11:35 |

Page 87

| | | |
|---|---|---|
| 1 | A   Three to four hours. | 11:43 |
| 2 | Q   Three, four hours twice a week -- I'm | 11:43 |
| 3 | sorry -- twice a month? | 11:43 |
| 4 | A   Yes. | 11:43 |
| 5 | Q   All right. | 11:43 |
| 6 | Back to the late payment of rent.  Have you | 11:43 |
| 7 | ever heard of an EQR tenant complaining about the | 11:43 |
| 8 | amount of the late rent? | 11:43 |
| 9 | A   Yes. | 11:43 |
| 10 | Q   Tell me the last time that happened. | 11:43 |
| 11 | A   See, it's so long ago, I -- I'd be -- I can't | 11:43 |
| 12 | recall a specific conversation. | 11:43 |
| 13 | Q   How about generally? | 11:44 |
| 14 | A   Generally, it's -- if it's their first late | 11:44 |
| 15 | payment, they are asking why it's -- why it's that | 11:44 |
| 16 | amount and how we got there. | 11:44 |
| 17 | Q   And then what would you typically tell them? | 11:44 |
| 18 | A   It's a formula that's used based on the | 11:44 |
| 19 | percentage of unpaid rent. | 11:44 |
| 20 | Q   The rent is listed in the lease; right? | 11:44 |
| 21 | A   Yeah, yeah. | 11:44 |
| 22 | Q   Well, do you have any tenants ever complain | 11:44 |
| 23 | that it's that high, or that it's too high? | 11:44 |
| 24 | A   I'm sure that has happened at some point.  I | 11:44 |
| 25 | can't recall a specific person phrasing it that way. | 11:44 |

| | | |
|---|---|---|
| 1 | Q   Do you know how Equity Residential came up | 11:44 |
| 2 | with its late fee structure or charge? | 11:44 |
| 3 | A   I don't.  I'm not involved in those | 11:45 |
| 4 | conversations. | 11:45 |
| 5 | Q   Do you know what criteria were used to come | 11:45 |
| 6 | up with the percentage method or the minimum late fee | 11:45 |
| 7 | charge? | 11:45 |
| 8 | A   I don't.  But I mean, I'm sure they are. | 11:45 |
| 9 | I -- I don't know how they came up with that. | 11:45 |
| 10 | ~~Q   Do you know if any EQR property in California~~ | 11:45 |
| 11 | ~~has ever charged anything different than what it~~ | 11:45 |
| 12 | ~~charges today?~~ | 11:45 |
| 13 | ~~A   I can't answer.  It's whatever the other~~ | 11:45 |
| 14 | ~~property might be doing.  Sorry.~~ | 11:45 |
| 15 | Q   Before tenants are actually evicted, do they | 11:45 |
| 16 | sometimes enter into settlement agreements to avoid | 11:45 |
| 17 | the eviction? | 11:45 |
| 18 | A   Yes. | 11:46 |
| 19 | Q   And do you have or do people in your office | 11:46 |
| 20 | have some role with that process, the pre-eviction | 11:46 |
| 21 | settlement? | 11:46 |
| 22 | A   It's typically either myself or the leasing | 11:46 |
| 23 | administrator preparing the document and sending it | 11:46 |
| 24 | over to KTS, Kimball Tirey & St. John once it's | 11:46 |
| 25 | signed. | 11:46 |

Page 94

| | | |
|---|---|---|
| 1 | Q   So there's a written pre-eviction settlement | 11:46 |
| 2 | that EQR will have the tenant enter into? | 11:46 |
| 3 | A   Yes. | 11:46 |
| 4 | Q   And you say your role is to help prepare that | 11:46 |
| 5 | document? | 11:46 |
| 6 | A   Sometimes, yes. | 11:46 |
| 7 | Q   But there's a form for that document on your | 11:46 |
| 8 | computer systems at work; right? | 11:46 |
| 9 | A   Yeah, there's a template we use, yes. | 11:46 |
| 10 | Q   It's like a one-page form; correct? | 11:46 |
| 11 | A   Correct. | 11:46 |
| 12 | Q   And when you say you fill it out or you | 11:46 |
| 13 | sometimes fill it out, what does that mean, exactly? | 11:46 |
| 14 | A   Updating the information to match their | 11:47 |
| 15 | occupants, their address, their date, their dollar | 11:47 |
| 16 | amount, having them sign it, getting a copy of the | 11:47 |
| 17 | checks and us countersigning it. | 11:47 |
| 18 | Q   About how many pre-eviction settlements have | 11:47 |
| 19 | you entered into with tenants at Terracina? | 11:47 |
| 20 | MS. ALEXANDER:  Overbroad; vague as to time. | 11:47 |
| 21 | THE WITNESS:  Yeah, I have no way of knowing | 11:47 |
| 22 | for sure the number that I have specifically entered | 11:47 |
| 23 | into. | 11:47 |
| 24 | MR. TOMASEVIC:  Q.  Are we talking about a | 11:47 |
| 25 | handful, like three or four, or more like a couple | 11:47 |

Page 95

```
 1    collected?                                          12:06

 2           MS. ALEXANDER:  Vague and ambiguous; calls   12:06

 3    for speculation.                                    12:06

 4           THE WITNESS:  No.  I would say that is just  12:06

 5    something that gets tracked.  I can never recall that 12:06

 6    being mentioned in any of my reviews.  It's more or  12:06

 7    less the control -- controllable income categories  12:06

 8    that I can influence.                               12:06

 9           MR. TOMASEVIC:  Q.  Is keeping expenses below 12:06

10    a certain level an important part of your job?      12:06

11       A   Yes.                                         12:06

12       Q   And how do you accomplish that?              12:06

13       A   I mean, there's a number of ways.  If there's 12:06

14    a major repair needed, getting multiple bids to see if 12:06

15    it's competitive bid.  The act of just keeping people 12:06

16    in their apartment rather than moving out cuts down 12:07

17    expenses dramatically.  So, you know, a manager of  12:07

18    people living here and encouraging them to live here. 12:07

19    Payroll.  All of those.  There's quite a few.       12:07

20       Q   Are you responsible for setting the schedule 12:07

21    for your colleagues and other employees at Terracina? 12:07

22       A   Yes.                                         12:07

23       Q   Are you given a budget to work within for   12:07

24    scheduling or for creating payroll?                 12:07

25       A   There is a budget, but I'm not told to make 12:07
```

Page 102

| | | |
|---|---|---|
| 1 | it work.  Like basically they're not -- I'm not told, | 12:07 |
| 2 | like, you have this much money to spend per month. | 12:07 |
| 3 | Make your budget or make your schedule and make sure | 12:08 |
| 4 | it's under that budget.  It's more or less a run rate | 12:08 |
| 5 | item, or it is what it was last year. | 12:08 |
| 6 | We added a certain percentage for inflation | 12:08 |
| 7 | and, you know, higher wages increase, budget, all | 12:08 |
| 8 | that.  That's how things are made. | 12:08 |
| 9 | Q   Did you say it's a run rate problem? | 12:08 |
| 10 | A   It's not a problem, but a lot of those | 12:08 |
| 11 | expenses that we just know we will have over the | 12:08 |
| 12 | course of the year, we call it a run rate.  So we'll | 12:08 |
| 13 | look at what we spent last year.  We'll assume we'll | 12:08 |
| 14 | be somewhere in that same range for the next year. | 12:08 |
| 15 | Q   What do you mean by "run rate," exactly? | 12:08 |
| 16 | A   That's just a term that we use when they're | 12:08 |
| 17 | figuring next year's budget out.  They will -- a run | 12:08 |
| 18 | rate will take into account, you know, the spend over | 12:08 |
| 19 | the course of a year that we had in a particular | 12:08 |
| 20 | topic, and then we will assume we should -- we more | 12:08 |
| 21 | than likely will fall in that same -- close to that | 12:08 |
| 22 | same number next year. | 12:09 |
| 23 | Q   Understood. | 12:09 |
| 24 | Have you changed your colleagues or your | 12:09 |
| 25 | employees at Terracina's schedule at all as a result | 12:09 |

Page 103

| | | |
|---|---|---|
| 1 | financial/operational activities, like reviewing the | 12:18 |
| 2 | MRI system related to financial performance? | 12:18 |
| 3 | A   A lot of these descriptions overlap quite a | 12:18 |
| 4 | bit, and it's hard to quantify them and isolate them | 12:18 |
| 5 | to one -- under one of these subjects, so I'm having a | 12:18 |
| 6 | hard time putting a percentage on them. | 12:18 |
| 7 | Q   I got you.  Let me ask it a little different | 12:19 |
| 8 | then. | 12:19 |
| 9 | So of the duties -- strike that. | 12:19 |
| 10 | How much of your time do you believe is spent | 12:19 |
| 11 | doing exclusively the duties listed under the | 12:19 |
| 12 | "Financial/Operational" activities in Exhibit 1? | 12:19 |
| 13 | MS. ALEXANDER:  Vague as to time. | 12:19 |
| 14 | THE WITNESS:  Ten to 20 percent. | 12:19 |
| 15 | MR. TOMASEVIC:  Okay.  That's all the | 12:19 |
| 16 | questions I have for today.  I didn't know if | 12:19 |
| 17 | Mr. Fields has any questions for you, but I'm done. | 12:19 |
| 18 | MS. ALEXANDER:  Thank you. | 12:19 |
| 19 | MR. TOMASEVIC:  Okay.  We're all set. | 12:20 |
| 20 | Thanks, everyone.  Thanks, Mr. Johnson. | 12:20 |
| 21 | THE REPORTER:  Do you all need a copy? | 12:20 |
| 22 | MS. ALEXANDER:  Yes, we'll take a copy. | 12:20 |
| 23 | THE REPORTER:  Thank you.  Regular | 12:20 |
| 24 | turnaround. | 12:20 |
| 25 | MR. TOMASEVIC:  That's fine. | 12:20 |

Trial Ex. 18

Page 108

```
 1                CERTIFICATE OF REPORTER

 2

 3        I, ANDREA M. IGNACIO, hereby certify that the

 4   witness in the foregoing deposition was by me remotely

 5   sworn to tell the truth, the whole truth, and nothing

 6   but the truth in the within-entitled cause;

 7        That said deposition was taken in shorthand

 8   by me, a disinterested person, remotely at the time

 9   stated, and that the testimony of the said witness was

10   thereafter reduced to typewriting, by computer, under

11   my direction and supervision;

12        That before completion of the deposition,

13   review of the transcript [ ] was [x] was not

14   requested.  If requested, any changes made by the

15   deponent (and provided to the reporter) during the

16   period allowed are appended hereto.

17        I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22   I

23   _____

24   ANDREA M. IGNACIO, RPR, CRR, CCRR, CLR, CSR No. 9830

25
```

Page 111

Exhibit 8

```
1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3                  OAKLAND DIVISION
   _____
4                                  )
   JAVANNI MUNGUIA-BROWN,          )
5  ANGELINA MAGAÑA, NORMA          )
   RODRIGUEZ, and DAVID            )
6  BONFANTI individually and on )
   behalf of others similarly     )
7  situated,                       )
                                   )
8          Plaintiffs,             )
   Vs.                             )No. 4:16-cv-01225-JSW-TSH
9                                  )
   EQUITY RESIDENTIAL, a real      )
10 estate investment trust, ERP )
   OPERATING LIMITED               )
11 PARTNERSHIP, a partnership,  )
   EQUITY RESIDENTIAL              )
12 MANAGEMENT, L.L.C., EQR-        )
   WOODLAND PARK A LIMITED         )
13 PARTNERSHIP, and EQR-WOODLAND)
   PARK B LIMITED PARTNERSHIP,  )
14                                 )
                                   )
15          Defendants.            )
   _____)
16
17        REMOTE DEPOSITION OF DAVID SANTEE
18    Deponent testifying from Marble Falls, Texas
19               Monday, March 8, 2021
20                   Volume I
21
22 Stenographically Reported By:
   Melissa M. Villagran, RPR
23 CSR No. 12543
24 Job No. 4490645
25 PAGES 1 - 204
```

Page 1

1          Marble Falls, Texas, Monday, March 8, 2021

2                    9:11 a.m.

3

4          MS. BELLOWS:  This is Anne Bellows on behalf

5     of plaintiffs.  And with me today are Andrew Lee and          09:11:28

6     Alex Tomasevic, also on behalf of plaintiffs.

7          MR. FIELDS:  Justin Fields for defendants and

8     for Mr. Santee today.

9

10                    DAVID SANTEE,

11     having been administered an oath, was examined and

12     testified as follows:

13

14                    EXAMINATION

15     BY MS. BELLOWS:

16        Q    Okay.  Good morning.

17             Would you please state and spell your name

18     for the record?

19        A    David Santee, S-a-n-t-e-e.

20        Q    As I just said, I'm Anne Bellows.  I          09:11:55

21     represent four plaintiffs and the certified classes

22     in this action.

23             Are you represented by an attorney today?

24        A    Yes.

25        Q    Is that Justin Fields?          09:12:07

Page 9

1        A   That was probably two, three weeks before

2    we -- Justin and I had our call.

3        Q   Okay.  And how long did you speak for?

4        A   Ten minutes.

5        Q   Any other conversations?                          09:31:50

6        A   Not that I recall.  No.

7        Q   All right.  So let's move onto some of your

8    background.

9            Can you please briefly describe your

10   educational background after high school?               09:32:05

11       A   I attended West Virginia University, got a

12   degree in finance and economics.  And then beyond

13   that it was more professional-level education.

14       Q   Okay.  What year did you graduate?

15       A   1982.                                            09:32:25

16       Q   Okay.  And what professional education did

17   you receive?

18       A   A B.S. in business administration, I

19   believe -- or finance and economics.  I'm sorry.

20       Q   I think you mentioned that after you         09:32:43

21   graduated you had other professional education.  I

22   meant to ask you that.

23       A   Oh.  You know, I went to a few MIT IT

24   classes.  General Electric change management.  You

25   know, it wasn't any formal education.  It was more   09:33:19

```
 1      professional level.

 2          Q    Okay.  So is it correct to say you no longer

 3      work for Equity Residential?

 4          A    It is very correct.

 5          Q    What were your dates of employment with        09:33:35

 6      Equity Residential?

 7          A    November of 1994.  And I believe my official

 8      retirement date was January 1st, 2019.

 9          Q    Can you please identify for me all positions

10      you've held at Equity Residential by title and give    09:33:56

11      the time period during which you held each position.

12          A    I started with Equity Residential as a

13      regional vice president in officially Bethesda,

14      Maryland, and I was in that role maybe two years,

15      two years.  And then I was promoted to divisional      09:34:30

16      V.P.  I relocated to Atlanta.  I -- so I was

17      division -- it's a little confusing.  I think I was

18      a division president for a while.  I'm not sure.

19      But regardless my responsibilities were pretty much

20      the same from 1998 until 2006.  So I oversaw the       09:35:07

21      eastern half of Equity Residential -- or the eastern

22      third of Equity Residential.

23          Q    Okay.  And then after 2006, what was your

24      next position?

25          A    At the end of 2006 I was promoted to          09:35:30
```

Page 21

1    executive vice president of operations, and I

2    relocated to Chicago.

3        Q    And how long did you hold that position for?

4        A    Well, I was -- well, I was always executive

5    V.P. of operations through January 1st of 2019.  And        09:35:55

6    I want to say it was 2013 that -- that I was

7    promoted to chief operating officer and executive

8    vice president of operations.

9        Q    So let's start with regional vice president,

10   your first position.  Can you provide an overview of        09:36:31

11   your job duties as regional vice president.

12       A    Okay.  Well, at the time, my job was to

13   on-board, so to speak.  We -- Equity Residential had

14   purchased a company in -- based in Bethesda,

15   Maryland.  And my job was to take that company and        09:37:01

16   integrate that into the operations of Equity

17   Residential.

18           Then beyond that, my job was to really

19   oversee every aspect of day-to-day operations, but I

20   would say at that time my primary responsibilities        09:37:23

21   were due diligence and participating in new

22   acquisitions.

23       Q    Okay.  And the region that you were regional

24   vice president of, can you tell me what that area

25   included?        09:37:48

Page 22

1        A   So initially it was -- it was basically just

2    the DC metro area, northern Virginia and then, you

3    know, Beltway, Maryland.

4        Q   And did that change?

5        A   Yes.                                          09:38:04

6        Q   While you were regional vice president?

7        A   My geographic responsibilities grew as my

8    time and performance grew with the organization.

9        Q   Okay.  So let's talk about the next position,

10   the next two positions where you said your job         09:38:27

11   duties were essentially the same, divisional vice

12   president and division president.  And you were

13   based in Atlanta.  Can you please give us an

14   overview of your job duties in those positions.

15       A   Really just more of the same, only about four  09:38:42

16   times the geographic footprint.  So I had to -- I

17   think I had 175 assets from Maine to Key West and as

18   far west as Memphis, Tennessee.  And I had --

19   obviously I had, you know, regional vice presidents

20   that were reporting to me.                             09:39:13

21       Q   Okay.  And then let's talk about your

22   position as executive vice president of operations.

23           Can you give an overview of your job duties

24   there, as detailed as you can remember?

25       A   Okay.  Well, basically in 2005 -- let's just   09:39:29

Page 23

| | |
|---|---|
| 1 | say in 2005, Equity made the decision to pursue a |
| 2 | new operating platform, more, you know, technology, |
| 3 | new software, what have you. |
| 4 | And so while I was fulfilling my full-time |
| 5 | job, I was reviewing various software applications. |
| 6 | I was -- our new CEO had -- had asked us to be more |
| 7 | standardized in our operations.  So I was head of |
| 8 | the standards committee, so to speak. |
| 9 | And so in 2006 I spent probably 90 percent of |
| 10 | my time preparing, working with Intuit, working with |
| 11 | other -- we had a team of 24 people internally, and |
| 12 | really we spent 2006 in preparation of implementing |
| 13 | this new software platform across the company. |
| 14 | Q   And what software platform was that? |
| 15 | A   Well, it would be MRI.  It was op techs, |
| 16 | not -- OpsTechnology.  It was LRO. |
| 17 | So those three -- which -- so MRI was really |
| 18 | the -- you know, the core software that ran the |
| 19 | company on a day-to-day basis, that really impacted |
| 20 | every single employee in the company. |
| 21 | So my job in 2006 was to prepare to roll this |
| 22 | out, as well as go out, meet with all the employees |
| 23 | at any time possible to promote, educate, inform of |
| 24 | what -- you know, where the company was going and |
| 25 | our expectations going forward.  And then basically |

Timestamps (right margin):
- Line 5: 09:40:09
- Line 10: 09:40:54
- Line 15: 09:41:20
- Line 20: 09:41:50
- Line 25: 09:42:16

Page 24

| | |
|---|---|
| 1 | all 2007 was spent implementing that across 400 |
| 2 | properties. |
| 3 | Q   Okay.  I think we are going to come back to a |
| 4 | few of these points, but I just want to make sure I |
| 5 | get an overview of your responsibilities in that          09:42:41 |
| 6 | position.  So after 2007 when implementation was |
| 7 | done, what did your position as executive vice |
| 8 | president of operations consist of? |
| 9 | A   Okay.  So as far as direct responsibility, |
| 10 | my -- my direct responsibilities were more corporate      09:42:54 |
| 11 | focused.  So I was responsible for marketing.  I was |
| 12 | responsible for our IT department.  I was |
| 13 | responsible for our real estate tax department.  I |
| 14 | was responsible for procurement, revenue management. |
| 15 | There's facilities.  There could be one or two more       09:43:28 |
| 16 | in there.  But these were more -- I did not have |
| 17 | direct responsibility or authority over the people |
| 18 | that actually ran the properties. |
| 19 | Q   You did not? |
| 20 | A   No, I did not.                                         09:43:45 |
| 21 | Q   What is revenue management? |
| 22 | A   Revenue management is -- basically it's |
| 23 | software program.  I'm sure everyone on this call |
| 24 | has experienced the effects of that, whether you buy |
| 25 | an airline ticket or a rental car, what have you.         09:44:06 |

Page 25

1    Justin did a minute ago.  Can you repeat, please.

2    BY MS. BELLOWS:

3        Q   Sure.

4            During the time that you were employed by

5    Equity Residential, did you become familiar with the          10:19:00

6    fee that Equity Residential charged its tenants for

7    the late payment of rent in its California

8    properties?

9        A   Yes.

10           MR. FIELDS:  Vague and ambiguous.                       10:19:12

11           Sorry, David.  Give me one second to object

12   before you answer.

13   BY MS. BELLOWS:

14       Q   Okay.  Can you repeat your answer so it's

15   clear.                                                          10:19:21

16       A   Yes, I was familiar.

17       Q   And at the time that you left Equity

18   Residential January 1st, 2019, what was the late fee

19   that was applicable to Equity Residential California

20   properties?                                                     10:19:36

21       A   I could not tell you.

22       Q   Was the late fee 5 percent of the outstanding

23   balance or $50, whichever was greater?

24           MR. FIELDS:  Asked and answered.

25       ///                                                         10:19:51

Page 40

1      posting, so eDocs was kind of the official record,

2      so to speak, of communication.  So I guess effective

3      June 4th, as it says.

4          Q   June 4, 2008, correct?

5          A   Yes.                                          10:26:58

6          Q   Do you know whether Equity Residential

7      charges California tenants a fee for the late

8      payment of rent prior to this change?

9          A   Okay.  Hold on a minute.  Because now you are

10     so loud, you are kind of muffled.                      10:27:13

11             Can you repeat that.

12         Q   Do you know whether Equity Residential

13     charged its California tenants a fee for the late

14     payment of rent prior to this change?

15         A   I believe so, yes.                             10:27:35

16         Q   Do you remember what that was?

17         A   No.

18         Q   Okay.  Can you please tell me everything you

19     remember about the California late fee in 2008?

20             And let's be clear about the terminology for   10:27:52

21     a second.  If I refer to this 5 percent late fee

22     with a minimum of $50 as the California late fee,

23     will that cause you any problem?

24         A   No.

25         Q   Okay.                                          10:28:06

Page 44

1        A    Or you can just say the June 4th late fee.

2        Q    So can you tell me what you remember about

3    the adoption of the June 4th late fee in 2008?

4             MR. FIELDS:   Overbroad and calls for a

5    narrative.                                          10:28:22

6    BY MS. BELLOWS:

7        Q    You can go ahead.

8        A    Okay.  So in 2007 we implemented a new

9    software platform as we discussed.  I've also

10   discussed that one of the deliverables or outcome    10:28:47

11   was a consistent application of our policies and

12   procedures across all properties.

13            So in 2008 I think we -- I think we

14   ended -- I think we kind of rolled out our last

15   market maybe in November of '07.                     10:29:18

16            Then came the job of -- because before you

17   couldn't see -- you couldn't see it.  Everybody had

18   a -- well, there wasn't any transparency into what

19   people were doing.  Okay?

20            So in 2008 basically you have all of your    10:29:45

21   software rolled out.  There are -- you know, within

22   the software, you can write -- well, you have to

23   program, you know, what -- how much is pet rent.

24   How much is an application fee.  You have to have --

25   you know, if you bought a new property and the       10:30:17

Page 45

| 1 | existing leases mandated things that were different | |
| 2 | from your standard operations, you had to have | |
| 3 | different formulas in there to calculate. | |
| 4 |     And so 2008 was really a review of everything | |
| 5 | that was out there in an effort to begin to | 10:30:50 |
| 6 | standardize and get all of these items memorialized | |
| 7 | and coded into -- into the new platform. | |
| 8 | Q   And so this new California late fee, June 4th | |
| 9 | late fee, is part of that effort -- (inaudible.) | |
| 10 |     Let me repeat first.  So the California late | 10:31:25 |
| 11 | fee implemented on June 4, 2008, is part of that | |
| 12 | effort of standardization? | |
| 13 | A   Yes.  Yes. | |
| 14 |     And as you can see, it addresses other fees | |
| 15 | as well. | 10:31:44 |
| 16 |     (Recess 10:31 to 10:33 PST.) | |
| 17 | BY MS. BELLOWS: | |
| 18 | Q   Mr. Santee, did you have any role in the | |
| 19 | decision to adopt the California late fee in 2008? | |
| 20 | A   Well, my role was to move processes along and | 10:33:58 |
| 21 | ensure decisions were made.  I can certainly express | |
| 22 | my opinion, but my authority was not such that I | |
| 23 | could make those decisions. | |
| 24 | Q   And who had the authority to make those | |
| 25 | decisions? | 10:34:34 |

Page 46

```
 1        A   Well, I think one of the reasons I was put

 2   into that role was because I was able to work across

 3   functional groups, try to get people to work

 4   together, facilitate conversation that ultimately

 5   arrived at decisions.                                    10:35:01

 6            So ultimately -- now, ultimately, the

 7   decision was that of Fred Tuomi and/or Mickey

 8   Cummings.

 9        Q   And why was it their decision?

10        A   Well, because that was the -- they            10:35:24

11   were -- they were property management and those are

12   the people that had owned the decision that had to

13   communicate, enforce, monitor their decisions.

14        Q   So Fred Tuomi and Mickey Cummings had the

15   ultimate authority to decide what the California        10:36:01

16   late fee should be for Equity Residential?

17        A   Yes.

18        Q   Okay.  Aside from Fred Tuomi and Mickey

19   Cummings, can you identify all the individuals that

20   you recall being involved in this process of            10:36:26

21   adopting the California late fee in 2008?

22        A   Well, so there are two aspects when you say

23   "adopting."  The decision process would have been

24   Mickey.  It would have been -- well, it would have

25   been Fred.  I would have been part of the process to     10:36:44
```

Page 47

1    try to facilitate decisions so that the programming

2    could be done to meet our release dates.

3         Certainly Denise Beihoffer.  Perhaps, you

4    know, Chris Jenkins, he was my -- he was my computer

5    guy, basically.  You know, and he -- he would pull    10:37:26

6    data for me and I would opine on it.  So those

7    were -- those were the people that were closest to

8    making the decision.

9         Then, you know, people like Chris Jenkins,

10   myself, once the decision was made, we would ensure   10:37:48

11   that the necessary steps were taken on the back end

12   as far as programming or what have you were done and

13   executed.

14        Q   Okay.

15            Who came up with the idea to change the late 10:38:07

16   fee in 2008?

17        A   I don't know that any one person came up with

18   the idea.  I think it was part of a process where we

19   as a company implemented an entirely new operating

20   platform that -- that we had no transparency into     10:38:40

21   the behaviors of a lot of our onsite managers, and,

22   you know, late fees were just one of those things of

23   probably 100 things that -- that we reviewed and was

24   on our to-do list, so to speak.

25        Q   Thinking about the people who had that on     10:39:12

Page 48

```
 1      believe you have policies and procedures.  And you
 2      hope that people are following them and then all of
 3      a sudden one day you get to see what all of your
 4      hopes and dreams actually produced.
 5           And those results were far different from        10:41:05
 6      your hopes and dreams and expectations of having a
 7      standardized approach to business practices.
 8           So, you know, we had the ability to pull
 9      every single transaction that occurred, whether it
10      was, you know, late fees, application fees -- you    10:41:36
11      know, just -- again, there's probably 100 of those
12      things that -- that once you had this new -- this
13      new toy, so to speak, that let you see everything
14      you ever wanted to see, basically you developed an
15      action list.  That list was prioritized monthly.     10:42:14
16           And, you know, it was some things were easier
17      to have people agree on.  Some -- some things were
18      just not up for discussion.  They were black and
19      white, clear as day.  But nevertheless, you know,
20      once the decision was made, the programming was      10:42:45
21      done, the decision was memorialized, and going
22      forward metrics were created, and people were held
23      accountable to the decisions that were made.
24      BY MS. BELLOWS:
25           Q    And what was the company's goal with regard 10:43:04
```

Page 50

```
 1    to the California late fee?

 2            MR. FIELDS:  That's vague and ambiguous.

 3            THE DEPONENT:  The company's goal was to have

 4    consistent customer experience and standardized

 5    operations so that if an employee was working in      10:43:29

 6    California and decided to move to Miami, Florida,

 7    that transition was seamless.

 8    BY MS. BELLOWS:

 9       Q   Speaking of the process that you went

10    through, let me make sure I understand what you       10:43:53

11    stated.  First the company used MRI to find out what

12    late fees it was charging; is that correct?

13            MR. FIELDS:  Misstates his testimony in terms

14    of the precise steps and what was done.

15            THE DEPONENT:  The late fees we were charging  10:44:11

16    were clearly stated in the lease.

17    BY MS. BELLOWS:

18       Q   So you said that in order to find out what

19    was actually happening, then you set about trying to

20    change it.  What did you -- what were you referring   10:44:27

21    to when you were talking about finding out what was

22    actually happening?

23       A   Well, I mean, there is what's stated in the

24    lease.  There is what people decide to do.  Those

25    can be two different things.  That doesn't mean they  10:44:56
```

Page 51

| | |
|---|---|
| 1 | were wrong.  That just means they were different. |
| 2 | And if two parties agreed to it, then so be it. |
| 3 | But it makes -- it creates, you know, a lot |
| 4 | of this was also in preparation because we |
| 5 | were -- one of our initiatives was to, you know, |
| 6 | create -- you know, move that transparency that I |
| 7 | spoke about to our customer, okay, so that the |
| 8 | customer could see their lease.  They could see all |
| 9 | the transactions.  They could see what we charged or |
| 10 | we didn't charge.  And basically it was called, you |
| 11 | know, an online statement. |
| 12 | So before you can start putting resident |
| 13 | statements and historical transactions online for |
| 14 | customers to see, you really have to have a |
| 15 | consistent business process and a, you know, |
| 16 | standardized way of operating before you do that. |
| 17 | So this was really kind of just an interim |
| 18 | step into being more transparent with our customer |
| 19 | and -- and eventually moving to the resident portal |
| 20 | where they could pay rent online.  They could see |
| 21 | all their transactions online, et cetera. |
| 22 | Q   I'm trying to understand what steps the |
| 23 | company took to adopt the California late fee, and I |
| 24 | just want you to walk me through sort of what |
| 25 | actions or communications took place while the |

Timestamps:
10:45:33 (line 5)
10:46:08 (line 10)
10:46:30 (line 15)
10:46:58 (line 20)
10:47:19 (line 25)

Page 52

| | |
|---|---|
| 1 | company was looking at this issue in 2008. |
| 2 | MR. FIELDS:  Overbroad and calls for a |
| 3 | narrative. |
| 4 | BY MS. BELLOWS: |
| 5 | Q   With that in mind, can you tell me the first |
| 6 | step of the process of adopting the California late |
| 7 | fee in 2008? |
| 8 | MR. FIELDS:  Overbroad and calls for |
| 9 | speculation potentially. |
| 10 | Go ahead. |
| 11 | THE DEPONENT:  Again, it was part of a |
| 12 | greater standardization effort.  There were numerous |
| 13 | other states.  There were numerous other fees. |
| 14 | I will add also that again -- I mean, a lot |
| 15 | of this was just technology driven and good business |
| 16 | sense.  We went from a paper lease to electronic |
| 17 | leases where you had electronic signatures. |
| 18 | And so when technology is involved, as I |
| 19 | think all of us witnessed today on this call, things |
| 20 | can get very complicated, very complex, and so you |
| 21 | want to make sure that just kind of some of the most |
| 22 | mundane things are put to bed and that we don't have |
| 23 | to constantly change because someone didn't apply |
| 24 | the appropriate thought process. |
| 25 | So, you know, if you have been in |

10:47:34

10:47:46

10:48:26

10:48:50

10:49:16

Page 53

```
 1    multifamily, the apartment business, for any length
 2    of time, you know that you are subject to scrutiny
 3    over fees or business practices.  Keep in mind this
 4    was also a period where social media was -- was
 5    taking hold and people were calling you out on Yelp      10:49:47
 6    or what have you.
 7         So really it was -- I mean, there wasn't
 8    anything special about California late fees.  It was
 9    on the list.  It was an item that perhaps probably
10    had, I don't know, probably ten different versions      10:50:10
11    across the leases.  No different than our prices.  I
12    mean, you know, when we were decentralized, a region
13    manager made whatever decisions they wanted.
14         So it was just part of a process to review
15    everything that was out there and select the most      10:50:40
16    appropriate approach for Equity Residential and our
17    customers.
18    BY MS. BELLOWS:
19       Q   Okay.  From April to June of -- let me start
20    again in case you didn't hear me.                        10:51:06
21         From April to June of 2008, did you
22    participate in any in-person meetings in which
23    changing the late fee was discussed?
24       A   I may have.
25       Q   Who else was in any meetings that you            10:51:19
```

1    participated in?

2        A    Well, it would have been people that -- well,

3    I mean, "meetings" is a very broad term.   Did

4    we -- would we have had a meeting solely

5    specifically about one fee in one state?   I don't      10:51:49

6    think so.   It would have been just part of a larger

7    meeting to review and standardize some of these

8    items.   But there were many venues or forums to

9    discuss these items, whether it was on the -- I

10   think every Friday we had a -- you know, a           10:52:20

11   divisional V.P. call where, you know, people like

12   Mickey Cummings, Fred, myself, you know, we talked

13   about that was -- that was an opportunity to try to

14   bring closure to things that perhaps were lingering.

15       There were meetings in Chicago with our          10:52:50

16   property management legal team where we would

17   discuss these items.   And then there were our MRI

18   prioritization planning meetings where we would

19   establish priorities for making changes to software,

20   what have you.                                       10:53:12

21       So there were many, many, many meetings.

22       Q   Do you specifically recall any meeting where

23   the California late fee was discussed?

24       A   Not specifically.

25       Q   Okay.                                        10:53:35

Page 55

```
 1            What about any conference calls, do you
 2   remember any conference calls in which the
 3   California late fee was discussed?
 4       A   I'm sure we had some, but nothing jumps out
 5   at me as being memorable or a reason to remember.      10:53:58
 6       Q   Okay.
 7            How about -- you said you didn't remember
 8   this specifically.  How about generally?
 9            Do you remember the California late fees
10   being discussed in a meeting or conference call?       10:54:15
11       A   Yeah, but generally it would have been on a
12   list with, you know, five other states and 20 other
13   items.
14       Q   Okay.  So in April to June 2008, you held the
15   position of executive vice president of property       10:54:36
16   operations; is that correct?
17       A   Yes.
18       Q   And in your role of executive vice president
19   of property operations, were you in charge of the
20   property operations department or team?                10:54:48
21       A   Well, yes, but who is that?
22       Q   Who is that?
23       A   Property operations team, I don't know what
24   that means.  I had my direct reports of which I've
25   given you those names.  You know, we're getting into   10:55:12
```

Page 56

```
 1              So the context would be the adoption of the

 2   late fee in 2008 and the people who were involved in

 3   those conversations?

 4      A    Okay.

 5              Well, property management was involved.      10:57:26

 6   Property operations was involved.  Our legal

 7   department was involved.  We were all involved in

 8   those conversations.

 9      Q    Okay.  Great.  And so when you say property

10   operations was involved, that includes you.           10:57:45

11              Does it include anybody else?

12      A    Yes.  It probably would have included Chris

13   Jenkins.

14      Q    In 2008, did anyone at Equity Residential ask

15   you to provide input on the cost of damages           10:58:11

16   resulting from the late payment of rent while you

17   were discussing the California late fee?

18              MR. FIELDS:  Vague and ambiguous as to

19   "input."

20              THE DEPONENT:  Not that -- asked me?  Not    10:58:22

21   that I recall.

22   BY MS. BELLOWS:

23      Q    Okay.  Do you remember anyone else providing

24   input on Equity Residential costs and damages

25   relating from the -- resulting from the late payment   10:58:36
```

Page 58

```
 1    of rent in California?

 2        A    I remember a discussion about the costs

 3    associated with -- I guess it was a previous suit in

 4    19 whatever.

 5        Q    What do you recall about that discussion?      10:58:58

 6        A    I recall that -- I recall that someone had

 7    found I guess it was some cost analysis that was

 8    numerous years older, and seeing as how nothing

 9    really gets cheaper, it seemed like a good starting

10    point to me.                                            10:59:42

11        Q    Who found this cost analysis?

12        A    I believe it was somebody in our legal team.

13        Q    And you remember them finding the documents

14    in 2008?

15            MR. FIELDS:  Objection; misstates testimony.    11:00:10

16            THE DEPONENT:  I don't remember finding them.

17    I remember somebody saying they found them.

18    BY MS. BELLOWS:

19        Q    What do you remember them saying about the

20    document?                                               11:00:30

21        A    Well, I don't remember what they said

22    specifically, but the -- what the impression that I

23    was left with was that there had been a -- if you

24    want to call it -- a time and motion study done at

25    that time at an earlier date.                           11:00:59
```

Page 59

| | | |
|---|---|---|
| 1 | Q   Did you review the time and motion study or | |
| 2 | anything relating to this analysis in 2008? | |
| 3 | A   I don't believe I did. | |
| 4 | Q   Do you remember what conclusions were reached | |
| 5 | by this analysis that were discussed in 2008? | 11:01:20 |
| 6 | A   Well, I believe that I believe that the | |
| 7 | conclusion was was that whatever we chose to do, | |
| 8 | that time and motion study supported whatever | |
| 9 | decision was made or whatever options were being put | |
| 10 | forth at the time. | 11:02:01 |
| 11 | Q   Was it Jim Fiffer who discussed those | |
| 12 | studies? | |
| 13 | A   That discussed what? | |
| 14 | Q   The study that you are describing. | |
| 15 | A   It doesn't sound like he would have been | 11:02:21 |
| 16 | involved. | |
| 17 | Q   Was is Denise Beihoffer? | |
| 18 | A   That's probably more appropriate. | |
| 19 | Q   And why -- why do you say that Fiffer would | |
| 20 | not have been involved? | 11:02:43 |
| 21 | A   Well, because this was -- well, because | |
| 22 | Fiffer -- well, because it was beneath him.  How | |
| 23 | about that? | |
| 24 | Q   Because he was high ranking? | |
| 25 | A   Well, he was a litigator.  I mean, he | 11:02:58 |

Page 60

```
 1    wasn't -- you know, these were day-to-day normal
 2    business decisions that needed to be made.  I guess
 3    if Denise felt compelled or a reason to discuss it
 4    with Jim, that would have been her call.  But I
 5    don't recall Jim Fiffer being involved in this.  He    11:03:23
 6    could have been, but I don't recall it.  And it
 7    doesn't add up.
 8        Q   Okay.  Do you recall Denise Beihoffer being
 9    in this study in 2008?
10        MR. FIELDS:  Asked and answered.                    11:03:44
11        THE DEPONENT:  Well, yes.  Yes.  It -- yeah,
12    there was only -- yeah.  She was the only one.
13    BY MS. BELLOWS:
14        Q   Do you remember exactly what she said?
15        A   No.                                             11:03:57
16        Q   Do you remember who else might have been
17    involved in that conversation besides yourself and
18    Ms. Beihoffer?
19        A   Well, I mean, it would have been, you know,
20    Chris Jenkins maybe.  I don't recall if we had that    11:04:25
21    discussion on a weekly VP call.  I mean, I don't --
22    I can't -- it would have been at the higher levels
23    of the organization.
24        Q   Okay.
25            Are you aware of any concerns raised by         11:05:01
```

| | |
|---|---|
| 1 | anyone in 2008 that a 5 percent late fee would not |
| 2 | correlate to the costs of collecting rent? |
| 3 | A   No. |
| 4 | Q   Are you familiar with a case titled Consumer |
| 5 | Justice Foundation versus Equity Residential |
| 6 | Property Trust filed in San Diego County Superior |
| 7 | Court in 1998? |
| 8 | MR. FIELDS:  Vague and ambiguous as to |
| 9 | "familiar." |
| 10 | THE DEPONENT:  If it's the suit that |
| 11 | references this time and motion study, I am only |
| 12 | vaguely -- that's the only reason why I know about |
| 13 | it.  Other than that, I know nothing about it. |
| 14 | BY MS. BELLOWS: |
| 15 | Q   Do you know the claims that -- and the answer |
| 16 | is yes, that is the suit we're discussing. |
| 17 | Do you know what the claims were that were |
| 18 | alleged in this lawsuit? |
| 19 | A   No. |
| 20 | MR. FIELDS:  Vague as to time. |
| 21 | BY MS. BELLOWS: |
| 22 | Q   Do you have an understanding of the outcome |
| 23 | of that lawsuit? |
| 24 | MR. FIELDS:  Vague as to time. |
| 25 | THE DEPONENT:  Vaguely, yes. |

Time stamps:
- 11:05:26 (line 5)
- 11:05:36 (line 10)
- 11:05:55 (line 15)
- 11:06:11 (line 20)
- 11:06:23 (line 25)

Page 62

1    BY MS. BELLOWS:

2        Q    Can you describe what you know?

3        A    Well, that -- I mean, it's my understanding

4    that there was a -- I guess what we refer to as

5    settlement agreement, and that the fee, I don't          11:06:46

6    recall what it was was, was determined to be

7    reasonable, relative to whatever studies were done.

8        Q    Okay.  And how did you gain that knowledge of

9    the lawsuit?

10       A    Well, that would have been, you know, when      11:07:24

11   Denise or whoever said they found this settlement

12   agreement outcome.

13       Q    Okay.

14           Did you -- is it correct that you never read

15   the report that we discussed earlier that was          11:07:48

16   generated in connection with the Consumer Justice

17   Foundation lawsuit?

18           MR. FIELDS:  Asked and answered.

19           THE DEPONENT:  No, I have not read that.  I

20   don't --                                                11:08:04

21   BY MS. BELLOWS:

22       Q    And is it -- do you know who -- the firm that

23   was responsible for creating the report?

24       A    No, I do not.

25       Q    You have not heard that it was                 11:08:14

Page 63

| | |
|---|---|
| 1 | PricewaterhouseCoopers that studied the company's |
| 2 | costs related to late rent in the 1998 case? |
| 3 | A   If it was ever mentioned, I don't recall. |
| 4 | Q   Okay. |
| 5 | A   But no.                                          11:08:32 |
| 6 | Q   Did you have any involvement in the creation |
| 7 | of that report in the 1998 case by |
| 8 | PricewaterhouseCoopers? |
| 9 | A   I don't believe so. |
| 10 | Q   Do you know anything about how the report was   11:08:52 |
| 11 | developed? |
| 12 | A   No. |
| 13 | Q   Could you identify any of the steps taken by |
| 14 | PricewaterhouseCoopers in preparing the report? |
| 15 | A   No.                                              11:09:03 |
| 16 | Q   Can you identify any of the Equity |
| 17 | Residential employees who provided information to |
| 18 | PricewaterhouseCoopers for purposes of developing |
| 19 | that report? |
| 20 | A   No.                                              11:09:16 |
| 21 | Q   Do you know what information was provided to |
| 22 | PricewaterhouseCoopers by Equity Residential for |
| 23 | that report? |
| 24 | A   No. |
| 25 | Q   Do you know the amount of the late fee that     11:09:28 |

Page 64

```
 1    was analyzed as part of the PWC report, the

 2    PricewaterhouseCoopers report?

 3          MR. FIELDS:  Vague and ambiguous.

 4          THE DEPONENT:  No.  I would be guessing.

 5    BY MS. BELLOWS:                                    11:09:40

 6       Q   Do you know whether a percentage-based late

 7    fee was assessed as part of the PWC report?

 8       A   No.  I do not know any details of that

 9    report.

10       Q   And it's correct to say you have not reviewed  11:10:08

11    it at any time?

12       A   Never.

13       Q   We've been going for about another hour.  Do

14    you want to take a break?

15       A   It's up to you.  I mean, I can go a little      11:10:24

16    bit longer.

17          MS. BELLOWS:  Okay.  Justin?

18          MR. FIELDS:  Whatever you want to do.

19    BY MS. BELLOWS:

20       Q   Okay.  Well, let's go to Exhibit Share.  We     11:10:40

21    can go a little longer and I'll check in again

22    shortly and let me know if you would like to take a

23    break in the meantime.
```

Trial Ex. 65

```
24          So I'm marking as Exhibit 3 a e-mail from

25    Denise Beihoffer dated May 14, 2008, at 1:20 p.m.,    11:11:25
```

| | |
|---|---|
| 1 | Bates stamped first page WP004340. |
| 2 | **Trial Ex. 65**<br>(~~Exhibit 3~~ was marked for |
| 3 | identification and is attached |
| 4 | hereto.) |
| 5 | BY MS. BELLOWS:                                    11:11:38 |
| 6 | Q   Can you let me know when you have it up |
| 7 | before you. |
| 8 | A   Yep. |
| 9 | Q   Okay.  If we can look first at the e-mail |
| 10 | dated May 8, 2008, at the bottom of the first page.  11:12:13 |
| 11 | Do you see that? |
| 12 | A   Yes. |
| 13 | Q   Do you recognize this e-mail? |
| 14 | A   Well, I mean, it has my name on it, but -- |
| 15 | Q   So it's correct that you were a recipient of  11:12:35 |
| 16 | this e-mail? |
| 17 | A   Yes. |
| 18 | Q   Do you recall receiving the e-mail? |
| 19 | A   I don't know.  I got a million e-mails. |
| 20 | Q   Do you have any reason to believe you did not  11:12:56 |
| 21 | receive the e-mail? |
| 22 | A   No. |
| 23 | ~~Q   So the subject reads (as read):~~ |
| 24 | ~~"Another issue -- not a good day at~~ |
| 25 | ~~2 North Pole."~~                                  11:13:08 |

Page 66

1          Do you have any understanding of what that

2     subject references?

3          A    Where it says "Hello"?  Where it starts with

4     "Hello"?

5          Q    No.  Thank you for clarifying.  We're looking        11:13:27

6     at the e-mail dated May 8, 2008.  It's at the bottom

7     of that first page.

8          A    Okay.  Okay.

9          Q    And it's from Denise Beihoffer to yourself,

10    Mickey Cummings, Bruce Lavine, Chris Reilly, Jack        11:13:41

11    Dickens, with CC's to Fred Tuomi, Karen Zions, and

12    Sarah Gunderson.

13          Do you see that?

14    A    Yes.

15          Q    And you were a recipient of this e-mail,        11:13:59

16    correct?

17    A    Yes.

18          Q    So my question was, the subject line reads

19    (as read):

20          "Another issue -- not a good day at        11:14:04

21    2 North Pole."

22          Do you know what that is referring to?

23    A    No, actually.

24    Q    Okay.  So then the first sentence reads (as

25    read):        11:14:19

Page 67

 1    ~~counsel, work with local apartment associations,~~

 2    ~~work with whoever to arrive at a consensus on the~~

 3    ~~best approach.~~

 4        Q    Okay.  Is it correct that the purpose of

 5    changing the late fee in 2008 was to enhance Equity          11:18:34

 6    Residential's revenue stream?

 7        A    I think the purpose was to have a

 8    standardized process, have the same late fee

 9    calculation across all of our properties because no

10    longer could our properties whip out a paper lease          11:18:56

11    and type up whatever they wanted.

12            So, you know, when all of a sudden people

13    have the ability to do whatever they want to do on a

14    day-to-day basis, and then the next day they can't

15    change a thing, well, you better make sure you have          11:19:15

16    it right.

17            So the purpose of this review, of any other

18    review was to make sure that it worked for everyone,

19    you know, and then -- worked for everyone.  In this

20    case, it worked for every one of our properties in          11:19:38

21    California.

22        ~~Q    Are you aware that the California late fee~~

23    ~~was standardized before 2008?~~

24        ~~A    Well, everything was standardized in writing.~~

25        ~~Q    So you're saying it may not have been~~          11:19:57

```
 1    standardized in practice.

 2           Do you have any basis for that?

 3           MR. FIELDS:  Argumentative.

 4           THE DEPONENT:  I'm pretty sure I did.

 5    BY MS. BELLOWS:                                         11:20:13

 6      Q   What basis would that have been?

 7      A   Pulling data to see what late fees were

 8    charged, what fees were waived, what -- just all the

 9    different possibilities that our employees could do.

10      Q   Can you think of any reason why Denise          11:20:30

11    Beihoffer in this e-mail would have written that

12    they are working to identify opportunities to

13    increase revenues to further enhance their revenue

14    streams?

15           MR. FIELDS:  Calls for speculation.            11:20:42

16           THE DEPONENT:  She was trying to suck up to

17    the operations people.  I don't know.

18           MR. FIELDS:  Mr. Santee, don't guess.  If you

19    are saying you don't know, don't guess.

20           THE DEPONENT:  I don't know -- I don't know    11:20:58

21    why she would say that.

22    BY MS. BELLOWS:

23      Q   And just to be clear, was the late fee the

24    same for all California properties prior to the

25    adoption of the June 4th late fee in 2008?            11:21:09
```

                                                        Page 71

```
 1          MR. FIELDS:  Overbroad and asked and

 2    answered.

 3    BY MS. BELLOWS:

 4       Q   You can answer.

 5       A   Well, I -- I can't say yes or no.  I mean, I      11:21:19

 6    want to say it may have not been California, but

 7    there were many places that had -- you know, there

 8    are options no different here in Texas.  I can

 9    charge a flat fee.  I can charge a lower flat fee

10    and then a per day fee.  I just -- I don't recall      11:21:50

11    all of the options available in every state.

12    BY MS. BELLOWS:

13       Q   Okay.  How many other fees do you think EQR

14    increased during the same period of approximately

15    spring of 2008?                                        11:22:15

16          MR. FIELDS:  Calls for speculation and

17    overbroad.

18          THE DEPONENT:  I don't know.

19    BY MS. BELLOWS:

20       Q   What is your best estimate?                     11:22:24

21       A   I don't -- I just don't have an estimate.  I

22    mean, I don't have an estimate.

23       Q   Okay.  What reasons would EQR, Equity

24    Residential, have had to increase fees in 2008?

25          MR. FIELDS:  Overbroad and asked and             11:23:02
```

Page 72

~~1        answered.~~

~~2     BY MS. BELLOWS:~~

~~3        Q   You can answer.~~

~~4        A   Well, the decision to increase the fee or not~~

~~5     was not in my purview.~~                                    11:23:11

~~6           My purview was to arrive at a decision,~~

~~7     memorialize that decision, embed that in our~~

~~8     software, develop the appropriate review materials,~~

~~9     and ensure that whatever they said they were going~~

~~10    to do, that they were doing.~~                             11:23:39

~~11           So, in a sense, property operations was more~~

~~12    of an audit-type function where we're not -- we're~~

~~13    not -- we're not commenting on your decision.  We're~~

~~14    commenting on you doing what you said you were going~~

~~15    to do, which are two different things.  So...~~           11:24:04

16        Q   Do you remember Equity Residential decreasing

17     any fees in the spring of 2008?

18           MR. FIELDS:  Overbroad.

19           THE DEPONENT:  I don't know.  I mean, I know

20     that we -- I know that we found as part of this       11:24:26

21     process, we found rogue players, which was the

22     purpose of having consistent -- and to

23     protect -- protect the company.  I mean, my job was

24     to protect the company from -- you know, from

25     litigation.                                           11:24:53

| | |
|---|---|
| 1 | BY MS. BELLOWS: |
| 2 | Q   So if this process discovered an unlawful |
| 3 | fee, your testimony is that may have been affected |
| 4 | or eliminated? |
| 5 | A   Absolutely. |
| 6 | Q   Do you have any memory of those fees, of |
| 7 | specific fees in that category being identified? |
| 8 | MR. FIELDS:  Don't answer that question.  It |
| 9 | calls for attorney-client privilege communication |
| 10 | and it's irrelevant to the case.  I'll instruct you |
| 11 | not to answer as phrased. |
| 12 | BY MS. BELLOWS: |
| 13 | Q   Let's look at the e-mail dated May 14, 2008, |
| 14 | which is the one at the top -- well, second from the |
| 15 | top of the page.  It's from Denise Beihoffer to |
| 16 | yourself, Fred Tuomi, and Chris Jenkins. |
| 17 | Do you have that before you? |
| 18 | A   Yes. |
| 19 | Q   Do you recognize this e-mail, the e-mail that |
| 20 | was sent on May 14, 2008, at 12:20 p.m.? |
| 21 | A   Sure. |
| 22 | Q   Is it correct that you were a recipient of |
| 23 | this e-mail? |
| 24 | A   I assume I am, yes. |
| 25 | Q   Do you remember receiving this e-mail? |

Timestamps:
- Line 5: 11:25:10
- Line 10: 11:25:22
- Line 15: 11:25:37
- Line 20: 11:25:57
- Line 25: 11:26:19

Page 74

1    A   Not specifically.

2    Q   Do you have any reason to believe that you

3    did not receive this e-mail?

4    A   No.

5    Q   So the e-mail reads (as read):                    11:26:36

6            "Hello.  As a follow-up to my below

7        message and since you've just been

8        poring through the data for

9        operational reviews, it seems like a

10       good time to sit down with the three     11:26:46

11       of you to identify the opportunities

12       for increasing fee amounts and to

13       prioritize our focus in anticipation

14       of peak leasing season."

15       Did you have a meeting with Denise Beihoffer    11:27:00

16   and Chris Jenkins about the late fee after Ms.

17   Beihoffer sent this e-mail on May 14, 2008?

18   A   I assume we did.

19   Q   Do you remember the meeting?

20   A   Not specifically.                                 11:27:20

21   Q   Generally?

22   A   Well, I mean, we periodically had these

23   meetings to review various fees in various states

24   along with -- I mean, look, legislation was all

25   constantly moving and, you know, sometimes we did it    11:27:55

Page 75

```
 1    on an annual basis.  If there were specific changes

 2    that rose to the level of, hey, we need to change

 3    our leases tomorrow, we certainly wouldn't wait till

 4    the next meeting.  But it was a very fluid process.

 5         I mean, this is just one fee out of hundreds,     11:28:21

 6    and that's probably an exaggeration, but it's also

 7    wrapped up in the world of legal changes, more

 8    specifically changes that would impact wording in

 9    our leases, et cetera.

10         So I don't recall having a specific meeting       11:28:50

11    about this.  We had meetings about these types of

12    things frequently.

13    Q    Okay.  Lower down in that same e-mail, it

14    reads (as read):

15              "We've been taking a closer look at          11:29:10

16         application fees and late fees in

17         California, and even in that highly

18         regulated state there may be," blank,

19         "and modify the late fee structure in

20         that state.  However, we briefly -- we          11:29:22

21         need to briefly discuss the potential

22         risks involved in that state before we

23         implement a change."

24         Do you see that?

25    A    Yes.                                             11:29:31
```

Page 76

```
 1        Q   Do you remember what risks were discussed

 2   with Denise Beihoffer and Chris Jenkins about

 3   changing the late fee in California in 2008?

 4        A   Well, Chris reported to me, so I'm not sure

 5   he would have been privy to it.  Privy to whatever       11:29:53

 6   the risks were, but --

 7        Q   Okay.  What about risks that you might have

 8   discussed with Ms. Beihoffer?

 9        A   You know, from my perspective, you know,

10   that's -- no offense, but, you know, that just --        11:30:11

11   kind of everything was a risk to the legal

12   department.  So that doesn't -- that doesn't seem

13   anything out of the ordinary to me based upon

14   business process at corporate.

15        Q   What kind of risk is this referring to?         11:30:45

16        A   Well --

17            MR. FIELDS:  If you know.  Let me just

18   caution.  Potentially calls for speculation.

19            THE DEPONENT:  Potential risks, I don't know.

20   BY MS. BELLOWS:                                           11:31:02

21        Q   Would it have been a risk of liability?

22            MR. FIELDS:  Calls for speculation.  He just

23   said he didn't know what this refers to.

24   BY MS. BELLOWS:

25        Q   You can answer.                                  11:31:15
```

Page 77

| | |
|---|---|
| 1 | A   I mean, that's -- I didn't want to do |
| 2 | anything that would create any liability.  I mean, |
| 3 | who -- what person in their right mind would? |
| 4 | Q   So when you say everything was a risk to the |
| 5 | legal department, if not liability, what risk were |
| 6 | you referring to? |
| 7 | A   Just lawyers.  Look, I'm a businessperson. |
| 8 | Business is taking risks.  Attorneys, they like to |
| 9 | put every possible risk out there so when something |
| 10 | doesn't go right, they can say, "Well, see, we told |
| 11 | you."  So that's just my perspective and personal |
| 12 | opinion, which is why I think they tried to become |
| 13 | more business partners.  But that's just my general |
| 14 | sentiment that attorneys are there to put all |
| 15 | possible risks in front of their client. |
| 16 | Q   And, to be clear, these are all possible |
| 17 | legal risks? |
| 18 | MR. FIELDS:  Overbroad.  I'm not sure what we |
| 19 | are talking about right now. |
| 20 | THE DEPONENT:  Well, there's competitive |
| 21 | risks.  Again, I mean, this was a period where |
| 22 | social media and, you know, anything you did wrong |
| 23 | as a company was basically put on Yelp.  So there |
| 24 | were -- there were many risks other than just legal |
| 25 | at that period of time. |

Time stamps (right margin):
- Line 5: 11:31:38
- Line 10: 11:32:11
- Line 15: 11:32:46
- Line 20: 11:33:01
- Line 25: 11:33:30

Page 78

```
 1   BY MS. BELLOWS:

 2       Q    That Ms. Beihoffer would have been talking to

 3   you about?

 4            MR. FIELDS:  Vague and ambiguous, overbroad,

 5   calls for speculation.  He's already said --          11:33:39

 6   (inaudible.)

 7            MS. BELLOWS:  Justin, you don't need to coach

 8   the witness.  Thank you.

 9            MR. FIELDS:  I'm not coaching.  I'm objecting

10   to your multiple efforts to have him say what these    11:33:51

11   risks are when he's already said he doesn't know

12   what she's referring to in the e-mail.

13            MS. BELLOWS:  I asked a specific question

14   about what risks Ms. Beihoffer would have been

15   talking to him about.                                  11:34:01

16            MR. FIELDS:  Well, "would have been" is

17   different than "did."  So, again, you are calling

18   for speculation.  But I'll have Mr. Santee answer

19   the question.  I don't want to argue with you on the

20   record.                                                11:34:12

21            THE DEPONENT:  I don't know specifically.

22   BY MS. BELLOWS:

23       Q    Okay.  I'm going to mark another exhibit.

24   You can go back to the Marked Exhibits folder.  You

25   will see it in a moment.                               11:34:38
```

Page 79

1        A   Okay.  So after this document, can we take --

2    let's take a break?

3        Q   Sure.  We can also do that now if you would

4    like.

5        A   Okay.  Since this is not up yet, let's -- can      11:34:55

6    we go ahead and take a break.

7            MR. FIELDS:  Sure.

8            (Recess 11:34 to 11:48 PST.)

9    BY MS. BELLOWS:

10       Q   I have marked as Exhibit 4 an e-mail that is       11:48:33

11   dated May 21, 2008, and it's 10:24 a.m. from Denise

12   Beihoffer to yourself.  The Bates number is

13   WP004362.

14           (Exhibit 4 was marked for

15           identification and is attached

16           hereto.)

17   BY MS. BELLOWS:

18       Q   Do you have that up before you?

19       A   Did you just post that?

20       Q   I did.                                             11:49:07

21       A   Or did you post it before we took a break?

22       Q   I just posted it.

23       A   Okay.

24       Q   Do you recognize this e-mail chain?

25       A   I mean, not specifically.                          11:49:40

Page 80

```
 1        Q   Is it -- well, let's go to the second page of

 2    the document, WP004363.

 3        Do you see an e-mail from yourself to Denise

 4    Beihoffer on May 21st at 8:19 a.m.?

 5        A   Yes.                                    11:50:12

 6        Q   Do you recall sending that e-mail?

 7        A   I guess I sent it.  Yes.

 8        Q   So it says (as read):

 9            "Could you e-mail me the documents

10            that we reviewed the other day?"        11:50:30

11        A   Okay.  Yep.

12        Q   Is this the meeting that took place after

13    Ms. Beihoffer sent you the last e-mails that we

14    discussed talking about the initiative to increase

15    fees across Equity Residential's portfolio?        11:50:51

16        A   I don't know.

17        Q   Okay.  And then if you go back to the first

18    page, Ms. Beihoffer responds (as read):

19            "Here you go."

20        And then you ask (as read):                 11:51:11

21            "Can I forward these?"

22        And then at the very top, she says (as read):

23            "Here are the versions you can

24            forward."

25        Why did you forward -- maybe we should look   11:51:21
```

Page 81

| | |
|---|---|
| 1 | at what the attachment was and then we can discuss |
| 2 | that.  Let me mark another exhibit. |
| 3 | Okay.  So I have marked as -- excuse me? |
| 4 | A   Go ahead and give me the number. |
| 5 | Q   I marked as Exhibit 5 a document that appears   11:52:16 |
| 6 | to be a chart.  It has at the bottom left corner a |
| 7 | revision date of 5/15/08.  The Bates Stamp for the |
| 8 | first page is WP004364. |
| 9 | (Exhibit 5 was marked for |
| 10 | identification and is attached   11:52:27 |
| 11 | hereto.) |
| 12 | BY MS. BELLOWS: |
| 13 | Q   Is that what you have before you? |
| 14 | A   I do. |
| 15 | Q   Do you recognize this document?   11:52:38 |
| 16 | A   I do. |
| 17 | Q   Can you describe for us what it is? |
| 18 | A   It's a summary document of all the different |
| 19 | states and -- |
| 20 | Q   And it's about late fee charges in different   11:53:08 |
| 21 | states, correct? |
| 22 | A   It appears to be, yes, correct. |
| 23 | Q   Okay.  Do you remember discussing this chart |
| 24 | with Denise Beihoffer? |
| 25 | A   I assume.  I mean, we would have had   11:53:28 |

Page 82

```
 1    discussions.  This would have been a summary

 2    document, I assume.

 3        Q   Do you remember discussing the items listed

 4    for California --

 5        A   Not specifically.                          11:53:51

 6        Q   -- with Ms. Beihoffer?

 7            So under California for late fee charges, it

 8    says (as read):

 9                "Equity's policy in connection with

10                negotiated settlement effective May     11:53:55

11                28, 2000, is not more than $50 late

12                fee with no per diems to be charged no

13                earlier than the 5th of the day of the

14                month."

15            Do you see that?                            11:54:09

16        A   I do.

17        Q   Does that refresh your recollection about the

18    late fee that was charged to California properties

19    prior to the adoption of the 5 percent late fee in

20    2008?                                               11:54:19

21        A   Well, this is a summary document of all the

22    fees.  I don't know that I would have been

23    specifically focused on any particular one.

24        Q   Before the break, we discussed whether

25    California had a standardized late fee prior to      11:54:41
```

Page 83

```
 1    2008.  Does this document refresh your recollection

 2    about what that standardized late fee was?

 3      A    Yes.

 4      Q    And what was it?

 5      A    Whatever is written there, I presume.        11:54:58

 6      Q    $50, a flat fee of $50 on the late --

 7      A    That was -- that was Equity's policy.  It

 8    says that there is no statutory cap.

 9      Q    Okay.  Okay?  Then if you would go back to

10    Exhibit 4, which is the e-mail we were just looking   11:55:23

11    at, for a moment, I'll ask you a few further

12    questions related to that.

13      A    Okay.

14      Q    So you asked if you could forward the

15    documents.  Who did you forward the documents to?     11:55:43

16          MR. FIELDS:  Misstates the document,

17    compound.

18          THE DEPONENT:  Yeah, I don't recall.

19    BY MS. BELLOWS:

20      Q    Why did you want to forward the documents to   11:56:00

21    somebody else?

22      A    If I was going to forward them, it would have

23    been because we were going to have a meeting or

24    probably trying to finalize something.

25      Q    So if you look at the bottom of WP004362,      11:56:12
```

Page 84

```
 1              (Exhibit 6 was marked for

 2              identification and is attached

 3              hereto.)

 4              THE DEPONENT:  You sent another one?

 5   BY MS. BELLOWS:                                    11:58:20

 6      Q   I just sent it.

 7      A   Okay.
```

Trial Ex. 64

```
 8      Q   I have marked as Exhibit 6 an e-mail chain,

 9   the first page of which is Bates stamped WP004338.

10   The e-mail -- the top e-mail is from Chris Jenkins   11:58:31

11   to Denise Beihoffer, with a CC to yourself, on

12   May 20, 2008, at 5:38 p.m.

13      A   Okay.

14      Q   Do you have that before you?

15      A   I do.                                        11:58:48

16      Q   Do you recognize this e-mail?

17      A   Not specifically, but I assume I've received

18   it.

19      Q   You were a recipient on this e-mail, correct?

20      A   Yes.                                         11:59:05

21      Q   Okay.  So the e-mail begins (as read):

22          "As you would suspect, this is a

23          slam dunk.  The average rent for all

24          current California leases is over

25          $1,500, and at 5 percent the average    11:59:26
```

| | |
|---|---|
| 1 | late fee would come in at $75. |
| 2 | Overall, you would expect to see a |
| 3 | 50 percent increase." |
| 4 | Was Mr. Jenkins informing you and Ms. |
| 5 | Beihoffer that implementing a 5 percent late fee |
| 6 | would increase aggregate late fee revenue by |
| 7 | 50 percent? |
| 8 | MR. FIELDS:  Vague and ambiguous as to the |
| 9 | terms used and the document speaks for itself. |
| 10 | Calls for speculation about Mr. Jenkins' intentions. |
| 11 | BY MS. BELLOWS: |
| 12 | Q   You can answer the question. |
| 13 | A   Okay.  Hold on.  I'm just reading the e-mail. |
| 14 | Okay.  So the question is? |
| 15 | Q   So the e-mail reads (as read): |
| 16 | "As you would suspect, this is a |
| 17 | slam dunk.  The average rent for all |
| 18 | current California leases is over |
| 19 | $1,500 and at about 5 percent the |
| 20 | average late fee would come in at $75. |
| 21 | Overall, you would expect to see a |
| 22 | 50 percent increase." |
| 23 | Do you see that? |
| 24 | A   I see that. |
| 25 | Q   Was Mr. Jenkins informing you and |

Timestamps:
- Line 5: 11:59:33
- Line 10: 11:59:51
- Line 15: 12:00:52
- Line 20: 12:01:42
- Line 25: 12:01:53

Page 87

| | |
|---|---|
| 1 | Ms. Beihoffer that implementing a 5 percent late fee |
| 2 | in California would increase aggregate late fee |
| 3 | revenue by 50 percent? |
| 4 |     MR. FIELDS:  Same objections. |
| 5 |     THE DEPONENT:  Well, I mean, Mr. Jenkins is |
| 6 | saying numerous things.  I mean, he just -- he |
| 7 | copied me on everything because I was his boss.  So |
| 8 | I don't know if he was pulling data for Denise or |
| 9 | what. |
| 10 | BY MS. BELLOWS: |
| 11 |    Q   What did Mr. Jenkins mean with that |
| 12 | statement, as you understand it? |
| 13 |     MR. FIELDS:  Calls for speculation and seems |
| 14 | to misstate the document. |
| 15 |     THE DEPONENT:  I -- yeah, I don't know. |
| 16 | BY MS. BELLOWS: |
| 17 |    Q   Go ahead. |
| 18 |    A   I'm saying he's offering up numerous |
| 19 | alternatives.  I don't know. |
| 20 |    Q   So let's focus on the line that says (as |
| 21 | read): |
| 22 |         "The average rent for all current |
| 23 |         California leases is over $1,500 and |
| 24 |         at 5 percent the average late fee |
| 25 |         would come in at $75.  Overall, you |

Timestamps (right column):
- Line 5: 12:02:09
- Line 10: 12:02:41
- Line 15: 12:02:55
- Line 20: 12:03:19
- Line 25: 12:03:30

Page 88

```
 1          would expect to see a 50 percent

 2          increase."

 3          How would you interpret that statement?

 4          MR. FIELDS:  Calls for speculation.  Vague as

 5   to time.                                           12:03:42

 6          THE DEPONENT:  Well, I mean, I -- I never

 7   paid much attention to averages and -- because

 8   averages don't tell the real story.  So I would have

 9   discounted when the whole average discussion

10   started.                                           12:03:59

11   BY MS. BELLOWS:

12     Q   Okay.  But what did you think -- how did you

13   interpret what he is saying regardless of how you

14   would have --

15     A   Well, I think --                             12:04:10

16          MR. FIELDS:  Calls for speculation, vague as

17   to time.

18          Go ahead.

19          THE DEPONENT:  I don't know.  He's -- he's

20   thinking out loud to Denise Beihoffer.  That's my    12:04:19

21   interpretation of this e-mail.

22   BY MS. BELLOWS:

23     Q   Do you have any reason to disagree that a

24   5 percent late fee implemented in 2008 would have

25   increased fee revenue by 50 percent?                 12:04:32
```

Page 89

```
 1    mean, I don't know what the previous calculation

 2    was.

 3    BY MS. BELLOWS:

 4        Q   Okay.  Why was Mr. Jenkins providing this

 5    information to you and Ms. Beihoffer?                    12:06:34

 6        A   Well, I don't know why he chose to include me

 7    at the very end when he hadn't included me in the

 8    previous kind of back and forth.

 9        Q   Okay.  But do you have an understanding of

10    why he was providing this information to                12:07:00

11    Ms. Beihoffer?

12        A   Well, I would assume it was just part of the

13    process of trying to get to the appropriate finish

14    line so a decision could be made.

15        Q   At the top of the e-mail dated May 20th at      12:07:20

16    5:38 p.m., Chris Jenkins wrote (as read):

17            "As you would suspect, this is a

18            slam dunk."

19            In your understanding, did Mr. Jenkins call

20    it a slam dunk because increasing the fees to           12:07:32

21    5 percent would increase fee revenue in California

22    in his estimation?

23            MR. FIELDS:  Calls for speculation.

24            THE DEPONENT:  Well, this is one of the

25    shortcomings of Mr. Jenkins.  So I don't agree that     12:07:49
```

Page 91

```
 1    that would be the outcome.

 2    BY MS. BELLOWS:

 3        Q    Okay.  Do you interpret him to be suggesting

 4    that would be the outcome?

 5            MR. FIELDS:  Calls for speculation.          12:08:04

 6    BY MS. BELLOWS:

 7        Q    I'm asking about your interpretation.

 8        A    One could interpret that.

 9        Q    What's your interpretation?

10            MR. FIELDS:  Calls for speculation.          12:08:20

11            THE DEPONENT:  My interpretation is that he's

12    making a statement that, based on his perspective,

13    is a slam dunk.  That doesn't mean his perspective

14    is correct.

15    BY MS. BELLOWS:                                      12:08:42

16        Q    That's fair.  But when you say it's a slam

17    dunk, it's a slam dunk because it would result,

18    according to him, in a significant increase in fee

19    revenue?

20            MR. FIELDS:  Calls for speculation as to     12:08:51

21    what's in Mr. Jenkin's mind.

22    BY MS. BELLOWS:

23        Q    According to your interpretation.

24            MR. FIELDS:  Again, calls for speculation as

25    to what's in Mr. Jenkin's mind.                      12:09:00
```

Page 92

| | |
|---|---|
| 1 | THE DEPONENT:  I assume that that is what he |
| 2 | is speculating. |
| 3 | MS. BELLOWS:  Okay.  I'm going to mark the |
| 4 | next exhibit, if you will hold with me a moment. |
| 5 | (Exhibit 7 was marked for |
| 6 | identification and is attached |
| 7 | hereto.) |
| 8 | BY MS. BELLOWS: |
| 9 | Q   Okay.  I have marked as Exhibit 7 an e-mail |
| 10 | chain.  The top e-mail is from you to Chris Jenkins |
| 11 | and Denise Beihoffer.  The Bates Stamp on the first |
| 12 | page is WP004332. |
| 13 | Do you have that before you? |
| 14 | A   I do. |
| 15 | Q   Do you recognize this e-mail? |
| 16 | A   I assume, since it's from me. |
| 17 | Q   Okay.  Am I correct that this is a |
| 18 | continuation of the e-mail string that was marked as |
| 19 | Exhibit 6 that we were just looking at? |
| 20 | A   Yes. |
| 21 | Q   So if you look at the middle of the page |
| 22 | marked WP00433, that's the e-mail that we just |
| 23 | discussed from Mr. Jenkins. |
| 24 | A   Uh-huh. |
| 25 | Q   Above that to the bottom of page 4332, |

Trial Ex. 63

Trial Ex. 64

12:09:34

12:10:03

12:10:17

12:10:39

12:11:04

Page 93

| | |
|---|---|
| 1 | there's an e-mail from Denise Beihoffer to yourself |
| 2 | and Mr. Jenkins on May 21st at 8:42, p.m. |
| 3 | Do you see that? |
| 4 | A   Yes. |
| 5 | Q   Do you recall receiving this e-mail?          12:11:26 |
| 6 | A   I'm going to assume I received it. |
| 7 | Q   There's no reason to think you didn't, |
| 8 | correct? |
| 9 | A   No.  Correct. |
| 10 | Q   So after Mr. Jenkins told Ms. Beihoffer that   12:11:39 |
| 11 | the 5 percent late fee is a slam dunk, she responded |
| 12 | (as read): |
| 13 | "I think it may be tough to defend |
| 14 | two different fee calculation methods |
| 15 | by trying to come up with some sort of   12:11:54 |
| 16 | reasonable explanation.  If we go with |
| 17 | 5 percent everywhere, it won't require |
| 18 | modification to the lease language, |
| 19 | e.g., it can be implemented quickly by |
| 20 | simply changing the property setup so   12:12:02 |
| 21 | the term sheet prints out with a |
| 22 | percent rather than a flat fee.  If we |
| 23 | want to set up a structure where the |
| 24 | greater of $50 or a percent, we will |
| 25 | have to do some MRI programming."   12:12:15 |

Page 94

| | |
|---|---|
| 1 | And then she adds (as read): |
| 2 | "David, how quickly do you want to |
| 3 | pull the trigger on this?" |
| 4 | Do you see all that? |
| 5 | A  I do. |
| 6 | MR. FIELDS:  The first part of the question |
| 7 | was argumentative insofar as it was not quoting. |
| 8 | But he answered the question, so... |
| 9 | BY MS. BELLOWS: |
| 10 | Q  And then you write back higher up to Ms. |
| 11 | Beihoffer (as read): |
| 12 | "The goal is to have all of the six |
| 13 | fees back in MRI sometime next week. |
| 14 | If we agree to make a change, then we |
| 15 | can change anytime." |
| 16 | Do you see that? |
| 17 | A  Yes. |
| 18 | Q  Do you recall sending that e-mail? |
| 19 | A  I'm going to assume I sent it. |
| 20 | Q  Okay.  What does the phrase "all the six |
| 21 | fees" refer to? |
| 22 | A  So this, again, goes back to the kind of more |
| 23 | the IT process and our -- and our desire to move to |
| 24 | electronic leases from paper leases.  So, you know, |
| 25 | my goal was to just reach a decision so that we can |

12:12:23 (line 5)
12:12:41 (line 10)
12:12:51 (line 15)
12:12:59 (line 20)
12:13:30 (line 25)

Page 95

| | |
|---|---|
| 1 | move forward.  The goal was to have -- my job was to |
| 2 | facilitate decision making if -- obviously if I had |
| 3 | the power to make a decision, I would make a |
| 4 | decision.  But my job was to facilitate decisions |
| 5 | across all cross-functional departments so any |
| 6 | changes made in any online lease documents, what |
| 7 | have you, could be made in a timely manner and we |
| 8 | could move forward with the process. |
| 9 |    Q   Okay.  And then all the way up at the top of |
| 10 | the e-mail, you say (as read): |
| 11 |        "I would just change everything to |
| 12 |        5 percent and be done with that." |
| 13 |      Do you remember sending that e-mail? |
| 14 |    A   I'm going to assume I sent it. |
| 15 |    Q   Okay.  Does this mean that you were in favor |
| 16 | of a simple 5 percent late fee for California? |
| 17 |      MR. FIELDS:  Argumentative. |
| 18 |      THE DEPONENT:  I think it means I just wanted |
| 19 | a decision made. |
| 20 | BY MS. BELLOWS: |
| 21 |    Q   Okay. |
| 22 |    A   And -- |
| 23 |    Q   And why -- |
| 24 |      Go ahead. |
| 25 |    A   That was my job, to get people to make |

Time stamps:
12:14:05 (line 5)
12:14:43 (line 10)
12:14:52 (line 15)
12:15:12 (line 20)
12:15:18 (line 25)

Page 96

| | |
|---|---|
| 1 | decisions and not -- to move the process forward. |
| 2 | So without decisions, you can't move forward.  And |
| 3 | my goal was to get people to make decisions. |
| 4 | Q   Okay.  And there were a few options described |
| 5 | in this document.  For example, Mr. Jenkins had    12:15:42 |
| 6 | described a proposal to have a minimum $50 fee. |
| 7 | That's the proposal that Denise Beihoffer was |
| 8 | discussing in her May 21st e-mail, 8:42 a.m. |
| 9 | Between that and the 5 percent fee, why did you |
| 10 | prefer the flat 5 percent -- simple 5 percent fee?    12:16:00 |
| 11 | MR. FIELDS:  Assumes facts about his |
| 12 | preferences. |
| 13 | THE DEPONENT:  I can only assume that by that |
| 14 | time I had heard everything and based upon my |
| 15 | knowledge of programming and ease of understanding    12:16:26 |
| 16 | and communicating to customers, I mean, it's really |
| 17 | just kind of a basket of decision-making points. |
| 18 | BY MS. BELLOWS: |
| 19 | Q   Do you remember those being the decision |
| 20 | points or is that your supposition about what you    12:16:51 |
| 21 | would have been thinking at the time? |
| 22 | A   I -- you know, I don't know why I would have |
| 23 | taken the 5 percent.  I mean, it's... |
| 24 | Q   Do you have anything further to say on that? |
| 25 | A   No.    12:17:32 |

Page 97

1    Q   So I'm going to introduce the next exhibit.

2    It will be up on your screen momentarily.

3         (Exhibit 8 was marked for

4         identification and is attached

5         hereto.)                                    12:17:41

6    BY MS. BELLOWS:

7    Q   So I've marked as Exhibit 8 [Trial Ex. 62] an e-mail from

8    yourself dated May 22nd, 2008, at 5:55 p.m., with a

9    Bates stamp WP004331.

10        Do you see that?                            12:18:12

11   A   Okay.

12   Q   Do you recognize the e-mail that has been

13   marked as Exhibit 8 [Trial Ex. 62]?

14   A   Yes.

15   Q   So this is an e-mail sent from you to Mickey   12:19:03

16   Cummings, Terry Kaye, John Rials, Bruce Lavine,

17   Bruce Salter, with CC's to Fred Tuomi and Denise

18   Beihoffer, correct?

19   A   Correct.

20   Q   So the e-mail reads (as read):               12:19:20

21        "I forgot to include this in the

22        last e-mail.  Currently all late fees

23        are set to a flat $50 in California

24        per the negotiated settlement.  I

25        believe that legal is comfortable with      12:19:34

Page 98

```
 1              a 5 percent late charge, which would

 2              improve late charges at all but six

 3              properties in California.  What are

 4              your thoughts on moving from $50 to 5

 5              percent?  I'm not up to speed on what        12:19:48

 6              your lease language allows, Denise."

 7              Do you see that?

 8         A    I do.

 9         Q    So with regard to your statement that you

10    forgot to include this in the last e-mail, do you     12:20:01

11    recall the subject of the last e-mail you reference

12    there?

13         A    No.

14         Q    And you say -- you state that changing to a

15    5 percent late fee would improve the late changes in   12:20:12

16    all but six properties in California.  That's

17    information that was provided to you by Mr. Jenkins

18    as reflected in Exhibit 7; is that correct?

19         A    Correct.

20         Q    With this statement were you communicating to  12:20:26

21    the recipients of this e-mail that changing the late

22    fee to 5 percent would increase late fees at all but

23    six Equity Residential properties in California?

24         A    I believe that's what it says.

25         Q    What kind of input were you seeking from      12:20:47
```

Trial Ex. 63

Page 99

| 1  | these individuals? |
| 2  | A   Well, this would have been -- it's really |
| 3  | just passing along information to try to reach a |
| 4  | consensus.  Those would have been the VPs and |
| 5  | regional VPs in California, including Fred.   12:21:22 |
| 6  | Q   Okay.  Anything else? |
| 7  | A   No. |
| 8  | Q   Okay.  I'm going to mark the next exhibit. |
| 9  |      (Exhibit 9 was marked for |
| 10 |      identification and is attached   12:21:45 |
| 11 |      hereto.) |
| 12 | BY MS. BELLOWS: |
| 13 | Q   So I've marked as Exhibit 9 [Trial Ex. 61] an e-mail from |
| 14 | Denise Beihoffer.  Appears to be responding to the |
| 15 | last e-mail we looked at.  The Bates Stamp on the   12:22:37 |
| 16 | first page is WP004329, and the e-mail is dated |
| 17 | May 22nd, 2008, at 6:22 p.m. |
| 18 |      Do you have that before you? |
| 19 | A   I do. |
| 20 | Q   Do you recognize the e-mail that I just   12:22:52 |
| 21 | marked as Exhibit 9 [Trial Ex. 61]? |
| 22 | A   I assume, yes. |
| 23 | Q   No reason to think you didn't receive this |
| 24 | e-mail, correct? |
| 25 | A   Correct.   12:23:11 |

Page 100

| | |
|---|---|
| 1 | Q   And Ms. Beihoffer is responding to your |
| 2 | e-mail, correct? |
| 3 | A   Okay. |
| 4 | Q   That's correct? |
| 5 | A   Yes. | 12:24:05 |
| 6 | Q   Have you had a moment to read Ms. Beihoffer's |
| 7 | e-mail? |
| 8 | A   I'm in the process. |
| 9 | Q   Okay.  Let me know when you are ready. |
| 10 | A   Okay. | 12:24:34 |
| 11 | Q   So Ms. Beihoffer's e-mail describes the |
| 12 | research that she and others performed and presents |
| 13 | the issue of whether the 5 percent should be applied |
| 14 | to the monthly rental amounts or to the amounts |
| 15 | owed; is that correct? | 12:25:48 |
| 16 | MR. FIELDS:  That mischaracterizes the |
| 17 | document.  It says a lot of other things. |
| 18 | THE DEPONENT:  Yeah, I mean, it's more broad |
| 19 | than that. |
| 20 | BY MS. BELLOWS: | 12:26:00 |
| 21 | Q   Okay.  Does it present the issue of whether |
| 22 | the 5 percent should be applied to the monthly |
| 23 | rental amounts or to the amount owed? |
| 24 | A   It does. |
| 25 | Q   Okay.  Does it summarize research that Ms. | 12:26:08 |

Page 101

| | |
|---|---|
| 1 | Beihoffer and others have performed related to the |
| 2 | late fee? |
| 3 | A   It does. |
| 4 | ~~MR. FIELDS:  Document speaks for itself.~~ |
| 5 | ~~BY MS. BELLOWS:~~                                     12:26:23 |
| 6 | ~~Q   Go on to the next document.~~ |
| 7 | ~~(Exhibit 10 was marked for~~ |
| 8 | ~~identification and is attached~~ |
| 9 | ~~hereto.)~~ |
| 10 | ~~BY MS. BELLOWS:~~                                     12:27:30 |
| 11 | Q   So I just marked as ~~Exhibit 10~~ [Trial Ex. 60] an e-mail from |
| 12 | Terry Kaye responding to Ms. Beihoffer's e-mail. |
| 13 | The e-mail is also dated May 28, 2008, sent at 6:35 |
| 14 | p.m.  the Bates stamp of the first page is WP004327. |
| 15 | Do you have that before you?                        12:27:26 |
| 16 | A   Almost. |
| 17 | Q   Okay.  Let me know when you are there. |
| 18 | A   Okay.  I'm there. |
| 19 | Q   Do you recognize this e-mail, the one that |
| 20 | has just been marked as ~~Exhibit 10~~ [Trial Ex. 60]?            12:27:38 |
| 21 | A   I'm going to assume I received it. |
| 22 | Q   Because you are listed as the recipient, |
| 23 | correct? |
| 24 | A   Correct. |
| 25 | Q   What position did Terry Kaye hold with Equity   12:27:48 |

Page 102

```
 1    Residential?

 2        A   She was an area V.P. for a very brief period

 3    of time.

 4        Q   Okay.  Do you know when Ms. Kaye left the

 5    company?                                          12:28:17

 6        A   No.

 7        Q   Do you know where Ms. Kaye works now?

 8        A   No.

 9        Q   Do you keep in touch with Ms. Kaye?

10        A   No.                                       12:28:31

11        Q   So in response to Ms. Beihoffer's mail that

12    was marked as Exhibit 9, Ms. Kaye wrote (as read):

13            "Maybe a $75 late fee would be

14            best."

15            Do you see that?                          12:28:47

16        A   I do.

17        Q   Did you respond to Ms. Kay's e-mail?

18        A   Probably not.

19        Q   Did you discuss with anyone Ms. Kay's

20    proposal to change the late fee to a fixed amount of  12:29:02

21    $75?

22        A   I don't recall.

23        Q   Why was the late fee changed to a

24    percentage-based late fee rather than a fixed sum

25    late fee, if you know?                            12:29:24
```

Trial Ex. 61

Veritext Legal Solutions
866 299-5127

```
 1        A   I don't know specifically.

 2        Q   How about generally?

 3        A   Well, I don't recall if it was on the balance

 4    or the total amount.  I mean, obviously if it was on

 5    a balance, it would be a smaller amount -- or          12:29:42

 6    potentially a smaller amount.

 7        Q   Okay.  I'm going to go ahead and mark

 8    Exhibit 11.

 9            (Exhibit 11 was marked for

10            identification and is attached              12:30:20

11            hereto.)

12    BY MS. BELLOWS:

13        Q   So the document I've marked as Exhibit 11 is

14    an e-mail from yourself to Mickey Cummings and

15    Denise Beihoffer, dated May 30, 2008, 4:21 p.m. with   12:30:41

16    a Bates Stamp of WP004285 on the first page.

17            Do you have that in front of you?

18        A   I do.

19        Q   Do you recognize this e-mail?

20        A   I assume I do.                                 12:31:07

21        Q   Is there any reason to believe you did not

22    send it?

23        A   No.

24        Q   So let's look at the bottom of the page.

25    Mr. Cummings appears to send an e-mail to a list of    12:31:21
```

Page 104

```
 1          Hang on a moment.

 2          (Recess 12:37 to 12:39 PST.)

 3    BY MS. BELLOWS:

 4     Q   So I'm going to go ahead and mark the next

 5    exhibit, Exhibit 13.                                    12:39:18

 6          (Exhibit 13 was marked for

 7          identification and is attached

 8          hereto.)

 9    BY MS. BELLOWS:
```

Trial Ex. 56

```
10     Q   Okay.  So Exhibit 13 is an e-mail from Bruce     12:39:37

11    Lavine to yourself, Mickey Cummings, and Denise

12    Beihoffer, dated May 30, 2008, at 11:21 p.m., and

13    the Bates Stamp is WP004312.

14          Do you see that?

15     A   Yes.                                              12:39:58

16     Q   Okay.  So the first e-mail is from Mickey

17    Cummings.  He writes (as read):

18            "Per my discussion with Denise,

19          late fees, 5 percent of monthly rent,

20          or minimum of $50 calculated on             12:40:19

21          outstanding balance, I vote yes to the

22          above."

23          Do you see that?

24     A   I do.

25     Q   Do you remember receiving that e-mail?          12:40:27
```

Page 110

```
 1        A   I am going to assume I did.

 2        Q   Because you are listed as the recipient; is

 3    that correct?

 4        A   Yes.

 5        Q   Do you know why Ms. Cummings discussed this        12:40:49

 6    issue with Ms. Beihoffer?

 7        A   Because that was his responsibility and the

 8    right thing to do, I assume.

 9        Q   Okay.  You responded to Mr. Cummings e-mail

10    (as read):                                                  12:41:02

11            "If Lavine agrees, we are done."

12    Do you recall sending that e-mail?

13        A   I'm going to assume I did.

14        Q   Is it fair to say that you were indicating

15    agreement with the proposal summarized in                   12:41:25

16    Mr. Cummings' e-mail?

17        A   Again, I'm looking for closure.  That's my

18    goal, which is, you know, which is why I say we are

19    done.

20        Q   Okay.  And then Mr. Lavine responds "Done,"         12:41:45

21    correct?

22        A   Yes.

23        Q   What position did Bruce Lavine hold in 2008?

24        A   So Bruce was the equivalent to Mickey

25    Cummings.  He would have been a divisional V.P.  But        12:42:07
```

Page 111

```
 1    he had -- I think he had Northern California, San

 2    Francisco, basically.

 3        Q   And what position did Mickey Cummings hold at

 4    that time in 2008?

 5        A   I want to say the title was divisional V.P.      12:42:29

 6        Q   And what areas was he responsible for?

 7        A   He would have had Southern California,

 8    Phoenix.

 9        Q   Anywhere else?

10        A   I don't believe so.                              12:42:53

11        Q   Why did Mr. Cummings start a separate e-mail

12    chain with you, Mr. Lavine, and Ms. Beihoffer?

13            MR. FIELDS:  Calls for speculation.

14            THE DEPONENT:  Some -- I don't know.

15    BY MS. BELLOWS:                                          12:43:16

16        Q   Is it correct that Mickey Cummings, Bruce

17    Lavine, and Denise Beihoffer and you were the

18    decision-makers when it came to changing the late

19    fee applicable to California properties in 2008?

20            MR. FIELDS:  Asked and answered.                 12:43:34

21            THE DEPONENT:  I was not a decision-maker.  I

22    was a facilitator of getting a decision made.  I

23    think this demonstrates that Mr. Cummings and

24    Mr. Lavine were the final decision-makers.

25    BY MS. BELLOWS:                                          12:43:54
```

Page 112

1    enough time to communicate all this or do -- you

2    know, get people to understand how it will change,

3    meaning how it will change through the MRI process,

4    then let us know when will be a good day.

5        Q   Okay.  Thanks for that clarification.          12:49:12

6            Did you instruct Chris Jenkins to make the 5

7    percent fee with the $50 minimum effective on

8    Wednesday, June 4, 2008?

9        A   I guess I did.

10       Q   Okay.                                           12:49:48

11           MR. FIELDS:  Please don't speculate.  If you

12   don't know, state something along those lines.

13   BY MS. BELLOWS:

14       Q   Why do you --

15       A   I mean, according to this e-mail, I did,       12:49:53

16   but...

17       Q   Is there any reason to think that you didn't?

18       A   Huh-uh.

19       Q   Okay.  So I'd like to discuss with you the

20   personnel costs at Equity Residential California     12:50:15

21   properties.  During the course of your employment at

22   Equity Residential, did you become familiar with the

23   personnel costs of Equity Residential's properties

24   in California?

25       A   Yes.                                            12:50:28

Page 115

| | |
|---|---|
| 1 | Q   Prior to the adoption of the California late |
| 2 | fee in 2008, did you review data regarding Equity |
| 3 | Residential's personnel costs in California as part |
| 4 | of your job? |
| 5 | A   Yes.                                                12:50:41 |
| 6 | Q   Could you please describe the personnel data |
| 7 | that you reviewed as part of your job? |
| 8 | MR. FIELDS:  Overbroad, vague as to time. |
| 9 | BY MS. BELLOWS: |
| 10 | Q   Prior to 2008.                                     12:50:56 |
| 11 | MR. FIELDS:  Same objections. |
| 12 | THE DEPONENT:  Do you want me to answer, |
| 13 | Justin? |
| 14 | MR. FIELDS:  Yes. |
| 15 | THE DEPONENT:  Generally, we would look at --   12:51:08 |
| 16 | it's kind of customary to review any costs initially |
| 17 | on a per-unit basis. |
| 18 | BY MS. BELLOWS: |
| 19 | Q   So you're saying you reviewed personnel costs |
| 20 | on a per-unit basis?                                   12:51:38 |
| 21 | A   Correct. |
| 22 | Q   And -- |
| 23 | A   Well, as part of the monthly financial -- the |
| 24 | monthly income statement as part of understanding |
| 25 | sources and uses of funds.                             12:51:49 |

Page 116

| | |
|---|---|
| 1 | Q   So what did that monthly income statement |
| 2 | look like? |
| 3 | A   It has revenue.   It shows different |
| 4 | components of revenue.   And then it shows your |
| 5 | expenses by category, leasing and advertising, | 12:52:17 |
| 6 | utilities, maintenance.   It gets you to an NOI.   It |
| 7 | gets -- and then it -- |
| 8 | Q   What does NOI mean? |
| 9 | A   Net operating income. |
| 10 | And then it subtracts taxes and insurance, | 12:52:34 |
| 11 | and then you get your operating income. |
| 12 | Q   So what categories of revenue are included in |
| 13 | the monthly statement? |
| 14 | A   Well, the income statement is -- so you have |
| 15 | gross rent possible, which is basically the -- every | 12:53:04 |
| 16 | single unit at market rent. |
| 17 | Then you have your rental revenue.   You have |
| 18 | vacancy.   And theoretically rental revenue and |
| 19 | vacancy are your primary income.   Then you just have |
| 20 | other -- other income. | 12:53:44 |
| 21 | Q   What is included in other income? |
| 22 | A   It's probably, I don't know, 50, 60 different |
| 23 | subaccounts. |
| 24 | Q   Would fees be included in other income? |
| 25 | A   It would. | 12:54:04 |

Page 117

| | |
|---|---|
| 1 | MR. FIELDS:  Vague and ambiguous. |
| 2 | BY MS. BELLOWS: |
| 3 | Q    Would late fees be included in other income? |
| 4 | A    Yes. |
| 5 | Q    What expenses were included on this income  12:54:16 |
| 6 | statement that are related to personnel costs? |
| 7 | A    Well, the income statement again is just |
| 8 | category expenses.  So there was a line for payroll. |
| 9 | But there are numerous, numerous, numerous |
| 10 | subaccounts that are in payroll, some of which are  12:54:49 |
| 11 | not actual payroll. |
| 12 | Q    And would those subaccounts be on the income |
| 13 | statements or not? |
| 14 | A    No. |
| 15 | Q    Okay.  And how is this information broken up?  12:55:05 |
| 16 | Is it across the entire portfolio or broken down |
| 17 | into regions or states? |
| 18 | MR. FIELDS:  Vague and ambiguous. |
| 19 | THE DEPONENT:  You can break it up however |
| 20 | you want.  I mean, you need an income statement for  12:55:20 |
| 21 | an individual business unit.  You can -- then you |
| 22 | can group it however you want from there. |
| 23 | BY MS. BELLOWS: |
| 24 | Q    So I guess I'm interested in what reports you |
| 25 | reviewed on a regular basis, and you had mentioned  12:55:37 |

Page 118

| | |
|---|---|
| 1 | that monthly income statement. |
| 2 | A   Correct. |
| 3 | Q   What -- thinking about that report, on what |
| 4 | level did it provide this data? |
| 5 | MR. FIELDS:  Vague and ambiguous.              12:55:51 |
| 6 | BY MS. BELLOWS: |
| 7 | Q   On what geographic level did it provide this |
| 8 | data? |
| 9 | MR. FIELDS:  Vague and ambiguous. |
| 10 | THE DEPONENT:  Basically I looked at -- I     12:56:03 |
| 11 | typically looked at by AVP, by person.  My job was |
| 12 | to make sure people were performing.  So it |
| 13 | wasn't -- it was geographic in a sense only because |
| 14 | the people were responsible for specific geographic |
| 15 | areas, but it was more about the person's          12:56:34 |
| 16 | performance. |
| 17 | BY MS. BELLOWS: |
| 18 | Q   The acronym you said was ABP; is that |
| 19 | correct? |
| 20 | A   AVP, area vice president.                   12:56:45 |
| 21 | Q   Area vice president.  Okay.  Thank you. |
| 22 | Was there an area vice president for |
| 23 | California? |
| 24 | A   There were several. |
| 25 | Q   How many were there?                        12:57:02 |

Page 119

| 1 | MR. FIELDS:  Vague as to time. | |
|---|---|---|
| 2 | BY MS. BELLOWS: | |
| 3 | Q   Talking about the period up to 2008. | |
| 4 | A   I believe -- well, there could have been | |
| 5 | four. | 12:57:23 |
| 6 | Q   Okay.  And what areas of the state did they | |
| 7 | cover? | |
| 8 | A   One was San Francisco.  One was L.A.  Another | |
| 9 | was Orange County, San Diego. | |
| 10 | Q   Did the income reports provide information | 12:57:46 |
| 11 | about the amount of time spent by the property-level | |
| 12 | employees performing late rent collection activities | |
| 13 | in California? | |
| 14 | A   No. | |
| 15 | Q   Did the income reports specify any dollar | 12:58:12 |
| 16 | figures attributable to the time spent by | |
| 17 | property-level employees performing late rent | |
| 18 | collection activities in California? | |
| 19 | A   No. | |
| 20 | Q   Were there any other reports regarding | 12:58:25 |
| 21 | personnel costs that you looked at on a regular | |
| 22 | basis for the period up to including 2008? | |
| 23 | A   No. | |
| 24 | Q   Are you familiar with what determines the | |
| 25 | level of staffing at Equity Residential properties? | 12:58:59 |

Page 120

1      NAA, you are going to contribute your payroll data

2      there.  But there's numerous -- numerous sources.

3         Q    Are the wages paid by other employers in the

4      locality for comparable work a factor in determining

5      the pay rates for Equity Residential's              01:02:57

6      property-level employees?

7         A    Of course.

8         Q    Is the minimum wage a factor in determining

9      the pay rates for Equity Residential's

10     property-level employees?                           01:03:11

11        A    I don't believe we had one single employee

12     making minimum wage.

13             MR. FIELDS:  We've been going over an hour.

14     So when would be a good time for a break?

15             MS. BELLOWS:  Let me just ask one more       01:03:25

16     question, and I think this is a good time.

17     BY MS. BELLOWS:

18        Q    What is your knowledge about staffing and

19     compensation based on?  Is it based on work that you

20     did as executive vice president of operations?       01:03:43

21        A    What is my knowledge based on?

22        Q    Your knowledge of Equity Residential's

23     practices related to staffing and compensation for

24     its property-level employees in California, how did

25     you derive that knowledge?                          01:04:03

Page 123

```
 1        A   Well, we had published pay ranges.  Employees

 2    knew where they fell within that range as part of

 3    their year-end compensation statement.

 4          I reviewed -- you know, I mean, I don't --

 5        Q   I guess I'm trying to ask about your              01:04:36

 6    knowledge of the company's practices.  Were you

 7    involved in making these decisions?

 8        A   Yes.

 9          MS. BELLOWS:  Okay.  All right.  Let's take a

10    break.                                                    01:04:51

11          (Recess 1:04 to 1:20 PST.)

12    BY MS. BELLOWS:

13        Q   Mr. Santee, before the break, we were

14    discussing personnel costs at Equity Residential

15    California properties.  Can you list every factor         01:20:47

16    that you can think of that drive personnel costs at

17    Equity Residential's California properties?

18          MR. FIELDS:  Overbroad, vague as to time,

19    improper deposition question.

20    BY MS. BELLOWS:                                           01:21:18

21        Q   You can answer.

22        A   Every factor or component -- do you mean

23    component or --

24        Q   Sure.  Component is a -- I guess what I'm

25    trying to talk about is why costs might be higher at      01:21:23
```

Page 124

```
 1    BY MS. BELLOWS:

 2       Q   And does Equity have units in California or

 3    at the time that you left the company or the last

 4    time you're familiar with this information, did

 5    Equity have such units in its properties in          01:34:31

 6    California?

 7       A   Yes, we did.

 8       Q   With respect to personnel costs at Equity

 9    Residential California property, does the rental

10    occupancy rate of a property impact the personnel    01:34:50

11    costs for that property?  4?

12       A   I would say no unless there is some dire

13    problem.

14       Q   What would be an example of a dire problem?

15       A   Well, I mean, if there was a natural          01:35:16

16    disaster, earthquake that created fires, that caused

17    some need for additional personnel.

18       Q   I see.  Okay.

19           During the process in the spring of 2008 to

20    adopt the California late fee, did you provide the   01:35:48

21    cumulative value in the fee any information

22    regarding Equity Residential's personnel costs

23    resulting from the late payment of rent?

24           MR. FIELDS:  Vague and ambiguous as to

25    "provide."                                           01:35:59
```

Page 132

```
 1    BY MS. BELLOWS:

 2        Q    You can answer.

 3        A    No, not that I recall.

 4        Q    Is it correct that no one asked you about

 5    Equity Residential's personnel costs resulting from      01:36:15

 6    the late payment of rent as part of the California

 7    late fee adoption process from April to June of

 8    2008?

 9        A    No one needed to ask me.  Everyone had access

10    to it.                                                   01:36:30

11        Q    To your knowledge, did anyone else provide

12    information regarding Equity Residential's personnel

13    costs resulting from the late payment of rent during

14    the process of adopting the California late fee from

15    April to June of 2008?                                   01:36:45

16        A    Not to my knowledge.

17        Q    At the time the California late fee was

18    adopted in 2008, were you familiar with the

19    activities performed by Equity Residential employees

20    at the property level to collect late rate from          01:37:05

21    California tenants?

22        A    Absolutely.

23        Q    Can you please describe the late rent

24    collection process as you understood it in 2008?

25        A    Well, there's -- the first step is typically    01:37:28
```

Page 133

| | |
|---|---|
| 1 | a three-day notice which requires, you know, issuing |
| 2 | the notice, having that delivered to the door. |
| 3 | In some places people would do a follow-up |
| 4 | notice, which required issuing the notice, |
| 5 | delivering it to the door. |
| 6 | Then there were -- you know, I'm sure every |
| 7 | manager had their own process.  But typically a |
| 8 | phone call was made once it went past a certain day |
| 9 | and then you would issue a pay or quit, which that's |
| 10 | a little more involved form that is posted and -- |
| 11 | posted to the door. |
| 12 | Then you have to make a decision as to |
| 13 | whether, you know, creating online payments created |
| 14 | more of a challenge, because once you accept even a |
| 15 | partial payment from someone that's on a three-day |
| 16 | pay or quit, you would then have to go back and |
| 17 | issue another three-day pay or quit.  So you could |
| 18 | make the decision to go disable their ability to |
| 19 | make a payment on the portal. |
| 20 | So let's just say they issue the three-day |
| 21 | pay or quit.  No activity, no response.  I mean, |
| 22 | typically a good manager would make numerous phone |
| 23 | calls trying to work with someone, you know, |
| 24 | numerous phone calls, and try to achieve a |
| 25 | commitment date to pay. |

01:37:52

01:38:24

01:38:48

01:39:15

01:39:40

Page 134

```
 1              As you are approaching the end of the month,

 2     you really need to make a decision if you are going

 3     to turn that over to an attorney or not.

 4              And then that requires pulling all these

 5     documents together, all of the files, what have you,     01:39:58

 6     and then making a decision to send it to attorney to

 7     file for eviction.

 8              So it's a pretty laborious, time-consuming

 9     process.

10        Q   You mentioned that if a property accepts a        01:40:12

11     partial payment, they would need to issue a new

12     notice.

13              Did the property have the discretion to

14     accept or reject a partial payment or was that set

15     by company policy?                                       01:40:33

16              MR. FIELDS:  Vague as to time.

17              THE DEPONENT:  Well, I guess I would say our

18     lease represented the company policy, but then there

19     is reality.

20              I'm sure there are people that took partial     01:40:49

21     payments.  To what extent, I have no idea.

22     BY MS. BELLOWS:

23        Q   And what is the purpose of disabling online

24     payments to avoid partial payments?  Why would the

25     company want to do that?                                 01:41:11
```

Page 135

1            MR. FIELDS:  Calls for speculation,

2    overbroad, vague as to time.

3            THE DEPONENT:  Again, I don't know -- I have

4    no idea.  It was not something that was ever

5    measured.  There are many reasons to accept a        01:44:36

6    partial payment.  There are just as many reasons not

7    to accept partial payments.  This is not a black and

8    white subject.

9    BY MS. BELLOWS:

10       Q   Sure.  I appreciate that.                     01:44:54

11           I'm trying to understand who made that

12   decision.

13       A   The person that is ultimately talking to the

14   resident that's making the promise to pay.

15       Q   Okay.                                         01:45:05

16       A   The property manager.

17       Q   Okay.  And what is the basis of your

18   knowledge regarding the late rent collection

19   process, specifically your knowledge -- the

20   knowledge that you had in 2008?                       01:45:19

21       A   I used to be a property manager in

22   California.

23       Q   Was that before -- okay.  That was before

24   working with Equity Residential?

25       A   Yes, it was.                                  01:45:40

Page 138

1        Q    Okay.

2        A    But the process doesn't -- the process

3    doesn't change.  I mean, the process is really

4    determined by the law.  And the law and the process

5    really hasn't changed.                              01:45:52

6        Q    And what company did you work for when you

7    were a property manager in California?

8        A    It was called R and B Enterprises, Oakwood --

9        Q    Where is it located?

10       A    They are no longer in existence, but they    01:46:17

11   were on Corinth Avenue in Los Angeles.

12       Q    And what years did you have that position,

13   approximately?

14       A    1983 until I think November of 1991.

15       Q    Okay.  Are you familiar with the term "lost   01:46:42

16   use of funds" as it relates to the late payment of

17   rent?

18       A    Lost use of funds?  Opportunity costs, yes.

19   Yes.

20       Q    Can you tell me what you mean by opportunity   01:47:04

21   costs?

22       A    Well, it's -- you are missing out on an

23   opportunity over here because the money is over

24   there.

25       Q    Okay.                                          01:47:15

Page 139

```
 1        A   You don't have use of the money.

 2        Q   Okay.  In 2008, did you assess Equity

 3   Residential's damages resulting from the lost use of

 4   funds in connection with the adoption of the

 5   California late fee?                              01:47:37

 6        A   No, I did not.

 7        Q   Are you aware of any assessment of Equity

 8   Residential's damages resulting from the lost use of

 9   funds in connection with the adoption of the

10   California late fee in 2008?                      01:47:50

11        A   I'm not.

12        Q   Prior to the adoption of the current late fee

13   policy for California in 2008, were you aware of the

14   amount of lost use of funds incurred by Equity

15   Residential as a result of the late payment of rent?  01:48:11

16        A   I'll say no.

17        Q   In 2008, in connection with the adoption of

18   the California late fee, did you assess the cost of

19   attorneys' fees resulting from unlawful detainer

20   proceedings for California?                       01:48:42

21        A   I had knowledge of attorneys' costs for

22   unlawful detainers.

23        Q   Did anyone ask you to provide data or other

24   information about what those costs might be?

25        A   No.                                      01:49:05
```

Page 140

| | |
|---|---|
| 1 | Q   Are you aware of anyone else assessing the |
| 2 | cost of attorneys' fees resulting from unlawful |
| 3 | detainer proceedings in 2008 when the company was in |
| 4 | the process of adopting the California late fee? |
| 5 | A   No.    01:49:22 |
| 6 | Q   To your knowledge, prior to adopting the |
| 7 | California late fee in 2008, did Equity Residential |
| 8 | attempt to calculate the actual costs resulting from |
| 9 | the late payment of rent by California tenants? |
| 10 | A   Not directly.    01:49:56 |
| 11 | Q   What do you mean by "not directly"? |
| 12 | A   I think it was common knowledge that the |
| 13 | process in California was much longer and more |
| 14 | expensive than pretty much any other state in the |
| 15 | United States.    01:50:16 |
| 16 | Q   Did you have data regarding the costs in |
| 17 | other states? |
| 18 | A   Yes. |
| 19 | Q   Regarding the costs of collecting late fees? |
| 20 | A   I had information --    01:50:37 |
| 21 | Q   I'm sorry, collecting late rent. |
| 22 | A   -- on the amount of money that we spent on |
| 23 | attorneys. |
| 24 | Q   Are there any reports or other materials that |
| 25 | you referred to for that knowledge in 2008?    01:51:00 |

Page 141

1    as achieving goals.  You know, basically just

2    measuring key performance indicators.

3        Q   Were late fees included in that review

4    process?

5        A   I don't recall.                          01:53:01

6        Q   I'm going to mark a document.  It's going to

7    take me a minute, but you can start making your way

8    to the Exhibit Share.

9            (Exhibit 15 was marked for

10           identification and is attached           01:53:31

11           hereto.)

12   BY MS. BELLOWS:

13       Q   I've just marked as -- let me check the

14   number here -- Exhibit 15 an e-mail from Ann Paton

15   to yourself, Chris Jenkins, and Denise Beihoffer     01:54:19

16   dated --

17           MR. FIELDS:  I'm sorry.  I need to take just

18   two minutes, please.  I have somebody that's

19   delivering something and I need to open the garage

20   door.                                             01:54:37

21           MR. FIELDS:  Sure.

22           MS. BELLOWS:  Okay.

23           (Recess 1:54 to 2:03 PST.)

24   BY MS. BELLOWS:

25       Q   I had just marked as Exhibit 15 an e-mail     02:03:42

Trial Ex. 1083

```
 1    from Ann Paton, dated July 11, 2008, addressed to

 2    yourself, Chris Jenkins, and Denise Beihoffer.  It

 3    has a Bates Stamp WP008006.  Do you have that in

 4    front of you?

 5         A   One second.                              02:04:07

 6             Okay.

 7         Q   Do you recognize the e-mail that has been

 8    marked as Exhibit 15?

 9         A   I guess.  Yes.

10         Q   You're a recipient of this e-mail; is that 02:04:35

11    correct?

12         A   Yes.

13         Q   Do you have any reason to believe you did not

14    receive the e-mail?

15         A   No.                                      02:04:43

16         Q   Okay.  Ms. Paton writes (as read):

17             "Attached are the charts that we

18             reviewed today.  I made a few minor

19             adjustments to them.  If you need a

20             hard copy, you should print these."     02:05:17

21             Do you remember reviewing late fee charts

22    with Denise Beihoffer on September 11, 2008?

23         A   Not specifically.

24         Q   Generally?

25         A   No.  I mean, I don't know what the charts 02:05:33
```

Trial Ex. 1083

Page 144

```
1    are.  I don't know what they represent.

2        Q   Okay.  Let's introduce the charts.
                                    Trial Ex. 1083
3            I've just marked as ~~Exhibit 16~~ a document

4    that is a chart with a title of "Late Fees."  It has

5    a revision date of July 11, 2008, and the Bates          02:06:31

6    Stamp begins at 8007, WP008007.
             Trial Ex. 1083
7            (~~Exhibit 16~~ was marked for

8            identification and is attached

9            hereto.)

10   BY MS. BELLOWS:                                           02:06:43

11       Q   Do you have that in front of you?

12       A   Not yet.  Hold on.

13       Q   Okay.

14           Do you recognize this chart?

15       A   Yes.                                              02:06:58

16       Q   Can you describe to me what it is?

17       A   It looks like the last chart you showed me,

18   just a summary by state of the fee.

19       Q   Now that you look at this, do you remember

20   reviewing this chart with Ms. Beihoffer and              02:07:17

21   Mr. Jenkins and Ms. Paton?

22       A   Well, I mean, to me it looks -- it's just the

23   same chart that we saw before.  When you asked me if

24   I reviewed -- the question you asked me is that's --

25   this is the late fee policy, not the charges.  So        02:07:43
```

Page 145

1    this is just the late fee policy.

2       Q   Why did you review this chart in July 2008?

3           MR. FIELDS:  Hang on.  Mischaracterizes his

4    testimony.  I don't think he's testified about that.

5    BY MS. BELLOWS:                                    02:08:15

6       Q   Did you review this chart in July of 2008?

7       A   I don't -- does it say I did?  I don't know.

8    I mean, it's a -- this is the same format document

9    that you put up a few slides ago.  It's just kind of

10   a working document.  I don't know that there's        02:08:40

11   anything to review.

12      Q   Is there any reason to think that this is

13   not the -- that you did not receive this chart along

14   with Ms. Paton's e-mail that we just reviewed as

15   Exhibit 15?                                          02:08:58

16      A   No, there's no reason.

17      Q   Okay.  Do you recall telling Ms. Paton and

18   Ms. Beihoffer in July 2008 that you believed that

19   the fees had been increased to what the market would

20   bear?                                               02:09:22

21      A   Did I make that statement?

22      Q   Yes.  Did you make that statement?

23      A   Not that I recall.

24      Q   Okay.  Let me introduce an exhibit.  Bear

25   with me a moment.                                    02:09:49

Page 146

1    didn't say that?

2        A   No.

3        Q   And the recent fee analysis, does that

4    include the effort to increase the California late

5    fee that we discussed earlier today?                    02:16:38

6            MR. FIELDS:  Misstates the document and calls

7    for speculation as to what that phrase refers to.

8    BY MS. BELLOWS:

9        Q   You can answer the question.

10       A   Again, this is really just a rehashment of a    02:16:51

11   document and a process that we have already

12   reviewed.  This was more about developing an

13   employee, not about the substantive nature of what

14   was in there.

15           You know, I don't know what else to tell you.   02:17:08

16   I mean, there's -- the late fee had been implemented

17   at not even a month based upon the last documents, I

18   believe.  I mean, it's certainly not any -- I mean,

19   it's just a restatement of the current position on

20   basically all fees across all states, and we agreed   02:17:45

21   to post it on eDocs so people would have a reference

22   so if there was any doubt, any question, there was a

23   point for them to go validate that.  I think this is

24   more about eDocs than the doc.

25       Q   Okay.  Let's go back to ~~Exhibit 16~~ Trial Ex. 1083, which is   02:18:15

                                                     Page 150

```
 1    the fee chart.  Let me know when you have that open.
 2    A   There it is.  Okay.
 3    Q   Do you know how this chart was put together?
 4        MR. FIELDS:  Vague and ambiguous as to how.
 5        THE DEPONENT:  Well, this was what Denise and          02:18:54
 6    Ann -- this is what they did.  This was their job.
 7    BY MS. BELLOWS:
 8    Q   What was the purpose of the chart?
 9    A   Keep us out of trouble.  So that we knew what
10    the boundaries were.  So people would not be rogue      02:19:12
11    and try to do something contrary to what was
12    acceptable.
13    Q   Do you see where it says -- this is in the
14    column under "Comments" for the state of California
15    (as read):                                              02:19:38
16            "From local counsel, courts will
17        apply a liquidated damages analysis.
18        Must be a reasonable estimate of
19        landlord's damages."
20        Do you see that?                                    02:19:50
21    A   Which?  I'm sorry.  Is it California?
22    Q   California.
23    A   (As read):
24            "Only as specified in the lease and
25        only -- or if the cost can't be
```

Page 151

| | |
|---|---|
| 1 | determined with certainty, any" -- |
| 2 | Q   I'm looking at the column called -- |
| 3 | A   Oh. (As read): |
| 4 | "Damage analysis must be a |
| 5 | reasonable estimate of damages." |
| 6 | Okay. |
| 7 | Q   Let's stop there. |
| 8 | So did you discuss the liquidated damages |
| 9 | analysis with Ms. Beihoffer, Ms. Paton, and |
| 10 | Mr. Jenkins?                              02:20:51 |
| 11 | A   Here is my response.  There was an amount |
| 12 | agreed to in the 19 whatever case it was, in the |
| 13 | settlement.  My job was to rely upon what my legal |
| 14 | department told me.  This -- this form is a -- or |
| 15 | probably other forms are fees that put us at risk.   02:21:31 |
| 16 | Not all fees are at risk.  So, to me, the fact that |
| 17 | we were mindful of this, that we were -- that we |
| 18 | spent considerable amounts of time discussing this, |
| 19 | at some point in time, the legal department says yay |
| 20 | or nay.  I mean, that's the process.        02:21:55 |
| 21 | So this is clearly put out there so that it |
| 22 | informs all employees, people that are closest to |
| 23 | the customer, people that enter the charges, and |
| 24 | what you have into the computer, this is to educate |
| 25 | them and to advise them not to do anything about   02:22:19 |

| | |
|---|---|
| 1 | increasing anything. |
| 2 | Again, this was going back to having a |
| 3 | standardized process, ensuring that, you know, |
| 4 | people just didn't go out there and do whatever they |
| 5 | wanted to do, and this document is directing them to |
| 6 | be very careful and to not do anything with these |
| 7 | fees without contacting the legal department. |
| 8 | That's all this -- |
| 9 | Q   I appreciate that context. |
| 10 | My question is, did you discuss the |
| 11 | liquidated damages analysis with Ms. Beihoffer or |
| 12 | Ms. Paton in July 2008? |
| 13 | A   I don't recall specifically. |
| 14 | Q   Do you recall discussing that requirement in |
| 15 | April to June 2008 when you were discussing the |
| 16 | California late fee that was eventually adopted on |
| 17 | June 4th? |
| 18 | A   Well, I mean, I guess I would be -- I would |
| 19 | assume that a settlement agreement was the |
| 20 | liquidated damages, and that was the baseline. |
| 21 | Q   Did you have any understanding of what the |
| 22 | landlord's damages referred to in this chart means? |
| 23 | A   I would assume it would be time, labor, costs |
| 24 | to pursue a delinquent account.  All the other costs |
| 25 | that go with it, loss of, you know, use of funds, |

02:22:38

02:22:54

02:23:20

02:23:43

02:24:08

Page 153

| | |
|---|---|
| 1 | what have you. |
| 2 |        MR. FIELDS:  Can you hear me? |
| 3 |        MS. BELLOWS:  Yes. |
| 4 |        MR. FIELDS:  Okay.  I was texting.  You all |
| 5 | froze on me.  And so I missed the last however many    02:24:23 |
| 6 | seconds. |
| 7 |        THE DEPONENT:  It was quiet. |
| 8 |        MR. FIELDS:  There was a question and I don't |
| 9 | know if David answered it, and then I'm back now. |
| 10 | Can I get whatever happened in the last 30 seconds    02:24:32 |
| 11 | read back. |
| 12 |        (Record was read back by the |
| 13 |        deposition officer as follows: |
| 14 |          "QUESTION:  Did you have any |
| 15 |          understanding of what the landlord's    02:23:49 |
| 16 |          damages referred to in this chart |
| 17 |          means? |
| 18 |          "ANSWER:  I would assume it would |
| 19 |          be time, labor, costs to pursue a |
| 20 |          delinquent account.  All the other    02:24:04 |
| 21 |          costs that go with it, loss of, you |
| 22 |          know, use of funds, what have you.") |
| 23 | BY MS. BELLOWS: |
| 24 |    Q   To your knowledge, did anyone calculate an |
| 25 | estimate of landlord's damages from late rent for    02:25:27 |

Page 154

```
 1    Equity's California residential properties in the

 2    summer of 2008 or any time after that before 2014?

 3           MR. FIELDS:  Overbroad.

 4           THE DEPONENT:  Not to my knowledge.

 5    BY MS. BELLOWS:                                          02:25:45

 6       Q   Do you know why not?

 7       A   I believe that the settlement amount that was

 8    done ten years prior -- I mean, inflation alone

 9    would more than move that number up.

10       Q   So you say that would be your assumption --    02:26:22

11       A   It comes down to what is the parameters of

12    liquidated damages.  It's impossible to do unless

13    you are mandated to calculate it a certain way.

14       Q   Yeah.  You said your assumption.  Do you

15    remember any specific decision-making about whether   02:26:51

16    to conduct such a calculation or not?

17       A   I think the basis of the discussion was

18    centered around the finding of the settlement

19    agreement from ten years earlier and discussions

20    with local counsel and looking at our competitor.    02:27:13

21       Q   And that was true for the period from 2008 to

22    2014?

23       A   I don't know what the significance of 2014

24    is.

25       Q   Well, we'll talk about 2014 in a moment.      02:27:34
```

Page 155

1        A    Okay.

2        Q    For reference --

3        A    Well, that was the basis and there wasn't any

4    reason to change anything unless something changed

5    in the legislative environment or what have you.          02:27:56

6        Q    Okay.  I'm going to mark the next exhibit.

7            (Exhibit 18 was marked for

8            identification and is attached

9            hereto.)

10   BY MS. BELLOWS:                                            02:28:11

11       Q    Are we good to go for a little longer or --

12       A    Yeah.

13       Q    -- are people feeling ready for a break?

14   Okay.

**Trial Ex. 68**

15            I have just marked as ~~Exhibit 18~~ a memorandum    02:28:58

16   addressed to yourself and Fred Tuomi from Ann Paton

17   and Denise Beihoffer.  It's dated January 25, 2011.

18            The Bates Stamp on the first page is

19   WP004373.

20            Do you have that before you?                      02:29:19

21       A    I do.

22       Q    Do you recognize this document?

23       A    Somewhat.

24       Q    So this document is dated 2011.  What was

25   Fred Tuomi's position in 2011?                             02:29:52

Page 156

 1        A   Fred was executive VP, property management,

 2   president of the property management company.

 3        Q   Okay.   Executive VP of property management

 4   and president of the property management company; is

 5   that right?                                              02:30:13

 6        A   Well, I guess it would be executive vice

 7   president of Equity Residential and then president

 8   of the property management company, which was a

 9   separate tax REIT.

10        Q   Is that Equity Residential Management?         02:30:29

11        A   There was an official name for it.  It was a

12   separate.

13        Q   Okay.  So if you go to the second page of

14   this document, there's another chart.  And the first

15   line of that chart is about California.                 02:30:54

16            Do you see that?

17        A   Yep.

18        Q   And under "Proposed Change," it reads (as

19   read):

20            "Consider changing late fees from 5           02:31:10

21            percent on the 5th to a flat fee of

22            $50 on the 5th."

23            And then in parentheses, it says (as read):

24            "And consider the potential to

25            charge another flat fee later in the          02:31:22

Page 157

```
 1        Q   I will introduce another exhibit.

 2            (Exhibit 19 was marked for

 3            identification and is attached

 4            hereto.)

 5   BY MS. BELLOWS:                                    02:33:29

 6        Q   I just marked as Exhibit 19 an e-mail from

 7   Denise Beihoffer dated February 2011.  Do you have

 8   that in front of you?

 9        A   Okay.

10        Q   And in that e-mail lower down, Denise      02:34:18

11   Beihoffer references the summaries that she sent to

12   you and mentions a meeting scheduled for Thursday.

13   That e-mail is dated Tuesday, January 25th.  And she

14   invites Jim Fiffer to join.

15            Does this help you to remember the meeting 02:34:44

16   dated January 27, 2011?

17        A   No.  Not actually.

18        Q   You don't know if Jim Fiffer attended that

19   meeting?

20        A   No, I don't.  I don't recall.             02:35:01
```

Trial Ex. 68

```
21        Q   If you go back to Exhibit 18, the memorandum

22   that we were just looking at.

23            Are you there?

24        A   I am.

25        Q   It is addressed to you and Fred Tuomi.  Is it 02:35:35
```

Page 159

1   correct that you two would have been the

2   decision-makers on accepting or rejecting any of the

3   changes set out in this memorandum?

4       A   My position was to facilitate decisions and,

5   you know, get those in the process.  I don't think          02:36:03

6   the decision-making process changed from when we

7   reviewed the -- the memos from Mickey and Bruce that

8   said, "Done.  Done."  But the process had not

9   changed as of this date.  The decision-makers were

10  still the same.  I was an influencer, but I was not         02:36:34

11  a decision-maker on that particular item.

12      Q   The decision-makers would have been

13  Mr. Cummings and Mr. Lavine?

14      A   Well, it would have been more Fred.

15          Again, see, you know, I think this was             02:36:49

16  more -- this memo is more of internal -- I don't

17  think it has anything to do with fees.  I think it

18  is just more creating a disciplined meeting process

19  between the operations of the legal department.

20      Q   I just want to be clear about this.  Who          02:37:25

21  would have the authority to act on the

22  recommendations made in this memo?

23      A   Certainly Fred.

24      Q   Fred had that authority?

25      A   Yes.                                                02:37:40

Page 160

```
 1        A   Not specifically.

 2        Q   Generally?

 3        A   Well, who did it?  If it was instituted by

 4    the legal department, I would not necessarily know

 5    that that was undertaken.                              02:39:40

 6        Q   Okay.  Do you have any memory of being

 7    involved in that effort?

 8        A   No, no.

 9        Q   Okay.  I'm going to mark another exhibit.

10    Hold on a minute.                                      02:40:16
```

```
11            The document I've just marked as Exhibit 20   [Trial Ex. 89]

12    is an e-mail from Susan Zumph to David Santee,

13    yourself, with CCs to Jim Fiffer, Bruce Strohm and

14    Ann Paton, dated November 24, 2014.  The Bates Stamp

15    is WP008050.                                           02:41:04

16            (Exhibit 20 was marked for                     [Trial Ex. 89]

17            identification and is attached

18            hereto.)

19    BY MS. BELLOWS:

20        Q   Do you have that document in front of you?     02:41:08

21        A   Okay.

22        Q   And do you recognize this e-mail?

23        A   Possibly.

24        Q   Did you receive it?

25        A   I assume I did.                                02:41:51
```

Page 162

| | |
|---|---|
| 1 | Q   You assume you did because you're a |
| 2 | recipient, correct, listed on the e-mail? |
| 3 | A   Yes. |
| 4 | Q   Well, there's no reason to think you didn't |
| 5 | receive it? |
| 6 | A   Right. |
| 7 | Q   This e-mail is from Susan Zumph about the |
| 8 | annual review of late fees.  Was she usually |
| 9 | involved in the annual review of late fees, in your |
| 10 | experience? |
| 11 | A   No, she was not. |
| 12 | Q   And why not? |
| 13 | MR. FIELDS:  Calls for speculation as |
| 14 | phrased. |
| 15 | BY MS. BELLOWS: |
| 16 | Q   If you know. |
| 17 | A   It wasn't in her bailiwick. |
| 18 | Q   Okay.  She says (as read): |
| 19 | "Attached is a memo summarizing the |
| 20 | the changes that we recommend." |
| 21 | And this is with regards to fees, correct? |
| 22 | A   Yes. |
| 23 | (~~Exhibit 21~~ **Trial Ex. 89** was marked for |
| 24 | identification and is attached |
| 25 | hereto.) |

02:42:00

02:42:16

02:42:26

02:42:46

02:43:32

Page 163

```
1    ///

2    BY MS. BELLOWS:
                                    Trial Ex. 89
3         Q    Okay.  I'm marking Exhibit 21, which is a

4    memo dated November 14, 2014.  It's addressed to

5    yourself, Bruce Strohm, and Jim Fiffer from Susan      02:43:40

6    Zumph and Ann Paton, with a CC to Denise Beihoffer.

7    The Bates Stamp on the first page is WP008051.

8         Do you see that?

9         A    Okay.

10        Q    Do you recognize this document?              02:44:15

11        A    I'm going to assume I received it.

12        Q    Because you are listed as the recipient?

13        A    Yes.

14        Q    And is there no reason you would not have

15   received this document, correct?                       02:44:35

16        A    No.

17        Q    Is there any reason to think this is not the

18   attachment to Ms. Zumph's e-mail that we were just

19   looking at?

20        A    That this would be the attachment?           02:44:46

21        Q    Yeah.

22        A    I don't know.

23        Q    Okay.  So I'd like to direct your attention

24   to the third full paragraph.

25        The last sentence of that paragraph states        02:45:17
```

Page 164

```
 1    (as read):

 2         "Our recommendations are a

 3         reflection of the balance between our

 4         legal guidance and our business

 5         judgment."                              02:45:30

 6         Do you see that?

 7    A   I'm sorry.  Tell me where.

 8    Q   The last sentence of the third full

 9  paragraph.
```

10      A   Okay.                                    02:46:14

11      Q   Do you see that sentence?

12      A   Okay.  I'm reading the entire paragraph.

13      Q   Okay.

14      A   Okay.

15      Q   How do you interpret the statement that our   02:46:59

16   recommendations are a reflection of the balance

17   legal guidance and business judgment?

18        MR. FIELDS:  Calls for speculation as to what

19   someone else said.  It's not really a proper

20   deposition question.                           02:47:13

```
21        MS. BELLOWS:  I'm asking about his

22   interpretation.  And you can keep your objections a

23   little shorter.  It would be appreciated.  Thank

24   you.

25        MR. FIELDS:  That was a five-second         02:47:19
```

Veritext Legal Solutions
866 299-5127

1   provide it.  But if you are guessing, she's not

2   entitled to your guesses.

3        THE DEPONENT:  Okay.

4        MS. BELLOWS:  Just note that this amount of                    02:58:07

5   coaching isn't required.

6        MR. FIELDS:  I'm not coaching.  You're asking

7   speculative questions of a lay witness, trying to

8   get him to commit to speculation, and that's

9   improper.  And that's why my objections have picked

10  up in the last ten minutes.  I don't like having to    02:58:18

11  object this much, but your questions are requiring

12  it.

13  BY MS. BELLOWS:

14   Q  Please answer the question.

15       MR. FIELDS:  Is there a question pending?          02:58:31

16  BY MS. BELLOWS:

17   Q  Yes.  Why would that common-sense approach

18  only apply to the listed states in that sentence?

19       MR. FIELDS:  Calls for speculation.

20       THE DEPONENT:  I don't know.  I can                 02:58:50

21  only -- there are very different states.

22  BY MS. BELLOWS:

23   Q  Okay.  Let's go to the next page.  This is

Trial Ex. 89

24  still Exhibit 21.  Do you see the heading,

25  "California"?                                            02:59:18

Page 173

```
 1        A   Yes.

 2        Q   And then the first bullet point is about the

 3   late fee, correct?

 4        A   Yes.

 5        Q   Okay.  Let's look first at the footnote to      02:59:36

 6   that paragraph.  It reads (as read):

 7            "Under California statute,

 8        liquidated damages provisions is only

 9        lawful if the parties agree in the

10        lease that it would be extremely         02:59:50

11        difficult to determine the amount of

12        actual damages arising out of the late

13        payment.  The cases interpreting the

14        statute further require that the

15        amount of the fee represent a           02:59:59

16        reasonable effort by the parties to

17        estimate the amount of the damage

18        arising out of the late payment."

19        Do you see that?

20        A   Yes.                                 03:00:12

21        Q   Okay.  And then if you look back in the

22   bullet point about the late fees, the second

23   sentence begins (as read):

24            "We settled a 1999 class action

25        lawsuit that challenged our late fee     03:00:29
```

Page 174

| | | |
|---|---|---|
| 1 | because we did not determine how much | |
| 2 | residents' late payments costs us | |
| 3 | before assessing the fees (or being | |
| 4 | sued.)  In an attempt to mitigate our | |
| 5 | damages in that lawsuit, we engaged an | 03:00:44 |
| 6 | expert to assess the amount of our | |
| 7 | damages based on our costs and | |
| 8 | business processes at that time." | |
| 9 | Do you see that? | |
| 10 | A   I do. | 03:00:50 |
| 11 | Q   Do you understand that to be referring to the | |
| 12 | PricewaterhouseCoopers report that we discussed | |
| 13 | earlier today? | |
| 14 | MR. FIELDS:  Calls for speculation. | |
| 15 | BY MS. BELLOWS: | 03:01:08 |
| 16 | Q   I'm sorry, what was your answer? | |
| 17 | A   I have not seen the Pricewaterhouse report. | |
| 18 | Q   Do you think this might be referring to some | |
| 19 | other report? | |
| 20 | A   I don't know. | 03:01:21 |
| 21 | Q   Okay.  The next sentence reads (as read): | |
| 22 | "We have not updated our -- we have | |
| 23 | not updated this analysis in the | |
| 24 | ensuing 15 years." | |
| 25 | Do you see that? | 03:01:36 |

Page 175

```
 1        A    Yes.

 2        Q    Is that an accurate statement, to your

 3    knowledge?

 4            MR. FIELDS:   Vague and ambiguous as to what

 5    the phrase that was quoted is referring to.          03:01:45

 6            THE DEPONENT:   I don't have any knowledge of

 7    an updated liquidated damage study.

 8    BY MS. BELLOWS:

 9        Q    Okay.  And then that sentence continues (as

10    read):                                                03:01:59

11           "Even though our business processes

12           and the amount of the fee have changed

13           drastically (and in inverse proportion

14           to each other.)"

15        Do you see that?                                 03:02:14

16        A    I do.

17        Q    To your knowledge, is this statement

18    accurate?

19            MR. FIELDS:  Vague and ambiguous, calls for

20    speculation.                                          03:02:36

21            THE DEPONENT:  Well, I don't know what's

22    inverse to what.  I mean, have our business

23    processes increased a lot more than our fee?  I

24    would think, versus the other direction.  I don't

25    know which -- I don't know what they are saying is    03:02:46
```

Page 176

1    increased drastically, our costs or the fee.

2    BY MS. BELLOWS:

3        Q   Do you know anything about how EQR's business

4    processes related to the collection of late rent

5    changed in the 15-year period mentioned in this          03:03:06

6    document?

7            MR. FIELDS:  Overbroad.

8            THE DEPOSITION REPORTER:  Can you repeat your

9    question.

10   BY MS. BELLOWS:                                           03:03:15

11       Q   Do you have any knowledge of how EQR's

12   business processes related to the collection of late

13   rent changed in the 15-year period referenced in

14   this document?

15           MR. FIELDS:  Overbroad, vague and ambiguous.      03:03:28

16           THE DEPONENT:  Well, I think it's increased.

17   BY MS. BELLOWS:

18       Q   Why do you think it's increased?

19       A   We certainly aren't paying people what we

20   paid them 15 years ago.  And based on the process        03:03:48

21   that I laid out, it's a very time-intensive process

22   to collect delinquent rent.

23       Q   Do you know anything about how the process to

24   collect delinquent rent changed in California from

25   roughly 1999 to 2014?                                     03:04:08

Page 177

```
 1     it was 5 percent on the minimum balance or the
 2     balance, not the full month's rent.
 3         Q   Okay.  I want to go back to your statement
 4     that you said the automated notices might reduce
 5     time by a hair.                                    03:10:10
 6             What do you mean by that exactly?
 7         A   Well, I mean, time saved is based upon some
 8     baseline.  The notices, the friendly reminders, if
 9     you want to call them that, are not required under
10     any law.  It's more of a courtesy.                 03:10:35
11             When I was in California, we had a white
12     tablet and an orange tablet with preprinted notices
13     that said, you know, your rent is late.  Please get
14     in touch with us.  The orange notice was your rent
15     was really late, we're going to have to file a pay  03:11:05
16     or quit.  And those were simply putting the
17     apartment number on it.  There was no -- you know,
18     you didn't have to fill out a person's name or what
19     have you.
20         Q   But to be clear, that's not Equity          03:11:22
21     Residential's practices that you're testifying
22     about, that's the company you worked for in
23     California?
24         A   To be honest, I don't know what Equity
25     Residential's practices were in California in that  03:11:30
```

Page 181

1    time.

2         I mean, the collection practices were still,

3    I guess I would say, up to that staff as to how they

4    thought best to contact a resident and make efforts

5    to collect any delinquent rent.  There is not a         03:12:02

6    specific science to that.

7         Q   If property-level personnel testified that

8    the automation has cut down on time collecting,

9    would you take issue with that?

10        A   I would have to hear the details of the        03:12:31

11   argument.

12        Q   Okay.

13        A   Just because somebody says something doesn't

14   mean it's true.

15        Q   So if you look back at exhibit -- I believe    03:12:55

16   we're on Exhibit 21.  The correct number.  So the

17   November 2014 memorandum.  Yes, Exhibit 21.

18        So if you look near the end of the paragraph

19   on late fees in California, this is on the second

20   page of the document, Ms. Zumph and Ms. Paton write    03:13:24

21   (as read):

22        "It is prudent to conduct a new

23        study to assess our costs and evaluate

24        whether any adjustments to the fee are

25        appropriate."                                      03:13:36

Page 182

1        A    Yes.

2        Q    Okay.  They provide an estimate for the study

3    and then they write, quote (as read):

4             "Without obtaining the supporting

5             analysis, we are not comfortable                03:15:10

6             continuing to charge these fees in" --

7             and then it breaks off.

8             Did you understand this recommendation to

9    apply to the California late fee in light of the

10   commentary above in the California section?            03:15:28

11            MR. FIELDS:  Calls for speculation.

12            THE DEPONENT:  I mean, they're referencing

13   other fees, I think.  We only need to conduct one

14   study for each fee, not one for each jurisdiction.

15            So not that I recall the specific document,    03:16:01

16   but it sounds like they are looking at other fees.

17   BY MS. BELLOWS:

18       Q    Okay.  Do you interpret that to mean they are

19   looking at studies for late fees nationwide?

20       A    No.  I mean, they are not necessarily --       03:16:20

21            MR. FIELDS:  Calls for -- sorry.

22   BY MS. BELLOWS:

23       Q    If you go back to the California late fee

24   paragraph on page WP008052 when it says (as read):

25            "It is prudent to conduct a new                03:16:45

| 1 | study to assess our costs and evaluate | |
| 2 | whether any adjustments to the fee are | |
| 3 | appropriate." | |
| 4 | And the paragraph explains the requirement of | |
| 5 | a liquidated damages analysis. | 03:16:57 |
| 6 | Does that give you any understanding of | |
| 7 | whether California is one of -- the California late | |
| 8 | fee is one of the fees that needs to be supported by | |
| 9 | the time and motion study reference on the following | |
| 10 | page? | 03:17:14 |
| 11 | MR. FIELDS:  Argumentative and calls for | |
| 12 | speculation as phrased. | |
| 13 | THE DEPONENT:  I mean, it says it is prudent | |
| 14 | to conduct a new study.  So I'm not sure what the | |
| 15 | summary of the other stuff is.  I don't -- | 03:17:31 |
| 16 | BY MS. BELLOWS: | |
| 17 | Q   Did you discuss this memorandum with | |
| 18 | Ms. Zumph? | |
| 19 | A   I could have. | |
| 20 | Q   Do you remember discussing it? | 03:17:58 |
| 21 | A   Not specifically. | |
| 22 | Q   Generally? | |
| 23 | A   Well, I mean, my job changed dramatically. | |
| 24 | As you can see, Fred Tuomi is not copied on that, | |
| 25 | so... | 03:18:15 |

Page 185

| | |
|---|---|
| 1 | Q   I believe he is one of the recipients of |
| 2 | this.  Oh, you're right.  He's not. |
| 3 | A   Yeah, because I became -- |
| 4 | Q   Why would it have been addressed to you and |
| 5 | not to him? |
| 6 | A   Because he left and I became chief operating |
| 7 | officer.  So everything that he did, I took over. |
| 8 | So I -- |
| 9 | Q   Okay. |
| 10 | A   So my recollection beyond that time is not |
| 11 | good.  It was too much -- |
| 12 | Q   If you took over -- I apologize.  If you took |
| 13 | over the same business he used to do, does that mean |
| 14 | that you had the authority to make decisions about |
| 15 | the fees discussed in this memorandum in 2014? |
| 16 | A   Yes. |
| 17 | Q   What decision did you make with regard to the |
| 18 | California late fee after reviewing this memorandum? |
| 19 | MR. FIELDS:  Assumes facts. |
| 20 | THE DEPONENT:  I don't recall the outcome |
| 21 | of -- of this meeting. |
| 22 | BY MS. BELLOWS: |
| 23 | Q   Do you recall the meeting? |
| 24 | A   You know, you had monthly meetings.  You had |
| 25 | weekly meetings with cross-functional groups.  I |

Timestamps (right column):
- 03:18:34 (line 5)
- 03:18:48 (line 10)
- 03:19:09 (line 15)
- 03:19:37 (line 20)
- 03:19:57 (line 25)

Page 186

1    don't recall every meeting or every subject.

2        Q    So that's a no?

3        A    So, no, not specifically.

4        Q    Do you remember your reaction when you read

5    this memorandum, specifically with regard to the          03:20:25

6    California late fee?

7            MR. FIELDS:  It's vague and ambiguous.

8            THE DEPONENT:  I mean, if I don't remember

9    the meeting, I don't remember my reaction.

10   BY MS. BELLOWS:                                            03:20:37

11       Q    So that's a no?

12       A    No.

13       Q    Are there any documents that would refresh

14   your recollection about that meeting?

15           MR. FIELDS:  Calls for speculation.               03:20:59

16           THE DEPONENT:  No.

17   BY MS. BELLOWS:

18       Q    Do you remember looking at any other

19   documents related to the California late fee in

20   connection with considering these recommendations?        03:21:26

21       A    No.

22       Q    Do you remember anyone suggesting changing or

23   eliminating the California late fee until a time and

24   motion study could be completed in connection with

25   this compliance review in 2014?                           03:21:52

Page 187

1         Did you understand that to mean that

2    Ms. Zumph and Ms. Paton were not comfortable

3    continuing to charge the late fee in California

4    without the supporting documentation of the new time

5    and motion study?                              03:23:40

6         MR. FIELDS:  Calls for speculation as to what

7    they intended by this sentence.

8         THE DEPONENT:  I mean, I can't say -- I can't

9    say.  I mean, there's many states, many fees.

10   BY MS. BELLOWS:                                03:23:56

11   Q    Okay.  Did EQR ever complete a time and

12   motion study following this memorandum to support

13   its late fees in California or nationwide?

14        MR. FIELDS:  Calls for speculation and

15   overbroad as phrased.                          03:24:13

16        THE DEPONENT:  Not that I'm aware of.

17   BY MS. BELLOWS:

18   Q    Do you know who made the decision not to

19   pursue a time and motion study?

20        MR. FIELDS:  Assumes facts.               03:24:27

21        THE DEPONENT:  Nope.

22   BY MS. BELLOWS:

23   Q    Would you have had the authority to make the

24   decision to pursue a time and motion study or not?

25   A    I don't know.                             03:24:44

Page 189

1    A   Well, each -- you know, each officer of the

2    company had their level of authority and level of

3    expenditures and what have you.  I don't know what

4    theirs were.

5    Q   Okay.  And, to be clear, you have no memory          03:40:11

6    of what decisions were made in response to the

7    memorandum marked as Exhibit 21?   [Trial Ex. 89]

8    A   No, I do not.

9         MS. BELLOWS:  I'm going to mark the next

10   exhibit for the record.                                  03:40:25

11        (Exhibit 22 was marked for

12        identification and is attached

13        hereto.)

14   BY MS. BELLOWS:

15   Q   I have marked as Exhibit 22 an e-mail from           03:40:48

16   Susan Zumph to yourself, dated December 5, 2014.

17   The Bates Stamp is 8070.

18        Do you have that in front of you?

19   A   Okay.

20   Q   Do you remember receiving this e-mail?               03:41:27

21   A   Not specifically.

22   Q   What do you remember about it?

23   A   Well, all I can say is I -- it says to me,

24   and perhaps I received it, something that I was

25   asked to forward on, and I probably did that.            03:42:07

Page 193

1        I, the undersigned, a Certified Shorthand

2   Reporter of the State of California, Registered

3   Professional Reporter, Certified Live Note Reporter,

4   do hereby certify:

5        That the foregoing proceedings were taken

6   before me at the time and place herein set forth;

7   that any witnesses in the foregoing proceedings,

8   prior to testifying, were duly sworn; that a record

9   of the proceedings was made by me using machine

10   shorthand which was thereafter transcribed under my

11   direction; that the foregoing transcript is a true

12   record of the testimony given.

13        Further, that if the foregoing pertains to

14   the original transcript of a deposition in a Federal

15   Case, before completion of the proceedings, review

16   of the transcript [  ] was [  ] was not requested.

17   I further certify I am neither financially

18   interested in the action nor a relative or employee

19   of any attorney or party to this action.

20        IN WITNESS WHEREOF, I have this date

21   subscribed my name.

22   Dated: March 23, 2021

23

24        MELISSA M. VILLAGRAN

     CSR No. 12543 RPR

25

                              Page 204

Exhibit 9

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

---

|  |  |
|---|---|
| JAVANNI MUNGUIA-BROWN, ANGELINA MAGAÑA, NORMA RODRIGUEZ, and DAVID BONFANTI individually and on behalf of others similarly situated,<br><br>         Plaintiffs,<br><br>     vs.<br><br>EQUITY RESIDENTIAL, a real estate investment trust, ERP OPERATING LIMITED PARTNERSHIP, a partnership, EQUITY RESIDENTIAL MANAGEMENT, L.L.C., EQR-WOODLAND PARK A LIMITED PARTNERSHIP, and EQR-WOODLAND PARK B LIMITED PARTNERSHIP,<br><br>         Defendants. | Case No.<br>4:16-cv-01225-JSW-TSH |

---

DEPOSITION OF JAMIE STERNBERG, ESQ.

CONDUCTED REMOTELY

MARCH 29, 2021


REPORTED BY KAYLEE LACHMANN, RPR, CSR NO. 14348

Jamie Sternberg, Esq.                                        March 29, 2021

1  CONDUCTED REMOTELY; MARCH 29, 2021; 11:11 A.M. PST

2                        PROCEEDINGS

3  · · · · · · · · ·     JAMIE STERNBERG, ESQ.,

4  having first been duly sworn, was examined and

5  testified as follows:

6                  EXAMINATION BY COUNSEL FOR THE

7                  PLAINTIFFS AND THE CERTIFIED CLASSES

8  BY MR. LITNEY:

9  · · · ·Q.· Good morning, Ms. Sternberg.· As I mentioned

10  off the record, my name is Ethan Litney, and I

11  represent the plaintiffs in this case including the

12  certified classes, and we are the ones who subpoenaed

13  you for your deposition here today.· Were you able to

14  review your deposition subpoena?

15  · · · ·A.· Yes.

16  · · · ·Q.· Okay.

17  · · · · · ·    For the record would you mind stating and

18  spelling your name?

19  · · · ·A.·    Jamie Sternberg, J-A-M-I-E, Sternberg,

20  S-T-E-R-N-B-E-R-G.

21  · · · ·Q.· Have you ever used any other names, including

22  maiden names or nicknames?

23  · · · ·A.· No.

24  · · · ·Q.· Okay.

25  · · · · · ·    And you're presently an attorney in

Jamie Sternberg, Esq.                                   March 29, 2021

```
 1    California, correct?
 2         A.   Yes.
 3         Q.   If you don't mind me asking, where did you
 4    attend undergraduate?
 5         A.   UC Davis and UCSD.
 6         Q.   UC Davis and UCSD, okay.
 7              Where did you attend law school?
 8         A.   USD.
 9         Q.   USD.
10              Okay.  For how long have you been practicing
11    law?
12         A.   This is my 30th fun-filled year.
13         Q.   Have you been practicing the whole time?
14         A.   Yes.
15         Q.   Or have you taken any time off?
16         A.   I got six weeks off when I gave birth.
17         Q.   Okay.
18              But other than that just a straight shot, 30
19    years?
20         A.   Yes.
21         Q.   Okay.
22              And you're presently an attorney at Kimball
23    Tirey & St. John LLP, is that correct?
24         A.   Yes.
25         Q.   So that's kind of a mouthful for me so
```

Jamie Sternberg, Esq.                                    March 29, 2021

1    throughout the deposition I may refer to Kimball Tirey

2    or KTS.  Can we agree that, you know, if I use those

3    terms you understand it to be Kimball Tirey & St. John

4    LLP?

5          A.   Yes.

6          Q.   Do you guys at KTS have an internal moniker

7    for the firm?

8          A.   KTS.

9          Q.   Is it KTS?  Okay.  I'll try to use that one.

10              What kind of law do you practice at KTS?

11         A.   Real estate and business generally.

12         Q.   Real estate —

13         A.   I mean I can go more granular than that if

14    you'd like.

15         Q.   I may go a little bit more granular later,

16    but for now that will suffice.

17              MR. LITNEY:  And, Karen, just a heads-up

18    here.  This is going to be my only question along this

19    line, but I want to ask this one now.

20         Q.   Ms. Sternberg, have you performed any work

21    for any of the defendants in this case whether it be

22    Equity Residential, ERP Operating Limited Partnership,

23    Equity Residential Management LLC, EQR Woodland Park

24    LLP, or EQR Woodland Park BLP?

25         A.   Yes.

Jamie Sternberg, Esq.                                    March 29, 2021

1          Q.    Got it.

2                So I'm going to get a little more granular

3     about some of the work that you do, if I can, and a

4     little bit more into your work history.  So when did

5     you start working for Kimball Tirey?

6          A.    January 1, 1999.

7          Q.    January 1, 1999.

8                Prior to working for KTS, what kind of legal

9     work did you do, if any?

10         A.    Worked for a firm called Nostrand & Lang, and

11    it was absorbed into KTS.

12         Q.    It was absorbed into KTS.  Okay.

13               What were the circumstances of that

14    absorption?

15         A.    A lot of our work was referrals from KTS, and

16    we had a good relationship with them and decided it

17    made sense to merge our two businesses.

18         Q.    That makes sense.

19               So when you were working at Nostrand & Lang,

20    what kind of work did you perform?

21         A.    Very similar to the work I do at KTS, real

22    estate and business.

23         Q.    And I'm just noticing, you know, you said --

24    I believe you said January 1, 1999.  That's about 20

25    years ago.  Did you stop essentially the litigation

Jamie Sternberg, Esq.                                    March 29, 2021

1          Q.   Got it.
2               So most of it would either be in the context
3     of real estate litigation or business litigation, is
4     that fair?
5          A.   We're transactional.  We transaction --
6     significant amount of transactional work.
7          Q.   Okay.
8               And is that both at KTS and your prior law
9     firm?
10         A.   Yes.
11         Q.   So what kind of transactional work do you do
12    at KTS?
13         A.   Just about everything related to real estate
14    and business.
15         Q.   Okay.
16              You know, again, you're going to have to
17    humor me a little bit.  I'm a little naive in regards
18    to real estate litigation.  Can you describe some of
19    the transactional work that you do, some kinds of work?
20         A.   Do a lot of lease work, both residential and
21    commercial, sales, loan opinion letters, business
22    formations, business maintenance, business sales.
23    Those are the things that immediately come to mind.
24         Q.   I appreciate that.
25              So what exactly do you mean by lease work?

Jamie Sternberg, Esq.                                    March 29, 2021

```
 1        A.   I do everything from drafting leases to
 2   answering questions about leases to drafting amendments
 3   to drafting documents related to leases.
 4        Q.   Is that for both commercial and
 5   residential --
 6        A.   Yes.
 7        Q.   -- rental properties?
 8        A.   Yes.
 9        Q.   So what is your current position with Kimball
10   Tirey today?
11        A.   I think my -- my title is partner, and also
12   I'm the manager of the business real estate group.
13        Q.   Manager of the business real estate group?
14        A.   Yes.
15        Q.   Got it.
16             And what exactly does that title mean to you?
17        A.   It means that I focus all of the business and
18   real estate attorneys so we're facing the same
19   direction, give them the resources they need to do
20   their jobs, deal with all the issues that arise.
21        Q.   What proportion of KTS is subsumed by the
22   business real estate group?
23        A.   Perhaps about a third.
24        Q.   And what are the other -- you know, what is
25   the rest of the KTS made up of?
```

Jamie Sternberg, Esq.                                   March 29, 2021

```
 1        A.   The two other primary groups are collections
 2   and what they call landlord-tenant, which is basically
 3   evictions.
 4        Q.   Okay.
 5             So collections, evictions, and -- well, let
 6   me just strike that.
 7             I'd appreciate if you could clarify, you
 8   know, how these three different groups are demarcated
 9   if you can.  I understand probably that collections may
10   be related just to litigating, you know, collections
11   matters and collecting, you know, costs after judgment.
12   Is that fair or am I wrong?
13        A.   There are two components to collections.
14   There's judgment collection and there's non-judgment
15   collection.
16        Q.   So could you please describe both for me?
17        A.   Judgment collection is collection of a
18   judgment, something has been reduced to a judgment.
19   Non-judgment collection would be for a tenant typically
20   who skipped, moved out, owing money.  There's not a
21   judgment, but they still owe money.
22        Q.   And what are the attorneys in the
23   non-judgment collections department, how do they
24   typically handle their non-judgment collection cases?
25        A.   They have to use powers of persuasion.  They
```

Jamie Sternberg, Esq.                                    March 29, 2021

1    can't use the involuntarily judgment collection

2    processes.

3         Q.   Does KTS work with any outside debt

4    collection firms to effectuate non-judgment

5    collections?

6         A.   Not that I know of.

7         Q.   Oh, so it's all done in-house as far as you

8    know?

9         A.   Yes.

10        Q.   Got it.

11             Do you know if KTS has ever been sued for

12   violating the -- you know, any laws relating to

13   collection of debts?

14        A.   Yes.

15        Q.   How many times?

16        A.   I don't know.

17        Q.   Has KTS ever been the defendant in a class

18   action relating to the unlawful collection of debts?

19        A.   I don't know.

20        Q.   Okay.

21             How many attorneys do you manage as part of

22   the business and real estate group?

23        A.   Numbers go up and down.

24        Q.   Sure.

25        A.   But approximately 27 right now.

Jamie Sternberg, Esq.                                    March 29, 2021

1          Q.   Wow, okay.

2               So the firm has, you know, somewhere between

3     75 and 100 attorneys, is that fair?

4          A.   I think closer to 75.

5          Q.   Closer to 75, okay.

6               So during your 30 years of practice, have you

7     ever won any professional awards?

8          A.   It depends on how you define professional

9     awards.  I got an AV rating from Martindale Hubbell.

10         Q.   Got it.

11              So yeah, I was being pretty liberal with the

12    term, but then again I suppose it's my deposition.

13    Were you ever a super lawyer, best of the bar, were you

14    ever 40 under 40, profiled in the San Diego Lawyer

15    magazine, you know?

16         A.   Oh, yeah, I've been in the San Diego Lawyer

17    magazine for years.

18         Q.   How many times, if you don't mind me asking?

19         A.   At least five.

20         Q.   At least five, fair enough.

21              So have you ever, you know, received any

22    trophies or anything like that as part of your work as

23    an attorney?

24         A.   No, no trophies.

25         Q.   Okay.

Jamie Sternberg, Esq.                              March 29, 2021

1          Sorry.  Sorry to hear that, but, you know, me

2  neither.

3          So jumping back to the division of the

4  attorneys at KTS, is the eviction third limited to just

5  litigation of unlawful detainer actions essentially?

6      A.   They utilize the processes through the court

7  system.  They serve notices and file unlawful detainer

8  actions.

9      Q.   Got it.

10          So what do you mean by they serve notices?

11     A.   They prepare notices and they serve them.

12     Q.   Got it.

13          Sorry, I wasn't clear.  What kind of notices

14  do they prepare in relation to their work?

15     A.   The notices that are necessary for an

16  unlawful detainer can generally be filed so it tends to

17  be three-day rent notices, notices to perform covenant

18  or quit, notices based on nuisance waste, unlawful

19  activity, those types of notices.  They're the notices

20  that are generally prerequisite to filing an unlawful

21  detainer.

22     Q.   Got it.

23          And is it the typical practice of KTS to send

24  those notices directly to the tenants or are those

25  notices effectuated through KTS's clients?

Jamie Sternberg, Esq.                              March 29, 2021

1    attorneys, and only one does it pretty much full-time.

2         Q.   I see.

3         A.   It's changed over the years.

4         Q.   I'm assuming it's kind of gotten smaller and,

5    you know, the real estate business evictions and

6    collections work has started to become more prominent?

7         A.   It just changes over time as attorneys come

8    and go.

9         Q.   That makes sense.

10              So for the work you do regarding lease and

11   document production reviews regarding residential

12   properties, does that mean -- I mean, is that -- that's

13   essentially consulting work regarding leases?  Is that

14   a fair read of that?

15        A.   Anything a client needs in connection with a

16   residential lease, I assist.

17        Q.   Okay.

18              How often do you draft a lease wholesale for

19   a client?

20        A.   It depends on how you're defining that.

21        Q.   Fair enough.  Let me redefine it.

22        A.   I -- I draft -- the different ways that I

23   assist clients with leases, I can take one of the

24   preprinted forms and fill it out.  People can use

25   leases that I created.  So it depends on how you define

Jamie Sternberg, Esq.                                    March 29, 2021

1              (Nonconfidential transcript resumed beginning

2       at page 41 as follows:)

3       BY MR. LITNEY:

4              Q.   Okay.

5                   If you know, does Kimball Tirey do any, you

6       know, work for landlords that have properties outside

7       the state of California?

8                   MS. ALEXANDER:  We can stop the

9       confidentiality designation at this point.  Thank you.

10             A.   I don't believe so other than possibly some

11      fair housing things because fair housing has both

12      federal and state components and so they can advise on

13      federal components.

14             Q.   That makes sense.

15                  Have you reviewed leases for the legality of

16      security deposit retention practices?

17             A.   Yes.

18             Q.   Have you reviewed leases for the legality of

19      liquidated damages clauses?

20             A.   Yes.

21             Q.   And does that include late fees for late

22      payment of rent?

23             A.   Yes.

24             Q.   How long have you been reviewing the legality

25      of liquidated damages clauses?

Jamie Sternberg, Esq.                                    March 29, 2021

1        A.    Same answer as before, 18 years significantly
2   but also some before then.
3        Q.    In the past 20 years have you ever provided
4   any seminars, presentations, MCLEs, or speeches
5   relating to the legality of late fees under California
6   law in the context of residential rental properties?
7        A.    Not that I currently recall.
8        Q.    Okay.
9             Have you ever written any articles,
10  treatises, or anything like that regarding the same?
11       A.    Yes, articles.
12       Q.    Articles.
13            At this time I'll try to save you a little
14  bit of time here.  I'm going to mark the document I'm
15  putting in the chat window as Exhibit 2.
16            (Whereupon, Exhibit 2, Avvo Publication, was
17  marked for identification.)
18       Q.    So this is a very poor capture -- or purports
19  to be a very poor capture from the Avvo page for you,
20  Ms. Sternberg, so I apologize for the artifacts of
21  printing it.  I'm only hoping to get some
22  clarification, save you some time on some publications
23  you may have been involved with.  Once you open it, I'd
24  like you to -- feel free to review it but I'm
25  interested primarily on page 3.

Jamie Sternberg, Esq.                                    March 29, 2021

1           Have you ever been involved in any
2    collections work for Equity Residential?
3           A.   No.
4           Q.   Do you know if Equity Residential has KTS
5    perform any collections work on its behalf?
6           A.   I believe that KTS has.  Whether we still do,
7    I don't know for sure.
8           Q.   Okay.
9                Are you familiar with whether EQR has KTS
10   perform any residential eviction work on its behalf?
11          A.   Same answer.  I believe that KTS has done
12   residential eviction work for Equity.  Whether they
13   still do, I don't know.
14          Q.   And do you know if that was based on, you
15   know, a particular geographical area or particular
16   properties or something else?
17          A.   I don't.
18          Q.   Okay.
19               Do you have any understanding about when the
20   professional relationship between Equity Residential
21   and Kimball Tirey began?
22          A.   I don't.
23          Q.   Okay.
24          A.   Other than I can say it's been going on since
25   at least 2004.

Jamie Sternberg, Esq.                                    March 29, 2021

1         Q.   At least 2004 --

2         A.   Possibly -- so possibly it's before that.

3         Q.   What makes you know that it was at least

4    going back to 2004?

5         A.   In compiling the documents you requested, I

6    saw documents where I had been involved with Equity

7    since 2004.

8         Q.   How did you originally get involved with

9    Equity?

10        A.   I don't recall.

11        Q.   Okay.

12             Do you recall the first contact you had at

13   Equity?

14        A.   No.  That's 17 years ago.  I don't remember.

15        Q.   Got it.

16             (Whereupon, the confidential portion of

17   Ms. Sternberg's deposition transcript was resumed at

18   page 53.)

19

20

21

22

23

24

25

Jamie Sternberg, Esq.                                    March 29, 2021

1          Q.   So that would be from -- essentially to 2015
2     approximately?
3          A.   I started having someone else assist me maybe
4     in -- yeah, about 2015.  Sounds about right.
5          Q.   And so when we're talking about this, you
6     know, period of time during your day when you're
7     responding to e mails and things like that, does that
8     include, you know, a project where a client has said,
9     hey, I need you to review my lease for legality?  Would
10    you include that or is that kind of a separate task?
11         A.   No.  That's part of legal work.
12         Q.   Okay.
13              That's kind of general I'm triaging client
14    needs?
15         A.   Yes.  I do the intake, triage, assisting
16    other attorneys, then assisting clients, all those
17    things all day, every day.
18         Q.   Fair enough.
19              How long have you been familiar with the law
20    regarding contractual liquidated damages provisions in
21    real property leases in California?
22         A.   I don't know.  I can't tell you when I first
23    became aware of it.
24         Q.   Okay.
25              Would it be at least 10 years ago?

Jamie Sternberg, Esq.                                    March 29, 2021

```
 1        A.   Oh, yes.

 2        Q.   Would it be at least 15 years ago?

 3        A.   Yes.

 4        Q.   Would it be at least 20 years ago?

 5        A.   Yes.

 6        Q.   Okay.

 7             Have you ever reviewed the opinion Garrett v.

 8   Coast And Southern Federal Savings And Loan

 9   Association?  I can provide the whole citation if you

10   need it.

11        A.   That name doesn't sound familiar with me.

12        Q.   Okay.

13             Are you familiar with the case Utility

14   Consumers' Action Network, Inc. v. AT&T Broadband of

15   Southern California, Inc.?  I can provide the full

16   citation.

17        A.   I don't know if I'm familiar with that case.

18        Q.   That's fine.

19             Are you familiar with the case Del Monte

20   Properties & Investments, Inc. v. Dolan?

21        A.   That doesn't sound familiar.

22        Q.   Fair enough.

23             So is it fair to say that the entire period

24   that you've been familiar with legality of liquidated

25   damages provisions under California law in the context
```

Jamie Sternberg, Esq.                                    March 29, 2021

1    of residential rental property that you've been

2    providing advice to clients about the same?

3         A.   Can you say that again?

4         Q.   Sorry.  That one went on a little long.

5              So how long have you been providing legal

6    advice to clients about the legality of California late

7    fees in California residential rental leases?

8         A.   Since at least 2004 and probably sometime

9    before that.

10        Q.   Do you provide advice to a number of

11   different clients regarding that subject?

12        A.   Yes.

13        Q.   Could you estimate approximately how many?

14        A.   No.

15        Q.   Okay.

16             Is it more than 5?

17        A.   I don't feel comfortable answering that

18   question for you.

19        Q.   Fair enough.

20             Just let me probe that, if I may.  Are you

21   objecting on the basis of that information would be

22   privileged?

23        A.   Yes.

24             MR. LITNEY:  Let's go off the record for a

25   second if you're okay with that, Karen.

Jamie Sternberg, Esq.                                      March 29, 2021

```
 1              : : :  CERTIFICATE OF REPORTER  : : :

 2

 3           I, Kaylee Lachmann, a Certified Shorthand
      Reporter, holding a valid and current license issued by
 4    the State of California, No. 14348, duly authorized to
      administer oaths, do hereby certify:
 5           That the witness in the foregoing deposition
      was administered an oath to testify to the whole truth
 6    in the within-entitled cause;
             That said deposition was taking down by me in
 7    shorthand at the time and place therein stated and
      thereafter transcribed into typewriting, by computer,
 8    under my direction and supervision.

 9           ( X )  Reading and signing was requested.

10           (   )  Reading and signing was waived.

11           (   )  Reading and signing was not requested.

12           Should the signature of the witness not be
      affixed to the deposition, the witness shall not have
13    availed himself/herself of the opportunity to sign or
      the signature has been waived.
14           I further certify that I am neither counsel
      for nor related to any party in the foregoing
15    depositions and caption named nor in any way interested
      in the outcome thereof.

16

17

18    Dated:   This 7th day of April, 2021

19           at San Diego, California.

20

21

22

23                   KAYLEE LACHMANN

24                   CSR NO. 14348

25
```

Exhibit 10

```
 1                  UNITED DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
    JAVANNI MUNGUIA-BROWN, ANGELINA   )
 5  MAGAÑA, NORMA RODRIGUEZ, and      )
    DAVID BONFANTI individually and   )
 6  on behalf of others similarly     )
    situated,                         )
 7                                    )
                 Plaintiffs,          )
 8                                    ) No.
            vs.                       ) 4:16-cv-01225-JSW-TSH
 9                                    )
    EQUITY RESIDENTIAL, a real estate )
10  investment trust, ERP OPERATING   )
    LIMITED PARTNERSHIP, a            )
11  partnership, EQUITY RESIDENTIAL   )
    MANAGEMENT, L.L.C., EQR-WOODLAND  )
12  PARK A LIMITED PARTNERSHIP, and   )
    EQR-WOODLAND PARK B LIMITED       )
13  PARTNERSHIP,                      )
                 Defendants.          )
14  _____   )
15
16          REMOTE DEPOSITION OF FREDERICK TUOMI
17                    Dallas, Texas
18              Friday, February 5, 2021
19
20  REPORTED BY:
21  JOHNNA PIPER
22  CSR 11268
23  Job No. 4448191
24
25  Pages 1 through 75

                                              Page 1
```

1    Dallas, Texas; Friday, February 5, 2021; 11:06 a.m. CST

2

3                    FREDERICK TUOMI,

4    having been first duly sworn, testifies as follows:

5

6                    EXAMINATION

7       BY MR. LEE:

8       Q   Please state and spell your name for the

9    record.

10      A   Fred, F-R-E-D, Tuomi, T-U-O-M-I.

11      Q   Good morning, Mr. Tuomi, and good afternoon

12   perhaps where you are.  My name is Andrew Lee.  I'm one

13   of the attorneys representing the plaintiffs in the

14   matter of Munguia-Brown, et al., versus Equity

15   Residential, et al., which is a certified class action

16   pending in Federal District Court in the Northern

17   District of California, the Honorable Jeffrey White

18   presiding.

19           Are you represented by Mr. Fields today?

20      A   Yes, I am.

21           MR. LEE:  And, Mr. Fields, do you -- will you

22   agree to accept service of any trial subpoenas for

23   Mr. Tuomi?

24           MR. FIELDS:  That's a question for us to

25   discuss offline.

                                             Page 5

1           MR. LEE:  Well, the reason I'm asking is

2      because I typically ask the witness for, you know, his

3      or her home address.  You know, depends if counsel is

4      not willing to stipulate.  I'm just trying to avoid

5      having to do that.

6           MR. FIELDS:  Let's discuss it at a break.  I

7      don't anticipate any issue.

8           MR. LEE:  Okay.

9           Q   Mr. Tuomi, have you ever had your deposition

10     taken before?

11          A   Yes.

12          Q   How many times?

13          A   Two.

14          Q   Two times.  Can you identify the cases in which

15     you've had your deposition taken?

16          A   The case name?

17          Q   If you know it.

18          A   I don't know the case names.

19          Q   Okay.  Can you -- so why don't we talk about

20     the first time you've been deposed.  Do you recall when

21     that occurred?

22          A   No, I don't recall the date.

23          Q   Can you recall the approximate time?  The year?

24     The month?

25          A   I can give you an approximate year.

Page 6

1     Q   Sure.  Yes.  Can you provide that information,

2  please?

3     A   It was approximately 2000.  The year 2000,

4  approximately.

5     Q   Okay.  And what was the nature of the case in

6  which you were deposed?

7     A   That was a late fee claim in the state of

8  California.

9     Q   Okay.  And was that the -- does "Consumer

10  Justice Foundation versus Equity Residential Property

11  Trust," does that name ring a bell?

12     A   No, not specifically.

13     Q   Okay.  Can you provide a little more

14  information about nature of the claims in the case that

15  you were just referencing?

16     A   Yeah.  From my -- my recollection was there was

17  a -- a claim brought from -- I can't remember who the

18  claimants were, ~~but I guess Equity Residential~~ -- it

19  originated in California -- who were saying that the

20  late fee was egregious, and we, of course, objected to

21  that, and they deposed me, you know, at that time for

22  some information on that.

~~23     Q  I may touch on that case later on in the~~

~~24  deposition.~~

~~25     Did you -- in that case do you recall~~

Page 7

1          Q   Did you review any documents in preparation for

2     your deposition today?

3          A   Yes.

4          Q   What documents did you review?

5          A   I cannot recall specifically what documents I

6     reviewed.

7          Q   Do you recall the nature of the documents, any

8     of the contents?

9          A   The nature of the -- the nature of the

10    documents were old e-mails.

11         Q   Please briefly describe your educational

12    background after high school.

13         A   I have a college degree, a bachelor's degree,

14    business information systems and quantitative methods,

15    and I have a master's in business administration.

16         Q   Where did you obtain your bachelor's degree?

17    Which school?

18         A   Georgia State University.

19         Q   And how about your graduate degree?

20         A   Georgia State University.

21         Q   Are you currently employed by Equity

22    Residential?

23         A   No, I'm not.

24         Q   Who are you -- who is your current employer?

25         A   Myself.

                                                        Page 14

1        Q    Okay.  When did you start working for Equity

2    Residential?

3        A    Approximately January of 2000 -- I'm sorry --

4    1994.

5        Q    Please identify all positions that you held at

6    Equity Residential by title and provide the time period

7    during which you held each position.

8        A    I do not recall time periods.

9        Q    Okay.  Well, if you could at least identify the

10   different positions you held.  Why don't we start there.

11       A    Okay.  Boy, I started -- first title I believe,

12   and this is an estimate on my part; I don't specifically

13   recall what my official title was -- I was president of

14   property management.  And that was basically the role I

15   had throughout the most of the time.

16            At another point in time, probably

17   approximately 1999, I was -- had the position division

18   president Western division.  And then in 2005, I was

19   executive vice president and president property

20   management, and that was up until my retirement.

21       Q    Okay.  And when did you retire?

22       A    I believe the official date was June 30th of

23   2013.

24       Q    The last position you held was executive vice

25   president of property management.  Is that correct?

Page 15

| | |
|---|---|
| 1 | A   No, that is not correct. |
| 2 | Q   Okay.  What was the last position you held with |
| 3 | Equity Residential? |
| 4 | A   Executive vice president, president of property |
| 5 | management. |
| 6 | Q   And is that the position you held in 2008? |
| 7 | A   Yes. |
| 8 | Q   Okay.  Can you please provide an overview of |
| 9 | your job duties as executive vice president, president |
| 10 | of property management? |
| 11 | A   Yes.  The -- that was a senior management |
| 12 | position with the company.  I was back at the |
| 13 | headquarters in Chicago, Illinois, so I was responsible |
| 14 | for the oversight of all activities and various |
| 15 | departments related to the operations of the properties |
| 16 | nationwide.  It included multiple markets across the |
| 17 | country.  I believe total employees approximately at |
| 18 | that time maybe 3,000.  And it included functional areas |
| 19 | directly related to operations such as marketing, IT, |
| 20 | and the property management core functions, you know, |
| 21 | management structure over each local market and the |
| 22 | assets.  It did not include other functional areas such |
| 23 | as accounting, finance, legal, human resources, you |
| 24 | know, et cetera. |
| 25 | And then also as the executive vice president |

1   for the company, I was also responsible for representing

2   the company at industry and company meetings with

3   investors, analysts, and a big part of my job was the

4   preparation for the participation on quarterly earnings

5   calls.

6        Q    Okay.  And you mentioned that your

7   responsibilities were nationwide.  Did you have

8   responsibility over operations in California as well?

9        A    Not directly, but indirectly, yes.

10       Q    What do you mean by "indirectly"?

11       A    I wasn't based there.  I wasn't -- that wasn't

12   my sole responsibility.  I wasn't, you know, driving the

13   operations organization.  We had multiple layers, and

14   eventually the -- those layers reported to me.

15       Q    And in your role as executive vice president,

16   president of property management, did you become

17   familiar with the personnel costs at Equity Residential

18   properties in California?

19            MR. FIELDS:  Vague and ambiguous.

20       A    I'm not sure I understand the nature of the

21   question.

22       Q    So I'm just trying to find out whether you were

23   familiar with the costs of employing property-level

24   people, community managers, leasing consultants,

25   employees of that nature at California properties.

                                            Page 17

```
 1              MR. FIELDS:  Vague and ambiguous.
 2              THE WITNESS:  And you are asking me if I was
 3    aware back then?
 4         BY MR. LEE:
 5         Q   Yes, in your role as executive vice president,
 6    president of property management.
 7         A   Okay.  To the specifics, the answer is no.
 8         Q   So you qualified that with "specifics."  Did
 9    you have some sort of higher-level understanding of
10    those costs?
11         A   I had a higher-level responsibility and
12    awareness of overall costs of operating large
13    portfolios.  A category of that is payroll which is one
14    lump sum.  The actual cost of individual positions,
15    labor, you know, in field operations as you mentioned,
16    there was no way I would have had that -- that direct
17    knowledge.
18         Q   And you referenced payroll as a lump sum.  Did
19    you -- were you aware of that information companywide,
20    or was it more specific than that?
21         A   Companywide for sure because we were -- had --
22    in my role, I didn't know what the metrics were on a
23    roll-up basis companywide for the entire portfolio.  And
24    then generally from time to time, we would review
25    regional results, and I would see them on a piece of
```

Page 18

1    paper, but I couldn't -- I didn't know the details

2    behind them, or, you know, I couldn't recall them now

3    for sure.

4        Q   All right.  And when you say "regional

5    results," at what level of specificity does that get to?

6    A state level, county level, or larger than a state

7    level?

8        A   Most frequently regional level western,

9    central, eastern -- we call those divisions -- and then

10   periodically by state, and then no cost metrics, but

11   general high-level metrics such as occupancy, et cetera,

12   on market basis which would be city MSA.

13       Q   Now, in terms of payroll, what was the most

14   specific level of payroll information that you became

15   aware of as executive vice president, president of

16   property management?

17       A   My focus was on the per-unit payroll cost.

18       Q   Per unit, and when you say "per unit," does

19   that refer to the number of rental units?

20       A   Per apartment unit, yes.

21           And then also percent growth it grows from year

22   to year.  Those are the two things that I would be

23   concerned with.

24           MR. LEE:  And, Justin, I just received a

25   message saying you should have access to the exhibit

                                              Page 19

1           Q    Please do that.

2           A    I have, it's best to say, somewhat vague

3     recollections.  This was -- a long time ago, but I would

4     have had the division vice presidents or senior vice

5     presidents reporting to me.  There would be a few of

6     those that would have large areas of the country

7     responsibility.  I believe I had the marketing and

8     branding group reporting to me.  For a brief period of

9     time, I had the information technology group reporting

10    to me.  That changed from time to time.  We would

11    reorganize.  That was primarily -- primarily it.

12          Q    Okay.  No others come to mind?

13          A    No.

14          Q    Earlier in your testimony you referenced having

15    your deposition taken in a case out of California.  Do

16    you -- and my understanding is that case is titled

17    "Consumer Justice Foundation versus Equity Residential

18    Property Trust."  That was filed in San Diego Superior

19    Court in the late '90s.  Does that ring a bell for you

20    at all?

21          A    Generally yes.  I remember the subject matter.

22    I don't remember the specific names of the entities.

23          Q    What was your understanding of the claims

24    alleged in that case?

25          A    Like I stated before, it was generally related

```
1    to plaintiffs' claim that the late fees being charged by

2    some apartment companies, including Equity Residential,

3    were -- were excessive.

4         Q    What is your understanding of the outcome of

5    that case?

6         A    My general understanding of the outcome was

7    that we had an understanding amongst the parties that

8    there would be a safe harbor, you know, not really

9    legislative, but agreed upon, and that we should -- you

10   know, as long as we were close to that safe harbor, it

11   would be just that, and it was based on study that we

12   did -- then to -- to show and demonstrate that there

13   were indeed costs to the organization for the nonpayment

14   of rent and the late payment of rent and there were

15   activities that needed to be performed related to that

16   and that cost approximated and certainly substantiated

17   safely that -- that level of agreement back then, at

18   that early part in -- point in time.

19        Q    What did you mean by "a safe harbor"?

20        A    The general term of that word is if you are in

21   that area that that would be considered reasonable, and

22   there would not be other claims of unreasonableness.

23        Q    So when you use the term "safe harbor," were

24   you referencing an amount of a late fee?

25        A    Yes.
```

~~1      you knew without preparing for any, you know, any type~~

~~2      of testimony.~~

~~3            MR. FIELDS:  Vague and ambiguous.~~

~~4            THE WITNESS:  I did not -- I did not -- I did~~

~~5      not recall preparing specifically for that deposition.~~

~~6            BY MR. LEE:~~

7      Q    Thank you.  Earlier in your testimony you

8      referenced a report that was created in that case.  Can

9      you tell me more about that?

10      A    Not really other than it was performed by a

11      reputable national accounting firm.  I can't remember

12      which one, but it is one of the big accounting firms.  I

13      know our company along with some other companies in

14      our -- in our competitive set commissioned this company

15      to assist us to do a detailed study of the cost.

16      Q    Could that company have been

17      PricewaterhouseCoopers?  Does that ring a bell?

18      A    It could have been.  I did not engage them, but

19      I know it was a well-respected, reputable firm --

20      accountant firm, one of the big -- I think back then it

21      was "a big three."

22      Q    Do you recall who at this accounting firm was

23      responsible for generating the report?

24      A    I don't recall, and I never knew.

25      Q    Okay.  So the name Robert Knudsen doesn't ring

1   a bell with you?

2         A    No, it does not.

3         Q    Did you have any involvement in the development

4   of the report generated by the accounting firm?

5         A    No, I did not.

6         Q    Do you know what the subject of the report was?

7         A    Yes.

8         Q    Please describe -- or please tell me what you

9   know about the subject of the report.

10        A    Again, my knowledge of it is from, you know, a

11  very high level.  It was generally to discover and

12  assist us in identifying, detailing, and validating and

13  documenting the various associated administrative costs

14  with -- related to the situation where someone does not

15  pay their rent.

16        Q    Do you know how that report was developed?

17        A    No, I do not.

18        Q    Are you able to identify any of the steps taken

19  by the accounting firm in preparing the report?

20        A    No, I cannot.

21        Q    Can you identify any of the Equity Residential

22  employees who provided information, if any, to the

23  accounting firm for purposes of developing the report?

24        A    No, I cannot.

25        Q    And do you know what information was provided

Page 26

```
 1    to the accounting firm by Equity Residential to develop

 2    the report?

 3         A    No, I do not.

 4         Q    Are you familiar with any of the conclusions

 5    that were made as part of the report, the accounting

 6    report?

 7         A    Yes, I am.

 8         Q    Okay.  What conclusions are you familiar with?

 9         A    Again, this is a broad and somewhat vague

10    recollection and, again, from a very high level.  The

11    conclusion was satisfactory to us and that it -- it

12    substantiated our assumption of -- you know, of what the

13    late fee cost was.  We always went out -- went at it

14    from two perspectives.  One is what does it cost us, and

15    then, two, what is -- what is friendly and reasonable

16    and, you know, acceptable to our client base because we

17    were very concerned about our brand and our relationship

18    with our residents, and even if something was

19    justifiable, we would often, you know, not want to, you

20    know, pursue it because of our brand reputation and our,

21    you know, success in the marketplace.  So it

22    substantiated what we were doing was accurate and -- and

23    in our minds the correct way to do it.

24         Q    Did this accounting report substantiate a

25    particular dollar figure as a late fee?
```

                                                    Page 27

```
 1                MR. FIELDS:  Vague and ambiguous.

 2                THE WITNESS:  I could not tell you if the

 3      report did or not, no.

 4           BY MR. LEE:

 5           Q    Do you know whether a percentage-based late fee

 6      was assessed as part of this accounting report?

 7                MR. FIELDS:  It is vague and ambiguous.

 8                THE WITNESS:  No, I don't.

 9           BY MR. LEE:

10           Q    Did you ever have an opportunity to review the

11      accounting report after it was completed?

12           A    No, I did not.

13           Q    Did you ever have an opportunity to review

14      drafts of the report before it was completed?

15           A    Explain what you mean by "opportunity."

16           Q    I'll just clarify.  Did you review a draft of

17      the report before it was completed?

18           A    No.

19           Q    So is it correct that you have never reviewed

20      the report generated by this accounting firm?  Is that

21      correct?

22           A    That is correct, yes.

23           Q    During your employment with Equity Residential,

24      and in particular in your role as executive vice

25      president, president of property management, did you
```

Page 28

1          Q   Okay.

2          A   I understand the words I'm reading on the page,

3     but I can't transcend myself back to June 4th, 2008.

4          Q   Do you have any reason to believe that any of

5     this -- any of the information on this e-mail which is

6     Exhibit 2 is inaccurate?

7               MR. FIELDS:  Overbroad; calls for speculation.

8               THE WITNESS:  Would you restate the question?

9               MR. LEE:  Can you please read back the

10    question.

11              (Record read by the reporter.)

12              THE WITNESS:  I have no reason to believe that

13    it is accurate or inaccurate.

14         BY MR. LEE:

15         Q   So Exhibit 2 indicates that the late fee for

16    the late payment of rent at Equity Residential's

17    California properties was changed effective June 4th,

18    2008.  Do you -- did you have any involvement in the

19    decision-making process about changing the late fee in

20    2008?

21         A   I don't recall.

22         Q   Okay.  So you don't recall being involved in

23    changing the fee for the late payment of rent in

24    California around June 4th of 2008?

25         A   No, I do not.

Page 33

```
 1          Q    Okay.  And so you would not be able to identify
 2     anyone who is involved in changing the fee for the late
 3     payment of rent at Equity Residential properties in
 4     California in 2008?
 5               MR. FIELDS:  That misstates his testimony;
 6     argumentative.
 7               THE WITNESS:  Again, specifically the answer to
 8     your question is no, I cannot.
 9          BY MR. LEE:
10          Q    So you wouldn't be able to tell me who came up
11     with the idea to change Equity Residential's California
12     late fee around 2008?
13          A    No way.
14          Q    Can you tell me what you recall, if anything,
15     about the late fee charged by Equity Residential at its
16     California properties in 2008?
17               MR. FIELDS:  Can you read that -- can you read
18     back the question.
19                    (Record read by the reporter.)
20               THE WITNESS:  Yes, I could.
21          BY MR. LEE:
22          Q    Please tell me what you know.
23          A    Nothing.
24          Q    Okay.  Do you recall participating in any
25     meetings regarding the late fee charged for the late
```

Page 34

1    payment of rent at California properties in 2008?

2         A    No, I don't.

3         Q    Do you recall any communications whatsoever,

4    whether they be e-mails, meetings, conference calls,

5    regarding changing the fee for the late payment of rent

6    at Equity Residential's California properties in 2008?

7         A    No, with the exception of I recall seeing

8    copies of e-mails recently shared with me by my

9    counsel --

10        Q    Okay.

11        A    -- which I did not recall prior to seeing them.

12        Q    Okay.  Now with respect to the case in which

13   you were deposed about late fees in the late '90s, is it

14   safe to say that you have no recollection of any

15   discussion of that case in 2008 regarding changing the

16   late fee in California at Equity Residential properties?

17        A    Yes.

18        Q    You do -- you do have a recollection of a

19   discussion about that case?

20        A    Oh, perhaps I misinterpreted your question.  I

21   thought you stated the negative.  Could you repeat the

22   question, please.

23        Q    Sure.  Let me reframe the question, try to make

24   it a little more clear.  Do you recall the previous late

25   fee case being discussed at all in 2008 in relation to

                                                Page 35

1    changing Equity Residential's fee for the late payment

2    of rent in California?

3         A   No.

4         Q   And the same question for the report generated

5    by the accounting firm:  Do you recall any discussion

6    vis-à-vis the -- the California late fee 2008?

7         A   No.

8              MR. LEE:  I'm going to mark the third exhibit.

9    Bear with me for a second.

10             MR. FIELDS:  Before we move on to your next

11   exhibit, can we take a two-minute break?

12             MR. LEE:  Sure.  How long do you need?

13             MR. FIELDS:  Two minutes.

14             MR. LEE:  Sure.

15                  (Recess taken.)

16             (Plaintiffs' Exhibit 3 was marked

17                  for identification.)

18        BY MR. LEE:

19        Q   All right.  Back on the record.  Mr. Tuomi, do

20   you understand you are still under oath?

21        A   Yes, I do.

22        Q   I have marked ~~Exhibit 3~~ Trial. Ex. 62 which should be now

23   available to you in exhibit share.  What has been marked

24   as ~~Exhibit 3~~ Trial. Ex. 62 is a single-page document bearing Bates

25   stamp WP 004331.  It is an e-mail from David Santee

Page 36

```
 1    dated May 22, 2008.

 2               Mr. Tuomi, do you have that -- do you have

 3    Exhibit 3 in front of you?     [Trial. Ex. 62]

 4         A    Yes, I do.

 5         Q    Do you recognize this document?

 6         A    No, I don't.

 7         Q    Do you know who David Santee is?

 8         A    Yes, I do.  He pronounces it San-TEE.

 9         Q    San-TEE.  Thank you.

10               Mr. Santee was one of your colleagues at Equity

11    Residential?

12         A    Yes.

13         Q    If you look at the cc line, it shows that this

14    e-mail was sent as a carbon copy to ftuomi@eqrworld.com.

15    Was that your e-mail address at Equity Residential?

16         A    Yes, it was.

17         Q    Do you recall receiving this e-mail?

18         A    No, I don't.

19         Q    Do you have any reason to believe that you did

20    not receive it?

21         A    No, I don't.

22         Q    Okay.  In this e-mail Mr. Santee writes,

23    "Currently all late fees are set to a flat $50 in

24    California per the negotiated settlement.  I believe

25    that legal is comfortable with a 5 percent late charge
```

Page 37

1    which would improve late charges at all but six

2    properties in California."

3         Does this e-mail jog your memory about what the

4    late fee was as of May 22, 2008, for Equity

5    Residential's California properties?

6         A   I cannot jog my recollection to that level of

7    specificity to May 22 of 2008, no.

8         Q   How about the nature of the late fee?

9         A   How about it?  What do you mean by that?

10        Q   Okay.  Let me specify.  So Mr. Santee writes

11   that late fees in California were a flat $50 per the

12   negotiated settlement.  Does that refresh your

13   recollection at all about what the late fee was as of

14   the date of the e-mail?

15        A   The recollection, no.  Assuming this e-mail is

16   true representation -- I mean I can put two and two

17   together.  The date says May 22, 2008.  Then it is

18   written right there, so logically I would say it does,

19   but do I have a recollection of it?  No.

20        Q   Okay.  Do you have any reason to believe that

21   this e-mail is inaccurate in any way?

22        A   No, I don't.

23        Q   Okay.  At the time of this e-mail, did you have

24   an understanding of that switching to a 5 percent fee

25   would improve late charges at all but six Equity

Page  38

1           THE WITNESS:  Again, the statement starts with

2     the words "I believe," so I can't, you know, tell you

3     the accuracy of his beliefs.  You'll have to ask him.

4     And then also the word "improve," what does that mean?

5     I don't know.  You would have to ask them, whoever wrote

6     this, what they were implying by that word "improve."

7           BY MR. LEE:

8           Q   Okay.

9           A   Depends on one's perspective.

10          Q   And were you coworkers with Denise Beihoffer?

11          A   Sorry.  I couldn't hear the one word.  Was I

12    what?

13          Q   Was Denise Beihoffer one of your colleagues at

14    Equity Residential?

15          A   Yes.

16          Q   Okay.  And you -- do recall working with her on

17    certain things?

18          A   Very vaguely.

19          MR. LEE:  Okay.  I'm going to go ahead and mark

20    another exhibit.

21          (Plaintiffs' Exhibit 4 was marked

22              for identification.)

23          MR. LEE:  Okay.  ~~Exhibit 4~~ Trial. Ex. 64 should now be

24    loading.  What has been marked as ~~Exhibit 4~~ Trial. Ex. 64 is a

25    single-page document bearing Bates stamp number WP

                                              Page 40

| | |
|---|---|
| 1 | 004340.  It is an e-mail chain and the it appears that |
| 2 | both there are three e-mails shown and all three are |
| 3 | sent by Denise Beihoffer. |
| 4 | Q   Mr. Tuomi, do you have ~~Exhibit 4~~ [Trial. Ex. 64] in front of |
| 5 | you? |
| 6 | A   Yes, I do. |
| 7 | Q   Do you recognize the e-mail that was sent by |
| 8 | Ms. Beihoffer on May 8, 2008, at 5:53 p.m.? |
| 9 | And just for the record, this is at the bottom |
| 10 | of the exhibit. |
| 11 | A   No, I have no recollection of that e-mail. |
| 12 | Q   In the cc line it shows it shows your name, |
| 13 | "Fred Tuomi."  Do you see that? |
| 14 | A   I see that, yes. |
| 15 | Q   And is it correct that you do not recall |
| 16 | receiving this e-mail? |
| 17 | A   That is correct. |
| 18 | Q   Do you have any reason to believe that you did |
| 19 | not receive this e-mail? |
| 20 | A   No. |
| 21 | ~~Q   And directing your attention to the top of the~~ |
| 22 | ~~page, but not all the way at the top, there is an e-mail~~ |
| 23 | ~~that was sent by Ms. Beihoffer on May 14, 2008, at~~ |
| 24 | ~~12:20 p.m.  Do you see that?~~ |
| 25 | ~~A   Yes.~~ |

Page 41

1    5 percent on lesser of the amount due or month's rent?

2             MR. FIELDS:  Vague and ambiguous.

3             THE WITNESS:  Yeah.  I could only speculate on

4    that.  Do you want me to speculate?

5         BY MR. LEE:

6         Q   No, I don't want you to speculate.  I want you

7    to testify based on what you recall.  Do you recall

8    anything about the statement that appears to be written

9    by you which is "I prefer 5 percent on lesser of amount

10   due or month's rent"?  Can you tell me anything about

11   that?

12        A   Well, again, this is May 22 of 2008 at

13   7:12 p.m. Central time.  That was a long time ago, so,

14   no.  I'm sorry.  I cannot recall any specifics of

15   writing those words or what they may have been meaning

16   to me at that time.  I would be speculating to infer

17   what they mean logically.  Again, it would be

18   conjecture.  It would be speculative.

19        Q   All right.  I understand that it was quite some

20   time ago.  I just want to be clear that you have no

21   memory of writing this e-mail or, you know, have any

22   further information that you can provide about it.

23        A   I do not remember.  I cannot give you more --

24   further information.

25        Q   Thank you.  Okay.  We've talked about various

Page 47

```
 1    formulations of the fee for the late payment of rent.

 2    You know, we've mentioned a flat fee, and this e-mail

 3    that we've been discussing, Exhibit 5, references a
```

Trial. Ex. 59

```
 4    percentage fee.  Do you have any understanding of the

 5    advantages of having a percentage late fee versus a flat

 6    late fee from a financial perspective?

 7              MR. FIELDS:  Vague and ambiguous and overbroad.

 8              THE WITNESS:  Do I -- was the question do I

 9    have an opinion on that?  Could you reread the first

10    part of that question back, please?

11              MR. LEE:  Can you read the question back,

12    please.

13              (Record read by the reporter.)

14              MR. FIELDS:  Same objections.

15              THE WITNESS:  Well, first of all, first part of

16    your question, I don't recall discussing it with you.

17    When -- when you mentioned "as we discussed," I don't

18    believe we've discussed that this morning.

19              Second part of the question is just logical.

20    Do the math.  So on the surface of that statement --

21    and, again, I can't recall anything of the specifics

22    around May 22nd, you know, at 17:21:54 in 2008.  But in

23    a general sense, you know, it is just mathematics.  A

24    5 percent of a month's rent, the lesser amount due of

25    month's rent, what those words mean in case someone is
```

Page  48

1   not aware is that you can calculate a fee based on one

2   month's rent.  We would not do it on cumulative.

3   Someone who did not pay their rent for two months, it

4   wouldn't be on the two, you know, the sum.  So it is not

5   the escalating.  It is just one month's rent at all

6   times.

7           And then as mentioned further down in the

8   e-mail, we would never try to apply that fee, 5 percent

9   of a month's rent, on something miscellaneous such as if

10  somebody was late on utility bill or some other small

11  balance.  That would be egregious.  So this is to

12  protect, you know, the policy and the system from

13  overcharging -- or not overcharging, but for -- for

14  assessing a late fee that would be on the surface, you

15  know, not proper.

16          So, again, our concern is for our residents'

17  satisfaction, in our brand, in our retention, and

18  reputation in the marketplace.  So that is always part

19  of the balance.  And the other part of the balance is we

20  have costs associated with those who choose not to pay

21  their rent.  It is not a free, you know, option to

22  choose when one wants to pay the rent with no

23  consequence.

24          So we -- we have to incur costs when that

25  happens.  There's financial costs.  There's

Page 49

```
 1    administrative costs.  There's operational costs.  So we

 2    are entitled -- we feel we're entitled for recovery of

 3    that cost, specifically the cost versus increasing rents

 4    for everyone to try to cover that assuming a certain

 5    level of late always.  So if you choose to be late,

 6    you'll help cover the cost that you are causing us to

 7    incur.

 8            That's the general thought of process on a

 9    percent of a month's rent or the lesser of -- you know,

10    lesser amount due.  Again, that is a general statement

11    of just interpreting that's the business sense.  That is

12    mathematics.  That's the logic behind it.  That stands

13    today.

14            What your specific question was, do I have, you

15    know, recollection, or can I opine what they meant, you

16    know, back in May of 2008, that answer is no, I cannot.

17            BY MR. LEE:

18        Q   You referenced the cost associated with the

19    late payment of rent.  Do you believe that a

20    percentage-based late fee approximates the costs

21    resulting from the late payment of rent?

22            MR. FIELDS:  Vague and ambiguous; overbroad;

23    calls for a legal conclusion; calls for improper opinion

24    testimony.

25            THE WITNESS:  Okay.  So the question was do I
```

Page 50

```
 1    believe in the percentage method.  I mean first of all,
 2    I'm no longer in the business.  If I were, I would.  I
 3    think it does -- it is appropriate.  It makes sense as a
 4    way to calculate costs.  The higher the rent, the more
 5    money we're missing, that we don't have, and the more we
 6    have to pursue.  The lower the amount is -- the
 7    consequence isn't quite as bad because it is relative.
 8    It is a percentage versus a flat fixed.
 9            If you had a flat fixed, those with higher
10    balances might be getting a break.  Those with lower
11    balances -- lower rent might be giving -- having to pay
12    too much.  So we thought this was -- or I think this is
13    a fair way of doing it, all subject to what is, you
14    know, going to be accepted by and considered fair and
15    just for our residents that agreed to this term in
16    advance in their lease and initial it, I believe.  And
17    if we were getting significant backlash, you know, in
18    business today, I would listen to that customer
19    backlash.
20            So that is a long answer to basically say I do
21    believe in it.  You know, asking me -- a man on the
22    street asked me today, you know, in 2021, yes, I believe
23    in it.
24        BY MR. LEE:
25        Q   Thank you.  Is it your understanding that
```

Page 51

1    Equity Residential adopted a percentage-based late fee

2    in 2008?

3         A    Again, I cannot specifically recall that, you

4    know, and peg it to a date 2008.  I just can't remember

5    anything back there.

6         Q    And do you recall any risk-benefit analysis

7    being undertaken by Equity Residential in relation to

8    adopting a percentage fee for its California properties

9    in 2008?

10        A    No.

11             MR. FIELDS:  Just to clarify --

12             (Reporter requests clarification.)

13             MR. FIELDS:  Just to clarify, based on how the

14   question was framed when you answered no, Mr. Tuomi, are

15   you saying you don't recall whether that happened one

16   way or the other, or, no, it did not happen, period?

17             THE WITNESS:  Yeah.  I believe the question was

18   do I recall, and no, I do not recall.

19             MR. FIELDS:  Thank you.

20        BY MR. LEE:

21        Q    Okay.  I would like to discuss with you the

22   personnel costs at Equity Residential's California's

23   properties as you understand them, you know, from your

24   time at Equity Residential, and I believe you referred

25   to those as payroll costs earlier in the deposition.  Do

Page 52

1    you recall our discussion about payroll costs earlier?

2         A   I remember reference to them.  I wouldn't call

3    it a discussion about them.

4         Q   Referenced, yeah.  That's fine.  During the

5    course of your employment with Equity Residential, did

6    you become familiar with the personnel or payroll costs

7    of Equity Residential's properties in California?

8              MR. FIELDS:  Vague and ambiguous.

9              THE WITNESS:  That's a very broad question

10   because the specific answer is no.  The general answer

11   is -- is relative to other parts of the country, they

12   were one of the highest.

13             BY MR. LEE:

14        Q   And --

15        A   Is my recollection.

16        Q   Yeah.  Why is it -- why would you say that?

17        A   I think it is generally known in all businesses

18   that labor costs in California are higher than, say, in

19   Colorado, Texas, Arizona, Georgia, Florida.  I think

20   most people in the world know that due to costs of

21   living and other, you know, costs related to employment

22   of employees in California versus other states.

23        Q   And are you basing that statement on an

24   understanding that wages are higher in California?

25        A   I believe wages are higher in California.  You

Page 53

| 1 | can go to a website and look them up, and they are |
|---|---|
| 2 | indexed by every state in the country, and California |
| 3 | would be one of the highest, yes. |
| 4 |     Q   Okay.  As part of your duties as executive vice |
| 5 | president, president of property management, did you |
| 6 | review data regarding Equity Residential's payroll costs |
| 7 | in California? |
| 8 |     A   No.  As I mentioned before, my review of |
| 9 | payroll costs were done in context of the entire |
| 10 | country, and we would compare them region to region and, |
| 11 | again, on a very high metric which was just overall |
| 12 | payroll costs divided by number of units on a per-unit |
| 13 | basis and then percentage growth.  That was the extent |
| 14 | of my, quote, you know, analysis of it.  Other people |
| 15 | would have been much closer, much more delving into |
| 16 | details of what makes up that total. |
| 17 | ~~Q   I see.  And you reference a per-unit metric.~~ |
| 18 | ~~Can you tell me a little bit more about that?~~ |
| 19 | ~~A   It would be the total cost divided by the~~ |
| 20 | ~~number of units.~~ |
| 21 | ~~Q   Is the per-unit metric that you just described~~ |
| 22 | ~~used to determine the level of staffing at properties --~~ |
| 23 | ~~Equity Residential properties?~~ |
| 24 | ~~A   No.  It is the other way around.  The level of~~ |
| 25 | ~~staffing, the cost of best act determined the outcome of~~ |

Page 54

1    that mass, you know, total costs divided by number of

2    units.

3          Q   Did you have any involvement during your time

4    at Equity Residential with determining the level of

5    staffing at properties in California or any other state?

6          A   No.

7          Q   Do you know how the level of staffing would be

8    determined at an individual property in California based

9    on your experience working at Equity Residential?

10         A   Yes.

11         Q   Okay.  Can you please tell me what you know

12   about that?

13         A   Yeah.  In very high-level, general terms, and

14   not specifically relating to any specific time period

15   such as this these specific months in 2008, but in

16   general, the business of operating apartment properties

17   on a large portfolio.  The methodology used to determine

18   staffing on-site, that is -- that is a wide open area

19   because it depends on the size of the property.  It

20   depends on how many similar size or other size

21   properties we have in close proximity where you can

22   perhaps share.  It depends on the levels of technology,

23   administrative support.  Sometimes we have support off

24   the properties on a centralized basis.  Other times it

25   is directly on the properties.  That changed over time

Page 55

```
 1    as we would initiate, you know, new concept --
 2    management concepts.  So they were forever being, you
 3    know, in flux.  And they would go back and forth.
 4          It depends on -- certain market areas requires
 5    higher staffing for one reason or another.  Higher-level
 6    property, you would want to have more customer service.
 7    So there's lots of things go into it to justify either
 8    higher or lower than norm.
 9          Again, my perspective, my position was to just
10    to be generally very aware of what the norms are, you
11    know, in general.  This is what our -- we're seeing in
12    staffing costs on a per-unit basis and percentage growth
13    year to year because those were the type of questions
14    that I would get, you know, from my constituents, which
15    were outside investors and analysts, and then generally
16    talking about comparisons of costs about markets across
17    the country.
18      Q    Thank you.  You referenced the size of the
19    property in determining staffing levels, I believe.  Can
20    you be a little more specific about that?  Did you mean
21    the number of units or, you know, the square footage?
22    You know, the aggregate square footage or something
23    else?
24      A    Generally I mean the number of units at a
25    particular community, which is logical sense.  If you
```

Page 56

1    have 1,000 units, it is going to require more

2    maintenance technicians, more leasing people, more

3    administrative people.  If you had 50 units, you know,

4    it'd obviously require less.  So it is -- you know, it

5    is linear in that fashion at this point.

6         Q    Okay.  And you also referenced technology and

7    support.  I was wondering if you could provide a little

8    more information about that, maybe provide an example of

9    how technology or support might impact level of staffing

10   at individual property.

11        A    Well, that evolved over time.  Again, I cannot

12   opine on or recall anything specific to this time frame

13   in 2008.  But over time the apartment business is no

14   different than any other business, including the legal

15   business, I would imagine, that as technology improves

16   that you become more efficient arguably, although your

17   spending on technology side goes up, and those are very

18   expensive systems and require a lot of support and

19   maintenance.  So maybe costs actually go up early on

20   versus down, or maybe they never come back down.  That

21   is kind of a debate.

22        So, you know, technology is an enabler of

23   things to, number one, to improve your brand because

24   we're all competing, and big way you compete is -- if

25   you can remember back then, the Internet wasn't all that

Page 57

1              THE WITNESS:  Yeah.  I think all of our

2    apartments were affordable or people wouldn't rent them.

3              BY MR. LEE:

4         Q   Okay.

5         A   Why would somebody enter a lease if they can't

6    afford it.

7         Q   No.  I understand it.  I think I'm referencing

8    specifically programs for, you know, below-market rental

9    rates.  Are you familiar with any programs like that

10   through Equity Residential?

11        A   No.

12        Q   And in terms of Equity Residential California

13   properties, would the rental occupancy rate of a

14   property impact the payroll costs in any way?

15             MR. FIELDS:  Vague and ambiguous and overbroad.

16             THE WITNESS:  No.

17             BY MR. LEE:

18        Q   Okay.  Now, earlier in your testimony, you

19   testified that you reviewed payroll data on a very

20   high-level basis.  Is that correct?

21        A   Yes.

22        Q   Okay.  Do you recall ever reviewing payroll

23   data specific to California?

24        A   No.

25        Q   In April to June of 2008, do you recall

Page 62

```
 1    providing any payroll information to your colleagues

 2    related to any discussions about changing the fee for

 3    the late payment of rent in California?

 4        A    No.

 5        Q    And is it correct that you have no recollection

 6    of anyone asking you about payroll data during that time

 7    frame for purposes of discussing changing the fee for

 8    the late payment of rent in California?

 9        A    Yes.

10        Q    You don't recall anyone asking you about that

11    information?

12        A    Yes, I don't recall.

13        Q    Okay.

14             MR. FIELDS:  We're still talking about April to

15    June 2008, correct?

16             MR. LEE:  Correct.  Justin, it is really hard

17    for us to hear you unless you kind of speak closely to

18    your microphone.

19             MR. FIELDS:  Got it.

20        BY MR. LEE:

21        Q    And in the time frame of April to June of 2008,

22    were you familiar with the activities performed by

23    Equity Residential employees at the property level to

24    collect late rent from California tenants?

25             MR. FIELDS:  Vague and ambiguous.
```

| 1 | THE WITNESS:  I have no recollection. |

2          BY MR. LEE:

3          Q   Okay.  And just in terms of the payroll data

4   that you -- that you are familiar with, during your time

5   at Equity Residential, did you receive reports about

6   payroll costs?

7          A   I don't recall any other than I've already

8   mentioned.

9          Q   Okay.  My question is just kind of how did you

10  receive this information?  I mean is it something that

11  you looked up in an electronic database?  Did you

12  receive reports?  Did -- you know, how did you receive

13  the information?  That is all I'm trying to figure out.

14         A   In 2008?  I cannot tell you.

15         Q   Okay.  Do you recall at any point?

16         A   Specific recollection, no.  I mean general, how

17  do people receive information?  You read something on a

18  screen if somebody sends you a report, or you could

19  choose to hit print and read it off a piece of paper.

20         Q   Okay.  But you don't have a specific

21  recollection as to how you received that information

22  during your time as executive vice president, president

23  property management?

24         A   Yes.

25         Q   You don't -- I'm sorry.  You don't have a

Page 64

1    recollection?  I just want to be clear.

2         A   Is that a question?

3         Q   Yes.  Do you have a recollection of how you

4    received that information?

5         A   I do not.

6         Q   Thank you.  Are you familiar with the term

7    "lost use of funds" as it relates to the late payment of

8    rent?

9         A   I don't recognize that term.

10        Q   Okay.  Do you have any understanding of that

11   term at all, "lost use of funds"?

12        A   If I never -- if I'm not familiar with that

13   term, I don't have an understanding of what it

14   specifically means.  I -- I understand the words.

15        Q   Okay.  Okay.  To your knowledge, prior to --

16   well let me withdraw that.

17             To your knowledge, did EQR attempt to calculate

18   its actual costs resulting from the late payment of rent

19   by California tenants in the April-to-June-2008 time

20   frame?

21        A   I do not recall.

22        Q   Did you have any involvement in monitoring or

23   evaluating the legality of the late fee charge for the

24   late payment of rent by Equity Residential after June of

25   2008?

                                              Page 65

```
 1              THE WITNESS:  That is -- definitely I can't
 2      remember.  I retired in '13, so no.
 3              BY MR. LEE:
 4         Q    That's right.  Okay.  Understood.
 5              Do you remember anything at all about the
 6      monitoring of the legality of the fee charged for the
 7      late payment of rent in California during your time at
 8      Equity Residential?
 9              MR. FIELDS:  Vague and ambiguous.
10              THE WITNESS:  Yeah.  That is very broad.  Do I
11      recall any specific monitoring and investigation?  No.
12      You know, I would speculate without specific
13      recollection that that was something we were concerned
14      about in all states.  I mean we do not want to violate
15      any laws.  And we had a legal department that
16      specifically, you know, reviewed that and helped ensure
17      that we never did.
18              BY MR. LEE:
19         Q    Understood.  I'm just trying to figure out what
20      you remember on this topic.  That's all I'm trying to
21      figure out, if you have any, you know, specific
22      recollections of any meetings, any specific efforts to
23      monitor the legality of the late fee, anything at all.
24         A    No, none of those specifics.
25         Q    Okay.  Okay.  Are you familiar with a former
```

Page 70

1    the record.  I just want to go over my notes and make

2    sure I've covered everything, but I think we're kind of

3    close to the end.

4         A   Okay.

5             MR. FIELDS:  Okay.  How long do you want?

6             MR. LEE:  Five minutes.

7             Off the record.

8                  (Recess taken.)

9         BY MR. LEE:

10        Q   All right.  We're back on the record, and,

11   Mr. Tuomi, we are coming to the end of my questions

12   here.  I just wanted to ask you specifically, though, in

13   the April-to-June-2008 time frame, do you recall any

14   assessment of attorneys' fees resulting from unlawful

15   detainer proceedings in connection with the adoption of

16   the fee for the late payment of rent in California?

17        A   No.

18        Q   Okay.  And just to clarify and summarize one

19   last time, do you have any recollection of any

20   assessments of any EQR's costs resulting from the late

21   payment of rent in the April-to-June-2008 time frame?

22        A   No.

23        Q   Okay.  Okay.  I don't have any other questions.

24        A   Okay.  Great.  Okay.  Thank you.

25            MR. LEE:  Justin, you don't have any questions?

Page 72

```
 1                   CERTIFICATE OF REPORTER

 2          I, JOHNNA PIPER, a Certified Shorthand

 3   Reporter, hereby certify that the witness in the

 4   foregoing deposition was by me duly sworn to tell the

 5   truth, the whole truth, and nothing but the truth in the

 6   within-entitled cause;

 7          That said deposition was taken in shorthand by

 8   me, a disinterested person, at the time and place

 9   therein stated, and that the testimony of the said

10   witness was thereafter reduced to typewriting, by

11   computer, under my direction and supervision;

12          That before completion of the deposition,

13   review of the transcript [ ]was [X]was not requested.

14   If requested, any changes made by the deponent (and

15   provided to the reporter) during the period allowed are

16   appended hereto.

17          I further certify that I am not of counsel or

18   attorney for either or any of the parties to the said

19   deposition, nor in any way interested in the event of

20   this cause, and that I am not related to any of the

21   parties thereto.

22   DATED: February 20, 2021.

23

24          _____

25          JOHNNA PIPER, CSR NO. 11268
```

Page 75

Exhibit 11

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

_____
                                          )
JAVANNI MUNGUIA-BROWN,                    )
ANGELINA MAGAÑA, NORMA                     )
RODRIGUEZ, and DAVID BONFANTI              )
individually and on behalf of             )
others similarly situated,                )    Case No.
                                          )    4:16-cv-01225-JSW-TSH
          Plaintiffs,                     )
                                          )
     vs.                                  )
                                          )
EQUITY RESIDENTIAL, a real                )
estate investment trust, ERP              )
OPERATING LIMITED PARTNERSHIP,            )
a partnership, EQUITY                     )
RESIDENTIAL MANAGEMENT,                    )
L.L.C., EQR-WOODLAND PARK A                )
LIMITED PARTNERSHIP, and                  )
EQR-WOODLAND PARK B LIMITED               )
PARTNERSHIP,                              )
                                          )
          Defendants.                     )
                                          )


DEPOSITION OF SUSAN ZUMPH

CONDUCTED REMOTELY

MARCH 22, 2021




REPORTED BY KAYLEE LACHMANN, RPR, CSR NO. 14348

Susan Zumph                                                        March 22, 2021

1    CONDUCTED REMOTELY; MARCH 22, 2021; 8:12 A.M. PST

2                          PROCEEDINGS

3    · · · · · · · · · · · ·SUSAN ZUMPH,

4    having first been duly sworn, was examined and

5    testified as follows:

6             EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7                  AND THE CERTIFIED CLASSES

8    BY MR. TOMASEVIC:

9    · · ·Q.· ·Good morning, Ms. Zumph.· My name is Alex

10   Tomasevic.· I represent the plaintiffs in this case.

11   Please state and spell your full name for us for the

12   record?

13   · · ·A.· ·Sure.· Susan Zumph.· Last name is spelled Z

14   as in zebra, U, M as in Mary, P as in Peter, H as in

15   Harry.

16   · · ·Q.· ·And did you at one point work for Equity

17   Residential as a vice president or first vice

18   president?

19   · · ·A.· ·I did.

20   · · ·Q.· ·You understand you're here to give a

21   deposition, right?

22   · · ·A.· ·I do.

23   · · ·Q.· ·All right.

24   · · · · · Have you ever been deposed before?

25   · · ·A.· ·Maybe, but maybe once or twice.

Susan Zumph                                                    March 22, 2021

1         Q.   Do you recall anything about those instances?

2         A.   No.   It would have been in connection with

3    insured litigation at Equity, and it would have been

4    done in a capacity as a -- like a company

5    representative-type deposition.

6         Q.   Did any of those matters have anything to do

7    with late fees or tenants challenging the late fees?

8         A.   No.   They would have been insured like

9    personal injury type litigation.

10         Q.   I understand.   Are you a licensed attorney in

11    Illinois or any other state?

12         A.   I am.

13         Q.   And for how long have you been a licensed

14    attorney?

15         A.   Not really supposed to ask questions that

16    lead to being able to guess a lady's age.

17         Q.   I hear you, but I've got your LinkedIn right

18    here if you need me to bail you out.

19         A.   No, I was first licensed in 1998 -- I mean

20    1990 -- yeah, wait.   1998.   And then I've been licensed

21    ever since then continuously, so however many years

22    that is.

23         Q.   And in your time as an attorney have you ever

24    taken depositions?

25         A.   Yes.

Susan Zumph                                          March 22, 2021

1   not in some other room sending you hand signals on how

2   to answer questions.

3        A.   He is not in another room in my house.

4        Q.   Fair enough.  I didn't think so.  Okay.

5             And are you on one of your personal computers

6   or work computer or something?

7        A.   I'm on a personal computer.

8        Q.   Now, you no longer work for Equity

9   Residential, right?

10        A.   Correct.

11        Q.   You work for AvalonBay communities?

12        A.   I do some legal consulting for them.  I'm not

13   an employee of them.

14        Q.   Okay.

15             Are you self employed?

16        A.   Yeah.

17        Q.   Does your self-employment have a name or a

18   company name?

19        A.   It does not.

20        Q.   You worked for Equity Residential until when?

21        A.   May of -- this would be my third summer, so I

22   guess 2019.  Yeah, May of 2019.

23        Q.   And you started with Equity Residential when?

24        A.   In 2002.

25        Q.   As a staff attorney, right?

Susan Zumph                                             March 22, 2021

1      A.   Yes.

2      Q.   So do me a favor, please, and give me a

3   synopsis of your positions or list of all your

4   positions at Equity Residential since 2002.

5      A.   There were title changes, but I started in

6   2002 overseeing certain kinds of litigation, and then

7   trial changes or not, I carried on through to -- what

8   did I say that year was, 2019, is that right?

9      Q.   I heard that your last year at EQR, Equity

10  Residential, was 2019, that you started in 2002 as a

11  staff attorney.

12     A.   Yeah.  So I carried on through there.  My

13  prime responsibilities were to oversee different kinds

14  of litigation.

15     Q.   When did you get the next title after staff

16  attorney?

17     A.   I have no idea.

18     Q.   At some point you became an assistant vice

19  president?

20     A.   Yes.  That was the next title change.

21     Q.   When you say you had responsibility in the

22  early years over certain types of litigation, what

23  types of litigation were you referring to?

24     A.   Well, it wasn't early years necessarily.

25  Over the course of my career there I had responsibility

Susan Zumph                                        March 22, 2021

```
 1   for different kinds of litigation and the kind of
 2   litigation varied depending on what suits were filed.
 3   But in the early years I did focus more the insured
 4   portfolio of litigation which would be -- insured
 5   litigation would be personal injury, property
 6   damage-type suits.  But I continued to work on those
 7   kind of suits through the end of my time at Equity as
 8   well.
 9        Q.   In 2008, what were you doing with Equity?
10        A.   In 2008?
11        Q.   Yes.
12        A.   I don't know.
13        Q.   I'm looking at your LinkedIn.  It says you
14   were an assistant vice president at that point in time.
15   I'm not trying to hide it from you.  Let me put it in
16   the chat box.  You have access to the chat box, right,
17   of Zoom?
18        A.   I should.  And I'm not trying to hide
19   anything from you but, you know, I just don't remember
20   exactly, you know, what it -- what it would have been,
21   so --
22        Q.   No, that's fair enough.  I hope no one ever
23   asks me what I was doing in 2008, so --
24        A.   Yeah, so as you can see, I was overseeing the
25   general liability insured litigation and then also
```

Susan Zumph                                                    March 22, 2021

```
 1   other types of commercial litigation that had been
 2   filed.
 3        Q.   Okay.
 4             Were there other folks with your same title
 5   in the office at that time or were you the only
 6   assistant vice president in legal doing these things?
 7        A.   There were -- there were other lawyers.  They
 8   may have had other titles.  I was more of a junior
 9   lawyer at Equity.  I was younger than most of the other
10   lawyers in the -- this group, the legal services group
11   is what it was called.  So they may have not have had
12   my title because they may have had other titles, but
13   they also oversaw litigation.  You know, there were
14   other trial lawyers in house.
15        Q.   Understood.
16             In 2008, how big or how many employees did
17   the legal services group have?
18        A.   They had -- I believe there were six lawyers
19   who did -- I believe there were six lawyers who did
20   various things, not all litigation.  But there were
21   three lawyers primarily focused on litigation-type
22   issues.
23        Q.   And who was the general counsel of the
24   organization in 2008?
25        A.   Bruce -- Bruce Strohm.
```

Susan Zumph                                      March 22, 2021

1    Q.   And who did you report to directly in 2008?

2    A.   Jim Fiffer.

3    Q.   And his title at the time was?

4    A.   I don't know.  Senior to me.

5    Q.   Understood.

6         And after you were assistant vice president,

7    what was the next title you received at Equity

8    Residential?

9    A.   Vice president.

10   Q.   Do you recall when you got that title?

11   A.   My LinkedIn page says 2008.

12   Q.   Did your duties change at all?

13   A.   No.

14   Q.   Did who you reported to change at all at that

15   time?

16   A.   No.

17   Q.   And was the general counsel at the time still

18   Bruce Strohm?

19   A.   Yes.

20   Q.   And then you became a first vice president in

21   about 2013, is that right?

22   A.   That's what I put in LinkedIn, so let's hope

23   it is.

24   Q.   And that was the title you had up until the

25   end of your tenure at Equity Residential, right?

Susan Zumph                                                    March 22, 2021

1      A.    Yes.

2      Q.    How did your duties change once you became

3    the first vice president, if at all?

4      A.    They did not.

5      Q.    So what would you describe as your job for

6    Equity Residential as of the time of your departure?

7      A.    I was primarily responsible for overseeing

8    litigation, and I collaborated with regard to

9    compliance issues as well.

10      Q.    Were you overseeing this litigation before

11    you left?

12      A.    I was.

13      Q.    Was anyone else helping you with the

14    oversight of this litigation on behalf of Equity

15    Residential?

16      A.    Well, actually, that was a misstatement.  Jim

17    Fiffer oversaw the litigation, and I assisted him in

18    overseeing the litigation.

19      Q.    Okay.

20            And who else was part of your team besides

21    yourself and Mr. Fiffer overseeing this litigation?

22      A.    It was just the two of us who oversaw it.  We

23    had assistants from paralegals or administrative

24    assistants, but we were -- it wasn't a team.

25      Q.    When you were working for Equity Residential,

Susan Zumph                                                  March 22, 2021

1    were they always full-time positions?

2         A.   I don't -- oh, were my positions full-time?

3         Q.   Correct.

4         A.   Yes.

5         Q.   I'm trying to understand if maybe you had

6    other jobs or other, you know, legal positions or kept

7    a firm or anything like that while you were still

8    working with Equity Residential?

9         A.   Oh, no.  I did not.

10        Q.   And why did you leave Equity Residential in

11   2019?

12        A.   The company was reducing head count, so they

13   let myself and the other more senior litigation

14   attorney go at the same time.

15        Q.   And who was that?

16        A.   I'm sure he'll be thrilled to be named here.

17   His name is Rich Murphy.

18        Q.   Did Mr. Murphy have any responsibilities with

19   respect to this litigation?

20        A.   No.

21        Q.   Generally speaking, what was Mr. Murphy's

22   role or duty at the end of his tenure?

23        A.   Well, I hate to speak for him.  You know, I

24   didn't do his job, but as his colleague I would say

25   that he helped with the construction and development

Susan Zumph                                          March 22, 2021

1        A.   I have no idea.

2        Q.   You don't remember when you saw them last

3   other than reviewing them in preparation for the

4   deposition?  Is that your testimony?

5        A.   That is.

6        Q.   And when you saw them on Friday, did you

7   recognize them?

8        A.   Not particularly.

9        Q.   Did you do anything else -- well, strike

10   that.

11        Did you review any other documents besides

12   the ones you've described or that we've talked a little

13   bit about?

14        A.   I haven't.

15        Q.   Did you talk with any former coworkers at

16   Equity Residential in preparation for your deposition?

17        A.   I have not.

18        Q.   Does anyone else know you're giving this

19   deposition or attending this deposition?

20        A.   I did get an e-mail from -- I don't have

21   it -- the person who took -- was hired after Jim Fiffer

22   left the company saying, I hear you've got -- you're

23   going to give a deposition, thank you for cooperating.

24        Q.   Who was that?

25        A.   Guy's name is Matt Koritz.

Susan Zumph                                                    March 22, 2021

1    Q.  Did you speak with Matt?  I'm sorry, I had a

2    weird pause and I do that a lot.  So other than the

3    e mail you described, did you have any communications

4    with Matt Koritz about today's deposition?

5    A.  No.

6    Q.  Did you have any communications with anyone

7    else at Equity Residential about today's deposition?

8    A.  No.

9    Q.  Have you ever talked to anyone at Equity

10   Residential about this case since you left?

11   A.  No.

12   Q.  Have you talked to anyone in the world

13   outside of Aaron and the people at his firm or your

14   former coworkers at Equity Residential about this case?

15   A.  No.

16   Q.  Let's go back to 2008 to the extent we can.

17   Are you familiar with the late fee charge to Equity

18   Residential's California tenants today?  Or let me

19   rephrase that.

20   Remind us what the late fee charge to Equity

21   Residential's California tenants was at the time that

22   you left Equity Residential.

23   MR. WINN:  Objection.  Objection.  Vague.

24   A.  I'm not entirely sure, but I -- I think it

25   was the late fee that's been challenged in this case,

Susan Zumph                                      March 22, 2021

1    communities that weren't charging the general policy

2    for different

3          Q.   Okay.

4               Fair enough.   But the general policy was to

5    charge a late fee of 5 percent in California, right?

6    You remember -- we remember that much?

7          A.   That's my -- that's my recollection.

8          Q.   Do you know when Equity Residential adopted

9    or implemented that percentage-based late fee in

10   California?

11         A.   I don't recall exactly when that was.   I

12   didn't have anything to do with the implementation of

13   that.

14         Q.   My understanding is it was sometime in 2008.

15   Is that your recollection?

16         A.   It's not my recollection, but could be.

17         Q.   Do you know what Equity Residential was

18   charging California tenants before it moved to the 5

19   percent fee?

20         A.   I don't.   I don't know, and I don't know if

21   it's I don't recall or I never knew.

22         Q.   That's fair.

23              And I know you included this in one of your

24   prior answers, but I'm very dim, and if I don't

25   answer -- ask it the way it is on my outline, I'll

Susan Zumph                                      March 22, 2021

1    screw up.  So let me ask the question -- strike that.

2             Were you involved in the adoption of the

3    California late fee in 2008?

4        A.   No.

5        Q.   Do you know who was?

6        A.   No.

7        Q.   Was anyone from the legal department involved

8    in 2008?

9        A.   I don't know.

10        Q.   I referred to a legal department, but what

11    did you call legal or the legal department or the

12    general counsel's kingdom in 2008?

13        A.   Generally we -- throughout the course of time

14    I worked for Equity we called it the legal department.

15        Q.   So can you tell me if anyone from the legal

16    department was involved in the decision to adopt a 5

17    percent late fee for Equity Residential properties in

18    California in 2008?

19        A.   I can't.

20        Q.   Who would be the best person to ask that

21    question?

22        A.   Since I wasn't involved, I don't -- I don't

23    know that I can tell you the best person to ask.

24        Q.   Who would you ask?

25        A.   If you said to me, go find out, I would talk

Susan Zumph                                                        March 22, 2021

```
 1    to Jim.
 2         Q.   I would say go find out, please, for the
 3    record, but okay.
 4              Jim Fiffer, right?
 5         A.   Fiffer.
 6         Q.   Fiffer, thank you.
 7              Can you tell me anything about the process
 8    that culminated in the adoption of the 5 percent late
 9    fee for California tenants?
10         A.   I cannot.
11         Q.   Can you tell me any individuals who might
12    have been involved in that process?
13         A.   I don't know.
14         Q.   Could you tell me who came up with the idea
15    to start charging a 5 percent late fee in or around
16    2008?
17         A.   No.
18         Q.   Can you tell me anything about why the late
19    fee was changed from its prior regime or structure to
20    the 5 percent late fee in 2008?
21         A.   No.
22         Q.   Do you remember what the fee was when you
23    first started with Equity Residential in 2002?
24         A.   I'm sorry.  What fee?
25         Q.   The late fee for California tenants.
```

Susan Zumph                                           March 22, 2021

1           A.   I have no idea.

2           Q.   What was the first time you had anything to

3    do with assessing or evaluating the late fees charged

4    by Equity Residential to California tenants?

5           A.   I don't remember a date.

6           Q.   About when?

7           A.   It would have been when I began taking

8    some -- having some compliance responsibilities in

9    addition to the litigation.

10          Q.   And was that in about 2014 or 2015?

11          A.   Maybe.  Sounds probably about right.

12          Q.   So can you recall having to do anything with

13   respect to evaluating or analyzing Equity Residential

14   late fees prior to 2014?

15          A.   I really can't.

16               Can I make sure I'm understanding here?

17          Q.   Sure.

18          A.   I don't want to make it sound as if I'm

19   clarifying for a particular reason, but can we agree

20   that when you say Equity Residential's late fee, we're

21   just talking about California, right?

22          Q.   That's fair, yeah.  No, that's a great --

23   that's a great qualifier, and I did say, and I meant

24   it, if you don't understand my question and you need me

25   to rephrase or repeat, please do so.  Please don't be

Susan Zumph                                                March 22, 2021

1    defense of this litigation and an attorney client

2    communication.  So my instruction to the witness is not

3    to disclose details of conversations about this report

4    that arose in the context of this litigation.

5         A.   Okay.  It was part of the defense of the

6    litigation.  Any communications about this report --

7    the existence of it, any conclusion of it, any

8    discussion of it -- all occurred as part of the defense

9    of this litigation, and I don't recall anything

10   specifically about it other than my general summary

11   that I gave you.

12        Q.   Fair enough.

13             The first time you ever heard of a

14   PricewaterhouseCoopers report related to Equity

15   Residential's late fees was after this lawsuit was

16   filed in 2014, right?

17        A.   Yes.

18        Q.   Do you know if the PricewaterhouseCoopers

19   report was ever reviewed or used in setting the 5

20   percent late fee for California tenants?

21             MR. WINN:  Objection.  Vague.  Lacks

22   foundation.

23        A.   I don't know anything about the setting of

24   the late fee.

25        Q.   Do you know what criteria, if any, were ever

Susan Zumph                                          March 22, 2021

1    used in the setting of the 5 percent late fee for

2    California tenants?

3         MR. WINN:  Objection.  Asked and answered.

4    Vague.  Lacks foundation.

5         A.   In the course of my defense of this lawsuit,

6    I did attend depositions in this case where that was

7    discussed, and so I do have some information, but none

8    of it I would have gained except in that context -- you

9    know, the context of defending this suit.  So that

10   being said, there's really nothing secret.  I don't

11   really recall much about it that wasn't contained in

12   testimony from witnesses already.

13        Q.   Before you sat for depositions as a part of

14   my lawsuit, did you have any idea what criteria, if

15   any, personnel at EQR used to help establish or arrive

16   at the 5 percent late fee for California tenants?

17        A.   No.  I didn't participate in those decisions,

18   and until this lawsuit got -- was filed, I didn't have

19   any discussions or interactions about it whatsoever.

20        Q.   Was it ever your job to monitor or reevaluate

21   the legality of the California late fees charged to

22   Equity Residential tenants before this lawsuit was

23   filed?

24        A.   Wait.  I'm sorry.  Ask -- I cut you off, and

25   so then I wasn't listening.

Susan Zumph                                          March 22, 2021

1      Q.   Were you ever involved in any way in

2   evaluating the legality of the California late fee at

3   any time before this lawsuit was filed?

4      A.   Yes, when I took on some compliance-related

5   responsibilities, which occurred shortly before this

6   lawsuit was filed, I began that process of looking at

7   the California late fee.

8      Q.   What's your understanding of when this

9   lawsuit was filed?

10      A.   If I recall, it was in like early fall, late

11   summer, September-ish of 2014.

12      Q.   And you're telling me you began some

13   compliance activities before then?

14      A.   Yes.  Again, I guess if I put those

15   responsibilities in a timeline with this lawsuit, I

16   said I couldn't recall exactly when that was, maybe

17   2014, maybe 2015.  I know it was shortly before this

18   lawsuit, so 2014 time frame sounds right.

19      Q.   So when was the first thing that you did to

20   evaluate the legality of the California late fee?

21      A.   The first thing I did was to meet with -- Ann

22   and I were going to be doing not just California late

23   fee but a more general review of certain charges, not

24   just in California but -- and not just late fees but

25   other charges that maybe were being charged in

Susan Zumph                                    March 22, 2021

1    different jurisdictions.  And so Ann and I, I'm sure,

2    sat down and started talking about what -- what even

3    fees would be charged, what was out there, what types

4    of things, because that was not my responsibility, to

5    set fees.  So I had to talk with her about that.

6         Q.   You're referring to Ann Patton?

7         A.   Patton, yes.

8         Q.   Patton.  Thank you.

9              And these first activities where you were

10   evaluating the legality of late fees everywhere,

11   including California, started in the second half of

12   2014?

13        A.   Sure, about then.  Maybe mid -- you know,

14   second half, maybe mid, so spring, say.

15        Q.   Before that compliance activity in 2014, did

16   you have any role whatsoever with evaluating late fees

17   in California or anywhere else?

18        A.   No.

19        Q.   Why did you take on a role with respect to

20   evaluating late fees in California and other

21   jurisdictions at that time?

22        A.   There had been a number of lawsuits not -- I

23   don't recall about what type of fee, not necessarily

24   late fees, filed against our competitors, and so Bruce

25   and Jim had asked me to do something different, do

Susan Zumph                                    March 22, 2021

1   something new, me to come in and see if some of those

2   fees could pose risk for Equity.

3        Q.   These other lawsuits against your

4   competitors, what do you remember about them?

5        A.   Not very much specifics, just that it was

6   about fees and charges and different ones.  They were

7   in different jurisdictions.

8        Q.   Can you recall any of the competitors or

9   apartment communities that were sued in these other

10  lawsuits you're referencing?

11       A.   This is a non-exhaustive list.  I believe

12  Archstone and AvalonBay were two of them.

13       Q.   Do you know what fees were being charged at

14  Archstone?

15       A.   No.

16       Q.   Do you recall what fees were being challenged

17  at AvalonBay?

18       A.   No, not specifically, other than to say the

19  industry in general charged fees, say, some -- in some

20  places at -- around move-in, and some places for late

21  fees and some places that move out, so I can't recall.

22  I know over the course of my tenure with Equity I heard

23  of many suits against competitors and sort of all of

24  those time frames, any of those fees, so I can't recall

25  which suits in particular were filed at that time that

Susan Zumph                                        March 22, 2021

1    caused Jim and Bruce to want me to begin compliance

2    activities.

3        Q.   Before you were asked to look at compliance

4    activities in 2014 or to undertake compliance

5    activities, were you aware of any lawsuits against

6    Equity Residential competitors challenging those

7    competitors' late fees?

8        A.   I can't recall if that was a fee that was

9    charge -- challenged in any of those suits.

10       Q.   Can you recall any of the fees that were

11   being challenged as part of these lawsuits against

12   competitors that you became aware of in or around 2014?

13       A.   No.

14       Q.   Can you recall the names of any of these

15   lawsuits?

16       A.   No.

17       Q.   Can you recall when any of them were filed?

18       A.   I -- no.  No, I can't recall.

19       Q.   Go ahead.

20       A.   No, I can't recall when they were filed other

21   than I believe they were newer lawsuits, and that was

22   what prompted Jim and Bruce to want to take a look at

23   what was happening at Equity.

24       Q.   Is that what Bruce or Jim told you that, hey,

25   as a result of these other lawsuits that I have become

Susan Zumph                                                          March 22, 2021

```
 1   aware of, I want you to undertake that compliance
 2   review?
 3        A.   I don't think that was the conversation, but
 4   I don't recall the exact conversation.
 5        Q.   How about in general?
 6        A.   In general, I was at -- I recall being asked
 7   to take a look to review in general fees or charges
 8   that were being -- that Equity was assessing because
 9   we'd seen competitors get sued and we felt the
10   plaintiff's file was very active and we wanted to see
11   if there was risk for Equity.
12        Q.   Do you recall the location or jurisdiction
13   for any of these other lawsuits against Equity's
14   competitors?
15        A.   No.
16        Q.   Do you know if it was federal court or state
17   court?
18        A.   No, definitely not.
19        Q.   Do you know if they were class actions or
20   individual suits or arbitrations?
21        A.   I don't.  I don't.
22        Q.   Do you know any of the lawyers representing
23   any of the parties in any of those cases?
24        A.   No.
25        Q.   Do you know the outcomes of any of those
```

Susan Zumph                                        March 22, 2021

1      Q.   How about generally?

2      A.   No.  I don't recall.

3      Q.   What communities or defendants did they work

4  at?

5      A.   As I mentioned before, the only -- the only

6  two I can recall were AvalonBay and Archstone, and I

7  don't know whether I spoke with either -- anyone

8  in house at either of those or both of them.

9      Q.   Do you recall exchanging e-mails with anyone

10  from Archstone or AvalonBay about their lawsuits?

11      A.   No.

12      Q.   Do you recall exchanging any e-mails with

13  Mr. Fiffer or Mr. Strohm?  Forgive me.  Strike that.

14          Do you recall exchanging any e-mails with Jim

15  Fiffer or Bruce Strohm about these other lawsuits?

16      A.   I don't -- I don't recall.

17      Q.   When you first learned about these other

18  lawsuits from your colleagues at Equity Residential,

19  was it via e-mail or telephone call or bumping into

20  someone at the lunch room?

21          MR. WINN:  Objection.  Vague.

22      A.   I don't have a memory of how this came up.

23      Q.   Can you remember anything about how it came

24  up?

25      A.   No.  But -- other than to say, generally

Susan Zumph                                      March 22, 2021

 1  speaking, we were very collaborative and in person, so

 2  if I were going to guess how it happened -- and this is

 3  a guess -- I'm guessing I had a conversation with them

 4  about it rather than sending an e-mail about it, but I

 5  can't say that that was how it happened.  That's

 6  just -- would be my guess based on how we generally

 7  interacted.

 8       Q.   Before you started this compliance review in

 9  2014, do you know if any other similar type of review

10  of Equity Residential's California late fees had ever

11  been conducted by the company?

12       A.   It -- I believe that the -- that there may

13  have been other reviews.  There may have been other

14  reviews done, but it wouldn't have been similar.  At

15  least I was asked to take a look at it because the idea

16  was I was going to bring a different perspective to it

17  from a litigation background.

18       Q.   Were any other reviews done before 2014 as to

19  Equity Residential's late fees charged that were from a

20  perspective of someone in the legal department that

21  you're aware of?

22            MR. WINN:  Objection.  Vague and ambiguous.

23  Lacks foundation.

24       A.   There may have been.

25       Q.   Can you recall any or any of the specifics of

Susan Zumph                                        March 22, 2021

1    those?

2         A.   I was not involved in any.  I wasn't asked to

3    collaborate on any of those.

4         Q.   Do you know if any were actually done or are

5    you guessing?

6         A.   Yeah.  I don't have any specific documents

7    about that.  Like at the time I was with Equity, I

8    don't recall reviewing any documents -- hey, take a

9    look at the old ones we did.  But that doesn't mean

10   that ones weren't done.  I just -- I don't have

11   knowledge of them.

12        Q.   Fair enough.

13             But can you recall if any were, in fact, done

14   by anyone in the legal department?

15        A.   I wouldn't have been involved, so I wouldn't

16   have had any knowledge of that.

17        Q.   Have you ever heard of another compliance

18   review being done by anyone in the legal department as

19   to Equity Residential's California late fee?

20        A.   I don't -- I don't recall.

21        Q.   You said there may have been other reviews,

22   though, outside of the legal department or legal

23   perspective.

24        A.   No.

25        Q.   Are you saying that some reviews were done or

Susan Zumph                                          March 22, 2021

1          Q.   No problem.  No problem.  Okay.  Let's take

2     five right now.

3               COURT REPORTER:  All right.  We'll go off the

4     record.

5               (Whereupon, a recess was taken.)

6     BY MR. TOMASEVIC:

7          Q.   We're back on the record, Ms. Zumph.  You

8     understand you're still under oath, right?

9          A.   Yes.

10              MR. TOMASEVIC:  I appreciate that right

11    before we got back on the record Ms. Zumph shared with

12    me her home address which addresses an earlier question

13    that I asked at the very beginning of the deposition.

14    We're not going to put it on the record, and I'm fine

15    with that.  I just want to acknowledge that the witness

16    did give it to us and resolved that one little issue

17    that we had and also further acknowledged that we will

18    keep her address and that information confidential and

19    use it only for purposes of this lawsuit.

20              MR. WINN:  Thank you.

21              MR. TOMASEVIC:  Very good.

22         Q.   So in 2014 when you were doing the compliance

23    review, Ms. Zumph, what was the makeup of the legal

24    department at EQR?  How many lawyers?  Who were they?

25         A.   I think previously I told you there were six

Susan Zumph                                          March 22, 2021

1    lawyers.

2         Q.   You did say that.

3         A.   There was a seventh at that time.

4         Q.   Okay.

5         A.   And otherwise the makeup was generally the

6    same.

7         Q.   And who were the lawyers in the office at the

8    time besides yourself and Mr. Fiffer and Mr. Strohm?

9         A.   Am I supposed to name them all?

10        Q.   If you can remember.

11        A.   Denise Beihoffer was one.  These people are

12   going to love it.  Rich Murphy, who I already told you

13   about.  A guy named Jim Athas.  Lisa Leib.  Helen Din.

14   She may or may not have been there in 2014.  I can't

15   recall when she was actually hired.  And myself and

16   Jim.

17        Q.   And Mr. Strohm was still the general counsel

18   at the time?

19        A.   He was, and there were a number of

20   transactional lawyers, people that bought and sold

21   properties.

22        Q.   Do you know who Mr. Strohm reported to at the

23   time?

24        A.   Not specifically.

25        Q.   How about generally?

Susan Zumph                                          March 22, 2021

1        A.   I mean, I would guess either the board or the
2    CEO or both.
3        Q.   Do I spell Strohm S T R O H M?
4        A.   Well, that's how he spells it.
5        Q.   That's -- that's a fair -- that's a fair
6    response to my vague question.  Thank you.
7        A.   So yes, you should spell it that way as well.
8        Q.   I will then.
9             Okay.  So let's skip right to this or talk
10   further about this 2014 compliance review.  Was that
11   the term internally used at Equity Residential,
12   compliance review?
13       A.   Sure.  It wasn't a formal thing, so yes.
14       Q.   Whose idea was it first to do a compliance
15   review of the California late fee in 2014?
16       A.   The idea to review the -- any late fee -- and
17   the California one included -- came up after
18   discussions and meetings with Ann and myself and then
19   probably other people internally in the operations.
20       Q.   So do you attribute any one person with
21   having the idea to start the compliance review in 2014?
22       A.   I don't attribute the idea to review the
23   California late fee or any late fee in 2014 to any
24   particular person.
25       Q.   So then tell me more about the genesis of

Susan Zumph                                        March 22, 2021

1      Q.   And then what was the very next thing that

2   happened with respect to your role in the 2014

3   compliance review?

4           MR. WINN:   Objection.   Vague.

5      A.   I can't tell you the very next thing that

6   happened.  What I can tell you generally, after I was

7   asked to do this, I'm sure I had more one-on-one

8   conversations with Jim where he probably gave me more

9   details about what he had thought about what he'd like

10  me to do so I had more direction.  And then I would

11  have met with Ann who at some point, I was told, was

12  going to -- she and I were going to do this together,

13  and we talked about how -- what we were going to do,

14  how we were going to do it, what -- who we would get

15  information from, that sort of thing.

16     Q.   Do you recall the substance of any of these

17  follow-up conversations you had with Jim Fiffer about

18  the 2014 compliance review?

19     A.   Not -- no specifics about them.

20     Q.   Did you trade any e-mails with Mr. Fiffer

21  about the scope of the compliance review project?

22     A.   It's possible I did.  I don't have any

23  particular memory of them.

24     Q.   You said you met with Ann Patton, right?

25     A.   Yes.

Susan Zumph                                          March 22, 2021

1    Q.   That was after you were told you'd be working

2  with Ms. Patton on this project, right?

3    A.   Yes.

4    Q.   And who told you you'd be working with

5  Ms. Patton on the project?

6    A.   I don't recall.

7    Q.   What was Ms. Patton's role to be as described

8  to you at the time?

9    A.   Oh, I don't recall specifically how her role

10 was described to me.

11   Q.   What did her role end up being?

12   A.   She was to help me with gathering

13 information.  She was familiar with what the fees were.

14 She was more familiar with our leases, for example,

15 which described what -- you know, the terms of the

16 lease, what was going to be charged.  In a particular

17 case, for example, with a late fee, it would have been

18 described in the lease.  I was not familiar with that

19 at the time because that had not been part of my

20 responsibilities.

21        So she was going to be -- we were going to be

22 working together.  One thing I know you've already

23 heard in depositions, Equity is a very collaborative

24 workplace, which means that we work together on things.

25 It's not hierarchical so that somebody at the top tells

Susan Zumph                                          March 22, 2021

1    the other person what to do.  So she was supposed -- we

2    were supposed to be assisting each other in assessing

3    fees and charges to determine whether there was risk

4    for the company associated with those.

5         Q.   And so once you had your conversations with

6    Mr. Fiffer and Mr. Strohm about the project and you met

7    with Ms. Patton, what happened next?

8         A.   Well, I'm sure we carried on with the

9    project.

10        Q.   And my question is attempting to get at the

11   step-by-step process as far as you can remember as you

12   sit here today regarding that project.

13        A.   I don't remember the step-by-step process.

14        Q.   Well, at some point Ms. Patton did her job

15   and helped gather the data and other pieces that you

16   had described previously, right?

17        A.   So I think that's what I'm trying to say, and

18   I think maybe you missed.  So it was collaborative.  It

19   wasn't that I defined what was going to happen and said

20   go do this and she came back to me.  So it wasn't

21   step-by-step like that.  I'm sure we were meeting

22   frequently to determine what should be investigated,

23   who we needed to get information from to even decide

24   what should be investigated, and then we met to figure

25   out how we were going to get information.  And then,

Susan Zumph                                    March 22, 2021

1   you know, as the process went on, we would have

2   probably had to do that more than once, see how that's

3   going, oh, it turns out we thought we could get this

4   information here but we can't, let's think about

5   another way to get information.  And then eventually we

6   gathered information and then eventually we took a look

7   at it and eventually we came to some conclusion about

8   it.

9        Q.   So you estimate that you had several meetings

10  with Ms. Patton regarding the 2014 compliance review?

11       A.   Yes.

12       Q.   Do you recall about how many meetings?

13       A.   Nope.

14       Q.   And other than, generally speaking, the

15  obtaining of information you needed for the compliance

16  review, can you tell me anything else about the

17  substance of your meetings with Ms. Patton?

18       A.   No.

19       Q.   Other than canvassing properties for the late

20  fees being charged, can you recall any other

21  information that you and Ms. Patton were gathering at

22  the time for the 2014 compliance review?

23       A.   I don't remember, but I would make an

24  assumption that we also gathered information about when

25  we're talking about this -- the late fee, California

Susan Zumph                                          March 22, 2021

 1    late fee portion of this.  I'm sure we also gathered

 2    information about what was being charged.

 3        Q.   The information that you and Ms. Patton

 4    obtained as part of the 2014 compliance review included

 5    the late fees being charged in the jurisdictions

 6    including California, right?

 7        A.   Yes, I believe so.

 8        Q.   What else did you gather?  What other data,

 9    if anything?

10        A.   I think Ann also gathered information about

11    what was actually being done on-site when rent was not

12    paid on time.  We had to look at the process involved

13    in collecting rent not paid timely.

14        Q.   And did Ann Patton primarily have

15    responsibility for gathering that information at the

16    property level?

17        A.   I think so.  I feel like she did.  You know,

18    I certainly don't recall myself calling up communities

19    or managers myself.  I may have spoken to some, but I

20    don't recall doing that.

21        Q.   What other information, if anything, did you

22    or Ms. Patton gather as part of the 2014 compliance

23    review?

24        A.   I can't specifically recall other information

25    we gathered from Equity about that.

Susan Zumph                                    March 22, 2021

```
 1        Q.   Anything in general?
 2        A.   There may have been.  I cannot think of a
 3   particular item at this moment.
 4        Q.   Why were you trying to learn about what the
 5   on-site late rent collection process was like?
 6        A.   To determine the expense involved in
 7   attempting to follow up on and collect on rent that was
 8   not paid timely.
 9        Q.   Why were you interested in learning the
10   expenses incurred?
11        A.   We were evaluating whether the late fee was
12   allowed and was allowable in California, and part of
13   that is attempting to determine the cost of rent that's
14   not paid on time.
15        Q.   When did you first learn that the cost of
16   collecting rent was relevant to the compliance review
17   or California law?
18        A.   I have no idea when I first learned that.
19        Q.   Did you learn that as part of the compliance
20   review, as part of your background research or
21   something?
22        A.   Possibly.
23        Q.   How long did it take you or Ms. Patton to
24   gather all the information you needed to go further in
25   the compliance review?
```

Susan Zumph                                    March 22, 2021

1      A.   An estimate would be several months.

2      Q.   Why did it take that long?

3      A.   Well, it wasn't an easy process, and number

4  one, there was a lot involved in it, and this is

5  difficult -- this is a particularly difficult thing to

6  do, but also because we both had a lot of other

7  responsibilities.

8      Q.   Once the initial information was gathered,

9  what happened next as part of the 2014 compliance

10 review?

11     A.   You know, again, I can't give you a

12 step-by-step about how this worked.  I don't recall

13 what happened when.  Things may have overlapped.  But

14 in general, the idea was we're going to perform a

15 review of a number of items, including the California

16 late fee, and we're going to -- I had to report to

17 Bruce -- sorry -- on a regular basis about how that --

18 how it was going.  You know, was it -- were we getting

19 the information, what more did we need, did we need --

20 were we doing all the things that we should have been

21 doing.  Oh, shoot.

22     Q.   If you need to get that or address that --

23     A.   I can't.

24     Q.   Please, please.

25     A.   I'm so sorry.

Susan Zumph                                    March 22, 2021

1        Q.   That's okay.  It happens.  That's fine.

2        A.   I'll be right back.

3        Q.   Take your time.

4            MR. WINN:  So let's go off the record.

5            MR. TOMASEVIC:  Yes.

6            (Whereupon, a recess was taken.)

7   BY MR. TOMASEVIC:

8        Q.   Ms. Zumph, before our little break there, you

9   were trying to give me your best recollection of the

10  steps that were taken as part of the 2014 compliance

11  review.  And where we were at, according to my

12  recollection, was generally speaking what was taking

13  place after the necessary information was gathered at

14  the property level?

15       A.   We would have been trying to determine what

16  additional pieces of information we needed, where to

17  get it, and then eventually sum up what did we learn.

18       Q.   Were you reporting to general counsel Bruce

19  Strohm about your progress in gathering information or

20  any issues you came across in trying to gather

21  information?

22       A.   Not on a daily or weekly basis on it, but I

23  had to check in with him to make sure that it was

24  moving along, not getting stalled.  He was -- he didn't

25  like it if people didn't, you know, come to a -- like a

Susan Zumph                                          March 22, 2021

1    finish of the projects he set.  So I do recall there

2    was some stress about that for me that it was taking a

3    long time and that I wasn't going to meet his

4    expectation that I actually finish it.

5         Q.   Were you reporting to Mr. Strohm via e-mail,

6    telephone, in-person meetings, or some other fashion

7    typically?

8         A.   It was more in-person meetings.

9         Q.   Did you have regular meetings set up with

10   Mr. Strohm as part of your job at the time?  Regardless

11   of the compliance review were you guys meeting

12   regularly?

13        A.   I don't recall.  He did like to meet with the

14   lawyers on a regular basis.  However, it's stressful to

15   meet with your boss's boss on a regular basis, and what

16   I do recall is I was able to put those meetings off for

17   a longer period of time than my colleagues.  So they --

18   so I -- at some point I did have more regular meetings

19   with Bruce, but I don't know if it was then.  I put it

20   off as long as possible and he didn't notice, and I

21   just didn't remind him.

22        Q.   Understood.

23             About how often did you have meetings with

24   Mr. Strohm about the 2014 compliance review?

25        A.   Not regularly.  They would have been at least

1   several more months -- a couple or several months

2   apart.

3       Q.   Do you think you had five meetings or one or

4   two or some other --

5       A.   I'm sorry.  You cut out there.

6       Q.   About how many meetings do you think you had

7   with Mr. Strohm about the 2014 compliance review?

8       A.   A handful, probably not more than four or

9   five.

10      Q.   Did you ever give him any e-mail updates

11  about your progress for the compliance review?

12      A.   I don't recall.

13      Q.   These meetings with Mr. Strohm, would anyone

14  be taking notes?  Would there be any agenda circulated,

15  any written reflections of the meetings at all that

16  you're aware of?

17      A.   The only person that would have been taking

18  notes would have been me for what he was telling me I

19  had to do next.  If he -- you know, if he said, I want

20  you to go call so-and-so, then I wrote that down.  I

21  had to go call so-and-so and follow up because he told

22  me to.  So I don't -- there was definitely not a note

23  taker.  I can't recall if there was any written

24  reflection.  You know, I'm sure I had handwritten

25  notes, but those I wouldn't keep after I completed

Susan Zumph                                          March 22, 2021

1    whatever he told me to do.

2         Q.   Were any calendar entries circulated?  Like

3    nowadays some people like to use Outlook and propose

4    meeting times and accept or reject meeting times.  Did

5    that process get used for these meetings?

6         A.   I'm sure they were put on his calendar and

7    mine so that we could both block off that time.

8         Q.   When you did meet with Mr. Strohm to talk

9    about the 2014 compliance review and its progress,

10   about how long would you typically need to meet with

11   him for?

12        A.   I tried to get out of there as fast as

13   possible, but the meetings were short, not more than

14   half an hour, I don't think.

15        Q.   And when you were meeting with Mr. Strohm and

16   discussing the 2014 compliance review progress, were

17   you typically meeting only about the 2014 or was it

18   included in a broader meeting typically?

19        A.   Again, I don't recall if I had to have more

20   regular meetings about everything I was doing at that

21   time or not, so if that was happening, then it would

22   have been part of a broader meeting, but if I was able

23   to push off those meetings -- if I started meeting with

24   him regularly, then it would have been specific to

25   this.

Susan Zumph                                          March 22, 2021

1    regularly just popped into his office.  And if you ask

2    him, probably too often.

3         Q.   Did you take hand notes from time to time of

4    your meetings with Mr. Fiffer?

5         A.   I'm sure it was the same situation as with

6    Bruce.  If there was some idea that he had that he

7    wanted me to -- something he wanted me to do, something

8    he wanted me to follow up on, I would write that down,

9    go ahead and do it, and then I'm sure I disposed of it.

10        Q.   Are you aware of any other written

11   memorialization of your meetings, other than your hand

12   notes, like circulated agendas or meeting invites or

13   anything of the sort?

14        A.   No.

15        Q.   Formal notes by the secretary of the

16   organization, anything like that?

17        A.   Well, that definitely not.

18        Q.   Were you meeting regularly or semi-regularly

19   with anyone else to talk about the progress of the 2014

20   compliance review?

21             MR. WINN:  Objection.  Vague.

22        Q.   And by anyone else, I mean other than

23   Ms. Patton, Mr. Fiffer, and Mr. Strohm?

24        A.   I may well have also met with Denise

25   Beihoffer.

Susan Zumph                                                  March 22, 2021

1      Q.   Same questions:  About how many meetings and
2  were they in person or typically e-mail updates or
3  phone?
4      A.   Any -- any decisions I had with Denise would
5  have been in person.  I have no idea how many.  Again,
6  they would be much more casual.  There wouldn't have
7  been calendar invites about them.  We would have
8  just -- I would have popped in her office or she mine,
9  and I would have said, hey, I've got this question
10 about how does it work in this state with this, that
11 and the other, what do you know about this.
12     Q.   And can you think of any written record of
13 any of these meetings with Ms. Beihoffer?
14     A.   No.  Again, other than my handwritten notes
15 that I would have taken so I could -- if I asked her
16 for something or she said, oh, you maybe -- you know,
17 for that state you want to go look -- you know, do
18 this, whatever, talk to so-and-so.  I would have done
19 that.
20     Q.   Fair enough.  The legal department at the
21 Chicago office, how was that situated?  Were you all on
22 one floor, cubicles, private offices?  What can you
23 tell me about that?
24          MR. WINN:  Objection.  Vague.
25     A.   We were all on one floor in offices.  Not

Susan Zumph                                                    March 22, 2021

 1   everyone had an office.  Offices and cubes.

 2         MR. WINN:  And I   to clarify, I don't know

 3   if it's changed over time but I assume you're talking

 4   about 2014 time period since that's what the focus has

 5   been?

 6         MR. TOMASEVIC:  My focus has been on the 2014

 7   compliance review.  That's a fair comment, Aaron, yes.

 8      Q.   So is your answer any different knowing that

 9   I'm focused on the 2014 compliance review time period,

10   Ms.

11      A.   I probably made a mistake and assumed you

12   were when I should not have, but I assume that's what

13   you were talking about.

14      Q.   Okay, good.  It was not a mistake on your

15   part.  If anything it was imprecision on my part, and I

16   appreciate you suffering through it with me.

17         So at any point in time did you report to any

18   of your colleagues that you were having trouble

19   obtaining data for the 2014 compliance review?

20      A.   I may have   I may have told them, oh, I'm

21   having difficulty getting this or that or whatever.

22      Q.   Was there anything that you needed to

23   conclude your 2014 compliance review that you never

24   got?

25      A.   I'm sure there was, but I don't have a

Susan Zumph                                                    March 22, 2021

1   specific item that I can think of now.  It was more of

2   an overview and sort of an initial starting point.  I

3   believe my conclusion from that review, at least in

4   part, was actually we need some more technical -- we

5   need some more detailed analysis on certain issues.

6        Q.   So let's make sure I know all of the things

7   that you can remember up until you got to that

8   conclusion or that point.  When you were gathering the

9   information, were you are working off of any

10  ingredients list or data list or wish list?

11       A.   Just what we came up with.

12       Q.   When you say you came up with, who is the we

13  in that sentence?

14       A.   It would be Ann and myself and probably with

15  consultation from the different members of the

16  operations team.  To some extent my guess would be

17  Denise.  I don't think she played a very involved role

18  in this, but I'm sure I went to her to get her, you

19  know, thoughts on, you know, where would be a good

20  place to go, what should -- you know, what we should

21  look at, what do we need, you know, what are her

22  thoughts.

23       Q.   Who were the colleagues on the operations

24  team that participated to the extent you haven't

25  mentioned them already?

Susan Zumph                                    March 22, 2021

1      A.   Well, I haven't mentioned any of them, and I
2    do not recall who they would have been.  They would
3    have been people in property management, for example,
4    property managers, that kind of thing, but also other
5    operational departments.
6      Q.   What departments would you have consulted
7    during the 2014 compliance review?
8      A.   It's hard for me to recall specifically for
9    this review as opposed to times I consulted with
10   departments to get information to defend lawsuits,
11   which was different, but I don't recall which times I
12   was going to which departments for what project.
13     Q.   Do you remember any of the departments that
14   you consulted as part of the 2014 compliance review?
15     A.   This is testing my memory, given how long ago
16   this was, so I may tell you something here and it might
17   not be right, but I'll give it a guess, and just
18   understand that, you know, I may be telling you
19   something that's not quite right.  But I think we went
20   to say like -- like a group that helped with
21   property-level accounting called the Central Business
22   Group.  I believe we talked to -- we may have talked to
23   internal audit.  And then I can't recall the name of
24   the group, but they did, like, data -- they had access
25   to data and did data -- I don't want to say crunching.

Susan Zumph                                            March 22, 2021

```
 1   That's not the right word, but they were looking at
 2   company data.  I can't recall what that group is
 3   called, but we went to them maybe for help getting
 4   information.  And I will also say that I don't know if
 5   any of them provided any specific information about
 6   late fees as opposed to maybe some of the other things
 7   that we were looking at in the compliance review.
 8        Q.   Do you recall why you were going to the
 9   essential business group [sic] for help with the 2014
10   compliance review?
11        A.   They help -- assisted the properties with
12   their like financial -- I don't want to say accounting.
13   They didn't do accounting, but they helped the
14   properties manage charges assessed to tenants and
15   credits for moneys collected from tenants and I'm sure
16   they did tons of other stuff as well.  I don't -- I
17   don't know -- I'm not the expert on what they did, but
18   they would have had information about what was charged
19   to tenants, what was collected for tenants, maybe the
20   process behind that and how that property -- that
21   tenant-type accounting worked.  And again, I'm using
22   accounting in a -- in the sense of the way a lawyer
23   would refer to it, not the way an accountant or
24   financial analyst would review to it -- would refer to
25   it, rather.
```

Susan Zumph                                          March 22, 2021

1  · · Q.· Who at the essential business group do you

2  recall interfacing with during the 2014 compliance

3  review?

4  · · A.· I don't recall anyone specifically.

5  · · Q.· How about generally or who you suspect would

6  have been there at the time?

7  · · A.· I don't recall the names of -- I don't recall

8  names of people.

9  · · Q.· At all from the essential business group?

10 · · A.· I might remember references -- I said, I

11 might remember the names of someone if you said it, but

12 right now I can't think of a particular person's name.

13 · · Q.· What was the work product or report, if any,

14 that the essential business group gave you as part of

15 the 2014 compliance review?

16 · · A.· Well, I don't know that they necessarily gave

17 us any work product.

18 · · Q.· Well, to the extent they did help you with

19 things like what was charged or the process for

20 charging, what format would that have taken?  Would it

21 have been a phone call where they walk you through it?

22 Would it have been an Excel spreadsheet of some kind or

23 a memo?  What can you tell me about that?

24 · · MR. WINN:· Objection.· Vague.

25 · · A.· I don't know what they would have provided

Susan Zumph                                             March 22, 2021

```
 1   specifically.  I know we would have spoken with them
 2   about -- about what things were charged, how they were
 3   charged.  This -- I don't know that they provided any
 4   documentation, any work product to us.  It may have
 5   been more that they provided us with understanding of
 6   how things worked and what was being done.
 7        Q.   Do you know if that resulted in any kind of
 8   memo or other work product?
 9           MR. WINN:  Objection.  Vague.
10        A.   Yeah.  That's what I'm saying.  I don't know
11   that they did.
12        Q.   Why would internal audit or the internal
13   audit department have been involved in the 2014
14   compliance review?
15        A.   Again, I don't recall specifically what they
16   did, but what my rec -- my general impression,
17   recollection is that team was more experienced at
18   conducting, like, an investigation, and they -- I don't
19   know what they audited specifically.  I'm not familiar
20   with exactly what their purview was, but because they
21   did investigations at -- of different things at
22   properties, they were useful in helping us identify
23   maybe what information was available, where it was
24   available, how we could go about doing things.  And
25   they were more like helping us get ideas about how we
```

Susan Zumph                                          March 22, 2021

1   could go about conducting ourselves, I think.  They may

2   have played a different role, but I don't recall.

3        Q.   And do you know who in the internal audit

4   department participated in assisting with the 2014

5   compliance review or who you interfaced with?

6        A.   Yes.  And again, I'm not sure that they

7   participated in assisting with the review.  I mean,

8   they assisted me, but I'm not sure that they assisted

9   with the review.  And I don't recall who we spoke to.

10       Q.   Can you recall anyone who you may have spoken

11  with or who may have assisted in the review?

12       A.   No.

13       Q.   And can you tell me if any work product or

14  final memo or any draft memos or spreadsheets were

15  created as a result of involving the internal audit

16  department?

17       A.   I don't recall what information they would

18  have sent.

19       Q.   Or what format they would have sent it to you

20  in?

21       A.   No.

22       Q.   Next, the data crunching group I'll refer to.

23  Do you recall what their role might have been with

24  respect to the 2014 compliance review, if any?

25       A.   That would have been because their role was

Susan Zumph                                          March 22, 2021

1    more limited, they would have been better able to tell
2    us, well, what information does the company have that
3    we could look at that would get us -- you know, that
4    would shed light on these fees and charges issues.
5            Q.   And do you know who within that data
6    crunching group would have participated in this
7    activity at the time?
8            A.   I don't.
9            Q.   Do you recall anyone who participated in it
10   or who assisted you at the time?
11           A.   I don't recall who would have participated in
12   them.
13           Q.   And same question as with the previous
14   groups.  Can you recall what, if any, work product was
15   generated with the assistance of the data crunching
16   group or that they gave you or reported to you to help
17   with the 2014 compliance review, if anything?
18           A.   No.  I don't recall where the information
19   that we gathered came from.  In terms of -- other than,
20   I should say, I know that Ann was interviewing people
21   to find out, you know, what their process was, but
22   beyond that I don't recall where we got the rest of the
23   information that we would have been using for this
24   compliance review.
25           Q.   Do you know who Ann Patton interviewed as

Susan Zumph                                    March 22, 2021

1   part of the 2014 compliance review?

2        A.   Not specifically.

3        Q.   How about generally?

4        A.   I think it was supposed to be property

5   managers.

6        Q.   Do you know which properties were interviewed

7   or surveyed?

8        A.   I have no idea.

9        Q.   How did you come up with which properties

10  would be surveyed or interviewed?

11       A.   I have no idea.

12       Q.   Was the intent to interview some manager at

13  every single property nationwide or was it some select

14  batch?

15       A.   It wouldn't have been every property manager

16  nationwide because that would have been too many.

17       Q.   So how did you go about selecting which ones

18  would be part of the interviews or review and which

19  ones would not?

20       A.   I don't know.  I'm not saying that I didn't

21  help select, but I have no idea.  The only thing I

22  generally remember -- I worked there a long time.  You

23  get a sense of which managers might be better to talk

24  to because they've -- they know what's going on, and

25  over time you might work with people.  Now, I'd had a

Susan Zumph                                                    March 22, 2021

1   lot less of that interaction with property staff, but I

2   would think that when we were talking about it, I'm

3   sure we talked about, oh, who are the good managers

4   that maybe you feel like would really be able to help

5   provide information about this and do you know of any

6   in this area or that area, let's talk to them first, or

7   let's talk to them.

8        Q.   Can you tell me anything else about the

9   methodology or criteria used by your team in deciding

10  who to talk to or what properties to survey in

11  connection with the 2014 compliance review?

12       A.   Well, first, it wasn't my team.  That implies

13  that I sort of led a group of people, and that's not

14  how that exactly worked, but no, I can't think of

15  anything else.

16       Q.   Is there some list or memo somewhere that was

17  created that would tell us who was surveyed or

18  interviewed and who wasn't and perhaps why they were

19  chosen?

20       A.   I have no idea.

21            (Whereupon, ~~Exhibit 1~~ Trial Ex. 1142, Memo, was marked for

22  identification.)

23       Q.   Let me mark our first exhibit here, and we're

24  going to call it ~~Exhibit 1~~ Trial Ex. 1142.  I'm just going to dump it

25  into the chat, and it is a memo dated May 13, 2014, and

Susan Zumph                                        March 22, 2021

1   it was produced with the Bates label WP8017.  As I'm

2   sure you know, that's the control number in the bottom

3   right-hand corner of every page.

4        A.   Hang on.  I am having a little trouble,

5   though.  So I have to download this, is that right?

6        Q.   I'm not quite sure what your machine is going

7   to require, but generally speaking you double click on

8   it and just say yes.

9        A.   Well, it's just pulling up something kind of

10  weird, and it wants me to save it.

11       Q.   If you're okay with that, then I would ask

12  you to save it.

13       A.   Well, not giving me a virus are you?

14       Q.   I promise I'm not giving you a virus.  These

15  are documents produced by Equity Residential in the

16  case.  This is --

17       A.   I see -- I see it's a PDF, but this is weird

18  how it's asking me to do this.  Let me see.  Hang on.

19       Q.   If you're more comfortable, I can try to send

20  you a link that will then   I think you only need to

21  look in your browser.  You don't actually have to

22  download it to your computer.

23       A.   Is that possible you can do that?  I don't

24  know.  It's just coming up with a weird --

25       Q.   It's possible by people who know what they're

Susan Zumph                                        March 22, 2021

1   written down 12:30 and I figured if we're a couple

2   minutes early that might help you, but that's okay.

3        A.   Yeah.

4        Q.   So for the record and what we're marking as
     Trial Ex. 1142
5   Exhibit 1 is a memo produced by Equity Residential as

6   WP8017, a memo dated May 13, 2014.  My question for

7   you, Ms. Zumph, first and foremost is do you have the

8   memo dated May 13, 2014, in front of you and that we're
              Trial Ex. 1142
9   marking as Exhibit 1?

10       A.   I do.  It's marked -- it's WP08017.

11       Q.   Correct.  Thank you.

12       A.   And it's one page, right?

13       Q.   It is one page.

14            Do you recognize this memo from you to Bruce

15   Strohm and Jim Fiffer?

16       A.   I mean, not particularly, but it looks like

17   memos that I -- it's the format of memos that I wrote

18   while I was with Equity.  Trial Ex. 1142

19       Q.   Do you believe Exhibit 1 to be a part of or

20   related at all to the 2014 compliance review that we've

21   been talking about before I showed you the document?

22       A.   I mean, it says it is and I've skimmed it.

23   It looks like it would be.  I have no reason to doubt

24   that it isn't.

25       Q.   Fair enough.

Susan Zumph                                          March 22, 2021

1 · · · · · Let me ask you a few questions about the

2 contents then.  It begins after the introductory

3 comments in bolded lettering by saying that there was a

4 meeting with stakeholders and then consulting with

5 internal audit and others.  Do you see that?

6 · · A.· I do.

7 · · Q.· What stakeholders are you referring to in

8 ~~Exhibit 1~~?     [Trial Ex. 1142]

9 · · A.· This was so long ago.  I don't recall who

10 specifically as an individual or even what group that

11 would be other than to say I would think it would be

12 people in property management.

13 · · Q.· Can you think of anyone else that would have

14 been included in stakeholders as you wrote in ~~Exhibit~~    [Trial Ex. 1142]

15 ~~1~~?

16 · · A.· No.

17 · · Q.· And then it speaks of consulting with

18 internal audit.  Is that the same internal audit group

19 that we talked about previously?

20 · · A.· Yes.

21 · · Q.· And it refers to something with the acronym

22 CBG.  What does that refer to?

23 · · A.· That is the central business group I referred

24 to earlier.

25 · · Q.· I may have called them erroneously the

Susan Zumph                                        March 22, 2021

 1   essential business group, but it's Central Business

 2   Group?

 3        A.   Yes, I think so.

 4        Q.   Fair enough.

 5             And you also spoke with the VP of financial

 6   planning in connection with the 2014 compliance review,

 7   is that right?

 8        A.   Yes.

 9        Q.   Who was the VP of financial planning at the

10   time?

11        A.   I don't know who the individual was, but that

12   was the number crunchy group that I was referring to.

13        Q.   Number crunchy group.  Okay.

14             Now, there is a section underneath where it

15   talks about the late fees that are the subject of this

16   memo, and it refers to an attached audit plan.  Do you

17   see that?

18        A.   I see it says that, yes.

19        Q.   Okay.

20             And then it continues by referencing a

21   California data analysis and community manager

22   interviews being completed by July 15, 2014.  Did I

23   read that correctly?

24        A.   Yes.  That's what it says.

25        Q.   And is it your testimony that it was Ms. Ann

Susan Zumph                                          March 22, 2021

1    Patton that primarily did the community manager

2    interviews?

3        A.   I think so.

4        Q.   Can you recall anyone else doing those

5    community manager interviews?

6        A.   I -- as I think I said, but maybe I didn't,

7    it's possible I may have spoken with some, but that

8    wouldn't have been -- I don't believe I primarily did

9    that.

10       Q.   I know I asked you your methodology for

11   perhaps selecting some of the community managers and we

12   talked about that.  My next question is, do you recall

13   about how many were finally consulted?

14       A.   I have no idea.

15       Q.   Or how many from California were consulted?

16       A.   I have no idea.

17       Q.   After analysis of the community manager

18   interviews, one of the steps of the 2014 compliance

19   review was to make recommendations for change or

20   further investigation, is that right?

21       A.   Mm-hmm.

22       Q.   That's a yes?

23       A.   I'm sorry.

24       Q.   Was that a yes?

25       A.   That was a yes.

Susan Zumph                                    March 22, 2021

1      Q.   Okay.

2           And the reason why I ask that, as you

3    probably already know is because when you say uh-uh I

4    got to make sure I get a clear written record.

5      A.   Yes.

6      Q.   So I'm not trying to be cute or waste your

7    time.

8           Whose job was it to make the recommendations

9    for change or further investigation?

10     A.   Ann and I were going to be doing that.

11     Q.   And did you, in fact, do that?

12     A.   I don't know.

13     Q.   Do you recall making any recommendations for

14   change or further investigation as part of the 2014

15   compliance review?

16     A.   I am sure that we, after that step, needed

17   additional investigation regarding this -- this late

18   fee compliance review.  There were other aspects to the

19   compliance initiative, other things that were looked at

20   as well, and I'm sure we had other investigation for

21   that as well.  So I don't know necessarily, you know,

22   which ones needed more than other ones.  But that being

23   said, I don't believe there was any formal written

24   recommendations for change.  I don't recall preparing

25   any sort of memo, like status memo, midterm memo for

Susan Zumph                                          March 22, 2021

```
 1   that.
 2        Q.   Right, right.  Okay.
 3        A.   Oh.
 4        Q.   I cut you off.  Go ahead.  Please continue.
 5        A.   I was just going to say, this was what I was
 6   referring to when I said that I was -- felt like I -- I
 7   recall -- I don't believe this timeline had been
 8   adhered to strictly.
 9        Q.   Understood.
10             Part of the 2014 compliance review included a
11   nationwide data analysis gathering that initially was
12   hoped to be completed by October 1, 2014?
13        A.   It says so.
14        Q.   What can you tell me about the makeup of this
15   nationwide data analysis?
16        A.   I can't tell you anything specifically other
17   than it would have looked at late fees and not just
18   California's.
19        Q.   And then the final piece of the five-step
20   process described as part of the 2014 compliance
21   initiative or review is that recommendations for change
22   would be prepared, at least initially, by November 1,
23   2014.  Did I read that correctly?
24        A.   That's what I wrote, yes.
25        Q.   And do you know if recommendations for change
```

Susan Zumph                                      March 22, 2021

 1  were ever actually prepared at any point?

 2      A.   I do believe around the end of the year I did

 3  prepare like a summary of what was done.  As I'm

 4  reading this, I am wondering why I assumed before I

 5  investigated anything I thought that we should have

 6  changes.

 7      Q.   Can you recall any recommendations for change

 8  ever being prepared?

 9      A.   I recall that I did a memo summarizing what

10  we learned through our investigation.  I do not recall

11  ever suggesting that we change the California late fee.

12      Q.   Can you recall any other recommendations that

13  may have been made?

14          MR. WINN:  Let me make an objection there.

15  To the extent you're talking about something that

16  doesn't relate to late fees or doesn't relate to

17  California, those communications are privileged and I

18  would ask the witness not to disclose those

19  communications.

20          MR. TOMASEVIC:  That's fair.  I want to keep

21  it limited to California and the late fee issue.

22      Q.   Can you recall any recommendations in that

23  regard?

24      A.   I don't recall -- I'm sorry.  Can -- can you

25  repeat your question again?  I'm not sure what

Susan Zumph                                          March 22, 2021

1   you're -- I want to make sure I know what you're asking

2   me.

3        Q.   Item number 5 on ~~Exhibit 1~~ refers to the

*Trial Ex. 1142*

4   making of some recommendations as one of the final

5   steps of the compliance review, and my question is

6   simply, do you recall making any recommendations with

7   respect to the California late fee?

8        A.   So I do not recall making any recommendations

9   for change, as indicated in step 5 of that memo

10  regarding the California late fee.

11       (Whereupon, ~~Exhibit 2~~, Audit Plan, was marked

*Trial Ex. 1142*

12  for identification.)

13       Q.   Let me mark ~~Exhibit 2~~ to the deposition,

*Trial Ex. 1142*

14  which should be the audit plan attached to ~~Exhibit 1~~.

*Trial Ex. 1142*

15  This was produced as WP008018.

16       A.   Okay.  I do -- I do --

17       Q.   And it says at the top late fee on it.  Go

18  ahead.

19       A.   I do see that, and I was just going to ask if

20  we could take a break now as I am suspecting

21       Q.   It's lunchtime.

22       A.   -- that someone has gone on his phone instead

23  of advising me that he is off of his class.

24       Q.   Okay.

25       Well, we will treat that as confidential

Susan Zumph                                              March 22, 2021

1    under our protective order to protect third parties,

2    and we can take our break.

3          A.   Protective -- I'm not so sure about that.

4          Q.   Fair enough.  How much time -- let's go off

5    the record, if that's okay.

6               (Whereupon, a recess was taken.)

7    BY MR. TOMASEVIC:

8          Q.   Let's go back to Exhibit 1, the May 13, 2014,

9    memo for a second, Ms. Zumph.  And the five items

10   listed under the late fee portion of the memo.

11         A.   Sure.

12         Q.   Why was a California data analysis being

13   prioritized or done first over a nationwide data

14   analysis?

15         A.   I have no idea.

16         Q.   Can you tell me anything about why California

17   may have been treated separately from the rest of the

18   nationwide analysis at all?

19         A.   I know that's where we started, but I can't

20   recall why we elected to start in California as opposed

21   to elsewhere.

22         Q.   Then back to Exhibit 2, which is the late fee

23   audit attachment, Bates label 8018.

24         A.   I have that.

25         Q.   Now, did you draft up this late fee audit

Susan Zumph                                                    March 22, 2021

1    attachment?

2        A.   I wrote it, I think.   Was this attached to

3    the other menu -- the other memo?

4        Q.   That's how it was presented to us, and that's
              [Trial Ex. 1142]                              [Trial Ex. 1142]
5    my belief that Exhibit 2 was attached to Exhibit 1.

6        A.   I -- based on the memo I'm reading, I believe

7    that to be true as well.   And then if that's the case,

8    then yes, I would have written this in connection with

9    the other document.

10       Q.   And do you agree that the four items listed
         [Trial Ex. 1142]
11   in Exhibit 2 under objectives were the objectives of

12   the late fee audit, at least in terms of the 2014

13   compliance review?

14       A.   Yes.

15       Q.   Did you have any other objectives for the

16   late fee audit other than the ones listed here in
     [Trial Ex. 1142]
17   Exhibit 2?

18       A.   I did not.

19       Q.   There is also a listing of four procedure

20   points under the late fee audit as written in Exhibit

21   2.  Do you see that?

22       A.   I see that.

23       Q.   Does the four items or do the four items
                              [Trial Ex. 1142]
24   listed under procedure in Exhibit 2 for the late fee

25   audit accurately reflect the procedures undertaken to

Susan Zumph                                    March 22, 2021

1    do the late fee audit?

2        A.   That was the intended procedure, and I

3    believe that's generally what we did.  I am not sure

4    that it reflects everything that we ultimately did or

5    not, but that's definitely the general framework that

6    we thought we'd have to follow, and we generally did

7    follow that.

8        Q.   Were there any other procedural steps taken

9    ultimately that are not listed in these four steps in

10   Exhibit 2?

Trial Ex. 1142

11       A.   There may have been.  In fact, I'm sure there

12   were additional things that we did.  I can't

13   specifically recall any, but --

14       Q.   How about generally?

15       A.   I think this generally summarizes what we

16   did, but there may well have been some additional

17   things that we did to collect information or that the

18   information didn't come -- I can't recall what -- what

19   data type -- for example, a sampling of late fee data

20   on a per-stay basis, can't recall how that actually

21   came through and exactly what we collected there.  It's

22   generally there.

23       Q.   Bates 1 -- go ahead.  I'm sorry.

24       A.   As I'm reading this, it does refresh my

25   recollection on a previous question you asked.

Susan Zumph                                          March 22, 2021

1    Q.   How so?

2    A.   You were asking me why we started -- why was

3  California the one that we started with.

4    Q.   Right.

5    A.   So when reading this, I recall some states

6  had a set amount that they allowed you to charge or a

7  not to exceed amount.  Differed per place.  And so we

8  started with California because that was the -- so if

9  it was -- because that was the most difficult state

10  because of the liquidated damages analysis.  So if a

11  state said, you can charge $100 late fee as an example,

12  without more, without any other parameters, then we

13  would know as long as we didn't charge someone more

14  than $100 we were being compliant with the law.  But

15  California required a different kind of analysis, and

16  so I think, now that I'm reading this, that's probably

17  why we started there.

18    Q.   California had a more complicated analysis

19  and posed more risk, and therefore you started with

20  California?

21    A.   No.  It just had a more complicated analysis.

22    Q.   The memo that we see or that is reflected in

23  Exhibits 1 and 2 is dated May of 2014.  Had you seen
       Trial Ex. 1142

24  this memo at all since May of 2014 and before today?

25    A.   I'm sure I had.

Susan Zumph                                     March 22, 2021

1    ·   ·   Q.   Do you recall the last time you saw it before

2    today?

3    ·   ·   A.   I do.

4    ·   ·   Q.   And when was that?

5    ·   ·   A.   I don't know that I can answer without --

6    ·   ·   Q.   Why is that?

7    ·   ·   A.   Well, if I even tell you, then you'll know.

8    You know, this has been a fun little game, but I'm not

9    sure how I    how I answer, but now you know, so I feel

10   like, you know, these questions are not quite fair and

11   not quite right.  I mean, the fact that I'm a lawyer

12   gives me some insight into it but I'm just a witness

13   and I'm just trying to do the right thing and not be

14   you know, I'm not here for any particular reason.  I'm

15   here because you asked me to be here and I want to give

16   you information, but it's not fair for you to keep

17   asking questions that cause me to violate privilege.

18   ·   ·   Q.   Well, I'm not trying to ask you questions

19   that violate privilege, and you have a lawyer there

20   who's been practicing longer than I have who is

21   perfectly capable of protecting yours and the company's

22   interest.

23   ·   ·   ·   ·   ·   My gathering from your statement is that you

24   won't answer the question which was when was the last

25   time you saw this memo that we see in ~~Exhibit 1~~ and ~~2~~,

Trial Ex. 1142

Susan Zumph                                          March 22, 2021

1   is that fair?  We can leave it at that.

2          A.    That would be nice.   Thank you.

3          Q.   Now, back to the data gathered as part of the

4   process and discussed in the memos in Exhibits 1 and 2,

5   at some point an analysis of all the data and

6   information gathered was done, right?

7          A.   I assume so.  I don't recall —— I don't sit

8   here today and say, yes, I remember doing that, but I

9   must have because that's what Bruce had expected me to

10  do.

11         Q.   Sure.  And if it wasn't you who did the

12  analysis, who would it have been?

13         A.   It would have been Ann and myself because we

14  were the ones who were responsible for doing this

15  project, as laid out here, and then coming up with some

16  results.

17         Q.   And when you did your review and analysis in

18  order to come up with your results, what kinds of

19  things were you actually physically looking at?  At

20  this point did you have spreadsheets or memos or a list

21  of handwritten notes or all of the above?

22         A.   I don't know.

23         Q.   Well, you were reviewing something, right?

24  You weren't just going off of memory, true?

25         A.   I'm not sure that we were reviewing anything.

Susan Zumph                                                      March 22, 2021

1    I think we went through this project, we gathered

2    information, and then -- you know, I don't have a

3    present recollection of exactly what we did -- Ann

4    interviewed -- for example, Ann interviewed community

5    managers.  I don't know what she did with that.  Did

6    she write down notes?  Did she summarize it?  But at

7    some point she must have done something with it and

8    then we talked about it and then we discussed like what

9    did that mean, what should we do, how does this

10   influence things.  So I can't tell you what we, like,

11   looked at when we were coming up with our conclusions

12   and then I -- I must have written them down.

13        Q.   Let's take it piece by piece.  The results of

14   Ms. Patton's interviews with the community managers,

15   how were those results conveyed to you?

16        A.   I have no idea.

17        Q.   Was there some running memo of the comments

18   or questions or answers as part of the interviews?

19        A.   I don't know.

20        Q.   What questions was Ann Patton asking the

21   community managers?

22        A.   I don't know the specific questions she asked

23   them.

24        Q.   Who came up with the questions?

25        A.   I don't know.  I would guess she and I did.

Susan Zumph                                          March 22, 2021

1    I hate anticipating your questions.

2        Q.   So don't do it.

3        A.   Okay.

4        Q.   I mean, I understand some of that's

5    inevitable but, you know, I'm not trying to be slick

6    here and lead you down some kind of path.  I really

7    just want to know what really happened to the extent

8    you can remember.  To the extent you can't and the

9    answer is I don't know, that's your answer, that's

10   fine.  I'm just trying to figure out the limit of what

11   you do remember and figure out what I can figure out.

12   So --

13       A.   I -- we generally talked about -- I don't

14   remember the specific questions that we -- that she

15   asked them, but we were trying to find out what the

16   process was beginning on the day the rent was due to

17   follow up on those -- with those residents that hadn't

18   paid to try to attempt to get them to pay.  That was

19   what the idea of the interviews was:  What happens?

20   How do they do it?  And so I don't recall specific

21   questions, but that was what we -- I'm sure we talked

22   about, oh, that's the information we need.  She must

23   have written it down I'm guessing.  I have no idea how.

24   I do not recall getting a summary or memo of that, but

25   maybe she did one.  I just don't recall what format

Susan Zumph                                      March 22, 2021

```
 1    that came in.
 2        Q.   Let's talk about the format for the
 3    questions.  Did those ever get written down in any kind
 4    of script or memo or talking points that you recall?
 5        A.   I have no idea if that happened.
 6        Q.   And the format for gathering the answers,
 7    your answer is the same?  You have no idea what format
 8    the answers would have taken -- memo, notes, recorded
 9    conversations, anything like that?
10        A.   I don't.  I can tell you I don't think it was
11    a recorded conversation because I don't believe we had
12    that technical capability.
13        Q.   Can you think of any other capability or
14    method that was utilized to capture the questions or
15    answers in the interviews with the community managers?
16        A.   It is logical that she did capture it
17    somehow, but I don't know how that was done.
18        Q.   And you don't remember seeing any e-mails,
19    memos, summaries, spreadsheets, anything of the sort?
20        A.   I cannot recall any of those, but --
21        Q.   Can you recall any of the questions asked of
22    any community manager?
23        A.   I cannot recall any specific questions.
24        Q.   And if I asked you, can you remember
25    generally, you would just repeat by telling me that
```

Susan Zumph                                              March 22, 2021

```
 1   generally we wanted to know the process for what's
 2   involved in collecting late rent?
 3        A.   That's what I recall the point of those
 4   interviews were and that that's what she was going to
 5   be asking them.
 6        Q.   And can you recall any answer that any
 7   community manager gave during these interviews?
 8        A.   From -- from -- even if I don't remember a
 9   particular property manager, I cannot recall any
10   specific series or sets of responses or even general --
11   general responses other than --
12        Q.   Go ahead.  I'm sorry.
13        A.   Other than maybe a very high-level, what the
14   process was.
15        Q.   Can you recall the name of any community
16   manager that furnished any of this information?
17        A.   No, I can't.
18        Q.   Or how many furnished information?
19        A.   I don't -- I don't recall how many we thought
20   was going to be enough to give us a good enough base of
21   information.
22        Q.   Did you have some threshold in your mind for
23   how many people you needed to hear back from or how
24   many questions you needed to answer before you were
25   comfortable taking the next step or analyzing what you
```

Susan Zumph                                         March 22, 2021

1    had heard?

2         A.   I don't.

3         Q.   What did you learn as a result of

4    interviewing the community managers in 2014?

5         A.   That when residents don't pay their rent on

6    time, it's very time-consuming and costly and difficult

7    to go through the process of trying to collect that

8    rent.

9         Q.   When you say that you learned that it was

10   very time-consuming, what exactly did you learn in that

11   regard?

12        A.   I learned --

13             MR. WINN:  Objection.  Vague.

14             THE WITNESS:  Sorry, Aaron.

15        A.   I learned that the process for -- that the

16   managers went through for each instance of that

17   occurring was different for each -- each time that

18   occurred.  So even if the same resident didn't pay on

19   time more than once it was still every time that

20   occurred, same resident, different resident, it was a

21   different set of circumstances that took a different

22   amount of time and different steps all depending on

23   each instance.  The general things that they had to do

24   were generally the same.  They had to try to contact

25   the person, whether it by phone or by -- in writing,

Susan Zumph                                          March 22, 2021

```
 1   and they had to try to figure out how they could get
 2   the rent.  There were a lot of other steps that I'm
 3   glossing over that the managers did to be able to go
 4   through this process because -- but that's generally
 5   what I recall coming out of it, is that it -- each time
 6   they did it, it took them a lot -- they spent a lot of
 7   time with each instance of the rent not being paid and
 8   how they could go about collecting it.
 9        Q.   Who at the community level or property level
10   was actually doing the work of trying to collect the
11   rent?
12        A.   So I believe -- I'm not the best person to
13   talk to about this.  It's been now -- I've been out of
14   Equity several years, and at the time I was never that
15   involved, but it was a variety of individuals.  I --
16   this is what I can recall, you know, two years on from
17   being employed there and seven years on from this
18   project, is that it was sometimes the manager.  If
19   there was an assistant manager, the assistant manager
20   would do it or the leasing consultant.  Sometimes
21   leasing consultants would get involved in the process.
22   Sometimes maintenance -- broad term maintenance guys
23   would also have some involvement.
24        Q.   What was the maintenance person's
25   involvement?  That's the first I've heard this.
```

Susan Zumph                                          March 22, 2021

1    · · · A.· Well, then I'm probably wrong because I'm not

2    the expert on this.· This property management process

3    wasn't mine, but I believe sometimes maintenance

4    people, but maybe it's -- it was an office person,

5    would deliver the certain legal notices or other

6    written -- sometimes they were legal ones, sometimes

7    they were written communications to residents' doors.

8    · · · Q.· When you conducted the community level

9    interviews, did you attempt to talk to the manager, the

10   assistant manager, the consultant or some mix of them?

11   · · · A.· I did not conduct interviews, and I don't

12   know -- if that's who -- I don't know.

13   · · · Q.· Do you know

14   · · · A.· I didn't [inaudible].· I don't know who they

15   · who they talked to.

16   · · · Q.· I'm sorry.

17   · · · · · COURT REPORTER:· I'm sorry.· You cut out a

18   little bit there.

19   · · · · · THE WITNESS:· That's all right.· I just want

20   to make sure my answer was clear, like, on that.· I

21   didn't conduct the interviews, and I don't know whether

22   the interviews were conducted with all of those people

23   in mind.

24   · · · Q.· Well, can you tell me if the majority of

25   people contacted were the managers versus the assistant

1   managers or some other distribution?

2       A.   I cannot tell you that.  I cannot tell you

3   distribution.  It may be that the managers that -- the

4   managers weren't interviewed but the managers then

5   relayed all the different people that were involved in

6   the process.  A particular manager maybe said, well,

7   this is the parts I do and then this is what I have,

8   you know, this person do for me, and this is how we do

9   this all together.

10      Q.   Now, is that just your guess of what

11  happened --

12      A.   Yeah.

13      Q.   -- or are you relaying to me your

14  recollection of a particular instance?

15      A.   No, it's my guess of what might have

16  happened.  I'm not relaying any kind of conversation

17  that I had or was relayed to me.

18      Q.   Did you ever come to learn what percentage of

19  tenants at a particular California property were late

20  versus who paid on time?

21          MR. WINN:  Objection.  Vague.

22      A.   Or never paid at all, but the answer to all

23  of that is I don't recall.  I may have had some of that

24  metrics calculated or, you know, had the information to

25  calculate it, but if I did, I don't recall having ever

Susan Zumph                                          March 22, 2021

 1    done that, knowing what that was.

 2          Q.   How many e-mails were typically sent from

 3    community managers to delinquent tenants in California?

 4               MR. WINN:   Objection.   Vague.

 5               THE WITNESS:   Sorry, I keep talking over you,

 6    Aaron.

 7          A.   I don't know how many were typically sent or

 8    how many were sent in any particular instance of it

 9    because as I did mention what I do recall out of it is

10    that every instance was different.

11          Q.   Did you review any example e-mails from

12    community managers to tenants regarding delinquent

13    rent?

14          A.   I don't --

15               MR. WINN:   Objection.   Vague.

16          A.   I don't recall ever doing that.

17          Q.   Did you ever learn that the MRI system at

18    Equity Residential would sometimes send automated

19    e-mails that required no human intervention?

20               MR. WINN:   Objection.   Vague.

21          A.   I do think the system used to -- there was

22    some automated capability, the system, but I do not

23    know when that was.

24          Q.   And of all the e-mails sent to tenants about

25    delinquent rent, do you have any idea how many were

Susan Zumph                                         March 22, 2021

1    automated by the system and how many were initiated by

2    a community manager?

3    · · · · ·MR. WINN:  Objection.  Vague.

4    · · ·A.  So certainly within the 2014 time frame I

5    don't know that any were automated particularly, but if

6    there were, I wouldn't know how many -- I think you

7    asked like percentage-wise, ratio-wise, but maybe I'm

8    just putting that into your question, but no, I don't

9    know that.  I wouldn't have any way of knowing that.

10   ~~And like I said, each instance of attempting to collect~~

11   ~~rent that wasn't paid was a different -- slightly~~

12   ~~different situation that required different steps~~

13   ~~necessarily.~~

14   ~~· · ·Q.  Give me an example that you heard during this~~

15   ~~process.~~

16   ~~· · ·A.  I wouldn't recall any example that I heard~~

17   ~~during this process.~~

18   · · ·Q.  Do you know when in California managers would

19   send legal notice, like a notice to pay rent or quit,

20   to delinquent tenants?

21   · · · · ·MR. WINN:  Objection.  Vague.

22   · · ·A.  I don't recall what California law is or when

23   it's done in California.  I had very little involvement

24   in the -- this -- in, like, the property management

25   processes other than, like, for example this compliance

Susan Zumph                                        March 22, 2021

1   review.  So I didn't -- I -- but I worked at the

2   company a really long time, and I know there are -- if

3   somebody doesn't pay rent on time, there are certain

4   things that have to be done, certain legal notices in

5   different states that get sent in the event that maybe

6   that person doesn't pay at all and you need to collect

7   it late or through a legal process, but I don't know

8   what California's process is.  I may have been more

9   familiar with it in 2014 when I was doing this, but

10   I'm -- certainly do not have any memory of it now.

11        Q.   What do you recall, if anything, of EQR's

12   practice with respect to serving notices to pay rent or

13   quit to California tenants?

14             MR. WINN:  Objection.  Vague.

15        A.   The only thing I can recall in this 2014 time

16   frame is that we did what was -- what California law

17   required, whatever that would have been.

18        Q.   And do you know how many legal notices were

19   sent on average at California properties in 2014?

20        A.   No.

21        Q.   So could you ballpark for me how many hours

22   were sent serving or drafting notices to pay or quit

23   rent in 2014 at California properties?

24             MR. WINN:  Objection.  Vague.  Are you asking

25   whether in 2014 she knew that or whether she knew that

Susan Zumph                                              March 22, 2021

```
 1   now?
 2        Q.   Did you know that at any point in time?
 3        A.   I can't ballpark it then, and I cannot
 4   ballpark it now.
 5        Q.   Other than e-mails, phone calls, and the
 6   notices to pay rent, did you ever come to learn what
 7   other steps were taken to try to collect late rent at
 8   California properties?
 9             MR. WINN:  Objection.  Vague.
10        A.   I'm sure in 2014 I did come to learn that.
11        Q.   And what's your memory today as to what that
12   process entailed?
13        A.   I don't recall anything.
14        Q.   Do you know -- do you know what percentage of
15   California tenants had to go on to an eviction
16   proceeding at 2014 -- in 2014?
17             MR. WINN:  Objection.  Vague.
18        A.   I didn't know that percentage then, and I
19   don't recall it now.
20        Q.   Did you survey any of the wages or attempt to
21   learn any of the payroll costs of any of the California
22   community employees in 2014?
23             MR. WINN:  Objection.  Vague.
24        A.   I don't recall whether we tried to do that
25   and couldn't either get the information or frankly
```

Susan Zumph                                          March 22, 2021

```
 1   didn't have the skills and abilities to do anything
 2   with the information or whether we knew that that was
 3   going to be beyond our abilities and just felt like
 4   that was something that we -- that was -- additional
 5   needed to be done.
 6       Q.   Do you recall ever trying in 2014 to obtain
 7   wage or payroll data for Equity Residential's
 8   California community employees or property employees?
 9       A.   That's what I'm saying.  I don't recall
10   whether we tried to and realized that it was beyond
11   anything that I could do anything with or if it was
12   something that we just thought we should get that or it
13   would be -- you know, the next step might be to do an
14   analysis of it but that we didn't actually -- but --
15   and that we didn't then go on and try to do that.  I
16   can't recall.
17       Q.   It's also possible you didn't even try to get
18   that information?
19       A.   I don't think that's the case, but maybe.  I
20   mean, it's possible.
21       Q.   Did you ever get that information?
22       A.   I don't recall whether we got it.
23       Q.   Do you recall any steps taken to try to get
24   that information?
25       A.   Again, I don't recall whether we tried to get
```

Susan Zumph                                                      March 22, 2021

```
 1    it and couldn't get it or try -- we tried to get it and
 2    realized that what we were asking for we couldn't do
 3    anything or it was going to be too hard or that we just
 4    thought the next set of information we would want to
 5    get would be this and that that's the next step to go
 6    ahead and do.  I don't recall.
 7         Q.   What discussions do you recall about
 8    attempting to get wage or payroll information for the
 9    California property employees in 2014?
10         A.   I don't recall any particular discussions
11    about it.
12         Q.   Do you ever come up with a figure, ballpark
13    or otherwise, about how much it cost the company when
14    someone paid rent late?
15         A.   No.
16              MR. WINN:  Objection.  Vague.
17         A.   I --
18         Q.   Do you know if anyone ever has?
19              MR. WINN:  Objection.  Vague.
20         A.   Yes.
21         Q.   When did that happen?
22              MR. WINN:  Let me assert an objection here.
23    Susan, if you're thinking about work that's done in
24    connection with the litigation, I'll ask you not to
25    disclose litigation-related work or analysis.  If it's
```

1   something else that you're thinking of, then I'm open

2   to your answering the questioning.

3        A.   Yeah.  I don't -- I wasn't thinking of

4   anything regarding this litigation.  I was thinking

5   of -- I was told that in the -- in the 1999 litigation

6   the -- there was an expert who analyzed the costs

7   associated with the collection of late rent.

8        Q.   And is that possibly the

9   PricewaterhouseCoopers analysis that we talked about

10  earlier?

11       A.   Yes.  That's where I got the name, yeah,

12  from.

13       Q.   Okay.

14            Other than the PricewaterhouseCoopers

15  analysis done in relation to the case in the '90s, are

16  you aware of any other analysis ever undertaken by

17  Equity Residential regarding costs to the company for

18  collecting late rent?

19            MR. WINN:  Objection.  Lacks foundation.

20  Vague.

21            And same instruction, Susan, as to

22  post-lawsuit discussions that might have involved those

23  issues.

24       A.   Yeah.  So I wasn't aware of any in the course

25  of my doing this -- doing this audit, anything in

1   advance of that, but in the course of the litigation,

2   defending the litigation there was -- I learned some

3   information about that.

4        Q.   Okay.  I understand.

5             I want to be crystal clear though.  If for

6   example some kind of analysis has been done by the

7   lawyers as one would expect in defending a lawsuit and

8   in connection to this lawsuit or in response to this

9   lawsuit, I'm not trying to get at that.  I'm trying to

10  get at whether in the normal course of business Equity

11  Residential has ever attempted to glean what it costs

12  it to try and collect late rent from tenants?

13       A.   Yeah --

14            MR. WINN:  Objection.  Lacks foundation.

15  Vague.

16       A.   And as I said, you know, every situation is

17  different.  It's really a hard -- very hard analysis

18  to -- to do, but I believe that there was testimony on

19  that by prior witnesses.

20       Q.   Are you aware of any analysis ever by EQR to

21  determine how much it costs it when a tenant pays its

22  rent late --

23            MR. WINN:  Same objections.

24       Q.   -- other than -- other than the

25  PricewaterhouseCoopers analysis and other than anything

Susan Zumph                                         March 22, 2021

1   done specifically in response to defend this lawsuit?

2        MR. WINN:  Lacks foundation.  Vague.

3     A.   Okay.  I'm sorry.  I was having trouble with

4   that last bit of your question, but no, I believe that

5   some -- I don't recall what it was, but I believe that

6   I heard some testimony about that from other witnesses

7   when I was sitting in depositions.

8     Q.   What do you recall?

9     A.   I might be wrong.  I don't recall much about

10  it, but I recall similar questions and I believe other

11  witnesses answered it.

12    Q.   And what do you recall hearing?

13    A.   I don't recall anything specifically, but I

14  recall this being an area that you asked other

15  witnesses about.  Maybe not you, I'm sorry, a

16  different -- I don't think I've ever seen you before,

17  so maybe a different lawyer.

18    Q.   Fair enough.

19         As you sit here today, what efforts, if any,

20  have ever been undertaken by Equity Residential to try

21  and figure out what it costs it when a California

22  tenant pays his or her rent late?

23         MR. WINN:  Objection.  Lacks foundation.

24  Vague.

25    A.   Yeah.  I don't have anything to add to my

Susan Zumph                                    March 22, 2021

1    answer is yes.

2        Q.   And what were those steps?

3        A.   That is all information that I only learned

4    in preparing the defense of this litigation.

5        Q.   Well, I don't want to know the contents of

6    the communications people gave you.  I want to know the

7    facts that the company undertook before this litigation

8    was ever even filed.

9        A.   And I don't -- I can't specifically say as to

10   what those people did.  I don't recall what I learned

11   at the time, but I recall learning from witnesses that,

12   yes, they did assess the costs associated with

13   residents not paying rent on time.  Now, I can't give

14   you more information than that because I don't know it

15   anyway, what those steps were, when they did it, who

16   did what.  So I mean, I know I'm -- you're not really

17   asking me a question, but I think I'd like to get you

18   the -- as -- let you know the limits of my information

19   so that you can move on or not, right?  So --

20       Q.   No, that's fair.  If the answer is I don't

21   know, then you've really kind of taken the wind out of

22   my balloon.  I haven't got anything to go fight over if

23   the answer is simply I don't know.  Is that your

24   testimony?  You just don't know?

25       A.   The question you asked is, did they do

1   anything?  I believe the answer is yes.  What

2   specifically was done and by who and when?  I don't

3   recall those details, but I do feel like these were

4   questions -- my recollection is limited to the fact

5   that I believe -- I recall this being an area of

6   investigation in other depositions, and I believe those

7   witnesses, who maybe would have done it, had answered

8   those questions.  And when I say depositions, I mean

9   ones that would have occurred while I was at the

10  company, not -- I don't know what was done since I've

11  left.

12      Q.   So once you gathered all the information you

13  were going to get from the 2014 compliance review, what

14  was the final product or report, if any, that you

15  created?

16      A.   I've -- I feel like I probably -- I feel like

17  that -- sorry.  It's been a long time.  I'm sure I had

18  to produce something in writing for Bruce, and I think

19  we met with, like, some of the business team about it

20  as well.  And I would have prepared maybe something for

21  Bruce and them to digest, to, you know -- like a memo

22  or something to give them a sense of why we were

23  meeting.

24      Q.   Who on the business team are you referring

25  to?

Susan Zumph                                                    March 22, 2021

1      A.   I don't recall who I would have met with, but

2   it would have been somebody senior responsible for, you

3   know, property management.

4      Q.   Such as who?

5      A.   I don't recall who it would have been.

6      Q.   Do you recall anyone you actually provided

7   your report or work product to?

8      A.   I know --

9           MR. WINN:  Objection.  Vague.

10          THE WITNESS:  Sorry, Aaron.

11     A.   I know that I did have a meeting, but I don't

12  have a present recollection of sitting in a room and

13  talking with people about it, so I don't recall who I

14  did meet with, but I -- it was very rare for me to meet

15  with senior leaders outside the department.  So I do

16  recall having, like, a meeting.  I just don't recall

17  many details about it.

18     Q.   Do you recall anyone who was there?

19     A.   Probably Jim.

20     Q.   Anyone else?

21     A.   I would guess Ann.  I mean, I don't recall.

22  I'm guessing.  I say Jim because typically he -- if I

23  had any meeting with a senior leader, he would have

24  been in the meeting with me.

25     Q.   What I've tried to put for you in the chat

Susan Zumph          Trial Ex. 90                    March 22, 2021

1    and marked as ~~Exhibit 3~~ should be --

2    ⋅   A.   Oh.

3    ⋅   Q.   -- a cover e-mail and a memo dated

4    November 14, 2014.  And for the record, what I've put

5    in the chat and intend to mark as ~~Exhibit 3~~ was     Trial Ex. 90

6    Bates-labeled WP8065 through 8069.

7    ⋅ ⋅ ⋅ ⋅ ⋅   (Whereupon, ~~Exhibit 3~~, E-mails, was marked     Trial Ex. 90

8    for identification.)

9    ⋅   Q.   Take as much time as you need, Ms. Zumph, and

10   tell me if you recognize any part of Exhibit 3.

11   ⋅   A.   Well, I've skimmed it, so I can read it in

12   detail when you've got those questions, but I don't

13   specifically recognize this other than these look like

14   they're e-mails from me that    if    and I assume

15   these e-mails are correct    refresh my recollection as

16   to who would have participated in the meeting.

17   ⋅   Q.   Okay.

18   ⋅        Let's unpack Exhibit 3 a little better this

19   time.

20   ⋅   A.   Sure.

21   ⋅   Q.   My understanding is that Exhibit 3 starts

22   with some e-mails, and at least one of the e-mails has

23   an attachment which is the memo that we see in the rest

24   of Exhibit 3.  Is that your understanding?

25   ⋅   A.   That's what I'm looking at, yeah.

Susan Zumph                                            March 22, 2021

 1           Q.   Okay.
 2               So starting with the memo itself dated
 3    November 14, 2014, what is that we're looking at?
 4           A.   I'm sorry.  Did you say the e-mail or the
 5    memo?
 6           Q.   I meant the memo dated November 14, 2014,
 7    subject is compliance initiative, dash, fee review.  Do
 8    you see that?
 9           A.   I do.  I'm sorry.  I was just looking at the
10    document while you were talking so I didn't hear what
11    you said.
12           Q.   Fair enough.
13               Tell me what this memo is.
14           A.   I believe this was the summary, the final
15    product of what Bruce had asked me to do to take a look
16    at some of the fees and do like a compliance review of
17    them.
                              Trial Ex. 90
18           Q.   So the memo we see in ~~Exhibit 3~~ is the final
19    work product or summary resulting from the 2014
20    compliance review?
21           A.   I think so.
22           Q.   And you were forwarding it to colleagues of
23    yours at EQR on or around November 24 of 2014, right?
24           A.   Yes.  It looks like this e-mail to Denise
25    said, you know, I sent this to David before I got you

Susan Zumph                                          March 22, 2021

1   on the cc line, here it is.

2        Q.   Right.  And in that same e-mail dated

3   November 24, 2014, which is at the very top of the

4   first page of Exhibit 3.  It says here's the final
    [Trial Ex. 90]

5   version of the memo, correct?

6        A.   Yeah.  I'm sorry.  Yes.

7        Q.   Do you know how many drafts or versions were
                                        [Trial Ex. 90]

8   created before this final version we see in Exhibit 3?

9        A.   I don't.

10       Q.   Well, can you tell me anything about how any

11  of the prior or other versions or drafts differed than
                                     [Trial Ex. 90]

12  the draft or version we see in Exhibit 3?

13       A.   No, not specifically.  I'm sure changes were

14  made but --

15       Q.   Can you recall any of them as you sit here

16  right now?

17       A.   I cannot recall any specific ones, no.

18       Q.   Do you recall circulating other drafts at

19  all?

20       A.   I may have.

21            Whoops.  Sorry.

22            I may have.  I know I got input from Ann on

23  it.  Well, I shouldn't say I know.  I believe I got

24  input from Ann on the memo, the substance of it,

25  certainly.  I would expect that both Jim and Denise

Susan Zumph                                          March 22, 2021

1    gave me input on this as well.  Just generally that's

2    how we collaborated and I mean, I collaborated with

3    Denise.  Jim was my boss, so he would have -- if I was

4    going to send a memo to C-suite, he typically would

5    have looked at it.

6          Q.   C-suite, meaning the more senior executives

7    of the company, CEO, CFO, right?

8          A.   I'm sorry.  Yes.  And even Bruce.

9          Q.   Right, right.

10              What was Mr. David Santee's position at the

11   time?

12         A.   I don't know what his position was in 2014.

13   I know when I left he was COO unless he left before I

14   did, but his last position was COO, I think.

15         Q.   Focusing on the memo portion of Exhibit 3,

16   did you actually type up this draft?

17         A.   I -- yes, I did.

18         Q.   Did anyone help you type it up?

19         A.   You mean like a secretary or assistant or

20   something?

21         Q.   Right.

22         A.   No, I did my own typing.

23         Q.   And then the content, did you come up with

24   all the content, or did some of the content come from

25   Ms. Patton, for example, or from anyone else?

Susan Zumph                                    March 22, 2021

~~1~~  ~~counsel, conducted independent analysis of applicable~~

~~2~~  ~~statutes and case law, and audited the fees charged at~~

~~3~~  ~~all communities.  Did I read that correctly?~~

~~4~~  ~~A.   Mm-hmm.  I'm sorry.  Yes, you did.~~

5        Q.   Let's take the first piece regarding opinions

6   from local counsel.  What opinions were taken from what

7   local counsel?

8        A.   Before I answer that, that actually somewhat

9   answer -- refreshes my memory as to why Denise would

10  have been on this e-mail and Ann.  They were the ones

11  that had the relationships with local counsel.  Denise

12  was involved in establishing fees or helping provide, I

13  should say, legal guidance to the business teams as to

14  fees and charges that were going to be assessed at

15  communities.  So that's why Denise was involved in it.

16  I'm sure that's why she was cc'd on the memo, and Ann

17  as well.  And so I don't know specifically which local

18  counsel.  I couldn't recall now which ones were

19  involved, but that would have been something that

20  Denise and Ann would have been more involved in

21  obtaining.  And Denise may not have been specifically

22  involved other than she and Ann had the relationships

23  with local counsel.

24       Q.   Okay.

25            Let me try to unpack that a little bit.  So

Susan Zumph                    Trial Ex. 90                    March 22, 2021

```
 1    when your memo, as we see in Exhibit 3, discusses the
 2    gathering of opinions from local counsel, were you the
 3    one personally gathering those opinions from local
 4    counsel?
 5         A.   No.
 6         Q.   Your understanding is that it was Denise
 7    and/or Ann Patton, right?
 8         A.   Yes.
 9         Q.   Do you know the identities of any of the
10    local counsel that were talked to or whose opinions
11    were gathered by Denise Beihoffer or Ann Patton?
12         A.   I don't recall who they would have reached
13    out to with regard to this.  I might recall names of
14    local counsel that I know they used or I'd heard them
15    used in the past if you said them, but I don't recall
16    people today.
17         Q.   Does the name Jamie Sternberg ring a bell?
18         A.   Do you have a firm name with her?
19         Q.   Kimball Tirey St. John maybe.
20         A.   I do think that her name sounds familiar.  I
21    don't know if they reached out to her with regard to
22    this, but that firm name -- and I think I know that
23    they went to her for other landlord-tenant fee type of
24    questions.
25         Q.   Do you know if anyone by the name of Todd
```

Susan Zumph                                          March 22, 2021

```
 1    Rothbard was consulted?
 2        A.   I don't, but I do recall that name as being a
 3    lawyer that they also went to in California with regard
 4    to landlord-tenant issues.
 5        Q.   Can you name any of the lawyers or firms from
 6    whom opinions were gathered in connection with your
 7    2014 compliance initiative and is suggested at the end
 8    of this first paragraph of Exhibit 3 in the memo?
 9        A.   Not without -- no.  Not without something
10    refreshing my memory as to the fact that they provided
11    an opinion in that time frame in response to that.
12        Q.   Do you know what opinions were given by these
13    local counsel?
14        A.   I don't recall any opinions as I sit here
15    today.
16        Q.   Do you know what format you would have had
17    those opinions in before you wrote this line in the
18    memo in Exhibit 3, like some kind of binder of
19    opinions, some kind of legal memorandum, some kind of
20    spreadsheet, anything of the sort?
21        A.   It was something because I know I didn't
22    speak with them individually, so it had to be
23    something, but I don't know how Ann or Denise would
24    have obtained them and how that was communicated to me.
25        Q.   Was it communicated to you?  Were the
```

Trial Ex. 90 (line 8)

Trial Ex. 90 (line 17-18)

Susan Zumph                                          March 22, 2021

1   opinions at one point communicated to you?

2        A.   Some -- I don't recall any specific ones, but

3   I'm sure some were.

4        Q.   And if it was communicated to you, do you

5   know how it would have been communicated to you,

6   whether by e-mail or telephone conversation or

7   otherwise?

8        A.   That could have been done by just discussion

9   orally, them telling me that, you know, okay, we talked

10  to so-and-so, they said such and such, or, you know,

11  however they received that information.

12       Q.   Was a litigation hold ever put on internal

13  documents as a result of the filing of this lawsuit?

14       A.   Yes.

15       Q.   And do you know what, if anything, was done

16  at the company to preserve any of the product related

17  to the 2014 compliance review, like if any memos or

18  notes capturing the local counsel opinions?

19       A.   I don't know  oh, wait.  I'm sorry.  Say

20  that again.

21       Q.   Do you know what would have been done by the

22  company, if anything, to preserve the opinions from

23  local counsel obtained as part of the 2014 compliance

24  review?

25       A.   I don't know specifically what would have

Susan Zumph                                           March 22, 2021

 1   been done with regard to that.

 2        Q.   Do you know if anything was done?

 3        A.   I know there was a litigation hold.

 4        Q.   But other than the implementation of a

 5   litigation hold, do you know what steps were taken to

 6   preserve the opinions from local counsel that were

 7   obtained as part of the 2014 compliance review?

 8             MR. WINN:   Objection.   Lacks foundation.

 9   Vague.

10        A.   Well, items subject to litigation hold, steps

11   would have been taken to preserve them.

12        Q.   What steps would have been taken to preserve

13   the opinions from local counsel?

14        A.   Items subject to litigation holds.   There --

15   I don't recall exactly how that process worked now that

16   we're talking about it, but when a litigation hold has

17   gone out, there are steps taken to make sure that

18   people are notified of the litigation and that -- the

19   scope of the litigation and the scope of the hold so

20   that documents are not destroyed.

21        Q.   So at some point you were instructed to

22   preserve documents related to the California late fee,

23   right?

24        A.   By you?

25        Q.   No, by anyone.

Susan Zumph                                          March 22, 2021

1         A.   Well, I'm not sure I understand your
2    question.
3         Q.   At some point did you ever come to understand
4    that you were supposed to preserve documents or hold
5    documents related to the California late fee at issue
6    in this lawsuit?
7         A.   Well, I was defense counsel on the case.
8         Q.   And so when did you first learn about the
9    lawsuit?
10        A.   I presume around the time it was filed.
11        Q.   And that was in September of 2014, does that
12   sound right to you?
13        A.   That does.
14        Q.   Okay.
15             And so what did you do to preserve documents
16   relevant to the case?
17        A.   Well, I didn't have any documents relevant to
18   the case, but if you're asking what did I do to
19   preserve documents related to my -- to this 2014
20   review, I wouldn't have disposed of any.  And I didn't
21   have these -- whatever your -- you know, this question
22   originated because you wanted to know about local
23   counsel opinions.  I personally didn't get them.  So
24   you're asking me what I did to not dispose of them.
25   Well, I didn't have them.

Susan Zumph                                    March 22, 2021

1          Q.   What did the company do to preserve the
2    opinions from local counsel?
3               MR. WINN:  Objection.  Lacks foundation.
4    Vague.
5          A.   It issued and implemented litigation hold.
6          Q.   Let's talk about that.  When you say it
7    issued a litigation hold, what does that mean exactly?
8          A.   A litigation hold typically and again because
9    I'm defense counsel, I issued these so I feel like I'm
10   not exactly sure how I'm supposed to answer this, but a
11   memo would have been written advising people that might
12   have had information about the case to preserve their
13   information, to not dispose of anything, and then there
14   were other steps taken, IT steps, behind the scenes
15   steps taken to prevent e-mails from being destroyed and
16   the like.
17         Q.   Did you write or circulate a litigation hold
18   memo specific to this case?
19         A.   I believe I did.
20         Q.   If it wasn't you, who would it have been at
21   the time?
22         A.   Could have been Jim.
23         Q.   And who did you send it around to?
24         A.   I have no way of knowing exactly who was sent
25   around, but it would have been sent broadly to anybody

Susan Zumph                                    March 22, 2021

```
1    that could have had information about the case --
2        Q.   And --
3        A.   -- about late fees charged in California.
4        Q.   And who would that have been at the time?
5        A.   Everyone from community managers, people
6    on-site, leasing consultants through to people in
7    property management, through to, as you know, Denise is
8    a witness in this case, and she was subject to
9    litigation hold.
10       Q.   What does your litigation hold say with
11   respect to this case?
12       A.   I could not tell you what it said.
13       Q.   Do you know how long it would have been -- a
14   page, two pages, ten pages?
15       A.   Somewhere between one and ten.
16       Q.   And do you know if you would have
17   specifically referenced in your litigation hold the
18   documents related to the 2014 compliant initiative or
19   compliance review?
20       A.   It would not have been that specific.
21       Q.   Would you have considered at the time the
22   2014 compliance initiative review to be governed by
23   litigation hold or that its documents would be
24   protected or held pursuant to your litigation hold?
25       A.   I can't tell you what in my mind as defense
```

Susan Zumph                                     March 22, 2021

```
 1   counsel I would have considered which documents would
 2   have been covered, but the litigation hold went out
 3   covering all documents related to the assessment of
 4   late fees that was -- would be a general summary.
 5        Q.   And you would expect that the 2014 compliance
 6   review would be protected by the litigation hold and
 7   documents would be preserved pursuant to your
 8   litigation hold, right?
 9        A.   I would expect documents to be preserved
10   pursuant to the litigation hold, yes.
11        Q.   And so I have a broader question then.  The
12   opinions that you gathered from local counsel, I have
13   not seen any memo or documentation that describes what
14   those opinions were, what all were given.  Do you have
15   any explanation for why that is?
16        A.   I didn't collect opinions from local counsels
17   personally.
18        Q.   Right, that would have been Ann or Denise,
19   right?
20        A.   Yes.
21        Q.   Do you know what those two individuals did,
22   if anything, to preserve the local counsel opinions
23   they gathered as part of the 2014 compliance review?
24        A.   I don't have --
25             MR. WINN:  Objection.  Lacks foundation.
```

Susan Zumph                                      March 22, 2021

1    Vague and ambiguous.

2         A.   I don't have any -- I don't know anything

3    specifically about that.

4              MR. WINN:  Susan, I know we're up against the

5    hour.

6              THE WITNESS:  We are.  I mean, we're in the

7    middle of line of questioning and I wouldn't cut you

8    off, but I don't have a lot   you know, I can give you

9    a little time.  I   in advance got everything ready so

10   we could run out the door, but I'm sorry.  I don't

11   have --

12             MR. TOMASEVIC:  No.  You've been   you've

13   fairly disclosed to me that we had a hard cutoff at

14   noon and I   we started the deposition under that

15   understanding.  So   I'm not going to finish and I'm

16   not going to finish in the next few minutes.  So maybe

17   this is a decent time to adjourn and I can work with

18   your counsel to try and

19             THE WITNESS:  No.  This is very stressful.

20   I'm not   I agreed voluntarily to appear and I did it

21   very quickly, but this does need to conclude today.  I

22   did disclose that I had limited time, so I did prepare

23   to run over.  So like I said, I'm all prepared and I

24   can give you another half an hour, but I think you

25   should proceed and try to wrap up then.

Susan Zumph                                           March 22, 2021

1              Since the first litigation hold was

2    circulated, were any other addendums or additions to

3    the litigation hold ever circulated, any other

4    clarifications?

5         A.   I don't know.

6         Q.   So were documents related to the interviews

7    of community managers --

8         A.   I'm sorry.  I should say I don't recall.

9         Q.   So were any documents related to the

10   interviews of community managers in California deleted

11   or disposed of?

12             MR. WINN:  Objection.  Vague.  Lacks

13   foundation.  She has not talked about any documents

14   existing today.

15        A.   I didn't conduct those interviews.  I don't

16   know what documents were created or were not.

17        Q.   Well, some documents were created at some

18   point, right?

19        A.   I don't -- I --

20             MR. WINN:  Objection.  Vague and ambiguous.

21        A.   About the interviews?  I don't know.

22        Q.   Well, at some point the results of the

23   interviews were captured and written down somewhere in

24   some kind of note at a minimum, right?

25        A.   I --

Susan Zumph                                          March 22, 2021

1                MR. WINN:  Objection.  Vague.  And if we only

2    have limited time, why are you asking the witness

3    something she -- she didn't conduct the interviews, she

4    said she wasn't involved in the process.  She gave that

5    information back from someone and now for a witness who

6    has -- who has graciously offered another 27 minutes of

7    her time we're talking about something she's already

8    said about 14 times she doesn't know anything about it.

9    So if you want to spend your time doing that, so be it.

10   But we're not going to -- you're not going to have more

11   time to ask questions that she actually knows the

12   answers to.

13           Go ahead.

14                MR. TOMASEVIC:  I don't agree with your

15   characterization, but you can answer, Ms. Zumph.

16        A.   I don't know.

17        Q.   Are you aware of the deletion of any

18   documents containing the opinions of local counsel as

19   mentioned in the first paragraph of your November 14,

20   2014, memo that's attached as part of ~~Exhibit 3~~? [Trial Ex. 90]

21        A.   I don't know.

22                ~~MR. WINN:  Objection.  The memo doesn't --~~

23   ~~said nothing about deletion.  There's nothing in the~~

24   ~~memo that says that.  It's absolutely false.  The memo~~

25   ~~never suggests anything about deletion of local counsel~~

Susan Zumph                                    March 22, 2021

1   comments, and it's not fair to represent that because

2   it's just not what the memo says.

3          A.   Yeah.  I don't -- it doesn't say that

4   anything was deleted, but I don't know that anything

5   was deleted.

6          Q.   Do you know who Sharon Gunnerson is?

7          A.   Oh, mm-hmm.  Yes, I do.

8          Q.   And what was her role with the company in

9   2014?

10         A.   I think she was a paralegal was her role.

11         Q.   And what role did she have, if anything, with

12  respect to the 2014 compliance review?

13         A.   I don't know if she did.

14         Q.   Do you remember meeting with her and talking

15  with her in connection with the 2014 compliance review?

16         A.   Not in connection with the compliance review.

17         Q.   Do you know if Ms. Gunnerson had any role

18  with respect to reviewing or analyzing any of the late

19  fees charged by Equity Residential in California?

20         A.   I would be surprised if she did.

21         Q.   Did you conduct any legal research as part of

22  your 2014 compliance review?

23         A.   I'm sure I did.

24         Q.   And what format would that have taken?

25  Westlaw, Google, something else?

Susan Zumph                                          March 22, 2021

1     A.   I can't remember which service we -- the --

2  Equity used.  You know, legal research service, but one

3  of the two of them.  And I'm sure I would have looked

4  on that.

5     Q.   Would you have printed any cases, done any

6  research memos, anything like that?

7     A.   I would not have done research memos.  I'm

8  almost certain I printed case because I -- or printed

9  cases or statutes, whatever, because I personally

10  printed.  So if I did a search, I would have printed

11  the results that I thought to be useful.

12     Q.   And what would you have done with your

13  printings or your printouts?

14     A.   Oh, I'm sure I would have gotten rid of them

15  like in the ordinary course, you know.  I just would

16  have read it in paper, not on the computer.

17     Q.   Right.  Before you got rid of it, though,

18  what would normally your practice have been?  Would you

19  just have a manila envelope on your desk titled Late

20  Fee Research or some file cabinet or what was your

21  practice at the time?

22     A.   Piles of paper on my desk, usually.

23     Q.   Would you have kept them until after you were

24  done with your memo, meaning the work product memo

25  dated November 14, 2014?

Susan Zumph                                          March 22, 2021

1          A.   Probably not.

2          Q.   How long would you have kept them?

3          A.   I mean, I don't know what I would have

4    printed out, but if I was looking at something online

5    so I could see what the -- let's say the statute said,

6    I would have -- if I were going to read it, I probably

7    wouldn't have read it on the screen.  I probably would

8    have read it in writing and then usually I'd keep it as

9    long as -- as long as I needed it.

10         Q.   And then was your practice sometimes to make

11   little notes or highlights to help you analyze or read

12   the printed materials you were making?

13         A.   No, not necessarily.

14         Q.   What was Equity Residential's document

15   retention or destruction policy in 2014?

16         A.   I don't recall.

17         Q.   Did it have one?

18         A.   Yes, I'm sure it did.

19         Q.   And what did it say about research notes or

20   research memoranda?

21         A.   I have no idea.

22         Q.   Or about interview notes?

23         A.   I have no idea.

24         Q.   Do you know who authored the document

25   retention or destruction policy as it existed in 2014?

Susan Zumph                                    March 22, 2021

1          A.   I'm sure I had something to do with it,

2   actually.

3          Q.   Anyone else?

4          A.   I'm sure Jim had something to do with it,

5   too.

6          Q.   Were you ever asked to delete documents

7   related to California late fees?

8          A.   Of course not.

9          Q.   Or Equity's damages from late rent?

10         A.   No.

11         Q.   Did you dispose of or delete any documents

12   related to your analysis of the California late fees or

13   Equity's damages from the payment of late rent?

14         A.   I'm sorry.  Say that again.

15         Q.   Other than your notes or your printouts, did

16   you delete any other documents related to the

17   California late fees or Equity's damages related to the

18   payment of late rent?

19         MR. WINN:  Let me   let me insert an

20   objection and clarification.  For years Susan worked on

21   the defense of this case.  During the course of that

22   I'm sure there's drafts of -- perhaps even responses to

23   discovery that your office may have sent to us that she

24   may have printed out and perhaps had destroyed.  If

25   that's what you're talking about, then I'm sure the

Susan Zumph                                            March 22, 2021

1    that was not relevant and responsive.

2        Q.   Back — back to the — back to the memo, and

3    specifically the opinions from local counsel that was

4    gathered and referenced in connection with the memo we

Trial Ex. 90

5    see in Exhibit 3, were those local counsel opinions

6    ever conveyed to David Santee, Bruce Strohm, or Jim

7    Fiffer?

8        A.   I have no idea.

9        Q.   Did anyone ever come back and ask you like,

10   hey, those local counsel opinions you referenced in

11   your excellent memo, where can I go see those or what

12   were those opinions?

13       A.   No one ever asked for that.

14       Q.   So do you know if the local counsel opinions

15   gathered as part of the 2014 compliance review were

16   ever shared with anyone outside of Ann Patton, Denise

17   Beihoffer, and yourself?

18       A.   I wouldn't know who they shared things they

19   received with.

20       Q.   Can you think of anyone who those opinions

21   were, in fact, shared with other than those people?

22           MR. WINN:  Objection.  Objection.  Vague.

23   Lacks foundation.

24       A.   I wouldn't know if they were or were not.

25       Q.   Do you know what was done with the opinions

Susan Zumph                                          March 22, 2021

```
 1   after they were --
 2        A.   I have no knowledge -- no.  I don't know
 3   anything about that.
 4        Q.   Do you know how those local counsel opinions
 5   shaped the conclusions that you drew at the end of your
 6   2014 compliance review?
 7        A.   That's a very broad question.  It's hard to
 8   answer.  I'm trying to be efficient so we can get
 9   through your questions because I'm really not coming
10   back, but with regard to -- I don't recall what opinion
11   California counsel had with regard to the late fees.
12   Let's say that.  I have no idea what the California
13   counsel did or didn't say about that -- about that, and
14   I have no memory of any local counsel opinion on any of
15   the issues, although there were many, because there
16   were many states and other fees, not just a late fee,
17   that were being looked at.
18        Q.   And you don't remember any of the opinions at
19   all?
20        A.   Specific opinions that they had?  No.
21        Q.   Or general opinions?
22        A.   No.
23        Q.   And so you don't know, as you sit here today,
24   whether local counsel opinions affected your analysis
25   of the California late fee regime in 2014?
```

Susan Zumph                                            March 22, 2021

1          MR. WINN:  Objection.  Misstates testimony.

2     Vague.

3          A.   I am saying I do not recall what their

4     opinion was.  Maybe this will help you.  So -- because

5     I know -- I read through this.  I know later it says

6     sometimes we considered it and sometimes we didn't.  I

7     wasn't talking about California late fees specifically

8     in that sentence.  I don't recall whether there were

9     some -- I generally recall that there were some --

10    there may have been some fees that some local counsel

11    said, well, we feel like judges don't give -- don't let

12    you charge that, so blah, blah, blah.  And so in that

13    case we would have gone and looked at the statute and

14    we would have -- Denise and I would have talked about,

15    why is this opinion this and what do you think, blah,

16    blah, blah.  But I don't recall ever hearing from any

17    local counsel or hearing -- not directly from, hearing

18    that a local counsel, I should say, ever said a

19    percentage late fee in California is not allowed.

20         Q.   What conversations did you have with

21    Ms. Beihoffer about the opinions of local counsel

22    related to California late fees?

23         A.   I don't think any.

24         Q.   And you don't remember any of the opinions

25    themselves about California late fees, right?

Susan Zumph                                    March 22, 2021

1      A.   I don't recall any opinions, but I would have

2    recalled if the opinion was that the percentage late

3    fee we were charging, which then wound up being subject

4    to the suit you filed, was not allowed.

5      Q.   What do you mean by not allowed?  Do you mean

6    on its face illegal or do you mean a bad idea or

7    subject to scrutiny or do you mean something else?

8      A.   All of those.  All of those --

9      Q.   Okay.

10     A.   -- you just said.

11     Q.   So you never heard anything to the effect of

12   that a percent-based late fee might be subject to

13   scrutiny?

14     A.   I don't recall hearing that from a local

15   counsel.

16     Q.   If you had heard that, what would you have

17   done with that information?

18        MR. WINN:  Objection.  Vague.

19     A.   I can't speculate as to if I would have heard

20   it, what would I have done with it.

21     Q.   Would you have told anyone?  Would you have

22   kept it to yourself?

23        MR. WINN:  Objection.  Vague.

24     A.   I don't know.

25     Q.   Did Jamie Sternberg ever advise you that

Susan Zumph                                          March 22, 2021

```
 1   Equity Residential should not charge a percentage late
 2   fee?
 3        A.   I don't -- I don't recall hearing that.
 4        Q.   Do you recall anyone telling you that it was
 5   okay or a good idea to charge a percentage late fee?
 6        A.   I don't recall asking anyone that.
 7        Q.   Well, whether you asked it or not, did any
 8   opinion ever come from any lawyer suggesting that a
 9   percentage late fee was legal or appropriate in
10   California?
11        A.   I didn't --
12             MR. WINN:  Objection.  Lacks foundation.
13   Vague.
14        A.   I didn't reach out and get those opinions,
15   and I don't -- so I don't recall either way, but I know
16   I would have remembered an opinion saying it was not
17   okay, given that we were sued in the same time frame
18   and that I then spent a number of years defending a
19   case based on that.
20        Q.   Before this lawsuit did EQR ever bother to
21   get any California lawyer's opinion as to whether a
22   percent-based late fee was appropriate or legal or
23   otherwise a good idea?
24        A.   I could --
25             MR. WINN:  Objection.  Lacks foundation.
```

Susan Zumph                                                  March 22, 2021

1    Vague.

2         A.   I was not involved in that activity or that

3    investigation.  I didn't set late -- I didn't set fees.

4    That was not my role in the company.  I wasn't involved

5    in that.  I didn't weigh in in that.  I didn't seek

6    outside counsel opinion on that.  So I don't know what

7    would have been done about that.

8         Q.   Right.

9              And you didn't do it, but are you aware of

10   anyone else doing it?

11        A.   I don't know.

12        Q.   The next portion of the last sentence of your

13   memo in Exhibit 3 references an independent analysis of

14   a couple of statutes and case law.  Did I read that

15   right?

16        A.   I'm sorry, the last sentence of the memo?

17        Q.   Yeah.  We've been in a roundabout way sort of

18   discussing some of the facets of the last sentence in

19   your memo dated November 14, 2014, which is part of

20   Exhibit 3, and we had talked about

21        A.   The last -- of the memo or the last sentence

22   of the first paragraph of the memo?

23        Q.   Last sentence of the first paragraph.

24        A.   Oh, I'm sorry.  I thought you said the last

25   sentence of the memo.

Susan Zumph                                          March 22, 2021

1        Q.   I may have and I apologize if I did, but let
2   me just be clear.  The last sentence of the last
3   paragraph of your memo which is part of Exhibit 3 says,
4   To complete this review, we gathered opinions from
5   local counsel --
6        A.   Mm-hmm.
7        Q.       conducted an independent analysis of
8   applicable statutes and case law, and audited the fees
9   charged at all communities.  Did I read that correctly
10  at the very least?
11       A.   Yeah.  I see that.
12       Q.   Okay.
13            I want to focus in on your memo where you say
14  that an independent analysis of applicable statutes and
15  case law was conducted, okay?
16       A.   Mm-hmm, yes.
17       Q.   Did you personally analyze statutes and case
18  law relevant to California's late fees as part of the
19  2014 compliance review project?
20       A.   I don't know.
21       Q.   If you --
22       A.   I say I don't know because I did it in
23  connection with the litigation for sure, and I know
24  I've looked at the statute.
25       Q.   Do you know if anyone did an analysis of the

Susan Zumph                                          March 22, 2021

1    statutes and case law in connection with the 2014

2    compliance review project?

3         A.   With regard to just California's late fee?  I

4    don't -- I don't know if anyone --

5         Q.   For any review that included an analysis of

6    California's late fee laws and case law.

7              MR. WINN:  Objection.  Vague.

8         A.   I can't say what someone else did with regard

9    to analyses that I was not involved in.

10        Q.   Well, you wrote this.

11        A.   Well, yeah --

12        Q.   An independent analysis -- well, let me just

13   ask the question.  So when you wrote to your bosses

14   that an independent analysis of applicable statutes and

15   case law was conducted, what did you mean?

16        A.   Well, there were like a ton of fees and other

17   charges that were part of this lawsuit.

18             MR. WINN:  You mean the memo?

19             THE WITNESS:  I'm sorry.  Thank you, Aaron.

20   Yes.

21        A.   This was not about California late fees.

22   That was part of it.  So this was a summary of

23   everything that was done with regard to everything.

24        Q.   So when you referenced an independent

25   analysis of applicable statutes and case law, what

Susan Zumph                                        March 22, 2021

1   analysis were you talking about with respect to

2   California law?

3        A.   I don't know that I was talking about any.

4        Q.   Well, what were you talking about when you

5   wrote that sentence?

6             MR. WINN:  Objection.  Argumentative.  Asked

7   and answered.

8        A.   This memo was written about many states, many

9   jurisdictions, many fees.  This was not a memo about

10  California late fees exclusively.  Now, I'm not saying

11  that that referred to anything related to California

12  late fees.  I'm not saying it didn't either.  I don't

13  know at this point what it did.  I couldn't --

14       Q.   And we're here to get what you do know and

15  what you do remember, and if the answer is I don't know

16  or none or I don't remember, well, then that's your

17  answer.  So let me just ask the question a different

18  way.  As part of the 2014 compliance initiative or

19  review, did you conduct an independent analysis of

20  applicable California law?

21       A.   I may have.

22       Q.   What did that entail?

23       A.   This was not just about late fees.  There

24  were other charges.  I may have looked at what some of

25  those other charges, what those statutes were related

Susan Zumph                                          March 22, 2021

```
 1    to those charges.  I may not have.  I don't recall.
 2         Q.   Did you conduct an independent analysis of
 3    California statutes related to late fees?
 4         A.   I don't recall.
 5         Q.   Did you review any cases or case law relevant
 6    to California late fees in 2014?
 7              MR. WINN:  Objection.  Vague.
 8         A.   I may have.  I don't recall whether it was in
 9    connection with this or my defense of this lawsuit.
10         Q.   Do you recall --
11         A.   When I say this, I mean this 2014 compliance
12    review.
13         Q.   When you did this compliance review, did you
14    read any California cases that covered late fees?
15         A.   I do not recall whether I read it in
16    connection with this.
17         Q.   Do you know if anyone at EQR did an
18    independent analysis of applicable statutes in
19    California relative to late fees in connection with the
20    2014 --
21              MR. WINN:  Objection.  Vague.  Lacks
22    foundation.
23         Q.   -- in connection with the 2014 compliance --
24         A.   I -- I -- I've already answered.  I really
25    don't -- I don't know that I can talk -- speak for
```

1    whether someone else did that.

2         Q.   Did anyone review any cases in connection

3    with the 2014 compliance initiative --

4              MR. WINN:  Objection.  Calls for speculation.

5    Lacks foundation.  Vague.

6         Q.   -- relevant to California late fees?

7              COURT REPORTER:  Please, just one at a time.

8    Can you repeat that question?

9         A.   I couldn't --

10        Q.   Do you know if anyone at EQR read any case

11   law or cases that talked about late fees in California

12   as part of the 2014 compliance initiative or fee

13   review?

14             MR. WINN:  Same objections.

15        A.   Sorry.  I can't say what someone else would

16   have done.

17        Q.   Are you aware of anyone else having done

18   that?

19        A.   I don't -- I haven't -- I don't know.  I

20   couldn't answer.

21        Q.   Well, when -- can you recall reviewing or

22   analyzing any of the statutes in any of the other

23   states related to any of the other fees?

24        A.   I don't have a present recollection of

25   anything specific related to this memo.  It was seven

Susan Zumph                                             March 22, 2021

```
 1    years ago.
 2         Q.    Well, do you recall reviewing any statutes as
 3    part of the 2014 compliance initiative?
 4         A.    Well, it says we did.
 5         Q.    And to the extent you reviewed statutes,
 6    would you have written down your analysis anywhere or
 7    created a memo or anything of that sort?
 8         A.    I think I answered this like 20 minutes ago.
 9    No.  I'm just really not sure at what you're getting at
10    here.  You know --
11         Q.    Don't worry about what I'm getting at.  Just
12    worry about answering the questions.
13         A.    Well, I'm trying to and I keep answering them
14    and you keep asking them, the same ones.
15         Q.    Yeah, the problem is that your answers aren't
16    responsive most of the time.  They're filled with --
17    no, they're filled with qualifiers.
18              MR. WINN:  The qualifier is I don't recall.
19              MR. TOMASEVIC:  And it's my job -- no, it's
20    my job to follow up on those qualifiers.
21              MR. WINN:  Well, there's been no qualifiers.
22              MR. TOMASEVIC:  I mean, look, if you just
23    want to tell me you don't remember what you did --
24              (Unintelligible cross talk.)
25              COURT REPORTER:  One at a time, one at a
```

Susan Zumph                                        March 22, 2021

1   time.  None of that was on the record.  The last thing

2   I got from Mr. Winn was, well, there's been no

3   qualifiers.

4           MR. WINN:  Do you have another question?

5   BY MR. TOMASEVIC:

6        Q.   The last item mentioned in the final sentence

7   of the first paragraph is that there was an audit of

8   the fees charged of all communities, right?

9        A.   Mm-hmm, yes.

10       Q.   Now, what audit was done specifically as to

11  late fees in California?

12       A.   Again, I do not know specifically what was

13  done other than to look at the prior document I

14  reviewed which said we are going to try to take a look

15  at the average late fee.  So I have no recollection of

16  exactly what was done other than what would have been

17  said -- written there and -- and whether it says an

18  audit of all fees, you know, I don't know what that --

19  I don't have a recollection of what specifically we did

20  with regard to that.

21       Q.   Skip down to the final paragraph of the first

22  page of your memo, and I'm talking still about WP8066.

23       A.   Mm-hmm.  Yes, I see that.

24       Q.   Now, the second sentence of that last

25  paragraph says, IT provided a more detailed breakdown

Susan Zumph                                       March 22, 2021

1    of fees from MRI which assisted in the audit portion of

2    this review.  Did I read that correctly?

3         A.   You did.  That's helpful actually for my

4    memory.  It may be -- I think what was done was that

5    a -- like a spreadsheet was pulled with regard to fees

6    that were charged, but I don't know the specifics of --

7    it may have -- I don't know that it was fees charged.

8    It may have been just bettings, like the computer is

9    set to charge at Greentree Apartments application fee

10   of $25.  Some data might have pulled -- was pulled from

11   MRI, but what specifically, I don't know.  I don't have

12   that.

13        Q.   Do you remember reviewing any data relevant

14   to the late fees personally?

15        A.   I may have.  I don't have a specific -- I

16   don't have a recollection of that.

17        Q.   Okay.

18             It's 12:31.  I have taken an extra minute

19   from you.  I'm not done, but I understand we have to

20   adjourn, so --

21        A.   Well, how much time do you have?  How much

22   more do you have?

23        Q.   Probably 45 minutes to an hour?  Well,

24   there's a few exhibits and depending on the answers it

25   could go longer than that, but my hope would be to be

Susan Zumph                                    March 22, 2021

```
 1   able to do it in less than an hour, but I can't do it
 2   now because I've got to do a series of calls.
 3        A.   Well, I'm not -- I mean, I cannot have this
 4   hanging over me.  Like, it's not -- no.  So I'm willing
 5   to make a call and get something bumped, but I'm not
 6   willing to come back another day.
 7        Q.   Well, I'm sorry, but I'm not going to agree
 8   to that.  I have calls.  Because you told me we would
 9   have a hard stop at noon, I have, not surprisingly,
10   more than just one case and I have other commitments
11   starting at least one minute ago with at least one call
12   with other clients.  So I need to now take you up on
13   what was thought to be a drop-dead of 12 o'clock and
14   extend it to 12:30, and I need to go do other business.
15   And so --
16        A.   Well, so --
17        Q.   I can come back to this, but it's not going
18   to be until tonight.
19        A.   When do you propose?
20        Q.   We could do it tomorrow.  We can do it
21   tomorrow.  But why don't we go off the record.  That's
22   all the questions I have for right now, although I have
23   many more questions possibly going another hour,
24   possibly more.
25             COURT REPORTER:  Before we go off the record,
```

Susan Zumph                                    March 22, 2021

1    can I just ask Mr. Winn if he would like a copy of the

2    transcript?  Then we can be done.

3    · · · · · MR. WINN:  Yeah.  Before we go off the

4    record, we'll want to read and review the transcript.

5    We do want a copy.  You can send it to us

6    electronically.  And I have no questions for the

7    witness at this time.

8    · · · · · COURT REPORTER:  Okay.  We'll go off the

9    record.

10   · · · · · (Off the record at 12:32 p.m.)

Susan Zumph                                          March 22, 2021

```
 1              : : :   CERTIFICATE OF REPORTER   : : :

 2

 3           I, Kaylee Lachmann, a Certified Shorthand
    Reporter, holding a valid and current license issued by
 4  the State of California, No. 14348, duly authorized to
    administer oaths, do hereby certify:
 5           That the witness in the foregoing deposition
    was administered an oath to testify to the whole truth
 6  in the within-entitled cause;
             That said deposition was taking down by me in
 7  shorthand at the time and place therein stated and
    thereafter transcribed into typewriting, by computer,
 8  under my direction and supervision.

 9           ( X )  Reading and signing was requested.

10           (   )  Reading and signing was waived.

11           (   )  Reading and signing was not requested.

12           Should the signature of the witness not be
    affixed to the deposition, the witness shall not have
13  availed himself/herself of the opportunity to sign or
    the signature has been waived.
14           I further certify that I am neither counsel
    for nor related to any party in the foregoing
15  depositions and caption named nor in any way interested
    in the outcome thereof.

16

17

18  Dated:   This 31st day of March, 2021

19           at San Diego, California.

20

21

22

23               KAYLEE LACHMANN

24               CSR NO. 14348

25
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

_____
                                    )
JAVANNI MUNGUIA-BROWN, ANGELINA     ) Case No. 4:16-cv-01225-
MAGAÑA, NORMA RODRIGUEZ, and        )       JSW-TSH
DAVID BONFANTI individually and     )
on behalf of others similarly      )
situated,                           )
                                    )
            Plaintiffs,             )
                                    )
vs.                                 )
                                    )
EQUITY RESIDENTIAL, a real estate   )
investment trust, ERP OPERATING     )
LIMITED PARTNERSHIP, a              )
partnership, EQUITY RESIDENTIAL     )
MANAGEMENT, L.L.C., EQR-WOODLAND    )
PARK A LIMITED PARTNERSHIP, and     )
EQR-WOODLAND PARK B LIMITED         )
PARTNERSHIP,                        )
                                    )
            Defendants.             )
_____)

DEPOSITION OF SUSAN ZUMPH

VOLUME II

Conducted Virtually

April 12, 2021

Reported by Gina Marie De Luca, CSR No. 6973, RMR, CRR

Susan Zumph                                                April 12, 2021

```
 1                        VOLUME II
 2  ·   ·   ·   ·   ·   ·   ·   SUSAN ZUMPH,
 3  having been first duly sworn, testified further as
 4  follows:
 5                          -oOo-
 6                        EXAMINATION
 7  BY MR. TOMASEVIC:
 8  ·   Q.   Good morning again, Ms. Zumph.
 9  ·   ·   Can you hear me okay?
10  ·   A.   Oh, yeah.  Um-hmm.
11  ·   Q.   Good.
12  ·   ·   Between our last deposition session and today,
13  did you get a chance to read your transcript?
14  ·   A.   I did not.
15  ·   Q.   Did you look at any documents?
16  ·   A.   I did not.
17  ·   Q.   Talk with anyone about this case or about your
18  deposition other than Mr. Winn or anyone who's part of
19  his legal team?
20  ·   A.   I did not.
21  ·   Q.   Talk to anyone else from EQR, for example?
22  ·   A.   I have not spoken to anyone from EQR about
23  anything.
24  ·   Q.   Okay.  Great.
25  ·   ·   Did you do anything to prepare for today's
```

Susan Zumph                                    April 12, 2021

1    session other than talk to Mr. Winn or his legal team?

2        A.   I didn't do anything to prepare for this

3    deposition.

4        Q.   Okay.  Great.

5             Let's go back over the litigation hold stuff

6    that we talked about briefly towards the end of our

7    first session.

8             Oh, and before I do that, was there anything

9    that stuck out in your mind from our last session that

10   you believe you stated and was either inaccurate,

11   incomplete, or needed modifying in any way?

12       A.   I -- I've given it no thought.  So I don't have

13   anything that I want to correct.  But I'm not saying

14   that everything I said was -- you know, that at some

15   point later I wouldn't have reason to correct it --

16       Q.   Anything that you can think of now that you

17   might want to --

18       A.   I have given it no thought, and I'm -- you

19   know, I don't really recall very much exactly what the

20   deposition was about.  I mean, I know what it was about,

21   but I don't recall everything that I said and you said

22   and what the questions were.

23       Q.   Let's go back over your learning of the case

24   and the litigation hold you sent out.

25            Now, you learned of this class action shortly

1  after it was filed in about September of 2014; is that

2  right?

3       A.   I assume so.

4       Q.   Do you remember it being in 2014?

5       A.   I mean, I don't recall when it was filed.  I

6  think it was filed in 2014, and I would have learned

7  about the case sometime after it was filed.  I'm not

8  sure.

9            "Shortly," I'm not sure what that means to you.

10  But it would have been after it was filed, within some

11  weeks or months.

12       Q.   Eventually you received a copy of the

13  complaint?

14       A.   Sure.

15       Q.   And at the time you understood that this case

16  was about, in short, challenging the legality of EQR's

17  late fees throughout California; right?

18       A.   I mean, I'm not sure that's a -- that's

19  everything it was about.  But generally, I mean, sure.

20       Q.   Well, what did you understand the case to be

21  about, once you learned of it?

22       A.   You know, you're asking -- you know, I'm not

23  sure what I recall I knew the case to be about then.

24            I would say now with my memory about the case,

25  not what I thought about the case when it was filed, is

Susan Zumph                                          April 12, 2021

 1   that it was challenging late fees in California.

 2        Q.   Did you ever understand that the case was about

 3   anything other than that?

 4        A.   Well, maybe.  I'm not sure that's exactly

 5   accurate.  I don't know that it originally even was

 6   challenging late fees in all of California.  It may have

 7   just been challenging the late fees charged in a

 8   particular community.  I can't recall.

 9        Q.   Okay.  You drafted a litigation hold letter or

10   memo to be sent out; right?

11        A.   Probably.  Sure.

12        Q.   Well, I think we said in your first session

13   that you're the one who drafted the litigation hold

14   letter for this matter; right?

15        A.   Again, it's been a long time, you know.  So I'm

16   not sure that I recall exactly, but -- so probably I

17   did.

18        Q.   And when you sent it out, where did you send it

19   out to?

20        A.   I don't remember.

21        Q.   Who would you have sent it out to?

22        A.   People who needed to preserve documents.

23        Q.   And based on your understanding of what the

24   case is about, who would those people have been?

25        A.   I can't recall who --

Susan Zumph                                                        April 12, 2021

```
 1        Q.    How many did -- how many did you send out?
 2        A.    How many litigation holds or how many
 3    recipients?
 4              I -- the answer to both questions is the same,
 5    which is "I don't recall."
 6        Q.    Do you know how many versions of the litigation
 7    hold letter you sent out related to this case?
 8        A.    Nope.
 9        Q.    Do you know if it was more than one?
10        A.    The case went on for -- I mean, it's still
11    going on now, but while I was there -- I can't remember
12    exactly when I left what -- in 2019 did I leave?  So
13    that was four, five years.  So I'm sure that it was
14    reviewed and -- I -- I shouldn't say "I'm sure."
15              It would -- it was probably reviewed and then
16    reminders sent out or reissued, depending -- I know the
17    case changed several times.  There was another case
18    filed.  So there would have -- I believe there was
19    likely more than one, but I couldn't say for sure.  And
20    I don't know to whom it went or how many people it would
21    have gone to.
22        Q.    Any estimate whatsoever?
23        A.    I can't.
24        Q.    So I put in the chat box Exhibit 3 from our
25    first session, and I want to go back to that.  That will
```

Trial Ex. 90

Susan Zumph                                                April 12, 2021

1   be the 2014 compliance initiative fee review memo and a

2   cover set of emails.   It should be in the chat box.

3   · · · · · Let me know if you have a problem.

4   · · A.   No.   I just -- hang on.   I need to adjust my

5   setup here.

6   · · Q.   Take your time.

7   · · A.   Yeah.

8   · · Q.   And for the record, it's -- again it's -- it

9   was produced as Bates-labeled WP 8065 through 8069.

10  · · A.   Yep, I have that document with those

11  Bates-numbered documents here.

12  · · · · · (Reporter query)

13  · · · · · THE WITNESS:   "I have those Bates-numbered

14  documents here."

15  BY MR. TOMASEVIC:

16  · · Q.   Thank you.

17  · · · · · Now, we had talked a little bit in the first

18  session about your statement in your memo at the end of

19  your first paragraph, and I'm talking about the first

20  paragraph on Bates label 8066 where it states that "To

21  complete this review, we gathered opinions from multiple

22  counsel" and so on.

23  · · · · · Do you have the language in front of you?

24  · · A.   I see that sentence.

25  · · Q.   All right.   Do you recall any other activities

```
 1   regarding the gathering of opinions from local counsel
 2   that you participated in or that were completed other
 3   than what we talked about in your first session?
 4        A.   Well, I don't recall --
 5             MR. WINN:  Objection.  Vague.
 6             THE WITNESS:  That's okay.  Sorry, Aaron.  And
 7   I apologize to the court reporter for speaking over him.
 8             I don't recall what we -- I said in my first
 9   deposition about that.
10   BY MR. TOMASEVIC:
11        Q.   Okay.  So what did you do to gather opinions
12   from local counsel for purposes of this memo?
13        A.   Well, I don't know if -- again, I can't
14   remember what I said.  So -- I thought I said that I did
15   not communicate with local counsel myself.  Other people
16   did that.  And they reached out to them.  They got
17   opinions from local counsel.
18        Q.   What opinions did you receive from that local
19   counsel as part of this compliance review process?
20        A.   They didn't come to me directly.  So I don't
21   know exactly or inexactly.  I know we got information
22   from them, but I don't know what specifically.
23        Q.   What opinions or information did the company
24   gather from local counsel as part of this 2014
25   compliance review?
```

Susan Zumph                                                    April 12, 2021

1      A.   Well, I can't speak for the company.  I'm not a
2   company rep.  I can only speak for what I did, and I
3   know that -- I recall that Ann Paton -- and maybe she
4   had other people -- other people as well -- reached out
5   to local counsel and gathered opinions from them, got
6   information from them, asked them questions.  But that
7   was not my primary role in that.
8           So I don't recall, because I didn't do it
9   myself, exactly what she asked them, what information
10  she got, how she got it.
11     Q.   Okay.  I understand all those qualifiers.
12  You've said them many times.
13          I want to know what you know, what you
14  remember, what you heard, what you did.  Just
15  because you --
16     A.   And I'm saying I don't know.
17     Q.   I'm not finished.
18          Just because you didn't do it doesn't mean you
19  don't know or you didn't hear.  So let me just ask it
20  one more time, and we can move on.
21          What opinions were gathered from local counsel
22  in connection with the 2014 compliance review that you
23  can recall, as you sit here today?
24     A.   I don't recall what was gathered.
25     Q.   Okay.  At some point an independent analysis of

Susan Zumph                                            April 12, 2021

1   applicable statutes and case law was conducted in

2   conjunction with the 2014 compliance review.

3   · · · · What independent analysis of applicable

4   statutes and case law was done with respect to

5   California late fees?

6   · · A.   I don't really -- I don't know what you mean.

7   · · Q.   These are your words from your memo.  We're

8   back at the end of the first paragraph of ~~Exhibit 3~~, the      [Trial Ex. 90]

9   memo portion --

10  · · A.   Um-hmm.

11  · · Q.   -- on Bates 8066, where you wrote, "We gathered

12  opinions from local counsel, conducted an independent

13  analysis of applicable statutes and case law, and

14  audited the fees charged at all communities."

15  · · · · Did I read that correctly?

16  · · A.   You did.

17  · · Q.   Okay.  So what independent analysis of

18  applicable statutes and case law was conducted with

19  respect to the 2014 compliance review regarding

20  California late fees?

21  · · A.   Well, I think that's clear.  Exactly that, an

22  analysis of whatever statutes were applicable.

23  · · Q.   What was that analysis?

24  · · A.   Again, now I'm not understanding what you're

25  asking.

Susan Zumph                                        April 12, 2021

1      Q.   I don't need you to just read the statement

2  here.  I want you to tell me what comprised the

3  independent analysis of applicable statutes and case

4  law.  What statutes?  What case law?  When did you

5  start?  Who participated?  How long did you spend doing

6  this?  What work product did you create as a result?

7           Do you know the answer to any of those

8  questions?

9      A.   Well --

10          MR. WINN:  Objection.  Hold on.  Time out.

11 Time out a minute here.  Let's pause for a minute here.

12          First, there's multiple questions there.  So

13 the objection is it's compound.

14          Second is it appears, Alex, that you're getting

15 quite heated here.  If you can just ask simple

16 questions, I'm sure we can get answers.

17          And the fact that she does not recall something

18 doesn't require you to get upset at her.

19          So if you don't mind just asking simple

20 questions, not compound questions, I'm sure the witness

21 will provide the best answer she can.

22          MR. TOMASEVIC:  Well, I'm not getting heated.

23 That's a misrepresentation.  What I'm getting is

24 nonanswers to my questions.

25          And to your point about "simple questions," I

Susan Zumph                                          April 12, 2021

1    don't know how it gets simpler than reading words

2    written by the witness and saying, "What did you mean by

3    that?  Please explain this."

4          I can't think of a simpler version of a

5    question along those lines, Aaron.

6          If you've got an example, then I'm happy --

7          MR. WINN:  Well, very good.

8          Let's read back -- let's read back -- let's

9    read back the last question.  Let's see if that's

10   simple, and we can see if she can answer it.

11         Will you please read back the last question,

12   Court Reporter.

13         THE REPORTER:  Yes.

14         (Record read)

15         MR. WINN:  Okay.  And my objection is the same.

16   I think that's a compound question.  I don't think it's

17   simple, and there were multiple questions in there, and

18   it's not fair to ask the witness about six questions and

19   ask whether she has answers to any of them.

20         So my instruction actually is -- unless you can

21   recall all those questions and answer them

22   independently, then you don't answer that question.

23         And if you don't mind, Alex, just ask her each

24   of those questions, if you'd like to.  I think that'll

25   provide a much cleaner way to go about this.

Susan Zumph                                            April 12, 2021

1          MR. TOMASEVIC:  You're instructing her not to

2    answer my question?

3          MR. WINN:  No.  I'm instructing her unless she

4    can remember each of those six questions and answer them

5    distinctly, that she shouldn't answer the question.

6          If she can remember all those six questions

7    embedded in one question, by all means, answer them.

8          MR. TOMASEVIC:  Let me ask the simple question

9    again and see what we get this time.

10   BY MR. TOMASEVIC:

11      Q.   So tell me more about the independent analysis

12   of applicable statutes and case law that was allegedly

13   conducted as part of the 2014 compliance review as it

14   related to California late fees.

15      A.   We would have looked at statutes and case law

16   in California that related to late fees.  There's a

17   statute, and there are a number of cases.  I can't

18   recall how many, but I know there was more than one that

19   related to -- that looked at late fees in California,

20   and we looked at them, and we looked at what the

21   local -- I'm sure we looked at the opinion from local

22   counsel.

23          I don't recall specifically with regard to

24   California or -- because this was a memo about multiple

25   different charges assessed at the communities and at

1   communities throughout the country in multiple states

2   whether anything specifically was done for, you know,

3   any particular fee in any particular state.  But we

4   would have looked at it, and we would have talked about

5   it.  And we would have seen if what -- our analysis of

6   that case law and the statutes was the same as what

7   local counsel was telling us.

8        Q.   Who is the "we" in your answer?

9        A.   I cannot recall specifically with regard to

10   California and late fees, but I can answer generally

11   with regard to this compliance project -- this

12   compliance initiative what would have -- the people that

13   were likely involved were Ann Paton and Denise Beihoffer

14   and Jim Fiffer and myself.  And there may have been --

15   that's -- that's probably who was involved.

16        Q.   Who actually read the applicable statutes?

17        A.   Possibly all of us.

18        Q.   Do you remember doing it?

19        A.   I -- at some point I'm sure I read some of the

20   statutes.  Sure.

21        Q.   I mean in connection with this memo in 2014.

22        A.   At some -- I'm sure I read some of them.  Yes.

23        Q.   How many of them?

24        A.   I couldn't say.  There were a lot of fees, and

25   there were a lot of charges assessed at the communities

Susan Zumph                                         April 12, 2021

1    that we were looking at, and there were a lot of

2    different locations that we were reviewing, different

3    states.

4         MR. WINN:  Objection.

5    BY MR. TOMASEVIC:

6         Q.   Who read the applicable statutes related to

7    late fees in California?

8         A.   I couldn't say.

9         Q.   Who read the applicable case law related to

10   late fees in California?

11        A.   I -- with regard to this only --

12        Q.   With regard to --

13             (Simultaneous colloquy)

14             (Reporter query)

15   BY MR. TOMASEVIC:

16        Q.   Who exactly reviewed -- ma'am, who exactly

17   reviewed the case law related to California late fees in

18   connection with the 2014 compliance review memo?

19        A.   I can't recall.  You know, I don't have a way

20   to answer that.

21        Q.   And then the review of the statutes and the

22   case law, at least as it related to California late

23   fees, did that review end up in any kind of memo,

24   analysis, or summary, to your recollection?

25        A.   I would -- I doubt it.

Susan Zumph                                          April 12, 2021

 1        Q.   Did you reach any conclusions at the end of
 2   your analysis of the statutes or case law as it related
 3   to California late fees?
 4            MR. WINN:  Objection.  Vague.
 5            THE WITNESS:  I -- I can't really recall.  I
 6   don't really remember.
 7            I suppose the only thing I would remember is
 8   that -- the negative, which is a weird thing to
 9   remember, but if we had concluded that we thought we
10   weren't following California law, I would have
11   remembered that because we had a lawsuit -- at the time
12   we were writing this memo we had already been sued with
13   regard to it, and I know that we did not conclude that
14   there was something wrong with what we were doing.
15   BY MR. TOMASEVIC:
16        Q.   Did you ever conclude that you weren't
17   comfortable continuing to charge late fees in California
18   without doing more analysis or studies?
19        A.   No, I don't recall that.
20        Q.   Let's go to the third paragraph that starts
21   with "Where local counsel's advice was ambiguous."
22        A.   Um-hmm.  I'm sorry.  Yes.
23        Q.   Did you ever receive advice from local counsel
24   that was ambiguous or differed from your policies --
25            MR. WINN:  Objection.  Go ahead.  I'm sorry.

Susan Zumph                                                April 12, 2021

```
 1           MR. TOMASEVIC:  I was going to strike that
 2    question.  I didn't like that question anyway.
 3    BY MR. TOMASEVIC:
 4       Q.   Let's go to the second sentence where it says,
 5    "In the areas where, based on our own experience" -- do
 6    you see that?
 7       A.   Are we on the third paragraph?
 8       Q.   Yes, ma'am.
 9       A.   Yes, I see that.
10       Q.   Okay.  There you write, "In the areas where,
11    based on our own experience, the Courts favor tenants
12    and we are likely to face class-action litigation or
13    attorney general investigations, our guidance is more
14    conservative."
15           What does that mean exactly?
16       A.   That means in a place where I felt like some of
17    the law was -- if -- I'm sorry.  Strike that, not that
18    you can because I'm the witness.  But let me start my
19    answer over.
20       Q.   I hear you.  I hear you.  Go for it.
21       A.   In a particular jurisdiction where there was a
22    law that seemed ambiguous, that it wasn't exactly clear,
23    "Yes, you can charge XYZ" -- for example, California was
24    clear about application fees:  "You can charge XYZ up to
25    W," a certain limit.  That was more clear.
```

Susan Zumph                                                April 12, 2021

1          In other states, there were things that said --
2    they were very clear:  "You can absolutely charge X in
3    the amount of Y."
4          If it was less clear than that, if it was, you
5    know -- some of the language would say, "Prior to
6    entering into a lease, the only -- you can only
7    charge" -- and then it was kind of vague as to what it
8    could be charged or assessed.
9          So in places where it wasn't black-and-white
10   clear, if that place was also a place where we knew that
11   landlords had been sued in the past, then we would try
12   to be very conservative and take the most restrictive
13   view of that ambiguous statute or case law possible.
14   And that might be regardless of -- of what local counsel
15   was saying in that sometimes local counsel was saying,
16   "Oh, everyone does it here."
17          And we'd look at it and we'd say, "Well, wait a
18   minute, though.  This doesn't -- this is kind of -- it
19   doesn't say you can specifically do -- assess that.  And
20   I don't care that other people are doing it.  The
21   question is 'do we think that's likely to become a
22   litigated issue for us?'"
23          And if it could be litigated, even if we
24   thought that everyone was doing it and the Courts had
25   approved those charges previously, we would be

Susan Zumph                                        April 12, 2021

 1   conservative and maybe not charge that because we didn't
 2   want to get sued.
 3        Q.   In the next sentence you refer to California as
 4   being a jurisdiction that fits in a particular class, in
 5   your mind.
 6            What class are you referring to?
 7        A.   I wouldn't say it was in a class.  It was just
 8   a location that we faced class-action litigation in the
 9   past, before the suit you filed.
10        Q.   Where did you feel California was on the
11   spectrum with respect to late fees in comparison to the
12   other jurisdiction?
13        A.   It wasn't -- that wasn't the spectrum I was
14   looking at.  It wasn't with respect to late fees.  It
15   was in general.  The places listed there -- they all
16   were more -- were places where litigation was more
17   likely.
18        Q.   Meaning "California, Florida, Massachusetts,
19   Maryland"?
20        A.   Yes.
21        Q.   Okay.  The final sentence of that same
22   paragraph says that, "Our recommendations are a
23   reflection of the balance between our legal guidance and
24   our business judgment."
25            What does that mean exactly?

Susan Zumph                                            April 12, 2021

```
 1        A.   I -- well, it's a little bit vague.  And to be
 2   honest, it was more of "puffery."
 3        Q.   What do you mean by that?
 4        A.   So this was being presented to -- I don't know
 5   what David's title was -- David Santee's title at the
 6   time was, but he was either the guy in charge of
 7   operations or one of the people in charge of operations.
 8             And so he didn't like it if the lawyers came in
 9   and just said, "This is the law, and we don't care what
10   the -- how that impacts the business."
11             So that was more "puffery" to say to him, "We
12   consider you running your business, and so anything I'm
13   saying here is -- is balanced."
14             But it was really just to make him feel like we
15   had considered all the things important to him so he'd
16   be willing to read the memo and listen to the words that
17   we said.
18        Q.   I understand.
19             David Santee put a priority on business needs;
20   right?
21        A.   Of course he did.  He was in charge of running
22   the business.
23        Q.   Yeah.
24             And you wanted to reflect some respect for his
25   prioritization of business needs within this memo so
```

Susan Zumph                                                    April 12, 2021

1   that he could see that?

2       A.   Yes, so that he would be open to hearing the

3   things that we had to say that maybe would change his

4   business, maybe.

5            I can't recall actually that we changed

6   anything out of this, but the idea was I wanted him to

7   look at me as someone that would -- that would be --

8   understanding the business too because then he would be

9   willing to listen to my opinion.

10      Q.   And by "the business" or "business judgment"

11  for people reading this transcript, what do you mean by

12  that?

13      A.   I didn't really mean much by that because I --

14  it was, again, just "puffery."  He has business

15  judgment.  I didn't really -- I was a trial lawyer, and

16  I got involved in compliance to bring a rigor to the

17  investiga- -- I don't want to say "investigation," but

18  to the process of looking into the fees.

19           So, again, that was really like a "puffery"

20  statement.  It wasn't actually anything.

21      Q.   Let's look at the next page where you have a

22  section devoted to "California analysis," please.

23      A.   Sure.

24      Q.   The first bullet point appears to talk about

25  the late fee.

```
 1        A.   It does.
 2        Q.   Now, in the middle, there is a sentence that
 3   says, "We have not updated this analysis in the ensuing
 4   15 years, even though our business processes and the
 5   amount of the fee have changed drastically, and in the
 6   inverse proportion to each other."
 7             Did I read that correctly?
 8        A.   Yes, that is what it says.
 9        Q.   Now, the earlier analysis being reflected in
10   this sentence, is that the PricewaterhouseCooper's
11   analysis we talked about, or is it something else?
12        A.   It was -- I think it was
13   PricewaterhouseCooper's.  It was the analysis performed
14   in connection with the previous litigation, like an
15   expert analysis with people that -- I want to say --
16   "accountant" isn't right, but, like, you know, somebody
17   with a -- again, it's not "accounting" or "economics."
18   I'm not really good with that kind of stuff, but that
19   kind of background, a background to be able to analyze
20   costs and expenses.
21        Q.   Okay.  You state that, "The business processes
22   and the amount of the fee have changed drastically."
23             How did the business processes change
24   drastically?
25        A.   Let me do my best.  So from 1999 -- and what I
```

Susan Zumph                                         April 12, 2021

1    was referring to was the process changed from '99 to

2    2000- -- when did this get written?  Was it '14?

3         Q.    Yes, ma'am.

4         A.    "2014."

5               So what I mean by that is I believe there were,

6    for example, two different computer systems.  Like, we

7    were on our third -- I -- the company was either on

8    its -- I think its third computer system.  And the

9    systems were remarkably different.

10              The one that was in use in 2014 was more of a

11   Web-based one.  The one that was in use in '99 and even

12   its replacement were all maintained right on, like, the

13   hard drive at the -- of a particular computer, and they

14   weren't -- it wasn't connected.  It didn't send data

15   anywhere.

16              So the process that was involved with a new

17   system and the old system and how fees got entered,

18   charges and payments, and how maybe a letter was written

19   or -- well, like, how they'd go about documenting, what

20   they did, and to try to collect rent that wasn't paid on

21   time, all of that, I believe, was really very different

22   because things in 14 years -- the world had changed.

23   Email was in use in 2014.  Frankly, texting was in use

24   in 2014.

25              And I can't recall when that

Susan Zumph                                              April 12, 2021

```
 1   PricewaterhouseCooper's analysis had been done, but I
 2   believe -- what I recall is it had been done when I was
 3   still in law school or just out of law school.  And to
 4   me, the process -- or the world between then and now and
 5   how we did everything was drastically different.
 6        ·   ·   ·   ·   And so that was part of the process that I was
 7   talking about.
 8   ·   Q.   How did the amount of the fee change?
 9   ·   A.   Well, the fee -- and I'm not sure the amount of
10   the fee changed.  I mean, in some cases I'm sure it did.
11   But in 20- -- 1999, if that's when that study was or --
12   we'll just say -- so I don't have to say a time, we'll
13   say when that expert analysis had been performed, I
14   believe it was at $50.  That's my recollection today.
15   So maybe when I wrote this I thought something else, if
16   I'm wrong.  But as I sit here today, what I recall is
17   that it was $50.
18        ·   ·   ·   ·   And then by the time I was looking at this in
19   2014, it had changed so that it was a percentage of
20   the -- the unpaid rent.
21   ·   Q.   And when you say that, "The business processes
22   and the amount of the fee changed in inverse proportion
23   to each other," you mean the fee went up and the
24   processes needed went down?
25   ·   A.   Yeah -- I mean, that doesn't actually make any
```

Susan Zumph                                                    April 12, 2021

```
 1   sense.  So I kind of hope this didn't go to David but --
 2   see, it doesn't make sense because the process isn't a
 3   cost.  It's just a process.
 4         And what I was saying here is that I wanted to
 5   conduct a new expert analysis to figure out how much the
 6   new process costs because I knew the process was really
 7   different, but what I couldn't -- I didn't have the
 8   skills to assess, "Well -- but what are those costs
 9   associated with that?"
10         And then I do know that the -- the amount of
11   the fee had gone -- it had gone up only because it was
12   not less than $50 based on, like, the average rental
13   rate, an average.  I'm not saying that nobody was
14   charged that.  But if you looked at the average rent --
15   assuming somebody didn't pay their rent on time, full
16   rent on time, the amount that that would be would be
17   more than $50 is what I suspected.
18      Q.   Did your analysis of the business processes
19   related to collecting rent in 2014 come from yours or
20   your colleagues' interviews with the property managers?
21      A.   Yes.
22      Q.   Did it come from anything else?  I mean, did
23   you receive any -- I don't know -- memos, standard
24   operating procedures, or things like that that you can
25   recall, as you sit here today?
```

Susan Zumph                                                    April 12, 2021

1     A.   We did not receive any memos or standard
2   operating procedures, that I recall.  I don't think
3   any -- I mean, I don't recall the existence of any, not
4   that some existed and we didn't get them.
5         But I think we talked about how Ann and I had
6   met with other people involved in the whole process, not
7   just people at -- on-site, but also people in more of a
8   corporate role.  So somebody in central business group.
9   And so some of the information about the process would
10  also have been related to meetings we had with people,
11  like, on the business side that weren't property
12  managers.
13    Q.   Did you ever obtain an understanding as to how
14  much time on average or in the aggregate EQR personnel
15  spent trying to collect late rent in the '90s or when
16  the first expert analysis was done?
17    A.   I have no idea what they did.  I -- I -- I
18  don't know what that showed and what information was
19  gathered for that.
20    Q.   Right.
21         Well, when you say, "The business processes
22  have changed in an inverse proportion to the fee
23  collected," do you mean that over the course of 15 years
24  and because of automation, at least in part, EQR
25  personnel spent less time trying to collect late rent?

Susan Zumph                                          April 12, 2021

```
 1        A.   No, I don't mean that.  I mean I didn't know,
 2   and I wanted someone who could do that analysis.  My
 3   thought was that it would be a good idea to get an
 4   expert to take a look at it.  And one of the things the
 5   expert -- I don't recall specifically, but I think in my
 6   mind -- I'm just trying to put myself back there then.
 7             I suspect what I was thinking is, "We'll let
 8   the expert look at that, look at what was done before
 9   and analyze -- and analyze that and then look at the
10   interviews and maybe even talk to people and do their
11   own assessment, tell me what information I should go
12   gather so that they can analyze it," because I didn't
13   necessarily know all the things that go into the cost of
14   this.  And then they could tell us whether it was more
15   or less cost on the property manager's side, and -- and
16   I don't know all the other things that go into
17   collecting -- collecting this and accounting for -- not
18   just collecting, but attempting to collect and
19   accounting for rent that wasn't paid when it was due.
20        Q.   Did you ever conclude that EQR personnel were
21   spending more time in 2014 collecting on late rent than
22   in prior years?
23        A.   No.  In 2014 we hadn't gotten to that
24   conclusion.  That was why I was saying we wanted an
25   expert.  It was more -- I'm not -- I want to make sure
```

Susan Zumph                                                April 12, 2021

 1    that the -- not just the time spent, whether it was less
 2    or more, but that the time spent at some -- you know,
 3    and all the costs.
 4            So some of it is time spent, but also you would
 5    want to look at -- you would need to take into account
 6    salaries or, like, how much we were paying people to do
 7    things.  And so I just didn't have an ability to make
 8    that assessment more or less, and I wanted to --
 9    that's -- I was recommending let's go ahead and have
10    that done because it's -- essentially I was saying it's
11    beyond me to be able to do that.
12         Q.   Yeah, I hear you.  You're going into a lot of
13    issues like property costs and stuff --
14            THE WITNESS:  Can you guys hold on one second?
15    Can you guys hold on one second?  I'm so sorry.  I have
16    a visitor.
17            MR. TOMASEVIC:  Yeah.
18            THE REPORTER:  Off the record?
19            MR. TOMASEVIC:  Off the record.
20            (Discussion off the record)
21    BY MR. TOMASEVIC:
22         Q.   Yeah, I appreciate that extra information about
23    salaries, but that's not what I'm asking.  I'm just
24    asking you a "Yes" or "No" question.  Strike that.
25            Did you ever conclude that EQR personnel were

Susan Zumph                                                        April 12, 2021

1   spending more of their time collecting late rent in 2014

2   than in prior years?

3        A.   We did not come to a conclusion either way

4   about that.

5        Q.   Okay.  Now, you said you wanted to conduct or

6   it was prudent to conduct a new study to assess costs

7   and these other things that you mentioned; right?

8        A.   Yes, that's what I say there.

9        Q.   What new study or new efforts did you want or

10   did you have in mind when you wrote that in 2014?

11        A.   So I wrote "new study."  What I should have

12   said was "new expert analysis."  I wanted to have, like,

13   a -- again, I'll call it "economist."  I'm not sure

14   that's the right actual specialty, but an "economist,"

15   somebody who is used to doing these types of analysis --

16   analyses, have them go ahead and -- have somebody that

17   knew what they were doing go ahead and do it, as opposed

18   to -- this was an attempt to head off the suggestion

19   that I just figure it out.

20        Q.   I understand.

21             Okay.  So you were recommending in 2014 that

22   EQR do another study or expert analysis like the

23   PricewaterhouseCooper's analysis done in the late '90s?

24        A.   Yes.

25        Q.   Did that ever happen before this lawsuit was

Susan Zumph                                          April 12, 2021

1    filed?

2         A.   No.  The recommendation is being made after the

3    lawsuit is filed.

4         Q.   Oh, I -- of course.

5              But did an actual analysis ever get done

6    before -- well, did it ever get done?

7              MR. WINN:  You mean before the -- before the

8    lawsuit was filed?  What -- I'm sorry.

9              Objection.  Vague.

10             MR. TOMASEVIC:  Strike that.

11             I don't want to -- I don't want to get into

12   your litigation efforts here.  So let me figure out

13   another way to ask it, if I can.

14   BY MR. TOMASEVIC:

15        Q.   At the bottom of WP 8068 there's reference to

16   "time and motion study" or "time and motion studies."

17             Do you see that?

18        A.   Ah.  Um-hmm.  Yes.  Sorry.  Yes, I see that.

19        Q.   What did you mean by "time and motion study" or

20   "studies"?

21        A.   That was what I meant by "expert analysis,"

22   similar to the one that had been in the late '90s.

23        Q.   Are you referring to the "late fee" here?

24        A.   At least in part.  I mean, I recommended we do

25   an "expert analysis" above.  And so in -- some of

Susan Zumph                                          April 12, 2021

1    this -- like here, I'm saying we recommend that we

2    conduct this "analysis."

3        Q.    And you're recommending you conduct the new

4    analysis including what you're referring to here as

5    "time and motion studies" with respect to the California

6    late fee; right?

7        A.    With respect to -- no, not just California's

8    late fee.

9        Q.    Including California's late fee?

10       A.    Yeah, that would be included here.

11       Q.    Okay.   So in this paragraph you're talking

12   about things, including the California late fee, that

13   you're analyzing at the time?

14       A.    Yes.

15            MR. WINN:   Objection.   Vague.

16   BY MR. TOMASEVIC:

17       Q.    Your memo concludes -- or at least I should say

18   this paragraph concludes on 8069 with the sentence that

19   says, "We have not identified any other fees to

20   substitute for the fees for which we recommend the

21   studies."

22            Did I read that correctly?

23       A.    You did.

24       Q.    What did you mean by that?

25       A.    Well, late fees are -- this was not related to

1   late fees, but there were some fee -- fees or --

2   assessed in other jurisdictions that -- and I can't

3   recall specifically, but sometimes we would take a look

4   at a charge and say, "Well, that one we think is not --

5   we don't -- what you're doing right now we either" -- it

6   was never black and white against the law, but maybe we

7   felt like it was risky given a jurisdiction, but there

8   might be something else that was allowed specifically by

9   a statute that we weren't assessing.  And we might say,

10  "Well, listen, don't do this thing, but the jurisdiction

11  specifically allows you to do that thing.  So we

12  recommend you do that thing, not this thing."

13        It didn't happen in this case, but I believe

14  that had been something that had been done in the past,

15  not in connection with the compliance initiative.  So

16  not something that I specifically did, but something

17  that other people made recommendations, "Don't do X, but

18  do Y."

19     Q.   In 2014, did you try to identify different

20  kinds of fees or fee structures to use as a substitute

21  for the then-current California late fee?

22     A.   No.  So not everything in this paragraph

23  relates to the California late fees.

24     Q.   Well, you said in that last sentence, "We have

25  not identified" --

Susan Zumph                                              April 12, 2021

```
 1           THE REPORTER:  I'm sorry.  You cut out.  "We
 2    have not identified" --
 3    BY MR. TOMASEVIC:
 4      Q.   The last paragraph which says, "We have not
 5    identified any other fees to substitute for the fees for
 6    which we recommend the studies" -- your testimony is
 7    that that doesn't apply to California late fees; right?
 8      A.   Yes, that that wasn't a place that we were
 9    looking to find a different fee to assess instead of
10    what we were currently doing.
11      Q.   But the rest of the paragraph intends to apply
12    to California late fees among other things, perhaps?
13      A.   Well, not necessarily.
14      Q.   So what doesn't?
15      A.   I'll give -- well, "Without obtaining this
16    supporting analysis, we are not comfortable to continue
17    to charge these fees in."
18           So, again, I really hope I didn't send that to
19    anybody because that's embarrassingly poorly written,
20    but -- I don't know what I meant by that, but I do know
21    that I never considered not charging -- I never
22    considered recommending not charging late fees in
23    California in this.
24           But there were a lot of fees that were covered
25    by this analysis -- by this compliance initiative, I
```

Susan Zumph                                               April 12, 2021

1    should say; and there were -- was a different

2    jurisdiction wherein there were -- there were other

3    jurisdictions where there were issues.

4        And so given that this lawsuit was pending and

5    that I was defense counsel for this lawsuit, I

6    absolutely would have remembered if I thought that I'm

7    not comfortable continuing to charge the fee that

8    generally forms the basis of the suit, and that was not

9    the case.

10       Q.   So when you wrote that you're "not comfortable

11   continuing to charge these fees in," what fees are you

12   referring to exactly?

13       A.   Well, I don't know exactly what I was referring

14   to, but this memo and this initiative covered lots of

15   jurisdictions and many fees, and it --

16       Q.   Okay.   The -- after you made the recommendation

17   to conduct time and motion studies -- strike that.

18       After you wrote this memo, did you have a

19   meeting to discuss the memo or your findings with anyone

20   at EQR, like Zumph, Fiffer, Beihoffer, or anyone else?

21       You're Zumph.   Sorry.

22       A.   I didn't meet with myself.

23       So -- I'm sorry.   So are you saying did I meet

24   with anyone --

25       Q.   Let me just reask the question.   Let me reask

Susan Zumph                                    April 12, 2021

```
 1    the question.
 2         A.    I'm sorry.
 3         Q.    Did you have a meeting to discuss your memo
 4    that we see in Exhibit 3 after you wrote the memo?
```
Trial Ex. 90
```
 5         A.    I believe I did.
 6         Q.    And do you know who was present at the meeting?
 7         A.    Well, this was intended to be a meeting with
 8    David Santee.  Now, I don't know that this memo went to
 9    David.  Like I said, I'm kind of hoping it didn't.
10          But the end -- one of the goals, I believe, of
11    this initiative was professional for me as well.  Bruce
12    and Jim had wanted me to start to raise my --
13         Q.    Profile?
14         A.    Thank you.  "Profile."
15         Q.    Yeah, I understand that.
16          I'm just asking if you remembered doing a memo
17    about -- or doing a meeting about this memo?
18         A.    I think a meeting did occur because that was
19    one of the goals, besides obviously compliance as well.
20    They wanted me to kind of meet with more senior people.
21         Q.    And what was David Santee's reaction to the
22    recommendation that a further study or a time and motion
23    study take place?
24         A.    I don't recall what his reaction was.  He --
25    I --
```

Susan Zumph                                              April 12, 2021

1    Q.   Well, what was the reaction of Mr. Strohm or

2  Mr. Fiffer, if anything?

3    A.   I don't recall specifically about the late fee.

4         You know, I think at the point that I would

5  have been meeting, it was already wrapped up with

6  litigation as well.  So --

7    Q.   Well, was there any reaction to your

8  recommendation in your memo about conducting time and

9  motion studies?

10    A.   In general?

11    Q.   Anything that you remember.

12    A.   Yeah.  I mean, not -- I'm not speaking

13  specifically with California late fee, but reaction with

14  the time and motion with -- with getting some kind of

15  expert analysis where we felt like that would be prudent

16  to do, that was accepted.

17    Q.   And was it done?

18    A.   With regard to California late fees?  I can't

19  speak to that.  But, yeah, we -- I believe where it --

20  you know, certain fees needed to be looked at and have

21  some kind of expert analysis, that was done.

22    Q.   With respect to other fees?

23    A.   Yeah.  I'm not talking about late fees now, and

24  I'm not talking about California now.  So I'm talking

25  about other places and other things that don't relate to

Susan Zumph                                                April 12, 2021

```
 1   this lawsuit.
 2       Q.   So what time and motion studies were actually
 3   completed?
 4       A.   Well, I can't recall specifically, but I'm not
 5   talking about this lawsuit, anyway.
 6       Q.   Well, how about generally, what do you recall?
 7       A.   I recall that -- well, this is what I'll say:
 8   I don't recall what exactly was done, but there was not
 9   a -- nobody pushed back and said, "What?  An expert
10   analysis?  That's ridiculous.  We're not doing that."
11       Q.   That's not my question.
12            My question is:  What time and motion studies
13   were actually done after you wrote and talked about this
14   memo?
15       A.   Yeah.  And I'm saying --
16            MR. WINN:  Hold on.  Hold on just a minute.
17            And you're not talking about the litigation
18   work.  You're talking about her jurisdictions outside of
19   California or her issues that aren't at issue in the
20   litigation?  Is that the qualification?
21            MR. TOMASEVIC:  I'm talking about whatever --
22            THE REPORTER:  Excuse me.  Excuse me.
23            "You're talking about jurisdictions outside of
24   California or" something "issues" -- after that, please.
25            MR. WINN:  "Issues that don't relate to the
```

Susan Zumph                                         April 12, 2021

1   litigation in California."

2   · · · · · THE REPORTER:  Thank you.

3   · · · · · MR. WINN:  Is that the qualification that --

4   you had that qualification earlier.  You didn't the

5   second time.  I was just trying to understand the scope

6   of your question.

7   BY MR. TOMASEVIC:

8   · · Q.   I'm trying to figure out what time and motion

9   studies referred to in this memo were actually

10  completed.

11  · · · · · Can you answer just question?

12  · · A.   I can't answer that question.  I don't recall.

13  · · Q.   Okay.  And what discussions did you have at

14  your meeting regarding the "time and motion studies"

15  referred to in your memo we see in Exhibit 3? `Trial Ex. 90`

16  · · A.   I don't recall a specific discussion.  I mean,

17  I can't recall what exactly was said at that meeting.

18  · · · · · My recollection is based on what's written

19  here.  So I assume if this is the memo I gave him, we

20  talked about what was in this memo.

21  · · Q.   And can you recall any of the details,

22  generally or specifically, about your discussions in the

23  meetings specific to the "time and motion studies"?

24  · · A.   No.

25  · · Q.   Okay.  Thank you.

Susan Zumph                                      April 12, 2021

1           Now, at some point this memo was revised; is

2    that right?

3        A.   I don't know.

4        Q.   Give me one second.

5        A.   I hope it was revised.  This one looks bad.

6           MR. TOMASEVIC:  What we're going to mark next

     [Trial Ex. 0]

7    in line as ~~Exhibit 4~~ to your deposition is documents

8    produced as WP 8046 through -8049, and it appears to be

9    another version of the memo with additional cover email

10   correspondence.

     [Trial Ex. 0]

11          (~~Exhibit 4~~ marked)

12   ~~BY MR. TOMASEVIC:~~

13       ~~Q.   Let me know that you've got it in front of you,~~

14   ~~at least.~~

15       ~~A.   Oh, yes, I have it in front of me.  I started~~

16   ~~to -- I checked that I have that -- you said it went to~~

17   ~~-49?~~

18       ~~Q.   It should go to -49, yes.~~

19       ~~A.   Yeah, I have all that.~~

20       ~~Q.   Thank you so much.~~

21          Now, whose idea was it to revise the

22   memorandum, if you recall?

23       A.   I don't -- I didn't realize it was revised.

24   I'm glad it was, maybe, because I didn't like what had

25   been written there.  And I don't recall whose idea it

Susan Zumph                                                    April 12, 2021

1    was.

2         But based on how I worked and the fact that I

3    copied my boss on this, it was probably his idea.  He

4    probably gave me some comments about what he wanted to

5    see and what he didn't think was necessary or how -- you

6    know, changing something, take -- whatever it was.

7         And so I was trying to take his comments to me

8    based on this email to him -- I was taking his comments

9    and saying, "Okay.  Based on what you told me, this is

10   what I did.  Take a look.  Tell me what you think."

11        Q.   Your best recollection is that Jim Fiffer asked

12   you to revise the original memo that we saw on

13   ~~Exhibit 3~~; right?   Trial Ex. 90

14        MR. WINN:  Objection.  That misstates prior

15   testimony.

16        THE WITNESS:  I wouldn't say he asked me to

17   revise it.  I think I probably sent it to him, he

18   reviewed it and gave me constructive criticism on it,

19   telling me, "This kind of thing doesn't need to -- this

20   kind of -- this is the kind of information you should be

21   talking about with senior execs."  That would be what I

22   would expect.

23   BY MR. TOMASEVIC:

24        Q.   Right.

25             And you and him discussed the kinds of things

Susan Zumph                                                      April 12, 2021

```
 1   that you should not discuss with senior execs; right?
 2        A.   Not specifically with regard to this.
 3        Q.   Well, at some point you felt --
 4        A.   If I can explain.  That's putting words --
 5   that's misstating -- that's not what I'm trying to
 6   communicate to you.  So if I wasn't clear and I kind
 7   of -- I'm just trying to explain -- I don't recall what
 8   he said, but in general, my boss would often comment on
 9   things I wrote both to execs and throughout the company
10   and to outside counsel and in general.  And he would
11   give me constructive criticism on how to make things
12   better and how he would have -- what he would want to
13   see in something.
14            And so if my boss asked me to revise something,
15   then I went ahead and did it.  But he didn't tell me
16   what words to put in necessarily.  That's what I was
17   trying to communicate.
18        Q.   So when you decided to eliminate most of the
19   description of your methodology because it was
20   unnecessary to communicate all of that to the VPs, was
21   that your decision or his decision or a collaborative
22   decision?
23        A.   I would -- mine, but kind of collaborative.
24   You know, I was trying to take his guidance and
25   implement it is I guess what I would say.
```

Susan Zumph                                                   April 12, 2021

1      Q.   And then you wrote that, "It could also be a
2   problem if we had to explain why we disregarded local
3   counsel's guidance about a fee in the course of
4   litigation about that fee."
5      A.   Um-hmm.  Yes.
6      Q.   What did you mean by that?
7      A.   Well, I think it's kind of self-explanatory,
8   that if we were going to have to explain why we
9   disregarded local counsel's guidance, that could
10  be -- you know, we would have to provide a big
11  explanation about that.
12          I will add that sometimes we disregard local
13  counsel's guidance where they say, "You should do this,"
14  and we said, "We don't think we can."
15          So it did go both ways.
16     Q.   When you refer to "VPs," that means "vice
17  presidents"; right?
18     A.   Yeah, it does.
19     Q.   And what VPs were you referring to at that
20  time?
21     A.   I have no idea.
22     Q.   Can you remember any of the VPs that might have
23  been referred to here when you wrote that sentence?
24     A.   I can't.  It actually surprised me when I just
25  read it.

Susan Zumph                                          April 12, 2021

```
 1    · · · ·  When I read it, I thought the same thing you're
 2    thinking, "Oh, obviously more people were in that
 3    meeting, not just David Santee."· And I don't know who
 4    that would have been or who else got the memo if they
 5    weren't listed on it.
 6    · ·  Q.·  Were any vice presidents or executives intended
 7    to comment on the findings of your memo?
 8    · ·  A.·  Were they "intended to comment"?
 9    · ·  Q.·  Yeah.· Were they [audio breakup] --
10    · · · ·  THE REPORTER:· Excuse me.· You broke up.
11    Again, please, your question.
12    BY MR. TOMASEVIC:
13    · ·  Q.·  Were they expected to weigh in on your
14    recommendations?
15    · ·  A.·  No, I don't think that.
16    · ·  Q.·  So why the need to tailor the message for the
17    VPs' understanding?
18    · ·  A.·  Well, because that's just how things work in
19    companies generally.
20    · ·  Q.·  But you didn't have any expectation that the
21    VPs would comment on your --
22    · ·  A.·  Well, no --
23    · ·  Q.·  -- recommendations in your memo?
24    · · · ·  THE WITNESS:· I apologize.· I spoke over him.
25    · · · ·  Do you need to repeat that?
```

Susan Zumph                                                April 12, 2021

```
 1          THE REPORTER:  No.  Thank you.
 2   BY MR. TOMASEVIC:
 3      Q.   Did you have an -- I'll reask it.
 4           Did you have an expectation that the VPs would
 5   weigh in on the recommendations in your memo?
 6      A.   I knew they'd have comments and thoughts about
 7   it, for sure, because they're the ones who are making
 8   the business decisions on what to charge.  But "weigh
 9   in," no.  "Comment on," yes.
10      Q.   Did -- what views did the VPs express as to
11   your recommendations?
12      A.   I don't recall anything.
13      Q.   Now, when you're referring to "course of
14   litigation" at the end of your paragraph, you're
15   referring to this lawsuit?
16      A.   Let me see.
17           I'm sorry.  Can you ask your question again?
18      Q.   Your last sentence refers to "the course of
19   litigation about a fee."
20           You're referring to this litigation?
21      A.   Oh, not the last sentence of the email?
22      Q.   Correct.  I'm so sorry.
23           The last sentence of the first paragraph, the
24   paragraph we're talking about.
25           Let me just --
```

Susan Zumph                                          April 12, 2021

1    A.   No, it did not relate specifically to this --

2    to the litigation that I'm currently being deposed in.

3    It was litigation in general, which either there were

4    other pending cases we had, and I expected that there

5    would be cases in the future.

6    Q.   What other pending cases did you have that were

7    germane?

8    A.   Not to California late fees, but there were

9    lots of other cases that -- I just didn't oversee this

10   case.

11   Q.   Right.

12        Did you have other pending litigations about

13   fees at the time; and if so, what were they?

14   A.   They were in other jurisdictions about other

15   fees.

16   Q.   And you had them pending as of November 25th,

17   2014?

18   A.   I think so, but I'm not 100 percent sure.  I'm

19   pretty sure the answer to that is "Yes."

20   Q.   Can you recall any other litigations pending

21   besides this one as of November 25th, 2014, regarding

22   EQR's fees?

23   A.   Yes.

24   Q.   Where were they?

25   A.   I'm not -- there's not going to be an exclusive

Susan Zumph                                          April 12, 2021

1   list, an all inclusive, but Massachusetts, Florida -- I

2   can't remember.  I don't think Maryland.

3       Q.   Any others?

4       A.   I can't recall all of them, I told you, but not

5   related to California.

6            And I'm wondering if -- I can't recall whether

7   the other suit that was filed that you kind of took over

8   from the other guy in California was also filed then.

9   So --

10      Q.   What litigation were you referring to where

11  local counsel's guidance was being disregarded?

12      A.   Again -- I believe I answered, but I'll try to

13  make sure that it's clear.  It was related to cases that

14  could be filed in the future in any jurisdiction.  I

15  don't recall which area, which jurisdiction.  We may

16  have had local counsel guidance that we decided to not

17  follow because we either wanted to be more conservative

18  and we didn't -- we felt that it was too risky, or we

19  felt that their guidance did not properly take into

20  account the law and what was occurring in the

21  jurisdiction.

22           But I can tell you that we never got local

23  counsel guidance saying that the late fee was -- should

24  be changed in California, in California.

25           MR. WINN:  Alex, I think we agreed that we

Susan Zumph                                          April 12, 2021

```
 1   would provide an hour of testimony.  We've done that.
 2   Your promise was that it would be no more than an hour,
 3   and I think we've reached that mark.
 4          Do you have only a few more questions left?
 5          MR. TOMASEVIC:  Yeah, maybe a couple.
 6          THE WITNESS:  That's fine.  I can give a few
 7   more minutes.
 8   BY MR. TOMASEVIC:
 9      Q.   That's fine.  This is our last topic, I promise
10   you.
11          Okay.  So when you wrote the last sentence of
12   the first paragraph of this email dated November 25th,
13   2014, were you referring to any particular litigation?
14      A.   No [audio breakup].
15      Q.   Were you referring to any particular --
16          THE REPORTER:  I'm sorry.  After "No"?
17          THE WITNESS:  I said, "No, I do not believe
18   that I was."
19   BY MR. TOMASEVIC:
20      Q.   Were you referring to any particular local
21   counsel guidance?
22      A.   No, I don't believe I was.
23      Q.   Were you referring to any particular kind of
24   fee?
25      A.   No, I don't think I was.
```

Susan Zumph                                        April 12, 2021

1           MR. TOMASEVIC:  All right.  Give me -- let's go

2    off the record for just two minutes.  I think I'm done.

3    Let me just check all the

4           THE WITNESS:  Sure.

5           MR. TOMASEVIC:  -- things in my outline.  But I

6    think we're wrapping up.

7           (Discussion off the record)

8           MR. TOMASEVIC:  All right.  I'm ready to go

9    back on the record.

10   BY MR. TOMASEVIC:

11       Q.   Now, nothing changed with respect to the

12   California late fee as a result of your 2014 memo;

13   right?

14       A.   I don't know, but I don't think so.

15       Q.   Do you recall any changes to the late fee

16   charged to tenants in California resulting from your

17   2014 memo or analysis?

18       A.   Well, I'm having trouble answering that

19   question because it's rela- -- you're saying "changes

20   related to this," but what I'm trying to think is

21   whether there were any changes at all, and I don't

22   recall.

23            Again, my answer is the same.  I don't recall,

24   but I don't believe so.

25       Q.   Do you know whose decision it was to not change

Susan Zumph                                                    April 12, 2021

1    the late fee?

2        A.   I don't -- no.

3        Q.   Have your    has your job or your profession

4    changed since the last time I deposed you?

5        A.   Oh, am I still doing some legal consulting?

6        Q.   Right.

7        A.   That has not changed, no.

8        Q.   Okay.  Do you have any new full time jobs, any

9    new employment?

10       A.   No.  Hmm um.  I'm sorry.  No, I do not.

11       Q.   Have you moved?

12       A.   I have not.

13       Q.   Do you have any plans to move?

14       A.   Not if I can help it.

15            MR. TOMASEVIC:  Okay.  Well, that's all the

16   questions I have.  I'll pass the witness.  Thank you.

17                              -oOo-

18                          EXAMINATION

19   BY MR. WINN:

20       Q.   Hi, Susan.  You were talking earlier about
     Trial Ex. 90
21   Exhibit 3, and I think in a joking way you said, "The

22   memo looks bad."

23            What did you mean by "The memo looks bad"?

24       A.   Well, there were several places where what I

25   said didn't make, like, logical sense or -- in one place

Susan Zumph                                                April 12, 2021

1    I just end a sentence without completing the sentence.

2         So I have a very high standard for my

3    professionalism and my writing, and if I sent a memo

4    like that to executives, even to my boss -- I'm kind of

5    embarrassed that I obviously didn't read it over and

6    make sure my sentences were complete and that they were

7    all sensible.

8         MR. WINN:  Understood.  Thank you.

9         We'll request the opportunity to read and

10   review the transcript.

11        I have no further questions for the witness.

12        And -- and so appreciate your time, Alex.

13        MR. TOMASEVIC:  Appreciate all your time.

14   Thank you for cooperating and getting this rescheduled

15   and getting it over with.

16        I appreciate everyone's efforts.  Thanks, and

17   everyone have a good week.

18        MR. WINN:  Thanks.  Bye bye.

19        THE REPORTER:  Mr. Winn, do you need a copy?

20        MR. WINN:  I do need a copy.

21        And I don't know -- and maybe we can, off the

22   record, talk about this.

23        (Discussion off the record)

24        MR. WINN:  So we have agreed that there will be

25   two volumes.  This will be the second volume of

Susan Zumph                                                    April 12, 2021

```
 1              : : :   CERTIFICATE OF REPORTER  : : :

 2

 3              I, GINA DE LUCA, a Certified Shorthand
       Reporter, holding a valid and current license issued by
 4     the State of California, CSR No. 6973, duly authorized
       to administer oaths, do hereby certify:
 5              That the witness in the foregoing deposition
       was administered an oath to testify to the whole truth
 6     in the within-entitled cause;
                That said deposition was taken down by me in
 7     shorthand at the time and place therein stated and
       thereafter transcribed into typewriting, by computer,
 8     under my direction and supervision.

 9              ( X )  Reading and signing was requested.

10              (   )  Reading and signing was waived.

11              (   )  Reading and signing was not requested.

12              Should the signature of the witness not be
       affixed to the deposition, the witness shall not have
13     availed himself/herself of the opportunity to sign or
       the signature has been waived.
14              I further certify that I am neither counsel for
       nor related to any party in the foregoing depositions
15     and caption named nor in any way interested in the
       outcome thereof.

16

17

18     Dated:  This 20th day of April 2021

19              at San Diego, California.

20

21

22

23             Gina Marie De Luca

24             CSR No. 6973, RMR, CRR

25
```

Exhibit 12

Aaron T. Winn (SBN 229763)
Karen L. Alexander (SBN 265926)
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone: 619.744.2200
atwinn@duanemorris.com
klalexander@duanemorris.com

Justin J. Fields (SBN 259491)
**DUANE MORRIS LLP**
One Market, Spear Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone: 415.957.3000
jfields@duanemorris.com

Attorneys for Equity Residential

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EQUITY RESIDENTIAL, et al.,<br><br>Defendants. | Case No. 16-cv-01225-JSW<br><br>**EQUITY RESIDENTIAL'S UNRESOLVED OBJECTIONS TO PLAINTIFFS' DEPOSITION DESIGNATIONS**<br><br>Dept: Courtroom 5<br>Before: Hon. Jeffrey S. White<br>Trial Date: February 27, 2023 |

1   Defendants' object to Plaintiffs' designations, by page and line number, the

2   testimony of:

## I.   BALAHADIA, GRACE

As Plaintiffs noted in their Objections to Defendants' Deposition Designations,
Ms. Balahadia is a current Equity employee whom is expected to testify live at trial.
"[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of
a witness who will be present and give live testimony at trial." *Mazloum v. D.C.*
*Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008).  As such, Defendants agree
with Plaintiffs' proposal to reserve any objections and counter-designations to the
deposition designations for this witness unless and until it appears this witness will
be unavailable to testify at trial.  Should Plaintiffs be permitted to introduce
deposition excerpts for this witness, Defendants respectfully request that they be
permitted to offer as counter-designations all passages identified in their Designation
of Deposition Testimony served previously upon Plaintiffs: 13:5-15:3; 18:15-18:25;
30:4-31:20; 32:18-33:11; 34:17-37:25; 40:8-40:15; 42:1-46:14; 49:6-49:23; 52:19-54:10;
55:15-56:10; 62:16-64:22; 85:24-89:12; 109:18-113:7.

## II.   CUMMINGS, MICKEY

Should Plaintiffs be permitted to introduce deposition excerpts for this witness,
Defendants respectfully request that they be permitted to offer as counter-
designations all passages identified in their Designation of Deposition Testimony
served previously upon Plaintiffs: 14:11-16:4; 22:10-25:23; 28:13-19; 40:9-41:8; 42:4-
44:6; 52:9-68:11; 70:12-21; 74:25-77:19; 85:24-104:9; 105:24-108:15; 110:12-112:1;
112:21-114:14; 118:25-119:7; 124:15-125:4; 138:18-139:1; 154:12-155:7; 160:18-161:1.

## III.   GOMES, CARINA

As Plaintiffs noted in their Objections to Defendants' Deposition Designations,

2

1  Ms. Gomes is a current Equity employee whom is expected to testify live at trial.
2  "[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of
3  a witness who will be present and give live testimony at trial." *Mazloum v. D.C.*
4  *Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008). As such, Defendants agree
5  with Plaintiffs' proposal to reserve any objections and counter-designations to the
6  deposition designations for this witness unless and until it appears this witness will
7  be unavailable to testify at trial. Should Plaintiffs be permitted to introduce
8  deposition excerpts for this witness, Defendants respectfully request that they be
9  permitted to offer as counter-designations all passages identified in their Designation
10 of Deposition Testimony served previously upon Plaintiffs: 5:24-6:3; 13:25-14:9; 15:14-
11 15:17; 16:4-18:22; 21:7-23:10; 28:9-29:10; 48:7-53:5; 56:17-56:25; 58:12-59:21; 60:17-
12 61:6; 61:13:62:18; 64:22-65:19; 66:6-66:20; 68:24-69:18; 72:11-73:2; 76:2-77:1; 79:10-
13 79:21; 88:22-89:7.

14 **IV.    JENKINS, CHRIS**

16      Should Plaintiffs be permitted to introduce deposition excerpts for this witness,
17 Defendants respectfully request that they be permitted to offer as counter-
18 designations all passages identified in their Designation of Deposition Testimony
19 served previously upon Plaintiffs: 4:9-12; 10:17-11:22; 12:3-18; 13:11-18; 17:7-19:25;
20 21:18-23:5; 28:9-15; 29:15-20; 20:11-16; 33:15-34:7; 37:24-38:5; 39:9-18; 40:10-17.

21 **V.    JOHNSON, CHAD**

22      Mr. Johnson is a former Equity employee who may testify live at trial.
23 "[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of
24 a witness who will be present and give live testimony at trial." *Mazloum v. D.C.*
25 *Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008). As such, Defendants agree
26 with Plaintiffs' proposal, articulated in their Objections to Defendants' Deposition
27 Designations, to reserve any objections and counter-designations to the deposition

28

EQUITY RESIDENTIAL UNRESOLVED OBJECTIONS TO PLAINTIFF'S
DEPOSITION DESIGNATIONS                          Case No. 16-cv-01225-JSW

designations for this witness unless and until it appears this witness will be unavailable to testify at trial.  Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 5:18-25; 6:2-3; 7:11-15; 20-25; 8:1-13; 15:21-25; 16:1-7; 21:16-24; 22:16-25; 23:1-8; 24:6-18; 25:11-15; 26:2-9; 30:25; 31:1-11; 42:3-8; 43:8-11; 19-22; 44:21-25; 46:25; 47:1-8; 10-12; 16-19; 22-25; 48:7-20; 23-25; 49:1-5; 50:25; 51:1-2; 5-17; 19-24; 53:4-11; 54:7-16; 58:25; 59:1-6; 60:22-24; 61:2-25; 62:1-2; 24-25; 63:1-8; 19-25; 64:1-25; 65:1-25; 66:1-17; 67:7-9; 12-25; 68:1-3; 12-25; 69:1-22; 70:6-7; 9-12; 15-25; 71:1-17; 72:22-25; 73:1-25; 74:1; 3-13; 24-25; 75:1; 3-9; 24-25; 76:1-7; 13-25; 77:1-7; 12-21; 78:4-11; 23-25; 79:1-5; 12-15; 18-19; 22-25; 80:1-8; 81:6-9; 12-16; 20-21; 82:9-25; 83:1-11; 15-17; 19-25; 84:1-3; 85: 2-23; 86:15-25; 87:1-4; 94:15-25; 95:1-6; 12-17; 102:23-25; 103:1-8; 108:10-12, 14.

## VI.    KNUDSEN, ROBERT

Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 18:13-19:4; 21:13-22:13; 26:10-14; 30:21-32:15; 41:15-21; 50:19-54:25; 68:3-15; 71:12-80:23; 82:18-83:21; 85:11-90:13; 90:25-92:13; 97:1-99:2; 110:1-125:3; 133:12-181:25.

## VII.    KOPCZYK, SAMANTHA

As Plaintiffs noted in their Objections to Defendants' Deposition Designations, Ms. Kopczyk is a current Equity employee whom is expected to testify live at trial. "[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of a witness who will be present and give live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008).  As such, Defendants agree

EQUITY RESIDENTIAL UNRESOLVED OBJECTIONS TO PLAINTIFF'S
DEPOSITION DESIGNATIONS                                          Case No. 16-cv-01225-JSW

with Plaintiffs' proposal to reserve any objections and counter-designations to the deposition designations for this witness unless and until it appears this witness will be unavailable to testify at trial.  Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 4:17-20; 15:1-18:11; 22:24-24:21; 26:13-30:4; 44:22-45:4; 47:5-52:8; 53:19-55:13; 57:11-79:24; 82:3-83:11; 85:18-87:2.

## VIII.  LAVINE, BRUCE

Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 12:10-13:19; 14:9-15:7; 22:2-7; 56:23-57:15; 58:20-59:23; 62:3-10; 68:14-18; 84:3-20; 89:22-91:1.


## IX.  MELENDEZ, MARTHA

Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 19:12-20:8; 22:5-26:24; 34:2-36:21; 51:11-15; 57:23-61:6; 62:1-65:14; 66:2-12; 67:16-69:10; 74:23-95:15; 100:14-107:7; 108:13-110:13; 115:2-118:12; 120:1-130:25; 131:21-133:8; 138:8-13; 140:16-141:12; 144:22-145:18; 152:7-153:16; 159:5-161:15; 162:20-164:11.

## X.    O'CONNELL, TARA

As Plaintiffs noted in their Objections to Defendants' Deposition Designations, Ms. O'Connell is a current Equity employee whom is expected to testify live at trial.

"[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of a witness who will be present and give live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008). As such, Defendants agree with Plaintiffs' proposal to reserve any objections and counter-designations to the deposition designations for this witness unless and until it appears this witness will be unavailable to testify at trial. Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 11:19-11:21; 18:5-22:16; 25:6-26:1; 28:13-29:5; 30:5-30:21; 31:5-31:14; 56:9-58:10; 65:22-66:8; 86:8-88:1; 93:15-94:10; 94:22-96:15; 98:5-99:23; 100:13-101:8; 109:2-110:2; 110:18-112:12; 147:8-147:23; 156:9-157:4.

## XI. SANTEE, DAVID

Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 9:17-19; 20:9-19; 21:5-22:8; 40:4-9; 45:2-48:13; 50:25-51:7; 51:18-55:21; 56:1-17; 58:1-13; 58:23-59:25; 60:4-10; 61:25-62:13; 63:2-12; 70:4-21; 73:16-74:5; 75:5-76:25; 115:19-120:5; 123:22-124:8; 133:4-10; 133:17-135:9; 141:6-15; 151:3-153:8; 153:14-154:1; 165:10-20; 177:11-22.

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter-Designations (Santee) | Plaintiffs' Responses to Defendants' Objections and Counter-Designations |
|---|---|---|
| 76:13-79:21 | 79:2-21 – discussion between counsel, not testimony | Lines 79:2-3 contains the question, and Line 79:21 contains the eventual answer. Both are plainly necessary to the testimony.<br><br>While the remaining lines addressed by this objection are not testimony, Plaintiffs |

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter-Designations (Santee) | Plaintiffs' Responses to Defendants' Objections and Counter-Designations |
|---|---|---|
| | | contend that Defense counsel's speaking objections had an influence on the witness's testimony. Therefore, those lines should be preserved within the designation. |
| 86:8-89:10 | 88:20-89:10 – calls for speculation (per the objection interposed during the deposition) | Mr. Santee's understanding and interpretation of a work email from his subordinate, which he was copied on, is fair game and, had he answered the question, would have qualified as an lay opinion "rationally based on [his] perception." See Fed. R. Ev. 701(a); *see also United States v. Gadson*, 763 F.3d 1189, 1210 (9th Cir. 2014) (affirming admission of lay opinion regarding the interpretation of statements in phone calls). As it is, Mr. Santee's answer volunteered other information about his own views which (setting aside its credibility) is not objectionable on evidentiary grounds. |
| 91:15-93:2 | 91:15-92:2 – calls for speculation | Mr. Santee's understanding and interpretation of a work email from his subordinate, which he was copied on, is a lay opinion "rationally based on [his] perception." *See* Fed. R. Ev. 701(a); *see also United States v. Gadson*, 763 F.3d 1189, 1210 (9th Cir. 2014). Moreover, it is helpful to understanding an issue in the case because it goes to Equity's focus on determining whether a five percent late fee would increase late fee revenue. See Fed. R. Ev. 701(b). |
| 184:18-187:3 | 184:18-185:15 – calls for speculation/lacks foundation | Mr. Santee's understanding and interpretation of a memorandum directed to him, which he received at the time, is a lay opinion "rationally based on [his] perception." *See* Fed. R. Ev. 701(a); *see also United States v. Gadson*, 763 |

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter-Designations (Santee) | Plaintiffs' Responses to Defendants' Objections and Counter-Designations |
|---|---|---|
| | | F.3d 1189, 1210 (9th Cir. 2014). Further, his understanding of whether Equity's in-house legal counsel recommended in 2014 that the company conduct a new study to evaluate the California late fee is helpful to determine Equity's intentions and knowledge related to the Standard Late Fee. |

**COURT RULING:**

## XII. STERNBERG, JAMIE

Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Counter-Designation of Deposition Testimony served previously upon Plaintiffs: **Non-confidential portion:** 5:21-24; 23:1-6; 26:11-23; 27:9-29:9; 29:20-25; 30:25-31:8; 51:4-51:13; 61:4-12; **Confidential portion:** 39:3-40:14; 53:4-15; 63:4-67:13; 70:17-71:14; 82:21-83:17; 85:20-88:3.

## XIII. TIBAYAN, FRANZ

Mr. Tibayan is a former Equity employee who may testify live at trial. "[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of a witness who will be present and give live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008). As such, Defendants agree with Plaintiffs' proposal to reserve any objections and counter-designations to the deposition designations for this witness unless and until it appears this witness will be unavailable to testify at trial. Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be

permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 4:15-19; 8:19-25; 9:1-7; 12-18; 10:5-7; 11:7-12; 14:14-25; 15:1-8; 16:8-9; 12-25; 17:1-2; 13-18; 22:8-25; 23:1-23; 24:1-24; 27:2-7; 52:7-25; 53:4-9; 11-13; 15-25; 54:1-20; 23-25; 55:1-2; 22-25; 56:1-25; 57:1-23; 58:19-25; 59:1-7; 61:3-25; 62:1-20; 66:8-25; 67:1-7; 23-24; 69:18-25; 70:1-10; 72:3-25; 73:1-15; 74:14-25; 75:1-2; 10-14; 19-25; 76:1-25; 77:1-25; 78:1-25; 79:1-25; 80:1-6; 81:11-15; 17-25; 82:1-4; 84:2-5; 89:10-21; 101:17-25; 102:1-9; 20-25; 103:1-17; 20-22; 24-25; 104:1-15; 105:15-19; 21-23; 107:6-25; 108:1-14; 109:20-25; 110:1-25; 111:1-15; 112:4-13; 17-25; 113:13-25; 114:1-6; 19-25; 115:1-12; 14-25; 116:1-25 117:1-25; 118:1-12.

## XIV. TUOMI, FREDRICK

Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 5:8-10; 6:19-7:22; 14:11-17:14; 18:18-19:23; 22:14-23:25; 25:7-21; 26:6-15; 27:4-23; 35:3-11; 38:10-19; 47:25-50:16; 50:18-51:23; 53:16-54:3; 56:18-57:5; 70:4-17.

## XV. VASQUEZ, MARISSA

As Plaintiffs noted in their Objections to Defendants' Deposition Designations, Ms. Vasquez is a current Equity employee whom is expected to testify live at trial. "[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of a witness who will be present and give live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008). As such, Defendants agree with Plaintiffs' proposal to reserve any objections and counter-designations to the deposition designations for this witness unless and until it appears this witness will be unavailable to testify at trial. Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be

permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 12:23-17:9; 18:15-19:18; 21:2-12:11; 21:18-22:1; 22:10-22:15; 23:8-23:23; 25:18-26:4; 27:14-28:8; 31:2-36:1; 37:1-37:8; 38:17-39:15; 39:23-40:16; 40:23-41:3; 46:11-47:17; 48:12-48-22; 49:20-50:2; 62:6-62:14; 66:9-66:17.

## XVI. VILLANUEVA, MAYRA

As Plaintiffs noted in their Objections to Defendants' Deposition Designations, Ms. Villanueva is a current Equity employee whom is expected to testify live at trial. "[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of a witness who will be present and give live testimony at trial." *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008). As such, Defendants agree with Plaintiffs' proposal to reserve any objections and counter-designations to the deposition designations for this witness unless and until it appears this witness will be unavailable to testify at trial. Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 19:17-23:7; 27:10-27:19; 28:4-29:18; 35:7-35:16; 58:20-59:8; 92:3-92:6; 93:1-94:17; 97:19-98:6; 101:10-101:16; 102:23-103:2; 116:7-116:16; 120:18-121:5; 124:13-125:5; 126:22-127:5; 128:2-128:25; 138:11-139:9; 164:10-165:19; 166:2-166:15; 171:10-171:22.

## XVII. ZUMPH, SUSAN

Should Plaintiffs be permitted to introduce deposition excerpts for this witness, Defendants respectfully request that they be permitted to offer as counter-designations all passages identified in their Designation of Deposition Testimony served previously upon Plaintiffs: 9:20-15:4; 31:11-14; 32:6-15; 35:2-4; 42:23-43:19; 45:19-47:2; 50:17-52:16; 60:1-66:25; 67:18-70:1; 75:6-80:9; 81:25-83:15; 86:4-93:15; 95:23-97:21; 99:17-100:12; 101:4-106:7; 111:20-113:11; 124:5-125:11; 133:5-136:11;

149:6-10; 154:23-157:19; 163:21-164:1; 165:10-195:20; 196:21-202:13; 204:19-213:5; 214:11-221:25; 223:20-224:7.  Further noting, many of the portions designated by Plaintiffs appear to be incomplete as they are missing either the question or part of the answer; any testimony provided to the Court should include the complete question and answer.

Dated: January 23, 2023    Respectfully submitted,


**GOLDSTEIN, BORGEN, DARDARIAN & HO**


/s/ *Anne Bellows*
Anne P. Bellows
Attorneys for Plaintiffs and the Certified Classes



**DUANE MORRIS** LLP


By /s/Aaron T. Winn
  Aaron T. Winn
  Justin J. Fields
  Karen L. Alexander
  Attorneys for Defendants

DM2\17193183.3

Exhibit 13

1  Margaret McBride (SBN 294066)
   mmcbride@clsepa.org
2  COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
   1861 Bay Road
3  East Palo Alto, CA 94303
   Tel:  (650) 326-6440
4  Fax:  (866) 688-5204

5  Linda M. Dardarian (SBN 131001)
   ldardarian@gbdhlegal.com
6  Andrew P. Lee (SBN 245903)
   alee@gbdhlegal.com
7  Anne P. Bellows (SBN 293722)
   abellows@gbdhlegal.com
8  Katharine L. Fisher (SBN 305413)
   kfisher@gbdhlegal.com
9  GOLDSTEIN, BORGEN, DARDARIAN & HO
   155 Grand Avenue, Suite 900
10 Oakland, CA 94612
   Tel:  (510) 763-9800
11 Fax:  (510) 835-1417

12 Attorneys for Plaintiffs and the Certified Classes
   (*Additional Counsel for Plaintiffs and the*
13 *Certified Classes listed on following page*)

14                    UNITED DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                      OAKLAND DIVISION

17 JAVANNI MUNGUIA-BROWN, ANGELINA          | **CLASS ACTION**
18 MAGAÑA, NORMA RODRIGUEZ, DAVID           |
   BONFANTI, and SHANNAH SMITH individually | Case No.: 4:16-cv-01225-JSW-TSH
19 and on behalf of others similarly situated, |
                                            | **NOTICE OF ERRATA TO PLAINTIFFS'**
20         Plaintiffs,                       | **UNRESOLVED OBJECTIONS TO**
                                            | **DEFENDANTS' DEPOSITION**
21 vs.                                      | **DESIGNATIONS (ECF NO. 416)**
22 EQUITY RESIDENTIAL, a real estate investment | Dept:     Courtroom 5
   trust, ERP OPERATING LIMITED            | Before:  Hon. Jeffrey S. White
23 PARTNERSHIP, a partnership, EQUITY       |
   RESIDENTIAL MANAGEMENT, L.L.C., EQR-     | Trial Date:    February 27, 2023
24 WOODLAND PARK A LIMITED                  |
   PARTNERSHIP, and EQR-WOODLAND PARK       |
25 B LIMITED PARTNERSHIP,                   |

26         Defendants.

27

28

868263.5

1   Craig Nicholas (SBN 178444)
    craig@nicholaslaw.org
2   Alex Tomasevic (SBN 245595)
    alex@nicholaslaw.org
3   NICHOLAS & TOMASEVIC, LLP
    225 Broadway, 19th Floor
4   San Diego, CA 92101
    Tel:  (619) 325-0492
5   Fax:  (619) 325-0496

6   Attorneys for Plaintiffs and the Certified Classes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

868263.5

**<u>NOTICE OF ERRATA TO PLAINTIFFS' UNRESOLVED OBJECTIONS TO
DEFENDANTS' DEPOSITION DESIGNATIONS</u>**

Plaintiffs Javanni Munguia-Brown, Angelina Magaña, Norma Rodriguez, David Bonfanti, and Shannah Smith, individually and on behalf of others similarly situated ("Plaintiffs") respectfully submit this Errata to their Unresolved Objections to Defendants' Deposition Designations (ECF No. 416) to eliminate portions of the pleading, and corresponding deposition excerpts, as to which there is no longer a dispute.

After the close of business yesterday and as the Parties were finalizing their pre-trial filings, Defendants indicated their non-opposition to some or all of Plaintiffs' counter-designations related to deposition testimony designated by Defendants, which resolved Plaintiffs' incompleteness objections. Plaintiffs offer this errata and amended filing in order to comply with the Court's Standing Order on Bench Trials, paras 2(c) and 26, which indicate that counter-designations as to which there is no dispute need not be submitted to the Court at this stage.

Additionally, after further reviewing the meet and confer record, Plaintiffs have determined that the Parties no longer have a dispute regarding Chad Johnson's testimony, and they are removing some text from their objection to Defendants' designation of deposition testimony by Franz Tibayan, as set out below.

Finally, Plaintiffs have also added Exhibit references immediately above the charts setting out deposition excerpts as to which there are objections, and they have added a blank column for the Court's ruling in each chart of objections.

These changes reflected in Plaintiffs' Amended Unresolved Objections to Defendants' Deposition Designations are summarized in the table below.

| Witness | Changes Reflected in Amended Unresolved Objections |
|---|---|
| Carnley, Jenay<br>*Section II.D*<br>*Exhibit A* | Added reference to Exhibit A containing Ms. Carnley's testimony.<br><br>Eliminated from chart objections and counter-designations related the following portions of Ms. Carnley's transcript which were designated by Defendants:<br>• 47:3-21<br>• 127:18-128:10 |

868263.5

| | |
|---|---|
| | • 144:1-12<br>• 178:23-181:25<br>• 188:15-193:12<br><br>Removed portions of deposition testimony no longer at issue from Exhibit A. |
| Cummings, Mickey<br>*Section II.E*<br>*Exhibit B* | Added reference to Exhibit B containing Mr. Cummings' testimony.<br><br>Eliminated from chart objections and counter-designations related the following portions of Mr. Cummings' transcript which were designated by Defendants:<br>• 70:12-21<br>• 74:25-77:19<br>• 154:12-155:7<br><br>Removed portions of deposition testimony no longer at issue from Exhibit B. |
| Johnson, Chad | Removed entire section, previously marked II.F in the original pleading.<br><br>Removed all deposition excerpts from exhibits. |
| Knudsen, Robert<br>*Section II.H*<br>*Exhibit C* | Added reference to Exhibit C containing Mr. Knudsen's testimony. |
| Jenkins, Chris<br>*Section II.I*<br>*Exhibit D* | Added reference to Exhibit D containing Mr. Jenkins' testimony. |
| Melendez, Martha<br>*Section II.J*<br>*Exhibit E* | Added reference to Exhibit E containing Ms. Melendez' testimony.<br><br>Corrected a heading in the chart to refer to Ms. Melendez rather than Mr. Santee.<br><br>Eliminated from chart objections and counter-designations related the following portions of Ms. Melendez's transcript which were designated by Defendants:<br>• 57:23-61:6<br>• 67:16-69:10<br>• 138:8-13<br>• 144:22-145:18<br><br>Removed portions of deposition testimony no longer at issue from Exhibit E. |
| Paton, Ann<br>*Section II.M*<br>*Exhibit F* | Added reference to Exhibit F containing Ms. Paton's testimony.<br><br>Eliminated from chart objections and counter-designations related the |

868263.5

| | following portions of Ms. Melendez's transcript which were designated by Defendants:<br>• 19:6-22:21<br>• 23:21-24:4<br>• 26:24-28:3<br>• 36:6-18<br>• 46:1-12<br>• 54:5-22<br>• 57:3-12<br>• 57:24-58:7<br>• 126:17-128:5<br><br>Removed portions of deposition testimony no longer at issue from Exhibit F. |
|---|---|
| Santee, David<br>*Section II.N*<br>*Exhibit G* | Added reference to Exhibit G containing Mr. Santee's testimony.<br><br>Eliminated from chart objections and counter-designations related the following portions of Mr. Santee's transcript which were designated by Defendants:<br>• 50:25-51:7<br>• 51:18-55:27<br>• 75:5-76:25<br>• 115:19-120:5<br><br>Removed portions of deposition testimony no longer at issue from Exhibit G. |
| Tibayan, Franz<br>*Section II.O* | Amended the first paragraph of Plaintiffs' portions as follows:<br><br>Defendants have designated deposition testimony of former-employee Franz Tibayan~~, while also informing Plaintiffs on a January 20, 2023 meet and confer call that they intend to call Mr. Tibayan live testimony at trial.  This is patently improper.  *See, e.g., Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727.~~  Defendants have made no showing that Mr. Tibayan is unavailable for trial, so Defendants' use of his deposition testimony constitutes inadmissible hearsay that does not fall into any exception.  *See* Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4).  Indeed, as of the date of his deposition, Mr. Tibayan was employed by Equity at a property within the subpoena power of the Court, and a quick internet search suggests Mr. Tibayan presently works within Alameda County. |
| Tuomi, Frederick<br>*Section II.P*<br>*Exhibit H* | Added reference to Exhibit H containing Mr. Tuomi's testimony.<br><br>Eliminated from chart objections and counter-designations related the following portions of Mr. Tuomi's transcript which were designated by Defendants:<br>• 18:18-19:23<br>• 25:7-21 |

868263.5

| | |
|---|---|
| | • 27:4-23<br>• 56:16-54:3<br><br>Removed portions of deposition testimony no longer at issue from Exhibit H. |
| Zumph, Susan<br>*Section II.S*<br>*Exhibit I* | Added reference to Exhibit I containing Ms. Zumph's testimony.<br><br>Eliminated from chart objections and counter-designations related the following portions of Ms. Zumphs' transcript which were designated by Defendants:<br>• 42:23-43:19<br><br>Removed portions of deposition testimony no longer at issue from Exhibit I. |

Dated:  January 24, 2023.            Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO


*/s/ Anne P. Bellows*
Anne P. Bellows

Attorneys for Plaintiffs and the Certified Classes

868263.5

1   Margaret McBride (SBN 294066)
    mmcbride@clsepa.org
2   COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
    1861 Bay Road
3   East Palo Alto, CA 94303
    Tel:  (650) 326-6440
4   Fax:  (866) 688-5204

5   Linda M. Dardarian (SBN 131001)
    ldardarian@gbdhlegal.com
6   Andrew P. Lee (SBN 245903)
    alee@gbdhlegal.com
7   Anne P. Bellows (SBN 293722)
    abellows@gbdhlegal.com
8   Katharine L. Fisher (SBN 305413)
    kfisher@gbdhlegal.com
9   GOLDSTEIN, BORGEN, DARDARIAN & HO
    155 Grand Avenue, Suite 900
10  Oakland, CA 94612
    Tel:  (510) 763-9800
11  Fax:  (510) 835-1417

12  Attorneys for Plaintiffs and the Certified Classes
    (*Additional Counsel for Plaintiffs and the*
13  *Certified Classes listed on following page*)

14                    UNITED DISTRICT COURT

15              NORTHERN DISTRICT OF CALIFORNIA

16                      OAKLAND DIVISION

17  JAVANNI MUNGUIA-BROWN, ANGELINA          | CLASS ACTION
18  MAGAÑA, NORMA RODRIGUEZ, DAVID           |
    BONFANTI, and SHANNAH SMITH individually | Case No.: 4:16-cv-01225-JSW-TSH
19  and on behalf of others similarly situated, |
                                              | **PLAINTIFFS' AMENDED UNRESOLVED**
20          Plaintiffs,                       | **OBJECTIONS TO DEFENDANTS'**
                                              | **DEPOSITION DESIGNATIONS**
21  vs.                                       |
                                              |
22  EQUITY RESIDENTIAL, a real estate investment | Dept:     Courtroom 5
    trust, ERP OPERATING LIMITED              | Before:  Hon. Jeffrey S. White
23  PARTNERSHIP, a partnership, EQUITY        |
    RESIDENTIAL MANAGEMENT, L.L.C., EQR-      | Trial Date:    February 27, 2023
24  WOODLAND PARK A LIMITED                   |
    PARTNERSHIP, and EQR-WOODLAND PARK        |
25  B LIMITED PARTNERSHIP,                    |
                                              |
26          Defendants.                       |

27

28

1  Craig Nicholas (SBN 178444)
   craig@nicholaslaw.org
2  Alex Tomasevic (SBN 245595)
   alex@nicholaslaw.org
3  NICHOLAS & TOMASEVIC, LLP
   225 Broadway, 19th Floor
4  San Diego, CA 92101
   Tel:  (619) 325-0492
5  Fax:  (619) 325-0496

6  Attorneys for Plaintiffs and the Certified Classes

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pursuant to paragraphs 2(c) and 26 of the Guidelines for Trial and Final Pretrial Conference in Civil Bench Cases Before the Honorable Jeffrey S. White, Plaintiffs provide the following excerpts of deposition designations to be used in Defendants' case in chief as to which Plaintiffs have objections and/or counter-designations, and responses to the objections and counter-designations.

## I.  PLAINTIFFS' OBJECTIONS TO DEFENDANTS' DEPOSITION DESIGNATIONS

### A.  Plaintiffs' Introductory Comments to Objections Stated Below

On the eve of the Parties' January 23, 2023 pretrial filing deadline, Defendants submitted to Plaintiffs a number of improper deposition designations for its own current and former employees who it plans to call live at trial.  Specifically, Defendants have represented to Plaintiffs that they plan to call the following current and former employees of Equity to testify live at trial:  Jenay Carnley (Rule 30(b)(6) witness), Grace Balahadia, Carina Gomes, Chad Johnson, Samantha Kopcyzk, Tara O'Connell, Amelia Ott,[1] Franz Tibayan, Marissa Vasquez, and Mayra Villanueva.  "[E]xcept for impeachment purposes, a party cannot introduce deposition testimony of a witness who will be present and give live testimony at trial."  *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. 725, 727 (D.D.C. 2008).  Moreover, Defendants are designating the testimony of their own non-party agents or employees, or persons within the subpoena power of the Court, without any showing that the witnesses are unavailable under Rule 804.  As such, the transcripts constitute hearsay for which no exception has been established.  FRE 801, 802.  Nor is Defendants' use of the deposition testimony at trial otherwise permitted under Federal Rule of Civil Procedure 32(a).  Because Defendants' designation of this testimony is improper, Plaintiffs have not provided counter-designations, but reserve the right to do so should Defendants be permitted to introduce these witnesses' deposition testimony at trial.

### B.  Defendants' Response

Defendants advised Plaintiffs during meet and confer discussions that they presently plan to call many of these deponents to testify live at trial, and will not seek to introduce into evidence deposition testimony for witnesses who are testifying live at trial.  However, in an abundance of

---

[1] This is the only witness Defendants have suggested may be unavailable under Rule 804.

868244.2

caution (particularly in light of the ongoing COVID pandemic), Defendants have designated deposition testimony for these witnesses *in the event they are unavailable to testify at trial*.

## C. Balahadia, Grace

### 1. Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony for Grace Balahadia

Defendants have designated deposition testimony of current-employee Grace Balahadia, while also indicating on Defendants' witness list that Ms. Balahadia will be providing live testimony at trial. This is patently improper. *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727. Moreover, Defendants have made no showing that Ms. Balahadia is unavailable for trial, so Defendants' use of her deposition testimony constitutes inadmissible hearsay that does not fall into any exception. *See* Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4). Indeed, as of the date of her deposition, Ms. Balahadia was employed by Equity at a property within the subpoena power of the Court.

Plaintiffs have not provided objections or counter-designations, but reserve the right to do so should Defendants be permitted to introduce Ms. Balahadia's deposition testimony at trial.

### 2. Defendants' Response

Defendants plan to call Ms. Balahadia to testify at trial and will only seek to introduce her deposition testimony if she is unavailable at trial.

### 3. Court's Ruling

## D. Carnley, Jenay

### 1. Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony for Jenay Carnley.

Defendants designated current-employee Jenay Carnley as a corporate-witness deponent under Federal Rule of Civil Procedure 30(b)(6) and have indicated on their witness list that she will provide live testimony at trial. Nonetheless, Defendants have simultaneously designated extensive portions of Ms. Carnley's deposition testimony without making any showing that Ms. Carnley is unavailable for trial. Defendants' designations violate the Federal Rules and the Court's Order on multiple levels, but

2

868244.2

Pls.' Amended Unresolved Objections to Defs.' Deposition Designations – Case No. 4:16-cv-01225-JSW-TSH

Plaintiffs nonetheless provide objections and counter-designations below.  *See generally* test Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4); *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727.  Plaintiffs also reserve the right to offer designations of Ms. Carnley's deposition for their case in chief, which they have not done based on Defendants' representation that she would be testifying live.

      **2.**     **Defendants' Response**

Defendants plan to call Ms. Carnley to testify at trial and will only seek to introduce her deposition testimony if she is unavailable at trial.

      **3.**     **Court's Ruling**

      **4.**     **Plaintiffs' Objections to Designated Testimony**

Relevant excerpts of testimony are contained in Exhibit A, attached hereto.

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter- Designations (Carnley) | Defendants' Responses to Plaintiffs' Objections and Counter-Designations | Court's Ruling |
|---|---|---|---|
| 36:7-16 | **Lack of personal knowledge, Rule 602.** Ms. Carnley's testimony demonstrates that she does not know who made the decision to suspend late fees. | Ms. Carnley was testifying as a 30(b)(6) witness so personal knowledge is not a requirement; furthermore, her testimony properly demonstrates her personal knowledge. | |
| 37:12-19 | **Lack of personal knowledge, Rule 602.** Ms. Carnley's testimony in 36:7-16 shows that she was not part of the decision to impose late fees.<br><br>**Improper legal opinion.** Ms. Carnley is expressing a legal opinion about the nature of pandemic-era legal restrictions on late fees (and one that Plaintiffs understand to be incorrect, as the only tenants protected from late fees were those who experienced economic hardship as a result of the pandemic). | Ms. Carnley was testifying as a 30(b)(6) witness so personal knowledge is not a requirement; furthermore, her testimony properly demonstrates her personal knowledge and she is not rendering an improper legal opinion. | |

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter- Designations (Carnley) | Defendants' Responses to Plaintiffs' Objections and Counter-Designations | Court's Ruling |
|---|---|---|---|
| 78:12-79:24 | **Lack of personal knowledge, Rule 602.** Ms. Carnley admits that she is not familiar with the standard amount of time allowed for a tenant to cure unpaid rent in California. | Ms. Carnley was testifying as a 30(b)(6) witness so personal knowledge is not a requirement; furthermore, her testimony properly demonstrates her personal knowledge. | |
| 130:1-132:13 | **Hearsay, Rules 801, 802.** This portion of testimony merely recites information in a spreadsheet created for purposes of this litigation based on undisclosed sources.<br><br>As demonstrated by testimony on 121:6-20, Ms. Carnley had no personal knowledge of the amount of time that members of the virtual payment team spent on tasks related to that team, but instead she is repeating hearsay stated in the document.<br><br>The testimony is hearsay-upon-hearsay, which Equity cannot offer for its truth.<br><br>**Counter designation:**<br>134:24-136:22 | Ms. Carnley was testifying as a 30(b)(6) witness so personal knowledge is not a requirement; furthermore, her testimony properly demonstrates her personal knowledge. | |
| 159:21-160:20 | **Lack of personal knowledge, Rule 602.** The designated testimony makes clear that Ms. Carnley is speculating about who entered information into the spreadsheet. | Ms. Carnley was testifying as a 30(b)(6) witness so personal knowledge is not a requirement; furthermore, her testimony properly demonstrates her personal knowledge. | |
| 237:17-238:1 | **Lack of personal knowledge, Rule 602.** There is no evidence that Ms. Carnley has any personal knowledge of the proportion of evictions happen for reasons other than late rent. | Ms. Carnley was testifying as a 30(b)(6) witness so personal knowledge is not a requirement and she may rely on information provided by others; furthermore, her testimony properly | |

4

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter- Designations (Carnley) | Defendants' Responses to Plaintiffs' Objections and Counter-Designations | Court's Ruling |
|---|---|---|---|
| | **Hearsay, Rule 801, 802.** As demonstrated by testimony on 239:6-240:1, Carnley was reporting assertions about statistics from other Equity employees. These assertions have not been substantiated by any data. *See* 242:24-244:8. (Ultimately, no production was made and Defendants' counsel subsequently reported to Plaintiffs that there was no data regarding type of eviction.)<br><br>**Incomplete, Rule 106.** The testimony in this passage refers back to earlier testimony on the possible reasons for evictions on pp. 230:17- 231:7, which should be included with this testimony for completeness.<br><br>**Counter-designations** 230:17-231:7 | demonstrates her personal knowledge.<br><br>No objection to counter designations. | |
| 238:2-23 | **Lack of personal knowledge, Rule 602.** There is no evidence that Ms. Carnley has any personal knowledge of how Natasha Gauthier's time was divided between the two geographical markets she worked in. | Ms. Carnley was testifying as a 30(b)(6) witness so personal knowledge is not a requirement; furthermore, her testimony properly demonstrates her personal knowledge. | |

**E.    Cummings, Mickey**

    Relevant excerpts of testimony are contained in Exhibit B, attached hereto.

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Cummings) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 52:19-55:2 | **Speculation, Lack of personal knowledge, Rule 602.** The designated testimony makes clear that Mr. Cummings did not | The testimony properly establishes a basis for the witness's knowledge and lack of speculation. | |

5

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Cummings) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | remember how late fees were reported and he is speculating as to how they might have been reported. | | |

## F.    Gomes, Carina

### 1.    Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony for Carina Gomes

Defendants have designated deposition testimony of current-employee Carina Gomes, while also indicating on Defendants' witness list that Ms. Gomes will be providing live testimony at trial. This is patently improper.  *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727. Moreover, Defendants have made no showing that Ms. Gomes is unavailable for trial, so Defendants' use of her deposition testimony constitutes inadmissible hearsay that does not fall into any exception. *See* Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4).

Plaintiffs have not provided objections or counter-designations, but reserve the right to do so should Defendants be permitted to introduce Ms. Gomes' deposition testimony at trial.

### 2.    Defendants' Response

Defendants plan to call Ms. Gomes to testify at trial and will only seek to introduce her deposition testimony if she is unavailable at trial.

### 3.    Court's Ruling

## G.    Kopczyk, Samantha

### 1.    Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony for Samantha Kopczyk

Defendants have designated deposition testimony of current-employee Samantha Kopczyk, while also indicating on Defendants' witness list that Ms. Kopcyzk will be providing live testimony at trial.  This is patently improper.  *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727.

868244.2

Moreover, Defendants have made no showing that Ms. Kopcyzk is unavailable for trial, so Defendants' use of his deposition testimony constitutes inadmissible hearsay that does not fall into any exception. *See* Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4).

Plaintiffs have not provided objections or counter-designations, but reserve the right to do so should Defendants be permitted to introduce Ms. Kopczyk's deposition testimony at trial.

### 2. Defendants' Response

Defendants plan to call Ms. Kopczyk to testify at trial and will only seek to introduce her deposition testimony if she is unavailable at trial.

### 3. The Court's Ruling

## H. Knudsen, Robert

Relevant excerpts of testimony are contained in Exhibit C, attached hereto.

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Knudsen) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| All pages designated by Defendants | **Relevance and Lack of Probative Value, Rules 401, 402, 403.** Mr. Knudsen's testimony is solely related to work he performed for Equity to create a draft expert report ("the PwC Report) for a separate court case from the late 1990s (the *Consumer Justice Foundation* litigation), which concerned a late fee that is different from either of the late fees that Plaintiffs challenge in this case. Plaintiffs have moved to exclude the PwC Report, and all testimony and argument regarding it, as set out in Pls.' Mot in Limine No. 1, because the PwC Report itself is improper expert opinion and inadmissible hearsay. If Plaintiffs' Motion in Limine is granted, Mr. Knudsen's deposition testimony will have no stand-alone value and should be excluded as | Defendants' position is set forth in their opposition to Plaintiffs' Motion in Limine. The issue of the PwC report and Mr. Knudsen's testimony is central to Equity's analysis and decision regarding its late fees in 2008. | |

7

Pls.' Amended Unresolved Objections to Defs.' Deposition Designations – Case No. 4:16-cv-01225-JSW-TSH

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Knudsen) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | well. | | |
| 18:13-19:4 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on his assumptions about what is "probably" true or "might have been," rather than on personal knowledge.<br><br>**Counter designation:**<br>19:5-12 | The testimony demonstrates foundation and personal knowledge. | |
| 21:13-22:13 | **Relevance and Lack of Probative Value, Rules 401, 402, 403.** This testimony regards work that Mr. Knudsen performed in the 1990s for a company other than Defendants, and has no tendency to prove any fact of consequence in this action. | The testimony is relevant to the issues before the Court. | |
| 53:20-54:3 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony states what he thinks "would have occurred" and not based on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 68:3-15 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony about costs of rent collection is based on assumptions about what "can be true" and "may be the case," rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 71:12-73:7 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "assumes" "probably" is true, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |

8

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Knudsen) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 74:17-21 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he assumes is "possible" rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 77:6-78:7 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on assumptions rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 79:6-80:23 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "think[s]" could have been done or was "possible" in 1999 to develop a late fee, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 82:18-83:21 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "think[s]" are "probably" the costs of late rent, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 85:11-86:10 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony about "potential" costs is not based on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 87:12-88:24 | **Hearsay, Rule 801, 802.** Mr. Knudsen's testimony regarding Equity's computer system in the 1990s is inadmissible hearsay and is not subject to any hearsay exception. | Mr. Knudsen prepared the PwC report as an expert and is permitted to rely on information learned from others in the course of his expert analysis. Also, statement is either non-hearsay (i.e. not offered for truth) and/or satisfies one of the hearsay exceptions such as effect on listener or state of mind. | |

9

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Knudsen) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 89:5-90:13 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony about other apartment owners or buildings is based on general assumptions rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 90:25-92:13 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony about apartment owners or buildings in general needing accounts receivable software is based on general assumptions rather than personal knowledge.<br><br>**Counter designations:**<br>94:7-15<br>95:10-19<br>96:10-16 | The testimony demonstrates foundation and personal knowledge.<br>No objection to counter designations. | |
| 97:1-99:2 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony about Defendants' accounts receivable software in the 1990s is based on general assumptions and what he "think[s was] probably true," rather than personal knowledge.<br><br>**Counter designation:**<br>99:8-12 | The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation. | |
| 110:1-14 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on general assumptions and what he "think[s] probably" or "guess[es]" occurred, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |

10

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Knudsen) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 112:1-25 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based he "think[s]" and assumes rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 117:3-118:2 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on general assumptions and what he "think[s]" "probably" or "might" occur, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 118:4-119:1 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on general assumptions and what he thinks "might," "maybe" or "probably" occurred, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 121:18-122:1 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony regarding Equity's need for funding in the 1990s is based on general assumptions rather than on personal knowledge.<br><br>**Hearsay, Rule 801, 802.** Mr. Knudsen's testimony regarding Equity's need for funding in the 1990s is inadmissible hearsay and is not subject to any hearsay exception. | The testimony demonstrates foundation and personal knowledge. In his capacity as an expert, Mr. Knudsen was permitted to rely on information learned from other sources. Also, statement is either non-hearsay (i.e. not offered for truth) and/or satisfies one of the hearsay exceptions such as effect on listener or state of mind. | |
| 133:1-15 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "suspect[s]" about Equity's present practices, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Knudsen) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 136:1-15 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony about what he "think[s]" or "suspect[s]" Equity currently does to track costs is based on general assumptions rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 138:25-141:16 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on general assumptions and what he "think[s]" Equity "could" or "might" do to reduce its costs of late rent collection, rather than on personal knowledge. | | |
| 147:1-13 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "may have" or "possibly" or "probably" did to develop an interview questionnaire, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 147:24-148:13 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "think[s]" he "possibl[y]" or "suspect[s]" he did to develop an interview questionnaire, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 149:17-150:5 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "think[s]" could have occurred, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 151:9-152:5 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on general assumptions and what he "think[s]" "could have" happened when doing work for Equity in | The testimony demonstrates foundation and personal knowledge. | |

12

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Knudsen) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | 1999, rather than on personal knowledge. | | |
| 153:9-21 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on general assumptions and what he "probably" did or "could have" done to calculate a figure for the draft PwC Report, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 156:5-157:17 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "guess[es]" he did to develop information for the draft PwC Report, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 160:3-12 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on what he "think[s]" he did to develop information for the draft PwC Report, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |
| 171:9-172:8 | **Lack of Foundation, Speculation, Rule 602.** Mr. Knudsen's testimony is based on general assumptions about whether the draft PwC Report from 1999 "could be useful" in developing a new late fee, rather than on personal knowledge. | The testimony demonstrates foundation and personal knowledge. | |

## I.   Jenkins, Chris

Relevant excerpts of testimony are contained in Exhibit D, attached hereto.

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Jenkins) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 17:7-17 | **Lack of personal knowledge, Rule 602.** There is no evidence | The testimony demonstrates foundation and personal | |

13

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Jenkins) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | that Mr. Jenkins has personal knowledge of any late fees that varied from property to property and/or lease to lease prior to June 4, 2008. | knowledge. | |
| 22:23-23:5 | **Lack of personal knowledge, Rule 602.** There is no evidence that Mr. Jenkins has personal knowledge of any late fees that varied from property to property or that Equity owned properties with different "fee structures" prior to June 4, 2008. | The testimony demonstrates foundation and personal knowledge. | |
| 29:15-20 | **Incomplete, Rule 106.** No question is designated, however, the question posed is at 28:24-29:1.<br><br>**Lack of personal knowledge, Rule 602.** There is no evidence that Mr. Jenkins has personal knowledge of any late fees that varied from property to property or that Equity owned properties with different "fee structures" prior to June 4, 2008. | No objection to counter designation.<br>The testimony demonstrates foundation and personal knowledge. | |

## J.    Melendez, Martha

Relevant excerpts of testimony are contained in Exhibit E, attached hereto.

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Melendez) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 22:5-26:24 | **Lack of Foundation, Speculation, Rule 602.** Ms. Melendez speculates at page 22:8-14 regarding the knowledge of other employees as to this lawsuit and the testimony must be stricken. | The testimony demonstrates foundation and personal knowledge.<br><br>The statements at issue are either non-hearsay (not offered for truth) and/or qualify for a hearsay exception, such as state | |

14

868242.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Melendez) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | **Hearsay, Rule 801, 802.** Ms. Melendez's testimony at page 25:4-9 regarding the interview responses of another EQR employee are inadmissible hearsay. | of mind or effect on listener. | |
| 100:14-107:7 | **Lack of Foundation, Speculation, Rule 602.** Ms. Melendez speculates at pages 100:22 – 101:1, 101:8-19, and 104:11-21 as to actions of her coworkers when she is not present at work and the testimony must be stricken.<br><br>**Lack of Foundation, Speculation, Rule 602.** Ms. Melendez's testimony at pages 105:1 – 106:20 regarding the follow-up communication provided to residents is speculation. Ms. Melendez states at page 118:3-8 that her description of the communication process is based the assumption that her co-workers are also engaging in this process and is not testimony based on her personal experience of the communications process.<br><br>**Counter designation:** 118:3-8 | The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation. | |
| 115:2-118:12 | **Lack of Foundation, Speculation, Rule 602.** Ms. Melendez's testimony at pages 115:11-17, 116:4-16, 116:23-118:2 regarding the follow-up communication provided to residents is speculation. Ms. Melendez states at page 118:3-8 that her description of the communication process is based | The testimony demonstrates foundation and personal knowledge. | |

15

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Melendez) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | an assumption that her co-workers are also engaging in this process and is not testimony based on her personal experience of the communications process. | | |
| 159:5-161:15 | **Lack of Foundation, Speculation, Rule 602.** Ms. Melendez's speculates at page 159:14-17 at to the amount of their days that her colleagues spent on delinquency issues during the pandemic period and it must sticked. That Ms. Melendez is basing her testimony on speculation and not personal knowledge is evidenced by the fact she at page 157:2-5 estimates during the pandemic period she spent fifty-percent of her day on the affordable program, while also estimating sixty to seventy-five percent of her day was also spent on rent delinquency issues. | The testimony demonstrates foundation and personal knowledge. | |

## K.    O'Connell, Tara

### 1.    Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony for Tara O'Connell

Defendants have designated deposition testimony of current-employee Tara O'Connell, while also indicating on Defendants' witness list that Ms. O'Connell will be providing live testimony at trial. This is patently improper.  *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727. Moreover, Defendants have made no showing that Ms. O'Connell is unavailable for trial, so Defendants' use of her deposition testimony constitutes inadmissible hearsay that does not fall into any exception.  *See* Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4).

Plaintiffs have not provided objections or counter-designations, but reserve the right to do so should Defendants be permitted to introduce Ms. O'Connell's deposition testimony at trial.

868244.2

1     **2.**     **Defendants' Response**

2     Defendants plan to call Ms. O'Connell to testify at trial and will only seek to introduce her

3 deposition testimony if she is unavailable at trial.

4     **3.**     **The Court's Ruling**

5

6 **L.**     **Ott, Amelia**

7     **1.**     **Plaintiffs' Request to Strike Defendants' Designations of Deposition Testimony for**
8     **Amelia Ott**

9     Defendants have designated deposition testimony of current-employee Amelia Ott, while also

10 indicating on Defendants' witness list that Ms. Ott will be providing live testimony at trial. This is

11 patently improper. *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727. Moreover,

12 Defendants have made no showing that Ms. Ott is unavailable for trial, so Defendants' use of her

13 deposition testimony constitutes inadmissible hearsay that does not fall into any exception. *See* Fed. R.

14 Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4).

15     Plaintiffs have not provided objections or counter-designations, but reserve the right to do so

16 should Defendants be permitted to introduce Ms. Ott's deposition testimony at trial.

17     **2.**     **Defendants' Response**

18     Defendants plan to call Ms. Ott to testify at trial and will only seek to introduce her deposition

19 testimony if she is unavailable at trial (though Defendants have advised Plaintiffs that this particular

20 witness may be unavailable at trial).

21     **3.**     **The Court's Ruling**

22

23 **M.**     **Paton, Ann**

24     **1.**     **Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony by**
25     **Ann Paton**

26     Defendants have designated deposition testimony of current-employee Ann Paton, while also

27 indicating on Defendants' witness list that Ms. Paton will be providing live testimony at trial. This is

28 patently improper. *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727. Moreover,

17

868244.2

Defendants have made no showing that Ms. Paton is unavailable for trial, so Defendants' use of his

deposition testimony constitutes inadmissible hearsay that does not fall into any exception.  *See* Fed. R.

Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4).

### 2.    Defendants' Response

.  Defendants plan to call Ms. Paton to testify at trial and will only seek to introduce her

deposition testimony if she is unavailable at trial.

### 3.    Court's Ruling

### 4.    Plaintiffs' Objections to Designated Testimony

Relevant excerpts of testimony are contained in Exhibit F, attached hereto.

| Testimony | Plaintiffs' Objections/Counter-designations | Response | Court's Ruling |
|---|---|---|---|
| 67:16-73:15 | **Inadmissible hearsay, Rule 802.**  In lines 68:22-69:1, 70:20-71:2, and 73:10-15, Ms. Paton is purporting to describe what she was told by property-level employees in calls about a decade ago.   This is hearsay inadmissible under any exception.<br><br>**Incomplete, Rule 106.**  The designation should begin at 67:12 to clearly identify the relevant period.  It should also extend to 74:22 to more completely describe the information Ms. Paton provided to Ms. Beihoffer on this subject, what types of information Ms. Paton was collecting, and what if anything was done with the information she gathered.<br><br>**Counter-designation:**<br>67:12-69:15<br>73:16-74:22 | Ms. Paton's discussions with property-level employees about the time they spend collecting late rent in California over time is part of Equity's analysis and "reasonable endeavor" to set its and maintain its late fee.  The evidence should be offered for its truth or at a minimum, to show the effect on the listener and Equity's state of mind.<br><br>No objection to counter designation. | |

18

Pls.' Amended Unresolved Objections to Defs.' Deposition Designations – Case No. 4:16-cv-01225-JSW-TSH

868244.2

N.    **Santee, David**

      Relevant excerpts of testimony are contained in Exhibit G, attached hereto.

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Santee) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 58:23-59:25, 60:4-10 | *See generally* Plaintiffs' Mot. in Limine No. 1.<br><br>**Hearsay, Rule 801, 802.** Mr. Santee's testimony regarding a discussion by others about the findings of the PwC Report (the subject of Pls' Motion in Limine No. 1), is hearsay-upon-hearsay Equity cannot offer for the truth of the assertions made either in the report, nor those made by his colleagues about the methods or findings of the report.<br><br>**Personal knowledge, Rule 602.** Mr. Santee's statements about the conclusions of the PwC Report and whether they supported the Standard Late Fee are not based in personal knowledge.<br><br>**Waste of time, Rule 403.** Introducing evidence of the PwC Report will consume significant amounts of trial time that is not justified by the report's probative value. For example, Mr. Santee's comments make incorrect statements about the study and its conclusions that will require time, testimony, and documents to rebut.<br><br>**Rule of Completeness, Rule 106**. The designation should include the omitted lines at 60:1-3 establishing that Mr. Santee did not review the PwC Report or anything related to that study in 2008. | Defendants have presented their position regarding the relevance and importance of the PwC report in their Opposition to Plaintiffs' Motion in Limine.<br><br>The truth of the PwC report will be established through other witnesses; here, it is offered to show the effect on the listener and Equity's reasonable reliance on the conclusions in the PwC report.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation. | |

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Santee) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | The designation should also include 60:11-18 establishing that Mr. Santee cannot definitively identify the who told him about the PwC Report but he believes it was not Mr. Fiffer, the only employee who had direct personal knowledge of the report.<br><br>**Counter-designations:**<br>60:1-3<br>60:11-18<br>63:15-65:12 | | |
| 62:4-13 | *See generally* Plaintiffs' Mot. in Limine No. 2.<br><br>**Relevance, Rules 401, 402.** Not relevant to any material issue in the case.<br><br>**Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as Mr. Santee is stating what was told to him by Ms. Beihoffer about the purported findings of the superior court.<br><br>**Personal knowledge, Rule 602.** Mr. Santee does not have any personal knowledge of the prior lawsuit.<br><br>**Waste of time, Rule 403.** The waste of time is particularly acute here were Mr. Santee clearly lacks any meaningful information about the *Consumer Justice Foundation* case, much less knowledge that could possibly be probative on a material issue in the present lawsuit. | Defendants have presented their position regarding the relevance and importance of the 1998 Superior Court case in their Opposition to Plaintiffs' Motion in Limine.<br><br>The facts of the *Consumer Justice Foundation* case will be established through other witnesses and/or judicial notice; here, it is offered to show the effect on the listener and Equity's reasonable reliance on its knowledge of the court's findings.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation. | |

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Santee) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | **Incomplete, Rule 106.** The designation should include the omitted lines at 62:14-25, which establish that Mr. Santee did not know the claims in the suit and his characterized his own understanding of the outcome as vague.<br><br>**Counter designation**: 62:14-25 | | |
| 73:16 | **Lack of Foundation, Speculation, Rule 602.** Mr. Santee's testimony is that he "does not know" if Equity decreased any fees in the spring of 2008. His response to the second question is speculative. | The testimony demonstrates foundation and personal knowledge. | |
| 133:4-10 | **Lack of foundation, Rule 602.** Mr. Santee's assertion that "everyone had access" to the personnel costs of collecting late rent is not supported by any evidence that he had personal knowledge of the existence of documentation of the personnel costs related to collecting rent. In fact, his testimony was that the personnel data that he reviewed on a regular basis did *not* contain that information. *See* 120:10-23.<br><br>**Incomplete, Rule 106.** The designation should begin at 132:19 and continue to 133:16, to establish that neither Mr. Santee nor anyone else provided information related to the costs of collecting late rent during the process of setting the Standard Late Fee. | The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation. | |

21

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Santee) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | **Counter designations:**<br>120:10-23<br>132:19-133:3<br>133:11-16 | | |
| 133:17-135:9 | **Lack of foundation, Rule 602.** The designated testimony does not identify a basis for Mr. Santee's knowledge of Equity's rent collection process.<br><br>**Incomplete, Rule 106.** The testimony on 138:17-139:14 should be added to the designation to clarify that his description of the rent collection process is based on his time working at another company decades before events in 2008. Likewise, the testimony on 181:24-182:6 clarifies that he does not "know what Equity Residential's practices were in California in that time."<br><br>**Relevance and insufficient probative value, Rules 402, 403.** Mr. Santee's experience with rent collections at a different company in California during the 1980s is not probative of whether Equity analyzed its costs from late rent in setting the Standard Late Fee in 2008, or even what Equity's costs of late rent were in the time period relevant to this case.<br><br>**Counter designations:**<br>138:17-139:14<br>181:24-182:6 | The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation.<br><br>Testimony is relevant to issues before the Court. | |
| 141:12-15 | **Lack of Foundation, Speculation, Rule 602.** Mr. Santee testimony at 141:12-15 should be stricken. He cannot testify or speculate as to what | The testimony demonstrates foundation and personal knowledge. | |

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Santee) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | other people may have known about costs.<br><br>**Incomplete, Rule 106.** If the testimony at 141:12-15 is allowed in, then the designation should extend to 141:23 to clarify that the costs Mr. Santee was referring to were "the amount of money that [Equity] spent on attorneys." It should also include the testimony at 140:17-141:5 to clarify that neither Mr. Santee nor anyone else that he is aware of provided information related to Equity's legal costs in connection with setting the Standard Late Fee. | No objection to counter designation. | |
| 152:8-153:8, 153:14-154:1 | **Hearsay, Rule 801, 802.** Mr. Santee's testimony on page 152:11-13 and the question and answer on 153:14-20 should be struck as inadmissible hearsay. Those portions refer to the settlement of the *Consumer Justice Foundation* case, but his testimony on 62:4-25 established that he had no personal knowledge of that case or the settlement and is merely describing what was told to him by Equity's legal department. *See also* Plaintiffs' Mot. in Limine No. 2.<br><br>**Incomplete, Rule 106.** If any of the testimony is allowed, the designation should include the omitted lines 153:9-13, which provide the actual answer to the pending question of whether Mr. Santee discussed the liquidated damages with Ms. Beihoffer and others. It should also include the subsequent testimony at 154:24-155:4, which clarifies that to Mr. | Defendants have presented their position regarding the relevance and importance of the *Consumer Justice Foundation* case in their Opposition to Plaintiffs' Motion in Limine.<br><br>The facts of the *Consumer Justice Foundation* case will be established through other witnesses and/or judicial notice; here, it is offered to show the effect on the listener and Equity's reasonable reliance on its knowledge of the court's findings.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation. | |

868244.2

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Santee) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | Santee's knowledge no one calculated damages from late rent during the time-period at issue in the designated testimony.<br><br>**Counter-designations:**<br>153:9-13<br>154:24-155:4 | | |
| 177:11-22 | **Lack of foundation and personal knowledge, speculation, Rule 602.** The designated testimony is Mr. Santee's speculation about what he "think[s]" has changed with Equity's business practices related to collecting late rent over a 15-year period. There is no evidence this is based on personal knowledge. To the contrary, other testimony at 138:17-139:14, 181:24-182:6 indicates that he did not have knowledge of Equity's processes related to collecting late rent.<br><br>**Counter-designations**<br>138:17-139:14<br>181:24-182:6 | The testimony demonstrates foundation and personal knowledge.<br><br>No objection to counter designation. | |

**O.    Tibayan, Franz**

**1.    Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony for Franz Tibayan.**

Defendants have designated deposition testimony of former-employee Franz Tibayan

Defendants have made no showing that Mr. Tibayan is unavailable for trial, so Defendants' use of his

deposition testimony constitutes inadmissible hearsay that does not fall into any exception. *See* Fed. R.

Evid. 801-804; *see also* Fed. R. Civ. P. 32(a)(4). Indeed, as of the date of his deposition, Mr. Tibayan

was employed by Equity at a property within the subpoena power of the Court, and a quick internet

search suggests Mr. Tibayan presently works within Alameda County.

868244.2

1    Plaintiffs have not provided objections or counter-designations, but reserve the right to do so

2    should Defendants be permitted to introduce Mr. Tibayan's deposition testimony at trial.

3    **2.    Defendants' Response**

4    Mr. Tibayan is a former Equity employee.  As Defendants' counsel shared in a meet and confer

5    call with Plaintiffs' counsel on January 20, Defendants presently do not know whether Mr. Tibayan is

6    within 100 miles of the court and/or whether he is available or willing to testify live.  Accordingly,

7    Defendants have identified deposition excerpts they will introduce at trial *if* Mr. Tibayan is an

8    "unavailable" witness within the meaning of the Federal Rules.

9    The remaining objections are moot as Defendants provided Plaintiffs with specific page and

10   line designations for this deposition testimony at Plaintiffs' request during the meet and confer process.

11   **3.    The Court's Ruling**

12

13   **P.    Tuomi, Frederick**

14   Relevant excerpts of testimony are contained in Exhibit H, attached hereto.

15

| Defendants' Deposition Designations | Plaintiffs' Objections and Counter Designations (Tuomi) | Defendants' Responses to Plaintiffs' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 50:18-51:23 | **Lack of personal knowledge, Rule 602.**  Mr. Tuomi provides no foundation for his testimony that the cost of collecting unpaid rent increases with the amount of the balance owed.  In fact, Mr. Tuomi disclaims any knowledge of California-specific payroll costs, and that his "review of payroll costs were done in the context of the entire country" and that "other people would have been much closer, much more delving into details of what makes up that total." *See* 54:4-16. | The testimony demonstrates foundation and personal knowledge. | |

**Q.    Vasquez, Marissa**

**1.    Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony by**

868244.2

**Marissa Vasquez**

Defendants have designated deposition testimony of current-employee Marissa Vasquez, while also indicating on Defendants' witness list that Ms. Vasquez will be providing live testimony at trial. This is patently improper. *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727. Moreover, Defendants have made no showing that Ms. Vasquez is unavailable for trial, so Defendants' use of her deposition testimony constitutes inadmissible hearsay that does not fall into any exception. *See* Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a).

Plaintiffs have not provided objections or counter-designations, but reserve the right to do so should Defendants be permitted to introduce Ms. Vasquez's deposition testimony at trial.

### 2. Defendants' Response

Defendants plan to call Ms. Vasquez to testify at trial and will only seek to introduce her deposition testimony if she is unavailable at trial.

### 3. Court's Ruling

## R. Villanueva, Mayra

### 1. Plaintiffs' Request to Strike Defendants' Designation of Deposition Testimony by Mayra Villanueva

Defendants have designated deposition testimony of current-employee Mayra Villanueva, while also indicating on Defendants' witness list that Ms. Villanueva will be providing live testimony at trial. This is patently improper. *See e.g.*, *Mazloum v. D.C. Metro. Police Dep't*, 248 F.R.D. at 727. Moreover, Defendants have made no showing that Ms. Villanueva is unavailable for trial, so Defendants' use of her deposition testimony constitutes inadmissible hearsay that does not fall into any exception. *See* Fed. R. Evid. 801-804; *see also* Fed. R. Civ. P. 32(a).

Plaintiffs have not provided objections or counter-designations, but reserve the right to do so should Defendants be permitted to introduce Ms. Villanueva's deposition testimony at trial.

### 2. Defendants' Response

See section 1.B above – this issue is moot as it has been fully resolved during the parties' meet

and confer efforts.  Defendants plan to call Ms. Villanueva to testify at trial and will only seek to introduce her deposition testimony if she is unavailable at trial.  Defendants have also provided more specific page and line designations for this witness at Plaintiffs' request.

### 3.    Court's Ruling

### S.    Zumph, Susan

Relevant excerpts of testimony are contained in Exhibit I, attached hereto.

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 45:19-47:2 | **Relevance, Rules 401, 402.**  Not relevant to any material issue in the case.  **Hearsay, Rules 801, 802.**  The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do.  **Personal knowledge, Lack of Foundation, Speculation, Rule 602.**  The witness admits to not having sufficient personal knowledge about other lawsuits against other apartment communities.  **Waste of time, Rule 403.** | The testimony is relevant to an issue before the Court.  The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.  The testimony demonstrates foundation and personal knowledge.  Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 50:17-52:16 | **Hearsay, Rules 801, 802.**  The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | **Lack of Foundation, Speculation, Rule 602.** Admits to speculating about other lawsuits and other purported compliance reviews. | statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 60:1-66:25 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events, and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 67:18-70:1 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as | |

28

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | describe what other persons told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 75:6-80:9 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 81:25-83:15 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves | |

30

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | limited so as render the entire line of inquiry practically useless. | designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 86:4-93:15 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 95:23-97:21 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.**  The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 99:17-100:12 | **Hearsay, Rules 801, 802.**  The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.**  Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.**  The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 101:4-106:7 | **Hearsay, Rules 801, 802.**  The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 124:5-125:11 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do, or what she told others.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | | portions too. | |
| 133:5-136:11 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others.<br><br>**Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 154:23-157:19 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do.<br><br>**Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others, and also that the purported (hearsay) conversations would not have involved her in any event. | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court. | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | **Waste of time, Rule 403.** The witness' recollection or willingness to recall is so limited so as render the entire line of inquiry practically useless. | Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 163:21-164:1 | **Relevance, Rules 401, 402.** Testimony fees charged outside of California is not relevant to any material issue in the case.<br><br>**Personal knowledge, Lack of Foundation, Speculation, Rule 602.** The witness admits to not having sufficient personal knowledge about what was done.<br><br>**Waste of time, Rule 403.** | The testimony is relevant and probative to an issue before the Court.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 165:10-195:20 | This wholesale or shotgun designation of 30 continuous pages is improper and should be stricken.  Counsel has again attempted to sweep in, for example, colloquy, discussions about breaks, arguing over objections, etc.  *Cf. Pooshs v. Philip Morris USA, Inc.*, No. 04-cv-1221-PJH, 2016 WL 860985, **1-2 (N.D. Cal. 2016) (striking the block designation of pages of testimony as "unusable").<br><br>Also:<br><br>**Relevance, Rules 401, 402.** Not relevant to any material issue in the case. | The testimony is relevant and not an improper "block" designation; Equity will agree that the Court can disregard discussions among counsel.<br><br>The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge. | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | **Hearsay, Rules 801, 802.**  The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do.<br><br>**Personal knowledge, Lack of Foundation, Speculation, Rule 602.**  Admits to not knowing or remembering any of the significant events and speculating about the acts of others, and also that the purported (hearsay) conversations would not have involved her in any event.<br><br>**Waste of time, Rule 403.** | The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| 196:21-202:13 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do.<br><br>**Personal knowledge, Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others, and also that the purported (hearsay) conversations would not have involved her in any event.<br><br>**Waste of time, Rule 403.** | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 205:17-210:6 | **Relevance, Rules 401, 402.** Not relevant to any material issue in the case.<br><br>**Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do.<br><br>**Personal knowledge, Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others, and also that the purported (hearsay) | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves | |

868244.2

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter Designations (Zumph) | Plaintiffs' Responses to Defendants' Objections and Counter Designations | Court's Ruling |
|---|---|---|---|
| | conversations would not have involved her in any event.<br><br>**Waste of time, Rule 403.** | designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |
| 214:11-221:25 | **Hearsay, Rules 801, 802.** The designated testimony is hearsay upon hearsay, as the witness is purporting to describe what other persons told her or instructed her to do, or what she told others.<br><br>**Personal knowledge, Lack of Foundation, Speculation, Rule 602.** Admits to not knowing or remembering any of the significant events and speculating about the acts of others, and also that the purported (hearsay) conversations would not have involved her in any event.<br><br>**Waste of time, Rule 403.** | The testimony is either non-hearsay (i.e. not offered for truth) and/or qualifies for a hearsay exception, such as effect on the listener. Instructions are not generally hearsay, as they are not a statement that can be true or false.<br><br>The testimony demonstrates foundation and personal knowledge.<br><br>The testimony is relevant and probative to an issue before the Court.<br><br>Plaintiffs have themselves designated substantial portions of Ms. Zumph's testimony, so if they are permitted to introduce her testimony than Equity should be permitted to offer portions too. | |

38

Dated: January 24, 2023

Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

/s/ Anne P. Bellows
Anne P. Bellows

Counsel for Plaintiffs and the Certified Classes

Dated: January 24, 2023

DUANE MORRIS LLP

/s/ Karen L. Alexander
Aaron T. Winn
Karen L. Alexander
Counsel for Defendants

## SIGNATURE ATTESTATION

In accordance with Civil Local Rule 5-1(i)(3), I attest that concurrence in the filing of this document has been obtained from the signatories on this e-filed document.

Dated: January 24, 2023

/s/ Anne P. Bellows
Anne P. Bellows

Counsel for Plaintiffs and the Certified Classes

868244.2

# EXHIBIT A

```
 1            UNITED DISTRICT COURT
 2        NORTHERN DISTRICT OF CALIFORNIA
 3              OAKLAND DIVISION
 4
 5   JAVANNI MUNGUIA-BROWN, ANGELINA
 6   MAGAÑA, NORMA RODRIGUEZ, and
 7   DAVID BONFANTI, individually and
 8   on behalf of others similarly
 9   situated,
10      Plaintiffs,            Case No.
11   vs.                       4:16-cv-01225-JSW-TSH
12   EQUITY RESIDENTIAL, a real
13   Estate investment trust,
14   ERP OPERATING LIMITED PARTNERSHIP,
15   A partnership, EQUITY RESIDENTIAL
16   MANAGEMENT, L.L.C., EQR-WOODLAND
17   PARK A LIMITED PARTNERSHIP, and
18   EQR-WOODLAND PARK B LIMITED
19   PARTNERSHIP,
20      Defendants.
     _____ )
21    ZOOM VIDEOTAPED DEPOSITION OF JENAY CARNLEY
22            Wednesday, July 13, 2022
                 10:00 a.m. PDT
23
     REPORTED BY:
24   BELLE VIVIENNE, CRR, RPR
25   Job No. 5301920
```

                                        Page 1

|    |                                           |          |
|----|-------------------------------------------|----------|
| 1  | THE VIDEOGRAPHER:  Good morning.          |          |
| 2  | We are on record at 10:06 a.m. on         | 10:06:31 |
| 3  | July 13, 2022.  This is the video         | 10:06:35 |
| 4  | recorded deposition of Jenay Carnley.     | 10:06:39 |
| 5  | My name is Dustin Brown here with our     | 10:06:42 |
| 6  | court reporter Belle Vivienne.  This      | 10:06:46 |
| 7  | deposition is being recorded using        | 10:06:48 |
| 8  | Zoom technology.  All participants are    | 10:06:51 |
| 9  | attending remotely.                       | 10:06:52 |
| 10 | The caption of this case is               | 10:06:56 |
| 11 | Munguia-Brown et al., versus Equity       | 10:07:00 |
| 12 | Residential, et al.                       | 10:07:02 |
| 13 | Please note that audio and video          | 10:07:04 |
| 14 | recording will continue to take place     | 10:07:06 |
| 15 | unless all parties agree to go off the    | 10:07:08 |
| 16 | record.  If there are any objections      | 10:07:11 |
| 17 | to proceeding, please state them at       | 10:07:12 |
| 18 | the time of your appearance beginning     | 10:07:13 |
| 19 | with the noticing attorney.               | 10:07:15 |
| 20 | Appearances, please.                      | 10:07:16 |
| 21 | MS. BELLOWS:  This is Anne                 | 10:07:22 |
| 22 | Bellows for plaintiffs.                    | 10:07:24 |
| 23 | MR. WINN:  This is Aaron Winn              | 10:07:24 |
| 24 | for Equity Residential.                    | 10:07:29 |
| 25 | JENAY CARNLEY,                             |          |

Page 8

```
 1              having been first duly sworn by
 2         the Certified Stenographic Realtime
 3         Reporter, testified as follows:
 4                    EXAMINATION
 5    BY MS. BELLOWS:
 6         Q.    Thank you for being here this        10:07:45
 7    morning.  Could you please state and spell      10:07:46
 8    your name for the record.                       10:07:49
 9         A.    It's Jenay Carnley.  J-E-N-A-Y,       10:07:50
10    last name is C-A-R-N-L-E-Y.                     10:07:54
11         Q.    As you just heard, I'm Anne          10:07:57
12    Bellows; I represent the plaintiffs in the      10:08:00
13    certified classes in this case.  Do you         10:08:02
14    have an understanding of what this case is      10:08:04
15    about?                                          10:08:05
16         A.    Yes, I do.                           10:08:06
17         Q.    Could you tell me what your          10:08:06
18    understanding is?                               10:08:08
19         A.    The understanding is the late        10:08:10
20    fees that have been charged throughout the      10:08:13
21    years just taking an issue with how much        10:08:15
22    has been or, you know, when they've been.       10:08:20
23         Q.    Okay.  Have you been deposed         10:08:22
24    before?                                         10:08:24
25         A.    No, I have not.                      10:08:25
```

Page 9

| | | |
|---|---|---|
| 1 | were able to be live and that was just | 10:35:30 |
| 2 | documented in one place to say we turned | 10:35:32 |
| 3 | it on here.  We turned it off here.  So it | 10:35:35 |
| 4 | was just a compilation of all of that into | 10:35:37 |
| 5 | one place. | 10:35:39 |
| 6 | BY MS. BELLOWS: | 10:35:39 |
| 7 | Q.    Okay.  Who made the decision to | 10:35:53 |
| 8 | initially suspend the late fee in April | 10:35:54 |
| 9 | 2020? | 10:35:57 |
| 10 | MR. WINN:  Objection, vague. | 10:35:59 |
| 11 | A.    The company as a whole gave that | 10:36:02 |
| 12 | directive.  I'm not sure where it was | 10:36:04 |
| 13 | decided, you know, amongst any one person | 10:36:08 |
| 14 | in particular, but in conjunction with all | 10:36:11 |
| 15 | of the things that were going on at that | 10:36:15 |
| 16 | time. | 10:36:17 |
| 17 | BY MS. BELLOWS: | 10:36:17 |
| 18 | Q.    Okay.  Do you -- can you tell me | 10:36:17 |
| 19 | who provided that message on behalf of the | 10:36:20 |
| 20 | company? | 10:36:23 |
| 21 | MR. WINN:  Objection, vague. | 10:36:24 |
| 22 | A.    It didn't come from one person. | 10:36:25 |
| 23 | It was just shared within that monthly | 10:36:28 |
| 24 | information that we shared earlier of when | 10:36:32 |
| 25 | we told the properties when they were | 10:36:34 |

Page 36

```
 1    turned on and off.  It was just a          10:36:35
 2    company-wide directive, not from any one   10:36:37
 3    source.                                    10:36:40
 4    BY MS. BELLOWS:                            10:36:40
 5        Q.    How did you learn about it?      10:36:42
 6        A.    Learned about the --             10:36:46
 7        Q.    Suspension of the late fees?     10:36:49
 8        A.    Participating in calls with      10:36:51
 9    other groups just talking about all of the 10:36:53
10    regulations that we needed to stay in line 10:36:56
11    with.                                      10:37:00
12        Q.    Were those calls you described,  10:37:04
13    were they part of a decision-making        10:37:05
14    process to suspend the late fee?           10:37:08
15            MR. WINN:  Objection, vague.       10:37:10
16        A.    No.  It was not part of a        10:37:11
17    decision-making -- really no decision to   10:37:13
18    be made.  We had -- we had to follow the   10:37:16
19    law.                                       10:37:17
20    BY MS. BELLOWS:                            10:37:17
21        Q.    Okay.  Are there any documents   10:37:20
22    that -- that are related to why the late   10:37:22
23    fee was suspended?                         10:37:25
24            MR. WINN:  Objection, vague, the   10:37:27
25        question exceeds the scope of the      10:37:38
```

Page 37

```
 1    limitations for the county or              11:33:20

 2    jurisdiction.                              11:33:22

 3         Q.    Is the process of serving pay or 11:33:27

 4    quit notices the same as before the       11:33:31

 5    pandemic in California?                    11:33:33

 6              MR. WINN:  Objection, vague,     11:33:35

 7         exceeds the scope of the deposition   11:33:37

 8         notice.                               11:33:38

 9         A.    I'm unsure if it's the same or  11:33:38

10    not.                                       11:33:40

11    BY MS. BELLOWS:                            11:33:40

12         Q.    Do you know anything about the  11:33:43

13    process of serving pay or quit notices in  11:33:44

14    California?                                11:33:49

15              MR. WINN:  Objection, vague.     11:33:49

16         A.    Yeah, only the kind of general  11:33:53

17    understanding of on this day, someone      11:33:55

18    hasn't paid, we send them the notice, but  11:33:58

19    that's all that is at the site level to    11:34:03

20    actually fulfill.                          11:34:06

21    BY MS. BELLOWS:                            11:34:06

22         Q.    In terms of what they need to do 11:34:07

23    to get the notice to the tenant?           11:34:09

24         A.    Yes.                            11:34:12

25         Q.    Okay.  Is it correct that for a 11:34:12
```

Veritext Legal Solutions
866 299-5127

| | | |
|---|---|---|
| 1 | time during the pandemic, the notices | 11:34:16 |
| 2 | provided 15-day periods to cure instead of | 11:34:19 |
| 3 | three? | 11:34:25 |
| 4 | MR. WINN:  Objection, vague, | 11:34:25 |
| 5 | exceeds the scope of the deposition | 11:34:26 |
| 6 | notice. | 11:34:27 |
| 7 | A.    I'm unaware of the time frame | 11:34:30 |
| 8 | within the demands outside of what I know | 11:34:32 |
| 9 | to be the standard. | 11:34:34 |
| 10 | BY MS. BELLOWS: | 11:34:34 |
| 11 | Q.    And what's the standard? | 11:34:35 |
| 12 | A.    It's five days. | 11:34:37 |
| 13 | Q.    Five days.  Is that the standard | 11:34:39 |
| 14 | in Arizona? | 11:34:41 |
| 15 | MR. WINN:  Objection, vague, | 11:34:43 |
| 16 | exceeds the scope of the deposition | 11:34:47 |
| 17 | notice. | 11:34:47 |
| 18 | A.    I'm -- I'm unsure if that's the | 11:34:48 |
| 19 | standard in Arizona. | 11:34:50 |
| 20 | BY MS. BELLOWS: | 11:34:50 |
| 21 | Q.    Are you aware of the standard in | 11:34:51 |
| 22 | California? | 11:34:52 |
| 23 | A.    I guess not.  I thought it was | 11:34:54 |
| 24 | five so I guess I'm incorrect. | 11:34:56 |
| 25 | Q.    Okay.  One part of collecting | 11:35:00 |

Page 79

```
 1    effort.                                  12:53:55
 2         Q.    And was she involved in       12:53:55
 3    overseeing the virtual payment team from 12:53:57
 4    the beginning of that team's work?       12:54:00
 5         A.    From my understanding, yes.   12:54:02
 6         Q.    How many hours per week did an 12:54:04
 7    employee on the virtual payment team spend 12:54:11
 8    on tasks related to that team?           12:54:13
 9              MR. WINN:   Objection, vague,   12:54:16
10         exceeds the scope of the deposition. 12:54:17
11         A.    I'm unsure as to how many hours 12:54:20
12    they might have spent.                   12:54:22
13    BY MS. BELLOWS:                          12:54:22
14         Q.    Do you have an estimate?      12:54:24
15         A.    I think again that might be in 12:54:32
16    somewhere in our later exhibits, so I feel 12:54:34
17    like the -- the maximum they forwarded out 12:54:38
18    was about ten hours a week per employee. 12:54:44
19         Q.    Okay.  And that's based on the 12:54:47
20    exhibit that you were looking at before? 12:54:48
21         A.    Correct.                      12:54:50
22         Q.    Okay.  We may get there.      12:54:51
23              Looking still at Exhibit 4, in 12:54:58
24    that section -- oh, sorry, I guess I'm on 12:55:01
25    the next section now under Community Team 12:55:04
```

Page 121

| | | |
|---|---|---|
| 1 | BY MS. BELLOWS: | 13:03:57 |
| 2 | Q.   Okay.  So I have marked as | 13:04:24 |
| 3 | Exhibit 7 an Excel spreadsheet with the | 13:04:25 |
| 4 | Bates designation WP0011682 and it's | 13:04:30 |
| 5 | entitled EQR_MB_RA Managers and Virtual | 13:04:36 |
| 6 | Payment Team Members 3/21/22. | 13:04:45 |
| 7 | Do you have that in front of | 13:04:51 |
| 8 | you? | 13:04:52 |
| 9 | A.   Yes. | 13:04:53 |
| 10 | Q.   Can you tell me what this | 13:04:54 |
| 11 | document is? | 13:04:55 |
| 12 | A.   This is a document of the | 13:04:58 |
| 13 | virtual payment team members in California | 13:05:00 |
| 14 | between March of 2020 and March of 2022. | 13:05:02 |
| 15 | Q.   Okay.  Who created this | 13:05:07 |
| 16 | document? | 13:05:08 |
| 17 | A.   Natasha Gauthier. | 13:05:12 |
| 18 | Q.   And why did she create it? | 13:05:19 |
| 19 | A.   At the request of this case. | 13:05:26 |
| 20 | Q.   Do you know if this is used for | 13:05:29 |
| 21 | anything apart from this case? | 13:05:31 |
| 22 | A.   Not that I'm aware of. | 13:05:33 |
| 23 | Q.   Do you know what data source the | 13:05:38 |
| 24 | information in it is based on? | 13:05:40 |
| 25 | MR. WINN:  Objection, vague. | 13:05:43 |

Page 130

| | | |
|---|---|---|
| 1 | A. I'm -- I'm unsure of what the | 13:05:44 |
| 2 | data source might have been, if there even | 13:05:49 |
| 3 | was one. | 13:05:51 |
| 4 | BY MS. BELLOWS: | 13:05:51 |
| 5 | Q. Okay. So if you look at the | 13:05:52 |
| 6 | second tab, which is virtual payment team | 13:05:55 |
| 7 | members, is this a list of California | 13:06:01 |
| 8 | employees assigned to the virtual payment | 13:06:05 |
| 9 | team at any time between March 2020 and | 13:06:07 |
| 10 | March 2022? | 13:06:11 |
| 11 | A. Yes. | 13:06:15 |
| 12 | Q. And the -- it provides their | 13:06:20 |
| 13 | title, their position apart from the | 13:06:25 |
| 14 | virtual payment team in the second column, | 13:06:28 |
| 15 | correct? | 13:06:30 |
| 16 | A. Yes. | 13:06:30 |
| 17 | Q. And it looks like based on | 13:06:31 |
| 18 | column E for all of these employees, they | 13:06:35 |
| 19 | were part-time on the virtual payment | 13:06:39 |
| 20 | team. Is it correct that all the virtual | 13:06:42 |
| 21 | payment team employees were -- served | 13:06:47 |
| 22 | part-time on the virtual payment team in | 13:06:49 |
| 23 | California? | 13:06:51 |
| 24 | A. Yes. | 13:06:52 |
| 25 | Q. Okay. And this may be the note | 13:06:56 |

Page 131

```
 1    that you were thinking of.  If you just        13:06:57
 2    scroll to the far right, it says "Average      13:07:00
 3    time commitment for VPT members was 2-8        13:07:04
 4    hours per week spent on VPT activities."       13:07:17
 5            Is that information that was            13:07:24
 6    provided by Ms. Gauthier?                       13:07:25
 7        A.    Yes.                                  13:07:27
 8        Q.    And is that in your                   13:07:34
 9    understanding a correct statement of the       13:07:36
10    amount of time that virtual payment team       13:07:36
11    members spent on their virtual payment         13:07:39
12    team activities?                                13:07:41
13        A.    To my understanding, yes.            13:07:43
14        Q.    Outside of the virtual payment        13:07:47
15    team, what other tasks do these employees      13:07:50
16    perform?                                        13:07:58
17        A.    Based on their title in there,        13:07:58
18    they would have differing duties, but          13:08:01
19    ranging from all facets of, you know,          13:08:05
20    on-site experience from leasing consultant     13:08:07
21    up to general manager.  So, again, the         13:08:10
22    everyday tasks of dealing with residents,      13:08:14
23    collecting payments, posting payments,         13:08:19
24    moving residents out, like all of the --       13:08:23
25    the day-in and day-out tasks.                  13:08:25
```

Page 132

```
 1        A.    There's no way that I'm aware of    13:09:37
 2   to -- to pinpoint that exact as we didn't      13:09:38
 3   log any of those specific time frames.         13:09:42
 4   BY MS. BELLOWS:                                13:09:42
 5        Q.    So there's a column that says       13:09:48
 6   Approximate Dates on VPT and that's            13:09:55
 7   essentially not filled out.  She marked        13:09:59
 8   "varies."  So is there any document where      13:10:01
 9   the dates that these employees were            13:10:06
10   assigned to the VPT is reflected?              13:10:09
11             MR. WINN:  Object, exceeds the       13:10:13
12        scope of the deposition.                  13:10:14
13        A.    Not that I'm aware of.              13:10:16
14   BY MS. BELLOWS:                                13:10:16
15        Q.    And then in terms of when they      13:10:21
16   were on the virtual payment team, are          13:10:23
17   there any records that reflect, you know,      13:10:25
18   each day or week how much time they spent      13:10:28
19   doing VPT tasks?                               13:10:31
20             MR. WINN:  Objection, exceeds        13:10:34
21        the scope of the deposition.              13:10:35
22        A.    Not that I'm aware of.              13:10:38
23   BY MS. BELLOWS:                                13:10:38
24        Q.    Okay.  So there are -- I'll         13:10:44
25   represent to you that there are 31             13:10:49
```

Page 134

| | | |
|---|---|---|
| 1 | employees who are listed on this sheet, | 13:10:51 |
| 2 | and I counted 14 community managers.  Is | 13:10:55 |
| 3 | that also what you see here?  Take a | 13:11:01 |
| 4 | minute. | 13:11:06 |
| 5 | A.    Community manager title, yes. | 13:11:21 |
| 6 | However, general manager also falls in | 13:11:23 |
| 7 | line with community manager.  All it means | 13:11:25 |
| 8 | is that they have a larger community or | 13:11:27 |
| 9 | potentially multiple communities. | 13:11:29 |
| 10 | Q.    Thanks for that clarification. | 13:11:35 |
| 11 | So I also saw five general | 13:11:38 |
| 12 | managers.  So altogether 15 community and | 13:11:41 |
| 13 | general managers.  I guess that would be | 13:11:45 |
| 14 | 19.  Is that also what you see? | 13:11:46 |
| 15 | A.    Yes. | 13:11:48 |
| 16 | Q.    And those are both salaried | 13:11:50 |
| 17 | positions, correct? | 13:11:52 |
| 18 | A.    To my understanding, yes. | 13:11:54 |
| 19 | Q.    Meaning that they're paid on a | 13:11:58 |
| 20 | salary basis rather than an hourly basis, | 13:12:00 |
| 21 | right? | 13:12:03 |
| 22 | MR. WINN:  Objection, exceeds | 13:12:03 |
| 23 | the scope of the deposition. | 13:12:04 |
| 24 | A.    Yes. | 13:12:06 |
| 25 | BY MS. BELLOWS: | 13:12:06 |

Page 135

```
 1        Q.    Okay.  And then I also saw a          13:12:08
 2   community administrator on here.  I just          13:12:12
 3   saw one.  Is that also what you see?              13:12:19
 4        A.    Yes.                                   13:12:24
 5        Q.    At line 17.                            13:12:26
 6              Is that a salaried position?           13:12:27
 7              MR. WINN:  Objection, exceeds          13:12:29
 8        the scope of the deposition.                 13:12:30
 9        A.    No, it is not.                         13:12:32
10   BY MS. BELLOWS:                                   13:12:32
11        Q.    And then I also saw someone            13:12:36
12   whose title is auditor at line 29.  Was           13:12:38
13   this a salaried position?                         13:12:43
14              MR. WINN:  Objection, exceeds          13:12:44
15        the scope.                                   13:12:45
16        A.    I'm not sure if that position is       13:12:47
17   or is not.                                        13:12:49
18   BY MS. BELLOWS:                                   13:12:49
19        Q.    So it sounds like out of the 31        13:12:52
20   employees listed, we know that 19 of them         13:12:55
21   are salaried and it's not clear if there          13:12:57
22   were any others who were salaried?                13:13:02
23        A.    Yes.                                   13:13:03
24        Q.    Okay.  Can you tell me when            13:13:11
25   Steve Conner was on the virtual payment           13:13:14
```

Page 136

```
 1    indicate that choice was a -- was somehow      13:48:01
 2    connected to AB 3088?                          13:48:06
 3              MR. WINN:  Objection, vague,          13:48:08
 4         calls for speculation.                     13:48:10
 5         A.    It's only, again, in reference       13:48:11
 6    to the volume of needing to -- to move         13:48:12
 7    those balances so rather than say this         13:48:16
 8    community is good to go, we're trying to       13:48:18
 9    get half done or some done, we just            13:48:20
10    decided to do all or nothing.                  13:48:22
11    BY MS. BELLOWS:                                13:48:22
12         Q.    Let me get another document.         13:48:36
13              (Exhibit 13, Spreadsheet, Under       13:48:36
14         Eviction_CDC AB 3088 List, marked for      13:48:36
15         identification.)                           13:48:36
16    BY MS. BELLOWS:                                13:48:36
17         Q.    Okay.  I have just marked as         13:48:53
18    Exhibit 13, a spreadsheet with the Bates       13:48:55
19    designation of WP011889.  And it's             13:48:58
20    entitled Under Eviction, AB -- sorry,          13:49:06
21    Under Eviction_CDC AB 3088 List.  Do you       13:49:11
22    have that up?                                  13:49:17
23         A.    Yes.                                 13:49:19
24         Q.    Are you familiar with this          13:49:22
25    spreadsheet?                                   13:49:24
```

Page 159

| | | |
|---|---|---|
| 1 | A.    Yes. | 13:49:26 |
| 2 | Q.    Can you tell me what it is? | 13:49:27 |
| 3 | A.    This is the tracking document | 13:49:30 |
| 4 | that was referenced earlier in the | 13:49:32 |
| 5 | guidance where they were to track any new | 13:49:34 |
| 6 | or current evictions. | 13:49:37 |
| 7 | Q.    Okay.  And who created this | 13:49:50 |
| 8 | spreadsheet? | 13:49:52 |
| 9 | MR. WINN:  Objection, vague. | 13:49:52 |
| 10 | A.    I'm not sure exactly who created | 13:49:54 |
| 11 | this. | 13:49:57 |
| 12 | BY MS. BELLOWS: | 13:49:57 |
| 13 | Q.    Do you know who was entering | 13:49:57 |
| 14 | information to this spreadsheet? | 13:50:00 |
| 15 | MR. WINN:  Objection, vague. | 13:50:02 |
| 16 | A.    From the guidance, it sounds | 13:50:05 |
| 17 | like every RM would have been entering | 13:50:07 |
| 18 | information on here.  Outside of that, I'm | 13:50:09 |
| 19 | not sure who else would have been | 13:50:12 |
| 20 | contributing. | 13:50:13 |
| 21 | BY MS. BELLOWS: | 13:50:13 |
| 22 | Q.    Do you have any knowledge of | 13:50:16 |
| 23 | on-site personnel using or filling out | 13:50:17 |
| 24 | anything in this document? | 13:50:19 |
| 25 | A.    I'm not sure if they used this | 13:50:22 |

Page 160

```
 1        A.    Correct.                        15:38:09

 2        Q.    And there are also no cases      15:38:11

 3   filed that month?                           15:38:13

 4        A.    Correct.                        15:38:16

 5        Q.    Based on column F?               15:38:18

 6        A.    Correct.                        15:38:20

 7        Q.    And that refers to eviction      15:38:21

 8   cases, correct?                            15:38:22

 9        A.    Yes.                            15:38:24

10        Q.    So then if you look at row 12,   15:38:27

11   we're still related to 340 Fremont, and do  15:38:32

12   you agree that this spreadsheet shows that  15:38:39

13   there were two cases filed in November      15:38:40

14   2016, two eviction cases filed in November  15:38:44

15   2016 for 340 Fremont?                       15:38:47

16        A.    Yes.                            15:38:52

17        Q.    Is there anything in this       15:38:53

18   spreadsheet that tells us what the basis    15:38:54

19   for the evictions?                          15:38:58

20        A.    No.                             15:38:59

21        Q.    It could have been an eviction   15:38:59

22   for nonpayment of rent, right?              15:39:02

23        A.    It could have, yes.             15:39:04

24        Q.    Or it could have been an         15:39:05

25   eviction for another material violation of  15:39:07
```

Page 230

```
 1    the lease, right?                          15:39:10
 2         A.    Potentially, but unlikely.      15:39:12
 3         Q.    Those are less common?          15:39:16
 4         A.    Correct.                        15:39:17
 5         Q.    But they do take place          15:39:18
 6    sometimes?                                 15:39:20
 7         A.    Yes.                            15:39:20
 8         Q.    This spreadsheet also does not  15:39:24
 9    allow us to determine which tenants were   15:39:26
10    the defendants in the two eviction cases   15:39:28
11    filed that month, correct?                 15:39:31
12         A.    Correct.                        15:39:34
13         Q.    And we can't tell if they were  15:39:36
14    members of the classes certified in this   15:39:38
15    case, right?                               15:39:41
16         A.    Correct.                        15:39:43
17         Q.    Okay.  So then the next month   15:39:48
18    for December 2016, there is a total of     15:39:50
19    $2,365 in combined fees and costs that     15:39:58
20    were billed to 340 Fremont, correct?       15:40:02
21         A.    Yes.                            15:40:07
22         Q.    Were any cases filed that month? 15:40:08
23         A.    No.                             15:40:12
24         Q.    And is there any way for us to  15:40:14
25    tell which of the cases filed in a couple  15:40:15
```

Page 231

```
 1    field, collections payment, has Equity          15:47:07

 2    kept that data in MRI for the years             15:47:14

 3    leading up to this deposition?                  15:47:19

 4            MR. WINN:  Objection, exceeds           15:47:21

 5        the scope of the deposition notice.         15:47:22

 6        A.    Yes.                                  15:47:24

 7    BY MS. BELLOWS:                                 15:47:24

 8        Q.    At least since 2014?                  15:47:26

 9            MR. WINN:  Same objections.             15:47:29

10        A.    Yes.                                  15:47:30

11            MS. BELLOWS:  I do not have any         15:47:37

12        further questions for you.                  15:47:39

13            MR. WINN:  I have just a couple         15:47:41

14        of questions before we wrap up.             15:47:42

15                    EXAMINATION                     15:47:42

16    BY MR. WINN:                                    15:47:42

17        Q.    Counsel was just asking               15:47:47

18    questions about evictions and there was a       15:47:48

19    question posed about whether evictions          15:48:01

20    happen for reasons other than nonpayment        15:48:05

21    of rent.  If you -- if you think back on        15:48:07

22    the questions, the question I have for you      15:48:11

23    is, how often does that happen that            15:48:14

24    evictions take place for reasons other          15:48:18

25    than the nonpayment of rent?                    15:48:22
```

Page 237

| | | |
|---|---|---|
| 1 | A.    That would be almost never. | 15:48:25 |
| 2 | Q.    Turning to another topic, we | 15:48:30 |
| 3 | spoke earlier -- or you spoke earlier | 15:48:34 |
| 4 | about Natasha Gauthier who was a rental | 15:48:36 |
| 5 | assistance coordinator.   And I understand | 15:48:40 |
| 6 | she was assigned to cover both Colorado | 15:48:44 |
| 7 | and California.   What percentage of her | 15:48:46 |
| 8 | time was spent on late rent collection | 15:48:50 |
| 9 | issues for California properties versus as | 15:48:53 |
| 10 | opposed to Colorado properties? | 15:48:58 |
| 11 | A.    The amount was a drastic | 15:49:00 |
| 12 | difference, just the -- the volume of | 15:49:04 |
| 13 | properties we have in Colorado alone, | 15:49:05 |
| 14 | there's only eight there versus her | 15:49:08 |
| 15 | portfolio that she had to maintain in | 15:49:10 |
| 16 | California. | 15:49:12 |
| 17 | Q.    Can you give me an estimate as | 15:49:14 |
| 18 | to what that would be in terms of | 15:49:15 |
| 19 | California versus Colorado in terms of a | 15:49:17 |
| 20 | time stamp? | 15:49:20 |
| 21 | A.    I would say somewhere between 98 | 15:49:22 |
| 22 | percent of her time was spent on the | 15:49:25 |
| 23 | California properties. | 15:49:27 |
| 24 | Q.    Okay. | 15:49:29 |
| 25 | MR. WINN:  No further questions. | 15:49:30 |

Page 238

```
 1              REDIRECT EXAMINATION          15:49:30

 2   BY MS. BELLOWS:                          15:49:30

 3       Q.    Sorry.  I was on mute there.  I  15:49:37

 4   do have a few follow-up after -- after   15:49:40

 5   that testimony.                          15:49:43

 6              You testified that there are   15:49:46

 7   almost never any evictions for anything  15:49:49

 8   other than the nonpayment of rent.  What 15:49:52

 9   is that statement based on?              15:49:56

10       A.    The eviction reportings that    15:50:00

11   they have, the majority -- and I shouldn't 15:50:03

12   even say the majority, the vast majority  15:50:07

13   of them are for nonpayment of rent.  The  15:50:09

14   occurrences of evictions that are for     15:50:11

15   other reasons outside of that are almost  15:50:14

16   nonexistent.                             15:50:16

17       Q.    I guess my question was what    15:50:18

18   information do you have that you're basing 15:50:21

19   that on, like what documents have you --  15:50:23

20   you reviewed or how -- how have you become 15:50:25

21   aware of that?                           15:50:27

22       A.    In preparation for my           15:50:28

23   deposition, I met with our collections    15:50:29

24   team and our credit reporting team that   15:50:32

25   handles all of those pieces and they      15:50:34
```

Page 239

1    informed me of those statistics.            15:50:36

2        Q.    Do they have documents            15:50:40

3    reflecting those statistics that they       15:50:41

4    keep?                                        15:50:43

5        A.    I'm not sure.                      15:50:45

6        Q.    How do they gather data on the     15:50:48

7    number of evictions that are not for the    15:50:50

8    nonpayment of rent?                          15:50:53

9        A.    They have each -- each one noted   15:50:58

10   for the -- the type of eviction that it is  15:51:02

11   set for.                                     15:51:05

12       Q.    Where is it noted?                 15:51:07

13       A.    So they have that in a -- I        15:51:09

14   don't know exactly what they -- what they   15:51:13

15   call it, but it's in their collection or    15:51:15

16   eviction workbook that was noted on one of  15:51:17

17   the other exhibits that we went through.    15:51:20

18   I'm not sure how long the historic data     15:51:25

19   gets kept on there.  If it's               15:51:28

20   year-over-year, ongoing or how far back     15:51:30

21   that goes.                                   15:51:33

22       Q.    Okay.  I'd like to go back and     15:51:36

23   look at one of those exhibits, but before   15:51:39

24   I do that, what about prior to the          15:51:41

25   pandemic, do they have any statistics       15:51:43

Page 240

```
 1    properties in those states?              15:53:09

 2        A.    No.  The volume of eight       15:53:13

 3    properties in California would have      15:53:15

 4    produced many more applicants, things for 15:53:17

 5    her to track down versus the -- the --   15:53:21

 6    what we saw come out of Colorado just in 15:53:23

 7    general, the delinquency was lower,      15:53:26

 8    residents didn't participate in programs 15:53:28

 9    as frequently.  They just seemed to be in 15:53:32

10    a different place.                       15:53:34

11        Q.    Is there any tracking or       15:53:37

12    documentation over time that could confirm 15:53:39

13    this estimate that you provided about how 15:53:42

14    much of her time was spent on California 15:53:45

15    versus Colorado?                         15:53:47

16            MR. WINN:  Objection, vague.     15:53:48

17        A.    Yes.  I think even looking at  15:53:50

18    her rental assistance workbook, just     15:53:52

19    looking at the properties themselves to  15:53:55

20    see how many entries are there for the   15:53:57

21    Colorado properties versus the California 15:53:59

22    properties would show that.              15:54:01

23    BY MS. BELLOWS:                          15:54:01

24        Q.    All right.  Let me get back into 15:54:09

25    Exhibit Share.  And I'm going to pull up 15:54:12
```

Page 242

```
 1    Exhibit 13, if you can do the same.  If          15:54:28
 2    you can point me to where in this                15:54:40
 3    spreadsheet identifies what kind of              15:54:43
 4    eviction is at issue, that would be great.       15:54:45
 5            MR. WINN:  Objection, vague,              15:54:48
 6        exceeds the scope of the deposition.         15:54:50
 7        A.    I don't see that listed on the         15:54:56
 8    California tab.  So I'm not sure if it's          15:54:58
 9    not included in this document or if it's         15:55:03
10    something else referenced on one of the          15:55:05
11    redacted tabs for some reason or if              15:55:07
12    potentially I'm thinking of another report       15:55:12
13    that she would have reviewed with me in          15:55:14
14    preparation for this that looked similar         15:55:15
15    but was not something that was provided.         15:55:18
16            MS. BELLOWS:  Okay.  Well, we             15:55:22
17        would like to have that report               15:55:25
18        produced, Aaron, if you could figure         15:55:26
19        out what it is.                              15:55:28
20            MR. WINN:  I -- I don't know              15:55:31
21        what report the witness has in mind,         15:55:32
22        but I'm happy to look into that issue        15:55:35
23        for you.                                     15:55:38
24            MS. BELLOWS:  Okay.  And, you             15:55:38
25        know, any other document they're             15:55:47
```

Page  243

```
 1        relying on that -- and any other        15:55:49
 2        document or source of data they were     15:55:59
 3        relying on when they provided            15:56:02
 4        Ms. Carnley with that estimate.          15:56:04
 5            Okay.  That's -- I have no            15:56:14
 6        further questions at this time.  I       15:56:16
 7        don't know if you have anything else,    15:56:18
 8        Aaron.                                   15:56:19
 9            MR. WINN:  Only that, you know,      15:56:21
10        we'd like to request the opportunity    15:56:23
11        to read and review the transcript and   15:56:25
12        allow time for that process to take     15:56:29
13        place.  So and I need to get back to    15:56:31
14        the court reporter with respect to the  15:56:35
15        time when the transcript will be        15:56:36
16        available, but I think we can agree     15:56:38
17        upon the timing for that based upon     15:56:40
18        the receipt of the transcript and --    15:56:42
19        and build in some time to allow for     15:56:44
20        that to take place.                      15:57:09
21            MS. BELLOWS:  Okay.  So I was        15:57:13
22        going to ask for the transcript in ten  15:57:15
23        days.  What's your proposal for         15:57:16
24        getting the review and -- and           15:57:20
25        signature done?                          15:57:22
```

Page 244

```
 1                    CERTIFICATION

 2

 3        I, BELLE VIVIENNE, a Nationally

 4    Certified Realtime Reporter, do hereby

 5    certify:

 6        That the witness whose testimony as

 7    herein set forth, was duly sworn by me;

 8    and that the within transcript is a true

 9    record of the testimony given by said

10    witness.

11        I further certify that I am not

12    related to any of the parties to this

13    action by blood or marriage, and that I am

14    in no way interested in the outcome of

15    this matter.

16        IN WITNESS WHEREOF, I have hereunto

17    set my hand this 29th day of July 2022.

18

19

20

21

22      BELLE VIVIENNE, CRR, CCR, RPR

23

24            *       *       *

25
```

Page 247

# EXHIBIT B

1          UNITED STATES DISTRICT COURT

2         NORTHERN DISTRICT OF CALIFORNIA

3

4   JAVANNI MUNGUIA-BROWN, ANGELINA)
    MAGAÑA, NORMA RODRIGUEZ, and   )
5   DAVID BONFANTI, individually   )
    and on behalf of others        )
6   similarly situated,            )
                                   )
7                    Plaintiffs,   )  Case No.
                                   )  4:16-CV-01225-JSW
8   vs.                            )
                                   )
9   EQUITY RESIDENTIAL, a real     )
    estate investment trust,       )
10  et al.,                        )
                                   )
11                                 )
                     Defendants.   )
12  _____)

13

14

15              DEPOSITION OF

16             MICKEY CUMMINGS

17          COSTA MESA, CALIFORNIA

18         THURSDAY, JULY 6, 2017

19

20

21

22

23
    Reported by:
24  DENISE HESS
    CSR NO. 7564 RPR
25  17-54401

```
 1        COSTA MESA, CALIFORNIA; JULY 6, 2017

 2

 3                MICKEY CUMMINGS,

 4   having been first duly sworn, was examined and

 5   testified as follows:

 6

 7                EXAMINATION

 8

 9   BY MR. TOMASEVIC:

10        Q    Good morning, again, Mr. Cummings.

11        A    Good morning.

12        Q    My name is Alex Tomasevic.  We met briefly

13   before we went on the record here today, but do me a

14   favor and for our record please state and spell your

15   full name.

16        A    Sure.  Albert Francis Cummings, III,

17   A-L-B-E-R-T, F-R-A-N-C-I-S, Cummings, C-U-M-M-I-N-G-S,

18   the third.

19             Would prefer to be called Mickey,

20   M-I-C-K-E-Y, during the testimony.

21        Q    I will call you Mickey.  And you can call me

22   Alex if you like.

23        A    Yes.

24        Q    You used to be a senior vice president for

25   Equity Residential, right?
```

```
 1        Q   So when the budget and pricing people are
 2   looking to do their job with respect to these master
 3   contracts, what are they looking at?  What are they
 4   looking to do?
 5        A   They are given a fee from what's called an
 6   ancillary revenue department that negotiated those
 7   contracts.  And we just get a fee, Here is your budget
 8   number, put it in the budget, and let's move on.
 9        Q   Now, the late fees, what were the people on
10   your team responsible for with respect to late fees?
11        A   Late fees, again, we would look at what we
12   had been doing for late fees, the previous, you know,
13   year or two, and generally budget a number similar to
14   that.
15        Q   When you say you were looking at what you had
16   been doing, you mean what you had been collecting in
17   the past?
18        A   Yes, yes.
19        Q   The budget line item for late fees in these
20   financials, was that for late fees paid or late fees
21   charged?
22            MR. WINN:  Objection; vague.
23            THE WITNESS:  That's a good question.
24            I don't -- you know, I don't recall.
25            When we budgeted --
```

```
 1           You know, I don't recall.  I don't recall.
 2  Let me -- give me a moment just to kind of think it
 3  through.  You know, I don't remember.  I honestly
 4  don't.  Shoot.
 5  BY MR. TOMASEVIC:
 6       Q   Correct me if I'm wrong, but if you counted
 7  it as income, wouldn't it be late fees paid?
 8             MR. WINN:  Objection; calls for speculation,
 9  vague.
10             THE WITNESS:  Well, yes.  But remember, you
11  can have a boatload of income accounts that are both
12  charges and you can have offsets, accounting offsets,
13  still within your income accounts.
14             So let's say I wanted to get to my late
15  fees -- it's all up in the same section of the
16  financial.  So let's say we charged $1,000 of late fees
17  during the month.  And let's say we collected 700.  So
18  we might see a charge of a thousand and a credit of
19  300, the net being the 700 we collected.
20             I do remember seeing accounting of that sort,
21  but I also do remember that we would also budget based
22  on what we believed we had received.  So I just don't
23  remember the accounting -- the Equity Residential
24  accounting.
25             But I will tell you, because I remember bad
```

```
 1    debt in that way.  So bad debt could be charged as an
 2    income item, and then in the same income section you
 3    might see a bad debt charge for $2,000, and you might
 4    see a credit against bad debt, you know, of the same
 5    2,000, which meant your actual bad debt ended up being
 6    zero.
 7    BY MR. TOMASEVIC:
 8         Q    Let me try to unpack what sort of an
 9    estimated or educated guess versus something that you
10    know and remember specifically.
11         A    Okay.
12         Q    Do you know whether Equity Residential in its
13    financial reports that you had reviewed, in the line
14    item for late fees, it included charged but unpaid late
15    fees?
16         A    I don't recall.  I just don't recall.
17         Q    Who would know the most about that?
18         A    Probably our budget analyst.  Somebody that
19    stuck with the company longer than 2008 probably would
20    remember better than me.
21         Q    Understood.
22              Are you thinking of a particular person?
23         A    Well, Stephanie I think was around another
24    few years.  You know, Gerry, Gerry retired come to
25    think of it, before I left, Gerry Spector.  Fred Tuomi
```

 1   left two years after I did.  Bruce Lavine was around

 2   three, four years longer, I think, than me.

 3        Q   When you and your team were analyzing and

 4   budgeting late fees, did you consider late fees charged

 5   by the competition?

 6            MR. WINN:  Objection; vague, misstates

 7   testimony, calls for speculation.

 8            THE WITNESS:  No, not when we were budgeting.

 9   But when -- this goes to the setting of a late charge

10   policy.  We would have a process in order to set and

11   justify the right charge for a late fee.  All right?

12            And that process -- and I don't remember the

13   particular numbers, but that process would include, you

14   know, what's being done through the apartment, what's

15   common in the apartment association.  What's -- what's

16   happened in court cases, unlawful detainers, anything

17   that's occurred with any company in California

18   regarding late fees and charges and approach.

19            What are our competitors doing.  You know,

20   what's Archstone Properties charging for late charges.

21            So, you know, we would gain -- we would go

22   around and collect as much information and data as

23   possible to charge what we felt was the correct and

24   defensible and common late fees, according to all of

25   those components.

```
 1        I, DENISE HESS, a Certified Shorthand Reporter of

 2   the State of California, do hereby certify:

 3        That the foregoing proceedings were taken before me

 4   at time and place herein set forth; that any witnesses

 5   in the foregoing proceedings, prior to testifying, were

 6   administered an oath; that a record of the proceedings

 7   was made by me using machine shorthand which was

 8   thereafter transcribed under my direction; that the

 9   foregoing transcript is a true record of the testimony

10   given.

11        Further, that if the foregoing pertains to the

12   original transcript of a deposition in a Federal case,

13   before completion of the proceedings, review of the

14   transcript [X] was [ ] was not requested.

15        I further certify I am neither financially

16   interested in the action nor a relative or employee of

17   any attorney or any party to this action.

18        IN WITNESS WHEREOF, I have this date subscribed my

19   name.

20

21   Dated:  7/11/17

22

23

24                    DENISE HESS
                      CSR No. 7564
25
```

# EXHIBIT C

Transcript of the Testimony of:

# ROBERT KNUDSEN

Javanni Munguia-Brown, et al.

vs.

Equity Residential, et al.

June 9, 2020



IMAGINE
REPORTING

```
 1              UNITED STATES DISTRICT COURT

 2            NORTHERN DISTRICT OF CALIFORNIA

 3   _____

                                     )
 4   JAVANNI MUNGUIA-BROWN, ANGELINA )
     MAGANA, NORMA RODRIQUEZ, and    )
 5   DAVID BONFANTI individually and )
     on behalf of others similarly   )
 6   situated,                       )
                                     )
 7                     Plaintiffs,   )
                                     )
 8          vs.                      )  Case No.
                                     )  4:16-cv-01225-JSW
 9   EQUITY RESIDENTIAL, a real      )
     estate investment trust, ERP    )
10   OPERATING LIMITED PARTNERSHIP,  )
     a partnership, EQUITY           )
11   RESIDENTIAL MANAGEMENT, L.L.C., )
     EQR-WOODLAND PARK A LIMITED     )
12   PARTNERSHIP, and EQR-WOODLAND   )
     PARK B LIMITED PARTNERSHIP,     )
13                                   )
                      Defendants.    )
14   _____)

15

16

17

18

19       RECORDED ZOOM DEPOSITION OF ROBERT KNUDSEN,

20       commencing at the hour of 10:19 a.m., on

21       Tuesday, June 9, 2020, reported remotely from

22       500 North State College, Suite 1100, Orange,

23       California, before January D. Allen, Certified

24       Shorthand Reporter in and for the State of

25       California.
```

```
 1 | APPEARANCES:
   |
 2 |
   |
 3 | For the Plaintiffs:
   |
 4 | NICHOLAS & TOMASEVIC, LLP
   | BY:  ALEX M. TOMASEVIC, ESQ.  (APPEARING REMOTELY)
 5 |       ETHAN T. LITNEY, ESQ.  (APPEARING REMOTELY)
   | 225 Broadway, 19th Floor
 6 | San Diego, California  92101
   |
 7 | GOLDSTEIN BORGEN DARDARIAN & HO
   | BY:  KATHARINE L. FISHER, ESQ.  (APPEARING REMOTELY)
 8 | 300 Lakeside Drive, Suite 1000
   | Oakland, California 94612
 9 |
   |
10 | For the Defendants:
   |
11 | DUANE MORRIS LLP
   | BY:  AARON WINN, ESQ.  (APPEARING REMOTELY)
12 | 170 B. Street, #2990
   | San Diego, California  92101
13 |
   |
14 | Also Present, appearing remotely:
   |
15 | BRANDON BARLOW, DEPOSITION TECHNICIAN
   |
16 |
   |
17 |
   |
18 |
   |
19 |
   |
20 |
   |
21 |
   |
22 |
   |
23 |
   |
24 |
   |
25 |
```

Robert Knudsen                                                    June 9, 2020

```
 1                      I N D E X

 2                     EXAMINATIONS

 3   WITNESS                                           PAGE

 4   ROBERT KNUDSEN

 5       Examination By MR. TOMASEVIC .............. 7

 6

 7

 8

 9                      EXHIBITS

10   NUMBER       DESCRIPTION                          PAGE

11   Exhibit 1    Defendant's List of Expert            27
                  Witnesses in Consumer Justice
12                Foundation vs. Equity Residential
                  Properties Trust, 11 pages
13                (WP003425 - 3435)

14   Exhibit 2    PricewaterhouseCoopers engagement     29
                  letter in Consumer Justice
15                Foundation v. Equity Residential
                  Properties Trust, dated 8/26/98,
16                6 pages (WP003329 - 3334)

17   Exhibit 3    Summary of Collection Costs,          37
                  Damages & Other Recoverable Losses,
18                23 pages (WP000851 - 873)

19
                  (Exhibit 4 was not marked.)
20

21   Exhibit 5    Declaration of Robert S. Knudsen,    100
                  2 pages (WP003436 - 3437)
22

23   Exhibit 6    Equity Residential Collection/       142
                  Delinquency Related Time
                  Survey, 1 page
24

25
```

```
 1              Tuesday, June 9, 2020

 2              Orange, California

 3              10:19 a.m.

 4              *   *   *   *

 5         THE VIDEOGRAPHER:  Good morning.  I am

 6  Brandon Barlow, your deposition technician, and I

 7  represent Imagine Reporting.  I'm not financially

 8  interested in this action, nor am I a relative or

 9  employee of any of the attorneys or parties in this

10  action.

11         The date is June 9th, 2020.  The time is

12  10:19 a.m.  This matter is being recorded via Zoom,

13  and we are on the record.  This deposition is taken

14  place via video conference.

15         This is Case No. 4:16-cv-01225-JSW in the

16  United States State District Court, Northern District

17  of California, entitled Munguia-Brown versus Equity

18  Residential.  The deponent is Robert Knudsen.  This

19  deposition is being taken on behalf of the plaintiff.

20         Counsel, will you now introduce yourselves

21  and state who you represent.

22         MR. TOMASEVIC:  Morning, everyone.  Alex

23  Tomasevic for the plaintiffs and the class.

24         MS. FISHER:  Katharine Fisher for the

25  plaintiffs and the class.
```

```
 1              MR. LITNEY:  Ethan Litney for the plaintiffs
 2    and the class.
 3              MR. WINN:  Aaron Winn on behalf of
 4    defendants.
 5              THE REPORTER:  Good morning.  My name is
 6    January Allen.  I am a certified shorthand
 7    stenographic reporter.  I'm the deposition officer
 8    for today's proceedings.  My CSR license number is
 9    13748 with the State of California, and it's in good
10    standing.
11              Before we proceed, I will ask counsel to
12    agree on the record that there is no objection to me
13    administering a binding oath to the witness appearing
14    before me via the Zoom video conference.
15              Is everybody okay with that?
16              MR. TOMASEVIC:  Plaintiff agrees.
17              MR. WINN:  As do defendants.
18              THE REPORTER:  Great.
19              If you would please, sir, raise your right
20    hand and I'll swear you in.
21              (Witness sworn.)
22              THE WITNESS:  I do.
23              THE REPORTER:  Thank you.
24              You may proceed.
25              MR. TOMASEVIC:  Thank you, everyone.
```

```
 1                        ROBERT KNUDSEN,

 2      having been first duly sworn, testified as follows:

 3

 4                          EXAMINATION

 5    BY MR. TOMASEVIC:

 6        Q.   Again, Mr. Knudsen, hello.  For the record,

 7    my name is Alex Tomasevic.  I represent the

 8    plaintiffs, and I'm class counsel in the case against

 9    Equity Residential.

10            Do me a favor and please spell your full

11    name for the record.

12        A.   Robert S. Knudsen.  Knudsen is spelled

13    K-N-U-D-S-E-N.

14        Q.   Thank you.

15            And what's your current address?

16        A.   Work address is 3 Park Plaza, Irvine,

17    California 92614.

18        Q.   And home address?

19        A.   I don't give out home address.

20        Q.   Well, unless Aaron will agree to accept

21    service of process on a trial subpoena or further

22    process, I'm going to need that from you.

23            MR. TOMASEVIC:  Aaron, will you agree to

24    accept that, in lieu of personal service, should we

25    need to serve a trial subpoena or anything like that?
```

```
 1   leading to the creation of that report to the best
 2   you can recall.
 3           Okay?
 4      A.   Okay.
 5      Q.   Before then, have you personally ever been
 6   retained by EQR to do any professional work?
 7      A.   No.
 8           MR. WINN:  Objection.  Vague.
 9   BY MR. TOMASEVIC:
10      Q.   Do you know if the PricewaterhouseCooper
11   firm had?
12      A.   Not that I recall.
13      Q.   Before 1999, have you ever been retained by
14   anyone to analyze or consult with regarding an
15   apartment late fee or proposed apartment late fee?
16      A.   Before when?
17      Q.   Before you did the report in 1999 or 1998,
18   when you were with Pricewaterhouse, regarding the EQR
19   late fee.
20      A.   The answer to that is probably yes.
21      Q.   Can you recall any other apartments or
22   apartment owners that you worked with in that regard?
23      A.   Let's see.  It was an Irvine Company entity.
24   Not sure if Archstone was before or after EQR; might
25   have been after.  And then there's at least one other
```

```
 1   whose name I cannot recall.
 2       Q.   What were you asked to do for the Irvine
 3   Company entity with respect to late fees?
 4       A.   Do a cost analysis.
 5       Q.   For what purpose?
 6       A.   For the -- it was an expert assignment.
 7       Q.   During an ongoing litigation?
 8       A.   I believe a litigation had been initiated,
 9   yes.
10       Q.   And you were retained by the defendant in
11   that case or the landlord?
12       A.   Correct.
13       Q.   Do you recall your conclusions from that
14   work, your final opinions?
15       A.   Not specifically.
16       Q.   How about generally?
17       A.   I mean, generally, I believe the costs
18   exceeded the late fees.
19       Q.   Was that case in federal or state court, if
20   you recall?
21       A.   State court.
22       Q.   Did you end up creating any kind of report
23   or declaration outlining your opinions in that case?
24       A.   There was an analysis for sure.  I don't
25   think there was a written report, if that's what you
```

Case 4:16-cv-01225-JSW   Document 303-2   Filed 06/02/23   Page 857 of 1110

Robert Knudsen                                          June 9, 2020

```
 1        A.   Yes.

 2        Q.   What happened?

 3        A.   The late fee was upheld.

 4        Q.   Do you recall what the late fee was in that

 5   case?

 6        A.   Not specifically.  Maybe 50 or $75.  One of

 7   the two.

 8        Q.   Was it just a flat 50 or 75?

 9        A.   Again, not sure, but I think so.

10        Q.   Do you have any of your files from that

11   matter still?

12        A.   No.

13        Q.   Tell me more about the Archstone matter.

14             Did you produce a report in that case?

15        A.   I did an analysis for them.  I don't know if

16   there was a case actually.

17        Q.   Tell me more about the Archstone retention.

18             Generally speaking, what were you asked to

19   do?

20        A.   Do a cost study.

21        Q.   For what purpose?

22        A.   To determine or look at the costs of dealing

23   with delinquent customers vis-a-vis the late fee.

24        Q.   Now, were you asked to assess whether a late

25   fee was sufficient or to help design a late fee
```

www.ImagineReporting.com | 855-203-2461          Page 21

1    moving forward?  What can you tell me about that?

2        A.   Again, I'm not really sure if I remember the

3    context, whether it was litigation or non-litigation,

4    and I think it's -- you know, my general recollection

5    would be that they wanted to see how their late fee

6    compared to the costs they were incurring.

7        Q.   Can you explain --

8        A.   Let me say it this way.  They wanted

9    somebody to do a study of that.  They'd already done

10   some work themselves to figure out whether they

11   thought the late fee was appropriate or not, but they

12   thought they needed a -- they wanted a study in

13   addition to that.

14       Q.   Were you working with lawyers as a part of

15   that matter?

16       A.   Yes.

17       Q.   What firm or lawyers?

18       A.   I don't recall.

19       Q.   Were the apartment buildings located here in

20   California?

21       A.   I believe so.

22       Q.   And what were your conclusions in that case

23   as well?

24       A.   I don't recall.

25       Q.   The third one -- you can't remember the

1   of, I have a vague recollection on.

2   BY MR. TOMASEVIC:

3       Q.   So EQR told you not to include certain

4   costs, like legal fees, in overhead?

5           MR. WINN:  Objection.  Misstates

6   testimony.

7           THE WITNESS:  We did do an overhead

8   calculation, as I mentioned a couple times, but I

9   don't see legal fees on this schedule.

10  BY MR. TOMASEVIC:

11      Q.   At some point, though, you and EQR would

12  have had discussions and come to an agreement as to

13  what costs should be reflected and what shouldn't;

14  right?

15      A.   It was more of a case of, you know, me doing

16  my analysis and presenting it to them.  That's what I

17  think actually this document probably is, is a draft

18  that I sent to them and counsel of, okay, here's what

19  we've come up with.

20      Q.   Are you saying that EQR would have had no

21  input on the cost categories included or not

22  included?

23      A.   Well, there would have been some upfront

24  discussion about what areas they thought were

25  impacted by that.  'Cause, clearly, I would have

Robert Knudsen                                          June 9, 2020

1    wanted to -- they know their business and so I would

2    have wanted to get their input on that, but the

3    ultimate analysis would have been mine.

4        Q.   Did you ever attempt with EQR, in 1998 or

5    1999, to determine a per occurrence or individual

6    cost to EQR for an instance of late rent?

7              MR. WINN:  Objection.  Vague.

8              THE WITNESS:  Not that I -- not that I've

9    seen in here.  You can -- you can potentially -- you

10   can potentially get there by dividing numbers by 50

11   or something like that, but I don't recall a

12   per-incident analysis.

13   BY MR. TOMASEVIC:

14       Q.   Is it fair to say your report in Exhibit 3,

15   in general, adds up costs associated with late fees

16   and compares that to late fees collected in the

17   aggregate?

18       A.   I don't know if I would describe it quite

19   that way.

20            Can I hear the question again?

21       Q.   How would you describe it?

22       A.   Well, I think we're taking the costs that --

23   basically, costs caused by delinquent customers and

24   summarizing those and then comparing to the fees

25   collected from those customers.

Robert Knudsen                                              June 9, 2020

```
 1   about it.
 2   BY MR. TOMASEVIC:
 3      Q.   Okay.  Generally speaking, the sooner a
 4   tenant pays rent, albeit late, the cheaper it is to
 5   the company, meaning there are less costs incurred in
 6   collecting them, late rent; right?
 7           MR. WINN:  Objection.  Incomplete
 8   hypothetical.  Calls for speculation.  Vague.
 9           THE WITNESS:  I think in a general sense
10   with respect to certain costs, that's -- that can be
11   true.
12   BY MR. TOMASEVIC:
13      Q.   For example, it may be the case --
14      A.   I mean, it's not universally true, but it
15   can be true.
16      Q.   Okay.  I appreciate that.
17           It may be the case that sometimes rent,
18   albeit being paid late, costs the company nothing;
19   right?
20           MR. WINN:  Objection.  Calls for
21   speculation.  Incomplete hypothetical.
22           And here's the reason for my objection,
23   Alex.  If this --
24           MR. TOMASEVIC:  I don't need you to explain
25   the reason for your objection.  I understand --
```

Robert Knudsen                                          June 9, 2020

1  you've put forth in front of the witness to make it
2  possible for us to understand what you're asking
3  about.
4          MR. TOMASEVIC:  So your objection is
5  vague.
6          MR. WINN:  It is.
7          MR. TOMASEVIC:  Okay.  Noted.  Thank you.
8  BY MR. TOMASEVIC:
9     Q.   So once again, Mr. Knudsen, thanks for
10 sitting through that bit of housekeeping.  I'm sure
11 you've seen it before.
12         But do you know if there were instances in
13 1997 for EQR where it cost them nothing when someone
14 paid rent late?
15    A.   Probably -- probably not.
16    Q.   Why do you say that?
17    A.   Because the -- one of the costs categories
18 is funds withheld or lost use of funds, and so when
19 you don't pay on time, you have a lost use of funds.
20    Q.   Could have put that money to work in the
21 interim, but you weren't able to so you lost
22 something; right?
23    A.   Well, it's actually -- it's actually more
24 than, you know -- maybe I should withdraw what I just
25 said.  It's really more the need to have a certain

```
 1   amount of money on hand because you have late
 2   customers.  In other words, the company needs, you
 3   know, X million in cash available to pay its expenses
 4   because people aren't paying on time so they can then
 5   pay those expenses.
 6       Q.   Are you aware of any instances, in 1997,
 7   where EQR couldn't meet its financial obligations
 8   because people weren't paying rent on time?
 9       A.   No.  I'm going to assume they did just what
10   I said, is they have to have a certain amount of
11   money on hand because they know that's going to
12   happen; so therefore, they have to plan for that,
13   and, therefore, they have to obtain or have
14   additional debt or equity financing in order to allow
15   for that.
16       Q.   So tenant John Doe at Equity Residential who
17   has a $1,000 monthly rent obligation and a grace
18   period that allows him to pay through the fifth of
19   the month, he actually doesn't walk in the office
20   until the 6th at 8:00 a.m. and he submits his check
21   for $1,000, you're saying that there's a cost
22   associated with that.
23           And what is that cost?
24           MR. WINN:  Objection.  Incomplete
25   hypothetical.  Vague.
```

1        THE WITNESS:  Well, again, it's back to
2   Equity Residential has more than one John Doe who is
3   doing that thing or doing -- or not paying for
4   several days or many days; and as a consequence, they
5   have to have a certain amount of money on hand
6   because that -- they're not going to get that rent
7   from John Doe --
8        MR. TOMASEVIC:  Forget about the --
9        THE WITNESS:  -- from John Doe or any other
10  delinquent customers.
11  BY MR. TOMASEVIC:
12     Q.   Forget about the other delinquent customers.
13  Let's just talk about the John Doe payment on the
14  morning of the 6th.
15        What costs are there to John Doe paying his
16  $1,000 rent on the morning of the 6th instead at
17  5:00 p.m. on the 5th?
18        MR. WINN:  Objection.  Incomplete
19  hypothetical.  Vague.
20        THE WITNESS:  There isn't -- the question
21  makes no sense relative to the cost caused by
22  delinquent customers.
23  BY MR. TOMASEVIC:
24     Q.   So EQR's --
25     A.   There isn't just -- let me finish.  There

```
 1   isn't just one John Doe, and there's not -- you
 2   can't -- you can't -- the costs aren't driven by the
 3   fact that there's only one guy doing this.  The
 4   costs -- there's a whole bunch of people doing it.
 5        Q.   Okay.  I think I understand you.  So it's
 6   not just John Doe paying lent rate -- I'm sorry.
 7   Strike that.
 8            It's not just John Doe paying late rent that
 9   is the problem.  It's that Jane Doe and Jeff Doe and
10   Brad Rowe, also, are probably paying rent late.
11            That's part of the issue?
12        A.   That's part of the issue, certainly, yeah.
13        Q.   So in order to --
14        A.   There's a group of people that are
15   delinquent, and they cause the company to incur
16   costs.
17        Q.   So in designing a late rent schedule or
18   charge for John Doe, you have to account for Jane Doe
19   and other tenants also being late?
20        A.   Well, it's because it's not possible to
21   develop a late fee tailored to John Doe individually.
22        Q.   So EQR, at least in 1999, had a late fee
23   system that required John Doe to help cover the costs
24   of Jane Doe also paying rent late?
25            MR. WINN:  Objection --
```

support that. You don't have the history to support that. It's just -- it's just not possible from an accounting system point of view to do what you're suggesting.

BY MR. TOMASEVIC:

Q. Well, in the instance of John Doe paying literally a minute late, how does that cost a company anything other than this lost use of funds that you mentioned earlier?

MR. WINN: Objection. Incomplete hypothetical. Calls for speculation. Vague.

THE WITNESS: Yeah, I think I've answered that question already. I mean, we don't know that the previous month John Doe didn't take us all the way to eviction. So we don't know at any -- for John Doe over the course of a year, for example, what he's cost us. And even when he pays late by a day, we don't know what other costs he might have cost us as of part of that process.

BY MR. TOMASEVIC:

Q. What if I told you that EQR knows exactly what the history of John Doe's payments or lack of payments were because they keep a ledger of every dollar that comes in and when it comes in.

Would your answer be different?

1        MR. WINN:  Objection.  Incomplete

2   hypothetical.

3        THE WITNESS:  I would tell you that they

4   don't keep information necessary, information you

5   would need to figure out what he would cost, that

6   their computer systems do not do that; and therefore,

7   that can't be a hypothetical so to speak.

8   BY MR. TOMASEVIC:

9        Q.   You're telling me you know that today that

10  EQR doesn't have any information of that type, and

11  you know that for a fact?

12       A.   I can tell you for a fact, in 1998, that was

13  not true, and suspect it's also not true as of today,

14  but I do not -- I cannot tell you as of today.

15       Q.   Well, couldn't you --

16       A.   I can tell you it was true in 1998.

17       Q.   What would have stopped EQR from developing

18  a late fee structure that treated people who paid

19  rent within 24 or 48 hours of the expiration of grace

20  period differently from people who took longer

21  amounts of time to pay?

22       MR. WINN:  Objection.  Incomplete

23  hypothetical.  Vague.

24  BY MR. TOMASEVIC:

25       Q.   What would have stopped them from doing that

1    at the time?

2            MR. WINN:  Same objections.

3            THE WITNESS:  I mean, they can develop late

4    fee payment mechanisms that they think are

5    appropriate.  That's not the issue.

6            The issue is -- that we were discussing was

7    whether they would know the cost that that particular

8    person cost them at any point in time.  That's what

9    they don't know.  How they structure the recovery of

10   their costs is somewhat up to them.  But to

11   understand what a particular person costs, that they

12   cannot -- they could not do.

13   BY MR. TOMASEVIC:

14       Q.  So if not a particular person, could they

15   have developed particular subcategories like I just

16   used as an example, people who pay within 48 hours or

17   72 hours?

18           MR. WINN:  Objection.  Vague.  Compound.

19   Calls for speculation.  And incomplete hypothetical.

20           THE WITNESS:  No, I don't think they could

21   have done that.

22   BY MR. TOMASEVIC:

23       Q.  Because they didn't have the capability in

24   1999?  They didn't keep that information; that's what

25   you're telling me?  Or do you have some other basis

Robert Knudsen                                      June 9, 2020

```
 1    for saying that?
 2        A.    Because they don't keep information
 3    necessary to know all the costs that a particular
 4    person cost them on an individual basis.
 5        Q.    And, again, I'm not talking about
 6    individuals necessarily.  I'm talking about groups of
 7    people.
 8        A.    Groups of individuals, then.  Yes, you
 9    can't -- if you -- if you use your 48-hour thing, you
10    still wouldn't know the people in the 48-hour group,
11    what costs they had caused you --
12        Q.    What would you need to know --
13        A.    -- as a group.
14        Q.    What would you need to know to develop that?
15            MR. WINN:  Objection.  Incomplete
16    hypothetical.  Calls for speculation.  Vague.
17            THE WITNESS:  You would -- for one thing,
18    you would probably have to have individual time
19    reporting by tenant.
20    BY MR. TOMASEVIC:
21        Q.    Meaning what?  Time as to what?
22        A.    I spent 10 minutes with Tenant A; I spent 15
23    minutes with Tenant B, etc.
24        Q.    But for some groups of people, like people
25    who pay immediately, they spend no time.  I mean, you
```

```
1              people, like people who pay immediately,

2              they spend no time.  I mean, you told me

3              that for some categories of people who pay

4              rent late, the costs to the company may only

5              be lost use of funds; right?")

6              MR. WINN:  My objections to that question

7     are:  One, it misstates the witness's prior

8     testimony; two, it's vague; and three, it's an

9     incomplete hypothetical.

10             THE WITNESS:  With respect to a particular

11    person on a particular month, that could be true.

12    BY MR. TOMASEVIC:

13        Q.   So it's sometimes true --

14        A.   (Cross talk.)

15        Q.   I'm sorry.  Go ahead.

16        A.    It's sometimes true.  The prior month for

17    that same individual, it might not be true.

18        Q.   But it's sometimes true that a particular

19    instance of a person or group of people paying rent

20    late by only a short amount of delinquency costs the

21    company nothing other than, perhaps, lost use of

22    funds?

23             MR. WINN:  Objection.  Calls for

24    speculation.  Lacks foundation.  Incomplete

25    hypothetical.
```

Robert Knudsen                                        June 9, 2020

1           THE WITNESS:  Well, there probably are some
2      other costs that would be included as well, besides
3      just lost use of funds, now that I think about it
4      some more.
5      BY MR. TOMASEVIC:
6           Q.   But there could be a group of people for
7      which there is no cost to the company for them paying
8      their rent late, other than potential lost use of
9      funds?
10          MR. WINN:  Objection.  Incomplete
11     hypothetical.  Calls for speculation.
12          THE WITNESS:  Actually, the more I think
13     about that, the more I think that's probably not
14     true.
15     BY MR. TOMASEVIC:
16          Q.   Why would it be untrue?
17          A.   Because it would probably be some labor
18     activity, and certainly the computer systems that
19     have to be in place to track accounts receivable and
20     other delinquency aspects.  That's an incremental
21     cost to the company that would be present as well.
22          Q.   How is a computer system an incremental cost
23     to the company that goes up because somebody pays
24     rent late?
25               MR. WINN:  Incomplete hypothetical.  Calls

```
 1              MR. WINN:  Objection.  Argumentative.  Lacks
 2    foundation.  Incomplete hypothetical.  Vague.
 3              THE WITNESS:  That would be my initial
 4    reaction to that question.
 5              MR. TOMASEVIC:  What, his objection?  Or
 6    my -- you're agreeing with my answer or my question?
 7              MR. WINN:  Objection.  Vague.
 8              Ask the question because I'm not sure now I
 9    know what the question is.
10    BY MR. TOMASEVIC:
11        Q.   What systems did EQR have, in 1997, that
12    they never would have needed at all had we lived in a
13    hypothetical world where nobody pays rent late?
14              MR. WINN:  Objection.  Incomplete
15    hypothetical.  Calls for speculation.  Vague.
16              THE REPORTER:  Is everybody there?
17              THE WITNESS:  Yeah.  I'm thinking about the
18    question.
19              THE REPORTER:  Sorry.
20              THE WITNESS:  Let me hear the question one
21    more time just to make sure I have it right.
22              MR. TOMASEVIC:  Can you read it back for me,
23    Madam Court Reporter.
24              THE REPORTER:  Yes, of course.
25    ///
```

Robert Knudsen                                                    June 9, 2020

```
 1          (The record was read by the reporter as
 2          follows:
 3              "QUESTION:  What systems did EQR have,
 4          in 1997, that they never would have needed
 5          at all had we lived in a hypothetical world
 6          where nobody pays rent late?")
 7          THE WITNESS:  I'm not sure if that's -- if
 8  we quantify -- to quantify some subset of that, but
 9  certainly the accounts receivable system would be,
10  potentially, in that category.
11  BY MR. TOMASEVIC:
12      Q.   What accounts receivable system did they
13  have in 1997?
14      A.   I'm talking about the accounts receivable
15  system they need to track the fact that they hadn't
16  been paid.
17      Q.   Right.  What was that in EQR, in 1997, and
18  how much did it cost?
19          MR. WINN:  Objection.  Compound.
20          THE WITNESS:  The analysis would say systems
21  that fall in that category, 16,379.
22  BY MR. TOMASEVIC:
23      Q.   But that's a proportion of an overall
24  system.  That's not a stand-alone system that could
25  be foregone if people always paid rent on time;
```

```
 1   right?
 2           MR. WINN:  Objection.  Argumentative.  Lacks
 3   foundation.
 4           THE WITNESS:  It's an estimate of the
 5   portion of a system that is devoted to delinquent
 6   activities.
 7   BY MR. TOMASEVIC:
 8      Q.   So do you know if --
 9      A.   (Cross talk.)
10      Q.   I'm sorry.  Go ahead.  You paused.
11      A.   That's okay.  That's fine.
12      Q.   Do you know if that particular system was
13   something they would have needed anyway, regardless
14   of whether people were paying rent late?
15      A.   No.  The criteria for including that was
16   what modules could have been eliminated if there were
17   no delinquent customers.
18      Q.   "Modules."  Where do I see that?
19      A.   Well, I'm talking about computer system
20   modules.
21      Q.   So there was a computer system module, in
22   1998, that they didn't need.
23           What was that module called?
24      A.   I don't know.
25      Q.   Then you're saying that module cost them
```

Robert Knudsen                                           June 9, 2020

1    $16,000 for that year?

2         A.    Let me see.  Let me go through the

3    calculation.

4         Q.    And what page are you referring to, by the

5    way, so the record is clear?

6         A.    I was looking at 871.

7         Q.    Thank you.

8         A.    Yeah, I think the answer to that question is

9    yes.

10        Q.    You came up with a delinquency allocation of

11   40 percent; right?

12        A.    Uh-huh.

13        Q.    So how did you come up with that number?

14        A.    That's the person responsible for the

15   system.

16        Q.    Paul Mitnick from EQR just told you to use

17   that number?

18        A.    That was his judgment based on his

19   understanding of the computer system and what we were

20   talking about.

21        Q.    So 40 percent of their overall computer

22   costs are devoted to tracking when people pay rent

23   late?

24        A.    Yes.

25        Q.    That's how I read this.

Robert Knudsen                                              June 9, 2020

```
 1        A.   Well, that --
 2        Q.   At least in 1997 --
 3        A.   -- of this particular set of costs, that's
 4   true.
 5        Q.   Are you aware of any apartment buildings
 6   that don't have an accounts receivable computer
 7   system or the ability to track accounts receivable?
 8             MR. WINN:  Objection.  Vague --
 9             THE WITNESS:  No.  They all have late
10   customers.
11   BY MR. TOMASEVIC:
12        Q.   Or any business that doesn't need an
13   accounts receivable software or system or way to
14   account for it?
15        A.   Saying -- well, that's -- that's a
16   different -- that's a different story.  I don't know
17   who you're talking about.
18        Q.   When you say "accounts receivable," you
19   necessarily mean rent that is late and past the grace
20   period?  Or is it also receivable as of, say,
21   January 1st or as soon as the lease is signed?
22             MR. WINN:  Objection.  Vague.
23             THE WITNESS:  The need for the ability to
24   track late rent --
25   BY MR. TOMASEVIC:
```

Robert Knudsen                                    June 9, 2020

1       Q.    Okay.  So there's no such thing --

2       A.    -- necessitates the account receivable for

3    rent.

4       Q.    Okay.  So there's no such thing -- strike

5    that.

6             There's no other amount of money or instance

7    that you would categorize into accounts receivable at

8    an apartment business other than late rent?

9             MR. WINN:  Objection.  Vague.  Incomplete

10   hypothetical.

11            THE WITNESS:  Well, I mean, there could be

12   other fees they collect from tenants, but basically,

13   that's their business.

14            MR. TOMASEVIC:  Right --

15            MR. WINN:  Alex, when you have a moment, I

16   need to take a short break.

17            MR. TOMASEVIC:  We're going to do a lunch

18   break after this question.  I'm just wrapping up this

19   issue if that's okay.

20            MR. WINN:  Yeah, take your time.  Whenever,

21   just the next five or ten --

22            MR. TOMASEVIC:  Yeah, five minutes or less.

23   Five minutes or less.

24   BY MR. TOMASEVIC:

25      Q.    So when you say accounts receivables at an

Robert Knudsen                                          June 9, 2020

1   apartment business, the only thing that qualifies as

2   accounts receivables from an accounting perspective,

3   in your view, is rent that was due and has not been

4   paid before the grace period in the lease?

5           MR. WINN:  Objection.  Misstates testimony.

6   Vague.  Incomplete hypothetical.

7           THE WITNESS:  Well, it's the need to -- it's

8   the need for an accounts receivable system to track

9   what tenants owe them.

10  BY MR. TOMASEVIC:

11      Q.   When does something --

12      A.   (Cross talk.)

13      Q.   Go ahead.

14      A.   If everybody paid on time, they would have

15  no need for that system.

16      Q.   They would have no need for an accounts

17  receivable system is your testimony?

18      A.   Or a system that can track payments that the

19  tenant hasn't made, either rent or otherwise.

20      Q.   Well, let's talk about something more basic

21  because I don't understand this stuff very readily,

22  as you can probably tell.

23          So is rent that has become due because the

24  person signed a lease and has lived there as of

25  January 1st, is that an account receivable?

Robert Knudsen                                              June 9, 2020

```
 1          MR. WINN:  Objection.  Incomplete
 2   hypothetical.  Vague.
 3          THE WITNESS:  I'm not sure.
 4   BY MR. TOMASEVIC:
 5      Q.   So apartments might characterize --
 6      A.   Say it again.  Give me your example again.
 7      Q.   Is rent due, but not necessarily late,
 8   considered an account receivable in the accounting
 9   world?
10      A.   If it's unpaid -- if it's unpaid rent, it
11   would be accounts receivable.  The only -- but the
12   reason you have to track it is the concern that it
13   won't be paid.
14      Q.   So rent that is due but not necessarily late
15   yet is still considered an accounts receivable in
16   your opinion?
17          MR. WINN:  Objection.  Incomplete
18   hypothetical.  Vague.
19          What do you mean by "it's due but not late"?
20   How is rent due but not late?
21          THE WITNESS:  Thank you.  That's helpful.
22   Trying to clarify what I was trying to figure out.
23   BY MR. TOMASEVIC:
24      Q.   For example, on January 2nd, if rent is due
25   and was due the day before, but it's not necessarily
```

```
 1   account receivable?  What isn't an account
 2   receivable?
 3          MR. WINN:  Okay.  That's a different
 4   question.  If you want to ask that question, I'm sure
 5   Mr. Knudsen can give you his best answer.
 6   BY MR. TOMASEVIC:
 7      Q.   Do you consider rent as of the 2nd of
 8   January, for someone who's lived there and still
 9   living there on the 2nd of January, an account
10   receivable in the amount of that rent?
11          MR. WINN:  That's an incomplete
12   hypothetical.  Vague.
13          THE WITNESS:  That would be rent that would
14   be past due, and it would be an accounts
15   receivable.
16   BY MR. TOMASEVIC:
17      Q.   Is it an accounts receivable on the 31st of
18   the prior month?
19          MR. WINN:  Objection.  Incomplete
20   hypothetical.  Vague.
21          THE WITNESS:  I don't believe it would be
22   because, at that point, it's not due.
23   BY MR. TOMASEVIC:
24      Q.   Well, if someone signs a lease that says I
25   want a 12-month lease for $1,000 a month, i.e.,
```

```
 1   $12,000 over the entire term, does that generate an
 2   accounts receivable for $12,000 at the time of the
 3   signing of the lease?
 4        A.   No.
 5             MR. WINN:  Objection.  Incomplete
 6   hypothetical.  Vague.
 7             What was your answer?
 8             THE WITNESS:  No.
 9   BY MR. TOMASEVIC:
10        Q.   Is it an account receivable on the 1st?
11   When does it become an account receivable or when
12   does it hit the accounts receivable?
13        A.   Would be when it became due.
14        Q.   So on midnight of the 1st of the month?
15             MR. WINN:  Objection.  Incomplete
16   hypothetical.  Vague.
17             THE WITNESS:  Well, I'm not sure about
18   midnight or 9:00 in the morning or whatever, but
19   certainly on the 1st it would become due.
20   BY MR. TOMASEVIC:
21        Q.   What about the 1st at noon versus 1:00,
22   2:00, 3:00, does it hit accounts receivable?
23             MR. WINN:  Objection.  Incomplete
24   hypothetical.  Vague.
25             THE WITNESS:  I don't --
```

Robert Knudsen                                                    June 9, 2020

```
 1              MR. WINN:  Can I have that --
 2              (Cross talk.)
 3   BY MR. TOMASEVIC:
 4       Q.   You don't know if that's considered an
 5   accounts receivable?
 6       A.   I don't know what distinction you're trying
 7   to draw talking about noon versus 1:00 in the
 8   afternoon versus 3:00 in the afternoon.  Probably
 9   depends on when they do the accounting, frankly.
10       Q.   Okay.  So would rent that is due on the 1st
11   be considered an accounts receivable on the 1st?
12              MR. WINN:  Objection.  Incomplete
13   hypothetical.  Vague.
14              THE WITNESS:  It's -- if it's due on the
15   1st, then -- and it's not paid on the 1st, then it
16   would become an accounts receivable on the 1st.
17   BY MR. TOMASEVIC:
18       Q.   Is there a particular time when it goes from
19   not an account receivable to an account receivable?
20              MR. WINN:  Objection.  Incomplete
21   hypothetical.  Vague.
22              THE WITNESS:  Yeah, I don't know.  It
23   depends on what their practices with respect to
24   that.
25   BY MR. TOMASEVIC:
```

Robert Knudsen                                           June 9, 2020

1      Q.   Is it your testimony that EQR was not

2   interested in tracking when timely rent was paid?

3           MR. WINN:   Objection.   Misstates testimony.

4   Incomplete hypothetical.   Vague.

5           THE WITNESS:   No, I'm saying that their need

6   to track rent due is based on the fact that they have

7   to track past rent due so that they can ensure that

8   they receive that money.

9   BY MR. TOMASEVIC:

10     Q.   Are you saying that the only reason to track

11  the payment of rent at all is because people might

12  pay it late?

13          MR. WINN:   Objection.   Argumentative.

14  Misstates testimony.   Incomplete hypothetical.

15  Vague.

16          THE WITNESS:   No, I'm not saying that's the

17  only reason.   I'm saying that is a reason why you

18  have to have that system in place.

19  BY MR. TOMASEVIC:

20     Q.   Okay.   But there are other reasons for

21  having a system to track the payment of rent timely

22  or otherwise; right?

23          MR. WINN:   Objection.   Incomplete

24  hypothetical.   Vague.

25          THE WITNESS:   Nothing that I'm thinking of

Robert Knudsen                                          June 9, 2020

```
 1    at the moment that would require you to have that,
 2    absent the need to track past due rent.
 3    BY MR. TOMASEVIC:
 4         Q.   What about at the end of a tenancy when
 5    someone -- there's a discrepancy as to what someone
 6    thinks they're owed in a security deposit, isn't it
 7    helpful to have a system that tracks when rent was
 8    paid, when charges were levied, whether they were
 9    paid, and when they were paid?
10              MR. WINN:  Objection.  Incomplete
11    hypothetical.  Calls for speculation.  Vague.
12              THE WITNESS:  But that's not the accounts
13    receivable system that you just talked about.  In
14    that circumstance, you're not accessing an accounts
15    receivable system to find out when money was paid.
16    That's the cash receipts system.
17    BY MR. TOMASEVIC:
18         Q.   How do you know they were not one in the
19    same system at EQR in 1997 or 1998?
20              MR. WINN:  Objection.  Incomplete
21    hypothetical.  Vague.
22              THE WITNESS:  Well, what we were separating
23    out was the accounts receivable portion of that
24    computer system.  Cash receipts would be a
25    separate -- generally speaking, would be a separate
```

Robert Knudsen                                          June 9, 2020

1   module, and I think that was probably true with

2   respect to EQR.

3   BY MR. TOMASEVIC:

4        Q.   Probably true, but you're not sure?

5        A.   Well, I assume the costs that we included

6   were things that would be separate from simply cash

7   receipts.

8        Q.   Is there any way to go back and see whether

9   that separation was actually done and how it was

10  apportioned?

11            MR. WINN:  Objection.  Vague.  Compound.

12            THE WITNESS:  Not to my knowledge.

13            MR. TOMASEVIC:  I promised you a break

14  probably ten minutes ago, so let's take that break.

15            We can go off the record, by the way, if

16  everyone is okay with that.

17            MR. WINN:  I'm okay going off the record.

18            MR. TOMASEVIC:  All right.  Let's go off the

19  record.

20            (Break in deposition proceedings from

21            12:35 p.m. until 1:33 p.m.)

22            MR. TOMASEVIC:  Back on the record.

23  BY MR. TOMASEVIC:

24       Q.   Mr. Knudsen, back to the 1999 retention or

25  late '90s retention by EQR, in that matter were you

1      Q.   Why did you need to do average numbers?

2  Didn't you have actual data?

3      A.   I think we -- I think what we probably

4  had -- and, again, this is kind of a guess -- is a

5  subset or sample of write-offs.

6      Q.   Do you recall anything else about that

7  sample?  Like what you would have asked for, how much

8  you would have been given, how you --

9      A.   Well, we --

10      Q.   Go ahead.

11      A.   We would have needed to know the account

12  detail, so we'd probably be working off some kind of

13  account detail in order to figure that out.  Maybe.

14  Again, that's somewhat of a guess.

15      Q.   And what's the purpose of coming up with

16  this number or these averages?

17      A.   Well, the late fees not in dispute would be

18  a calculation of late fees that, presumably, wouldn't

19  be recoverable, just like late fees written off

20  wouldn't be recoverable because they -- in the case

21  of the write-offs, they were never paid in the first

22  place.  In the case of these, although they were

23  paid, they're owed back to somebody that owes you

24  much more money than you owe them.  If, in fact,

25  there was some determination that late fees were owed

Robert Knudsen                                              June 9, 2020

```
 1        Q.   Now, is that as of the end of the business
 2   day or is that at the beginning of the day?  Is that
 3   taken at some point in time?
 4        A.   That I don't recall.
 5        Q.   Or is it simply an add-up or sum total of
 6   all of the rents that would be due for all of the
 7   leases in effect on January 1st, 1997?
 8        A.   I don't think so because we were, it looks
 9   like -- based on the footnote, it looks like we were
10   subtracting out cash receipts from charges.
11        Q.   What footnote are you talking about?
12        A.   This would be on 864.
13        Q.   You're talking about Footnote No. 1?
14        A.   Yes.
15        Q.   You're also including some prepayment of
16   rent?
17        A.   Yeah.  And I'm not sure what that means at
18   this stage.
19        Q.   So can you say with any certainty, as you
20   sit here, whether the balance on January 1st, 1997,
21   is anything other than simply the multiplication of
22   the rents due or the sum total of all rents due in
23   the normal course as of the first of the month?
24        A.   I think it's -- I think it's total rents
25   less receipts.
```

```
1    some sort of argument in that regard and calculated a
2    lesser number.  I just don't know.
3        Q.   Okay.  Have you ever been asked to account
4    for the grace period when assessing a late fee
5    program for any of your clients?
6            MR. WINN:  Objection.  Vague.
7            THE WITNESS:  You know, I don't recall; but
8    I know that's an issue that sometimes comes up and
9    sometimes probably alternative calculations are
10   performed just to see the impact.
11           Although, generally speaking, I think it's
12   not done because of the fact that many people are --
13   if they're delinquent, they're delinquent at
14   different times; and, therefore, even if they paid on
15   the 4th, let's say, and didn't get assessed the late
16   fee, the next time they may pay on the 6th and would
17   be assessed a late fee.
18   BY MR. TOMASEVIC:
19       Q.   How is that reflected in Schedule B or how
20   does it affect the lost use of funds for the same
21   time period?
22           MR. WINN:  Objection.  Vague.
23           THE WITNESS:  I'm not sure.  I'm just
24   explaining what sometimes -- or considerations that
25   you might have if you were looking at lost use of
```

1    funds.  I'm not saying that any of that occurred

2    here.

3    BY MR. TOMASEVIC:

4        Q.   Okay.  Let me go back, then, to Schedule B

5    in Exhibit 3.  Does the Schedule B or the lost use of

6    funds analysis account for people paying -- strike

7    that.

8            I'm trying to understand your prior answer

9    where you say, well, sometimes it is that someone's

10   multiple late rent payments are important to

11   understanding the true damage.

12           Is that fair to characterize your testimony

13   or a fair way to characterize it?

14       A.   Well, that's something you might consider if

15   you thought that such an adjustment might be

16   appropriate.

17       Q.   Is that considered here in Schedule B

18   anywhere?

19       A.   I don't know.  It may be.

20       Q.   And how would you go about figuring out if

21   it was?

22       A.   Well, I probably want this summary of cash

23   receipts versus income charge schedule, and then I

24   might see if that average is just a simple average of

25   the numbers above or if it's some more complex

1    calculation.

2              (Brief pause while Mr. Tomasevic rejoins

3              the videoconference.)

4              MR. TOMASEVIC:  I'm back.

5              Madam Court Reporter, can you read the

6    witness's last response to me, please.

7              (The record was read by the reporter as

8              requested.)

9    BY MR. TOMASEVIC:

10       Q.   This method of using the account receivable

11   balance, is that something you used in all of the

12   instances where you were retained to assess a late

13   fee program?

14             MR. WINN:  Objection.  Vague.

15             THE WITNESS:  I don't know that I can speak

16   to every one of them.  I certainly don't recall every

17   one of them.  But I would certainly say that

18   calculating an average accounts receivable balance

19   was -- was done frequently.

20   BY MR. TOMASEVIC:

21       Q.   And when you did it in other cases, did you

22   include days covered by a contractual grace period?

23             MR. WINN:  Objection.  Vague.

24             THE WITNESS:  I just -- I don't know.  To

25   refresh my recollection, I'd have to see what was

1      A.   Right.

2      Q.   Now, explain as you would to a court what's

3  being reflected in B-2 or how to interpret B-2.

4      A.   This is where we're calculating Equity

5  Residential's cost of funds.

6      Q.   So what do the various columns mean?

7      A.   Well, there's two components, debt and

8  equity, and so we're basically -- to get a

9  percentage, we first need to figure out how much is

10  debt and how much is equity and weight those

11  according to get an overall average cost of funds or

12  overall cost of funds.

13     Q.   And what does that tell you about alleged

14  damages from lost use of funds?

15     A.   That it basically cost Equity Residential,

16  at that time, 7.9 percent for its funds that it had

17  in the business.

18     Q.   Do you have any basis for saying or

19  concluding that had people not paid rent late in

20  1997, Equity Residential would have, in fact, bought

21  back shares of stock?

22     A.   Well, I mean, their capital structure is

23  based on a need for funds -- their need for funds; a

24  component of which is a need to fund late-paying

25  customers, so to speak, or late customers, and so

1    those funds would come from those two sources.

2        Q.   I'm not sure I understand your answer.  Let

3    me ask a different question.

4            Are you aware of any instances in 1997 where

5    EQR wanted to buy back stock but could not for any

6    reason?

7            MR. WINN:  Objection.  Vague.  Calls for

8    speculation.  Incomplete hypothetical.

9            THE WITNESS:  I have no memory of their

10   stock buy-back plans one way or the other.

11   BY MR. TOMASEVIC:

12       Q.   Did you look at or ask to look at any of

13   their historical stock buy-back plans to see if they

14   had a history of buying back stock?

15       A.   No, not that I recall.

16       Q.   Do you know if, in 1997, Equity Residential

17   wanted to pay down some debt but was precluded

18   because people were paying rent late?

19       A.   Well, I mean their need for funds, both debt

20   and equity, is predicated on their need to float that

21   money.  So that's the way I would answer that

22   question.

23       Q.   Are you aware of any debt payment due by

24   EQR, in 1997, that they could not pay at all for any

25   reason?

1          MR. WINN:  Yeah.

2          THE WITNESS:  Should I get off the phone

3     then or leave the room or what?

4          MR. TOMASEVIC:  It's a break.  You can do

5     whatever you want.  We'll be back in five minutes.

6          THE WITNESS:  Okay.

7          MR. TOMASEVIC:  Thanks.

8          (Break in deposition proceedings from

9          2:21 p.m. until 2:30 p.m.)

10         MR. TOMASEVIC:  Back on the record.

11    BY MR. TOMASEVIC:

12         Q.  Let's move on to Schedule C which, for me,

13    starts at WP867 of Exhibit 3.

14         Now, explain to us generally what's going on

15    in Schedule C.

16         A.  This is calculating the incremental costs of

17    labor.

18         Q.  And, also, other things like office expenses

19    and postage?

20         A.  Yeah, that's true.  That would be there too.

21         Q.  Okay.  Let me just focus in on the office

22    and postage expenses for a minute.

23         So you start with total office expenses for

24    the calendar year of 1997 of $109,819; right?

25         A.  Correct.

Robert Knudsen                                    June 9, 2020

1      Q.   Do you have any knowledge as to whether or
2  not they can do such cost tracking today?
3      A.   I would -- I don't.  I would suspect not,
4  but I don't, no.
5      Q.   Why do you suspect not?
6      A.   Because that kind of tracking is usually
7  done only at professional services firms.
8      Q.   Is there anything precluding them from doing
9  that kind of tracking that you're aware of today?
10         MR. WINN:  Objection.  Lacks foundation.
11  Calls for speculation.  Vague.
12         THE WITNESS:  Generally, it's probably cost
13  prohibitive, but no particular reason why -- I mean,
14  you know, it's not something I looked into for them,
15  obviously.
16  BY MR. TOMASEVIC:
17      Q.   So if people didn't pay rent late, would
18  that change the amount of office space EQR needed, do
19  you think?
20         MR. WINN:  Objection.  Incomplete
21  hypothetical.
22         THE WITNESS:  Office expense here isn't
23  talking about office space, I don't believe.
24  BY MR. TOMASEVIC:
25      Q.   Well, then that's -- thank you for

```
 1   include for purposes of the analysis in Exhibit 3,

 2   besides paper.

 3        A.   Yeah.  No, I just don't remember.

 4        Q.   Well, what kinds of office expenses would

 5   you typically expect to see on a P&L statement at an

 6   apartment complex or for an apartment owner?

 7             MR. WINN:  Objection.  Vague.

 8             THE WITNESS:  Well, it's probably some kind

 9   of supplies category, whatever is in that category.

10   BY MR. TOMASEVIC:

11        Q.   Anything else you can recall as you sit here

12   right now?

13        A.   No.

14        Q.   Would it include furniture?

15        A.   I'm sorry.  I'm just not sure what's in that

16   category.

17        Q.   Would you expect that it included furniture?

18        A.   I would expect that it didn't include

19   hardware-type things like furniture, but I don't

20   recall.

21        Q.   What about computers?

22        A.   Again, I'm not sure.  I don't think so.

23        Q.   Are you able to say how many fewer -- strike

24   that.

25             Are you able to say if or whether EQR would
```

```
 1    need fewer employees in 1997 if people weren't paying
 2    rent late?
 3           MR. WINN:  Objection.  Vague.  Incomplete
 4    hypothetical.
 5           THE WITNESS:  Well, it would certainly have
 6    this amount of hours to either reduce employees or
 7    redirect the time to other things they thought were
 8    beneficial.
 9    BY MR. TOMASEVIC:
10       Q.   When you say "this amount of hours," are you
11    referring to something in particular?
12       A.   Well, this amount of cost, this amount of
13    hours.  The time represented by the
14    delinquency-related time.
15       Q.   Can you name any positions that would have
16    been completely eliminated at EQR, in 1997, had
17    everyone paid rent on time or if late rent just
18    wasn't a thing?
19           MR. WINN:  Objection.  Vague.  Incomplete
20    hypothetical.
21           THE WITNESS:  Yeah, I don't -- you know,
22    what they might have done in terms of position
23    elimination, that's hard to say.
24    BY MR. TOMASEVIC:
25       Q.   Well, can you think of any positions that
```

1   existed at the time, meaning 1997, that were devoted

2   exclusively to the collection of late rent or

3   delinquent rent?

4       A.   I think there was -- I think I saw

5   reference, actually, in one of the schedules that

6   they did have somebody who devoted most of their time

7   to that activity.  But, also, some of my recollection

8   is that a number of people, particularly the

9   assistant property managers, their time was not

10  necessarily full-time; and, therefore, they would or

11  could reduce their hours and true of some of the

12  other positions as well.

13      Q.   Well, we can talk about a reduction of

14  hours --

15      A.   There's a bunch of different ways in which

16  they could capture those costs or that time if it

17  were available to them, either by having people do

18  other things that were useful or by eliminating that

19  time.

20      Q.   I understand that from a general

21  perspective.

22           I'm just wondering if you're aware, as you

23  sit here today, or you recollect any positions that

24  were devoted exclusively to the collection of rent.

25  Can you name them by position, title, location,

1    anything like that?

2         A.    I think I recall -- it looks -- I see

3    reference on Schedule C-2 at one of the sites to a

4    collection specialist.  That may be somebody who

5    was -- might be responsive to your question.

6         Q.    Where do we see a collection specialist --

7    oh, in the Note No. 1 of WP869?

8         A.    Yeah.

9         Q.    So they had a collection specialist at the

10   La Mirage property, is your estimation after

11   reviewing this document?

12        A.    That's what the note says.

13        Q.    Okay.  But you don't know how many hours a

14   week they spent and whether it was exclusively

15   devoted to collection of late rent?

16        A.    Not at this stage, I don't recall that, no.

17        Q.    Now, did PricewaterhouseCoopers conduct a

18   survey to help derive some of these figures or these

19   estimates or these rates?

20             (Cross talk.)

21             MR. WINN:  Vague.

22             THE REPORTER:  What was the answer?

23             THE WITNESS:  Yes.

24             MR. TOMASEVIC:  Do me a favor and go next to

25   Exhibit 6, what was premarked as Exhibit 6, and this

Robert Knudsen                                          June 9, 2020

1        Q.   So other than conversing with the client,

2   what other process was utilized to come up with these

3   particular items for the survey?

4            MR. WINN:  Objection.  Vague.

5            THE WITNESS:  So far as I -- well, I mean, I

6   may have had some understanding of what other

7   entities did, and in discussing it with Equity

8   Residential may have asked them, "Oh, do you do

9   this," that sort of thing.  That's possible.

10           But the primary source would have been

11  discussions with some number of their, probably,

12  property managers regarding the procedures that they

13  utilized.

14  BY MR. TOMASEVIC:

15       Q.   Did you speak with any maintenance

16  personnel?

17       A.   Not that I would recall, no.

18       Q.   Any leasing consultants?

19       A.   No.  That wouldn't have been the level at

20  which we talked to.  That would only come into

21  play -- no.  In terms of developing the list of

22  tasks, that would have been more at the property

23  manager level.

24       Q.   Did you speak with any assistant property

25  managers to help develop the survey?

Robert Knudsen                                              June 9, 2020

1      A.   To develop the list of things?

2      Q.   Right.

3      A.   Again, I think that was -- I don't have a

4  specific recollection.  It's possible, but my -- I

5  would suspect it was mainly driven by either property

6  managers or other people who were very familiar with

7  the process that they went through.

8      Q.   Well, did you personally speak with any of

9  the property managers to help develop these survey

10  questions or topics?

11      A.   I was definitely -- would have been involved

12  in the discussions, and so whoever they were with, I

13  would have been a participant in that.

14      Q.   Who is the "they" in that answer?

15      A.   Whoever we were talking to.

16      Q.   And that's my question:  Who were you

17  talking to, to help develop these questions?

18      A.   My best recollection is it was some

19  combination of property managers or former property

20  managers or those people who felt very familiar with

21  the steps in the collection process.

22      Q.   What did you say your degree was in?

23  Industrial...?

24      A.   My undergraduate degree is in industrial

25  engineering.

```
 1        Q.   Okay.  You have an undergraduate degree in
 2   industrial engineering; right?
 3        A.   Yes.
 4        Q.   Does that mean you know what a
 5   time-and-motion study is?
 6        A.   Yes.  That's part of the study of industrial
 7   engineering is time-and-motion studies, learning
 8   curves, etc.
 9        Q.   Did PricewaterhouseCoopers conduct a
10   time-and-motion study to help with the analysis that
11   we see in Exhibit 3 or any of its schedules?
12             MR. WINN:  Objection.  Vague.
13             THE WITNESS:  No.
14             MR. TOMASEVIC:  What was your answer?
15             THE WITNESS:  No.
16   BY MR. TOMASEVIC:
17        Q.   Now, back to Schedule C at WP867.  I see a
18   figure for total compensation of property manager of
19   $732,061 for the calendar year 1997; is that right?
20        A.   I believe that's right, yes.
21        Q.   So at 63 locations -- and I'm going by
22   Schedule C-2 at WP869 -- that's somewhere in the
23   range of $11,000 per property manager, per location.
24   Or another way to say that is it sounds to me like
25   there's property managers working at more than one
```

Robert Knudsen                                    June 9, 2020

1    property.  Would you agree?  Or did you observe that

2    when you were working with EQR?

3            MR. WINN:  Objection.  Lacks foundation.

4            THE WITNESS:  I think that could be the

5    case.

6    BY MR. TOMASEVIC:

7        Q.   Or there was more than one at each location?

8        A.   My recollection is they had a number of

9    arrangements of how they used their people and what

10   locations they might cover.  I don't have any

11   specific recollection of what, precisely, they did;

12   but that's, sort of, my general recollection.

13       Q.   So did PricewaterhouseCoopers do anything to

14   ensure that people's survey responses accurately

15   reflected conditions at one property versus another

16   property, or that people were not confusing work at

17   one property versus a second property that they

18   worked at?

19           MR. WINN:  Same objections.

20           THE WITNESS:  Yeah.  That's why the survey

21   was done on a property-by-property basis was to

22   ensure that's the case.

23   BY MR. TOMASEVIC:

24       Q.   Did PricewaterhouseCoopers do anything else

25   to check or conduct a sanity check on any of the

```
 1    responses?  Throw out outliers?  Do any other data
 2    verification?
 3         A.   My recollection is that if we had outliers,
 4    either high or low, we would follow them up at the
 5    property to make sure they understood the survey and
 6    had filled it out correctly.
 7         Q.   Do you recall that actually happening during
 8    this process with EQR?
 9         A.   I don't recall EQR, specifically.  My, sort
10    of, general recollection -- may be spanning more than
11    EQR -- would be that, yeah, there were instances
12    where we would have had follow-up conversations.
13         Q.   Well, look at Schedule C for me at WP869,
14    and if you scroll down at the Vista Del Lago property
15    in the alphabetized list of properties at the time,
16    you see that assistant property manager reported
17    163.5 hours of delinquency-related time per month;
18    right?
19         A.   Uh-huh, yes --
20         Q.   So that's like a full-time job.  That's one
21    person spending all day long every day doing nothing
22    but collections, give or take?
23         A.   No, that's not necessarily one person.
24    That's the assistant property manager classification
25    of people, which could be more than one person.
```

1    Q.    What about the property manager

2   classification?  Do you know how many people that

3   would have been for Vista Del Lago?

4    A.    That could have also been more than one

5   person.

6    Q.    And the assistant property managers, do you

7   know how many were at properties, on average, at EQR

8   at the time?

9    A.    I don't recall that, no.

10    Q.    Or at Vista Del Lago?

11    A.    I recall instances where there was more than

12   one.

13    Q.    Do you know, as you sit here today, whether

14   any follow-up with the Vista Del Lago property or its

15   personnel was done to try and get at why their

16   numbers were substantially larger than all the

17   others?

18    A.    Again, my recollection of our process would

19   have been that, yes, that would have been one that

20   was contacted to discuss that number because it's on

21   the higher side.

22    Q.    But do you know if that actually happened

23   here in this case?

24    A.    That was our process.  I couldn't tell you

25   for certain that it happened here since I don't have

```
 1   any specific recollection of any particular item.
 2        Q.   So back to Schedule C-1, which is page 868.
 3   There's a total work hours per month figure of 173
 4   for each position.
 5             Do you see that?
 6        A.   Yes.
 7        Q.   How is that arrived at?
 8        A.   I don't recall at the moment.
 9        Q.   Do you know why it would have been the same
10   exact number for all four of the positions?
11        A.   Just offhand, I think it's probably a
12   monthly average of hours in a month, but I haven't
13   tried to recreate that calculation.  Four weeks would
14   be 160 hours, probably.  So assuming 4.3 weeks in the
15   month, that's probably how the 173 is there.
16        Q.   Or it's like assuming an 8-hour workday
17   times 20-something days a month, 'cause there's more
18   than four weeks' worth of workweeks in a month.
19   There's a little extra.
20        A.   Yeah, there's a little extra.  So yeah, it
21   could be derived either of those ways probably.
22        Q.   Okay.  And then back to C-2, some other
23   quick questions I have.  And I understand we don't
24   have the underlying surveys, but let me see if it
25   sparks your recollection and draw on your expertise
```

```
 1            THE WITNESS:  Not other than what I've
 2     already said.  I can't think of anything else that
 3     would fall in that category.
 4     BY MR. TOMASEVIC:
 5         Q.    In working with apartments and looking over
 6     rent payment and late rent payment data, have you
 7     ever observed trends according to the time of year?
 8     Like maybe rent is more often paid late one time of
 9     year versus another time of year.  Anything like
10     that?  Tax return season, Christmas.
11            Have you ever seen that or observed that?
12         A.    I guess it's something that we probably
13     looked for in the past, but as I sit here now, I
14     don't recall whether that that's the case or not --
15         Q.    Do you know if --
16         A.    -- the kind of thing -- let me finish.  The
17     kind of thing we typically look for, particularly if
18     we were having to make an estimate covering a certain
19     time period, but I don't recall anything specific
20     related to this or apartment complexes in general.
21         Q.    So would it typically be your practice to
22     look for seasonality patterns with respect to the
23     payment of rent or delinquent payment of rent over
24     the course of a year?
25         A.    It would be our practice to ensure that
```

1    there's not a seasonality factor that we're not

2    taking into account.

3            Now, in this case, we're doing an entire

4    year, so I don't know that -- I think there's one

5    place we had to -- I remember there's a place in here

6    somewhere where we had to estimate a few days at the

7    end of the year; but other than that, we're

8    essentially doing the whole year, so there wouldn't

9    really be a seasonality factor.

10        Q.    So there was no seasonality adjustment or

11   analysis done for purposes of Exhibit 3 is what

12   you're saying?

13           MR. WINN:  Objection.  Misstates testimony.

14           THE WITNESS:  I think that's probably true

15   since we're dealing with an entire year.  I don't

16   recall anything, at least, in that regard.

17   BY MR. TOMASEVIC:

18        Q.    Do you know what time of year you sent out

19   the work surveys?

20        A.    I don't recall.

21        Q.    Let's talk about collection agency costs.

22   And I know they're referenced in Schedule D,

23   beginning at WP870 of the Exhibit 3, the PwC report.

24        A.    I'm there.

25        Q.    Okay.  So what does the $205,282 reflect?

Robert Knudsen                                           June 9, 2020

```
 1        A.   Well, I can't recall in total what it did at

 2   this stage.

 3        Q.    How about in general?

 4        A.    Well, I think we had a fairly extended

 5   conversation about accounts receivable that's in

 6   there somewhere.  I think there were other modules

 7   that had collections-related functions, like maybe

 8   doing printing "Pay or Quits," that sort of thing.

 9   That's possible.

10            I don't recall specifically.  So that's, at

11   least, those two items that I can think of off the

12   top of my head.

13        Q.   Well, how did RIS and WIZ or WIZ differ?

14        A.   I don't know.  I don't recall.  And, in

15   fact, if they -- it may have been a change from one

16   system to the other as well.  That's also possible.

17        Q.   So you don't know if these are two systems

18   being used at the same time or one replaced another?

19        A.   I don't.  I just don't recall.

20        Q.   Now, you kept mentioning modules in prior

21   answers.

22            What did you mean by modules?

23        A.   Most financial systems have modules; like a

24   payroll module, an accounts receivable module, a cash

25   receipts and disbursements module.  That sort of
```

Robert Knudsen                                          June 9, 2020

```
 1              MR. WINN:  Objection.  Incomplete
 2    hypothetical.  Vague.
 3              THE WITNESS:  That could be part of the
 4    information I would use in doing the cost of funds
 5    calculation.  Again, I'd have to see what the
 6    information showed before I could answer that in any
 7    kind of definitive way.
 8    BY MR. TOMASEVIC:
 9       Q.   Would you suspect that having this
10    20-year-old report that we see in Exhibit 3 would be
11    any significant help to you in trying to do a new
12    analysis today, in 2020, for EQR?
13              MR. WINN:  Objection.  Lack of foundation.
14    Calls for speculation.  Vague.
15              THE WITNESS:  I think it could be useful
16    particularly to the extent that the collection
17    activities are similar.
18    BY MR. TOMASEVIC:
19       Q.   You mean the steps to collection?
20       A.   Steps to collection, yeah, the process.  And
21    you'd, obviously -- if you were going to try to do
22    something off of this, you'd have to -- you'd want to
23    know a little bit about, you know, what -- how much
24    change there's been and that sort of thing.  But it
25    could -- it could potentially form a basis for some
```

```
 1   kind of initial estimate.

 2        Q.    Would you feel comfortable -- okay.

 3              Potentially an initial estimate is your

 4   testimony?

 5        A.    You know, I just don't -- I don't know

 6   enough about Equity Residential today to tell you how

 7   you could use this to come up with a new, say, late

 8   fee estimate, for example.

 9              MR. TOMASEVIC:  Okay.  Let's take a

10   few-minute break.  We're in the home stretch.  I will

11   have more for you, but I'm going to go over my notes,

12   consolidate them, and streamline this for our final

13   push.  So let's take five minutes if that's okay.

14              MR. WINN:  That's okay.

15              MR. TOMASEVIC:  Thanks.

16              (Break in deposition proceedings from

17              3:30 p.m. until 3:50 p.m.)

18              MR. TOMASEVIC:  Back on the record.

19   BY MR. TOMASEVIC:

20        Q.    Mr. Knudsen, referring back to Schedule C-2,

21   which was the hours per property, and also Exhibit 6,

22   the survey of tasks sent to property managers,

23   assistant property managers, and others, do you know

24   which of those tasks would have been made obsolete

25   since 1999 or could have been automated by computer?
```

```
 1              I, JANUARY D. ALLEN, CSR No. 13748, a
 2    Certified Shorthand Reporter for the County of
 3    Riverside, State of California, do hereby certify:
 4              That prior to being examined, the witness
 5    named in the foregoing deposition, was by me duly
 6    sworn to testify the truth, the whole truth, and
 7    nothing but the truth;
 8              That said deposition was taken before me at
 9    the time and place herein set forth, and was taken by
10    me in stenographic shorthand and thereafter
11    transcribed into typewriting under my direction and
12    supervision, and I hereby certify that the said
13    deposition is a full, true, and correct transcription
14    of my shorthand notes so taken;
15              (X) Reading and signing was requested.
16              ( ) Reading and signing was waived.
17              ( ) Reading and signing was not requested.
18              I further certify that I am neither counsel
19    for nor related to any party to said action, nor in
20    any way interested in the outcome thereof.
21              IN WITNESS WHEREOF, I hereunto subscribe my
22    name this 24th day of June, 2020.
23                        _____
24                        Certified Shorthand Reporter in
                          and for the County of Riverside
25                        State of California
```

# EXHIBIT D

```
 1                   UNITED DISTRICT COURT
 2              NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
 4
     JAVANNI MUNGUIA-BROWN,        ) CLASS ACTION
 5   ANGELINA MAGANA, NORMA        )
     RODRIGUEZ, and DAVID BONFANTI ) Case No.
 6   individually and on behalf of ) 4:16-cv-01225-JSW-TSH
     other similarly situated,     )
 7                                  )
                   Plaintiffs,      )
 8                                  )
     vs.                            )
 9                                  )
     EQUITY RESIDENTIAL, a real     )
10   estate investment trust, ERP  )
     OPERATING LIMITED             )
11   PARTNERSHIP, a partnership,    )
     EQUITY RESIDENTIAL             )
12   MANAGEMENT, L.L.C.,            )
     EQR-WOODLAND PARK A LIMITED    )
13   PARTNERSHIP, and EQR-WOODLAND  )
     PARK B LIMITED PARTNERSHIP,    )
14                                  )
                   Defendants.      )
15                                  )
16
        ZOOM VIDEOCONFERENCE DEPOSITION OF CHRISTOPHER JENKINS
17
                      February 9, 2021
18                       11 a.m.
19
20
21   PREPARED BY:
22
23   Toni M. Gehm, RPR, CR
24   Arizona Certified Reporter
25   Certificate No. 50935
```

Page 1

```
 1     ZOOM VIDEOCONFERENCE DEPOSITION OF CHRISTOPHER JENKINS

 2

 3          commenced at 11:03 a.m. on February 9, 2021, before

 4     Toni M. Gehm, Arizona Certified Reporter, Certificate

 5     No. 50935, for the State of Arizona.

 6

 7

 8                    A P P E A R A N C E S

 9

10     For the Plaintiffs:

11          Andrew P. Lee, Esq.
            GOLDSTEIN, BORGEN, DARDARIAN & HO

12          155 Grand Avenue, Suite 900
            Oakland, CA 94612

13          (510)763-9800
            alee@gbdhlegal.com

14

15     For the Witness:

16          Justin Fields, Esq.
            DUANE MORRIS LLP

17          Spear Tower
            One Market Plaza, Suite 2200

18          San Francisco, CA 94105-1127
            (415)957-3079

19          JFields@duanemorris.com

20

21

22

23

24

25
```

Page 3

```
 1                    CHRISTOPHER JENKINS,

 2     called as a witness herein, having been first duly sworn

 3     by the Arizona Certified Reporter to speak the whole

 4     truth and nothing but the truth, was examined and

 5     testified as follows:

 6

 7                       EXAMINATION

 8     BY MR. LEE:

 9         Q.    Good morning, Mr. Jenkins.  Can you please state

10     and spell your name for the record.

11         A.    Christopher Jenkins.  C-H-R-I-S-T-O-P-H-E-R.

12     J-E-N-K-I-N-S.

13         Q.    My name is Andrew Lee.  I'm one of the attorneys

14     representing the plaintiffs in the matter of

15     Munguia-Brown, et al, versus Equity Residential, et al,

16     which is a certified class action pending in federal

17     district court, the Honorable Jeffrey White presiding.

18     Are you represented by an attorney today?

19         A.    I am represented by Mr. Fields.

20         Q.    Okay.  When did you first learn about this case?

21         A.    I don't exactly recall, but I've been aware of

22     it for several years.

23         Q.    Are you a current employee of Equity

24     Residential?

25         A.    No, I am not.
```

1    charged its California tenants a fee for the late payment

2    of rent prior to June 4 of 2008?

3         A.   To clarify were late fees charged to tenants

4    prior to 2008 in any form?

5         Q.   Correct.

6         A.   Yes.

7         Q.   Do you know what the formulation of the late fee

8    was prior to June 4, 2008 for California properties?

9         A.   California -- a very large number.  We had

10   acquired lots of properties in California and they all

11   came with their late fees, so there were bunches of

12   different ones based on existing leases.

13        Q.   I see.  Does a $50 late fee ring a bell at all

14   like a flat $50 fee?

15        A.   Like I said, there were a bunch of different

16   ones, so it varied from property to property and lease to

17   lease.

18        Q.   Did you have any role in the decision to adopt

19   the late fee that is described in Exhibit 2 in 2008?

20        A.   I do recall having some involvement in some of

21   the analytics.

22        Q.   Okay.  Can you describe what your role was?

23        A.   I don't remember specifically being so long ago,

24   but usually in those types of cases I would be involved

25   in estimating the impacts of changes in fees.

                                              Page 17

```
 1        A.   I -- well, I mean, I have no specific memory of
 2   it, but looking at it I'm sure it's a discussion that
 3   Denise and I had.
 4        Q.   Am I correct that this e-mail was sent to you by
 5   Denise Beihoffer?
 6        A.   Yes.
 7        Q.   And you said you don't have any specific memory
 8   of it.  Do you have any reason to believe that you didn't
 9   receive it?
10        A.   No, I have no reason.
11        Q.   And the e-mail reads:
12                  We may, repeat may, be in a position
13                  to modify our late fee structure in
14                  California from a $50 flat fee to a 5
15                  percent fee.  Can you run some
16                  numbers for me to see what the
17                  financial impact might be?  I'm
18                  thinking the average rents are more
19                  than the $1,000 rent that would
20                  result in a $50 charge.  We are still
21                  in the midst of our research, so no
22                  promises.
23             Mr. Jenkins, do you know why Equity Residential was
24   considering a percentage based late fee for its
25   California residential properties in 2008?
```

Page 22

1    A.   I have no recollection specifically other than,

2 as I mentioned before, we had acquired a lot of different

3 properties with a lot of different fee structures and

4 there was in general some work being done to standardize

5 to make the administration more efficient.

6    Q.   I see.  Do you know why a percentage based fee

7 was being considered as opposed to simply a flat fee for

8 the standardization?

9    A.   I don't know.  No.

10    Q.   I'll go ahead and mark the next exhibit.  All

11 right.

12           (Deposition Exhibit No. 4 was marked for

13 identification.)

14 BY MR. LEE:

15    Q.   The next exhibit should be uploading now.  And

16 what has been marked as Exhibit 4 is a two-page document

17 bearing Bates stamp number WP004313 to 4314.  And it is

18 an e-mail chain that includes Mr. Jenkins as well as some

19 other Equity Residential employees.

20         And, Mr. Jenkins, if you could take a look at

21 this document that's been marked as Exhibit 4.

22    A.   Okay.

23    Q.   If you look at the bottom of page WP4314 it

24 shows the e-mail that we were just discussing.  Do you

25 see that?

1    don't have any specific recollections of anything

2    specific.

3         Q.   As of May 2008 did you work in the same office

4    as Ms. Beihoffer -- physical location?

5         A.   That was an interesting time and I don't

6    remember.  I believe I did, but it was at that time I

7    believe I was moving from Colorado to Chicago, so I was

8    back and forth.

9         Q.   I see.  Do you ever recall discussing the risks

10   of changing the late fee as referenced in Exhibit 5 with

11   anyone at Equity Residential in the April to June 2008

12   time frame?

13        A.   I am -- I have no specific recollection.  I'm

14   sure that I worked with Denise and I'm sure that topic

15   came up at some point.

16        Q.   Do you remember anything about what risks were

17   discussed?

18        A.   No.  I have no recollection.

19        Q.   And do you recall who may have been involved in

20   those discussions about risk?

21        A.   Were me, my primary contact would have been

22   Denise, but again, I don't have any specific

23   recollections of any specific discussions.

24        Q.   And just to be clear do you have any

25   understanding as to why Equity Residential was looking at

                                              Page 28

```
 1   changing the late fee in April to June of 2008?

 2              MR. FIELDS:  Asked and answered.

 3   BY MR. LEE:

 4      Q.   I'm sorry.  I didn't hear your answer.

 5      A.   I'm sorry.  Am I answering this question?

 6              MR. FIELDS:  Yes, so that's another example

 7   where I will object and you're still required to answer

 8   the question.

 9              THE WITNESS:  Okay.  I'm sorry.  Can you

10   repeat the question?

11   BY MR. LEE:

12      Q.   Can you please read back the question.

13              (The requested portion of the record was

14   read by the certified reporter.)

15              THE WITNESS:  Only in general that we were

16   looking at fee structures and we had, as I stated

17   earlier, a lot of different fee structures from -- it

18   varied property to property, lease to lease and there was

19   some general movement to attempt to standardize for

20   efficiency.

21   BY MR. LEE:

22      Q.   Okay.  And if you look at the same e-mail we've

23   been referencing that was sent by Ms. Beihoffer on May

24   14, 2008 at 12:20 p.m., she starts off by saying this:

25              Hello.  As a follow-up to my below
```

Page 29

```
 1                    CERTIFICATE OF REPORTER
 2
 3           I, TONI M. GEHM, a Certified Reporter in the
      State of Arizona, do hereby certify that the foregoing
 4    deposition was taken before me in the County of Maricopa,
      State of Arizona; that an oath or affirmation was duly
 5    administered by me to the witness, CHRISTOPHER JENKINS,
      pursuant to A.R.S. 41-324 (B); that the questions
 6    propounded to the witness and the answers of the witness
      thereto were taken down by me in shorthand and thereafter
 7    reduced to typewriting; that the 74-page transcript is a
      full, true, and accurate record of the proceeding, all
 8    done to the best of my skill and ability; that the
      preparation, production and distribution of the
 9    transcript and copies of the transcript comply with the
      Arizona Revised Statutes and in ACJA 7-206(F)(3); and
10    ACJA 7-206 J(1)(g)(1) and (2); and ACJA 7-206(J)(3)(b).
11           The witness herein, CHRISTOPHER JENKINS,
      requested to read and sign.
12
13           I FURTHER CERTIFY that I am in no way related
      to any of the parties nor am I in any way interested in
14    the outcome hereof.
15           IN WITNESS WHEREOF, I have set my hand in my
      office in the County of Maricopa, State of Arizona, this
16    26th day of February, 2021.
17
18
19           Toni Ghem
20
21           TONI M. GEHM, RPR
22           Arizona Certified Reporter No. 50935
23
24
25
                                                     Page 74
```

# EXHIBIT E

```
 1                UNITED STATES DISTRICT COURT
 2      NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION
 3
                                   )
 4   JAVANNI MUNGUIA-BROWN,         )
     ANGELINA MAGAÑA, NORMA         )
 5   RODRIGUEZ, and DAVID           )
     BONFANTI individually and      )
 6   on behalf of others           )
     similarly situated,           )
 7                                   )
                      Plaintiffs,)
 8                                   ) Case No.
              vs.                  ) 4:16-cv-01225-JSW-TSH
 9                                   )
     EQUITY RESIDENTIAL, a real )
10   estate investment trust,      )
     ERP OPERATING LIMITED         )
11   PARTNERSHIP, a partnership,)
     EQUITY RESIDENTIAL            )
12   MANAGEMENT, L.L.C.,           )
     EQR-WOODLAND PARK A LIMITED)
13   PARTNERSHIP, and             )
     EQR-WOODLAND PARK B LIMITED)
14   PARTNERSHIP,                  )
                                   )
15                    Defendants.)
16   _____
17            DEPOSITION OF MARTHA MELENDEZ
18               Zoom Video Conference
19                December 9, 2020
20                    Volume I
21
22   Reported by:
23   KAYLA M. KNOWLES
     CSR No. 14071
24   Job No. 4367991
25   PAGES 1 - 168
```

                                                    Page 1

```
 1              Zoom Video Conference, December 9, 2020
 2                         10:14 a.m.
 3
 4                     MARTHA MELENDEZ,
 5     having been administered an oath, was examined and
 6     testified as follows:
 7
 8                        EXAMINATION
 9     BY MR. LEE:
10          Q    Great.  Good morning.  Can you please state
11     and spell your name for the record?
12          A    Martha Melendez, M-a-r-t-h-a
13     M-e-l-e-n-d-e-z.
14          Q    My name is Andrew Lee.  I am one of the
15     attorneys representing the plaintiffs in the matter
16     of Munguia-Brown versus Equity Residential, a
17     certified class action pending in federal district
18     court, the Honorable Jeffrey White presiding.
19               Have you ever had your deposition taken
20     before?
21          A    No.  It's my first time.
22          Q    First one.  Okay.  In that event, I am
23     going to briefly go over some of the deposition
24     ground rules, just so we're all on the same page,
25     and these are instructions that are typically given
```

Page 6

1    Ms. Gudjenova regarding the deposition today, have

2    you had any communications with any other people

3    regarding this lawsuit?

4         A    Only the attorney that contacted me.

5         Q    Okay.  Okay.  And you -- you mentioned that

6    other Equity Residential employees are aware of this

7    lawsuit.  Can you provide more details about that?

8         A    No.  I -- I know that it's -- it's not a

9    secret that I -- I don't know much about it, but

10   there's -- there's one out there, and I think it

11   was -- you know, most of us here also know that.

12        Q    Okay.

13        A    Some of our employees have been here for a

14   while; so they know.

15        Q    Have you been interviewed by an expert or a

16   consultant hired by Equity Residential regarding how

17   much time you spend on various tasks?

18        A    Yes.

19        Q    Okay.  And when did that -- when were you

20   first contacted by -- well, first, let me ask:

21             Do you remember the name of the person who

22   contacted you?

23        A    No.

24        Q    Okay.  Do you remember what company that

25   person worked for?

Veritext Legal Solutions
866 299-5127

```
 1        A    No.
 2        Q    When was the communication -- when was the
 3   first communication you had with this person
 4   regarding how much time you spend on tasks that you
 5   performed as part of your employment with Equity
 6   Residential?
 7        A    It was in the last year and a half.  It was
 8   one -- one call in the last year and a half.  I
 9   can't give you an exact date.
10        Q    Okay.  Do you remember the time of year?
11   Was it, like, winter? fall? summer? spring?
12        A    No.
13        Q    Okay.  And did they reach you on your cell
14   phone or on your work phone?
15        A    It was -- it was a Google call.  It was a
16   virtual call.
17        Q    A virtual call.  Was it a videoconference?
18        A    Uh-huh.
19        Q    Okay.  And that's a yes, just to clarify?
20        A    Yes, I'm so sorry.  I'm so sorry.  Yes.
21        Q    We all forget.  Don't worry.
22             Okay.  And how long did that
23   videoconference call last?
24        A    No more than two hours.
25        Q    And aside from you and the -- the expert or
```

Page  23

1   consultant, how many other people were on that call?

2        A    One.

3        Q    So there's three people total; is that

4   correct?

5        A    Oh, two on their end, two on our end.

6        Q    Okay.  And do you remember who they were?

7        A    The one on my end was the general manager

8   at that time, which was a different one than we have

9   now.  And on their end, it was two general managers.

10  I don't remember their names.

11       Q    Okay.  And what was the name of your former

12  general manager who participated in the

13  videoconference?

14       A    Brandon Robles.

15       Q    Is that spelled R-o-b-l-e-s?

16       A    Uh-huh.

17       Q    Okay.  Is he still with Equity Residential?

18       A    Yes.

19       Q    Okay.  Do you know what position he holds

20  now?

21       A    Area manager.

22       Q    Is he area manager for the Pasadena area?

23       A    Northern California.

24       Q    Okay.  Can you tell me everything you

25  remember about what was discussed on that call?

Veritext Legal Solutions
866 299-5127

```
 1       A       Just pretty much when you asked me earlier
 2   about tasks, how long it takes me to do certain
 3   things, how -- you know, they had me walk them
 4   through a day of what we do.   Brandon was there with
 5   me; so he was able to answer a lot of the questions
 6   as far as, you know, times and things like that,
 7   but -- so it was a little different because there
 8   were two of us there talking instead of just -- just
 9   me.
10       Q       Okay.   And so the -- the consultants were
11   asking you questions about time that you had spent,
12   and the answers were provided by both you and
13   Brandon?
14       A       Uh-huh.
15       Q       Okay.   Has Brandon ever worked as a -- at
16   the property level?
17       A       It's -- it's Brandon.   I just want to make
18   sure.   Okay.   Brandon.
19           And, yes, he has.
20       Q       Okay.   Do you know what positions he held
21   at property level previously?
22       A       Well, the general manager is a
23   property-level position.
24       Q       I see.   Okay.   Aside from walking through
25   your day, do you recall -- does anything else stand
```

Page  25

```
 1    out, in your mind, in terms of what you discussed?

 2        A    No.   It was pretty much just, you know,

 3    asking us how long it takes to do, you know,

 4    basically everything we do or I do on the property

 5    and everything that he did on the property; so it

 6    wasn't -- it wasn't specific -- they just -- they

 7    wanted us to tell them exactly what we did on a

 8    daily basis.

 9        Q    Okay.   And did you estimate amounts of time

10    that you spend on particular tasks?

11        A    Tried.   It's really hard to do that.

12        Q    Uh-huh.

13        A    It's not an easy answer.

14        Q    Okay.   Okay.   So you did your best to

15    provide time estimates of various tasks that you

16    performed?

17        A    Yes.

18        Q    Okay.   Anything else that you recall about

19    that conversation, aside from walking through your

20    day and estimating time?

21        A    No.

22        Q    Okay.   Do you know what the purpose of the

23    videoconference was?

24        A    No.

25             MR. WINN:   Objection.   Vague.
```

Page 26

1      Q    You sign both.  Okay.

2      A    Uh-huh.

3      Q    Is the declaration also posted on the door

4  when you deliver it if no one answers?

5      A    No.  No.  It's put in the file.

6      Q    Okay.  Okay.  And is the declaration part

7  of the documents that you print when you --

8      A    Yes.

9      Q    Okay.

10     A    Uh-huh.

11     Q    All right.  And are you the only employee

12  at Westgate who issues the three-day notices?

13     A    No.

14     Q    Okay.  Who else at Westgate issues

15  three-day notices?

16     A    We all do.  Everybody in the leasing office

17  does.

18     Q    Everybody in the leasing office does.

19  Okay.

20          And how -- how is that responsibility

21  typically divided up?

22     A    We have our two leasing managers.  If -- if

23  it's a day that I'm here, I will -- I will do that.

24  If it's a day that I'm not here on the weekends, the

25  leasing manager will take over, and that will be

Page 100

1    Lorna and Suzanne, and split them up that way.

2         Q    Okay.  But --

3         A    I'm sorry.

4         Q    I was just going to say the -- typically,

5    you know, issuing the three-day notices is a duty

6    that you perform?

7         A    Yes.

8         Q    Okay.  And other people who work -- your

9    coworkers would handle this duty only if you are out

10   or unavailable; is that right?

11        A    Well, when they -- when they created the --

12   the role for the second leasing manager, who is

13   Suzanne Santos, she oversees most of everything that

14   is at the Residences 1 and 2.  If -- we will split

15   it up between the two of us so that, you know, they

16   get out as early as possible in the day.  I'll do

17   Westgate; she'll do Residences 1 and 2.  And that's

18   just part of it.  But then we stopped giving out

19   three-days; so --

20        Q    Right.  Right.  Okay.  So -- and I want to

21   talk pre-pandemic, when Equity, you know, was

22   issuing late fees.

23        A    Yeah, we had just started splitting them up

24   because we had just split our leasing offices up; so

25   we split up the responsibility of posting and --

Page 101

```
 1    I'll print them out, and her and I will sit there
 2    and go through them, and then we split them up to go
 3    deliver them.
 4        Q    Okay.  So when did -- when did you -- when
 5    did you start splitting up, sort of, the -- you
 6    know, the distribution of three-day notices?
 7        A    Summer of 2019.
 8        Q    Okay.
 9        A    That summer.
10        Q    And before the summer of 2019, were you the
11    primary employee who issued the three-day notices?
12        A    If I was -- if I was here, yes, yes.  I'm
13    not going to say that I did that every single time
14    because I didn't.  If I was here, yes, but, again,
15    like I said, we're -- we're a big team.  We help
16    each other out because it -- you know, it's a big
17    task.  So if I'm here and I'm able to do them all,
18    then I will.  If I need help, then everyone here is
19    willing to help.
20        Q    Right.  Right.  Okay.  You said it was
21    Suzanne Santos who splits the duties with you --
22        A    Uh-huh.
23        Q    -- who has split the duties with you
24    starting in the summer of 2019?
25        A    Yes.
```

Page 102

1      Q      And if you were to resume issuing late

2    fees -- well, actually, let me step back for a

3    moment.

4            Do you still issue three-day notices

5    currently?

6      A      No.

7      Q      Okay.  No one is issuing any three-day

8    notices at this point?

9      A      No.

10      Q      Okay.  When Equity commences issuing

11    three-day notices again, is it your understanding

12    that you will split -- split the duties regarding

13    issuing the three-day notices with Ms. Santos?

14      A      I hope so, yes.

15      Q      Okay.  Okay.  And does Ms. Santos -- well,

16    let me ask this a different way.

17            So you said that you -- when you were

18    splitting up this duty, you were the one who printed

19    the notices; right?  Ms. Santos is not the one who

20    prints notices?

21      A      She does -- can.  But when I'm here, I'll

22    be the one that does them.  Or there's been days

23    when I've come in, and she's like, "I already have

24    them printed out," and we work together on it.

25      Q      Okay.  But generally, just one person does

Page 103

1    the printing, either you or her?

2        A    Yes.

3        Q    Okay.

4        A    Yes, but if I'm off or she's off, I mean,

5    everybody here knows how to and are able to, and I'm

6    not going to say that they don't ever do it because

7    everyone does and can print those out when needed.

8        Q    All right.  Does anyone else, aside from

9    you and Ms. Santos, regularly perform duties related

10   to issuing the three-day notices?

11       A    The other leasing manager, Lorna Zapata.

12       Q    And what does -- what does she do with

13   respect --

14       A    It's the same as what Suzanne and I do,

15   yeah.  On the weekends, days off, vacations,

16   somebody has to be able to -- to take over that

17   duty; so the three of us will do it.  If I'm here,

18   Lorna does not, unless I'm really backed -- you

19   know, she will help me out.  But for the most part,

20   I will print them out, unless it's on the weekend or

21   unless it's on a day out -- a day off that I have.

22       Q    Okay.  Okay.  So after you complete the --

23   the three-day notice process, what do you -- what

24   would you do next in terms of the late rent

25   collection process, if anything?

Page 104

1     A      I would -- like I said, I -- within the

2   next few days after that, I will send e-mails out to

3   residents that have balances that I did not

4   three-day on.   That's part of my -- I usually do

5   that on Wednesdays.   But I -- you know, I can't

6   pinpoint a day to do them on a weekly basis.

7          And three-days do not expire on the 9th; so

8   around the 9th, 10th, of the month, sometimes

9   longer -- if it's a weekend, depends -- I will send

10  an e-mail to those that did have three-days and have

11  not paid reminding them that their three days is

12  going to expire, just to give them a heads-up that

13  they -- you know, "You still haven't paid your rent.

14  This is going to go to legal.   You're going to have

15  legal fees," that kind of stuff.

16    Q      Okay.   So it sounds like the next step is

17  conducting some form of follow-up on the three-day

18  notice.

19    A      Uh-huh.

20    Q      And that usually occurs on the 9th or the

21  10th of the month?

22    A      Yeah, I try to, and sometimes, you know, it

23  will be done on the -- a little later than that.   It

24  just depends on the busyness of the office.   I don't

25  have it scheduled for any certain day.   I don't --

Page 105

```
 1    you know, I don't know that -- I mean, I know on the
 2    5th I do three-days.  I don't have a date like the
 3    7th or the 8th that I have to do that.  I just --
 4    when I get the time to do them, I go in there, and I
 5    do as much as I can.
 6         Q    And is it -- does that step require
 7    anything more than, you know, writing an e-mail and
 8    sending it out?  Is there anything else that is
 9    involved in that step?
10         A    No.
11              MR. WINN:  Objection.  Vague.
12              THE WITNESS:  The e-mail, send them out.  I
13    have to look up their balance to verify.  If I see
14    something that may be not quite rent or if they've
15    made a partial payment, stuff like that, I have to
16    be able to explain what's on their ledger to them;
17    so I need to go in there, look at it to make sure I
18    understand before I make the call.  So I have to go
19    in, look at the ledger, make sure everything makes
20    sense to me before I make the phone call or e-mail.
21    BY MR. LEE:
22         Q    Right.  Okay.  Is it correct that the
23    follow-up process involves checking the ledger so
24    that you understand what is owed and then the next
25    step is engaging in some type of communication,
```

Page 106

1    whether that be an e-mail or a phone call?

2        A    Yes.

3        Q    Okay.  And is checking the ledger the --

4    the same process that you would go through when you

5    issue the three-day notice, like prior to issuing

6    the three-day notice?

7        A    Yes.

8        Q    Okay.  Bear with me for a second here.

9             Okay.  I've marked the next exhibit.

10            (Exhibit No. 3 marked for identification.)

11   BY MR. LEE:

12        Q    So if you could go into the exhibit folder

13   and pull up Exhibit 3, I would appreciate it.  And

14   what has been marked as Exhibit 3 is a document

15   bearing Bates Stamp Numbers WP003714 through 3716,

16   and the title of the document is "Payment Options

17   Collecting on Delinquent Accounts and Late Fees."

18            Ms. Melendez, were you able to pull up this

19   document?

20        A    I have it open.

21        Q    Okay.

22        A    Yeah, I have it open.

23            MR. WINN:  This document also is

24   confidential like Exhibit Number 2; so -- so let's,

25   you know, mark it -- the exhibit will be marked

Page 107

```
 1      Q     You see that?  Okay.
 2            And I'm just trying to figure out whether
 3   you engage in any, you know, different type of
 4   process for large balances, or do you use, sort of,
 5   the same process, regardless of the amount.
 6      A     I use the same process.  After the
 7   initial -- after the initial three-day is served --
 8   and we're only going by three-day -- correct? -- not
 9   balances due?
10      Q     Right.
11      A     Once I serve a three-day, I try to put
12   everything in writing so that I have it in writing;
13   so communication would be done through e-mail.  If I
14   feel like they're not responding, I will attempt to
15   make a phone call, but I -- I feel like I get
16   more -- the communication is a lot better when
17   you're doing it by e-mail.
18      Q     Okay.  And your answer differentiated
19   between the three-day process and balances due; is
20   that right?
21      A     I'm sorry.  I didn't understand.
22      Q     Yeah, let me reframe the question.
23            So you asked whether my question was
24   specific to three-day notices.  Do you remember
25   that?
```

Page 115

```
 1        A    Yes.  Yes.
 2        Q    Okay.  I'm just trying to figure out what
 3   might be different for a balances due process.
 4        A    On all collection efforts that I try to
 5   make or all payments or communications with
 6   residents, me, myself, I try to do it through e-mail
 7   so that I have it documented every way possible that
 8   I did try to call you or did make an attempt to
 9   reach you before I send your file over to legal for
10   eviction.  Because the last thing I want to do is
11   send a file over without -- you know, I make every
12   effort to try to reach them, and I have it there in
13   writing that I've done it.  And that would be
14   whether you owe us, you know, $10 or, you know,
15   $4,000.  I want to have that record that I did make
16   the attempt.
17        Q    Okay.  Okay.  So we've talked about issuing
18   three-day notices, and we've talked about the
19   follow-up that you conduct typically on the 9th or
20   the 10th of the month.
21             What do you do next in terms of trying to
22   collect late rent, if anything?
23        A    There isn't -- I mean, other -- like I --
24   other than letting the resident know right before
25   I'm sending it to legal, "Hey, this is your last
```

Page 116

```
1    chance," once it's sent, there is no more
2    communication.
3         Q    Okay.  Okay.  Is there a typical number of
4    follow-ups that you -- that you do for each -- for
5    each account?
6         A    No.
7         Q    Okay.
8         A    No.  It's just -- you know, there's some
9    days when, hey, I have some free time that we work
10   on this.  There's some days where I'm not able to
11   make as many attempts as I did the prior month, but
12   it's -- it's not -- it's not something that is
13   scheduled, you know.
14        Q    Would it be correct to say that -- that you
15   make at least one attempt to follow up for each --
16        A    Yes.
17        Q    -- outstanding --
18        A    Yes.
19        Q    Okay.  I mean, would it be fair to say that
20   you follow up at least twice for each outstanding
21   account?
22        A    I try, but, you know, it may not -- and,
23   also, it may be that the resident did get back,
24   maybe not to me but to somebody else, and now
25   somebody else is in contact with this resident; so I
```

Page 117

1   do not -- I'm not going to do any more follow-up
2   because they're now working with somebody else.
3           Like I said, we have a really big team
4   here, and, you know, we all work together; so if,
5   you know, Mary is contacting now Suzanne, Suzanne is
6   going to start contacting her and discussing her
7   balance, and that is pretty much taken off my plate
8   now.
9       Q    Okay.  I see.  So the follow-up process is
10  sort of the -- the last step in the process before a
11  file gets sent to eviction; is that correct?
12      A    Yes.
13      Q    Okay.  And generally speaking, your
14  follow-up efforts are documented in resident notes?
15      A    Yes.
16      Q    Okay.  Bear with me while I mark the next
17  exhibit.
18          Okay.  I have marked Exhibit 4.  If you
19  could go into the marked exhibit folders and refresh
20  and pull up Exhibit 4, please.
21          (Exhibit No. 4 marked for identification.)
22          MR. LEE:  For the record, what has been
23  marked as Exhibit 4 is a -- one, two, three, four --
24  five-page document bearing the Bates Stamp Numbers
25  WP003771 through 3775.

Page 118

1    again for a few days because I'm waiting for

2    something.  So I would -- I would probably say that

3    50 percent of my -- of that would be spent on the

4    affordable program and monitoring to make sure it's

5    in compliance.

6        Q    Okay.  So if I understand you correctly,

7    about half of your overall work time is spent on the

8    affordable housing program?

9        A    Yes.

10       Q    Okay.  And we also discussed your duties

11   with respect to posting rents, and we discussed that

12   you collect rent checks and send them to the bank,

13   and that's how Equity gets paid, and I just want to

14   clarify.

15            You don't physically go to the bank to

16   deposit checks; is that correct?

17       A    No, I have a scanner in my office.  It

18   scans right to the bank.

19       Q    Okay.  Great.  And earlier you testified

20   that Equity stopped issuing three-day notices at

21   Westgate in March 2020.  That's right?

22       A    I want to say March or April.  I'm not

23   exactly positive on -- on the date that we stopped,

24   but whenever the -- the City of Los Angeles stopped,

25   we did also.  But it was either one of those months.

                                              Page 157

```
 1    questions.
 2              MR. WINN:  I have just a few questions.
 3                      EXAMINATION
 4    BY MR. WINN:
 5         Q    You mentioned that you're not currently
 6    issuing three-day notices; correct?
 7         A    Correct.
 8         Q    Do you still spend time handling
 9    delinquency issues?
10         A    Yes.
11         Q    Can you give me an estimate of how much
12    time as a percentage of your time you spend handling
13    delinquency issues during this pandemic period?
14         A    I would say probably, with the help of the
15    other leasing manager, it's about 75 percent of our
16    day.  60 to 75 percent of our day that we are
17    following up with residents on balances.
18         Q    Has that increased since the time of the
19    pandemic?
20         A    Yes.
21         Q    Can you give me your estimate prior to the
22    pandemic about, you know, roughly what kind of
23    percentage of time you're spending on delinquency
24    issues?  Again, this is pre-pandemic.
25         A    Maybe on a -- on a monthly basis, you
```

Page 159

```
 1   think, the beginning of the month being more,
 2   beginning of the month is like 50 percent --
 3   50 percent of my time is posting rent.  Making
 4   sure -- you know, getting ready for the 5th.  And
 5   then maybe 40 percent of my day in between my other
 6   tasks I am reaching out to residents.
 7        Q    So -- so your estimate, was that for the --
 8   I'm sorry.  I want to make sure I understand it.
 9            So you said 40 to 50 percent.  Is that for,
10   you said, the first two weeks of the month?
11        A    Yes, the first two weeks of the month.
12   During the whole -- the posting of rent and the
13   three-day process.
14        Q    Okay.  When does -- when is rent considered
15   late?
16        A    On the 2nd.
17        Q    And are there things you do with late rent
18   between the 2nd and the 5th of the month to try to
19   collect it, account for it, things like that?
20        A    We spend those days -- I spend most of that
21   time posting.  It's a lot of rent that comes into
22   the office; so, for instance, on Monday, I spent the
23   entire day posting rent checks that had come in over
24   the weekend.  I didn't do anything else but that.
25   Tuesday was a little better.  And right now, you
```

Page 160

 1    know, without the three-days going out, the checks
 2    are slowly still coming in, but we still have to
 3    reach out to them.
 4         Q     So you're talking about Monday the 7th.
 5    This Monday?
 6         A     This Monday, yes.
 7         Q     So my calendar, that's the 7th.
 8               So those are late rent checks that you're
 9    processing; is that correct?
10         A     Yes.  Yeah.  And that was because there
11    aren't any late fees right now; so it's -- you know,
12    residents know this, but that's a typical -- Monday
13    is a typical day that I would spend before the
14    pandemic posting rent.  It's an all-day process
15    because there's so much.
16               MR. WINN:  Okay.  No further questions.
17                     FURTHER EXAMINATION
18    BY MR. LEE:
19         Q    I have just a few follow-up questions on
20    that.
21               In terms of posting rent, is it correct
22    that you have to, you know, process rent checks,
23    regardless of whether they're late or whether
24    they're timely?
25         A     Yes.

                                        Page 161

```
 1              I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California do hereby
 3    certify:
 4              That the foregoing proceedings were taken
 5    before me at the time and place herein set forth;
 6    that any witnesses in the foregoing proceedings,
 7    prior to testifying, were duly sworn; that a
 8    verbatim record of the proceedings was made by me
 9    using machine shorthand which was thereafter
10    transcribed under my direction; that the foregoing
11    transcript is an accurate transcription thereof.
12              I further certify I am neither financially
13    interested in the action nor a relative or employee
14    of any attorney or any of the parties.
15              IN WITNESS WHEREOF, I have this date
16    subscribed my name.
17
18         Dated: December 16, 2020
19
20
21
22         KAYLA KNOWLES
23         CSR No. 14071
24
25
```

                                        Page 168

# EXHIBIT F

1            UNITED STATES DISTRICT COURT

2          NORTHERN DISTRICT OF CALIFORNIA

3              OAKLAND DIVISION

4

5  JAVANNI MUNGUIA-BROWN et al.,   )
                            )

6        Plaintiffs,       )
                            )

7    vs.                   )
                            ) CASE NO.

8  EQUITY RESIDENTIAL, et al.,   ) 4:16-cv-01225-JSW-
                            ) TSH

9        Defendants.       )
  _____ )

10

11

12

13

14          REMOTE PROCEEDINGS OF THE

15          DEPOSITION OF ANN PATON

16              VOLUME I

17        THURSDAY, MARCH 18, 2021

18

19

20

21  Stenographically Reported by:
    LISA RICHARDSON, RMR, CRR, RPR, CSR No. 5883

22

23  Job No. 4500759

24

25  PAGES 1 - 170

                                Page 1

```
 1                      ANN PATON,
 2    having been administered an oath, was examined and
 3    testified as follows:
 4             THE STENOGRAPHER:  Proceed, Counsel.
 5                      EXAMINATION
 6    BY MS. BELLOWS:
 7        Q    Good morning.  Would you please state and spell
 8    your name for the record.
 9        A    Ann Paton.  A-N-N, P-A-T-O-N.
10        Q    Thank you.
11             So I'm Anne Bellows, I represent the four
12    plaintiffs and the two certified classes in this action.
13             Are you represented by an attorney in this
14    case?
15        A    I am.
16        Q    And who's that?
17        A    Justin Fields.
18        Q    When did you first learn about this case?
19        A    I don't, I don't recall.
20        Q    Okay.  What is your home address?
21        A    1155 West Madison Street, Apartment 302,
22    Chicago, Illinois 60607.
23        Q    Okay.  Thank you.
24        A    You're welcome.
25        Q    Have you ever had your deposition taken before?
```

Veritext Legal Solutions
866 299-5127

```
1    department consulting with outside counsel directly

2    about the California late fee in April to June of 2008?

3        A    I don't recall, no.

4        Q    Were you involved in any way in monitoring or

5    evaluating the California late fee on an ongoing basis

6    after it was adopted in June 2008?

7             MR. FIELDS:  Vague and ambiguous.

8             THE WITNESS:  Can you be more specific with

9    your question?

10   BY MS. BELLOWS:

11       Q    Sure.

12            Did you do any work related to the California

13   late fee at any time from June 2008 until the end of

14   2013?

15       A    I'm sure I did.

16       Q    Okay.  Could you describe what kinds of work

17   you did related to the California late fee over that

18   period?

19       A    I would contact local counsel from time to time

20   to see if any laws had changed, to see how fees were

21   viewed by, by judges in various markets around

22   California.  I might contact properties and ask them,

23   you know, what are their practices in collecting rents

24   to see if anything had changed since I was collecting

25   rent in the past.  I would look at data pools from IT
```

Page 67

1    about -- that included information specifically about

2    what fees were being charged by each property.

3        Q    Okay.  And did you do this on a roughly annual

4    basis?

5        A    It varied.  It could be annually, it could be

6    every 18 months, 24 months.

7        Q    Okay.  You mentioned contacting properties.  Is

8    that something that you did regularly?  I want you to

9    focus on the period from 2008 to the end of 2013.

10            MR. FIELDS:  Vague and ambiguous.

11            THE WITNESS:  Are you asking if I contacted the

12    properties specifically about --

13   BY MS. BELLOWS:

14       Q    About late rents.  Thank you for that

15   clarification.  I'm talking about California properties

16   too.

17       A    Yeah.  I would say closer to maybe 2012, 2013

18   to see if, you know, any technology that we introduced

19   had changed their time spent on collecting late rent.

20       Q    And what did you learn as a result of those

21   conversations?

22       A    That they were still spending a significant

23   amount of time with phone calls and letters and

24   delivering notices and contacting the attorney and

25   talking to guarantors and multiple residents.  They were

```
1    still spending a lot of time collecting late rent.
2         Q    You said tours.  How are tours related to
3    collecting late rents?
4         A    I don't remember staying tours.
5         Q    Maybe I misunderstood you.  Talking to
6    guarantors, I see.
7         A    Guarantors.  Yes.  Correct.
8         Q    All right.  Those are, like, cosigners on a
9    lease or something?
10        A    That's correct.
11        Q    Okay.  Was anyone else in the legal department
12   working on this project with you, the project you
13   described where you were gathering information related
14   to the California late fees?
15        A    During --
16             MR. FIELDS:  Vague and ambiguous.
17   BY MS. BELLOWS:
18        Q    From -- so let's focus on the period from 2008
19   to 2013.
20        A    I can't specifically remember time frames at
21   all.  It's, it's a big blend.  That was a long time ago.
22             I know that Sharon Gunneson had assisted me in
23   asking questions of the -- some properties in
24   California, the same questions that, that I just shared
25   with you about the time spent on collecting late rent.
```

Veritext Legal Solutions
866 299-5127

1    Q    Okay.  When you and Sharon were talking to

2    these property level personnel, did you ask them for

3    specific estimates of time that they spent on the tasks

4    you described?

5    A    It may have included that, yeah.  That sounds

6    right.

7    Q    Okay.  Did you note that information down?

8    A    Oh, I'm sure I took notes, like handwritten

9    notes.

10   Q    Handwritten notes.  And where would you have

11   kept those notes?

12   A    They are I'm sure in the trash and long gone by

13   now.  I don't keep my pieces of paper notes.

14   Q    Did you communicate those time estimates to

15   anybody?

16   A    I'm sure we discussed them.  Yes.

17   Q    Did you, did you record them in your systemized

18   data in any way?

19        MR. FIELDS:  Vague and ambiguous.

20        THE WITNESS:  I don't recall ever doing that

21   for that project.  It was, it was discussions.  I got

22   very comfortable with the information that Sharon

23   provided, and it was consistent with what I had learned.

24   And we were both comfortable that there was -- any

25   automated emails that we had started using did not

```
1    change the amount of time that was spent in collecting
2    late rent.
3    BY MS. BELLOWS:
4        Q    Okay.  Did you do any calculations based on the
5    time estimates that you received from the people you
6    talked to?
7        A    I don't remember ever doing any calculations,
8    no.
9        Q    Is there any record of the time estimates that
10   you would be able to find?
11       A    No, we didn't -- like I said, we just took
12   notes and had conversations about it.
13       Q    So you discussed these as a general matter, you
14   did not use those time estimates to calculate specific
15   numbers.  Am I understanding your testimony right?
16            MR. FIELDS:  Vague and ambiguous.
17            THE WITNESS:  Well, I think what I said was
18   I -- or not that I think I said -- what I said was
19   Sharon and I had conversations about the information
20   that she obtained from the properties and the
21   information that I got, and it was consistent
22   information.  And so no reports or anything formal was
23   produced.
24   BY MS. BELLOWS:
25       Q    And how were the properties selected that you
```

Page 71

1    reached out to?

2         A    I would say our target was maybe around 20, and

3    I don't know if -- it seems like we did more than that,

4    but I don't know a number.

5         Q    How did you pick the 20 properties?

6         A    I believe it was whenever we were talking to a

7    property about some other legal issue that they had

8    contacted our group about, we would then ask them.

9         Q    Okay.  Did you track how many employees were at

10   each of the properties involved in this project?

11        A    I don't recall doing that.

12        Q    Did you track how many units were at each of

13   the properties involved in the project?

14        A    I didn't track anything.  I had conversations.

15        Q    Did you, did you ask about that?

16        A    I could have, yeah.  Seems like something I

17   would ask.

18        Q    Okay.  Did you -- if you were asked to provide

19   a time estimate that you received, could you do that

20   now?

21        A    That was such a long time ago.  No.

22        Q    I'm correct you did not reduce this information

23   to any sort of report?

24        A    That's correct.

25        Q    Okay.  Besides talking to Sharon about it, did

1    you talk to anybody else?

2        A    I'm sure I had a conversation with Denise about

3    it, yes.

4        Q    Okay.  Can you tell me about that conversation?

5        A    I don't remember the exact details of the

6    conversation.  I would have conveyed the information and

7    my comfort level that I got.

8        Q    So you would have conveyed to her orally what

9    information exactly?

10       A    That the effort that was being put forth with

11   collecting late rents was consistent with what I had

12   done in the past and when I was on-site and when I was a

13   district and regional manager, and that I did not think

14   at all that the automated emails that we implemented

15   changed the time spent on collecting rents.

16       Q    Did you communicate to her an estimate of how

17   much time personnel were spending based on a percentage

18   of their time only collecting late rent?

19       A    No.  I don't recall that.

20       Q    Did you convey to her which positions were

21   involved in collecting late rent?

22       A    I don't recall that.  I don't know if I got

23   that detailed.

24       Q    When you were interviewing property level

25   personnel, which -- what were the positions of the

```
1    people you spoke with?

2        A    They would range from a leasing consultant to a

3    community administrator, an assistant manager, a

4    community manager, a general manager.

5        Q    And were they all personally involved in

6    collecting late rent?

7        A    Yes.  It depends on the property who assists

8    with that.

9        Q    Okay.  Did you take any notes about who -- what

10   positions were involved in collecting late rent at the

11   different properties?

12       A    Can you be more specific with your question?

13       Q    Did you reduce that to writing in any way,

14   information about who was involved in collecting late

15   rent at a given property?

16       A    No, I don't recall doing that.

17       Q    Did you convey that information to anybody who

18   worked with payroll data or who analyzed cost data?  By

19   "that information" I mean the information you gathered

20   from property level personnel about collecting and

21   accounting for late rent.

22       A    No.

23       Q    Are you aware of any cost analyses based on

24   payroll data that were done as a result of the

25   interviews that you conducted and the information that
```

Page 74

```
 1              STENOGRAPHIC COURT REPORTER'S CERTIFICATE

 2

 3         I, the undersigned, a Stenographic Certified

 4    Shorthand Reporter of the State of California, do hereby

 5    certify:

 6              That the foregoing proceedings were taken

 7    before me remotely; that any witnesses in the foregoing

 8    proceedings, prior to testifying, were duly sworn; that

 9    a verbatim record of the proceedings was made by me

10    using stenographic machine shorthand, to the best of my

11    ability, which was thereafter transcribed under my

12    direction; that the foregoing transcript is an accurate

13    transcription thereof.

14         I further certify I am neither financially

15    interested in the action nor a relative or employee of

16    any attorney or any of the parties.

17         IN WITNESS WHEREOF, I have this date subscribed

18    my name.

19

20         Dated: this 24th day of March, 2021

21

22

23

24         LISA RICHARDSON, RPR, CRR, RMR

25         CSR No. 5883
```

# EXHIBIT G

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                    OAKLAND DIVISION
    _____
 4                                  )
    JAVANNI MUNGUIA-BROWN,          )
 5  ANGELINA MAGAÑA, NORMA          )
    RODRIGUEZ, and DAVID            )
 6  BONFANTI individually and on )
    behalf of others similarly     )
 7  situated,                       )
                                    )
 8          Plaintiffs,             )
    Vs.                             )No. 4:16-cv-01225-JSW-TSH
 9                                  )
    EQUITY RESIDENTIAL, a real      )
10  estate investment trust, ERP )
    OPERATING LIMITED               )
11  PARTNERSHIP, a partnership,     )
    EQUITY RESIDENTIAL              )
12  MANAGEMENT, L.L.C., EQR-        )
    WOODLAND PARK A LIMITED         )
13  PARTNERSHIP, and EQR-WOODLAND)
    PARK B LIMITED PARTNERSHIP,     )
14                                  )
                                    )
15          Defendants.            )
    _____)
16
17        REMOTE DEPOSITION OF DAVID SANTEE
18    Deponent testifying from Marble Falls, Texas
19              Monday, March 8, 2021
20                    Volume I
21
22  Stenographically Reported By:
    Melissa M. Villagran, RPR
23  CSR No. 12543
24  Job No. 4490645
25  PAGES 1 - 204
```

                                        Page 1

```
 1              Marble Falls, Texas, Monday, March 8, 2021

 2                        9:11 a.m.

 3

 4         MS. BELLOWS:  This is Anne Bellows on behalf

 5    of plaintiffs.  And with me today are Andrew Lee and      09:11:28

 6    Alex Tomasevic, also on behalf of plaintiffs.

 7         MR. FIELDS:  Justin Fields for defendants and

 8    for Mr. Santee today.

 9

10                   DAVID SANTEE,

11    having been administered an oath, was examined and

12    testified as follows:

13

14                    EXAMINATION

15    BY MS. BELLOWS:

16    Q    Okay.  Good morning.

17         Would you please state and spell your name

18    for the record?

19    A    David Santee, S-a-n-t-e-e.

20    Q    As I just said, I'm Anne Bellows.  I          09:11:55

21    represent four plaintiffs and the certified classes

22    in this action.

23         Are you represented by an attorney today?

24    A    Yes.

25    Q    Is that Justin Fields?                        09:12:07
```

Page 9

```
 1          So the context would be the adoption of the

 2    late fee in 2008 and the people who were involved in

 3    those conversations?

 4       A   Okay.

 5          Well, property management was involved.          10:57:26

 6    Property operations was involved.  Our legal

 7    department was involved.  We were all involved in

 8    those conversations.

 9       Q   Okay.  Great.  And so when you say property

10    operations was involved, that includes you.           10:57:45

11          Does it include anybody else?

12       A   Yes.  It probably would have included Chris

13    Jenkins.

14       Q   In 2008, did anyone at Equity Residential ask

15    you to provide input on the cost of damages           10:58:11

16    resulting from the late payment of rent while you

17    were discussing the California late fee?

18          MR. FIELDS:  Vague and ambiguous as to

19    "input."

20          THE DEPONENT:  Not that -- asked me?  Not        10:58:22

21    that I recall.

22    BY MS. BELLOWS:

23       Q   Okay.  Do you remember anyone else providing

24    input on Equity Residential costs and damages

25    relating from the -- resulting from the late payment   10:58:36
```

Page 58

 1   of rent in California?

 2       A   I remember a discussion about the costs

 3   associated with -- I guess it was a previous suit in

 4   19 whatever.

 5       Q   What do you recall about that discussion?                10:58:58

 6       A   I recall that -- I recall that someone had

 7   found I guess it was some cost analysis that was

 8   numerous years older, and seeing as how nothing

 9   really gets cheaper, it seemed like a good starting

10   point to me.                                                     10:59:42

11       Q   Who found this cost analysis?

12       A   I believe it was somebody in our legal team.

13       Q   And you remember them finding the documents

14   in 2008?

15       MR. FIELDS:   Objection; misstates testimony.              11:00:10

16       THE DEPONENT:   I don't remember finding them.

17   I remember somebody saying they found them.

18   BY MS. BELLOWS:

19       Q   What do you remember them saying about the

20   document?                                                       11:00:30

21       A   Well, I don't remember what they said

22   specifically, but the -- what the impression that I

23   was left with was that there had been a -- if you

24   want to call it -- a time and motion study done at

25   that time at an earlier date.                                   11:00:59

Page 59

| | |
|---|---|
| 1 | Q   Did you review the time and motion study or |
| 2 | anything relating to this analysis in 2008? |
| 3 | A   I don't believe I did. |
| 4 | Q   Do you remember what conclusions were reached |
| 5 | by this analysis that were discussed in 2008?              11:01:20 |
| 6 | A   Well, I believe that I believe that the |
| 7 | conclusion was was that whatever we chose to do, |
| 8 | that time and motion study supported whatever |
| 9 | decision was made or whatever options were being put |
| 10 | forth at the time.                                          11:02:01 |
| 11 | Q   Was it Jim Fiffer who discussed those |
| 12 | studies? |
| 13 | A   That discussed what? |
| 14 | Q   The study that you are describing. |
| 15 | A   It doesn't sound like he would have been     11:02:21 |
| 16 | involved. |
| 17 | Q   Was is Denise Beihoffer? |
| 18 | A   That's probably more appropriate. |
| 19 | Q   And why -- why do you say that Fiffer would |
| 20 | not have been involved?                                     11:02:43 |
| 21 | A   Well, because this was -- well, because |
| 22 | Fiffer -- well, because it was beneath him.  How |
| 23 | about that? |
| 24 | Q   Because he was high ranking? |
| 25 | A   Well, he was a litigator.  I mean, he     11:02:58 |

Page 60

```
 1    anyone in 2008 that a 5 percent late fee would not

 2    correlate to the costs of collecting rent?

 3        A   No.

 4        Q   Are you familiar with a case titled Consumer

 5    Justice Foundation versus Equity Residential          11:05:26

 6    Property Trust filed in San Diego County Superior

 7    Court in 1998?

 8            MR. FIELDS:   Vague and ambiguous as to

 9    "familiar."

10            THE DEPONENT:   If it's the suit that         11:05:36

11    references this time and motion study, I am only

12    vaguely -- that's the only reason why I know about

13    it.  Other than that, I know nothing about it.

14    BY MS. BELLOWS:

15        Q   Do you know the claims that -- and the answer  11:05:55

16    is yes, that is the suit we're discussing.

17            Do you know what the claims were that were

18    alleged in this lawsuit?

19        A   No.

20            MR. FIELDS:   Vague as to time.                11:06:11

21    BY MS. BELLOWS:

22        Q   Do you have an understanding of the outcome

23    of that lawsuit?

24            MR. FIELDS:   Vague as to time.

25            THE DEPONENT:   Vaguely, yes.                  11:06:23
```

Page 62

```
 1   BY MS. BELLOWS:

 2       Q   Can you describe what you know?

 3       A   Well, that -- I mean, it's my understanding

 4   that there was a -- I guess what we refer to as

 5   settlement agreement, and that the fee, I don't        11:06:46

 6   recall what it was was, was determined to be

 7   reasonable, relative to whatever studies were done.

 8       Q   Okay.  And how did you gain that knowledge of

 9   the lawsuit?

10       A   Well, that would have been, you know, when    11:07:24

11   Denise or whoever said they found this settlement

12   agreement outcome.

13       Q   Okay.

14           Did you -- is it correct that you never read

15   the report that we discussed earlier that was         11:07:48

16   generated in connection with the Consumer Justice

17   Foundation lawsuit?

18           MR. FIELDS:  Asked and answered.

19           THE DEPONENT:  No, I have not read that.  I

20   don't --                                              11:08:04

21   BY MS. BELLOWS:

22       Q   And is it -- do you know who -- the firm that

23   was responsible for creating the report?

24       A   No, I do not.

25       Q   You have not heard that it was               11:08:14
```

Page 63

1      PricewaterhouseCoopers that studied the company's

2      costs related to late rent in the 1998 case?

3         A    If it was ever mentioned, I don't recall.

4         Q    Okay.

5         A    But no.                                    11:08:32

6         Q    Did you have any involvement in the creation

7      of that report in the 1998 case by

8      PricewaterhouseCoopers?

9         A    I don't believe so.

10        Q    Do you know anything about how the report was    11:08:52

11     developed?

12        A    No.

13        Q    Could you identify any of the steps taken by

14     PricewaterhouseCoopers in preparing the report?

15        A    No.                                        11:09:03

16        Q    Can you identify any of the Equity

17     Residential employees who provided information to

18     PricewaterhouseCoopers for purposes of developing

19     that report?

20        A    No.                                        11:09:16

21        Q    Do you know what information was provided to

22     PricewaterhouseCoopers by Equity Residential for

23     that report?

24        A    No.

25        Q    Do you know the amount of the late fee that    11:09:28

Page 64

Veritext Legal Solutions
866 299-5127

```
1    was analyzed as part of the PWC report, the

2    PricewaterhouseCoopers report?

3              MR. FIELDS:  Vague and ambiguous.

4              THE DEPONENT:  No.  I would be guessing.

5    BY MS. BELLOWS:                              11:09:40

6        Q   Do you know whether a percentage-based late

7    fee was assessed as part of the PWC report?

8        A   No.  I do not know any details of that

9    report.

10       Q   And it's correct to say you have not reviewed   11:10:08

11   it at any time?

12       A   Never.

13       Q   We've been going for about another hour.  Do

14   you want to take a break?

15       A   It's up to you.  I mean, I can go a little     11:10:24

16   bit longer.

17             MS. BELLOWS:  Okay.  Justin?

18             MR. FIELDS:  Whatever you want to do.

19   BY MS. BELLOWS:

20       Q   Okay.  Well, let's go to Exhibit Share.  We    11:10:40

21   can go a little longer and I'll check in again

22   shortly and let me know if you would like to take a

23   break in the meantime.

24             So I'm marking as Exhibit 3 a e-mail from

25   Denise Beihoffer dated May 14, 2008, at 1:20 p.m.,    11:11:25
```

Page 65

```
 1    answered.

 2    BY MS. BELLOWS:

 3        Q   You can answer.

 4        A   Well, the decision to increase the fee or not

 5    was not in my purview.                              11:23:11

 6            My purview was to arrive at a decision,

 7    memorialize that decision, embed that in our

 8    software, develop the appropriate review materials,

 9    and ensure that whatever they said they were going

10    to do, that they were doing.                        11:23:39

11            So, in a sense, property operations was more

12    of an audit-type function where we're not -- we're

13    not -- we're not commenting on your decision.  We're

14    commenting on you doing what you said you were going

15    to do, which are two different things.  So...        11:24:04

16        Q   Do you remember Equity Residential decreasing

17    any fees in the spring of 2008?

18            MR. FIELDS:  Overbroad.

19            THE DEPONENT:  I don't know.  I mean, I know

20    that we -- I know that we found as part of this       11:24:26

21    process, we found rogue players, which was the

22    purpose of having consistent -- and to

23    protect -- protect the company.  I mean, my job was

24    to protect the company from -- you know, from

25    litigation.                                          11:24:53
```

Page 73

```
 1            MR. FIELDS:  Vague as to time.

 2   BY MS. BELLOWS:

 3       Q   Talking about the period up to 2008.

 4       A   I believe -- well, there could have been

 5   four.                                            12:57:23

 6       Q   Okay.  And what areas of the state did they

 7   cover?

 8       A   One was San Francisco.  One was L.A.  Another

 9   was Orange County, San Diego.

10       Q   Did the income reports provide information   12:57:46

11   about the amount of time spent by the property-level

12   employees performing late rent collection activities

13   in California?

14       A   No.

15       Q   Did the income reports specify any dollar    12:58:12

16   figures attributable to the time spent by

17   property-level employees performing late rent

18   collection activities in California?

19       A   No.

20       Q   Were there any other reports regarding       12:58:25

21   personnel costs that you looked at on a regular

22   basis for the period up to including 2008?

23       A   No.

24       Q   Are you familiar with what determines the

25   level of staffing at Equity Residential properties?  12:58:59
```

Page 120

```
 1   BY MS. BELLOWS:

 2       Q   And does Equity have units in California or

 3   at the time that you left the company or the last

 4   time you're familiar with this information, did

 5   Equity have such units in its properties in          01:34:31

 6   California?

 7       A   Yes, we did.

 8       Q   With respect to personnel costs at Equity

 9   Residential California property, does the rental

10   occupancy rate of a property impact the personnel    01:34:50

11   costs for that property?  4?

12       A   I would say no unless there is some dire

13   problem.

14       Q   What would be an example of a dire problem?

15       A   Well, I mean, if there was a natural        01:35:16

16   disaster, earthquake that created fires, that caused

17   some need for additional personnel.

18       Q   I see.  Okay.

19           During the process in the spring of 2008 to

20   adopt the California late fee, did you provide the   01:35:48

21   cumulative value in the fee any information

22   regarding Equity Residential's personnel costs

23   resulting from the late payment of rent?

24           MR. FIELDS:  Vague and ambiguous as to

25   "provide."                                           01:35:59
```

Page 132

BY MS. BELLOWS:

    Q    You can answer.

    A    No, not that I recall.

    Q    Is it correct that no one asked you about

Equity Residential's personnel costs resulting from        01:36:15

the late payment of rent as part of the California

late fee adoption process from April to June of

2008?

    A    No one needed to ask me.  Everyone had access

to it.                                                      01:36:30

    Q    To your knowledge, did anyone else provide

information regarding Equity Residential's personnel

costs resulting from the late payment of rent during

the process of adopting the California late fee from

April to June of 2008?                                      01:36:45

    A    Not to my knowledge.

    Q    At the time the California late fee was

adopted in 2008, were you familiar with the

activities performed by Equity Residential employees

at the property level to collect late rate from           01:37:05

California tenants?

    A    Absolutely.

    Q    Can you please describe the late rent

collection process as you understood it in 2008?

    A    Well, there's -- the first step is typically      01:37:28

                                                    Page 133

1     a three-day notice which requires, you know, issuing

2     the notice, having that delivered to the door.

3             In some places people would do a follow-up

4     notice, which required issuing the notice,

5     delivering it to the door.                          01:37:52

6             Then there were -- you know, I'm sure every

7     manager had their own process.  But typically a

8     phone call was made once it went past a certain day

9     and then you would issue a pay or quit, which that's

10    a little more involved form that is posted and --    01:38:24

11    posted to the door.

12            Then you have to make a decision as to

13    whether, you know, creating online payments created

14    more of a challenge, because once you accept even a

15    partial payment from someone that's on a three-day   01:38:48

16    pay or quit, you would then have to go back and

17    issue another three-day pay or quit.  So you could

18    make the decision to go disable their ability to

19    make a payment on the portal.

20            So let's just say they issue the three-day    01:39:15

21    pay or quit.  No activity, no response.  I mean,

22    typically a good manager would make numerous phone

23    calls trying to work with someone, you know,

24    numerous phone calls, and try to achieve a

25    commitment date to pay.                              01:39:40

Page 134

1        As you are approaching the end of the month,

2    you really need to make a decision if you are going

3    to turn that over to an attorney or not.

4        And then that requires pulling all these

5    documents together, all of the files, what have you,        01:39:58

6    and then making a decision to send it to attorney to

7    file for eviction.

8        So it's a pretty laborious, time-consuming

9    process.

10   Q   You mentioned that if a property accepts a        01:40:12

11   partial payment, they would need to issue a new

12   notice.

13       Did the property have the discretion to

14   accept or reject a partial payment or was that set

15   by company policy?        01:40:33

16       MR. FIELDS:  Vague as to time.

17       THE DEPONENT:  Well, I guess I would say our

18   lease represented the company policy, but then there

19   is reality.

20       I'm sure there are people that took partial        01:40:49

21   payments.  To what extent, I have no idea.

22   BY MS. BELLOWS:

23   Q   And what is the purpose of disabling online

24   payments to avoid partial payments?  Why would the

25   company want to do that?        01:41:11

Page 135

```
 1          MR. FIELDS:  Calls for speculation,

 2   overbroad, vague as to time.

 3          THE DEPONENT:  Again, I don't know -- I have

 4   no idea.  It was not something that was ever

 5   measured.  There are many reasons to accept a         01:44:36

 6   partial payment.  There are just as many reasons not

 7   to accept partial payments.  This is not a black and

 8   white subject.

 9   BY MS. BELLOWS:

10      Q   Sure.  I appreciate that.                       01:44:54

11          I'm trying to understand who made that

12   decision.

13      A   The person that is ultimately talking to the

14   resident that's making the promise to pay.

15      Q   Okay.                                           01:45:05

16      A   The property manager.

17      Q   Okay.  And what is the basis of your

18   knowledge regarding the late rent collection

19   process, specifically your knowledge -- the

20   knowledge that you had in 2008?                        01:45:19

21      A   I used to be a property manager in

22   California.

23      Q   Was that before -- okay.  That was before

24   working with Equity Residential?

25      A   Yes, it was.                                    01:45:40
```

                                                Page 138

```
 1        Q    Okay.

 2        A    But the process doesn't -- the process

 3   doesn't change.  I mean, the process is really

 4   determined by the law.  And the law and the process

 5   really hasn't changed.                              01:45:52

 6        Q    And what company did you work for when you

 7   were a property manager in California?

 8        A    It was called R and B Enterprises, Oakwood --

 9        Q    Where is it located?

10        A    They are no longer in existence, but they    01:46:17

11   were on Corinth Avenue in Los Angeles.

12        Q    And what years did you have that position,

13   approximately?

14        A    1983 until I think November of 1991.

15        Q    Okay.  Are you familiar with the term "lost   01:46:42

16   use of funds" as it relates to the late payment of

17   rent?

18        A    Lost use of funds?  Opportunity costs, yes.

19   Yes.

20        Q    Can you tell me what you mean by opportunity   01:47:04

21   costs?

22        A    Well, it's -- you are missing out on an

23   opportunity over here because the money is over

24   there.

25        Q    Okay.                                        01:47:15
```

Page 139

```
 1          A    You don't have use of the money.

 2          Q    Okay.  In 2008, did you assess Equity

 3     Residential's damages resulting from the lost use of

 4     funds in connection with the adoption of the

 5     California late fee?                              01:47:37

 6          A    No, I did not.

 7          Q    Are you aware of any assessment of Equity

 8     Residential's damages resulting from the lost use of

 9     funds in connection with the adoption of the

10     California late fee in 2008?                      01:47:50

11          A    I'm not.

12          Q    Prior to the adoption of the current late fee

13     policy for California in 2008, were you aware of the

14     amount of lost use of funds incurred by Equity

15     Residential as a result of the late payment of rent?  01:48:11

16          A    I'll say no.

17          Q    In 2008, in connection with the adoption of

18     the California late fee, did you assess the cost of

19     attorneys' fees resulting from unlawful detainer

20     proceedings for California?                       01:48:42

21          A    I had knowledge of attorneys' costs for

22     unlawful detainers.

23          Q    Did anyone ask you to provide data or other

24     information about what those costs might be?

25          A    No.                                     01:49:05
```

                                          Page 140

```
 1        Q    Are you aware of anyone else assessing the

 2   cost of attorneys' fees resulting from unlawful

 3   detainer proceedings in 2008 when the company was in

 4   the process of adopting the California late fee?

 5        A    No.                                          01:49:22

 6        Q    To your knowledge, prior to adopting the

 7   California late fee in 2008, did Equity Residential

 8   attempt to calculate the actual costs resulting from

 9   the late payment of rent by California tenants?

10        A    Not directly.                                01:49:56

11        Q    What do you mean by "not directly"?

12        A    I think it was common knowledge that the

13   process in California was much longer and more

14   expensive than pretty much any other state in the

15   United States.                                         01:50:16

16        Q    Did you have data regarding the costs in

17   other states?

18        A    Yes.

19        Q    Regarding the costs of collecting late fees?

20        A    I had information --                          01:50:37

21        Q    I'm sorry, collecting late rent.

22        A    -- on the amount of money that we spent on

23   attorneys.

24        Q    Are there any reports or other materials that

25   you referred to for that knowledge in 2008?           01:51:00
```

Page 141

```
 1              determined with certainty, any" --

 2         Q    I'm looking at the column called --

 3         A    Oh. (As read):

 4              "Damage analysis must be a

 5         reasonable estimate of damages."

 6         Okay.

 7         Q    Let's stop there.

 8              So did you discuss the liquidated damages

 9    analysis with Ms. Beihoffer, Ms. Paton, and

10    Mr. Jenkins?                                    02:20:51

11         A    Here is my response.  There was an amount

12    agreed to in the 19 whatever case it was, in the

13    settlement.  My job was to rely upon what my legal

14    department told me.  This -- this form is a -- or

15    probably other forms are fees that put us at risk.  02:21:31

16    Not all fees are at risk.  So, to me, the fact that

17    we were mindful of this, that we were -- that we

18    spent considerable amounts of time discussing this,

19    at some point in time, the legal department says yay

20    or nay.  I mean, that's the process.              02:21:55

21              So this is clearly put out there so that it

22    informs all employees, people that are closest to

23    the customer, people that enter the charges, and

24    what you have into the computer, this is to educate

25    them and to advise them not to do anything about    02:22:19
```

Page 152

1   increasing anything.

2        Again, this was going back to having a

3   standardized process, ensuring that, you know,

4   people just didn't go out there and do whatever they

5   wanted to do, and this document is directing them to        02:22:38

6   be very careful and to not do anything with these

7   fees without contacting the legal department.

8   That's all this --

9        Q   I appreciate that context.

10            My question is, did you discuss the                02:22:54

11   liquidated damages analysis with Ms. Beihoffer or

12   Ms. Paton in July 2008?

13        A   I don't recall specifically.

14        Q   Do you recall discussing that requirement in

15   April to June 2008 when you were discussing the            02:23:20

16   California late fee that was eventually adopted on

17   June 4th?

18        A   Well, I mean, I guess I would be -- I would

19   assume that a settlement agreement was the

20   liquidated damages, and that was the baseline.             02:23:43

21        Q   Did you have any understanding of what the

22   landlord's damages referred to in this chart means?

23        A   I would assume it would be time, labor, costs

24   to pursue a delinquent account.  All the other costs

25   that go with it, loss of, you know, use of funds,          02:24:08

                                                        Page 153

1   what have you.

2          MR. FIELDS:  Can you hear me?

3          MS. BELLOWS:  Yes.

4          MR. FIELDS:  Okay.  I was texting.  You all

5   froze on me.  And so I missed the last however many        02:24:23

6   seconds.

7          THE DEPONENT:  It was quiet.

8          MR. FIELDS:  There was a question and I don't

9   know if David answered it, and then I'm back now.

10  Can I get whatever happened in the last 30 seconds         02:24:32

11  read back.

12          (Record was read back by the

13          deposition officer as follows:

14             "QUESTION:  Did you have any

15          understanding of what the landlord's            02:23:49

16          damages referred to in this chart

17          means?

18             "ANSWER:  I would assume it would

19          be time, labor, costs to pursue a

20          delinquent account.  All the other            02:24:04

21          costs that go with it, loss of, you

22          know, use of funds, what have you.")

23  BY MS. BELLOWS:

24      Q   To your knowledge, did anyone calculate an

25  estimate of landlord's damages from late rent for          02:25:27

                                                    Page 154

1    Equity's California residential properties in the

2    summer of 2008 or any time after that before 2014?

3        MR. FIELDS:  Overbroad.

4        THE DEPONENT:  Not to my knowledge.

5    BY MS. BELLOWS:                                    02:25:45

6        Q   Do you know why not?

7        A   I believe that the settlement amount that was

8    done ten years prior -- I mean, inflation alone

9    would more than move that number up.

10       Q   So you say that would be your assumption --  02:26:22

11       A   It comes down to what is the parameters of

12   liquidated damages.  It's impossible to do unless

13   you are mandated to calculate it a certain way.

14       Q   Yeah.  You said your assumption.  Do you

15   remember any specific decision-making about whether  02:26:51

16   to conduct such a calculation or not?

17       A   I think the basis of the discussion was

18   centered around the finding of the settlement

19   agreement from ten years earlier and discussions

20   with local counsel and looking at our competitor.    02:27:13

21       Q   And that was true for the period from 2008 to

22   2014?

23       A   I don't know what the significance of 2014

24   is.

25       Q   Well, we'll talk about 2014 in a moment.      02:27:34

                                              Page 155

```
1    increased drastically, our costs or the fee.

2    BY MS. BELLOWS:

3        Q   Do you know anything about how EQR's business

4    processes related to the collection of late rent

5    changed in the 15-year period mentioned in this        03:03:06

6    document?

7            MR. FIELDS:  Overbroad.

8            THE DEPOSITION REPORTER:  Can you repeat your

9    question.

10   BY MS. BELLOWS:                                         03:03:15

11       Q   Do you have any knowledge of how EQR's

12   business processes related to the collection of late

13   rent changed in the 15-year period referenced in

14   this document?

15           MR. FIELDS:  Overbroad, vague and ambiguous.    03:03:28

16           THE DEPONENT:  Well, I think it's increased.

17   BY MS. BELLOWS:

18       Q   Why do you think it's increased?

19       A   We certainly aren't paying people what we

20   paid them 15 years ago.  And based on the process      03:03:48

21   that I laid out, it's a very time-intensive process

22   to collect delinquent rent.

23       Q   Do you know anything about how the process to

24   collect delinquent rent changed in California from

25   roughly 1999 to 2014?                                   03:04:08
```

Page 177

```
 1    it was 5 percent on the minimum balance or the
 2    balance, not the full month's rent.
 3        Q    Okay.  I want to go back to your statement
 4    that you said the automated notices might reduce
 5    time by a hair.                                    03:10:10
 6            What do you mean by that exactly?
 7        A    Well, I mean, time saved is based upon some
 8    baseline.  The notices, the friendly reminders, if
 9    you want to call them that, are not required under
10    any law.  It's more of a courtesy.                 03:10:35
11            When I was in California, we had a white
12    tablet and an orange tablet with preprinted notices
13    that said, you know, your rent is late.  Please get
14    in touch with us.  The orange notice was your rent
15    was really late, we're going to have to file a pay  03:11:05
16    or quit.  And those were simply putting the
17    apartment number on it.  There was no -- you know,
18    you didn't have to fill out a person's name or what
19    have you.
20        Q    But to be clear, that's not Equity          03:11:22
21    Residential's practices that you're testifying
22    about, that's the company you worked for in
23    California?
24        A    To be honest, I don't know what Equity
25    Residential's practices were in California in that  03:11:30
```

Page 181

Veritext Legal Solutions
866 299-5127

```
 1     time.

 2          I mean, the collection practices were still,

 3     I guess I would say, up to that staff as to how they

 4     thought best to contact a resident and make efforts

 5     to collect any delinquent rent.  There is not a          03:12:02

 6     specific science to that.

 7     Q   If property-level personnel testified that

 8     the automation has cut down on time collecting,

 9     would you take issue with that?

10     A   I would have to hear the details of the               03:12:31

11     argument.

12     Q   Okay.

13     A   Just because somebody says something doesn't

14     mean it's true.

15     Q   So if you look back at exhibit -- I believe          03:12:55

16     we're on Exhibit 21.  The correct number.  So the

17     November 2014 memorandum.  Yes, Exhibit 21.

18          So if you look near the end of the paragraph

19     on late fees in California, this is on the second

20     page of the document, Ms. Zumph and Ms. Paton write    03:13:24

21     (as read):

22          "It is prudent to conduct a new

23          study to assess our costs and evaluate

24          whether any adjustments to the fee are

25          appropriate."                                        03:13:36
```

Page 182

```
 1              I, the undersigned, a Certified Shorthand
 2    Reporter of the State of California, Registered
 3    Professional Reporter, Certified Live Note Reporter,
 4    do hereby certify:
 5              That the foregoing proceedings were taken
 6    before me at the time and place herein set forth;
 7    that any witnesses in the foregoing proceedings,
 8    prior to testifying, were duly sworn; that a record
 9    of the proceedings was made by me using machine
10    shorthand which was thereafter transcribed under my
11    direction; that the foregoing transcript is a true
12    record of the testimony given.
13              Further, that if the foregoing pertains to
14    the original transcript of a deposition in a Federal
15    Case, before completion of the proceedings, review
16    of the transcript [  ] was [  ] was not requested.
17    I further certify I am neither financially
18    interested in the action nor a relative or employee
19    of any attorney or party to this action.
20              IN WITNESS WHEREOF, I have this date
21    subscribed my name.
22    Dated: March 23, 2021
23
24                        MELISSA M. VILLAGRAN
                          CSR No. 12543 RPR
25
```

Page 204

# EXHIBIT H

```
 1                  UNITED DISTRICT COURT
 2               NORTHERN DISTRICT OF CALIFORNIA
 3                     OAKLAND DIVISION
 4
    JAVANNI MUNGUIA-BROWN, ANGELINA  )
 5  MAGAÑA, NORMA RODRIGUEZ, and      )
    DAVID BONFANTI individually and  )
 6  on behalf of others similarly    )
    situated,                        )
 7                                   )
                  Plaintiffs,        )
 8                                   ) No.
            vs.                      ) 4:16-cv-01225-JSW-TSH
 9                                   )
    EQUITY RESIDENTIAL, a real estate)
10  investment trust, ERP OPERATING  )
    LIMITED PARTNERSHIP, a           )
11  partnership, EQUITY RESIDENTIAL  )
    MANAGEMENT, L.L.C., EQR-WOODLAND )
12  PARK A LIMITED PARTNERSHIP, and  )
    EQR-WOODLAND PARK B LIMITED      )
13  PARTNERSHIP,                     )
                  Defendants.        )
14  _____)
15
16         REMOTE DEPOSITION OF FREDERICK TUOMI
17                    Dallas, Texas
18              Friday, February 5, 2021
19
20  REPORTED BY:
21  JOHNNA PIPER
22  CSR 11268
23  Job No. 4448191
24
25  Pages 1 through 75
```

Page 1

1    administrative costs.  There's operational costs.  So we

2    are entitled -- we feel we're entitled for recovery of

3    that cost, specifically the cost versus increasing rents

4    for everyone to try to cover that assuming a certain

5    level of late always.  So if you choose to be late,

6    you'll help cover the cost that you are causing us to

7    incur.

8            That's the general thought of process on a

9    percent of a month's rent or the lesser of -- you know,

10   lesser amount due.  Again, that is a general statement

11   of just interpreting that's the business sense.  That is

12   mathematics.  That's the logic behind it.  That stands

13   today.

14           What your specific question was, do I have, you

15   know, recollection, or can I opine what they meant, you

16   know, back in May of 2008, that answer is no, I cannot.

17       BY MR. LEE:

18       Q    You referenced the cost associated with the

19   late payment of rent.  Do you believe that a

20   percentage-based late fee approximates the costs

21   resulting from the late payment of rent?

22           MR. FIELDS:  Vague and ambiguous; overbroad;

23   calls for a legal conclusion; calls for improper opinion

24   testimony.

25           THE WITNESS:  Okay.  So the question was do I

                                                    Page 50

1 believe in the percentage method.  I mean first of all,

2 I'm no longer in the business.  If I were, I would.  I

3 think it does -- it is appropriate.  It makes sense as a

4 way to calculate costs.  The higher the rent, the more

5 money we're missing, that we don't have, and the more we

6 have to pursue.  The lower the amount is -- the

7 consequence isn't quite as bad because it is relative.

8 It is a percentage versus a flat fixed.

9    If you had a flat fixed, those with higher

10 balances might be getting a break.  Those with lower

11 balances -- lower rent might be giving -- having to pay

12 too much.  So we thought this was -- or I think this is

13 a fair way of doing it, all subject to what is, you

14 know, going to be accepted by and considered fair and

15 just for our residents that agreed to this term in

16 advance in their lease and initial it, I believe.  And

17 if we were getting significant backlash, you know, in

18 business today, I would listen to that customer

19 backlash.

20    So that is a long answer to basically say I do

21 believe in it.  You know, asking me -- a man on the

22 street asked me today, you know, in 2021, yes, I believe

23 in it.

24  BY MR. LEE:

25  Q    Thank you.  Is it your understanding that

Page 51

```
 1                    CERTIFICATE OF REPORTER

 2            I, JOHNNA PIPER, a Certified Shorthand

 3    Reporter, hereby certify that the witness in the

 4    foregoing deposition was by me duly sworn to tell the

 5    truth, the whole truth, and nothing but the truth in the

 6    within-entitled cause;

 7            That said deposition was taken in shorthand by

 8    me, a disinterested person, at the time and place

 9    therein stated, and that the testimony of the said

10    witness was thereafter reduced to typewriting, by

11    computer, under my direction and supervision;

12            That before completion of the deposition,

13    review of the transcript [ ]was [X]was not requested.

14    If requested, any changes made by the deponent (and

15    provided to the reporter) during the period allowed are

16    appended hereto.

17            I further certify that I am not of counsel or

18    attorney for either or any of the parties to the said

19    deposition, nor in any way interested in the event of

20    this cause, and that I am not related to any of the

21    parties thereto.

22    DATED: February 20, 2021.

23

24

25            JOHNNA PIPER, CSR NO. 11268
```

Page 75

# EXHIBIT I

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

_____

                                      )
JAVANNI MUNGUIA-BROWN,                 )
ANGELINA MAGAÑA, NORMA                 )
RODRIGUEZ, and DAVID BONFANTI          )
individually and on behalf of          )
others similarly situated,             )      Case No.
                                      )      4:16-cv-01225-JSW-TSH
          Plaintiffs,                  )
                                      )
     vs.                               )
                                      )
EQUITY RESIDENTIAL, a real             )
estate investment trust, ERP           )
OPERATING LIMITED PARTNERSHIP,         )
a partnership, EQUITY                  )
RESIDENTIAL MANAGEMENT,                )
L.L.C., EQR-WOODLAND PARK A            )
LIMITED PARTNERSHIP, and               )
EQR-WOODLAND PARK B LIMITED            )
PARTNERSHIP,                           )
                                      )
          Defendants.                  )
                                      )

DEPOSITION OF SUSAN ZUMPH

CONDUCTED REMOTELY

MARCH 22, 2021

REPORTED BY KAYLEE LACHMANN, RPR, CSR NO. 14348

1    different jurisdictions.  And so Ann and I, I'm sure,

2    sat down and started talking about what -- what even

3    fees would be charged, what was out there, what types

4    of things, because that was not my responsibility, to

5    set fees.  So I had to talk with her about that.

6         Q.   You're referring to Ann Patton?

7         A.   Patton, yes.

8         Q.   Patton.  Thank you.

9              And these first activities where you were

10   evaluating the legality of late fees everywhere,

11   including California, started in the second half of

12   2014?

13        A.   Sure, about then.  Maybe mid -- you know,

14   second half, maybe mid, so spring, say.

15        Q.   Before that compliance activity in 2014, did

16   you have any role whatsoever with evaluating late fees

17   in California or anywhere else?

18        A.   No.

19        Q.   Why did you take on a role with respect to

20   evaluating late fees in California and other

21   jurisdictions at that time?

22        A.   There had been a number of lawsuits not -- I

23   don't recall about what type of fee, not necessarily

24   late fees, filed against our competitors, and so Bruce

25   and Jim had asked me to do something different, do

Susan Zumph                                        March 22, 2021

1   something new, me to come in and see if some of those

2   fees could pose risk for Equity.

3        Q.   These other lawsuits against your

4   competitors, what do you remember about them?

5        A.   Not very much specifics, just that it was

6   about fees and charges and different ones.  They were

7   in different jurisdictions.

8        Q.   Can you recall any of the competitors or

9   apartment communities that were sued in these other

10  lawsuits you're referencing?

11       A.   This is a non-exhaustive list.  I believe

12  Archstone and AvalonBay were two of them.

13       Q.   Do you know what fees were being charged at

14  Archstone?

15       A.   No.

16       Q.   Do you recall what fees were being challenged

17  at AvalonBay?

18       A.   No, not specifically, other than to say the

19  industry in general charged fees, say, some -- in some

20  places at -- around move-in, and some places for late

21  fees and some places that move out, so I can't recall.

22  I know over the course of my tenure with Equity I heard

23  of many suits against competitors and sort of all of

24  those time frames, any of those fees, so I can't recall

25  which suits in particular were filed at that time that

1    caused Jim and Bruce to want me to begin compliance

2    activities.

3        Q.   Before you were asked to look at compliance

4    activities in 2014 or to undertake compliance

5    activities, were you aware of any lawsuits against

6    Equity Residential competitors challenging those

7    competitors' late fees?

8        A.   I can't recall if that was a fee that was

9    charge -- challenged in any of those suits.

10       Q.   Can you recall any of the fees that were

11   being challenged as part of these lawsuits against

12   competitors that you became aware of in or around 2014?

13       A.   No.

14       Q.   Can you recall the names of any of these

15   lawsuits?

16       A.   No.

17       Q.   Can you recall when any of them were filed?

18       A.   I -- no.  No, I can't recall.

19       Q.   Go ahead.

20       A.   No, I can't recall when they were filed other

21   than I believe they were newer lawsuits, and that was

22   what prompted Jim and Bruce to want to take a look at

23   what was happening at Equity.

24       Q.   Is that what Bruce or Jim told you that, hey,

25   as a result of these other lawsuits that I have become

```
 1        Q.   How about generally?

 2        A.   No.   I don't recall.

 3        Q.   What communities or defendants did they work

 4   at?

 5        A.   As I mentioned before, the only -- the only

 6   two I can recall were AvalonBay and Archstone, and I

 7   don't know whether I spoke with either -- anyone

 8   in-house at either of those or both of them.

 9        Q.   Do you recall exchanging e-mails with anyone

10   from Archstone or AvalonBay about their lawsuits?

11        A.   No.

12        Q.   Do you recall exchanging any e-mails with

13   Mr. Fiffer or Mr. Strohm?  Forgive me.  Strike that.

14             Do you recall exchanging any e-mails with Jim

15   Fiffer or Bruce Strohm about these other lawsuits?

16        A.   I don't -- I don't recall.

17        Q.   When you first learned about these other

18   lawsuits from your colleagues at Equity Residential,

19   was it via e-mail or telephone call or bumping into

20   someone at the lunch room?

21             MR. WINN:  Objection.  Vague.

22        A.   I don't have a memory of how this came up.

23        Q.   Can you remember anything about how it came

24   up?

25        A.   No.  But -- other than to say, generally
```

1    speaking, we were very collaborative and in person, so

2    if I were going to guess how it happened -- and this is

3    a guess -- I'm guessing I had a conversation with them

4    about it rather than sending an e-mail about it, but I

5    can't say that that was how it happened.  That's

6    just -- would be my guess based on how we generally

7    interacted.

8         Q.   Before you started this compliance review in

9    2014, do you know if any other similar type of review

10   of Equity Residential's California late fees had ever

11   been conducted by the company?

12        A.   It -- I believe that the -- that there may

13   have been other reviews.  There may have been other

14   reviews done, but it wouldn't have been similar.  At

15   least I was asked to take a look at it because the idea

16   was I was going to bring a different perspective to it

17   from a litigation background.

18        Q.   Were any other reviews done before 2014 as to

19   Equity Residential's late fees charged that were from a

20   perspective of someone in the legal department that

21   you're aware of?

22             MR. WINN:  Objection.  Vague and ambiguous.

23   Lacks foundation.

24        A.   There may have been.

25        Q.   Can you recall any or any of the specifics of

Susan Zumph                                          March 22, 2021

1    those?

2        A.   I was not involved in any.  I wasn't asked to

3    collaborate on any of those.

4        Q.   Do you know if any were actually done or are

5    you guessing?

6        A.   Yeah.  I don't have any specific documents

7    about that.  Like at the time I was with Equity, I

8    don't recall reviewing any documents -- hey, take a

9    look at the old ones we did.  But that doesn't mean

10   that ones weren't done.  I just -- I don't have

11   knowledge of them.

12       Q.   Fair enough.

13            But can you recall if any were, in fact, done

14   by anyone in the legal department?

15       A.   I wouldn't have been involved, so I wouldn't

16   have had any knowledge of that.

17       Q.   Have you ever heard of another compliance

18   review being done by anyone in the legal department as

19   to Equity Residential's California late fee?

20       A.   I don't -- I don't recall.

21       Q.   You said there may have been other reviews,

22   though, outside of the legal department or legal

23   perspective.

24       A.   No.

25       Q.   Are you saying that some reviews were done or

Susan Zumph                                              March 22, 2021

1      Q.   And then what was the very next thing that
2  happened with respect to your role in the 2014
3  compliance review?
4           MR. WINN:  Objection.  Vague.
5      A.   I can't tell you the very next thing that
6  happened.  What I can tell you generally, after I was
7  asked to do this, I'm sure I had more one-on-one
8  conversations with Jim where he probably gave me more
9  details about what he had thought about what he'd like
10  me to do so I had more direction.  And then I would
11  have met with Ann who at some point, I was told, was
12  going to -- she and I were going to do this together,
13  and we talked about how -- what we were going to do,
14  how we were going to do it, what -- who we would get
15  information from, that sort of thing.
16      Q.   Do you recall the substance of any of these
17  follow-up conversations you had with Jim Fiffer about
18  the 2014 compliance review?
19      A.   Not -- no specifics about them.
20      Q.   Did you trade any e-mails with Mr. Fiffer
21  about the scope of the compliance review project?
22      A.   It's possible I did.  I don't have any
23  particular memory of them.
24      Q.   You said you met with Ann Patton, right?
25      A.   Yes.

Susan Zumph                                          March 22, 2021

1    Q.   That was after you were told you'd be working
2  with Ms. Patton on this project, right?
3    A.   Yes.
4    Q.   And who told you you'd be working with
5  Ms. Patton on the project?
6    A.   I don't recall.
7    Q.   What was Ms. Patton's role to be as described
8  to you at the time?
9    A.   Oh, I don't recall specifically how her role
10 was described to me.
11   Q.   What did her role end up being?
12   A.   She was to help me with gathering
13 information.  She was familiar with what the fees were.
14 She was more familiar with our leases, for example,
15 which described what -- you know, the terms of the
16 lease, what was going to be charged.  In a particular
17 case, for example, with a late fee, it would have been
18 described in the lease.  I was not familiar with that
19 at the time because that had not been part of my
20 responsibilities.
21        So she was going to be -- we were going to be
22 working together.  One thing I know you've already
23 heard in depositions, Equity is a very collaborative
24 workplace, which means that we work together on things.
25 It's not hierarchical so that somebody at the top tells

1   the other person what to do.  So she was supposed -- we

2   were supposed to be assisting each other in assessing

3   fees and charges to determine whether there was risk

4   for the company associated with those.

5        Q.   And so once you had your conversations with

6   Mr. Fiffer and Mr. Strohm about the project and you met

7   with Ms. Patton, what happened next?

8        A.   Well, I'm sure we carried on with the

9   project.

10       Q.   And my question is attempting to get at the

11  step-by-step process as far as you can remember as you

12  sit here today regarding that project.

13       A.   I don't remember the step-by-step process.

14       Q.   Well, at some point Ms. Patton did her job

15  and helped gather the data and other pieces that you

16  had described previously, right?

17       A.   So I think that's what I'm trying to say, and

18  I think maybe you missed.  So it was collaborative.  It

19  wasn't that I defined what was going to happen and said

20  go do this and she came back to me.  So it wasn't

21  step-by-step like that.  I'm sure we were meeting

22  frequently to determine what should be investigated,

23  who we needed to get information from to even decide

24  what should be investigated, and then we met to figure

25  out how we were going to get information.  And then,

Susan Zumph                                              March 22, 2021

1   you know, as the process went on, we would have

2   probably had to do that more than once, see how that's

3   going, oh, it turns out we thought we could get this

4   information here but we can't, let's think about

5   another way to get information.  And then eventually we

6   gathered information and then eventually we took a look

7   at it and eventually we came to some conclusion about

8   it.

9       Q.    So you estimate that you had several meetings

10  with Ms. Patton regarding the 2014 compliance review?

11      A.    Yes.

12      Q.    Do you recall about how many meetings?

13      A.    Nope.

14      Q.    And other than, generally speaking, the

15  obtaining of information you needed for the compliance

16  review, can you tell me anything else about the

17  substance of your meetings with Ms. Patton?

18      A.    No.

19      Q.    Other than canvassing properties for the late

20  fees being charged, can you recall any other

21  information that you and Ms. Patton were gathering at

22  the time for the 2014 compliance review?

23      A.    I don't remember, but I would make an

24  assumption that we also gathered information about when

25  we're talking about this -- the late fee, California

Susan Zumph                                          March 22, 2021

```
 1   late fee portion of this.  I'm sure we also gathered
 2   information about what was being charged.
 3        Q.   The information that you and Ms. Patton
 4   obtained as part of the 2014 compliance review included
 5   the late fees being charged in the jurisdictions
 6   including California, right?
 7        A.   Yes, I believe so.
 8        Q.   What else did you gather?  What other data,
 9   if anything?
10        A.   I think Ann also gathered information about
11   what was actually being done on-site when rent was not
12   paid on time.  We had to look at the process involved
13   in collecting rent not paid timely.
14        Q.   And did Ann Patton primarily have
15   responsibility for gathering that information at the
16   property level?
17        A.   I think so.  I feel like she did.  You know,
18   I certainly don't recall myself calling up communities
19   or managers myself.  I may have spoken to some, but I
20   don't recall doing that.
21        Q.   What other information, if anything, did you
22   or Ms. Patton gather as part of the 2014 compliance
23   review?
24        A.   I can't specifically recall other information
25   we gathered from Equity about that.
```

Susan Zumph                                                        March 22, 2021

1      Q.   Anything in general?

2      A.   There may have been.  I cannot think of a

3   particular item at this moment.

4      Q.   Why were you trying to learn about what the

5   on-site late rent collection process was like?

6      A.   To determine the expense involved in

7   attempting to follow up on and collect on rent that was

8   not paid timely.

9      Q.   Why were you interested in learning the

10  expenses incurred?

11     A.   We were evaluating whether the late fee was

12  allowed and was allowable in California, and part of

13  that is attempting to determine the cost of rent that's

14  not paid on time.

15     Q.   When did you first learn that the cost of

16  collecting rent was relevant to the compliance review

17  or California law?

18     A.   I have no idea when I first learned that.

19     Q.   Did you learn that as part of the compliance

20  review, as part of your background research or

21  something?

22     A.   Possibly.

23     Q.   How long did it take you or Ms. Patton to

24  gather all the information you needed to go further in

25  the compliance review?

Susan Zumph                                          March 22, 2021

1      A.   An estimate would be several months.

2      Q.   Why did it take that long?

3      A.   Well, it wasn't an easy process, and number

4  one, there was a lot involved in it, and this is

5  difficult -- this is a particularly difficult thing to

6  do, but also because we both had a lot of other

7  responsibilities.

8      Q.   Once the initial information was gathered,

9  what happened next as part of the 2014 compliance

10 review?

11     A.   You know, again, I can't give you a

12 step-by-step about how this worked.  I don't recall

13 what happened when.  Things may have overlapped.  But

14 in general, the idea was we're going to perform a

15 review of a number of items, including the California

16 late fee, and we're going to -- I had to report to

17 Bruce -- sorry -- on a regular basis about how that --

18 how it was going.  You know, was it -- were we getting

19 the information, what more did we need, did we need --

20 were we doing all the things that we should have been

21 doing.  Oh, shoot.

22     Q.   If you need to get that or address that --

23     A.   I can't.

24     Q.   Please, please.

25     A.   I'm so sorry.

Susan Zumph                                         March 22, 2021

1       Q.   That's okay.  It happens.  That's fine.

2       A.   I'll be right back.

3       Q.   Take your time.

4            MR. WINN:  So let's go off the record.

5            MR. TOMASEVIC:  Yes.

6            (Whereupon, a recess was taken.)

7   BY MR. TOMASEVIC:

8       Q.   Ms. Zumph, before our little break there, you

9   were trying to give me your best recollection of the

10  steps that were taken as part of the 2014 compliance

11  review.  And where we were at, according to my

12  recollection, was generally speaking what was taking

13  place after the necessary information was gathered at

14  the property level?

15      A.   We would have been trying to determine what

16  additional pieces of information we needed, where to

17  get it, and then eventually sum up what did we learn.

18      Q.   Were you reporting to general counsel Bruce

19  Strohm about your progress in gathering information or

20  any issues you came across in trying to gather

21  information?

22      A.   Not on a daily or weekly basis on it, but I

23  had to check in with him to make sure that it was

24  moving along, not getting stalled.  He was -- he didn't

25  like it if people didn't, you know, come to a -- like a

1    finish of the projects he set.  So I do recall there

2    was some stress about that for me that it was taking a

3    long time and that I wasn't going to meet his

4    expectation that I actually finish it.

5        Q.   Were you reporting to Mr. Strohm via e-mail,

6    telephone, in-person meetings, or some other fashion

7    typically?

8        A.   It was more in-person meetings.

9        Q.   Did you have regular meetings set up with

10   Mr. Strohm as part of your job at the time?  Regardless

11   of the compliance review were you guys meeting

12   regularly?

13       A.   I don't recall.  He did like to meet with the

14   lawyers on a regular basis.  However, it's stressful to

15   meet with your boss's boss on a regular basis, and what

16   I do recall is I was able to put those meetings off for

17   a longer period of time than my colleagues.  So they --

18   so I -- at some point I did have more regular meetings

19   with Bruce, but I don't know if it was then.  I put it

20   off as long as possible and he didn't notice, and I

21   just didn't remind him.

22       Q.   Understood.

23            About how often did you have meetings with

24   Mr. Strohm about the 2014 compliance review?

25       A.   Not regularly.  They would have been at least

Susan Zumph                                         March 22, 2021

1    several more months -- a couple or several months

2    apart.

3         Q.   Do you think you had five meetings or one or

4    two or some other --

5         A.   I'm sorry.  You cut out there.

6         Q.   About how many meetings do you think you had

7    with Mr. Strohm about the 2014 compliance review?

8         A.   A handful, probably not more than four or

9    five.

10        Q.   Did you ever give him any e-mail updates

11   about your progress for the compliance review?

12        A.   I don't recall.

13        Q.   These meetings with Mr. Strohm, would anyone

14   be taking notes?  Would there be any agenda circulated,

15   any written reflections of the meetings at all that

16   you're aware of?

17        A.   The only person that would have been taking

18   notes would have been me for what he was telling me I

19   had to do next.  If he -- you know, if he said, I want

20   you to go call so-and-so, then I wrote that down.  I

21   had to go call so-and-so and follow up because he told

22   me to.  So I don't -- there was definitely not a note

23   taker.  I can't recall if there was any written

24   reflection.  You know, I'm sure I had handwritten

25   notes, but those I wouldn't keep after I completed

1   whatever he told me to do.

2      Q.   Were any calendar entries circulated?  Like

3   nowadays some people like to use Outlook and propose

4   meeting times and accept or reject meeting times.  Did

5   that process get used for these meetings?

6      A.   I'm sure they were put on his calendar and

7   mine so that we could both block off that time.

8      Q.   When you did meet with Mr. Strohm to talk

9   about the 2014 compliance review and its progress,

10  about how long would you typically need to meet with

11  him for?

12     A.   I tried to get out of there as fast as

13  possible, but the meetings were short, not more than

14  half an hour, I don't think.

15     Q.   And when you were meeting with Mr. Strohm and

16  discussing the 2014 compliance review progress, were

17  you typically meeting only about the 2014 or was it

18  included in a broader meeting typically?

19     A.   Again, I don't recall if I had to have more

20  regular meetings about everything I was doing at that

21  time or not, so if that was happening, then it would

22  have been part of a broader meeting, but if I was able

23  to push off those meetings -- if I started meeting with

24  him regularly, then it would have been specific to

25  this.

 1    specific item that I can think of now.  It was more of

 2    an overview and sort of an initial starting point.  I

 3    believe my conclusion from that review, at least in

 4    part, was actually we need some more technical -- we

 5    need some more detailed analysis on certain issues.

 6         Q.   So let's make sure I know all of the things

 7    that you can remember up until you got to that

 8    conclusion or that point.  When you were gathering the

 9    information, were you are working off of any

10    ingredients list or data list or wish list?

11         A.   Just what we came up with.

12         Q.   When you say you came up with, who is the we

13    in that sentence?

14         A.   It would be Ann and myself and probably with

15    consultation from the different members of the

16    operations team.  To some extent my guess would be

17    Denise.  I don't think she played a very involved role

18    in this, but I'm sure I went to her to get her, you

19    know, thoughts on, you know, where would be a good

20    place to go, what should -- you know, what we should

21    look at, what do we need, you know, what are her

22    thoughts.

23         Q.   Who were the colleagues on the operations

24    team that participated to the extent you haven't

25    mentioned them already?

Susan Zumph                                                    March 22, 2021

```
 1        A.   Well, I haven't mentioned any of them, and I
 2   do not recall who they would have been.  They would
 3   have been people in property management, for example,
 4   property managers, that kind of thing, but also other
 5   operational departments.
 6        Q.   What departments would you have consulted
 7   during the 2014 compliance review?
 8        A.   It's hard for me to recall specifically for
 9   this review as opposed to times I consulted with
10   departments to get information to defend lawsuits,
11   which was different, but I don't recall which times I
12   was going to which departments for what project.
13        Q.   Do you remember any of the departments that
14   you consulted as part of the 2014 compliance review?
15        A.   This is testing my memory, given how long ago
16   this was, so I may tell you something here and it might
17   not be right, but I'll give it a guess, and just
18   understand that, you know, I may be telling you
19   something that's not quite right.  But I think we went
20   to say like -- like a group that helped with
21   property-level accounting called the Central Business
22   Group.  I believe we talked to -- we may have talked to
23   internal audit.  And then I can't recall the name of
24   the group, but they did, like, data -- they had access
25   to data and did data -- I don't want to say crunching.
```

Susan Zumph                                    March 22, 2021

1    That's not the right word, but they were looking at

2    company data.  I can't recall what that group is

3    called, but we went to them maybe for help getting

4    information.  And I will also say that I don't know if

5    any of them provided any specific information about

6    late fees as opposed to maybe some of the other things

7    that we were looking at in the compliance review.

8         Q.   Do you recall why you were going to the

9    essential business group [sic] for help with the 2014

10   compliance review?

11        A.   They help -- assisted the properties with

12   their like financial -- I don't want to say accounting.

13   They didn't do accounting, but they helped the

14   properties manage charges assessed to tenants and

15   credits for moneys collected from tenants and I'm sure

16   they did tons of other stuff as well.  I don't -- I

17   don't know -- I'm not the expert on what they did, but

18   they would have had information about what was charged

19   to tenants, what was collected for tenants, maybe the

20   process behind that and how that property -- that

21   tenant-type accounting worked.  And again, I'm using

22   accounting in a -- in the sense of the way a lawyer

23   would refer to it, not the way an accountant or

24   financial analyst would review to it -- would refer to

25   it, rather.

Susan Zumph                                      March 22, 2021

1       Q.   Who at the essential business group do you

2   recall interfacing with during the 2014 compliance

3   review?

4       A.   I don't recall anyone specifically.

5       Q.   How about generally or who you suspect would

6   have been there at the time?

7       A.   I don't recall the names of -- I don't recall

8   names of people.

9       Q.   At all from the essential business group?

10      A.   I might remember references -- I said, I

11  might remember the names of someone if you said it, but

12  right now I can't think of a particular person's name.

13      Q.   What was the work product or report, if any,

14  that the essential business group gave you as part of

15  the 2014 compliance review?

16      A.   Well, I don't know that they necessarily gave

17  us any work product.

18      Q.   Well, to the extent they did help you with

19  things like what was charged or the process for

20  charging, what format would that have taken?  Would it

21  have been a phone call where they walk you through it?

22  Would it have been an Excel spreadsheet of some kind or

23  a memo?  What can you tell me about that?

24           MR. WINN:  Objection.  Vague.

25      A.   I don't know what they would have provided

1    specifically.  I know we would have spoken with them

2    about -- about what things were charged, how they were

3    charged.  This -- I don't know that they provided any

4    documentation, any work product to us.  It may have

5    been more that they provided us with understanding of

6    how things worked and what was being done.

7         Q.   Do you know if that resulted in any kind of

8    memo or other work product?

9              MR. WINN:  Objection.  Vague.

10        A.   Yeah.  That's what I'm saying.  I don't know

11   that they did.

12        Q.   Why would internal audit or the internal

13   audit department have been involved in the 2014

14   compliance review?

15        A.   Again, I don't recall specifically what they

16   did, but what my rec -- my general impression,

17   recollection is that team was more experienced at

18   conducting, like, an investigation, and they -- I don't

19   know what they audited specifically.  I'm not familiar

20   with exactly what their purview was, but because they

21   did investigations at -- of different things at

22   properties, they were useful in helping us identify

23   maybe what information was available, where it was

24   available, how we could go about doing things.  And

25   they were more like helping us get ideas about how we

Susan Zumph                                                    March 22, 2021

1    could go about conducting ourselves, I think.  They may

2    have played a different role, but I don't recall.

3         Q.   And do you know who in the internal audit

4    department participated in assisting with the 2014

5    compliance review or who you interfaced with?

6         A.   Yes.  And again, I'm not sure that they

7    participated in assisting with the review.  I mean,

8    they assisted me, but I'm not sure that they assisted

9    with the review.  And I don't recall who we spoke to.

10        Q.   Can you recall anyone who you may have spoken

11   with or who may have assisted in the review?

12        A.   No.

13        Q.   And can you tell me if any work product or

14   final memo or any draft memos or spreadsheets were

15   created as a result of involving the internal audit

16   department?

17        A.   I don't recall what information they would

18   have sent.

19        Q.   Or what format they would have sent it to you

20   in?

21        A.   No.

22        Q.   Next, the data crunching group I'll refer to.

23   Do you recall what their role might have been with

24   respect to the 2014 compliance review, if any?

25        A.   That would have been because their role was

1   more limited, they would have been better able to tell

2   us, well, what information does the company have that

3   we could look at that would get us -- you know, that

4   would shed light on these fees and charges issues.

5        Q.   And do you know who within that data

6   crunching group would have participated in this

7   activity at the time?

8        A.   I don't.

9        Q.   Do you recall anyone who participated in it

10  or who assisted you at the time?

11       A.   I don't recall who would have participated in

12  them.

13       Q.   And same question as with the previous

14  groups.  Can you recall what, if any, work product was

15  generated with the assistance of the data crunching

16  group or that they gave you or reported to you to help

17  with the 2014 compliance review, if anything?

18       A.   No.  I don't recall where the information

19  that we gathered came from.  In terms of -- other than,

20  I should say, I know that Ann was interviewing people

21  to find out, you know, what their process was, but

22  beyond that I don't recall where we got the rest of the

23  information that we would have been using for this

24  compliance review.

25       Q.   Do you know who Ann Patton interviewed as

Susan Zumph                                        March 22, 2021

1   part of the 2014 compliance review?

2        A.    Not specifically.

3        Q.    How about generally?

4        A.    I think it was supposed to be property

5   managers.

6        Q.    Do you know which properties were interviewed

7   or surveyed?

8        A.    I have no idea.

9        Q.    How did you come up with which properties

10  would be surveyed or interviewed?

11       A.    I have no idea.

12       Q.    Was the intent to interview some manager at

13  every single property nationwide or was it some select

14  batch?

15       A.    It wouldn't have been every property manager

16  nationwide because that would have been too many.

17       Q.    So how did you go about selecting which ones

18  would be part of the interviews or review and which

19  ones would not?

20       A.    I don't know.  I'm not saying that I didn't

21  help select, but I have no idea.  The only thing I

22  generally remember -- I worked there a long time.  You

23  get a sense of which managers might be better to talk

24  to because they've -- they know what's going on, and

25  over time you might work with people.  Now, I'd had a

1   lot less of that interaction with property staff, but I
2   would think that when we were talking about it, I'm
3   sure we talked about, oh, who are the good managers
4   that maybe you feel like would really be able to help
5   provide information about this and do you know of any
6   in this area or that area, let's talk to them first, or
7   let's talk to them.
8       Q.   Can you tell me anything else about the
9   methodology or criteria used by your team in deciding
10  who to talk to or what properties to survey in
11  connection with the 2014 compliance review?
12      A.   Well, first, it wasn't my team.  That implies
13  that I sort of led a group of people, and that's not
14  how that exactly worked, but no, I can't think of
15  anything else.
16      Q.   Is there some list or memo somewhere that was
17  created that would tell us who was surveyed or
18  interviewed and who wasn't and perhaps why they were
19  chosen?
20      A.   I have no idea.
21          (Whereupon, Exhibit 1, Memo, was marked for
22  identification.)
23      Q.   Let me mark our first exhibit here, and we're
24  going to call it Exhibit 1.  I'm just going to dump it
25  into the chat, and it is a memo dated May 13, 2014, and

```
 1   written down 12:30 and I figured if we're a couple

 2   minutes early that might help you, but that's okay.

 3        A.   Yeah.

 4        Q.   So for the record and what we're marking as

 5   Exhibit 1 is a memo produced by Equity Residential as

 6   WP8017, a memo dated May 13, 2014.  My question for

 7   you, Ms. Zumph, first and foremost is do you have the

 8   memo dated May 13, 2014, in front of you and that we're

 9   marking as Exhibit 1?

10        A.   I do.  It's marked -- it's WP08017.

11        Q.   Correct.  Thank you.

12        A.   And it's one page, right?

13        Q.   It is one page.

14             Do you recognize this memo from you to Bruce

15   Strohm and Jim Fiffer?

16        A.   I mean, not particularly, but it looks like

17   memos that I -- it's the format of memos that I wrote

18   while I was with Equity.

19        Q.   Do you believe Exhibit 1 to be a part of or

20   related at all to the 2014 compliance review that we've

21   been talking about before I showed you the document?

22        A.   I mean, it says it is and I've skimmed it.

23   It looks like it would be.  I have no reason to doubt

24   that it isn't.

25        Q.   Fair enough.
```

```
 1          Let me ask you a few questions about the
 2   contents then.  It begins after the introductory
 3   comments in bolded lettering by saying that there was a
 4   meeting with stakeholders and then consulting with
 5   internal audit and others.  Do you see that?
 6       A.   I do.
 7       Q.   What stakeholders are you referring to in
 8   Exhibit 1?
 9       A.   This was so long ago.  I don't recall who
10   specifically as an individual or even what group that
11   would be other than to say I would think it would be
12   people in property management.
13       Q.   Can you think of anyone else that would have
14   been included in stakeholders as you wrote in Exhibit
15   1?
16       A.   No.
17       Q.   And then it speaks of consulting with
18   internal audit.  Is that the same internal audit group
19   that we talked about previously?
20       A.   Yes.
21       Q.   And it refers to something with the acronym
22   CBG.  What does that refer to?
23       A.   That is the central business group I referred
24   to earlier.
25       Q.   I may have called them erroneously the
```

1    essential business group, but it's Central Business

2    Group?

3         A.    Yes, I think so.

4         Q.    Fair enough.

5               And you also spoke with the VP of financial

6    planning in connection with the 2014 compliance review,

7    is that right?

8         A.    Yes.

9         Q.    Who was the VP of financial planning at the

10   time?

11        A.    I don't know who the individual was, but that

12   was the number crunchy group that I was referring to.

13        Q.    Number crunchy group.  Okay.

14              Now, there is a section underneath where it

15   talks about the late fees that are the subject of this

16   memo, and it refers to an attached audit plan.  Do you

17   see that?

18        A.    I see it says that, yes.

19        Q.    Okay.

20              And then it continues by referencing a

21   California data analysis and community manager

22   interviews being completed by July 15, 2014.  Did I

23   read that correctly?

24        A.    Yes.  That's what it says.

25        Q.    And is it your testimony that it was Ms. Ann

Susan Zumph                                                    March 22, 2021

```
 1    Patton that primarily did the community manager
 2    interviews?
 3         A.   I think so.
 4         Q.   Can you recall anyone else doing those
 5    community manager interviews?
 6         A.   I -- as I think I said, but maybe I didn't,
 7    it's possible I may have spoken with some, but that
 8    wouldn't have been -- I don't believe I primarily did
 9    that.
10         Q.   I know I asked you your methodology for
11    perhaps selecting some of the community managers and we
12    talked about that.  My next question is, do you recall
13    about how many were finally consulted?
14         A.   I have no idea.
15         Q.   Or how many from California were consulted?
16         A.   I have no idea.
17         Q.   After analysis of the community manager
18    interviews, one of the steps of the 2014 compliance
19    review was to make recommendations for change or
20    further investigation, is that right?
21         A.   Mm-hmm.
22         Q.   That's a yes?
23         A.   I'm sorry.
24         Q.   Was that a yes?
25         A.   That was a yes.
```

Susan Zumph                                                    March 22, 2021

1        Q.    Okay.

2              And the reason why I ask that, as you

3    probably already know is because when you say uh-uh I

4    got to make sure I get a clear written record.

5        A.    Yes.

6        Q.    So I'm not trying to be cute or waste your

7    time.

8              Whose job was it to make the recommendations

9    for change or further investigation?

10       A.    Ann and I were going to be doing that.

11       Q.    And did you, in fact, do that?

12       A.    I don't know.

13       Q.    Do you recall making any recommendations for

14   change or further investigation as part of the 2014

15   compliance review?

16       A.    I am sure that we, after that step, needed

17   additional investigation regarding this -- this late

18   fee compliance review.  There were other aspects to the

19   compliance initiative, other things that were looked at

20   as well, and I'm sure we had other investigation for

21   that as well.  So I don't know necessarily, you know,

22   which ones needed more than other ones.  But that being

23   said, I don't believe there was any formal written

24   recommendations for change.  I don't recall preparing

25   any sort of memo, like status memo, midterm memo for

Susan Zumph                                        March 22, 2021

1    that.

2         Q.   Right, right.  Okay.

3         A.   Oh.

4         Q.   I cut you off.  Go ahead.  Please continue.

5         A.   I was just going to say, this was what I was

6    referring to when I said that I was -- felt like I -- I

7    recall -- I don't believe this timeline had been

8    adhered to strictly.

9         Q.   Understood.

10             Part of the 2014 compliance review included a

11   nationwide data analysis gathering that initially was

12   hoped to be completed by October 1, 2014?

13        A.   It says so.

14        Q.   What can you tell me about the makeup of this

15   nationwide data analysis?

16        A.   I can't tell you anything specifically other

17   than it would have looked at late fees and not just

18   California's.

19        Q.   And then the final piece of the five-step

20   process described as part of the 2014 compliance

21   initiative or review is that recommendations for change

22   would be prepared, at least initially, by November 1,

23   2014.  Did I read that correctly?

24        A.   That's what I wrote, yes.

25        Q.   And do you know if recommendations for change

Susan Zumph                                          March 22, 2021

```
 1   were ever actually prepared at any point?
 2        A.   I do believe around the end of the year I did
 3   prepare like a summary of what was done.  As I'm
 4   reading this, I am wondering why I assumed before I
 5   investigated anything I thought that we should have
 6   changes.
 7        Q.   Can you recall any recommendations for change
 8   ever being prepared?
 9        A.   I recall that I did a memo summarizing what
10   we learned through our investigation.  I do not recall
11   ever suggesting that we change the California late fee.
12        Q.   Can you recall any other recommendations that
13   may have been made?
14             MR. WINN:  Let me make an objection there.
15   To the extent you're talking about something that
16   doesn't relate to late fees or doesn't relate to
17   California, those communications are privileged and I
18   would ask the witness not to disclose those
19   communications.
20             MR. TOMASEVIC:  That's fair.  I want to keep
21   it limited to California and the late fee issue.
22        Q.   Can you recall any recommendations in that
23   regard?
24        A.   I don't recall -- I'm sorry.  Can -- can you
25   repeat your question again?  I'm not sure what
```

Susan Zumph                                           March 22, 2021

1   you're -- I want to make sure I know what you're asking

2   me.

3        Q.   Item number 5 on Exhibit 1 refers to the

4   making of some recommendations as one of the final

5   steps of the compliance review, and my question is

6   simply, do you recall making any recommendations with

7   respect to the California late fee?

8        A.   So I do not recall making any recommendations

9   for change, as indicated in step 5 of that memo

10  regarding the California late fee.

11           (Whereupon, Exhibit 2, Audit Plan, was marked

12  for identification.)

13       Q.   Let me mark Exhibit 2 to the deposition,

14  which should be the audit plan attached to Exhibit 1.

15  This was produced as WP008018.

16       A.   Okay.  I do -- I do --

17       Q.   And it says at the top late fee on it.  Go

18  ahead.

19       A.   I do see that, and I was just going to ask if

20  we could take a break now as I am suspecting --

21       Q.   It's lunchtime.

22       A.   -- that someone has gone on his phone instead

23  of advising me that he is off of his class.

24       Q.   Okay.

25           Well, we will treat that as confidential

```
 1   attachment?
 2        A.   I wrote it, I think.  Was this attached to
 3   the other menu -- the other memo?
 4        Q.   That's how it was presented to us, and that's
 5   my belief that Exhibit 2 was attached to Exhibit 1.
 6        A.   I -- based on the memo I'm reading, I believe
 7   that to be true as well.  And then if that's the case,
 8   then yes, I would have written this in connection with
 9   the other document.
10        Q.   And do you agree that the four items listed
11   in Exhibit 2 under objectives were the objectives of
12   the late fee audit, at least in terms of the 2014
13   compliance review?
14        A.   Yes.
15        Q.   Did you have any other objectives for the
16   late fee audit other than the ones listed here in
17   Exhibit 2?
18        A.   I did not.
19        Q.   There is also a listing of four procedure
20   points under the late fee audit as written in Exhibit
21   2.  Do you see that?
22        A.   I see that.
23        Q.   Does the four items or do the four items
24   listed under procedure in Exhibit 2 for the late fee
25   audit accurately reflect the procedures undertaken to
```

Susan Zumph                                          March 22, 2021

1    do the late fee audit?

2          A.    That was the intended procedure, and I

3    believe that's generally what we did.  I am not sure

4    that it reflects everything that we ultimately did or

5    not, but that's definitely the general framework that

6    we thought we'd have to follow, and we generally did

7    follow that.

8          Q.    Were there any other procedural steps taken

9    ultimately that are not listed in these four steps in

10   Exhibit 2?

11         A.    There may have been.  In fact, I'm sure there

12   were additional things that we did.  I can't

13   specifically recall any, but --

14         Q.    How about generally?

15         A.    I think this generally summarizes what we

16   did, but there may well have been some additional

17   things that we did to collect information or that the

18   information didn't come -- I can't recall what -- what

19   data type -- for example, a sampling of late fee data

20   on a per-stay basis, can't recall how that actually

21   came through and exactly what we collected there.  It's

22   generally there.

23         Q.    Bates 1 -- go ahead.  I'm sorry.

24         A.    As I'm reading this, it does refresh my

25   recollection on a previous question you asked.

Susan Zumph                                    March 22, 2021

```
1      Q.    How so?
2      A.    You were asking me why we started -- why was
3  California the one that we started with.
4      Q.    Right.
5      A.    So when reading this, I recall some states
6  had a set amount that they allowed you to charge or a
7  not to exceed amount.  Differed per place.  And so we
8  started with California because that was the -- so if
9  it was -- because that was the most difficult state
10  because of the liquidated damages analysis.  So if a
11  state said, you can charge $100 late fee as an example,
12  without more, without any other parameters, then we
13  would know as long as we didn't charge someone more
14  than $100 we were being compliant with the law.  But
15  California required a different kind of analysis, and
16  so I think, now that I'm reading this, that's probably
17  why we started there.
18      Q.    California had a more complicated analysis
19  and posed more risk, and therefore you started with
20  California?
21      A.    No.  It just had a more complicated analysis.
22      Q.    The memo that we see or that is reflected in
23  Exhibits 1 and 2 is dated May of 2014.  Had you seen
24  this memo at all since May of 2014 and before today?
25      A.    I'm sure I had.
```

Susan Zumph                                      March 22, 2021

1   is that fair?  We can leave it at that.

2        A.   That would be nice.  Thank you.

3        Q.   Now, back to the data gathered as part of the

4   process and discussed in the memos in Exhibits 1 and 2,

5   at some point an analysis of all the data and

6   information gathered was done, right?

7        A.   I assume so.  I don't recall -- I don't sit

8   here today and say, yes, I remember doing that, but I

9   must have because that's what Bruce had expected me to

10  do.

11       Q.   Sure.  And if it wasn't you who did the

12  analysis, who would it have been?

13       A.   It would have been Ann and myself because we

14  were the ones who were responsible for doing this

15  project, as laid out here, and then coming up with some

16  results.

17       Q.   And when you did your review and analysis in

18  order to come up with your results, what kinds of

19  things were you actually physically looking at?  At

20  this point did you have spreadsheets or memos or a list

21  of handwritten notes or all of the above?

22       A.   I don't know.

23       Q.   Well, you were reviewing something, right?

24  You weren't just going off of memory, true?

25       A.   I'm not sure that we were reviewing anything.

Susan Zumph                                           March 22, 2021

1    I think we went through this project, we gathered

2    information, and then -- you know, I don't have a

3    present recollection of exactly what we did -- Ann

4    interviewed -- for example, Ann interviewed community

5    managers.  I don't know what she did with that.  Did

6    she write down notes?  Did she summarize it?  But at

7    some point she must have done something with it and

8    then we talked about it and then we discussed like what

9    did that mean, what should we do, how does this

10   influence things.  So I can't tell you what we, like,

11   looked at when we were coming up with our conclusions

12   and then I -- I must have written them down.

13       Q.   Let's take it piece by piece.  The results of

14   Ms. Patton's interviews with the community managers,

15   how were those results conveyed to you?

16       A.   I have no idea.

17       Q.   Was there some running memo of the comments

18   or questions or answers as part of the interviews?

19       A.   I don't know.

20       Q.   What questions was Ann Patton asking the

21   community managers?

22       A.   I don't know the specific questions she asked

23   them.

24       Q.   Who came up with the questions?

25       A.   I don't know.  I would guess she and I did.

1    I hate anticipating your questions.

2          Q.    So don't do it.

3          A.    Okay.

4          Q.    I mean, I understand some of that's

5    inevitable but, you know, I'm not trying to be slick

6    here and lead you down some kind of path.  I really

7    just want to know what really happened to the extent

8    you can remember.  To the extent you can't and the

9    answer is I don't know, that's your answer, that's

10   fine.  I'm just trying to figure out the limit of what

11   you do remember and figure out what I can figure out.

12   So --

13         A.    I -- we generally talked about -- I don't

14   remember the specific questions that we -- that she

15   asked them, but we were trying to find out what the

16   process was beginning on the day the rent was due to

17   follow up on those -- with those residents that hadn't

18   paid to try to attempt to get them to pay.  That was

19   what the idea of the interviews was:  What happens?

20   How do they do it?  And so I don't recall specific

21   questions, but that was what we -- I'm sure we talked

22   about, oh, that's the information we need.  She must

23   have written it down I'm guessing.  I have no idea how.

24   I do not recall getting a summary or memo of that, but

25   maybe she did one.  I just don't recall what format

Susan Zumph                                      March 22, 2021

 1    that came in.

 2         Q.   Let's talk about the format for the

 3    questions.  Did those ever get written down in any kind

 4    of script or memo or talking points that you recall?

 5         A.   I have no idea if that happened.

 6         Q.   And the format for gathering the answers,

 7    your answer is the same?  You have no idea what format

 8    the answers would have taken -- memo, notes, recorded

 9    conversations, anything like that?

10         A.   I don't.  I can tell you I don't think it was

11    a recorded conversation because I don't believe we had

12    that technical capability.

13         Q.   Can you think of any other capability or

14    method that was utilized to capture the questions or

15    answers in the interviews with the community managers?

16         A.   It is logical that she did capture it

17    somehow, but I don't know how that was done.

18         Q.   And you don't remember seeing any e-mails,

19    memos, summaries, spreadsheets, anything of the sort?

20         A.   I cannot recall any of those, but --

21         Q.   Can you recall any of the questions asked of

22    any community manager?

23         A.   I cannot recall any specific questions.

24         Q.   And if I asked you, can you remember

25    generally, you would just repeat by telling me that

Susan Zumph                                    March 22, 2021

1    generally we wanted to know the process for what's
2    involved in collecting late rent?
3         A.   That's what I recall the point of those
4    interviews were and that that's what she was going to
5    be asking them.
6         Q.   And can you recall any answer that any
7    community manager gave during these interviews?
8         A.   From -- from -- even if I don't remember a
9    particular property manager, I cannot recall any
10   specific series or sets of responses or even general --
11   general responses other than --
12        Q.   Go ahead.  I'm sorry.
13        A.   Other than maybe a very high-level, what the
14   process was.
15        Q.   Can you recall the name of any community
16   manager that furnished any of this information?
17        A.   No, I can't.
18        Q.   Or how many furnished information?
19        A.   I don't -- I don't recall how many we thought
20   was going to be enough to give us a good enough base of
21   information.
22        Q.   Did you have some threshold in your mind for
23   how many people you needed to hear back from or how
24   many questions you needed to answer before you were
25   comfortable taking the next step or analyzing what you

Susan Zumph                                          March 22, 2021

1   had heard?

2        A.   I don't.

3        Q.   What did you learn as a result of

4   interviewing the community managers in 2014?

5        A.   That when residents don't pay their rent on

6   time, it's very time-consuming and costly and difficult

7   to go through the process of trying to collect that

8   rent.

9        Q.   When you say that you learned that it was

10  very time-consuming, what exactly did you learn in that

11  regard?

12       A.   I learned --

13            MR. WINN:  Objection.  Vague.

14            THE WITNESS:  Sorry, Aaron.

15       A.   I learned that the process for -- that the

16  managers went through for each instance of that

17  occurring was different for each -- each time that

18  occurred.  So even if the same resident didn't pay on

19  time more than once it was still every time that

20  occurred, same resident, different resident, it was a

21  different set of circumstances that took a different

22  amount of time and different steps all depending on

23  each instance.  The general things that they had to do

24  were generally the same.  They had to try to contact

25  the person, whether it by phone or by -- in writing,

Susan Zumph                                    March 22, 2021

1   and they had to try to figure out how they could get

2   the rent.  There were a lot of other steps that I'm

3   glossing over that the managers did to be able to go

4   through this process because -- but that's generally

5   what I recall coming out of it, is that it -- each time

6   they did it, it took them a lot -- they spent a lot of

7   time with each instance of the rent not being paid and

8   how they could go about collecting it.

9        Q.   Who at the community level or property level

10  was actually doing the work of trying to collect the

11  rent?

12       A.   So I believe -- I'm not the best person to

13  talk to about this.  It's been now -- I've been out of

14  Equity several years, and at the time I was never that

15  involved, but it was a variety of individuals.  I --

16  this is what I can recall, you know, two years on from

17  being employed there and seven years on from this

18  project, is that it was sometimes the manager.  If

19  there was an assistant manager, the assistant manager

20  would do it or the leasing consultant.  Sometimes

21  leasing consultants would get involved in the process.

22  Sometimes maintenance -- broad term maintenance guys

23  would also have some involvement.

24       Q.   What was the maintenance person's

25  involvement?  That's the first I've heard this.

1    A.   Well, then I'm probably wrong because I'm not

2  the expert on this.  This property management process

3  wasn't mine, but I believe sometimes maintenance

4  people, but maybe it's -- it was an office person,

5  would deliver the certain legal notices or other

6  written -- sometimes they were legal ones, sometimes

7  they were written communications to residents' doors.

8    Q.   When you conducted the community-level

9  interviews, did you attempt to talk to the manager, the

10 assistant manager, the consultant or some mix of them?

11   A.   I did not conduct interviews, and I don't

12 know -- if that's who -- I don't know.

13   Q.   Do you know --

14   A.   I didn't [inaudible].  I don't know who they

15 -- who they talked to.

16   Q.   I'm sorry.

17        COURT REPORTER:  I'm sorry.  You cut out a

18 little bit there.

19        THE WITNESS:  That's all right.  I just want

20 to make sure my answer was clear, like, on that.  I

21 didn't conduct the interviews, and I don't know whether

22 the interviews were conducted with all of those people

23 in mind.

24   Q.   Well, can you tell me if the majority of

25 people contacted were the managers versus the assistant

```
 1   answer is yes.
 2        Q.   And what were those steps?
 3        A.   That is all information that I only learned
 4   in preparing the defense of this litigation.
 5        Q.   Well, I don't want to know the contents of
 6   the communications people gave you.  I want to know the
 7   facts that the company undertook before this litigation
 8   was ever even filed.
 9        A.   And I don't -- I can't specifically say as to
10   what those people did.  I don't recall what I learned
11   at the time, but I recall learning from witnesses that,
12   yes, they did assess the costs associated with
13   residents not paying rent on time.  Now, I can't give
14   you more information than that because I don't know it
15   anyway, what those steps were, when they did it, who
16   did what.  So I mean, I know I'm -- you're not really
17   asking me a question, but I think I'd like to get you
18   the -- as -- let you know the limits of my information
19   so that you can move on or not, right?  So --
20        Q.   No, that's fair.  If the answer is I don't
21   know, then you've really kind of taken the wind out of
22   my balloon.  I haven't got anything to go fight over if
23   the answer is simply I don't know.  Is that your
24   testimony?  You just don't know?
25        A.   The question you asked is, did they do
```

Susan Zumph                                              March 22, 2021

1    anything?  I believe the answer is yes.  What
2    specifically was done and by who and when?  I don't
3    recall those details, but I do feel like these were
4    questions -- my recollection is limited to the fact
5    that I believe -- I recall this being an area of
6    investigation in other depositions, and I believe those
7    witnesses, who maybe would have done it, had answered
8    those questions.  And when I say depositions, I mean
9    ones that would have occurred while I was at the
10   company, not -- I don't know what was done since I've
11   left.
12        Q.   So once you gathered all the information you
13   were going to get from the 2014 compliance review, what
14   was the final product or report, if any, that you
15   created?
16        A.   I've -- I feel like I probably -- I feel like
17   that -- sorry.  It's been a long time.  I'm sure I had
18   to produce something in writing for Bruce, and I think
19   we met with, like, some of the business team about it
20   as well.  And I would have prepared maybe something for
21   Bruce and them to digest, to, you know -- like a memo
22   or something to give them a sense of why we were
23   meeting.
24        Q.   Who on the business team are you referring
25   to?

```
 1    counsel, conducted independent analysis of applicable
 2    statutes and case law, and audited the fees charged at
 3    all communities.  Did I read that correctly?
 4        A.    Mm-hmm.  I'm sorry.  Yes, you did.
 5        Q.    Let's take the first piece regarding opinions
 6    from local counsel.  What opinions were taken from what
 7    local counsel?
 8        A.    Before I answer that, that actually somewhat
 9    answer -- refreshes my memory as to why Denise would
10    have been on this e-mail and Ann.  They were the ones
11    that had the relationships with local counsel.  Denise
12    was involved in establishing fees or helping provide, I
13    should say, legal guidance to the business teams as to
14    fees and charges that were going to be assessed at
15    communities.  So that's why Denise was involved in it.
16    I'm sure that's why she was cc'd on the memo, and Ann
17    as well.  And so I don't know specifically which local
18    counsel.  I couldn't recall now which ones were
19    involved, but that would have been something that
20    Denise and Ann would have been more involved in
21    obtaining.  And Denise may not have been specifically
22    involved other than she and Ann had the relationships
23    with local counsel.
24        Q.    Okay.
25              Let me try to unpack that a little bit.  So
```

Susan Zumph                                    March 22, 2021

```
1    when your memo, as we see in Exhibit 3, discusses the
2    gathering of opinions from local counsel, were you the
3    one personally gathering those opinions from local
4    counsel?
5         A.    No.
6         Q.    Your understanding is that it was Denise
7    and/or Ann Patton, right?
8         A.    Yes.
9         Q.    Do you know the identities of any of the
10   local counsel that were talked to or whose opinions
11   were gathered by Denise Beihoffer or Ann Patton?
12        A.    I don't recall who they would have reached
13   out to with regard to this.  I might recall names of
14   local counsel that I know they used or I'd heard them
15   used in the past if you said them, but I don't recall
16   people today.
17        Q.    Does the name Jamie Sternberg ring a bell?
18        A.    Do you have a firm name with her?
19        Q.    Kimball Tirey St. John maybe.
20        A.    I do think that her name sounds familiar.  I
21   don't know if they reached out to her with regard to
22   this, but that firm name -- and I think I know that
23   they went to her for other landlord-tenant fee type of
24   questions.
25        Q.    Do you know if anyone by the name of Todd
```

Susan Zumph                                    March 22, 2021

1    Rothbard was consulted?

2        A.    I don't, but I do recall that name as being a

3    lawyer that they also went to in California with regard

4    to landlord-tenant issues.

5        Q.    Can you name any of the lawyers or firms from

6    whom opinions were gathered in connection with your

7    2014 compliance initiative and is suggested at the end

8    of this first paragraph of Exhibit 3 in the memo?

9        A.    Not without -- no.  Not without something

10   refreshing my memory as to the fact that they provided

11   an opinion in that time frame in response to that.

12       Q.    Do you know what opinions were given by these

13   local counsel?

14       A.    I don't recall any opinions as I sit here

15   today.

16       Q.    Do you know what format you would have had

17   those opinions in before you wrote this line in the

18   memo in Exhibit 3, like some kind of binder of

19   opinions, some kind of legal memorandum, some kind of

20   spreadsheet, anything of the sort?

21       A.    It was something because I know I didn't

22   speak with them individually, so it had to be

23   something, but I don't know how Ann or Denise would

24   have obtained them and how that was communicated to me.

25       Q.    Was it communicated to you?  Were the

1    opinions at one point communicated to you?

2         A.   Some -- I don't recall any specific ones, but

3    I'm sure some were.

4         Q.   And if it was communicated to you, do you

5    know how it would have been communicated to you,

6    whether by e-mail or telephone conversation or

7    otherwise?

8         A.   That could have been done by just discussion

9    orally, them telling me that, you know, okay, we talked

10   to so-and-so, they said such and such, or, you know,

11   however they received that information.

12        Q.   Was a litigation hold ever put on internal

13   documents as a result of the filing of this lawsuit?

14        A.   Yes.

15        Q.   And do you know what, if anything, was done

16   at the company to preserve any of the product related

17   to the 2014 compliance review, like if any memos or

18   notes capturing the local counsel opinions?

19        A.   I don't know -- oh, wait.  I'm sorry.  Say

20   that again.

21        Q.   Do you know what would have been done by the

22   company, if anything, to preserve the opinions from

23   local counsel obtained as part of the 2014 compliance

24   review?

25        A.   I don't know specifically what would have

```
 1   after they were --
 2        A.   I have no knowledge -- no.  I don't know
 3   anything about that.
 4        Q.   Do you know how those local counsel opinions
 5   shaped the conclusions that you drew at the end of your
 6   2014 compliance review?
 7        A.   That's a very broad question.  It's hard to
 8   answer.  I'm trying to be efficient so we can get
 9   through your questions because I'm really not coming
10   back, but with regard to -- I don't recall what opinion
11   California counsel had with regard to the late fees.
12   Let's say that.  I have no idea what the California
13   counsel did or didn't say about that -- about that, and
14   I have no memory of any local counsel opinion on any of
15   the issues, although there were many, because there
16   were many states and other fees, not just a late fee,
17   that were being looked at.
18        Q.   And you don't remember any of the opinions at
19   all?
20        A.   Specific opinions that they had?  No.
21        Q.   Or general opinions?
22        A.   No.
23        Q.   And so you don't know, as you sit here today,
24   whether local counsel opinions affected your analysis
25   of the California late fee regime in 2014?
```

Susan Zumph                                                    March 22, 2021

1          MR. WINN:  Objection.  Misstates testimony.
2     Vague.
3          A.   I am saying I do not recall what their
4     opinion was.  Maybe this will help you.  So -- because
5     I know -- I read through this.  I know later it says
6     sometimes we considered it and sometimes we didn't.  I
7     wasn't talking about California late fees specifically
8     in that sentence.  I don't recall whether there were
9     some -- I generally recall that there were some --
10    there may have been some fees that some local counsel
11    said, well, we feel like judges don't give -- don't let
12    you charge that, so blah, blah, blah.  And so in that
13    case we would have gone and looked at the statute and
14    we would have -- Denise and I would have talked about,
15    why is this opinion this and what do you think, blah,
16    blah, blah.  But I don't recall ever hearing from any
17    local counsel or hearing -- not directly from, hearing
18    that a local counsel, I should say, ever said a
19    percentage late fee in California is not allowed.
20         Q.   What conversations did you have with
21    Ms. Beihoffer about the opinions of local counsel
22    related to California late fees?
23         A.   I don't think any.
24         Q.   And you don't remember any of the opinions
25    themselves about California late fees, right?

Susan Zumph                                                    March 22, 2021

1        A.   I don't recall any opinions, but I would have

2   recalled if the opinion was that the percentage late

3   fee we were charging, which then wound up being subject

4   to the suit you filed, was not allowed.

5        Q.   What do you mean by not allowed?  Do you mean

6   on its face illegal or do you mean a bad idea or

7   subject to scrutiny or do you mean something else?

8        A.   All of those.  All of those --

9        Q.   Okay.

10        A.   -- you just said.

11        Q.   So you never heard anything to the effect of

12   that a percent-based late fee might be subject to

13   scrutiny?

14        A.   I don't recall hearing that from a local

15   counsel.

16        Q.   If you had heard that, what would you have

17   done with that information?

18             MR. WINN:  Objection.  Vague.

19        A.   I can't speculate as to if I would have heard

20   it, what would I have done with it.

21        Q.   Would you have told anyone?  Would you have

22   kept it to yourself?

23             MR. WINN:  Objection.  Vague.

24        A.   I don't know.

25        Q.   Did Jamie Sternberg ever advise you that

1    Equity Residential should not charge a percentage late
2    fee?
3         A.   I don't -- I don't recall hearing that.
4         Q.   Do you recall anyone telling you that it was
5    okay or a good idea to charge a percentage late fee?
6         A.   I don't recall asking anyone that.
7         Q.   Well, whether you asked it or not, did any
8    opinion ever come from any lawyer suggesting that a
9    percentage late fee was legal or appropriate in
10   California?
11        A.   I didn't --
12             MR. WINN:  Objection.  Lacks foundation.
13   Vague.
14        A.   I didn't reach out and get those opinions,
15   and I don't -- so I don't recall either way, but I know
16   I would have remembered an opinion saying it was not
17   okay, given that we were sued in the same time frame
18   and that I then spent a number of years defending a
19   case based on that.
20        Q.   Before this lawsuit did EQR ever bother to
21   get any California lawyer's opinion as to whether a
22   percent-based late fee was appropriate or legal or
23   otherwise a good idea?
24        A.   I could --
25             MR. WINN:  Objection.  Lacks foundation.

1   whether someone else did that.

2        Q.   Did anyone review any cases in connection

3   with the 2014 compliance initiative --

4             MR. WINN:  Objection.  Calls for speculation.

5   Lacks foundation.  Vague.

6        Q.   -- relevant to California late fees?

7             COURT REPORTER:  Please, just one at a time.

8   Can you repeat that question?

9        A.   I couldn't --

10        Q.   Do you know if anyone at EQR read any case

11   law or cases that talked about late fees in California

12   as part of the 2014 compliance initiative or fee

13   review?

14             MR. WINN:  Same objections.

15        A.   Sorry.  I can't say what someone else would

16   have done.

17        Q.   Are you aware of anyone else having done

18   that?

19        A.   I don't -- I haven't -- I don't know.  I

20   couldn't answer.

21        Q.   Well, when -- can you recall reviewing or

22   analyzing any of the statutes in any of the other

23   states related to any of the other fees?

24        A.   I don't have a present recollection of

25   anything specific related to this memo.  It was seven

1   years ago.

2        Q.   Well, do you recall reviewing any statutes as

3   part of the 2014 compliance initiative?

4        A.   Well, it says we did.

5        Q.   And to the extent you reviewed statutes,

6   would you have written down your analysis anywhere or

7   created a memo or anything of that sort?

8        A.   I think I answered this like 20 minutes ago.

9   No.  I'm just really not sure at what you're getting at

10  here.  You know --

11       Q.   Don't worry about what I'm getting at.  Just

12  worry about answering the questions.

13       A.   Well, I'm trying to and I keep answering them

14  and you keep asking them, the same ones.

15       Q.   Yeah, the problem is that your answers aren't

16  responsive most of the time.  They're filled with --

17  no, they're filled with qualifiers.

18            MR. WINN:  The qualifier is I don't recall.

19            MR. TOMASEVIC:  And it's my job -- no, it's

20  my job to follow up on those qualifiers.

21            MR. WINN:  Well, there's been no qualifiers.

22            MR. TOMASEVIC:  I mean, look, if you just

23  want to tell me you don't remember what you did --

24            (Unintelligible cross talk.)

25            COURT REPORTER:  One at a time, one at a

Susan Zumph                                           March 22, 2021

1   time.  None of that was on the record.  The last thing

2   I got from Mr. Winn was, well, there's been no

3   qualifiers.

4           MR. WINN:  Do you have another question?

5   BY MR. TOMASEVIC:

6       Q.   The last item mentioned in the final sentence

7   of the first paragraph is that there was an audit of

8   the fees charged of all communities, right?

9       A.   Mm-hmm, yes.

10      Q.   Now, what audit was done specifically as to

11  late fees in California?

12      A.   Again, I do not know specifically what was

13  done other than to look at the prior document I

14  reviewed which said we are going to try to take a look

15  at the average late fee.  So I have no recollection of

16  exactly what was done other than what would have been

17  said -- written there and -- and whether it says an

18  audit of all fees, you know, I don't know what that --

19  I don't have a recollection of what specifically we did

20  with regard to that.

21      Q.   Skip down to the final paragraph of the first

22  page of your memo, and I'm talking still about WP8066.

23      A.   Mm-hmm.  Yes, I see that.

24      Q.   Now, the second sentence of that last

25  paragraph says, IT provided a more detailed breakdown

Susan Zumph                                        March 22, 2021

1   of fees from MRI which assisted in the audit portion of

2   this review.  Did I read that correctly?

3        A.   You did.  That's helpful actually for my

4   memory.  It may be -- I think what was done was that

5   a -- like a spreadsheet was pulled with regard to fees

6   that were charged, but I don't know the specifics of --

7   it may have -- I don't know that it was fees charged.

8   It may have been just bettings, like the computer is

9   set to charge at Greentree Apartments application fee

10  of $25.  Some data might have pulled -- was pulled from

11  MRI, but what specifically, I don't know.  I don't have

12  that.

13       Q.   Do you remember reviewing any data relevant

14  to the late fees personally?

15       A.   I may have.  I don't have a specific -- I

16  don't have a recollection of that.

17       Q.   Okay.

18            It's 12:31.  I have taken an extra minute

19  from you.  I'm not done, but I understand we have to

20  adjourn, so --

21       A.   Well, how much time do you have?  How much

22  more do you have?

23       Q.   Probably 45 minutes to an hour?  Well,

24  there's a few exhibits and depending on the answers it

25  could go longer than that, but my hope would be to be

Susan Zumph                                        March 22, 2021

1   able to do it in less than an hour, but I can't do it

2   now because I've got to do a series of calls.

3        A.   Well, I'm not -- I mean, I cannot have this

4   hanging over me.  Like, it's not -- no.  So I'm willing

5   to make a call and get something bumped, but I'm not

6   willing to come back another day.

7        Q.   Well, I'm sorry, but I'm not going to agree

8   to that.  I have calls.  Because you told me we would

9   have a hard stop at noon, I have, not surprisingly,

10  more than just one case and I have other commitments

11  starting at least one minute ago with at least one call

12  with other clients.  So I need to now take you up on

13  what was thought to be a drop-dead of 12 o'clock and

14  extend it to 12:30, and I need to go do other business.

15  And so --

16       A.   Well, so --

17       Q.   I can come back to this, but it's not going

18  to be until tonight.

19       A.   When do you propose?

20       Q.   We could do it tomorrow.  We can do it

21  tomorrow.  But why don't we go off the record.  That's

22  all the questions I have for right now, although I have

23  many more questions possibly going another hour,

24  possibly more.

25            COURT REPORTER:  Before we go off the record,

Susan Zumph                                          March 22, 2021

1   can I just ask Mr. Winn if he would like a copy of the

2   transcript?  Then we can be done.

3           MR. WINN:  Yeah.  Before we go off the

4   record, we'll want to read and review the transcript.

5   We do want a copy.  You can send it to us

6   electronically.  And I have no questions for the

7   witness at this time.

8           COURT REPORTER:  Okay.  We'll go off the

9   record.

10          (Off the record at 12:32 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Susan Zumph                                                    March 22, 2021

1              Declaration Under Penalty of Perjury

2

3              I, SUSAN ZUMPH, declare under penalty of

4    perjury under the laws of the State of California that

5    the foregoing is true and correct; that I have read my

6    deposition and have made the necessary corrections,

7    additions, or changes to my answers that I deem

8    necessary.

9              Executed on this _____day of

10   _____, 2021.

11

12

13

14   _____        _____

15                        SUSAN ZUMPH

16

17

18

19

20

21

22

23

24

25

Susan Zumph                                                    March 22, 2021

```
 1              : : :   CERTIFICATE OF REPORTER   : : :

 2

 3            I, Kaylee Lachmann, a Certified Shorthand
      Reporter, holding a valid and current license issued by
 4    the State of California, No. 14348, duly authorized to
      administer oaths, do hereby certify:
 5            That the witness in the foregoing deposition
      was administered an oath to testify to the whole truth
 6    in the within-entitled cause;
              That said deposition was taking down by me in
 7    shorthand at the time and place therein stated and
      thereafter transcribed into typewriting, by computer,
 8    under my direction and supervision.

 9            ( X )  Reading and signing was requested.

10            (   )  Reading and signing was waived.

11            (   )  Reading and signing was not requested.

12            Should the signature of the witness not be
      affixed to the deposition, the witness shall not have
13    availed himself/herself of the opportunity to sign or
      the signature has been waived.
14            I further certify that I am neither counsel
      for nor related to any party in the foregoing
15    depositions and caption named nor in any way interested
      in the outcome thereof.

16

17

18    Dated:   This 31st day of March, 2021

19            at San Diego, California.

20

21

22

23                        KAYLEE LACHMANN

24                        CSR NO. 14348

25
```

Susan Zumph                                                March 22, 2021

```
 1                  CORRECTION CERTIFICATE

 2      To add testimony, indicate "Add" and print the exact
        words you wish to add. To delete testimony, indicate
 3      "Delete" and print the exact words you wish to delete.

 4

 5      Deposition of:      Susan Zumph
        Proceedings Date:   March 22, 2021
 6

 7      I, Susan Zumph,
        have the following changes to my proceedings transcript:
 8

 9      PAGE   LINE      CHANGE TESTIMONY TO READ AS FOLLOWS:

10      _____ _____    _____

11      _____ _____    _____

12      _____ _____    _____

13      _____ _____    _____

14      _____ _____    _____

15      _____ _____    _____

16      _____ _____    _____

17      _____ _____    _____

18      _____ _____    _____

19      _____ _____    _____

20      _____ _____    _____

21      _____ _____    _____

22      _____ _____    _____

23

24      _____   Date_____
        Susan Zumph
25
```

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – OAKLAND DIVISION

_____
                                    )
JAVANNI MUNGUIA-BROWN, ANGELINA     ) Case No. 4:16-cv-01225-
MAGAÑA, NORMA RODRIGUEZ, and        )          JSW-TSH
DAVID BONFANTI individually and     )
on behalf of others similarly      )
situated,                           )
                                    )
              Plaintiffs,           )
                                    )
vs.                                 )
                                    )
EQUITY RESIDENTIAL, a real estate   )
investment trust, ERP OPERATING     )
LIMITED PARTNERSHIP, a              )
partnership, EQUITY RESIDENTIAL     )
MANAGEMENT, L.L.C., EQR-WOODLAND    )
PARK A LIMITED PARTNERSHIP, and     )
EQR-WOODLAND PARK B LIMITED         )
PARTNERSHIP,                        )
                                    )
              Defendants.           )
_____)


DEPOSITION OF SUSAN ZUMPH

VOLUME II

Conducted Virtually

April 12, 2021


Reported by Gina Marie De Luca, CSR No. 6973, RMR, CRR

Susan Zumph                                                    April 12, 2021

1          UNITED STATES DISTRICT COURT

2     NORTHERN DISTRICT OF CALIFORNIA - OAKLAND DIVISION

3    _____
                                      )
4    JAVANNI MUNGUIA-BROWN, ANGELINA  ) Case No. 4:16-cv-01225-
     MAGAÑA, NORMA RODRIGUEZ, and     )        JSW-TSH
5    DAVID BONFANTI individually and  )
     on behalf of others similarly    )
6    situated,                        )
                                      )
7              Plaintiffs,            )
                                      )
8    vs.                              )
                                      )
9    EQUITY RESIDENTIAL, a real estate)
     investment trust, ERP OPERATING  )
10   LIMITED PARTNERSHIP, a           )
     partnership, EQUITY RESIDENTIAL  )
11   MANAGEMENT, L.L.C., EQR-WOODLAND )
     PARK A LIMITED PARTNERSHIP, and  )
12   EQR-WOODLAND PARK B LIMITED      )
     PARTNERSHIP,                     )
13                                    )
               Defendants.           )
14   _____)

15

16

17

18

19

20

21          DEPOSITION OF SUSAN ZUMPH, VOLUME II,

22   conducted virtually, commencing at the hour of 8:04 AM

23   on Monday, April 12, 2021, before Gina Marie De Luca,

24   Certified Shorthand Reporter in and for the State of

25   California.

```
 1   APPEARANCES VIA VIDEOCONFERENCE:

 2

 3   For the Plaintiffs and the Certified Classes:

     NICHOLAS & TOMASEVIC, LLP
 4   BY:  ALEX TOMASEVIC, ESQ.
     225 Broadway, 19th Floor
 5   San Diego, California 92101
     619.325.0492
 6   619.325.0496 Fax
     atomasevic@nicholaslaw.org

 7

 8   For the Defendants:

 9   DUANE MORRIS LLP
     BY:  AARON WINN, ESQ.
10   750 B Street, Suite 2900
     SAN DIEGO, California 92101-4681
11   619.744.2200
     619.744.2201 Fax
12   atwinn@duanemorris.com

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Susan Zumph                                                    April 12, 2021

```
 1                      I N D E X

 2

 3   WITNESS:  SUSAN ZUMPH, VOLUME II

 4

 5   EXAMINATION                                      PAGE

 6   By Mr. Tomasevic                                  176

 7   By Mr. Winn                                       223

 8

 9               A T T A C H M E N T S

10   REFERENCED                                       PAGE

11   Exhibit 3    Emails                               180

12

13                 E X H I B I T S

14   MARKED FOR IDENTIFICATION                        PAGE

15   Exhibit 4    Email from Susan Zumph to Ann Paton  213
                  dated 11/25/14 and memo
16

17

18

19

20

21

22

23

24

25
```

Susan Zumph                                                April 12, 2021

```
 1                          VOLUME II
 2                        SUSAN ZUMPH,
 3   having been first duly sworn, testified further as
 4   follows:
 5                          -oOo-
 6                        EXAMINATION
 7   BY MR. TOMASEVIC:
 8       Q.   Good morning again, Ms. Zumph.
 9            Can you hear me okay?
10       A.   Oh, yeah.  Um-hmm.
11       Q.   Good.
12            Between our last deposition session and today,
13   did you get a chance to read your transcript?
14       A.   I did not.
15       Q.   Did you look at any documents?
16       A.   I did not.
17       Q.   Talk with anyone about this case or about your
18   deposition other than Mr. Winn or anyone who's part of
19   his legal team?
20       A.   I did not.
21       Q.   Talk to anyone else from EQR, for example?
22       A.   I have not spoken to anyone from EQR about
23   anything.
24       Q.   Okay.  Great.
25            Did you do anything to prepare for today's
```

1   session other than talk to Mr. Winn or his legal team?

2       A.   I didn't do anything to prepare for this

3   deposition.

4       Q.   Okay.  Great.

5            Let's go back over the litigation hold stuff

6   that we talked about briefly towards the end of our

7   first session.

8            Oh, and before I do that, was there anything

9   that stuck out in your mind from our last session that

10  you believe you stated and was either inaccurate,

11  incomplete, or needed modifying in any way?

12      A.   I -- I've given it no thought.  So I don't have

13  anything that I want to correct.  But I'm not saying

14  that everything I said was -- you know, that at some

15  point later I wouldn't have reason to correct it --

16      Q.   Anything that you can think of now that you

17  might want to --

18      A.   I have given it no thought, and I'm -- you

19  know, I don't really recall very much exactly what the

20  deposition was about.  I mean, I know what it was about,

21  but I don't recall everything that I said and you said

22  and what the questions were.

23      Q.   Let's go back over your learning of the case

24  and the litigation hold you sent out.

25           Now, you learned of this class action shortly

Susan Zumph                                              April 12, 2021

1    after it was filed in about September of 2014; is that

2    right?

3         A.    I assume so.

4         Q.    Do you remember it being in 2014?

5         A.    I mean, I don't recall when it was filed.  I

6    think it was filed in 2014, and I would have learned

7    about the case sometime after it was filed.  I'm not

8    sure.

9              "Shortly," I'm not sure what that means to you.

10   But it would have been after it was filed, within some

11   weeks or months.

12        Q.    Eventually you received a copy of the

13   complaint?

14        A.    Sure.

15        Q.    And at the time you understood that this case

16   was about, in short, challenging the legality of EQR's

17   late fees throughout California; right?

18        A.    I mean, I'm not sure that's a -- that's

19   everything it was about.  But generally, I mean, sure.

20        Q.    Well, what did you understand the case to be

21   about, once you learned of it?

22        A.    You know, you're asking -- you know, I'm not

23   sure what I recall I knew the case to be about then.

24              I would say now with my memory about the case,

25   not what I thought about the case when it was filed, is

Susan Zumph                                          April 12, 2021

```
 1   that it was challenging late fees in California.
 2      Q.   Did you ever understand that the case was about
 3   anything other than that?
 4      A.   Well, maybe.  I'm not sure that's exactly
 5   accurate.  I don't know that it originally even was
 6   challenging late fees in all of California.  It may have
 7   just been challenging the late fees charged in a
 8   particular community.  I can't recall.
 9      Q.   Okay.  You drafted a litigation hold letter or
10   memo to be sent out; right?
11      A.   Probably.  Sure.
12      Q.   Well, I think we said in your first session
13   that you're the one who drafted the litigation hold
14   letter for this matter; right?
15      A.   Again, it's been a long time, you know.  So I'm
16   not sure that I recall exactly, but -- so probably I
17   did.
18      Q.   And when you sent it out, where did you send it
19   out to?
20      A.   I don't remember.
21      Q.   Who would you have sent it out to?
22      A.   People who needed to preserve documents.
23      Q.   And based on your understanding of what the
24   case is about, who would those people have been?
25      A.   I can't recall who --
```

Susan Zumph                                                April 12, 2021

1      Q.   How many did -- how many did you send out?

2      A.   How many litigation holds or how many

3   recipients?

4           I -- the answer to both questions is the same,

5   which is "I don't recall."

6      Q.   Do you know how many versions of the litigation

7   hold letter you sent out related to this case?

8      A.   Nope.

9      Q.   Do you know if it was more than one?

10     A.   The case went on for -- I mean, it's still

11  going on now, but while I was there -- I can't remember

12  exactly when I left what -- in 2019 did I leave?  So

13  that was four, five years.  So I'm sure that it was

14  reviewed and -- I -- I shouldn't say "I'm sure."

15          It would -- it was probably reviewed and then

16  reminders sent out or reissued, depending -- I know the

17  case changed several times.  There was another case

18  filed.  So there would have -- I believe there was

19  likely more than one, but I couldn't say for sure.  And

20  I don't know to whom it went or how many people it would

21  have gone to.

22     Q.   Any estimate whatsoever?

23     A.   I can't.

24     Q.   So I put in the chat box Exhibit 3 from our

25  first session, and I want to go back to that.  That will

Susan Zumph                                                    April 12, 2021

1   be the 2014 compliance initiative fee review memo and a

2   cover set of emails.  It should be in the chat box.

3          Let me know if you have a problem.

4      A.    No.  I just -- hang on.  I need to adjust my

5   setup here.

6      Q.    Take your time.

7      A.    Yeah.

8      Q.    And for the record, it's -- again it's -- it

9   was produced as Bates-labeled WP 8065 through 8069.

10     A.    Yep, I have that document with those

11  Bates-numbered documents here.

12          (Reporter query)

13          THE WITNESS:  "I have those Bates-numbered

14  documents here."

15  BY MR. TOMASEVIC:

16     Q.    Thank you.

17          Now, we had talked a little bit in the first

18  session about your statement in your memo at the end of

19  your first paragraph, and I'm talking about the first

20  paragraph on Bates label 8066 where it states that "To

21  complete this review, we gathered opinions from multiple

22  counsel" and so on.

23          Do you have the language in front of you?

24     A.    I see that sentence.

25     Q.    All right.  Do you recall any other activities

1    regarding the gathering of opinions from local counsel

2    that you participated in or that were completed other

3    than what we talked about in your first session?

4        A.   Well, I don't recall --

5             MR. WINN:  Objection.  Vague.

6             THE WITNESS:  That's okay.  Sorry, Aaron.  And

7    I apologize to the court reporter for speaking over him.

8             I don't recall what we -- I said in my first

9    deposition about that.

10   BY MR. TOMASEVIC:

11       Q.   Okay.  So what did you do to gather opinions

12   from local counsel for purposes of this memo?

13       A.   Well, I don't know if -- again, I can't

14   remember what I said.  So -- I thought I said that I did

15   not communicate with local counsel myself.  Other people

16   did that.  And they reached out to them.  They got

17   opinions from local counsel.

18       Q.   What opinions did you receive from that local

19   counsel as part of this compliance review process?

20       A.   They didn't come to me directly.  So I don't

21   know exactly or inexactly.  I know we got information

22   from them, but I don't know what specifically.

23       Q.   What opinions or information did the company

24   gather from local counsel as part of this 2014

25   compliance review?

1    A.   Well, I can't speak for the company.  I'm not a

2    company rep.  I can only speak for what I did, and I

3    know that -- I recall that Ann Paton -- and maybe she

4    had other people -- other people as well -- reached out

5    to local counsel and gathered opinions from them, got

6    information from them, asked them questions.  But that

7    was not my primary role in that.

8         So I don't recall, because I didn't do it

9    myself, exactly what she asked them, what information

10   she got, how she got it.

11   Q.   Okay.  I understand all those qualifiers.

12   You've said them many times.

13        I want to know what you know, what you

14   remember, what you heard, what you did.  Just

15   because you --

16   A.   And I'm saying I don't know.

17   Q.   I'm not finished.

18        Just because you didn't do it doesn't mean you

19   don't know or you didn't hear.  So let me just ask it

20   one more time, and we can move on.

21        What opinions were gathered from local counsel

22   in connection with the 2014 compliance review that you

23   can recall, as you sit here today?

24   A.   I don't recall what was gathered.

25   Q.   Okay.  At some point an independent analysis of

```
 1    applicable statutes and case law was conducted in

 2    conjunction with the 2014 compliance review.

 3            What independent analysis of applicable

 4    statutes and case law was done with respect to

 5    California late fees?

 6        A.    I don't really -- I don't know what you mean.

 7        Q.    These are your words from your memo.  We're

 8    back at the end of the first paragraph of Exhibit 3, the

 9    memo portion --

10        A.    Um-hmm.

11        Q.    -- on Bates 8066, where you wrote, "We gathered

12    opinions from local counsel, conducted an independent

13    analysis of applicable statutes and case law, and

14    audited the fees charged at all communities."

15            Did I read that correctly?

16        A.    You did.

17        Q.    Okay.  So what independent analysis of

18    applicable statutes and case law was conducted with

19    respect to the 2014 compliance review regarding

20    California late fees?

21        A.    Well, I think that's clear.  Exactly that, an

22    analysis of whatever statutes were applicable.

23        Q.    What was that analysis?

24        A.    Again, now I'm not understanding what you're

25    asking.
```

Susan Zumph                                      April 12, 2021

1      Q.   I don't need you to just read the statement

2  here.  I want you to tell me what comprised the

3  independent analysis of applicable statutes and case

4  law.  What statutes?  What case law?  When did you

5  start?  Who participated?  How long did you spend doing

6  this?  What work product did you create as a result?

7           Do you know the answer to any of those

8  questions?

9      A.   Well --

10          MR. WINN:  Objection.  Hold on.  Time out.

11  Time out a minute here.  Let's pause for a minute here.

12          First, there's multiple questions there.  So

13  the objection is it's compound.

14          Second is it appears, Alex, that you're getting

15  quite heated here.  If you can just ask simple

16  questions, I'm sure we can get answers.

17          And the fact that she does not recall something

18  doesn't require you to get upset at her.

19          So if you don't mind just asking simple

20  questions, not compound questions, I'm sure the witness

21  will provide the best answer she can.

22          MR. TOMASEVIC:  Well, I'm not getting heated.

23  That's a misrepresentation.  What I'm getting is

24  nonanswers to my questions.

25          And to your point about "simple questions," I

1    don't know how it gets simpler than reading words

2    written by the witness and saying, "What did you mean by

3    that?  Please explain this."

4            I can't think of a simpler version of a

5    question along those lines, Aaron.

6            If you've got an example, then I'm happy --

7            MR. WINN:  Well, very good.

8            Let's read back -- let's read back -- let's

9    read back the last question.  Let's see if that's

10   simple, and we can see if she can answer it.

11           Will you please read back the last question,

12   Court Reporter.

13           THE REPORTER:  Yes.

14           (Record read)

15           MR. WINN:  Okay.  And my objection is the same.

16   I think that's a compound question.  I don't think it's

17   simple, and there were multiple questions in there, and

18   it's not fair to ask the witness about six questions and

19   ask whether she has answers to any of them.

20           So my instruction actually is -- unless you can

21   recall all those questions and answer them

22   independently, then you don't answer that question.

23           And if you don't mind, Alex, just ask her each

24   of those questions, if you'd like to.  I think that'll

25   provide a much cleaner way to go about this.

Susan Zumph                                              April 12, 2021

 1          MR. TOMASEVIC:  You're instructing her not to
 2   answer my question?
 3          MR. WINN:  No.  I'm instructing her unless she
 4   can remember each of those six questions and answer them
 5   distinctly, that she shouldn't answer the question.
 6          If she can remember all those six questions
 7   embedded in one question, by all means, answer them.
 8          MR. TOMASEVIC:  Let me ask the simple question
 9   again and see what we get this time.
10   BY MR. TOMASEVIC:
11      Q.   So tell me more about the independent analysis
12   of applicable statutes and case law that was allegedly
13   conducted as part of the 2014 compliance review as it
14   related to California late fees.
15      A.   We would have looked at statutes and case law
16   in California that related to late fees.  There's a
17   statute, and there are a number of cases.  I can't
18   recall how many, but I know there was more than one that
19   related to -- that looked at late fees in California,
20   and we looked at them, and we looked at what the
21   local -- I'm sure we looked at the opinion from local
22   counsel.
23          I don't recall specifically with regard to
24   California or -- because this was a memo about multiple
25   different charges assessed at the communities and at

1   communities throughout the country in multiple states

2   whether anything specifically was done for, you know,

3   any particular fee in any particular state.  But we

4   would have looked at it, and we would have talked about

5   it.  And we would have seen if what -- our analysis of

6   that case law and the statutes was the same as what

7   local counsel was telling us.

8       Q.   Who is the "we" in your answer?

9       A.   I cannot recall specifically with regard to

10  California and late fees, but I can answer generally

11  with regard to this compliance project -- this

12  compliance initiative what would have -- the people that

13  were likely involved were Ann Paton and Denise Beihoffer

14  and Jim Fiffer and myself.  And there may have been --

15  that's -- that's probably who was involved.

16      Q.   Who actually read the applicable statutes?

17      A.   Possibly all of us.

18      Q.   Do you remember doing it?

19      A.   I -- at some point I'm sure I read some of the

20  statutes.  Sure.

21      Q.   I mean in connection with this memo in 2014.

22      A.   At some -- I'm sure I read some of them.  Yes.

23      Q.   How many of them?

24      A.   I couldn't say.  There were a lot of fees, and

25  there were a lot of charges assessed at the communities

1   that we were looking at, and there were a lot of

2   different locations that we were reviewing, different

3   states.

4          MR. WINN:  Objection.

5   BY MR. TOMASEVIC:

6      Q.   Who read the applicable statutes related to

7   late fees in California?

8      A.   I couldn't say.

9      Q.   Who read the applicable case law related to

10  late fees in California?

11     A.   I -- with regard to this only --

12     Q.   With regard to --

13          (Simultaneous colloquy)

14          (Reporter query)

15  BY MR. TOMASEVIC:

16     Q.   Who exactly reviewed -- ma'am, who exactly

17  reviewed the case law related to California late fees in

18  connection with the 2014 compliance review memo?

19     A.   I can't recall.  You know, I don't have a way

20  to answer that.

21     Q.   And then the review of the statutes and the

22  case law, at least as it related to California late

23  fees, did that review end up in any kind of memo,

24  analysis, or summary, to your recollection?

25     A.   I would -- I doubt it.

Susan Zumph                                              April 12, 2021

1      Q.   Did you reach any conclusions at the end of

2  your analysis of the statutes or case law as it related

3  to California late fees?

4           MR. WINN:  Objection.  Vague.

5           THE WITNESS:  I -- I can't really recall.  I

6  don't really remember.

7           I suppose the only thing I would remember is

8  that -- the negative, which is a weird thing to

9  remember, but if we had concluded that we thought we

10  weren't following California law, I would have

11  remembered that because we had a lawsuit -- at the time

12  we were writing this memo we had already been sued with

13  regard to it, and I know that we did not conclude that

14  there was something wrong with what we were doing.

15  BY MR. TOMASEVIC:

16      Q.   Did you ever conclude that you weren't

17  comfortable continuing to charge late fees in California

18  without doing more analysis or studies?

19      A.   No, I don't recall that.

20      Q.   Let's go to the third paragraph that starts

21  with "Where local counsel's advice was ambiguous."

22      A.   Um-hmm.  I'm sorry.  Yes.

23      Q.   Did you ever receive advice from local counsel

24  that was ambiguous or differed from your policies --

25           MR. WINN:  Objection.  Go ahead.  I'm sorry.

Susan Zumph                                                    April 12, 2021

```
 1          MR. TOMASEVIC:  I was going to strike that
 2   question.  I didn't like that question anyway.
 3   BY MR. TOMASEVIC:
 4      Q.   Let's go to the second sentence where it says,
 5   "In the areas where, based on our own experience" -- do
 6   you see that?
 7      A.   Are we on the third paragraph?
 8      Q.   Yes, ma'am.
 9      A.   Yes, I see that.
10      Q.   Okay.  There you write, "In the areas where,
11   based on our own experience, the Courts favor tenants
12   and we are likely to face class-action litigation or
13   attorney general investigations, our guidance is more
14   conservative."
15          What does that mean exactly?
16      A.   That means in a place where I felt like some of
17   the law was -- if -- I'm sorry.  Strike that, not that
18   you can because I'm the witness.  But let me start my
19   answer over.
20      Q.   I hear you.  I hear you.  Go for it.
21      A.   In a particular jurisdiction where there was a
22   law that seemed ambiguous, that it wasn't exactly clear,
23   "Yes, you can charge XYZ" -- for example, California was
24   clear about application fees:  "You can charge XYZ up to
25   W," a certain limit.  That was more clear.
```

1          In other states, there were things that said --
2     they were very clear:  "You can absolutely charge X in
3     the amount of Y."
4          If it was less clear than that, if it was, you
5     know -- some of the language would say, "Prior to
6     entering into a lease, the only -- you can only
7     charge" -- and then it was kind of vague as to what it
8     could be charged or assessed.
9          So in places where it wasn't black-and-white
10    clear, if that place was also a place where we knew that
11    landlords had been sued in the past, then we would try
12    to be very conservative and take the most restrictive
13    view of that ambiguous statute or case law possible.
14    And that might be regardless of -- of what local counsel
15    was saying in that sometimes local counsel was saying,
16    "Oh, everyone does it here."
17         And we'd look at it and we'd say, "Well, wait a
18    minute, though.  This doesn't -- this is kind of -- it
19    doesn't say you can specifically do -- assess that.  And
20    I don't care that other people are doing it.  The
21    question is 'do we think that's likely to become a
22    litigated issue for us?'"
23         And if it could be litigated, even if we
24    thought that everyone was doing it and the Courts had
25    approved those charges previously, we would be

```
 1    conservative and maybe not charge that because we didn't
 2    want to get sued.
 3       Q.   In the next sentence you refer to California as
 4    being a jurisdiction that fits in a particular class, in
 5    your mind.
 6           What class are you referring to?
 7       A.   I wouldn't say it was in a class.  It was just
 8    a location that we faced class-action litigation in the
 9    past, before the suit you filed.
10       Q.   Where did you feel California was on the
11    spectrum with respect to late fees in comparison to the
12    other jurisdiction?
13       A.   It wasn't -- that wasn't the spectrum I was
14    looking at.  It wasn't with respect to late fees.  It
15    was in general.  The places listed there -- they all
16    were more -- were places where litigation was more
17    likely.
18       Q.   Meaning "California, Florida, Massachusetts,
19    Maryland"?
20       A.   Yes.
21       Q.   Okay.  The final sentence of that same
22    paragraph says that, "Our recommendations are a
23    reflection of the balance between our legal guidance and
24    our business judgment."
25           What does that mean exactly?
```

Susan Zumph                                                    April 12, 2021

1    A.   I -- well, it's a little bit vague.  And to be

2  honest, it was more of "puffery."

3    Q.   What do you mean by that?

4    A.   So this was being presented to -- I don't know

5  what David's title was -- David Santee's title at the

6  time was, but he was either the guy in charge of

7  operations or one of the people in charge of operations.

8          And so he didn't like it if the lawyers came in

9  and just said, "This is the law, and we don't care what

10 the -- how that impacts the business."

11         So that was more "puffery" to say to him, "We

12 consider you running your business, and so anything I'm

13 saying here is -- is balanced."

14         But it was really just to make him feel like we

15 had considered all the things important to him so he'd

16 be willing to read the memo and listen to the words that

17 we said.

18   Q.   I understand.

19         David Santee put a priority on business needs;

20 right?

21   A.   Of course he did.  He was in charge of running

22 the business.

23   Q.   Yeah.

24         And you wanted to reflect some respect for his

25 prioritization of business needs within this memo so

1   that he could see that?

2       A.   Yes, so that he would be open to hearing the

3   things that we had to say that maybe would change his

4   business, maybe.

5            I can't recall actually that we changed

6   anything out of this, but the idea was I wanted him to

7   look at me as someone that would -- that would be --

8   understanding the business too because then he would be

9   willing to listen to my opinion.

10      Q.   And by "the business" or "business judgment"

11  for people reading this transcript, what do you mean by

12  that?

13      A.   I didn't really mean much by that because I --

14  it was, again, just "puffery."  He has business

15  judgment.  I didn't really -- I was a trial lawyer, and

16  I got involved in compliance to bring a rigor to the

17  investiga- -- I don't want to say "investigation," but

18  to the process of looking into the fees.

19           So, again, that was really like a "puffery"

20  statement.  It wasn't actually anything.

21      Q.   Let's look at the next page where you have a

22  section devoted to "California analysis," please.

23      A.   Sure.

24      Q.   The first bullet point appears to talk about

25  the late fee.

1      A.   It does.

2      Q.   Now, in the middle, there is a sentence that

3   says, "We have not updated this analysis in the ensuing

4   15 years, even though our business processes and the

5   amount of the fee have changed drastically, and in the

6   inverse proportion to each other."

7           Did I read that correctly?

8      A.   Yes, that is what it says.

9      Q.   Now, the earlier analysis being reflected in

10  this sentence, is that the PricewaterhouseCooper's

11  analysis we talked about, or is it something else?

12     A.   It was -- I think it was

13  PricewaterhouseCooper's.  It was the analysis performed

14  in connection with the previous litigation, like an

15  expert analysis with people that -- I want to say --

16  "accountant" isn't right, but, like, you know, somebody

17  with a -- again, it's not "accounting" or "economics."

18  I'm not really good with that kind of stuff, but that

19  kind of background, a background to be able to analyze

20  costs and expenses.

21     Q.   Okay.  You state that, "The business processes

22  and the amount of the fee have changed drastically."

23          How did the business processes change

24  drastically?

25     A.   Let me do my best.  So from 1999 -- and what I

1    was referring to was the process changed from '99 to
2    2000- -- when did this get written?  Was it '14?
3         Q.   Yes, ma'am.
4         A.   "2014."
5              So what I mean by that is I believe there were,
6    for example, two different computer systems.  Like, we
7    were on our third -- I -- the company was either on
8    its -- I think its third computer system.  And the
9    systems were remarkably different.
10             The one that was in use in 2014 was more of a
11   Web-based one.  The one that was in use in '99 and even
12   its replacement were all maintained right on, like, the
13   hard drive at the -- of a particular computer, and they
14   weren't -- it wasn't connected.  It didn't send data
15   anywhere.
16             So the process that was involved with a new
17   system and the old system and how fees got entered,
18   charges and payments, and how maybe a letter was written
19   or -- well, like, how they'd go about documenting, what
20   they did, and to try to collect rent that wasn't paid on
21   time, all of that, I believe, was really very different
22   because things in 14 years -- the world had changed.
23   Email was in use in 2014.  Frankly, texting was in use
24   in 2014.
25             And I can't recall when that

1   PricewaterhouseCooper's analysis had been done, but I
2   believe -- what I recall is it had been done when I was
3   still in law school or just out of law school.  And to
4   me, the process -- or the world between then and now and
5   how we did everything was drastically different.
6          And so that was part of the process that I was
7   talking about.
8      Q.   How did the amount of the fee change?
9      A.   Well, the fee -- and I'm not sure the amount of
10  the fee changed.  I mean, in some cases I'm sure it did.
11  But in 20- -- 1999, if that's when that study was or --
12  we'll just say -- so I don't have to say a time, we'll
13  say when that expert analysis had been performed, I
14  believe it was at $50.  That's my recollection today.
15  So maybe when I wrote this I thought something else, if
16  I'm wrong.  But as I sit here today, what I recall is
17  that it was $50.
18          And then by the time I was looking at this in
19  2014, it had changed so that it was a percentage of
20  the -- the unpaid rent.
21      Q.   And when you say that, "The business processes
22  and the amount of the fee changed in inverse proportion
23  to each other," you mean the fee went up and the
24  processes needed went down?
25      A.   Yeah -- I mean, that doesn't actually make any

Susan Zumph                                              April 12, 2021

1    sense.  So I kind of hope this didn't go to David but --
2    see, it doesn't make sense because the process isn't a
3    cost.  It's just a process.
4           And what I was saying here is that I wanted to
5    conduct a new expert analysis to figure out how much the
6    new process costs because I knew the process was really
7    different, but what I couldn't -- I didn't have the
8    skills to assess, "Well -- but what are those costs
9    associated with that?"
10          And then I do know that the -- the amount of
11   the fee had gone -- it had gone up only because it was
12   not less than $50 based on, like, the average rental
13   rate, an average.  I'm not saying that nobody was
14   charged that.  But if you looked at the average rent --
15   assuming somebody didn't pay their rent on time, full
16   rent on time, the amount that that would be would be
17   more than $50 is what I suspected.
18      Q.   Did your analysis of the business processes
19   related to collecting rent in 2014 come from yours or
20   your colleagues' interviews with the property managers?
21      A.   Yes.
22      Q.   Did it come from anything else?  I mean, did
23   you receive any -- I don't know -- memos, standard
24   operating procedures, or things like that that you can
25   recall, as you sit here today?

1      A.   We did not receive any memos or standard

2  operating procedures, that I recall.  I don't think

3  any -- I mean, I don't recall the existence of any, not

4  that some existed and we didn't get them.

5          But I think we talked about how Ann and I had

6  met with other people involved in the whole process, not

7  just people at -- on-site, but also people in more of a

8  corporate role.  So somebody in central business group.

9  And so some of the information about the process would

10 also have been related to meetings we had with people,

11 like, on the business side that weren't property

12 managers.

13     Q.   Did you ever obtain an understanding as to how

14 much time on average or in the aggregate EQR personnel

15 spent trying to collect late rent in the '90s or when

16 the first expert analysis was done?

17     A.   I have no idea what they did.  I -- I -- I

18 don't know what that showed and what information was

19 gathered for that.

20     Q.   Right.

21          Well, when you say, "The business processes

22 have changed in an inverse proportion to the fee

23 collected," do you mean that over the course of 15 years

24 and because of automation, at least in part, EQR

25 personnel spent less time trying to collect late rent?

Susan Zumph                                                    April 12, 2021

```
1        A.   No, I don't mean that.  I mean I didn't know,
2   and I wanted someone who could do that analysis.  My
3   thought was that it would be a good idea to get an
4   expert to take a look at it.  And one of the things the
5   expert -- I don't recall specifically, but I think in my
6   mind -- I'm just trying to put myself back there then.
7            I suspect what I was thinking is, "We'll let
8   the expert look at that, look at what was done before
9   and analyze -- and analyze that and then look at the
10  interviews and maybe even talk to people and do their
11  own assessment, tell me what information I should go
12  gather so that they can analyze it," because I didn't
13  necessarily know all the things that go into the cost of
14  this.  And then they could tell us whether it was more
15  or less cost on the property manager's side, and -- and
16  I don't know all the other things that go into
17  collecting -- collecting this and accounting for -- not
18  just collecting, but attempting to collect and
19  accounting for rent that wasn't paid when it was due.
20       Q.   Did you ever conclude that EQR personnel were
21  spending more time in 2014 collecting on late rent than
22  in prior years?
23       A.   No.  In 2014 we hadn't gotten to that
24  conclusion.  That was why I was saying we wanted an
25  expert.  It was more -- I'm not -- I want to make sure
```

Susan Zumph                                                 April 12, 2021

1    that the -- not just the time spent, whether it was less

2    or more, but that the time spent at some -- you know,

3    and all the costs.

4            So some of it is time spent, but also you would

5    want to look at -- you would need to take into account

6    salaries or, like, how much we were paying people to do

7    things.  And so I just didn't have an ability to make

8    that assessment more or less, and I wanted to --

9    that's -- I was recommending let's go ahead and have

10   that done because it's -- essentially I was saying it's

11   beyond me to be able to do that.

12       Q.   Yeah, I hear you.  You're going into a lot of

13   issues like property costs and stuff --

14            THE WITNESS:  Can you guys hold on one second?

15   Can you guys hold on one second?  I'm so sorry.  I have

16   a visitor.

17            MR. TOMASEVIC:  Yeah.

18            THE REPORTER:  Off the record?

19            MR. TOMASEVIC:  Off the record.

20            (Discussion off the record)

21   BY MR. TOMASEVIC:

22       Q.   Yeah, I appreciate that extra information about

23   salaries, but that's not what I'm asking.  I'm just

24   asking you a "Yes" or "No" question.  Strike that.

25            Did you ever conclude that EQR personnel were

Susan Zumph                                                    April 12, 2021

```
 1   this -- like here, I'm saying we recommend that we
 2   conduct this "analysis."
 3        Q.   And you're recommending you conduct the new
 4   analysis including what you're referring to here as
 5   "time and motion studies" with respect to the California
 6   late fee; right?
 7        A.   With respect to -- no, not just California's
 8   late fee.
 9        Q.   Including California's late fee?
10        A.   Yeah, that would be included here.
11        Q.   Okay.  So in this paragraph you're talking
12   about things, including the California late fee, that
13   you're analyzing at the time?
14        A.   Yes.
15             MR. WINN:  Objection.  Vague.
16   BY MR. TOMASEVIC:
17        Q.   Your memo concludes -- or at least I should say
18   this paragraph concludes on 8069 with the sentence that
19   says, "We have not identified any other fees to
20   substitute for the fees for which we recommend the
21   studies."
22             Did I read that correctly?
23        A.   You did.
24        Q.   What did you mean by that?
25        A.   Well, late fees are -- this was not related to
```

Susan Zumph                                              April 12, 2021

```
 1   late fees, but there were some fee -- fees or --
 2   assessed in other jurisdictions that -- and I can't
 3   recall specifically, but sometimes we would take a look
 4   at a charge and say, "Well, that one we think is not --
 5   we don't -- what you're doing right now we either" -- it
 6   was never black and white against the law, but maybe we
 7   felt like it was risky given a jurisdiction, but there
 8   might be something else that was allowed specifically by
 9   a statute that we weren't assessing.  And we might say,
10   "Well, listen, don't do this thing, but the jurisdiction
11   specifically allows you to do that thing.  So we
12   recommend you do that thing, not this thing."
13           It didn't happen in this case, but I believe
14   that had been something that had been done in the past,
15   not in connection with the compliance initiative.  So
16   not something that I specifically did, but something
17   that other people made recommendations, "Don't do X, but
18   do Y."
19      Q.   In 2014, did you try to identify different
20   kinds of fees or fee structures to use as a substitute
21   for the then-current California late fee?
22      A.   No.  So not everything in this paragraph
23   relates to the California late fees.
24      Q.   Well, you said in that last sentence, "We have
25   not identified" --
```

Susan Zumph                                              April 12, 2021

```
 1          THE REPORTER:  I'm sorry.  You cut out.  "We
 2  have not identified" --
 3  BY MR. TOMASEVIC:
 4     Q.   The last paragraph which says, "We have not
 5  identified any other fees to substitute for the fees for
 6  which we recommend the studies" -- your testimony is
 7  that that doesn't apply to California late fees; right?
 8     A.   Yes, that that wasn't a place that we were
 9  looking to find a different fee to assess instead of
10  what we were currently doing.
11     Q.   But the rest of the paragraph intends to apply
12  to California late fees among other things, perhaps?
13     A.   Well, not necessarily.
14     Q.   So what doesn't?
15     A.   I'll give -- well, "Without obtaining this
16  supporting analysis, we are not comfortable to continue
17  to charge these fees in."
18          So, again, I really hope I didn't send that to
19  anybody because that's embarrassingly poorly written,
20  but -- I don't know what I meant by that, but I do know
21  that I never considered not charging -- I never
22  considered recommending not charging late fees in
23  California in this.
24          But there were a lot of fees that were covered
25  by this analysis -- by this compliance initiative, I
```

1    should say; and there were -- was a different

2    jurisdiction wherein there were -- there were other

3    jurisdictions where there were issues.

4         And so given that this lawsuit was pending and

5    that I was defense counsel for this lawsuit, I

6    absolutely would have remembered if I thought that I'm

7    not comfortable continuing to charge the fee that

8    generally forms the basis of the suit, and that was not

9    the case.

10   Q.   So when you wrote that you're "not comfortable

11   continuing to charge these fees in," what fees are you

12   referring to exactly?

13   A.   Well, I don't know exactly what I was referring

14   to, but this memo and this initiative covered lots of

15   jurisdictions and many fees, and it --

16   Q.   Okay.  The -- after you made the recommendation

17   to conduct time and motion studies -- strike that.

18        After you wrote this memo, did you have a

19   meeting to discuss the memo or your findings with anyone

20   at EQR, like Zumph, Fiffer, Beihoffer, or anyone else?

21        You're Zumph.  Sorry.

22   A.   I didn't meet with myself.

23        So -- I'm sorry.  So are you saying did I meet

24   with anyone --

25   Q.   Let me just reask the question.  Let me reask

1    the question.

2         A.    I'm sorry.

3         Q.    Did you have a meeting to discuss your memo

4    that we see in Exhibit 3 after you wrote the memo?

5         A.    I believe I did.

6         Q.    And do you know who was present at the meeting?

7         A.    Well, this was intended to be a meeting with

8    David Santee.  Now, I don't know that this memo went to

9    David.  Like I said, I'm kind of hoping it didn't.

10        But the end -- one of the goals, I believe, of

11   this initiative was professional for me as well.  Bruce

12   and Jim had wanted me to start to raise my --

13        Q.    Profile?

14        A.    Thank you.  "Profile."

15        Q.    Yeah, I understand that.

16        I'm just asking if you remembered doing a memo

17   about -- or doing a meeting about this memo?

18        A.    I think a meeting did occur because that was

19   one of the goals, besides obviously compliance as well.

20   They wanted me to kind of meet with more senior people.

21        Q.    And what was David Santee's reaction to the

22   recommendation that a further study or a time and motion

23   study take place?

24        A.    I don't recall what his reaction was.  He --

25   I --

Susan Zumph                                              April 12, 2021

1      Q.   Well, what was the reaction of Mr. Strohm or
2   Mr. Fiffer, if anything?
3      A.   I don't recall specifically about the late fee.
4           You know, I think at the point that I would
5   have been meeting, it was already wrapped up with
6   litigation as well.  So --
7      Q.   Well, was there any reaction to your
8   recommendation in your memo about conducting time and
9   motion studies?
10     A.   In general?
11     Q.   Anything that you remember.
12     A.   Yeah.  I mean, not -- I'm not speaking
13  specifically with California late fee, but reaction with
14  the time and motion with -- with getting some kind of
15  expert analysis where we felt like that would be prudent
16  to do, that was accepted.
17     Q.   And was it done?
18     A.   With regard to California late fees?  I can't
19  speak to that.  But, yeah, we -- I believe where it --
20  you know, certain fees needed to be looked at and have
21  some kind of expert analysis, that was done.
22     Q.   With respect to other fees?
23     A.   Yeah.  I'm not talking about late fees now, and
24  I'm not talking about California now.  So I'm talking
25  about other places and other things that don't relate to

Susan Zumph                                                    April 12, 2021

1   was.

2           But based on how I worked and the fact that I

3   copied my boss on this, it was probably his idea.  He

4   probably gave me some comments about what he wanted to

5   see and what he didn't think was necessary or how -- you

6   know, changing something, take -- whatever it was.

7           And so I was trying to take his comments to me

8   based on this email to him -- I was taking his comments

9   and saying, "Okay.  Based on what you told me, this is

10  what I did.  Take a look.  Tell me what you think."

11      Q.   Your best recollection is that Jim Fiffer asked

12  you to revise the original memo that we saw on

13  Exhibit 3; right?

14           MR. WINN:  Objection.  That misstates prior

15  testimony.

16           THE WITNESS:  I wouldn't say he asked me to

17  revise it.  I think I probably sent it to him, he

18  reviewed it and gave me constructive criticism on it,

19  telling me, "This kind of thing doesn't need to -- this

20  kind of -- this is the kind of information you should be

21  talking about with senior execs."  That would be what I

22  would expect.

23  BY MR. TOMASEVIC:

24      Q.   Right.

25           And you and him discussed the kinds of things

Susan Zumph                                                    April 12, 2021

1    that you should not discuss with senior execs; right?

2        A.    Not specifically with regard to this.

3        Q.    Well, at some point you felt --

4        A.    If I can explain.  That's putting words --

5    that's misstating -- that's not what I'm trying to

6    communicate to you.  So if I wasn't clear and I kind

7    of -- I'm just trying to explain -- I don't recall what

8    he said, but in general, my boss would often comment on

9    things I wrote both to execs and throughout the company

10   and to outside counsel and in general.  And he would

11   give me constructive criticism on how to make things

12   better and how he would have -- what he would want to

13   see in something.

14           And so if my boss asked me to revise something,

15   then I went ahead and did it.  But he didn't tell me

16   what words to put in necessarily.  That's what I was

17   trying to communicate.

18       Q.    So when you decided to eliminate most of the

19   description of your methodology because it was

20   unnecessary to communicate all of that to the VPs, was

21   that your decision or his decision or a collaborative

22   decision?

23       A.    I would -- mine, but kind of collaborative.

24   You know, I was trying to take his guidance and

25   implement it is I guess what I would say.

Susan Zumph                                    April 12, 2021

1      Q.   And then you wrote that, "It could also be a
2   problem if we had to explain why we disregarded local
3   counsel's guidance about a fee in the course of
4   litigation about that fee."
5      A.   Um-hmm.  Yes.
6      Q.   What did you mean by that?
7      A.   Well, I think it's kind of self-explanatory,
8   that if we were going to have to explain why we
9   disregarded local counsel's guidance, that could
10  be -- you know, we would have to provide a big
11  explanation about that.
12       I will add that sometimes we disregard local
13  counsel's guidance where they say, "You should do this,"
14  and we said, "We don't think we can."
15       So it did go both ways.
16     Q.   When you refer to "VPs," that means "vice
17  presidents"; right?
18     A.   Yeah, it does.
19     Q.   And what VPs were you referring to at that
20  time?
21     A.   I have no idea.
22     Q.   Can you remember any of the VPs that might have
23  been referred to here when you wrote that sentence?
24     A.   I can't.  It actually surprised me when I just
25  read it.

 1        When I read it, I thought the same thing you're
 2   thinking, "Oh, obviously more people were in that
 3   meeting, not just David Santee."  And I don't know who
 4   that would have been or who else got the memo if they
 5   weren't listed on it.
 6      Q.   Were any vice presidents or executives intended
 7   to comment on the findings of your memo?
 8      A.   Were they "intended to comment"?
 9      Q.   Yeah.  Were they [audio breakup] --
10        THE REPORTER:  Excuse me.  You broke up.
11   Again, please, your question.
12   BY MR. TOMASEVIC:
13      Q.   Were they expected to weigh in on your
14   recommendations?
15      A.   No, I don't think that.
16      Q.   So why the need to tailor the message for the
17   VPs' understanding?
18      A.   Well, because that's just how things work in
19   companies generally.
20      Q.   But you didn't have any expectation that the
21   VPs would comment on your --
22      A.   Well, no --
23      Q.   -- recommendations in your memo?
24        THE WITNESS:  I apologize.  I spoke over him.
25        Do you need to repeat that?

Susan Zumph                                          April 12, 2021

1         THE REPORTER:  No.  Thank you.

2   BY MR. TOMASEVIC:

3      Q.   Did you have an -- I'll reask it.

4           Did you have an expectation that the VPs would

5   weigh in on the recommendations in your memo?

6      A.   I knew they'd have comments and thoughts about

7   it, for sure, because they're the ones who are making

8   the business decisions on what to charge.  But "weigh

9   in," no.  "Comment on," yes.

10     Q.   Did -- what views did the VPs express as to

11  your recommendations?

12     A.   I don't recall anything.

13     Q.   Now, when you're referring to "course of

14  litigation" at the end of your paragraph, you're

15  referring to this lawsuit?

16     A.   Let me see.

17          I'm sorry.  Can you ask your question again?

18     Q.   Your last sentence refers to "the course of

19  litigation about a fee."

20          You're referring to this litigation?

21     A.   Oh, not the last sentence of the email?

22     Q.   Correct.  I'm so sorry.

23          The last sentence of the first paragraph, the

24  paragraph we're talking about.

25          Let me just --

Susan Zumph                                                    April 12, 2021

```
 1        A.   No, it did not relate specifically to this --
 2   to the litigation that I'm currently being deposed in.
 3   It was litigation in general, which either there were
 4   other pending cases we had, and I expected that there
 5   would be cases in the future.
 6        Q.   What other pending cases did you have that were
 7   germane?
 8        A.   Not to California late fees, but there were
 9   lots of other cases that -- I just didn't oversee this
10   case.
11        Q.   Right.
12             Did you have other pending litigations about
13   fees at the time; and if so, what were they?
14        A.   They were in other jurisdictions about other
15   fees.
16        Q.   And you had them pending as of November 25th,
17   2014?
18        A.   I think so, but I'm not 100 percent sure.  I'm
19   pretty sure the answer to that is "Yes."
20        Q.   Can you recall any other litigations pending
21   besides this one as of November 25th, 2014, regarding
22   EQR's fees?
23        A.   Yes.
24        Q.   Where were they?
25        A.   I'm not -- there's not going to be an exclusive
```

```
 1   list, an all inclusive, but Massachusetts, Florida -- I
 2   can't remember.  I don't think Maryland.
 3        Q.    Any others?
 4        A.    I can't recall all of them, I told you, but not
 5   related to California.
 6             And I'm wondering if -- I can't recall whether
 7   the other suit that was filed that you kind of took over
 8   from the other guy in California was also filed then.
 9   So --
10        Q.    What litigation were you referring to where
11   local counsel's guidance was being disregarded?
12        A.    Again -- I believe I answered, but I'll try to
13   make sure that it's clear.  It was related to cases that
14   could be filed in the future in any jurisdiction.  I
15   don't recall which area, which jurisdiction.  We may
16   have had local counsel guidance that we decided to not
17   follow because we either wanted to be more conservative
18   and we didn't -- we felt that it was too risky, or we
19   felt that their guidance did not properly take into
20   account the law and what was occurring in the
21   jurisdiction.
22             But I can tell you that we never got local
23   counsel guidance saying that the late fee was -- should
24   be changed in California, in California.
25             MR. WINN:  Alex, I think we agreed that we
```

Susan Zumph                                              April 12, 2021

1   would provide an hour of testimony.  We've done that.
2   Your promise was that it would be no more than an hour,
3   and I think we've reached that mark.
4           Do you have only a few more questions left?
5           MR. TOMASEVIC:  Yeah, maybe a couple.
6           THE WITNESS:  That's fine.  I can give a few
7   more minutes.
8   BY MR. TOMASEVIC:
9       Q.   That's fine.  This is our last topic, I promise
10  you.
11          Okay.  So when you wrote the last sentence of
12  the first paragraph of this email dated November 25th,
13  2014, were you referring to any particular litigation?
14      A.   No [audio breakup].
15      Q.   Were you referring to any particular --
16          THE REPORTER:  I'm sorry.  After "No"?
17          THE WITNESS:  I said, "No, I do not believe
18  that I was."
19  BY MR. TOMASEVIC:
20      Q.   Were you referring to any particular local
21  counsel guidance?
22      A.   No, I don't believe I was.
23      Q.   Were you referring to any particular kind of
24  fee?
25      A.   No, I don't think I was.

```
 1              : : :   CERTIFICATE OF REPORTER   : : :

 2

 3         I, GINA DE LUCA, a Certified Shorthand
    Reporter, holding a valid and current license issued by
 4  the State of California, CSR No. 6973, duly authorized
    to administer oaths, do hereby certify:
 5         That the witness in the foregoing deposition
    was administered an oath to testify to the whole truth
 6  in the within-entitled cause;
           That said deposition was taken down by me in
 7  shorthand at the time and place therein stated and
    thereafter transcribed into typewriting, by computer,
 8  under my direction and supervision.

 9         ( X )  Reading and signing was requested.

10         (   )  Reading and signing was waived.

11         (   )  Reading and signing was not requested.

12         Should the signature of the witness not be
    affixed to the deposition, the witness shall not have
13  availed himself/herself of the opportunity to sign or
    the signature has been waived.
14         I further certify that I am neither counsel for
    nor related to any party in the foregoing depositions
15  and caption named nor in any way interested in the
    outcome thereof.

16

17

18  Dated:  This 20th day of April 2021

19         at San Diego, California.

20

21

22  _____

23         Gina Marie De Luca

24         CSR No. 6973, RMR, CRR

25
```

Exhibit 14

Aaron T. Winn (SBN 229763)
Karen L. Alexander (SBN 265926)
**DUANE MORRIS** LLP
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone:   619.744.2200
atwinn@duanemorris.com
klalexander@duanemorris.com

Justin J. Fields (SBN 259491)
**DUANE MORRIS** LLP
One Market, Spear Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone:   415.957.3000
jfields@duanemorris.com

Attorneys for Equity Residential

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, et al.,<br><br>    Plaintiffs,<br><br>        v.<br><br>EQUITY RESIDENTIAL, et al.,<br><br>    Defendants. | Case No. 16-cv-01225-JSW<br><br>**EQUITY RESIDENTIAL'S OBJECTIONS TO PLAINTIFFS' REBUTTAL DEPOSITION DESIGNATION OF WITNESS COLLIN GLANCY**<br><br>Dept:     Courtroom 5<br>Before:  Hon. Jeffrey S. White<br>Trial Date:   February 27, 2023 |

1

Defendants object to the Plaintiffs' rebuttal designation of the 30(b)(6) deposition testimony of Collin Glancy on the grounds that it is improper rebuttal testimony and therefore should be excluded.

Furthermore, should Plaintiffs be permitted to introduce deposition excerpts for this witness in rebuttal, Defendants assert the following counter-designations and objections:

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter-Designations | Plaintiffs' Responses to Defendants' Objections and Counter-Designations |
|---|---|---|
| 5:5-7 | | |
| 5:19-25 | | |
| 6:1-3 | | |
| 11:8-19 | | |
| 16:10-17 | | |
| 17:8-24 | 17:4-7 | |
| 18:6-25 | 18:3-5 | |
| 19:1-25 | | |
| 20:10-15 | | |
| 24:22-25 | | |
| 25:1-2 | | |
| 26:17-24 | | |
| 27:18-25 | | |

EQUITY RESIDENTIAL'S OBJECTIONS TO PLAINTIFF'S
DEPOSITION DESIGNATIONS                                    Case No. 16-cv-01225-JSW

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter-Designations | Plaintiffs' Responses to Defendants' Objections and Counter-Designations |
|---|---|---|
|  |  |  |
| 28:1-12 |  |  |
| 32:6-22 |  |  |
| 35:6-20 |  |  |
| 36:14-25 |  |  |
| 37:1-25 | 37:9-25 vague; scope (scope = beyond scope of 30 (b)(6) topics) | The questions is not impermissibly vague, especially to the VP of Treasury who has been an executive in the Finance department of EQR for over 10 years.  The question is also well within the scope of the designated topic which was, in short, alleged damages felt by EQR from "lost use of funds" related to late payment of rent.[1] The answer would be admissible in any event as within the witness' personal knowledge, even if not directly binding on EQR under FRCP 30(b)(6) alone (which it is). |
| 40:4-16 | 40:1-16 vague, foundation, scope |  |
| 41:4-23 |  |  |
|  | 46:13-47:21 |  |
| 48:15-25 |  |  |
| 49:1-25 |  |  |
| 50:1-25 |  |  |
| 51:1-11 | 51:12-25 |  |
|  | 52:1-10, 19-25 |  |
|  | 53:1-7 |  |
|  | 54:3-57:7 |  |
|  |  |  |
| 56:3-25 |  |  |
| 57:1-7 |  |  |
| 60:3-11 |  |  |
|  | 62:7-25 |  |
|  | 63:13-14 |  |
| 65:11-25 |  |  |
| 66:1-22 |  |  |
| 67:13-25 | 67:20-25 |  |
| 68:1-13 | 68:1-6 scope; 68:7-13 vague, foundation, scope | The questions is not impermissibly vague. Moreover, the fact that this |

[1] The relevant deposition notice is at Trial Exhibit 240 (See Topic #1 – the only topic in the notice).  Mr. Glancy confirms his role as the designee at Transcript page 11:8-19 (also designated above).

EQUITY RESIDENTIAL OBJECTIONS TO PLAINTIFF'S
DEPOSITION DESIGNATIONS                                    Case No. 16-cv-01225-JSW

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter-Designations | Plaintiffs' Responses to Defendants' Objections and Counter-Designations |
|---|---|---|
| | | executive and corporate designee does not know the answers (or knows he and the finance department were not consulted in setting the late fee), is itself probative of the issues in the case. The question is also well within the scope of the designated topic which was, in short, alleged damages felt by EQR from "lost use of funds" related to late payment of rent. The answer would be admissible in any event as within the witness' personal knowledge, even if not directly binding on EQR under FRCP 30(b)(6) (which it is). |
| | 69:1-72:2 | |
| | 73:24-74:1 | |
| | 75:2-76:8 | |
| 77:4-25 | | |
| 78:1-25 | 78:15-22 vague, scope | The question is not impermissibly vague and the discussion is within scope of the designated topic which was, in short, alleged damages felt by EQR from "lost use of funds" related to late payment of rent. The answer would be admissible in any event as within the witness' personal knowledge, even if not directly binding on EQR under FRCP 30(b)(6) (which it is). |
| 79:1 | 79:8-25 | |
| 89:2-17 | 89:18-25 | |
| 90:2-24 | 90:1; 90:2-24 vague, scope, foundation | The question is not vague and this is precisely what the topic was meant to explore and that this corporate executive was designated and prepared to speak about, i.e., whether the "lost use" of the funds related to rent *actually* caused the company any harm. |
| 91:13-25 | | |
| 92:1-12 | | |
| 98:7-20 | 98:16-20 scope | Again, there is no such thing |

| Plaintiffs' Deposition Designations | Defendants' Objections and Counter-Designations | Plaintiffs' Responses to Defendants' Objections and Counter-Designations |
|---|---|---|
| | | as a "scope" objection to admissibility.  Moreover, the topic concerns the "lost use" of late rent, and the fact that the company does not even know the amount of said late rent at any given time is, itself, probative and well within the designated topic. |
| 102:14-25 | | |
| 103:1-25 | | |
| 104:1-25 | | |
| 105:1-25 | 105:17-25 scope, vague | Many of the objections were not preserved at the deposition. In any event, the questions are not impermissibly vague.  The discussion – in which the designated executive cannot identify any damage from rent being <u>late</u> (as opposed to never paid at all) is also well within the topic of alleged "lost use of funds" damages claimed by the company for the late payment of rent. |
| 106:1-25 | 106:1 scope, vague<br>106:2-9 scope, vague, foundation<br>106:11-25 scope, vague | Same |
| 107:1-3 | 107:1-3 scope, vague | same |

**COURT RULING:**

Dated: June 16, 2023            Respectfully submitted,

**DUANE MORRIS** LLP

By /s/Karen Alexander
            Aaron T. Winn

5

Justin J. Fields
Karen L. Alexander
Attorneys for Defendants

DM2\18026631.1

6