Aaron T. Winn (SBN 229763)
Karen L. Alexander (SBN 265926)
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone:   619.744.2200
atwinn@duanemorris.com
klalexander@duanemorris.com

Justin J. Fields (SBN 259491)
**DUANE MORRIS LLP**
One Market, Spear Tower, Suite 2200
San Francisco, CA 94105-1127
Telephone:   415.957.3000
jfields@duanemorris.com

John Sheldon Letchinger (Admitted Pro Hac Vice)
Baker & Hostetler LLP
One N. Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: 312-416-6200
Email: jletchinger@bakerlaw.com

Attorneys for Equity Residential

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>EQUITY RESIDENTIAL, et al.,<br><br>Defendants. | Case No. 16-cv-01225-JSW<br><br>**EQUITY RESIDENTIAL'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>**Judge:      Hon. Jeffrey S. White<br>Courtroom:  5** |

# TABLE OF CONTENTS

**Page**

FINDINGS OF FACT ............................................................................................ 2

    A.    Stipulated Facts ................................................................................ 2

    B.    Pre-Trial Motions and Rulings ....................................................... 2

    C.    The Parties ....................................................................................... 3

    D.    Fact Witnesses ............................................................................... 10

    E.    Equity's Experts ............................................................................ 11

    F.    Plaintiffs' Experts ......................................................................... 11

    G.    Equity's Standard Leases .............................................................. 11

    H.    The 1998 Consumer Justice Late Fee Litigation & PwC Analysis .............. 13

    I.    Los Angeles County's Late Fee Guidance ................................... 14

    J.    Equity's On-Site Rent Collection Activities ................................ 14

    K.    Adoption of Equity's Standard Late Fee ...................................... 16

    L.    The $50 Woodland Park Late Fee ................................................ 37

    M.    Late Fees Collected by Equity ..................................................... 38

CONCLUSIONS OF LAW .............................................................................. 38

    A.    Equity's Standard Late Fee Complies with Section 1671(d) ....... 38

    B.    Equity's Woodland Park $50 Late Fee Complies with Section 1671(d) ........ 46

    C.    Even If Equity Had Failed To Perform A Reasonable Endeavor And Even If The Court Had Found That The Subject Late Fees Were Invalid, Equity's Offset Damages Exceed The Late Fees Charged .............. 46

        a.    Class Members paid Equity approximately $29 million in late fees during the Class Period. ................................... 49

        b.    Equity incurred more than $39 million in costs relating to delinquent rent during the Class Period. ............................ 51

        c.    Equity incurred more than $27 million in employee costs relating to collection of delinquent rent during the Class Period. ..................................................................... 53

    D.    Equity incurred more than $7 million in eviction costs relating to delinquent rent during the Class Period – all costs incurred prior to resident move-out. ......................................................................... 73

        a.    Equity incurred more than $2.1 million in collection costs related to delinquent rent. ........................................... 75

        b.    Equity incurred over $8.7 million in lost use of funds costs during the Class Period due to delinquent rent. ............. 78

E.      Hosfield's "Cost Savings" analysis of Equity's employee costs caused
        by delinquent rent serves as additional confirmation that Equity's
        delinquency-related costs exceeded the late fees it received during the
        Class Period. ................................................................................................... 82

F.      The Court generally discounts the rebuttal testimony offered by
        Plaintiffs' experts. ............................................................................................ 85

G.      Equity Rebuttal Expert Stanton ........................................................................ 91

H.      Voluntary Payment Doctrine ............................................................................. 92

I.      Statute of Limitations Defense .......................................................................... 97

J.      Defendant's Request for Decertification ........................................................... 99

K.      Plaintiffs' Request for Prejudgment Interest ................................................... 100

CONCLUSION ............................................................................................................... 100

On June 8, 2023, the parties appeared before the Court for a bench trial. The trial proceeded on June 8, 9, 12, 13, 14, 15, 20, and 21.

Plaintiffs allege that Defendants' ("Equity's") late fee does not comply with California law. Plaintiffs seek restitution of late fees paid.

By Orders dated October 23, 2017 (ECF 91) and October 25, 2021 (ECF 315), the Court certified two classes:

a.  **Standard Late Fee Class**: All Equity tenants in California from September 3, 2010 until October 28, 2022 who were charged one or more late fee(s) under Equity's standard late fee provision: 5% of the outstanding balance owed (capped at 5% of the total amount of monthly recurring charges) or $50, whichever is greater. (*See* ECF 91, 388.) This standard late fee provision shall hereinafter be referred to as the "Standard Late Fee."

b.  **Woodland Park Preexisting Lease Class**: All Equity tenants in the Woodland Park Property from December 1, 2011 until Equity sold the property in February 2016 who were charged one or more late fee(s) of $50 under Equity's policy of charging a flat $50 late fee to tenants on pre-existing non-Equity leases. (*See* ECF 91.) The $50 late fee charged to Woodland Park Preexisting Lease Class members shall hereinafter be referred to as the "Woodland Park $50 Late Fee."

The Court has carefully considered the trial testimony, the exhibits admitted in evidence, the parties' briefs and other submissions, and their proposed findings of fact and conclusions of law. The Court issues the following findings of fact and conclusions of law, which result in the Court's conclusion that Equity's Standard Late Fee and Woodland Park $50 Late Fee are lawful, comply with Civil Code § 1671(d), and that Equity is entitled to judgment in its favor.

# FINDINGS OF FACT[1]

**A.   Stipulated Facts**

1.   The Parties previously entered into several fact stipulations, which are incorporated into these Findings of Fact as if fully stated herein:

> a.   Stipulation of Facts Regarding the Responsibility of Certain Defendants for the Challenged Late Fees, executed on October 26, 2020. (Trial Ex. 244.)
>
> b.   Joint Stipulation Regarding the Electronic MRI, Property Management, and Financial Management Data Produced by Defendants in this Action, executed on May 7, 2021. (Trial Ex. 247.)
>
> c.   Joint Stipulation Regarding the Electronic Personnel Data Produced by Defendants in this Action, executed on April 28, 2021. (Trial Ex. 246.)
>
> d.   Stipulated Facts set forth in the Joint Updated Final Pretrial Order (ECF 454, pp. 16:5-19:32.)
>
> e.   Stipulated Facts filed on July 28, 2023.

2.   The Court has reviewed and considered the Parties' fact stipulations, and will specifically reference certain of those stipulated facts below, along with additional facts found by the Court.

**B.   Pre-Trial Motions and Rulings**

3.   Before trial, this Court heard and ruled on five motions in limine:

> • First, the Court DENIED Plaintiffs' Motion in Limine No. 1 to exclude testimony and evidence related to the 1999 PricewaterhouseCoopers report because "the Court may examine in the context of Equity's state of

---

[1] To the extent that any of the Court's findings of fact are included in the Court's conclusions of law, they shall be deemed findings of fact. Similarly, to the extent that any of the Court's conclusions of law are included in the findings of fact, they shall be deemed conclusions of law.

mind and knowledge regarding whether it engaged in a reasonable endeavor to set appropriate late fees and whether the fees reasonably approximated its costs associated with late rent." (ECF 436, p. 5:19-25.)

- Second, the Court DENIED Plaintiffs' Motion in Limine No. 2 to exclude testimony and evidence related to the 2000 *Consumer Justice* litigation because "[a]gain, as the Court will repeat, [the Court] may examine in the context of Equity's state of mind and knowledge regarding whether it engaged in a reasonable endeavor to set appropriate fees and whether the fees reasonably approximated its costs associated with late rent." (ECF 436, p. 6:2-9.)

- Third, the Court DENIED but subsequently GRANTED Plaintiffs' Motion in Limine No. 3 to exclude evidence related to the amount owed to Equity by class members.

- Fourth, the Court DENIED Plaintiffs' Motion in Limine No. 4 to exclude evidence of Equity's collections costs as "the Court may examine the evidence both in reference to Equity's claimed reasonableness of its late fee and to support an offset of restitution." (ECF 436, p. 6:10-14.)

- Fifth, the Court DENIED Plaintiffs' Motion in Limine No. 5 to exclude certain of Equity's property-level witnesses and class members from testifying.

4.      This Court also DENIED Plaintiffs' *Daubert* Motion to exclude Defendants' cost-accounting expert Mark Hosfield from testifying, finding that Hosfield's "methodologies and computations" were sufficiently reliable and precise. (ECF 422, p. 5.)

**C.      The Parties**

5.      On September 3, 2014, Plaintiffs Munguia-Brown, Magaña, and Rodriguez—all residents of the Woodland Park Community—filed the original complaint in this action. (ECF 1, Notice of Removal, at Ex. 1.) On March 23, 2015, they filed a First Amended Complaint. (*Id.*, at Ex. 8.)

6.     None of the original named Plaintiffs signed a lease agreement with Equity. (*See* Trial Exs. 2-4 *and* ECF 454, p. 15 ¶ 17.) And none of the original named Plaintiffs were subjected to the 5% late fee that is the subject of the Standard Late Fee class. (*Id.*)

7.     On February 8, 2017, with their Second Amended Complaint, Plaintiffs added a new named Plaintiff (David Bonfanti) to the case who did sign a lease agreement with Equity Residential and who did incur a 5% late fee as a result of his failure to timely pay rent. (ECF 45.)

8.     On November 16, 2021, Plaintiffs filed their operative Fourth Amended Complaint for the purpose of adding another new party—plaintiff Shannah Smith, who is a current resident at one of Equity's apartment communities in California. (ECF 322.)

**Plaintiff Javanni Munguia-Brown**

9.     In 2008, Plaintiff Mungia-Brown signed a lease agreement with a *predecessor entity* and moved into an apartment in the Woodland Park community. (5 RT 823:23-25; ECF 454, SF #14.)

10.     In 2011, Brown learned that Equity Residential acquired the Woodland Park community. (5 RT 824:9-25.)

11.     Brown was a tenant of the Woodland Park community throughout the time Equity owned it from December 2011 to February 2016. (ECF 454, SF #13.)

12.     When Equity acquired Brown's building as of December 1, 2011, Equity and Brown assumed the terms of the pre-existing lease. (ECF 454, SF #15.) Brown never signed a lease agreement with Equity Residential. (*See* Trial Ex. 2 *and* ECF 454, p. 15 ¶ 17.)

13.     Brown's rent was always due on the 1st of the month. (5 RT 826:12-14.)

14.     Her rent was late if not paid by the 1st of the month. (5 RT 826:15-17.)

15.     From roughly December 2011 through January 2013, Brown almost never paid rent on time. (5 RT 830:2-5.)

16.     Because Brown repeatedly failed to timely pay rent, she repeatedly incurred late fees. (Trial Ex. 1561; 5 RT 832:9-835:3.)

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – CASE NO. 4:16-CV-01225-JSW-TSH

17.     For purposes of this litigation, Brown's tenant ledger (Trial Ex. 1561) accurately reflects all late fee charges to and payments made by Brown. And the Parties stipulated that Brown was charged and paid a $50 late fee during the class period. (ECF 454, SF #16.)

18.     When Brown failed to pay rent, she would regularly receive a Three-Day Notice to pay or quit. (Trial Exs. 1108, 1110, 1113, 1117; 5 RT 832:5-8.)

19.     Brown would *not* receive a late fee if she timely paid rent. (Trial Ex. 1561.)

20.     Brown not only failed to timely pay rent, she also failed to pay her late fees. (5 RT 835:8-13.)

21.     She was not evicted for failing to pay her late fees. (5 RT 836:1-12.)

22.     Nor did anyone at Equity tell Brown that she would be evicted for failing to pay her late fees. (5 RT 835:22-24; 837:9-11.)

23.     Because Brown knew that she would not be evicted for failing to pay her late fees, the Court does not find it credible that Brown paid late fees involuntarily or under duress.

**Plaintiff Norma Rodriguez**

24.     Plaintiff Norma Rodriguez was also a tenant of Equity's Woodland Park community in East Palo Alto, California. She moved into her apartment prior to Equity's ownership. (ECF 454, SF #18.)

25.     On December 1, 2011, Equity acquired Rodriguez's building; Equity and Rodriguez assumed the terms of the pre-existing lease. (ECF 454, SF #19.)

26.     Rodriguez continued to live in her Woodland Park apartment throughout Equity's ownership of the Woodland Park community. (ECF 454, SF #17.)

27.     For purposes of this litigation, Rodriguez's tenant ledger (Trial Ex. 1562) accurately reflects all late fee charges to and payments made by Rodriguez. The Parties stipulated that Rodriguez was charged and paid a $50 late fee during the class period. (ECF 454, SF #20.)

1

**Plaintiff Angelina Magaña**

2

28.     Plaintiff Angelina Magaña also lived in an apartment within the Woodland

3

Park community. (ECF 454, SF #21.)

4

29.     Magaña moved into her apartment at that property prior to Equity's

5

ownership. (ECF 454, SF #22.)

6

30.     When Equity acquired Magaña's building (in December 2011), Equity and

7

Magaña assumed the terms of the pre-existing lease. (ECF 454, SF #23.)

8

31.     For purposes of this litigation, Magaña's tenant ledger (Trial Ex. 1564)

9

accurately reflects all late fee charges to and payments made by Magaña. The Parties

10

stipulated that Magaña was charged and paid a $50 late fee during the class period.

11

(ECF 454, SF #24.)

12

**Plaintiff David Bonfanti**

13

32.     From October 2014 to July 2017, Plaintiff David Bonfanti was a tenant at

14

Equity Residential's Bella Vista apartment community. (ECF 454, SF #9, Trial Ex. 1564.)

15

33.     Equity Residential's Bella Vista community is located in Los Angeles

16

County. (2 RT 331:16-18.)

17

34.     While at Bella Vista, Bonfanti signed three lease agreements with Equity

18

Residential. His signed his initial lease agreement in October 2014, and then renewed

19

his lease in July 2015 and again in July 2016. (ECF 454, SF #10, Trial Exs. 41, 43, 1152.)

20

35.     Each of Bonfanti's lease agreements with Equity Residential stated that

21

rent was due on the first of the month and that he would be charged a late fee of "5% on

22

the 5th – minimum of $50," if Bonfanti did not cure his default by the end of the day

23

(11:59 p.m.) on the fourth day of the month. (ECF 454, SF #11; 2 RT 331:22-25, Trial Exs.

24

41, 43, 152.)

25

36.     Bonfanti knew that, under the terms of the parties' lease agreement, if he

26

did not pay rent by the 4th of the month, he would incur a late fee. (2 RT 323:1-3.)

27

28

37.    Bonfanti knew that he could avoid any late fee by timely paying his rent. (2 RT 325:5-7.) As reflected in his tenant ledger (Trial Ex. 1564), Bonfanti failed to timely pay rent roughly 15 times. (Trial Ex. 1564, 2 RT 328:15-19.)

38.    Because he repeatedly failed to timely pay rent, Bonfanti received several "pay or quit" notices from Equity. (Trial Exs. 1148, 1153, 1161, 1163, 1164, 1165, 1168, 1171; 2 RT 325:21-23.)

39.    Late fees were not included in Bonfanti's pay-or-quit notices. (Trial Exs. 1564, 1148, 1153, 1161, 1163, 1164, 1165, 1168, 1171.) As a result, Bonfanti did not need to pay any late fee to cure his default. (*Id.*)

40.    Bonfanti spoke with and emailed several Equity employees about the late fees he incurred. (2 RT 330:4-20; 331:14-17.)

41.    Bonfanti renewed his lease in July 2015, *after* incurring and paying late fees. (Trial Ex. 1152; 2 RT 332:22-333:2.) And Bonfanti knew that his new lease had the same late fee provision as his original lease. (2 RT 333:8-14.)

42.    In April 2016, Bonfanti contacted Plaintiffs' counsel to discuss his concerns about Equity's late fee. (2 RT 336:10-12.) Bonfanti then sued Equity Residential, alleging that Equity's 5% late fee was illegal and unreasonable. (ECF 45; 2 RT 337:7-20.)

43.    After coming to believe that Equity's late fee was illegal and unreasonable, Bonfanti continued to incur and pay late fees. (Trial Ex. 1564; 2 RT 337:17-20; 2 RT 341:3-14.)

44.    Bonfanti is not sure why he did not refuse to pay late fees after coming to believe that the late fees were unlawful. (2 RT 342:21-343:11.)

45.    Although Bonfanti repeatedly paid rent late, Bonfanti never missed a car payment. (2 RT 346:20-347:4.)

**Plaintiff Shannah Smith**

46.    Plaintiff Shannah Smith is a current tenant of Riva Terra II, one of Equity's residential properties located in Redwood City, California. (1 RT 56:10-19; ECF 454, Stipulated Fact ("SF") #5.)

1   47.   Smith has resided at the Riva Terra II property since December 2004, when

2   it was owned by a different landlord. (1 RT 56:20-57:3; ECF 454, SF #6.)

3   48.   Smith first entered into a lease agreement with Equity in 2013. (1 RT 58:19-

4   23, discussing Trial Ex. 78; ECF 454, SF #7.) That lease agreement, and each subsequent

5   lease agreement, stated that if she failed to pay her rent on time, she would be charged a

6   late fee of "5% on the 5th – minimum of $50." (Trial Ex. 78 (Original Lease); ECF 454, SF

7   #7; Trial Ex. 147 (Current Lease).)

8   49.   For purposes of this litigation, Smith's tenant ledger (Trial Ex. 1514)

9   accurately reflects all late fee charges to and payments made by Smith. The Parties

10  stipulated that Smith was charged and paid one or more of the Standard Late Fees

11  challenged in this action during the class period. (ECF 454, SF #8.)

12  50.   In the roughly 10 years that Smith has resided at her current property

13  under Equity's ownership, she has only incurred one late fee. (1 RT 56:25-57:3, 61:1-7.)

14  51.   On January 4, 2015, Smith attempted to transmit payment of her $2,648

15  monthly rent to Equity, but her bank denied the payment for insufficient funds. (1 RT

16  61:1-7, 61:24-62:11.)

17  52.   On January 8, 2015, Equity charged Smith a $132.40 late fee for that late

18  rent payment. (1 RT 61:24-62:11.)

19  53.   Smith acknowledges that the one late fee she was charged was because her

20  attempted payment failed, which was not Equity's fault. (1 RT 68:16-69:16.)

21  54.   In connection with Smith's January 2015 late rent payment, Smith testified

22  that Equity posted a Three-Day Notice on her door and provided a copy in her mailbox on

23  January 8, 2015. (1 RT 62:18-20.)

24  55.   Smith testified that upon receipt of the Three-Day Notice, she called the

25  office to speak to an Equity employee about her account. (1 RT 63:4-8.)

26  56.   On January 9, 2015, Smith paid Equity the $132.40 late fee, along with her

27  monthly rent payment and a $25 Not Sufficient Funds fee. (1 RT 63:13-15.)

28

57.     Smith admitted that the late fee provision in her lease was not hidden. (1 RT 66:12-14.)

58.     Smith admitted that she knew the terms and conditions of the late fee, which were contained in her written lease. (1 RT 66:15-24, 71:7-10.)

59.     Smith also knew the circumstances that would trigger the late fee, i.e. a payment not made on time. (1 RT 71:14-17.)

60.     She understands that she can avoid any late fee by continuing to pay her rent on time. (1 RT 68:13-15.)

61.     Other than the one instance in which she was charged a late fee, Smith has avoided incurring late fees because she has paid her rent on time. (1 RT 68:9-12.) Smith plans to continue living in her current Equity apartment for the foreseeable future. (1 RT 57:11-14.)

**Defendants Equity Residential, et al.**

62.     Equity Residential is a real estate investment trust organized under the laws of the state of Maryland, with its corporate home office in Chicago, Illinois.

63.     All of the other Defendants—Equity Residential Management L.L.C., ERP Operating Limited Partnership, Equity Residential Management LLC, EQR-Woodland Park A Limited Partnership, and EQR-Woodland Park B Limited Partnership—are, or during time periods relevant to the case were, entities related to Equity Residential, organized under the laws of various states in the United States.

64.     For purposes of this litigation only, Plaintiffs and Defendants stipulated to the following facts as set forth in Trial Ex. 244:

   a. All named Defendants are properly joined in this action.

   b. No other entities exist that are necessary to provide Plaintiffs and the certified Standard Late Fee and Woodland Park classes complete relief in this action.

   c. Equity Residential, ERP Operating Limited Partnership, and/or Equity Residential Management, LLC (collectively referred to herein as

1    "Equity") share responsibility for adopting and implementing the

2    Standard Late Fee and Woodland Park $50 Late Fee.

3       d.   The Standard Late Fee was first adopted in 2008 by Equity's agents

4    acting within the scope of their agency. All other individuals who were

5    involved in or exercised control over the decision to adopt the Standard

6    Late Fee were also Equity's agents acting within the scope of their

7    agency.

8       e.   On each occasion that the Standard Late Fee was evaluated following

9    its adoption, the persons who made the decision to maintain the

10   Standard Late Fee, and all persons who had the right to control that

11   decision, were agents of Equity acting in the scope of their agency.

12      f.   The Woodland Park $50 Late Fee was also adopted by Equity's agents

13   who were acting within the scope of their agency.

14        65.    Between September 3, 2010 and December 31, 2021, Equity has owned and

15   operated nearly 200 residential communities in California. (ECF 454, SF #25.)

16   **D.    Fact Witnesses**

17        66.    Over the course of the trial, the Court received live testimony from eleven

18   fact witnesses. These witnesses were: Shannah Smith—June 8, 2023; Mayra Villaneuva

19   —June 9, 2023; Samantha Kopczyk—June 9, 2023; David Bonfanti—June 9, 2023;

20   Michelle Grubbs—June 9, 2023; Amelia Ott—June 9, 2023; James Fiffer—June 12, 2023;

21   Denise Beihoffer—June 13, 2023; Javanni Munguia-Brown—June 14, 2023; Ann Paton—

22   June 14, 2023; and Debra Rivera—June 15, 2023.

23        67.    The Court also received deposition testimony from eleven fact witnesses.

24   (ECF 503, 515.) These witnesses and their depositions dates, respectively, were: Grace

25   Balahadia—February 23, 2021; Mickey Cummings—July 6, 2017; Collin Glancy—June

26   29, 2021; Carina Gomes—January 26, 2021; Bruce Lavine—July 11, 2017; Chris

27   Jenkins—February 9, 2021; Chad Johnson—January 5, 2021; David Santee—March 8,

28

2021; Jamie Sternberg—March 29, 2021; Frederick Tuomi—February 5, 2021; and Susan Zumph—March 22, 2021 and April 12, 2021.

**E.   Equity's Experts**

**Mark Hosfield**

68.   Equity offered the expert testimony of Certified Management Accountant Mark Hosfield, CMA, CPA. Using his cost-accounting expertise, Hosfield calculated the damages Equity incurs as a result of tenants' failure to pay rent and provided calculations regarding Equity's potential offset.

**Steven F. Stanton**

69.   Equity offered the expert testimony of certified accountant Steven F. Stanton, CPA, CFF to rebut and respond to certain of Plaintiffs' expert opinions.

**F.   Plaintiffs' Experts**

70.   Plaintiffs offered expert testimony of David Breshears, Michael Childers, Andrew Schwarz, Christian Tregillis, and Paul French to calculate the Classes' claimed restitution and to rebut the opinions of Hosfield.

71.   The Court will refer below to portions of the parties' experts' opinions found to be most salient to the Court's analysis in this case.

**G.   Equity's Standard Leases**

72.   Members of the Standard Late Fee Class signed a residential lease agreement that included the following late fee provision:

> **Late Charges and Returned Item Fees:** You acknowledge that if we do not receive your rent or other lease related charges on time, we will incur costs, the exact dollar amount of *which is difficult or impracticable to determine*. Such costs may include, among other things, lost use of funds, bank or other charges, costs incurred in connection with accounting for and attempting to collect late payments; collection expenses; and other administrative and accounting costs. As a result, if we do not receive your rent when it is due, *we will assess late fees as described in the Late Fees section of the Term Sheet.* . . . [italics added] [ECF 454, SF #26.]

73.   Each Standard Lease Agreement also included a Term Sheet, with the rental rate, the start and end dates of the lease, and related information. The Term Sheet included the following Late Fee provision:

> **Late Fees:** Your rent is due on the 1st of each month. If we do not receive your rent and other recurring charges, in person before the close of business, or electronically by 11:59 pm local time[], on day [X], you will be charged a late fee as follows: 5 percent on [day X+1] – minimum of $50. [ECF 454, SF #27.]

74.   Equity involves its in-house counsel in the drafting of Equity's residential lease agreements. (4 RT 768:20-769:15.) In-house counsel's responsibility in that regard is to ensure the lease agreements are consistent with law, including in California where Equity uses written lease agreements. (4 RT 768:20-769:15.)

75.   Equity's California leases ensure that its residents have notice of and agree to the late fee within the written lease agreement itself. (4 RT 769:16-770:11, 4 RT 771:20-25, discussing lease example at Trial Ex. 78.)

76.   As noted, the Equity California lease contains a Late Fee section identifying the amount that will be charged, and when (e.g., 5% or $50 minimum on the 5th). (4 RT 770:13-771:1, discussing Trial Ex. 78.)

77.   The California lease Terms & Conditions, Section 5, includes language regarding liquidated damage provisions, consistent with the lease language recommended by Equity's outside California counsel for landlord-tenant matters, Jamie Sternberg of Kimbell Tirey & St. John. (4 RT 770:13-771:12, discussing lease example at Trial Ex. 78.)

