Margaret McBride (SBN 294066)
mmcbride@clsepa.org
COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
1861 Bay Road
East Palo Alto, CA 94303
Tel: (650) 326-6440
Fax: (866) 688-5204

Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
Andrew P. Lee (SBN 245903)
alee@gbdhlegal.com
Anne P. Bellows (SBN 293722)
abellows@gbdhlegal.com
Katharine L. Fisher (SBN 305413)
kfisher@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel: (510) 763-9800
Fax: (510) 835-1417

Attorneys for Plaintiffs and the Certified Classes
(*Additional Counsel for Plaintiffs and the
Certified Classes listed on following page*)

UNITED DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, ANGELINA MAGAÑA, NORMA RODRIGUEZ, DAVID BONFANTI, and SHANNAH SMITH individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>EQUITY RESIDENTIAL, a real estate investment trust, ERP OPERATING LIMITED PARTNERSHIP, a partnership, EQUITY RESIDENTIAL MANAGEMENT, L.L.C., EQR-WOODLAND PARK A LIMITED PARTNERSHIP, and EQR-WOODLAND PARK B LIMITED PARTNERSHIP,<br><br>        Defendants. | **CLASS ACTION**<br><br>Case No.: 4:16-cv-01225-JSW-TSH<br><br>**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Dept:   Courtroom 5<br>Before: Hon. Jeffrey S. White<br><br>Trial Date:  June 8, 2023 |

873269.27

Craig Nicholas (SBN 178444)
craig@nicholaslaw.org
Alex Tomasevic (SBN 245595)
alex@nicholaslaw.org
NICHOLAS & TOMASEVIC, LLP
225 Broadway, 19th Floor
San Diego, CA 92101
Tel:  (619) 325-0492
Fax:  (619) 325-0496

Attorneys for Plaintiffs and the Certified Classes

873269.27

# TABLE OF CONTENTS

I.    PROPOSED FINDINGS OF FACT .............................................................................. 1

     A.    The Parties ...................................................................................................... 2

         1.    Plaintiff Shannah Smith ................................................................... 2

         2.    Plaintiff David Bonfanti .................................................................. 3

         3.    Plaintiff Javanni Munguia-Brown .................................................. 4

         4.    Plaintiff Norma Rodriguez .............................................................. 5

         5.    Plaintiff Angelina Magaña ............................................................... 5

         6.    Defendants Equity Residential, et al. .............................................. 6

     B.    The Standard Late Fee .................................................................................... 8

         1.    Equity's Standard Leases ................................................................. 8

         2.    Equity's Adoption of the Standard Late Fee ................................. 10

             a.    Equity Adopted the Standard Late Fee Without Making Any Effort to Estimate Its Costs from Late Rent. ........................................ 10

             b.    Equity's Purpose in Adopting the Standard Late Fee Was to Increase Revenue. ................................................................... 15

             c.    Equity's Misplaced Reliance on the Los Angeles Department of Consumer Affairs Information Sheet. .................................. 17

             d.    Equity's Consultation with Outside Counsel and Knowledge of Legal Authorities ................................................................... 19

             e.    Equity's Knowledge in 2008 of the *Consumer Justice Foundation* Settlement and the Draft Expert Report Provided by Robert Knudsen in that Case ........................................................... 22

             f.    The Standard Late Fee's Percentage-Based Formula Is Not Aligned with Equity's Costs of Collecting Late Rent. ....................... 24

         3.    In Practice, the Amounts Charged Under the Standard Late Fee Formula Have Been Far Greater than Equity's Costs of Collecting Late Rent. ............. 26

     C.    The Woodland Park $50 Late Fee ................................................................ 27

     D.    The Amount of Late Fees Equity Collected from Class Members .............................. 29

i

873269.27

1        1.    Equity's MRI Property Management and Accounting Database ...................... 29

2        2.    Plaintiffs' Expert Accountant David Breshears' Calculated Class
3               Members' Late Fee Charges and Payments. ..................................... 30

4        3.    Plaintiffs' Computer-Forensics Expert Paul French Formatted the
               Underlying Data Used by Mr. Breshears to Calculate Class Members'
5               Late Fee Charges and Payments, and Data Used by Other Experts. ............... 31

6        4.    Restitution.............................................................................. 32

7        5.    Pre-Judgment Interest ................................................................ 38

8    E.    Defendants' Alleged Offset Damages ...................................................... 38

9        1.    Rent Is "Late" When Equity Charges the Late Fee. .......................... 39

10       2.    Mr. Hosfield's Calculations Do Not Measure Costs Proximately Caused
11             by Class Members, As Is Required for an Offset Defense.............................. 41

12       3.    Personnel Costs ....................................................................... 43

13            a.    Equity's Property-Level Staffing ........................................ 43

14            b.    Equity's Rent Collection Practices ..................................... 44

15            c.    Equity's Personnel Pay and Hours Databases ...................... 47

16            d.    Most of Equity's Personnel Costs Are Fixed. ...................... 47

17            e.    Mr. Hosfield's "Costs Incurred" Mcthodology Is Unreliable and
18               Unscientific.............................................................. 49

19                i.    Flaws in Mr. Hosfield's Interviewee Selection Process
                     Render It Improper for Extrapolation to a Broad
20                   Population......................................................... 49

21                ii.    Flaws in Mr. Hosfield's Interview Process Renders It
22                   Unreliable. ........................................................ 54

23               iii.    Mr. Hosfield's Calculations Include Costs that Were Not
                    Proximately Caused by the Late Payments Underlying the
24                  Late Fees at Issue in this Case. ................................. 61

25               iv.    Mr. Hosfield's Calculations Include Costs Incurred
26                  During the Four-Day Grace Period. ......................... 63

27            f.    Mr. Hosfield's "Cost Savings" Method Is Unreliable and
              Unscientific, and Does Not Measure Costs Caused by Late Rent. ...... 64

28

PLS.' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW – CASE NO. 4:16-CV-01225-JSW-TSH

873269.27

g.    Mr. Schwarz's Multiple Regression Model Reliably Measures Personnel Costs Associated with Class Members' Late Rent. ............ 65

4.    Lost Use of Funds ................................................................. 69

     a.    Mr. Hosfield Incorrectly Includes the Grace Period in His Interest Calculations. .............................................................. 69

     b.    Equity's Interest Costs Are Most Accurately Measured by Its Short-Term Borrowing Costs. ............................................. 70

5.    Eviction Costs ..................................................................... 75

     a.    Equity Recovers Eviction-Related Attorneys' Fees and Costs from Defaulting Tenants Separately from Its Collection of Late Fees. ...................................................................... 75

     b.    Additionally, Equity's Calculation of Its Eviction Costs Is Overstated. ...................................................................... 77

6.    Collection Costs .................................................................. 79

F.    Facts Related to Equity's Other Affirmative Defenses ......................... 80

1.    Facts Related to Equity's Voluntary Payment Doctrine Defense .................. 80

2.    Facts Related to Equity's Statute of Limitations Defense ....................... 83

II.    CONCLUSIONS OF LAW .............................................................. 85

A.    Plaintiffs Have Satisfied Article III, UCL, and Injunctive Relief Standing Requirements. ............................................................................. 85

B.    EQR's Late Fees Are Liquidated Damages. ........................................ 87

C.    EQR Has the Burden of Demonstrating Compliance with California Civil Code Section 1671. ........................................................................... 88

D.    The Standard Late Fee Is Invalid Under California Civil Code Section 1671. ........... 88

1.    Equity Did Not Engage in a Reasonable Endeavor to Estimate Its Actual Damages Caused by the Late Payment of Rent. ................................ 88

     a.    Equity Must Demonstrate that It Conducted a Non-Pretextual Analysis of Its Actual Costs of Late Rent When Setting the Challenged Late Fees. ................................................. 89

     b.    Equity Must Also Demonstrate that It Had a Proper Purpose When Setting the Challenged Late Fees. ............................... 90

c.      Equity Must Demonstrate that the Challenged Late Fees Are Proportionate to Its Costs of Late Rent. ................................. 90

d.      Equity Did Not Engage in a Non-Pretextual Analysis of Its Actual Damages Caused by the Late Payment of Rent. ...................... 91

e.      Equity Adopted the Standard Late Fee for the Improper Purpose of Increasing Revenue. ...................................... 92

f.      The Standard Late Fee Lacks Any Reasonable Relationship to the Costs Caused by the Breaches It Is Intended to Compensate. .............. 92

2.      Equity's Other Arguments Are Unavailing. ...................................... 93

E.      The Woodland Park $50 Late Fee Is Invalid Under California Civil Code Section 1671. ........................................................... 93

F.      Plaintiffs and the Classes Are Entitled to Restitution of Late Fees They Paid Defendants. ........................................................... 94

G.      Plaintiffs and Class Members Are Also Entitled to Prejudgment Interest at the Rate of 7 Percent Per Annum. ...................................... 96

H.      Equity's Offset Damages Are Minimal. ................................................. 97

1.      Equity Has the Burden to Prove That Its Claimed Offset Damages Were Proximately Caused by Class Members' Late Payment of Rent. .................. 98

2.      Defendants Cannot Offset "Damages" that Are Barred by Its Leases. ............. 99

3.      Defendants Cannot Offset Damages that Equity Reserves the Right to Seek Under Other Provisions of Its Leases. .................................... 100

4.      Violating the Prior Core Principles, Mr. Hosfield's "Cost Incurred" Employee Cost Calculations Are Excessive and Unreliable. ...................... 102

a.      Mr. Hosfield's Employee Survey Is Unreliable. ............................... 102

b.      Mr. Hosfield Lacks the Qualifications to Design and Conduct a Survey. ................................................................... 103

i.      The Survey Results Are Unreliable Due to Recall Bias. ........ 103

ii.      The Survey Has Other Indicia of Unreliability. .................... 105

c.      Mr. Hosfield's Method of Calculation Does Not Adhere to Generally Accepted Principles of Statistics. ..................................... 106

d.      Fixed Employee Costs Are Not Recoverable. .................................. 109

|   |   | e. | Employee Costs Allegedly Incurred During the Grace Period Are Not Proximately Caused by Class Members' Late Rent. ................. 110 |
|   |   | f. | Costs Incurred During the COVID-19 Pandemic Are Not Recoverable. ...................................................................... 111 |
|   | 5. | | Plaintiffs' Multiple Regression Model Reliably Measures Equity's Employee Costs Resulting from Class Members' Late Rent Payments ........ 112 |
|   | 6. | | Mr. Hosfield's "Cost Savings" Methodology Lacks Foundation and Is Unscientific ................................................................ 114 |
|   |   | a. | Mr. Hosfield's "Cost Savings" Methodology Does Not Meet the *Garrett* Standard of Proof ................................................ 115 |
|   |   | b. | Mr. Hosfield Is Not Qualified to Opine on Equity's Staffing Decisions. ...................................................................... 115 |
|   |   | c. | Mr. Hosfield May Not Assert the Opinions of Equity's Managers .... 116 |
|   | 7. | | Equity's Lost Use of Funds Calculations Are Inappropriate. ........................ 116 |
|   | 8. | | Defendants May Not Recover Their Attorneys' Fees and Costs That They Already Charge and Collect Under Their Default Remedies Lease Provisions. .................................................................................. 118 |
|   | 9. | | Equity's Percentage-Based Collection Costs Are Not Recoverable. ............. 120 |
| I. | | | Equity's Remaining Affirmative Defenses Fail. ........................................... 122 |
|   | 1. | | Equity Has Not Supported Its Voluntary Payment Defense. ........................ 122 |
|   | 2. | | Equity Has Not Established a Statute of Limitations Affirmative Defense. ..................................................................................... 125 |
| J. | | | Declaratory Relief. ........................................................................... 128 |
| K. | | | Injunctive Relief. ............................................................................. 129 |
| L. | | | Restitution and Interest Owed to the Classes. ........................................ 132 |

# I.     PROPOSED FINDINGS OF FACT

1.     Plaintiffs Javanni Munguia-Brown, Angelina Magaña, Norma Rodriguez, David Bonfanti, and Shannah Smith have brought this suit against Equity Residential, ERP Operating Partnership, Equity Residential Management, L.L.C. (collectively, "Equity"), EQR-Woodland Park A Limited Partnership, and EQR-Woodland Park B Limited Partnership (with Equity, "Defendants" or "EQR"), on behalf of themselves and the following three classes of similarly situated tenants of EQR:

   a.     "**Standard Late Fee Class**": All Equity tenants in California from September 3, 2010 until October 28, 2022 who were charged one or more late fee(s) under Equity's standard late fee provision: 5% of the outstanding balance owed (ca[pp]ed at 5% of the total amount of monthly recurring charges) or $50, whichever is greater." ECF Nos. 91, 315. This standard late fee provision shall hereinafter be referred to as the "Standard Late Fee."

   b.     The Court has appointed Plaintiffs Shannah Smith and David Bonfanti as the representatives of the Standard Late Fee Class.

   c.     "**Standard Late Fee Injunctive Relief Class**": All current and future Equity tenants in California who at any time prior to judgment in this action were charged and/or paid one or more Standard Late Fees.

   d.     The Court has appointed Plaintiff Shannah Smith as the representative of the Standard Late Fee Injunctive Relief Class.

   e.     "**Woodland Park Preexisting Lease Class**": "All EQR tenants in the Woodland Park property from December 1, 2011 until Defendants sold the property in February 2016 who were charged one or more late fee(s) of $50 under EQR's policy of charging a flat $50 late fee to tenants on pre-existing non-EQR leases." ECF No. 91. The $50 late fee charged to Woodland Park Preexisting Lease Class members shall hereinafter be referred to as the "Woodland Park $50 Late Fee."

   f.     The Court has appointed Plaintiffs Javanni Munguia-Brown, Norma Rodriguez, and Angelina Magaña as the representatives of the Woodland Park Preexisting Lease Class.

873269.27

## A. The Parties

### 1. Plaintiff Shannah Smith

2. Plaintiff Shannah Smith is a current tenant of Riva Terra II, one of Equity's residential properties located in Redwood City, California. ECF No. 521, The Parties Joint Proposed Findings of Fact ("JPFOF") at ¶ 2; *see also* ECF No. 454, (Joint Updated Final Pretrial Order) at 18 (Stip. No. 5); *see* Reporter's Transcript of Proceedings, vol. 1, Tr. 56:13-21.[1]

3. Plaintiff Smith has resided at the Riva Terra II property since December 2004, when it was owned by a different landlord. JPFOF ¶ 3; ECF No. 454 (Stip. No. 6).

4. Plaintiff Smith first entered into a lease agreement with Equity on March 20, 2013. JPFOF ¶ 4; ECF No. 454 at 18-19 (Stip. No. 7); *see* 1 Tr. 58:18-23 & Ex. 78.

5. That lease agreement provides that Plaintiff Smith would be charged "5% on the 5th – minimum of $50" if she failed to pay her rent on time. JPFOF ¶ 4; ECF No. 454 at 18-19 (Stip. No. 7); *see* 1 Tr. 59:1-18 & Ex. 78-2.

6. Each of Plaintiff Smith's subsequent Equity lease agreements has included the same late fee provision. JPFOF ¶ 4; ECF No. 454 (Stip. No. 7); 1 Tr. 60:19-25.

7. Plaintiff Smith's current Equity lease signed in the week before trial commenced in this case on June 8, 2023 also provides that her rent is due on the first of the month with a grace period of four days, after which Equity would charge her the Standard Late Fee for the late payment of rent. JPFOF ¶ 5; *see* 1 Tr. 60:19-25.

8. In the roughly 10 years that Plaintiff Smith has resided at her current property under Equity's ownership, she has only incurred one late fee. JPFOF ¶ 7; 1 Tr. 61:1-7; *see also* JPFOF ¶ 6 citing ECF No. 454 at 19 (Stip. No. 8) (Ex. 1514 accurately reflects all late fee charges to and payments made by Plaintiff Smith.)).

9. On January 4, 2015, Plaintiff Smith attempted to transmit payment of her $2,648 monthly rent to Equity, but her bank denied the payment for insufficient funds. JPFOF ¶ 8; *see* 1 Tr. 61:1-62:11 & Ex. 1514 at 1514-7.

---

[1] Subsequent references to the Reporter's Transcript will provide volume, page, and line number in the following format: "[volume] Tr. [page]:[line]."

10.     On January 8, 2015, Equity charged Plaintiff Smith a $132.40 late fee for that late rent payment.  JPFOF ¶ 9; *see* 1 Tr. 61:1-62:11 & Ex. 1514 at 1514-7.

11.     Equity also posted a three-day notice on Plaintiff Smith's door and provided a copy in her mailbox on January 8, 2015.  1 Tr. 62:18-21.

12.     Upon receipt of the three-day notice, Ms. Smith called the office at Riva Terra II to speak to an Equity employee about her account.  1 Tr. 63:1-12.

13.     Based on the conversation and the notice she received, Plaintiff Smith believed that if she did not pay her balance in full, including the late fee, Equity would start eviction proceedings against her.  1 Tr. 62:22-63:15.

14.     The next morning, on January 9, 2015, Plaintiff Smith paid Equity the $132.40 late fee, along with her monthly rent payment and a $25 Not Sufficient Funds fee.  JPFOF ¶ 10; *see* 1 Tr. 61:1-62:11 & Ex. 1514 at 1514-7.

15.     Plaintiff Smith plans to continue living in her current apartment for the foreseeable future.  JPFOF ¶ 11; 1 Tr. 57:11-14.

16.     No one at Equity has ever informed Plaintiff Smith how the company decided that her late fee would be set at 5% of her outstanding balance, nor did she have a means of determining whether Equity's late fee was a reasonable approximation of its costs of late rent.  1 Tr. 64:8-24.

## 2.     **Plaintiff David Bonfanti**

17.     Between October 2014 and July 2017, Plaintiff David Bonfanti was a tenant of Bella Vista, one of Equity's residential properties in Woodland Hills, California.  JPFOF ¶ 12; ECF No. 454 at 19 (Stip. No. 9).

18.     Plaintiff Bonfanti first entered into a lease agreement with Equity on October 11, 2014.  JPFOF ¶ 14; ECF No. 454 at 19 (Stip. No. 10); Ex. 41.

19.     The rent amount set by Plaintiff Bonfanti's initial 2014 lease was $2,115.00.  Ex. 41 at 41-1.

20.     That lease agreement provided that Plaintiff Bonfanti would be charged "5% on the 5th – minimum of $50" if he failed to pay his rent before the fifth day of the month.  *See id.* at Ex. 41-2.

21.     Plaintiff Bonfanti renewed his lease with Equity in July 2015 and again in July 2016. JPFOF ¶ 14; ECF No. 454 at 19 (Stip. No. 10); Ex. 43.

22.     Each of Plaintiff Bonfanti's lease agreements with Equity stated that rent was due on the first of the month, and if Bonfanti did not pay his rent by the end of the day (11:59 p.m.) on the fourth of the month, he would be charged a late fee of "5% on the 5th – minimum of $50." JPFOF ¶ 15; ECF No. 454 at 19 (Stip. No. 11).

23.     Over the course of his tenancy, Equity charged Plaintiff Bonfanti a total of 15 late fees, all of which he paid. JPFOF ¶ 17; 2 Tr. 328:15-19; Ex. 1564 (Bonfanti Resident Statement). *See* JPFOF ¶ 16 (citing ECF No. 454 at 19 (Stip. No. 12) (Ex. 1564 accurately reflects all late fee charges to and payments made by Plaintiff Bonfanti.)).

24.     Plaintiff Bonfanti believed that if he did not pay the late fee, Equity would evict him. 2 Tr. 341:24-342:2, 351:22 to 352:1.

25.     The late fees charged to Plaintiff Bonfanti ranged from $103.12 to $122.20 per incident. Ex. 1564 (Bonfanti Resident Statement). Altogether, Plaintiff Bonfanti paid Equity $1,730.98 in late fees. *See id.*

### 3.     Plaintiff Javanni Munguia-Brown

26.     Plaintiff Javanni Munguia-Brown was a tenant of Defendants' Woodland Park property in East Palo Alto, California during the time Equity owned it from December 2011 to February 2016. JPFOF ¶ 18; ECF No. 454 at 19-20 (Stip. No. 13).

27.     Plaintiff Munguia-Brown moved into her apartment at that property prior to Defendants' ownership. JPFOF ¶ 19; ECF No. 454 at 19 (Stip. No. 14); Ex. 2 (pre-existing lease).

28.     Defendants acquired Plaintiff Munguia-Brown's building as of December 1, 2011 and assumed the duties of the lessor in her pre-existing lease. JPFOF ¶ 20; ECF No. 454 at 19-20 (Stip. No. 15); Ex. 2 (pre-existing lease).

29.     For approximately the first three years of her tenancy, until Defendants located Plaintiff Munguia-Brown's pre-existing lease, Defendants charged Plaintiff Munguia-Brown the Woodland Park $50 Late Fee in months when she did not pay her rent balance in full on time. *See* Ex. 1561

(Munguia-Brown Resident Statement).  *See* JPFOF ¶ 21 (citing ECF No. 454 at 19-20 (Stip. No. 16)

(Ex. 1561 accurately reflects all late fee charges to and payments made by Plaintiff Munguia-Brown.)).

30.     Defendants charged Plaintiff Munguia-Brown the Woodland Park $50 Late Fee on 15

occasions between December 2011 and March 2014 (totaling $750 in late fees), all of which she paid.

*See* Ex. 1561 (Munguia-Brown Resident Statement).

31.     Plaintiff Munguia-Brown believed that if she did not pay her full balance, including any

late fee, Defendants would evict her.  5 Tr. 835:22-25, 837:17-19.

### 4. **Plaintiff Norma Rodriguez**

32.     Plaintiff Norma Rodriguez was a tenant of Defendants' Woodland Park property in East

Palo Alto, California during the time Equity owned it from December 2011 to February 2016.  JPFOF

¶ 22; ECF No. 454 at 20 (Stip. No. 17).

33.     Plaintiff Rodriguez moved into her apartment at that property prior to Defendants'

ownership.  JPFOF ¶ 23; ECF No. 454 at 20 (Stip. No. 18); Ex. 4 (pre-existing lease).

34.     Defendants acquired Plaintiff Rodriguez's building on December 1, 2011 and assumed

the duties of the lessor in her pre-existing lease.  JPFOF ¶ 24; ECF No. 454 at 20 (Stip. No. 19).

35.     Defendants charged Plaintiff Rodriguez the Woodland Park $50 Late Fee in months

when she did not pay her rent balance in full on time, though she did make rent payments in each of

those months (and nearly always during the grace period).  *See* Ex. 1562 (Rodriguez Resident

Statement).  *See* JPFOF ¶ 25 (citing ECF No. 454 at 20 (Stip. No. 20) (Ex. 1562 accurately reflects all

late fee charges to and payments made by Plaintiff Rodriquez.)).

36.     In total, Defendants charged Plaintiff Rodriguez the Woodland Park $50 Late Fee 8

times (amounting to $400), all of which she paid.  *See* Ex. 1562 (Rodriguez Resident Statement).

### 5. **Plaintiff Angelina Magaña**

37.     Plaintiff Angelina Magaña was a tenant of Defendants' Woodland Park property in East

Palo Alto, California during the time Equity owned it from December 2011 to February 2016.  JPFOF

¶ 26; ECF No. 454 at 20 (Stip. No. 21).

38.     Plaintiff Magaña moved into her apartment at that property prior to Defendants'

ownership.  JPFOF ¶ 27; ECF No. 454 at 20 (Stip. No. 22); *see* Ex. 3 (pre-existing lease).

39.     Defendants acquired Plaintiff Magaña's building as of December 1, 2011 and assumed the duties of the lessor in her pre-existing lease.  JPFOF ¶ 28; ECF No. 454 at 20 (Stip. No. 23); Ex. 3 (pre-existing lease).

40.     Defendants charged Plaintiff Magaña the Woodland Park $50 Late Fee in months when she did not pay her rent balance in full on time, though she did make rent payments in each of those months.  *See* Ex. 1563 (Magaña Resident Statement).  *See* JPFOF ¶ 29 (citing ECF No. 454 at 20 (Stip. No. 24) (Ex. 1563 accurately reflects all late fee charges to and payments made by Plaintiff Magaña.)).

41.     In total, Defendants charged Plaintiff Magaña the Woodland Park $50 Late Fee 17 times (amounting to $850), all of which she paid.  *See* Ex. 1563 (Magaña Resident Statement).

**6.     Defendants Equity Residential, et al.**

42.     Equity Residential is a Maryland real estate investment trust incorporated on July 21, 1992, with a principal place of business in Chicago, Illinois.  *See* Ex. 1243 (Hosfield May 2021 Report) at 1243-11.

43.     All of the other Defendants – Equity Residential Management L.L.C., ERP Operating Limited Partnership, Equity Residential Management LLC, EQR-Woodland Park A Limited Partnership, and EQR-Woodland Park B Limited Partnership – are, or during time periods relevant to the case were, entities related to Equity Residential, organized under the laws of various states in the United States, doing business in or having sufficient contacts with the State of California, and are subject to the jurisdiction of this Court.  *See id.* at 1243-11-12.

44.     Each of the Defendants have or had roles in owning or managing properties at which class members resided, or in implementing or receiving the late fees that Plaintiffs challenge.  *See id.*

45.     For purposes of this litigation, Plaintiffs and Defendants have stipulated to the following facts regarding Defendants' relative responsibilities for actions in this case, *see* Ex. 244, which the Court adopts as its findings:

        a.      All Defendants are properly joined in this action.  *See* Ex. 244-4 ¶ 3.

        b.      No other entities exist that are necessary to provide Plaintiffs and the certified Standard Late Fee and Woodland Park Preexisting Lease Classes complete relief in this action.  Ex. 244-4 ¶ 4.

6

873269.27

1         c.      Equity Residential, ERP Operating Limited Partnership, and Equity Residential

2  Management, LLC (collectively referred to herein as "Equity") share responsibility for designing and

3  implementing the Standard Late Fee and the Woodland Park $50 Late Fee.  *See* Ex. 244-4 ¶ 2.

4         d.      The Standard Late Fee was designed, approved and implemented (collectively,

5  "adopted") in 2008 by Equity's agents acting within the scope of their agency.  All other individuals

6  who were involved in or exercised control over the decision to adopt the Standard Late Fee were also

7  Equity's agents acting within the scope of their agency with respect to the Standard Late Fee.  *See* Ex.

8  244-4 ¶ 7.

9         e.      On each occasion that the Standard Late Fee was evaluated following its

10  adoption, the persons who made the decision to maintain the Standard Late Fee, and all persons who

11  had the right to control that decision, were agents of Equity acting within the scope of their agency.

12  *See* Ex. 244-4 ¶ 8.

13         f.      Equity received all Standard Late Fees paid by members of the Standard Late

14  Fee class.  *See* Ex. 244-4 ¶ 9.

15         g.      The Woodland Park $50 Late Fee was approved and implemented (collectively,

16  "adopted") by Equity's agents who were acting within the scope of their agency with respect to the

17  Woodland Park $50 Late Fee.  *See* Ex. 244-4 ¶ 10.

18         h.      On each occasion that the Woodland Park $50 Late Fee was evaluated following

19  its adoption, the persons who made the decision to maintain the Woodland Park $50 Late Fee, and all

20  persons who had the right to control that decision, were agents of Equity acting within the scope of

21  their agency.  *See* Ex. 244-4 ¶ 11.

22         i.      Equity received all Woodland Park $50 Late Fees paid by members of the

23  Woodland Park Preexisting Lease Class.  *See* Ex. 244-4 ¶ 12.

24      46.      Between September 3, 2010 and December 31, 2021, Equity has owned and operated

25  nearly 200 residential communities in California, with approximately 100 to 150 properties in its

26  California portfolio at a given time.  JPFOF ¶ 30; ECF No. 454 at 20 (Stip. No. 25).  *See also* Exs. 24;

27  40; 129.

28

873269.27

47.     Each year during the period between September 3, 2010 and December 31, 2021, Equity has owned and operated, on average, 34,000 apartment units in California that together have an average gross possible rent of $765,636,295 per year, and up to $1.148 billion in a year. *See* Exs. 24, 40, and 129 at Units and Gross Rent Possible. In an average month during this period, Equity's California apartment units have had gross possible monthly rent averaging $77,245,000. *See id.*

**B.     The Standard Late Fee**

**1.     Equity's Standard Leases**

48.     The Standard Lease that Equity currently uses, and has used throughout the Class Period, for its California properties has generally consisted of three parts: (1) a two-page "Residential Lease – Term Sheet," which contains blank fields for the start and end dates of the tenancy, the rental rate, the Standard Late Fee, and other charges; (2) a California-specific "Residential Lease – Terms and Conditions" document; and (3) potential addenda that address terms other than the monthly tenant's rental rate, and the Standard Late Fee. JPFOF ¶ 33; ECF No. 454 at 21 (Stip. No. 26).

49.     For the purposes of this litigation, the Parties have stipulated that Trial Exhibit Nos. 6 (Residential Lease – Terms and Conditions) , 83 (Residential Lease – Terms and Conditions & Term Sheet for Plaintiff Shannah Smith (2018)), 85 (Residential Lease – Terms and Conditions & Term Sheet for Plaintiff Shannah Smith (2020)), and 147 (Residential Lease – Terms and Conditions & Term Sheet for Plaintiff Shannah Smith (2022) are representative exemplars of the Standard Lease used by Equity throughout the class period. JPFOF ¶ 48; ECF No. 454 at 17 ¶ VII.8.a.-b.

50.     The Standard Lease defines "rent" to include "[a]ll fees and charges described on the Term Sheet or in this Lease, including, but not limited to, late charges, returned item fees and utility bills …"). *See* Exs. 6 at 6-1, ¶ 4; 83 at 83-3, ¶ 4; 85 at 85-3, ¶ 4.

51.     The Standard Lease's Term Sheet provides as follows: "Your rent is due on the 1st of each month. If we do not receive your rent and other recurring charges, in person before the close of business, or electronically by 11:59 pm local time, on day 4, you will be charged a late fee as follows: 5% on the 5th – minimum of $50." JPFOF ¶ 34; *see* Exs. 83 at 83-2; 85 at 85-2; 147 at 147-2.

52.     Similarly, the Standard Lease's Terms and Conditions provide that rent is due on the 1st, and that if rent is not paid when due, a late fee will be assessed, as described in the Term Sheet, *i.e.,*

after the grace period expires.  *See* JPFOF ¶ 34; Exs. 6 at 6-1 & 2, at ¶ 5; 83 at 83-4, ¶ 5; 85 at 85-4, ¶ 5.

53.     The "Late Charges" provision of the Standard Lease specifies that the imposition of the Standard Late Fee for the late payment of rent is "in addition to any other remedies we may have in the event of your default under the terms of this lease."  *See* Exs. 6-1 & 2 at ¶ 5; 83-4 ¶ 5; 85-4 ¶ 5.

54.     The Standard Lease specifically provides that Equity may report negative payment histories and collection efforts to credit reporting agencies and future landlords.  *See* Exs. 6-2 ¶ 13; 83-5 ¶ 14; 85-5 ¶ 14.

55.     The Standard Lease contains a separate "Default Remedies" provision that separately authorizes Equity to recover "all damages, costs and expenses" caused by tenant default, including delinquent rent, late fees, collection costs, and up to $2,000 in attorneys' fees and costs."  *See* Exs. 6-5 ¶ 26; 83-7 ¶ 27; 85-7 ¶ 27.  In full, the paragraph states:

> **Default Remedies:** If you fail to perform any of your obligations under this Lease, we may exercise all of our rights under this Lease, at law or in equity.  This may include giving you notice to correct or cure such default, taking action to recover possession of the Premises via the eviction process or otherwise, and/or terminating the Lease, all in accordance with applicable law. In addition, we can recover from you all damages, costs and expenses, including, among other things, damage to the Premises, cleaning and trash removal charges, the costs to repair, replace or restore personal property, delinquent Total Monthly Rent and additional rent (described in the Rent paragraph above) such as utilities, late fees, and returned item fees, and the amount by which unpaid rent for the balance of the Lease term exceeds the amount of such rental loss that you prove could be reasonably avoided. We can also recover the costs of taking possession of and re-renting the Premises and other fees and charges we incur in enforcing this Lease and collecting outstanding amounts hereunder, even if we do not file formal litigation. The party that does not prevail in any litigation commenced under this Lease will pay all attorneys' fees and costs reasonably incurred by the prevailing party in prosecuting or defending such litigation, up to a maximum of $2,000. If the Lease is terminated early, you must also repay us a portion of the concessions you received as described in the Lease Concessions paragraph above. In all cases, we reserve the right to report your payment history, outstanding balances, returned item fees, late fees, defaults, and other payment-related activity to consumer reporting agencies who track such information.

*See id.*

873269.27

56.     Accordingly, if the tenant fails to pay "rent" – specifically defined to mean their full outstanding balance, including their monthly apartment rent *and* any late fees, *see* Exs. 6-1 ¶ 4, 83-3 ¶ 4, 85-3 ¶ 4 – Equity may start eviction proceedings. *See* Exs. 6-5 ¶ 26; 83-7 ¶ 27; 85-7 ¶ 27. Exs. 6-1 ¶ 4. And, Equity reserves the right to report the tenant's payment history, outstanding balances, and late fees to credit reporting agencies. *See* Exs. 6-5 ¶ 26; 83-7 ¶ 27; 85-7 ¶ 27; 6-1 ¶ 4.

## 2.  **Equity's Adoption of the Standard Late Fee**

57.     Around June 2008, Equity changed its late fee in California from a flat $50 to the Standard Late Fee of 5% or $50. JPFOF ¶ 35; ECF No. 454 at 19 (Stip. No. 28).

58.     The Equity employees involved in the decision to adopt the Standard Late Fee included Senior Vice President and Deputy General Counsel James Fiffer, First Vice President – Legal Denise Beihoffer, Executive Vice Presidents David Santee and Frederick Tuomi, Vice President of Financial Planning Christopher Jenkins, and the two Senior Vice Presidents responsible for the California portfolio, Mickey Cummings and Bruce Lavine. JPFOF ¶ 37; ECF No. 454 at 19 (Stip. No. 30); *see also* JPFOF ¶¶ 38-39.

### a.  **Equity Adopted the Standard Late Fee Without Making Any Effort to Estimate Its Costs from Late Rent.**

59.     No one at Equity compiled or analyzed cost data related to late rent in connection with Equity's adoption of the Standard Late Fee in 2008. 3 Tr. 453:21-454:7, 455:16-456:2; 4 Tr. 690:24-691:1, 707:17-708:6.

60.     The contemporaneous emails exchanged by Equity employees in connection with the decision to adopt the Standard Late Fee are devoid of any mention of costs from late rent or any reference to anyone at Equity collecting or analyzing cost data related to the late fee. Exs. 54, 56, 57, 60, 61, 62, 63, 64, 65, 66, & 67; 3 Tr. 456:3-6.

61.     Equity did not present the Court with any documents reflecting any calculations or analyses of Equity's actual costs caused by the late payment of rent that were considered by Equity prior to the adoption of the Standard Late Fee in June 2008. Nor did Equity's witnesses testify to the existence of any such documents. *See, e.g.*, 4 Tr. 689:14-21, 690:24-691:14; 3 Tr. 554:3-12.

62.     The Court finds that the absence of documents reflecting an analysis of Equity's actual costs from late rent is highly probative of the absence of any analysis of costs in light of the uncontested evidence that Equity's outside counsel, when consulted in relation to the adoption of the Standard Late Fee in 2008, advised the company not only to analyze its actual costs from late rent but also to keep records of the cost analysis. Ex. 50; 4 Tr. 688:10-689:10,785:8-21.

63.     Mr. Fiffer testified live at trial. The Court also heard and has considered portions of Mr. Fiffer's prior deposition testimony in this case. Except for the select portions cited in these Findings, the Court finds Mr. Fiffer's trial testimony largely not to be credible based on his demeanor, evasive responses, and multiple contradictions of prior testimony in this case.

64.     Prior to his retirement from Equity on January 1, 2019, Mr. Fiffer was responsible for overseeing the defense of this lawsuit, with the assistance of another in-house attorney, Susan Zumph. JPFOF ¶ 38; Dep. of Susan Zumph ("Zumph Dep.") 14:10-24; 3 Tr. 577:11-17.

65.     Mr. Fiffer testified that in 2008, he "attempted to make a determination in [his] own mind as to whether or not the costs that [Equity] incurred exceeded or did not exceed" costs that were the subject of a prior litigation report from 1999. 3 Tr. 554:3-12. The Court found this testimony not credible.

66.     Even assuming arguendo that Mr. Fiffer did consider the cost issue in 2008, the Court finds that Mr. Fiffer's mental consideration of the issue does not amount to an analysis of Equity's actual costs of its California tenants' late rent payments, and that he lacked adequate information to reasonably attempt to estimate those costs. *See* 3 Tr. 552:25-553:12 (Mr. Fiffer citing an annual memorandum on merit raises as his source of knowledge about personnel costs); 3 Tr. 549:1-6 (Mr. Fiffer acknowledging that changes in policies or practices related to late rent collection activities would not necessarily come to his attention); 4 Tr. 709:21-710:4 (admission by Ms. Beihoffer that no one analyzed personnel costs related to late rent, or assessed the amount of time property-level employees spent collecting late rent).

67.     The Court credits Mr. Fiffer's deposition testimony in his capacity as a corporate designee under Rule 30(b)(6), which was introduced into the record during his testimony, that there was no "collection of data" or "formal analysis" of costs performed in connection with the adoption of

873269.27

the Standard Late Fee; instead, Equity just assumed that its costs had increased. 3 Tr. 453:21-454:7, 455:16-456:2.

68.     Ms. Beihoffer also testified live at trial, and during her testimony the Court heard and considered portions of her prior deposition testimony in this case. The Court gives only limited credit to her testimony based on her demeanor, her failure to support her own assertions with specific facts, and the inconsistencies between some of her statements about Equity's consideration of costs or goals in adopting in the Standard Late Fee and the weight of the evidence in the case.

