Margaret McBride (SBN 294066)
mmcbride@clsepa.org
COMMUNITY LEGAL SERVICES IN EAST PALO ALTO
1861 Bay Road
East Palo Alto, CA 94303
Tel:  (650) 326-6440
Fax:  (866) 688-5204

Linda M. Dardarian (SBN 131001)
ldardarian@gbdhlegal.com
Andrew P. Lee (SBN 245903)
alee@gbdhlegal.com
Anne P. Bellows (SBN 293722)
abellows@gbdhlegal.com
Katharine L. Fisher (SBN 305413)
kfisher@gbdhlegal.com
GOLDSTEIN, BORGEN, DARDARIAN & HO
155 Grand Avenue, Suite 900
Oakland, CA 94612
Tel:  (510) 763-9800
Fax:  (510) 835-1417

Attorneys for Plaintiffs and the Certified Classes
(*Additional Counsel for Plaintiffs and the
Certified Classes listed on following page*)

UNITED DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, ANGELINA MAGAÑA, NORMA RODRIGUEZ, DAVID BONFANTI, and SHANNAH SMITH individually and on behalf of others similarly situated,<br><br>        Plaintiffs,<br><br>vs.<br><br>EQUITY RESIDENTIAL, a real estate investment trust, ERP OPERATING LIMITED PARTNERSHIP, a partnership, EQUITY RESIDENTIAL MANAGEMENT, L.L.C., EQR-WOODLAND PARK A LIMITED PARTNERSHIP, and EQR-WOODLAND PARK B LIMITED PARTNERSHIP,<br><br>        Defendants. | **CLASS ACTION**<br><br>Case No.: 4:16-cv-01225-JSW-TSH<br><br>**PLAINTIFFS' POST-TRIAL BRIEF**<br><br>Dept:      Courtroom 5<br>Before:  Hon. Jeffrey S. White<br><br>Trial Date:    June 8, 2023 |

Craig Nicholas (SBN 178444)
craig@nicholaslaw.org
Alex Tomasevic (SBN 245595)
alex@nicholaslaw.org
NICHOLAS & TOMASEVIC, LLP
225 Broadway, 19th Floor
San Diego, CA 92101
Tel:  (619) 325-0492
Fax:  (619) 325-0496

Attorneys for Plaintiffs and the Certified Classes

873847.19

# **TABLE OF CONTENTS**

Page

I.    INTRODUCTION ................................................................................................ 1

II.   ARGUMENT ..................................................................................................... 2

    A.    Equity's Late Fees Are Void Under Civil Code Section 1671(d). ................................ 2

        1.    The Standard Late Fee Is Invalid. ................................................................ 3

            a.    The Standard Late Fee Was Not Based on Any Analysis of Equity's Costs from Late Rent. ............................................ 3

            b.    Equity Adopted and Maintained the Standard Late Fee for the Improper Purpose of Increasing Revenue. ............................................. 7

            c.    The Standard Late Fee Is Not Proportionate to Equity's Costs. ............. 9

            d.    Equity's Purported Reliance on the 1999 Knudsen Report Does Not Satisfy the Reasonable Endeavor Requirement. ............................ 10

            e.    Equity's Reliance on the LA County Information Sheet Confirms that It Failed to Conduct a Reasonable Endeavor. ............................... 11

        2.    The Woodland Park Late Fee Is Also Invalid. .................................................. 12

    B.    The Standard Late Fee Class Is Entitled to Injunctive Relief. ..................................... 13

    C.    The Classes Are Entitled to Restitution and Prejudgment Interest Thereon. ............... 14

    D.    Equity's "Offset" Calculations Are Fundamentally Flawed. ....................................... 15

        1.    Equity Failed to Perform an Actual Offset Calculation. .................................... 16

        2.    Equity Did Not Limit Its Offset to Costs Proximately Caused by Class Members' Late Rent Payments ....................................................... 17

            a.    Equity's Costs Incurred During the Grace Period Are Not Proximately Caused by Late Rent. ..................................................... 18

            b.    Equity's Fixed Personnel Costs Are Not Proximately Caused by Late Rent. ............................................................................... 19

            c.    Equity's Eviction Costs Are Not Proximately Caused by Late Rent. .................................................................................. 19

            d.    Equity's Collection Agency Fees Are Not Proximately Caused by Late Rent. ............................................................................ 20

        3.    Equity Overstates Its Offset Costs. .............................................................. 21

873847.19

a.  Mr. Hosfield's Cost-Incurred Analysis Is Unscientific and Unreliable. ..................................................................... 21

i.  Mr. Hosfield Lacks the Qualifications to Design and Conduct a Survey. ............................................ 22

ii.  Mr. Hosfield Did Not Adhere to Fundamental Statistical Principles. ................................................... 22

iii.  The Survey Results Are Unreliable Due to Recall Bias. ........... 24

iv.  Interviewees' Knowledge of the Survey's Litigation Purpose Created a Likelihood of Bias in Favor of Their Employer. ............................................................. 25

v.  The Survey Has Other Indicia of Unreliability. ...................... 26

vi.  Cost Accounting Does Not Save Mr. Hosfield's Failure to Adhere to Generally Accepted Principles in Survey Research and Statistics. ....................................... 27

b.  Mr. Hosfield's Cost Savings Methodology Is Speculative, Unreliable, Inapt. ....................................................... 27

c.  The Court Should Adopt Plaintiffs' Personnel Cost Calculations. ...... 28

i.  Mr. Schwarz's Regression Model Reliably Measures Equity's Personnel Costs Associated with Class Members' Late Rent. ............................................. 29

ii.  Equity's Unfounded Criticisms of Mr. Schwarz Offer No Basis for Rejecting His Sound Damages Calculations. ........... 31

d.  Equity Overstates Its Lost Use of Funds. ............................. 32

E.  Equity Has Not Proved Its Voluntary Payment Defense. ............................. 34

F.  The Standard Late Fee Claims Relate Back to the Original Complaint. ...................... 36

G.  Trial Confirmed the Propriety of Class Certification. .................................. 38

1.  The Offset Evidence at Trial Confirms the Correctness of Class Treatment. .................................................................. 38

2.  The Voluntary Payment Doctrine Does Not Offer a Basis for Decertification. ............................................................ 39

III.  CONCLUSION ................................................................. 40

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Adamson v. ADT, LLC*,
No. 2:12-cv-10558-DMG-PLA, 2014 WL 12551405 (C.D. Cal. Apr. 7, 2014) ........................... 35

*Allen v. Similasan Corp.*,
96 F. Supp. 3d 1063 (S.D. Cal. 2015) ........................................................................................ 37

*Am. Title Ins. Co. v. Lacelaw Corp.*,
861 F.2d 224 (9th Cir. 1988) ...................................................................................................... 37

*In re: Autozone, Inc. Wage & Hour Emp. Pracs. Litig.*,
No. 3:10-MD-02159-CRB, 2016 WL 4208200 (N.D. Cal. Aug. 10, 2016) ........................... 24, 26

*Bayol v. Zipcar, Inc.*,
78 F. Supp. 3d 1252 (N.D. Cal. 2015) ........................................................................................ 5, 6

*Berrien v. New Raintree Resorts Int'l, LLC*,
276 F.R.D. 355 (N.D. Cal. 2011) ............................................................................................... 40

*Casey v. Home Depot*,
No. 5:14-cv-02069-JGB-SP, 2016 WL 7479347 (C.D. Cal. Sept. 15, 2016) ................... 22, 25, 26

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013) ...................................................................................................................... 39

*Dukes v. Wal-Mart, Inc.*,
222 F.R.D. 189 (N.D. Cal. 2004) ............................................................................................... 26

*Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*,
285 F.3d 609 (7th Cir. 2002) ...................................................................................................... 28

*Eastman Kodak Co. v. S. Photo Materials Co.*,
273 U.S. 359 (1927) .................................................................................................................... 39

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) .................................................................................................................... 14

*Gutierrez v. Wells Fargo & Co.*,
622 F. Supp. 2d 946 (N.D. Cal. 2009) ........................................................................................ 35

*Immigrant Assistance Project of L.A. Cnty. Fed'n of Lab. v. I.N.S.*,
306 F.3d 842 (9th Cir. 2002) ...................................................................................................... 37

*Jimenez v. Allstate Ins. Co.*,
No. 2:10-cv-08486-JAK-FFM, 2019 WL 13088814 (C.D. Cal. May 13, 2019) ................... 24, 25

iii

873847.19

*Kivett v. Flagstar Bank, FSB*,
   506 F. Supp. 3d 749 (N.D. Cal. 2020)................................................................ 14, 15

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ................................................................................... 17

*Marlo v. United Parcel Serv., Inc.*,
   251 F.R.D. 476 (C.D. Cal. 2008)............................................................................ 22

*Martell v. Trilogy Ltd.*,
   872 F.2d 322 (9th Cir. 1989) ................................................................................... 37

*Monaco v. Bear Stearns Cos., Inc.*,
   No. 2:09-cv-05438-SJO-JC, 2012 WL 10006987 (C.D. Cal. Dec. 10, 2012)................. 39

*Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*,
   15 F.4th 885 (9th Cir. 2021) ...................................................................................... 6

*Najarian Holdings LLC v. CoreVest American Finance Lender LLC*,
   No. 4:20-cv-00799-PJH, 2021 WL 5630679 (N.D. Cal. Dec. 1, 2021) ........................... 6

*Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*,
   31 F.4th 651 (9th Cir. 2022) .................................................................................... 38

*Parino v. BidRack, Inc.*,
   838 F. Supp. 2d 900 (N.D. Cal. 2011)...................................................................... 35

*Rodmanv. Safeway Inc.*,
   125 F. Supp. 3d 922 (N.D. Cal. 2015)...................................................................... 35

*Senne v. Kansas City Royals Baseball Corp.*,
   No. 3:14-cv-00608-JCS, 2017 WL 897338 (N.D. Cal. Mar. 7, 2017) ........................... 25

*State Farm Fire & Cas. Co. v. Electrolux N. Am.*,
   No. 2:10-cv-01147-RSM, 2011 WL 6753140 (W.D. Wash. Dec. 23, 2011)................. 26

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab.
Litig.*,
   978 F. Supp. 2d 1053 (C.D. Cal. 2013) ................................................................... 28

*Tyson Foods, Inc. v. Bouaphakeo*,
   577 U.S. 442 (2016) ........................................................................................ 16, 39

*Zeff v. Greystar Real Est. Partners, LLC*,
   No. 3:20-cv-07122-EMC, 2021 WL 632614 (N.D. Cal. Feb. 18, 2021) ...................... 5, 6

**State Cases**

*Aguiar v. Cintas Corp. No. 2*,
   144 Cal. App. 4th 121 (2006)................................................................................... 24

873847.19

*Am. Oil. Serv. v. Hope Oil Co.*,
194 Cal. App. 2d 581 (1961) ............................................................... 34

*Baypoint Mortg. Corp. v. Crest Premium*,
168 Cal. App. 3d 818 (1985) ............................................................... 18

*Beasley v. Wells Fargo Bank*,
235 Cal. App. 3d 1383 (1991) .......................................................*passim*

*Better Food Markets, Inc. v. American District Telegraph Co.*,
40 Cal. 2d 179 (1953) ..................................................................... 6, 7

*Bisno v. Sax*,
175 Cal. App. 2d 714 (1959) ............................................................... 18

*Blum v. Swarbrick*,
No. ACIAS 900013, 2010 WL 9009712 (Cal. Super. Ct. App. Div. Unpubl. Apr. 7,
2010) ........................................................................................... 10

*BMG Direct Marketing, Inc. v. Peake*,
178 S.W. 3d 763 (Tex. 2005) .......................................................... 34, 39

*Bondanza v. Peninsula Hosp. & Med. Ctr.*,
23 Cal. 3d 260 (1979) ....................................................................... 20

*Cellphone Termination Fee Cases*,
193 Cal. App. 4th 298 (2011) .......................................................*passim*

*Colgan v. Leatherman Tool Grp., Inc.*,
135 Cal. App. 4th 663 (2006) ............................................................. 14

*Cortez v. Purolator Air Filtration Prods. Co.*,
23 Cal. 4th 163 (2000) .......................................................... 13, 14, 20

*Crossroads Invs., L.P. v. Fed. Nat'l Mortg. Ass'n*,
13 Cal. App. 5th 757 (2017) .......................................................... 18, 31

*Del Monte Props. & Invs., Inc. v. Dolan*,
26 Cal. App. 5th Supp. 20 (Cal. Super. Ct. App. Div. 2018) ....................... 9, 10

*Duran v. U.S. Bank Nat'l Ass'n*,
59 Cal. 4th 1 (2014) ........................................................................ 22

*Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*,
9 Cal. 3d 731 (1973) ...................................................................*passim*

*Ghazaryan v. Diva Limousine, Ltd.*,
169 Cal. App. 4th 1524 (2008) ............................................................ 24

873847.19

*Guntert v. City of Stockton*,
    55 Cal. App. 3d 131 (1976) ................................................................. 19, 24

*Harper v. 24 Hour Fitness, Inc.*,
    167 Cal. App. 4th 966 (2008) ....................................................................... 24

*Harrison v. Adams*,
    20 Cal. 2d 646 (1942) ................................................................................... 16

*Hitz v. First Interstate Bank*,
    38 Cal. App. 4th 274 (1995) ................................................................. *passim*

*Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*,
    23 Cal. 4th 305 (2000) .................................................................................. 33

*Leeper v. Beltrami*,
    53 Cal.2d 195 (1959) .................................................................................... 36

*Lynch v. Cal. Coastal Comm'n*,
    3 Cal. 5th 470 (2017) .............................................................................. 18, 33

*Ridgley v. Topa Thrift & Loan Ass'n*,
    17 Cal. 4th 970 (1998) .................................................................................. 2, 6

*Sandquist v. Lebo Auto., Inc.*,
    1 Cal. 5th 233 (2016) .................................................................................... 18

*Steinman v. Malamed*,
    185 Cal. App. 4th 1550 (2010) ...................................................... 35, 36, 40

**Federal Statutes**

Class Action Fairness Act, 28 U.S.C. § 1332(d) *et seq.* ...................................... 37

Rules Enabling Act, 28 U.S.C. § 2072 ................................................................ 16, 38

**State Statutes**

Cal. Bus. & Prof. Code
    § 17203 ................................................................................................... 13, 14

Cal. Civ. Code
    § 1654 ......................................................................................................... 18
    § 1671 ...................................................................................................... 6, 15
    § 1671(b) ....................................................................................................... 6
    § 1671(d) .............................................................................................. *passim*
    § 3300 ............................................................................................... 17, 18, 31

873847.19

**Rules**

Fed. R. Civ. Proc.
  15(c)(1)(B) ................................................................................................................ 36
  23 ...................................................................................................................... 16, 38
  23(b)(2) ........................................................................................................................ 40
  30(b)(6) ................................................................................................................... 4, 11

Fed. R. Evid.
  702 ............................................................................................................................... 28
  803(18) ......................................................................................................................... 27

**Other Authorities**

4 Newberg & Rubenstein on Class Actions
  §§ 12:2, 12:4 (6th ed. 2022) ....................................................................................... 17

Fed. Jud. Ctr., *Reference Manual on Scientific Evidence*
  361 & n.1 (3d ed. 2011) ............................................................................................... 21

Restatement (Second) of Contracts § 90(1) (Am. L. Inst. 1981) ...................................... 33

Restatement (Third) of Restitution and Unjust Enrichment § 6 (Am. L. Inst. 2011) .......................... 34

3 Williston on Contracts 2385 (rev. ed. 1936) ................................................................. 18

873847.19

# I.   **INTRODUCTION**

The trial record and the law both compel a finding that Defendants ("Equity") adopted the Standard Late Fee and the Woodland Park $50 Late Fee without conducting the required reasonable endeavor to estimate the costs from late payments. Equity seeks to lower the bar for itself by replacing the reasonable endeavor standard with a nebulous reasonableness inquiry, but this effort is inconsistent with controlling law. Equity's attempts to mount a factual defense of the late fees are equally unavailing. The overwhelming weight of the evidence shows that Equity imposed the Standard Late Fee to "further enhance [the company's] revenue stream" without any analysis of the company's late rent costs, and that the formula of 5% with a minimum charge of $50 was selected to increase revenue, manage the risk of attracting litigation, and ensure that the new fee would be a "slam dunk guarantee to be better" than the prior $50 fee. *See* Exs. 65, 57. Similarly, Equity has not provided any credible support for the Woodland Park $50 Late Fee.

