United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, et al., | Case No. 16-cv-01225-JSW |
| Plaintiffs, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| EQUITY RESIDENTIAL, et al., | |
| Defendants. | |

This matter came before the Court for a bench trial on June 8, 9, 12, 13, 14, 15, 20, and 21, 2023. Plaintiff tenants allege that Defendant Equity Residential ("Equity")'s late fee adopted in 2008 does not comply with California law. Plaintiffs seek restitution of late fees paid. The Court has carefully considered the trial testimony, the exhibits admitted in evidence, trial briefs, proposed findings of fact and conclusions of law, and relevant legal authority. The Court issues the following findings of fact and conclusions of law, which result in the conclusion in favor of Plaintiffs as set forth below.

## FINDINGS OF FACT

### A. Procedural History.

1. On September 3, 2014, Plaintiffs Javanni Munguia-Brown, Norma Rodriguez, and Angelina Magana, all residents of the Woodland Park Community, filed their original complaint in this action in the Superior Court of the State of California, County of Alameda. (Dkt. No. 1-1.) On March 23, 2015, they filed a First Amended Complaint. (Dkt. No. 1-8.) On February 8, Plaintiffs filed their Second Amended Complaint, adding

1  Plaintiff David Bonfanti.  (Dkt. No. 45.)  On November 16, 2021, Plaintiffs filed their

2  operative Fourth Amended Complaint and added Plaintiff Shannah Smith.  (Dkt. No. 322.)

**B.  Liquidated Damages.**

2.  The Standard Late Fee and Woodland Park $50 Late Fee are liquidated damage

provisions that are subject to the requirements of California Civil Code section 1671(d).

**C.  The Parties.**

3.  Plaintiff Shannah Smith is a current tenant of Riva Terra II, one of Equity's residential

properties located in Redwood City, California.  (Dkt. No. 521, Parties' Joint Proposed

Findings of Fact ("F/F"), ¶ 2; Dkt. No. 454, Joint Updated Final Pretrial Order ("P/O") at

16.)  Plaintiff Smith has resided at Riva Terra II property since December 2004, when it

was owned by a different landlord.  (F/F ¶ 3; P/O at 16.)

4.  Plaintiff Smith first entered into a lease agreement with Equity on March 20, 2013.  That

lease agreement, and each of her subsequent lease agreements with Equity, stated that her

rent was due on the first of the month, and if she failed to pay her rent by the end of the

day (11:59 p.m.) on the fourth of the month, she would be charged a late fee of "5% on

the 5th – minimum of $50."  (F/F ¶ 4, P/O at 16-17.)

5.  Plaintiff Smith's current Equity lease signed in the week before trial commenced in this

case on June 8, 2023, also provides that her rent is due on the first of the month with a

grace period of four days, after which Equity would charge her the Standard Late Fee for

the late payment of rent.  (F/F ¶ 5; 1 Tr. 60:19-25.)

6.  For purposes of this litigation, Plaintiff Smith's tenant ledger (Trial Exhibit ("Ex.")

1514) accurately reflects all late fee charges to and payments made by Plaintiff Smith.

(F/F ¶ 6; P/O at 17.)

7.  In the roughly 10 years that Plaintiff Smith has resided at her current property under

Equity's ownership, she has only incurred one late fee.  (F/F ¶ 7; P/O at 17; 1 Tr. 56:25-

57:3, 61:1-7.)

8.  On January 4, 2015, Plaintiff Smith attempted to transmit payment of her $2,648

monthly rent to Equity, but her bank denied the payment for insufficient funds.  (F/F ¶ 8;

United States District Court
Northern District of California

1 Tr. 61:1-7, 61:24-62:11; Ex. 1513-7.)

9.  On January 8, 2015, Equity charged Plaintiff Smith a $132.40 late fee for that late rent payment.  (F/F ¶ 9; 1 Tr. 61:24-62:11, Ex. 1514-7.)

10. On January 9, 2015, Plaintiff Smith paid Equity the $132.40 late fee, along with her monthly payment and a $25 Not Sufficient Funds fee.  (F/F ¶ 10; 1 Tr. 61:1-62:11, 63:13-15, Ex. 1514-7.)

11. Plaintiff Smith plans to continue living in her current Equity apartment for the foreseeable future.  (F/F ¶ 11; 1 Tr. 57:11-14.)

12. Plaintiff David Bonfanti was a tenant of Bella Vista, one of Equity's residential properties in Woodland Hills, California, between October 2014 and July 2017.  (F/F ¶ 12; P/O at 17; Ex. 1564; 2 Tr. 338:11-12.)  While at Bella Vista, Plaintiff Bonfanti signed three lease agreements.  (F/F ¶13; Exs. 41, 43, 1152.)  Plaintiff Bonfanti first entered a lease agreement with Equity on October 11, 2014.  Plaintiff Bonfanti renewed his lease with Equity in July 2015 and again in July 2016.  (F/F ¶ 14; P/O at 17.)

13. Each of Plaintiff Bonfanti's lease agreements with Equity stated that rent was due on the first of the month, and if Bonfanti did not pay his rent by the end of the day (11:59 p.m.) on the fourth of the month, he would be charged a late fee of "5% on the 5th – minimum of $50."  (F/F ¶ 15; P/O at 17.)

14. For the purposes of this litigation, Plaintiff Bonfanti's tenant ledger (Ex. 1564) accurately reflects all late fee charges to and payments made by Plaintiff Bonfanti.  (F/F ¶ 16; P/O at 17.)  While at Bella Vista, Plaintiff Bonfanti failed to timely pay rent roughly 15 times and was charged a late fee each time.  (F/F ¶ 17; Ex. 1564; 2 Tr. 328:15-19; P/O at 17.)

15. Plaintiff Javanni Munguia-Brown was a tenant of Equity's Woodland Park property in East Palo Alto, California throughout the time period Equity owned the property, from December 2011 to February 2016.  (F/F ¶ 18; P/O at 17.)

16. Plaintiff Munguia-Brown moved into her apartment in Woodland Park prior to Equity's ownership of the property.  (F/F ¶ 19; P/O at 17.)  Equity acquired Plaintiff Munguia-

3

Brown's building as of December 1, 2011.  Equity and Munguia-Brown both assumed the terms of her pre-existing lease.  (F/F ¶ 20; P/O at 17.)

17. For the purposes of this litigation, Plaintiff Munguia-Brown's tenant ledger (Ex. 1561) accurately reflects all late fee charges to and payments made by Plaintiff Munguia-Brown.  The parties stipulate that Plaintiff Munguia-Brown was charged and paid one or more of the Woodland Park $50 Late Fees challenged in this action during the class period.  (F/F ¶ 21; P/O at 17-18.)

18. Plaintiff Norma Rodriguez was a tenant of Equity's Woodland Park property in East Palo Alto, California throughout the time Equity owned it from December 1, 2011, to February 2016.  (F/F ¶ 22; P/O at 18.)

19. Plaintiff Rodriguez moved into her apartment at that property prior to Equity's ownership.  (F/F ¶ 23; P/O at 18.)  Equity acquired Plaintiff Rodriguez's building as of December 1, 2011.  Equity and Rodriguez both assumed the terms of her pre-existing lease.  (F/F ¶ 23; P/O at 18.)

20. For purposes of this litigation, Plaintiff Rodriguez's tenant ledger (Ex. 1562) accurately reflects all late fee charges and payments made by Plaintiff Rodriguez.  The parties stipulate that Plaintiff Rodriguez was charged and paid one or more of the Woodland Park $50 Late Fees challenged in this action during the class period.

21. Plaintiff Angelina Magana was a tenant of Equity's Woodland Park property in East Palo Alto, California throughout the time Equity owned it from December 1, 2011, to February 2016.  (F/F ¶ 26; P/O at 18.)  Plaintiff Magana moved into her apartment at the property prior to Equity's ownership.  (F/F ¶ 27; P/O at 18.)

22. Equity acquired Plaintiff Magana's building as of December 1, 2011.  Equity and Magana both assumed the terms of her pre-existing lease.  (F/F ¶ 28; P/O at 18.)

23. For purposes of this litigation, Plaintiff Magana's tenant ledger (Ex. 1563) accurately reflects all late fee charges to and payments made by Plaintiff Magana.  The parties stipulate that Plaintiff Magana was charged and paid one or more of the Woodland Park $50 Late Fees challenged in this action during the class period.  (F/F ¶ 29; P/O at 18.)

**D. Equity's California Properties Communities and Operations.**

24. Between September 3, 2010, and December 31, 2021, Equity has owned and operated nearly 200 residential communities in California, with approximately 100 to 150 properties in its California portfolio at a given time.  (F/F ¶ 30; P/O at 18.)

25. Each year during the period between September 3, 2010, and December 31, 2021, Equity has owned and operated, on average, 34,000 apartment units in California that together have an average gross possible rent of $765,636, 295 per year, and up to $1.148 billion in a year.  In an average month during this period, Equity's California apartment units have had a gross possible monthly rent averaging $77,245,000.  (Dkt. No. 523, Plaintiffs' Proposed Findings of Fact and Conclusions of Law ("PFC"), ¶ 47; Exs. 24, 40, 129.)

