Aaron T. Winn (SBN 229763)
Justin J. Fields (SBN 259491)
Karen L. Alexander (SBN 265926)
**DUANE MORRIS LLP**
750 B Street, Suite 2900
San Diego, CA 92101-4681
Telephone:  619.744.2200
atwinn@duanemorris.com
jfields@duanemorris.com
klalexander@duanemorris.com

John Sheldon Letchinger (*Pro Hac Vice*)
**Baker & Hostetler LLP**
One N. Wacker Drive, Suite 4500
Chicago, IL 60606
Telephone: 312.416.6200
jletchinger@bakerlaw.com

Attorneys for Equity Residential

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| JAVANNI MUNGUIA-BROWN, et al.<br><br>Plaintiffs,<br><br>v.<br><br>EQUITY RESIDENTIAL, et al.,<br><br>Defendants. | Case No.  16-cv-01225-JSW<br><br>**EQUITY RESIDENTIAL'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF**<br><br>Hon. Jeffrey S. White<br>Courtroom 5, 2nd Floor |

# TABLE OF CONTENTS

                                                                    **Page**

I.    The Court should deny the proposed injunctive relief. .................... 14

      A.    Plaintiffs are not entitled to an injunction under federal
            law. ................................................................................... 15

            1.    There is no threat of future injury. ............................... 16

            2.    There is no irreparable harm ......................................... 17

            3.    The balance of hardships strongly militates
                  against an injunction. ...................................................... 20

            4.    The public interest is not served by having courts
                  dictate what fees to assess their customers. .................. 20

      B.    Plaintiffs are not entitled to an injunction under state
            law. ................................................................................... 22

            1.    California law does not ignore irreparable harm. ......... 23

            2.    Even if California law considered nothing but the
                  likelihood of a future violation, there is no risk of
                  any future violation. ........................................................ 24

      C.    Plaintiffs' proposed injunction is not narrowly tailored. ........ 28

            1.    Affirmatively limiting the amount of any future
                  late fee is neither narrowly tailored nor legally
                  permissible. ...................................................................... 30

            2.    A late fee cap contravenes the reasonable
                  endeavor requirement. ...................................................... 31

            3.    Plaintiffs' experts' analyses do not support a late
                  fee cap. ............................................................................ 33

            4.    A ban on percentage-based fees would constitute
                  improper legislation from the bench. .............................. 34

II.   The Court should not reconsider pre-judgment interest. ................ 36

III.  The Court should strike Plaintiffs' post-trial calculations
      because the Court cannot adjudicate disputes that arose after
      trial. ........................................................................................... 36

IV.   Equity is already adjusting class members' unpaid late fees.......... 39

2

V.    Plaintiffs' proposed judgment is problematic in other ways. .......... 39

    A.    Plaintiffs' payment proposal is unprecedented and
          unsupported. ................................................................ 40

    B.    Plaintiffs' request for post-trial discovery is unnecessary
          and unwarranted. ......................................................... 40

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF       4:16-CV-01225-JSW

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Academy of Motion Picture Arts and Sciences v. GoDaddy.com,*
*Inc.*
CV 10-03738-AB, 2015 U.S. Dist. LEXIS 186627, 2015 WL
12684340 (April 10, 2015, S.D. Cal.) ............................................... 25, 28

*Alliance For Wild Rockies v. Cottrell*
632 F.3d 1127 (9th Cir. 2011) ............................................... 18

*Ballard v. Equifax Check Services*
158 F.Supp.2d 1163 (E.D. Cal., 2001) ............................................... 33

*Blizzard Ent. Inc. v. Ceiling Fan Software, LLC*
28 F. Supp. 3d 1006 (C.D. Cal. 2013) ............................................... 14

*Center for Food Safety v. Vilsack*
734 F.Supp.2d 948 (N.D. Cal. 2010) (J. White) ............................................... 16

*In re Circuit Breaker Litigation*
860 F. Supp. 1453 (C.D. Cal. 1994) ............................................... 16-17, 21

*eBay, Inc. v. MercExchange, L.L.C.*
547 U.S. 388 (2006) ............................................... 15

*Elizondo v. City of Junction City*
No. 6:15-cv-1853-AA, 2016 U.S. Dist. LEXIS 18934, 2016 WL
659082 (D. Or. Feb. 16, 2016) ............................................... 18

*Epic Games, Inc. v. Apple Inc.*
No. 4:20-cv-05640-YGR, 2020 U.S. Dist. LEXIS 154231, 2020
WL 5073937 (N.D. Cal. Aug. 24, 2020) ............................................... 17

*Gallagher Benefit Servs. v. De La Torre*
283 F. App'x 543 (9th Cir. 2008) ............................................... 14

*Garcia v. Google, Inc.*
786 F.3d 733 (9th Cir. 2015) ............................................... 14

*Haas Automation, Inc. v. Denny*
  2014 U.S. Dist. LEXIS 89860, 2014 WL 2966989 (C.D. Cal.
  July 1, 2014) ................................................................................. 23, 28

*Hartford-Empire Co. v. United States*
  323 U.S. 386, 65 S. Ct. 373 (1945) ......................................................... 29

*Idaho v. Coeur d'Alene Tribe*
  794 F.3d 1039 (9th Cir. 2015) ................................................................ 18

*Keene v. City & Cty. of S.F.*
  No. 22-cv-01587-JSW, 2024 U.S. Dist. LEXIS 29685, 2024
  WL 714669 (N.D. Cal. Feb. 21, 2024) .................................................. 18

*Kirola v. City & County of San Francisco*
  860 F.3d 1164 (9th Cir. 2017) ................................................................ 16

*Kryzhanovskiy v. Amazom.com Services, Inc.*
  2022 U.S. Dist. LEXIS 115025, 2022 WL 2345677 (E.D.Cal.
  June 29, 2022) ........................................................................................ 22

*L.A. Mem'l Coliseum Com. v. Nat'l Football League*
  634 F.2d 1197 (9th Cir. 1980) ................................................................ 18

*Mehta v. Wells Fargo Bank*
  737 F.Supp.2d 1185 (S.D. Cal.2010) ...................................................... 18

*Midwest Growers Co-op. Corp. v. Kirkemo*
  533 F.2d 455 (9th Cir. 1976) .................................................................. 20

*Miller ex rel. NLRB v. Cal. Pac. Med. Ctr.*
  991 F.2d 536 (9th Cir. 1993) .................................................................. 18

*Perfect 10 v. Google, Inc.*
  653 F.3d 976 (9th Cir. 2011) .................................................................. 25

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*
  793 F.2d 1132 (9th Cir 1986) ................................................................ 10

*Rodriguez v. Equal Exchange, Inc.*
  2024 U.S. Dist. LEXIS 58982, 2024 WL 1421971 (S.D.Cal.
  March 31, 2024) ...................................................................................... 22

*Sampson v. Murray*
　415 U.S. 61, 94 S. Ct. 937 (1974) ...................................................... 17-18

*San Miguel Pure Foods Co. v. Ramar Int'l Corp.*
　625 F. App'x 322 (9th Cir. 2015) ...................................................... 17

*Seale v. GSK Consumer Health, Inc.*
　2024 U.S. Dist. LEXIS 44140, 2024 WL 1949854 (C.D.Cal.
　Feb. 27, 2024) ...................................................................................... 22

*Siegel v. Dignity Health*
　No. CV-14-02561-PHX-SPL, 2018 U.S. Dist. LEXIS 2977,
　2018 WL 11277609 (D. Ariz., Jan. 5, 2018) ........................................ 16

*Stormans, Inc. v. Selecky*
　586 F.3d 1109 (9th Cir. 2009) ...................................................... 11, 14, 20

*Sun Microsystems, Inc., v. Microsoft Corp.*
　188 F.3d 1115 (9th Cir. 1999) ...................................................... 25

*United States v. BNS, Inc.*
　858 F.2d 456 (9th Cir. 1988) ...................................................... 29

*Winter v. NRDC*
　555 U.S. 7 (2008) ...................................................... 14, 20

*Zepeda v. United States Immigration & Naturalization Serv.*
　753 F.2d 719 (9th Cir. 1983) ...................................................... 29

**California Cases**

*Barguis v. Merchants Collection Assn.*
　7 Cal.3d 94 (1972) ...................................................... 24

*Beasley v. Wells Fargo Bank*
　235 Cal.App.3d 1383 (1991) ...................................................... 21, 30-31

*In re Berry*
　68 Cal.2d 137 (1968) ...................................................... 29

*Blum v. Swarbrick*
　2010 WL 9009712 (Cal.App.Unpubl. April 7, 2020) ............................ 35

*Bondanza v. Peninsula Hospital and Medical Center*
  23 Cal.3d 260 (1979)......................................................................... 32-33