78.   The California lease also states that Equity "strongly encourage residents to use online or electronic payment methods." (4 RT 772:6-9.)

79.   Equity provides and encourages online and electronic payments to afford residents more flexibility around how and when they can pay. (4 RT 772:10-773:9.)

1    80.    These payment options include automatic debit, which provides automatic

2    payments assuming the account debited has sufficient funds; meaning, the resident can

3    avoid a late fee by setting up auto-pay. (4 RT 772:10-773:9.)

4    **H.    The 1998 *Consumer Justice* Late Fee Litigation & PwC Analysis**

5    81.    In 1998, Equity was sued in California for allegedly violating the Unfair

6    Competition Law and Civil Code section 1671(d) by charging an allegedly unreasonable

7    late fee (the "*Consumer Justice*" action). (ECF 454, SF #31.)

8    82.    The *Consumer Justice* action was filed in the Superior Court of the State of

9    California, County of San Diego, entitled *Consumer Justice Foundation, Inc. v. Equity*

10   *Residential Properties Trust, et al*, Case No. 718159. (ECF 454, SF #31.)

11   83.    When the *Consumer Justice* action was filed, Equity's "standard" late fee

12   was $50 plus $5 for each additional day that rent remained unpaid. (3 RT 471:19-22.)

13   84.    In response to the *Consumer Justice* action, Equity engaged

14   PricewaterhouseCoopers ("PwC") to examine Equity's costs to account for and attempt to

15   collect late rent. (3 RT 473:14-474:22; Trial Ex. 1010.) PwC found that Equity's costs

16   from late rent exceeded the late fees charged during the time in which Equity's late fee

17   was $50 plus a $5 per diem. (Trial Ex. 1044; 3 RT 501:13-502:19; 3 RT 536:7-12.)[2]

18   85.    In February 2000, the parties settled the *Consumer Justice* action. (ECF

19   454, SF #32.)

20

21

_____

22   [2] The Court denied Plaintiffs' Motion in Limine No. 1 (ECF 396), which sought to exclude
     testimony and documents related to the PwC Report. (ECF 429.) As the Court explained
23   during its oral ruling, "the Court may examine in the context of Equity's state of mind
     and knowledge regarding whether it engaged in a reasonable endeavor to set
24   appropriate late fees and whether the fees reasonably approximated its costs associated
     with late rent. So motion in limine number 1 by plaintiffs is denied." (ECF 436, 2/6/2023
25   Reporter's Transcript, at 5:19-6:1.) During trial, the Court permitted certain evidence
     and testimony relating to the PwC Report insofar as it went to Equity's state of mind
26   and reasonable endeavor analysis. The Court did not admit the PwC Report itself into
     evidence, but finds on balance that evidence of PwC's conclusion—that Equity's costs
27   from late rent circa 1998 exceeded the $50-plus-$5-per-day late fee charged at the time—
     is admissible for the limited purpose of showing Equity's state of mind in 2008.
28

86.    The parties in the *Consumer Justice* action asked the Court to approve the settlement. In support of that motion, Robert S. Knudsen, the PwC expert who conducted the analysis of Equity's costs, submitted a declaration based upon his analysis of Equity's costs. (Trial Ex. 1044, Knudsen Declaration ("Our analysis showed that, for each year from 1995 through 1998, the direct costs attributable to delinquency-related activity on EQR properties exceeded net late fee revenues.").)

87.    On February 28, 2000, the Court approved the settlement. (Trial Ex. 13, Order and Judgment of Dismissal.) As part of the settlement, Equity agreed to charge late fees of no more than $50 for 30 months. (3 RT 544:13-18.) The Court's order approving the settlement specifically held that Equity's $50 late fee complied with Civil Code section 1671(d). (Trial Ex. 13, at 1:21-23 ("The modified late fee that defendant has agreed to implement pursuant to the settlement complies with Civil Code Section 1671(d).").)

**I.    Los Angeles County's Late Fee Guidance**

88.    The Los Angeles County Department of Consumer & Business Affairs ("DCBA") has for decades published and distributed guidance to tenants and landlords stating that "Late fees of 5% or less of the monthly rent are considered reasonable." (*See* Trial Ex. 10 (DCBA publication printed in 2008).)

89.    Relatedly, the DCBA has published a website advising that "Late fees that are 5% or less of your monthly rent are considered reasonable." The website further states not to contact the DCBA unless the late fee exceeds 10%. (*See* Trial Exs. 220-3 *and* 220-4, respectively, DCBA publications from 2013 *and* 2017.)

**J.    Equity's On-Site Rent Collection Activities**

90.    The Court received testimony from Equity personnel experienced with the Company's on-site, property-level rent collection activities during the class periods. This included live testimony (Mayra Villanueva (6/9/2023), Samantha Kopczyk (6/9/2023), Michelle Grubbs (6/9/2023), and Amelia Ott (6/9/2023)), and deposition testimony (Carina Gomes (1/26/2021), Chad Johnson (1/5/2021), Grace Balahadia (2/23/2021).)

91.     The testimony of these Equity employees confirmed that the amount of time spent collecting or accounting for late rent varies by tenant, property, time of the year, and individual circumstance.[3]

92.     Their testimony also showed that Equity's on-site, property level personnel spend considerable time collecting and accounting for late rent.[4]

93.     Their testimony also showed a generally consistent pattern in terms of the timing and tasks associated with late rent collection. As a general description, the efforts include review of the residents with delinquent rent; preparing and posting Three-Day Notices; communicating with delinquent residents particularly starting on or around the 5th of the month and thereafter; escalating resident issues relating to delinquent rent when deemed appropriate; preparing files for eviction around the 15th of the month; ongoing communication with delinquent residents sent to eviction, including to prepare settlement agreements to resolve the delinquency; and continuing to interact with delinquent residents into the next month. Equity's resident interactions are in-person, over the phone, and by email.[5]

94.     The testimony of these employees also revealed an increase in time spent on delinquency during the COVID pandemic, particularly for the community manager and assistant community manager positions.[6]

95.     Also during the pandemic, Equity created the Rental Assistant Team position, whose role was almost exclusively to assist California residents with delinquent

[3] (*See e.g.*, 2 RT 215:25; 2 RT 216:1-18; 2 RT 216:24-25; 2 RT 359:5-367:10; 2 RT 407:8-18; 2 RT 409:22-410:9; 2 RT 410:10-22; 2 RT 66:6-20, ECF 503, p. 242.)

[4] (*See e.g.*, 2 RT 218:9-25; 2 RT 219:1-13; 2 RT 281:12-283:1; 2 RT 292:10-293:1; 2 RT 283:18-284:11; 2 RT 287:9-288:4; 2 RT 288:8-23; 2 RT 289:2-24; 50:21-52:18, ECF 503, p. 230-232; 64:22-65:19, ECF 503, p. 240-241; 68:24-69:18, ECF 503, p. 243-244.)

[5] (*See e.g.,* 2 RT 219:25; 2 RT 220:1-13; 2 RT 226:8-20; 2 RT 222:13-228:25; 229:16-232:6; 2 RT 235:8-236:10; 2 RT 237:2-7; 2 RT 238:25-239:6; 2 RT 237:12-239:184; 2 RT 284:12-23; 50:21-52:18, ECF 503, p. 230-232; 64:22-65:19, ECF 503, p. 240-241; 68:24-69:18, ECF 503, p. 243-244; 76:2-25, ECF 503, p. 247; 94:15-95:6, ECF 503, p. 390-391.)

[6] (*See e.g.*, 2 RT 292:5-14; 2 RT 292:10-293:1; 2 RT 414:9-415:2.)

1  rent.[7] This team typically ranged in size during the pandemic from three to six
2  employees. (Trial Ex. 1272.)

3      96.    Equity's on-site, property level employees generally do not record all
4  interactions with residents regarding late rent issues. They explained that it would be
5  impractical given the various daily demands and tasks to keep track of time in the same
6  manner that lawyers and other professionals do.[8]

7      97.    These Equity employees also confirmed that technology, such as automated
8  late rent emails, have not drastically reduced the time and effort associated with
9  collecting and accounting for late rent; if anything, technology has created additional
10 efforts such as increased communications and visits from residents about delinquent
11 rent.[9]

12 **K.  Adoption of Equity's Standard Late Fee**

13     98.    Around June 2008, Equity changed its late fee in California from a flat $50
14 to the Standard Late Fee of 5% or $50. (ECF 454, SF #28.) Before doing so, Equity's
15 business and legal teams analyzed the propriety of changing the late fee.

16     99.    The employees involved in the decision to adopt the Standard Late Fee
17 included Senior Vice President and Deputy General Counsel James Fiffer, First Vice
18 President—Legal Denise Beihoffer, Executive Vice Presidents David Santee and
19 Frederick Tuomi, Vice President of Financial Planning Christopher Jenkins, and the two
20 Senior Vice Presidents responsible for the California portfolio, Mickey Cummings and
21 Bruce Lavine. (ECF 454, SF #30.)

22     100.   In or around April 2008, Equity began assessing whether to modify its
23 California late fee. Specifically, in or around April 2008, the legal department was

---

[7] (*See e.g.*, 2 RT 412:5-414:8; 2 RT 414:9-415:2; 2 RT 415:3-23; 2 RT 424:6-23, 3 RT 616:16-617:14.)

[8] (*See e.g.*, 2 RT 416:10-417:15; 2 RT 416:19-417:7, 2 RT 417:20-418:7; 43:8-22, ECF 503, p. 349; 74:15-19, ECF 503, p. 375; 52:19-54:10, ECF 503, p. 34-36.)

[9] (2 RT 274:9-17; 5 RT 1015:14-18 and 5 RT 1017:2-14; Trial Ex. 1248, p. 19 ¶ 67-68; *see also* 3 RT 600:19-23.)

1  approached by David Santee and Fred Tuomi, who were in the midst of their financial

2  and operational reviews. (4 RT 743:1-25.) They asked the legal department to undertake

3  a nationwide review of Equity's fees and charges, including the California late fee. (4 RT

4  743:1-25.)

5      101.    Denise Beihoffer[10] in particular played a prominent role in the 2008

6  California late fee review. Beihoffer's role during the fee review was to make sure the

7  decision-makers were aware of the legal requirements related to late fees in California.

8  (4 RT 661:15-18.) In her role, she determined the rules and requirements in various

9  jurisdictions with respect to fees, communicated that to the business team so that they

10 understood the rules, and assisted the business team in navigating through the decision-

11 making about the fees. (4 RT 744:1-25.) She viewed part of her role as trying to

12 determine whether or not the proposed change to the California late fee was reasonable

13 and lawful. (4 RT 745:1-4.)

14     102.    When Beihoffer was first approached about reviewing the Company's fees in

15 2008, Equity had not already decided that it was actually going to modify the California

16 late fee. (4 RT 744:1-9.) Nor did Beihoffer know when she was first approached what

17 conclusion she would reach about whether the proposed late fee (5%) was appropriate. (4

18 RT 745:5-10.) No one told her during the course of her review of the California late fee in

19 2008 that the Company would adopt a 5% late fee regardless of the outcome she reached

20 about its legality. (4 RT 745:11-16.)

21     103.    At the time of the 2008 California late fee review, Beihoffer had prior

22 experience with or knowledge of late fees being assessed on a percentage basis, as

23

24 [10] Beihoffer joined Equity as in-house counsel in 1998. (4 RT 658:23-25.) Since 2006, she

25 has held the title of Vice President in the legal department. (4 RT 741:17-24, 4 RT
   742:10-12.) Her job involves running a team of legal professionals to support the

26 property operations and property management teams, and to focus on compliance with
   company policies, procedures, and forms. (4 RT 659:508, 4 RT 741:9-24.) In 2008,

27 Beihoffer reported to James Fiffer, and had her own reports including Legal Services
   Director Ann Paton and divisional legal representative Sharon Gunneson. (4 RT 742:20-

28 25, 4 RT 743:1-25.)

PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – CASE NO. 4:16-cv-01225-JSW-TSH

1  opposed to a flat fee basis. (4 RT 745:17-22.) She was aware that a number of

2  jurisdictions throughout Equity's portfolio allowed percentage late fees by local statutes

3  or local rules. (4 RT 745:17-22.)

4  104.   At the time of the 2008 California late fee review, Beihoffer knew that

5  Equity's existing $50 late fee in that state was based on the amount agreed upon in the

6  settlement of the *Consumer Justice* action. (4 RT 746:1-3, 4 RT 746:9-747:4.)

7  105.   The fact that Equity had faced a prior litigation challenge to its California

8  late fee in the *Consumer Justice* action impacted the analysis Beihoffer performed in

9  2008 as to whether Equity could modify its late fee. (4 RT 747:8-19.) In particular,

10  knowing that Equity had already faced a lawsuit specifically targeting its California late

11  fee, and that she was now evaluating a change to that late fee, meant that she wanted to

12  be "super cautious" about how Equity was evaluating and making sure that the late fee

13  would be reasonable. (4 RT 747:8-19.)

14  106.   During the 2008 California late fee review, Beihoffer discussed the PwC

15  report with the Equity team, in particular Fiffer, Santee, Tuomi, and Jenkins. (4 RT

16  747:20-748:4, 4 RT 748:20-24.) She discussed the PwC report with the Equity team

17  during this timeframe because Equity knew about the resolution of the *Consumer Justice*

18  action and knew there was an analysis done on the company's costs collecting late rent at

19  that time. (4 RT 748:6-17.)

20  107.   In May 2008, Beihoffer solicited help from Sharon Gunneson (and later Ann

21  Paton) to help with some of the "legwork" for the California law fee review in terms of

22  contacting outside counsel and identifying what peer companies were charging for late

23  fees. (Trial Ex. 66; 4 RT 662:4-663:13.)

24  108.   Ultimately, Paton reached out to local counsel in the jurisdictions involved

25  in operational fee reviews, including Equity's outside landlord-tenant counsel in

26  California, Jamie Sternberg of Kimball Tirey & St John ("KTS") regarding California late

27  fees. (4 RT 750:2-16.)

28

1    109.    Gunneson researched late fees charged by peer companies. (4 RT 750:22-

2  751:4.)

3    110.    As part of the 2008 California late fee review, Beihoffer also independently

4  communicated with Sternberg, in particular discussing the proposed 5% late fee. (4 RT

5  661:19-22, 4 RT 681:3-682:9, 4 RT 750:17-21.)

6    111.    Beihoffer also conducted her own legal research during the 2008 fee review,

7  including review of (1) California's statute addressing liquidated damages, (2) guidance

8  from the California Apartment Association ("CAA"), (3) the DCBA publication on

9  residential late fees, and (4) input from Ms. Sternberg. (4 RT 751:5-14.)

10    112.    Beihoffer also reported to her superiors in the legal department, Fiffer and

11  Strohm, keeping them apprised of the portfolio-wide fee review project, and in particular

12  the California late fee where they were having a lot of discussion about the proposed

13  change. (4 RT 751:15-752:3.)

14    113.    On May 8, 2008, Beihoffer wrote to Fiffer about the status of her review of

15  the California late fee, noting, among other things, that she wanted to "quantify the

16  potential upside" of a change in the California late fee if Equity were to move to a 5% late

17  fee. (Trial Ex. 66; 4 RT 663:14-22.) By that, Beihoffer meant looking at the possibility

18  that there might be more recovery of costs from delinquent rent incurred through the

19  changed late fee. (Trial Ex. 66; 4 RT 663:14-22.)

20    114.    Beihoffer solicited the help of Equity Vice President of Financial Planning

21  Chris Jenkins to understand the dollar amount impact for a late fee that was equal to 5

22  percent of the rent, as compared to the existing $50 late fee in California. (Trial Ex. 67; 4

23  RT 664:23-665:3.) On May 8, 2008, Beihoffer wrote to Jenkins that Equity "may" be in a

24  position to modify its California late fee structure, and asked him to run numbers

25  regarding the financial impact of the proposed change. (Trial Ex. 67.) She also informed

26  Jenkins that Equity was still "in the midst of our research" such that Equity had not

27  determined whether it would or would not modify the late fee as of her May 8 email.

28  (Trial Ex. 67.)

1    115.   Jenkins ran the numbers as requested by Beihoffer. (Trial Ex. 64.) By email

2 on May 20, 2008, Jenkins informed Beihoffer that the average late fee in California

3 would be $75 with a 5% late fee. (Trial Ex. 64; 4 RT 669:16-670:10.)

4    116.   Jenkins' analysis related to whether and to what extent Equity would be

5 able to recover more of its costs associated with delinquent rent by moving to a 5% late

6 fee. (4 RT 677:3-11.)

7    117.   During the 2008 fee review, Beihoffer recognized the possibility of litigation

8 resulting from a change in the California late fee, as it was her job as in-house counsel to

9 be concerned or cautious about matters that may involve litigation; Beihoffer recounted

10 that Equity would obviously like to avoid litigation if it can. (4 RT 678:12-17.)

11    118.   In doing its research in connection with the 2008 California late fee review,

12 Equity's legal department located a publication from the DCBA in May. (Trial Ex. 10

13 (print date of May 7, 2008); *see* also Trial Ex. 61 (May 22, 2008 email from Beihoffer,

14 discussing the DCBA publication).)

15    119.   The DCBA publication stated that residential late fees of 5% or less are

16 "considered reasonable." (Trial Ex. 10.) As noted, Beihoffer reviewed and considered the

17 DCBA publication during the California late fee review in 2008, identifying it as

18 guidance regarding residential late fees. (4 RT 752:17-753:7.) The DCBA's guidance

19 impacted her view as to whether moving to a 5% late fee in California was reasonable

20 and lawful, particularly given that the regulatory agency opining on the subject

21 regulated consumer affairs. (4 RT 753:24-754:12.)[11]

22

23

24   ────────────────────

25 [11] Beihoffer confirmed that the Civil Code provision cited in the 2008 DCBA publication
was omitted in subsequent publications by the DCBA, in which the DCBA re-affirmed

26 that residential late fees of 5% or less "are considered reasonable." (Trial Exs. 220-3 and
220-4 which respectively are DCBA publications from 2013 and 2017; 4 RT 754:19-

27 758:16.) This fact undercuts any suggestion by Plaintiffs that the DCBA guidance could
not reasonably be relied upon in the residential housing context due to the Civil Code

28 provision citation.

120.    Notwithstanding the DCBA publication, however, Beihoffer still ran through the liquidated damage analysis to make sure Equity was not recovering more than its anticipated or estimated costs from delinquent rent in moving to a 5% late fee (*i.e.*, she did not just rely on the publication). (4 RT 753:24-754:12.)

121.    As part of the 2008 California late fee review, Beihoffer conversed with the business team about the legal requirements and that the rule in California is that late fees must reasonably approximate Equity's anticipated costs of pursuing late rent. (4 RT 685:13-20.)

122.    Beihoffer explained to the business team in 2008 that unlike other jurisdictions, California required late fees to be based on some approximation of anticipated losses, and that actual damages have to be difficult or impracticable to determine. (4 RT 768:5-19.) In that regard, no one ever told Beihoffer that the purpose of modifying the late fee in 2008 was to generate more profit for Equity. (4 RT 767:15-18.)

123.    Beihoffer understood during the 2008 fee review that revenue generated by late fees must comport with the test of what its costs are: the Company can't profit from late fees. (4 RT 687:18-688:9.)

124.    In 2008, Beihoffer drew a clear distinction between revenue and profit; revenue is simply money that comes into the company, while profit is what is left after subtracting expenses unless there is a loss.[12] (4 RT 767:19-768:4.)

125.    As for Equity's attempt to calculate its actual costs of late rent in adopting the Standard Late Fee, Beihoffer confirmed that Equity was aware of the PwC study and that Equity relied on the conclusions reached by that study as part of the California late fee review. (4 RT 689:14-21.)

126.    Equity has payroll and other line-item costs associated with running its properties documented in its statement of operations that its financial teams were reviewing during the California late fee review. (4 RT 690:16-23.)

_____

[12] The Court agrees with that distinction and rejects Plaintiffs' attempts to equate "revenue" with "profit."

127.    As a participant in the California late fee review in 2008, Beihoffer came to understand that Equity's motive and purpose in moving to the 5% late fee was to recover its anticipated or estimated costs associated with collecting late rent. (4 RT 762:11-17.) This motive was consistent with the contemporaneous advice that Equity received from its outside counsel in terms of what the proper purpose of a late fee must be,[13] as well as the advice given by Equity's in-house legal team regarding the liquidated damage requirements in California.[14]

128.    Beihoffer determined that better cost recovery was an appropriate motive and purpose under California law, as part of the review. (4 RT 762:18-22.)

129.    As part of the California late fee review in 2008, Beihoffer also evaluated the effect of the proposed 5% late fee. (4 RT 763:3-12.) In terms of the effect, Beihoffer solicited Jenkins to perform an analysis, which, as noted, determined that the average late fee in California based on average monthly rent at the time would approximate $75. (4 RT 763:3-12.) Based on Jenkins' analysis, Beihoffer concluded that the 5% late fee was not designed to exceed the damages Equity suffers from delinquent rent. (4 RT 763:13-764:4.)

130.    Beihoffer also considered whether it was appropriate for Equity to adopt a percentage late fee in California. (4 RT 773:10-774:2.) She confirmed that Equity concluded based on their discussions and research, including Jenkins' analysis and input from local counsel, that the late fee amount at 5% would be a reasonable approximation to allow Equity to recover some of its costs associated with delinquent rent. (4 RT 773:10-774:2.)

---

[13] See Trial Ex. 50, May 2008 advice from Sternberg regarding California late fee requirements.

[14] See Trial Ex. 1075, May 2008 fee chart explaining that the late fee "must be a reasonable estimate of landlord's damages"; see Trial Ex. 61, May 22, 2008 email from Beihoffer explaining some of the reasons why the proposed 5% late fee was defensible.

131.    As for why a percentage late fee was appropriate here (which would translate to a higher late fee for larger units), before setting the Standard Late Fee, it was general knowledge that the more people you have to contact, and the more people you have to discuss an outstanding balance with, the more time is spent collecting late rent. (4 RT 704:21-705:4.) Beihoffer confirmed that prior to the California late fee review in 2008, Equity knew that it might cost more to pursue higher balances, and to pursue multiple residents and units. (4 RT 703:21-704:5.) Equity also knew that in terms of actual time and energy spent, it would likely be more for large balances because Equity personnel are going to seek to collect higher balances and be more persistent with such balances. (4 RT 703:21-704:5.)

132.    Equity also considered on what rent amount to charge the 5% late fee, *i.e.*, based on the full monthly rent amount or just the outstanding balance; Equity decided that the late fee should only be charged on the outstanding balance, which allows for credit against partial payments. (See e.g., Trial Ex. 61 (discussing on what amount to charge the late fee).) While a percentage fee might result in a higher late fee for more expensive units, it also had the counter-impact of not charging lower cost units the same late fee amount as higher cost units. As the Standard Late Fee Class definition confirms, Equity ultimately chose to charge the late fee only on the outstanding rent balance.

133.    During the California late fee review, Equity's legal team also prepared fee charts documenting information learned in the review. (4 RT 778:21-779:4.)

134.    On May 21, 2008, Beihoffer sent Santee one such fee chart. (4 RT 779:5-782:7, discussing Trial Ex. 1075.) This particular fee chart contained (a) information regarding the resolution of the *Consumer Justice* action, (b) input from local counsel that California courts apply a liquidated damage analysis where the late fee must be a reasonable estimate of landlord's damages, and (c) reference to the DCBA's guidance that a late fee of 5% or less is reasonable. (4 RT 779:5-782:7, discussing Trial Ex. 1075.) The fee chart included this kind of information because Equity wanted those in the legal department and business team to have access to this information. (4 RT 780:17-23.)

135. On May 21, 2008, Santee shared with other business team members the comment from the fee chart that the current late fee in California was "set to a flat $50 in California per the negotiated settlement" in the *Consumer Justice* action. (4 RT 782:15-783:3, discussing Trial Ex. 62.)

136. In his May 21 email, Santee reported to the business team that he believed "that legal is comfortable with a 5 percentage late fee" in California. (Trial Ex. 62.) Beihoffer agreed. (4 RT 783:4-13.)

137. Beihoffer responded to Santee's May 21 email on May 22, 2008. (4 RT 783:14-784:2, discussing Trial Ex. 61.) Beihoffer's May 22 email response copied the same recipients as Santee's original email because her principal conversations on the California late fee issue were with Santee and Tuomi as of that time, and she wanted to give the other recipients further assurances, in addition to what Santee had shared with them, that Equity had reviewed the proposed late fee and provide some of the reasons why Equity was comfortable adopting it. (4 RT 784:3-19, discussing Trial Ex. 61.)

138. Beihoffer believed a 5% late fee was defensible including based on Equity's analysis that 5% of the rent would average a $75 late fee. (4 RT 784:25-785:3.) Accordingly, in her May 22, 2008 email to Equity business team members, she concluded: "I believe that either a flat fee or a % fee is defensible, so long as the % is not greater than 5% of the rent." (Trial Ex. 61.) Equity's Standard Late Fee follows the late fee amount that Beihoffer advised was defensible based on Equity's contemporaneous analysis.

139. On May 27, 2008, Paton forwarded Sternberg's written input to Beihoffer. (4 RT 785:8-14, discussing Trial Ex. 50.) By the time Paton forwarded Sternberg's written input, Beihoffer had already spoken directly with Sternberg about California late fees. (4 RT 785:15-18.) Still, Beihoffer reviewed and considered Sternberg's written input when she received it from Paton, which did not change her belief that the proposed 5% late fee was defensible. (4 RT 785:19-24.)