69.     In 2008, Ms. Beihoffer played a central role in advising Equity regarding legal requirements applicable to late fees in California and assisting the business team in navigating the decision-making process that culminated in the adoption of the Standard Late Fee. 4 Tr. 744:11-745:3; *see* JPFOF ¶¶ 39-40; *see also*, *e.g.*, Exs. 56, 65, 66.

70.     Through her work on the 2008 fee review, Ms. Beihoffer became familiar with the requirement in California law that a landlord undertake a reasonable endeavor to determine its costs from late rent in setting the late fee. *See* JPFOF ¶¶ 42-45; Exs. 50, 1075, 4 Tr. 751:5-14 (Beihoffer describing her information gathering, including input from Equity's outside counsel Jamie Sternberg from Kimball, Tirey and St. John, who Equity relied on for expertise in landlord/tenant issues in California, and guidance from the California Apartment Association); 4 Tr. 759:4-760:8 (Beihoffer describing her knowledge of the legal requirements, including reasonable endeavor); 4 Tr. 768:5-19 (Beihoffer testifying that she advised the business team of the requirement to conduct an analysis to estimate costs from late rent); 4 Tr. 780:12-781:6 (same).

71.     Ms. Beihoffer, during her testimony, was unable to clearly or specifically describe any effort to analyze Equity's actual costs from its California tenants' late rent. *Cf., e.g.*, 4 Tr. 765:19-766:5 (asserting in a conclusory manner that she and her colleagues "were comfortable" that a percentage late fee with an average charge of $75 "was a reasonable estimation of recovering some of the costs that we incur in chasing late rent"); 4 Tr. 773:10-774:2 (same); 4 Tr. 775:5-11, 775:15-776:1 (asserting that others knew that payroll costs had increased in the prior eight to ten years).

72.     Ms. Beihoffer admitted that she was not aware of any formal study of Equity's actual personnel costs of California tenants' late rent from April to June 2008, and she was not aware of any

12

assessment of the time spent by property-level employees on late rent collection activities in 2008. 4 Tr. 707:17-23; 709:21-710:4. In light of Ms. Beihoffer's central role in Equity's adoption of the Standard Late Fee, these admissions are strongly probative of the absence of any analysis of Equity's actual personnel costs related to late rent when it set the Standard Late Fee in 2008.

73. David Santee, the Executive Vice President of Operations in 2008, was not asked to provide any input on Equity's late rent costs in connection with the adoption of the Standard Late Fee. Deposition of David Santee ("Santee Dep.") 58:14-21. He was not aware of an analysis of Equity's costs from late rent during the spring of 2008, or at any time in the years leading up to 2008. *Id.* 150:25-154:1, 173:23-176:7.

74. As Executive Vice President, Mr. Santee had access to income reports that stated total payroll by unit for each region. *Id.* 115:19-116:25, 118:5-119:16, 120:10-23. Those reports did not contain information about the amount of time employees spent performing late rent collection activities, nor did they attribute a dollar figure to late rent collection tasks. *Id.* 120:10-23. Mr. Santee did not review any other reports addressing personnel costs during his time as Executive Vice President. *Id.* 115:19-116:25, 118:5-119:16, 120:10-23.

75. Frederick Tuomi, the Executive Vice President and President of Property Management in 2008, also had no memory of any attempt by Equity to calculate its actual costs from late payment of rent in the months leading up to the adoption of the Standard Late Fee. Deposition of Frederick Tuomi ("Tuomi Dep.") 16:2-7, 65:17-21.

76. Mr. Tuomi reviewed payroll data only on a very high-level basis as part of his job, and he had no recollection of reviewing payroll data specific to California. *Id.* 62:18-24. Mr. Tuomi did not provide any information about payroll costs to his colleagues as part of the decision-making around the Standard Late Fee in 2008, nor was he asked about that information. *Id.* 62:25-63:12. In 2008, Mr. Tuomi lacked any familiarity with the activities performed by on-site staff to collect late rent. *Id.* 63:21-64:1.

77. Vice President of Financial Planning Christopher Jenkins, who was involved in estimating the impacts of the proposed late fee in 2008 and whose role was to provide "operations analytics and decision support," was not asked for any information regarding Equity's personnel costs

13

as part of that process and has no specific knowledge of anyone else providing input on those costs. Ex. 57, 63; Deposition of Chris Jenkins ("Jenkins Dep.") 11:5-18, 17:18-25, 39:20-41:6; *see also* Santee Dep. 47:18-48:13 (Mr. Jenkins' role was to pull data for Mr. Santee).

78.     Senior Vice President Bruce Lavine, who was responsible for Defendants' Northern California properties, has no recollection of any analysis of costs from late rent connected with the adoption of the Standard Late Fee.  Dep. of Bruce Lavine ("Lavine Dep.") 22:2-24, 23:22-24, 62:3-63:16.

79.     Senior Vice President Mickey Cummings, who was responsible for Equity's Southern California properties, recalls Equity considering late fees charged by competitors, current law, and information from apartment associations as the only "data points" the company relied on in setting the Standard Late Fee.  Dep. of Mickey Cummings ("Cummings Dep.") 5:24-3, 25:13-23, 67:10-68:11. The process of adopting the Standard Late Fee, as described by Mr. Cummings, did not include consideration of Equity's actual costs resulting from its California tenants' late payment of rent.  *See id*. 67:10-68:11.

80.     Equity's internal documents also confirm that the company did not analyze its actual costs from late rent in connection with the adoption of the Standard Late Fee in 2008.  In a 2014 "Fee Review Memorandum" (Exs. 89, 90, 538, 1147) authored by in-house attorney Susan Zumph and shared with other attorneys and members of the business team, Ms. Zumph wrote:

> We settled a 1999 class action lawsuit that challenged our late fee because we did not determine how much residents' late payments cost us before assessing the fees (or being sued).  In an attempt to mitigate our damages in that lawsuit, we engaged an expert to assess the amount of our damages, based on our costs and business processes at that time.  We have not updated this analysis in the ensuing 15 years, even though our business processes and the amount of the fee have changed drastically (and in inverse proportion to each other).

81.     Ms. Zumph explained that the dramatic technological changes between 1999 and 2014, both within Equity and in the world at large, had significantly streamlined Equity's process of collecting and accounting for late rent.  Zumph Dep. 196:21-198:7; 199:18-200:12.  In contrast, the amount of the average late fee had increased significantly from $50 in 2000 to almost $83 at the time of the memo in 2014.  *See id.* 197:8-199:17; *see also* Ex. 1243, at 1243-40 (showing an average late

fee of $82.99 for calendar year 2014); 1 Tr. 176:2-20 (summarizing data showing that the late fee increased "year over year" during the class period).

82.     Despite Mr. Fiffer's denial at trial to having any previous knowledge of Ms. Zumph's memorandum (3 Tr. 582:8-583:23), on which he was impeached (*id.* 587:23-589:8), Ms. Zumph received substantive input from Mr. Fiffer and Director of Legal Services Ann Paton before sending the memorandum to Equity's senior executives.  Ex. 1147 (sharing a draft with James Fiffer, noting that she has made revisions, and asking Mr. Fiffer to "please let me know if it is good to go to David [Santee]"); Ex. 90 (sharing the same memo with Mr. Santee less than an hour later, copying Mr. Fiffer, Ms. Paton, and General Counsel Bruce Strohm); Zumph Dep. 129:10-130:14; *see also* Ex. 538 (sending a further revised version to Mr. Fiffer and Ms. Paton the day after sending the memo to Mr. Santee).

83.     The Court finds that the Standard Late Fee adopted by Equity in June 2008 was not based on any cost analysis or attempt by Equity to estimate its actual costs of its California tenants' late rent payments.

**b.     Equity's Purpose in Adopting the Standard Late Fee Was to Increase Revenue.**

84.     After carefully weighing the evidence, the Court concludes that Equity's goal in adopting the Standard Late Fee was to increase revenue, without regard to the amount of actual costs the company incurred as a result of its California tenants' late rent payments.

85.     The Standard Late Fee was adopted after Equity's legal department undertook a review of fees it charged at properties throughout its portfolio.  Ex. 65; 4 Tr. 665:19-666:2, 743:1-25.

86.     Ms. Beihoffer, an attorney and First Vice President in Equity's legal department, played a central role in this review.  *See* JPFOF ¶¶ 39-40; *see e.g.*, Exs. 56, 65, 66.

87.     According to Ms. Beihoffer's contemporaneous communications, the goal of the fee review was to look for opportunities to increase fee revenue.  Ex. 65.  Ms. Beihoffer's contemporaneous communications also reflect that Equity was "committed to pushing the envelope a bit where the risk of doing so is low."  *Id.*

873269.27

88.     As part of that review, Equity considered increasing its late fee in California from a flat $50 to a 5% late fee.  Ex. 67; 4 Tr. 664:10-665:3.

89.     On May 8, 2008, Ms. Beihoffer asked Mr. Jenkins to quantify the potential increase in revenue that would result from changing the late fee from a flat $50 to a fee set at 5% of the rent.  *Id.*

90.     Mr. Jenkins agreed to run the numbers, but even before doing that suggested setting a fee of 5% with a minimum charge of $50 so that it would be a "a slam dunk guarantee to be better." Ex. 57.

91.     Mr. Jenkins analyzed average rents at Equity's properties across California and determined that a 5% fee would increase late fee amounts at all but six of those properties.  Ex. 63.

92.     Mr. Jenkins shared his conclusions from that analysis with Ms. Beihoffer and Mr. Santee on May 20, 2008.  Exs. 63, 62.  He wrote, "[a]s you would suspect, this is a slam dunk.  The average rent for all current CA leases is over $1500 & at 5%, the average late fee would come in at $75.  Overall, you'd expect to see a 50% increase."  In the same email, Mr. Jenkins reiterated his suggestion of setting the fee at 5% with a minimum of $50.  Ex. 63.

93.     Later on May 22, 2008, Mr. Santee solicited input on a proposed 5% fee from other members of the property operations and property management teams.  In that email, he conveyed Mr. Jenkins' conclusion that a 5% fee would increase fee amounts at nearly all of Equity's California properties.  Ex. 62; Santee Dep. 98:7-100:7.

94.     In response to Mr. Santee's email, Ms. Beihoffer summarized her discussion with Jamie Sternberg of Kimball, Tirey and St. John, who served as Equity's eviction counsel in California.  Ms. Beihoffer reported that Ms. Sternberg had informed her that "late fees of 6% have been challenged as an Unfair Business Practice and late fees of 4% appear to be below the radar screen" but that Ms. Sternberg had "not seen a standalone claim successfully objecting to a 5% late fee."  This summary also states Ms. Beihoffer's conclusion that "5% seems to be the 'sweet spot' in California."  Ex. 61. *Cf.* Ex. 69 (May 23, 2008 email from Ms. Sternberg to Equity advising, "I have seen unfair business practice lawsuits for late fees as low as 5%.").

873269.27

95.     None of Equity's witnesses offered any rationale for the minimum $50 charge other than Mr. Jenkins' reasoning that if the minimum charge was $50, it would be a "slam dunk guarantee to be better" than the existing late fee.  *See* Ex. 57.

96.     The 5% late fee, modified with a $50 minimum as Mr. Jenkins had proposed, was eventually adopted by Equity's decision makers in June 2008.  Exs. 9, 56.

97.     The testimony of Mr. Fiffer and Ms. Beihoffer that the Standard Late Fee was merely intended to recover Equity's costs is not credible.  *See, e.g.*, 3 Tr. 554:3-12; 4 Tr. 663:14-22, 668:22-669:7, 667:5-10, 762:11-17.  Additionally, these assertions are not corroborated by any contemporaneous written documentation, or the testimony of any business people involved in the decision to adopt the Standard Late Fee.

98.     Ms. Beihoffer acknowledged that to determine whether a 5% late fee was lawful, it would be necessary to "run it through the tracks of the liquidated damages analysis and make sure we're not recovering more than what our anticipated or estimated costs might be."  4 Tr. 753:23-754:12.  The record lacks any credible evidence that she or anyone at Equity ever did that.

### c.     Equity's Misplaced Reliance on the Los Angeles Department of Consumer Affairs Information Sheet.

99.     In May 2008, Mr. Fiffer located an Information Sheet regarding late fees from the Los Angeles County Department of Consumer Affairs ("LA County Information Sheet").  3 Tr. 464:4-19, 557:10-21.

100.     The LA County Information Sheet found by Mr. Fiffer states that "Late fees that are 5% or less of your monthly rent are considered reasonable" and cites California Civil Code § 1812.626.  Ex. 10.

101.     Mr. Fiffer and Ms. Beihoffer regarded the LA County Information Sheet as a significant document supporting a 5% late fee.  3 Tr. 464:4-21; Ex. 61; 4 Tr. 753:23-754:3.

102.     California Civil Code § 1812.626 is part of the Rental-Purchase Act, which applies to the rental of personal property, not residential property.  Exs. 199, 200.

103.     California Civil Code § 1812.626(e), since 1994, has provided that "[t]he total of all fees for a late payment shall not exceed the lesser of 5% of the payment or five dollars ($5), except that a minimum total fee of two dollars ($2) may be required." Ex. 199.

104.     Despite both being lawyers, neither Mr. Fiffer nor Ms. Beihoffer recall reviewing Civil Code § 1812.626 in 2008. 3 Tr. 464:22-465:2; 4 Tr. 680:7-12. Neither was aware in 2008 that Civil Code § 1812.626 applied to leases of personal property and not to residential leases, nor that it capped late fees at $5. 3 Tr. 464:22-466:1; 4 Tr. 680:17-23.

105.     The Court finds that Ms. Beihoffer's and Mr. Fiffer's reliance on the LA County Information Sheet does not in any way indicate that Equity attempted to estimate its actual costs from late rent in setting the Standard Late Fee. To the contrary, their reliance on that document demonstrates that the selection of the fee amount was not based on Equity's costs. Furthermore, the LA County Information Sheet cannot substitute for the analysis of actual costs that governing California law requires, as Equity's outside counsel for landlord/tenant issues in California Ms. Sternberg and the California Apartment Association guidance explained to Ms. Beihoffer before Equity adopted the Standard Late Fee. *See* Exs. 50 and 72.

106.     Moreover, Ms. Beihoffer's and Mr. Fiffer's reliance on an LA County Information Sheet that cited inapposite law, without checking the law or determining whether the information in that document was related to or consistent with California law governing late fees in residential leases, demonstrates a lack of diligence and a failure to exercise reasonable care. Their reliance on that document undermines their testimony that their primary objective in advising Equity on the adoption of the Standard Late Fee was to ensure that the company complied with California law regarding late fees.

107.     Equity attempts to justify its reliance on the LA County Information Sheet by pointing out that reference to Civil Code § 1812.626 was deleted in the versions of the Information Sheet that were allegedly posted on the LA County Department of Business and Consumer Affairs' website in 2014 and 2017. The Court allowed those documents to be introduced solely for the limited purpose of demonstrating Equity's state of mind in adopting the Standard Late Fee. 5 Tr. 811:5-813:23.

108.    It is undisputed that the 2014 and 2017 versions of the LA County Information Sheet, Exhibits 220-3 and 220-4, did not exist when Equity adopted the Standard Late Fee in 2008.

109.    Moreover, there is no evidence that anyone at Equity was aware of these versions of the LA County Information Sheet in 2014, 2017, or any other time before Equity attached them to Ms. Beihoffer's declaration in opposition to Plaintiffs' Motion for Partial Summary Judgment in 2019.

110.    Unlike other documents from Ms. Beihoffer's and other Equity managers' records produced in this litigation, these versions of the LA County Information Sheet were not Bates labeled. *See* Exs. 220-3 and 220-4.  Ms. Beihoffer testified that all of her relevant records were produced to Defense counsel in this litigation.  4 Tr. 792:7-18.  Documents that were in the possession of any of Equity's decision makers were produced in this litigation bearing Bates numbers.  *See e.g.*, Exs. 9-10, 50-67, 69-72, 1065-71, 1073-78, 1080-84.  That these versions of the LA County Information Sheet do not bear Bates numbers strongly indicates that they were never in the possession of Equity's decision makers and had no impact on Equity's state of mind in adopting or monitoring the Standard Late Fee's legality.  Instead they were found by Defense Counsel in 2019 when Equity opposed Plaintiffs' motion for partial summary judgment, and were presented to the Court at that time for purposes of defeating Plaintiffs' motion.

#### d.    Equity's Consultation with Outside Counsel and Knowledge of Legal Authorities

111.    In May 2008, Equity sought input from Equity's local eviction counsel in California, Jamie Sternberg of Kimball, Tirey and St. John, regarding the requirements for late fees under California law.  JPFOF ¶ 42; Ex. 61; 4 Tr. 680:24-682:13.

112.    Ms. Sternberg advised Equity of the legal requirement that a late fee be based on a reasonable endeavor to estimate the company's average costs from late rent and informed Equity that to meet this requirement it must attempt to estimate its average costs from late rent, based on an analysis of those actual costs.  4 Tr. 685:1-20.

113.    Ms. Sternberg advised Equity to retain back-up materials relating to its analysis of its actual costs of late rent.  Ex. 69; 4 Tr. 688:24-689:10.

873269.27

114.     Ms. Sternberg also advised Equity that she had seen legal challenges to late fees of 5% of tenants' monthly rent.  Ex. 69.

115.     Ms. Sternberg never advised Equity that the Standard Late Fee was lawful.  Deposition of Jamie Sternberg ("Sternberg Dep.") 84:4-14; *see also* Ex. 194 at 194-6-7 (Ms. Sternberg's liquidated-damages advice remained the same in 2015).

116.     Ms. Sternberg testified that she could not advise Equity on whether the Standard Late Fee complied with California law because she was never provided any analysis of Equity's costs. Sternberg Dep. 84:4-14.

117.     Shortly before Equity implemented the Standard Late Fee, Ms. Beihoffer received and reviewed a background paper on late fees by the California Apartment Association that stated that a "percentage fee is susceptible to challenge because the portion of the fee the represents administrative costs may not increase proportionate to the amount of rent."  Exs. 71, 72; 4 Tr. 692:23-693:2, 695:7-23; *see* JPFOF ¶ 43.

118.     The California Apartment Association background paper also explained that a California appellate court had "refused to enforce a bank's late fee, citing evidence that the fee was intended to 'generate new revenue' and 'increase profitability'" and that "[t]his testimony did not support the conclusion that the late fee was merely intended to recoup damages suffered by late payments" and cites to that case, *Hitz v. First Interstate* case, 38 Cal. App. 4th 274, 289 (1995).  Exs. 71, 72.

119.     If Ms. Beihoffer or Mr. Fiffer had read *Hitz*, they would have learned that the court of appeals equated "generating revenue" absent an analysis of actual costs, with the improper purpose of generating a profit.  *See Hitz*, 38 Cal. App. 4th at 290.

120.     If Ms. Beihoffer or Mr. Fiffer had read *Hitz*, they also would have learned the following additional three basic principles, none of which Equity followed:

a.     First, "A company cannot satisfy the reasonable endeavor requirement if it failed to complete any actual analysis of its costs before setting the late fee."  *Id.*, at 290-91.

b. Second, a company executive's "good understanding" of the company's costs from the information that he got on a regular basis, did not demonstrate a reasonable endeavor. *Id.* at 290.

c. Third, an analysis of the company's actual costs must be performed before setting a late fee. *Id.* at 291.

121. The *Hitz* case is part of what Mr. Fiffer tried to pass off as "a very meager body of case law" on reasonable endeavor in 2008. 3 Tr. 580:12-20.

122. In 2008 and in the years afterward, Mr. Fiffer and Ms. Beihoffer were both aware of the requirement in California law that a late fee must be based on an analysis of costs from late rent. 3 Tr. 580:12-22, 684:22-685:8.

123. After the adoption of the Standard Late Fee in 2008, Equity's legal department reviewed the Standard Late Fee among other lease provisions as part of a roughly annual fee review. 3 Tr. 506:9-16.

124. The roughly annual fee review did not include any collection of data related to Equity's actual costs from late rent. 3 Tr. 507:23-508:12.

125. According to Equity, the purpose of the annual fee reviews was purportedly to ensure that Equity's fees complied with governing law. Ex. 68 at 68-1.

126. Equity's legal staff twice recommended changes to the Standard Late Fee as part of the annual fee reviews, but Equity did not implement the recommended changes in either instance.

a. First, as part of the fee review completed in January 2011, Denise Beihoffer and Ann Paton recommended changing the California late fee from a 5% fee to a flat $50. Ex. 68; 3 Tr. 511:18-513:18. Equity did not implement that recommendation. 3 Tr. 513:13-514:2.

b. Second, Equity's legal staff recommended changes to the late fee in 2014 during a fee review led by in-house attorney Susan Zumph. Zumph Dep. 44:1-18, 45:15-46:2; 3 Tr. 514:13-515:18; Exs. 89, 90; *see generally* Ex. 194 at 194-6-7 (Outside-counsel Ms. Sternberg's legal advice remained the same in 2015).

873269.27

127. In a memo transmitted to Chief Operating Officer David Santee on November 24, 2014, Ms. Zumph set out the requirement in California law that a fee be based on "a reasonable effort by the parties to the [*sic*] estimate the amount of the damage arising out of the late payment." Ex. 89 at 89-3.

128. After noting Equity's failure to analyze its costs from late rent since a 1999 report obtained to "mitigate damages" in a prior lawsuit, Ms. Zumph recommended that Equity "conduct a new study to assess our costs and evaluate whether any adjustments to the fee are appropriate." Ex. 89 at 89-3; *see also id.* at 89-4-5 (recommending that Equity conduct a time and motion study to validate the amount of fees that are required to be based on their actual damages); 3 Tr. 523:11-524:12.

129. No witness was able to describe or testify to the existence of any study of late rent costs completed in accordance with Ms. Zumph's recommendation in the 2014 fee review memorandum. 3 Tr. 521:6-522:3, 526:23-527:3; Zumph Dep. 209:21-211:12; Santee Dep. 184:23-186:3. Equity has not presented any evidence that such a study was completed, much less that the results of the study supported the Standard Late Fee.

        **e.** **Equity's Knowledge in 2008 of the *Consumer Justice Foundation* Settlement and the Draft Expert Report Provided by Robert Knudsen in that Case**

130. The Court briefly addresses Mr. Fiffer's knowledge related to a 1998 lawsuit related to Equity's late fees in California at that time (the "*Consumer Justice Foundation* lawsuit") and a draft expert report submitted as part of that lawsuit. *See* 3 Tr. 469:10-21, 473:14-474:15.

131. Mr. Fiffer was personally involved in the defense of the *Consumer Justice Foundation* lawsuit, first as outside litigation counsel, and subsequently as the in-house attorney responsible for overseeing the case. 3 Tr. 473:2-13.

132. In September 1998, Equity retained an expert, Robert Knudsen of PricewaterhouseCoopers, to assist in the defense of the *Consumer Justice Foundation* lawsuit. Ex. 1010; 3 Tr. 473:14-474:11.

133. Mr. Knudsen completed a draft expert report for that litigation in April 1999 (the "Knudsen Report"). Ex. 1041 at 1041-1; 3 Tr. 480:6-481:10.

134. In 1999, Mr. Fiffer did not have a meaningful understanding of the analysis contained in the Knudsen Report. 3 Tr. 499:9-500:20, 503:9-19. In 1999, in his role as in-house counsel

overseeing the litigation, the "only thing [Mr. Fiffer] cared about was the overall conclusion" of the

Knudsen Report, that is, "did [Mr. Knudsen] find that it was more than 50 bucks or less than 50

bucks." 3 Tr. 500:4-13.

135.    Equity reached a settlement in principle in the *Consumer Justice Foundation* lawsuit

two days after PricewaterhouseCoopers transmitted the draft Knudsen Report to Equity's counsel. Ex.

1041 at 1041-1; Ex. 1042; 3 Tr. 478:22-481:7; *see* JPFOF ¶ 47.

136.    The settlement agreement provided that Equity could charge a late fee of "no more than

to $50" for a period of two and a half years after the new late fee went into effect. Ex. 12 at 12-4 ¶ 21

and 12-6 ¶ 26.

137.    The Superior Court approved the settlement by signing a two-page proposed order on

February 28, 2000. Ex. 13; 3 Tr. 489:8-490:9.

138.    The Superior Court approved the settlement without being presented with any analysis

or evidence of Equity's late rent costs. Exs. 1047, 1044; 3 Tr. 492:7-495:23.

139.    The Superior Court's order approving the settlement does not endorse a $50 late fee,

nor does it contain any factual findings or references to evidence to support at $50 late fee. Ex. 13.

140.    As of 2017, three years after the instant case was filed, Mr. Fiffer had never spoken

with Mr. Knudsen about the 1999 draft Knudsen Report. 3 Tr. 500:22-502:2.

141.    In 2017, when Mr. Fiffer was deposed in the capacity of a Federal Rule of Civil

Procedure 30(b)(6) deponent on the topic of Equity's late fee practices at the time of the *Consumer

Justice Foundation* lawsuit, Mr. Fiffer acknowledged that he had searched for, but was unable to find,

documentation of Equity's late fees in 1997. 3 Tr. 470:22-471:10; *see also* 3 Tr. 450:6-20, 451:14-

452:12; Ex. 234, Topic No. 3 (regarding scope of designation).

142.    When Equity adopted the Standard Late Fee in 2008, Mr. Fiffer did not have a

meaningful memory or understanding of the substance of the Knudsen Report. 3 Tr. 499:9-500:20,

500:22-502:2, 503:9-19.

143.    The Knudsen Report was in a box in off-site storage in 2008. 3 Tr. 579:24-580:1.

144.    Mr. Fiffer did not access or review the Knudsen Report in 2008 in connection with the

adoption of the Standard Late Fee. 3 Tr. 503:21-504:1.

145.     In 2008, Mr. Fiffer did not retrieve the Knudsen Report from off-site storage to show it to any of his colleagues. 3 Tr. 579:21-23.

146.     Ms. Beihoffer, Mr. Santee, Mr. Tuomi, and Mr. Lavine all confirmed that they have never reviewed the Knudsen Report, and their testimony demonstrated their lack of substantive knowledge about that report. 4 Tr. 690: 3-7 (Beihoffer); Santee Dep. 63:14-65:12; Tuomi Dep. 25:22-27:3, 27:4-28:22; Lavine Dep. 68:20-69:6.

147.     Equity has not presented any evidence that Mr. Jenkins or Mr. Cummings had any knowledge of the Knudsen Report.

148.     Equity's claim that the Knudsen Report figured into its 2008 decision to adopt the Standard Late Fee is not supported by any contemporaneous emails or documentation. *Cf.* Ex. 61 (email from Ms. Beihoffer discussing and summarizing other information considered by Equity, but omitting any mention of costs from late rent or Mr. Knudsen's report).

149.     Based on all the evidence presented at trial on this issue, the Court finds that Equity's decision to adopt the Standard Late Fee was not based on the Knudsen Report.

150.     Even assuming *arguendo* that Equity's decision-makers in 2008 did rely on Mr. Fiffer's minimal knowledge of the Knudsen Report as a measure of the company's relevant costs, that reliance was neither reasonable nor a good faith effort to estimate Equity's actual costs from late rent in 2008.

151.     Further, based on the decision makers' failure to take any steps to review or analyze the Knudsen Report in 2008, the Court finds that any reliance on the assumed conclusions of that report was pretextual in nature—that is, that Equity's decision makers only relied on the existence of the report to the extent they thought they could later use it to justify their position.

**f.     The Standard Late Fee's Percentage-Based Formula Is Not Aligned with Equity's Costs of Collecting Late Rent.**

152.     The Standard Late Fee of 5% of the outstanding balance with a minimum of $50 results in higher and higher late fees as the tenant's outstanding balance increases beyond $1000, while ensuring that tenants are charged a late fee of at least $50 even for outstanding balances as small as $100. *See, e.g.*, 2 Tr. 254:23-255:13.

873269.27

153.     In practice, the percentage formula has led to stark differences in late fees charged even at one property, based on differences in the underlying rent amounts. Ex. 249 at 249-18-19.

154.     Plaintiffs' expert accountant David Breshears observed "countless instances" in Equity's class-member ledger data "where different late fee amounts were assessed on the same date" to different tenant households at the same property. Ex. 249 at 249-19, ¶ 44; *see also* 8 Tr. 1353:8-1355:5 (describing demonstrative Ex. 541-4 that summarizes examples from Ex. 249 report).  For example, on December 5, 2016 at Equity's Westgate property, Equity charged one household a late fee of $76.70, while charging another a late fee of $177.25.  Both paid their outstanding charges on the following day.  Ex. 249 at 249-19, ¶ 44a.  On March 5, 2018, at Equity's Hesby property, Equity charged one household a late fee of $61.52 and another household a late fee of $211.80.  Both paid their outstanding charges that same day.  *Id.* ¶ 44b.  And on October 5, 2018, Equity charged one household a late fee of $52.75 while charging another household a late fee of $153.10.  Both paid their outstanding charges that same day.  *Id.* ¶ 44c.

155.     The differences in these late fee amounts do not correspond to differences in Equity's interest costs for the outstanding balances.  In each of the examples above, Mr. Breshears conservatively calculated Equity's interest costs on the outstanding balances as ranging between $0.06 (for the balance resulting in the $52.75 fee) and $0.14 (for the balance resulting in the $211.80 fee). Ex. 249 at 249-19, ¶ 44a-c; *see also* 8 Tr. 1353:8-1355:5 (describing demonstrative Ex. 541-4 that summarizes examples from Ex. 249 report).

156.     Equity has not provided evidence of any actual costs that would justify the differences in late fees paid by households at the same property that paid their rent and late fees on the same date, as in the examples cited above, where the only apparent difference in their circumstances is the amount of their monthly rent.

157.     Before the adoption of the Standard Late Fee in June 2008, Ms. Beihoffer was aware of guidance from the California Apartment Association that a "percentage fee is susceptible to challenge because the portion of the fee that represents administrative costs may not increase proportionate to the amount of rent."  4 Tr. 696:12-23; Ex. 72 at 72-4.

158. Additionally, Ms. Beihoffer was aware of concerns raised by another Equity employee that "[I]t seems odd that the cost [of late rent] (except for interest) would be greater" to pursue standard rent collection activities "just because someone pays more in rent." Ex. 70 at 70-2; 4 Tr. 701:20-703:11.

159. There is no evidence that Ms. Beihoffer or anyone else at Equity took any steps in 2008 or afterward to determine whether Equity's personnel costs increased proportionally with the amount of the balance. *See* 4 Tr. 705:5-9; *see also* Ex. 70 at 70-1 (responding to the concern about a percentage fee by referencing the LA County Information Sheet, but not providing any rationale for why administrative costs would increase for higher balances).

160. At most, Ms. Beihoffer described a "general assumption" that costs of late rent collection would increase with additional roommates and by extension, larger units. 4 Tr. 704:21-705:4; *see also* 703:24-704:5.

161. Equity did not show at trial that it incurs proportionally more personnel costs to collect higher balances. *Cf.* Ex. 249 at 249-19, ¶ 44 (describing markedly diverging fee amounts for outstanding balances that were ultimately paid on the same day).

162. The evidence supports the opposite conclusion. Equity's personnel costs associated with late rent payments do not increase or decrease proportionally with the amount of outstanding rent. *See, e.g.*, 2 Tr. 255:20-256:3 (Villanueva testifying that she would contact any account with a rent balance); Ex. 19 at 19-2 (requiring personnel to serve three-day notices for delinquent rent on the fifth of the month without prioritizing based on the amount of the balance); *see also, e.g.*, 8 Tr. 1147:24-1148:14 (some personnel costs increase the longer rent is outstanding, without regard to the amount).

### 3. **In Practice, the Amounts Charged Under the Standard Late Fee Formula Have Been Far Greater than Equity's Costs of Collecting Late Rent.**

163. Plaintiffs offered testimony from expert economist Andrew Schwarz, MBA, MA, to criticize Equity's analysis of its personnel costs and to present an alternative model for measuring Equity's personnel-cost damages from relevant instances of late rent. *See* 8 Tr. 1077:8-18.

164. Mr. Schwarz studied doctorate-level economics at U.C. Berkeley and has worked as a professional economist for approximately 25 years. Ex. 259 at 259-7 ¶ 1 Suppl. Expert Rebuttal Rpt.

of Andrew D. Schwarz ("Schwarz 2022 Report"); 266 (CV); 8 Tr. 1078:5-1079:8. He regularly lectures and publishes on economic issues, and he has extensive experience in applying economic and statistical principles to questions relevant to the calculation of economic damages. Ex. 259 at 259-7 ¶ 1 (Schwarz 2022 Report); Ex. 266 ("Schwarz CV"); 8 Tr. 1078:5-21.

165. The Court finds that Mr. Schwarz is qualified to provide expert testimony in this case related to economics, econometrics, and statistics, including performing multiple regression analyses, for purposes of calculating Defendants' offset damages. 6 Tr. 1078:5-1079:21; 1081:19-1083:20; Ex. 259 at 259-7 ¶ 1 (Schwarz 2022 Report); 266 (Schwarz CV).

166. Mr. Schwarz conducted several multiple regression analyses to determine the extent to which Equity's employee costs increased as a result of class members' late rent payments (based both on the number of late fees per month per property and the number of days rent was outstanding), then for each class member household totaled those costs with Equity's interest costs stemming from the late payments to calculate the company's costs caused by the late payments. Ex. 259, Schwarz 2022 Report, at 259-54 - 259-73, ¶¶ 80-98.

167. Mr. Schwarz's analysis demonstrates that Equity's costs resulting from class members' late rent payments are almost entirely within the range of $12 to $25 per late payment, far below even the minimum $50 late fee charged under the Standard Late Fee. Ex. 531.

168. Mr. Schwarz's calculations show that the late fees class members paid are 4.8 times greater than the damages caused by those class members. Ex. 259 at 259-75 - 259-67 (Schwarz June 2022 Report) ¶¶ 102, 103; 6 Tr. 1178:10-1179:17.

**C.  The Woodland Park $50 Late Fee**

169. Woodland Park is an 1,800-unit rental property in East Palo Alto, California. JPFOF ¶ 32; 4 Tr. 733:18-20.

170. Defendants acquired Woodland Park on December 1, 2011, and sold it in February 2016. JPFOF ¶ 31; 4 Tr. 733:15-17.

171. When Defendants acquired Woodland Park, they were unable to locate leases for all existing tenants. 4 Tr. 733:21-734:2. Even for the leases they were able to locate, it took months for

1    Defendants to complete the process of inputting late fees amounts from the pre-existing leases into

2    MRI. *Id.*

3         172.    Defendants charged members of the Woodland Park Preexisting Lease Class a flat $50

4    late fee until Defendants updated the tenants' account information in MRI to reflect the late fee set

5    forth in the resident's pre-existing lease agreement. 4 Tr. 734:3-10. Defendants also charged a flat

6    $50 late fee on the fifth of each month to tenants leasing units for which Defendants were unable to

7    locate an existing lease. *Id.*

8         173.    The leases for the Woodland Park Plaintiffs included a grace period until the fifth of the

9    month to pay their rent before they incurred a late fee. *See* Exs. 2 to 4 & 1561 to 1563.

10        174.    There is no evidence that any member of the Woodland Park Preexisting Lease Class

11   signed a lease agreeing to pay the Woodland Park $50 Late Fee for their late payment of rent.

12        175.    Defendants have no records demonstrating the process they used, if any, to set the

13   Woodland Park $50 Late Fee that they charged to members of the Woodland Park Preexisting Lease

14   Class. 4 Tr. 734:11-25.

15        176.    Defendants are unable to identify the individuals who were involved in setting the

16   Woodland Park $50 Late Fee Equity charged to members of the Woodland Park Preexisting Lease

17   Class. 4 Tr. 735:1-4.

18        177.    Defendants did not perform an analysis of their costs and damages resulting from the

19   late payment of rent in setting the Woodland Park $50 Late Fee. 4 Tr. 735:5-10.

20        178.    In 2012 or 2013, CBG commenced an audit of the Woodland Park property. One

21   purpose of the audit was to ensure that Woodland Park tenants were charged late fees consistent with

22   their pre-existing leases. For some tenants, Defendants increased the late fee to a fixed amount of

23   $100. Defendants also refunded any late fee charges that were inconsistent with tenants' pre-existing

24   leases. All refunds issued pursuant to the Woodland Park audit were entered into MRI. 3 Tr. 621:5-

25   625:12.

26        179.    Defendants never completed the Woodland Park audit. 3 Tr. 624:19-625:7.

27        180.    The Woodland Park $50 Late Fee is disproportionate to Defendants' damages caused by

28   late rent payments. Almost all of Defendants' damages from Woodland Park Preexisting Lease Class

873269.27

1    Members' late payments fall in the range of $12 to $21 per late payment, depending on how many

2    days the rent is outstanding.  Ex. 531 (4(b)(ii) numbers)).  Thus, Woodland Park $50 Late Fee was two

3    to four times the amount of Defendants' actual damages from late rent payments.

4    **D.**    **The Amount of Late Fees Equity Collected from Class Members**

5         **1.**    **Equity's MRI Property Management and Accounting Database**

6         181.    Throughout the class period of September 3, 2010 to October 28, 2022 ("Class Period"),

7    Defendants have used a property management and accounting software database ("MRI") to track

8    resident charges and payments, as well as company expenses.  *See* Ex. 247 at 247-4 to 5; ECF No. 454

9    at 17 ¶ 5.

10        182.    The Parties' Joint Stipulation Regarding the Electronic MRI Property Management, and

11   Financial Management Data Produced by Defendants in this Action ("MRI Stipulation"), executed on

12   May 7, 2021, explains Defendants' use of the MRI Database in detail as relevant to this action.  *See*

13   Ex. 247.  The Court incorporates by reference the Parties' stipulations in Exhibit 247.

14        183.    Defendants use MRI to track and store transactions with their California residential

15   tenants, including class members.  *See* Ex. 247 at 247-7 § II.B ¶ 14 (The RMLEDG table "contains all

16   charges to and payments by" tenants "up until the point a former resident is sent to collections.").