Accordingly, the late fees must be held void, and the amounts paid by members of both classes must be returned to them, with interest. The Court should also swiftly implement effective injunctive relief to prevent Equity from charging the Standard Late Fee, or any other late fee that is not based on or is disproportionate to its costs from late rent. Moreover, in accordance with the Parties' pretrial stipulations (ECF No. 388), the Court should order Equity to fully supplement its data productions so that the Parties may calculate the full amount owed to the Standard Late Fee Class.

Equity may offset restitution to class members with the actual damages resulting from class members' late payment of rent. But the analyses that Equity offers to prove the amount of offset are fatally flawed many times over—flaunting the Rules Enabling Act by forcing some class members to compensate Equity for costs related to other class members; ignoring fundamental tenets of California law governing contract damages; and using unreliable and unscientific methods that result in untrustworthy expert calculations. The Court should reject Equity's offset calculations, and instead adopt the methods used by Plaintiffs' experts.

Equity's remaining bids to avoid or minimize restitution based on its voluntary payment and statute of limitations defenses also fail on the record. And contrary to Equity's complaints, trial has confirmed that the classes were appropriately certified—indeed, that the classes are entitled to

1  judgment on a class-wide basis and restitution according to the standard, class-wide formulas

2  Plaintiffs' experts used to calculate damages and net restitution.  Plaintiffs urge the Court to bring this

3  case to a swift and just conclusion by adopting Plaintiffs' Proposed Findings of Fact and Conclusions

4  of Law and ensuring that the post-trial data supplementation process is completed as soon as possible.

## II.   ARGUMENT

**A.   Equity's Late Fees Are Void Under Civil Code Section 1671(d).**

7  The Parties have stipulated that both the Standard Late Fee and the Woodland Park $50 Late

8  Fee are liquidated damages provisions subject to California Civil Code section 1671(d) ("section

9  1671(d)").  ECF 521, Parties' Jointly Proposed Findings of Fact ¶ 1.  Under section 1671(d), late fees

10  in residential leases "are presumed void," shifting the burden to the proponent of the late fee "to rebut

11  that presumption."  *Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 322 (2011)

12  ("*Cellphone*"); *see also Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 738 (1973) ("The

13  party seeking to rely on a liquidated damages clause bears the burden of proof.").  To meet its burden,

14  Equity was required to show that the challenged late fees were the "result of a reasonable endeavor ...

15  to estimate a fair average compensation for any loss that may be sustained" by its California tenants'

16  late payment of rent.  *See Garrett*, 9 Cal. 3d at 739.

17  To pass the reasonable endeavor test, Equity had to satisfy each of the three hallmarks of a

18  reasonable endeavor.  **First,** it was required to show that each late fee was based on an actual, non-

19  pretextual analysis of its costs from the breach, specifically, its California tenants' late payment of rent.

20  *See Cellphone*, 193 Cal. App. 4th at 322-23 (quoting *Hitz v. First Interstate Bank*, 38 Cal. App. 4th

21  274, 291 (1995)).  **Second,** it was required to show that the late fees were not adopted with an

22  improper "motivation and purpose" such as enhancing revenue.  *See Garrett*, 9 Cal. 3d at 740; *Hitz*, 38

23  Cal. App. 4th at 289, 290; *Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1395 (1991).  **Third,**

24  Equity was required to demonstrate that the late fees it adopted are proportionate to its costs of

25  collecting and accounting for late rent.  *See Garrett*, 9 Cal. 3d at 740; *see also Ridgley v. Topa Thrift &*

26  *Loan Ass'n*, 17 Cal. 4th 970, 977 (1998) (a fee that is disproportionate to costs from the breach is void

27  as a penalty).  Equity has failed each of these requirements.

28

873847.19

1. **The Standard Late Fee Is Invalid.**

At trial, Equity failed to introduce any credible evidence that in connection with the 2008 adoption of the Standard Late Fee, Equity "actually engaged in some form of analysis" of its costs from its California tenants' late rent, as required by well-established governing law. *See Hitz* 38 Cal. App. 4th at 291; *see also Garrett*, 9 Cal. 3d 739-40; *Cellphone*, 193 Cal. App. 4th at 328. To the contrary, the record is clear that Equity adopted the Standard Late Fee as part of a portfolio-wide project to "increase [its] fees to further enhance [the company's] revenue stream" (Ex. 65), and focused on considerations far afield from the company's costs from late rent, such as the financial upside to a new formula, competitors' practices, and litigation risk. *See* ECF No. 523, Plaintiffs' Proposed Findings of Fact ("PFOF") ¶¶ 79, 87-94;[1] Reporter's Transcript of Proceedings, vol. 3, Tr. 557:5-16.[2]

a. **The Standard Late Fee Was Not Based on Any Analysis of Equity's Costs from Late Rent.**

Equity has not come close to carrying its burden to show that "it actually engaged in some form of analysis to determine what losses it would sustain from [late rent payments], and that it made a genuine and non-pretextual effort to estimate a fair average compensation" for those losses before it set the Standard Late Fee in 2008. *See Hitz*, 38 Cal. App. 4th at 291; *see also Garrett*, 9 Cal. 3d at 739-40 The evidence in fact showed the opposite. Equity's decision-makers at that time gathered no data about its administrative or interest costs of collecting and accounting for California tenants' late rent in 2008, and they analyzed no data regarding those costs. *See* PFOF ¶¶ 59, 60, 61, 67. The Federal Rule of Civil Procedure ("Rule") 30(b)(6) testimony of Equity's former Deputy General Counsel James Fiffer, read into the record at trial, was quite definitive on this point. 3 Tr. 453:9-456:2. Equity's supposed "cost analysis" was simply based on assumptions about the rise in personnel costs overall since the last time Equity had raised its late fee in 2000. 3 Tr. 455:6-456:2.

---

[1] Throughout this brief, Plaintiffs' references to their Proposed Findings of Fact (PFOF) and Conclusions of Law (PCOL) should be understood to include the record citations for each such finding, and case citations for each such conclusion of law.

[2] Subsequent references to the Reporter's Transcript will provide volume, page, and line number in the following format: "[volume] Tr. [page]:[line]."

1    Mr. Fiffer's Rule 30(b)(6) deposition testimony is corroborated by **every single witness** offered

2  on reasonable endeavor, lawyers and businesspeople alike, all of whom either explicitly denied or were

3  unable to describe any actual analysis related to personnel or other late rent costs in 2008. *See* PFOF

4  ¶¶ 71-79.  The absence of any analysis or even consideration of Equity's actual costs of late rent is also

5  strongly corroborated by the contemporaneous email record, which contains no mention of Equity's

6  personnel costs, lost use of funds, or other damages from late rent.[3]  S*ee* PFOF ¶ 60.

7    At trial, Mr. Fiffer testified that in 2008 he "attempted to make a determination in [his] own

8  mind as to whether or not the costs that [Equity] incurred exceeded or did not exceed" costs that were

9  the subject of a prior litigation report from 1999.  PFOF ¶ 65 (quoting 3 Tr. 554:3-12).  This trial

10  testimony directly conflicts with Mr. Fiffer's prior Rule 30(b)(6) testimony that the company had acted

11  on general assumptions regarding its costs and made no effort to actually quantify those costs. *See* 3

12  Tr. 453:7-454:7, 454:15-456:2.  Moreover, Mr. Fiffer lacked adequate information to estimate those

13  costs. *See* PFOF ¶ 66.  Even assuming that Mr. Fiffer did attempt to mentally consider Equity's costs

14  in 2008, intuition and assumptions about costs fall well short of the reasonable endeavor standard. *See*

15  *Hitz*, 38 Cal. App. 4th at 290-91 (an executive's "good understanding" of the company's costs from the

16  information that he got on a regular basis did not demonstrate a reasonable endeavor); *Cellphone*, 193

17  Cal. App. 4th at 328 ("[I]nstitutional intuition is not a substitute for analytical evaluation.").

18    Equity's other chief trial witness on the setting of the Standard Late Fee, Denise Beihoffer, was

19  also unable to clearly or specifically describe any effort to analyze Equity's actual costs from its

20  California tenants' late rent.  PFOF ¶ 71.  She lacked awareness of any formal study of Equity's actual

21  personnel costs from April to June 2008, or of any assessment of the time property-level employees

22  spent on late rent collection activities in 2008.  PFOF ¶ 72.  Instead, she tried to pass off as a "cost"

---

[3] Not only is any discussion of costs conspicuously absent from the 2008 email record, Equity's own
internal memoranda in a 2014 compliance review admitted that Equity had not done an analysis of its
costs of late rent in 15 years, prior to setting the Standard Late Fee.  PFOF ¶ 80 (citing Exs. 89, 90,
538, 1147 (copies and different versions of memo)).  Faced with the admissions in those documents,
Equity tries to undermine the author, Susan Zumph.  Its attacks on its own former employee are
baseless.  Ms. Zumph reported directly to James Fiffer, and twice provided him drafts seeking and
incorporating his input. *See* Exs. 89, 538; ECF No. 503 at 666, 739, Dep. of Susan Zumph ("Zumph
Dep.") at 129:7-130:14, 213:5-215:25. The Court can and should infer that the reason Mr. Fiffer did
not instruct Ms. Zumph to change her comments about the absence of a cost analysis is because the
statements in the memo were true.

4

study a nine-sentence email from May 20, 2008, which made no reference to costs and merely projected that based on the then-average California rent of $1,500 per month, a 5% late fee would result in an average fee of $75.  4 Tr. 791:12-24; Ex. 64.  In light of Ms. Beihoffer's central role in Equity's adoption of the Standard Late Fee, these admissions confirm that Equity made no analysis of its actual costs related to late rent when it set the Standard Late Fee in 2008.

Equity also attempts to create the optics of a cost analysis by referring to the existence of its "statement of operations" reports reviewed by its financial teams as part of their work in running the business.  *See* ECF No. 522, Defendants' Proposed Findings of Fact ("DFOF") ¶ 126.[4]  However, these reports showed only very high-level employee cost information, with a single payroll-per-unit number for each region considered.  *See* PFOF ¶¶ 74 & 76.  They did not reflect costs or time related to late rent collection.  *See id.*  Moreover, Equity cites no evidence that anyone relied on these reports to estimate Equity's actual costs from late rent.  Equity's executives' mere awareness of this information cannot satisfy the costs analysis requirement.  *See Cellphone*, 193 Cal. App. at 324 ("whatever information as to costs and revenues Sprint may have been 'aware' of, it cites to no evidence in the trial record that any of this information" affected the decision to impose the fee or the fee's amount.).

Given the absence of a cost analysis, Equity attempts to undercut the requirement of *Garrett*, *Hitz*, and *Cellphone* that a late fee be based on an actual analysis of costs.  Equity rests this argument on *dicta* from *Zeff v. Greystar Real Est. Partners, LLC*, No. 3:20-cv-07122-EMC, 2021 WL 632614, at *7 n.1 (N.D. Cal. Feb. 18, 2021) suggesting that "the bar for the 'reasonable endeavor' requirement appears to be low" and can be based on considerations other than costs.  In support of this proposition, *Zeff* mistakenly cites out-of-context language from *Bayol v. Zipcar, Inc.*, 78 F. Supp. 3d 1252, 1259–60 (N.D. Cal. 2015).  *See Zeff*, 2021 WL 632614, at *7 n.1.  *Bayol*, however, was clear that a late fee must be the result of "a reasonable endeavor to estimate the fair value of the loss" caused by the late payment.  78 F. Supp. 3d at 1260; *see also id.* at 1258-59 (citing *Cellphone*, 193 Cal. App. 4th at 322).  The passage *Zeff* mistakenly cited was in fact holding that it was "plausible" that the company had *failed* to satisfy the reasonable endeavor requirement because it may have considered improper factors

---

[4] Equity cites testimony by Ms. Beihoffer, who did not claim to have reviewed, or even to understand, the reports herself.  *See* DFOF ¶126 (citing 4 Tr. 690:16-23).  Such testimony deserves little weight.

1   "such as the likelihood of deterring late returns, or the opportunity to generate income from customers'

2   tardiness."  *See Bayol*, 78 F. Supp. 3d at 1259-60.  Nothing in *Zeff* or *Bayol* authorizes an entity to

3   ignore the rule that a late fee must be based on an analysis of costs resulting from the breach.  *Garrett*,

4   9 Cal. 3d at 739; *Hitz*, 38 Cal. App. 4th at 291.  To the extent the Court finds *Zeff* or *Bayol* to be in

5   conflict with *Garrett, Hitz, Cellphone,* or *Beasley*, the Court is required to follow the state-court

6   decisions.  *See Mudpie, Inc. v. Travelers Cas. Ins. Co. of Am.*, 15 F.4th 885, 889 (9th Cir. 2021).

7        Equity's two additional authorities on the reasonable endeavor requirement are also unavailing.

8   First, Equity cites *Najarian Holdings LLC v. CoreVest American Finance Lender LLC*, No. 4:20-cv-

9   00799-PJH, 2021 WL 5630679 (N.D. Cal. Dec. 1, 2021)—but that case applies the more permissive

10  rules that govern liquidated damages provisions in commercial, rather than consumer, contracts under

11  **subsection (b)** of California Civil Code section 1671.  *See* 2021 WL5630679, at *1, *7-8.  "Unlike

12  subdivision (d)," that is, the provision governing residential leases and the dispute in this case,

13  "subdivision (b) gives the parties considerable leeway in determining the damages for breach," and it

14  places the "burden of proof on the issue of reasonableness [] on the party seeking to invalidate the

15  liquidated damages provision."  Cal. Civ. Code § 1671 advisory committee's note to 1977 amendment.