26. Equity Residential is a real estate investment trust incorporated on July 21, 1992, organized under the laws of the state of Maryland, with its corporate home in Chicago, Illinois.  (Dkt. No. 522, Equity Proposed Findings of Fact and Conclusions of Law ("EFC"), ¶ 62; PFC ¶ 42.)

27. All of the other Defendants (Equity Residential Management LLC, ERP Operating Limited Partnership, EQR-Woodland Park A Limited Partnership, and EQR-Woodland Park B Limited Partnership) are, or during the time periods relevant to the case, were, entities related to Equity Residential, organized under the laws of various states in the United States, doing business in or having sufficient contacts with the state of California, and are subject to the jurisdiction of this Court.  (EFC ¶ 63; PFC ¶ 43; Ex. 1243-11, 12.)

28. Each of the Defendants have or had roles in owning or managing properties at which class members resided, or in implementing or receiving the late fees that Plaintiffs challenge.  (PFC ¶ 44; Ex. 1243-11, 12.)

29. For purposes of this litigation, Plaintiffs and Defendants have stipulated to the following facts regarding Defendants' relative responsibilities for actions in this case, *see* Ex. 244, which the Court adopts as its findings:

   a.     All Defendants are properly joined in this action.  (PFC ¶ 45(a); Ex. 244-4 ¶ 3.)

United States District Court
Northern District of California

b.      No other entities exist that are necessary to provide Plaintiffs and the certified Standard Late Fee and Woodland Park Preexisting Lease Classes complete relief in this action.  (PFC ¶ 45(b); Ex. 244-4 ¶ 4.)

c.      Equity Residential, ERP Operating Limited Partnership, and Equity Residential Management LLC (collectively, "Equity") share responsibility for designing and implementing the Standard Late Fee and the Woodland Park $50 Late Fee.  (PFC ¶ 45(c); Ex. 244-4 ¶ 2.)

d.      The Standard Late Fee was designed approved, and implemented (collectively, "adopted") in 2008 by Equity's agents acting within the scope of their agency.  All other individuals who were involved in or exercised control over the decision to adopt the Standard Late Fee were also Equity's agents acting within the scope of their agency with respect to the Standard Late Fee.  (PFC ¶ 45(d); Ex. 244-4 ¶ 7.)

e.      On each occasion that the Standard Late Fee was evaluated following its adoption, the persons who made the decision to maintain the Standard Late Fee, and all persons who had the right to control that decision, were agents of Equity acting within the scope of their agency.  (PFC ¶ 45(e); Ex. 244-4 ¶ 8.)

f.      Equity received all Standard Late Fees paid by members of the Standard Late Fee class.  (PFC ¶ 45(f); Ex. 244-4 ¶ 9.)

g.      The Woodland Park $50 Late Fee was approved and implemented (collectively, "adopted") by Equity's agents who were acting within the scope of their agency with respect to the Woodland Park $50 Late Fee.  (PFC ¶ 45(g); Ex. 244-4 ¶ 10.)

h.      On each occasion that the Woodland Park $50 Late Fee was evaluated following its adoption, the persons who made the decision to maintain the Woodland Park $50 Late Fee, and all persons who had the right to control that decision, were agents of Equity acting within the scope of their agency.  (PFC ¶ 45(h); Ex. 244-4 ¶ 11.

i.      Equity received all of Woodland Park $50 Late Fees paid by members of the Woodland Park Preexisting Lease class.  (PFC ¶ 45(i); Ex. 244-4 ¶ 12.)

30. Equity owned Woodland Park from December 2011 until February 2016.  (F/F ¶ 31; 4

United States District Court
Northern District of California

Tr. 733:15-17.)  Woodland Park was made up of approximately 1,800 units.  (F/F ¶ 32; 4 Tr. 733:18-20.)

**E.      Equity's Standard Leases.**

31. The Standard Lease that Equity currently uses, and has used throughout the class period, for its California properties has generally consisted of three parts: (1) a two-page Term Sheet, which contains blank fields for the start and end dates of the tenancy, the rental rate, the Standard Late Fee, and other charges; (2) a California-specific "Terms and Conditions" document; and (3) potential addenda that address terms other than the monthly tenant's rental rate and the Standard Late Fee.  (F/F ¶ 33; P/O at 19; PFC ¶ 48.)

32. For the purposes of this litigation, the parties have stipulated that Trial Exhibits Nos. 6 (Residential Lease – Terms and Conditions), 83 (Residential Lease – Terms and Conditions & Term Sheet for Plaintiff Shannah Smith (2018)), 85 (Residential Lease – Terms and Conditions & Term Sheet for Plaintiff Shannah Smith (2020)), and 147 (Residential Lease – Terms and Conditions & Term Sheet for Plaintiff Shannah Smith (2022)) are representative exemplars of the Standard Lease used by Equity throughout the class period.  (F/F ¶ 48a, b; PFC ¶ 49.)

33. The Standard Lease defines "rent" to include "[a]ll fees and charges described on the Term Sheet or in this Lease, including, but not limited to, late charges, returned item fees and utility bills …").  (PFC ¶ 50; Exs. 6-1 ¶ 4; 83-3 ¶ 4; 85-3 ¶ 4.)

34. Members of the Standard Late Fee Class signed a residential lease agreement that included the following late fee provision:

> **Late Charges and Returned Item Fees:** You acknowledge that if we do not receive your rent or other lease related charges on time, we will incur costs, the exact dollar amount of which is difficult or impracticable to determine.  Such costs may include, among other things, lost use of funds, bank or other charges, costs incurred in connection with accounting for and attempting to collect late payments; collection expenses; and other administrative and accounting costs. As a result, if we do not receive your rent when it is due, we will assess late fess as described in the Late Fees section of the Term Sheet.

(EFC ¶ 72.)

35. In the Standard Leases used in California during the class period, the Term Sheet states:

**Late Fees:** Your rent is due on the 1st of each month. If we do not receive your rent and other recurring charges, in person before the close of business, or electronically by 11:59 pm local time[], on day [X], you will be charged a late fee as follows: 5 percent on [day X+1] – minimum of $50.

(F/F ¶ 34; P/O at 19.)

36. The "Late Charges" provision of the Standard Lease specifies that the imposition of the Standard Late Fee for the late payment of rent is "in addition to any other remedies we may have in the event of your default under the terms of this lease." (PFC ¶ 53; Exs. 6-1 & 2 at ¶ 5; 83-4 ¶ 5; 85-4 ¶ 5.)

37. The Standard Lease specifically provides that Equity may report negative payment histories and collection efforts to credit reporting agencies and future landlords. (PFC ¶ 54; Exs. 6-2 ¶ 13; 83-5 ¶ 14; 85-5 ¶ 14.)

38. The Standard Lease contains a separate "Default Remedies" provision that separately authorizes Equity to recover "all damages, costs and expenses" caused by tenant default, including delinquent rent, late fees, collection costs, and up to $2,000 in attorneys' fees and costs. (PFC ¶ 55; Exs. 6-5 ¶ 26; 83-7 ¶ 27; 85-7 ¶ 27.)

39. Accordingly, if the tenant fails to pay "rent" – specifically defined to mean their full outstanding balance, including their monthly apartment rent and any late fees – Equity may start eviction proceedings. And, Equity reserves the right to report the tenant's payment history, outstanding balances, and late fees to credit reporting agencies. (PFC ¶ 56; Exs. 6-5 ¶ 26; 83-7 ¶ 27; 85-7 ¶ 27; 6-1 ¶ 4.)

**F.    Prior Court Case.**

40. In 1998, Equity was sued in California for allegedly charging a late fee that did not comply with California Civil Code section 1671(d). The action was filed in the Superior Court of the State of California, County of San Diego, entitled *Consumer Justice Foundation, Inc. v. Equity Residential Properties Trust, et al.*, San Diego Superior Court Case No. 718159 ("*Consumer Justice* Lawsuit"). (F/F ¶ 46; P/O at 19; Dkt. No. 522, Defendant's Proposed Findings of Fact and Conclusions of Law ("DFC") ¶¶ 81, 82.)

41. When the *Consumer Justice* Lawsuit was filed, Equity's "standard" late fee was $50 plus

$5 for each additional day that rent remained unpaid.  (DFC ¶ 83; 3 Tr 471:19-22.)

42. In response to the *Consumer Justice* Lawsuit, Equity engaged Robert Knudsen of PricewaterhouseCoopers ("PwC") to examine Equity's costs to account for and attempt to collect late rent.  (DFC ¶¶ 84, 150; PFC ¶ 132.)

43. Mr. Knudsen completed a draft expert report for the *Consumer Justice* Lawsuit in April 1999 ("the Knudsen Report").  (PFC ¶ 133; Ex. 1041-1; 3 Tr. 480:6-481:10.)  The Knudsen Report concluded that Equity's costs from late rent exceeded the late fees charged during the time in which Equity's late fee was $50 plus a $5 per diem.  (DFC ¶ 84; Ex. 1044; 3 Tr 501:13-502:19; 3 Tr 536:7-12.)

44. In February 2000, the parties settled the 1998 *Consumer Justice* Lawsuit.  (F/F ¶ 47; P/O at 19; DFC ¶ 85; PFC ¶ 135.)  The parties in that action requested that the court approve their settlement.  In support of the motion for approval. Mr. Knudsen submitted a declaration based upon his analysis of Equity's costs.  The declaration concluded that "Our analysis showed that, for each year from 1995 through 1998, the direct costs attributable to delinquency-related activity on [Equity] properties exceeded net late fee revenues."  (DFC ¶ 86; Ex. 1044.)