*Cal. Grocers Ass'n v. Bank of Am.*
  22 Cal. App. 4th 205 (1994) ................................................. 14, 30-31, 36

*California Retail Liquor Dealers Inst. v. United Farm Workers*
  57 Cal.App.3d 606 (1976) ........................................................... 29

*Canyon Vineyard Estates I, LLC v. DeJoria*
  78 Cal. App. 5th 995, 1014 (2022) ................................................. 14, 29

*Cellphone Termination Fee Cases*, 193 Cal.App.4th 298 (2011).............. 32

*City of South Pasadena v. Dep't of Transportation*
  29 Cal.App.4th 1280 (1985), *as modified on denial of reh'g*
  (Nov. 22, 1994)....................................................................... 23

*Dawson v. Eastside Union H.S. Dist.*
  28 Cal.App.4th 998, 1040 (1994) ........................................... 29

*Feminist Women's Health Ctr. v. Blythe*
  32 Cal. App. 4th 1641 (1995) ...................................................... 14

*Freeman v. San Diego Association of Realtors*
  77 Cal. App. 4th 171 (1999) ............................................... 21, 30

*Gafcon, Inc. v. Ponsor & Associates*
  98 Cal.App.4th 1388 (2002) ................................................. 25

*Garrett v. Coast & Southern Fed. Sav. & Loan, Ass'n*
  9 Cal.3d 731 (1973)....................................................... 31

*Intel Corp. v. Hamidi*
  30 Cal.4th 1342 (2003) ................................................... 23

*Lazzareschi Investment Company v. San Francisco Federal
  Savings and Loan Association*
  22 Cal.App.3d 303 (1971) .......................................... 21, 30-31, 33, 36

*Madrid v. Perot Systems Corp.*
  130 Cal.App.4th 440 (2005) ...................................... 10, 25

7

*People ex rel. Herrera v. Stender*
212 Cal.App.4th 614 (2012) ................................................................. 25

*People v. National Association of Realtors*
120 Cal.App.3d 459 (1981) ................................................................. 28

*Robinson v. U-Haul Co. of California*
4 Cal.App.5th 304 (2016) ............................................................. 27-28

*Thompson v. 10,000 RV Sales, Inc.*
130 Cal. App. 4th 950 (2005) ............................................................. 29

*United Farm Workers Organizing Comm. v. Superior Court*
4 Cal 3rd 556, 568, 570-71 (1971) ...................................................... 29

*Warner Bros. International Television Distribution v. Golden
Channels & Co.*
No. CV0209326MMMSHSX) 2003 U.S. Dist. LEXIS 29635,
2003 WL 27384425, at *26-29 (C.D. Cal., Mar. 31, 2003) ................... 24

**State Statutes**

Cal. Bus. & Prof. Code § 21713.5(b)(3) ............................................. 35

Cal. Civ. Code § 1161 ........................................................................ 19

Cal. Civ. Code § 1164 ........................................................................ 19

Cal. Civ. Code § 1671 ............................................................. 31-32, 34-35

Cal. Civ. Code § 1671(d) .................................................................... 31

Colo. Rev. Stat. § 38-12-105 .............................................................. 35

N.C. Gen. Stat. § 42-46 ..................................................................... 35

Nev. Rev. Stat. § 118A.210 ................................................................ 35

Tenn. Code Ann. § 66-28-201 ............................................................ 35

Texas Property Code § 92.019 ............................................................ 35

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF     4:16-CV-01225-JSW

**Treatises**

5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 782 .......................... 23

**Non-Periodical Publications**

https://www.casb.uscourts.gov/post-judgment-interest-rates.................. 36

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF    4:16-CV-01225-JSW

# INTRODUCTION

Plaintiffs' post-trial brief seeks an astonishingly broad injunctive (even though there is no risk of any irreparable harm). It also makes the extraordinary (and improper) request that the Court adjudicate *post-trial* dispute and issue a monetary aware for alleged post-trial conduct. The Court should deny both requests.

Plaintiffs' request for injunctive relief rests on the assumption that, without an injunction, Equity will continue charging the Standard Late Fee. Wrong. Already, Equity has (1) stopped charging the Standard Late Fee; (2) removed the Standard Late Fee from its California lease agreements; (3) informed residents that Equity will not assess the Standard Late Fee; (4) ceased collection activity on unpaid late fees; (5) paused adverse credit reporting for residents whose unpaid balances include unpaid late fees; and (6) commenced the laborious process of reversing and crediting accounts that were assessed a Standard Late Fee. In short, there is no risk of anyone being charged the Standard Late Fee. And because this risk is non-existent, an injunction is unwarranted. See *Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir 1986) (cessation of unlawful conduct moots a request for injunctive relief); *Madrid v. Perot Systems Corp.*, 130 Cal.App.4th 440, 465 (2005) ("an injunction may not issue unless the alleged misconduct is ongoing or likely to recur").

Plaintiffs' demands for injunctive relief are also extraordinary because they are not—by any stretch of the imagination—narrowly tailored. For example, instead of merely asking the Court to enjoin Equity from charging the Standard Late Fee (something Equity is no longer doing), Plaintiffs ask the Court to (1) dictate the precise late fee that Equity may charge in the future (without considering Equity's current or

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF    4:16-CV-01225-JSW

1  future damages from late rent); (2) oversee and approve Equity's

2  communications with its late-paying residents; and (3) bar Equity from

3  using a percentage-based late fee in the future, regardless of future

4  circumstances. (ECF No. 558, pp. 10-11.) Because these types of

5  affirmative business restrictions are not narrowly tailored to address the

6  alleged harm (the Standard Late Fee), granting Plaintiffs' injunctive relief

7  would be improper. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th

8  Cir. 2009) ("an overbroad injunction is an abuse of discretion").

9      Plaintiffs' demands for monetary relief are also extraordinary

10  because they ask the Court to adjudicate factual disputes that occurred

11  *after* trial (which is improper) and then award monetary relief for that

12  alleged post-trial conduct (also improper). But courts cannot summarily

13  adjudicate post-trial factual disputes any more than they can summarily

14  adjudicate pre-trial factual disputes. Indeed, as this Court has already

15  held, any potential recovery must be limited to the time-period ending "75

16  days before trial." (See ECF No. 315, p. 4.)

17      But even if courts could summarily resolve post-trial factual

18  disputes, Plaintiffs' experts did not follow the Court's directive to update

19  their calculations to include "post-trial numbers." (ECF No. 547, p. 2.) For

20  example, instead of updating their calculations using current employee

21  cost data, Plaintiffs recycled old calculations based on employee cost data

22  from 2010-2017. But in the ensuing seven years, Equity's personnel costs

23  have soared. (See ECF No. 522, ¶¶ 94-95.) Because Plaintiffs did not

24  update their numbers to account for these increased costs (as the Court's

25  Order contemplates), their post-trial calculations grossly understate

26  Equity's actual damages resulting from late rent. The Court should thus

27  deny Plaintiffs' request for post-trial restitution and limit any monetary

28  relief to the evidence presented at trial.

11

# BACKGROUND

On October 20, 2020, Plaintiffs moved this Court for leave to file a Third Amended Complaint in order to, among other things, extend the Standard Late Fee class period to 75 days before trial. (ECF No. 198, as discussed in ECF No. 315, p. 4.) On October 25, 2021, this Court granted their Motion, "find[ing] that the amendment should be granted . . . to allow potential recovery up to 75 days before trial of this matter." (ECF No. 315, p. 4.)

On September 12, 2022, the Court ordered that "the trial currently scheduled for February 27, 2023 will proceed based on data about class late fee charges and payments and Defendants' costs . . . through December 29, 2021," with data to be supplemented after trial if warranted by the Court's post-trial findings of fact and conclusions of law. (ECF No. 388, p. 5.)

On June 21, 2023, the parties completed an eight-day bench trial. (ECF No. 509.)

On April 8, 2024, the Court issued certain Findings of Fact and Conclusions of Law ("Findings"), finding that Equity's Standard Late Fee was void and directing the parties to brief "the factors for issuance of an injunction" and "the final judgment amount." (ECF No. 547, p. 2.) The Court further ordered the parties to submit the instant post-trial briefing, including directing Plaintiffs to "update" their calculations based on "post-trial numbers."[1]  (ECF No. 547, p. 2.)

---

[1] The Court's reference to "post-trial numbers" presumably refers to the updated data covering the time period from the last time data was pulled until the date "75 day days before trial." (See ECF No. 315, p. 4.)

In response to the Court's Findings, Equity immediately stopped charging and collecting the Standard Late Fee at its California properties.[2] (See Declaration of Jenay Carnley, "Carnley Decl.," at ¶ 5.)