140.   Beihoffer had previously reviewed a background paper from the CAA, and then reviewed it again in early June 2008 when Cummings emailed it to her. (Trial Exs. 71-72; 4 RT 692:17-693:3.) After she reviewed the CAA paper sent by Cummings on June 3, 2008, Beihoffer agreed with Cummings' view that the CAA paper did not change Equity's position that the 5% late fee was appropriate based on the analysis Equity performed as part of the California late fee review. (4 RT 759:10-760:19.)

141.   Beihoffer testified about the CAA background paper's section on "tips for reasonable late fees," which has five subparts. (Trial Ex. 72; 4 RT 764:6-12.)

     a.  First, put the late fee in the written rental agreement—Beihoffer confirmed Equity does that. (4 RT 764:13-17.)

     b.  Second, include language concerning liquidated damages in the rental agreement—Beihoffer confirmed Equity does that. (4 RT 764:18-25.)

     c.  Third, have information in your file about how the company arrived at the late fee—Beihoffer confirmed that Equity did that, providing examples of the extensive email exchanges in May 2008 on subjects like Jenkins' analysis of the effect of the late fee and the DCBA publication. (4 RT 765:1-10.)

     d.  Fourth, the article discusses percentage late fees—Beihoffer confirmed that Equity concluded that under the totality of the circumstances as analyzed by Equity, and her personally, a percentage late fee was appropriate here. (4 RT 765:11-766:4.) In particular, Beihoffer noted the Company's conclusion that a 5% late fee, which it knew in 2008 would translate to an average late fee of $75, was a reasonable estimation of recovering some of the company's costs incurred in addressing delinquent rent. (4 RT 765:19-766:4.)

     e.  Fifth, the article suggests consulting with counsel before adding a late fee—Beihoffer confirmed that Equity consulted with its local landlord-tenant counsel at KTS, in addition to the involvement of multiple

members of Equity's in-house legal department including Beihoffer. (4 RT 766:5-13.)

142.   As part of the 2008 California late fee review, Equity included a broad segment of business and legal team members, addressing questions and concerns as they arose. For instance, when someone from Equity's training department asked about the proposed 5% late fee, Beihoffer reviewed those questions, answered them, and confirmed that Equity was comfortable with the analysis and conclusion it had reached to adopt the Standard Late Fee. (Trial Ex. 70; 4 RT 702:3-17, 4 RT 785:25-787:7.)

143.   As part of the 2008 California late fee review, Beihoffer also concluded that it was impracticable or extremely difficult for Equity to determine actual damages associated with delinquent rent. (4 RT 774:3-23.) Beihoffer noted that Equity has about 30,000 apartment units in California; as such, resident payment profiles differ, and it would not be possible to look at every single resident or every unit and calculate the actual damage from delinquent rent. (4 RT 774:3-23.)

144.   Beihoffer was also familiar with the reasonable endeavor concept during the 2008 California late fee review. (4 RT 774:25-775:4.)

145.   Before the 5% late fee was adopted, Beihoffer concluded that Equity had performed a reasonable endeavor. (4 RT 775:5-10.) Beihoffer believed Equity had performed a reasonable endeavor, including because Equity knew its personnel costs had gone up substantially in the eight to ten years since Equity previously set its existing $50 late fee, and Equity had analyzed that moving to 5% would translate to a $75 late fee on average. (4 RT 775:11-776:1.)

146.   Beihoffer also concluded at the time Equity decided to adopt the 5% late fee that the formulation chosen was reasonable and lawful. (4 RT 776:7-11.) Beihoffer reached that conclusion, including based on her knowledge of the liquidated damage requirements in California, the input from local counsel, her review of published documents, including from the DCBA and CAA, and knowing that 5% as analyzed by Jenkins resulted in an average late fee amount of only $75. (4 RT 776:12-19.)

147.   Beihoffer confirmed that all of the members of Equity's business teams involved in the 2008 fee review are no longer with Equity. (4 RT 766:14-23.) However, their involvement in 2008 was relevant to the analysis Beihoffer was performing on the proposed 5% late fee. (4 RT 766:24-767:14.) In particular, it was important to her as the in-house lawyer to impart the applicable late fee rules to the business team so they understood that whatever late fee was ultimately agreed upon and established was consistent with the liquidated damage approach and only intended to recover costs associated with delinquent rent, and not as a "profit center." 4 RT (*Id.*)

### Other Individuals Involved In The California Late Fee Review In 2008

148.   **James Fiffer.** From approximately 1999 until his retirement in 2019, Fiffer worked as deputy general counsel for Equity Residential. (3 RT 445:2-11; 3 RT 577:10-21.)

149.   Fiffer was lead outside counsel for Equity in the *Consumer Justice* action when it began in 1998. (3 RT 473:9-10.) Fiffer continued to oversee the *Consumer Justice* action when Equity hired him as in-house counsel. (3 RT 473:11-13.)

150.   In connection with the *Consumer Justice* action, Equity retained Robert Knudsen of PricewaterhouseCoopers ("PwC"). (Trial Ex. 1010; 3 RT 473:14-474:22.)

151.   PwC was asked to study the costs Equity incurred as a result of late rent and to assess whether those costs exceeded the late fees paid. (3 RT 535:16-536:1, 14-23.)

152.   In 1999, when he reviewed the PwC report, Fiffer would have known about the details in the report. What was important to Fiffer in 2008 was the conclusion—that Equity's late rent costs exceeded its late fees. (3 RT 501:13-502:19; 3 RT 536:7-12.) PwC concluded that Equity's late fee was less than its late rent costs; in other words, the company did not recoup all of its late rent costs via the late fee. (3 RT 538:7-18.)

153.   The *Consumer Justice* Court's order stating that Equity could lawfully charge a $50 late fee was significant to Equity, as it confirmed that in 2000, a $50 late fee was reasonable. (3 RT 539:7-15.)

154.    Fiffer confirmed that Equity's business team would consult with Equity's legal team before implementing changes, like late fees, because Equity wanted to comply with the law. (3 RT 548:15-25.) Even though the $50 cap on its California late fee expired in 2002 under the *Consumer Justice* settlement, Equity did not consider raising the late fee until 2008. (3 RT 550:17-551:2.)

155.    Fiffer was involved in the 2008 late fee analysis that led to the adoption of the Standard Late Fee. (3 RT 447:15-16.) Fiffer confirmed that before setting the Standard Late Fee, Equity (1) considered its costs from late rent (3 RT 454:12-14), (2) learned that some competitors were using a percentage late fee (3 RT 461:22-462:25), and (3) learned that Los Angeles County published guidance to tenants stating that a 5% late fee was reasonable. (Trial Ex. 10; 3 RT 462:25-463:9.) Another factor Equity considered was the National Apartment Association's guidance regarding percentage late fees. (3 RT 463:11-464:3.)

156.    As part of his analysis of a potential new late fee in 2008, Fiffer attempted to determine whether Equity's costs had increased since the time PwC prepared its report. (3 RT 554:3-12.) Equity did not view California as a "low-risk" jurisdiction; Equity saw more class actions and more regulatory risk in California than in other states where it did business. (3 RT 554:17-555:9.) After analyzing the costs and legal issues, Fiffer concluded that the Standard Late Fee complied with California law. (3 RT 555:18-556-5.)

157.    Fiffer concluded that the $50 floor was lawful because (1) it had been approved by a court, and (2) if $50 + $5 per day was less than Equity's late rent costs in 1999 when Knudsen did his study, then $50 was clearly less than Equity's costs in 2008. (3 RT 556:9-18.)

158.    Fiffer concluded that the 5% aspect of the Standard Late Fee was lawful because (1) Los Angeles County declared it reasonable, (2) other jurisdictions where Equity did business deemed it reasonable, and (3) a 5% late fee was, on average, $75, which was reasonable given what Knudsen already established regarding Equity's late rent costs. (3 RT 556:19-560:25.)

159.   According to Fiffer, Equity did not retain a third-party to perform another cost analysis in 2008 because (1) the law does not require any formal study, and (2) Equity already had a study from PwC that showed that Equity's late fees were less than its costs when it charged a late fee of $50 plus $5 per day, and the only material thing that had changed since the study was that Equity's labor costs had steadily increased over the last decade. (3 RT 552:7-22, 3 RT 561:1-20.)

160.   **Ann Paton**. Ann Paton has worked at Equity for over 30 years. (5 RT 1001:21-22.) She began with Equity as an assistant community manager and then a manager, where her job responsibilities included rent collection. (5 RT 1002:15-1003:2, 5 RT 1003:23-1004:5.) As an Equity property level employee, the amount of time she would have to spend addressing late rent collection varied from tenant to tenant and late payment to late payment. (5 RT 1003:3-6.) Paton cited as one reason for the variability the fact that typically the larger apartments had multiple residents, which required contacting all the residents living in those units as well as guarantors on the lease. (5 RT 1003:7-15.)

161.   Later as a District Manager for Equity, Paton experienced firsthand how delinquent rent can affect portfolio operations for which she was responsible; in particular, delinquent rent made paying the bills difficult within the portfolio, resulting in her having to choose which vendors to pay in a given month and having to find new vendors because some would not continue to work without getting paid. (5 RT 1005:11-1006:12.)

162.   Paton has been the Director of Legal Services in Equity's in-house legal department since 2005, in which she supports the legal team as a non-lawyer. (5 RT 1006:13-1007:2.) In 2008, Paton reported to Denise Beihoffer. (5 RT 1007:13-15.)

163.   As part of the 2008 California late fee review, Paton's role was to collect information from local counsel regarding late fees, specifically Jamie Sternberg of KTS. (5 RT 1007:16-1008:7.) Paton communicated with Sternberg in May 2008, who then provided input about California late fees. (5 RT 1008:16-1009:2, discussing Trial Ex. 69.)

1    Paton forwarded Sternberg's written input to Beihoffer in May 2008. (5 RT 1008:3-13,

2    discussing Trial Ex. 50.)

3         164.    As part of the California late fee review in 2008, Paton also assisted with

4    preparing fee charts. (5 RT 1009:16-1010:12, discussing Trial Ex. 1075.)[15]

5         165.    In 2014, Paton prepared a report describing interviews she planned to

6    conduct as part of the California late fee compliance review. (5 RT 1012:4-1013:8,

7    discussing Trial Ex. 1133, an example of a 2011 fee chart.) The purpose of the 2014

8    interviews was to confirm Paton's belief that technology had not changed the efforts that

9    the properties had to go through when collecting delinquent rent. (5 RT 1014:18-22.) The

10   interviews were conducted by her and Sharon Gunneson in or around June or July of

11   2014. (5 RT 1015:6-18.) Paton interviewed leasing consultants, community

12   administrators, assistant community managers, community managers, and general

13   managers. (5 RT 1015:14-18.) When asked whether automated emails or other technology

14   had changed the time spent collecting rent at Equity based on the interviews, Paton's

15   conclusion was that nothing had changed drastically at all and that Equity was still

16   taking the same steps in collecting rent. (5 RT 1017:2-14.)

17        166.    **Chris Jenkins**. Jenkins was employed at Equity from 1994 to 2020,

18   including serving as V.P. of Financial Planning from 2001 through 2020. (ECF 503, p.

19   290-291, Jenkins Dep. 10:17-11:12.) As V.P. of Financial Planning, he worked for the

20   chief operating officer, primarily handling operations analytics and decision support.

21   (ECF 503, p. 291, Jenkins Dep. 11:13-22.)

22

23

24   _____

25   [15] Paton also assisted with preparing fee charts as part of fee reviews after 2008. (5 RT
     1012:4-1013:8, discussing Trial Ex. 1133, an example of a 2011 fee chart.) After 2008,
26   Paton was also involved with California late fee reviews. (5 RT 1010:20-1011:8.) In those
     fee reviews after 2008, Paton would contact Sternberg at KTS seeking information about
27   California late fees. (5 RT 1010:20-1011:8.) Paton described several examples of her
     outreach to Sternberg after 2008. (5 RT 1011:9-22, discussing Trial Ex. 1092, a 2010
28   exchange between Sternberg and Paton.)

1     167.   Jenkins is familiar with the late fee charged by Equity at its California

2 properties. (ECF 503, p. 293, Jenkins Dep. 13:11-18.) In terms of adoption of the

3 California late fee in 2008, Jenkins recalls involvement in analytics surrounding the

4 proposed late fee, specifically in estimating the impacts of changes in fees. (ECF 503, p.

5 294-295, Jenkins Dep. 17:18-25.) In analyzing those impacts in 2008, he would have

6 worked with the members of the property management and legal teams, including the

7 COO (Santee), Tuomi, and Beihoffer. (ECF 503, p. 294-295, Jenkins Dep. 18:1-16.)

8 Typically, Jenkins would be asked to do analytics to review any type of change like the

9 late fee. (ECF 503, p. 295-296, Jenkins Dep. 18:17-19:24.)

10     168.   **David Santee.** Santee was employed at Equity from November 1994

11 through January 1, 2019. (ECF 503, p. 400, Santee Dep. 21:5-8.) He was the Chief

12 Operating Officer and Executive Vice President of Operations in 2008. (ECF 503, p. 400,

13 Santee Dep. 21:12-22:8.) In that role, he was familiar with Equity's California late fee.

14 (ECF 503, p. 405, Santee Dep. 40:4-9.)

15     169.   From his operations perspective, Santee viewed the 2008 fee review as part

16 of Equity's effort to standardize following its implementation of a new software platform,

17 with one of the deliverables or outcomes being a consistent application of Equity's

18 policies and procedures across all properties. (ECF 503, p. 407-408, 411-414, Santee Dep.

19 45:8-12, 46:4-15, 50:25-51:7, 52:5-53:16.) The California late fee review was part of the

20 broader fee review process in 2008, with Equity selecting what it believed was the most

21 appropriate approach. (ECF 503, p. 415, Santee Dep. 54:14-17.)

22     170.   As part of the 2008 California late fee review, Santee recalls discussion

23 about the delinquent rent costs associated with the *Consumer Justice* action, and that

24 the legal team raised the cost analysis done in connection with that case, which Santee

25 found to be a good starting point in reviewing the late fee in 2008 knowing that costs go

26 up over time. (ECF 503, p. 419-420, 422, Santee Dep. 59:19-25, 60:11-18, 62:4-13.)

27 Santee's belief was that based on what the prior (PwC) analysis' conclusion was, that

28 analysis supported whatever decision was made or whatever options were being put forth

1   in 2008. (ECF 503, p. 420, Santee Dep. 60:4-10.) He further recalls as part of the 2008

2   late fee review, that he understood from his discussions with Beihoffer and the

3   settlement agreement in the *Consumer Justice* action, that the late fee adopted at that

4   time ($50 flat) was determined to be reasonable. (ECF 503, p. 423, Santee Dep. 63:2-12.)

5   171.   Santee viewed part of his job as protecting Equity from litigation, such that

6   if the fee review process discovered an unlawful fee, that fee may have been modified or

7   eliminated. (ECF 503, p. 431, Santee Dep. 73:23-74:5.) As part of the fee review, Santee

8   was not looking to create legal liabilities for Equity, pointedly stating: "I mean, that's - - I

9   didn't want to do anything that would create any liability. I mean, who - - what person in

10   their right mind would?" (ECF 503, p. 435, Santee Dep. 77:25-78:3.)

11   172.   Santee was familiar with the personnel costs of Equity's properties in

12   California and reviewed those costs before adoption of the Standard Late Fee as part of

13   his job. (ECF 503, p. 464-465, Santee Dep. 115:19-25, 116:1-5.) He was also involved in

14   making decisions related to staffing and compensation for property-level employees in

15   California. (ECF 503, p. 470-471, Santee Dep. 123:22-124:8.)

16   173.   At the time the California late fee was adopted in 2008, Santee was also

17   familiar with the activities performed by Equity employees at the property level to collect

18   late rent from tenants, which he described in detail and concluded was a "laborious, time-

19   consuming process." (ECF 503, p. 473-475, Santee Dep. 133:17-135:9.)

20   174.   Santee believed that with respect to late rent collection, "it was common

21   knowledge that the process in California was much longer and more expensive than

22   pretty much any other state in the United States." (ECF 503, p. 479, Santee Dep. 141:6-

23   15.)

24   175.   From his perspective, the purpose of documents like the 2008 fee chart

25   (Trial Ex. 1083) prepared by Beihoffer and Paton was to "[k]eep us out of trouble. So that

26   we knew what the boundaries were. So people would not be rogue and try to do

27   something contrary to what was acceptable." (ECF 503, p. 485, Santee Dep. 151:3-12.)

28

1        176.   Santee was asked about the fee chart admitted as Trial Ex. 1083

2  (specifically where it says "Damage analysis must be a reasonable estimate of

3  damages."), and specifically whether he discussed the liquidated damage analysis with

4  Beihoffer, Paton, and Jenkins. (ECF 503, p. 485-486, Santee Dep. 151:8-152:10.)

5        177.   In response, Santee testified that "[t]here was an amount agreed to in the

6  19 whatever [*Consumer Justice*] case it was, in the settlement. My job was to rely upon

7  what my legal department told me. […] So, to me, the fact that we were mindful of this

8  [information in the fee chart], that we were—that we spent considerable amounts of time

9  discussing this, at some point in time, the legal department says ya[y] or nay. I mean

10  that's the process. So this is clearly put out there so that it informs all employees … this

11  is to educate them … and this document is directing them to be very careful and to not do

12  anything with these fees without contacting the legal department." (ECF 503, p. 486-487,

13  Santee Dep. 152:8-153:8.)

14        178.   Santee thought Equity's business processes related to the collection of late

15  rent increased in the 15-year period referenced in Trial Ex. 89, citing the fact that

16  Equity's payroll costs have increased in that timeframe and the late rent collection

17  process is a very time-intensive process. (ECF 503, p. 502, Santee Dep. 177:11-22.)

18        179.   **Frederick Tuomi.** Tuomi was the Executive Vice President—Property

19  Management. (ECF 503, p. 538-541, Tuomi Dep. 14:11-17:14.) Tuomi was deposed in

20  another California late fee litigation matter, which, in context, appears to have been the

21  *Consumer Justice* action. (ECF 503, p. 536-537, Tuomi Dep. 6:19-7:22.) Tuomi generally

22  recalls the subject matter of *Consumer Justice* action. (ECF 503, p. 544-545, Tuomi Dep.

23  22:14-22.) His understanding of the *Consumer Justice* action outcome was that there

24  would be a "safe harbor" in terms of the late fee amount ($50) based on the study that

25  Equity performed to demonstrate that it had costs associated with delinquent rent and

26  collection activities and that the agreed upon late fee was considered reasonable based on

27  the costs justified by that analysis. (ECF 503, p. 545, Tuomi Dep. 23:4-25.) He understood

28  that Equity retained one of the "big 3" accounting firms in connection with the *Consumer*

1    *Justice* action, which was commissioned to assist Equity in a detailed cost study report.

2    (ECF 503, p. 546, Tuomi Dep. 25:7-21.)

3        180.    The subject matter of the report was to identify, detail, validate and

4    document the various associated administrative costs related to late rent payments.

5    (ECF 503, p. 547, Tuomi Dep. 26:6-15.) Tuomi was familiar with the conclusions from the

6    report prepared by the accounting firm in the *Consumer Justice* action. (ECF 503, p. 548,

7    Tuomi Dep. 27:4-7.)

8        181.    Tuomi supports a percentage-based late fee because the higher the rent, the

9    more rent revenue is being lost. With a flat fee, residents with higher rent might not be

10   paying enough or residents with lower rent might be overpaying. Tuomi thinks the 5%

11   late fee is appropriate, subject to residents' approval when signing their lease, which

12   occurred here. (ECF 503, p. 561-562, Tuomi Dep. 50:18-51:23.)

13       182.    Tuomi was involved with payroll data on a company-wide basis, and

14   sometimes they reviewed payroll data more closely on regional basis. In terms of payroll,

15   Tuomi's focus was on the per-unit payroll cost, as well as the percent growth from year to

16   year. (ECF 503, p. 542-543, Tuomi Dep. 18:18-19:23.)

17       183.    According to Tuomi, it is generally known that labor costs in California are

18   higher than Colorado, Texas, Arizona, Georgia or Florida. The labor costs are online and

19   indexed by every state and California is one of the highest. (ECF 503, p. 564-565, Tuomi

20   Dep. 53:16-54:3.)

21       184.    **Mickey Cummings**. Cummings was an Executive or Senior Vice President

22   at Equity. (ECF 503, p. 62-63, Cummings Dep. 5:24-6:3.) His role expanded from

23   operations in Arizona, to include overseeing Assistant Vice Presidents for Southern

24   California, Colorado, Texas, Georgia, and Florida. (ECF 503, p. 69-72, Cummings Dep.

25   22:10-25:23.) Cummings and Bruce Lavine were respectively responsible for Southern

26   and Northern California regions and they reported to Fred Tuomi. (ECF 503, p. 73,

27   Cummings Dep. 28:13.)

28

185.   When his team analyzed late fees in terms of setting a late fee policy, he recalls there being a process to set and justify the right charge for a late fee. (ECF 503, p. 82, Cummings Dep. 55:3-11.) The late fee setting process involved collecting as much information and data as possible so that Equity could charge what it felt was the correct and defensible and common late fee. (ECF 503, p. 82, Cummings Dep. 55:21-25.) The ultimate conclusion from the process and research-oriented analysis followed by Equity in setting the late fee was establishing a legally defensible and appropriate late fee. (ECF 503, p. 83, Cummings Dep. 56:5-9.) Cummings recalls Equity being concerned with making sure it set a late fee that followed the law and was lawful. (ECF 503, p. 86, Cummings Dep. 59:14-60:18.)

186.   Cummings does not recall the particulars of the late fee setting process, but he recalls that Equity researched and considered four main data points: 1. Analyzing what certain competitors were charging since those businesses were well-managed and had done appropriate research; 2. Complying with the current law as researched by Equity's in-house counsel and local counsel; 3. Analyzing current court decisions; and 4. Analyzing data from local Apartment Associations regarding late charges in their standard leases. (ECF 503, p. 82, Cummings Dep. 55:12-20 *and* p. 82-95; Cummings Dep. 55:3-68:11.)

187.   Cummings testified that the 2008 California late fee adoption was a collaborative process between the business team and legal department. (ECF 503, p. 112-114, Cummings Dep. 90:18-92:3.) With respect to its late fee, Equity was not looking to be an industry outlier or unfair to its customers, but the bottom line is that Equity wanted to comply with the law. (ECF 503, p. 118, Cummings Dep. 96:6-24.) In terms of why Equity considered and then adopted a 5% late fee, Cummings observed that Equity would not have done so if it felt the policy was not supported by the law. (ECF 503, p. 125-126, Cummings Dep. 103:19-104:9.)

188.   Equity did not change its late fee to 5% in order to incentivize tenants to pay rent on time. (ECF 503, p. 128-129, Cummings Dep. 106:21-107:3.) Equity did not

change its late fee to 5% in order to increase revenue either. (ECF 503, p. 129, Cummings Dep. 107:5-17.) Instead, Equity sought to recover charges associated with late collection of rent, and to comply with law in doing so. (*Id*.) Cummings' recommendation to change to a 5% late fee was based on synopsis of all the information provided and with approval of the in-house legal department. (ECF 503, p. 133-134, Cummings Dep. 112:21-113:11.)

189.   In short summary, before adopting the Standard Late Fee, Equity engaged in a process that included key members of its legal and business teams in consultation with one another in order to determine whether the proposed late fee was reasonable and lawful. The evidence did not support – and in fact strongly contradicted – Plaintiffs' contention that Equity performed no cost analysis and had an improper motive in setting the Standard Late Fee. (*See* 1 RT 22:3-32:12.)

190.   **Bruce Lavine**. Bruce Lavine was a Senior Vice President with responsibility over Equity's Northern California region in 2008 and reported to Fred Tuomi. (ECF 503, p. 266-67, 276, Lavine Dep. 22:2-23:24; 59:1-5.)

191.   Mr. Lavine did not have a strong recollection during his deposition of Equity's adoption of the Standard Late Fee in 2008, but he testified that he believed ultimately any change to the late fee would have needed to be approved by Equity's legal department. (ECF 503, p. 272-275, Lavine Dep. 55:8-57:22, 58:20-25.)

192.   **Susan Zumph**. Plaintiffs made much of a memo authored in 2014 by Equity's in-house attorney Susan Zumph (Trial Ex. 90); however, for the reasons that follow, this Court finds the evidence has no relevance or bearing on Equity's reasonable endeavor in 2008, and therefore disregards it.

193.   Zumph was an attorney in Equity's legal department from 2002 until 2019. (ECF 503, p. 580, Zumph Dep. 9:20-24.) Zumph was not involved in the adoption of the Standard Late Fee in 2008, nor is she aware of who was involved. (ECF 503, p. 590, Zumph Dep. 35:2-9.) She does not know anything about the process of adopting the Standard Late Fee in 2008. (ECF 503, p. 591, Zumph Dep. 36:7-21.) As discussed above,

1  Beihoffer was the in-house Equity attorney primarily involved in the 2008 late fee setting
2  process.

3      194.   Zumph was not involved with review of Equity's California late fees until
4  2014 or 2015, when she took on some compliance-related responsibilities. (ECF 503, p.
5  592, Zumph Dep. 37:2-11, 44:12-18.)