17        184.    MRI assigns each tenant, tenancy (*i.e.* tenants sharing a lease), and property a unique

18   identifier – all of which are noted for each transaction which facilitates tenant-level, lease-level, and

19   property-level analyses.  *See* Ex. 247 at 247-5 §II.A ¶ 13 & 247-7 § II.B ¶ 18; *see also* Ex. 252 Second

20   Suppl. Expert Rpt. of David Breshears ("Breshears June 2022 Report").

21        185.    MRI records extensive information about each transaction – including the date and time

22   of the transaction, the amount of the transaction, the category of the transaction (*e.g.,* whether it is for

23   rent or a late fee), and the type of transaction (*e.g.,* a charge or payment).  Ex. 247 at 47-7 § II.B ¶ 18;

24   *see* 1 Tr. 123:25-124:25 (Mr. Breshears describes the "source codes" that appear in the stipulation at

25   Ex. 247-10).  *See generally* 1 Tr. 125:13-130:7 (reviewing Ex. 535, Breshears RMLEDG

26   demonstrative).

27        186.    MRI records each charge to and payment by a tenant (as well as any waivers, reversals,

28   etc.) as separate transactions and assigns each transaction a unique identifier.  Ex. 247 at 247-9 § II.B ¶

29

873269.27

18.a, d-f. MRI also links related transactions by transaction identification number – *e.g.,* it tracks that a specific payment satisfies a specific charge. 1 Tr. 128:14-130:7 (reviewing Ex. 535); Ex. 247 at 247-9 & 15 § II.B ¶ 18.a, j.

187.    Throughout the Class Period, late fees have been one of the lowest "priority" charges categories in Equity's MRI database; in other words, late fees are in the last charge category that is credited with monies paid by tenants. 1 Tr. 120:5-121:19; 122:2-123:10; Ex. 113 (MRI Charge Code Details Table); *see also* Ex. 248 (Expert Rpt. of David Breshears) ("Breshears May 2021 Report ") at ¶¶ 18-19); Ex. 247 at 247-16 (MRI Stipulation at § III.B.19.d.xiii (247-16, 19)). Accordingly, MRI recording that a late fee has been paid indicates that all other outstanding charges for the relevant tenancy for that month have also been paid, including rent. *See* Ex. 247 (MRI Stipulation at § III.B.19.d.xiii); 1 Tr. 120:5-121:19; 122:2-123:10.

### 2.    Plaintiffs' Expert Accountant David Breshears' Calculated Class Members' Late Fee Charges and Payments.

188.    Plaintiffs presented testimony from accounting expert David Breshears to calculate late fee charges and payments between class members and Defendants based on Equity's MRI tenant ledger data through December 29, 2021, the last date for which Equity produced MRI data to Plaintiffs. *See* 1 Tr. at 116:11-25 (Mr. Breshears will update if and when the data is updated). Mr. Breshears also calculated prejudgment interest on the amount of late fees paid by the Standard Late Fee and Woodland Park Preexisting Lease Class Members, and offered testimony in rebuttal to the opinions of Defendants' expert Mark Hosfield regarding Defendants' claims for offset of the lost use of funds and eviction costs. *See* 1 Tr. 114:4-21; *see also* Exs. 249; 252.

189.    Mr. Breshears is a partner at the accounting firm Hemming Morse, LLP, a Certified Public Accountant, licensed in the State of California, and Certified in Financial Forensics by the American Institute of Certified Public Accountants. *See* Tr. 107:15-109:5; Ex. 252-7 - 8 (Breshears June 2022 Report ¶¶ 9-10; Ex. 263 (CV).

190.    Mr. Breshears has been a forensic and financial accountant for over 20 years, specializing in litigation consulting, economic and financial research, and database analysis. *See* 5 Tr. 107:15-108:22; Exs. 263; 252-7 to 8 ¶¶ 9-10.

191. Mr. Breshears has served as an expert in over 450 matters with class-action issues on behalf of both plaintiffs and defendants, and is familiar with reviewing contemporaneous cost accounting systems and their structures, as well as analyzing voluminous system generated records in order to calculate class damages and restitution. *See* 1 Tr. 108:3-21, 109:25-110:25; Exs. 263; 252 at 252-7 ¶ 10.

192. The Court finds Mr. Breshears is qualified as an expert in forensic accounting for the purposes of analyzing and calculating the late fees charged to and paid by the classes, calculating prejudgment interest on the late fees paid by the classes, analyzing and calculating Equity's lost use of late rent funds, and analyzing and calculating the legal fees and costs that Equity claims as part of its offset defense. *See* 1 Tr. 114:4-21.

### 3. Plaintiffs' Computer-Forensics Expert Paul French Formatted the Underlying Data Used by Mr. Breshears to Calculate Class Members' Late Fee Charges and Payments, and Data Used by Other Experts.

193. Plaintiffs' computer-forensic expert Paul French provided testimony describing his process for analyzing the extensive MRI and personnel data produced by Defendants in this action and translating it to be usable to Plaintiffs' accounting expert Mr. Breshears and expert economist Mr. Schwarz. *See* Ex. 256 Suppl. Expert Rpt. of Paul French ("French 2022 Report"); 1 Tr. 74:19-25.

194. Following his thirteen-year formal military training by the U.S. Air Force, including in computer forensic analysis, Mr. French has consulted in private-sector electronic forensic matters since 1999. He has over twenty years of experience as a forensics database expert, including as a consultant managing digital investigations for a wide array of complex legal disputes. Ex. 265; 1 Tr. 76:44-79:3.

195. The Court finds Mr. French to be qualified as an expert in computer forensics for purposes of analyzing and processing the data sets produced by Defendants in this action for use by other experts. 1 Tr. 78:11-79:3.

196. The Court finds credible Mr. French's testimony that the SQL database containing tenant ledger data Mr. French prepared in February 2022 and provided to Mr. Breshears accurately and correctly reflects the tenant ledger data produced by Defendants in this action. *See* 1 Tr. 83:9-88:14; 102:15-104:3.

197.    The Parties agree that Exhibit 196, prepared by Mr. French, accurately reflects the list of Standard Late Fee Class Members from September 3, 2010 to October 28, 2022.  1 Tr. 81:23-82:5; 82:20-83:6.  The Woodland Park Class List was produced by Defendants at Exhibit 30.

### 4.    **Restitution**

198.    Both Plaintiff-expert Mr. Breshears and Defense-expert Mr. Hosfield calculated late fee charges and payments between class members and Defendants based on Equity's MRI tenant ledger data through December 29, 2021, the last date for which Equity produced MRI data to Plaintiffs.  1 Tr. 153:10-18 (Mr. Breshears explains that differences in the experts' calculations arise "based on our methodologies not the actual data set that we're using").

199.    Mr. Breshears also testified to patterns and trends that he observed regarding class members' late-fee payments, which he treated as "restitution" owed to class members, notwithstanding any permitted offset.  1 Tr. 137:14-20; *see* 1 Tr. 168:9-169:14 & Ex. 252 at 252-19 (Breshears June 2022 Report) (demonstrating that the majority of late fees charged were paid within five days of the expiration of the grace period); 1 Tr. 175:8-176:20 & Ex. 537 (demonstrative depicting average late fee charge for each year from September 2010 through December 2021, showing that the average late fee charged rose from $68.03 in 2010 to $106.14 in 2021); *see also* 1 Tr. 172:4-175:6 & Ex. 536 (demonstrative showing distribution of late-fee-payment amounts through same period).

200.    Mr. Breshears calculated, and Mr. Hosfield did not dispute, that Defendants collected $270,022 in total late fees from Woodland Park Preexisting Lease Class Members between December 1, 2011 and February 16, 2016.  1 Tr. 140:18-141:16 (reviewing summary chart at Ex. 252-9); 1 Tr. 152:6-12 (no difference from Mr. Hosfield).  *Cf.* 1 Tr. 143:3-9 & Ex. 252 at 252-36 (Breshears June 2022 Report) ($610,923 in late-fee charges to the Woodland Park Preexisting Lease Class); *cf.* 1 Tr. 144:10-12 ("Of the $610,923 in charges, $226,061 were reversed, ending up in a net charge amount of $384,862 in net charges.").

201.    The Court adopts Mr. Breshears' calculation of total late fee payments made by Woodland Park Preexisting Lease Class Members through the end of the class period in February 2016.

873269.27

202.    As for the Standard Late Fee Class, both Mr. Breshears and Mr. Hosfield calculated that Equity charged those class members $36,119,831 in late fees during the period of September 3, 2021 through December 31, 2021.  1 Tr. 131:9-132:8, 142:15-143:1 & Ex. 252-35 (Breshears June 2022 Report) ($36,119,831 in late-fee charges to Standard Late Fee Class from September 3, 2010 through December 31, 2021); 1 Tr. 152:16-24 (there is no difference in Mr. Breshears' and Mr. Hosfield's calculation of the number or dollar-amount of late fees charged to Standard Late Fee Class Members); *see also* Ex. 252 at 252-13 (Breshears June 2022 Report).

203.    Mr. Breshears clarified that only approximately $32 million of those late-fee charges relate to the late-fee payments included in his and Mr. Hosfield's calculations.  1 Tr. 143:11-144:8 & Ex. 252-13 ¶ 33 (describing that "[$]4,106,848 [charges] were reversed, waived, or otherwise reduced by NC transactions.").

204.    According to Mr. Breshears, between September 3, 2010 and December 31, 2021, Standard Late Fee Class Members paid Equity $28,920,220 in late fees, based on the data from the MRI tenant ledger table (RMLEDG) linking late fee charge ("CH") and cash receipt payment ("CR") transaction codes.  1 Tr. 136:18-137:13, 138:12-138:18 (reviewing chart at Ex. 252-8) (Breshears June 2022 Report)); *see generally* 132:9-134:17 (Breshears describing methodology for payments, including adjustments based on linked transactions).

205.    Mr. Hosfield calculated $28,903,390 in total late fees paid by Standard Late Fee Class Members.  5 Tr. 849:15-850:10.

206.    The experts' calculations differ by only $16,810 out of the approximately $28.9 million dollars in Standard Late Fee Class Member late-fee payments made through cash receipts.  1 Tr. 152:25-153:9; *see also* 5 Tr. 850:11-20.

207.    The relatively small difference between the Parties' experts' calculations is a feature of their different methodologies: Mr. Breshears performed a transaction-level analysis of the ledger data, whereas Mr. Hosfield's analysis aggregated the ledger data.

208.    Both experts calculated total late fees paid based on the total late-fee cash-receipt transactions (CR) in the RMLEDG data, and reduced the total payment amount by the dollar amounts of transactions for payment reversals (PR), non-sufficient funds (NS), and refunds (RF).  However,

1   Mr. Hosfield's reduction included all PR, NS and RF transactions appearing in the ledger data related

2   to any type of payment, whereas Mr. Breshears only included adjustments that specifically related to

3   late-fee payment transactions.  *See* 1 Tr. 153:20-156:16 ("So that's really the difference, [] that [Mr.

4   Breshears] directly linked the debits and the credits or the payment and the adjustments, where [Mr.

5   Hosfield] just took the global bottom line number for all of those."); 5 Tr. 850:11-20 (Mr. Hosfield

6   agreed that "[v]irtually all of the [difference] is just from refunds that [Mr. Hosfield] counted as

7   refunds and the other side did not count"); *see also* 1 Tr. 132:9-134:17, 153:20-154:6, 1 Tr. 182:18-

8   183:2, 183:12-184:9.  Specifically, Mr. Breshears only included in his calculation of the reduction

9   those PR, NS and RF transaction amounts that he could link to positive late-fee payments by matching

10  the TransactionID and ReferenceID fields in the data.

11      209.    The Court agrees with Mr. Breshears that it is appropriate to limit the payment-reducing

12  transactions to those specifically related to late-fee payments at issue in this action.  *See generally* 1 Tr.

13  134:13-17 ("[I]t's a more thoughtful analysis to identify all of the payments in the system and then

14  identify any specific adjustments that were made to those dollars so that I can try to determine the most

15  accurate number in terms of what was actually paid by that tenant."); 1 Tr. 154:20-25 (Mr. Hosfield's

16  calculation creates a "situation where … instead of calculating an amount that a person paid, it might

17  falsely show that not only did they not pay it, but [] it would be a credit [to Equity to be used] against

18  other people."); 1 Tr. 155:15-21 ("[I]t's a small difference, but I think it's an important difference that

19  I can tie actual payments and the adjustments to the original payment that occurred.  And I can do that

20  for each and every class member so you don't end up with situations where a person not only ended up

21  [showing as] not paying a late fee, but it shows a surplus [to Equity] or essentially a charge in the

22  payment column.").

23      210.    During the course of trial, Mr. Breshears alerted the Court that both he and Mr. Hosfield

24  had understated the total amount of late fees paid by class members by failing to include certain "NC"

25  (non-cash credit) transactions that functioned as late fee payments as a result of Equity applying

26  tenants' security deposits to those charges.  After argument from Counsel for both Parties, the Court

27  ordered that Plaintiffs would be permitted to supplement the record with Mr. Breshears' testimony

28  regarding the "NC" non-cash security-deposit late-fee payments, Defendants would have the

34

1    opportunity to cross-examine Mr. Breshears, and then Defendants could also bring Mr. Hosfield back
2    to testify. 7 Tr. 1224:3-1233:5, 1290:24-1293:7 ("[S]ince the evidence has not been closed, this would
3    be the time to complete the record – the trial record without prejudice to either side, particularly the
4    defendants [being able to] argue what weight, if any, or even what consideration, if any, should be
5    given to this testimony.").

6        211.    This issue came to light when Mr. Breshears reviewed a demonstrative presented by
7    Mr. Hosfield (Ex. 1569) depicting a late-fee transaction in the RMLEDG tenant ledger data as an
8    example of Mr. Hosfield's crediting a late-fee refund where Mr. Breshears had not. *Compare* 5 Tr.
9    850:11-852:11, 981:17-984:25 & Ex. 1569; *with* 7 Tr. 1296:8-1297-25 & Ex. 541-2. When Mr.
10   Breshears examined the transactions surrounding Mr. Hosfield's example, Mr. Breshears determined
11   that Mr. Hosfield was reducing class members' total late fees paid based on refunds for payments that
12   were not included in Mr. Hosfield's calculation of total late fees paid. *See generally* Ex. 541-2 & 7 Tr.
13   1296:8-1297-25. Specifically, Mr. Hosfield's example included a refund that was linked to an NC, or
14   non-cash payment, from the tenant's security deposit; Mr. Breshears did not include the same refund in
15   his calculation since it was not specifically linked to a CR payment.

16       212.    This examination confirmed the source of the $16,810 difference in Mr. Breshears' and
17   Mr. Hosfield's restitution calculations: unlike Mr. Hosfield, Mr. Breshears had not included the refund
18   as a deduction to the class's restitution because it was "not tied directly to an actual payment, *i.e.*, a CR
19   entry." *See* 7 Tr. 1298:3-6.

20       213.    However, it also alerted Mr. Breshears and Class Counsel that when Equity takes
21   money from a tenant's security deposit to pay for a late fee, the transaction is coded as "NC" (non-cash
22   credit) with the description "security applied," as opposed to a CR code entry, which both experts used
23   to calculate the total amount of late fees paid by class members. Accordingly, neither expert had
24   included these "security applied" payments as part of the classes' potential restitution. 7 Tr. 1304:2-
25   1305:11; *see* 7 Tr. 1305:24-1306:6 (both experts relied on CR source code to calculate payments); 7
26   Tr. 1306:13-1307:8 (neither expert characterized "NC" transactions as payments); *see also* Tr.
27   1307:17-21 (Mr. Breshears explained "that the NC source code with the description of security applied
28   is Equity applying a tenant's security deposit to an outstanding balance upon their moveout."); 8 Tr.

1  1408:1-11 (Mr. Hosfield confirmed NC-security-applied as Equity applying a security deposit to a

2  charge).

3       214.   Both experts had addressed these NC transactions in their analyses, but characterized

4  them as charge reversals, rather than payments.  7 Tr. 1304:2-1305:11; *see also* 8 Tr. 1410:5-1411:3 &

5  Ex. 1569 (Mr. Hosfield counted 58,352 late fees reversed, which matches the number of "NCs" Mr.

6  Breshears identified); *see also* 8 Tr. 1406:22-1407:12 (Mr. Hosfield removed all non-cash credits

7  (NCs) from the late fees paid by Standard Late Fee Class Members).

8       215.   Mr. Breshears testified that, if the NC-security-applied transactions were treated as late-

9  fee payments, the Standard Late Fee Class's restitution would increase by approximately $815,000.  7

10  Tr. 1307:22-1308:6 (reflecting "total amount of late fee charges in the RMLEDG tenant data that had

11  the NC source code [and] the description of security applied").

12       216.   Both experts testified that they would be able to update their analyses to include the

13  NC-security-applied transactions that appear in the class member tenant ledger data.  *See* 7 Tr. 1308:7-

14  13 (Mr. Breshears: "Yes it's already in the data being used by both experts."); 7 Tr. 1408:25-1409:19

15  (Mr. Hosfield agrees that "[y]ou could do that simple math" to determine the amount of NC-security-

16  applied transactions.); *cf.* 4 Tr. 850:1-4 (Mr. Hosfield testified that ledger transactions are "all

17  segregated by codes in the database.  And you literally just run through the database and count up the –

18  those that were paid, remove the reversals, and you end up with a net amount of late fees that were

19  paid.").

20       217.   Indeed, Mr. Hosfield returned to testify at trial about the effect of the additional

21  $815,000 in NC-security-deposit, late-fee payments on his cost-incurred and cost-savings models for

22  calculating Equity's claim of offset costs of late rent.  *See generally* 8 Tr. 1399:2-1400:25 & Ex. 1578

23  ("Q. If by some chance the Court accepts the argument from plaintiffs about this $815,000, did you

24  prepare demonstratives for the Court what the impact would be on your overall analysis?  A. Yes, I

25  did.").

26       218.   For both models, Mr. Hosfield updated his calculations comparing Equity's costs to

27  class members' late fees paid to include the additional $815,000 in late-fees-paid.  *See* 8 Tr. 1402:13-

28  1403:15 & Ex. 1578-1 (cost-incurred model from Ex. 1278-20 with $815,000 added) & Ex. 1578-2

36

(graph of updated cost-incurred calculations); 8 Tr. 1403:16-1404:9 & Ex. 1578-3 (cost-savings model from Ex. 1278-21 with $815,000 added) & Ex. 1578-4 (graph of updated cost-savings calculations).

219. In both of Mr. Hosfield's updated models, the total costs did not change—*i.e.,* Equity's costs were not impacted by re-characterizing the NC transactions as late-fee payments instead of charge-reversals. *See* 8 Tr. 1399:11-17 & Ex. 1578 at 1578-1-2 (costs-incurred model); 8 Tr. 1400:4-15 & Exs. 1578 at 1578-3-4 (cost savings).

220. Rather than an error with the data, this issue boils down to whether these security-deposit payments should be included when considering potential restitution to the classes. For the reasons set forth in the Conclusions of Law below, the Court agrees with Plaintiffs that to the extent Equity retained security-deposit monies from class members to pay for late fees at issue in this action, those payments should be included in the total calculation of the dollar amount of late fees paid by the classes.

221. The Court heard Counsel's arguments and weighed Defendants' claim that the late-disclosure of this issue was prejudicial, against Plaintiffs' claim that the class would be significantly prejudiced if these late fee payments were not included in the restitution calculations.

222. On balance, the Court agrees with Class Counsel that the prejudice to the class of excluding the approximately $815,000 payments outweighs any prejudice to Defendants in responding. Their expert has already provided updated models, and the Parties already have an agreement to update their restitution calculations after trial based on the Court's findings herein. Accordingly, the Court will permit both Parties to update their analyses to re-characterize these specific NC transactions as payments toward restitution when performing their updated calculations following the Court's issuance of its Findings of Fact and Conclusions of Law.

223. Accordingly, the Court orders the Parties to use Mr. Breshears' methodology for calculating the pre-offset restitution to the class: *i.e.,* summing cash receipts (CR) and security-applied non-cash credits (NC) linked to late fee charges and reducing the total by specifically-linked payment-reducing transactions (refunds (RF), payment reversals (PR), and non-sufficient funds (NS)).

873269.27

**5. Pre-Judgment Interest**

224. Mr. Breshears also calculated the amount of prejudgment interest that had accrued as of December 31, 2022 on $29,190,242 in late fees paid by the classes (not accounting for security applied payments). *See* 1 Tr. 138:20-139:11.

225. Specifically, Mr. Breshears calculated the simple interest at seven percent per annum that accrued between the specific date of each late-fee payment (CR) transaction in the data through December 31, 2022. 1 Tr. 138:20-140:6.

226. He is commonly asked to use the seven percent simple interest rate to calculate prejudgment interest. 1 Tr. 139:9-15.

227. Mr. Breshears calculated that, as of December 31, 2022, $14,152,524 in prejudgment interest had accrued on the $28,920,220 in Standard Late Fee Class Member late-fee payments that he calculated. 1 Tr. 140:7-16 (totaling $43,072,724 in restitution and interest based on calculations at Ex. 252-8 (Breshears June 2022 Report)).

228. For the Woodland Park Preexisting Lease Class, Mr. Breshears calculated that as of December 31, 2022, $175,610 in prejudgment interest had accrued on the $270,022 in late-fee payments. 1 Tr. 141:3-16 (totaling $445,632 in restitution and interest based on calculations at Ex. 252-9 (Breshears June 2022 Report)).

229. Defendants did not present evidence disputing Mr. Breshears' prejudgment interest calculations.

230. The Court finds that class members are entitled to prejudgment interest on restitution and orders the Parties to use Mr. Breshears' methodologies in updating calculations for both classes through the date of judgment, as set forth in the Conclusions of Law below.

231. As the Court has found it appropriate to include the approximately $815,000 in late fees paid with security deposits in the restitution calculation, the updated calculation should also reflect prejudgment interest on those payments through judgment.

**E. Defendants' Alleged Offset Damages**

232. Equity offers the expert testimony of accountant Mark Hosfield, CPA, CMA, to calculate Equity's claimed offset damages, including Equity's claimed personnel-cost, lost-use-of-

funds, eviction, and collection costs.  Mr. Hosfield has specialized training and credentials in accounting.  5 Tr. 841:23-843:1.

233.     The Court finds that Mr. Hosfield is qualified to provide expert testimony based on his education and experience as an accountant on the topics of late fees charged by Equity, late fees paid by class members, and Equity's costs of collecting late rent.  5 Tr. 844:24-845:6.

234.     Equity did not seek to qualify Mr. Hosfield to provide expert testimony on the topics of statistics, survey methodology, work measurement, employee staffing, or residential property management.  5 Tr. 844:24-845:6.

235.     Mr. Hosfield has no experience in the field of work measurement, and is not an expert on time and motion studies.  5 Tr. 956:5-15.

236.     Mr. Hosfield offers no opinions as to whether Equity engaged in a reasonable endeavor to estimate its costs when it adopted the Standard Late Fee or the Woodland Park $50 Late Fee.  5 Tr. 920:16-20.

237.     Mr. Hosfield offers no opinion or calculations as to the actual damages proximately caused by class members' late payments of rent.  5 Tr. 920:21-922:6 ("We're not talking about causation here …").

238.     Plaintiffs present three experts who criticize Mr. Hosfield's personnel costs analysis: Dr. Michael Childers, Andrew Schwarz, and Christian Tregillis.  As discussed below, the Court finds that each are qualified to rebut Mr. Hosfield's analyses based on their expertise in the fields of work measurement, economics and statistics, and accounting and statistics, respectively.

### 1.     Rent Is "Late" When Equity Charges the Late Fee.

239.     The issue of when rent is late is a significant one in this case, and the Court heard conflicting testimony at trial about when rent is due and when it is late.

240.     Equity's expert Mark Hosfield's offset cost calculations include personnel and lost-use-of-funds costs that Equity contends it incurred during the grace period before the fifth day of the month, before Equity charges the late fee, because he "assumed" that rent is late if not paid on the first. 5 Tr. 967:9-20.

873269.27

241. Based on the Standard Lease Term Sheet and Terms and Conditions documents, and as testified to by Plaintiff and class representative David Bonfanti, a tenant may reasonably understand that rent is due by 11:59 p.m. on the fourth day of the month, at the end of the grace period. Exs. 6, 83, 85; 2 Tr. 322:8-22.

242. For example, Plaintiff and class representative Shannah Smith regularly paid her rent after the first of the month but before the fifth of the month; Equity only considered her to be "late" once – the one occasion in which Equity charged her a late fee. *See e.g.*, 1 Tr. 68:9-18 (During Defendants' cross-examination, Plaintiff Smith testified that she had not been charged a late fee outside of the one occasion: "Q. And that's because you paid your rent on time, correct? A. I believe so. Q. And so you can avoid any late fee by continuing to pay your rent on time, agree? A. I agree"); *see also* Ex. 1514 (approximately 64% of time, Plaintiff Smith's rent was paid after the first, but within the grace period).

243. Equity's property-level employees testified at trial that rent is due on the first and late as of the second. Two of those managers, Samantha Kopcyck and Amelia Ott, however, were impeached with their deposition testimony from two years ago, where they both testified to their understanding that although the Standard Lease says that rent is due on the 1st, rent was not late until 11:59 p.m. on the 4th of the month. 2 Tr. 295:20-23, 427:14-15.

244. As set forth in Findings of Fact paragraphs 49, 51 and 52, above, the Standard Lease agreements applicable throughout the class period contain a grace period, allowing tenants to pay their rent until 11:59 p.m. on the 4th of the month, after which rent is considered "late." Equity provided a similar grace period to the Woodland Park Preexisting Lease Class. *See supra* at FOF ¶ 171.

245. The Court finds that rent is not "late" for the purposes of Equity's offset damages until Equity charges a late fee because a reasonable tenant may consider payments made during the "grace period" to be timely. Moreover, as explains further in the Conclusions of Law below, the end of the grace period in a lease defines when rent is late.

873269.27

**2.** **Mr. Hosfield's Calculations Do Not Measure Costs Proximately Caused by Class Members, As Is Required for an Offset Defense.**

246.     Although Equity appears to present Mr. Hosfield's analyses as relevant to its offset defense, it is undisputed that Mr. Hosfield did not actually calculate offset damages or present numbers that can be used by the Court to compute offset damages. Nor did he limit his analysis to costs proximately caused by class members' late rent payments.

247.     As the Court previously held, Equity may only "offset or reduce the amount it is to return to the tenants by the amount of actual damages it succeeds in proving were *proximately caused* by the tenants' late payment of rent." ECF No. 142 (Order re Summ. J. at 6-7 (citing *Garrett*, 9 Cal. 3d at 740-41) (emphasis added); ECF No. 422 (Order Denying Motion to Decertify the Class at 4) ("…should the late fee provision be found void, the late fees paid must be returned, less any amount in actual damages including personnel costs that Equity succeeds in proving were proximately caused by those tenants' late payment of rent.").

248.     Equity, however, did not ask Mr. Hosfield to calculate the actual damages proximately caused by class members' late rent payments. 5 Tr. 920:21-922:6 ("We're not talking about causation here …"). Mr. Hosfield made no effort to determine the costs attributable to each class member and to compare those costs to the late fees paid by that class members. *See* 5 Tr. 993:23-994:15; Ex. 1278-17 to 1278-21.

249.     Rather, Equity instructed Mr. Hosfield to calculate Equity's overall costs of collecting what Equity and Mr. Hosfield broadly defined as "delinquent rent" from all tenants in California. *See* 5 Tr. 993:13-17. To that end, Mr. Hosfield totaled what he considers to be Equity's costs resulting from delinquent rent collection whether or not those costs are directly caused by class members' late rent payments. 5 Tr. 993:13-994:15.

250.     According to Mr. Hosfield, Equity's total costs incurred from delinquent rent amount to $39,027,357 through resident move out, and $45,138,381 through two years in collections for the September 2010 to December 2021 time period. Ex. 1278-20; 5 Tr. 912:21-914:14.

251.    Based on these improper calculations, Mr. Hosfield opines that Equity's costs from delinquent rent exceed the late fees paid by class members in every year during the class period. 5 Tr. 915:18-22.

252.    Mr. Hosfield also divided his total cost figures by the number of late fee charges, resulting in a single average cost number per year for each of his scenarios. Ex. 1278-17 to 1278-20; 6 Tr. 1123:11-1124:24; *but see* 6 Tr. 1150:12-1153:11 (it is possible to calculate individual late rent damages amounts based on Defendants' data). This result is inconsistent with evidence that class members vary widely in how quickly they pay delinquent rent. *See* Ex. 252 at 252-19; 1 Tr. 168:9-169:14.

253.    The Court cannot simply deduct the total cost number calculated by Mr. Hosfield from the total amount of late fees paid. Such a calculation is improper because it disregards the differences in the amount of costs proximately caused, and late fees paid, by individual class members.

254.    For example, such a calculation would eliminate restitution due to class members who paid more in late fees than the average cost amount calculated by Mr. Hosfield. Assuming *arguendo* that his average cost outcomes reflected the costs caused by each instance of late rent, Mr. Hosfield does not calculate the amount of restitution remaining after deducting those costs from the amounts actually paid by class members. 6 Tr. 1126:1-25 (explaining that a class member who paid a $150 late fee but only caused only $92 in costs is owed restitution of $58).

255.    The calculation advanced by Mr. Hosfield would also credit Equity with more than the amount of costs that could be offset from any class member whose restitution should be offset to zero rather than a negative number. 6 Tr. 1099:8-1101:11, 1123:11-1124:24, 1126:1-1127:6 (explaining that a class member who paid a $50 late fee but caused $92 in costs is owed nothing, however, the additional $42 cannot be deducted from the restitution owed to other class members).

256.    Mr. Hosfield's failure to determine Equity's costs proximately caused by class members' late payment of rent pervades his analysis and calculations. As discussed in more detail below, Mr. Hosfield's calculations improperly include fixed personnel costs, such as salary compensation for property-level employees, that are unaffected by the number of late fees charged, and therefore cannot be attributed to individual class members. He similarly included lost-use-of-funds

and personnel costs that were incurred during the four-day grace period before any late fees were charged. Finally, Mr. Hosfield failed to link Equity's claimed eviction costs to individual class members, assuming without foundation that all eviction costs are attributable to class members.

257. Mr. Hosfield's failure to limit his calculation to those costs proximately caused by class members is a serious flaw in his methodology. Accordingly, the Court finds that Mr. Hosfield's calculations are inaccurate and unreliable, and affords them little weight.

### 3. Personnel Costs

258. Mr. Hosfield presented two different approaches to determining Defendants' costs from late rent—the "Costs-Incurred" method and the "Cost Savings" method. For the reasons set out below, the Court finds that neither method provides a reliable or accurate measure of Defendants' recoverable costs.

### a. Equity's Property-Level Staffing

259. Equity staffs its properties with full-time salaried community managers or general managers and a mix of other hourly positions. Exs. 76, 87, 127, 128 (payroll data showing positions and pay type); *see also* Ex. 18 (community manager job description), Ex. 32 (general manager job description); 6 Tr. 1052:7-20. *See* JPFOF ¶ 48 (Exs. 18 and 32 are representative job descriptions).

260. Depending on the property, the hourly positions may include assistant community managers, community administrators, leasing consultants, customer support assistants, and other positions. *See* Ex. 17 (assistant community manager job description), Ex. 26 (community administrator job description), Ex. 27 (leasing consultant job description); *see also* Exs. 76, 87, 127, 128 (payroll data); 5 Tr. 937:2-14 (regarding customer support assistants). *See* JPFOF ¶ 48 (Exs. 17, 26 and 27 are representative job descriptions).

261. The vast majority of Equity's hourly property-level employees work full time. 6 Tr. 1057:17-19; *see e.g.,* 2 Tr. 316:19-25 (Ms. Kopczyk worked 8-hours per day and 40-hours per week as Leasing Consultant and Assistant Community Manager); 2 Tr. 403:20-24 (Ms. Ott always worked full-time as Customer Service Associate, Leasing Consultant, and Leasing Administrator).

262. Community managers and general managers are paid their salaries regardless of the number of hours they work in a week, which, according to some employees' estimates, can range

873269.27

anywhere from less than 30 hours per week to more than 60 hours per week.  Ex. 1278 at 1278-143 & 1278-150 (Updated App. C Scheds. 14 & 21) & 1278-195 & 1278-207 (App. C1 Scheds. 6 & 18); Exs. 76, 87, 127, 128 (payroll data showing positions and pay type); *see generally* 6 Tr. 1052:7-20 (Rivera confirms community managers are paid on salary basis); Ex. 18 (community manager job description), Ex. 32 (general manager job description); *see e.g.*, 2 Tr. 247:3-16 (Villanueva); 3 Tr. 393:14-21 (Grubbs).

263.    The leasing offices at Equity's California properties are open from 9:00 a.m. to 6 p.m., Tuesday through Saturday.  In 2019, Equity reduced its hours from 10 a.m. to 6 p.m., however, Equity's property-level employees still work from 9:00 a.m. to 6 p.m.  6 Tr. 1053:14-1054:16.

264.    Equity's staffing needs are property specific.  Equity considers a number of factors when determining the level of staffing for its California properties, including the size of the property, number of units, types of units, foot traffic, resident turnover, packages received, maintenance needs, and recent rent delinquency activity.  6 Tr. 1040:2-24; 1054:20-1055:6.

265.    Equity conducts "position management" reviews with senior management in Chicago on an annual basis.  Equity does not maintain any written records of position management reviews.  6 Tr. 1055:14-1056:9.

266.    Vice President of Property Management Debra Rivera must obtain approval from her superiors to increase, reduce, or otherwise change the staffing at the 31 California properties in her portfolio.  6 Tr. 1036:21-1037:6, 1056:10-19.

### b.    Equity's Rent Collection Practices

267.    Over the course of the Class Period, Equity has used standard procedures to collect and account for late rent.  Exs. 8 (Collecting Payments for Delinquent Accounts); 11 (Processing Payments in MRI); 1243-12 to 14 (Expert Rpt. of Mark J. Hosfield) ("Hosfield 2021 Report").

268.    Equity's property management database, MRI, automatically calculates and charges late fees when tenants do not pay their rent by 11:59 p.m. on the fourth day of the month.  Ex. 7 (Late Fees); *see also* Ex. 247-7 & 15 § II.B ¶ 19.c.

269.    Equity uses software to send automated reminder emails to tenants who have not paid their rent as of five and ten days past the day the late fee was charged.  4 Tr. 713:23-715:9; Ex. 1 (Rent Payment Reminder).

270.    On the same day that the Standard Late Fee is charged—in most cases the fifth of the month—property-level personnel serve a legal demand for payment, or Three-Day Notice to Pay or Quit, on any California tenant with outstanding rent.  Ex. 8; *see also* 2 Tr. 220:7-25; 286:9-11; Ex. 47 & JPFOF ¶ 48 (representative exemplar Three-Day Notice to Pay Rent or Quit).

271.    Property-level personnel print these notices from MRI in a single batch, sign and deliver the notices to tenants' doors, and send copies to the tenants through the mail.  Ex. 8; *see also e.g.*, 2 Tr. 227:3-228:25 (Villanueva); 288:3-15 (Kopczyk).

272.    Between the service of the Three-Day Notice to Pay or Quit and the fifteenth of each month, property-level personnel communicate with tenants who have rent outstanding to request that the tenants make their rent payments.  *See e.g.,* 2 Tr. 231:5-232:6; 301:9-12; 392:10-17.

273.    Equity instructs its property-level personnel to "[d]ocument all telephone conversations in the Resident Notes [in MRI], using DELQ [*i.e.,* delinquent] note type" and to "[b]e sure to note the date, time, to whom you spoke and a short summary of the conversation."  Ex. 8-2; Ex. 19 (Payment Options, Collecting on Delinquent Accounts, and Late Fees); 4 Tr. 712:19-713:22; *see e.g.*, 2 Tr. 261:17-262:11 & 263:25-264:5; 297:14-25.

274.    On approximately the fifteenth of the month, property-level personnel prepare and send tenant files to Equity's outside eviction counsel to begin eviction proceedings against tenants who have unpaid rent balances.  *See* Exs. 23, 49; *see, e.g.*, 2 Tr. 232:1; 303:19-21.

275.    Equity personnel spend "very little time" on evictions, "almost an immaterial amount of time spent on evictions."  5 Tr. 952:11-22; *see e.g.*, 2 Tr. 306:18-21 (Kopczyk).

276.    In April 2020, the first month following the onset of the COVID-19 pandemic, Equity stopped charging late fees at all of its California properties.  Equity implemented this change by turning off the late fee function in MRI, which automatically stopped the charges from occurring.  Tr. 626:20-627:17.  As Equity resumed late fees at certain properties, it turned on the late fee function for each property in MRI.  *Id*.

277.    For the first eight months of the pandemic, Equity did not charge late fees at any of its California properties.  In February 2021, Equity charged the Standard Late Fee at 17 properties in California.  3 Tr. 632:2-9.  In March 2021, that number increased to 20 properties.  3 Tr. 632:15-18.  The months for which late fees were suspended in each relevant jurisdiction, and the dates they were resumed, are reflected in Exhibit 115.  3 Tr. 627:23-628:4; 631:10-14; Ex. 115 (accurate as of February 25, 2022).

278.    Once late fee charges resumed, MRI was programmed to calculate and charge late fees to all tenants with delinquencies except for tenants who (1) were on a payment plan, or, later on, (2) had provided Equity with a declaration that they experienced financial hardship as a result of the COVID-19 pandemic.  3 Tr. 628:15-629:12.

279.    Equity's decision not to charge late fees during those months of 2020 and 2021 was made at the corporate level on a jurisdiction-by-jurisdiction basis.  *See* Ex. 115; 3 Tr. 626:1-11, 626:20-627:17; 627:18-628:4; 629:2-12.