16  *See also Ridgley*, 17 Cal. 4th at 977.  In *Najarian Holdings*, the court awarded summary judgment to

17  the defendants because the plaintiff "fail[ed] to provide any evidence and thus fail[ed] to meet its

18  burden to explain the unreasonableness of the liquidated damages charged."  2021 WL 5630679, at *8.

19  In contrast, here the burden is squarely on Equity to support the fee, and Plaintiffs have in any event

20  offered a robust record demonstrating that the Standard Late Fee was not based on any endeavor,

21  reasonable or otherwise, to estimate Equity's late rent costs.

22        Equity's citation to *Better Food Markets, Inc. v. American District Telegraph Co.* does little to

23  help its cause.  Equity points to the ambiguous remark that "[i]t had been suggested that the greater the

24  difficulty encountered by the parties in estimating the damages which might arise from a breach, the

25  greater should be the range of estimates which the courts should uphold as reasonable."  40 Cal. 2d

26  179, 187 (1953); DCOL ¶ 220.  But *Better Food Markets* does not change the foundational

27  requirement that a liquidated damages provision "must represent the result of a reasonable endeavor by

28  the parties to estimate a fair average compensation for any loss that may be sustained" from breach.

*See* 40 Cal. 2d at 187 (citations omitted) *cited & quoted in Garrett*, 9 Cal. 3d at 739.  Because Equity did not comply with that requirement in setting the Standard Late Fee, the fee must be held invalid.

<blockquote>

**b.**     **Equity Adopted and Maintained the Standard Late Fee for the Improper Purpose of Increasing Revenue.**

</blockquote>

Under *Garrett*, the proper "motivation and purpose" of a late fee is to "compensate the defendant for its administrative expenses and the costs of money wrongfully withheld."  9 Cal. 3d at 739-40.  Late fees adopted to coerce payment through imposition of a penalty or to increase revenue are unlawful.  *Id.*; *Hitz*, 38 Cal. App. 4th at 289; *Beasley*, 235 Cal. App. 3d at 1395.

The overwhelming weight of the evidence shows that Equity's goal in adopting the Standard Late Fee in 2008 was to increase revenue, without regard to the amount of the company's late rent costs.  *See generally* PFOF ¶¶ 84-98.  The adoption of the Standard Late Fee was part of a portfolio-wide effort in the midst of the Great Recession to "increase [Equity's] fees to further enhance [the company's] revenue stream."  Ex. 65; *see also* 4 Tr. 665:19-666:2, 743:1-25.  The sole quantitative analysis performed by Equity focused on the financial "upside" that could be gained from a 5% late fee, compared with its then-existing $50 late fee.  Ex. 66, 4 Tr. 663:6-22; Ex. 67, 4 Tr. 664:10-665:3.  Christopher Jenkins, Equity's Vice President of Financial Services who performed that analysis, advised that a 5% fee would be a "slam dunk," particularly with a minimum charge of $50 to ensure that no late fees would decrease as a result of the shift from a flat $50 to a percentage fee.  Exs. 57, 64.  None of Equity's witnesses offered any rationale for the minimum $50 charge other than Mr. Jenkins' reasoning that it would be a "slam dunk guarantee to be better" than the existing $50 fee.  PFOF ¶ 95.

This factual record is remarkably similar to the evidence in *Hitz* and *Beasley* that supported a finding that the fees at issue in those cases were adopted with the improper purpose.  In *Hitz*, the appellate court upheld the trial court's finding that the challenged fees "were intended to generate revenue" rather than recoup costs and therefore reflected an improper purpose where internal bank documents discussed "new revenue" from the fees "without any mention of costs;" an employee involved in the decision described late fees as "'a good source of revenue;'" the bank was "looking for new sources of revenue" at that time; and the bank adopted the new fee without any "study or analysis of the costs resulting from late and overlimit activity."  38 Cal. App. 4th at 289-90.

1    Similarly, in *Beasley*, the Court of Appeals found the liability determination against Wells

2    Fargo to be supported by substantial evidence where the bank's internal documents "described the fees

3    as a 'good source of revenue' and proposed their increase pursuant to a strategy of 'maximizing fee

4    income.'"  235 Cal. App. 3d at 1395.  While the bank's witness attempted to describe these references

5    to revenue as "trying to recover our costs"—similar to Ms. Beihoffer's trial testimony in this case—the

6    Court of Appeals found that the question turned on the witness's credibility.  *Id.*

7    Here, too, the Court should find not credible Mr. Fiffer's and Ms. Beihoffer's testimony that

8    the fee was intended merely to recoup the company's costs.  *See* PFOF ¶¶ 97 & 98.  This supposed

9    goal is not corroborated by any contemporaneous documentation, nor by the testimony of any

10   businesspeople involved in the decision to adopt the Standard Late Fee.  Instead, the contemporaneous

11   documentary record focuses entirely on the opportunity for financial "upside" and "further enhanc[ing]

12   ... revenue streams" that could come with increasing late fees.  *See* Exs. 65, 66.  When presented with

13   her exchange of emails with Mr. Jenkins about the anticipated increase in late fee amounts, Ms.

14   Beihoffer sought mightily to avoid or deny their plain meaning.  *See* 4 Tr. 668:7-21 (suggesting that

15   Mr. Jenkins' proposal to impose a $50 minimum so the late fee is a "slam dunk guarantee to be better"

16   may not have referred to increases in fee amounts and revenue); 669:16-671:1 (claiming not to

17   understand what Mr. Jenkins meant when he described a 5% fee as a "slam dunk" yielding an average

18   fee of $75 and concluded that "overall, you'd expect to see a 50 percent increase.").

19   Equity has pointed to its consultation with counsel as evidence of its proper purpose.  But that

20   evidence only underscores Equity's determination to raise its late fee without complying with

21   California law.  Both by her own admission and as demonstrated by the evidence, Ms. Beihoffer was

22   well aware of the requirement to base a late fee on the company's expected costs of late rent.  PFOF ¶¶

23   112, 113 & 122.  Yet as described above, Equity did not attempt to analyze its costs, much less follow

24   the advice of counsel to retain back-up materials documenting that analysis.  *See* Ex. 69; 4 Tr. 688:15-

25   691:14.  Instead, in her May 22, 2008 email to decision-makers, Ms. Beihoffer referenced outside

26   counsel's information that "late fees of 6% have been challenged as an Unfair Business Practice and

27   late fees of 4% appear to be below the radar screen" as support for her own conclusion that "5% seems

28   to be the 'sweet spot' in California."  Ex. 61; *see* PFOF ¶ 94.  Ms. Beihoffer's email confirms that the

873847.19

1    purpose of the Standard Late Fee was to maximize revenue generation while minimizing the risk of

2    attracting a lawsuit.  It had nothing to do with merely recovering costs of late rent.

3                    c.    **The Standard Late Fee Is Not Proportionate to Equity's Costs.**

4          At trial, the Court questioned whether, absent a formal cost study, the reasonable endeavor test

5    is met if the Standard Late Fee turns out to bear a reasonable relationship to Equity's actual costs of

6    late rent.  1 Tr. 25:15-19.  California law clearly prohibits such a finding.  As *Cellphone* explains,

7    "retrospective rationalization does not excuse the objective assessment required at the inception of the

8    contract."  193 Cal. App. 4th at 328; *see also Del Monte Props. & Invs., Inc. v. Dolan*, 26 Cal. App.

9    5th Supp. 20, 24 (Cal. Super. Ct. App. Div. 2018) ("Some analysis of actual losses is required prior to

10   setting the amount."); *Hitz*, 38 Cal. App. 4th at 291 ("the required reasonable endeavor logically must

11   have preceded the setting of those amounts.").  Indeed, "focusing solely on hindsight justifications

12   would render the reasonable endeavor requirement meaningless," allowing "arbitrarily selected charges

13   [to] be routinely imposed in consumer contracts, subject only to the ability of a company to muster a

14   credible defense if challenged in litigation."  *Cellphone*, 193 Cal. App. 4th at 327.

15         Here, the evidence demonstrates that the Standard Late Fee bears no reasonable relationship to

16   Equity's actual costs, giving the Court yet another reason to reject Equity's attempted post hoc

17   rationalization and hold that Equity failed to engage in a reasonable endeavor.  The damages analysis

18   performed by Plaintiffs' expert economist Andrew Schwarz demonstrates that Equity's actual costs are

19   almost entirely within the range of $12 to $25 per late payment—far below even the minimum $50

20   charge.  PFOF ¶ 167; Ex. 531.  Class members collectively paid 4.8 times more in late fees than they

21   caused in damages, confirming that under the Standard Late Fee the "sum extracted from the [tenant]

22   is designed to exceed substantially the damages suffered by [Equity]."  *See Garrett*, 9 Cal. 3d at 740.

23         Additionally, on a fee-by-fee level, the Standard Late Fee's percentage-based formula results in

24   wildly different fee amounts for tenants with identical payment histories, even at the same property.

25   PFOF ¶¶ 153, 154.  These differences in fee amounts do not correspond to differences in interest costs,

26   which are typically a matter of pennies.  PFOF ¶ 155.

27         Moreover, Equity has not offered any credible evidence demonstrating that the cost of

28   collecting late rent varies in even rough proportion to the amount of rent the tenant has not paid.  PFOF

¶ 156.  Equity's cost-expert Mark Hosfield failed to address such an assertion.  Even more crucially, there is no evidence that anyone involved in the adoption of the Standard Late Fee took any steps in 2008 or afterward to investigate whether costs of rent collection increase proportionally with the amount of the balance owed—even after one of Equity's own employees raised concerns about the proposed percentage late fee on this basis.  PFOF ¶¶ 158, 159 & 160.  On this record, the remark made by the court in *Del Monte* is particularly apt: "Setting the liquidated damages to a percentage of the contract price demonstrates a purpose other than compensating losses."  *See* 26 Cal. App. 5th Supp. at 24 (citing *Garrett,* 9 Cal. 3d at 740).[5]

### d.   Equity's Purported Reliance on the 1999 Knudsen Report Does Not Satisfy the Reasonable Endeavor Requirement.

To make up for its failure to conduct a reasonable endeavor in setting the Standard Late Fee, Equity tries to use the expert analysis accountant Robert Knudsen created to defend the company in the *Consumer Justice Foundation* ("*CJF*") litigation in 1999, nearly a decade prior to the adoption of the Standard Late Fee.  *See* DCOL ¶¶ 225, 226.  Equity's suggestion that the Standard Late Fee was somehow based on Knudsen's report is simply not credible.  No one at Equity even bothered to review that report in 2008—when it was in a box in offsite storage.  PFOF ¶¶ 143-146.  The record is also clear that no one at Equity had any meaningful understanding of the Knudsen Report in 2008.  *Id.* at PFOF ¶¶ 134, 142, 144, 146 & 147.  And for all its efforts to pin the validity of the Standard Late Fee on the Knudsen Report, Equity was unable to establish that the Knudsen Report indicated that the company's late-rent damages would be appropriately captured by a percentage-based fee with a minimum charge, the formula eventually adopted by Equity in 2008.  *Cf.* DFOF ¶¶ 81-87, 106, 125, 150-152, 156, 159 & 170.  *But see Garrett*, 9 Cal. 3d at 739.

At trial, Equity tried to paper over these cracks with fresh testimony from Mr. Fiffer claiming that he had substantive knowledge about the Knudsen Report—knowledge that he definitively

---

[5] Asking this Court to ignore the published and well-reasoned decision in *Del Monte*, Equity instead cites to the unpublished and non-citable decision *Blum v. Swarbrick*, No. ACIAS 900013, 2010 WL 9009712 (Cal. Super. Ct. App. Div. Unpubl. Apr. 7, 2010).  *Blum* neither cites to *Garrett* nor acknowledges the reasonable endeavor requirement.  Thus, even if *Blum* could be cited, to the extent it suggests a percentage late fee is reasonable without regard to the company's costs from late rent, it must be discarded as inconsistent with binding California law.  *See Garrett*, 9 Cal. 3d at 739, 740.

1   disclaimed in his Rule 30(b)(6) testimony read into the record at trial.  Equity argues that in 1999, Mr.

2   Fiffer would have had detailed knowledge of the Knudsen Report.  *See* DFOF ¶ 152.  But Mr. Fiffer

3   himself testified that in 1999, "[t]he only thing [he] cared about was the overall conclusion," that is,

4   "did [Mr. Knudsen] find that it was more than 50 bucks or less than 50 bucks."  3 Tr. 500:4-13 *cited in*

5   PFOF ¶ 134.  In need of a higher numerical benchmark, Equity points to Mr. Fiffer's alleged

6   knowledge that the late fee in place at the time of the Knudsen Report was $50 plus $5 a day.  *See*

7   DFOF ¶ 158.  To put it bluntly, this "knowledge" was manufactured for trial.  As a Rule 30(b)(6)

8   designee on the issue, Mr. Fiffer testified that he had been unable to find any documentation of the late

9   fee practices at the time of the *CJF* litigation, and that the "best that [he could] remember" was that the

10  late fee at issue "was $50 charged on some day of the month after the first with some additional

11  amount being charged at some other point in the month."  3 Tr. 470:10-472:24.

12       The contextual evidence at trial supports a conclusion that the Knudsen Report was not

13  intended to be a neutral analysis, but rather "an attempt to mitigate [Equity's] damages in that lawsuit."

14  Ex. 89-3.  Such a document, even if anyone at Equity had reviewed it in 2008, cannot satisfy the

15  "reasonable endeavor" requirement, which demands a "genuine and non-pretextual" analysis of the

16  company's costs.  *See Hitz*, 38 Cal. App. 4th at 291; *Beasley*, 235 Cal. App. 3d at 1395 (evidence

17  supported inference that a cost study was obtained "merely to justify" the increased fees rather than

18  satisfy the reasonable endeavor requirement).  Certainly, any reliance on Mr. Fiffer's minimal

19  knowledge of that report as a measure of Equity's relevant costs nine years after the report was

20  completed cannot be regarded as either a reasonable or a good faith effort to determine fair

21  compensation for late rent losses in 2008.  PFOF ¶ 150.  To the extent that Equity's decisionmakers

22  may have relied on the existence of Mr. Knudsen's report in 2008—a supposition that is very much to

23  be doubted, given the factual record—their reliance was pretextual in that they only intended to use the

24  report later to justify their position.  PFOF ¶ 151; *see Beasley*, 235 Cal. App. 3d at 1395 (affirming

25  liability where contemporaneous cost study was intended merely to justify the planned fee increases).