45. On February 28, 2000, the court approved the settlement.  (Ex. 13.)  As part of the settlement, Equity agreed to charge late fees of no more than $50 for 30 months.  (*Id.*; PFC ¶ 136; 3 Tr. 544:13-18.)  The court's order approving the two-page proposed order of settlement, as submitted by the parties, indicated that Equity's $50 late fee complied with California Civil Code section 1671(d): "The modified late fee that defendant has agreed to implement pursuant to the settlement complies with Civil Code Section 1671(d)."  (Ex. 13 at 1:21-23; DFC ¶¶ 87, 153; PFC ¶¶ 136, 138.)

46. Mr. Fiffer was involved in the *Consumer Justice* Lawsuit, first as outside litigation counsel and subsequently as the in-house attorney responsible for overseeing the case.  (PFC ¶ 131; 3 Tr. 473:2-13; DFC ¶ 149.)

47. In 1999, in his role as in-house counsel overseeing the litigation, the "only thing [he] cared about was the overall conclusion" of the Knudsen Report, that is, "did [Mr.

9

United States District Court
Northern District of California

Knudsen] find that it was more than 50 bucks or less than 50 bucks."  (PFC ¶ 134; 3 Tr. 500:4-13.)

48. As of 2017, Mr. Fiffer had never spoken with Mr. Knudsen about the 1999 draft Knudsen Report.  In connection with this matter, Mr. Fiffer acknowledged that he had searched for, but was unable to find, documentation of Equity's late fees in 1997.  (PFC ¶¶ 140, 141; 3 Tr. 470:22-471:10; 3 Tr. 450:6-20, 451:14-452:12; Ex. 234.)

49. Mr. Fiffer did not access or review the Knudsen Report in 2008 in connection with the adoption of the Standard Late Fee.  The Knudsen Report was in a box in off-site storage in 2008 and Mr. Fiffer did not retrieve it or show it to any of his colleagues.  (PFC ¶¶ 143-45; 3 Tr. 503:21-504:1, 579:21-580:1.)

50. Ms. Beihoffer, Mr. Santee, Mr. Tuomi, and Mr. Lavine all confirmed that they never reviewed the Knudsen Report, and their testimony demonstrated their lack of substantive knowledge about the report.  (PFC ¶ 146; 4 Tr. 690:3-7 (Beihoffer); Santee Depo. 63:15-65:12; Tuomi Depo. 25:22-28:22; Lavine Depo. 68:20-69:6.)

**G.     The Adoption of the Standard Late Fee.**

51. Around June 2008, Equity changed its late fee in California from a flat $50 to the Standard Late Fee of 5% or $50.  (F/F ¶ 35; P/O at 19; PFC ¶¶ 57, 96.)

52. Around April 2008, Equity began assessing whether to modify its California late fee.  At that time, David Santee and Fred Tuomi, who were in the midst of their financial and operational reviews, approached the legal department with a request to undertake a nationwide review of Equity's fees and charges, including the California late fee.  (DFC ¶ 100; 4 Tr. 743:1-25.)

53. Equity continues to charge the Standard Late Fee to its California tenants if they do not pay their rent by the expiration of the grace period specified in their lease, which is typically the end of the day (11:59 p.m.) on the fourth day of each month.  (F/F ¶ 36; P/O at 19.)

54. The employees involved in the decision to adopt the Standard Late Fee included Senior Vice President and Deputy General Counsel James Fiffer, First Vice President – Legal

Denise Beihoffer, Executive Vice Presidents David Santee and Frederick Tuomi, Vice President of Financial Planning Christopher Jenkins, and two Senior Vice Presidents responsible for the California portfolio, Mickey Cummings and Bruce Lavine.  (F/F ¶ 37; P/O at 19; PFC ¶ 58.)

55. From approximately 1999 until his retirement in 2019, James Fiffer worked as deputy general counsel for Equity Residential.  (F/F ¶ 38; 3 Tr. 445:2-11, 577:10-21.)

56. Since 2006, Ms. Beihoffer has held the title of First Vice President in Equity's legal department.  (F/F ¶ 39; 4 Tr. 741:17-24, 742:10-12; PFC ¶ 86.)  Ms. Beihoffer provided general legal advice to Equity's property operations and property management teams in 2008.  (F/F ¶ 40; 4 Tr. 659:5-8.)  In 2008, Ms. Beihoffer reported to Equity's Deputy General Counsel and Senior Vice President, James Fiffer.  (F/F ¶ 41; 4 Tr. 742:13-19.)

57. In May 2008, Equity sought input from Equity's local eviction counsel in California, Jamie Sternberg of Kimball Tirey & St. John, regarding the requirements for late fees under California law.  (F/F ¶ 42; Ex. 61; 4 Tr. 680:24-682:13; DFC ¶¶ 108, 110; PFC ¶ 111.)

58. Ms. Sternberg advised Equity of the legal requirement that a late fee be based on a reasonable endeavor to estimate the company's average costs from late rent and informed Equity that to meet this requirement it must attempt to estimate its average costs from late rent, based on an analysis of those actual costs.  (PFC ¶ 112; 4 Tr. 685:1-20.)

59. Ms. Sternberg advised Equity to retain back-up materials relating to its analysis of its actual costs related to late rent.  (PFC ¶ 113; Ex. 69; 4 Tr. 688:24-689:10.)  Ms. Sternberg also advised Equity that she had seen legal challenges to late fees of 5% of tenants' monthly rent.  (PFC ¶ 114; Ex. 69.)

60. Ms. Sternberg testified that she could not advise Equity on whether the Standard Late Fee complied with California law because she was never provided any analysis of Equity's costs.  (PFC ¶ 116; Sternberg Depo. at 84:4-14.)

61. Ms. Beihoffer also conducted her own legal research during the 2008 fee review, including review of (1) California's statute addressing liquidated damages, (2) guidance

11

from the California Apartment Association ("CAA"), (3) the Los Angeles County Department of Consumer Affairs ("DCBA")'s publication on residential late fees, and (4) input from Ms. Sternberg.  (F/F ¶ 43; 4 Tr. 751:5-14; DFC ¶¶ 111, 118, 119.)

62. Ms. Beihoffer had previously reviewed a background paper from the CAA, and then reviewed it again in June 2008 when Mr. Cummings emailed it to her.  (F/F ¶ 44; Exs. 71, 72; 44 Tr. 692:17-693:3; DFC ¶ 140.)

63. The CAA background paper stated that a "percentage fee is susceptible to challenge because the portion of the fee that represents administrative costs may not increase proportionate to the amount of rent."  (PFC ¶ 117; Exs. 71, 72; 4 Tr. 692:23-693:2, 695:7-23.)  It also explained that a California appellate court had "refused to enforce a bank's late fee, citing evidence that the fee was intended to 'generate new revenue' and 'increase profitability' and that "[t]his testimony did not support the conclusion that the late fee was merely intended to recoup damages suffered by late payments'" and cites to *Hitz v. First Interstate*, 38 Cal. App. 4th 274, 289 (1995).  (PFC ¶ 118; Exs. 71, 72.)

64. The DCBA publishes and distributes guidance to tenants and landlords stating that "Late fees of 5% or less of the monthly rent are considered reasonable."  Their website also states the same.  The website further states not to contact the DCBA unless the late fee exceeds 10%.  (DFC ¶¶ 88, 89; PFC ¶ 100; Ex. 10, 220-3, 220-4.)

65. The Information Sheet regarding late fees operative in 2008 cites law relevant only to rental of personal property and not residential property.  The sheet also references California Civil Code section 1812.62(e) which provides that "[t]he total of all fees for a late payment shall not exceed the lesser of 5% of the payment or five dollar ($5), except that a minimum total fee of two dollars ($2) may be required."  (PFC ¶¶ 102, 103; Ex. 199.)  Neither Ms. Beihoffer nor Mr. Fiffer checked that the law cited at the time was not relevant to residential leases.  (PFC ¶ 106.)

66. Ms. Beihoffer was also familiar with the reasonable endeavor concept during the 2008 California late fee review.  (F/F ¶ 45; 4 Tr. 774:25-775:4; PFC ¶ 70; DFC ¶¶ 121-24, 144; Exs. 50, 1075; 4 Tr. 751:5-14 (Ms. Beihoffer describing her information gathering,

including input from Equity's outside counsel Jamie Sternberg, whom Equity relied on for expertise in landlord/tenant issues in California, and guidance from the CAA); 4 Tr. 759:4-760:8 (Ms. Beihoffer describing her knowledge of the legal requirement, including reasonable endeavor); 4 Tr. 768:5-19, 780:12-781:6 (Ms. Beihoffer testifying that she advised the business team of the requirement to conduct an analysis to estimate costs from late rent).)

67. Ms. Beihoffer played a central role in advising Equity regarding legal requirements applicable to late fees in California and assisting the business team in navigating the decision-making process that culminated in the adoption of the Standard Late Fee.  (PFC ¶¶ 69, 86; 4 Tr. 744:11-745:3; F/F ¶¶ 39-40; Exs. 56, 65, 66.)  In her role, Ms. Beihoffer determined the rules and requirements in various jurisdictions with respect to fees, communicated that to the business team, and assisted the business team in navigating through the decision-making about the fees.  She viewed her role as trying to determine whether or not the proposed change to the California late fee was reasonable and lawful. (DFC ¶ 101; 4 Tr. 744:1-25; 745:1-4.)