Equity also removed the Standard Late Fee from its California leases. (Carnley Decl., ¶ 11.) This process took some time, as any time Equity changes a standard lease template, internal review and programming must be completed. (*Id.*, ¶ 11.) Then, it takes additional time for the new lease template to be updated in Equity's systems and rolled out to the individual properties. (*Id.*, ¶ 11.) As a result, after the Court issued its Findings, a small subset of California residents signed new or renewal leases before Equity's launch of the new lease template and received the prior version of the California lease agreement that still contained the Standard Late Fee language. (*Id.*, ¶ 12.) But Equity informed these residents that it would not charge the Standard Late Fee— and it has not, and will not, charge the Standard Late Fee. (*Id.*, ¶ 7.)

Equity also paused all adverse credit reporting for tenants in California. (Carnley Decl., ¶ 16.) Equity also directed its collections partners to pause all collections efforts for former tenants whose unpaid balances included unpaid Standard Late Fees. (*Id.*, ¶ 17.) And Equity has started the laborious process of adjusting balances for current tenants who had unpaid Standard Late Fees on their account balance. (*Id.*, ¶ 14.)

---

[2] Although Equity promptly modified its late fee practices, Equity disagrees with the Court's findings and, as outlined at trial, believes that it reasonably endeavored to tether its late fees to its costs and limited its late fee to an amount that Los Angeles County deemed "reasonable." (See ECF No. 522, ¶¶ 88-89.)

Plaintiffs now seek injunctive relief and an award of damages for conduct that allegedly occurred *after* the trial. For the reasons outlined below, the Court should deny these requests.

## ARGUMENT

## I.    The Court should deny the proposed injunctive relief.

Injunctive relief is an "extraordinary remedy" that is "never awarded as of right"; it is awarded only when absolutely necessary to prevent unlawful conduct that is likely to be repeated in the future. *Winter v. NRDC*, 555 U.S. 7, 24 (2008); *Feminist Women's Health Ctr. v. Blythe*, 32 Cal. App. 4th 1641, 1658 (1995).

The party seeking an injunction bears "the heavy burden of establishing they are entitled to injunctive relief." *Blizzard Ent. Inc. v. Ceiling Fan Software, LLC*, 28 F. Supp. 3d 1006, 1018 (C.D. Cal. 2013).

This heavy burden is doubly demanding when plaintiffs seek an injunction that "orders an affirmative act or mandates a specified course of conduct," like capping the fees that a business may charge its customers. *Garcia v. Google, Inc.*, 786 F.3d 733, 740 (9th Cir. 2015) (injunctions mandating a specific course of conduct are "particularly disfavored"); *Cal. Grocers Ass'n v. Bank of Am.*, 22 Cal. App. 4th 205, 218 (1994) (explaining that even if a bank fee was unconscionable, that fact "could not support affirmative injunctive relief" that sought to limit the fee to $1.73).

Even when injunctive relief is warranted, "the order must be narrowly tailored to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Gallagher Benefit Servs. v. De La Torre*, 283 F. App'x 543, 546 (9th Cir. 2008) (internal quotations omitted); *Stormans,* 586 F.3d at 1140 (courts must ensure that any injunction is narrowly tailored); *Canyon Vineyard Estates I, LLC v. DeJoria*, 78 Cal. App. 5th 995, 1014 (2022) (reversing injunction,

even though injunctive relief was warranted, because the injunction was overbroad).

Here, Plaintiffs argue that they are entitled to injunctive relief under both federal and state law. They also argue that even if they are not entitled to injunctive relief under federal law (which allegedly requires a more rigorous showing), the Court could still issue a permanent injunction under California law, which—according to Plaintiffs—doesn't care about things like irreparable injury or the balance of hardships. Instead, under Plaintiffs' view of California law, the permanent injunction inquiry is reduced to a single question: is the conduct likely to reoccur? (See ECF No. 558, pp. 12-13.)

Equity shows below that Plaintiffs are not entitled to a permanent injunction under either federal or state law. And even if there was a factual or legal basis for injunctive relief, Plaintiffs' demands for an injunction that dictates the late fees Equity can legally charge in the future, dictates what Equity communicates to its residents regarding late fees, and outlaws the use of a percentage-based late fee (regardless of future circumstances or supporting rationale) is the antithesis of narrowly tailored injunctive relief.

## A.    Plaintiffs are not entitled to an injunction under federal law.

As Plaintiffs acknowledge, federal law requires the party seeking an injunction to show that there is "a real and immediate threat of repeated injury" *and* that (1) the potential injury would be irreparable; (2) there would be no adequate legal remedy for the injury; (3) the balance of hardships warrants an injunction; and (4) injunctive relief would serve the public interest. (ECF No. 558, p. 17, citing *eBay, Inc. v. MercExchange,*

1   *L.L.C.*, 547 U.S. 388 (2006).) Plaintiffs have not come close to satisfying
2   their heavy burden.

### 1.   There is no threat of future injury.

4   Every proponent of injunctive relief must first show that, absent an
5   injunction, the defendant is likely to continue the offending conduct. See
6   *Kirola v. City & County of San Francisco*, 860 F.3d 1164, 1174 (9th Cir.
7   2017); *Siegel v. Dignity Health* No. CV-14-02561-PHX-SPL, 2018 U.S. Dist.
8   LEXIS 2977, 2018 WL 11277609, at *2 (D. Ariz., Jan. 5, 2018) (plaintiffs
9   alleged that the defendant failed to provide an interpreter for deaf patients
10  and the court dismissed plaintiffs' claims for injunctive relief due to lack of
11  Article III standing because the plaintiff had moved out of state, so there
12  was no risk of the same thing happening again).

13  Courts likewise deny permanent injunctions where there is no risk of
14  future injury. For example, in *In re Circuit Breaker Litigation*, 860 F.
15  Supp. 1453 (C.D. Cal. 1994), the jury found that the defendants violated
16  the UCL and Lanham Act by selling reconditioned circuit breakers bearing
17  the plaintiff's marks. *Id.* at 1454. Notwithstanding the jury verdict, the
18  court denied plaintiff's request for an injunction because the defendants
19  had already ceased the complained-of conduct and the plaintiff failed to
20  show that the infringement was likely to reoccur. *Id.* at 1456; accord.
21  *Center for Food Safety v. Vilsack*, 734 F.Supp.2d 948, 954 (N.D. Cal. 2010)
22  (J. White) (denying permanent injunction where plaintiffs' claim of future
23  injury is "purely speculative and dependent on future conduct).

24  The same is true here. There is *zero* risk that Equity will charge the
25  Standard Late Fee in the future. Not only has Equity already stopped
26  charging the Standard Late Fee, Equity has removed the Standard Late
27  Fee from its California lease agreements and informed residents that
28  Equity will not assess the Standard Late Fee. (Carnley Dec., ¶¶ 7, 11.)

16

1   Equity has also ceased collection activity on unpaid late fees, paused

2   adverse credit reporting for residents with unpaid late fees, and

3   commenced adjusting and crediting accounts that were assessed a

4   Standard Late Fee. (Carnley Dec. ¶¶ 14, 16, 17.)

5        These facts point to only one conclusion:  there is no likelihood that

6   Equity will charge the Standard Late Fee in the future. Because Equity is

7   not currently charging the Standard Late Fee and will not do so in the

8   future, injunctive relief is improper. *See In re Circuit Breaker Litigation*,

9   860 F. Supp. at 1456 ("courts usually deny requests for permanent

10   injunctions" where the complained-of conduct has ceased and the

11   defendant has "assured the court that it has no intention of [continuing

12   that conduct] in the future").

13                 **2.**       **There is no irreparable harm.**

14        To obtain a permanent injunction, Plaintiffs must provide "evidence

15   of irreparable injury." *San Miguel Pure Foods Co. v. Ramar Int'l Corp.*, 625

16   F. App'x 322, 327 (9th Cir. 2015) (vacating permanent injunction because

17   there was no evidence of irreparable harm).

18        "The key word in this consideration is *irreparable*. Mere injuries,

19   however substantial, in terms of money, time and energy . . . are not

20   enough" to show an *irreparable* injury. *Sampson v. Murray*, 415 U.S. 61,

21   90, 94 S. Ct. 937, 953 (1974) (italics original); *Epic Games, Inc. v. Apple

22   Inc.*, No. 4:20-cv-05640-YGR, 2020 U.S. Dist. LEXIS 154231, at *8, 2020

23   WL 5073937 (N.D. Cal. Aug. 24, 2020) ("At its core, irreparable harm is

24   harm or injury that cannot be repaired.").