6      195.   Zumph recalls preparing a memo in 2014 addressing various Equity fees,
7  including the California late fee, but does not recall ever suggesting that Equity change
8  the California late fee. (ECF 503, p. 636, Zumph Dep. 92:7-11.) Contrary to Plaintiffs'
9  suggestion, Zumph confirmed that she did not conclude that there was something
10  "wrong" with Equity's California late fee. (ECF 503, p. 716, Zumph Dep. 190:1-19.)
11  Zumph also clarified that the "business processes" her 2014 Memo refers to are Equity's
12  computer systems. (ECF 503, p. 722, Zumph Dep. 196:21-198:7, discussing Trial Ex. 90.)
13  Also contrary to Plaintiffs' suggestion, Zumph confirmed that California was not a
14  market where she recommended that Equity modify its late fee in connection with her
15  2014 Memo. (ECF 503, p. 733, Zumph Dep. 207:4-208:9.)

16      196.   For similar reasons, the Court finds equally unpersuasive any internal
17  emails or communications written by members of Equity's legal or business teams *after*
18  Equity's adoption of the Standard Late Fee, and therefore disregards those as well.

19  **L.   The $50 Woodland Park Late Fee**

20      197.   The three original named plaintiffs (Munguia-Brown, Rodriguez, and
21  Magaña) lived in apartments in the Woodland Park community in East Palo Alto. (ECF
22  454, p. 19-20.)

23      198.   At the time Plaintiffs signed their lease agreements, the properties
24  comprising the Woodland Park community were not owned by Equity; instead, they were
25  owned and managed by multiple landlords and property management companies. (Trial
26  Exs. 2, 3, 4.)

27      199.   As a result, all three original plaintiffs had different lease agreements, with
28  different late fee provisions. (Trial Exs. 2, 3, 4.)

200. Equity owned Woodland Park from December 2011 until February 2016. (4 RT 733:15-17.)

201. Woodland Park was made up of approximately 1800 units. (4 RT 733:18-20.)

202. When Equity bought Woodland Park in 2011, the files were messy and Equity was not able to locate leases for all existing tenants. (4 RT 733:21-734:2.)

203. Where Equity located a lease, it charged a late fee consistent with the existing lease agreement. (4 RT 734:3-10.)

204. If Equity did not locate a lease, then it established a late fee of $50. (4 RT 734:3-10.)

205. Equity based the $50 late fee amount on the fact that the $50 late fee had already been approved in 2000 (in connection with the *Consumer Justice* case), so Equity used the $50 flat fee at Woodland Park until Equity could determine whether the lease stated something different. (4 RT 734:15-25.)

**M.    Late Fees Collected by Equity**

206. Standard Late Fee Class Members were charged approximately $36,119,831 in total late fees between September 3, 2010 and December 31, 2021. (Trial Exs. 1278-0004 *and* 1278-0105.)

207. Standard Late Fee Class Members paid approximately $28,903,390 in total late fees between September 3, 2010 and December 31, 2021 (Trial Exs. 1278-0004, *and* 1278-0107.)

208. Woodland Park Class Members were charged approximately $610,000 in total late fees between December 1, 2011 and February 29, 2016. (Trial Ex. 1278-0110.)

209. Woodland Park Class Members paid approximately $270,021 in total late fees between December 1, 2011 and February 29, 2016. (Trial Ex. 1278-0108.)

## CONCLUSIONS OF LAW

**A.    Equity's Standard Late Fee Complies with Section 1671(d)**

210. California Civil Code Section 1671(d) provides that "a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such

1    a contract may agree therein upon an amount which shall be presumed to be the amount

2    of damage sustained by a breach thereof, when, from the nature of the case, it would be

3    impracticable or extremely difficult to fix the actual damage."

4    211.   Section 1671 requires that the liquidated damage provision be the product

5    of a "reasonable endeavor … to estimate a fair average compensation for any loss that

6    may be sustained" by the breach. See Cal. Civ. Code §1671(d); *Garrett v. Coast &*

7    *Southern Fed. Sav. & Loan Ass'n*, 9 Cal.3d 731, 739 (1973).

8    212.   This "reasonable endeavor" requirement is not part of Section 1671; instead,

9    it is a judicially-crafted requirement. *Util. Consumers' Action Network, Inc. v. AT&T*

10    *Broadband of S. Cal., Inc.*, 135 Cal. App. 4th 1023, 1029 (2006).

11    213.   "The bar for the 'reasonable endeavor' requirement appears to be low." *Zeff*

12    *v. Greystar Real Estate Partners, LLC*, 2021 WL 63214, 2021 U.S.Dist.LEXIS 30615, fn. 1

13    (N.D.Cal. Feb. 18, 2021).

14    214.   A liquidated damage clause is reasonable and enforceable if it bears a

15    reasonable relationship to the range of potential damages that the parties could have

16    anticipated would flow from a breach at the time the contract was made. *Cellphone Fee*

17    *Termination Cases*, 193 Cal. App. 4th 298, 322 (2011).

18    215.   Liquidated damage provisions are enforceable in form consumer contracts

19    and do not require actual mutual negotiation to validate the liquidated damage. *Util.*

20    *Consumers' Action Network, Inc.*, 135 Cal. App. 4th at 1029-1039.

21    216.   Two factors are at the heart of any inquiry into whether a reasonable

22    endeavor was made: "(1) the motivation and purpose in imposing the charges, and

23    (2) their effect." *Util. Consumers' Action Network, Inc.*, 135 Cal. App. 4th at 1029.

24    217.   When assessing the effect, the "focus is not . . . on whether [the late fees] are

25    disproportionate to the loss from breach, but on whether they were *intended* to exceed

26    loss substantially—a result of which is to generate a profit." *Hitz v. First Interstate Bank,*

27    38 Cal. App. 4th 274, 289 (1995) (emphasis in original); *Najarian Holdings LLC v.*

28    *CoreVest Am. Fin. Lender*, 2021 WL5630679, 2021 U.S.Dist.LEXIS 230249, at *20-22

1   (N.D.Cal. Dec. 1, 2021) (granting summary judgment for defendant involving challenge

2   to late fee where defendant offered evidence of the type of costs it faced as a result of

3   plaintiffs' defaults, justifying its liquidated damages).

4       218.   In other words, to be unlawful, the late fee must bear "no reasonable

5   relationship to the range of actual damages that the parties could have anticipated would

6   flow from a breach." *Cellphone Fee Termination Cases*, 193 Cal. App. 4th at 322.

7       219.   A formal cost study is not required, but a post-hoc analysis of costs will not

8   do either. *Hitz*, 38 Cal.App.4th at 291-292.

9       220.   Moreover, "[i]t has been suggested that the greater the difficulty

10  encountered by the parties in estimating the damages which might arise from a breach,

11  the greater should be the range of estimates which the courts should uphold as

12  reasonable." *Better Food Markets, Inc. v. American Dist. Tel. Co.*, 40 Cal.2d 179, 187

13  (1953) (observing that it would be improper to construe an agreed upon amount as a

14  penalty where the actual loss resulting from a breach could be less than the amount

15  provided or more than the amount provided in different situations). The parties'

16  agreement that an amount will be paid as a liquidated damage and not as a penalty is

17  not conclusive, but is entitled to some weight. *Id.*

18      221.   This is not a "hidden fees" case. Equity's Standard Leases expressly set

19  forth the amount of the late fee and the circumstances under which it would be imposed.

20  (ECF 454, SF # 26, #27.) Moreover, Plaintiffs are charged a late fee for breaching *their*

21  lease obligation to pay rent on time. (*Id.*, #27.)

22      222.   The parties agreed in their lease agreements that the actual cost to Equity

23  associated with collecting or accounting for late rent is difficult and impracticable to

24  calculate, hence the need and propriety of a late fee provision. (ECF 454, SF #26, *see e.g.*,

25  Trial Ex. 78.)

26      223.   The testimony also established that it would be impracticable or extremely

27  difficult to fix the actual damage to Equity as a result of delinquent rent. The time and

28  effort, and associated expense to Equity, to collect and account for delinquent rent varies

by tenant, property, and circumstance. Sometimes late rent is quickly paid. Sometimes the situation requires numerous communications, three-day notices, negotiation, and other efforts to obtain late rent that a tenant owes. Sometimes Equity must proceed to evict tenants who refuse to pay rent. With numerous properties, tens of thousands of tenants, and many hundreds or thousands of late rent payments each month, it would be impracticable to calculate the exact cost for delinquent rent for each tenant. This is precisely the type of situation where liquidated damage provisions may be expected and appropriate. Thus, the Court finds that the subject late fees comply with Civil Code section 1671.

224. The complexities and vastly different opinions of the Parties' experts on Equity's costs incurred as a result of delinquent rent, discussed below, also serves to highlight the element of extreme difficulty and impracticability. See also *Garrett*, 9 Cal.3d at 741 ("where the measure of actual damages would be a comparatively small amount and that it would be economically impracticable in each instance of a default to require to prove to the satisfaction of the borrower the actual damages by accounting procedures.").

225. Because the plaintiff in the *Consumer Justice* action challenged the reasonableness of Equity's then-late fee, Equity commissioned PwC to examine Equity's costs and other damages from late rent. As part of the settlement of that prior late fee lawsuit in 2000, Equity agreed to charge late fees of no more than $50 for the next 30 months, even though the PwC's conclusions supported a higher late fee. The California Superior Court approved the settlement, dismissed the case, and specifically found that Equity's late fee complies with Civil Code section 1671(d). Thus, in 2008, when Equity considered whether to modify its late fee, it already had a foundation to estimate the range of potential or anticipated damages resulting from late rent.

226. With the backdrop of Equity's prior experience with the *Consumer Justice* case and the PwC conclusions, the evidence showed that prior to setting the 5% late fee,

1    Equity's legal and operations teams evaluated the appropriateness of a 5% late fee in

2    California in 2008.

3        227.    Among other aspects of its pre-implementation analysis in 2008 detailed

4    above, Equity apprised itself of California liquidated damage requirements and

5    researched the legality of a 5% late fee. Equity involved its in-house legal team, its core

6    operations members with knowledge of Company costs and accounting, and its outside

7    California landlord-tenant counsel in its deliberation. Equity analyzed the financial

8    impact of moving to a 5% late fee, determining that would translate to an average late

9    fee of $75. Based on its knowledge of the existing $50 late fee, which the Superior Court

10   found complied with Section 1671, and the activities and costs associated with late rent,

11   Equity believed the proposed late fee was a reasonable approximation of the range of its

12   damages flowing from late rent.[16] Based on Equity's evaluation discussed above, Equity

13   ultimately concluded that a 5% late fee was reasonable and lawful. Equity's analysis

14   easily satisfies the "low" bar of the reasonable endeavor requirement. *Zeff*, 2021 WL

15   63214, 2021 U.S.Dist.LEXIS 30615 at fn. 1.

16       228.    The Court finds that Equity's 2008 late fee analysis is materially different—

17   and more extensive—than in the authorities principally relied upon by Plaintiffs. For

18   example, in *Cellphone Fee Termination Cases*, defendant-Sprint "made no endeavor—

19   reasonable or otherwise—to determine what losses it would sustain from breach or to

20

21   _____

22   [16] Fiffer also testified that his conclusion that the Standard Late Fee was reasonable was
     informed by his understanding in 2008 that between 1999 when the PwC report was
23   issued and 2008, "our labor costs which were the predominate factor in the pursuit of
     late [rent]… had been going up and compounding steadily during that time." (3 RT
24   552:7-22.) Fiffer further testified that his knowledge of increasing labor costs was based
     on a number of things, including that as a senior manager in the company, every year he
25   would receive and review a year-end memorandum from the Human Resources
     Department that would advise senior managers about forthcoming wage increases at the
26   property and corporate levels. (3 RT 553:2-12.) Upon review of this evidence in the
     context of the trial testimony, the Court finds this evidence admissible for the non-
27   hearsay purpose of showing Fiffer and Equity's state of mind in 2008 when setting the
     Standard Late Fee, and considers it for that purpose.
28

1   estimate a fair average compensation for such losses." 193 Cal.App.4th at 323. Moreover,

2   Sprint's primary purpose in setting the ETF fees at issue in that case was to "control

3   churn" as a means "to prevent customers from leaving." *Id*. Sprint's non-existent

4   endeavor is not comparable to the steps undertaken by Equity, including that Equity

5   considered California liquidated damage law, analyzed the legality of the proposed 5%

6   late fee, involved in-house and outside counsel, and analyzed the financial impact of the

7   proposed late fee before adopting it.

8      229.   Nor is the Court persuaded by Plaintiffs' reliance on an opinion by the

9   appellate division of the Humbuldt County Superior Court, in *Del Monte Properties &*

10  *Investments, Inc. v. Dolan*, 26 Cal.App.5th Supp. 20 (2018). As an initial matter, the

11  Court notes that the dispute in *Del Monte* arose from an unlawful detainer proceeding,

12  which is "necessarily expedited because of the limitations imposed on pleadings and

13  issues that may be litigated" in such proceedings. See *Lincoln Place Tenants Ass'n v. City*

14  *of Los Angeles*, 155 Cal.App.4th 425, 452 (2007). The complaint in *Del Monte* was filed on

15  May 10, 2017, and the trial occurred less than one month later, over June 6 and 7, 2017.

16  26 Cal.App.5th Supp. at 22. The landlord failed to even prove in that case that the actual

17  losses caused by late payment of rent were extremely difficult or impracticable to

18  determine. *Id*. at *24. As found above, that is not the case with Equity, as Equity

19  established the difficulty and impracticability element in this case. Suffice it to say, the

20  landlord in *Del Monte* did not marshal the evidence that this Court was privy to,

21  including testimony from multiple property-level witnesses, corporate personnel, and

22  experts. As for a reasonable endeavor, the landlord effectively admitted in *Del Monte* that

23  it simply set the late fee as a percentage of the monthly rent, without more. 26

24  Cal.App.5th Supp. at 24. Equity's decision to adopt the Standard Late Fee was not

25  arbitrary as with the landlord in *Del Monte*, but instead followed various steps taken by

26  the Company before Equity decided it was reasonable and lawful to adopt the Standard

27  Late Fee.

28

230.   *Blum v. Swarbrick*, a decision from the appellate division of the San Bernardino Superior Court, serves as a comparison to *Del Monte*. 2010 WL 9009712 (Cal.App.Unpubl. April 7, 2010.) In that case, the written rental agreement in a residential lease contained a provision allowing for a 10% late fee ($187.50). *Id*. at *2. The appellate division upheld the validity of the late fee under Civil Code section 1671, observing that the written lease contained a liquidated damage provision for the payment of the 10% late fee. *Id*. at *10. The appellate division further observed that the 10% late fee amounting to $187.50 was not "of such size that it is unenforceable as a matter of law." *Id*. These same observations applied to Equity's late fee would compel the conclusion that the Standard Late Fee satisfies Civil Code section 1671.

231.   Nor is the situation here akin to *Hitz v. First Interstate Bank*, 38 Cal.App.4th 274 (1995). There, the evidence showed that when it imposed the late and overlimit fees at issue, the defendant-company intended those fees to generate profit. *Id*. at 289. Equity's personnel consistently testified that the Standard Late Fee was not adopted to generate profit. The question addressed by Equity during the 2008 fee review was whether the revenue generated by the proposed late fee would allow Equity to recoup its costs from late rent. Also unlike in *Hitz*, Equity presented contemporaneous evidence that the Company had researched and considered California liquidated damage law and made effort to analyze the financial impact of moving to a 5% late fee.

232.   Put simply, Equity's contemporaneous documentation and efforts show that Equity intended to set a late fee that complied with California law and was within the sphere of reasonableness.

233.   The Court observes that Equity's endeavor to set the Standard Late Fee occurred over 15 years ago. At the time of trial, the only Equity employee still with the Company who was directly involved in the late fee setting process was Denise Beihoffer. (4 RT 766:14-23.) The Court is mindful that "case law is replete with examples of the need to resolve cases expeditiously. Trials can be significantly impacted by a delay from the underlying events as memories fade." *Cisco Systems, Inc. v. Sheikh*, No. 4:18-cv-

07602-YGR, 2020 WL 7408229, 2020 U.S.Dist.LEXIS 240391, at *5 (N.D.Cal. April 17, 2020); accord *Wilkins-Jones v. County of Alameda*, No. C-08-1485-EMC, 2012 WL 3116025, 2012 U.S.Dist.LEXIS 107127, at *24-25 (N.D.Cal. July 31, 2012) (citing prejudice and challenges to defend actions as witnesses become unavailable and memories fade.)

234.     Plaintiffs initiated this lawsuit in 2014, and trial did not begin until June 2023. Notwithstanding that significant passage of time, Equity marshalled a substantial written record documenting its efforts to set the California late fee in 2008. (*See e.g.* Trial Exs. 9, 10, 50, 54, 56, 57, 61, 62, 63, 64, 65, 66, 67, 69, 70, 71, 72, 1065, 1075.)

235.     Nationwide developments in late fee regulation after Plaintiffs filed this lawsuit in 2014 further support the reasonableness of the late fee.

236.     For example, effective October 1, 2021, Colorado's statute permits residential late fees of up to 5% of monthly rent or $50, whichever is greater. Colo. Rev. Stat. §38-12-105. That is precisely the late fee at issue before this Court. As amended and effective September 1, 2019, Texas Property Code Section 92.019 deems reasonable late fees of up to 12% of the monthly rent for single-family homes and up to 10% in multi-family apartment complexes. Equity's late fee is also consistent with the other jurisdictions that expressly identify what is a permissible residential late fee. See Nev. Rev. Stat. § 118A.210 (up to 5% of monthly rent); N.C.G.S.A. § 42-46 (up to 5%); Tenn. Code Ann. § 66-28-201 (up to 10%).

237.     Consistent with the above, the regulatory guidance available in California at the time Equity set its late fee in 2008 from the DCBA also concluded that residential late fees of 5% are considered reasonable. (Trial Ex. 10; accord Trial Exs. 220-3 and 220-4.)

238.     In sum, the Court finds that Equity's Standard Late Fee complies with Section 1671 and that Equity satisfied the reasonable endeavor requirement before setting the Standard Late Fee.

**B.     Equity's Woodland Park $50 Late Fee Complies with Section 1671(d)**

239.    The basis for the Woodland Park $50 Late Fee imposed in or after 2011 was the $50 late fee that had been approved in the *Consumer Justice* action. (4 RT 734:15-25.)

240.    When Equity adopted a $50 late fee for the Woodland Park communities in 2011, it knew that (1) PwC had performed an analysis of its costs associated with late rent in connection with the *Consumer Justice* action, and (2) the Court in the *Consumer Justice* action thereafter found that a $50 late fee to be charged by Equity complied with Civil Code section 1671. (*See* 3 RT 473:14-474:22; Trial Ex. 13.)

241.    When Equity adopted a $50 late fee for the Woodland Park communities, Equity had already undertaken its analysis in setting the Standard Late Fee in 2008, which, at the time, showed that a 5% late fee would average a $75 late fee. (Trial Ex. 64.) The Woodland Park $50 Late Fee was thus on average less than the Standard Late Fee.

242.    Based on the above, the Court finds that the Woodland Park $50 Late Fee complied with Civil Code section 1671 and that Equity satisfied the reasonable endeavor requirement before setting the Woodland Park $50 late fee.

**C.     Even If Equity Had Failed To Perform A Reasonable Endeavor And Even If The Court Had Found That The Subject Late Fees Were Invalid, Equity's Offset Damages Exceed The Late Fees Charged**

243.    If a late fee provision is found to be void under Section 1671(d), the late fees paid by tenants must be returned to them. *Beasley v. Wells Fargo*, 235 Cal.App.3d 1383, 1398-1401 (1991). However, a landlord may offset or reduce the amount it is to return to the tenants by the amount of actual damages it proves resulted from the tenants' late payment of rent. *See Garrett*, 9 Cal.3d at 740-741.

244.    As previously noted, the Court has concluded that the late fee provision in Equity's rental agreement is enforceable. For that reason alone, Plaintiffs are not entitled to any recovery.

245.    Plaintiffs also are not entitled to any recovery because Equity's costs related to delinquent rent exceeded the amount of late fees that it received during the Class Period. Here, the Court finds the testimony presented by Hosfield credibly establishes

1    that Equity's costs subject to offset exceed the late fees that Equity collected from

2    tenants.

3         246.   The Court does not find persuasive Plaintiffs' argument that Hosfield

4    improperly included costs associated with late rent collection activities unrelated to class

5    members.

6         247.   Plaintiffs contend that if a resident incurred a late fee, and Equity spent

7    time collecting the unpaid rent from that resident but then waived the late fee, then the

8    associated cost must be excluded from any offset. But, waiver of the late fee does not

9    correspondingly negate the time and effort expended in dealing with the delinquency.

10   Moreover, Plaintiffs' Classes are defined to include any Equity tenant who was *charged* a

11   late fee. (ECF. 91, 388, 91.) This would include any tenant within the stated

12   hypothetical, and thus it would be appropriate for Hosfield to include costs associated

13   with late rent collection in that instance.

14        248.   Plaintiffs also theorize that there could be instances where Equity spends

15   time on late rent collection issues for tenants who are never charged a late fee. The

16   evidence, however, dispels this theory. The property-level witness testimony painted a

17   clear picture that their time spent collecting and accounting for delinquent rent is spent

18   on those who pay rent late and incur a late fee. Where a property level employee would

19   occasionally interact about delinquent rent before a late fee was charged, the evidence

20   indicated that occurred with "habitual" late payers, which would indicate those who have

21   incurred late fees and are part of the Classes. (*See* ECF 503, p. 355, 357, Johnson Dep.

22   50:5-15; 53:4-54:16.)

23        249.   Even if there were instances where an Equity employee spent time on late

24   rent collection without the tenant ever being charged a late fee and becoming a class

25   member, to parse such instances would require an individualized analysis of each tenant

26   and each employee for each interaction relating to late rent collection. That would be an

27   impossible task in a class action of this size and nature for the reasons already stated.

28

1      250.    Hosfield's analysis is also consistent with the Court's earlier

2  pronouncements of the aggregate cost analysis appropriate for offset in this case. (*See*

3  ECF 91, at 2:10-11 ("However, these amounts may be reduced, or offset, by the amount of

4  any actual costs the landlord can prove were suffered as a result of the tenant's late

5  payment of rent."); ECF 142, at 5:20-22 ("A landlord may offset or reduce the amount it is

6  to return to the tenants by the amount of actual damages it succeeds in proving were

7  proximately caused by the tenants' late payment of rent.").) Plaintiffs' position would be

8  inconsistent with this Court's prior rulings that the offset should represent Equity's costs

9  incurred in collecting delinquent rent in the aggregate.

10      251.    The Court was persuaded that Hosfield's offset calculations represent a

11  reasonable approximation of the costs incurred by Equity as a result of delinquent rent

12  from the standpoint of Equity's tenants during the Class Period, or the Class Members

13  themselves, which in this context is a distinction without a difference. *Cf Robi v. Five*

14  *Platters, Inc*., 918 F.2d 1439, 1443 (9th Cir. 1990) ("It is well-established under California

15  law that while the fact of damages must be clearly shown, the amount need not be proved

16  with the same degree of certainty, so long as the court makes a reasonable

17  approximation."

18      252.    The offset analysis here is relevant because the Classes "remain[] liable for

19  the actual damages resulting from [their] breach." *Garrett*, 9 Cal.3d at 741. Equity

20  established that it incurs damage resulting from delinquent rent. At a minimum, and

21  sufficiently under established law, Equity also presented evidence representing a

22  reasonable approximation of the amount of the resulting damage from delinquent rent in

23  the form of Hosfield's analysis.

24      253.    Even where a late fee provision is rendered void, it does not mean that the

25  delinquent party escapes his or her contractual obligations. *See Garrett*, 9 Cal. 3d at 741

26  ("We do not hold that merely because the late charge provision is void and thus cannot be

27  used in determining the lender's damages, the borrower escapes unscathed.") The

28  delinquent party remains liable for the actual damages resulting from the default. *See id*.

1    These damages "can be measured by the period of time the money was wrongfully

2    withheld plus the administrative **costs reasonably related** to collecting and accounting

3    for late payment." *Id.* (emphasis added).

4       254.   As explained more fully below, the Court finds that Equity received

5    $28,903,390 in late fees during the Class Period relating to the Standard Late Fee Class.

6    Further, the Court finds that Equity received $270,021 in late fees relating to the

7    Woodland Park Preexisting Lease Class. The Court finds that Equity received a total of

8    $29,173,411 in late fees during the Class Period.

9       255.   The Court also finds that, during the Class Period, Equity incurred costs of

10   $39,027,337 through move out, and total costs of $45,138,381 through two years of

11   collections.

12      256.   Because Equity's costs associated with delinquent rent exceeded the late

13   fees that it received during the Class Period, the Plaintiffs would not be entitled to any

14   recovery, even if the Court had concluded the late fee provisions were unenforceable.

15              **a.    Class Members paid Equity approximately $29 million in late
                        fees during the Class Period.**
16

17      257.   In reaching certain of its factual findings, the Court considered the

18   testimony of Equity's expert, Mark J. Hosfield. Hosfield is a Certified Public Accountant

19   ("CPA") and a Certified Management Accountant ("CMA"). (5 RT 842:1-6.)

20      258.   Over the course of his career, Hosfield has testified at trial or arbitration as

21   an expert in over one hundred matters. (5 RT 843:5-13; Trial Ex. 1278-0026-29.) Certain

22   of these matters have involved Hosfield's testimony relating to cost accounting. (5 RT

23   843:16-23.) Prior to the instant case, the most recent matter in which he testified

24   regarding cost accounting was as an expert for Dominion Voting Systems in its case

25   against Fox News. (5 RT 844:9-14.)