280.    Throughout the period of the pandemic, Equity has continued to send automated rent payment reminder emails from its corporate office.  3 Tr. 633:3-635:1.  Equity, however, stopped sending automated late rent reminder emails.  *Id.*

281.    As eviction restrictions lifted, Equity began serving Three-Day Notices to Pay or Quit and in some cases pursuing evictions.  3 Tr. 635:9-636:10.

282.    The Court heard testimony from Jenay Carnley, who holds the position of Residential Financial Director and supervises the Central Business Group ("CBG") located in Phoenix, Arizona.  3 Tr. 597:4-598:1; 620:22-621:1; *see also* Ex. 241 (Rule 30(b)(6) deposition notice).  Ms. Carnley does not supervise any property-level employees.  3 Tr. 621:2-4.

283.    Starting in April 2020, Ms. Carnley oversaw Equity's Rental Assistance Team.  3 Tr. 616:21-617:3; Ex. 1272.  The Rental Assistance Team was created to assist tenants in applying for rental assistance through governmental programs.  3 Tr. 640:22-641:19; Ex. 139 (Rental Assistance FAQ).  Rental assistance applications were submitted by tenants.  *Id.*  Thereafter, Equity was required to submit information to the government entity in charge of the property, including verification that the tenant lived at an Equity property.  *Id.*

284. The Rental Assistance Team had both part-time and full-time members. 3 Tr. 617:4-14; Ex. 1272. While some members of the Rental Assistance Team worked full time on rental assistance duties, other members divided their time between rental assistance duties and their regular duties as property-level employees. 3 Tr. 617:4-14; Ex. 1272. The Rental Assistance team did not keep track of time spent performing rental assistance tasks. 6 Tr. 644:12-14.

285. During the pandemic, Equity created a Virtual Payment Team to allow tenants to make payments over the phone. It was comprised of property-level management employees who divided their time between their regular property-level duties and Virtual Payment Team duties. 3 Tr. 617:18-618:6. The Virtual Payment Team was active during periods of time when Equity was not charging late fees. 3 Tr. 640:18-21. Virtual Payment Team members did not document the time they spent performing virtual payment duties. 3 Tr. 640:13-17.

### c. Equity's Personnel Pay and Hours Databases

286. Throughout the Class Period, Equity has used electronic databases to track and store information regarding Equity employees in California (and nationwide) – including human-resource records, employee schedules and time records, and payroll data. *See* Ex. 246 at 246-3 to 4 § B ¶¶ 2-6.

287. For the purposes of this litigation, the Parties executed a Joint Stipulation Regarding the Electronic Personnel Data Produced in this Action ("Personnel Stip.") on April 28, 2021, which explains Equity's personnel data in detail as relevant to this action and which the Court incorporates as its findings here. *See* Ex. 246.

288. Throughout the Class Period, Equity's PeopleSoft and (eventually) Fusion databases have tracked and stored information relating to Equity's personnel in California, including: job titles, hours worked (including overtime and paid time off), wages paid, pay rates, standard hours, type of schedule (*i.e.* full or part time), type of compensation (*i.e.*, hourly or salaried), employment location, and unique employee identification number. *See* Ex. 246 at 246-9 ¶¶ 23-26.

### d. Most of Equity's Personnel Costs Are Fixed.

289. Equity contends that employees in the following job positions are involved in collecting and accounting for late rent: General Manager, Manager, Assistant Manager, Community Manager, Community Administrator, Customer Support Assistant, Berkeley Resident Manager, Floating

Community Manager, Senior Community Administrator, Floating Assistant Community Manager, Leasing Consultant, Leasing Manager, Senior Leasing Consultant, Area Leasing Consultant, Leasing Administrator, Affordable Leasing Administrator. Ex. 1278 (Second Suppl. Expert Rpt. of Mark J. Hosfield) ("Hosfield April 2022 Report"), Updated Appendix B, Schedules 1A, 1B, 2A, 2B.

290.    Several of these positions are salaried positions, whose compensation is fixed and paid on a biweekly basis. Salaried positions include General Managers, Community Managers, and Floating Community Managers. Exs. 76, 87, 127, 128 (payroll data showing positions and pay type); *see also* Ex. 18 (community manager job description); Ex. 32 (general manager job description); 6 Tr. 1052:7-20.

291.    Salaried employees' compensation does not change based on the number of late fees charged. 5 Tr. 970:9-15. Equity presented no evidence that its salary costs for relevant employees is affected or increased by tenants' late payment of rent. To the contrary, as discussed further below in Section I.E.2.g, making findings related to Andrew Schwarz's statistical modeling, the evidence shows that salary compensation is not increased by tenants' late payment of rent.

292.    In contrast, because hourly employees' compensation depends on the amount of time they work, Equity's personnel costs may increase as a result of late rent if tenants' failure to timely pay rent causes Equity's hourly employees to work additional regular or overtime hours beyond what they otherwise would have worked. Ex. 257 at 257-30 ¶ 46 Expert Rebuttal Rpt. of Andrew D. Schwarz ("Schwarz 2021 Report"); *id.* at 257-95 ¶ 186.

293.    The majority of Equity's hourly office employees work a regular full-time schedule of 8 hours per day, five days per week, which typically corresponds to standard office hours at Equity's California properties. 6 Tr. 1053:14-1054:16; 1057:17-19; *see, e.g.*, 1 Tr. 249:8-14 & 250:16-24 (Ms. Villanueva testified that employees work set schedules throughout the month); 2 Tr. 316:19-25; 403:20-24.

294.    To the extent late rent collection work replaces non-productive time that employees otherwise would have spent at the office during a standard eight-hour day, that work does not increase Equity's hourly costs.

295. Mr. Hosfield admits that salary compensation, commissions, paid time off (*e.g.*, vacation, sick leave, and parental leave), and insurance (*e.g.*, health insurance, dental insurance, vision insurance, and life insurance) for property-level employees do not change based on the number of late fees charged. 5 Tr. 969:23-972:8. Nonetheless, Mr. Hosfield includes these fixed forms of compensation in his cost calculations even though they do not increase with the number of late fees charged. *Id*.

     e.    **Mr. Hosfield's "Costs Incurred" Methodology Is Unreliable and Unscientific.**

        i.    **Flaws in Mr. Hosfield's Interviewee Selection Process Render It Improper for Extrapolation to a Broad Population.**

296. Mr. Hosfield's "Costs Incurred" method is based on two sets of interviews with a total of 86 of the more than 3,000 employees who have worked in "office management" and "leasing" positions at Equity's California properties since September 2010, with the first set occurring in 2020-21 and the second in February to April 2022. Ex. 1278 at 1278-5-7 (Hosfield April 2022 Report).

297. To select interviewees, Mr. Hosfield first divided the properties into two sets of quartiles—one set based on the number of units in the property, and the other set based on the number of late fees charged per month at the property—and then chose properties from within the eight quartiles of properties that he believed resulted from this exercise. Ex. 1243) at 1243-18-21 (Hosfield May 2021 Report); 5 Tr. 865:6-866:5; 870:15-871:9.

298. Mr. Hosfield then relied on Equity to set up interviews with employees who worked at the selected properties and met two specific criteria: 1) the employee worked for Equity for at least one year; and 2) the employee was not a class member. 5 Tr. 871:22-872:11; 925:10-16; 6 Tr. 1116:18-1118:13 (Mr. Schwartz notes the risk of bias resulting from equity's selection of employees to be interviewed).

299. Although Mr. Hosfield initially testified that he interviewed all employees at a selected property who satisfied his criteria, he later clarified that he "tried to interview all of them." *Compare* 5 Tr. 871:22-872:1 (testifying that he interviewed all employees at selective properties) *with* 5 Tr. 925:17-926:1 ("I think I tried to interview all of them.").

300. All employees interviewed by Mr. Hosfield were current employees at the time of their interviews. 5 Tr. 963:18-21.

301. Neither the employees Mr. Hosfield interviewed, nor the properties at which they worked, were randomly selected in a rigorous statistical sense. 5 Tr. 924:18-925:16. Mr. Hosfield instead sought to focus on the subset of job titles that he understood "were most likely to have spent time on collecting delinquent rent." 5 Tr. 928:20-929:21.

302. Additionally, the properties from which the interviewees were selected were predominately drawn from large properties that due to their sheet physical size and number of tenants take up more time for collecting late rent. Ex. 257 at 257-73 (Schwarz July 2021 Report) (chart showing distribution of interviews across strata); 6 Tr. 1114:7-24.

303. Mr. Hosfield acknowledges that he did not set out to create a random sample, a stratified random sample, or perform any type of statistical analysis. 5 Tr. 875:16-19; 922:8-17; 926:12-19.

304. When Mr. Hosfield uses the term "representative" to describe his selection of properties, he means that the selection was representative "of the properties in Equity's California communities based on a quartile-by-quartile basis." 5 Tr. 927:16-928:9; *but see* 6 Tr. 1110:16-1115:15 (illustrating that Mr. Hosfield's selected properties are skewed and fail to cover segments of properties).

305. Mr. Hosfield's first set of interviews, conducted in the 2020-2021 time frame, involved 58 employees who held positions that Defendants contend are involved in collecting and accounting for late rent: General Manager (2 interviewees), Acting Manager (1), Community Manager (19), Assistant Community Manager (3), Community Administrator (1), Leasing Consultant (28), Leasing Administrator (3), and Leasing Manager (1). Ex. 1278 at 1278-128-29 (Updated Appendix C).

306. For this set of interviews, Mr. Hosfield asked respondents to estimate the amount of time they regularly spent on late rent in 2019, prior to the onset of the COVID-19 pandemic. 5 Tr. 946:11-947:2; Ex. 1243 at 1243-19; Ex. 1278 at 1278-128-29 (Updated Appendix C).

307. Based on the first round of interviews, Mr. Hosfield concluded that "office management employees" spent 12.32% of their time on late rent collections activities prior to March 2020, and that

873269.27

1  "leasing employees" spent 4.45% of their time on late rent collection activities prior to March 2020.  5

2  Tr. 922:24-923:3.  Although he collected information about the estimated number of hours

3  interviewees reported working, Mr. Hosfield did not temper his analysis by considering whether

4  interviewees reported working at or more or less than full time or, for salaried employees, whether

5  their compensation was impacted by the number of hours worked.  *Id.*

6     308.   Mr. Hosfield extrapolated the 12.32% percentage time estimate to the personnel costs

7  for all of Equity's California employees holding the following office management positions from 2010

8  to 2021: General Manager, Other Office Administrative, Admin Role Unknown, Manager, Assistant

9  Manager, Community Manager, Community Administrator, Customer Support Assistant, Assistant

10 Community Manager, Berkeley Resident Manager, Floating Community Manager, Senior Community

11 Administrator, and Floating Assistant Community Manager.  5 Tr. 922:18-23; Ex. 1278 at 1278-111.

12    309.   Similarly, Mr. Hosfield extrapolated the 4.45% percentage time estimate to the

13 personnel costs for all of Equity's California employees holding the following leasing positions from

14 2010 to 2021: Leasing Consultant, Admin Role Unknown, Leasing Manager, Senior Leasing

15 Consultant, Area Leasing Consultant, Leasing Administrator, and Affordable Leasing Administrator.

16 5 Tr. 922:18-23; Ex. 1278 at 1278-113.

17    310.   Mr. Hosfield applied the percentage time estimates to a number of positions for which

18 he conducted few or no interviews.  For office management employees, Mr. Hosfield conducted a

19 single interview of a community administrator, and no interviews of customer support assistants,

20 floating community managers, floating assistant community administrators, or any employees in the

21 Other Office Administrative or the Admin Role Unknown categories.  He nonetheless applied the

22 12.32% percentage time estimate to Equity's costs associated with those positions.  5 Tr. 931:15-20;

23 932:8-933:17; 936:17-938:21.

24    311.   Similarly, for leasing employees, Mr. Hosfield conducted no interviews of senior

25 leasing consultants, area leasing consultants, affordable leasing administrators, and only one interview

26 of a leasing manager.  He nonetheless applied the 4.45% percentage time estimate to Equity's costs

27 associated with those positions.  5 Tr. 940:24-942:5.

28

312. And despite conducting no interviews of any employees who worked at Woodland Park, Mr. Hosfield applied the percentage time estimates to Equity's personnel costs at that property as well. 5 Tr. 942:6-11.

313. Mr. Hosfield does not know the total number of employees to which he applied the percentage time estimates derived from the first round of employee interviews he conducted. 5 Tr. 923:7-924:14.

314. The second set of interviews, conducted in February, March, and April 2022, involved 59 employees (some repeated from the first set of interviews, and some new) in the following positions: General Manager (3), Community Manager (17), Assistant Community Manager (4), Customer Support Assistant (1), Community Administrator (1); Leasing Consultant (27), Senior Leasing Consultant (2), Affordable Leasing Administrator (1), Leasing Administrator (1), and Leasing Manager (2). Ex. 1278 at 1278-188-89 (Updated Appendix C.1).

315. For this set of interviews, Mr. Hosfield followed the same non-statistical and non-random selection process as the first round. 5 Tr. 964:14-18. He re-interviewed 32 of the 59 employees who were interviewed during the first set of interviews. 5 Tr. 963:9-13. He did not attempt to conduct follow up interviews with employees who were no longer working for Equity. 5 Tr. 963:13-21.

316. In the second set of interviews, Mr. Hosfield asked respondents to estimate the amount of time they regularly spent on collecting late rent after the start of the COVID-19 pandemic in March 2020. Ex. 1278 at 1278-6, 188-189 (Updated Appendix C.1).

317. Mr. Hosfield conducted these interviews despite the fact that Equity had stopped charging late fees at the vast majority of its California properties in April 2020 because of the COVID-19 pandemic. 3 Tr. 626:20-627:17.

318. Based on the second set of interviews, Mr. Hosfield concluded that "office management employees" spent 18.18% of their time, and "leasing employees" spent 3.74% of their time, on late rent activities after March 2020. Ex. 1278 at 1278-7. Again, Mr. Hosfield collected information about the estimated number of hours interviewees reported working, but he did not factor into his analysis

873269.27

whether interviewees reported working at or more or less than full time, or, for salaried employees, whether their compensation was impacted by the number of hours worked. *Id.*

319. While Mr. Hosfield's interviews, over both rounds, only included employees in 11 positions, he ultimately extrapolated their time estimates to personnel costs for 21 distinct job titles. Ex. 1278 at 1278-128-129 (Updated Appendix C) & 1278-188-189 (Updated Appendix C.1).

320. Mr. Hosfield's interview methodology was statistically improper. The Court is persuaded by the well-reasoned testimony of Mr. Schwarz and Dr. Childers that non-random samples cannot be validly used to generalize the results observed in the sample to the broader population, as Mr. Hosfield has done here. Ex. 257 (Schwarz July 2021 Report) at 257-67-69, ¶¶ 123-128; 6 Tr. 1106:6-1110:14; Ex. 253 (Childers Report) at 253-17-19, § 8.2.5 (in addition to other flaws, "the lack of randomness in the sample would have also rendered the study useless" because "without random sampling the study is not generalizable" to the broader population).

321. Mr. Hosfield has failed to identify any principle or theoretical framework supporting his admittedly non-statistical sampling method.

322. Rather, he has repeatedly pointed to the field of "cost accounting" as a basis for his methodology. 5 Tr. 922:8-23. Invoking the field of "cost accounting," however, does not justify statistically improper methods as it does not identify a principle that renders those methods reliable.

323. In response, Plaintiffs present Christian Tregillis, CPA, ABV, CFF, CLP, who is, like Mr. Hosfield, an accountant. Ex. 267 (CV). In his professional work, Mr. Tregillis has extensive experience analyzing financial, accounting, and statistical issues. *Id.* Mr. Tregillis has previously chaired tasks forces and committees on the topic of Economic Damages within professional accounting associations. *Id.* He currently co-chairs the Standards, Admissions and Recertification Committee of the Certified Licensing Professionals within the Licensing Executives Society. *Id.*

324. The Court finds that Mr. Tregillis is qualified to provide expert testimony in this case related to the fields of accounting and statistics.

325. The Court finds convincing Mr. Tregillis' testimony that the professional standards for the field of accounting require its practitioners to be familiar with statistics and to use statistical methods when appropriate.

326.    The Court also agrees with Mr. Tregillis that in addition to the grave statistical impropriety of Mr. Hosfield's extrapolation, Mr. Hosfield has failed to justify applying the results of his interviews, which he concedes were focused on positions most likely to be involved in collecting late rent, to other positions.  5 Tr. 928:20-929:21; Ex. 261 (Tregillis July 2021 Report) ¶ 72 (making the related point that Mr. Hosfield's extrapolation to other positions that have not been demonstrated to have involvement in collection of late rent was overinclusive).

### ii.    Flaws in Mr. Hosfield's Interview Process Renders It Unreliable.

327.    In addition to the flaws associated with a non-statistical extrapolation, the Court finds that Mr. Hosfield's interviews generated unreliable data for the reasons outlined in the following paragraphs.

328.    Mr. Hosfield did not use a consistent script throughout his interviews, but rather used three different questionnaires to guide his conversations with employees.  5 Tr. 877:24-879:11; 947:8-23; 949:5-12; Exs. 170 (initial version), 171 (subsequent version), 168 (subsequent version).

329.    Mr. Hosfield did not strictly follow the questionnaires, instead asking questions not listed on the questionnaires.  5 Tr. 951:8-17.  There is no record of the phrasing of these questions nor of the interviewees' responses.  *Id*.  Similarly, Mr. Hosfield did not record the version of the questionnaire used for each interview.  5 Tr. 950:8-951:7.

330.    Some of the interviews were conducted by two of Mr. Hosfield's colleagues.  There is no record of who conducted which interviews.  5 Tr. 943:3-13.

331.    The first questionnaire used by Mr. Hosfield and/or his associates to request time estimates from employees did not define the tasks included in the category of working on delinquent rent collection.  Ex. 170.  By failing to define the tasks included in delinquent rent collection, Mr. Hosfield created a risk of misunderstanding or confusion that undermines the reliability of his results.

332.    For example, Mr. Hosfield did not ask the interviewees to distinguish between time spent collecting rent during the grace period versus time spent collecting late rent after the fourth day of the month.  5 Tr. 966:2-18.  Similarly, he did not ask the interviewees to limit their estimates to the time spent on collecting rent from tenants who were charged late fees.  5 Tr. 966:19-24.

1    333.   Two of the three questionnaires also included plainly slanted questions about time spent

2    on delinquent rent, such as "Describe The Worst Rent Collection Episode You Can Remember," "Are

3    There Oher Things You Could Be Doing Instead," and "Do You Consider Chasing Tenants for Rent

4    To Be A Time-Suck For You?"  5 Tr. 948:2-12; 949:18-950:7; Exs. 170, 171.  Mr. Hosfield testified

5    that "most of these [questions] never were asked," however, Mr. Hosfield's interview notes indicate

6    that they were posed to numerous property-level employees.  5 Tr. 948:13-24; Ex. 169 at 169-3

7    ("worst rent collection episode" "chasing down delinquencies" "time sink"), -5 ("time sink"), -7 ("Any

8    particularly bad eviction episodes), -12 ("Chasing tenets [sic] for rent is a big time sink for her tasks");

9    -14 ("Chasing tenets [sic] to pay rent on time"); -16 ("Considers the delinquency issue to 100% detract

10   from other aspects of her job"); -18 ("Chasing tenets [sic] for late rent definitely gets in the way of her

11   other tasks on occasion").

12   334.   The Court finds the plainly slanted questions included in two of the interview

13   questionnaires are indicative of an unprofessional and biased approach taken by Mr. Hosfield to

14   determine Defendants' costs from late rent.

15   335.   In collecting data through surveys, it is important to use a standardized questionnaire or

16   survey instrument to ensure that the responses elicited are comparable to each other.  7 Tr. 1320:20-

17   1322:1; Ex. 253 at 253-15 § 8.2.2 (Childers Report).

18   336.   The absence of written records of the actual questions asked and actual responses

19   received in each of the interviews makes it impossible to evaluate the extent to which biased questions

20   and comments influenced the estimates generated by Mr. Hosfield's interviews.  As a result, the Court

21   regards each of the interviews conducted by Mr. Hosfield or his assistants as likely to be tainted by

22   bias.

23   337.   In each of his interviews, Mr. Hosfield (or his assistants) asked employees to estimate

24   average amounts of time spent on tasks many months prior to the interview.  5 Tr. 854:7-22; Ex. 1243

25   at 1243-19, 137-38; Ex. 1278 at 1278-6, 188-89.

26   338.   Mr. Hosfield did not take any steps to improve recall accuracy for the property-level

27   employees that were interviewed.  5 Tr. 954:1-7.  RM Notes, which are stored in Equity's MRI

28   database, are created by property-level employees and include tenant-specific records of phone calls

and emails made by property-level employees regarding late rent.  5 Tr. 954:13-19; *see*, *e.g.*, Ex. 1367. These records could have been provided to interviewees to trigger their recall of relevant events and provide context for their time estimates.  Mr. Hosfield did not use the RM Notes created by the interviewees as memory aids to improve the accuracy of their recall of time spent on late rent collection activities.  5 Tr. 954:20-955:21.

339.    Mr. Hosfield did not elicit time estimates using a consistent unit of time, allowing interviewees to state their estimate by day, month, or week.  5 Tr. 952:23-953:5; Ex. 1243 at 1243-19. Mr. Hosfield then converted their responses into weekly estimates using incorrect math.  He divided monthly estimates by four to convert to weekly estimates, even though most months are longer than twenty-eight days.  5 Tr. 953:6-25; *cf.* Ex. 253 at 253-20-21 (Childers Report) § 8.3.2 (criticizing Hosfield's "faulty extrapolation of 4 weeks/month, when there are actually 13 four-week segments in a calendar year").

340.    These incorrect adjustments inflated the interviewees' time estimates and demonstrate that Mr. Hosfield's data gathering methods were sloppy and unprofessional.

341.    Nor did Mr. Hosfield cross check the interviewee's weekly hours worked estimates against Equity's time and payroll records.  5 Tr. 958:14-18.  Interviewees estimated their time spent on late rent collection activities as either a number of hours or a percentage of their total weekly hours worked.  Ex. 1278 at 1278-130-187 (Updated Appendix C, Schedules 1-58); Ex. 1278 at 1278-190-248 (Appendix C.1, Schedules 1-59).  Mr. Hosfield did not confirm that the interviewees' estimates of their total weekly hours worked were consistent with existing time and payroll records used to compensate hourly employees even though he had access to such records.  5 Tr. 958:14-18.

342.    Many of the property-level employees interviewed by Mr. Hosfield were informed that the interviews were related to late fee litigation because they received a calendar invitation titled "CA Late Fee Litigation."  5 Tr. 944:11-945:11; Ex. 167 (compendium of calendar invitations).  At least 40 of the 58 employees interviewed in the first round of interviews received a calendar invitation with this title.  *Id.*  Similarly, at least 9 of the 59 employees interviewed in the second round of interviews received the same calendar invitation.  *Id.*  The Court finds that this information likely biased the

873269.27

employees to provide inflated time estimates that they believed would be favorable to their employer. Ex. 253 at 253-16-17 (Childers Report § 8.2.3).

343.     Mr. Hosfield has not identified any reliable principles supporting this method of gathering data for cost extrapolations, particularly for calculating actual damages in a lawsuit.

344.     Plaintiffs present testimony by Dr. Michael Childers, PhD, to rebut Mr. Hosfield's personnel-offset analysis, based on his expertise in work measurement.

345.     Dr. Childers holds a doctorate in Workforce Education and Development and is a professor in, and current chair of, the Department of Labor Education at the University of Wisconsin-Madison.  7 Tr. 1311:11-1312:9; Ex. 264.

346.     Dr. Childers has specialized training and experience in the field of work measurement, including, specifically, time studies in a broad range of industries and professions.  7 Tr. 1312:10-1313:12; Ex. 253 at 253-7-8; Ex. 264.  Dr. Childers' teaching experience "includes field study design and data collection in field studies, as well as data analysis, interpretation, and presentation," and topics including "time and motion study, work methods design analysis" and statistics.  *Id.*

347.     The Court finds that Dr. Childers is qualified to provide expert testimony in this case on the subject of work measurement, including sub-topics such as study design, data collection and analysis, surveys, and statistics.  7 Tr. 1314:20-1315:5.

348.     As Dr. Childers explains, "[w]ork measurement is broadly defined as the systematic examination of the methods of carrying on activities to improve the effective use of resources, and to set up standards of performance for the activities being carried out."  Ex. 253 at 253-7.  Specifically, work measurement as relevant to the present matter is "the determination of the amount of time that a normal worker under set conditions would perform a set specified group[] of tasks."  7 Tr. 1315:7-15.

349.     In the field of work measurement, an engineered estimate—commonly known as a time and motion study—is "the most precise and preferred method of determining the time it should take to complete a task."  Ex. 253 at 253-9; 7 Tr. 1316:17-22.  This method involves (1) standardization of the tasks at issue, including documenting work methods, conditions, and tools; (2) timing the performance of the tasks multiple times to assure statistically reliable data; and (3) analysis of the data, including

making appropriate allowances for fatigue, delay, and personal needs. Ex. 253 at 253-11; 7 Tr. 1315:16-1316:4.

350. Non-engineered time estimates are also acceptable in the field of work measurement. 7 Tr. 1317:24-1325:2. These include various forms of time logs, including paper logs, time sheets, and time-tracking software. Ex. 253 at 253-12; 7 Tr. 1316:23-1317:16. White collar workers in many professions, including lawyers, accountants, and consultants, use time logs to document the amount of time they spend on various activities and tasks. Ex. 253 at 253-12; 7 Tr. 1317:13-16.

351. Mr. Hosfield has no experience in the field of work measurement, and is not an expert on time and motion studies. 5 Tr. 956:5-15. Nonetheless, Mr. Hosfield opines that a time and motion study would not provide reliable estimates of the amount of time property-level employees spend on the collection of late rent. 5 Tr. 956:23-957:2. He further opines that property-level employees are not able to accurately record time spent on late rent activities using time tracking software or paper time logs. 5 Tr. 957:13-958:6. The Court finds Mr. Hosfield's opinions on this subject to be without foundation and unconvincing.

352. Dr. Childers testified, that in his opinion, Mr. Hosfield's interview methodology did not comport with generally accepted and standard practices within the field of work measurement. 7 Tr. 1318:21-1319:2. Accordingly, Mr. Hosfield's interviews did not produce accurate and reliable estimates of time spent on late rent collection activities. *Id.*; Ex. 253 at 253-14.

353. In particular, Dr. Childers criticized Mr. Hosfield's reliance on memory-based time estimates, testifying that academic research shows that "people have an extremely difficult time trying to provide such estimates." 7 Tr. 1319:17-1320:8; Ex. 253 at 253-14 ("In general, the problem is that autobiographical memory is notoriously unreliable."). The fact that Mr. Hosfield conducted interviews in 2020 and 2021, but asked about late rent collection activities that occurred in 2019, made recalling accurate time estimate even more difficult, Dr. Childers opined. *Id*.

354. The unreliability of memory-based time estimates on work tasks performed months or years earlier, particularly as the foundation for awarding contract damages against class members' restitution, was borne out by the testimony of Equity's property-level employees, who gave broad, vague and inconsistent estimates of time spent on "delinquent rent" years earlier, qualified their

estimates with such terms as "maybe," "about" and "probably," acknowledged that time spent on delinquent rent varies from month to month, and admitted that estimating time is difficult. *Cf.*, *e.g.*, 2 Tr. 239-45 (Ms. Villanueva); 283-85 (Ms. Kopczyk); 372:1-35; 378-387 (Ms. Grubbs, providing estimates that added up to more than 200% of her time); 410 (Ms. Ott).

355. Dr. Childers also testified that in attempting to provide percentages of time spent on specific tasks, employees are likely to "overstate[] the amount of total time when presented with the options for how much time is spent on any one task." 7 Tr. 1324:6-14. Dr. Childers also stated that it is common for employees to provide inconsistent estimates of time spent on specific tasks when asked for such estimates at different times. 7 Tr. 1325:15-21.

356. Dr. Childers further explained that the collection of actual work time is important "because we understand that inherently people have poor memories for this sort of information and remember the exceptions rather than the rule." 7 Tr. 1325:4-14 (testifying that people tend to remember the one driver that cuts them off and "not the ten people that let you in when you were in the wrong lane."). Mr. Hosfield's interview questionnaires, which asked Equity's employees to focus on the "worst rent collection episode you can remember," demonstrates Mr. Hosfield's divergence from accepted methods within the field of work measurement. Exs. 170, 171.

357. As Dr. Childers also reasoned, Mr. Hosfield's interview methodology was also flawed because he failed to use a standardized questionnaire or data collection tool. 7 Tr. 1320:20-1322:1; Ex. 253 at 253-15. The use of multiple different questionnaires is not a generally accepted and reliable method of collecting survey data. Ex. 253 at 253-15 (citing *Lavrakas*, Encyclopedia of Survey Research Methods (2008)). Mr. Hosfield's use of a non-standard data collection tool means that Equity employees were responding to different stimuli, thus introducing variability in responses that make them less comparable to one another. 7 Tr. 1320:20-1322:1; Ex. 253 at 253-15.

358. In addition, Dr. Childers opined that Mr. Hosfield likely obtained overinclusive time estimates because the questionnaires did not clearly and consistently define the tasks for which employees were asked to provide time estimates. 7 Tr. 1325:23-1326:12.

359. Dr. Childers further opined that the responses provided by Equity's property-level employees were likely impacted by social desirability bias. 7 Tr. 1322:2-1323:7; Ex. 253 at 253-16,

17. There is a significant amount of academic literature establishing and documenting social desirability bias. 7 Tr. 1322:9-23; Ex. 253 at 253-16, 17. Based on Mr. Hosfield's calendar invitations, which indicated that the interviews were for "CA Late Fee Litigation," Dr. Childers opined that "being questioned by your employer will lead you to try and provide answers that will make you look better to your employer." 7 Tr. 1322:2-1323:7; Ex. 253 at 253-16, 17.

360. Equity points out that Dr. Childers has used interviews to collect information in performing job evaluation projects. This is a red herring. Dr. Childers used those interviews to supplement data collected by computers used by the employees at issue. 7 Tr. 1329:20-1330:9. Moreover, job evaluations differ from time studies in that they seek "to develop the relative worth of different positions normally within a firm," and are "not related to the amount of time that's required to perform operations." 7 Tr. 1342:21-1343:8.

361. Equity also asserts that Dr. Childers has conducted time studies in donning and doffing cases for which he collected data for non-randomized samples of employees. 7 Tr. 1331:15-1332:9. In those cases, however, Dr. Childers was the expert for the plaintiffs and did not have the opportunity to conduct an engineered time study. 7 Tr. 1344:4-6. Furthermore, the employers in those cases did not have time records of the work activities that were being measured. 7 Tr. 1344:7-10. Dr. Childers therefore had limited access to the employers' facilities, and simply collected as much data as he could based on that limited access. 7 Tr. 1343:16-1344:3.

362. The Court agrees with Dr. Childers that Mr. Hosfield's failure to adhere to scientific methods in the interviews he used to collect and record data renders his interviews unreliable. Ex. 253 (Childers Report) at 253-19, § 8.3. This is especially potent considering the Mr. Hosfield had access to Defendants employees, and could have performed an engineered study at any time during the course of this litigation (as was recommended by Ms. Zumph in her November 2014 memo (Ex. 90 at 90-4-5), including with sufficient COVID protections even during the pandemic. Similarly, Defendants had the opportunity to conduct a non-engineered time study, including the use of time logs or time tracking software, both before and during the pandemic. 2 Tr. 251:15-252:6 (Ms. Villanueva testifies that she did not track her time, and thought it would be "unreasonable given how busy we are," but would have attempted to track time if asked); 298:7-12 (Ms. Kopczyk did not track time spent on tasks, but did

record notes and series of communications in MRI); 373:23-314:17 (Ms. Grubbs did not record time spent on late-rent activities, but there was nothing precluding time-tracking, so she would have if asked.).

363.    The Court finds persuasive Dr. Childers' testimony, which is grounded in empirical research in his field of expertise, that asking employees to estimate time spent on specific work tasks, particularly in the past, is unreliable because human memory is not well suited to this task.  7 Tr. 1319:17-1320:8; Ex. 253 at 253-14 ("In general, the problem is that autobiographical memory is notoriously unreliable.").  As Dr. Childers described, "this problem is compounded by Mr. Hosfield's inquiring about activities that occurred many months ago."  Ex. 253 at 253-15.

364.    The Court also agrees with Dr. Childers' testimony that Mr. Hosfield's failure to use a standardized data collection process, based on a standard and uniform questionnaire, renders the data he collected unreliable.  7 Tr. 1320:20-1322:1; Ex. 253 at 253-15 § 8.2.2 (Childers Report).

365.    For the reasons outlined above, Mr. Hosfield's "cost-incurred" survey of personnel costs is unreliable in both design and execution.  As explained in the Conclusions of Law below, and for the reasons outlined above, the Court gives the results of that survey no weight in determining the amount of Defendants' personnel costs damages.

iii.    **Mr. Hosfield's Calculations Include Costs that Were Not Proximately Caused by the Late Payments Underlying the Late Fees at Issue in this Case.**

366.    As pointed out above, a fundamental, fatal problem with Mr. Hosfield's analysis of employee costs is that he made no effort to determine which costs Equity would have incurred regardless of any given tenant's late payment of rent, and which costs can be said to be caused by a class member's late payment of rent associated with a late fee challenged by this case.  Indeed, Mr. Hosfield conceded that his cost analyses have nothing to do with causation, or with class members.  5 Tr. 920:21-922:6 ("We're not talking about causation here …"); 990:12-17, 21-25 ("This has nothing to do with the class members.  There's no class member reference in here at all.  It has nothing to do with class members. …  That's not the – that's not what I understand the calculation requires. …  It's the – it's the costs incurred by Equity to collect delinquent rent.").

873269.27

367.    In this context, the economic concept of "marginal" costs captures the inquiry of which costs are increased as a direct result of late rent, in contrast with "inframarginal" costs that are fixed and will be incurred whether or not a given tenant pays rent late.  These concepts are analogous to "variable" and "fixed" costs.  Ex. 257 at 257-12-13, ¶ 9 & n.12 (Schwarz July 2021 Report); *id.* at 257-20-21, ¶ 25; 6 Tr. 188:15-1091:9.  A cost is marginal to a tenant's late rent payment if a single additional late rent payment increases that cost.  *Id.*

368.    Mr. Hosfield's "costs-incurred" model fails to identify which costs are caused by a tenant's late payment of rent.  Instead, his model directly translates the percentage of time he estimates employees spend collecting late rent from all tenants into a cost figure, without taking any steps to determine whether employees' hours or compensation increased as a result of *class members'* late rent.  Ex. 1243 at 1243-20 (Hosfield May 2021 Report).  This is inappropriate where, as reflected in the Court's findings, *infra*, many of Equity's personnel costs are fixed.  *See* Section I.J.1.b.

369.    Moreover, Mr. Hosfield's costs-incurred calculations include categories of costs that are fixed and unaffected by a tenant's late payment of rent.  The total personnel costs to which he applies the percentages he derived from the interviews include cost categories that lack any causal relationship to the late payment of rent.  Those include "allocable costs," health insurance and employment benefits, bonus pay (which is based on factors other than hours worked or late rent collection), leasing commissions, paid time off, salary for exempt employees, and hourly pay for non-exempt personnel who are not involved in collecting late rent.  6 Tr. 1087:16-1098:1; Ex. 259 at 259-21-41 ¶¶ 35-69 (Schwarz June 2022 Report).

370.    In his April 2022 expert report, Mr. Hosfield also included compensation and related employee costs for the period since the onset of the COVID-19 pandemic in March 2020.  5 Tr. 962:24-963:8.  For most of that period, and at most of those properties, Equity was not charging late fees.  5 Tr. 962:14-23; Ex. 115.

371.    Personnel costs for properties where late fees were not being charged cannot be offset against any restitution that might be owed to the Classes.  When no late fees are charged, there are no late fees against which costs could be offset.  Any such costs, by definition, were not caused by class members' late payments that resulted in the late fees at issue in this litigation.

372.    Removing from Mr. Hosfield's calculations the personnel costs that are fixed and unaffected by the late payment of rent shrinks Mr. Hosfield's base personnel costs by 60.1%. 6 Tr. 1102:4-1103:1; Ex. 259 at 259-48. Excluding costs associated with properties not charging late fees during the COVID pandemic period shrinks the base costs even further. *Id.*

373.    Once those improper costs are removed, Equity's personnel costs associated with late rent under Mr. Hosfield's cost-incurred model drop to $6,465,567 during the class period (compared with Mr. Hosfield's $27,221,049), or an average of $15.80 per late fee charged. *Compare* Ex. 534 *and* Ex. 1278 at 1278-9.

### iv.    Mr. Hosfield's Calculations Include Costs Incurred During the Four-Day Grace Period.

374.    In gathering time estimates from his interviewees, Mr. Hosfield included time those employees spent collecting rent paid during the grace period, which is improper for the reasons set out in the Conclusions of Law, *infra.* 5 Tr. 966:25-967:20 (admitting that did not ask the interviewees to distinguish between time they spent collecting rent during and after the grace period).

375.    For example, Mr. Hosfield's interview notes of Martha Melendez reflect that during the first four days of the month, "her primary duty is posting money," *i.e.*, rent timely paid by tenants, which takes four hours a day. Ex. 169 at 169-9. These hours were included in Mr. Hosfield's calculations. *See* 5 Tr. 997:14-998:15; Ex. 1278-186.

376.    Although the Court is unable to quantify the effect of this error, it appears to be substantial. *See, e.g.*, 2 Tr. 370:13-20 (Grubbs) (estimating that 35 to 40% percent of her total time spent collecting "delinquent" rent took place during the 1st through the 4th of the month).