26         **e.**   **Equity's Reliance on the LA County Information Sheet Confirms that It**
      **Failed to Conduct a Reasonable Endeavor.**

27

28  Equity also strenuously argues that the non-authoritative Information Sheet from the Los

873847.19

Angeles County Department of Consumer and Business Affairs regarding late fees shows that Equity complied with the reasonable endeavor requirement.  To the contrary, Equity's reliance on this information sheet underscores that Equity's decision to adopt the Standard Late Fee had **nothing to do with its costs from late rent**.  Simply put, there is no logical connection between a document posted by an external agency and Equity's own costs.  *Cf.* 3 Tr. 581:1-7 (Fiffer unable to explain how the Information Sheet satisfied duty to base the fee on an analysis of late rent costs).  Yet again and again—in pretrial motions, at trial, and now in its Proposed Findings and Conclusions—Equity argues that its reliance on this document shows that it conducted a reasonable endeavor.  *See* DFOF ¶¶ 88, 89, 118, 119, 141; DCOL ¶¶ 231, 237; *see also, e.g.*, Defs.' Pre-Trial Brief at 6, ECF No. 413; Defs.' Mot. to Decertify the Class at 9, ECF No. 335; Defs.' Opp. to Summ. J. at 2, 5, & 10, ECF No. 131.

In addition to being unreasonable for lawyers like Mr. Fiffer and Ms. Beihoffer to accept the Information Sheet as an authoritative statement of the law, particularly when it references a Civil Code section specific to personal property rentals that they did not bother to look up (*see* PFOF ¶¶ 100-106), Equity's reliance on this document demonstrates that any alleged consideration of costs was pretextual if not flat out false, and that in fact Equity was seeking to increase its late fee revenue based on whatever justification it could find.  *See* Ex. 70 (Beihoffer referencing this document to dismiss an employee's cost-related objection to the percentage based late fee).  The overwhelming weight of the evidence therefore compels a finding that the Standard Late Fee violates section 1671(d).

### 2.    <u>The Woodland Park Late Fee Is Also Invalid.</u>

Equity did not come close to meeting its burden of proving that it engaged in a reasonable endeavor to estimate fair average compensation for late rent payments when setting the Woodland Park $50 Late Fee in 2011.  Ms. Beihoffer admitted at trial that Equity did no analysis of its costs of late rent when it set that late fee.  PFOF ¶ 177.  *See also* PFOF ¶¶ 175 & 176.  That admission is fatal.  *See Cellphone*, 193 Cal. App. 4th at 322-28; *Hitz*, 38 Cal. App. 4th at 291.  Additionally, the Woodland Park $50 Late Fee was two to four times the amount of Equity's actual damages from late rent payments.  PFOF ¶ 180.  That disproportionality also compels the conclusion that the late fee fails the reasonable endeavor test.  *See Garrett*, 9 Cal. 3d at 739 ("lack of proportional relation" between a fee

1  and "the damages which may actually flow from failure to perform under a contract" shows that the

2  fee is an invalid penalty).

3       Equity argues that the Woodland Park $50 Late Fee is justified by the 1999 Knudsen Report

4  and the settlement Equity finalized in the *CJF* litigation in 2000.  DCOL ¶¶ 239-241.  This is also

5  pretextual.  The Knudsen Report and the *CJF* settlement took place more than eleven years before

6  Equity acquired the Woodland Park Property.  *See* PFOF ¶¶ 133 & 170.  They had nothing to do with

7  Woodland Park, or with any costs of late rent in 2011.  Equity did not establish that these documents

8  played any role in the state of mind of those who made the decision to adopt the Woodland Park $50

9  Late Fee, since Equity could not even identify who those decisionmakers were.  Moreover, such

10 reliance would be unreasonable, given that Equity's in-house lawyers in charge of ensuring compliance

11 with California law were also aware that a late fee must be based on an analysis of Equity's actual

12 costs of late rent.  *See* PFOF ¶¶ 69-70, 112, 113 & 122.  Additionally, Equity specifically agreed when

13 contracting for the Knudsen Report that Equity would only use it for purposes of the *CJF* litigation, not

14 for any business purpose.  3 Tr. 472:1-478:15 & Ex. 1010.  Furthermore, to the extent Equity seeks to

15 rely on the Report or Mr. Knudsen's conclusions about Equity's costs in 1999 as the evidentiary basis

16 for proving the costs to be recovered by the Woodland Park $50 Late Fee, such reliance is precluded

17 by the Court's ruling that the report is hearsay and inadmissible to prove the truth of the matters

18 asserted therein.  *See* 3 Tr. 494:2-495:18, 536:25-537:25, 594:4-14 (Knudsen Report is hearsay and

19 *CFJ* settlement-approval declaration only admissible for state of mind).  Similarly, the cursory

20 approval order in *CJF*, backed by no cost analysis or evidence of a reasonable endeavor (PFOF ¶¶ 135-

21 139), cannot support the Woodland Park $50 Late Fee.

22 **B.**     **The Standard Late Fee Class Is Entitled to Injunctive Relief.**

23       Given that the invalid Standard Late Fee is still in effect, it is appropriate for the Court to

24 employ its broad equitable power to enjoin Equity's unlawful late-fee charges.  *See generally* PCOL

25 ¶¶ 185-198.  Once liability under the UCL has been established, the court "may make such orders or

26 judgments ... as may be necessary to prevent the use or employment by any person of any practice

27 which constitutes unfair competition."  Cal. Bus. & Prof. Code § 17203; *see also Cortez v. Purolator*

28 *Air Filtration Prods. Co.*, 23 Cal. 4th 163, 180 (2000) (Section 17203 is a "grant of broad equitable

1  power.").  Plaintiffs satisfy each of the four factors set forth by the Supreme Court to guide this

2  discretionary exercise: irreparable injury, inadequate remedies at law, balance of hardships, and the

3  public interest.  *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); PCOL ¶¶ 188-197.

4  Class members are subject to a lease with an invalid (and severable) late-fee provision; Equity has no

5  valid interest in continuing to charge an unlawful late fee; and the requested injunction will benefit,

6  rather than disserve, the public interest in enforcing section 1671(d) and the UCL.  Therefore, the

7  Court should also grant Plaintiffs' requested prospective relief or alternatively fashion its own remedy

8  to prevent Equity from continuing to violate section 1671(d) and the UCL.

9  **C.**   **The Classes Are Entitled to Restitution and Prejudgment Interest Thereon.**

10          Under both section 1671(d) and the UCL, if the Court finds the late fees to be void under

11  section 1671(d), then the invalid fees paid by class members must be returned to them, limited only by

12  the actual damages Equity can prove were caused by the late payments.  *See Beasley*, 235 Cal. App. 3d

13  at 1398-1401; *see also* Cal. Bus. & Prof. Code § 17203.  There is very little factual dispute regarding

14  the amount of late fees paid by the Classes.  *See generally* PFOF ¶¶ 198-206.  Indeed, the Parties'

15  experts have accounted for the differences in their calculations of late-fees-paid, and the Court need

16  only determine whether Mr. Breshears was correct not to reduce restitution by $16,000 in unrelated

17  refunds, and whether or not Equity would be prejudiced by including the $815,000 in late-fee-

18  payments addressed by both Parties' experts but previously excluded before trial based on a

19  misunderstanding of the nature of those payments, which were discovered to be late fees paid through

20  application of class members' security deposits instead of cash payments.[6]  *See id.* ¶¶ 206-222.

21          Restitution is an equitable remedy that "serves two purposes — returning to the plaintiff

22  monies in which he or she has an interest and deterring the offender from future violations."  *Kivett*,

23  506 F. Supp. 3d at 762 (quoting *Colgan*, 135 Cal. App. 4th at 695).  Accordingly, the Court's

24  discretion in fashioning an award may and should be guided by "equitable principles."  *Cortez*, 23 Cal.

25

26  ---

[6] It is indisputable that these monies are restitutionary and supported by substantial evidence.  *See generally Cortez*, 23 Cal. 4th at 178 (permitting restitution of monies wrongfully taken, even if never

27  directly possessed by class members); *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 698, 700 (2006) (approving restitution as any "measurable amounts which are wrongfully taken" as

28  supported by "substantial evidence"); *Kivett v. Flagstar Bank, FSB*, 506 F. Supp. 3d 749, 763 (N.D. Cal. 2020).

4th at 178-79 (describing the court's "full range of powers 'in order to accomplish complete justice between the parties, restoring if necessary the *status quo ante* as nearly as may be achieved.'").

With regard to the additional $815,000 in late fee payments taken from security deposits, it is class members who would be greatly prejudiced if they were denied such a significant amount of restitution merely because those late fee payments had inadvertently been mischaracterized until trial. *See generally* PFOF ¶¶ 212-222.  In light of these equitable principles, and both experts' testifying to their ability to update their calculations to incorporate the undisputed data, *see* PFOF ¶¶ 215-217, the Court should find that the Classes are entitled to gross restitution in the amount of $29,735,220 through 2021, subject to reduction by the amount of offset damages Equity has proven, and order that further restitution calculations be based on Mr. Breshears' methodology.

The Court should also order prejudgment interest on restitution owed to the Classes.  "The policy underlying an award of prejudgment interest is to make the injured party whole for the accrual of wealth that could have been produced during the period of loss."  *Kivett*, 506 F. Supp. 3d at 767 (quoting *Espejo v. The Copley Press, Inc.*, 13 Cal. App. 5th 329, 375 (2017) (describing court's discretion to award prejudgment interest as a component of restitution)).  Because California Civil Code section 1671 and the UCL do not specify a rate of interest to be awarded, Plaintiffs may recover interest at 7% per annum as part of their restitution award.  *See* PCOL ¶ 522.  Equity has not provided any basis for opposing this request.  *See* DFOF ¶ 486 (reserving entire topic for post-trial briefing). The Court should award prejudgment interest "to make [class members] whole," and it should adopt Mr. Breshears' methodology and rate.  *See Kivett*, 506 F. Supp. 3d at 767; PFOF ¶¶ 224-231 (totaling over $14 million through December 2022 based on data through 2021).

**D.**  **Equity's "Offset" Calculations Are Fundamentally Flawed.**

Under governing law, Equity may offset or reduce the amount it is to return to the Classes by the amount of actual damages it succeeds in proving were proximately caused by the tenants' late payment of rent.  PCOL ¶ 54-55.  Those losses are limited to interest and administrative costs of collecting and accounting for class members' late rent.  PCOL ¶ 56.

Equity's expert accountant Mark Hosfield calculated Equity's offset by adding up what he and Equity broadly defined as "delinquent rent" from all tenants in California (*see* 5 Tr. 993:13-17) and

1    deducting that sum from class members' total late-fees-paid.  Mr. Hosfield's conclusion that Equity

2    owes the Classes nothing springs from his failure to follow the basic offset rules enshrined in the law.

3         First, Mr. Hosfield did not conduct an offset: he made no effort to apportion the costs

4    attributable to each class member and offset those costs from the late fees the class member paid.  He

5    also seeks to offset costs incurred during the COVID-19 era, when Equity was not charging late fees.

6         Second, Mr. Hosfield admittedly did not limit his calculations to the actual damages

7    proximately caused by class members' late rent payments as required by applicable law.  5 Tr. 920:21-

8    922:6 ("We're not talking about causation here ..."); 5 Tr. 993:23-994:15; Ex. 1278-17 to 1278-21.

9         Third, even for those personnel and lost use of funds damages that are allowable, Mr. Hosfield

10   used unscientific and inappropriate methods to calculate those costs.

11        **1.    <u>Equity Failed to Perform an Actual Offset Calculation.</u>**

12        Proving Equity's offset defense requires: (1) reliable evidence of the costs proximately caused

13   by class members' late payment of rent; and (2) subtraction of those costs from the amount of

14   restitution each class member would otherwise be entitled to receive.  *See Harrison v. Adams*, 20 Cal.

15   2d 646, 648 (1942).  Mr. Hosfield's analysis has done neither, and the Court can discard it outright.

16        Equity bases its argument that the Court should award the Classes no restitution on a simplistic

17   calculation summing all of its alleged damages and deducting them from total late fees paid.  DFOF ¶

18   256.  This is erroneous as it burdens individual class members with costs they did not cause.  *See, e.g.*,

19   6 Tr. 1126:1-1127:6 (under Mr. Hosfield's method, "person A ends up paying person B's damages");

20   *cf.* Ex. 259-11 & PFOF ¶¶ 9, 10 (Plaintiff Smith would recover nothing even though average costs

21   were $40 lower than the fee she immediately paid).  The Rules Enabling Act prohibits Equity from

22   deducting costs from individual class members' recovery that Equity could not have deducted if the

23   class member had proceeded individually.  *See* 28 U.S.C. § 2072(b); *Tyson Foods, Inc. v. Bouaphakeo*,

24   577 U.S. 442, 455 (2016) ("use of the class device cannot 'abridge ... any substantive right.').[7]

25

26

27   ---

28   [7] The meager authority Equity proffers was litigated in state court – so not subject to Rule 23 or the
     Rules Enabling Act.  *See* DCOL ¶ 483.  Even so, the part of the order Equity recites did not reach the
     propriety of handling offset in wholly aggregate amounts.  *Cellphone,* 193 Cal. App. 4th at 304 n.7.

1   Properly apportioning class members' costs and restitution is not the sword and shield Equity

2   argues.  *See* DCOL ¶ 270.  Equity conflates "aggregate damages"—which "describe a defendant's total

3   liability to the plaintiff class" with the need for a common "classwide *method* for determining

4   *individual* damages."  4 Newberg & Rubenstein on Class Actions ("Newberg") §§ 12:2, 12:4 (6th ed.

5   2022) (emphasis original).  Plaintiffs agree that Equity's offset costs can be reduced to an aggregate

6   amount, and their expert economist Andrew Schwarz did so, but that amount must take into account

7   the actual late fees paid and the costs caused by each class member.  Doing so neither defeats class

8   certification, nor requires an unreasonable approximation of damages.  *Cf.* DFOF ¶ 251 (citing *Robi v.*

9   *Five Platters, Inc.*, 918 F.2d 1439, 1443 (9th Cir. 1990) (**not** holding that "reasonable approximation"

10   of damages allows imposition of liability on parties who are not responsible for those damages));

11   *accord Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 513 (9th Cir. 2013).

12   Relatedly, Equity cannot offset all of its costs incurred during the period of the COVID-19

13   pandemic when Equity ceased charging late fees at all of its properties in California, and then only

14   resumed charges gradually in selected locations.  Ex. 115, 5 Tr. 962:14-963:8; 6 Tr. 1098:2-1099:7.

15   This is essentially asking tenants who paid late fees during that period "to have their restitution offset

16   by costs imposed by people in other [properties] in other parts of the state."  6 Tr. 1098:21-1099:7; *see,*

17   *e.g.,* 5 Tr. 989:2-991:7 & Ex. 1278-1 (calculating abnormally high per-late-fee-cost of $1,086.94

18   during COVID period).  This is patently improper.

19   ### 2.   Equity Did Not Limit Its Offset to Costs Proximately Caused by Class Members'

20   Late Rent Payments.

21   Under applicable contract law, Equity has the burden of proving "a direct causal link between

22   the breaches underlying the litigation and the actual damages caused by those breaches."  *Beasley*, 235

23   Cal. App. 3d at 1403; *accord* Cal. Civ. Code § 3300; *Garrett*, 9 Cal. 3d at 741 (a tenant is liable for

24   "the actual damages *resulting from*" the breach) (emphasis added).  This standard requires Equity to

25   prove that its offset damages were caused by the late rent payments that resulted in the late fees at

26   issue in this case.  *See Beasley*, 235 Cal. App. 3d at 1403.  This rule reflects the fundamental

27   requirement of causation in contract damages.  The measure of contract damages "is the amount which

28   will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the

ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300; *see also Crossroads Invs., L.P. v. Fed. Nat'l Mortg. Ass'n*, 13 Cal. App. 5th 757, 792 (2017).