68. In 2008 and the years afterward, Ms. Beihoffer was aware of the requirement under California law that a late fee must be based on an analysis of costs from late rent.  (PFC ¶ 122; 3 Tr. 684:22-685:8.)

69. Ms. Beihoffer testified that she was not aware of any formal study performed of Equity's actual personnel costs measuring California tenants' late rent from April to June 2008, and she was not aware of any assessment of the time spent by property-level employees on late rent collection activities in 2008.  (PFC ¶ 72; 4 Tr. 707:17-23; 709:21-710:4.)  In their annual review, Equity did not include any collection of data related to Equity's actual costs from late rent.  (PFC ¶ 214; 3 Tr. 507:23-508:12.)

70. Ms. Beihoffer testified that, at the time of the 2008 fee review, she was aware of Equity's existing $50 late was based on the amount agreed upon in the settlement of the *Consumer Justice* Lawsuit.  (DFC ¶ 104; 4 Tr. 746:1-3; 746:9-747:4.)  During the review, Ms. Beihoffer discussed the Knudsen Report with the Equity team (in particular,

with Fiffer, Santee, Tuomi, and Jenkins).  (DCF ¶¶ 105, 125; 4 Tr. 747:8-19.)

71. On May 8, 2008, Ms. Beihoffer wrote to Mr. Fiffer about the status of her review of the California late fee and noted, among other things, that she wanted to "quantify the potential upside" of a change in the California late fee if Equity were to move to a 5% late fee structure.  (DFC ¶ 113; Ex. 66; 4 Tr. 663:14-22; PFC ¶ 89.)  The communication also indicated that the goal of the fee review was to look for opportunities to increase fee revenue.  (PFC ¶ 87; Ex. 65.)  Equity was "committed to pushing the envelope a bit where the risk of doing so is low."  (*Id.*)

72. Ms. Beihoffer solicited the help of Equity Vice President of Financial Planning Chris Jenkins to understand the dollar amount impact for a late fee that was equal to 5% of the rent, as compared to the then-existing $50 late fee in California.  (DFC ¶¶ 114, 129; Ex. 67; 4 Tr. 664:23-665:3; PFC ¶ 89.)  On May 8, 2008, Ms. Beihoffer wrote to Jenkins indicating that Equity "may" be in a position to modify its California late fee structure and asked him to run the numbers regarding the financial impact of the proposed change.  (*Id.*)  She also informed Mr. Jenkins that Equity was still "in the midst of our research" such that it had not determined whether it would or would not modify the late fee.  (*Id.*)

73. Mr. Jenkins agreed to run the numbers and suggested setting a fee of 5% with a minimum charge of $50 so that it would be "a slam dunk guarantee to be better."  (PFC ¶ 90; Ex. 57; DFC ¶ 167.)  Mr. Jenkins then ran the numbers as requested and after analyzing average rents at Equity's properties across California, determined that a 5% fee would increase late fee amounts at all but six of those properties.  (DFC ¶ 115; PFC ¶ 91; Ex. 63.)

74. By email dated May 20, 2008, Mr. Jenkins informed Ms. Beihoffer that the average late fee in California would be $75 with a 5% late fee.  (DFC ¶ 115; Ex. 64; 4 Tr. 669:16-670:10.)  He wrote, "[a]s you would suspect, this is a slam dunk.  The average rent for all current CA leases is over $1500 & at 5%, the average late fee would come in at $75. Overall, you'd expect to see a 50% increase."  (PFC ¶ 92; Ex. 63.)  In the same email, Mr. Jenkins reiterated his suggestion of setting the fee at 5% with a minimum of $50.

1

(*Id.*)

75. On May 21, 2008, Mr. Santee sent an email to the business team indicating that he believed that "legal is comfortable with a 5 percentage late fee" in California.  (DCF ¶ 136; Ex. 62.)  Ms. Beihoffer agreed.  (*Id.*; 4 Tr. 783:4-13.)

76. On May 22, 2008, Mr. Santee solicited input on a proposed 5% fee from other members of the property operations and property management teams.  In that email, he conveyed Mr. Jenkins' conclusion that a 5% fee would increase fee amounts at nearly all of Equity's California properties.  (PFC ¶ 94; Ex. 62; Santee Depo. 98:7-100:7.)

77. In response to Mr. Santee's email, Ms. Beihoffer summarized her discussion with Ms. Sternberg, who served as Equity's eviction counsel in California.  Ms. Beihoffer reported that Ms. Sternberg had informed her that "late fees of 6% have been challenged as an Unfair Business Practice and late fees of 4% appear to be below the radar screen" but that Ms. Sternberg had "not see a standalone claim successfully objecting to a 5% late fee."  In her summary, Ms. Beihoffer also concluded that "5% seems to be the 'sweet spot' in California."  (PFC ¶ 94; Ex. 61.)

78. In an email dated May 23, 2008, from Ms. Sternberg to Equity, she advised that "I have seen unfair business practice lawsuits for late fees as low as 5%."  (PFC ¶ 94; Ex. 69.)

79. Ms. Beihoffer acknowledged that to determine whether a 5% late fee was lawful, it would be necessary to "run it through the tracks of the liquidated damages analysis and make sure we're not recovering more than what our anticipated or estimated costs might be."  (PFC ¶ 98; 4 Tr. 753:23-754:12.)  As part of her review, Ms. Beihoffer also concluded that it was impracticable or extremely difficult for Equity to determine actual damages associated with delinquent rent.  (DFC ¶ 143; 4 Tr. 774:3-23.)  Ms. Beihoffer noted that Equity had about 30,000 apartment units in California; as such, resident payment profiles differ, and it would not be possible to look at every single resident or every unit and calculate the actual damage from delinquent rent.  (*Id.*)

80. Ms. Beihoffer determined that the late fee amount at 5% would be a reasonable approximation to allow Equity to recover some of its estimated costs associated with

United States District Court
Northern District of California

15

delinquent rent.  (DFC ¶ 130; 4 Tr. 773:10-774:2.)  She believed that the 5% late fee was defensible in part based on Equity's analysis that 5% of the rent would average $75 late fee.  (DFC ¶ 138; 4 Tr. 784:25-785:3.)  In her confirming email to Equity business team members, Ms. Beihoffer concluded: "I believe that either a flat fee or a % fee is defensible, so long as the % is not greater than 5% of the rent."  (DCF ¶ 138, Ex. 61.)

81. Mr. Fiffer was involved in the 2008 adoption of the Standard Late Fee.  Mr. Fiffer testified that before setting the Standard Late Fee, Equity considered its costs from late rent, the fact that competitors were using a percentage late fee, and the Los Angeles County's published guidance to tenants stating that a 5% late fee was reasonable.  (DCF ¶ 155; 3 Tr. 447:15-16, 454:12-14, 461:22-463:9; Ex. 10.)  After analyzing the costs and legal issues, Mr. Fiffer concluded that the Standard Late Fee complied with California law.  (DCF ¶¶ 156, 158; 3 Tr. 555:18-556:5.)

82. According to Mr. Fiffer, Equity did not retain a third-party to perform a cost analysis in 2008 because the law did not require a formal study and Equity already had a study from PwC that indicated that Equity's late fees were less than its costs when it charged a late fee of $50 plus $5 per day, and the only material thing that had changed since the study was the Equity's labor costs had steadily increased over the interim decade.  (DCF ¶ 159; 3 Tr. 552:7-22. 561:1-20.)

83. There is no evidence that anyone at Equity took any steps in 2008 or afterward to determine whether Equity's personnel costs increased proportionately with the amount of the outstanding balance.  (PFC ¶ 159; 4 Tr. 705:5-9; Ex. 70 at 70-1.)  Equity did not show at trial that it incurs proportionately more personnel costs to collect higher balances.  (PFC ¶ 161; Ex. 249 at 249-19, ¶ 44 (describing markedly diverging fee amounts for outstanding balances that were ultimately paid on the same day).  At most, Ms. Beihoffer described a "general assumption" that costs of late rent collection would increase with additional roommates and by extension, larger units.  (PFC ¶ 160; 4 Tr. 703:24-705:5, 704:21-705:4.)

84. Equity's internal documents confirm that the company did not analyze its actual costs

from late rent in connection with the adoption of the Standard Late Fee in 2008.  In a 2014 "Fee Review Memorandum" authored by in-house attorney Susan Zumpf and shared with other attorneys and members of the business team, Ms. Zumpf wrote:

85. We settled a 1999 class action lawsuit that challenged our late fee because we did not determine how much residents' late payments cost us before assessing the fees (or being sued).  In an attempt to mitigate our damages in that lawsuit, we engaged an expert to assess the amount of our damages, based on our costs and business processes at that time.  We have not updated this analysis in the ensuing 15 years, even though our business processes and the amount of the fee have changed drastically (and in inverse proportion to each other).  (PFC ¶¶ 80, 126(b), 127; Exs. 89, 90, 538, 1147.)