25

26

27

28

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF    4:16-CV-01225-JSW

1    Examples of irreparable harm include cutting down a century-old

2  tree,[3] allowing developers to clear forest land for a development,[4] or

3  foreclosing on someone's home.[5]

4    Monetary injuries, in contrast, are "generally not irreparable, as

5  money lost may be recovered later[.]" *Idaho v. Coeur d'Alene Tribe*, 794

6  F.3d 1039, 1046 (9th Cir. 2015); *L.A. Mem'l Coliseum Com. v. Nat'l*

7  *Football League,* 634 F.2d 1197, 1202 (9th Cir. 1980) ("It is well

8  established [that] monetary injury is not normally considered

9  irreparable."); *Keene v. City & Cty. of S.F.*, No. 22-cv-01587-JSW, 2024

10  U.S. Dist. LEXIS 29685, at *12, 2024 WL 714669 (N.D. Cal. Feb. 21, 2024)

11  (a "pocketbook injury" is not irreparable harm).

12    Here, the potential future injury is a late fee—a quintessential

13  "pocketbook injury" that is imminently repairable. See *Sampson v.*

14  *Murray*, 415 U.S. 61, 90 (1974) ("The possibility that adequate

15  compensatory or other corrective relief will be available at a later date, in

16  the ordinary course of litigation, weighs heavily against a claim of

17  irreparable injury.").[6]

18    Plaintiffs attempt to side-step this problem by arguing that if a

19  resident is charged the Standard Late Fee, *but doesn't pay it*, then the

20  resident does not have a monetary injury. But a resident who never pays a

21  late fee is more likely to have *no* injury than an irreparable one. And

22

23  [3] *Elizondo v. City of Junction City*, No. 6:15-cv-1853-AA, 2016 U.S. Dist.
   LEXIS 18934, at *7, 2016 WL 659082 (D. Or. Feb. 16, 2016).

24

25  [4] *Alliance For Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011).

26  [5] *Mehta v. Wells Fargo Bank,* 737 F.Supp.2d 1185, 1194 (S.D. Cal.2010).

27  [6] The fact that Plaintiffs waited 10 years to seek injunctive relief also
   "implies a lack of urgency and irreparable harm." *Miller ex rel. NLRB v.*
   *Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993).

28

again, even if the mere charging of the Standard Late Fee could be described as an irreparable injury, the risk of anyone suffering that harm has vanished:  Equity stopped charging the Standard Late Fee, dropped the Standard Late Fee from its lease agreement, ceased collections, stopped credit reporting, and agreed to adjust the account ledgers for all California residents with an unpaid Standard Late Fee. (Carnley Decl., ¶¶ 7, 14-16.)

Plaintiffs also argue that charging a late fee could ultimately result in an eviction or adverse credit report, which they attempt to frame as an irreparable harm. But the risk of eviction or adverse credit reporting comes from the *failure to pay rent*, not the assessment of a late fee.

In addition, this risk of eviction exists in the world of hypothetical scenarios:  Equity does not evict or threaten to evict tenants for unpaid late fees. (Carnley Decl., ¶ 18.) Even Plaintiffs cannot point to anyone who was evicted for failing to pay late fees.[7] (See ECF No. 522, ¶ 463, n. 32 [citing trial evidence].) Indeed, the undisputed evidence at trial showed that many California tenants have numerous unpaid late fees; yet Equity never sought to evict any of them. *Id.*

This argument is also specious because evictions do not happen without court approval. See Cal. Code Civ. Proc. §§ 1161, 1164. And a court-approved outcome is not an injury, much less an irreparable injury.

---

[7] Plaintiffs' brief argues that one class representative testified at trial that he recalled someone in the office telling him that he needed to pay "the late fee and total balance" to avoid an eviction, but he also admitted that his written three-day notice correctly noted *only the outstanding rent balance*. (ECF No. 558, p. 22-23.)  Another claimed that she believed her three-day notice included a late fee. But if such a notice ever existed, Plaintiffs never produced it. *Id.* at pp. 23-24.

1    In short, Plaintiffs' spurious insinuations that Equity might again

2 charge the Standard Late Fee does not present the risk of any irreparable

3 injury. And because there is no risk of an irreparable injury, Plaintiffs are

4 not entitled to injunctive relief. See *Midwest Growers Co-op. Corp. v.*

5 *Kirkemo*, 533 F.2d 455, 465-66 (9th Cir. 1976) (dissolving permanent

6 injunction because plaintiff failed to show likelihood of future irreparable

7 harm).

8    **3.    The balance of hardships strongly militates against**
**an injunction.**

9

10    To carry their burden, the Plaintiffs must also show that the balance

11 of harms supports an injunction. *Winter*, 555 U.S. at 24. "In assessing

12 whether the plaintiffs have met this burden, the district court has a duty

13 to balance the interests of all parties and weigh the damage to

14 each." *Stormans,* 586 F.3d at 1138.

15    Here, class members would suffer no harm but rather reap unjust

16 benefits under Plaintiffs' proposed $31.98 late fee, which Plaintiffs

17 computed from pre-pandemic cost data. (See Section III, below, for further

18 discussion of Plaintiffs' experts' updated calculations.) But if Plaintiffs'

19 proposed injunction is granted, Equity's ability to charge late fees will be

20 limited and it may be in the position of being unable to recoup millions of

21 dollars of costs from tenants who breached their duty to pay rent on time.

22 Unlike Plaintiffs here, Equity would not be able to go back and

23 retroactively seek payment of a higher late fee. (See Section I.C, below, for

24 further discussion of the impropriety of Plaintiffs' proposed injunction.)

25    **4.    The public interest is not served by having courts**
**dictate what fees to assess their customers.**

26

27    Finally, the public interest weighs against an injunction. The public

28 interest is not served when courts endeavor to regulate what fees private

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF    4:16-CV-01225-JSW

businesses may assess their customers and others. As courts have noted, these decisions should be made by legislators and regulators.

For example, in *Beasley v. Wells Fargo Bank*, 235 Cal.App.3d 1383 (1991) (a case cited by Plaintiffs), the trial court appropriately determined that it was not "well suited to regulating retail bank pricing via injunction on an ongoing basis." 235 Cal.App.3d at 1391. The plaintiffs had requested an injunction against future imposition of fees. *Id.* at 1389.

Likewise, in *Lazzareschi Investment Company v. San Francisco Federal Savings and Loan Association*, 22 Cal.App.3d 303, 311 (1971), the Court of Appeal affirmed the trial court's grant of summary judgment finding that a prepayment fee on a loan used for purchase of commercial property was not excessive, noting that "the control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by *ad hoc* decision of the courts. Legislative committees and an administrative officer charged with regulating an industry have better sources of gathering information and assessing its value than do courts in isolated cases."

And in *Freeman v. San Diego Association of Realtors*, 77 Cal. App. 4th 171, 203 fn. 35 (1999), the Court of Appeal affirmed the trial court's sustaining of a demurrer to a complaint challenging the monthly fee to access a real estate sales multiple listing service (MLS) under California's antitrust laws because "[t]o hold otherwise would place this court in the role of a price control board."

Moreover, where—as here—the defendant has voluntarily ceased the challenged practice before judgment and assured the court that it would not resume the conduct, the public interest factor weighs against a permanent injunction. *In re Circuit Breaker Litigation*, 860 F. Supp. at 1456 (denying permanent injunction, finding "the public needs no

protection" under those circumstances). For these myriad reasons, Plaintiffs cannot carry their burden of demonstrating that a permanent injunction is in the public interest.

In sum, each of the four federal factors weighs in Equity's favor, and the cases cited in Plaintiffs' brief do not hold otherwise. In fact, many of the remaining cases cited by Plaintiffs (1) do not involve opinions imposing injunctive relief, but instead involve courts finding that a prayer for injunctive relief survives a pleading challenge and/or (2) involve specific fact patterns where there is a clear danger of the complained-of conduct continuing absent an injunction, which is not the situation here.[8] Given their different procedural postures and fact patterns, these cases do not carry any weight. This Court should deny the injunction.

## B.    Plaintiffs are not entitled to an injunction under state law.

Because Plaintiffs cannot show that they are entitled to an injunction under federal law, they argue that the Court should impose an

---

[8] See e.g., *Rodriguez v. Equal Exchange, Inc.*, 2024 U.S. Dist. LEXIS 58982, 2024 WL 1421971 (S.D.Cal. March 31, 2024) (denying 12(b)(6) motion to dismiss injunctive relief request under UCL; finding that injunctive relief may be appropriate to ensure adequate disclosure of toxic metals in food product going forward, which is factually inapposite because Equity is no longer charging the Standard Late Fee); *Seale v. GSK Consumer Health, Inc.*, 2024 U.S. Dist. LEXIS 44140, 2024 WL 1949854 (C.D.Cal. Feb. 27, 2024) (same; finding injunctive relief may be appropriate to protect against false product advertising going forward, which is again factually inapposite because Equity is no longer charging the Standard Late Fee); *Kryzhanovskiy v. Amazom.com Services, Inc.*, 2022 U.S. Dist. LEXIS 115025, 2022 WL 2345677 (E.D.Cal. June 29, 2022) (same; finding injunctive relief may be appropriate in employment/fair wage discrimination case based on concern for ongoing failure to pay men and women equally).

injunction under a watered-down version of California law. According to Plaintiffs, California's UCL statute only cares about one thing:  is future harm likely to occur? (ECF No. 558, pp. 11-12.