26      259.   In the instant case, Hosfield opined that class members paid Equity a net

27   total of $28,903,390 in late fees during the Class Period relating to the Standard Late

28

Fee Class. (5 RT 849:19-850:10; Trial Ex. 1278-0004, 1278-0105.)[17] He also opined that class members paid Equity a net total of $270,021 in late fees relating to the Woodland Park Preexisting Lease Class. (Trial Ex. 1278-0108.) The Court is persuaded by Hosfield's testimony on this subject. Accordingly, the Court finds that Equity received a total of $29,173,411 in late fees during the Class Period.

260.    The first step in Hosfield's analysis of the late fees that Equity received during the Class Period involved identification of the total number and amount of late fees that Equity charged during the Class Period. Equity's ledger records reflected late fees by the CHGCODE of "LAT" and a SRCCODE of "CH." (Trial Ex. 1243-0017; 1278-0105; 849:22-850:4.) From September 3, 2010 through January 31, 2021, members of the Standard Late Fee Class were charged 409,295 late fees totaling $36,119,831. (Trial Ex. 1278-0102.)

261.    Of the 409,295 late fee transactions that Equity charged to the Standard Late Fee Class, it reversed 58,532 of them. (Trial Ex. 1278-0105.) These reversals amounted to a corresponding reversal of $4,106,844 in late fees, reducing the net fees that Equity charged to $32,012,982. (*Id*.). Of that amount, Class Members actually paid Equity $28,903,930 in late fees during the Class Period. (Trial Ex. 1278-0107.)

262.    For the Woodland Park Preexisting Lease Class, from December 1, 2011 through February 29, 2016, members of the class were charged 11,968 late fees totaling $610,945. (Trial Ex. 1243-0017.) After accounting for reversals, from December 1, 2011 through February 29, 2016, members of the Woodland Park Preexisting Lease Class were charged 8,650 late fees totaling $384,885. (*Id*.). Of that amount, members of the Woodland Park Preexisting Lease Class actually paid Equity $270,021 in late fees. (Trial Ex. 1278-0108.)

---

[17] Given that the amount of late fees received from the Woodland Park Pre-existing Lease Class amounted to less than 1% of the total late fees paid, the trial testimony elicited by the Parties focused on the Standard Late Fee Class.

263.     Plaintiffs' expert, David Breshears, also opined as to the amount of late fees that Equity received during the Class Period. His calculations of late fees received were nearly identical Hosfield's. In his expert report and trial testimony, Breshears opined Standard Late Fee Class Members paid late fees of $28,920,220, and that Woodland Park Pre-Existing Class Members paid late fees of $270,022. (1 RT 136:23-137:8; 141:3-6.) Breshears conceded that that he was in general agreement with Hosfield's calculation of late fees paid to Equity. (1 RT 182:4-182:11.) Indeed, the difference between their calculations was only approximately $16,800, or less than one half of one percent. (*See id.*).

264.     Given these immaterial differences, the Court notes that even if it had adopted the opinion of Breshears as to the amount of late fees paid to Equity, it would not have made any difference to the Court's ultimate determination that Equity's costs exceeded the amount of late fees it incurred during the Class Period relating to its collection of delinquent rent.[18]

### b.     Equity incurred more than $39 million in costs relating to delinquent rent during the Class Period.

265.     The second part of the analysis relates to the determination of Equity's costs relating to delinquent rent during the Class Period. These costs "can be measured by the period of time the money was wrongfully withheld plus the administrative costs

---

[18] At trial, Breshears initially testified that his calculation of late fees received was $16,810 greater than what Hosfield opined (1 RT 182:4-11), and those two numbers were relied upon throughout expert discovery and trial. At Plaintiffs' urging at the end of trial, the Court allowed Plaintiffs to briefly reopen their case because Breshears apparently discovered that he made a mistake in how he calculated late fees collected in the amount of approximately $815,000. (7 RT 1224:10-1233:5; 1290:24-1292:9.) Notwithstanding the Court allowing Plaintiffs' request to reopen their case to address the issue, Plaintiffs failed to supply any evidence to justify a change to their calculation. (8 RT 1397:6-17.) In any event, even if the Court were to accept this increased figure, it would not affect the Court's ultimate conclusion that Equity's costs relating to collection of delinquent rent exceeded the amount of late fees that it received during the Class Period. (*See* 8 RT 1402:2-1404:9.)

1  reasonably related to collecting and accounting for late payment." *Garrett*, 9 Cal. 3d at

2  741.

3      266.    Hosfield analyzed and calculated four categories of costs that Equity

4  incurred in connection with delinquent rent during the Class Period: (1) employee costs;

5  (2) eviction costs; (3) collection costs; and (4) the lost use of funds while the rent was

6  delinquent. (5 RT 853:16-24; *see generally* Trial Exs. 1243 and 1278.)

7      267.    Based on his analysis and using a "Cost Incurred" method to measure

8  Equity's employee costs, Hosfield opined that Equity incurred costs through moveout of

9  $39,027,337 and total costs of $45,138,381 through two years of collections. (5 RT 911:18-

10  912:3; Trial Exs. 1278-0020, 1278-0055, 1278-0060.)

11      268.    At the outset, the Court rejects Plaintiffs' contention that Hosfield should

12  have performed his analysis of Equity's costs on an individual class member basis. (*See* 1

13  RT 36:21-37:10.) The Court previously rejected the argument that these costs should be

14  calculated on an individualized basis. (*See* ECF 91, p. 7 ("the legal issue of the amounts

15  that could be considered an offset is amenable to resolution classwide and the analysis of

16  aggregate costs can only be made in the context of classwide analysis."); ECF 116, p. 5-6

17  (in its order denying Equity's request to file counterclaims, the Court reiterated that the

18  issue of offset is amenable to classwide resolution as "[t]he Court shall not allow

19  Defendants to parse out the individual plaintiff borrowers – of more than 120,000

20  members – once the class has been certified and contend that they may counterclaim for

21  reimbursement of damages against any particular plaintiff[.]").)

22      269.    The Court will not revisit this conclusion now for various reasons. To begin

23  with, it would not be feasible for Equity to determine its costs on an individual basis.

24  (Trial Ex. 1243-0018.) Requiring Equity to calculate its costs on an individual basis

25  would render this class action unmanageable and would necessitate decertification of the

26  Classes. Additionally, there is insufficient underlying data to credibly evaluate Equity's

27  costs on an individualized, tenant-by-tenant or late-fee-by-late-fee basis as—among other

28

1    things—employees do not keep track of their time or consistently notate all interactions

2    with residents regarding unpaid rent.[19]

3        270.    Moreover, it would be incongruous and unfair. Plaintiffs cannot use class

4    certification as both a sword and a shield by promising that this case can be tried as a

5    class action and then—after certification is granted—arguing that Equity's costs must be

6    determined on an individualized basis. (*See* ECF 422, Order on *Daubert* Motion, at 5:8-9:

7    "The Court agrees that it must look at the 'aggregate costs that are directly linked to the

8    collection of delinquent rent.'".)

9                    **c.    Equity incurred more than $27 million in employee costs
                          relating to collection of delinquent rent during the Class**

10                        **Period.**

11        271.    Hosfield used two methods to measure employee costs. (5 RT 854:7-10.) The

12   first was using a Cost Incurred Method. (5 RT 845:7-10.) The second was using a Cost

13   Savings Method. (*Id.*)

14        272.    Under the first approach, to measure the employee costs that Equity

15   incurred in collecting delinquent rent, Hosfield used activity-based costing. (*See* 5 RT

16   854:7-855:9.) Activity-based costing is a common method used in cost accounting across

17   many industries to determine costs of activities. (5 RT 855:1-4.) Academic literature on

18   cost accounting recognizes that activity-based costing is more reliable than other

19   methods of cost allocation. Michael W. Maher, Clyde P. Stickney, Roman L. Weil,

20   MANAGERIAL ACCOUNTING 76 (11th ed. 2012).

21                        **i.    Selection of Interviewees**

22        273.    As part of his activity-based costing analysis, Hosfield conducted interviews

23   of Equity employees. (5 RT 855:10-856:15.) The interviews were designed to assess the

24   percentage of time Equity employees spent performing their various job responsibilities.

25   (5 RT 854:15-18.) Interviews are a common, and accepted, method of obtaining

26

27   _____

28   [19] (*See e.g.*, 2 RT 416:10-417:15; 2 RT 416:19-417:7, 2 RT 417:20-418:7; 43:8-22, ECF 503,
     p. 349; 74:15-19, ECF 503, p. 375; 52:19-54:10, ECF 503, p. 34-36.)

1  information as part of an activity-based costing analysis. (5 RT 854:24-855:9); Will Seal,

2  MANAGEMENT ACCOUNTING FOR BUSINESS DECISIONS 127-128 (1st ed. 2011) (Often the

3  "best way" to get activity data in a cost accounting analysis "is to ask the people who are

4  directly involved [and] ask them what percentage of time they spend" on certain

5  activities.); STATEMENTS ON MANAGEMENT ACCOUNTING, TOOLS AND TECHNIQUES FOR

6  IMPLEMENTING ABC/ABM (2000), p. 13-14 (Activity-based costing methodology "begins

7  with employee interviews led by the core team" which "establish how employees spend

8  their time in terms of the top 10 to 15 activities they perform[.]" Once the cost accountant

9  identifies activities of interest, the "next step is to gather information from the

10  organization's employees regarding how much time they spend on each major activity.");

11  Surendra P. Agrawal, James A. Brimson, and Mukul Gupta, *Activity-Based Costing and*

12  *Management*, BLOOMBERG TAX & ACCOUNTING PORTFOLIO NO. 5306, p. 16 (2022)

13  (a common approach in an activity-based analysis is "to interview workers and managers

14  to obtain a list of activities carried out by them and the time devoted by them to various

15  activities.").)

16      274.   Moreover, interviews were the most practical means of obtaining the

17  necessary information during expert discovery, which occurred during the pandemic. As

18  even Plaintiffs' expert Childers observed, "time studies" were not feasible due to the

19  remote work environment during the pandemic, assuming *arguendo* that a time study

20  would otherwise have been an alternative, appropriate information gathering option. (7

21  RT 1336:15-1337:8-13.)

22      275.   Hosfield conducted two rounds of interviews in connection with this

23  analysis. The first round pertained to an assessment of Equity's employee costs during

24  the pre-COVID-19 portion of the Class Period (September 3, 2010 through February 29,

25  2020) (5 RT 872:13-18) ("Round One"). The second round related to an assessment of

26  Equity's employee costs during an extended portion of the Class Period, which the Court

27  expanded at Plaintiffs' urging, much of which covered the COVID-19 pandemic time

28

1   period (March 2020 through December 2021) (Trial Ex. 1278-0005-06; 5 RT 874:10-13)

2   ("Round Two").

3         276.    During Plaintiffs' Opening Statement, Plaintiffs' Counsel contended that

4   Hosfield's analysis of Equity's employee costs was flawed because the employees that

5   Hosfield interviewed were "handpicked by Equity." (1 RT 34:25-35:8.)

6         277.    The Court finds Plaintiffs' contention to be groundless and rejects it. At

7   trial, Hosfield specifically denied that suggestion. (5 RT 864:20-865:5.) To the contrary,

8   and as explained below, Hosfield testified in detail about the measures that he undertook

9   to ensure that he developed a set of representative interviewees who were identified

10  solely based on objective criteria that he set.

11        278.    To identify representative interviewees, Hosfield first focused on the

12  selection of representative communities (or, properties). In so doing, Hosfield first

13  categorized Equity's communities in California using two criteria: the number of units at

14  each community and the number of late fees charged per month at each community. (5

15  RT 865:6-866:11; Trial Ex. 1243-0018; Trial Ex. 1278-0006.)

16        279.    Hosfield then ranked each of the two criteria into quartiles. (*Id.*; 5 RT 865:6-

17  865:16.) Quartile One reflected the highest 25% in each criterion through Quartile Four,

18  which reflected the lowest 25% in each criterion. (*Id.*; 5 RT 865:23-866:2.)

19        280.    Hosfield selected properties from which to interview Equity employees from

20  each of these quartiles to ensure that he had a good representation throughout

21  California. (5 RT 870:16-871:5.) Hosfield also selected the properties based on geographic

22  area and included properties from each of five different regions across the state. (5 RT

23  871:6-9.)

24        281.    In his report and trial testimony, Plaintiffs' expert Schwarz criticized

25  Hosfield for purportedly only choosing to interview employees from properties in roughly

26  half of the resulting community groupings. (6 RT 1112:12-1113:9; Trial Ex. 257, p. 73.)

27  However, on cross-examination, Schwarz admitted that Hosfield *did* interview employees

28  from many of the community groupings that he had previously reported—with a big red

0—as not being included in Hosfield's study. (6 RT 1202:1-1207:24.) For example, when employees worked at two properties, Schwarz only counted one of those properties for his analysis. (6 RT 1204:21-1205:5.) And Schwarz didn't include any of Hosfield's interviews of leasing employees—or the properties at which they worked—in his analysis. (6 RT 1207:20-24.)

282.   The Court rejects Schwarz's testimony and graphical chart regarding *his opinion* about the distributions of Hosfield's interviewees across the community groupings.

Here is what Schwarz's inaccurate and incomplete chart looked like:



| | | Late Payments | | |
|---|---|---|---|---|
| | First Quartile | Second Quartile | Third Quartile | Fourth Quartile |
| First Quartile | 2 | | 4 | 1 |
| Second Quartile | 3 | | 2 | 0 |
| Third Quartile | 0 | | 1 | 3 |
| Fourth Quartile | 0 | 0 | 0 | 2 |

*Note: Unsampled strata in red, s... observation strata in...*

accurately counted all the employees Hosfield interviewed. Of course, there was no requirement that Hosfield interview an employee in every grouping (5 RT 870:15-871:9)—but even if there were, the below chart shows that Hosfield did:

Late Payments

| Units | First Quartile | Second Quartile | Third Quartile | Fourth Quartile |
|---|---|---|---|---|
| First Quartile | 3 | 1 | 6 | 1 |
| Second Quartile | 4 | 2 | 3 | 2 |
| Third Quartile | 1 | 7 | 2 | 3 |
| Fourth Quartile | 1 | 0 | 1 | 4 |

Source: Trial Ex. 1278, p. 265-67.[20]

---

[20] Trial Ex. 1278 Appendix E confirms that Hosfield interviewed employees at Azure, Riva Terra I, Glo, 88 Hillside, and Schooner Bay II—which are all properties in groupings that Schwarz incorrectly alleged had no representation in Hosfield's interview process. (*See* Trial Ex. 1278-265 *to* -267 and 1278-136, 161, 165, 176, *and* 180.)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

283.    Once Hosfield identified the relevant, representative Equity communities from which to interview Equity employees, he instructed Equity's management to arrange interviews with all of the employees at those communities that met certain criteria. (*See* 5 RT 871:22-872:5.) To be eligible, employees had to meet the following criteria:

- They had to have at least one year of working experience at Equity to ensure that they possessed knowledge relating to a minimum of one full annual rent collection cycle. (*See* 5 RT 871:5-8);

- They could not be members of the Class. (5 RT 872:13-18); and

- For Round One, interviewees had to have worked at an Equity community during the pre-pandemic portion of the class, because that portion of his analysis related to the period before the onset of COVID-19. (5 RT 872:9-11.)

284.    Hosfield instructed Equity's management to arrange interviews with each of the employees at the relevant communities that met these criteria. (5 RT 872:25-873:2.) He did so to preclude Equity from exercising discretion, subjectivity or influence as to which Equity employees would be interviewed. (*Id.*).

285.    Because there were not a sufficient number of Equity employees who met the criteria from the initial group of Equity communities blindly selected by Hosfield, Hosfield blindly expanded the number of Equity communities from which he interviewed Equity employees. (5 RT 873:8-20.) He did so based on the same quartile methodology that he used to identify the initial set of communities that were the subject of the analysis. (*Id.*). He repeated this process several times until he had a sufficient number of qualified interviewees. (5 RT 873:11-20.) All Hosfield knew about the properties he blindly selected at each iteration were the number of units, the number of late fees charged per month and the general geographic location of the communities. (5 RT 865:9-16; 870:16-871:21; 873:8-17; 924:15-25.)

286.    Ultimately in Round One, Hosfield interviewed 58 property-level employees, which represented approximately 13 percent of the property-level employees in

California. (5 RT 873:21-874:4; Trial Ex. 1243-0018, 1243-0137-38.) These employees were drawn from 41 different Equity communities in California, which represented approximately one-third of the Equity communities in California. (5 RT 874:2-4.)

287.   Hosfield conducted Round Two to enable him to perform cost calculations for the period of March 2020 through December 2021 in light of the expansion of the class. (Trial Ex. 1278-0005-06.) He conducted interviews of 59 employees working at a representative sample of Equity's communities throughout California. (5 RT 874:10-25; Trial Ex. 1278-0005-06.) Hosfield attempted to interview the same employees he had in Round One, but because several had ceased to be employees or had become class members in the intervening time period, it took several iterations to identify those employees that he would interview in Round Two. (5 RT 874:18-20; Trial Ex. 1278-0006.)

288.   Ultimately, in Round Two, Hosfield interviewed 59 employees from 58 different Equity communities, which comprised a little more than 40 percent of Equity's California communities. (5 RT 874:10-25; Trial Ex. 1278-0006.)

### ii.   The Interview Process

289.   During Plaintiffs' Opening Statement, their counsel contended that Hosfield conducted the interviews in an "unscientific" manner and "focused the interviews entirely on rent collection as opposed to any of the other tasks that . . . make up the vast majority of [the interviewees'] work time." (1 RT 35:17-24.) But these contentions are baseless, and the Court rejects them.

290.   Using information provided by Equity's corporate team, Hosfield obtained a detailed understanding of Equity's rent collection and accounting processes. (Trial Ex. 1243-0018; 5 RT 857:11-19.) Based on this information, Hosfield developed a list of categories of activities performed by Equity's administrative employees in California and the primary tasks associated with each activity. (Trial Ex. 1243-0018; 5 RT 857:11-19.)

291.   These activities entailed:

- Filling vacant apartments by attracting and screening new residents;
- Negotiating new and renewal leases;

- Addressing move-ins and move-outs;

- Resolving resident complaints and enforcing community rules;

- Supervision of community maintenance and repairs;

- Collection of delinquent rent;

- Managing budget issues and financial reporting;

- Preparing required reports and records and participating in required company programs; and

- Other tasks not captured by any of the above categories.

(Trial Ex. 1243-000018-19; 5 RT 860:3-25.)

292.    Contrary to Plaintiffs' contention that the process focused "entirely on rent collection," during each interview, Hosfield discussed each of these categories to understand how much time the employee spent performing each task. (Trial Ex. 1243-0019.) When Hosfield discussed these categories with the interviewees, he followed the same order every time. (5 RT 880:23-881:1.) Hosfield did not start with a discussion of delinquent rent because he did not want to emphasize the activity that was the focus of the analysis. (5 RT 881:2-9.)

293.    When Hosfield conducted the interviews and asked the interviewees about these activities and corresponding tasks, many of the interviewees had immediate questions for him about what each activity entailed. (5 RT 861:2-862:13.) The interactive and less rigid nature of these interviews enabled Hosfield to obtain a much more accurate estimate of the percentage of time that these employees spent on their activities than he would if he had simply sent out a static questionnaire or survey. (5 RT 862:14-18.) Hosfield could not have obtained reliable data if he had simply used a questionnaire, survey or other static method. (5 RT 864:11-15.)[21]

---

[21] Numerous cost accounting treatises and practice guides—not to mention Plaintiffs' own time-and-motion study expert—affirm Hosfield's testimony that interviews are an appropriate and reliable tool for gathering data in a cost accounting or workplace measurement exercise. *See, e.g.,* Michael W. Maher, Clyde P. Stickney, Roman L. Weil, MANAGERIAL ACCOUNTING 91 (11th ed. 2012); Will Seal, MANAGEMENT ACCOUNTING FOR

294.    For Round One interviews, Hosfield instructed each of the interviewees to provide their answers regarding their activities and time spent performing tasks prior to the COVID-19 pandemic. (Trial Ex. 1243-0019; 5 RT 946:11-20.)

295.    Although the information Hosfield gathered during Round One was generally based on the time Equity employees spent performing tasks around 2018 and 2019, it served as an appropriate basis to estimate Equity employee time spent on delinquency-related tasks from September 3, 2010 through February 29, 2020. (Trial Ex. 1243-0019-20; 5 RT 887:14-888:4.) The percentage of time Equity employees spent on rent delinquency is driven by the proportion of the population that is delinquent in paying their rent. (Trial Ex. 1243-0020.) Rent delinquency in the years 2011 through 2017 was generally greater than in 2018 and 2019 and generally constant, as reflected by this chart:

BUSINESS DECISIONS 123, 125, 128 (1st ed. 2011); Statements on Management Accounting, TOOLS AND TECHNIQUES FOR IMPLEMENTING ABC/ABM 13 (2000); Surendra P. Agrawal, James A. Brimson, and Mukul Gupta, *Activity-Based Costing and Management*, BLOOMBERG TAX & ACCOUNTING PORTFOLIO NO. 5306, p. 16 (2022); Fred Reich and A. Abraham, *Activity based costing and activity data collection: a case study in the Higher Education sector,* UNIVERSITY OF WOLLONGONG RESEARCH ONLINE, https://ro.uow.edu.au/commpapers/211, p. 9 (2006); *see also* (7 RT 1329:16-1330:14 [Childers testifying that he has performed multiple work measurement analyses where he relied on data that he obtained through face-to-face discussions with employees].)

1
2
3
4
5
6
7
8
9
10
11



12 (Trial Ex. 1243-0020-21.) Moreover, there were no technological or other changes to the

13 processes for collecting and accounting for delinquent rent that materially impacted or

14 altered the processes for accounting for and collecting delinquent rent throughout the

15 Class Period. (Trial Ex. 1243-0020-21, 5 RT 888:5-889:2.) This was confirmed by several

16 Equity witnesses. (2 RT 274:9-17; 5 RT 1015:14-18; 5 RT 1017:2-14.)

17    296.    Round Two interviews related to the interviewees' time spent during the

18 expanded class period, between March 1, 2020 through December 31, 2021. (Trial Ex.

19 1278-0005-06.)

20    297.    For both Rounds, Hosfield explained that the employee could provide time

21 estimates in any format, *i.e.,* by day, week, or month. (Trial Ex. 1243-0019; 5 RT 952:23-

22 953:5.) It became evident at the very outset of the interview process that the interviewees

23 thought of the delinquent rent process in four distinct periods, to which Hosfield

24 generally referred to as week one, two, three and four. (5 RT 881:16-882:2.)

25    298.    At the end of each interview, Hosfield read back each employee's responses

26 to give them an opportunity to review and confirm them for accuracy. (Trial Ex. 1243-

27 0019.) Hosfield logged their responses into a spreadsheet and converted any daily or

28 monthly estimates into weekly estimates for consistency. (*Id*.) Based on these responses,

1    for each employee, Hosfield calculated a percentage that the employee spent on each of

2    the nine (9) activities. (Trial Exs. 1243-0019, 1243-0137-38; Trial Ex. 1278-0007, Trial

3    Ex. 1278-0127-28.)

4        299.    In those situations where an employee did not spend any time performing a

5    particular activity, the activity would be assigned a percentage of zero. (5 RT 885:14-

6    886:5.) In each such instance, including for delinquency, a percentage of zero was

7    recorded and used in the calculation of average time spent by Equity employees. (*Id.*).

8        300.    Hosfield testified that he developed a guide that he used to conduct these

9    interviews. (5 RT 878:12-879:1.) Because the interviews were interactive, the process was

10   somewhat flexible. (*See* 5 RT 856:1-17.) As noted earlier, this was a necessary part of

11   obtaining reliable results and was more reliable than simply using a static questionnaire

12   or survey. (5 RT 855:16-25; 864:11-15.) Hosfield likened the guide to an outline a lawyer

13   might use when taking a deposition—rather than simply reading pre-crafted questions,

14   he used the guide to make sure he covered the necessary topics while, at the same time,

15   being able to remain interactive and engaged with each interviewee. (5 RT 950:8-14.)[22]

16               **iii.    Calculation of Equity's employee costs incurred**

17       301.    Based on these interviews, Hosfield determined that for the first/larger

18   portion of the Class Period (September 3, 2010 through February 29, 2020), Equity's

19   office management employees[23] spent 12.32 percent of their time on collection of

20

21

22   [22] Plaintiffs seek to impeach Hosfield's interview process by pointing to certain questions
     that appeared an early versions of a document that Hosfield's team used as a guide for
23   these interviews. But Hosfield credibly testified that the questions at issue were rarely if
     ever used in interviews (5 RT 948:9-24), and the trial testimony and evidence established
24   that interviewees' time estimates were credible and reliable. The Court notes that
     Plaintiffs deposed and/or cross-examined many of the interviewees and introduced *no*
25   evidence at trial that any interviewee found the interview process to be biased or unfair
     in any way.
26

27   [23] The "Office Management" positions in Hosfield's analysis include the general
28   manager, acting manager, community manager, community administrator, and
     assistant community manager positions. (Trial Ex. 1243, at 1243-0008.)

delinquent rent. (5 RT 890:1-9; Trial Ex. 1278-0007.) For the same time period, Equity's leasing employees[24] spent 4.39 percent of their time on delinquency tasks. (5 RT 890:1-9; Trial Ex. 1278-0007.)