377.    Moreover, Equity's own presentation of its evidence undercuts its contention that the time tallied for the first few days of the month is related to delinquencies from prior months. For example, Equity's counsel elicited testimony, at some length, from property-level witness Mayra Villanueva about her time spent during the grace period posting payments and reaching out to tenants who had not yet made their rent payment for the month. *See* 2 Tr. 222:13-225:25; *see also id.* at 267:6-19 (Villanueva) (agreeing that she has to spend time posting payments "whether it's late or on

873269.27

time" to "keep the accounting straight"). Equity elicited similar testimony from other of its witnesses. 2 Tr. 284:24-286:1 (Kopczyk); 2 Tr. 406:4-407:9 (Ott).

**f.** **Mr. Hosfield's "Cost Savings" Method Is Unreliable and Unscientific, and Does Not Measure Costs Caused by Late Rent.**

378.    Mr. Hosfield's alternative method of calculating personnel costs damages from the late payment of rent consists of calculating the "savings" resulting from staffing changes that a group of four high-level Equity employees estimate they would make in a world where no tenant ever paid rent late. 5 Tr. 972:9-973:973:21; Ex. 1243 at 1243-33-36.

379.    The question that Mr. Hosfield posed to this group of high-level Equity employees was fully speculative: "If all residents paid their rent on time, how would Equity's staffing needs change?" Ex. 1243 at 1243-34. Even Mr. Hosfield recognizes that this scenario would never come to pass. 5 Tr. 973:1-21.

380.    Mr. Hosfield did not possess or apply any expertise related to residential property management operations in creating this "Costs Savings" scenario. 5 Tr. 973:1-21; 974:17-975:15. Mr. Hosfield has no expertise in the area of employee staffing or property management. 5 Tr. 974:25-975:5.

381.    Instead, the group of four high-level Equity employees that he enlisted in this exercise made all the substantive decisions regarding which positions they would eliminate, combine, or reduce to part time. Ex. 1243 at 1243-34; 5 Tr. 972:9-25; 974:17-975:15.

382.    The process of generating the model involved no rigorous or testable methodology, or at least none that Mr. Hosfield himself is able to testify to, much less justify.

383.    The staffing changes scenario constructed by the four high-level Equity employees was solely created for purposes of this litigation and for use in Mr. Hosfield's expert report. Ex. 1243 at 1243-33-36; 5 Tr. 973:1-21.

384.    Equity did not timely disclose or seek to qualify the four high-level employees as expert witnesses. As addressed below in the Conclusions of Law, their model is in the nature of an expert analysis, as they were asked to apply their specialized knowledge to a hypothetical.

873269.27

385. Because the cost savings analysis is speculative and unrealistic, and because Mr. Hosfield unreasonably relied on a made-for-litigation model and does not have the expertise to support the substantive content of that model, this Court finds that the "cost-savings" methodology is unreliable and unscientific. As explained in the Conclusions of Law that follow, the Court gives this component of Mr. Hosfield's testimony no weight because of the unreliable and speculative nature of the model, as outlined above.

386. The Court further finds that the premise of the costs-savings model—that Equity hires more staff because of expected levels of rent delinquency—is contradicted by the reality that Equity largely decreased its staffing per unit over the course of the COVID-19 pandemic, a time period in which Mr. Hosfield acknowledges that rent delinquency increased. *See, e.g.*, 5 Tr. 973:1-12; 973:25-974:5; 976:20-977:8; *see also* Ex. 259 at 259-49-54 ¶¶ 72-79.

387. Moreover, similar to the "costs-incurred" model, the "costs-savings" model presented by Mr. Hosfield does not measure the costs that are proximately caused by class members' late payment of rent. 5 Tr. 974:6-16.

388. Rather, the "cost-savings" model focuses on fixed or inframarginal costs by considering the baseline staffing decisions made by Equity rather than the extent to which costs are increased when a class member paid rent late. Ex. 257 at 257-54-57 ¶¶ 94-103 (Schwarz July 2021 Report).

      **g.**    **Mr. Schwarz's Multiple Regression Model Reliably Measures Personnel Costs Associated with Class Members' Late Rent.**

389. Mr. Schwarz used multiple regression modeling to test the relationship between late rent and Equity's payroll for relevant employees in California. *See* 6 Tr. 1077:8-18. Multiple regression is a rigorous and well-established statistical tool to assess the relationship between variables. 6 Tr. 1140:16-1143:1; *see* Ex. 257 at 257-87 ¶ 164 (Schwarz July 2021 Report); Ex. 259 at 259-55 ¶¶ 81-82 (Schwarz June 2022 Report). Multiple regression is effective at measuring the marginal change in costs, such as a landlord's payroll costs, associated with a marginal increase in alleged cost drivers, such as tenants' late payment of rent. *See* Ex. 257 at 257-87-90 ¶¶ 164-170 (Schwarz July 2021 Report); Ex. 259 at 259-55-56 ¶¶ 81-84 (Schwarz June 2022 Report); 6 Tr. 1085:14-1086:4, 1140:16-1143:1, 1184:5-1185:21; *see also* 6 Tr. 1143:2-1144:4 (Mr. Schwarz

testified that his model fits all three purposes of multiple regressions described in Ex. 415 (Reference Manual on Scientific Evid.) at 415-304: "More generally, multiple regression may be useful, one, in determining whether a particular effect is present; two, in measuring the magnitude of a particular effect; and three, in forecasting what a particular effect would be but for an intervening event.").

390. Mr. Schwarz developed a multiple regression model to test the relationship between variables related to late rent at a property—including (a) how many tenants paid their rent late in a given month ("Incidence of Lateness"), (b) how long their rent was outstanding ("Total Days Late"), and (c) the number of evictions, if any that month ("Evictions")—and categories of Equity's payroll costs at that property, including (a) salary compensation, (b) regular hourly pay, and (c) overtime and double time pay. Ex. 257 at 257-90-99 ¶¶ 171-175 (Schwarz July 2021 Report); *see generally* 6 Tr. 1138:23-1140:14; 1144:5-1145:5 (salary); 1145:7-1147:23 (hourly); 1147:24-1148:22 (overtime).

391. Mr. Schwarz's model also includes variables designed to control for influences on payroll costs unrelated to late rent activity. These variables include (a) "Time Trend" or the year of each observation, which allows the model to account for company- or industry-specific factors that contribute to higher or lower wage growth over time, (b) "Fixed Effects" variables to capture the baseline costs of a given property, allowing the model to focus on month-to-month changes within each community, and (c) "Substitutable Payroll," or a variable designed to capture the extent to which hourly pay and salary pay can substitute for each other (*e.g.*, one property may have higher monthly hourly pay because it has fewer salaried employees). Ex. 259 at 259-62-64 ¶ 88(i)-(n) (Schwarz June 2022 Report); Ex. 257 (Schwarz July 2021 Report) at 257-96-98, ¶ 174(i)-(n).

392. Mr. Schwarz's model is based on reliable data drawn from Equity's centrally maintained databases used for core business functions: payroll records, records of tenant charges and payments, and other property management records related to tenancies and evictions. Exs. 246-247; ECF No. 454 at 17 ¶ 5; 1 Tr. 88:16-90:20 & Exs. 345 to 348 referenced therein.

393. The Court finds that Mr. Schwarz reliably applied econometric principles in constructing his multiple regression model and applying it to this data.

394. To determine the magnitude of the relationship between the late rent variables and Equity's payroll costs, Mr. Schwarz's model uses three regressions—one for salary compensation, one

for regular hourly pay, and one for overtime and double time pay. *See* Ex. 259 at 259-57-68 ¶¶ 86-89 & Supp. Reb. Exs. 4a-4d (Schwarz June 2022 Report); *see also generally* Ex. 257 at 257-98-99 ¶ 175 & Appendix C (Schwarz July 2021 Report); 6 Tr. 1138:23-1140:14; 1144:5-1145:6 (salary); 1145:7-1147:23 (hourly); 1147:24-1148:22 (overtime). In evaluating the results of these regressions, Mr. Schwarz used common and accepted standards of statistical significance. *See generally* 6 Tr. 1149:3-1155:15, 1156:2-13.

395. ***Overtime and double time pay.*** In his regression related to hourly employees' overtime and double time pay, Mr. Schwarz found that both Incidence of Lateness and Totals Days Late has a positive and statistically significant relationship with increased overtime costs. Ex. 259 at 259-65 ¶ 89 & Suppl. Reb. Ex. 4A (Schwarz June 2022 Report); 6 Tr. 1148:2-22. The regression supports a conclusion that for each time a tenant is late in paying rent (*i.e.*, as measured by the Incidence of Lateness variable), Equity incurs a $2.01 increase in overtime costs. 6 Tr. 1148:2-22; Ex. 259 at 259-65 ¶ 89 & Suppl. Reb. Ex. 4A (Schwarz June 2022 Report); *see generally* Ex. 257 at 257-100 ¶ 178 (Schwarz July 2021 Report). For each day after the grace period that a tenant remains late in paying rent, Equity's overtime payroll rises by 19 cents. 6 Tr. 1148:2-22; *see also* Ex. 257 at 257-101 ¶ 179 (Schwarz July 2021 Report).

396. In the overtime and double time pay regression, the variable reflecting evictions is positive but not statistically significant. 6 Tr. 1148:2-22; Ex. 259 at 259-65 ¶ 89 & Suppl. Reb. Ex. 4A (Schwarz June 2022 Report); *see generally* Ex. 257 at 257-102 ¶ 180. The lack of statistical significance means that, under accepted statistical standards, the results of the regression are consistent with the possibility that an eviction does not result in any measurable increase in a property's overtime or double time costs. *Id.* Thus, consistent with accepted statistical principles, the Court will not include this factor in calculating Equity's actual damages caused by class members' late payment of rent.

397. ***Regular hourly pay.*** The regression related to regular hourly pay shows that the incidence of lateness has a positive and statistically significant relationship with regular hourly pay. 6 Tr. 1145:7-1147:23; Ex. 259 at 259-65-66 ¶ 89 & Suppl. Reb. Ex. 4B (Schwarz June 2022 Report); *see also* Ex. 257 at 257-105-106 ¶¶ 186-88 (Schwarz July 2021 Report). The regression supports a

conclusion that for each tenant that is late in paying rent, Equity pays an additional $7.70 in regular hourly pay. 6 Tr. 1145:19-1146:9; Ex. 259 at 259-65-66 ¶ 89 & Suppl. Reb. Ex. 4B (Schwarz June 2022 Report).

398.    In the regular hourly pay regression, the variables for total days late and evictions are both positive but not statistically significant. Ex. 259 at 259-65-66 ¶ 89 & Suppl. Reb. Ex. 4B (Schwarz June 2022 Report); *see also* 6 Tr. 1146:12-1147:23. Consistent with accepted statistical principles, the Court will not include these factors in calculating Equity's actual damages caused by class members' late payment of rent.

399.    ***Salary.*** Mr. Schwarz's regression related to salary compensation rules out any hypothesis that salary increases as a result of late rent by estimating a negative relationship (*i.e.*, that as late rent increases, salary decreases). 6 Tr. 1144:5-1145:6; Ex. 259 at 259-65, 67 ¶ 89 & Suppl. Reb. Ex. 4c (Schwarz June 2022 Report); *see also* Ex. 257 at 257-108-109 ¶¶ 191-92 (Schwarz July 2021 Report). Mr. Schwarz further confirmed this result with a regression using the number of salaried employees (rather than the amount of their pay) as the dependent variable; this regression, too, showed no relationship between late rent and salaried personnel costs. 6 Tr. 1144:5-1145:6; Ex. 259 at 259-65, 68 ¶ 89 & Suppl. Reb. Ex. 4d (Schwarz June 2022 Report); *see also* Ex. 257 at 257-109-10 ¶¶ 193-195 (Schwarz July 2021 Report).

400.    The results of these regressions can be used to calculate the added personnel costs that each tenant household (or ResidentID) caused to Defendants for each late payment of rent that resulted in a late fee, using Defendants' actual data relevant to that household. Ex. 259 at 259-62-74 ¶¶ 90-98 (Schwarz June 2022 Report); 6 Tr. 1150:12-1153:15.

401.    For each incidence of late rent, *i.e.*, each late payment leading to a late fee, Defendants incurred $9.71 in increased hourly and overtime pay. Ex. 259 at 259-70 ¶ 91 (Schwarz June 2022 Report). For each additional day that rent remained outstanding for a tenant household, Defendants incurred $0.188 in increased overtime costs. *Id.* Additionally, it is appropriate to scale up these costs by an additional 20% to account for pay-roll driven costs (*e.g.,* payroll taxes) that increase proportionally when pay increases. Thus, the additional costs resulting from each late payment leading

to a late fee, based on the facts specific to the particular tenant household that paid late, can be calculated using this formula: Costs = 1.2*($0.188*(Total Days Late)+$9.71). *Id.*

402.    As found above, property-level personnel do not spend significant time on tenants who are going through the eviction process. *See* 5 Tr. 952:11-22; *see*, *e.g.*, 2 Tr. 306:18-21 (Ms. Kopczyk). Accordingly, for class members who were evicted, the Total Days Late variable in Mr. Schwarz's calculations under the version of his model labeled 4(b)(ii) appropriately counts only those days prior to the date their files were sent out for eviction, as documented by Equity's records. Ex. 259 at 259-70 ¶ 90(ii) (Schwarz June 2022 Report).

403.    Mr. Schwarz's model shows that the median personnel costs resulting from the late payment of rent is $14.05. Tr. 1162:4-1165:20; Ex. 531-1 (4(b)(ii)). In 99 percent of the cases of late payment, the resulting increase in personnel costs to Defendants is $21.24 or less. *Id.*

404.    For all the reasons set out above, the Court adopts Mr. Schwarz's model (specifically, the version labeled 4(b)(ii)) as the basis for calculating the personnel costs created by each class member household's late payment of rent.

**4.    Lost Use of Funds**

405.    Defendants also rely on Mr. Hosfield to present their calculation of interest costs related to late rent payments. The Court finds persuasive Plaintiffs' criticisms that Mr. Hosfield inflates Defendants' interest costs in two ways: first by including the grace period in his calculations; and second, by using a steep interest rate based on Equity's weighted average cost of capital.

**a.    Mr. Hosfield Incorrectly Includes the Grace Period in His Interest Calculations.**

406.    Mr. Hosfield calculates interest for three distinct time periods: "(1) Before residents move out; (2) After residents move out and before their accounts are sent to collections; and (3) After residents' accounts are sent to collections." Ex. 1243 at 1243-2 (Hosfield 2021 Report); Ex. 1278 at 1278-12 (Hosfield 2022 Report). For each of these scenarios, he begins calculating interest as of the first of the month. Ex. 261 at 261-37 ¶ 80 (Tregillis 2021 Report).

407.    During the grace period each month, *i.e.*, the first four days of the month, rent outstanding spikes dramatically as the new month's rent becomes due and tenants largely pay it off.

Ex. 262 at 262-37 ¶ 72 (Tregillis 2022 Report) (chart) & Ex. 540 at 540-28 (Outstanding Rent Balance demonstrative). For example, for the calendar year 2018, on average $17 million in rent was outstanding on the second of the month—an amount that rapidly decreases during the grace period and is paid down to just under $9 million by the time the late fee is charged on the fifth of the month. Ex. 261 at 261-36 ¶ 78 (Tregillis 2021 Report). This spike reflects tenants using the flexibility afforded to them under the lease to pay their rent within the grace period.

408. In calculating interest, Mr. Hosfield ignores that the first four days of the month are a grace period. Thus, he charges interest for a period when rent is not actually late under the terms of the lease. Also, he is charging a class member interest even for months where the class member ultimately paid their rent within the grace period and were not charged a late fee. *See* Ex. 261 at 261-37 ¶ 80 (Tregillis 2021 Report); *see also* Ex. 1243 at 1243-26, 105-106 Ex. 7, Sched. 1A-1B (Hosfield May 2021 Report); Ex. 1278 at 1278-92-93 Updated Ex. 7, Sched. 1-A-1B (Hosfield 2022 Report). As set out in the Conclusions of Law below, Section II.H.2 & 7, *infra*, this calculation is improper as the interest costs incurred during the grace period are contractually waived by the grace period Equity includes in its Standard Lease.

409. Additionally, as set out in Conclusions of Law Nos. 74 & 74 below, Mr. Hosfield's interest calculations for the period after the tenant moves out are also improper, as those interest damages relate to unpaid rent, not late rent.

        **b.**    **<u>Equity's Interest Costs Are Most Accurately Measured by Its Short-Term Borrowing Costs.</u>**

410. Mr. Hosfield applies an interest rate to unpaid rent based on Equity's weighted average cost of capital ("WACC"), which is defined as "the cost of capital (discount rate) determined by the weighted average, at market value, of the cost of all financing sources in the business enterprise's capital structure." Ex. 1243 at 1243-2 (Hosfield 2021 Report); Ex. 1278 at 1278-12 (Hosfield 2022 Report).

411. The weighted average cost of capital is used in business valuations and in evaluating investments. 5 Tr. 898:13-899:8; 985:19-986:1 (Hosfield).

412.     Equity's WACC from 2010 to 2021, as calculated by Mr. Hosfield, ranged from 6.36% in 2010 to 8.75% in 2022.  Ex. 1278 Ex. 8, Sched. 1 (Hosfield 2022 Report).

413.     Based on Equity's annual WACC, and including all rent outstanding as of the first of the month, Mr. Hosfield opines that Equity's interest costs total $8,712,991 for the late rent payments of the Standard Late Fee Class and $80,143 for the late rent payments of the Woodland Park Preexisting Lease Class.  Ex. 1278 at 1278-14 (Hosfield 2022 Report); Ex. 1243 at 1243-31 (Hosfield 2021 Report).

414.     Equity offers testimony by Steven F. Stanton in response to the criticisms of Mr. Hosfield's use of WACC that Mr. Tregillis offered in his May 10, 2021 Report (Ex. 260).

415.     Mr. Stanton is a Managing Director with Deloitte Financial Advisory Services LLP where he specializes in forensic accounting and litigation consulting.  Ex. 1248 (Stanton Report) at ¶ 1.  He is a Certified Public Accountant ("CPA") licensed in Maryland, Washington, D.C., and Virginia, and is Certified in Financial Forensics by the American Institute of Certified Public Accountants ("AICPA").  *Id.*  Mr. Stanton has experience performing cost accounting, financial reporting, and damages analyses.  *Id.* ¶¶ 6-8.

416.     Plaintiffs do not dispute Mr. Stanton's qualifications.  Accordingly, the Court finds that Mr. Stanton is qualified to offer expert testimony related to the field of accounting to rebut the May 10, 2021 Tregillis Report.

417.     The Court accepts the expert testimony by Mr. Tregillis and Mr. Stanton that professional accounting standards require accountants to have sufficient relevant data to support their accounting opinions.  7 Tr. 1248:22-1249:12.  Specifically, to conduct a proper financial accounting, an accountant must analyze the particular facts of the case including where the money at issue would or should normally go, or be used, in practice.  7 Tr. 1257:13-1258:25; 8 Tr. 1424:25-1425:3, 1425:16-1427:1.

418.     Mr. Hosfield did not conduct that analysis.  Instead, Mr. Hosfield assumed in determining the interest rate for the lost use of funds calculation that where the money at issue (rent proceeds) actually would or should go, including into what types of accounts, was completely irrelevant.  7 Tr. 1258:1-1259:12.

419. Had Mr. Hosfield conducted a proper analysis of lost use of funds, he would have learned that (1) Equity never collects rent proceeds into interest-bearing accounts, 7 Tr. 1259:17-1260:8; (2) Equity only pays debts when they become due, not early, and thus there is no attempt, by Equity, to avoid interest charges by paying debts early, 7 Tr. 1260:10-1261:1; and (3) Equity has never lacked sufficient funds in its operating accounts to pay debts as they have become due. 7 Tr. 1260:10-1261:1.

420. Equity has presented no evidence that the late payment of rent has caused Equity to raise capital through the issuance of stock. Ex. 1243 at 1243-25 (Hosfield 2021 Report); Ex. 1278 at 1278-0012 (Hosfield 2022 Report); Ex. 262 at 262-35, 41 (Tregillis 2022 Report); Ex. 261 at 261-42 ¶ 96 (Tregillis 2021 Report).

421. Equity produced no evidence that it is not sufficiently capitalized to pay its bills without regard to the monthly fluctuation in outstanding rent. The amount of outstanding rent balance swing each month, from the expiration of the grace period to the end of the month, is typically $6 million. Ex. 261 at 261-42 ¶ 96 (Tregillis 2021 Report). Equity, as of July 9, 2021, had total equity of over $30 billion.

422. The Court finds that Mr. Hosfield's use of the WACC to determine Equity's interest damages is inappropriate.

423. Plaintiffs have presented convincing evidence that Equity has not lost interest income as a result of the late payment of rent.

424. Equity's Vice President of Treasury Collin Glancy was Equity's designated representative under Federal Rule of Civil Procedure 30(b)(6) on the topic of Equity's "damages from any lost use of funds attributable to its California residential tenants' late payment of rent." Deposition of Collin Glancy ("Glancy Dep.") 11:8-19; *see also* Ex. 240 (the Notice of Deposition). Mr. Glancy did not testify live at trial, so the Court relies on his deposition testimony.

425. All rent money collected by Equity from its California tenants is initially deposited into Equity's deposit accounts based on the method of payment (*i.e.*, electronic debit payment, paper check, and credit card). Glancy Dep. 24:22-25:2; 26:17-24.

873269.27

426. Rent money held in these deposit accounts is then transferred into Equity's main operating account on a weekly or daily basis. Glancy Dep. 27:18-28:12, 35:13-17.

427. Equity's various deposit accounts, including its main operating account, are non-interest-bearing accounts. Glancy Dep. 35:6-11, 37:4-16, 40:4-16, 41:4-23, 60:3-11.

428. The money held in Equity's main operating account is used to run Equity's business, including for payroll and maintenance of its properties. Glancy Dep. 36:14-37:4.

429. Equity considers its cash provided by operating activities to be adequate to meet operating requirements and payment of distributions. Glancy Dep. 78:6-14; Ex. 201.

430. Mr. Glancy admitted that since September 2010, Equity has had sufficient cash on hand to meet its operating obligations and has had no need to sell commercial paper or draw down its credit line as a result of class members' late payment of rent. Glancy Dep. 77:4-79:1.

431. Mr. Glancy is not aware of an instance where the main operating account did not have enough money to meet debt payments due at any time. Glancy Dep. 48:15-22.

432. There is no evidence that class members' late payment of rent has ever precluded Equity from undertaking a particular investment, paying off a particular debt, or undertaking any particular capital improvement or business activity. Glancy Dep. 89:2-90:24.

433. Equity is unable to attribute any actual damage to rent being *late,* for example, by a matter of days, as opposed to rent that is *never paid*, which, as explained in Conclusions of Law Nos. 74 & 75 below, is a separate breach of the lease and is not at issue in this case. Glancy Dep. 104:23-107:3.

434. If Equity were faced with the need to borrow funds to cover its costs while rent payments were outstanding, the company has short-term financing options available to it with interest rates far lower than the weighted average cost of capital. *See* Glancy Dep. 50:14-18, 56:3-9.

435. Plaintiffs' expert David Breshears has calculated Equity's lost use of funds damages based on Equity's short-term borrowing costs, using interest rates provided to him by Mr. Tregillis.

436. Using Equity's MRI tenant ledger data, Mr. Breshears determined the running rent balances for all class members. Ex. 252 (Breshears Supplemental and Rebuttal Expert Report) ¶ 45.

873269.27

437.    Since September 2010, Equity has maintained a $2.5 billion line of credit; the cost of using Equity's line of credit is LIBOR plus additional basis points.  Glancy Dep. 48:24-50:18.  Using the calculation of the resulting interest rate provided by Mr. Tregillis, which assumed the interest rate was LIBOR plus 77.5 basis points or .775%, Mr. Breshears applied the cost of Equity's credit line to class members' running rent balances between September 2010 through February 2016.  Ex. 252 ¶ 46 & n.27 (Breshears Supplemental and Rebuttal Expert Report).

438.    In March 2016, Equity commenced selling commercial paper, which provided Equity short-term financing at a lower cost.  Glancy Dep. 51:2-11, 56:3-57:7.  Mr. Tregillis identified 30 basis points or .3% as the appropriate interest rate for this period based on his understanding of Mr. Glancy's Federal Rule of Civil Procedure 30(b)(6) deposition testimony.  7 Tr. 1263:2-1264:4; Glancy Dep. 16:15-17.

439.    Mr. Breshears applied the 0.3% interest rate identified by Mr. Tregillis to class members' running rent balances for the period of March 2016 through December 31, 2022, calculating interest on an individual basis by ResidentID.  Ex. 252 (Breshears Supplemental and Rebuttal Expert Report) ¶ 46 & n.27.

440.    The Court finds that this interest calculation should be revised to reflect Equity's actual line of credit and commercial paper rates as established at trial, based on the company's SEC Form 10ks for the relevant class period, which are as follows:

441.    Equity's line of credit rate in 2010 was LIBOR + .50%.  Ex. 1093 at 1093-9.

442.    Equity's line of credit rate in 2011 was LIBOR + 1.15%.  Ex. 1093 at 1098-11.

443.    Equity's line of credit rate in 2012 was LIBOR + 1.15%.  Ex. 1119 at 1119-11.

444.    Equity's line of credit rate in 2013 was LIBOR + 1.15%.  Ex. 1137 at 1137-12.

445.    Equity's line of credit rate in 2014 was LIBOR + 1.15%.  Ex. 1150 at 1150-12.

446.    Equity's line of credit rate in 2011 was LIBOR + 1.15%.  Ex. 1162 at 1162-11.

447.    Equity's commercial paper rate in 2016 was 0.9%. 7 Tr. 1277:7-1278:22; Ex. 1172 at 1172-55.

448.    Equity's commercial paper rate in 2017 was 1.41%.  7 Tr. 1278:25-1280:2; Ex. 1188 at 1188-46.

449. Equity's commercial paper rate in 2018 was 2.35%. 7 Tr. 1280:3-1280:24; Ex. 1194 at 1194-43.

450. Equity's commercial paper rate in 2019 was 2.42%. 7 Tr. 1280:25-1281:19; Ex. 1199 at 1199-34.

451. Equity's commercial paper rate in 2020 was 1.72%. 7 Tr. 1281:21-1282:15; Ex. 1229 at 1229-37.

452. Equity's commercial paper rate in 2021 was .27%. 7 Tr. 1282:16-1283:19; Ex. 202 at 202-94.

453. The Parties will be providing supplemental calculations based on updated data. The Court directs Mr. Breshears to update his lost use of funds calculations to use the commercial paper routes as found above. Additionally, in calculating interest costs for subsequent years (2022, 2023), the Court directs Mr. Breshears to use the commercial paper rate disclosed in Equity's Form-10ks for those subsequent years.

**5. Eviction Costs**

**a. Equity Recovers Eviction-Related Attorneys' Fees and Costs from Defaulting Tenants Separately from Its Collection of Late Fees.**

454. The Court finds that Equity has a policy and practice of seeking eviction-related attorneys' fees from tenants separate and apart from its collection of late fees from the same tenants. 5 Tr. 977:15-22 ("That is a separate charge from late fees, yes.").

455. During the period since September 2010, Equity contends it engaged three law firms in California to act as its local eviction counsel, whose legal fees and costs Equity now seeks to recover through its offset defense: Kimball Tirey & St. John, The Law Offices of Todd B. Rothbard, and Hollenbeck & Cardoso, LLP. Ex. 1278 at 1278-80-85, Schedule 1A & Schedule 4A (Hosfield April 2022 Report). Whether The Law Offices of Todd B. Rothbard and Hollenbeck & Cardoso, LLP performed eviction services for Equity during the class period is unclear as Ms. Beihoffer testified that neither firm had worked for Equity for "a number of years." 4 Tr. 718:3-11.

456. As the Court found above, Equity sends tenant files to local eviction counsel to begin unlawful detainer proceedings if tenants have not paid rent by approximately the 15th of the month.

Ex. 23 at 23-1 ("Eviction should be filed on residents who have not paid rent by the eviction filing date (varies from area to area)"); 49 at 49-1 (same); 2 Tr. 232:8-25 (Ms. Villanueva); 303:19-304:15 (Ms. Kopczyk).

457. Equity may resolve the unlawful detainer in either of two different ways. First, prior to or while the unlawful detainer action is pending, the tenant and Equity may negotiate a "pre-eviction settlement agreement," (or "pay and stay" agreement) under which the tenant may avoid eviction in exchange for paying the tenant's full outstanding balance, including rent and late fees. 4 Tr. 720:10-19.

458. As part of the pre-eviction settlement agreement, Equity requires tenants to pay Equity's attorneys' fees and costs, including the costs of filing an eviction action, unless Equity waives those fees and costs. 4 Tr. 720:20-722:5; 724:24-725:11.

459. Equity's pre-eviction settlement agreements separately account for the tenant's payment of any late fees owed and the amount of attorneys' fees and costs the tenant is required to pay under the settlement. 4 Tr. 722:25-725:11; Ex. 39 (Pre-Eviction Settlement Template).

460. Second, as an alternative to a pre-eviction settlement agreement, Equity's local eviction counsel may negotiate a formal, court-approved stipulation with the tenant ("Stipulated Judgment") under which the tenant agrees to pay some amount to satisfy their outstanding balance, including rent and late fees, in addition to Equity's attorneys' fees and court costs. 4 Tr. 725:17-727:8. Like with pre-eviction settlement agreements, Equity's policy is to seek reimbursement of its attorneys' fees and costs from the tenant as part of resolving the eviction proceeding. *Id.*

461. Under these Stipulated Judgments, the tenants may also agree to stay in or vacate their units. 4 Tr. 726:10-13.

462. In each instance where Equity begins eviction proceedings against a tenant and incurs attorneys' fees and costs, Equity charges those attorneys' fees and court costs directly to the tenant's account in MRI, separate from and in addition to any late fee charges. Ex. 23 ("Legal costs associated with eviction proceedings should always be charged to the resident's account where permitted by law"); Ex. 49 (same); 4 Tr. 726:14-727:1; 727:21-728:5; 737:10-25. Equity expects the tenant to pay those amounts separate from and in addition to any late fees the tenant may owe or pay, and the fees

and costs are addressed as part of a judgment or settlement. 4 Tr. 724:24-725:11; 726:10-727:8; 727:21-728:1 (MRI records attorneys' fees and costs separate from other charges).

463. Mr. Breshears confirmed that late fees and eviction-legal-fees are separate transactions in the RMLEDG data. 7 Tr. 1357:6-1358:4 (explaining that LAT is the distinct charge code for late fees, whereas EVI and S05 are the charge codes for eviction-related legal fees).

464. As set out in the Conclusions of Law below, the Court concludes that these costs are not liquidated by the late fee and may not be recovered as an offset to Equity's restitution of unlawful late fees.

**b.  Additionally, Equity's Calculation of Its Eviction Costs Is Overstated.**

465. Even assuming *arguendo* that Equity is entitled to seek its legal costs as an offset to class members' late fee restitution, the Court agrees with Plaintiffs and their expert Mr. Breshears that Mr. Hosfield's calculation of these costs is flawed.

466. Mr. Hosfield's analysis is limited to the "pre-Covid period" since "Equity's eviction costs from March 2020 through December 2021 have been minimal." *See* Ex. 1278 at 1278-11 (Hosfield April 2022 Report); 5 Tr. 977:23-978:4.

467. Mr. Hosfield's calculation of Defendants' legal cost offset takes all eviction legal fees and costs Equity paid to its local counsel, subtracts any class-member payments evidenced in the MRI ledger data, and concludes that the entire remainder should be deducted from any restitution owed to the classes. *See* Ex. 1243 at 1243-23, 97-98 (Exhibit 5, Schedules 4A and 4B); 5 Tr. 978:5-9 (Mr. Hosfield "used the amount [Equity] actually paid to eviction counsel); *see also* 7 Tr. 1363:7-1364:13 (Breshears). In essence, Mr. Hosfield's formula takes the largest-possible amount of eviction costs and reduces it by the smallest-possible amount of class member payments to calculate the amount class members purportedly still owe Equity in legal fees that should be offset from their restitution.

468. As the starting point, Mr. Hosfield calculated as Equity's total legal costs during the period of September 2010 through December 2021 to be $9.9 million based on three invoice spreadsheets that summarize Equity's class-period attorneys' fees and costs billed to each property by the three California law firms that prosecute evictions on Equity's behalf. *See* Ex. 1243 at 18 n.61

(Hosfield 2021 Report) (citing, among others, Exs. 73 (KTS); 86 (Hollenbeck); and 16 (Rothbard)); *but see* 8 Tr. 1364:2-13 (Breshears).

469.    However, the spreadsheets contain no information linking the fees and costs billed either to class members or to the late payment of rent by class members. 5 Tr. 979:10-18 (Hosfield); *see also* 7 Tr. 1363:7-1364:1; 1365:9-1366:22 (Mr. Breshears explained that the spreadsheets may contain information unrelated to class members and/or unrelated to late rent).

470.    The spreadsheets similarly contain no information sufficient to identify class members who, after Equity commenced eviction proceedings, paid their outstanding balances and were not evicted from their rental units as opposed to those tenants who were evicted. *See generally* 5 Tr. 979:10-18; 1363:7-1364:1; 1365:9-1366:22; Ex. 249 (Breshears 2021 Report) at 249-24, ¶ 65.

471.    Accordingly, Mr. Hosfield's analysis fails to demonstrate that the claimed legal costs were caused by class members' late payment of rent. Tr. 979:10-981:2. Indeed, Mr. Hosfield did not confirm that the claimed legal costs were for eviction work, that they were awarded by a court, or whether any of the legal costs had been waived by Equity. *Id.*

472.    Conversely, Mr. Breshears explained that the RMLEDG tenant ledger data specified the eviction legal costs that Equity charged to class members – and that the charges in the ledger data are approximately $1.5 million less than the costs Mr. Hosfield claimed based on the vendor invoices. 7 Tr. 1364:2-13 ("Based on the RMLEDG data, the total charges for EVI and SODA eviction is only $8.4 million specific to these class members or specific to the RMLEDG records").

473.    Mr. Hosfield did rely on the tenant ledger data for the second part of the equation, however. Mr. Hosfield credited against Defendants' offset the amounts of legal costs paid by class members based on two categories of legal-cost data in the MRI tenant ledger data. 5 Tr. 981:3-9 (calculating legal fees paid by totaling payments categorized as "EVI" or "S05"); Ex. 1243 at 1243-91 & 93 (Ex. 5, Schedule 1A & Schedule 2A).

474.    Mr. Breshears analyzed the same two legal-cost data categories (EVI and S05), but ultimately concluded that "only $3.6 million of the $8.4 million [eviction legal cost charges] is open and outstanding versus the $7,066,000 Mr. Hosfield has calculated" as being owed by the class in offset. 7 Tr. 1369:10-22 & Ex. 541 at 541-5; *see also* Ex. 252 at 252-24, ¶¶ 58-59.

1   475.   And of the $3.6 million potentially outstanding legal costs, approximately $2.4 million

2   of the charges were coded as S05, meaning that they occur as the tenant is moving out or vacating the

3   unit, such that subsequent payments may be recorded in a separate database that Mr. Hosfield did not

4   consider.  *See* 7 Tr. 1369:23-1370:20 & Ex. 541 at 541-5.

5   476.   Accordingly, while Mr. Hosfield relies on sources that likely overstate the total legal

6   costs that Equity is claiming to have been caused by class members, Mr. Hosfield relies upon a narrow

7   subset of relevant data to determine the amounts class members paid toward those legal costs – likely

8   understating the amounts paid by class members that would reduce Equity's eviction-cost offset.  *See* 7

9   Tr. 1366:24-1367:21.  The Court finds Mr. Hosfield's analysis of the legal-cost offset to be biased and

10  unreliable.

11  477.   Moreover, the Default Remedies clause of Equity's Standard Lease limits recovery of

12  attorneys' fees to $2,000 per claim under the lease.  *See* Exs. 6 at 6-5, ¶ 26; 83 at 83-7, ¶ 27; 85 at 85-7,

13  ¶ 27.  The aggregate data Mr. Hosfield used to demonstrate Defendants' legal fees leaves the Court

14  powerless to ensure that Equity is not attempting to recover legal fees beyond the per-tenancy limit set

15  in its own lease.

16  478.   In sum, the Court finds that Equity's late fee does not liquidate its eviction-related legal

17  costs, and those costs are not among the actual damages Defendants have incurred as a result of class

18  members' late payment of rent.

19  **6.   Collection Costs**

20  479.   Equity also seeks to offset from the Classes' restitution the collection agency fees that it

21  has paid in connection with outstanding amounts owed by its former California tenants.

22  480.   Since at least 2010, Equity has retained a collection agency called "FCO" or Fair Credit

23  Outsourcing to collect debts from former Equity tenants in California.  4 Tr. 729:14-16; Ex. 15 at 15-1.

24  481.   For all relevant times, Equity's policies and arrangements with FCO as applicable to

25  California tenants have been as follows:

26  a.   If a tenant moves out with amounts owing on their ledger, for 45 days Equity

27  staff seek to contact the tenant to collect the amount owing.  4 Tr. 728:13-23; Ex. 21 (FCO

28  Collections).

b.      If the tenant still owes a balance 45 days after move-out, Equity sends a tenant's file to FCO for the collection agency to pursue the debt.  4 Tr. 728:24-729:8; Ex. 21.

482.    As compensation FCO retains a percentage (typically, 30 to 50%) of the amount it collects from the former tenant.  4 Tr. 729:17-731:13; Ex. 15.

483.    In December 2013, Equity also entered into an arrangement with its outside eviction counsel in California, Kimball Tirey & St. John, to collect money judgments it has obtained against former Equity tenants.  4 Tr. 731:20-732:1; Ex. 14 at 14-1; Ex. 23.

484.    As compensation for this work, Kimball Tirey & St. John retains a percentage (typically, 40%) of the amounts it collects from the former tenants.  4 Tr. 732:20-733:3; Ex. 14 at 14-1.