Mr. Hosfield admitted that he did not even attempt to meet the proximate cause standard in designing his analyses.  5 Tr. 921:22-926:2 ("We're not talking about causation here" so questions about causation do not "really make any sense in the []concept of the analysis I did.").  Although he attempted to distance himself from that testimony, his candid admission that causation was irrelevant to his analyses is confirmed by his design and execution of those analyses, as discussed below.

### a.   Equity's Costs Incurred During the Grace Period Are Not Proximately Caused by Late Rent.

Under California law, a grace period "define[s] what shall constitute timely performance of the payment terms" of a contract.  *Baypoint Mortg. Corp. v. Crest Premium*, 168 Cal. App. 3d 818, 827 (1985).  Unless a contract "clearly, unequivocally and unmistakably" states that time is of the essence with respect to the date of payment, a grace period "negates a finding [that] payment on the so-called 'due date' to be the essence" of the contract.  *Id*. at 826-27; *Bisno v. Sax*, 175 Cal. App. 2d 714, 721-22 (1959) (same); 3 Williston on Contracts 2385 (rev. ed. 1936) (same).  None of the leases at issue in this case include language making clear that time is of the essence with respect to payment of rent on the first of the month.  *See* PFOF ¶¶ 51-52; PCOL ¶¶ 64-65.  And, inclusion of the grace period permits a reasonable interpretation that the tenants have four days before a payment is considered "late" under the lease; such ambiguity must be resolved against the drafter.  *See* Cal. Civ. Code § 1654; *Sandquist v. Lebo Auto., Inc.*, 1 Cal. 5th 233, 247 (2016); *see generally, e.g.*, PFOF ¶¶ 243-244 (citing tenant and personnel interpretations that rent is not late until the 5th).  Accordingly, Equity's lease terms establish the end of the four-day grace period as when rent is "late" for purposes of Equity's offset damages.

Moreover, Equity has waived the right to recover damages for any costs it incurs during the grace period.  *See Lynch v. Cal. Coastal Comm'n*, 3 Cal. 5th 470, 475 (2017).  Each of the factors for waiver set forth by the California Supreme Court are met, as Equity had an existing right to seek damages caused by late rent, *Garrett*, 9 Cal. 3d at 741 n.11, but included a grace period permitting class members to avoid those damages.  *See Lynch*, 3 Cal. 5th at 475 (intentional waiver may be inferred from "conduct that is 'so inconsistent with an intent to enforce the right as to induce a

1   reasonable belief that such right has been relinquished.'") (citation omitted).  Equity has therefore

2   waived any right to seek offset damages it allegedly incurred during the grace period.

3       In sum, under fundamental principles of California contract law, Equity is not entitled to

4   recover any personnel costs, lost use of funds, or other alleged damages that it incurred during the

5   grace period it afforded to class members.

6       **b.    Equity's Fixed Personnel Costs Are Not Proximately Caused by Late Rent.**

7       As a natural application of the causation requirement, it is well-established that "[i]f overhead

8   costs are not increased by the breach it is error to allow them as damages."  *Guntert v. City of Stockton*,

9   55 Cal. App. 3d 131, 149-50 (1976) (overturning award of overhead costs where evidence showed "no

10  absolute increase in overhead" costs as a result of the breach) *cited in Beasley*, 235 Cal. App. 3d at

11  1403 (rejecting offset costs "attributable to the bank's maintenance of an 'in place' infrastructure for

12  dealing with" the breaches, because they lacked "the necessary causal link" required under *Garrett*).

13      Perhaps the most glaring example of this is Mr. Hosfield's inclusion of fixed costs—salary,

14  health insurance, leasing commissions, paid time off, and the like—in his calculation of personnel

15  costs despite there being no basis to conclude that these costs increase with and so could be caused by

16  "any individual late [rent payment]."  *See Beasley*, 235 Cal. App. 3d at 1403.  *See generally* PFOF ¶¶

17  336-373.  Salary compensation does not change based on the number of late fees charged, or even the

18  number of hours worked, and salaried employees would be paid the same even if they spent no time on

19  delinquent rent.  *See generally* PFOF ¶¶ 289-295; *accord* 5 Tr. 969:23-972:8 *see also* Ex. 1243-0190 to

20  0209; Ex. 1278-0139 to 0160 (admitting the other forms of fixed compensation do not change based on

21  the number or amount of late fees charged).  There is no evidence that these fixed costs are affected or

22  increased by tenants' late payment of rent.  *Cf.* DFOF ¶ 336 (without citation, claiming these costs are

23  not fixed because Equity's property-level staffing was "management-controllable," which has no

24  bearing on variance with late-rent activity); *but see* Ex. 259-51 ¶ 75 (COVID pandemic demonstrated

25  Equity's employee costs do not increase with late rent activity, but actually decreased).

26      **c.    Equity's Eviction Costs Are Not Proximately Caused by Late Rent.**

27      Equity may not offset its eviction-related legal costs because they are not liquidated by either

28  the Standard Late Fee or the Woodland Park $50 Late Fee.  *See Garrett*, 9 Cal. 3d at 739, 741.  In

19

other words, the legal costs go beyond the costs that are proximately caused by and so could be satisfied through payment of the late fees.  Trial confirmed that Equity considers eviction legal costs to be governed by the distinct Default Remedies provision of its Standard Leases, under which Equity charges and collects these costs separately from late fees from the same tenants.  *See* PFOF ¶ 53-56 (distinguishing between Late Charges and Default Remedies), 454-463; 5 Tr. 977:15-22 ("That is a separate charge from late fees, yes."); Ex. 23 (charging legal fees "where permitted by law").

Attempting to include these costs in Equity's offset not only runs astray of the "actual [contract] damages" analysis, but it also violates the equitable principles underlying section 1671(d) and the UCL.  *See generally Beasley*, 235 Cal. App. 3d at 1403; *Cortez*, 23 Cal. 4th at 178-79. Equity's late fee being invalidated pursuant to these consumer-protective statutes does not and should not create a forum to give Equity a second chance to obtain these separate costs.  Moreover, Equity grossly overstates the costs that are supposedly outstanding, and "complete justice between the parties" requires excluding costs Equity cannot prove with any reasonable certainty.  *See generally* PFOF ¶¶ 467-478 (explaining how Mr. Hosfield relies on vague legal invoices that are not linked to class members for amounts owed and possibly incomplete data for total-paid and so overstates the potentially remaining costs by as much as $6 million (out of the $7 million claimed by him)).

### d.   Equity's Collection Agency Fees Are Not Proximately Caused by Late Rent.

Equity cannot offset its collection fees because they are based on the percentage of the balance collected rather than the actual damages proximately caused by late-rent collection.  *See* DFOF ¶ 353 ("Equity paid [its] collection agencies a percentage of the amounts of the delinquent rent that they collected on behalf of Equity."); *see also* PFOF ¶¶ 480-485.  The California Supreme Court unequivocally held that the lack of causation prohibits percentage-based collection fees from being included as offset under *Garrett*. *Bondanza v. Peninsula Hosp. & Med. Ctr.*, 23 Cal. 3d 260, 263-64 (1979); *see also Beasley*, 235 Cal. App. 3d at 1405-06.  Equity's attempts to distinguish *Bondanza* and *Beasley* are unavailing; Equity's fees are the same as those courts rejected for lack of causation, and Equity has presented no evidence to the contrary.  Just as in *Beasley,* "[t]he reasoning of *Bondanza* is dispositive here."  235 Cal. App. 3d at 1405.  Because Equity's percentage-based collection fees "have no relationship to the actual expense required to collect a late balance, those costs do not necessarily

873847.19

represent [Equity's] 'actual damages resulting from [the tenants'] default' within the meaning of the *Garrett* standard, even though [Equity] actually paid the fees." *Id.* As such, Equity's collection costs cannot be included in an offset against restitution.

Additionally, Equity incurred collection costs "*after residents had moved out*", which means they are not liquidated by the late fee pursuant to the Default Remedies provision and should be excluded on that basis. *See* DFOF ¶ 351 (emphasis added) (citing 5 Tr. 896:19-897:2).

### 3.    Equity Overstates Its Offset Costs.

Equity, through its expert Mr. Hosfield, offered two flawed methods for calculating Equity's personnel costs offset. First, Mr. Hosfield did a "cost incurred" analysis based upon a poorly-designed survey which he was unqualified to conduct, and then extrapolated the results to 11 years' and thousands of employees' worth of payroll costs—including fixed costs—without adhering to fundamental principles of sampling and statistical inference. *See generally* PFOF ¶¶ 296-373. Second, Mr. Hosfield offered a speculative "cost-savings" model that is nothing more than hypothetical staffing decisions repackaged as expert opinions—also largely targeted to eliminating fixed costs. PFOF ¶¶ 387-388. Both deserve no weight, and should be rejected in favor of Mr. Schwarz's analysis.

### a.    Mr. Hosfield's Cost-Incurred Analysis Is Unscientific and Unreliable.

Mr. Hosfield's cost-incurred calculation is based on the proportion of time purportedly spent by Equity's "office management" and "leasing" property-level employees on delinquent rent, which Mr. Hosfield derived from two rounds of informal interviews he conducted with a small sample of employees in which he attempted to elicit memory-based estimates of their time spent on late rent collection tasks. This survey is flawed in nearly every respect and has no probative value.

Equity attempts to sidestep Plaintiffs' criticisms by claiming that Mr. Hosfield's cost incurred calculations were an "interview project," not a survey. But regardless of the label, it is undisputed that Mr. Hosfield attempted to determine the amount of time spent on late rent collection activities for all of Equity's California property-level employees by collecting information from a sample of those employees. This is indeed a survey, which is defined as a "standardized approach[] to collecting information" with the "end goal [to] provide information on the relevant population from which the sample was drawn." Fed. Jud. Ctr., *Reference Manual on Scientific Evidence* ("*Reference Manual*")

361 & n.1 (3d ed. 2011).  Accordingly, Mr. Hosfield's employee interviews must be evaluated by the evidentiary standards and scientific principles applicable to survey methodology.

### i.      Mr. Hosfield Lacks the Qualifications to Design and Conduct a Survey.

Expert witnesses who provide survey evidence must have expertise in survey methodology. *Casey v. Home Depot*, No. 5:14-cv-02069-JGB-SP, 2016 WL 7479347, at *21 (C.D. Cal. Sept. 15, 2016); *Marlo v. United Parcel Serv., Inc.*, 251 F.R.D. 476, 485-86 (C.D. Cal. 2008), *aff'd,* 639 F.3d 942 (9th Cir. 2011); *Reference Manual* 409-10 (a survey administered by someone without the proper training can "seriously undermine the trustworthiness of any survey.").  Mr. Hosfield is an accountant, not a survey expert.  5 Tr. 844:24-845:6.  This lack of expertise undermines his opinion's reliability.

### ii.     Mr. Hosfield Did Not Adhere to Fundamental Statistical Principles.

"[A] good survey defines an appropriate population, uses a probability method for selecting the sample, has a high response rate, and gathers accurate information on the sample units." *Reference Manual* 226; *see generally* PCOL ¶¶ 90-92.  Mr. Hosfield readily admitted that he did not attempt to create a random sample, a stratified random sample, or perform any type of statistical analysis.  5 Tr. 875:16-19; 922:8-17; 926:12-19.  This admission alone renders his analyses unreliable: there can be no dispute that Mr. Hosfield's cost-incurred analysis is statistical, as he uses data from a sample of surveyed employees and extrapolates the results to the broader employee population.  *See* PCOL ¶ 91.  Equity cites no authority for its claim that Mr. Hosfield's non-statistical "quartile methodology" ensured that he "developed a set of representative interviewees."  DCOL ¶¶ 277, 279; Ex. 1569-15.  Mr. Hosfield's non-statistical approach is irreparably flawed and unreliable.

*First* and most fundamentally, Mr. Hosfield failed to randomly select the properties or the employees that were interviewed.  PFOF ¶¶ 320, 326.  Randomization is essential to obtaining a representative sample.  *Reference Manual* 230 (requiring "randomness in the technical sense ....  Looser definitions of randomness are inadequate for statistical purposes."); *Duran v. U.S. Bank Nat'l Ass'n*, 59 Cal. 4th 1, 43 (2014).  Instead of using a random number generator or another rigorous method ensuring randomness, Mr. Hosfield "blindly" selected the properties based on the two sets of quartiles he had selected.  But "[s]tatistical randomness is not the same as ignorance or haphazard" selection.  6

Tr. 1109:24-1110:8.  Additionally, some employees selected by Mr. Hosfield were not interviewed due to their unavailability, with an unknown number of employees dropped from the 2021 survey without replacement or adjustment for non-response bias.  5 Tr. 945:25-946:10 ("There were some no-shows.").  Accordingly, the selected employees represent an availability sample that is inappropriate for statistical extrapolation.  PFOF ¶¶ 320, 326; *see also* 6 Tr. 1116:18-1118:13.

*Second*, Mr. Hosfield failed to understand that his use of two sets of quartiles he used to select properties resulted in *sixteen* strata rather than eight.  6 Tr. 1111:23-1112:10.  As a result, Mr. Hosfield did not interview office management and leasing employees from each stratum.  *See* 6 Tr. 1110:16-1118:13 (Five strata were not represented in his office management sample; three others have a single data point.); *cf.* 6 Tr. 1113:12-1114:6 (explaining that the data in each stratum must be averaged and weighed).  Where a stratum has no data, or only one data point, averaging is not possible, making the stratum inappropriate for statistical extrapolation.  *Id*.  The following chart illustrates these omissions:

Exhibit 3c. Sample – Office Management Employees by Stratum

| | | Late Payments | | |
|---|---|---|---|---|
| | First Quartile | Second Quartile | Third Quartile | Fourth Quartile |
| First Quartile | 2 | 1 | 4 | 1 |
| Second Quartile | 3 | 2 | 2 | 0 |
| Third Quartile | 0 | 5 | 1 | 3 |
| Fourth Quartile | 0 | 0 | 0 | 2 |

Note: Unsampled strata in red, single observation strata in gray.

Ex. 257-73 (Schwarz July 2021 Report).  This chart also demonstrates that Mr. Hosfield oversampled certain strata.  As Mr. Schwarz explained, Mr. Hosfield "only looked at buildings that were big with – buildings with a lot of units in the upper quartile and the second quartile.  And didn't look at any buildings among the ones with a high degree of late payments in the small buildings."  6 Tr. 1114:7-1115:15.  This means that larger, more expensive properties dominate Mr. Hosfield's sample, inflating the percentage time estimates that he extrapolated to the population of employees.  *Id*.