86. In a memo sent to Chief Operating Office David Santee on November 24, 2014, Ms. Zumpf set out the requirement in California law that a fee be based on "a reasonable effort by the parties to the [*sic*] estimate the amount of the damage arising out of the late payment."  (PFC ¶ 127; Ex. 89 at 89-3.)

87. After noting Equity's failure to analyze its costs from late rent since a 1999 report obtained to "mitigate damages" in a prior lawsuit, Ms. Zumpf recommended that Equity "conduct a new study to assess our costs and evaluate whether any adjustments to the fee are appropriate."  (PFC ¶ 218; Ex. 89 at 89-3; *see also id*. at 89-4-5 (recommending that Equity conduct a time and motion study to validate the amount of fees that are required to be based on their actual damages).  (*Id*.; 3 Tr 523:11-524:12.)  No witness or evidence was introduced to indicate that such a study was completed.  (PFC ¶ 129.)

**H.    Calculations of Damages.**

88. Standard Late Fee class members were charged approximately $36,119,831 in total late fees between September 3, 2010, and December 31, 2021.  (DCF ¶ 206; PFC ¶ 202; Exs. 1278-0004, 1278-015.)

89. Standard Late fee class members paid approximately $28,920,220 in total late fees between September 3, 2010, and December 31, 2021.  (PFC ¶ 204; DFC ¶ 207; Exs. 1278-0004, 1278-0107.)

90. Woodland Park class members were charged approximately $610,000 in total late fees between September 3, 2010, and February 29, 2016.  (DFC ¶ 208; Ex. 1278-0110.)

91. Woodland Park class members paid approximately $270,022 in total late fees between September 3, 2010, and February 29, 2016.  (DFC ¶ 208; Ex. 1278-0108; PFC ¶ 200.)[1]

92. For each incidence of late rent resulting in a late fee, Equity incurred $9.71 in increased hourly and overtime pay.  (PFC ¶ 401; Ex. 259 at 259-70 ¶ 91 (Schwarz June 2022 Report).)  For each additional day that rent remained outstanding for a tenant household, Equity incurred $0.188 in increased overtime costs.  (*Id.*)  It is appropriate to scale those costs by an additional 20% to account for pay-roll driven costs (*e.g.*, payroll taxes) that increase proportionately when pay increases.  Thus, the additional costs resulting from each late payment leading to a late fee can be calculated using the formula: Costs = 1.2*($0.188*(total days late) + $9.71).  (*Id.*)[2]

93. The median personnel costs resulting from the late payment of rent is $14.05.  (PFC ¶ 403; Tr. 1162:4-1165:20; Ex. 531-1(4(b)(ii)).)  In 99 percent of the cases of late rent payment, the resulting increase in personnel costs to Equity is $21.24 or less.  (*Id.*)

94. The lost use of funds estimates shall be based upon all updated data provided by the parties by no later than April 26, 2024. and utilizing Mr. Breshears' calculations.  (*See* PFC ¶¶ 435-53.)

95. Eviction-related attorney's fees and costs are not liquidated by the late fee, are separate from the late fee calculations and charges, and may not be recovered as an offset to Equity's restitution of late fees.  (PFC ¶¶ 454-64.)

---

[1] The Court does not find it appropriate to include the approximately $815,000 in late fees paid with security deposits that Plaintiff introduced during the trial.  All of the accounting for damages was set at the lower number and the Court finds it would unduly prejudice Defendant to require new calculations.  (PFC ¶ 231.)

[2] The Court does not find the analysis of costs incurred by Equity for late payment of rent as performed by Mark Hosfield to be accurate or persuasive.  Similarly, the Court finds Mr. Hosfield's use of the weighted average cost of capital to determine Equity's interest damages to be inappropriate.

United States District Court
Northern District of California

# CONCLUSIONS OF LAW

**A.  California Civil Code Section 1671(d).**

1.  To trigger the protections of California Civil Code section 1671(d), Plaintiffs must demonstrate that the challenged fees are liquidated damages provisions in a consumer contract.  *See In re Cellphone Termination Fee Cases*, 193 Cal. App. 4th 298, 321-22 (2011).

2.  Under California law, liquidated damages are defined as "an amount of compensation to be paid in the event of a breach of contract, the sum of which is fixed and certain by agreement."  *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1002 (9th Cir. 2002) (quoting *Kelly v. McDonald*, 98 Cal. App. 121, 125 (1929)).  Fees charged for late payments are archetypical liquidated damages provisions.  *See Garrett v. Coast & S. Fed. Sav. & Loan Ass'n*, 9 Cal. 3d 731, 737 (1973) (charges triggered by late payments were governed by California Civil Code section 1671).

3.  The Standard Late Fee formula, 5% of the outstanding balance with a minimum of $50, is set forth in Equity's Standard Lease and fixes with certainty an amount of compensation for the breach of a late rent payment.  This qualifies as a liquidated damages provision.  *See Chodos*, 292 F.3d at 1002.  Likewise, the $50 late fee charged to the Woodland Park Preexisting Lease class was a pre-set amount charged to tenants if they breached their leases by paying late rent.

4.  California Civil Code section 1671(d) provides that "a provision in a contract liquidating damages for the breach of the contract is void except that the parties to such a contract may agree upon an amount which shall be presumed to be the amount of damage sustained by a breach thereof, when, from the nature of the case, it would be impracticable or extremely difficult to fix the actual damage."

5.  Section 1671 requires that the liquidated damage provision be the product of a "reasonable endeavor … to estimate a fair average compensation for any loss that may be sustained" by the breach.  *See* Cal. Civ. Code § 1671(d); *Garrett v. Coast & Southern Fed. Sav. & Loan, Ass'n*, 9 Cal. 3d 731, 739 (1973).

United States District Court
Northern District of California

6. A liquidated damages clause is reasonable and enforceable if it bears a reasonable relationship to the range of potential damages that the parties could have anticipated would flow from a breach at the time the contract was made.  *In re Cellphone*, 193 Cal. App. 4th at 322.  Residential leases are among the consumer contracts governed by the protections of Section 1671(d).

7. Under California Civil Code section 1671(d), liquidated damages provisions in consumer contracts "are presumed void," shifting the burden to the proponent of the provision "to rebut that presumption."  *In re Cellphone*, 193 Cal. App. 4th at 322 (citing *Garrett*, 9 Cal. 3d at 738); Cal. Civ. Code § 1671 (c), (d).  In this case, Equity is the proponent of the challenged late fees and Equity bears the burden of demonstrating that the Standard Late Fee and the Woodland Park $50 Late Fee are valid under Section 1671(d).

**B. The Late Fee is Invalid.**

8. To carry its burden to show that the challenged late fees are valid, Equity must demonstrate that the late fees are the product of a "reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained" by Equity as a result of its tenants' late payment of rent.  *See Garrett*, 9 Cal. 3d at 739.  Otherwise, the liquidated damages clause will be considered void as an unlawful penalty.  *Id.*

9. "Courts look beyond the language of the contract to determine the actual circumstances of a liquidated damages clause."  *El Monte Props. & Invs., Inc. v. Dolan*, 26 Cal. App. 5th Supp. 20, 23 (Cal. Super. Ct. App. Div. 2018) (citing *Garrett*, 9 Cal. 3d at 737).

10. In order to meet the reasonable endeavor requirements, Equity must satisfy (1) an actual, non-pretextual analysis of its costs to estimate its damages from the breach, (2) a proper purpose, or the lack of an improper purpose, and (3) a fee that is in proportion to the costs.  *See Garrett*, 9 Cal. 3d at 739 (requiring an effort to estimate "fair average compensation" for the loss, and prescribing that whether that effort rises to a reasonable endeavor "depends upon the motivation and purpose in imposing such charges and their effect"); *see also, e.g., Ridgley v. Topa Thrift & Loan Ass'n*, 17 Cal. 4th 970, 977 (1998) (holding that a fee that is disproportionate to costs from a breach is void as a penalty); *In re Cellphone*,

193 Cal. App. 4th at 324, 327-28 (analysis of actual costs is required).

11. To show that it conducted a "reasonable endeavor," a company "is required to show that it actually engaged in some form of analysis to determine what losses it would sustain from breach, and that it made a genuine and non-pretextual effort to estimate a fair average compensation for the losses to be sustained." *Hitz v. First Interstate Bank*, 38 Cal. App. 4th 274, 291 (1995) (internal quotation marks omitted); *see also id*. ("Such an estimate cannot occur without some sort of analysis of the loss that is to be compensated.").

12. A company cannot satisfy the reasonable endeavor requirement if it failed to complete any actual analysis of its costs before setting the fee. *Hitz*, 38 Cal. App. 4th at 290-91 (affirming trial court's ruling that executive's testimony that he "had a good understanding of [the company's costs] from the information that [he] got on a regular basis" did not demonstrate a reasonable endeavor, and reasoning that "a company cannot satisfy the reasonable endeavor requirement if it failed to complete any analysis of its costs before setting the late fee."); *In re Cellphone*, 193 Cal. App. 4th at 324, 327-28 ("Sprint was required to show that it actually engaged in *some form of analysis* to determine what losses it would sustain from the breach") (emphasis in original); *Del Monte Props.*, 26 Cal. App. 5th at 24 ("Some analysis of actual losses is required prior to seeing the amount" of the fee).