Plaintiffs' proposed test misconstrues the law. But even if California law did not care about the risk of irreparable harm or balancing hardships, there is no risk of future harm:  Equity is not charging the Standard Late Fee, has removed the Standard Late Fee from its lease agreements, and will not charge the Standard Late Fee in the future.

### 1. California law does not ignore irreparable harm.

California law—like federal law—generally requires plaintiffs to show irreparable harm: "In order to obtain injunctive relief the plaintiff must ordinarily show that the defendant's wrongful acts threatened to cause *irreparable* injuries, ones that cannot be adequately compensated in damages." *Intel Corp. v. Hamidi*, 30 Cal.4th 1342, 1352 (2003) (citing 5 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 782, p. 239) (emphasis in original); *City of South Pasadena v. Dep't of Transportation*, 29 Cal.App.4th 1280, 1293 (1985) (equitable relief is only warranted when there is no other adequate remedy to address the potential harm).

Moreover, while the California legislature authorized courts to grant injunctive relief as part of the remedies available under the UCL, nothing suggests that the California legislature was silently eliminating the "irreparable injury" requirement. Indeed, courts evaluating whether to impose an injunction under the UCL have adopted the traditional equitable injunction standards. For example, in *Haas Automation, Inc. v. Denny*, 2014 U.S. Dist. LEXIS 89860, 2014 WL 2966989, at *9 (C.D. Cal. July 1, 2014), a case cited in Plaintiffs' brief, the district court stated that in order to obtain a permanent injunction under the UCL, the plaintiff must prove "(1) the elements of a cause of action involving the wrongful act

1    sought to be enjoined and (2) the grounds for equitable relief, such as,

2    inadequacy of the remedy at law."

3    Similarly, in *Warner Bros. International Television Distribution v.*

4    *Golden Channels & Co.* No. CV0209326MMMSHSX) 2003 U.S. Dist.

5    LEXIS 29635, 2003 WL 27384425, at *26-29 (C.D. Cal., Mar. 31, 2003), the

6    district court concluded that a preliminary injunction under the UCL was

7    not warranted in the absence of evidence that defendant's conduct was

8    likely to recur, but noted that even if injunctive relief had been available,

9    plaintiff had not met its burden of establishing irreparable injury.

10    Even the cases cited in Plaintiffs' brief consider the factors of

11    irreparable injury in connection with a request for injunctive relief. For

12    example, in *Barguis v. Merchants Collection Assn.*, 7 Cal.3d 94, 105 (1972),

13    the court evaluated the adequacy of adequate legal remedies and the risk

14    of future injury when assessing whether injunctive relief allegations could

15    survive a demurrer.

16    In short, California has not excised irreparable injury from its

17    injunctive relief jurisprudence. And because Plaintiffs cannot show any

18    irreparable injury or lack of adequate legal remedies (see discussion,

19    *supra*), they cannot meet their burden of proof for a permanent injunction

20    under California law.

        **2.  Even if California law considered nothing but the**

21    **likelihood of a future violation, there is no risk of**

22    **any future violation.**

23    Even assuming *arguendo* that Plaintiffs have identified the correct

24    legal standard of for a preliminary injunction under the UCL and that the

25    only relevant factor is whether there is "a threat that the misconduct to be

26    enjoined is likely to be repeated in the future," *Madrid*, 130 Cal.App.4th at

27    465, they have still failed to meet their burden.

28

1    Where, as here, a defendant has ceased the allegedly wrongful
2  conduct, the court should *not* grant injunctive relief "absent a showing that
3  past violations will probably recur." *Id*.[9]
4    For example, in *Academy of Motion Picture Arts and Sciences v.*
5  *GoDaddy.com, Inc.*, No. CV 10-03738-AB (CWX) 2015 U.S. Dist. LEXIS
6  186627, 2015 WL 12684340, at *11 (C.D. Cal., Apr. 10, 2015), the district
7  court denied a permanent injunction under the UCL where the defendant
8  showed that it had ceased its practice of placing advertisements on parked
9  domains that include any of the plaintiff's marks on the domain name, and
10 introduced evidence that it had no intention of modifying or abandoning
11 that practice in the future. The plaintiff argued that an injunction was
12 necessary because the defendant waited several years into the litigation to
13 implement this change, but the district court noted that "courts have held
14 that a voluntary abandonment of a long-standing practice in response to
15 litigation generally moots a claim for injunctive relief under California's
16 UCL." *Id*. (citing cases).

17
18
19 ───────────────
20 [9] See also *Gafcon, Inc. v. Ponsor & Associates* 98 Cal.App.4th 1388, 1403,
   n.6 (2002) (injunction relief is unwarranted where there is "a change in
21 circumstances at the time of the hearing, rendering injunctive relief moot
   or unnecessary"; *Sun Microsystems, Inc., v. Microsoft Corp.,* 188 F.3d 1115,
22 1123 (9th Cir. 1999) (abrogated on other grounds as stated in *Perfect 10 v.*
   *Google, Inc.,* 653 F.3d 976, 979 (9th Cir. 2011) (plaintiff cannot receive an
23 injunction for past conduct unless he shows that the conduct will probably
   recur); *Academy of Motion Picture Arts and Sciences v. GoDaddy.com, Inc.*,
24 CV 10-03738-AB, 2015 U.S. Dist. LEXIS 186627, 2015 WL 12684340 at
25 *11 (April 10, 2015, S.D. Cal.) (citing *People ex rel. Herrera v. Stender*, 212
   Cal.App.4th 614, 631 (2012)) (where conduct has ceased, California law
26 presumes that "there is no reasonable probability that the past acts
27 complained of will recur.")
28

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF    4:16-CV-01225-JSW

Here, Equity has already voluntarily stopped charging and collecting its Standard Late Fee. Since the Court's issuance of its Findings, *Equity has not charged the Standard Late Fee*. Not once.

Equity also took several additional steps—some of which even go beyond Plaintiffs' demands. For example, Equity has:

- removed the Standard Late Fee from its California leases;

- notified residents that it would not charge the Standard Late Fee;

- paused all adverse credit reporting for California tenants with outstanding balances that include unpaid late fees;

- stopped collection efforts for former residents whose unpaid accounts included an unpaid Standard Late Fee; and

- commenced the laborious process of adjusting accounts with unpaid Standard Late Fees (save for Plaintiffs' proposed offset amounts). (Carnley Decl. ¶¶ 7, 11, 14-17, Ex. A.)

Plaintiffs claim that Equity intends to charge the Standard Late Fee in the future because (1) a few residents signed renewal leases that contained the old Standard Late Fee (before the lease form was updated); (2) in May 2024, an automated payment reminder, which referenced late fees, was sent to Equity's California residents who had not paid rent, and (3) Equity's counsel did not agree to let Plaintiffs' counsel oversee Equity's communications with its California residents. None of these arguments has merit.

First, although there was a small window of time in which a small number of current residents including Plaintiff Shannah Smith signed renewal lease agreements with the old Standard Late Fee before Equity could change its lease agreement, Equity's current lease template removed the Standard Late Fee provision. (Carnley Decl. ¶¶ 11-12, Ex. C.)  Thus,

1  the Standard Late Fee does not (and will not) appear in any renewal or
2  new lease agreements. In addition, Equity has informed these residents
3  that Equity *will not charge* the Standard Late Fee and Equity *has not*
4  *charged* the Standard Late Fee. (*Id.* at ¶ 7, Ex. A.)

5      Second, the May 2024 automated payment reminder was a
6  longstanding reminder sent to delinquent tenants across the country. It
7  did not reference the Standard Late Fee. No California resident was
8  assessed or paid a Standard Late Fee. And Equity has since modified the
9  automated payment reminder for California residents, removing all
10  references to a potential late fee (Carnley Decl. ¶ 8, Ex. B).

11      Finally, declining Plaintiffs' demands to oversee and approve
12  Equity's communications does not suggest that Equity will charge the
13  Standard Late Fee in the future—it reflects that Plaintiffs are not entitled
14  to micromanage or approve Equity's communications with its residents.