302.  For the second/smaller portion of the Class period (March 1, 2020 through December 31, 2021) as delinquencies went up significantly, Equity's office management employees spent 18.18 percent of their time collecting delinquent rent. (5 RT 890:10-13; Trial Ex. 1278-0007.) For the same time period, Equity's leasing employees spent an average of 3.74 percent of their time on the collection of delinquent rent. (5 RT 890:10-13; Trial Ex. 1278-0007.)

303.  After determining the applicable percentage for each group and time period, Hosfield applied the relevant percentage to the corresponding employee costs and computed the cost associated with each subgroup and time period. (5 RT 892:4-10.)

304.  To determine employee costs, Hosfield used data produced by Equity that contained Equity's actual employee costs for its administrative employees. (Trial Ex. 1243-0021 *and* n. 54; 5 RT 892:11-25.) Hosfield summarized Equity's employee costs by job title. (Ex. 1243-0021.) He then separated them into two categories, office management and leasing. (*Id*.). The costs included in Hosfield's calculations were limited to the costs for Equity employees who were on-site, property level personnel and directly involved in the rent delinquency process. (*Id*.).

305.  For September 2010—February 29, 2020, for office management, employee costs associated with delinquent rent were $15,143,126. (5 RT 892:11-18; Trial Exs. 1278-0074, 1278-0076.) To arrive at this number, Hosfield multiplied $122,914,974 in total (actual payroll costs for applicable employees) against the percentage of time these employees spent collecting delinquent rent (12.32%) (5 RT 892:13-18.)

---

[24] The leasing employee positions in Hosfield's analysis include the leasing consultant, leasing administrator, and leading manager positions. (Trial Ex. 1243, at 1243-0009.)

306.    For the March 1, 2020 through December 31, 2021 period for office management, Hosfield used the percentage of employee time attributable to delinquent rent collection (18.18 percent) and multiplied it against the total, actual office management employee costs for that time period ($26,199,160) to arrive at the employee cost for that time period of $4,763,008. (5 RT 892:19-22; Trial Ex. 1278-0076.)

307.    For the March 1, 2020—December 31, 2021, Hosfield also included $570,159 for Equity rental assistance coordinators. (5 RT 893:1-3; Trial Ex. 1278-0076.) The job of rental assistance coordinators was to help people find ways to pay their rent and to reduce the level of delinquent rent by helping to collect money. (5 RT 890:14-25.) Rental assistance coordinators only existed during a portion of the Class Period after the onset of COVID-19. (5 RT 891:1-891:6.) They spent all of their time working on activities aimed at reducing delinquent rent. (5 RT 891:1-891:6.) The addition of the expense associated with rental assistance coordinators for this period ($570,159) brought Equity's employee expense for office management employees for the March 1, 2020—December 31, 2021 time period to $5,333,167.

308.    Added together, Hosfield determined that Equity's employee costs for Office Management for the September 3, 2010—February 29, 2020 time period ($15,143,126) and the March 1, 2020—December 31, 2021 time period ($5,333,167) totaled $20,476,293. (*See* Trial Ex. 1278-0074, Trial Ex. 1278-0076.) All of these costs were incurred prior to resident move-out. (*See* 5 RT 911:18-25; Trial Ex. 1278-0060.)

309.    Hosfield performed similar calculations for Equity's leasing employees (again, only for costs incurred prior to resident move-out). Equity's total leasing employee costs for the September 3, 2010—February 29, 2020 time period were $131,414,547. (Trial Ex. 1278-0078.) Applying the percentage of time Equity's leasing employees spent on the collection of delinquent rent during this period collecting delinquent rent (4.39%) against these costs, Equity's incurred $5,769,098 relating to the collection of delinquent rent among its leasing employees for this time period. (*See* 5 RT 890:1-9; Trial Exs. 1278-0007, 1278-0078.)

310.   For the March 1, 2020—December 31, 2021 time period, Hosfield determined that Equity's leasing employees spent 3.74% (a reduction) of their time collecting delinquent rent. (5 RT 890:10-13; Trial Ex. 1278-0007.) When applied against the total cost of Equity's leasing employees for this time period of $26,087,117, the leasing employee expense for this time period equaled $975,658. (Trial Ex. 1278-0078.)

311.   Hosfield determined that Equity's total expense for leasing employees associated with delinquency throughout the entire Class Period totaled $6,744,756. (Trial Ex. 1278-0074.)

312.   Added together, Hosfield determined that, under the Cost Incurred Method, Equity's total employee costs for the collection of delinquent rent for its local California office management and leasing employees throughout the Class Period equaled $27,221,049. (Trial Ex. 1278-0078.) This consisted of $20,912,224 of employee costs for the September 3, 2010—February 29, 2020 time period, and $6,308,825 for the March 1, 2020—December 31, 2021 time period. (Trial Ex. 1278-0074.) When calculated on a property-level basis, the average, annual cost per property was $18,118 to address all delinquency-related tasks. (5 RT 893:19-25.)

313.   Based on the testimony at trial, the Court finds there was ample evidence supporting Hosfield's opinions with respect to the local property employee time expended and the associated costs incurred in accounting for and collecting delinquent rent.

### iv.   The Court finds that these employee costs were reasonably related to the collection of delinquent rent.

314.   The Court is persuaded by Hosfield's calculation of employee costs related to the collection of delinquent rent during the Class Period. Further, the Court finds that these amounts ($27,221,049) were costs that were reasonably related to collecting and accounting for delinquent payment of rent throughout the Class Period. *See Garrett*, 9 Cal. 3d at 741.

315.   But for consistent delinquent rental payments throughout the Class Period, Equity would have been able to avoid its employee costs related to the collection of

1    delinquent rent by reducing or changing its community level staffing in the same way it

2    did in the contexts described by Debra Rivera, Vice President of Property Management at

3    Equity, in her trial testimony and summarized below. (*See infra* at ¶ 337-339; Trial Ex.

4    1243-0022; 6 RT 1041:2-16; 1044:20-1046:14; 1046:20-1047:9; 1047:10-16.)

5        316.   Moreover, the employee costs identified by Hosfield that related to collection

6    of delinquent rent were proximately caused by delinquent rent.[25] Hosfield included only

7    property level employee costs in his analysis because he sought to include the costs

8    associated with employees directly responsible for collecting and accounting for

9    delinquent rent. (5 RT 853:12-15; 859:21-25.) Hosfield's exclusion of the time spent by

10   Equity's regional management and senior personnel who spent time on the collection and

11   accounting of delinquent rent suggests his calculation is conservative. (5 RT 859:8-860:1;

12   Trial Ex. 1243-022.) Hosfield also excluded that time which was spent by Equity

13   maintenance personnel on delinquency-related tasks. (5 RT 859:2-7; Trial Ex. 1243-

14   0022.)

15       317.   Hosfield also excluded the time of Equity's Central Business Group ("CGB"),

16   founded in 2010, which presently includes 28 team members. (*See* Trial Ex. 1243-21; 3

17   RT 599:22-600:2; 3 RT 598:22-599:9.)[26]

18

19

20   ─────────────────────

21   [25] The test for whether costs are subject to the offset analysis is whether they are

     "reasonably related" to collecting and accounting for delinquent payment of rent. *See*

22   *Garrett*, 9 Cal. 3d at 741. The California Supreme Court's use of the term "reasonably

     related" suggests a lower causation standard than a "proximate cause" standard.

23   However, the Court finds that it is unnecessary to reach that determination because

     Equity has established that its costs were proximately caused by delinquent rent during

24   the Class Period.

25   [26] CBG handles administrative matters for Equity's various markets including

     California. (3 RT 598:16-22.) Jenay Carnley, who oversees CBG, described the time-

26   consuming process of charging late fees to resident ledgers performed manually by CBG

     from 2010-2013. (3 RT 600:9-18; 3 RT 600:19-601:8.) After 2013 until the start of COVID,

27   CBG performed thousands of delinquency reviews per year on all California accounts

     that had outstanding balances greater than $500. (3 RT 600:19-601:15; 3 RT 600:19-

28   602:7; 3 RT 602:9-15; 3 RT 602:16-23; 3 RT 603:2-4.)

1

2

            **v.**      **Plaintiffs have misstated and misapplied the relevant standard for the inclusion of costs in the offset analysis.**

3   318.   Having found that Equity incurred $27,221,049 in employee costs that were

4   reasonably related to its collection of delinquent rent throughout the Class Period, the

5   Court will address Plaintiffs' main counterarguments.

6   319.   First, as articulated by their expert Andrew Schwarz, Plaintiffs contend

7   that costs may be included in an offset analysis only if particular expenses flow from

8   specific, individual instances of late rent. (6 RT 1184:19-1185:19; Trial Ex. 257, at 6.) The

9   Court rejects this proposition.

10   320.   The controlling standard for whether Equity's costs are properly included in

11   an offset analysis is forth in *Garrett*, 9 Cal. 3d at 741. *Garrett* simply requires that the

12   costs at issue be "reasonably related" to collecting and accounting for delinquent rent. *See*

13   *id*; *accord Beasley v. Wells Fargo Bank*, *N.A.,* 235 Cal. App.3d 1383 (1991) ("In each of

14   these instances, [plaintiffs' expert's] testimony constituted an expression of opinion that

15   under the *Garrett* standard the disputed costs were not 'reasonably related' to collecting

16   and accounting for late or overlimit balances....")

17   321.   Whether costs are reasonably related to the collection of delinquent rent is a

18   question of fact to be determined by the factfinder. *See Beasley*, 235 Cal. App.3d at 1404

19   (affirming jury verdict of $5.2 million where jury had credited some, but not all, of Well's

20   Fargo's "indirect" costs; court interpreted jury to have determined that the *amounts* of

21   indirect costs it did not allow were not "reasonably related" because they had nothing to

22   do with the collection of late or overlimit activity.)

23   322.   Schwarz's approach assumes that *Garrett* does not permit the recovery of all

24   actual costs related to the collection of delinquent rent. Instead, he assumes that the only

25   recoverable costs are those that correspond "to the economic concept of 'marginal cost,'

26   *i.e.*, the costs generated by one additional unit of production, one additional sale, or as in

27   this case, one additional late-paying tenant." (*Id*. at 3.)

28

323.    Although Schwarz conceded that Equity incurs costs when its salaried employees are required to spend time on the collection of delinquent rent (6 RT 1187:13-20), his model *entirely excluded* the salaried costs of Equity personnel who were involved in the collection of delinquent rent. (6 RT 1200:1-7.) He achieved this result by applying his "marginal cost" concept that he assumed was required by *Garrett* and *Beasley*. This is inappropriate and inconsistent with this Court's prior rulings and this Court's interpretation of *Garrett* and *Beasley*. Schwarz's analysis is also predicated on a fundamental misinterpretation of *Garrett* and *Beasley*.[27]

324.    In the course of recognizing a cause of action under Cal. Civ. Code § 1671, *Garrett* clarified that simply because a late fee provision is invalid does not mean that the borrower is relieved of his contractual obligations. *Id.* at 740-41. Moreover, contrary to Schwarz's assumptions, *Garrett* does not say that costs must be attributed to specific instances of delinquent payments. To the contrary, *Garrett* makes clear that courts should not hold liquidated damages provisions to violate § 1671 "where the measure of actual damages would be a comparatively small amount and that it would be economically impracticable in each instance of a default to require to prove to the satisfaction of the borrower the actual damages by accounting procedures." *Garrett*, 9 Cal.3d at 741-742. In short, *Garrett* does not support the notion that Equity must engage in an impracticable process as part of an offset analysis; in fact, the parties' experts have shown, if anything, that it would be economically impracticable to prove actual damages in each instance of a default, which supports the reasonableness of Equity's late fee provision in the first instance.

---

[27] For example, at Trial Ex. 257, p. 29-30, Schwarz opines that "At core, … what matters for 'actual damages' is not how much time Defendants' employees spend on late rent overall, but how much that amount of time changes when an additional late tenant is added to the to the mix," and he agreed at trial that his conception of damages to Equity are based on the marginal costs, meaning "costs generated by one additional unit of production, one additional sale, or in this case, one additional late fee." (6 RT 1184:5-13.)

325.   *Beasley* also undermines Schwarz's assumption. *Beasley* involved a certified class action brought pursuant to California Civil Code § 1671. The plaintiff class challenged the defendant bank's assessment of fees against credit card customers who failed to make timely payments or who exceeded their credit limits. *Beasley,* 235 Cal. App.3d at 1389.

326.   The jury found that the bank's late fee and overcharge fee provisions were invalid. *Id*. at 1391. The jury also determined that the bank's late fees and overlimit fees had exceeded its late and overlimit costs collectively in an amount of approximately $5.2 million, which the jury awarded to the class. (*See id*.).

327.   The bank appealed, arguing that it was entitled to offset both the "direct" increased costs resulting from specific late and overlimit activity by particular customers, as well as "indirect" costs such as its overhead costs. *Id*. at 1402.

328.   In affirming the jury verdict, the California Court of Appeals noted that it was unnecessary to decide whether *Garrett*'s "reasonably related" test encompassed the bank's theory of indirect costs. *Id*. at 1403. The Court noted that the disputed evidentiary issue came down to competing opinions of the respective experts. *Id*. at 1404.

329.   Critically, and contrary to Schwarz's "assumption" about *Beasley*, the *Beasley* court specifically noted that this factual dispute did not relate to whether they "were indirect costs not linked to *particular* late fee and overlimit transactions." *Id*. (emphasis in original). Rather, the question was whether the disputed costs were "*reasonably related*" to collecting and accounting for late or overlimit balances because those costs "had *nothing to do* with *any* late or overlimit activity." *Id*. (emphasis in original).

330.   The court noted that there was "an evidentiary conflict" as to whether the bank's expert had "overstated the amount of Wells Fargo's indirect costs." *Id*. In affirming the jury verdict, the *Beasley* court noted that "even accepting Wells Fargo's *theory* of indirect costs of recovery, the judgment is unaffected because substantial

1  evidence supports the jury's apparent rejection of half the claimed amount of indirect

2  costs."[28] *Id.* at 1404-05 (emphasis in original).

3        331.    In summary, nothing about *Beasley*'s holding supports the assumption that,

4  to be entitled to offset its costs, a defendant is required to show that those costs are

5  linked to *particular* instances of delinquent payments. This conclusion is particularly

6  untenable in the context of a class action because analyzing the particular costs of each

7  individualized instance of a late payment would render the case entirely unmanageable.

8        332.    Because, Schwarz's analysis is, among other things, predicated on a basic

9  misinterpretation of *Garrett* and *Beasley*, the Court finds Schwarz's opinion to be flawed,

10  and rejects it.

11        333.    Moreover, the Court finds Schwarz's opinion to be incompatible with the

12  Court's prior determination that Equity's costs must be calculated on an aggregate, not

13  an individual, basis. (*See* ECF 91, p. 7, *and* ECF 116, p. 5-6, quoted above.)

14        334.    The Court also finds that the complexity of the approach to the offset

15  analysis urged by Plaintiffs and their expert supports the Court's determination that the

16  late fee provision in Equity's contracts is enforceable. *Garrett*'s recognition of a cause of

17  action under § 1671 was not intended as an open invitation to thousands of parties who

18  are delinquent in their payment obligations to second guess late fee provisions in

19  situations where "the measure of actual damages would be a comparatively small

20  amount and that it would be economically impracticable in each instance of a default to

21  require to prove to the satisfaction of the borrower the actual damages by accounting

22  procedures." *Garrett*, 9 Cal.3d at 741-742.

23        335.    The complexity of the approach advocated by Plaintiffs, coupled with the

24  contentious and protracted nature of the litigation relating to how Equity's costs should

25

26

27  _____

28  [28] As this passage reflects, the jury credited the bank with an offset of half of its
"indirect" costs. The plaintiffs did not appeal the jury's verdict.

be calculated, strongly supports this Court's decision not to invalidate the late fee provision in this case. *See id.*

> **vi.   The employee costs included in Hosfield's analysis were not "fixed."**

336.   Plaintiffs also assert that Equity's employee costs cannot be included in the offset calculation because they purportedly were "fixed." (1 RT 33:15-18.) Among the reasons that this argument fails is that Equity's employee costs were not fixed. (Trial Ex. 1243-0022.) Instead, they were community-level costs that were management-controllable, *i.e.*, positions that could be eliminated or changed at the discretion of Equity's management. (*Id.*).

337.   As confirmed by the testimony of Debra Rivera, Vice President of Property Management at Equity, Equity assesses its staffing needs on a monthly basis at each community with an eye on how to eliminate, modify or share positions among two or more properties, or to fill vacancies with lower-level positions. (6 RT 1041:2-16.)

338.   Equity was capable of changing its staffing levels on a regular basis. (*Id.*). Over the course of the more than decade-long Class Period, Equity's staffing levels were not fixed, but instead consisted of positions that could be changed or eliminated at the discretion of Equity management. (Trial Ex. 1243-0022; 6 RT 1041:2-16.) Equity can and did change its staffing levels regularly throughout the Class Period in response to changes in the type and amount of work at the local community level. (6 RT 1044:20-1046:14; 1046:20-1047:9.)

339.   For example, as described in Rivera's testimony, Equity implemented several significant changes across the state of California that resulted in the elimination of significant portions of the office staff responsibilities and that resulted in corresponding changes to staffing at the communities—all of which resulted in material cost savings to Equity. These changes included the implementation of "meet Elise," an artificial intelligence tool that helps field initial questions from potential resident applicants; the introduction of self-guided tours, which relieved a lot of leasing staff

1   responsibilities; and the adoption of a centralized renewal process, that relieves local

2   property personnel from needing to work with current residents on renewals for another

3   term (6 RT 1044:20-1046:14.) Rivera also described the almost wholesale elimination of

4   the assistant manager position (allowing Equity to materially reduce costs by eliminating

5   one of the highest property-level employee positions) when the company centralized a

6   significant portion of the local community financial administration tasks—and the

7   subsequent reintroduction of that position at select properties when those properties

8   experienced high delinquency, as more experienced personnel are often needed to

9   interact with residents about delinquency issues. (6 RT 1046:20-1047:16.)

10      340.   As these examples reflect, Equity can and did change its staffing levels

11   throughout the Class Period in response to changes in the type and amount of work at

12   the local community level. The Court rejects any suggestion that Equity's community-

13   level staffing costs are or were "fixed" costs. This is especially true given that this class

14   action involves the evaluation of Equity's aggregate costs over more than ten years. *See,*

15   *e.g.,* Michael W. Hamer, Clyde P. Stickney, Roman L. Weil, *Managerial Accounting* (11th

16   ed. 2012) at 506 ("Some practitioners suggest that [activity based cost accounting]

17   attempts to find the drivers for all indirect costs; these people note that in the *long run*,

18   all costs are *variable,* so *fixed* indirect costs do not occur.") (emphasis in original); *see also*

19   Charles T. Horngren, et al., Cost Accounting (Eighth Edition), Prentice Hall (1994), p.

20   377 ("Whether a cost is variable or fixed with respect to a particular driver is affected by

21   the time span considered in the decision situation. The longer the time span, other things

22   being equal, the more variable the cost.")[29] Indeed, Hosfield's Cost Savings approach

23   demonstrates that *all* costs are variable over a sufficiently large change in activity. (*See*

24   *generally,* Trial Ex. 1243.)

25

26

27   _____

28   [29] Plaintiff's expert economist Schwarz relies on the Horngren textbook's discussion of
     variable costs at Trial Ex. 257-20.

**D.    Equity incurred more than $7 million in eviction costs relating to delinquent rent during the Class Period – all costs incurred prior to resident move-out.**

341.    The second component of Hosfield's analysis relates to the eviction costs that Equity incurred as a result of delinquent rent during the Class Period. (5 RT 853:16-24; 894:13-896:5.) Equity's eviction costs consisted of the unreimbursed legal fees and SODA court fees for the Standard Late Fee Class and Woodland Park Pre-existing Lease Class Members. (Trial Ex. 1243-0023; Trial Exs. 1278-0011, 1278-0080.)

342.    To determine Equity's net eviction costs, Hosfield started with the amounts that Equity had to spend on eviction-related legal costs and SODA fees. (5 RT 894:13-894:19; Trial Ex. 1243-0023; Trial Ex. 1278-0082; Trial Ex. 247, p. 16, 18, 19-20.) He identified those eviction fees that class members paid by way of the codes CHGCODE "EVI" or "SO5" and the SRCCODE "CR." (5 RT 895:10-17; Trial Ex. 1243-0023.)

343.    The gross amount of eviction costs incurred by Equity for the September 3, 2010 – February 29, 2020 time period was $9,968,140. (Trial Ex. 1278-0080.)

344.    From that amount, Hosfield deducted two categories of costs. First, he deducted $2,792,098 in eviction costs paid by residents to Equity to settle up their accounts. (5 RT 894:20-895:4; Trial Ex. 1278-0080.) Second, Hosfield deducted $109,351 in SODA court eviction costs paid by Equity's residents. (Trial Ex. 1278-0080.) After deducting those categories, Hosfield arrived at Equity's net eviction costs of $7,066,691.[30] (5 RT 895:22-896:2; Trial Ex. 1278-0080.) These eviction costs **did not** include any costs associated with legal fees incurred after Equity's residents moved out. (5 RT 896:3-5.)

345.    Likewise, the Court finds persuasive the unrebutted testimony that Equity almost never initiates eviction proceedings for reasons other than late rent. (5 RT 979:19-980:5.)

_____

[30] During the COVID-19 pandemic, each of Equity's California communities stopped evicting residents for unpaid rent for various periods of time. Therefore, Equity's eviction costs from March 2020 through December 2021 were minimal. (Trial Ex. 1278-0011.)

1

346.    Plaintiffs contend that Hosfield's analysis of eviction costs is flawed because

2

"Equity separately charges tenants for those eviction costs when Equity brings eviction

3

proceedings against them." (1 RT 34:2-6.) As noted above, however, Hosfield removed

4

those fees and costs for which Equity had been reimbursed to arrive at the value of net

5

eviction costs. (*See supra* at ¶ 344.) As a result, Plaintiffs' criticism is unfounded.

6

347.    This Court has previously held that Equity may offset costs up until the

7

tenant moves out of the unit. (ECF 142, p. 7 ["As long as a tenant remains in possession

8

of the rental unit, Defendants' efforts to collect the late, unpaid rent would be considered

9

damages from the default."].) The Court finds that the evictions costs described above,

10

which accrue necessarily *before* a tenant vacates a unit, are appropriately included in

11

Hosfield's offset analysis.

12

348.    The Court finds Hosfield's analysis of Equity's eviction costs to be

13

persuasive. Accordingly, the Court finds that Equity incurred eviction costs of $7,066,691

14

during the Class Period relating to the collection of delinquent rent.

15

349.    Further, the Court finds that the $7,066,691 in eviction costs that Equity

16

incurred during the Class Period were costs that were reasonably related to collecting

17

and accounting for delinquent payment of rent during the Class Period, and may be

18

appropriately counted as part of Equity's offset. *See Garrett v. Coast & S. Fed. Sav. &*

19

*Loan Assn.*, 9 Cal. 3d 731, 741 (1973).

20

350.    The Court also finds that Equity's eviction costs of $7,066,691 were

21

proximately caused by delinquent rent during the Class Period.[31]

22

23

24

25

26

27

28

[31] On the seventh day of trial, Plaintiffs' counsel suggested for the first time that Breshears had made a miscalculation related to his calculation of Equity's total eviction costs. Over Equity's objection, the Court permitted Plaintiffs to recall Breshears; however Breshears failed to provide any testimony from which this Court could conclude that there was a miscalculation or that Hosfield's number is incorrect. (*See* 7 RT 1363:7-1364:13.) The late efforts to "correct" Breshears' report were also procedurally improper. The Court disregards the testimony of Breshears on the issue of eviction costs, and adopts Hosfield's calculations.

1

2

### a.   Equity incurred more than $2.1 million in collection costs related to delinquent rent.

3   351.   The third component of costs that that Equity incurred as a result of

4   delinquent rent during the Class Period was collection costs. (5 RT 853:16-24, 896:8-

5   897:21; Trial Ex. 1243-0024-25; Trial Ex. 1278-0012.) These costs represent the amounts

6   of money that Equity paid to two collection agencies to collect delinquent rent after

7   residents had moved out. (5 RT 896:19-897:2.) Specifically, Equity sent delinquent

8   amounts for collection from its evicted residents to KTS. (Trial Ex. 1243-0024; 5 RT

9   896:19-24.) It sent delinquent amounts for former residents who were not subject to

10   eviction proceedings to Fair Collections & Outsourcing ("FCO"). (5 RT 896:19-24.)

11   352.   This Court has previously held that Equity may offset costs up until the

12   tenant moves out of the unit. (ECF 142, p. 7.) The Court also finds that the testimony at

13   trial showed that Equity's attempt to collect and account for delinquent rent do not end

14   when a tenant vacates the property; thus, Hosfield reasonably included these costs when

15   looking at the actual costs caused by late rent.

16   353.   Equity paid these collection agencies a percentage of the amounts of the

17   delinquent rent that they collected on behalf of Equity. The amounts that Equity paid to

18   these agencies for their collection of delinquent rent constituted Equity's collection costs.

19   (5 RT 896:19-897:2.)