485.    Thus, all collection agency fees paid by Equity are percentage-based commissions.  As set out in the Conclusions of Law below, Equity cannot legally recover such costs from the Classes.  Accordingly, the Court excludes them from the calculation of Equity's relevant cost offset and the Classes' net restitution.

## F.      Facts Related to Equity's Other Affirmative Defenses

### 1.      Facts Related to Equity's Voluntary Payment Doctrine Defense

486.    No class member paid a late fee with full knowledge of the facts relevant to whether the late fee was excessive.

487.    Prior to trial in this action, Defendants' communications and documents concerning their decision-making related to the Standard Late Fee and Woodland Park $50 Late Fee had never been made public.  4 Tr. 735:20-736:13 (Equity's lease includes the late-fee formula and "language about the liquidated damages requirement," but does not contain information regarding the process that Equity followed in adopting the Standard Late Fee in 2008).

488.    Even within this litigation, Defendants vigorously opposed production of many of their documents and communications related to the adoption and determination of the Standard Late Fee.  *See* ECF Nos. 165, 170 & 184 (letter briefs in which Equity opposed discovery into its communications and documents related to adopting and monitoring the Standard Late Fee); ECF No. 173 (ruling by Magistrate Judge Hixson that Equity waived attorney-client privilege over the 2008 setting of the Standard Late Fee and subsequent monitoring thereof); ECF No. 173 (Equity appealing

waiver ruling to the district court); ECF No. 196 (order by Magistrate Judge Hixson requiring Equity to produce privilege log for documents withheld under work-product protection); ECF No. 212-2 (opposing Plaintiffs' request for a more thorough search and more detailed privilege log); ECF No. 250 (Equity's brief opposing production of fee review documents after September 2014).

489.    Even after Defendants were ordered to produce documents related to their late fee decision-making and monitoring processes, Defendants have required those documents to be filed under seal when presented to the Court related to the Parties' extensive motion practice.  ECF Nos. 216, 249, 259, 344 (seeking sealing of documents related to the adoption and evaluation of the Standard Late Fee).

490.    Similarly, Defendants have cloaked their decision-making about the Woodland Park $50 Late Fee in a blanket of confidentiality.

491.    As class members were not privy to those documents, class members did not have access to, much less knowledge of, the facts bearing on the Parties' dispute about whether the Standard Late Fee and the Woodland Park $50 Late Fee are based on a reasonable endeavor by Defendants to estimate their damages from late rent.  *See*, *e.g.*, 1 Tr. 64:5-24 (Plaintiff Smith had no access to information regarding Equity's costs of collecting late rent.); 4 Tr. 736:14-737:4 (Equity has never informed tenants that the fee it charges for the late payment of rent exceeds the costs caused by tenants' late rent payments); 5 Tr 837:20-22 (Plaintiff Brown was never told how Equity decided that the late fee would be $50).

492.    Even property level-personnel working for Defendants were not privy to the internal decision-making that led to the adoption of the challenged late fees.  2 Tr. 272:12-273:1 (Ms. Villanueva); 306:23-307:9 (Ms. Kopczyk); Balahadia Dep. at 71:21-72:2; Johnson Dep. at 94:1-9; Gomes Dep. 40:15-19.

493.    A reasonably prudent tenant would feel compelled to pay the late fees charged by Equity, which are expressly categorized as "additional rent" in the California Standard Lease Terms and Conditions, in order to protect their tenancy.  *See* Ex. 6 ¶ 4.  The Standard Lease Terms and Conditions also provide that Equity may report negative payment histories and collection efforts to

873269.27

credit reporting agencies, which would also compel a reasonably prudent tenant to pay their balance in full. *See* Ex. 6 ¶ 13.

494.     As noted above, Defendants also have a practice of posting Three-Day Notices to Pay Rent or Quit to tenants' doors on the same day they are charged a late fee. There was conflicting testimony regarding whether the Three-Day Notices itemized late fees as being due in order to "cure the default." In any event, a reasonably prudent tenant in receipt of the Notice that threatens not only eviction but also possible eviction-related legal costs and punitive damages would feel compelled to pay their outstanding balance, including late fees, to avoid those dire consequences. *See* 2 Tr. 327:14-327:14 (discussing Ex. 1148, Plaintiff Bonfanti testified that even if the Notice only listed the rent amount, it was "confusing because [his] ledger would have a different amount" and so he would not have understood that the rent amount was the "amount that [he] had to pay, the total amount.").

495.     For example, Plaintiff Smith felt compelled to pay her full balance, including the late fee, because – based on the three-day notice she received and her conversation with property staff – she was concerned about eviction, negative credit reporting, further fees, or that it would be taken from any security deposit. 1 Tr. at 64:5-65:20; 72:13-20 (fear of eviction based on notice received and conversation with property staff). *See also*, *e.g.*, 5 Tr. 837:17-19 (Plaintiff Brown thought she would be evicted if she did not pay the late fee Equity charged her).

496.     Plaintiff Bonfanti asked Equity to allow him to pay rent in the middle of the month, when he was paid, so he could avoid late fees. 2 Tr. 349:8-19; Ex. 1367 at 1367-9-10 (Sept. 8, 2016 correspondence with property manager Mayra Villanueva). The property manager told him that they could not modify his lease, but suggested that Plaintiff Bonfanti "take out a loan or an advance" as another resident had done, and he could use the "money [he] saved on the late fees to make payments on the loan." *See* Ex. 1367 at 1367-9-10 (Sept. 8, 2016 correspondence with property manager Mayra Villanueva).

497.     Mr. Bonfanti understood from Equity staff that he had to pay the outstanding balance in full, including late fees, or he would be "out on the streets." 2 Tr. 350:1-353:14; *see also* Ex. 529.

498.     For example, on December 10, 2014, Mr. Bonfanti was charged a late fee because his December 4th rent payment had not cleared. *See* Ex. 1564. That same day an Equity staff member

(Kennia Lindo) posted a Three-Day Notice to Pay Rent or Quit on Mr. Bonfanti's door. *See* Ex. 1148. The Three-Day Notice listed the amount of his rent that was due, but an email from the same staff member made clear that his "current balance," owed in certified funds, "include[d] the late fee and NSF returned check fee." *See* Ex. 1367 at 1367-39.

499.    In July 2015, Mr. Bonfanti received a Three-Day Notice from Equity because his payment had been returned for insufficient funds. *See* Ex. 1153 (Three-Day Notice showing $2,196 in rent outstanding). Mr. Bonfanti emailed Equity staff to confirm that he would "bring [his] account current [w]ithin the three days after [Equity's] notice," and the staff member indicated his payment "would have to be in a cashiers check with the total balance due of $2,417.39." Ex. 1367 at 1367-24-25. In response to Mr. Bonfanti pointing out that the "total balance" was higher than the amount listed on the Three-Day Notice, the staff member responded that "the note only had your rent amount. You must pay the late fee and total balance." *Id.*

## 2.    Facts Related to Equity's Statute of Limitations Defense

500.    Plaintiffs Munguia-Brown, Rodriguez, and Magaña filed the initial Complaint in this action on behalf of themselves and a California-wide class, on September 3, 2014 in state court. Ex. 204, ECF No. 1-1. The date four years prior to that date is September 3, 2010.

501.    The action was removed to federal court on March 11, 2016. Ex. 203, ECF No. 1. With the Court's leave, on February 8, 2017, Plaintiffs filed a Second Amended Complaint, conforming their claims to federal court and adding Plaintiff David Bonfanti. ECF No. 45. Again, with the Court's leave, Plaintiffs filed a Third Amended Complaint, adding Plaintiff Shannah Smith on November 16, 2021. ECF No. 322.

502.    Defendants' Answers to each of Plaintiffs' complaints assert a statute of limitations defense. Previously, Defendants unsuccessfully opposed Plaintiffs' motions for leave to file their Second and Third Amended Complaints, arguing that they did not relate back to the filing of Plaintiffs' initial complaint.

503.    In granting Plaintiffs' Motion for Leave to File Third Amended Complaint, this Court already found that "[e]ver since the original complaint was filed, Plaintiffs have consistently raised the same claims and causes of action under the same general set of operative facts and on behalf of the

873269.27

same people seeking the same relief against the same defendants." Order Resolving Outstanding Motions and Setting Case Management Conference, Oct. 25, 2021, ECF No. 248 at 4-5.

504. Despite the Court's not agreeing with Defendants, as set forth in Finding No. 503, above, Defendants still argue that the filing of Plaintiffs' initial complaint did not toll the statute of limitations for claims of Equity's California tenants who entered into the Standard Lease and were charged the Standard Late Fee. Defendants have provided no evidence to disturb this finding, and thus Court reiterates it here.

505. In the notice of removal that Defendants filed on March 11, 2016, Defendants' counsel summarized their understanding of Plaintiffs' claims as follows: "Plaintiffs allege that Defendants own, lease, or manage residential properties throughout California, and that Defendants imposed illegal late fees on plaintiffs and other tenants who failed to timely pay rent." ECF No. 1 ¶ 2. Additionally, this pleading contained statements demonstrating Equity's recognition that Plaintiffs were seeking to represent all California tenants who had been charged excessive late fees in order to recover "restitution of all late fees charged to Defendants' California tenants from September 3, 2010 through the date of any judgment," and that, based on "an analysis of Defendants' records," "plaintiffs' claims implicate more than $10,000,000 in late charges." *Id.* ¶¶ 6, 9.

506. The statements made by Defendants' lawyers and representatives in the court filings described above constitute judicial admissions that are binding on Equity.

507. The Court further finds that Plaintiffs' original complaint gave Equity adequate notice of the claims of Plaintiff Bonfanti and the putative Standard Late Fee Class that were alleged in the Second Amended Complaint and of Plaintiff Smith and the putative Standard Late Fee Class that are alleged in the Third Amended Complaint.

508. The Court further finds that the initial Plaintiffs share an identity of interests with Plaintiffs Bonfanti and Smith.

509. As Defendants appear to have accepted the statewide scope of the putative class encompassed within the original complaint well before the filing of Plaintiffs' Second Amended Complaint, the Court finds that the statute of limitations for all of the claims that Plaintiffs raised on

873269.27

behalf of the Standard Late Fee Class and the Woodland Park Preexisting Lease Class were tolled by the filing of Plaintiffs' original complaint on September 3, 2014.

510.     Accordingly, the monetary relief claims of the Standard Late Fee Class and the Woodland Park Preexisting Lease Class extend back to September 3, 2010.

## II.     CONCLUSIONS OF LAW

### A.     Plaintiffs Have Satisfied Article III, UCL, and Injunctive Relief Standing Requirements.

1.     Plaintiffs must support each element of the standing inquiry "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Accordingly, Plaintiffs must prove they have standing by a preponderance of the evidence.  *Id*.; *see also Aguilar v. Atl. Richfield Co.*, 25 Cal. 4th 826, 866 (2001) (plaintiff bears burden of proving California Unfair Competition Law claim by a preponderance of the evidence).

2.     To demonstrate standing under Article III, Plaintiffs must show they: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, -- U.S. --, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan*, 504 U.S. at 560-61).

3.     California's Unfair Competition Law has particular standing requirements.  To demonstrate UCL standing, Plaintiffs must "(1) establish a loss or deprivation of money or property sufficient to qualify as injury in fact, *i.e., economic injury*, and (2) show that economic injury was the result of, *i.e., caused by*, the unfair business practice … that is the gravamen of the claim." *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 322 (2011) (emphasis original).  "[P]roof of injury in fact will in many instances overlap with proof of the next element of standing, to have 'lost money or property.'" *Id*. at 323.  "Notably, lost money or property—economic injury—is itself a classic form of injury in fact." *Id*.

4.     With respect to causation for UCL claims that do not involve fraud, "the plaintiff must simply show that the alleged violation caused or resulted in the loss of money or property" without regard to the plaintiff's reliance on the violation.  *See Medrazo v. Honda of N. Hollywood*, 205 Cal. App. 4th 1, 12 (2012) (reversing judgment against plaintiff and addressing UCL standing where

defendant's violation did not involve fraud); *In re Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 159-60 (2010), *as modified on denial of reh'g* (Feb. 8, 2010) (no showing of reliance required where defendants' sale violated the law). Indeed, the California Supreme Court envisions "many types of unfair business practices in which the concept of reliance … has no application." *See In re Tobacco II Cases*, 46 Cal. 4th 298, 325 n.17 (2009); *see also Kwikset*, 51 Cal. 4th at 326 (Court's actual-reliance analysis was limited to fraud theory before it).

5.      The Court finds that Plaintiffs Javanni Munguia-Brown, Angelina Magaña, Norma Rodriguez, David Bonfanti, and Shannah Smith have Article III and UCL standing to pursue their claims for restitution on behalf of themselves and the classes they represent. Plaintiffs are current and former tenants of Equity. It is undisputed that Equity charged Plaintiffs Bonfanti and Smith the Standard Late Fee of 5% of their outstanding rent balance, which they paid. It is similarly undisputed that Defendants charged Plaintiffs Munguia-Brown, Magaña, and Rodriguez the Woodland Park $50 Late Fee, which they paid. The late fees charged by Defendants and paid by Plaintiffs demonstrate that Plaintiffs have lost money as a result of Defendants' Standard Late Fee and Woodland Park $50 Late Fee policies. Accordingly, they have suffered an economic injury resulting from, and traceable to, Defendants' alleged unlawful conduct, which satisfies UCL standing. This economic injury also constitutes an injury in fact traceable to Defendants' late fee policies, which will be redressed by a favorable result on the merits, satisfying Article III standing. *Kwikset*, 51 Cal. 4th at 324 (economic injury "is but one among many types of injury in fact" that satisfies Article III standing).

6.      Plaintiffs also seek injunctive relief to enjoin Equity from continuing to charge the Standard Late Fee. To have standing to obtain injunctive relief, Plaintiffs must demonstrate "a likelihood of future injury" in addition to establishing Article III standing. *Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1174 (9th Cir. 2017). This inquiry turns on whether Plaintiffs face a "'real and immediate threat of repeated injury.'" *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974)).

7.      The Court finds that Plaintiff Smith has standing to pursue the requested injunctive relief on behalf of herself and the Injunctive Relief Class. Plaintiff Shannah Smith is a current resident of Riva Terra II, one of Equity's residential properties located in Redwood City, California. Plaintiff

86

Smith's current lease establishes that she is subject to the Standard Late Fee, and that she will be charged the greater of $50 or 5% of her outstanding rent balance if she fails to pay her rent by the 5th of each month.  Accordingly, Plaintiff Smith faces a real and immediate threat that Equity will charge her late fees that she contends are unlawful and excessive.

8.     In sum, Plaintiffs have met their burden of proof regarding standing.  Plaintiffs have proved that they have Article III standing, including standing to pursue injunctive relief to enjoin Equity's imposition and collection of the Standard Late Fee.  Plaintiffs have also proved that they have statutory standing to pursue their claims for restitution and injunctive relief under the UCL.

**B.     EQR's Late Fees Are Liquidated Damages.**

9.     To trigger the protections of California Civil Code section 1671(d), Plaintiffs must demonstrate that the challenged late fees are liquidated damages provisions in a consumer contract.  *In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 321-22 (2011).

10.     Under California law, liquidated damages are defined as "'an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by agreement . . .'" *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1002 (9th Cir. 2002) (quoting *Kelly v. McDonald*, 98 Cal. App. 121, 125 (1929)).  Fees charged for late payments are archetypical liquidated damages provisions.  *Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 737 (1973) (charges triggered by late payments were governed by Cal. Civ. Code § 1671; *Del Monte Props. & Invs., Inc. v. Dolan*, 26 Cal. App. 5th Supp. 20, 23 (Cal. Super. Ct. App. Div. 2018); *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1390 (1991).

11.     The Standard Late Fee's formula, 5% of the outstanding balance with a minimum of $50, is set forth in Equity's Standard Lease and fixes with certainty an amount of compensation for the breach of a late rent payment.  This qualifies as a liquidated damages provision.  *See Chodos*, 292 F.3d at 1002; *Del Monte Props.*, 26 Cal. App. 5th Supp. at 23.

12.     Likewise, the $50 late fee charged to the Woodland Park Preexisting Lease Class was a pre-set amount charged to tenants if they breached their leases by paying rent late.

13.     Having determined that both the Standard Late Fee and the Woodland Park $50 Late Fee are liquidated damages provisions, the Court will next evaluate whether the Standard Late Fee and

the Woodland Park $50 Late Fee comply with the requirements of Section 1671(d). If not, they are invalid.

**C.** **EQR Has the Burden of Demonstrating Compliance with California Civil Code Section 1671.**

14. Under California Civil Code section 1671(d), liquidated damages provisions in consumer contracts "are presumed void," shifting the burden to the proponent of the provision "to rebut that presumption." *In re Cellphone*, 193 Cal. App. 4th at 322 (citing *Garrett*, 9 Cal. 3d at 738); Cal. Civ. Code § 1671(c), (d). Residential leases are among the consumer contracts governed by the protections of Section 1671(d).

15. In this case, Equity is the proponent of the challenged late fees. Plaintiffs contend that the fees are invalid, and Equity opposes that contention. As the proponent of the fees, Equity bears the burden of demonstrating that the Standard Late Fee and the Woodland Park $50 Late Fee are valid under Section 1671(d).

**D.** **The Standard Late Fee Is Invalid Under California Civil Code Section 1671.**

16. To carry its burden to show that the challenged late fees are valid, Equity must demonstrate that the late fees are the product of a "reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained" by Equity as a result of its tenants' late payment of rent. *Garrett*, 9 Cal. 3d at 739. Otherwise, the liquidated damages clause will be considered void as an unlawful penalty. *Id.*

17. "Courts look beyond the language of the contract to determine the actual circumstances of a liquidated damages clause." *Del Monte Props.*, 26 Cal. App. 5th Supp. at 23 (citing *Garrett*, 9 Cal. 3d at 737). Tenants' "[a]greement to an invalid liquidated damages clause does not insulate it from attack under Civil Code § 1671." *Id.*

**1.** **Equity Did Not Engage in a Reasonable Endeavor to Estimate Its Actual Damages Caused by the Late Payment of Rent.**

18. There are three hallmarks of a reasonable endeavor that Equity must satisfy: (1) an actual, non-pretextual analysis of its costs to estimate its damages from the breach, (2) a proper purpose, or the lack of an improper purpose, and (3) a fee that is in proportion to the costs. *See*

*Garrett*, 9 Cal. 3d at 739, 740 (requiring an effort to estimate "fair average compensation" for the loss, and prescribing that whether that effort rises to a reasonable endeavor "depends upon the motivation and purpose in imposing such charges and their effect"); *see also, e.g.*, *Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998) (a fee that is disproportionate to costs from the breach is void as a penalty); *In re Cellphone*, 193 Cal. App. 4th at 324, 327-28 (analysis of actual costs is required).

### a. Equity Must Demonstrate that It Conducted a Non-Pretextual Analysis of Its Actual Costs of Late Rent When Setting the Challenged Late Fees.

19.     To show that it conducted a "reasonable endeavor," a company "is required to show that it actually engaged in some form of analysis to determine what losses it would sustain from breach, and that it made a genuine and non-pretextual effort to estimate a fair average compensation for the losses to be sustained." *Hitz v. First Interstate Bank*, 38 Cal. App. 4th 274, 291 (1995) (internal quotation marks omitted); *see also id.* ("Such an estimate cannot occur without some sort of analysis of the loss that is to be compensated.").

20.     A company cannot satisfy the reasonable endeavor requirement if it failed to complete any actual analysis of its costs before setting the fee. *Hitz,* 38 Cal. App. 4th at 290-91 (affirming trial court's ruling that executive's testimony that he "had a good understanding of [the company's costs] from the information that [he] got on a regular basis" did not demonstrate a reasonable endeavor, and reasoning that "a company cannot satisfy the reasonable endeavor requirement if it failed to complete any actual analysis of its costs before setting the late fee."); *In re Cellphone*, 193 Cal. App. 4th at 324, 327-28 ("Sprint was required to show that it actually engaged in *some form of analysis* to determine what losses it would sustain from the breach .... [I]nstitutional intuition is not a substitute for analytical evaluation") (emphasis original); *Del Monte Props.*, 26 Cal. App. 5th Supp. at 24 ("Some analysis of actual losses is required prior to setting the amount" of the fee).

21.     The analysis must occur before the fee is set—"[p]ost-hoc rationalization will be rejected." *Del Monte Props.*, 26 Cal. App. 5th Supp. at 24 (citing *In re Cellphone*, 193 Cal. App. 4th at 328).

22.     Assumptions about costs do not meet the reasonable endeavor standard. *See, e.g.*, *Hitz*, 38 Cal. App. 4th at 290 ("general knowledge" and "opinion" on costs "simply do not constitute the

89

type of reasonable endeavor to estimate actual loss or damages that is required."); *Del Monte Props.*, 26 Cal. App. 5th Supp. at 24 ("If no effort was made to estimate the actual losses, then the resulting fee cannot approximate the losses."); *In re Cellphone*, 193 Cal. App. 4th at 320, 327-28 (rejecting a late fee that was set, not on the basis "of any actual or estimated loss, but from a competitive standpoint"; declaring "institutional intuition is not a substitute for analytical evaluation, and retrospective rationalization does not excuse the objective assessment required at the inception of the contract.").

        **b.**      **Equity Must Also Demonstrate that It Had a Proper Purpose When Setting the Challenged Late Fees.**

        23.      A late fee is invalid if it was motivated by improper purposes such as coercing payment through a penalty or increasing profits without regard to costs caused by late payments. *Garrett*, 9 Cal. 3d at 740.

        24.      If the landlord's "motivation and purpose was to generate profit" or "generate new revenue," there was no reasonable endeavor. *Hitz*, 38 Cal. App. 4th at 289, 290; *see also Beasley*, 235 Cal. App. 3d at 1395 (evidence that the company's working papers described fees as a "good source of revenue" and "proposed their increase pursuant to a strategy of 'maximizing fee income'" supported the finding that the late fees were invalid for lack of a reasonable endeavor to approximate actual losses).

        25.      Additionally, a late fee cannot be said to have the purpose of recouping losses caused by the breach if the amount of the fee "bear[s] little or no relationship to the amount of the actual loss incurred" by the company. 9 Cal. 3d at 740. For this reason, "[s]etting the liquidated damages to a percentage of the contract price demonstrates a purpose other than compensating losses." Summ. J. Order, ECF No. 142 at 5, *quoting Del Monte Props.*, 26 Cal. App. 5th Supp. at 24; *see also Garrett*, 9 Cal. 3d at 740 (holding that a late fee of 2% of the loan balance was invalid because it was "not reasonably calculated to merely compensate the injured lender").

        **c.**      **Equity Must Demonstrate that the Challenged Late Fees Are Proportionate to Its Costs of Late Rent.**

        26.      Finally, late fees that are disproportionate to the damages caused by the breach are invalid penalties. *Garrett*, 9 Cal. 3d at 739 ("The characteristic feature of a penalty is its lack of

90

873269.27

proportional relation to the damages which may actually flow from failure to perform under a contract."); *Ridgley*, 17 Cal. 4th at 977 ("'[A]n amount disproportionate to the anticipated damages is termed a penalty" and is void) (citation omitted).

### d. **Equity Did Not Engage in a Non-Pretextual Analysis of Its Actual Damages Caused by the Late Payment of Rent.**

27. The Court concludes that the Standard Late Fee is invalid because it is not the result of a reasonable endeavor by Equity to estimate its costs from late rent. *Cf. Garrett*, 9 Cal. 3d at 739. Equity has failed to show that it "actually engaged in some form of analysis to determine what losses it would sustain" from the late payment of rent, much less that it "made a genuine and non-pretextual effort to estimate a fair average compensation" for those losses. *Hitz*, 38 Cal. App. 4th at 291; *see also In re Cellphone*, 193 Cal. App. 4th at 328. Rather, as the Court found above, no one at Equity performed any analysis of the company's costs of its California tenants' late rent payments, genuine or otherwise, prior to the June 4, 2008 adoption of the Standard Late Fee. Equity's failure to analyze its costs, standing alone, is fatal to the validity of its Standard Late Fee. *See In re Cellphone*, 193 Cal. App. 4th at 326-28; *Hitz*, 38 Cal. App. 4th at 290-91.

28. While Equity argues that its decision makers were aware of the company's costs and acted on their general knowledge that employee costs had increased overall, reliance on such "[i]nstitutional intuition" does not meet the reasonable endeavor standard. *In re Cellphone*, 193 Cal. App. 4th at 328; *accord Hitz*, 38 Cal. App. 4th at 290-91. Moreover, any reliance on an overall increase in employee costs was not reasonable, where this Court has found that no one at Equity made any attempt to determine the amount of employee costs incurred by the company as a result of late rent payments at the time Equity adopted the Standard Late Fee.

29. Equity also argues that its decision makers relied on the conclusions of the Knudsen Report completed in 1999. This argument is foreclosed by the Court's factual findings that no one at Equity reviewed or evaluated that report in 2008, that none of those participating in the decision to adopt the Standard Late Fee had any meaningful knowledge or understanding of the Knudsen Report's analysis, and that any reliance by Equity in 2008 on the mere existence of that report or its conclusions was pretextual.

91

e. **Equity Adopted the Standard Late Fee for the Improper Purpose of Increasing Revenue.**

30.     The Court concludes that the Standard Late Fee is also invalid because it had an improper purpose.  Equity's principal motive behind the adoption of the Standard Late Fee was to increase revenue, which is an improper purpose under governing law.  *See Hitz*, 38 Cal. App. 4th at 289, 290; *Beasley*, 235 Cal. App. 3d at 1395.  Section 1671(d) does not countenance a fee designed to extract additional revenues from tenants without regard to the company's actual compensable losses.  The California Law Review Commission, which recommended the current form of Section 1671(d), noted serious concern about "the risk that a liquidated damages provision will be used oppressively by a party able to dictate the terms of the agreement."  *See Recommendation and Study Relating to Liquidated Damages*, 11 Cal. L. Rev. Comm'n 1201, 1209 (1973), *quoted in In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1087-88 (C.D. Cal. 2010).  A fee designed to increase the company's revenue rather than being "reasonably calculated to merely compensate the injured [landlord]," *see Garrett*, 9 Cal. 3d at 740, is precisely the type of oppressive fee that Section 1671(d) prohibits in residential leases.

f. **The Standard Late Fee Lacks Any Reasonable Relationship to the Costs Caused by the Breaches It Is Intended to Compensate.**

31.     The Standard Late Fee is invalid for the further reason that its percentage-based formula bears "little or no relationship to the amount of the actual loss incurred" by Equity as a result of any given late payment of rent.  *See Garrett*, 9 Cal. 3d at 740, *see also id.* (holding that a late fee of 2% of the loan balance was invalid because it was "not reasonably calculated to merely compensate the injured lender").

32.     This case aptly illustrates the principle observed by California appellate courts that "[s]etting the liquidated damages to a percentage of the contract price demonstrates a purpose other than compensating losses."  *Del Monte Props.*, 26 Cal. App. 5th Supp. at 24.  As the Court found above, Equity's decision makers were on notice that a percentage late fee was unlikely to align with Equity's costs caused by late rent, since Equity's lost use of funds (interest costs, which do vary with the amount owed) were minimal and administrative costs were not likely to be proportional to the

amount owed. Yet Equity proceeded to adopt a percentage-based fee anyway. And predictably, the percentage-based Standard Late Fee formula regularly generates late fee amounts that vary significantly and unjustifiably between tenants whose rent payments were equally late.

33. Accordingly, the Standard Late Fee must be deemed an invalid penalty because the fees charged under its formula are grossly disproportionate to Equity's actual costs caused by those breaches. *See Garrett*, 9 Cal. 3d at 739; *Ridgley*, 17 Cal. 4th at 977.

34. Thus, Equity has failed to carry its burden of proving under each of the three hallmarks of the reasonable endeavor test that the Standard Late Fee complies with Section 1671(d).

### 2. **Equity's Other Arguments Are Unavailing.**

35. Equity also argues that its annual "fee review" confirmed that the Standard Late Fee was "reasonable." The annual fee review does not satisfy the reasonable endeavor requirement because it did not include any effort to analyze the company's costs from late rent. *See Garrett*, 9 Cal. 3d at 739; *Hitz*, 38 Cal. App. 4th at 291; *In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th at 328. Nor is the Standard Late Fee in any sense based on the fee review—to the contrary, on two occasions in the annual fee review, Equity's in-house counsel suggested lowering or revisiting the Standard Late Fee, but their recommendations were ignored. *See Garrett*, 9 Cal. 3d at 739 (a valid liquidated damages provision must "represent *the result of* a reasonable endeavor" to estimate costs) (emphasis added).

### E. **The Woodland Park $50 Late Fee Is Invalid Under California Civil Code Section 1671.**

36. The Court concludes that the Woodland Park $50 Late Fee is invalid for three independent reasons.

37. First, the Woodland Park $50 Late Fee, which was unilaterally imposed by Defendants on the Woodland Park Preexisting Lease Class without regard to their leases and without their agreement, fails the basic requirement in Section 1671(d) that the parties to the contract "agree therein" to the amount of the fee. Cal. Civ. Code § 1671(d).

38. Second, Equity has failed to meet its burden to show that the Woodland Park $50 Late Fee it imposed on its Woodland Park residents after purchasing the property was the result of a reasonable endeavor to estimate its costs from late rent. *Cf. Garrett*, 9 Cal. 3d at 739. There is no

873269.27

1  evidence that the company conducted any analysis of its costs from late rent prior to setting the fee,
2  and in fact Ms. Beihoffer admitted that Equity did not conduct a cost analysis prior to adopting the
3  Woodland Park $50 Late Fee.  Indeed, Equity is unable even to identify the individuals involved in
4  setting the $50 late fee.

5  39.     Moreover, as the Court found above, the Woodland Park $50 Late Fee was not based on
6  the Knudsen Report, and no one at Equity even reviewed the report in setting the fee.  *Cf. Garrett*, 9
7  Cal. 3d at 739 (to be valid, a liquidated damages provision must be "the result of" a reasonable
8  endeavor).

9  40.     Third, the Woodland Park $50 Late Fee is invalid as a penalty because it is grossly
10  disproportionate to Defendants' actual damages from late rent, which largely fell within the range of
11  $12 to $20 per late payments.  *See Garrett*, 9 Cal. 3d at 739 ("The characteristic feature of a penalty is
12  its lack of proportional relation to the damages which may actually flow from failure to perform under
13  a contract.").

14  **F.     Plaintiffs and the Classes Are Entitled to Restitution of Late Fees They Paid Defendants.**

15  41.     A late fee that violates Section 1671(d) also constitutes an unlawful business act or
16  practice in violation of California's Unfair Competition Law, California Business and Professions
17  Code section 17200, *et seq.  See Hauk v. JP Morgan Chase Bank U.S.*, 552 F.3d 1114, 1122 (9th Cir.
18  2009); *see also Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (An
19  unlawful business practice under the UCL is "anything that can properly be called a business practice
20  and that at the same time is forbidden by law.") (quotation marks & citation omitted); *Farmers Ins.*
21  *Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992) (violations of predicate law treated "as unlawful
22  practices independently actionable under section 17200 *et seq.* and subject to the distinct remedies
23  provided thereunder").

24  42.     If a late fee provision is found to be void under Section 1671(d), the late fees paid by
25  tenants must be returned to them, pursuant to both Section 1671(d) and the UCL.  *Beasley*, 235 Cal.
26  App. 3d at 1398-1401; *see also* Cal. Bus. & Prof. Code § 17203 (Under the UCL, "[t]he court may
27  make such orders or judgments ... as may be necessary ... to restore to any person in interest any

28

money or property, real or personal, which may have been acquired by means of such unfair competition.").

43.     It is well settled under California law that, where the Court finds unfair competition, it may order class-wide restitution under the UCL without further "individualized proof of deception, reliance, [or] injury." *In Re Tobacco II Cases*, 46 Cal. 4th at 320 (citing cases); *see also Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 985 (9th Cir. 2015) ("a court need not make individual determinations regarding entitlement to restitution ....  Instead, restitution is available on a class-wide basis once the class representative makes the threshold showing of liability under the UCL.").

44.     The Court has found Defendants' Standard Late Fee and Woodland Park $50 Late Fee void under Section 1671.  *See* Section I.B & C, *supra*.  Accordingly, the Late Fees also constitute unlawful business practices under the UCL.  *See Hauk*, 552 F.3d at 1122.  As such, the late fees paid by class members to Defendants must be returned to them.  *See Beasley*, 235 Cal. App. 3d at 1398-1401, subject to the following.

45.     The Court acknowledges, and details extensively below, that, in accordance with Defendants' Seventh Affirmative Defense of Offset, Defendants seek to and may indeed reduce the amount of restitution they ultimately pay to the class members by the amount of actual damages Defendants prove were proximately caused by class members' late payment of rent.  *See Garrett*, 9 Cal. 3d at 740-41.  But before evaluating Defendants' offset defense, the Court will determine the total amount of late fees that class members paid to Defendants.

46.     Plaintiffs have demonstrated through their accounting expert David Breshears that Defendants collected a total of $29,735,220, which includes the $815,000 in late fees paid through security deposits, in void Standard Late Fees from Standard Late Fee Class Members between September 3, 2010 and December 29, 2021, and a total of $270,022 in void Woodland Park $50 Late Fees from Woodland Park Preexisting Lease Class Members between December 1, 2011 and February 16, 2016.

47.     The Court has adopted, Mr. Breshears' late-fee payment calculations.

48.     Accordingly, the Court concludes that, in absence of any offset of administrative and interest costs to Defendants that Defendants can prove were directly caused by class members' late

rent payment, Defendants owe $29,735,220 in restitution to the Standard Late Fee Class through December 29, 2021 and $270,022 in restitution to the Woodland Park Preexisting Lease Class. The Court terms this amount "gross restitution" to indicate that it is the amount of the late fees that would be owed to the Classes absent any offset that should be made as a result of any costs that Equity succeeds in proving were proximately caused by class members' late rent payments.

49.     Additionally, as noted above, the Court directs the Parties to follow Mr. Breshears' methods in determining the amount of late fees Equity collected from Standard Late Fee Class Members after January 1, 2022 that Defendants therefore owe as additional restitution to Standard Late Fee Class Members (and the interest that is owed on that amount, which is addressed immediately below).

## G.     Plaintiffs and Class Members Are Also Entitled to Prejudgment Interest at the Rate of 7 Percent Per Annum.

50.     The Court may exercise its power in equity to restore not only the amounts Defendants acquired directly from class members, but also the amounts in which class members have a vested interest. *See generally*, *Cortez v. Purolator Air Filtration Prods. Co*., 23 Cal. 4th 163, 178 (2000). Courts regularly award prejudgment interest on restitution awards under the UCL where the class members could have earned interest on the monies that had been wrongfully withheld from them. *See, e.g., Espejo v. Copley Press, Inc*., 13 Cal. App. 5th 329, 375-77 (2017) (endorsing "principle that prejudgment interest is a necessary component of restitution.").

51.     The Court concludes that Standard Late Fee Class Members and Woodland Park Preexisting Lease Class Members should receive prejudgment interest on the restitution awarded by the Court.

52.     Because Section 1671 and the UCL do not specify a rate of interest to be awarded, Plaintiffs may recover interest at 7% per annum as part of their restitution award. *See id.* at 377; *see also* Cal. Const., Art. XV, § 1 ("In the absence of the setting of such rate by the Legislature, the rate of interest on any judgment rendered in any court of the State shall be 7 percent per annum.").

53.     The Court again directs the Parties to follow Mr. Breshears' methodologies to update the prejudgment interest calculations on late fees paid through December 29, 2021 for both the Standard Late Fee and Woodland Park Preexisting Lease Classes through judgment.  The Court further directs the Parties use Mr. Breshears' methodology to also calculate any prejudgment interest owed on restitution of Standard Late Fee Class Members' late-fee payments made after the December 29, 2021 cut off for data used at trial.

**H.     Equity's Offset Damages Are Minimal.**

54.     As discussed above, the Court concludes that the Standard Late Fee and Woodland Park $50 Late Fee are void under Section 1671(d) because they were not the product of a reasonable endeavor to estimate a fair average compensation for Equity's losses resulting from the late payment of rent.  Accordingly, "the late fees paid by tenants must be returned to them."  ECF No. 142 (Order re Summ. J. at 5 (citing *Beasley*, 235 Cal. App. 3d at 1398-1401; Cal. Bus. & Prof. Code § 17203)).

55.     Equity, however, "may offset or reduce the amount it is to return to the tenants by the amount of actual damages it succeeds in proving were proximately caused by the tenants' late payment of rent."  ECF No. 142 (Order re Summ. J. at 6-7 (citing *Garrett*, 9 Cal. 3d at 740-41) ("We do not hold herein that merely because the late charge provision is void and thus cannot be used in determining the lender's damages, the borrower escapes unscathed.  He remains liable for the actual damages resulting from his default.")); ECF No. 422 (Order re Motions to [De]Certify Class, Exclude Expert Testimony, and for Sanctions) at 4 ("should the late fee provision be found void, the late fees paid must be returned, less any amount in actual damages including personnel costs that Equity succeeds in proving were proximately caused by those tenants' late payment of rent."); *Hitz*, 38 Cal. App. 4th at 288 (if a liquidated damages provision is found void, "breaching parties remain liable for the actual damages resulting from the breach.").

56.     "The losses caused by late payment of residential rent are limited to interest and administrative costs of collecting and accounting for the late rent."  ECF No. 142 (Order re Summ. J. at 4 (quoting *Del Monte Props.*, 26 Cal. App. 5th Supp. at 23); *see also Beasley*, 235 Cal. App. 3d at 1402 ("The lender's charges could be fairly measured by the period of time the money was wrongfully

withheld plus the administrative costs reasonably related to collecting and accounting for a late

payment."); *Orozco v. Casimiro*, 121 Cal. App. 4th Supp. 7, 11 (Cal. Super. Ct. App. Div. 2004).