Equity disputes the accuracy of Mr. Schwarz's chart, claiming that Mr. Schwarz did not count employees who worked at multiple properties and "didn't include any of Hosfield's interviews of leasing employees—or properties at which they worked—in his analysis."  DCOL ¶¶ 281, 282.  But the above chart is limited to office management employees by design, and it is intended to demonstrate the lack of representativeness for that group only.  Equity's rebuttal chart deceptively includes

properties where leasing employees were interviewed, even though those interviews were used to calculate a different average applied to a different set of employees.

For office management and leasing employees combined, Equity agrees that Mr. Hosfield sampled only 15 of the 16 strata. The following chart is identical to the one advanced by Equity. *See* DCOL ¶ 282. And even this distribution would not be sufficiently representative as it includes one stratum with no data and five strata with only one data point. It also continues to oversample large properties with necessarily higher numbers of late fees.

**EQR Property Sampling Distribution in Office Management and Leasing Employees Interviews**

|  | Quartile | Number of Late Fees Charged per Unit per Month | | | | Total |
|---|---|---|---|---|---|---|
|  |  | 1 | 2 | 3 | 4 |  |
| Number of Units | 1 | 3 | 1 | 6 | 1 | 11 |
|  | 2 | 4 | 2 | 3 | 2 | 11 |
|  | 3 | 1 | 7 | 2 | 3 | 13 |
|  | 4 | 1 | 0 | 1 | 4 | 6 |
|  | **Total** | 9 | 10 | 12 | 10 | 41 |

Source: Expert Report and Disclosure of Mark J. Hosfield, May 10, 2021, Appendix E.

*Third*, Mr. Hosfield did not properly weight the values resulting from each stratum. *Reference Manual* 299 (requiring data from the strata be weighted "to extrapolate from the sample to the population"). Instead, he gave equal weight to the percentage estimates provided regardless of either the number of employees in each stratum or the number of employees interviewed from each stratum.

### iii.      The Survey Results Are Unreliable Due to Recall Bias.

Memory-based estimates regarding the amount of time spent on work tasks can be problematic due to recall bias.[8] *See Jimenez v. Allstate Ins. Co.*, No. 2:10-cv-08486-JAK-FFM, 2019 WL 13088814, at *21-22 (C.D. Cal. May 13, 2019) (noting "serious concerns" and finding credible expert opinion that "people are particularly predisposed to overestimate the amount of time they spent working."). [9] Plaintiffs' work-measurement expert Dr. Michael Childers explained that time estimates

---

[8] Plaintiffs note that reliance on time estimates may be appropriate in certain circumstances, such as a lack of recordkeeping by the other party. *See, e.g., Guntert*, 55 Cal. App. 3d at 143; *Aguiar v. Cintas Corp. No. 2*, 144 Cal. App. 4th 121, 134-35 (2006); *Ghazaryan v. Diva Limousine, Ltd.*, 169 Cal. App. 4th 1524 (2008); *Harper v. 24 Hour Fitness, Inc.*, 167 Cal. App. 4th 966, 976 n.5 (2008).

[9] *See also In re: Autozone, Inc. Wage & Hour Emp. Pracs. Litig.*, No. 3:10-MD-02159-CRB, 2016 WL 4208200, at *19 (N.D. Cal. Aug. 10, 2016), *aff'd*, 789 F. App'x 9 (9th Cir. 2019) (excluding survey based in part on recall bias).

based solely on employees' own recollections of the amount of time spent working are often inconsistent over time and inaccurately "overstate[] the amount of total time when presented with the options for how much time is spent on any one task."  7 Tr. 1324:6-14; *see* PFOF ¶¶ 345, 352-56.[10] Recall bias also invariably arises when surveys seek "typical" or "average" time estimates because they require participants to perform complex cognitive functions.  *Casey*, 2016 WL 7479347, at *20 *Jimenez*, 2019 WL 13088814, at *19 (questions requiring calculations of average number of hours worked per week "raise significant reliability issues.").  While memory aides may improve the accuracy, courts also recommend that the party attempt to verify the accuracy of the responses with other evidence.  *See Senne v. Kansas City Royals Baseball Corp.*, No. 3:14-cv-00608-JCS, 2017 WL 897338, at *25 (N.D. Cal. Mar. 7, 2017) (accepting survey evidence after expert "check[ed]" survey results against daily schedules and deposition testimony).  Accurate and reliable results more likely arise from time and motion studies,[11] time-tracking software commonly used by professionals who bill their customers by the hour, or even simple paper activity logs.  Ex. 253-12; 7 Tr. 1316:23-1317:16.

These issues were evident throughout Equity's property-level witnesses' testimony at trial. PFOF ¶ 354.  Mr. Hosfield's analysis contravened all of these accepted principles by relying on outdated memory-based estimates, asking for averages, failing to use memory aids, or to crosscheck the survey responses against Equity's employee time records.  *See* Exs. 170, 171, 168. Equity fails to address these arguments.  DCOL ¶¶ 289-300, 399-406.

### iv.   Interviewees' Knowledge of the Survey's Litigation Purpose Created a Likelihood of Bias in Favor of Their Employer.

A "survey instrument should provide no explicit or implicit clues about the sponsorship of the survey or the expected responses."  *Reference Manual* 410-11; *see also* Ex. 253-16-17 (Childers Report) § 8.2.3.  Numerous courts have excluded survey evidence where the survey participants were

---

[10] Academic research shows that "autobiographical memory is notoriously unreliable" and "people have an extremely difficult time trying to provide such estimates."  7 Tr. 1319:17-1320:8; Ex. 253-14.

[11] While Equity contends that it could not conduct a time and motion study during the COVID-19 pandemic, which is incorrect, it ignores the fact that it had over five years of open discovery to conduct such a study prior to the onset of the pandemic in March 2020.

1    aware of the survey's sponsor and purpose. *Dukes v. Wal-Mart, Inc.*, 222 F.R.D. 189, 197 (N.D. Cal.

2    2004); *Casey*, 2016 WL 7479347, at *21; *In re: Autozone, Inc.*, 2016 WL 4208200, at *19.

3         Mr. Hosfield's survey is unreliable and biased on these grounds.  In scheduling his first round

4    of interviews, Equity sent 40 of the 58 employees calendar invitations titled "CA Late Fee Litigation."

5    PFOF ¶ 342.  The 32 employees who were re-interviewed during the second round were aware of the

6    purpose of the survey from their initial interviews. Ex. 1278-6.  Moreover, Mr. Hosfield asked the

7    survey participants whether they "thought that rent collection was a 'time suck,'" and to "Describe

8    The Worst Rent Collection Episode You Can Remember," which provided clues regarding the

9    responses that would be favorable to Equity and demonstrate a direct attempt to bias employees'

10    recollections.  Exs. 170, 171.  Mr. Hosfield claims that he minimized any bias by conducting

11    "interactive" interviews in which he pushed back on their time estimates, however, he has failed to

12    demonstrate that this is an accepted method of reducing this type of bias.  5 Tr. 964:6-10.

13                 **v.**       **The Survey Has Other Indicia of Unreliability.**

14    "[O]ne indicator of the trustworthiness of the survey and the professionalism of the expert" is

15    the completeness of the survey documentation, including "[t]he exact wording of the questions used,

16    including a copy of each version of the actual questionnaire." *Reference Manual* 415; *see also State*

17    *Farm Fire & Cas. Co. v. Electrolux N. Am.*, No. 2:10-cv-01147-RSM, 2011 WL 6753140, at *2, *4

18    (W.D. Wash. Dec. 23, 2011) (excluding "survey" because, *inter alia*, the questions actually asked were

19    not recorded).  Furthermore, the use of multiple different questionnaires is not a generally accepted and

20    reliable method of collecting survey data.  Ex. 253-15.

21         Contrary to these accepted standards, Mr. Hosfield did not record the actual questions asked or

22    the answers provided in context.  Mr. Hosfield explained that he treated the questionnaires as mere

23    prompts and that in his view, the interview questions did not need to be the same from one interview to

24    the next.  The use of a non-standard data collection tool means that Equity employees were responding

25    to different stimuli, thus introducing variability in responses that make them less comparable to one

26    another.  7 Tr. 1320:20-1322:1; Ex. 253-15.

27         Moreover, Mr. Hosfield did not elicit time estimates using consistent units of time, allowing

28    employees to provide time estimates by day, week, or month.  5 Tr. 952:23-953:5; Ex. 1243-19.  He

then converted monthly estimates into weekly estimates by dividing by four, which inaccurately drives up the reported weekly averages because almost all months are longer than twenty-eight days.  5 Tr. 953:6-25; *cf.* Ex. 253-20 to 253-21 (Childers Report) § 8.3.2.

### vi.   Cost Accounting Does Not Save Mr. Hosfield's Failure to Adhere to Generally Accepted Principles in Survey Research and Statistics.

Equity claims that Mr. Hosfield's interview process constitutes a cost accounting exercise, and therefore he had no obligation to adhere to reliable survey methods and accepted principles of statistics.  DCOL ¶ 273; 5 Tr. 854:23-855:9.  But cost accounting is not somehow exempt from the laws of statistics.  *Cf.* 6 Tr. 1106:2-15 (Mr. Hosfield unwittingly conducted a statistical analysis).

Nor has Equity shown that his interviewing methods are reliable.  Equity cites several accounting treatises for the proposition that "[i]nterviews are a common, and accepted, method of obtaining information as part of an activity-based costing analysis."  DCOL ¶ 273.  Equity's attempt to rely on these authorities is improper.  They are not in evidence, and even if they were, they would be inadmissible as hearsay due to Equity's failure to comply with Federal Rule of Evidence 803(18):  Mr. Hosfield did not disclose these treatises in his reports, nor did he rely on them during his direct examination.  Exs. 1243-63-64; 1278-30-41; 5 Tr. 841:9-919:24.  Nor were the excerpts read into the record at trial.  Equity did not establish the treatises as reliable authority through Mr. Hosfield's testimony or otherwise.  And as a matter of basic fairness, Plaintiffs have not been provided copies of the treatises to determine whether Equity has accurately and fairly represented their contents.  The Court should disregard the treatise quotations as inadmissible hearsay which is not in the record.

### b.   Mr. Hosfield's Cost Savings Methodology Is Speculative, Unreliable, Inapt.

Mr. Hosfield's alternative "cost savings" methodology is based on interviews he had with four Equity managers speculating about which positions they would eliminate, combine, or reduce to part time based on a hypothetical world where rent was never paid late.  PFOF ¶ 381; Ex. 1278-35.[12]  Mr. Hosfield is not qualified to opine on this issue, as he admitted that he has no expertise in property

---

[12] Mr. Hosfield did not apply his "cost savings" methodology to the COVID-19 era due to "constantly changing requirements of Equity's operations."  Ex. 1278-10.  Tellingly, during this period, Equity's staffing decreased while rent delinquency increased.  PFOF ¶ 386.

1  management or employee staffing.  *See* 5 Tr. 974:25-975:5; Fed. R. Evid. 702.  This lack of foundation

2  undermines the reliability of Mr. Hosfield's cost savings calculations.

3  Also, it is improper for an expert to present a model created by others.  Expert witnesses are not

4  "permitted to be the mouthpiece of a scientist"—much less corporate executive—"in a different

5  specialty."  *Dura Auto. Sys. of Ind., Inc. v. CTS Corp.*, 285 F.3d 609, 612-14 (7th Cir. 2002).  Although

6  experts may reasonably rely on analyses conducted by others, "[w]here the 'soundness of the

7  underlying expert judgment is in issue,' the testifying expert cannot merely act as a conduit for the

8  underlying expert's opinion."  *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs.,*

9  *& Prods. Liab. Litig.*, 978 F. Supp. 2d 1053, 1066 (C.D. Cal. 2013) (citation omitted); *see also* PCOL

10 ¶ 129.  Mr. Hosfield confirmed that his cost savings opinions are based largely, if not exclusively, on

11 the judgment of Equity managers, admitting that his only contribution to the model was to "push[]

12 back and ask for justification for the changes" these employees proposed.  5 Tr. 975:6-15

13 (acknowledging reliance on "[t]heir expertise, their experience.").  Equity has not established that these

14 managers have the authority to make such staffing decisions, nor has it disclosed or qualified those

15 employees as expert witnesses.  PFOF ¶ 266 (Rivera must obtain approval for any staffing changes).

16 Equity cannot use Mr. Hosfield as a mouthpiece for the model these employees created.  PCOL ¶ 129.

17 Furthermore, the cost-savings model is irrelevant to the actual damages Equity incurred as a

18 result of class members' late payment of rent.  PCOL ¶¶ 125, 126.  Like the "indirect" costs rejected in

19 *Beasley*, the cost savings methodology improperly seeks to quantify and offset employee costs that are

20 necessary to deal with the mere possibility that tenants may pay their rent late.  6 Tr. 1127:11-1128:6.

21 There is no dispute that the cost savings method cannot be used to calculate the actual costs caused by

22 class members' late rent payments.  5 Tr. 974:6-16 (Hosfield admitting as much).  For this reason, Mr.

23 Hosfield characterized his cost savings model as merely a "benchmark data point" rather than a

24 measure of actual damages.  5 Tr. 907:1-907:23.  The Court should reject the cost-savings model for

25 lack of the required "direct causal link" to underlying breaches.  *Beasley*, 235 Cal. App. 3d at 1403.

26 ### c.   The Court Should Adopt Plaintiffs' Personnel Cost Calculations.

27 Equity attempts to excuse the numerous failings in Mr. Hosfield's cost calculations, and to

28 renew its request to decertify the class (addressed separately in Section II.G, *infra*) by arguing that

1    there is no feasible way to calculate individual damages amounts using class-wide data and a class-

2    wide analysis.  DCOL ¶ 269.  Plaintiffs' expert economist Andrew Schwarz, however, has offered

3    rebuttal damages calculations using on a regression-based model that permits a calculation of

4    personnel costs damages based on objective data regarding each class member household.  Ex. 259-54

5    to 259-78 (Schwarz expert report discussing and providing the results of his model); Ex. 531

6    (summarizing the results of Schwarz's damages and offset calculations).

7    
8

**i.      Mr. Schwarz's Regression Model Reliably Measures Equity's Personnel Costs Associated with Class Members' Late Rent.**

9    Multiple regression, the method Mr. Schwarz used, is a rigorous and well-established statistical

10   tool that is well suited to the task at hand: measuring the extent of personnel costs that are increased as

11   a result of tenants' late payment of rent.  *See* PCOL ¶¶ 58-63 & PFOF ¶¶ 389, 111-113; *see esp.* Ex.

12   259-54 to 259-57 (explaining why multiple regression is an appropriate statistical tool in this case); 6

13   Tr. 1084:14-1086:4 (multiple regression "allows you to control for other factors but then identify the

14   change that happens" as a result of a particular act, in line with the "but-for" causation concept); *id.*

15   1142:17-23 (multiple regression can be used to measure the magnitude of one variable's causal impact

16   on another), *id.* at 1143:5-1144:4 (reading in and discussing a portion of the *Reference Manual*

17   regarding the use of multiple regression).  Numerous cases have recognized the suitability of

18   regression models in determining damages, including on a class basis.  *See* PCOL ¶ 113; *see also*

19   *Reference Manual* 308 (discussing district courts' wide acceptance of regression models).