13. The analysis must occur before the fee is set – "[p]ost-hoc rationalization will be rejected." *Del Monte Props.*, 26 Cal. App. 5th at 24 (citing *In re Cellphone*, 193 Cal. App. 4th at 328).

14. Assumptions about costs do not meet the reasonable endeavor standard. *See, e.g., Hitz*, 38 Cal. App. 4th at 290 ("general knowledge" and "opinion" on costs "simply do not constitute the type of reasonable endeavor to estimate actual loss or damages that is required."); *Del Monte Props.*, 26 Cal. App. 5th at 24 ("If no effort was made to estimate the actual losses, then the resulting fee cannot approximate the losses."); *In re Cellphone*, 193 Cal. App. 4th at 320, 327-28 (rejecting a late fee that was set, not on the basis "of any actual or estimated loss, but from a competitive standpoint" and declaring "institutional

intuition is not a substitute for analytical evaluation, and retrospective rationalization does not excuse the objective assessment required at the inception of the contract.").

15. In addition, a late fee is invalid if it was motivated by improper purposes such as coercing payment through a penalty or increasing profits without regard to costs caused by late payments. *See Garrett*, 9 Cal. 3d at 740. If the landlord's "motivation and purpose was to generate profit" or "generate new revenue," there was no reasonable endeavor. *Hitz¸* 38 Cal. App. 4th at 289, 290; *see also Beasley v. Wells Fargo Bank*, 235 Cal. App. 3d 1383, 1395 (1991) (evidence that the company's working papers described fees as a "good source of revenue" and "proposed their increase pursuant to a strategy of 'maximizing fee income'" supported the finding that the late fees were invalid for lack of a reasonable endeavor to approximate actual losses). Two factors are at the heart of any inquiry into whether a reasonable endeavor was made: "(1) the motivation and purpose in imposing the charges, and (2) their effect." *Util. Consumers' Action Network, Inc. v. AT&T Broadband of S. Cal., Inc.*, 135 Cal. App. 4th 1023, 1029 (2006).

16. A late fee cannot be said to have the purpose of recouping losses caused by the breach if the amount of the fee "bear[s] little or no relationship to the amount of the actual loss incurred" by the company. *Garrett*, 9 Cal. 3d at 740. For this reason, "[s]etting the liquidated damages to a percentage of the contract price demonstrates a purpose other than compensating losses." (Dkt. No. 142, Summary Judgment Order ("MSJ Order") at 5, quoting *Del Monte Props.*, 26 Cal. App. 5th Supp. at 24). *See also Garrett*, 9 Cal. 3d at 740 (holding that a late fee of 2% of the loan balance was invalid because it was "not reasonably calculated to merely compensate the injured lender").

17. Late fees that are disproportionate to the damages caused by the breach are invalid penalties. *Garrett*, 9 Cal. 3d at 739 ("The characteristic feature of a penalty is its lack of proportional relationship to the damages which may actually flow from the failure to perform under a contract."); *Ridgley*, 17 Cal. 4th at 977 ("[A]n amount disproportionate to the anticipated damages is termed a penalty" and is void) (citation omitted).

18. The Court concludes that the Standard Late Fee is invalid because it is not the result of a

United States District Court
Northern District of California

reasonable endeavor by Equity to estimate its costs actually incurred as a result of late rent. *Cf. Garrett*, 9 Cal. 3d at 739. Equity has failed to show that it "actually engaged in some form of analysis to determine what losses it would sustain" from the late payment of rent, nor that it "made a genuine and non-pretextual effort to estimate a fair average compensation" for those losses. *Hitz*, 38 Cal. App. 4th at 291; *see also In re Cellphone*, 193 Cal. App. 4th at 328. Rather, no one at Equity performed any analysis of the company's actual costs of its California tenants' late rent payments, genuine or otherwise, prior to the adoption of the Standard Late Fee on June 4, 2008. Equity's failure to analyze its costs, standing alone, is fatal to the validity of its Standard Late Fee. *See In re Cellphone*, 193 Cal. App. 4th at 326-28; *Hitz*, 38 Cal. App. 4th at 290-91.

19. While Equity argues that its decision makers were aware of the company's costs and acted on their general knowledge that employee costs had increased overall, reliance on such "[i]nstitutional intuition" does not meet the reasonable endeavor standard. *See In re Cellphone*, 193 Cal. App. 4th at 328; *accord Hitz*, 38 Cal. App. 4th at 290-91. Any reliance on an overall increase in employee costs was not reasonable, where this Court has found that no one at Equity made any attempt to determine the amount of employee costs incurred by the company as a result of late rent payments at the time Equity adopted the Standard Late Fee.

20. The Court concludes that the Standard Late Fee is also invalid because it was adopted for an improper purpose. (*See* Findings of Fact ¶¶ 71, 73, 74, 76.) Equity's principal motive behind the adoption of the Standard Late Fee was to increase revenue, which is an improper purpose under governing law. *See Hitz*, 38 Cal. App. 4th at 289, 290; *Beasley*, 235 Cal. App. 3d at 1395. Section 1671(d) does not countenance a fee designed to extract additional revenue from tenants without regard to the company's actual compensable losses. The California Law Review Commission, which recommended the current form of Section 1671(d), noted serious concern about "the risk that a liquidated damages provision will be used oppressively by a party able to dictate the terms of the agreement." *See Recommendation and Study Relating to Liquidated Damages*, 11 Cal. L. Rev. Comm'n

1201, 1209 (1973), *quoted in In re DirecTV Early Cancellation Litig.*, 738 F. Supp. 2d 1062, 1087-88 (C.D. Cal. 2010).  A fee designed to increase the company's revenue rather than being "reasonably calculated to merely compensate the injured [landlord]," is precisely the type of oppressive fee that Section 1672(d) prohibits in residential leases.

21. Equity's decision makers were on notice that a percentage late fee was unlikely to align with Equity's costs caused by late rent, since Equity's lost use of funds were minimal and administrative costs were not likely to be proportional to the amount owed.  The percentage-based Standard Late Fee formula regularly generates late fee amounts that vary significantly and unjustifiably among tenants whose rent payments were equally late.

22. Equity also argues that its annual "fee review" confirmed that the Standard Late Fee was "reasonable."  However, the annual fee review does not satisfy the reasonable endeavor requirement because it did not include any effort to analyze the company's costs from late rent.  *See Garrett*, 9 Cal. 3d at 739; *Hitz*, 38 Cal. App. 4th at 291; *In re Cellphone*, 193 Cal. App. 4th at 328.  The Standard Late Fee is not based on the fee review – on the contrary, on two occasions in the annual fee review, Equity's in-house counsel suggested lowering or revisiting the Standard Late Fee, but their recommendations were disregarded. *See Garrett*, 9 Cal. 3d at 739 (a valid liquidated damages provision must "represent the result of a reasonable endeavor" to estimate costs).

23. With regard to the Woodland Park $50 Late Fee, which was unilaterally imposed by Equity on the Woodland Park Preexisting Lease Class without regard to their leases and without their agreement, it too fails the basic requirement under Section 1671(d) that the parties to the contract "agree herein" to the amount of the fee.

24. In addition, Equity failed to meet its burden to show that the Woodland Park $50 Late Fee imposed on its Woodland Park tenants after purchasing the property was the result of a reasonable endeavor to estimate its costs from late rent.  *Cf. Garrett*, 9 Cal. 3d at 739. There is no evidence that Equity conducted any analysis of its costs from late rent prior to setting the fee, and Ms. Beihoffer admitted that Equity did not conduct a cost analysis prior to adopting the Woodland Park $50 Late Fee.  Equity is unable to identify the individuals

United States District Court
Northern District of California

involved in the decision to set the Woodland Park $50 Late Fee.

25. The Woodland Park $50 Late Fee is invalid as a penalty because it is disproportionate to the damages Equity actually incurs from late rent, which largely fell between the range of $12 to $20 per late payment.  *See Garrett*, 9 Cal. 3d at 739 ("The characteristic feature of a penalty is its lack of proportional relation to the damages which may actually flow from failure to perform under a contract.").

26. A late fee that violates Section 1671(d) also constitutes an unlawful business practice in violation of California's Unfair Competition law ("UCL"), California Business and Professions Code section 17200, *et seq.  See Hauk v. JP Morgan Chase Bank U.S.*, 552 F.3d 1114, 1122 (9th Cir. 2009); *see also Cel-Tech Communications, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal. 4th 163, 180 (1999) (holding that an unlawful business practice under the UCL is "anything that can properly be called a business practice and that at the same time is forbidden by law.") (quotation marks and citation omitted); *Farmers Ins. Exch. v. Superior Court*, 2 Cal. 4th 377, 383 (1992) (violations of predicate law treated "as unlawful practices independently actionable under section 17200 *et seq.* and subject to the distinct remedies provided thereunder").

**C. Restitution.**

27. If a late fee provision is found to be void under Section 1671(d), the late fees paid by tenants must be returned to them, pursuant to both Section 1671(d) and the UCL.  *See Beasley*, 235 Cal. App. 3d at 1398-1401; *see also* Cal. Bus. & Prof. Code § 17203 (under the UCL, "[t]he court may make such order or judgments … as may be necessary … to restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition.").