15      Given these facts, even Plaintiffs' authorities confirm that there is no
16  basis for an injunction. For example, Plaintiffs rely heavily on *Robinson v.*
17  *U-Haul Co. of California*, 4 Cal.App.5th 304 (2016). In *Robinson*, U-Haul
18  sued one of its independent dealers, Robinson, after he terminated their
19  contract and began renting trucks from U-Haul's competitor Budget. *Id.* at
20  308. After losing a request for a preliminary injunction, U-Haul dismissed
21  its lawsuit. *Id.* Robinson then filed a successful malicious prosecution
22  action against U-Haul for violation of the UCL. *Id.* In Robinson's action
23  against U-Haul, the trial court issued a permanent injunction prohibiting
24  U-Haul from initiating or threatening to initiate judicial proceedings to
25  enforce the subject noncompetition covenant. *Id.*

26      On appeal, U-Haul argued that the imposition of the permanent
27  injunction was an error because there was no evidence supporting a
28  continuing violation by U-Haul so as to justify an injunction. *Id.* at 314.

27

The Court of Appeal acknowledged that "[t]here is case authority saying an injunction may be denied" on the basis that the defendant "voluntarily undert[ook] to do what the injunction would require." *Id*. at 315-16, citing among others *People v. National Association of Realtors*, 120 Cal.App.3d 459, 476 (1981) ("[W]here the injunction is sought solely to prevent recurrence of proscribed conduct which has, in good faith been discontinued, there is no equitable reason for an injunction."). The *Robinson* Court of Appeal observed, however, unlike Equity's decision to stop charging the Standard Late Fee, in *Robinson* "the company has not taken action to bind itself legally to a violation-free future." *Id*. at 316.

Plaintiffs also focus on *Haas Automation, Inc.*, 2014 U.S. Dist. LEXIS 89860. There, the court issued an injunction where the defendant continued to register domain names that were found to violate the UCL. *Id*. at 24.

Unlike *Robinson*, where there was evidence that U-Haul was continuing to enforce its noncompete clause, and unlike *Haas,* where the defendant was continuing to improperly register domain names, Equity is *not* charging the Standard Late Fee. Nor, for the reasons outlined above, is there any risk of that occurring.

Thus, this case is far more like *Academy of Motion Picture Arts*, discussed *supra*, where courts denied the requested injunction because the prohibited conduct was no longer occurring and was unlikely to reoccur in the future.

### C.    Plaintiffs' proposed injunction is not narrowly tailored.

For the reasons stated above, Plaintiffs have not shown that they are entitled to any injunctive relief. But even if they were, injunctions—whether under federal or state law—must be narrowly tailored. The United States Supreme Court and Ninth Circuit have emphasized that

overbroad injunctions are improper.[10] And California courts have done the same.[11]

Here, Plaintiffs' requests for injunctive relief are anything but narrowly tailored. For example, even though this case involved only a narrow question—the legality of Equity's Standard Late Fee—Plaintiffs' proposed injunctive relief goes *far* beyond that issue. Among other things, they ask this Court to limit any future late fee to an amount the Plaintiffs deem reasonable. They ask the Court to dictate how Equity should

[10] See, e.g., *Hartford-Empire Co. v. United States*, 323 U.S. 386, 432, 65 S. Ct. 373, 395 (1945) (finding injunction overbroad because it was not limited to the issues before the court and was "legislative rather than remedial"); *Zepeda v. United States Immigration & Naturalization Serv.*, 753 F.2d 719, 727 (9th Cir. 1983) ("We must vacate and remand, however, because the scope of the injunction is too broad."); *United States v. BNS, Inc.*, 858 F.2d 456, 460 (9th Cir. 1988) (reversing injunction, even when it was legally and factually supported, because the injunction "was overbroad").

[11] See, e.g., *Thompson v. 10,000 RV Sales, Inc.*, 130 Cal. App. 4th 950, 979 (2005) (plaintiffs may seek injunctive relief only if such relief is narrowly tailored to proscribe only the complained-of unlawful conduct); *United Farm Workers Organizing Comm. v. Superior Court*, 4 Cal 3rd 556, 568, 570-71 (1971) (injunctive relief must be narrowly tailored to address only the specific conduct found to be illegal, and injunctions that offend this principle and potentially prohibit lawful as well as unlawful conduct are unconstitutionally overbroad); *In re Berry*, 68 Cal.2d 137, 151-52, 154 (1968) (same); *California Retail Liquor Dealers Inst. v. United Farm Workers*, 57 Cal.App.3d 606 (1976) (same); *Dawson v. Eastside Union H.S. Dist.,* 28 Cal.App.4th 998, 1040 (1994) ("California adheres to the rule, particularized to injunctive relief, that 'injunction is an extraordinary power and is to be exercised always with great caution. . . .' "); *Canyon Vineyard Estates I, LLC v. DeJoria*, 78 Cal. App. 5th 995, 1014 (2022) (reversing permanent injunction, even though injunctive relief was warranted, because the trial court's order was not "narrowly tailored" to address the harm at issue).

communicate with its residents. And they ask the Court to bar Equity from ever using a percentage-based late fee, regardless of future circumstances or rationale (and despite the California Legislature having approved the use of percentage-based late fees in analogous situations). None of this is narrowly tailored to the alleged harm (the assessment of the Standard Late Fee). Nor is it proper.

### 1. Affirmatively limiting the amount of any future late fee is neither narrowly tailored nor legally permissible.

Even if a court deems a fee unconscionable, that fact does "not support affirmative injunctive relief" limiting the amount of any future fees. *California Grocers Assn.*, 22 Cal.App.4th at 218; *Beasley*, 235 Cal.App.3d at 1391.

The "control of charges [or fees], if it be desirable, is better accomplished by statute or by regulation authorized by statute than by *ad hoc* decision of the courts." *Lazzareschi*, 22 Cal.App.3d at 311; see also *Freeman v. San Diego Ass'n of Realtors*, 77 Cal.App.4th 171, 203 fn. 35 (1999) (refusing to consider a request to modify the monthly fee defendants charged realtors to access their listings because "[t]o hold otherwise would place this court in the role of a price control board").

*California Grocers Assn. v. Bank of America*, 22 Cal.App.4th 205 (1994) is particularly instructive. There, the trial court found that the bank's $3 fee was unconscionable. The trial court then took one additional step: it issued an injunction that limited the bank from charging no more than $1.73 for the next 10 years. *Id.* at 209. The Court of Appeal reversed, explaining that even if the fee was unconscionable (it was not) "*that fact would not support affirmative injunctive relief.*" *Id.* (italics added). The court explained that even if a challenged fee is unconscionable, an unconscionable fee "cannot be used offensively to obtain mandatory

injunctive relief [i.e., capping the amount of future fees]." *Id*. at 217. Doing so, the *California Grocers* court emphasized, would be "an entirely inappropriate method of overseeing bank service fees." *Id.* at 218.

Moreover, as discussed above, in *Beasley*, another "unconscionable fee" dispute, the court reached the same conclusion, explaining that courts are not "well suited to regulating retail bank pricing via injunction on an ongoing basis." 235 Cal.App.3d at 1391.

This case is no different. As *California Grocers, Beasley, Lazzareschi,* and others have emphasized, finding that Equity's late fee was void does *not* permit the Court to dictate what Equity's late fee should be in the future. Doing so would put improperly put this Court in the shoes of the legislature and run afoul of the reasonable endeavor requirement, as discussed in the next section.

### 2.    A late fee cap contravenes the reasonable endeavor requirement.

This Court observed in its Findings that "Section 1671 requires that the liquidated damage provision be the product of a 'reasonable endeavor … to estimate a fair average compensation for any loss that may be sustained' by the breach. See Cal. Civ. Code § 1671(d); *Garrett v. Coast & Southern Fed. Sav. & Loan, Ass'n,* 9 Cal.3d 731, 739 (1973)." (ECF No. 546, at 19:25-28.)  Plaintiffs' proposed cap on Equity's future late fees is inconsistent with California's reasonable endeavor requirement.

Under California law, a landlord has the right to fix a reasonable late fee after conducting a reasonable endeavor to estimate its potential damages from late rent. Courts generally avoid dictating to a business that is obliged to undertake a reasonable endeavor what it may or may not charge before the company has determined the nature and scope of its liquidated damage provision via the reasonable endeavor.

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF      4:16-CV-01225-JSW

1    Nor have Plaintiffs practically or accurately determined what an

2    appropriate cap on Equity's late fee should be. As one would expect, the

3    Court's ruling in this case will cause Equity to reevaluate its late fee and

4    the associated costs involved with delinquent rent. Whatever factual

5    foundation Plaintiffs believe might exist for imposing a cap may not reflect

6    the reality of Equity's business framework and associated costs for

7    addressing delinquent rent in the future. That is precisely why it is the

8    company that has the right and legal obligation to perform the reasonable

9    endeavor.

10    The authorities cited by Plaintiffs do not hold otherwise. Plaintiffs

11    have cited no case, and Equity is not aware of any, in which a court

12    ordered a private defendant to charge a specific fee or capped a private

13    party defendant's ability to charge a future fee following a finding that the

14    existing fee was invalid.