20   354.   Hosfield identified the amounts that Equity paid to collection agencies

21   during the relevant time period by way of spreadsheets that detailed the total amount of

22   fees that Equity paid to collection agencies over the relevant time period. (Trial Ex. 1243-

23   0024.)

24   355.   To ensure that the collection costs related only to delinquent rent (as

25   opposed to other charges), Hosfield calculated the percentage of delinquent rent relative

26   to the overall account balance. (5 RT 897:3-9.) He then applied that percentage to the

27   collection fees, to ensure his analysis only captured fees that Equity paid to these

28   collection agencies that related to rent collection. (5 RT 897:9-11.)

356.    Hosfield's analysis established that Equity incurred collection costs of $2,137,650 as a result of delinquent rent during the Class Period. (5 RT 897:12-14; Trial Ex. 1278-0012.)

357.    Plaintiffs suggest that collection fees of this nature are not appropriately included in the analysis. The Court rejects that contention and finds that these are "administrative costs reasonably related to collecting and accounting for late payment." *Garrett*, 9 Cal. 3d at 741.

358.    Plaintiffs rely upon *Bondanza v. Peninsula Hosp. & Med. Ctr.*, 23 Cal.3d 260, 263-264 and *Beasley*, 235 Cal.App.3d at 1405, in arguing that percentage-based collection agency costs should not be the subject of offset under *Garrett*. Plaintiffs overstate the relevance of these cases to the instant case.

359.    In *Bondanza*, the court invalidated a late fee provision in a hospital admission agreement that suffered from numerous defects. Among them, the provision did not specify *any* late fee amount, but instead permitted the defendant hospital to recover its "reasonable" expenses for collecting on unpaid accounts. *Bondanza,* 23 Cal.3d at 266. One reason, among others, that the *Bondanza* court found the relevant late fee provision to be unlawful was that the parties had failed to agree to the amount of collection costs. *Id.*

360.    Here, in contrast, the relevant late fee provision did specify the amount of the late fee. For reasons already explained, this Court has concluded that the late fee provision in Equity's lease was reasonable and enforceable. Beyond that, a deeper analysis of *Bondanza* reveals that the case is not properly understood as creating, as Plaintiffs appear to suggest, a *per se* rule that a defendant is not permitted to apply the costs it incurred to collection agencies as part of an offset analysis under § 1671. The question before the *Bondanza* court was the enforceability of a late fee provision in the hospital's entry agreement. The case involved an award of injunctive relief to three named plaintiffs. It did not involve an offset calculation in the context of a certified class action. *See id.* at 269.

361.   Moreover, unlike the instant case, a collection agency was a party to the litigation in *Bondanza*. *See id.* at 264 (defendants included collection agency Medical Adjustment Service). Among the myriad reasons that the California Supreme Court found that the late fee was unlawful and unenforceable was that the defendant *credit agency* had not justified that the 33% late fee charged in all instances was reflective of *its* actual collection costs. *See id.* ("The charge is calculated on the amount due at the time of assignment, yet it may be that that patient or his insurer has paid all or most of the obligation shortly *after* assignment and before the collection agency has expended any effort to collect the debt.") Here, no collection agency is a party to the litigation.

362.   Of additional significance, Equity is not seeking the full contingency fee amount paid to KTS or FCO for any and all collection matters. Instead, Hosfield has specifically targeted and calculated the cost percentage attributable to delinquent rent, as opposed to other unpaid items subject to collection. Hosfield's calculation to limit the collection agency costs related to delinquent rent is a reasonable approximation of expenses associated with the effort to collect delinquent rent in the context of this case.

363.   In a class action of this size and nature, it would be impracticable and unfair for Equity to make individualized inquiries into what effort the collection agency must make for any particular delinquent resident.

364.   That leaves *Beasley*. As already noted, Equity is not seeking to offset the total amounts it paid to KTS or FCO for any and all collection matters. Instead, Hosfield has specifically targeted and calculated the cost percentage attributable to delinquent rent, as opposed to other unpaid items subject to collection. Moreover, to the extent that Plaintiffs suggest that Equity was obligated to establish that the fees of *non-party collection agencies* fees charged to Equity represented *the agencies*' actual costs of collection, this Court disagrees. Unlike *Bondanza*, the collection agencies were not parties to this litigation. Moreover, that case involved fundamentally different relief (injunctive relief vs. calculation of damages) in a fundamentally different context (a case involving three named plaintiffs vs. a certified class action). To require Equity to

establish that the fees of that KTS and FCO charged Equity approximated *the collection agencies'* collection costs would impose an insurmountable burden on Equity, particularly in the context of a certified class action. What is relevant here is that the amounts Hosfield calculated and included in his offset opinions were only amounts reasonably incurred by Equity in connection with delinquent rent collection efforts.  The Court does not interpret either *Bondanza* or *Beasley* to dictate such an arbitrary and unfair result. And the Court finds Hosfield's analysis of Equity's collection costs to be persuasive.

365.    Accordingly, the Court finds that Equity incurred collection costs of $2,137,650 during the Class Period that were reasonably related to collecting and accounting for delinquent payment of rent. *See Garrett*, 9 Cal. 3d at 741.

366.    The Court also finds that Equity's collection costs of $2,137,650 were proximately caused by delinquent rent during the Class Period.

> **b.     Equity incurred over $8.7 million in lost use of funds costs during the Class Period due to delinquent rent.**

367.    The fourth component of Hosfield's analysis relates to the interest costs that Equity incurred by not having the delinquent rent available to invest in business initiatives or pay off debt because it had not been paid – Equity's lost use of funds. (Trial Ex. 1243-0025; Trial Ex. 1278-0012-13; 5 RT 897:25-898:12.)

368.    Hosfield began his analysis of Equity's interest costs by calculating Equity's Weighted Average Cost of Capital ("WACC") for each year of the Class Period. (Trial Exs. 1243-0025; 1278-0013; 5 RT 898:13-23.) A company's WACC is "the cost of capital (discount rate) determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure." (Trial Ex. 1278-0013.)

369.    A company's capital structure is the combination of debt and equity that a company uses to fund its business. (5 RT 900:2-9.) Debt is the money that a company borrows, ranging from long-term notes to lines of credit to short term instruments. (*Id.*). A company's "equity" is essentially the money that investors have invested in the business (e.g., represented by shares). (5 RT 900:10-12.)

370.   To calculate Equity's WACC during the Class Period, Hosfield relied on Equity's public filings with the Securities and Exchange Commission for information about Equity's cost of debt and capital structure. (Trial Ex. 1243-0025; Trial Ex. 1278-0100; 5 RT 901:23-902:15; 903:18-23.) For Equity's pre-tax cost of equity, he relied upon an industry-recognized database called Business Valuation Resources' Cost of Professional Capital. (Trial Exs. 1243-0025, 1243-0114; 5 RT 903:6-13.)

371.   Hosfield used this information to determine the percentage of Equity's capital that consisted of equity and the percentage that consisted of debt. (Trial Ex. 1243-0025-26; Trial Ex. 1278-0013; 5 RT 899:19-24, 903:14-904:1.) By adding Equity's weighted cost of capital and weighted cost of debt, Hosfield determine that Equity's WACC has ranged from 6.36% to 8.75% from 2010 through 2021. (Trial Ex. 1278-0100.)

372.   Using the WACC for each year of the Class period, Hosfield calculated Equity's interest costs due to late rent for three time periods using the model he developed. (5 RT 904:2-904:19, 905:2-905:16; Trial Ex. 1243:25-31; Trial Exs. 1278-0092, 1278-0094, 1278-0096.)

373.   The first period calculated the interest cost on delinquent rent from the first day that payment was late through the date the resident moved out. (5 RT 905:7-9.) Hosfield began the calculation starting the day after the rent was due because rent became delinquent the day after it was due. (5 RT 904:20-905:1.) Equity's interest costs for the first period were $4,739,617. (Trial Exs. 1278-0014, 1278-0092; 5 RT 905:17-906:5.)

374.   Plaintiffs argue that because the late fee is not imposed until the fifth day of the month, Equity is not permitted to count its costs of collecting late rent on the first through fourth days (i.e. before a late fee is imposed). The Court finds this argument unpersuasive on multiple levels. If the late fee is found to be void, then the grace period provision is also void and Equity is entitled to recover all its costs from delinquent rent at any point in the month. Furthermore, as a practical matter, Equity employees testified that they spend very little time attempting to collect late rent from tenants in the first

1   four days of the month. Such efforts are usually limited to responding to tenants who
2   affirmatively reach out to staff to advise that they will pay rent late (e.g. 2 RT 285:3-24);
3   targeting habitual late payers who are known to staff to *regularly* pay rent after the
4   grace period (ECF 503, p. 357-385, Johnson Dep. 53:4-54:16); and/or following up with
5   tenants who still haven't paid their late rent from the previous month (ECF 503, p. 357
6   Johnson Dep. 53:4-19.)

7   375.   The second period was Equity's interest cost after move-out but before the
8   account was sent to third-party collections. (Trial Exs. 1278-0014, 1278-0094; 5 RT
9   905:24.) Equity's interest costs for this period totaled $303,021. (Trial Ex. 1278-0094; 5
10  RT 905:24.)

11  376.   The third period was Equity's interest costs from two years after the
12  account was sent to collections. (Trial Exs. 1278-0014, 1278-0096; 5 RT 905:25.) As
13  Hosfield opined, after two years, the collection rate for delinquent rent materially drops.
14  (5 RT 906:13-24.) Equity's interest costs for this period were $3,670,353. (Trial Ex. 1278-
15  0096; 5 RT 905:25.)

16  377.   The total interest costs that Equity incurred as a result of the lost use of
17  funds associated with delinquent rent for the time period of September 3, 2010 through
18  December 31, 2021 were $8,712,919. (Trial Exs. 1278-0014, 1278-0092, 1278-0094, 1278-
19  0096; 5 RT 905:17-25.)

20  378.   Plaintiffs argue that Hosfield should not have used Equity's weighted cost of
21  capital as a measure for determining Equity's costs because Equity "sweeps its rental
22  payments into a non-interest bearing account" and there is "no evidence that Equity has
23  ever had to raise capital to cover late rent." (1 RT 34:18-24.) But Plaintiffs' argument
24  misses the point in at least two respects.

25  379.   First, it is appropriate to use WACC in these calculations because Equity's
26  WACC is the cost of operating its business. (Trial Ex. 1278-0013; 5 RT 897:25-899:8; *see*
27  *also* ECF 515, p. 44, Glancy Dep. 69:4-12 [Equity calculates WACC essentially as a
28  "hurdle rate" that Equity must clear in order to earn money].) Equity's rebuttal expert,

1    Steven Stanton, also confirmed that WACC is the appropriate rate of interest to use. (8

2    RT 1416:15-23.) The interest rate of an individual bank account is irrelevant to the

3    determination of damage from lost use of funds. (5 RT 987:19-24.)

4         380.    Equity incurred costs as a result of these delinquent rental payments

5    because the business had to finance the delinquent rental payments out of its overall

6    capital structure. (5 RT 901:16-22.) If all of Equity's residents paid their rent on time,

7    Equity would have had a substantial increase in cash that it could have used to fund its

8    operations, including paying off high-interest debt and investing in properties. (Trial Ex.

9    1278-0013.) As Equity's Vice President of Treasury Collin Glancy testified, "[t]here's

10   always an [] amount of rent that is unpaid. That's part of [the] apartment business. . .,

11   and [Equity has] capitalized [itself] to continue operating the business." (*Id*., quoting

12   ECF 515, p. 62, Glancy Dep. 104:18-21.) That fact was confirmed by Plaintiffs' expert

13   Christian Tregillis, who testified that Equity had a constant balance of delinquent rent

14   that varied between $9 and $17 million. (7 RT 1261:7-20; *accord.* ECF 515, p. 44, 46,

15   Glancy Dep. 69:8-12, 71:18-21.)

16        381.    Second, and tellingly, in an article published and discussed at trial by

17   Plaintiffs' expert Tregillis, he conceded that it is appropriate for a company to use its cost

18   of capital to quantify the cost of the lost use of funds because it represents the

19   opportunity costs that the company is incurring by not having the cash to invest in its

20   ongoing business operations. (*See* Trial Ex. 505-47-48.) ("The plaintiff's cost of capital (or

21   cost of equity) has been argued as appropriate for the award of prejudgment interest on

22   the theory that plaintiff has been deprived of monies it would have had to invest in the

23   company, and the best evidence of expected return on investment in a company is its cost

24   of capital. This can be compelling when a plaintiff has raised debt and equity financing,

25   providing evidence of capital markets' views of the returns required on an investment in

26   the plaintiff company.")

27        382.    The Court finds Hosfield's analysis of Equity's costs relating to the lost use

28   of funds to be persuasive. Accordingly, the Court finds that Equity incurred costs of

$8,712,919 during the Class Period that were attributable to the amount of time that delinquent rent was wrongfully withheld from Equity. *See Garrett*, 9 Cal. 3d at 741 (offset analysis includes costs for the period of time the money was wrongfully withheld).

**E.    Hosfield's "Cost Savings" analysis of Equity's employee costs caused by delinquent rent serves as additional confirmation that Equity's delinquency-related costs exceeded the late fees it received during the Class Period.**

383.    Hosfield conducted an alternative method of analyzing Equity's employee costs using a Cost Savings method. (5 RT 907:1-17.) The purpose of this analysis was to determine the cost savings that Equity would have achieved in the form of reduced employee costs if all residents paid their rent on time. (5 RT 907:1-17; Trial Ex. 1243-0033-34.)

384.    This method was separate from the "Cost Incurred" analysis that Hosfield conducted for Equity's employee costs and serves as an additional benchmark validating Hosfield's analysis for Equity's employee costs associated with accounting for and collection of delinquent rent. (5 RT 907:18-20.)

385.    In connection with this analysis, Hosfield directed Equity to produce data regarding the total annual cost of Equity's employees involved in the delinquency process in Equity's California markets: Los Angeles, San Francisco, Orange County, and San Diego. (Trial Ex. 1243-0034.) Within the model that Hosfield prepared for each region, Equity's communities were combined into groups based on geography and the ability to share staff. (*Id.*).

386.    To determine how staffing might change in an environment where there was no more delinquent rent, Hosfield conducted interviews with members of Equity leadership. (Trial Ex. 1243-0033.) Specifically, Hosfield interviewed Rivera, Shanna Dion, Vice President—Property Management, Alla Feldman, Senior Regional Manager, and Jesse Jennell, Senior Regional Manager. (Trial Ex. 1243-0033; 6 RT 1048:9-10.)

387. Rivera, Dion, Feldman, and Jennell then reviewed the employee lists in the markets for which they were responsible and proposed how staffing might change if all of Equity's residents paid their rent on time. (Trial Ex. 1243-0034; 6 RT 1048:13-1049:9.)

388. For example, Rivera testified that she and Hosfield met several times to discuss the study. Hosfield then presented her with a model, after which they met again several times to discuss how staffing would change at the properties. (6 RT 1048:13-1049:9.)

389. Hosfield conducted this analysis using Equity's 2017 actual costs. (5 RT 907:21-23.) Hosfield used 2017 actual costs because it gave him sufficient data to create the model that he used for the analysis. (*Id*.). Based on his discussions with Rivera, Equity would expect a similar percentage reduction in staffing any year from September 2010 through February 2020 if all residents paid their rent on time. (Trial Ex. 1243-0035.)

390. Hosfield determined that the potential, resulting staffing changes could be grouped into the following categories:

- The position was eliminated;
- An employee was shared by two or more properties;
- The title and responsibilities changed; or
- A full-time employee was converted to a part-time employee.

(Trial Ex. 1243-0034; 5 RT 907:25-908:9.)

391. As noted above, and as Rivera described in her testimony, Equity regularly made changes of this nature throughout the Class Period. (*See supra* at ¶ 337-339.)

392. In the situation where title and responsibilities changed, Hosfield directed Rivera, Dion, Feldman, and Jennell to provide the mid-point salary for the updated position. (Trial Ex. 1243-0034.) To convert that salary into an annual cost, Hosfield calculated salary as a percentage of Equity employees by position and market. (*Id*.). Hosfield then divided the midpoint salary information by salary as a percentage of annual cost to estimate the total annual cost for each position. (*Id*.).

393.   In the situation in which a full-time employee was converted to a part-time employee, Hosfield determined, based on discussions with Equity leadership, that its part-time employees typically work 3 days, or 24 hours, per week. (Trial Ex. 1243-0034.) However, because part-time employees do not receive certain benefits, such as health insurance and bonuses, the annual cost of a part-time employee cannot be estimated by simply multiplying the annual cost for a full-time employee by 60%. (*Id*.).

394.   To estimate the cost of a part-time employee, Hosfield first multiplied the full-time equivalent employees' annual cost by 60% to account for less hours worked by the part-time employee. (Trial Ex. 1243-0034-35.) He then multiplied that result by the annual cost for a part-time employee as a percentage of the annual cost for a full-time employee to estimate the cost associated with employing a part-time employee. (*Id*.).

395.   Based on his analysis, Hosfield determined that, if all of Equity's residents paid their rent on time, Equity would reduce its costs for local property-level employees involved in delinquency by 9.78%. (5 RT 910:7-16; Trial Ex. 1243-0035; Trial Ex. 1278-0249-61.) That figure represented a weighted average reduction across Equity's California communities. (5 RT 910:7-16.) The average for Equity's Southern California (non-LA) communities was 10.49%; for Los Angeles, it was 7.33%; and for San Francisco, it was 11.26%. (5 RT 910:7-16; Trial Ex. 278-0249-61.)

396.   Hosfield then applied the percentage reduction in employee costs (9.78%) against Office Management employee costs ($122,914,974) and Leasing employee costs ($131,414,547) for the September 3, 2010 – February 29, 2020 time period. (5 RT 911:4-16.) This calculation yielded total cost savings relating to collecting and accounting for delinquent rent of $24,873,426. (Trial Exs. 1278-0068, 1278-0070, 1278-0072.)

397.   Under the Cost Savings Method, Hosfield determined that Equity's total costs related to rent delinquency during the Class Period through move out was $34,595,801, and $39,544,919 through two years of collections. (5 RT 912:6-9; Trial Exs. 1278-0042, 1278-0046.)

398.   As previously noted, pursuant to the Cost Incurred method, the Court has concluded that Equity incurred more than $39 million in costs relating to delinquent rent. (*See supra* at ¶ 267.) The figures reflected in the Cost Savings Analysis serve as an additional confirmation that Equity incurred greater costs relating to delinquent rent than it received in late fees during the Class Period. They also serve as corroboration for the accuracy of Hosfield's conclusions flowing from the Cost Incurred Analysis.

**F.     The Court generally discounts the rebuttal testimony offered by Plaintiffs' experts.**

**Childers.**

399.   Childers testified as an expert in work measurement and statistics. (7 RT 1314:20-1315:5.) Childers is not a Certified Management Accountant. (7 RT 1329:9-10.) Childers was not qualified to testify as an expert in the field of cost accounting. (7 RT 1329:13-14.)

400.   Childers has performed multiple work measurement analyses where he relied on data that he obtained through face-to-face discussions with employees, including nurses and aides in a hospital setting and school secretaries. (7 RT 1329:16-1330:14.) Childers has performed multiple workplace time studies where he did not scientifically randomize his sample, relying instead on a non-random "convenience sample." (7 RT 1330:19-1332:9.)

401.   Childers agrees that it is appropriate to exclude employees from a time study sample if the employee is new or inexperienced and does not understand or follow the preferred methods for the process being studied. (7 RT 1332:10-15.)

402.   Though a "Type 1" time study is only possible if the job being evaluated is standardized, Childers has no personal knowledge of whether Equity's late rent collection process is sufficiently standardized to conduct a Type 1 study. (7 RT 1332:23-1333:9.) In a Type 1 time study, the textbook "rule of thumb" is to observe 30 minutes or 30 occurrences of the activity of interest. (7 RT 1333:10-1335:17.)

403.   Of the three types of time studies Childers described (Type 1 or "stopwatch" studies, occurrence sampling, and time logs), none of these studies could be performed in 2021 to get an estimate of how much time Equity's employees spent on late rent collection before COVID. (7 RT 1336:15-1337:7.)

404.   Having a large percentage of employees working remotely, as occurred during COVID, would present unique challenges to conducting a Type 1 time study. (7 RT 1337:8-13.)

405.   Occurrence sampling (i.e. watching what a worker is doing and recording each occurrence of a particular behavior) does not indicate the duration of time an employee spends on an activity. (7 RT 1337:16-25.) Childers has never performed occurrence sampling in a white-collar or office setting. (7 RT 1338:1-3.) And, in order for social desirability bias to be in play, the interview subject would need to know what the socially desirable response is. (7 RT 1339:11-17.)

406.   Based on the above, the Court was not persuaded by Childers' stated criticisms of Hosfield's methodology and conclusions.

**Breshears**

407.   Breshears agrees that rent is late on the 2nd of the month, even though late fees are not assessed until the 5th of the month. (1 RT 189:7-12.)

408.   Breshears acknowledged that unpaid late fees can remain on tenant ledgers for several months. He noted multiple occasions where unpaid late fees would remain on tenant ledgers for more than a month, with rent payments being received and credited in the interim. (2 RT 205:2-12.)

409.   Breshears noted that even during the COVID pandemic when there was a legal moratorium on evictions, late fee charges were paid at the same rate in terms of the number of days after being charged, as they were pre-COVID. (2 RT 205:14-206:2.)

410.   The Court finds unpersuasive Breshears' criticisms of Hosfield, including (as previously noted) his criticisms of Hosfield's calculations of late fees paid and Equity's evictions costs.

**Schwarz**

411.    Plaintiffs proffered Schwarz as an expert in economics. Schwarz has taken some economics courses, but he does not have a Ph.D. (6 RT 1078:12-15.) In fact, Schwarz graduated with a degree in history (not economics). (6 RT 1080:13-1081:4; Trial Ex. 266.)

412.    Schwarz is also not a certified public accountant. (6 RT 1080:15-16.)

413.    Nor is he a cost accountant. (6 RT 1181:8-10.) But he criticized Hosfield's cost accounting approach because Hosfield analyzed actual costs instead of marginal costs. (6 RT 1086-1088.)

414.    Schwarz, in contrast, did not attempt to measure Equity's actual costs from late rent; instead, he tried to measure the marginal cost arising from one additional late fee. (6 RT 1088:21-24.) He looked at data like an economist might look at data; he did not look at the issue from the perspective of a cost accountant. (6 RT 1081:11-13.)

415.    Schwarz did not speak to anyone at any of Equity's properties to understand how they spend their time. (6 RT 1081:14-21.)

416.    Schwarz's approach tried to identify the change in Equity's personnel costs attributable to one additional instance of late rent. (6 RT 1085:2-17.)

417.    Because Schwarz's model looks at changes, it does not consider the salaries of Equity's employees as costs related to late rent, even if the employees spent 100% of their time on late rent issues. (6 RT 1186:6-1188:9.)

418.    Schwarz also does not consider the time spent by hourly employees on late rent issues *unless* those hourly employees incurred overtime. Then, regardless of the reason of the overtime, Schwarz's model attributes a portion of the overtime costs to late rent. (6 RT 1188:2-1191:10.)

419.    The COVID-19 time period highlighted one of the flaws in Schwarz's model. During the COVID-19 time period, when the costs from late rent skyrocketed, Schwarz's model suggests the costs from late rent actually *decreased*. This backwards conclusion reflects the fact that there were fewer hours spent performing in-person tours and performing other tasks that were paused during COVID-19; but there is no evidence to

87

1 │ suggest that when Equity had to spend more time than ever trying to collect delinquent
2 │ rent, its costs for late rent actually *decreased*.

3 │     420.    For these reasons, the Court rejects Schwarz's criticisms of Hosfield and his
4 │ "rebuttal" regression model. No statute or case law has ever suggested that a regression
5 │ model based on a marginal cost theory is the appropriate way to analyze these costs.

6 │     **Tregillis**

7 │     421.    Tregillis agrees that the time Equity personnel spend collecting late rent
8 │ varies from tenant to tenant. (7 RT 1266:14-16.) But Tregillis has not made an
9 │ independent analysis of the amount of time spent by Equity personnel tasked with
10 │ collecting late rent. (7 RT 1266:21-25.)

11 │     422.    Tregillis agrees that it is possible that for some class members, Equity's
12 │ costs associated with collecting late rent exceed the late fees paid by those particular
13 │ class members. (7 RT 1266:17-20.)

14 │     423.    Tregillis did not opine on whether rent is late on any particular day. (7 RT
15 │ 1267:13-18.) Tregillis also acknowledged that in Days 1-4 of the month, it is possible
16 │ Equity personnel are performing late rent collection work addressing late rent from the
17 │ prior month, but he did not try to quantify that amount. (7 RT 1267:19-1268:10.) He also
18 │ has not quantified any instances where a tenant paid rent on the 15th of the month but
19 │ was not charged a late fee, nor did he quantify any instances where that happened
20 │ outside of the COVID period. (7 RT 1268:15-1269:6.)

21 │     424.    When asked whether evaluating which tenants had a late fee waived but
22 │ were still subject to rent collection activity would require an individualized inquiry, he
23 │ agreed that might be possible but that he was not familiar with all of the information
24 │ that would be necessary to make that investigation. (7 RT 1269:15-24.)

25 │     425.    Tregillis acknowledges that Equity uses its primary source of revenue,
26 │ which is rent, to finance its business. (7 RT 1271:19-22.)