57.     The measure of Equity's offset is governed by principles of contract damages.  *Garrett*,

9 Cal. 3d at 740-41; *Beasley*, 235 Cal. App. 3d at 1398-1401.  The salient principles in this case

include the following:  (1) Equity is only entitled to offset class restitution by the damages that Equity

proves are proximately caused by class members' late payments, and accordingly, fixed costs that are

not increased by the breach are not recoverable, (2) costs during the period before rent is "late" cannot

be offset from class members' restitution; (3) Equity's offset is limited to those damages that were

intended to be liquidated by its late fees, and (4) that Equity may not seek to recover damages that are

otherwise prohibited by law.

### 1.     Equity Has the Burden to Prove That Its Claimed Offset Damages Were Proximately Caused by Class Members' Late Payment of Rent.

58.     Under the contract law principles that apply to its offset damages, Equity has the burden

of proving "a direct causal link between the breaches underlying the litigation and the actual damages

caused by those breaches."  *Beasley*, 235 Cal. App. 3d at 1403; *accord* Cal. Civ. Code § 3300.

59.     This standard requires Equity to prove that the damages that can be deducted from the

Classes' restitution were caused by the late rent payments that resulted in the late fees that make up

that restitution amount.  *See Beasley*, 235 Cal. App. 3d at 1403.  Equity may not use its offset to

recover costs from late rent payments for which it did not charge a late fee that a class member paid.

60.     Under the proximate-cause standard and well-established law on contract damages,

fixed costs, such as those attributable to overhead or infrastructure needed for "dealing with late ...

activity generally," cannot be offset from the voided late fees that must be returned to the Classes.

*Beasley*, 235 Cal. App. 3d at 1403.

61.     Such "indirect costs," which do not increase "by virtue of any individual late [rent

payment] transaction … [do] not comport with the manner of proof required by *Garrett*, in particular

the element of causation."  *Id*. (rejecting offset costs "attributable to the bank's maintenance of an 'in

place' infrastructure for dealing with" the breaches, because they lacked "the necessary causal link.").

62. The example set forth in *Beasley* illustrates this concept. There, the court noted that an offset for fixed costs is inconsistent with the "*Garrett* standard of proof" because it would allow the proponent of the late fee to deduct such costs even if no breaches occurred:

> For example, if there were absolutely no late or over-limit activity in a given month, [the fixed costs] method would still afford compensation for that month's costs of the "in-place" infrastructure, while the *Garrett* method would not, since there were no underlying breaches.

*Id.* at 1403.

63. The *Garrett* standard of proof is merely an application of fundamental contract law. The measure of contract damages, by statute, "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300; *see also Crossroads Inv'rs, L.P. v. Fed. Nat'l Mortg. Ass'n*, 13 Cal. App. 5th 757, 792 (2017) ("It is essential to establish a causal connection between the breach and the damages sought."). As a natural application of the causation requirement, it is well-established that "[i]f overhead costs are not increased by the breach it is error to allow them as damages." *Guntert v. City of Stockton*, 55 Cal. App. 3d 131, 149 (1976) (reversing an award of overhead costs in a contract case where the evidence showed that the plaintiff "suffered no absolute increase in overhead" costs as a result of the breach).

## 2. Defendants Cannot Offset "Damages" that Are Barred by Its Leases.

64. As set forth in Findings of Fact at Section I.B.1, above, Equity's leases afford tenants a 4-day grace period after the first of the month before they will incur a late fee for late payment of rent. California contract law makes clear that "a grace period defines what shall constitute timely performance of the payment terms of a contract." *Baypoint Mortgage Corp. v. Crest Premium*, 168 Cal. App. 3d 818, 827 (1985). Unless a contract "clearly, unequivocally and unmistakably" states that time is of the essence with respect to the date of payment, a grace period "negates a finding [that] payment on the so-called 'due date' to be the essence" of the contract. *Id.*; *Bisno v. Sax*, 175 Cal. App. 2d 714, 721-22 (1959) (same); Williston on Contracts, vol. III (rev. ed. 1936), p. 2385 ("The general rule in equity is that time is not of the essence" in a contract, unless it has been made so by the contract's express terms or is necessarily so from the nature of the contract."). As none of the leases at

99

issue herein make clear that time is of the essence with respect to payment of rent on the first of the month, the end of the four-day grace period establishes when rent payments are late for purposes of calculating Defendants' offset damages.

65.     Even in absence of the binding law described above, Equity's inclusion of a contractually set grace period of five days permits an interpretation that the tenants have five days before a payment is considered inconsistent with their obligations under the lease and therefore "late." This ambiguity must be resolved against the drafter, Equity, and further bolsters the conclusion that the grace period falls outside the scope of the late fee. *See* Cal. Civ. Code § 1654; *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 247 (2016).

66.     As further basis for excluding any damages Equity claims to have incurred during the grace period, by contractually granting its tenants a grace period, Equity has waived the right to recover damages for any costs it incurs in that period. *See Lynch v. Cal. Coastal Comm'n*, 3 Cal. 5th 470, 475 (2017) (waiver is "the intentional relinquishment or abandonment of a known right") (internal citation omitted). Each of the requirements of waiver is met here. *See id.* ("Waiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish the right.'") (citation omitted). Equity had an existing right to seek damages covering its losses caused by a late payment. *See Garrett*, 9 Cal. 3d at 741 n.11. Equity's knowledge and intention to relinquish that right are both made plain by its drafting a lease that provides a grace period to its tenants during which they can pay their rent without incurring additional charges. *See Lynch*, 3 Cal. 4th at 475 (intentional waiver may be inferred from "conduct that is 'so inconsistent with an intent to enforce the right as to induce a reasonable belief that such right has been relinquished.'").

67.     Accordingly, under fundamental principles of California contract law, Equity is not entitled to recover any personnel costs, lost use of funds, or other alleged damages that it incurred during the grace period afforded by Equity's leases with the classes.

### 3.     <u>Defendants Cannot Offset Damages that Equity Reserves the Right to Seek Under Other Provisions of Its Leases.</u>

68.     Furthermore, the scope of Equity's offset damages is determined by the scope of the damages liquidated by the late fees. *See Garrett*, 9 Cal. 3d at 741 (a void liquidated damages provision

100

is replaced by "the actual damages' resulting from the relevant breach); *see also* DAMAGES, Black's Law Dictionary (11th ed. 2019) ("Liquidated damages" means "[a]n amount contractually stipulated as a reasonable estimation of actual damages to be recovered by one party if the other party breaches").

69.     The damages encompassed by Equity's challenged late fees are those flowing from the late payment of rent. *See Garrett*, 9 Cal. 3d at 739 (late charges "compensate the [landlord] for its administrative expenses and the cost of money wrongfully withheld" due to the tenants' failure "to make timely payments"); *Beasley*, 235 Cal. App. 3d at 1403 (evidence proving offset damages under *Garrett* must establish "a direct causal link between the breaches underlying the litigation and the actual damages caused by those breaches."); Exs. 6-1 & 2 at ¶ 5; 83-4 ¶ 5; 85-4 ¶ 5 (Standard Lease) ¶ 5 ("[I]f we do not receive your rent or other charges on time, we will incur costs, the exact dollar amount of which is difficult or impracticable to determine.").

70.     As set forth in Findings of Fact at Section I.B.1, above, Equity's Standard Lease contains a distinct provision, separate from the late fee provision, which is entitled "Default Remedies." The Default Remedies provision allows Equity, in the event of a tenant's default under the lease, to terminate the lease, seek possession of the apartment, seek damages from the tenant, and recover attorneys' fees and costs from the tenant. Exs. 6-5 ¶ 26; 83-7 ¶ 27; 85-7 ¶ 27 (Standard Lease) ¶¶ 26 & 27.

71.     The provisions of the Woodland Park Leases that have been submitted to the Court are materially the same. Each has a distinct provision, separate from the late fee provision, which specifically authorizes the owner or agent to seek damages detailed by California Civil Code section 1951.2, which include past and future rent as well as any amount "necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom." Cal. Civ. Code § 1951.2; Ex. 2 (Munguia-Brown Lease ¶ 16); Ex. 4 (Rodriguez Lease ¶ 17); Ex. 3 (Magaña Lease ¶ 17). Additionally, the Woodland Park Leases that have been submitted to the Court all permit Equity to seek attorneys' fees in connection with an unlawful detainer action. Ex. 2 (Munguia-Brown Lease ¶ 23); Ex. 4 (Rodriguez Lease ¶ 24); Ex. 3 (Magaña Lease ¶ 24).

72.     Adopting the name used in Equity's Standard Lease, the Court shall refer to these distinct provisions authorizing the owner to seek damages and attorneys' fees resulting from defaults as the "Default Remedies" provision.

73.     A party "is not entitled to more than a single recovery for each distinct item of compensable damage." *Tavaglione v. Billings*, 4 Cal. 4th 1150, 1158-59 (1993).  "Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited." *Id.* at 1159.  To avoid a double recovery, Equity's leases must be construed so that damages that have been liquidated by its late fees do not include the damages that Equity can and does seek under its Default Remedies provisions.

74.     As this Court has already explained, the division between late-rent damages and damages under the "Default Remedies" provision depends on whether the tenant ultimately pays their rent and retains possession of the unit.  ECF No. 142 (Order re Summ. J.) 7 ("[I]f the tenant has defaulted then the default remedies clause in the lease agreement may come into play.  But, if the tenant remains in the unit, abides by the contract, and only pays the rent late, the late fees are assessed under the late fee provision.").  Therefore, late rent damages end when a tenant vacates the unit.

75.     In addition, as addressed below, Equity's actions in seeking and collecting certain damages under the default remedies provision even when tenants ultimately remain in their units demonstrate that those damages have not been liquidated by the late fee.  Equity is barred by the rule against a double recovery from seeking those same damages as an offset to restitution of the late fees in this case.  *See Tavaglione*, 4 Cal. 4th at 1158-59.

### 4.     Violating the Prior Core Principles, Mr. Hosfield's "Cost Incurred" Employee Cost Calculations Are Excessive and Unreliable.

#### a.     Mr. Hosfield's Employee Survey Is Unreliable.

76.     Equity seeks to prove its personnel costs resulting from the late payment of rent through surveys of its property-level employees conducted by Mr. Hosfield.  Section I.E.3.e., *supra*.  Mr. Hosfield refers to the employee surveys as his "cost incurred" method of calculating employee costs.  The first set of interviews involved 58 employees and were conducted in 2020-21.  As discussed above

873269.27

in the Findings of Fact, these employees were asked to estimate the amount of time they regularly spent collecting late rent in 2019, prior to the onset of the COVID-19 pandemic. The second set of interviews involved 59 employees who were interviewed in February through April 2022. These employees were asked to estimate the amount of time they regularly spent collecting late rent during the COVID-19 pandemic.

### b. Mr. Hosfield Lacks the Qualifications to Design and Conduct a Survey.

77.     Plaintiffs challenge Mr. Hosfield's qualifications to conduct the employee survey. At trial, Mr. Hosfield testified that he is an accountant, but not a survey professional. Defendants did not attempt to qualify Mr. Hosfield as an expert in survey methodology given that he has not received any training or education on surveys or survey methods. Perhaps because of this lack of survey expertise, Mr. Hosfield testified that he did not conduct a survey but instead engaged in an interview project. Regardless of the label Mr. Hosfield attaches to his work, the Court concludes, consistent with the Findings above, that Mr. Hosfield's "interview project" amounts to a survey that must be evaluated by the evidentiary standards and scientific principles applicable to survey methodology.

78.     Despite his lack of survey expertise, Mr. Hosfield designed and administered the survey himself (or, in some cases, delegated interviews to his associates to conduct). Having a survey administered by inadequate or poorly trained staff can be a significant source of error and can "seriously undermine the trustworthiness of any survey." Fed. Judicial Ctr., *Reference Manual on Scientific Evidence* (3d ed. 2011) ("Reference Manual") 409-10.

79.     The Court concludes that Mr. Hosfield's lack of expertise regarding survey methodology undermines the reliability of his testimony and survey evidence.

### i. The Survey Results Are Unreliable Due to Recall Bias.

80.     Memory-based estimates regarding the amount of time spent on work tasks can be problematic.[2] As one court recently explained, "there are serious concerns in the academic community

---

[2] The Court notes that reliance on time estimates may be appropriate in certain circumstances. Courts generally tolerate approximations where one party must estimate its damages due to a circumstance that was created by the opposing party, such as a lack of recordkeeping. *See e.g.*, *Benard v. Walkup*, 272 Cal. App. 2d 595, 606 (1969) ("one whose wrongful conduct has rendered difficult the ascertainment of damages cannot complain because the court must make an estimate of damages rather than on actual computation."); *Guntert*, 55 Cal. App. 3d at 143. This is particularly true in wage

873269.27

associated with relying on a survey respondent's own subjective recollections, particularly ones as to estimates of the time spent working." *Jimenez v. Allstate Ins. Co.*, No. 2:10-cv-08486-JAK-FFM, 2019 WL 13088814, at *21 (C.D. Cal. May 13, 2019) (finding credible expert opinion that "people are particularly predisposed to overestimate the amount of time they spent working."); *see also In re: Autozone, Inc.*, No. 3:10-MD-02159-CRB, 2016 WL 4208200, at *19 (N.D. Cal. Aug. 10, 2016), *aff'd sub nom. In re: AutoZone, Inc., Wage & Hour Emp. Pracs. Litig.*, 789 F. App'x 9 (9th Cir. 2019) (excluding survey based in part on recall bias).

81.     This is consistent with the testimony of Plaintiffs' expert Dr. Michael Childers, Ph.D., an expert in work measurement, who opined that time estimates based solely on employees' own recollections of the amount of time spent working are often inaccurate.  Dr. Childers further testified that Equity failed to use well-established, generally accepted methods of measuring work time that could have produced reliable and accurate results, including time and motion studies, time-tracking software commonly used by professionals who bill their customers by the hour, or even simple paper activity logs.

82.     Survey questions seeking "typical" or "average" time estimates are "out of step with established survey methodology" because they require survey participants to perform complex cognitive functions of averaging that can lead to inaccurate results.  *Casey v. Home Depot*, No. 5:14-cv-02069-JGB-SP, 2016 WL 7479347, at *20 (C.D. Cal. Sept. 15, 2016) (excluding employee survey that asked respondents about the "typical" or "average" amount of time they devoted to specific work activities, and noting that "various studies hold that such questions carry a high risk of eliciting erroneous answers."); *Jimenez*, 2019 WL 13088814, at *19 (questions requiring survey participants to calculate an average number of hours worked per week "raise significant reliability issues.").  This is referred to as "recall bias."

---

and hour cases, where it is reasonable for employees to rely on estimates of time worked because the employer failed to meet its record keeping duty.  *See, e.g.*, *Aguiar v. Cintas Corp. No. 2*, 144 Cal. App. 4th 121, 134-35 (2006) (recognizing the difficult problem in wage and hour cases where the employer's records are inaccurate or inadequate and the employee cannot offer convincing substitutes and explaining the "burden shifting" analysis regarding the proffering of evidence); *Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524 (2008); *Harper v. 24 Hour Fitness, Inc.*, 167 Cal. App. 4th 966, 976 n.11 (2008).

83.     The accuracy of memory-based survey responses can be improved with use of memory aides. "There is a body of literature that shows that aided recall questions are an accepted technique for assisting in recall." *Senne v. Kansas City Royals Baseball Corp.*, No. 3:14-cv-00608-JCS, 2017 WL 897338, at *25 (N.D. Cal. Mar. 7, 2017). Moreover, courts are more likely to accept survey evidence where a party verifies the accuracy of the survey responses by crosschecking relevant information. *See id.* at *25 (accepting survey evidence after expert "check[ed]" survey results against daily schedules and deposition testimony).

84.     Contrary to accepted survey methodology, Mr. Hosfield's interviews relied entirely on property-level employees providing memory-based estimates of how much time they spent on rent collection one to two years prior to their interviews. The questionnaires utilized by Mr. Hosfield asked survey participants to "estimate the percentage of [their] time [they] devote to each [general task] category *in an average week*." This question is unlikely to elicit accurate responses and is inconsistent with accepted survey methodology. Moreover, Mr. Hosfield took no steps to enhance interviewees' recall through the use of memory aids, including by providing them with RM Notes that reflect their late rent collection activities that the interviewees actually conducted. He also failed to crosscheck the survey responses against Equity's employee time records.

85.     The Court therefore concludes that Mr. Hosfield's employee survey is inaccurate and unreliable due to recall bias.

### ii.     <u>The Survey Has Other Indicia of Unreliability.</u>

86.     "[O]ne indicator of the trustworthiness of the survey and the professionalism of the expert" is the completeness of the survey documentation, including "[t]he exact wording of the questions used, including a copy of each version of the actual questionnaire." *Reference Manual* 415; *see also State Farm Fire & Cas. Co. v. Electrolux N. Am.*, No. 2:10-cv-01147 RSM, 2011 WL 6753140, at *2, *4 (W.D. Wash. Dec. 23, 2011) (excluding "survey" because, *inter alia*, the questions actually asked were not recorded).

87.     Contrary to these accepted standards, Mr. Hosfield did not record the actual questions asked or answers employees provided in the context of those questions. Indeed, Mr. Hosfield

explained that his practice was to treat the questionnaires as merely prompts and that in his view, the interview questions did not need to be the same from one interview to the next.

88. Moreover, Mr. Hosfield did not elicit time estimates using consistent units of time, allowing employees to provide time estimates in any format, *i.e.*, by day, week, or month. He then converted their responses into weekly estimates using incorrect math that inflated the weekly time estimates he ultimately used to calculate Equity's total employee costs. Mr. Hosfield divided monthly estimates by four to arrive at weekly estimates. Converting monthly estimates in this way is incorrect, as almost all months are longer than twenty-eight days, and inaccurately drives up the reported weekly average figures.

89. The Court concludes that the lack of standardized data collection processes and Mr. Hosfield's error-ridden method of deriving weekly estimates are strong indicators that the testimony and calculations offered by Mr. Hosfield to prove Equity's employee costs of late rent collection are inaccurate and unreliable.

### c. Mr. Hosfield's Method of Calculation Does Not Adhere to Generally Accepted Principles of Statistics.

90. "[A] good survey defines an appropriate population, uses a probability method for selecting the sample, has a high response rate, and gathers accurate information on the sample units." *Reference Manual* 226; *Jimenez*, 2019 WL 13088814, at *18. "A sample must be randomly selected for its results to be fairly extrapolated to the entire class." *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 43 (2014) (reviewing accepted statistical principles that are necessary to ensuring reliable use of sampling evidence).

91. The Court concludes that Mr. Hosfield's employee cost calculations are statistical in nature as he used data from a sample of surveyed employees and extrapolated the results to the broader population of employees. *Reference Manual* 217 ("The population is the whole class of units that are of interest; the sample is the set of units chosen for detailed study. Inferences from the part to the whole are justified when the sample is representative."); *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1019-20 (5th Cir.1997) ("The essence of the science of inferential statistics is that one may confidently draw inferences about the whole from a representative sample of the whole.").

92.     The Court further concludes that Mr. Hosfield's sampling technique did not adhere to accepted statistical principles.  Mr. Hosfield's sampling technique[3] superficially resembles a stratified random sample, which is defined as follows:

> A type of probability sample.  The researcher divides the population into relatively homogeneous groups called "strata," and draws a random sample separately from each stratum.  Dividing the population into strata is called "stratification."  Often the sampling fraction will vary from stratum to stratum. Then sampling weights should be used to extrapolate from the sample to the population.

*Reference Manual* 299.

93.     Mr. Hosfield, however, did not correctly apply this sampling technique.  First, the use of two sets of quartiles resulted in sixteen strata rather than eight.  As a result of this error, Mr. Hosfield did not interview employees from each stratum.  For office management and leasing employees combined, Mr. Hosfield sampled only 15 of the 16 strata.  Considering the office management distribution standing alone, four of the sixteen strata were unrepresented.  An additional four strata have only a single data point, making them inappropriate for statistical extrapolation.

94.     Second, the Court concludes that Mr. Hosfield failed to randomly select the properties or the employees that were interviewed.  Accepted statistical methods and applicable case law make clear that randomization is essential to obtaining a representative sample.  *Reference Manual* 230 ("It is randomness in the technical sense that provides assurance of unbiased estimates from a randomized controlled experiment or a probability sample ....  Looser definitions of randomness are inadequate for statistical purposes."); *Duran*, 59 Cal. 4th at 43 ("A sample must be randomly selected for its results to be fairly extrapolated to the entire class.").

95.     Instead of using a random number generator or another rigorous method ensuring randomness, Mr. Hosfield hand selected the properties himself.  Additionally, some employees

---

[3] As discussed in the Findings of Fact, Mr. Hosfield divided properties into quartiles along two dimensions (the number of units in the property, and the number of late fees charged per month at the property), and then selected properties from within the eight quartiles that he believed resulted from that exercise.  He then interviewed one or more office management and leasing employees at each property, in some cases replacing properties if a suitable interviewee was not identified.

selected by Mr. Hosfield were not interviewed due to their unavailability, with eleven employees dropped from the 2021 survey without replacement or adjustment for non-response bias.

96. Equity contends that a hand-picked sample of employees was likely to be more representative than a random sample because it eliminates the possibility of sampling too many similar properties. However, variability within a population is addressed through sample size. An appropriate sample "depends in large part on the variability of the population. The more diverse the population, the larger the sample must be in order to reflect the population accurately." *Duran*, 59 Cal. 4th at 42 (citing Michael Saks & Peter David Blanck, *Justice Improved: The Unrecognized Benefits of Aggregation and Sampling in the Trial of Mass Torts*, 44 Stan. L. Rev. 815, 842 (1992)). Any concerns about a random sample including too many similar properties should have been addressed by determining the appropriate sample size, not by abandoning a rigorous random selection.

97. Third, the Court concludes that Mr. Hosfield did not properly weight the values resulting from each stratum. A stratified random sample requires that "sampling weights ... be used to extrapolate from the sample to the population. For example, if 1 unit in 10 is sampled from stratum A while 1 unit in 100 is sampled from stratum B, then each unit drawn from A counts as 10, and each unit drawn from B counts as 100. The first kind of unit has weight 10; the second has weight 100." *Reference Manual* 299. Contrary to this requirement, Mr. Hosfield gave equal weight to the percentage time estimates provided by each employee he interviewed regardless of the number of employees that worked at the properties in each stratum.

98. The foregoing errors are consistent with Mr. Hosfield's admission that he did not adhere to accepted statistical principles in conducting the employee survey. Mr. Hosfield testified that he was not required to follow statistical requirements because his employee survey and calculations were merely a "cost accounting study" based on a standard accounting technique for gathering information about costs. But Mr. Hosfield fails to identify any accepted cost-accounting methods that permit an analysis that is contrary to accepted statistical principles. Equity has failed to present the Court with any authoritative written materials supporting his cost accounting methodology.

99. Considering all of the evidence regarding Mr. Hosfield's employee survey, including that Mr. Hosfield lacks expertise in survey methodology, the likelihood that the survey responses are

<sub>1</sub> inaccurate due to recall bias, straightforward mathematical errors in the conversion of monthly time

<sub>2</sub> estimates into weekly time estimates, and Mr. Hosfield's admitted failure to adhere to accepted

<sub>3</sub> statistical principles, the Court concludes that Mr. Hosfield's employee cost calculations are unreliable,

<sub>4</sub> unpersuasive, and should be given no weight.

<sub>5</sub>               **d.**    **Fixed Employee Costs Are Not Recoverable.**

<sub>6</sub>        100.    Mr. Hosfield's employee cost calculations are flawed for the additional reason that they

<sub>7</sub> include fixed employee compensation in the amount that Equity seeks to offset from class members'

<sub>8</sub> restitution. In calculating Equity's "cost incurred" employee costs, Mr. Hosfield derived an average

<sub>9</sub> percentage of time that the employees he interviewed estimated they spent on collection of

<sub>10</sub> "delinquent" rent (which inappropriately included time spent on rent paid during the grace period and

<sub>11</sub> unpaid rent, which are addressed in the subsections below) and applied that percentage to all categories

<sub>12</sub> of employee compensation for 16 property-level job positions that Equity contends are involved in the

<sub>13</sub> collection of late rent.

<sub>14</sub>        101.    Many of these categories of employee compensation do not increase as a result of the

<sub>15</sub> late payment of rent. For example, General Managers, Community Managers, and Floating

<sub>16</sub> Community Managers are paid on a salary basis. *Id*. Compensation for salaried employees remains

<sub>17</sub> the same regardless of the amount of time they spend collecting late rent. Other fixed employee costs

<sub>18</sub> include "allocable costs," health insurance and employment benefits, bonus pay (which is based on

<sub>19</sub> factors other than hours worked on late rent collection), leasing commissions, paid time off, and hourly

<sub>20</sub> pay for non-exempt personnel who are not involved in collecting late rent. *Id*.

<sub>21</sub>        102.    As the Court previously held, employee costs that "are fixed and unaffected by the late

<sub>22</sub> payment of rent … satisfy the standard to preclude an offset of this amount." ECF No. 142 (Order re

<sub>23</sub> Summ. J. at 7); *see also Beasley*, 235 Cal. App. 3d at 1403. Equity has presented no evidence

<sub>24</sub> demonstrating that employee salaries and the other categories of compensation identified above are

<sub>25</sub> "affected by Plaintiffs' late payments." *Id*. Therefore, Equity has failed to establish any direct causal

<sub>26</sub> link between these employee costs and the late payment of rent.

<sub>27</sub>        103.    The Court therefore concludes that Equity may not reduce the amount of restitution

<sub>28</sub> owed to the Standard Late Fee Class and Woodland Park Preexisting Lease Class by offsetting fixed

109

873269.27

employee compensation, including "allocable costs," health insurance and employment benefits, bonus pay (which is based on factors other than hours worked or late rent collection), leasing commissions, paid time off, salary for exempt employees, and hourly pay for non-exempt personnel who are not involved in collecting late rent.

### e. Employee Costs Allegedly Incurred During the Grace Period Are Not Proximately Caused by Class Members' Late Rent.

104. Mr. Hosfield's employee cost calculations are also unreliable because they impermissibly include costs that Equity allegedly incurred during the four-day grace period at the beginning of each month.

105. In addition to being barred by governing law, as set forth in Section II.H.2, above, costs incurred during the grace period are akin to fixed overhead costs in that Equity incurs them regardless of whether any late fees are actually charged and collected during a given month. For example, property-level employees spend time during the grace period posting rental payments to accounts, but they would be doing that work if all tenants paid their rent on the first day of the month. Similarly, property-level employees may spend time during the grace period reminding tenants that their rent is due no later than the fourth day of the month. But that work is performed irrespective of whether tenants pay their rent late and are charged late fees. As with fixed employee compensation, Equity has presented no evidence that work performed during the grace period is "affected by Plaintiffs' late payments." ECF No. 142 (Order re Summ. J. at 7); *see also Beasley*, 235 Cal. App. 3d at 1403.

106. As set forth in more detail below, Mr. Hosfield admittedly included the days of the grace period in both his calculations of the employee costs and lost use of funds that Equity claims should be offset from class members' restitution. By doing so, Mr. Hosfield's analysis violates basic California contract law.

107. The Court therefore concludes that Equity may not reduce the amount of restitution owed to the Standard Late Fee Class and Woodland Park Preexisting Lease Class by offsetting interest costs it incurred during the grace period.

873269.27

1          **f.    Costs Incurred During the COVID-19 Pandemic Are Not Recoverable.**

2          108.    Mr. Hosfield's calculation of Equity's offset also inappropriately includes employee

3  costs incurred during the COVID-19 pandemic.  From April 2020 to as late as July 2022, Equity

4  ceased charging late fees at some or all of its properties in California due to the COVID-19 pandemic.

5  The precise dates applicable for each property depend on the local jurisdiction where the property is

6  located, as set out in Exhibit 115.  The Court will use the term "Late Fee Suspension Period" to refer to

7  those months, for any Equity property during the period when that property was not charging late fees

8  due to the COVID-19 pandemic.  Equity claims that it incurred significant employee costs associated

9  with collecting late rent during Late Fee Suspension Period and seeks to offset those costs against the

10 restitution owed to the Standard Late Fee Class.

11         109.    Any actual damages Equity incurred from its California tenants' late rent payments

12 during the Late Fee Suspension Period resulted from breaches for which no late fees were charged.

13 Accordingly, there are no late fees against which those costs could be offset.  Moreover, it is plain that

14 there is no "direct causal link" between Equity's COVID-19 pandemic costs and the pre-pandemic

15 breaches for which Equity charged and collected late fees.  *Beasley*, 235 Cal. App. 3d at 1403.  The

16 Court therefore concludes that Equity may not reduce the amount of restitution owed to the Standard

17 Late Fee Class by offsetting the costs it incurred during the Late Fee Suspension Period.

18         110.    Mr. Hosfield's analysis of Equity's costs incurred after the Late Fee Suspension Period

19 is also flawed and must be completely discounted for failure to assess the costs that are directly caused

20 by Standard Late Fee Class Members' late rent payments.  As set forth in the Findings of Fact, Mr.

21 Hosfield attributes all of Equity's COVID-19 pandemic period costs, including post-Late Fee

22 Suspension Period costs, as offset costs, as though all of those costs were caused by Standard Late Fee

23 Class Members' late rent payments.  The evidence does not show such a causal link.  The Court

24 therefore concludes that Mr. Hosfield's analysis of Equity's offset costs is unreliable and entitled to no

25 weight.

26

27

28

873269.27

**5.**     **Plaintiffs' Multiple Regression Model Reliably Measures Equity's Employee Costs Resulting from Class Members' Late Rent Payments.**

111.     Plaintiffs' expert Andrew Schwarz presents a multiple regression model to rebut the employee cost calculations performed by Mr. Hosfield.  As discussed below, the Court concludes that Mr. Schwarz's regression model is a reliable means of determining Equity's employee costs resulting from class members' late payment of rent.

112.     "Multiple regression analysis is a statistical tool used to understand the relationship between or among two or more variables," and "involves a variable to be explained—called the dependent variable—and additional explanatory variables that are thought to produce or be associated with changes in the dependent variable." *Reference Manual* 305.  "Multiple regression analysis can be a source of valuable scientific testimony in litigation" and has a wide range of applications. *Id*. at 306-08 (discussing application in the context of sex and race discrimination, antitrust, voting rights, and intellectual property cases).

113.     Courts within the Ninth Circuit regularly accept regression models to measure damages in class actions. *See, e.g., Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.31 (9th Cir. 2022), *cert. denied sub nom. Starkist Co. v. Olean Wholesale Grocery*, No. 22-131, 2022 WL 16909174 (Nov. 14, 2022) (approvingly discussing proposed damages model that would determine individual amounts by applying the results of the experts' regression); *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 411 (N.D. Cal. 2021) (certifying class after determining regression model was capable of showing class-wide damages); *In re High-Tech Emp. Antitrust Litig.*, 985 F. Supp. 2d 1167, 1223-26 (N.D. Cal. 2013) (regression model was capable of determining damages); *Andrews v. Plains All Am. Pipeline, LP*, No. 2:15-cv-04113-PSG-JEM, 2020 WL 3105423, at *4 (C.D. Cal. May 21, 2020) (regression model was a "valid means of determining class-wide injury and causation").

114.     Mr. Schwarz's multiple regression model designates three dependent variables: 1) salary compensation; 2) regular hourly pay; and 3) overtime and double time pay.  As these categories of compensation represent the primary components of Equity's claimed employee costs, the Court concludes that they are "the appropriate [dependent] variable[s] for analyzing the question at issue." *Reference Manual* 312.

115.    Mr. Schwarz's multiple regression model designates three explanatory variables: 1) how many tenants paid their rent late in a given month ("Incidence of Lateness"), 2) how long their rent was outstanding ("Total Days Late"), and 3) the number of evictions, if any that month ("Evictions").  These variables directly impact the amount of Equity's employee costs in that their increase would likely result in an increase in the amount of time spent on late rent collection by Equity's property-level personnel in a given month.  The Court concludes that these explanatory variables are appropriate because they are the characteristics of late payment that, based on the record in this case, may "produce or be associated with changes in the dependent variable[s]," namely the three categories of compensation discussed above.  *Reference Manual* 305.

116.    Mr. Schwarz's model also includes variables designed to control for influences on payroll costs unrelated to late rent activity, including the following: 1) the year of each observation, which allows the model to account for company- or industry-specific factors that contribute to higher or lower wage growth over time ("Time Trend"), 2) variables to capture the baseline costs of a given property, allowing the model to focus on month-to-month changes within each community ("Fixed Effects"), and 3) a variable designed to capture the extent to which hourly pay and salary pay can substitute for each other (*e.g.*, one property may have higher monthly hourly pay because it has fewer salaried employees) ("Substitutable Payroll").

117.    Having designated appropriate dependent and explanatory variables, the Court concludes that Mr. Schwarz's multiple regression model is an appropriate and reliable method of determining the incremental impact of each tenant's late payment of rent on Equity's employee costs.

118.    With respect to salary compensation, Mr. Schwarz's multiple regression model concluded that there is no relationship between class members' late rent and Equity's salaried personnel costs.  In other words, Equity does not pay additional salary each time a class member is late paying rent.  This result is consistent with the Court's conclusion that salaries are fixed costs that may not be offset from the late fees that must be returned to the Classes.

119.    For regular hourly pay, the Incidence of Lateness variable produced a positive and statically significant result.  The multiple regression model indicated that Equity pays an additional

$7.70 in regular hourly pay for each time a class member is late in paying rent. Mr. Schwarz opines that the Total Days Late and Evictions variables produced positive but statistically insignificant results.

120. For overtime and double time pay, the Total Days Late and Incidence of Lateness variables produced positive and statically significant results. The multiple regression model indicated that Equity incurs a $2.01 increase in overtime costs, and that those costs increase by 19 cents for each day after the grace period that a class member remains late on rent. The Evictions variable produced positive but statistically insignificant results.

121. The Court adopts Mr. Schwarz's application of the results of his regression to the data for each class member household, pursuant to the assumptions reflected in his scenario labeled 4(b)(ii). This scenario properly reflects the scope of the relevant damages as running from the end of the grace period until the tenant vacates their apartment.

122. In total, Mr. Schwarz's multiple regression model appropriately and reliably measures Equity's employee costs resulting from class members' late payment of rent.

123. Accordingly, and as set forth further at the end of the Conclusions of Law, the Court concludes that the amount that Equity may offset in employee costs from the restitution owed to the Standard Late Fee Class and the Woodland Park Preexisting Lease Class shall be calculated in accordance with Mr. Schwarz's multiple regression model, as applied in his scenario 4(b)(ii).

### 6. Mr. Hosfield's "Cost Savings" Methodology Lacks Foundation and Is Unscientific.

124. Equity also seeks to prove its employee costs resulting from the late payment of rent by presenting Mr. Hosfield's "cost-savings" model, which attempts to calculate the "savings" resulting from staffing changes that Equity would allegedly make in a world where no tenant ever paid rent late. He opines that Equity would have saved $20,850,087 in personnel costs for both classes from September 3, 2010 through February 29, 2020 if all tenants paid their rent on time. As explained below, the Court finds this method unreliable and gives it no weight.

a. **Mr. Hosfield's "Cost Savings" Methodology Does Not Meet the *Garrett* Standard of Proof.**

125. The Court concludes that Mr. Hosfield's "cost savings" methodology does not assist the Court in determining Equity's cost offset. As this methodology attempts to determine the amount of employee costs Equity would save in a hypothetical world in which no tenants pay rent late, it is irrelevant to the actual damages Equity incurred as a result of class members' late payment of rent.

126. Mr. Hosfield's "cost savings" methodology is similar to the expert calculations that were rejected in *Beasley*. There, the court held that "indirect" costs—*i.e.,* costs that are "linked only to the general proposition that breaches may occur"—lack a direct causal link to the underlying breaches and do not meet the *Garrett* standard of proof. *Beasley*, 235 Cal. App. 3d at 1403. Like the "indirect" costs rejected in *Beasley*, Mr. Hosfield's "cost savings" approach improperly seeks to quantify and offset employee costs that are necessary to deal with the mere possibility that tenants may pay their rent late. Such employee costs are part of Equity's in-place infrastructure for dealing with late rent, and accordingly must be incurred regardless of whether any tenants pay their rent late. Accordingly, the Court concludes that Mr. Hosfield's "cost saving" methodology lacks "a direct causal link" between the underlying breaches and Equity's costs and does not comport with the *Garrett* standard of proof. *Beasley*, 235 Cal. App. 3d at 1403 (holding that an analogous cost study failed to conform to the legal standard for proof of damages under *Garrett*, 9 Cal. 3d at 741).

b. **Mr. Hosfield Is Not Qualified to Opine on Equity's Staffing Decisions.**

127. To be qualified to provide an expert opinion on a topic, "a witness must have 'knowledge, skill, experience training, or education' relevant to such evidence." *United States v. Chang*, 207 F.3d 1169, 1172 (9th Cir. 2000). Determining whether a proffered expert is so qualified does not turn on "the qualifications of a witness in the abstract, but whether those qualifications provide a foundation for a witness to answer a specific question." *Berry v. City of Detroit*, 25 F.3d 1342, 1351 (6th Cir. 1994); *see also Chang*, 207 F.3d at 1171-74 (affirming exclusion of expert testimony where the witness's qualifications did not match his proposed testimony).

128. Mr. Hosfield admits that he has no education, experience, or training on the area of property management or staffing for residential rental operations. Accordingly, the Court concludes

that Mr. Hosfield lack of expertise regarding property management or staffing undermines the reliability of Mr. Hosfield's testimony and "cost savings" calculations.