20   Mr. Schwarz designed regressions to test and calculate the impact of late rent costs on the three

21   core components of Equity's personnel costs—salary costs, regular hourly pay, and overtime pay.

22   PFOF ¶¶ 390, 395-399; *see generally* Ex. 259-54 to 259-71.  His regressions examined the impact of

23   (1) the "incidence" of late rent—that is, the fact that a tenant pays late in a given month; (2) the

24   number of days rent remained outstanding before it was fully paid; and (3) evictions.  PFOF ¶ 390.  In

25   order to isolate the impact of these delinquent rent indicators, Mr. Schwarz's regressions also included

26   variables to control for other factors that may influence personnel costs.  PFOF ¶ 391.

27   Mr. Schwarz's analysis definitively rules out the hypothesis that late rent activity causes an

28   increase in either Equity's salary costs or its headcount of salaried employees.  PFOF ¶ 399; 6 Tr.

29

1143:5-1145:6.  His model does, however, reveal a positive and statistically significant impact on hourly and overtime pay when tenants pay rent late, and a small but statistically significant increase in daily overtime costs as rent remains outstanding.  PFOF ¶¶ 395-398.  His analysis also shows that there is no statistically significant increase in personnel costs associated with tenants undergoing evictions. PFOF ¶¶ 396, 398; 6 Tr. 1149:3-1150:8.

Not only are the results of Mr. Schwarz's work technically robust by statistical standards (6 Tr. 1154:1-1156:13), they are also corroborated by evidence of the efforts Equity's property-level employees take in collecting late rent.  As soon as the grace period expires, and on the same day that Equity assesses a late fee, property personnel print, serve, and mail Three Day Notices to Pay Rent or Quit for each tenant whose rent is still unpaid.  PFOF ¶¶ 270, 271.  This explains the component of employee costs damages associated with the mere "incidence" or occurrence of late rent in Mr. Schwarz's model.  *See* 6 Tr. 1145:19-1148:14 (summarizing the results of his regressions related to hourly payroll).  Likewise, the small daily increase in personnel costs that accrues as long as the rent remains outstanding corresponds to employees' outreach and communications with tenants to encourage payment.  *Compare id. and* PFOF ¶¶ 272, 273.  Finally, Mr. Schwarz's conclusion that there is not a statistically significant cost associated with evictions is corroborated by the fact that, as even Mr. Hosfield admits, Equity personnel spend "almost an immaterial amount of time" on evictions. PFOF ¶ 275 (quoting 5 Tr. 952:11-22).

Using the results of his regression analysis, Mr. Schwarz constructed a formula for calculating individual damages based on the tenant ledger data produced by Equity.  PFOF ¶¶ 400, 401.  In the version of this calculation labeled 4(b)(ii), Mr. Schwarz properly excludes the grace period and cuts off damages when a tenant moves out, or for tenants who are actually evicted, when their file is sent out for eviction.[13]  Ex. 259-10.  The results, summarized in Exhibit 531, show that the personnel cost damages Equity incurs for each late payment of rent range from $12.27 to $21.24, with the average

---

[13] Equity's collection efforts are concentrated in the period before sending a file out to the attorney.  2 Tr. 271:10-25.  Personnel spend little or no time on the eviction process itself.  PFOF ¶ 275.  However, personnel do spend time on reaching pay-and-stay agreements with tenants, 2 Tr. 268:2-269:24, which is why it is appropriate that Mr. Schwarz's model does not cut off damages for tenants who were able to ultimately avoid eviction.

873847.19

cost falling at $14.65.  Ex. 531-1.  Aggregated across the class, personnel cost damages caused by the late payments at issue through December 2021 total approximately $5.8 million.

Unlike Mr. Hosfield, Mr. Schwarz then compares damages attributable to each class-member household to the amount of fees paid by that class-member household to determine the amount of Equity's offset and the net restitution owed to the class.  Including the lost use of funds calculations provided by Mr. Breshears, Mr. Schwarz found that Equity's total offset through December 2021 amounted to $5,975,782.  Ex. 259-75.

### ii.   Equity's Unfounded Criticisms of Mr. Schwarz Offer No Basis for Rejecting His Sound Damages Calculations.

Equity essentially argues that the Court should reject Mr. Schwarz's model because Equity does not like his conclusions.  *See* DCOL ¶¶ 419-420.  Equity attempts only a few criticisms of Mr. Schwarz and his work, all of them baseless.

First, Equity appears to attack Mr. Schwarz for his two degrees in history, *see* DCOL ¶ 411, but makes no mention of Mr. Schwarz's MBA, nor his specialization in the study of markets, nor his graduate-level economics training.  *See* Ex. 266; 6 Tr. 1081:24-1083:14.  As Mr. Schwarz testified, during his PhD work under the auspices of the highly rated Haas School of Business, he took courses nearly exclusively in the extremely well-regarded U.C. Berkeley Economics Department, with mentorship from former chief economists for the Department of Justice.  6 Tr. 1082:14-1083:14.  The evidence further details his 25 years of professional service as an economist, including his academic achievements and publications.  Ex. 266.  Moreover, Equity does not (and cannot) argue that Mr. Schwarz approached his econometric analysis in this case with insufficient skill or expertise.

Next, Equity criticizes Mr. Schwarz for analyzing the marginal cost associated with late rent payments.  DCOL ¶ 414 (citing 6 Tr. 1088:21-24) & 416.  But this approach is appropriately tailored to the legal standard for contract damages, which limits recovery to those costs that Equity can demonstrate were "proximately caused" by the late rent payments at issue.  Cal. Civ. Code § 3300; *see also Crossroads Invs.*, 13 Cal. App. 5th at 792 ("It is essential to establish a causal connection between the breach and the damages sought."); *Beasley*, 235 Cal. App. 3d at 1403.  Mr. Schwarz selected a multiple regression analysis because it corresponded to the causation standard for damages by allowing

1  him to "control for other factors but then identify the change [in costs] that happens because of" the

2  late payment of rent.  6 Tr. 1085:14-1086:4.

3  Equity then falsely suggests that Mr. Schwarz's model "does not consider the salaries of

4  Equity's employees as costs related to late rent" and that he exclusively considered hourly employees'

5  overtime.  DCOL ¶¶ 417, 418.  To the contrary, as discussed above, Mr. Schwarz specifically analyzed

6  both salary costs and salaried-personnel headcount and determined, that neither has any statistically

7  significant relationship to late rent activity.  PFOF ¶ 399.  Mr. Schwarz also analyzed regular (non-

8  overtime) hours worked by hourly personnel.  He found that regular hourly pay costs increased

9  modestly with late rent activity, and he incorporated those costs into his model.  PFOF ¶¶ 395-398.

10  Equity also strangely suggests, without citation to anything in the record, that Mr. Schwarz's

11  model shows that Equity's costs from late rent decreased during the pandemic.  *See* DCOL ¶ 419.  This

12  is simply incorrect.  To the extent class members' late rent underlying a late fee was outstanding for a

13  longer period of time, as Equity suggests, Mr. Schwarz's model would result in *higher* costs for that

14  period on a per late fee basis.  *See* Ex. 259-70 (setting out the formula for calculating damages, which

15  is based in part on the number of days late).  Moreover, due to inflation, even for class members who

16  paid the same number of days late in 2021 as in 2019, the costs associated with the 2021 late payment

17  would be higher.  *See* Ex. 259-56 (explaining that the ultimate results of the calculation take into

18  account the inflation applicable for the time period).

19  **d.   Equity Overstates Its Lost Use of Funds.**

20  Equity's method of calculating lost use of funds has two serious flaws that dramatically inflate

21  this offset category.  First, Mr. Hosfield pads Equity's lost use of funds calculations by including time

22  periods—during the grace period, and after the tenant moves out of the unit—that are outside the scope

23  of late rent damages.  *See* PFOF ¶¶ 406, 408.  As discussed in Sections II.D.2.a, & c., above, rent does

24  not become late until the expiration of the grace period, and costs incurred after move-out are caused

25  by a different breach.  *See also* PCOL ¶¶ 68-74; Order re Summ. J. at 7, ECF No. 142 (late rent

26  damages are those incurred while the tenant remains in the unit.

27  Exacerbating the issue, Mr. Hosfield calculates interest damages even for months when class

28  members *complied with their leases* and timely paid rent within the grace period, albeit not on the first

1   day.  PFOF ¶ 408.  Equity attempts to justify this shameless raid on the Classes' restitution by arguing

2   that "[i]f the late fee is found to be void, then the grace period provision is also void and Equity is

3   entitled to recover all its costs from delinquent rent at any point in the month."  DCOL ¶ 374.  Equity

4   offers no citation for this argument, and indeed it is legally unsupportable.  Section 1671(d)

5   contemplates that only the provision "liquidating damages for breach of the contract" is void, not

6   ancillary components like a grace period.  Moreover, class members justifiably relied on the grace

7   period and cannot be forced now to pay damages Equity incurred because of the reliance the company

8   knowingly induced.  *See Kajima/Ray Wilson v. L.A. Cnty. Metro. Transp. Auth.*, 23 Cal. 4th 305, 310

9   (2000) (citing Restatement (Second) of Contracts § 90(1) (Am. L. Inst. 1981)).  Finally, as argued

10  above, Equity's voluntary contractual agreement to a grace period constituted voluntary waiver of its

11  right to recover damages for unpaid rent during that period.  *See Lynch*, 3 Cal. 5th at 475.

12          The second major flaw in Mr. Hosfield's lost use of funds calculations is his reliance on

13  Equity's Weighted Average Cost of Capital ("WAAC"), despite Equity's failure to demonstrate a

14  "direct causal link" between class members' late payment of rent and its sources of long-term

15  financing, including equity.  *See* PCOL ¶ 133; *Beasley*, 235 Cal. App. 3d 1403.  Simply put, there is no

16  factual basis for using the WACC to calculate interest on quintessential short-term debts that last, in

17  most cases, no more than a week or two.  Class members' late rent has *never* caused Equity to raise

18  capital through the issuance of stock, nor precluded the company from undertaking a particular

19  investment, paying off a particular debt on its preferred schedule, or undertaking any particular capital

20  improvement or business activity.  PFOF ¶¶ 418-433.  In light of the predictable monthly "swing" of

21  unpaid rent balances accruing then being paid down, Equity's short-term financing provides the most

22  appropriate measure of its interest damages.  PFOF ¶¶ 407, 421, 434, 437, 438, 440-452.

23          Equity cites to a passage of a forensic accounting article authored by Plaintiffs' expert Christian

24  Tregillis that it claims supports the use of WACC.  *See* DCOL ¶ 381.  This article does not "concede"

25  that WACC is the appropriate benchmark for interest damages, but rather identifies that this measure

26  "has been argued" and discusses circumstances affecting its use.  *See* Ex. 505-47 to 505-48.  Moreover,

27  that passage relates to the longer-term context of prejudgment interest, inapposite here.  The article

28  embraces the principle that the award must be based on a fact-specific determination of whether the

1  company "would have used the money to invest, or to avoid borrowing" and guided by "the percentage

2  yield that [the party] either would have earned or avoided paying." *Id.* at 505-47 (quoting *Mars, Inc. v.*

3  *Coin Acceptors, Inc.*, 513 F. Supp. 3d 128, 133 (D.N.J. 2007)); *accord* PFOF ¶¶ 417-418 (the

4  standards of forensic accounting require the accountant to analyze the particular facts of the case).

5      In contrast, Plaintiffs' expert David Breshears correctly calculated lost use of funds damages

6  for the time between when the grace period expired and when the rent was ultimately paid or the tenant

7  moved out.  PFOF ¶ 436.  He also correctly sought to use interest rates based on Equity's short-term

8  borrowing costs.  PFOF ¶ 435.  Accordingly, the Court should reject Equity's methodology and order

9  that Equity's lost use of funds be based on Mr. Breshears' method, using the interest rates for Equity's

10  short-term financing that were demonstrated at trial.  PFOF ¶¶ 440-453.

11  **E.    Equity Has Not Proved Its Voluntary Payment Defense.**

12      Under California jurisprudence, "it is elementary that an excessive payment made in ignorance

13  of the fact that it is excessive is recoverable." *Am. Oil. Serv. v. Hope Oil Co.*, 194 Cal. App. 2d 581,

14  586 (1961); *accord id.* at 587 ("Means of knowledge were not the equivalent of knowledge.").  The

15  Court has held three times that Equity's voluntary payment affirmative defense "must be premised on a

16  fully informed consumer understanding the facts bearing on the validity of the late fee." [14]  ECF No.

17  422, Order Denying Defs.' Mot. for Decert. at 3; *see also* ECF No. 315, Order Re Outstanding Mots. at

18  3; ECF No. 91, Class Cert. Order at 7-8.  Equity has presented no evidence that class members had any

19  understanding of, or even means of discovering, the "*validity* of the [late-fee] payment[s]." *Cf.*

20  *generally* PFOF ¶¶ 487-499 (citing extensive record evidence demonstrating the opposite).

21      Knowledge of the circumstances in which a late fee is charged and paid is not sufficient to

22  invoke the voluntary payment doctrine.  For its contrary position, Equity relies on *BMG Direct*

23  *Marketing, Inc. v. Peake*, 178 S.W. 3d 763 (Tex. 2005), but that case has been sharply criticized by the

24  Restatement (Third) of Restitution and Unjust Enrichment ("Restatement of Restitution") section 6,

25  (Am. L. Inst. 2011), which noted that although *BMG Direct Marketing* "quote[d] from this

26

27

28  ---
[14] Plaintiffs continue to dispute the applicability of the voluntary-payment doctrine to the consumer-protective statutes at issue here.

873847.19

1  Restatement's discussion of the voluntary payment rule, [the] Texas court misapplies it."  Restatement

2  of Restitution § 6 cmt. e.[15]

3     *Rodman v. Safeway, Inc.*, affirmed by the Ninth Circuit, is directly on point.  *See Rodmanv.*

4  *Safeway Inc.*, 125 F. Supp. 3d 922, 941 (N.D. Cal. 2015) (*"Rodman I"*), *aff'd*, 694 F. App'x 612 (9th

5  Cir. 2017) (*"Rodman II"*).  In that case, a certified class of consumers challenged Safeway's practice

6  of charging higher prices for goods purchased online than in corresponding physical stores, in violation

7  of Safeway's "price parity promise."  *Id.*  The court found the voluntary payment defense failed in the

8  absence of evidence "that any class members knew 1) line prices were more expensive …, 2) the

9  extent of the markup, and 3) that any markup was in violation of the Special Terms' price parity

10  promise."  *Id.*  Here, just as in *Rodman*, class members did not know and had no means of knowing

11  that Equity's late fees were excessive, the extent to which the late fees exceeded costs, or that the late

12  fees were void under California law.[16]  *See id.*; *see also Gutierrez v. Wells Fargo & Co.,* 622 F. Supp.