28. The Court, in its discretion, has determined not to exercise its equitable power to award prejudgment interest.  *See, e.g., M&F Fishing, Inc. v. Sea-Pac Ins. Managers, Inc.*, 202 Cal. App. 4th 1509, 1539 (2012).  Plaintiffs failed to offer any evidence that they could have earned 7% interest on the monies that were wrongfully withheld from them.  In addition, the passage of nearly nine years from the initiation of the lawsuit until trial, based

on factors outside of Equity's control, do not favor the requested $14 million in prejudgment interest sought by Plaintiffs.

29. However, a landlord may offset or reduce the amount it is to return to the tenants by the amount of actual damages it proves resulted from the tenants' late payment of rent. *See Garrett*, 9 Cal. 3d at 740-41 ("We do not hold that merely because the late charge provision is void and thus cannot be used in determining the lender's damages, the borrower escapes unscathed;" these damages "can be measured by the period of time the money was wrongfully withheld plus the administrative costs reasonably related to collecting and accounting for late payment."); *see also* Dkt. No. 91, Order Granting Motion for Class Certification ("Class Cert Order"), at 2:10-11 ("However, these amounts may be reduced or offset, by the amount of any actual costs the landlord can prove were suffered as a result of the tenant's late payment of rent."); MSJ Order, at 5:20-22 ("A landlord may offset or reduce the amount it is to return to the tenants by the amount of actual damages it succeeds in proving were proximately caused by the tenants' late payment of rent."); *see also Beasley*, 235 Cal. App. 3d at 1402 ("The lender's charges could be fairly measured by the period of time the money was wrongfully withheld plus the administrative costs reasonably related to collecting and accounting for a pate payment.").

**D. Offset.**

30. The measure of Equity's offset is governed by principles of contract damages. *See Garrett*, 9 Cal. 3d at 740-41; *Beasley*, 235 Cal. App. 3d at 1398-1401. The salient principles in this case include the following: (1) Equity is only entitled to offset class restitution by the damages that Equity proves are proximately caused by class members' late payments, and accordingly, fixed costs that are not increased by the breach are not recoverable; (2) costs during the period before rent is deemed to be "late" cannot be offset from the class members' restitution; (3) Equity's offset is limited to those damages that were intended to be liquidated by its late fees; and (4) Equity may not seek to recover damages that are otherwise prohibited by law.

31. Under contract law principles that apply to its offset damages, Equity has the burden of proving "a direct causal link between the breaches underlying the litigation and actual damages caused by those breaches." *Beasley*, 235 Cal. App. 3d at 1403; *accord* Cal. Civ. Code § 3300.

32. Fixed costs, such as those attributable to overhead or infrastructure needed for "dealing with late … activity generally," cannot be offset from the voided late fees that must be returned to the classes. *See Beasley*, 235 Cal. App. 3d at 1403. Such "indirect costs" do not increase "by virtue of any individual late [rent payment] transaction …[do] not comport with the manner of proof required by *Garrett*, in particular the element of causation." *Id.* (rejecting offset costs "attributable to the bank's maintenance of an 'in pace' infrastructure for dealing with" with breaches, because they lacked "the necessary causal link.").

33. The example set forth in *Beasley* illustrates this concept. There, the court noted that an offset for fixed costs is inconsistent with the "*Garrett* standard of proof" because it would allow the proponent of the late fee to deduct such costs even if no breaches occurred. "For example, if there were absolutely no late or over-limit activity in a given month, [the fixed costs] method would still afford compensation for that month's costs of the "in-place" infrastructure, while the *Garrett* method would not, since there were no underlying breaches. *Id.* at 1403.

34. The measure of contract damages, by statute, "is the amount which will compensate the party aggrieved for all the detriment proximately caused thereby, or which, in the ordinary course of things, would be likely to result therefrom." Cal. Civ. Code § 3300. As a natural application of the causation requirement, it is well-established that "[i]f overhead costs are not increased by the breach it is error to allow them as damages." *Guntert v. City of Stockton*, 55 Cal. App. 131, 149 (1976) (reversing an award of overhead costs in a contract case where the evidence showed that the plaintiff "suffered no absolute increase in overhead" costs as a result of the breach).

35. As set forth in paragraphs 5, 13, and 56 of this Court's Findings of Fact, Equity's leases

27

United States District Court
Northern District of California

afford tenants a four-day grace period after the first of the month before they will incur a late fee for late payment of rent. California contract law provides that "a grace period defines what shall constitute timely performance of the payment terms of a contract." *Baypoint Mortgage Corp. v. Crest Premium*, 168 Cal. App. 3d 818, 827 (1985). Unless a contract "clearly, unequivocally and unmistakably" states that time is of the essence with respect to the date of payment, a grace period "negates a finding [that] payment on the so-called 'due date' to be the essence" of the contract. *Id.*; *see also Bisno v. Sax*, 175 Cal. App. 2d 714, 721-22 (1959) (same). As none of the leases at issue here make clear that time is of the essence with respect to payment of rent on the first of the month, the end of the four-day grace period established when rent payments are considered late for purposes of calculating Equity's offset damages.

36. In addition, Equity's inclusion of a contractually set grace period of five days permits an interpretation that the tenants have five days before a payment is considered inconsistent with their obligations under the lease and therefore "late." Any ambiguity must be resolved against the drafter, Equity, and thus further bolsters the conclusion that the grace period falls outside of the scope of the late fee. *See* Cal. Civ. Code § 1654; *Sandquist v, Lebo Auto., Inc.*, 1 Cal. 5th 233, 247 (2016).

37. As further basis for excluding any damages Equity claims to have incurred during the grace period, by contractually granting its tenants a grace period, Equity has waived the right to recover damages for any costs it incurs in that period. *See Lynch v. Cal. Coastal Comm'n*, 3 Cal. 5th 470, 475 (2017) (waiver is "the intentional relinquishment of abandonment of a known right") (internal citation omitted). Each of the requirements are met here as "[w]aiver requires an existing right, the waiving party's knowledge of that right, and the party's 'actual intention to relinquish that right." *Id.* (citation omitted). Equity had an existing right to seek damages covering its losses caused by late payment. *See Garrett*, 9 Cal. 3d at 741 n.11. Equity's knowledge and intention to relinquish that right are both made plain by its drafting a lease that provides a grace period to its tenants during which they can pay their rent without incurring additional charges. *See Lynch*, 3

Cal. 4th at 475 (intentional waiver may be inferred from "conduct that is so inconsistent with an intent to enforce the right as to induce a reasonable belief that such a right has been relinquished.")

38. Accordingly, Equity is not entitled to recover any personnel costs, lost use of funds, or other alleged damages that it may have incurred during the grace period afforded by Equity's leases with the classes.

39. The damages encompassed by Equity's challenged late fees are those flowing from the late payment of rent.  *See Garrett*, 9 Cal. 3d at 739 (late charges "compensate the [landlord] for its administrative expenses and the cost of money wrongfully withheld" due to tenants' failure "to make timely payments"); *Beasley*, 235 Cal. App. 3d at 1403 (evidence proving offset damages under *Garrett* must establish "a direct causal link between the breaches underlying the litigation and the actual damages caused by those breaches."); Standard Lease Default Remedies Provision, Exs. 6-5 ¶ 26, 83-7 ¶ 27, 85-7 ¶ 27.

40. The provisions of the Woodland Park Leases that have been submitted to the Court are materially the same.  Each has a distinct provision, separate from the late fee provision, which the Court will call "Default Remedies" provision, and which specifically authorizes the owner or agent to seek damages detailed by California Civil Code section 1951.2, which include past and future rent as well as any amount "necessary to compensate the lessor for all the detriment proximately caused by the lessee's failure to perform his obligations under the lease or which in the ordinary course of things would be likely to result therefrom."  Cal. Civ. Code § 1951.2; Exs. 2 ¶ 23, 3 ¶ 24, 4 ¶ 24.)

41. A party "is not entitled to more than a single recovery for each distinct item of compensable damage."  *Tavaglione v. Billings*, 4 Cal. 4th 1150, 1158-59 (1993).  "Double or duplicative recovery for the same items of damage amounts to overcompensation and is therefore prohibited."  *Id.* at 1159.  To avoid double recovery, Equity's leases must be construed so that damages that have been liquidated by its late fees do not include the damages Equity can and does seek under its Default Remedies provisions.

42. The division between late-rent damages and damages under the "Default Remedies"

1    provisions, depends on whether the tenant ultimately pays their rent and retains possession

2    of the unit.  (*See* MSJ Order at 7:5-8 ("[I]f the tenant has defaulted then the default

3    remedies clause in the lease agreement may come into play.  But, if the tenant remains in

4    the unit, abides by the contract, and only pays late rent, the late fees are assessed under the

5    late fee provision.").)  Therefore, late rent damages end when a tenant vacates the unit.

43.  Employee costs that "are fixed and unaffected by the late payment of rent … satisfy the

standard to preclude an offset of this amount."  (MSJ Order at 7:23-25.)  Equity has not

presented any evidence demonstrating that employee salaries and the other categories of

compensation are "affected by Plaintiffs' late payments."  (*Id.*)  Therefore, Equity has

failed to establish any direct causal link between these employee costs and the late

payment of rent.

44.  Therefore, Equity may not reduce the amount of restitution owed to the classes by

offsetting fixed employee compensation, including "allocable costs," health insurance and

employment benefits, bonus pay (which is based on factors other than hours worked or late

rent collection), leasing commissions, paid time off, salary for exempt employees, and

hourly pay for non-exempt personnel who are not involved in collecting late rent.