15    In *Bondanza v. Peninsula Hospital and Medical Center*, 23 Cal.3d

16    260 (1979), the plaintiffs sought "an injunction prohibiting use of the

17    admission agreement to recover collection costs except under various

18    circumstances." *Id*. at 265. The Court of Appeal agreed that plaintiffs'

19    requested injunction was "too uncertain to provide a standard of conduct

20    for the activities proscribed." *Id*. at 269. Instead, the Court of Appeal

21    confined its analysis to the specific fee at issue, narrowed the injunction to

22    prevent the defendant from continuing to charge the specific amount found

23    to violate the UCL, and directed the defendant to comply with California

24    law. *Id.* But the Court of Appeal did *not* direct the defendant to charge a

25    specific, different amount going forward as part of any kind of injunction.

26    In *Cellphone Termination Fee Cases*, 193 Cal.App.4th 298 (2011), the

27    trial court found Sprint's early termination fees violated Civil Code section

28    1671. *Id*. at 303. The trial court "enjoined Sprint from further efforts to

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF        4:16-CV-01225-JSW

1   collect ETF's assessed during the class period[.]" *Id.* at 308. The Court of
2   Appeal affirmed the judgment. *Id.* at 303. The Court did not seek to
3   impose or direct a specific, going forward fee on Sprint.

4       In *Ballard v. Equifax Check Services*, 158 F.Supp.2d 1163 (E.D. Cal.,
5   2001), the court found that Equifax's $20 service charge on certain
6   dishonored checks violated various statutes. *Id.* at 1175. The court did not
7   fix the amount of any future service charge—it merely enjoined Equifax
8   from charging or collecting the illegal service charge on *prior* checks. *Id.* at
9   1177. Because the court did not limit what fees Equifax could charge in the
10  future, this case is of little help to Plaintiffs.

11      It would be an unprecedented overreach for this Court to tell a
12  private business what liquidated damage provision it must use in its
13  contracts. A court's retrospective ability to evaluate a challenged, existing
14  late fee in an isolated case does not allow a court to impose its own
15  business judgment about what future late fees should be. See *Lazzareschi*,
16  22 Cal.App.3d at 311 ("Legislative committees and an administrative
17  officer charged with regulating an industry have better sources of
18  gathering information and assessing its value than do courts in isolated
19  cases.")

### 3. Plaintiffs' experts' analyses do not support a late fee cap.

22      Finally, even if California law permitted this Court to cap Equity's
23  future late fees—which it does not—Plaintiffs' experts' analyses do not
24  support Plaintiffs' requested cap.[12]

25  ───────────────────────
    [12] At trial, Equity highlighted a number of reasons why Schwarz's model
26  was not an appropriate method for determining Equity's offset. These
27  same issues make Schwarz's model even more problematic as a method of
    determining what Equity's late fee should be in the future. For example,
28  (1) Schwarz does not calculate the personnel costs for those residents who

1    Moreover, Schwarz' own post-trial calculations show why it would be
2  inappropriate for this Court to cap Equity's late fee going forward.  At
3  trial, Schwarz opined that an appropriate average offset was in the range
4  $14.65.  (Trial Ex. No. 531.)  But now, post-trial, Schwarz has changed his
5  tune.  He opines today that Equity's average reasonable cost of collecting
6  late rent over the class period is $22.51.  (ECF No. 557-5, p. 11.)  However,
7  if he limits his analysis to the last two years, that number jumps to $31.98.
8  *Id.*   This analysis illustrates that Equity's average cost of collecting late
9  rent is fluid over time, and it would be wholly inappropriate to use
10  Equity's average cost from one point in time in the past to cap or constrain
11  its ability to modify its late fee and recoup its actual costs from collecting
12  late rent in the future.

### 4.    A ban on percentage-based fees would constitute improper legislation from the bench.

15    Plaintiffs also ask the Court to declare that a percentage late fee can
16  never comply with Civil Code section 1671. This request, if granted, would
17  improperly and impermissibly usurp the province of the Legislature.

---

19  were charged a late fee but never paid a late fee, but rather only calculates
20  Equity's personnel costs for those who paid late fees.  (2) Schwarz's model
    does not account for the costs Equity incurs, and pays every month, for
21  established staffing to handle the collection of delinquent rent, and
    thereby only measures month-to-month changes in costs, not the costs
22  themselves.  (3) Schwarz's Adjusted R-squared, the indicator of potential
    correlation is only .554.  This indicates that Schwarz's model only explains
23  55.4% of the movement in the overtime costs correlated with the late fees:
    his model is unable to explain the remaining 45% of the movement. In fact,
24  Schwarz is only 99% confident that his coefficients are greater than zero—
25  not that the coefficient is correct.  His 95% confidence interval
    demonstrates that he is only 95% confident that the Value is within a wide
26  range—and not necessarily the value he presented to the court.  (Schwarz
27  7/9/2021 Report, Trial Ex. 257, p. 178)

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF      4:16-CV-01225-JSW

1    If the Legislature wanted to outlaw percentage liquidated damage

2    provisions, it could have done so under section 1671. It did not. In fact, the

3    evidence at trial demonstrated, among other things, that (1) numerous

4    state Legislatures have decided to adopt percentage residential late fees at

5    or above the level charged by Equity to provide landlords with a safe

6    harbor;[13] and (2) even the Los Angeles Department of Consumer and

7    Business Affairs informs the public that a percentage late fee of 5% is

8    reasonable for residential leases.[14]

9    Existing California precedent also confirms that percentage-based

10    residential late fees can comply with section 1671. See e.g., *Blum v.*

11    *Swarbrick*, 2010 WL 9009712 (Cal.App.Unpubl. April 7, 2020) (upholding

12    validity of 10% residential late fee under Civil Code section 1671). The

13    California legislature has also upheld a percentage-based late fee in the

14    context of consumer storage units. See Cal. Bus. & Prof. Code §

15    21713.5(b)(3) (defining a "reasonable late fee" as one that does not exceed

16    15% of the monthly rental fee.)

17    The law requires Equity to conduct a reasonable endeavor to

18    determine its future late fee. The Court should decline Plaintiffs'

19    invitation to craft a new law that could have sweeping reverberations not

20    just for Equity but for every residential property manager in the state of

21

22    [13] See ECF No. 522, p. 45 (citing Colo. Rev. Stat. §38-12-105 [permitting

23    residential late fees of up to 5% of monthly rent or $50, whichever is
    greater]; Texas Property Code § 92.019 (deeming reasonable late fees of up

24    to 12% of the monthly rent for single-family homes and up to 10% in multi-
    family apartment complexes); Nev. Rev. Stat. §118A.210 (up to 5% of

25    monthly rent); N.C.G.S.A. §42-46 (up to 5% of monthly rent); Tenn. Code

26    Ann. §66-28-201 (up to 10% of monthly rent).

27    [14] See ECF No. 522, p. 45 (citing Trial Ex. 10); accord. Trial Exs. 220-3 and

28    220-4.

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF    4:16-CV-01225-JSW

California. As the California Court of Appeal noted in *Lazzareschi*, 22 Cal. App. 3d at 311 and again in *California Grocers Assn.*, 22 Cal. App. 4th at 218, "[T]he control of charges, if it be desirable, is better accomplished by statute or by regulation authorized by statute than by *ad hoc* decision of the courts."

## II.    The Court should not reconsider pre-judgment interest.

In their Motion, Plaintiffs inappropriately attempt to re-argue whether the Court should award prejudgment interest. (ECF No. 558, p. 30 n. 8.) The Court already considered this issue and denied Plaintiffs' request for prejudgment interest. (ECF No. 546, pp. 25-26 ["The Court, in its discretion, has determined not to exercise its equitable power to award prejudgment interest."]; see also ECF 532 [Equity's 9/6/2023 Post-Trial Brief, explaining why awarding prejudgment interest would be improper].) Plaintiffs' efforts to relitigate this issue are decidedly improper.

If the Court awards *post-judgment* interest as Plaintiffs request (ECF No. 558, p. 33), the appropriate federal post-judgment interest rate (for the week of July 15 to July 21, 2024) would be 4.96%.[15]

## III.   The Court should strike Plaintiffs' post-trial calculations because the Court cannot adjudicate disputes that arose after trial.

Finally, the Court should strike Plaintiffs' experts' post-trial calculations and reject any efforts to increase the final judgment beyond the figures that were presented to this Court at trial.

Contrary to Plaintiffs' assumptions, this Court has not ruled and Plaintiffs have not established that this Court has the authority to award restitution for late fees charged and collected after the close of trial. The

---

[15] *See* https://www.casb.uscourts.gov/post-judgment-interest-rates (last accessed 7/31/2024).