27 │     426.    Tregillis prepared interest rate calculations that he understands Breashers
28 │ has used for his opinions, but he did not know exactly what Breashers was doing or how.

(7 RT 1273:23-1274:4.) Specifically, Tregillis calculated interest rates related to Equity's commercial paper and line of credit. (7 RT 1272:5-8, *and* discussion of Trial Ex. 261, Schedule 1.)

427.    Schedule 1 to Tregillis' July 9, 2021 report, Trial Ex. 261, reflects his interest rate figures on Equity's commercial paper and line of credit. (7 RT 1273:6-23.)

428.    Based on the purported deposition testimony of Equity's Vice-Treasurer Colin Glancy, Tregillis used a 0.3% commercial paper rate, beginning from March 2016, when Equity's commercial paper program began, until 2021. (7 RT 1273:18-24; 7 RT 1274:1-14, 7 RT 1274:23-1275:2.)

429.    Commercial paper is essentially a short-term debt funding source. (7 RT 1274:15-18.)

430.    Plaintiffs deposed Glancy on June 29, 2021. Tregillis reviewed Glancy's deposition in preparing his opinions. (7 RT 1275:15-20.) Glancy testified that the commercial paper rate at the time of his deposition in 2021 was 0.3%; he did not testify that 0.3% was the rate for the entire 2016-2021 timeframe. (7 RT 1275:21-1276:12.)

431.    Tregillis has reviewed company 10-Ks, and had Equity's 10-Ks available to him, of which he reviewed at least some. (7 RT 1276:19-25.) However, he did not use the commercial paper rates reflected in the company's 10-K's in order verify the accuracy of what he believed Glancy had testified to in deposition. (7 RT 1277:1-5.)

432.    Tregillis was shown the commercial paper rates reflected on the 10-K's for the 2016-2021 timeframe, which Tregillis had wrongly assumed was a constant 0.3% based on his erroneous reading of Glancy's testimony. (7 RT 1277-1283.)

433.    Equity's 10-K's revealed a different commercial paper rate in the relevant timeframe than the five-year constant of 0.3% assumed by Tregillis.

434.    The 2016 10-K reflects a commercial paper rate of 0.9%. (7 RT 1277:7-1278:22, discussing Trial Ex. 1172.)

435.    Equity's 2017 10-K reflects a commercial paper rate of 1.41%. (7 RT 1278:25-1280:2, discussing Trial Ex. 1188.)

436. Equity's 2018 10-K reflects a commercial paper rate of 2.35%. (7 RT 1280:3-1280:24, discussing Trial Ex. 1194.)

437. Equity's 2019 10-K reflects a commercial paper rate of 2.42%. (7 RT 1280:25-1281:19, discussing Trial Ex. 1199.)

438. Equity's 2020 10-K reflects a commercial rate of 1.72%. (7 RT 1281:21-1282:15, discussing Trial Ex. 1229.)

439. Equity's 2021 10-K reflects a commercial paper rate of 0.27%. (7 RT 1282:16-1283:19, discussing Trial Ex. 202.)

440. Upon review of the 2021 10-K (Trial Ex. 202), Tregillis agreed that the reference to a weighted average interest rate of commercial paper of 0.27% was what Glancy had referred to in his deposition (rounded up to 0.3%) when Glancy testified about the current rate in 2021 at the time of his deposition. (7 RT 1283:6-1284:1.)

441. In Schedule 1 of his July 9, 2021 report, Tregillis also assigned interest rates for Equity's line of credit for the September 2010 through February 2016 timeframe (*i.e.*, up until Equity began its commercial paper program in March 2016). (7 RT Schedule 1 to Trial Ex. 261.)

442. For that entire timeframe, Tregillis used a constant rate of LIBOR plus 77.5 basis points based on how he understood Glancy to have testified in deposition. (7 RT 1284:4-18.) However, Glancy had actually testified that LIBOR plus 77.5 basis points was the current line of credit rate as of his deposition in 2021, not a constant rate for all relevant times. (7 RT 1276:1-10.)

443. When shown the 2021 10-K, Tregillis agreed that the reference to LIBOR plus 77.5 basis points in that document was consistent with Glancy's deposition testimony about the current line of credit rate in 2021 when Glancy was deposed. (7 RT 1284:19-1285:15.)

444. When shown as an example Equity's 10-K from 2011, Tregillis acknowledged that the weighted average rate for the line of credit that year was 1.42%. (7 RT 1285:16-1286:20, discussing Trial Ex. 1098.) The referenced 1.42% rate was higher

1  than any of the calculated rates on his Schedule 1, which ranged from 0.925% to 1.206%

2  for the period in which Tregillis calculated line of credit rates. (7 RT 1286:21-1287:6;

3  Schedule 1 to Trial Ex. 261.)

4       445.   As for his opinion on percentage late fees, Tregillis confirmed that he was

5  not opining on whether or when a percentage late fee can be lawful under California law.

6  (7 RT 1287:11-15.) He is aware of situations in which California has permitted a late fee

7  based on a percentage of rent. (7 RT 1287:16-19.) His own research confirmed that

8  Equity's most concentrated market in terms of property locations was Los Angeles

9  County. (7 RT 1287:20-1288:17, discussing Schedule 1 of Trial Ex. 260.) He had this fact

10  about Equity's presence in Los Angeles County in mind when he opined about percentage

11  late fees. (7 RT 1288:13-17.) Los Angeles is the County in which the DCBA has

12  repeatedly proclaimed that 5% residential late fees "are considered reasonable." (7 RT

13  Trial Ex. 10, 220-3, *and* 220-4 [respectively, publications from the DCBA in 2008, 2013,

14  and 2017 all stating that 5% residential late fees "are considered reasonable."].)

15       446.   Based on the above, the Court was not persuaded by Tregillis' stated

16  criticisms of Hosfield's methodology and conclusions, or Tregillis' interest rate

17  calculations and opinion regarding percentage late fees.

18  **G.    Equity Rebuttal Expert Stanton**

19       447.   Stanton has been a licensed CPA for 39 years. (8 RT 1413:6-9; 1413:13-25;

20  1414:1.)

21       448.   His rebuttal to Tregillis was based on cost accounting and managerial

22  accounting. (8 RT 1414:6-18.)

23       449.   Approximately half of Stanton's engagements over time have involved cost

24  accounting. (8 RT 1414:19-25; 1415:1.)

25       450.   Stanton agrees with Hosfield that the appropriate interest rate to use when

26  measuring Equity's lost use of funds is WACC, which is a standard, commonly used

27  calculation and metric across many industries. (8 RT 1416:10-25; 1417:1-11.) WACC is

28  unique to each company. (8 RT 1417:12-22.)

451.    Based on Stanton's analysis of the article authored by Tregillis and relied upon by him during trial, at Ex. 505, pp. 46-48, Tregillis has opined that using WACC is an appropriate measure for calculating prejudgment interest in a damage scenario to properly calculate the lost use of funds and the appropriate measure/metric to use in the present case because it measures the company's opportunity costs incurred in not having the cash to use to run its business. (8 RT 1418:11-25; 8 RT 1419:2-9; 8 RT 1420:17-25; 8 RT 1421:1-11.)

452.    A proper analysis for determining the appropriate metric for measuring lost use of funds is to analyze the overall capital structure of the company and overall cash management procedures that the company employs. (8 RT 1428:2-14.)

453.    Based on the above, the Court finds Stanton's opinion as credible and supportive of Hosfield's methodology and calculation with respect to WACC.

**H.    Voluntary Payment Doctrine**

454.    The voluntary payment doctrine bars the recovery of money that was voluntarily paid with full knowledge of the facts. *See Steinman v. Malamed*, 185 Cal. App. 4th 1550, 1556-57 (2010) (reversing trial court's failure to apply the voluntary payment doctrine because making a payment "under protest" does not make the payment involuntary); *Ellsworth v. U.S. Bank N.A.*, 908 F.Supp.2d 1063, 1083 (N.D. Cal. 2012) ("The voluntary payment doctrine is an affirmative defense that bars the recovery of money that was voluntarily paid with knowledge of the facts.").

455.    A payment is voluntary when it is made without duress, coercion, or compulsion. *Steinman*, 185 Cal. App. 4th at 1558 (even a payment made "under protest" is not involuntary). If a party had a reasonable alternative to making the disputed payment, the payment was not made under duress. *Leeper v. Beltrami*, 53 Cal.2d 195, 204 (1959); *Western Gulf Oil Co. v. Title Ins. & Trust Co.*, 92 Cal.App.2d 257, 265-266 (1949) (finding no duress because plaintiff could have immediately filed suit; instead, plaintiff chose to pay the disputed amount.)

456.   In the context of disputes regarding late fees, "full knowledge of the facts," has been described as "knowledge of a late fee's amount and the circumstances under which it will be imposed." *BMF Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 773 (Tex. 2005); *Dillon v. U-A Columbia Cablevision of Westchester, Inc.*, 740 N.Y.S.2d 396, 398 (2002) (dismissing plaintiff's claims based on the voluntary payment doctrine because plaintiff paid the late fee knowing the circumstances under which it would be imposed).

457.   With respect to application of the voluntary payment doctrine, contractual late fee disputes are unlike consumer claims regarding hidden commissions or surcharges because in the former the consumer knows in advance under the written contract the amount of the late fee and when it will be imposed. See *Tallahassee Pediatric Dentistry PLLC v. Airgas USA*, LLC, 2020 U.S.Dist.LEXIS 265237, at *16 (N.D.Fla. Jan. 9, 2020) (explaining the distinction between a contractual late fee dispute and cases involving hidden commissions or surcharges, with respect to the meaning of "full knowledge of the facts") (discussing *Sanchez v. Time Warner, Inc.*, 1998 WL 834345, 1998 U.S.Dist.LEXIS 22011, at *5 (M.D.Fla. Nov. 4, 1998), as an example of a case where the voluntary doctrine should and does apply because the plaintiff paid what the parties' agreement described as a late fee, having known in advance the amount of the late fee and when it would be imposed.).

458.   In *BMG*, a consumer class action, the plaintiffs challenged their alleged payment of illegal late fees. 178 S.W.3d at 765. The plaintiffs argued against application of the voluntary payment doctrine, claiming that to show "full knowledge of the facts," the consumer must have known that the late fees were illegal and unenforceable when they paid them. *Id.* at 772-773. The Texas Supreme Court resoundingly *rejected* this position, concluding instead that in a late fee dispute "full knowledge of the facts" simply means knowing the amount and circumstances under which the charge will be imposed. *Id.* at 773. The Court explained that the plaintiffs' position would be "impractical and unfair to parties entering into late-fee agreements" including because it would mean a

1  company must disclose precisely how its late fee is calculated with an itemized list

2  explaining the basis of each charge. *Id*. at 773.

3      459.   Here, the evidence showed that class members who paid late fees did so

4  with full knowledge of the amount and circumstances under which late fees would be

5  imposed, as proven by the express terms of their lease agreements. The tenants could

6  have lived elsewhere; instead, they chose to reside at Equity properties and agree to the

7  terms of their lease agreements, including the subject late fee. (*See* Smith Testimony, 1

8  RT 57:11-14.)

9      460.   Moreover, given that Plaintiffs filed this lawsuit in 2014, the majority of the

10  late fees paid by class members at issue occurred *after* Plaintiffs' challenge to Equity's

11  late fee claiming that it is unlawful. And yet, year after year since 2014, tenants who are

12  class members renewed their leases annually. (*See* e.g., Smith, Bonfanti, and Brown

13  Testimony.) Bonfanti continued to pay late fees even after becoming a named plaintiff. In

14  other words, many class members have continually and repeatedly agreed to the subject

15  late fee in spite of this class action challenging its legality, and voluntarily subjected

16  themselves to the possibility of incurring late fee should they fail to pay rent on time.

17  These are classic examples of a voluntary payment.

18      461.   *Rodman v. Safeway Inc*., 125 F.Supp.3d 922 (N.D.Cal. 2015), is instructive.

19  In that certified class action, the plaintiffs alleged that the defendant-supermarket

20  charged higher prices for groceries on its online delivery service than it charged in stores

21  where the groceries were selected. (*Id*. at 925.) Safeway unsuccessfully asserted the

22  voluntary payment defense on summary judgment, because it failed to establish that any

23  class members made excessive payments "despite awareness 1) that online prices were

24  more expensive than the prices in the store from which the customers' items were

25  selected and delivered, 2) the extent of the markup, and 3) that any markup was in

26  violation of the Special Terms' price parity promise. Class members did not even possess

27  means of discovering this knowledge, as Safeway's online pricing algorithm was not

28  publicly disclosed." (*Id*. at 941.)

462.   Here, unlike in *Rodman*, the nature, amount, and circumstance of the charge at issue—the late fee—was known in advance and stated in each written lease. (ECF 454, SF #26, #27.)

463.   Recent decisions in the landlord-tenant and consumer context, respectively, refute Plaintiffs' unfounded argument that they have a colorable defense of coercion or duress in response to Equity's voluntary payment defense.[32] (*American Multi-Cinema, Inc. v. Manteca Lifestyle Center*, LLC, No. 2:16-cv-01066, 2023 WL 3775333, 2023 U.S.Dist.LEXIS 96391, at \*42 (E.D.Cal. June 1, 2023) (rejecting Plaintiff's argument that it made all payments under protest to avoid penalties including eviction; finding that "paying 'under protest' after receiving a single notice of default, without more, is insufficient to show that Plaintiff's payments were due to economic duress or coercion."; citing California authorities); *see* also *Rabin v. Google LLC*, No. 22-cv-04547-BLF, 2023 WL 4053804, 2023 U.S.Dist.LEXIS 104694, at \*17-17 (N.D.Cal. June 15, 2023) (in a putative consumer class action, dismissing Plaintiffs' breach of contract claim on ground that Plaintiffs made voluntary payments to Google with knowledge of all relevant facts underlying their claim); *Parduci v. Overland Solutions, Inc.*, 399 F.Supp.3d 969, 980 (N.D.Cal. 2019) (dismissing claim based on voluntary payment doctrine where plaintiff did not change insurance carriers after learning about his carrier's alleged breach of contract).

464.   The Court does not agree with Plaintiffs' position that for the voluntary payment to apply, the consumer must actually know the fee at issue is unlawful. Accord *BMG*, 178 S.W.3d at 773. That would likely require consumers to have specialized knowledge of law, and presumably such a belief would only be informed after a decision

---

[32] Moreover, the evidence presented at trial established that Equity does not evict residents as a result of unpaid late fees. (2 RT 234:14-235:4; 2 RT 273:11-13; 2 RT 290:2-17; 2 RT 367:18-368:6; 2 RT 416:4-6; 3 RT 603:22-604:4; 3 RT 606:18-610:14 *and see also* Trial Ex. 1344 (compilation of sample California resident ledgers reflecting residents who accrued one or more unpaid late fees and were not evicted for failing to pay those late fees); 3 RT 605:15-25; 5 RT 836:1-12.)

on the merits or acknowledgement by the defendant of illegality, which would effectively

nullify the voluntary payment doctrine. Nor does the law require a company like Equity

to itemize its "reasonable endeavor" to the consumer. That said, Equity's standard

California lease has the resident acknowledge that Equity incurs costs associated with

delinquent rent, the exact dollar of which is difficult or impracticable to determine;

identifies the nature of the costs incurred; and confirms that Equity charges a late fee as

a result of those costs. (*See* Trial Ex. 78, Terms and Conditions, Section 5.)

465.   Thus, the Court finds that, even if Equity had not prevailed on the

questions of reasonable endeavor and offset, it would be entitled to judgment based on its

voluntary payment defense.

466.   Further, and alternatively, in light of the evidence at trial, the Court finds

that resolving the voluntary payment doctrine on a class-wide basis is untenable. The

Court agrees with the logic and conclusions of courts which have held in similar

situations that the voluntary payment doctrine cannot be adjudicated on a class-wide

basis. See e.g., *Monaco v. Bear Stearns Cos., Inc.*, 2012 WL 10006987 at *9 (No.

09cv05438, C.D. Cal., Dec. 10, 2012) (voluntary payment defense required individualized

inquiries regarding the knowledge of each potential class member, and the Court "cannot

simply certify a class and then hope that these defenses do not become relevant"); *Endres

v. Wells Fargo Bank*, 2008 WL 344204 at *11, (No. C 06-7019 PJH, N.D. Cal. Feb. 6,

2008) ("the applicability of the voluntary payment doctrine" would "require

individualized inquiries into the circumstances of each member of the class, and those

individual inquiries would predominate over common questions of law and fact").[33]

---

[33] *See also, Easter v. City of Orlando*, 249 So. 3d 723, 730-31 (Fla. Dist. Ct. App. 2018)
(denying certification because adjudicating the "voluntary payment defense would
require a 'highly individualized' determination" and collecting cases reaching the same
conclusion); *CLN Properties, Inc. v. Republic Services, Inc.*, 2010 U.S.Dist.LEXIS 135953,
at *29 (D.Az. Dec. 13, 2010) ("the voluntary payment doctrine would require an
individualized inquiry"); *Easter v. City of Orlando*, 249 So.3d 723, 725 (2018) (denying
class certification based on voluntary payment doctrine); *Camafel Bldg. Inspections, Inc.
v. BellSouth Adver. & Pub'lg Corp.*, 2008 U.S.Dist.LEXIS 18192, at *16, *32 (N.D.Ga.
March 7, 2008) (denying class certification based on voluntary payment doctrine); *MCG

467.   Accordingly, the Court finds that, even had the Court not found in Equity's favor on reasonable endeavor and its offset defense, the Court must decertify the class.

**I.      Statute of Limitations Defense**

468.   The Court will briefly address Equity's statute of limitations defense, though the Court has disposed of Plaintiffs' claims in their entirety on other grounds.

469.   On September 3, 2014, Plaintiffs Munguia-Brown, Magaña, and Rodriguez—all of the Woodland Park Class—filed the original complaint in this action challenging the Woodland Park $50 Late Fee.[34] There is no reference to a 5% late fee or the Standard Late Fee in the complaint.

470.   On February 8, 2017, Plaintiff Bonfanti was added. Bonfanti's lease involved the Standard Late Fee, unlike the originally named Plaintiffs. (ECF 45.)

471.   As between the Woodland Park and Standard Late Fee Class members, the late fee amounts and related terms such as the grace period differ. The Woodland Park Class asserts claims against EQR Woodland Park A &B, while the Standard Late Fee Class does not.

---

*Health, Inc. v. Perry*, 326 Ga.App. 833, 836-837 (2014) (observing that the voluntary payment doctrine "would require individualized analysis" and reversing trial court's certification of class); *Telescripps Cable Co. v. Welsh*, 247 Ga.App. 282, 285-287 (2000) (voluntary payment doctrine barred plaintiffs' claim for recovery of late fees; plaintiffs' ignorance of the law or whether the late fee was an enforceable liquidated damage provision was no defense to the voluntary payment doctrine); *BMF Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 773 (Tex. 2005) (decertifying late fee class action based on voluntary payment doctrine); *Salvaggio v. Houston Independent School Dist.*, 709 S.W.2d 306, 308 (1986) (trial court did not abuse discretion in refusing to certify a class based on the voluntary payment doctrine); *City of Aledo v. Smith*, 2016 Tex.App.LEXIS 5930, at *23-*26 (Tex. Ct. App. 2016) (affirming denial of class certification because of voluntary payment rule).

[34] (*See* ECF 1-1, Complaint, ¶1 ("Defendants' policy and practice is to charge tenants *flat-rate fees* of at least $50 for the late payment of rent […] This *flat late fee* is a liquidated damage penalty[.]"; ¶2 (defining "Excessive Late Fees" as relating to when "Defendants charge a $50 late fee"); ¶¶20-22, 25, 27, 29 (alleging Plaintiffs Munguia-Brown, Magaña, and Rodriguez were charged the Excessive Late Fee, and complaining of their being charged "a late fee of $50"); ¶45 (class defined as tenants who were subjected to the "Excessive Late Fees").)

472.   Bonfanti and the Standard Late Fee Class, however, define their class as beginning on September 3, 2010, four years from when the originally named Woodland Park Plaintiffs filed their lawsuit. In other words, for statute of limitations purposes, the Standard Late Fee Class seeks the benefit of the Woodland Park Classes' original filing date.

473.   The Court previously denied Plaintiffs' motion for summary judgment as to Equity's statute of limitations defense, finding questions of fact. (ECF 142, at 8:18-21.)

474.   The Court now finds that Plaintiffs may not borrow the statute of limitations for the Woodland Park Class to stretch the class period back to 2010 for the Standard Late Fee Class.

475.   "The relation-back doctrine requires that the amended complaint must (1) rest on the same general set of facts, (2) involve the same injury, and (3) refer to the same instrumentality, as the original one." *Branick v. Downey Sav. & Loan Ass'n*, 39 Cal. 4th 235, 243 (2006). But here, the original Plaintiffs' claims (1) rest on different lease agreements, different late fees, different apartment communities, and different ownership groups, (2) involve different injuries; and (3) refer to different instrumentalities (*i.e.*, different leases and late fees.). *Id.*

476.   Plaintiffs Munguia-Brown, Magaña, and Rodriguez never had standing to represent the Standard Late Fee Class members, with different leases and late fees, who resided in different communities, owned by a different set of defendants, and who are part of a separate class. *See Tan v. Grubhub, Inc.*, No. 15-CV-05128-JSC, 2016 U.S. Dist. LEXIS 186342, at *15-16 (N.D. Cal, July 19, 2016) (named plaintiff lacked standing to challenge provisions that did not apply to him); *Meyer v. T-Mobile USA Inc.*, 836 F.Supp.2d 994, 1003 (N.D. Cal. 2011) (finding the plaintiff did not have standing to challenge the change-in-terms provision because it had never been applied to her).

477.   Accordingly, there was no "equitable" tolling of the Standard Late Fee Class claims by virtue of the Woodland Park Plaintiffs' 2014 case filing. See *In re Countrywide Financial Corp Mortgage-Backed*, 860 F.Supp.2d 1062, 1068 (C.D.Cal. 2012) (tolling of

1  class action claims only occurs when the named plaintiff in the original class action had

2  standing to pursue the claim).

3       478.    The statute of limitations for UCL claims is four years. (Cal. Bus. & Prof.

4  Code §17208.) Therefore, the Standard Late Fee Class claims begin as of February 8,

5  2013. The Court finds that the Standard Late Fee Class is time-barred to the extent the

6  Class seeks relief for claims arising before February 8, 2013. (This finding does not

7  change the Court's ultimate conclusion that Equity has shown its delinquency-related

8  costs exceed the late fees it received during the Standard Late Fee Class Period.)

9  **J.      Defendant's Request for Decertification**

10       479.    This Court has already set forth the reasons why Equity prevails in this

11  action and Plaintiffs recover nothing. But even if this Court had not so ruled, the Court

12  would have granted Equity's request to decertify the class as the trial evidence

13  demonstrated that this case raised individualized issues that preclude class resolution.

14       480.    Plaintiffs assert that in calculating Equity's offset, Hosfield should have

15  analyzed Equity's costs resulting from "each class member and determined which class

16  members are entitled to restitution and which class members' restitution offsets to zero."

17  (1 RT 36:21-37:4.) Likewise, their expert, Schwarz, contends that costs may be included

18  in an offset analysis only if particular expenses flow from specific, individual instances of

19  late rent. (6 RT 1184:19-1185:19.)

20       481.    The approach of Plaintiffs and their expert runs afoul of both Federal Rule

21  of Civil Procedure 23, and the handling of restitution and offset analyses in California

22  UCL claims specifically.

23       482.    In its order granting class certification, the Court observed that "[t]he legal

24  issue of the amounts that could be considered an offset is amenable to resolution

25  classwide and the analysis of aggregate costs can only be made in the context of a

26  classwide analysis." ECF 91, at 7:22-24.

27       483.    In *Cellphone Fee Termination Cases*, 193 Cal.App.4th 298, the class

28  certification was "expressly predicated" on an "aggregate approach to monetary relief and

1  the related setoff and cross-claim issues." *Id.* at 304. The Court's pre-trial order indicated

2  that the "Court will permit Plaintiffs to present aggregate damage calculations … [and]

3  the Court will also permit Defendants to present aggregate damage calculations for their

4  cross-claims … The Court will then set off the two numbers." *Id.* at 304 n. 7.

5       484.   Plaintiffs' position at trial is directly inconsistent with the class-wide

6  approach upon which class certification was based, and which is necessary in a case of

7  this size and nature.

8       485.   Accordingly, the Court finds that, even had the Court not found in Equity's

9  favor on reasonable endeavor and its offset defense, the Court must decertify the class.

10  **K.**    **Plaintiffs' Request for Prejudgment Interest**

11       486.   [RESERVED FOR POST TRIAL BRIEFING]

12                   **<u>CONCLUSION</u>**

13       For the foregoing reasons, the Court concludes that Equity has met its burden of

14  proof to establish a reasonable endeavor and has established that the subject late fees

15  comply with applicable law. Equity has also established that its permissible offset costs

16  exceed the amount of restitution sought by Plaintiffs.

17       Accordingly, Plaintiffs have failed to prove any of their claims. The Court shall

18  enter a separate judgment in favor of Equity, and the Clerk shall close this file.

19

20       **IT IS SO ORDERED**.

21

22       DATED:                 _____

23                                HON. JEFFREY S. WHITE

                              UNITED STATES DISTRICT COURT

24                                JUDGE

25  DM2\18209166.1

26

27

28