### c. Mr. Hosfield May Not Assert the Opinions of Equity's Managers.

129. Expert witnesses are not "permitted to be the mouthpiece of a scientist"—much less corporate executives—"in a different specialty." *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-14 (7th Cir. 2002). "Where the 'soundness of the underlying expert judgment is in issue,' the testifying expert cannot merely act as a conduit for the underlying expert's opinion." *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) (citing and quoting *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613-14). If the person whose judgment is at issue is not qualified or timely disclosed as an expert, other expert opinions relying on their analysis must be struck. *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613-14; *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478-81 (6th Cir. 2008); *Mesfun v. Hagos*, No. 2:03-cv-02182-MMM-RNB, 2005 WL 5956612, at *18 (C.D. Cal. Feb. 16, 2005); *Cf. In re Toyota*, 978 F. Supp. 2d at 1082 (concluding that because the underlying expert's testimony on a given point was admissible, the challenged expert "may rely upon it").

130. Mr. Hosfield's "cost savings" methodology relies exclusively on the judgment of others, namely the Equity vice presidents and regional managers who determined what staffing changes might occur if all tenants paid their rent on time. Equity has not established that these managers have the authority to make such staffing decisions, nor has it disclosed or qualified those employees as expert witnesses. The Court concludes that Equity cannot use Mr. Hosfield as a mouthpiece for the unqualified lay opinions of its employees. *Dura Auto. Sys. of Ind., Inc.*, 285 F.3d at 613-14; *Sigler*, 532 F.3d at 478-81; *Mesfun,* 2005 WL 5956612, at *18. The Court therefore accords Mr. Hosfield's "cost savings" testimony and analysis no weight.

### 7. Equity's Lost Use of Funds Calculations Are Inappropriate.

131. Equity is entitled to offset interest damages resulting from class members' late payment of rent. *Del Monte Props.*, 26 Cal. App. 5th Supp. at 23 ("The losses caused by late payment of residential rent are limited to interest and administrative costs of collecting and accounting for the late rent.") (citing *Orozco*, 121 Cal. App. 4th Supp. at 11, 17); ECF No. 142 (Order re Summ. J. at 4-5).

1    Like other categories of offset damages, Equity must demonstrate a "direct causal link" between its

2    claimed interest damages and class members' late payment of rent. *Beasley*, 235 Cal. App. 3d at 1403.

3         132.    Equity claims that it is entitled to offset the interest damages it incurred during the four-

4    day grace period at the beginning of each month. For the same reasons discussed in the context of

5    employee costs (*see supra* at COL ¶ 109), interest damages that accrue during the grace period are

6    beyond the scope of Equity's permissible offset damages. The Court therefore concludes that Equity

7    may not reduce the amount of restitution owed to the Classes by offsetting interest damages it incurred

8    during the grace period.

9         133.    Equity further contends that the interest rate applicable to late rent is determined by

10   Equity's weighted average cost of capital ("WACC"), which ranged between 6.36% and 8.75% during

11   the Class Period. The WACC measures "the cost of capital (discount rate) determined by the weighted

12   average, at market value, of the cost of all financing sources in the business enterprise's capital

13   structure." Equity, however, has not demonstrated any causal connection between class members' late

14   payment of rent and Equity's costs related to equity financing. For example, Equity has not proven,

15   nor does it contend, that the late payment of rent caused it to issue stock in order to finance its

16   operations. Furthermore, from a practical perspective, it does not make sense that Equity would issue

17   stock early in a month to account for late rent, and subsequently buy it back as rent is collected

18   throughout that month, only to reissue the stock again early the next month. Accordingly, the Court

19   concludes that it is improper to use the WACC to determine Equity's interest damages from class

20   members' late rent payment.

21        134.    The Court instead concludes that the appropriate measure of Equity's interest damages

22   from its lost use of class members' rent payments is the cost of Equity's short-term financing.

23   Between 2010 and 2015, Equity maintained a line of credit that carried an interest rate of LIBOR plus

24   115 basis points or 1.15%; Equity's line of credit rate in 2016 was LIBOR plus 82.5 basis points or

25   .825%. In March 2016, Equity commenced selling commercial paper, which lowered Equity's short-

26   term borrowing costs to 30 basis points, or .3% on the borrowed amount.

27        135.    Plaintiffs' expert David Breshears has calculated Equity's interest damages based on

28   Equity's short-term borrowing costs. He applied the cost of Equity's credit line to class members'

running balances for the period of September 2010 to February 2016, and the cost of Equity's commercial paper program to class members' running balances for the period of March 2016 through December 31, 2021.

136.    Mr. Breshears also allowed for a four-day grace period in which no interest costs are incurred, which is appropriate under governing law, as the Court concluded above.

137.    The Court concludes that Mr. Breshears's method is sound, and orders that Equity's lost use of funds be calculated using Mr. Breshears' method, applying the interest rates adopted in the Court's Findings of Fact at Section I.E.4.b., above.

### 8.    Defendants May Not Recover Their Attorneys' Fees and Costs That They Already Charge and Collect Under Their Default Remedies Lease Provisions.

138.    The Parties dispute whether Equity may recover its attorneys' fees and costs related to unlawful detainer proceedings as part of its offset against any restitution it may owe to the Classes.

139.    Preliminarily, the Court notes that the Default Remedies provisions in Equity's leases specifically authorize it to recover from its tenants any attorneys' fees and costs resulting from their default or breach of the lease.  Ex. 6 (Standard Lease ¶ 27); Ex. 2 (Munguia-Brown Lease ¶ 23); Ex. 4 (Rodriguez Lease ¶ 24); Ex. 3 (Magaña Lease ¶ 24).  Since Equity reserved the right to seek those items of damages separately, the Court concludes that the challenged late fees do not liquidate Equity's attorneys' fees and costs.  *Frittelli, Inc. v. 350 N. Canon Dr., LP*, 202 Cal. App. 4th 35, 46-47 (2011) (interpretation that harmonizes a lease's provisions must be preferred over one that creates a conflict between them); *Tavaglione*, 4 Cal. 4th at 1159 (double recovery is prohibited).

140.    Equity's offset is limited to those damages that were intended to be liquidated by the challenged late fees.  *See Garrett,* 9 Cal. 3d at 739, 741.  As Equity's leases do not liquidate its attorneys' fees and costs associated with unlawful detainer actions, but rather affirmatively authorize Equity to seek those items of damage directly from its tenants under the Default Remedies provision, Equity may not now seek reimbursement of its attorneys' fees and costs from unlawful detainer actions through its offset in this case.

141.    This conclusion is buttressed by the evidence submitted in the case and the Court's Findings of Fact above, which demonstrate that throughout the time period covered by this case,

118

873269.27

1    Equity has charged class members for its attorneys' fees and costs incurred in pursuing evictions for

2    those tenants' non-payment of rent.  These charges are permitted by its Default Remedies lease

3    provisions as well as the pre-eviction settlement agreements that Equity enters into with its tenants

4    who agree to pay amounts owing and remain in their units ("pay and stay agreements.")  Even when

5    class members have resolved their delinquencies and reach pay and stay agreements with Equity,

6    Equity's policy is to require those tenants to pay Equity's outstanding attorneys' fees and costs as part

7    of those agreements, unless the tenant's agreement specifically waives attorneys' fees.

8        142.    Contract terms "may be explained or supplemented by ... course of performance."  Cal.

9    Civ. Proc. Code § 1856; *see also Emps. Reinsurance Co. v. Superior Court*, 161 Cal. App. 4th 906,

10   921 (2008), *as modified* (Apr. 22, 2008) ("[W]hen a contract is ambiguous, a construction given to it

11   by the acts and conduct of the parties with knowledge of its terms, before any controversy has arisen as

12   to its meaning, is entitled to great weight, and will, when reasonable, be adopted and enforced by the

13   court.") (internal quotation marks & citation omitted).

14       143.    Here, Equity's consistent practice of charging class members for Equity's attorneys'

15   fees and costs incurred in connection with any unlawful detainer proceeding (including in settling the

16   dispute and allowing the class member to remain in their unit), reflects and supports an interpretation

17   of its lease that attorneys' fees and costs are not liquidated by the challenged late fees.  *See* Cal. Civ.

18   Proc. Code § 1856; *Emps. Reinsurance*, 161 Cal. App. 4th at 921.

19       144.    Equity has argued that this Court's order regarding Plaintiffs' Motion for Partial

20   Summary Judgment permits it to recover attorneys' fees through its offset defense.  The Court rejects

21   this argument for two reasons.

22       145.    First, the Court's order regarding Plaintiffs' Motion for Partial Summary Judgment did

23   not specifically address whether attorneys' fees could be recovered as part of Equity's offset.  *See* ECF

24   No. 142 at 7.  Moreover, in that order, the Court ruled that "Defendants would not be entitled to double

25   recovery under both provisions"—*i.e.*, the late fee provision and the Default Remedies provision.  *Id.*

26   Because Equity routinely charges and collects attorneys' fees and costs from its tenants, allowing

27   Equity to seek attorneys' fees and costs as an offset against restitution in this action would constitute a

28   prohibited double recovery.  *See Tavaglione*, 4 Cal. 4th at 1158-59.

119

146.     Second, even under Equity's reading of the Court's order—that Equity is entitled to attorneys' fees and costs incurred only with regard to class members who ultimately paid what they owed and remained in their apartments—there is no evidence in the record that can support a recovery under this theory.  Equity's expert calculation regarding attorneys' fees and costs is not limited to those tenants who ultimately "paid and stayed."  Indeed, Mr. Hosfield acknowledges that the spreadsheets he used as the basis for his eviction costs calculation are not capable of being linked to any particular class members, and there is no way to determine which of the fees and costs he included are attributable to unlawful detainers for unpaid rent, much less unlawful detainers for unpaid rent that were settled by a pay and stay agreement.  Similarly, the aggregate data used by Mr. Hosfield does not allow the Court to determine if any of the attorneys' fees and costs are beyond the $2,000 limit (per claim under the lease) set by Equity in the leases' Default Remedies provision.

147.     With benefit of the full trial record regarding Equity's practice of charging and collecting attorneys' fees and costs from its tenants, including in settlements, through the separate Default Remedies lease provision, the Court concludes that Equity's challenged late fees do not liquidate attorneys' fees and costs, and that those amounts are therefore beyond the reach of its offset affirmative defense.

### 9.     Equity's Percentage-Based Collection Costs Are Not Recoverable.

148.     Equity also seeks to offset collection costs resulting from class members' late payment of rent.  As set forth above, Equity utilizes the collection agency Fair Credit Outsourcing ("FCO") to collect tenant balances that are unpaid 45 days after move out.  In addition, Equity utilizes its outside eviction counsel in California, Kimball Tirey & Steinbeck ("KTS"), to collect money judgments it has obtained against former tenants who have been evicted.  Both FCO and KTS retain a percentage of the amount they collect, ranging from 30% to 50%, as compensation for their collection services.

149.     Mr. Hosfield has calculated Equity's collection costs as $2,137,650 for the Standard Late Fee Class, and $7,088 for the Woodland Park Preexisting Lease Class.  Mr. Hosfield arrived at these numbers by multiplying the collection fees charged to Equity by the class members' unpaid rent balances as a percentage of their unpaid account balances each year.

150.     It is well settled that percentage-based collection costs do not represent the actual damages caused by late payments. *Bondanza v. Peninsula Hosp. & Med. Ctr.*, 23 Cal. 3d 260, 263-64 (1979); *Beasley*, 235 Cal. App. 3d at 1405-06.

151.     In *Bondanza*, a hospital assigned patients' delinquent bills to a collection agency and required patients to pay the commission charged by the collection agency, which was one-third of the balance owed at the time the account was assigned, plus interest. 23 Cal. 3d at 263-64. The California Supreme Court held this arrangement was unlawful under *Garrett* because the percentage-based commission bore no relationship to the actual expense required to collect the debt. *Id.* at 267-69. In so doing, the court specifically rejected the argument that percentage-based collection costs were recoverable because they represent the actual amount paid by the hospital, reasoning that "an individual debtor may not be charged a fee calculated on the income that a collection agency to which the debt is assigned needs or desires in order to flourish economically." *Id.* at 269.

152.     In *Beasley*, the court applied *Bondanza* to disallow the bank from recovering collection agency costs, which were typically one-third of the debt outsourced to the agency, as "actual damages" from late payment after its contract late fees were voided under Section 1671(d). 235 Cal. App. 3d at 1405-06. The court reasoned that because "the amount of a collection agency fee may have no relationship to the actual expense required to collect a late balance, the fee does not necessarily represent Wells Fargo's 'actual damages resulting from [the borrower's] default' within the meaning of the *Garrett* standard." *Id.* (citing *Garrett*, 9 Cal. 3d at 741).

153.     Just as in *Bondanza* and *Beasley*, the percentage-based collection costs incurred by Equity do not represent the actual, direct costs required to collect the unpaid rent balances. Equity has presented no evidence demonstrating a direct causal relationship "between the charge assessed against the [tenant] and the *actual expense* required to collect an account." *Bondanza*, 23 Cal. 3d at 267 (emphasis added). The fact that Equity actually paid these collection costs makes no difference. *Beasley*, 235 Cal. App. 3d at 1405 ("… the fee does not necessarily represent Wells Fargo's 'actual damages resulting from [the borrower's] default' within the meaning of the *Garrett* standard (9 Cal. 3d at p741), *even though the bank actually paid the fees*. Only the actual expenses of collection (which the bank did not demonstrate) were compensable.") (emphasis added).

873269.27

154. Separate and apart from *Bondanza*'s prohibition on charging the Classes with Equity's percentage-based collection costs, Equity's collection agency fees are universally incurred after the tenants whose debt is being collected have moved out of the Equity property. As such, those costs are associated with *unpaid* rather than late rent, which is a breach of a separate lease provision, as discussed above. These costs therefore fall outside the scope of costs that are liquidated by the late fee.

155. Accordingly, the Court concludes that Equity may not offset its percentage-based collection costs from the restitution owed to the Classes.

## I. Equity's Remaining Affirmative Defenses Fail.

### 1. Equity Has Not Supported Its Voluntary Payment Defense.

156. Defendants have raised as an affirmative defense that restitution to the Classes is barred by the voluntary payment doctrine, which provides that payments made to settle a dispute may not be recovered if they were "voluntarily made with knowledge of the facts." *Am. Oil Serv. v. Hope Oil Co*, 194 Cal. App. 2d 581, 586 (1961).

157. For the purposes of these Conclusions of Law, the Court assumes without deciding that the voluntary payment defense may be validly asserted against a claim premised on the protections in California Civil Code section 1671(d) or the California Unfair Competition Law. *But see Adamson v. ADT, LLC*, No. 2:12-cv-10558-DMG-PLA, 2014 WL 12551405, at *6 (C.D. Cal. Apr. 7, 2014) (noting the persuasive argument that the voluntary payment defense "does not apply at all" to statutory consumer protection claims "because the statutory provisions at issue are designed by the legislature to protect consumers and cannot be waived"); *Purcell v. Schweitzer*, 224 Cal. App. 4th 969, 975 (2014) (holding that the protections of Cal. Civil Code § 1671(d) cannot be waived).

158. To support their voluntary payment defense, Defendants have the burden to demonstrate that class members had "'full knowledge of the facts.'" *Rodman v. Safeway Inc.*, 125 F. Supp. 3d 922, 941 (N.D. Cal. 2015) ("*Rodman I*"), *aff'd*, 694 F. App'x 612 (9th Cir. 2017) ("*Rodman II*") (quoting *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 908-09 (N.D. Cal. 2011)). In *Rodman*, one of the courts within the Northern District granted partial summary judgment against defendants on the voluntary payment defense where class members were not demonstrated to have knowledge of the relevant facts and "did not even possess means of discovering this knowledge, as Safeway's online pricing algorithm

was not publicly disclosed." *Id.* The Ninth Circuit affirmed, explaining that the voluntary payment defense "requires full disclosure and the undisputed evidence shows that Safeway did not make a full disclosure." *Rodman II*, 694 F. App'x at 614. *See also, e.g.*, *Am. Oil. Serv.*, 194 Cal. App. 2d at 586 ("[I]t is elementary that an excessive payment made in ignorance of the fact that it is excessive is recoverable"); *Brink v. Raymond James & Assocs., Inc.*, 341 F. Supp. 3d 1314, 1320 (S.D. Fla. 2018) (When "a plaintiff makes the allegedly excessive payments to a defendant without the knowledge of the factual circumstances rendering them excessive or illegal, the voluntary payment affirmative defense does not apply").

159.    With respect to the voluntary payment defense, this Court has twice already held that it "must be premised on a fully informed consumer understanding the validity of the payment." ECF No. 315, Order at 3; ECF No. 422, Order at 3.

160.    In this case, to support its voluntary payment defense Defendants would need to establish that when class members paid their challenged late fees, they had full knowledge of the facts demonstrating that (1) Defendants did not analyze their costs from late rent in connection with adopting the Standard Late Fee or the Woodland Park $50 Late Fee, (2) Equity's motivation and purpose in adopting the Standard Late Fee was to increase fee revenue, not recoup its losses, and (3) amounts charged pursuant to the challenged late fee policies are disproportionate to the amount of damages Defendants have incurred as a result of tenants' late payment of rent. *Cf. Rodman I*, 125 F. Supp. 3d at 941 (rejecting the voluntary payment defense due to the absence of evidence that class members made payments despite knowledge of the facts demonstrating liability); *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 955-56 (N.D. Cal. 2009) (same).

161.    Defendants have not met this burden. Not only have Defendants failed to demonstrate that any class members have full knowledge of the facts relevant to the validity of the challenged fees, the record shows that class members "did not even possess means of discovering this knowledge." *See Rodman I*, 125 F. Supp. 3d at 941. Defendants never fully and publicly disclosed the facts related to their adoption of the challenged late fees (including their failure to analyze its costs of late rent collection and its purpose of increasing fee revenue), and instead have insisted throughout this litigation that the communications regarding their decision-making be sealed from public view. For

example, class members did not have access to internal emails that Defendants have shielded from public disclosure, which demonstrate that Defendants set their late fees with the purpose of increasing revenue and fail to show any consideration of Defendants' costs caused by late rent. Similarly, class members had no means of knowing Defendants' true costs from late rent. Defendants have not made the "full disclosure" required by the voluntary payment defense. *See Rodman II*, 694 F. App'x at 614.

162. While Defendants' failure to prove that Plaintiffs had full knowledge of the facts about the validity of the late fees is fatal to Defendants' voluntary payment defense, Plaintiffs also argue that application of the voluntary payment defense is barred in this case because the payments are not "voluntary" but were made under economic duress. "Duress, for the purposes of this defense, requires two inquiries: (1) whether a 'reasonably prudent man' would have found 'that in order to preserve his property or protect his business interests it is necessary to make a payment of money which he does not owe' and (2) whether the party demanding payment acted wrongfully, 'with the knowledge that the claim asserted is false.'" *Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D. 355, 363 (N.D. Cal. 2011) (quoting *Steinman v. Malamed*, 185 Cal. App. 4th 1550, 1558-59 (2010)).

163. Whether a reasonably prudent tenant would pay the fees is determined objectively. *Berrien*, 275 F.R.D. at 363. Courts have held that a reasonably prudent person would make a payment to avoid adverse credit consequences or other serious economic repercussions. *See, e.g.*, *Parino*, 838 F. Supp. 2d at 909 (voluntary payment defense did not apply where plaintiff made payment to maintain her credit); *Adamson*, 2014 WL 12551405, at *6 ("a 'reasonably prudent' ADT customer would find it 'necessary to make the payment' to prevent referral to a collection or credit agency").

164. In the facts applicable here, the Court concludes that a reasonably prudent tenant at an Equity property in California would pay the challenged late fees to avoid adverse credit reporting and minimize the risk of eviction. Equity's California lease designates late fees as "rent" and warns tenants that negative payment histories and collection efforts may be reported to credit reporting agencies. A reasonably prudent tenant would pay the late fees charged by their landlord in these circumstances.

165. Defendants also "acted wrongfully" by knowingly charging late fees that they knew to be invalid. *See Berrien*, 276 F.R.D. at 363 (quoting *Steinman*, 185 Cal. App. 4th at 1558-59). It is

undisputed that Defendants were aware when they adopted the challenged late fees that the law required them to base a late fee on a genuine analysis of their costs from late rent, as this is the advice they received from their California lawyers before they made their final decision to adopt the Standard Late Fee in 2008. Yet Defendants adopted the challenged late fees without meeting that requirement and collected tens of millions of dollars in unlawful late fees over the period relevant to this case.

166. Accordingly, the Court concludes that Equity has not met its burden of proving its voluntary payment affirmative defense.

**2. Equity Has Not Established a Statute of Limitations Affirmative Defense.**

167. The Parties do not dispute, and the Court agrees, that Plaintiffs' Section 1671(d) and UCL claims are governed by a four-year statute of limitations. *See* Cal. Bus. & Prof. Code § 17208 (four-year statute of limitations for UCL claims); *Beasley*, 235 Cal. App. 3d at 1401-02 (claims under § 1671(d) are subject to Cal. Civ. Proc. Code § 337's four-year limitations period for liabilities founded on written instruments.). The Parties also do not dispute, and the Court agrees, that Plaintiffs' original complaint was timely filed to toll claims as of September 3, 2014. Defendants, however, raise a challenge as to which class members' claims were tolled by the filing of Plaintiffs' original complaint.

168. Defendants raise an affirmative statute of limitations defense, asserting that the limitations period for the claims of the Standard Late Fee Class should be based on the February 8, 2017 filing of Plaintiffs' Second Amended Complaint adding Plaintiff Bonfanti, rather than the September 3, 2014 filing of the initial complaint in this action. In other words, Defendants would limit the claims of the Standard Late Fee Class to those accruing as of February 8, 2013 (four years prior to the filing of the Second Amended Complaint filing), rather than September 3, 2010 (four years prior to the filing of the original Complaint).

169. Defendants bear the burden of showing that Plaintiffs' claims fall beyond the statute of limitations. *Cal. Sansome Co. v. U.S. Gypsum*, 55 F.3d 1402, 1406 (9th Cir. 1995) ("A defendant raising the statute of limitations as an affirmative defense has the burden of proving the action is time barred.") (*collecting cases*). In order to satisfy that burden, Defendants would have to demonstrate that

Plaintiffs' Second Amended Complaint, in which Plaintiffs clearly articulated claims on behalf of a distinct Standard Late Fee Class, did not relate back to the date Plaintiffs' original complaint was filed.

170. In a diversity case such as this, federal courts apply a state's relation back doctrine only when state law is more permissive than the relation back standard set forth in Federal Rule of Civil Procedure 15(c). *See Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1200-01 (9th Cir. 2014) ("the general purpose of the Federal Rules of Civil Procedure is 'to minimize technical obstacles to a determination of the controversy on its merits.' ... This purpose is served by deferring to the more permissive law, state or federal, which allows an amendment to relate back.") (quotation omitted). *See also* Fed. R. Civ. P. 15(c)(1) advisory committee's note to 1991 amendment (instructing federal courts to apply the "more forgiving principle of relation back," whether that be derived from state or federal law).

171. Amendments of pleadings under California law are generally governed by California Civil Procedure Code section 473(a)(1), which does not contain any express provision for relation back of amendments. Accordingly, the Court concludes that Federal Rule of Civil Procedure 15(c)(1)(B) governs whether Plaintiffs' Second Amended Complaint relates back to Plaintiffs' original complaint.

172. As the Ninth Circuit long ago explained, "the purpose of Rule 15(c) is to defeat the bar of statutes of limitations." *Rural Fire Prot. Co. v. Hepp,* 366 F.2d 355, 362 (9th Cir. 1966). Under Rule 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out--or attempted to be set out--in the original pleading." Fed. R. Civ. P. 15(c)(1)(B). The focus of this standard is to determine whether the original and amended pleadings "share a common core of operative facts sufficient to impart fair notice of the transaction, occurrence, or conduct called into question." *Martell v. Trilogy Ltd.*, 872 F.2d 322, 327 (9th Cir. 1989).

173. Defendants cannot demonstrate a lack of fair notice of the claims raised in Plaintiffs' Second Amended Complaint, or for that matter, their Third Amended Complaint. As set forth in the Findings of Fact above, Plaintiffs' complaints all raise the same general facts about Defendants' alleged violation of Section 1671(d) and the UCL by charging their California residential tenants a late fee "of at least $50" that bears no relation to Defendants' actual costs of late rent collection. All of

Plaintiffs' complaints seek the same relief (restitution of late fees plus interest, injunctive relief, and attorneys' fees and costs) on behalf of the same people (all of Defendants' California tenants who have been charged a late fee of at least $50) against the same Defendants, for the same injury (being charged a penalty for late rent payment).

174. Defendants admitted as much when, well before Plaintiffs filed their Second Amended Complaint, Defendants filed statements in this and other courts acknowledging that this case has always been about the legality for the late fees that Defendants charge their California tenants. There was no hint in Defendants' statements that they believed Plaintiffs' claims to be limited to those incidents where Defendants charged only a $50 late fee or to tenants of the Woodland Park property. Defendants' statements in these pleadings are clear, deliberate and unambiguous. They therefore constitute judicial admissions of Defendants' notice and knowledge of the scope of Plaintiffs' claims that are conclusive and binding on Defendants. *See Spokane Law Enf't Fed. Credit Union v. Barker (In re Barker)*, 839 F.3d 1189, 1195 (9th Cir. 2016) ("The Ninth Circuit has acknowledged the doctrine of judicial admissions. 'Judicial admissions are formal admissions in the pleadings which have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact.' Judicial admissions are 'conclusively binding on the party who made them.'") (quoting *Am. Title Ins. Co. v. Lacelaw Corp.,* 861 F.2d 224, 226 (9th Cir. 1988)). *See also Everett v. Pitt*, 788 F.3d 132, 141 (4th Cir. 2015) (judicial admissions are deliberate, clear and unambiguous representations made by a party that go to matters of fact that would otherwise require evidentiary proof, and which, unless allowed by the court to be withdrawn, are conclusive in the case.).

175. Moreover, the Court has already rejected Defendants' efforts to convince the Court that the claims raised in Plaintiffs' Second and Third Amended Complaints do not relate back to Plaintiffs' original complaint. In its Order granting Plaintiffs' Motion for Leave to File Third Amended Complaint, the Court denied Defendants' contentions about prejudice and delay and concluded that "ever since the original complaint was filed, Plaintiffs have consistently raised the same claims and causes of action under the same general set of operative facts and on behalf of generally the same people seeking the same relief against the same defendants." Order Resolving Outstanding Motions and Setting Case Management Conference, Oct. 25, 2021, ECF No. 248 at 4-5. Defendants offered no

127

1    evidence at trial to disturb this conclusion.  Indeed, Defendants never addressed this defense in any

2    substantive way during the trial.

3        176.    The Court's earlier findings are sound.  There is no question that the Second and Third

4    Amended Complaints did not take Equity by surprise.  As Defendants' own pleadings demonstrate,

5    from the commencement of this action, Defendants had the necessary information to enable them to

6    gather and preserve relevant materials and prepare its defense on the merits.  Plaintiffs' original

7    complaint thus put Defendants on notice of the claims that were later refined in Plaintiffs' Second and

8    Third Amended Complaints.  *See Rural Fire*, 366 F.2d at 361-62.

9        177.    Accordingly, the Court concludes that claims of the Standard Late Fee Class set forth in

10   Plaintiffs' Second and Third Amended Complaints are timely and relate back to the filing of Plaintiffs'

11   original complaint, meaning that the statute of limitations on their claims was tolled as of September 3,

12   2010.

13   **J.      Declaratory Relief.**

14       178.    Plaintiffs seek declaratory relief setting out that the Standard Late Fee is unlawful and

15   void under Section 1671(d) and the California Unfair Competition Law, California Business and

16   Professions Code section 17200 *et seq.*

17       179.    Declaratory relief is proper where "(1) the judgment will serve a useful purpose in

18   clarifying and setting the legal relations in issue; and (2) it will terminate and afford relief from the

19   uncertainty, insecurity, and controversy giving rise to the proceeding."  *Ballard v. Equifax Check*

20   *Servs., Inc.*, 158 F. Supp. 2d 1163, 1177 (E.D. Cal. 2001).

21       180.    The Court finds that these conditions are met for the Injunctive Relief Class, who all

22   have entered into residential leases with Equity containing the Standard Late Fee that this Court has

23   concluded violates California Civil Code section 1671(d).

24       181.    Section 1671(d) provides that liquidated damages provisions in residential leases which

25   do not comply with its standards are "void."  The California Supreme Court has further held that a late

26   fee is void under Section 1671 if it is not based on a "reasonable endeavor to estimate a fair

27   compensation for a loss which would be sustained" as a result of a late payment, or if it is otherwise an

28   unenforceable penalty.  *Garrett*, 9 Cal. 3d at 740 & 736 n.4.

873269.27

182.    Therefore, the Court finds and declares that the Standard Late Fee provision in the Equity's residential leases in California is null and void.

183.    Further, the Court concludes that by imposing a late fee that is void under Section 1671(d), Equity has engaged in an unlawful business practice, which is further prohibited by the Unfair Competition Law.  *See Cel-Tech Commc'ns, Inc.*, 20 Cal. 4th at 180 (the UCL renders as an unlawful practice "'anything that can properly be called a business practice and that at the same time is forbidden by law'") (quoting *Rubin v. Green*, 4 Cal. 4th 1187, 1200 (1993)).

184.    Accordingly, the Court finds and declares that by including the unlawful Standard Late Fee provision in its California leases, and by charging, and collecting the Standard Late Fee to its tenants, Equity has engaged in an unlawful business practice that violates the Unfair Competition law.

**K.    Injunctive Relief.**

185.    Plaintiffs also seek injunctive relief that (1) permanently precludes Equity from charging or collecting the Standard Late Fee; (2) permanently precludes Equity from including the Standard Late Fee or any percentage based late fee in any future leases, and (2) for three years following judgment limits the amount of any late fee that Equity may charge during this period to a reasonable amount based on this Court's findings regarding Equity's actual damages proximately caused by late rent, based on the evidence presented at trial.

186.    California Business and Professions Code section 17203 authorizes injunctions against "[a]ny person" who "has engaged" in a practice violating the UCL.  Once liability under the UCL has been established, the court "may make such orders or judgments ... as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition."  Cal. Bus. & Prof. Code § 17203.

187.    The California Supreme Court has described California Business and Professions Code section 17203 as a "grant of broad equitable power."  *Cortez*, 23 Cal. 4th at 180.  "The equitable remedies of the UCL are subject to the broad discretion of the trial court."  *Zhang v. Superior Court*, 57 Cal. 4th 364, 371 (2013) (citing *Cortez*, 23 Cal. 4th at 180).

188.    Before the Court may issue a permanent injunction, Plaintiffs must demonstrate "(1) that [they] have suffered an irreparable injury; (2) that remedies available at law, such as monetary

damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). "The decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court, reviewable on appeal for abuse of discretion." *Id.* As set out below, the Court concludes Plaintiffs have satisfied each of those factors.

189.    Irreparable injury "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 978 (9th Cir. 2017). Accordingly, the first two factors may be analyzed together. *See id.*

190.    Members of the Injunctive Relief Class, who are current tenants of Equity subject to the Standard Lease, have established the injury of being subject to a lease that imposes an invalid penalty for the late payment of rent. The injury of the invalid obligation in their lease is not reparable by an award of damages. Equity also has charged the Standard Late Fee to each member of the Injunctive Relief Class, and as it has continued to charge the late fee throughout this litigation, the injury of unlawful late fee charges is also continuing. The continuing unlawful late fee provision and charges satisfy the irreparable injury requirement. *See Epic Games, Inc. v. Apple Inc.*, 559 F. Supp. 3d 898, 1057 (N.D. Cal. 2021) (awarding injunctive relief under the UCL based on the finding that "[t]he injury has occurred and continues and can best be remedied by invalidating the offending provisions.").

191.    The second requirement, that the Plaintiffs have no adequate remedy at law, is satisfied for the same reasons. *See Ariz. Dream Act Coal.*, 855 F.3d at 978; *Epic Games*, 559 F. Supp. 3d at 1057.

192.    Next the Court considers the balance of hardship between the parties and concludes that this weighs in favor of granting the injunction.

193.    Defendants have no valid interest in continuing to charge a late fee that is unlawful, nor in charging a percentage late fee when this Court's findings confirm that Equity's damages caused by a late rent payment do not vary proportionally with the amount charged. Moreover, as the amount of Equity's costs from late rent have been litigated extensively in this case and the Court has made

130

findings regarding the amount of those damages which are binding on Equity, it is neither necessary or appropriate to allow Equity to ignore those findings and conduct a new analysis of its costs to support a higher late fee. Therefore, the Court does not perceive any equitable basis for allowing Equity to charge a late fee greater than its average damages proximately caused by late rent, as established in this case.

194.    While Equity does have a valid interest in using a late fee to liquidate its damages, the injunctive relief requested by Plaintiffs does not preclude it from charging a valid late fee. Equity's current leases contain a provision that allow the company to replace provisions that are "determined to be illegal, invalid or unenforceable" with "similar provisions or language that will make such clause or provision legal, valid, and enforceable." Smith's 2021-2022 lease. Thus, Equity's existing leases allow it to replace the invalid Standard Late Fee with a valid fee that corresponds to its actual costs from late rent, should it elect to do so.

195.    Considering next the interests of the Plaintiffs, the Standard Late Fee Injunctive Relief Class has an unquestionable interest in being protected from unlawful fees that do not correspond to Equity's costs from late rent. This Court has found that Equity's median costs caused by a late payment, including interest and increased administrative costs from collecting and accounting for the late payment, are approximately $14 to $15. A fee set higher than that amount would be disproportionate to Equity's actual costs and therefore unlawful. *See Garrett*, 9 Cal. 3d at 739-740.

196.    Thus, weighing the Parties' interests favors an injunction precluding Equity from charging the Standard Late Fee or any other fee for the late payment of rent that exceeds Equity's damages from late rent as found by the Court. *Accord Bondanza*, 23 Cal. 3d at 269 ("Since we have concluded that defendants' conduct constitutes an unlawful and unfair business practice, plaintiffs are entitled to an injunction prohibiting defendants from assessing patients who sign the admission agreement a collection expense of one-third of the amount owed at the time of assignment"—that is, the amount the Court held constituted an unlawful penalty under Cal. Civ. Code § 1671—"or any other sum which does not represent the actual costs of collection as defined in *Garrett*.").

197.    Finally, the Court concludes that an injunction would not disserve the public interest. To the contrary, the injunction requested by Plaintiffs will serve "California's fundamental policy"

embedded in California Civil Code section 1671(d) "to protect consumers against the oppressive use of liquidated damages clauses by parties with superior bargaining power." *See In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1087 (C.D. Cal. 2010).

198. Accordingly, the Court orders that (1) Equity is hereby permanently enjoined from charging or collecting the Standard Late Fee; (2) Equity is further permanently enjoined from imposing a percentage based late fee on its California tenants in its Standard lease; and (3) for the following three years, Equity may not charge any fee for the late payment of rent that is greater than $15 per instance of late rent.

## L. Restitution and Interest Owed to the Classes.

199. Class damages and restitution need not be calculated with absolute precision. *See Eastman Kodak Co. v. Southern Photo Materials Co.*, 273 U.S. 359, 379 (U.S. 1927) ("It is sufficient if a reasonable basis of computation is afforded, although the result be only approximate .... [A] defendant whose wrongful conduct has rendered difficult the ascertainment of the precise damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the same exactness and precision as would otherwise be possible.").

200. Under the UCL, Plaintiffs and the Classes are entitled to restitution of "any money ... which may have been acquired by means of such unfair competition." Cal. Bus. & Prof. Code § 17203.Pursuant to a Stipulation and Order entered into by Plaintiffs and Defendants ("the Parties) and approved by the Court, trial proceeded based on Equity's MRI, Fusion and PeopleSoft data about Class late fee charges and payments and Defendants' costs, described above, that Equity had produced to Plaintiffs for the period through December 29, 2021. ECF No. 388.

201. As set forth above, the Court concludes that Mr. Breshears reliably determined that Equity had collected $29,735,220 in total late fees from Standard Late Fee Class Members between September 3, 2010 and December 29, 2021.

202. In addition, the Court concludes that Mr. Breshears reliably determined that Defendants had collected $270,022 in total late fees from Woodland Park Preexisting Lease Class Members between December 1, 2011 and February 16, 2016.

873269.27

203.    The Court also concludes that prejudgment interest on any net restitution due to the Classes shall be calculated at the rate of 7 percent per annum through the date of judgment.

204.    The Court further concludes that Defendants' offset damages are limited to a portion of their claimed employee costs, as determined through Mr. Schwarz's multiple regression analysis by the methods utilized by Mr. Schwarz, and Equity's lost use of funds figures using Mr. Breshears' methodology.

205.    In order to determine the amount of net restitution and interest owed to the Classes consistent with the Court's Findings of Fact and Conclusions of Law, the Court directs the Parties as follows, as provided by the Stipulation and Order at ECF No. 388:

206.    Within 14 days of the date of this Order, the Parties shall present their competing positions on the appropriate period through which Equity will provide Plaintiffs with supplemental data from its MRI system since December 29, 2021, and updated data of Equity's employee costs from its Fusion database since December 29, 2021.

207.    In those same filings, the Parties shall propose a schedule for data production and updating expert calculations of restitution and prejudgment interest owed to the Classes, and Equity's offset damages, for the Court's resolution.

208.    In performing those updated calculations, the Court directs the Parties to use Mr. Breshears' methods for calculating total late fee charges and payments and prejudgment interest due to the Classes.

209.    The Court further directs the Parties to follow Mr. Schwarz's methods in determining the amount of employee costs Equity has incurred as a result of Standard Late Fee class members' late rent payments after January 1, 2022, and to utilize Mr. Breshears' methodology, and applying the interest rates adopted in the Findings of Fact, for calculating Equity's lost use of funds resulting from class members' late rent payments.

873269.27

Dated: July 28, 2023        Respectfully submitted,

GOLDSTEIN, BORGEN, DARDARIAN & HO

/s/ *Andrew P. Lee*

Andrew P. Lee

Attorneys for Plaintiffs and the Certified Classes

873269.27