13  2d 946, 955-56 (N.D. Cal. 2009).

14     Moreover, class members' late fee payments were not "voluntary" where a reasonable tenant

15  would pay the fee to avoid risks to their credit and tenancy.  *See Steinman v. Malamed*, 185 Cal. App.

16  4th 1550, 1558-59 (2010); *see, e.g.*, *Parino v. BidRack, Inc.*, 838 F. Supp. 2d 900, 909 (N.D. Cal.

17  2011) (defense did not apply where plaintiff paid to maintain her credit); *Adamson v. ADT, LLC*, No.

18  2:12-cv-10558-DMG-PLA, 2014 WL 12551405, at *6 (C.D. Cal. Apr. 7, 2014) ("a 'reasonably

19  prudent' ADT customer would find it 'necessary to make the payment' to prevent referral to a

20  collection or credit agency") (citation omitted).  Contrary to Equity's assertions, a reasonably prudent

21  tenant would neither abandon their apartment nor refuse to make the payments demanded of them by

22  their landlord based on a pending class-action lawsuit that their landlord has vigorously opposed for

23  nearly a decade.  Equity's authorities are unpersuasive in this context.  *Cf.* DFOF ¶ 463 (citing *Am.*

24  *Multi-cinema, Inc. v. Manteca Lifestyle Ctr., LLC*, No. 2:16-cv-01066-TLN-KJN, 2023 WL 3775333,

25  at *16 (E.D. Cal. June 2, 2023) (both parties' witnesses testified at trial that the at-issue contract was

---

[15] The other out-of-state cases Equity cites also misapply the rule.

[16] Neither class members, nor property personnel understood or had the means of understanding that the late fees were excessive.  *See* PFOF ¶¶ 491-492.  And indeed Equity has continued to conceal the relevant facts throughout this litigation.  *See* PFOF ¶¶ 487-492.

unambiguous and there was no dispute); *Rabin v. Google LLC*, No. 5:22-cv-04547-BLF, 2023 WL

4053804, at *7 (N.D. Cal. June 15, 2023) (complaint failed to allege facts showing plaintiffs would

lose any property if they refused to pay for online productivity tool); *Parducci v. Overland Sols., Inc.*,

399 F. Supp. 3d 969, 981 (N.D. Cal. 2019) (complaint failed to allege duress where plaintiff obtained

alternative homeowner insurance estimates but did not plead why he did not transfer coverage)).[17]

And indeed, Plaintiffs' trial testimony described their concerns that they might be evicted or

have their credit dinged if they refused to pay the late fees, and even then the fees would ultimately be

taken from them.  *See* PFOF ¶¶ 494-497.  These fears were not unreasonable where Equity posted

Three-Day Notices to Pay or Quit the same day late fees were charged, and staff suggested the tenants

had to pay their balances in full, including late fees, to avoid eviction.  *See id.* ¶¶ 494-499; *accord id.*

¶ 493 (Standard Lease describes fees as additional rent, and states negative balances may be reported).

*See, e.g.*, Restatement of Restitution § 14, illus. 14-16 (illustrating duress).  And if class members

failed to pay the late fees, Equity withheld the fees from their security deposits.  *See* PFOF ¶¶ 213-218.

The record also supports the other element of duress, that "the party insisting on payment

[acted] wrongfully, with the knowledge that the claim asserted is false."  *Steinman*, 185 Cal. App. 4th

at 1559.  Equity was aware of the requirement that a late fee be based on a reasonable endeavor to

estimate damages from the breach, yet for over a decade it has imposed and collected late fees that

were not based on such an endeavor and has repeatedly ignored counsel's suggestions to lower the fee

or conduct an analysis to determine the appropriate amount.  *See* PFOF ¶¶ 59, 70, 111-113, 122-129.

**F.**     **The Standard Late Fee Claims Relate Back to the Original Complaint.**

Plaintiffs' Standard Late Fee claims relate back to the initial complaint filed on September 3,

2014.  Under Rule 15(c)(1)(B), "[a]n amendment to a pleading relates back to the date of the original

pleading when the amendment asserts a claim or defense that arose out of the conduct, transaction, or

occurrence set out--or attempted to be set out--in the original pleading."  Fed. R. Civ. P. 15(c)(1)(B).

---

[17] Similarly, Equity's suggestion that class members could have "immediately filed suit" rather than pay the fee presupposes that they would have reason to know the fee was unlawful.  *Compare* DFOF 455 *and Leeper v. Beltrami*, 53 Cal. 2d 195, 204-05 (1959) (finding it "unsound" that being forced to sell one's home is a "reasonable alternative" because a "reasonably prudent person would not take such a course.  This is the test.").

873847.19

The focus of this standard is to determine whether the original and amended pleadings "share a common core of operative facts sufficient to impart fair notice of the transaction, occurrence, or conduct called into question." *Martell v. Trilogy Ltd.*, 872 F.2d 322, 327 (9th Cir. 1989). Equity cannot demonstrate a lack of fair notice of the claims raised in Plaintiffs' Second Amended Complaint ("SAC") where the complaints raise the same general facts on behalf of the same statewide class alleging that Equity's California late fees "of at least $50" violate section 1671(d) and the UCL. *Compare* ECF No. 1-1 (original complaint) at ¶¶ 1, 2, 34, 45 *with* ECF No. 45 (SAC).

Equity cannot plausibly argue now that the original complaint gave insufficient notice of the Standard Late Fee class claims. Equity sought removal to this Court based on allegations that were included in the original complaint filed on September 3, 2014. *Compare* Exs. 203 *and* 204. This Court would not have had jurisdiction under the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d) *et seq.*, over the Woodland Park Claims alone. *Compare* PFOF ¶ 200 (restitution for the Woodland Park class totals $270,022); *with* 28 U.S.C. § 1332(d)(2) ($5 million amount in controversy minimum for CAFA jurisdiction). However, Equity's Notice of Removal admitted that "plaintiffs seek restitution of all late fees charged to Defendants' California tenants from September 3, 2010 through the date of judgment" and informed the Court, based on its own business records, that the class "implicates more than 66,000 tenancies" and "more than $10,000,000 in late fee charges"—plainly encompassing the Standard Late Fee claims. Moreover, each of the allegations Equity cited in the Notice of Removal regarding the scope of the class and the nature of their claims was also present in the original complaint. *See* Ex. 204 at ¶¶ 1, 45, 46. Equity's admission that Plaintiffs' original allegations factually encompass the Standard Late Fee claims constitutes a "conclusively binding" judicial admission. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988).

This result does not change in the face of Equity's arguments that the Woodland Park Plaintiffs originally lacked Article III standing to represent a statewide class. Equity's argument is foreclosed by governing law, which allows relation back even where the original plaintiffs did not have standing to assert the class claims alleged in the complaint. *See Immigrant Assistance Project of L.A. Cnty. Fed'n of Lab. v. I.N.S.*, 306 F.3d 842, 857-58 (9th Cir. 2002) (claims of the newly named putative class representatives related back to the original complaint); *see also Allen v. Similasan Corp.*, 96 F. Supp.

3d 1063, 1069 (S.D. Cal. 2015) (in false advertising class action, finding relationship back where amended complaint added named plaintiffs who had purchased products different from the original named plaintiffs'). Equity's judicial admissions in its Notice of Removal acknowledge that the allegations in the original complaint encompassed the Standard Late Fee class claims, including the claims of David Bonfanti, resolving the relation-back issue against them.

**G.      Trial Confirmed the Propriety of Class Certification.**

Equity repeats the arguments the Court has already rejected in denying Equity's motion for decertification.[18] *See* ECF No. 337; *accord* ECF No. 91 at 7. Yet the trial record has substantiated the validity of the class treatment and confirmed the correctness of class certification.

**1.      The Offset Evidence at Trial Confirms the Correctness of Class Treatment.**

Equity continues to assert that Plaintiffs are raising "individualized issues" by contending that restitution and offset damages must be calculated in a way that yields appropriate results for each individual class member. *See* DCOL ¶ 479. In making this argument, Equity gravely misrepresents both the legal standards governing certified class action and the factual record in this case.

It is well settled that a "common class-wide method for calculating individual damages" is fully consistent with Rule 23 and supports a finding that common issues predominate. Newberg § 12:4; *accord Olean Wholesale Grocery Coop. v. Bumble Bee Foods LLC*, 31 F.4th 651, 673 n.19 & 682 n.31 (9th Cir. 2022). That is just what Plaintiffs have done here. Using Equity's own data and a common methodology, Plaintiffs' expert Andrew Schwarz derived a reliable and statistically robust formula for calculating the increased personnel costs associated with each late fee charged to class members. *See* Ex. 259-69 (stating the formula after explaining at length how it was derived); 6 Tr. 1151:23-153:11 (confirming the formula is based on "class-wide data and a common methodology"). Likewise, Mr. Breshears has calculated Equity's interest damages on a class-member-household basis. PFOF ¶ 439.

It is Equity's position, not Plaintiffs', which runs afoul of Rule 23 and the Rules Enabling Act. As described above, Equity's aggregate offset approach burdens some class members with the excess damages caused by others. For example, while the average "Costs per Late Fee" calculated by Mr.

---

[18] Plaintiffs extensively briefed this issue in opposing Equity's decertification motion, and refer the Court to that briefing for additional discussion of Equity's meritless arguments. *See* ECF No. 342.

1   Hosfield for the year 2015 is $92, Equity's aggregate offset method would not award *any* restitution to

2   Plaintiff Shannah Smith, who paid a late fee of $132.40 that year, and made that payment almost

3   immediately after receiving the charge, certainly placing her below-average in terms of the costs her

4   late payment imposed on Equity.  *Compare* Ex. 259-11 (excerpting a table from Mr. Hosfield's report)

5   *and* PFOF ¶¶ 9, 10; *see also* 6 Tr. 1126:1-25.  Instead, Ms. Smith's restitution would be wiped out due

6   to damages caused by other class members.  *But see Tyson Foods*, 577 U.S. at 455 ("use of the class

7   device cannot 'abridge ... any substantive right.'") (quoting 28 U.S.C. § 2072(b)).

8       Equity complains that "there is insufficient underlying data to credibly evaluate Equity's costs

9   on an individualized, tenant-by-tenant or late-fee-by-late-fee basis" because its employees did not track

10  their time or "consistently notate all interactions with residents regarding unpaid rent."  DCOL ¶ 269.

11  But "a defendant whose wrongful conduct has rendered difficult the ascertainment of the precise

12  damages suffered by the plaintiff, is not entitled to complain that they cannot be measured with the

13  same exactness and precision as would otherwise be possible."  *Eastman Kodak Co. v. S. Photo*

14  *Materials Co.*, 273 U.S. 359, 379 (1927) *quoted in* PCOL ¶ 199; *see also* DCOL ¶ 251 (quoting *Robi*,

15  918 F.2d at 1443).  The same rule applies in class action settings.  *Comcast Corp. v. Behrend*, 569 U.S.

16  27, 35 (2013) (calculations of class damages "need not be exact," but must "'be consistent with [the]

17  liability case'"; acknowledging that a regression model could have met that standard had it been

18  consistent with the plaintiffs' liability theory) (citation omitted).

19      In sum, the offset damages evidence presented at trial confirms the correctness of the Court's

20  class certification orders by showing that class restitution and damages can be reliably calculated based

21  on a "common class-wide method for calculating individual damages."  *See* Newberg § 12:4, *supra*.

22      **2.      The Voluntary Payment Doctrine Does Not Offer a Basis for Decertification.**

23      Equity's renewed request for decertification based on the voluntary payment doctrine is equally

24  meritless.  Equity cites cases concluding the voluntary payment doctrine created individual issues in

25  far different contexts.  *See, e.g.*, *Monaco v. Bear Stearns Cos., Inc.*, No. 2:09-cv-05438-SJO-JC, 2012

26  WL 10006987, at *9 (C.D. Cal. Dec. 10, 2012) (doctrine precluded class certification where its

27  application turned on individuals' knowledge of their mortgage terms); *BMG Direct Mktg.*, 178 S.W.

28  3d at 773 (applying inapposite Texas law).  None of those citations can overcome the reality that in

39

873847.19

1   this case, the record is clear on a class-wide basis that no class member had "'full knowledge of the

2   facts'" bearing on the validity of the late fees, which is the threshold showing that Equity must make to

3   succeed on this defense.  *See Rodman I*, 125 F. Supp. 3d at 941 (certifying class where defendant

4   offered no evidence "that any class members made excess payments despite awareness" of the facts

5   rendering them excessive) (citation omitted); PFOF ¶¶ 486-492 (class members could not have had full

6   knowledge of the facts because Equity never disclosed them) & PCOL ¶¶ 160-161.

7        The doctrine of duress, which creates an exception to the voluntary payment doctrine, is

8   similarly suitable to class treatment.  *See Steinman*, 185 Cal. App. 4th at 1558.  First, whether a

9   "reasonably prudent" tenant would pay the fee "to preserve his property or protect his [economic]

10  interests," calls for an objective inquiry.  *See Berrien v. New Raintree Resorts Int'l, LLC*, 276 F.R.D.

11  355, 363 (N.D. Cal. 2011) (citation omitted) (granting class certification).  Second, whether Equity

12  "acted wrongfully, 'with the knowledge that the claim asserted is false'" turns on Equity's conduct and

13  knowledge.  *See id.*  Neither raises common issues.  Both elements of duress are amply demonstrated

14  on a class-wide basis by the record at trial.  *See* PFOF ¶¶ 493-499, PCOL ¶¶ 164-165.

15       Although Equity appears to assume that decertifying the classes on the basis of these damages

16  issues would end the case, it fails to acknowledge the Standard Late Fee Injunctive Relief Class that is

17  unaffected by any of Equity's decertification arguments.  As was demonstrated at trial, the liability

18  issue turns on class-wide evidence related to Equity's adoption and maintenance of the Standard Late

19  Fee.  Plaintiffs' request for injunctive relief, which seeks to protect members of the certified Rule

20  23(b)(2) class from further imposition of that unlawful fee, is unquestionably proper for class

21  treatment.  *See* ECF No. 315 at 5-6 (certifying Rule 23(b)(2) class).

22                                 ### III.   <u>CONCLUSION</u>

23       For all the reasons set out above, the Court should (1) enter a finding of liability against Equity

24  on behalf of all certified classes, (2) enter an order granting the declaratory and injunctive relief

25  requested by Plaintiffs, (3) adopt Plaintiffs' methods of calculating restitution and offset damages, and

26  (4) order the Parties to update restitution and offset calculations to provide full recovery to all Standard

27  Late Fee Class members through the date that the injunctive relief goes into effect (*see* ECF No. 388).

28

873847.19

Dated: August 14, 2023               Respectfully submitted,

                                     GOLDSTEIN, BORGEN, DARDARIAN & HO


                                     _/s/ Anne P. Bellows_
                                     Anne P. Bellows

                                     Attorneys for Plaintiffs and the Certified Classes

873847.19