45.  Plaintiffs' expert, Andrew Schwarz, presented a multiple regression model to rebut the

employee cost calculations performed by Equity's expert, Mr. Hosfield.  The Court

concludes that Mr. Schwarz's regression model is a reliable means of determining Equity's

employee costs resulting from class members' late payment of rent.  *See e.g., Olean*

*Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 682 n.31 (9th Cir.

2022) (approvingly discussing proposed damages model that would determine individual

amounts by applying the results of the experts' regression analysis).

46.  Mr. Schwarz's multiple regression model designates three independent variables: (1) salary

compensation; (2) regular hourly pay; and (3) overtime and double time pay.  As these

categories of compensation represent the primary components of Equity's claimed

employee costs, the Court concludes that they are "the appropriate [dependent] variable[s]

for analyzing the question at issue."  Fed. Judicial Ctr., *Reference Manual on Scientific*

United States District Court
Northern District of California

Evidence ("*Reference Manual*") (3d Ed. 2011) 312.

47. Mr. Schwarz's multiple regression model designates three explanatory variables: (1) how many tenants paid their rent late in a given month ("Incidence of Lateness"); (2) how long their rent was outstanding ("Total Days Late"); and (3) the number of evictions, if any, that month ("Evictions").  These variables directly impact the amount of Equity's employee costs in that their increase would likely result in an increase in the amount of time spent on late rent collection by Equity's property-level personnel in a given month.  The Court concludes that these explanatory variables are appropriate because they are characteristics of late payment that, based on the record in this case, may "produce or be associated with changes in the independent variable[s]," namely the three categories of compensation discussed above.  *Reference Manual* 305.

48. Mr. Schwarz's model also includes variables to control for influences on payroll costs unrelated to late rent activity, including the following: (1) the year of each observation, which allows the model to account for company- or industry-specific factors that contribute to higher or lower wage growth over time ("Time Trend"); (2) variables to capture the baseline costs of a given property, allowing the model to focus on month-to-month changes within each community ("Fixed Effects"); and (3) a variable designed to capture the extent to which hourly pay and salary pay can substitute for each other (*e.g.*, one property may have higher monthly hourly pay because it has fewer salaried employees) ("Substitute Payroll").

49. Having designated appropriate dependent and explanatory variables, the Court concludes that Mr. Schwarz's multiple regression model is an appropriate and reliable method of determining the incremental impact of each tenant's late payment of rent on Equity's employee costs.

50. Consistent with the Court's conclusion that salaries are fixed costs that may not be offset from the late fees that must be returned to the classes, Mr. Schwarz's multiple regression model concluded that there is no relationship between class members' late payment of rent and Equity's salaried personnel costs.  Equity does not pay additional salary each time a

United States District Court
Northern District of California

class member is late paying rent.

51. For regular hourly pay, the Incidence of Lateness variable produced a positive and statistically significant result.  The multiple regression model indicated that Equity pays an additional $7.70 in regular hourly pay for each time a class member is late paying rent.

52. For overtime and double time pay, the Total Days Late and Incidence of Lateness variables produced positive and statistically significant results.  The multiple regression model indicated that Equity incurs a $2.01 increase in overtime costs, and that those costs increase by 19 cents for each day after the grace period that a class member remains late on rent.

53. Accordingly, the Court concludes that the amount that Equity may offset in employee costs from the restitution owed the Classes shall be calculated in accordance with Mr. Schwarz's multiple regression model (as applied in his scenario labeled 4(b)(ii)).[3]

54. Equity is entitled to offset interest damages resulting from class members' late payment of rent.  *See Del Monte Props.*, 26 Cal. App. 5th Supp. at 23 ("The losses caused by late payment of residential rent are limited to interest and administrative costs of collecting and accounting for the late rent.") (citation omitted); *see also* MSJ Order at 4-5.)  Like other categories of offset damages, Equity must demonstrate a "direct causal link" between its claimed interest damages and class members' late payment of rent.  *See Beasley*, 235 Cal. App. 3d at 1403.

55. Interest damages that accrue during the rental agreements' grace period are beyond the scope of Equity's permissible offset damages.  Equity may not reduce the amount of restitution owed to the Classes by offsetting interest damages it incurred during the grace period.

56. The appropriate measure of Equity's interest damages from its lost use of class members' rent payments is the cost of Equity's short-term financing.  Between 2010 and 2015, Equity's line of credit that carried an interest rate of LIBOR plus 115 basis points or

---

[3] The Court finds Mr. Hosfield's costs savings methodology to be unscientific and lacking foundation and, accordingly, disregards it.

1   1.15%; Equity's line of credit in 2016 was LIBOR plus 82.5 basis points or .825%.  In

2   March 2016, Equity commenced selling commercial paper, which lowered Equity's short-

3   term borrowing costs to 30 points, or .3% on the borrowed amount.

57. Plaintiffs' expert Mr. Breshears calculated Equity's interest damages based on Equity's

short-term borrowing costs.  He applied the cost of Equity's credit line to class members'

running balances for the period of September 2010 to February 2016, and the cost of

Equity's commercial paper program to class members' running balance for the period of

March 20166 through December 31, 2021.  Mr. Breshears also allowed for a four-day

grace period in which no interest costs are incurred.  The Court concludes that Mr.

Breshears' method is sound, and orders that Equity's lost use of funds be calculated using

Mr. Breshears' method.

58. With regard to attorneys' fees and costs related to unlawful detainer actions, the Default

Remedies provisions in Equity's leases specifically authorize it to recover from its tenants

any attorneys' fees and costs resulting from their default or breach of the lease.  (Ex. 6 ¶

27; Ex. 2 ¶ 23 Ex. 4 ¶ 24; Ex. 3 ¶ 24.)  As Equity reserved the right to seek those items of

damages separately, the Court concludes that the challenged late fees do not liquidate

Equity's attorneys' fees and costs related to unlawful detainer actions.  Here, Equity's

consistent practice of charging class members for Equity's attorneys' fees and costs

incurred in connection with any unlawful detainer proceeding (including in settling the

dispute and allowing the class member to remain in their unit), reflects and supports an

interpretation of its lease that attorneys' fees and costs are not liquidated by the challenged

late fees.  *See* Cal. Civ. Proc. Code § 1856; *Emps. Reinsurance Co. v. Superior Court*, 161

Cal. App. 4th 906, 921 (2008), *as modified* (Apr. 22, 2008).

59. Equity's offset damages are limited to those damages that were intended to be liquidated

by the challenged late fees.  *See Garrett*, 9 Cal.3d at 739, 741.  As Equity's leases do not

liquidate its attorneys' fees and costs associated with unlawful detainer actions, but rather

affirmatively authorize Equity to seek those items of damage directly from its tenants

under the Default Remedies provision, Equity may not now seek reimbursement of its

United States District Court
Northern District of California

attorneys' fees and costs from unlawful detainer actions through its offset in this case. Equity routinely charges and collects attorneys' fees and costs from its tenants, and therefore allowing Equity to seek attorneys' fees and costs as an offset against restitution in this action would constitute a prohibited double recovery. *See Tavaglione*, 4 Cal. 4th at 1158-59.[4]

**D. Declaratory Relief.**

60. Declaratory relief is proper where "(1) the judgment will serve a useful purpose in clarifying and setting the legal relations in issue; and (2) it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *Ballard v. Equifax Check Servs., Inc.*, 158 F. Supp. 2d 1163, 1177 (E.D. Cal. 2001). The Court finds that these conditions are met for all Plaintiffs who have entered into residential leases with Equity containing the Standard Late Fee that this Court has concluded violates California Civil Code section 1671(d).

61. Section 1671(d) provides that liquidated damages provisions in residential leases which do not comply with its standards are "void." The California Supreme Court has further held that a late fee is void under Section 1671(d) if it is not based on a "reasonable endeavor to estimate a fair compensation for a loss which would be sustained" as a result of a late payment, or if it is otherwise an unenforceable penalty. *Garrett*, 9 Cal. 3d at 740 & 736 n.4. Accordingly, the Court finds and declares that the Standard Late Fee provision in Equity's residential leases in California is null and void.

62. The Court further concludes that by imposing a late fee that is void under Section 1671(d), Equity has engaged in an unlawful business practice, which is prohibited by the Unfair Competition Law. *See, e.g., Cel-Tech Communications*, 20 Cal. 4th at 180 (the UCL renders as an unlawful practice "anything that can properly be called a business practice and at the same time is forbidden by law") (quotations omitted). Accordingly, the Court

---

[4] In addition, the Court finds that Equity cannot recover percentage-based collection costs associated with unpaid, rather than late, rent. These costs fall outside the scope of costs that are liquidated by the late fee.

finds and declares that by including the unlawful Standard Late Fee provision in its California leases, Equity has engaged in an unlawful business practice that violates the Unfair Competition Law.

63. The Court does not find persuasive Equity's voluntary payment doctrine or statute of limitations defenses, nor does it grant Equity's request for decertification.

64. The issue of damages, injunctive relief, and final judgment shall be addressed by the parties as instructed by the Court in a separate filing.

**IT IS SO ORDERED.**

Dated:   April 8, 2024

JEFFREY S. WHITE
United States District Judge

United States District Court
Northern District of California

35