1    Court cannot adjudicate disputes that arose after trial. As a result, this

2    Court should limit its post-trial judgment to the evidence before the Court

3    at trial and should disregard Plaintiffs' efforts to increase their restitution

4    based on alleged UCL violations that occurred *after trial*.

5        This Court recognized as much in its October 2021 Order (ECF No.

6    315), in which the Court granted Plaintiffs' Motion for leave to amend

7    their complaint "to allow a current tenant to represent the plaintiff class

8    *and to allow potential recovery up to 75 days before trial of this matter*."

9    (ECF No. 315, p. 4, emphasis added.)  This Court has already determined

10   that the period of class recovery should end 75 days before trial—or on

11   March 25, 2023, which was 75 days before the trial commenced on June 7,

12   2023.

13       It appears Plaintiffs hope that this Court's post-trial order (directing

14   Plaintiffs to "update" their calculations with "post-trial numbers," see ECF

15   No. 547, p. 2) authorized them to claim restitution for late fees charged

16   and paid after trial. But this interpretation is inconsistent with the Court's

17   October 2021 order (EFC No. 315), ending restitution 75 days before trial.

18   A more reasonable and consistent reading of the Court's post-trial order is

19   that the Court expected Plaintiffs to update their calculations with data

20   produced by Equity after trial, covering late fees charged and paid through

21   the date 75 days before trial—something that Plaintiffs and their experts

22   wholly failed to do.

23       But even assuming *arguendo* that Plaintiffs are legally entitled to

24   collect restitution for purported violations that occurred after the close of

25   trial (a proposition that Plaintiffs wholly failed to support in their moving

26   papers) and correctly interpret this Court's post-trial order to allow them

27   to do so, their experts have failed to perform the task this Court directed:

28   to "update" their calculations with "post-trial numbers." (See ECF No. 547,

p. 2.) Instead of updating their calculations with new, current cost data, Plaintiffs have recycled on their old, stale cost calculations based on 2010-2017 cost data, and have applied those old numbers to new late fees payments through April 2024. (See ECF No. 557-5, pp. 6-7 [Schwarz explaining he "appl[ied] the multiple regression models I presented previously in the Schwarz Report and the Schwarz Supplemental Report to the extended data set," including the "estimated coefficients" from those earlier regression models].)

It is easy to see why Plaintiffs ignored the Court's directive. The trial evidence showed that Equity's employee costs to collect late rent have increased since 2017—particularly during the COVID pandemic, when delinquency skyrocketed and Equity had to create an entirely new job category (Rental Assistance Coordinators who devoted nearly all their time to addressing rent delinquency). (See ECF No. 522, ¶¶ 94-95.)

Since Equity's costs to collect late rent rose in recent years, it follows that any correct calculation of the coefficients and variables in the regression analysis with updated employee cost data through the present would yield a larger offset—and a smaller final judgment—than what Plaintiffs have proposed in their Motion. Because Schwarz did not do this work, the Court should reject his latest calculations along with Plaintiffs' proposed post-trial judgment amount.[16]

By relying on coefficients and variables that were calculated years ago based on pre-2017 employee cost data, Plaintiffs ensured that their

_____

[16] Even Schwarz's "average cost" calculation of $31.98 for the time period May 1, 2022 to April 30, 2024, relies on coefficients calculated with pre-2017 employee cost data. (See ECF No. 557-5, p. 13 [Schwarz explaining he calculated these from his "actual damages" analysis which, as noted above, relies on the same coefficients from his pre-trial reports, which were based on 2010-2017 cost data].)

offset numbers would be artificially low. Because Plaintiffs have failed to justify their reliance on old data and have failed to "update" their calculations using "post-trial numbers," this Court should strike their experts' "new" calculations and their efforts to include post-trial late fees in the final judgment and should limit the class's recovery to the calculations presented by Schwarz at trial.[17]

## IV.   Equity is already adjusting class members' unpaid late fees.

Equity has already begun the laborious process of adjusting tenants' balances to reverse unpaid Standard Late Fees charges for all class members, less plaintiffs' proposed offset representing their calculation of Equity's reasonable average costs per late fee. (Carnley Decl. ¶ 14.) Though Equity believes Schwarz has substantially under-calculated its "reasonable average cost of collecting late rent," in the interest of being conservative and bringing this matter to resolution, Equity has adopted the median figures proposed in Plaintiffs' brief, i.e. $22.51 for charges before May 1, 2022, and $31.98 for charges after. (See ECF No. 558, pp. 32-33, ns. 11-12; Carnley Decl. ¶ 14.)  Given the number of late fees and resident accounts involved, it will take time to complete the adjustments. (*Id.*, ¶ 14.) Equity proposes filing a status report with the Court no later than 30 days after completing the adjustment process for all class members as the appropriate mechanism.

## V.   Plaintiffs' proposed judgment is problematic in other ways.

This Court directed the parties to brief two issues: injunctive relief, and the final restitution amount. Plaintiffs' proposed judgment (ECF No. 559) goes beyond these two issues and includes several additional terms

---

[17] Schwarz's June 3, 2022 report on page 69 reflects total positive net restitution of $23,066,268—nearly three million dollars less than the post-trial figure Plaintiffs propose today.

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF       4:16-CV-01225-JSW

that were not ordered by the Court and are not supported by the law or equities in the case. These unsolicited additional proposed terms are also improper and unfair to Equity. The Court should reject them.

**A.    Plaintiffs' payment proposal is unprecedented and unsupported.**

Without citing any authorities or even offering any supporting argument, Plaintiffs urge this Court to not merely enter judgment, but to also enter what amounts to an injunction compelling Equity to deposit the amount of the judgment into Plaintiffs' designated account. (ECF No. 559, p. 1.) This extraordinary relief is improper and unwarranted. Moreover, before issuing injunctions that order Equity to deposit funds into specific accounts, the Court should first address the unanswered question regarding *how* to determine what each individual Plaintiff is entitled to receive, especially since—as Plaintiffs' expert admits—some of the class members *caused* Equity far more in damages than they paid in late fees.

As if that were not complicated enough, Plaintiffs are now asking this Court to consider *new evidence after trial*, and to award restitution for purported UCL violations that occurred after the close of the evidence.And while it is unclear from Plaintiffs' papers, it seems that they are also asking the Court to silently certify an additional class. Because Plaintiffs' proposed judgment ignores these issues, the Court should reject Plaintiffs' proposed judgment.

**B.    Plaintiffs' request for post-trial discovery is unnecessary and unwarranted.**

Once again without citing any authorities or offering any supporting argument, Plaintiffs make the unusual request that this Court order Equity to "produce to Class Counsel the updated mailing addresses, e-mail addresses and last known phone numbers for each class member, updated

1   using the National Change of Address Registry for any class member who

2   no longer lives in an Equity property." (ECF No. 559, p. 1.)

3       Plaintiffs fail to explain why they are entitled to any post-trial

4   discovery or why Equity should be required to update the contact

5   information of Plaintiffs' counsel's own clients using the National Change

6   of Address Registry, when Plaintiffs' counsel or their Class Administrator

7   are equally if not better positioned to do so. The Court should reject this

8   proposal.

9       Plaintiffs also propose that the parties submit a joint plan for what

10   might happen next. Buried in this ambiguous request is a concession that

11   Plaintiffs' proposed requests for relief are thorny, complicated, and

12   imprecise. Ignoring those issues does not make them disappear. For all of

13   these reasons, Plaintiffs' proposed form of judgment is fundamentally

14   flawed.

15                    **CONCLUSION**

16       Because Equity stopped charging the Standard Late Fee, and will

17   not charge it in the future, there is no basis for injunctive relief. Nor does

18   the hypothetical risk of Equity resuming the Standard Late Fee create a

19   risk of irreparable harm. An injunction is thus improper. But even if the

20   Court were to enter an injunction, Plaintiffs' proposed injunctive relief is

21   not narrowly tailored. The Court should thus deny Plaintiffs' request for

22   injunction relief.

23

24

25

26

27

28

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF      4:16-CV-01225-JSW

1    The Court should also reject Plaintiffs' extraordinary request to

2    adjudicate and award monetary relief for alleged post-trial conduct. Doing

3    so would be improper as a matter of law and unwarranted, factually, since

4    Plaintiffs did not even update their numbers to reflect current

5    circumstances.

6    Dated: July 31, 2024                    **DUANE MORRIS LLP**

7

8    By:*/s/Aaron T. Winn*
         Aaron T. Winn

9         Justin J. Fields
          Karen L. Alexander

10        John Sheldon Letchinger

11        Attorneys for Defendants
          EQUITY RESIDENTIAL

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

EQUITY'S OPPOSITION TO PLAINTIFFS' POST-TRIAL BRIEF    4:16-CV-01225-JSW